# EXHIBIT 2

REDACTED VERSION

**IN THE MATTER OF AN ARBITRATION**

**UNDER THE RULES OF ARBITRATION OF THE INTERNATIONAL CENTRE FOR THE SETTLEMENT OF INVESTMENT DISPUTES**

**ICSID CASE No. ARB/14/22**

**BETWEEN:**

**(1) BSG RESOURCES LIMITED**

**(2) BSG RESOURCES (GUINEA) LIMITED**

**(3) BSG RESOURCES (GUINEA) SÀRL**

Claimants

- v -

**THE REPUBLIC OF GUINEA**

Respondent

_____

**CLAIMANTS' MEMORIAL**
_____

**Karel Daele**
**James Libson**
**Mishcon de Reya LLP**
**Africa House**
**70 Kingsway**
**WC2B 6AH**
**London**
**Tel: +44 (0) 203 321 7060**
**Fax: +44 (0) 203 761 1856**

## CONTENTS

I.    INTRODUCTION.................................................................................................5

1.1   Preliminaries .................................................................................................5

1.2   Summary of the Claimants' claims................................................................5

1.3   The nature of the projects at issue in this case............................................8

1.4   Related proceedings ...................................................................................10

1.5   The BSGR Group.........................................................................................10

II.   BACKGROUND FACTS.....................................................................................16

2.1   The geographical areas in question............................................................16

2.2   The Guinean opportunity.............................................................................17

2.3   Prospecting permits over Simandou North and Simandou South ...............19

2.4   The Memorandum of Understanding ...........................................................21

2.5   Investment in Simandou North and Simandou South ..................................22

2.6   Application for and grant of Blocks 1 and 2 Permit .....................................23

2.7   The Base Convention and the Zogota Mining Concession ..........................27

2.8   Joint Venture with Vale ...............................................................................32

2.9   Further investments in relation to Project Zogota and Blocks 1 and 2 ........34

2.10  Summary of investments held and/or made.................................................35

2.11  The election of Alpha Condé and the campaign against the Claimants .......36

2.12  The Technical Committee "investigation"....................................................43

2.13  The end game ..............................................................................................46

2.14  Expropriation and/or nationalization of the Claimants' investments............50

2.15  The Measures were politically motivated.....................................................53

III.  THE CLAIMANTS' CLAIMS..............................................................................56

3.1   Summary ......................................................................................................56

3.2   Mining Rights...............................................................................................57

      3.2.1   The Mining Code ..............................................................................57

      3.2.2   The Base Convention .......................................................................60

      3.2.3   The new 2011 Mining Code ..............................................................67

      3.2.4   Conclusions......................................................................................69

3.3   Infrastructure Rights.....................................................................................70

3.3.1    The BOT Act..........................................................................................70

3.3.2    The Base Convention as a qualifying development infrastructure project .................71

3.4    Breaches of the Base convention ...........................................................................75

3.4.1    Protections offered by the Base Convention........................................................75

3.4.2    Summary of breaches of the Base Convention ........................................78

3.5    Breaches of the Investment Code..........................................................................82

3.5.1    Breach of Article 5 of the Investment Code ...........................................82

a.    "Investments carried out by… corporations" ..........................................83

b.    The Measures constituted an involuntary taking of the Claimants' investments ........................................................................................86

c.    Expropriation and/or nationalization of BSGR's and BSGR Guernsey's investment in BSGR Guinea ..........................................................92

d.    The Measures constituted an illegal expropriation and/or nationalization ........95

e.    No compensation provided in respect of the expropriation and/or nationalization ........................................................................95

3.5.2    Breach of Article 6 of the Investment Code. ...........................................95

3.5.3    Breach of Article 30 of the Investment Code...........................................96

3.5.4    Conclusion ...........................................................................................98

3.6    Breaches of the Mining Code..............................................................................98

3.6.1    Breach of Article 21 of the Mining Code ...............................................98

3.6.2    Breach of Article 22 of the Mining Code ..............................................100

3.6.3    Breach of Article 11 of the Mining Code ..............................................100

3.6.4    Breach of Article 26 of the Mining Code ..............................................100

3.6.5    Breach of Article 41 of the Mining Code ..............................................101

3.6.6    Breach of Article 43 of the Mining Code ..............................................101

3.6.7    Conclusion .........................................................................................102

3.7    Breaches of the BOT Act...................................................................................102

3.7.1    Breach of Article 7.1 of the BOT Act ..................................................102

3.7.2    Breach of Article 7.2.2 of the BOT Act ................................................103

3.7.3    Breach of Article 7.2.7 of the BOT Act ................................................103

3.7.4    Breach of Article 7.2.12 of the BOT Act...............................................104

3.7.5    Conclusion .........................................................................................105

3.8    Breaches of International Law ............................................................................105

3.9     Flaws in the process by which Guinea decided to implement the Measures ...........................107

    3.9.1     The review process was ultra vires ........................................................................108

    3.9.2     The review process was unfair, partial and dependent .............................................109

        a.     Composition of the review committees ..........................................................109

        b.     The process in which the Technical Committee engaged was unfair ..............110

        c.     The conclusion was pre-determined ...............................................................114

3.10    No substance to the corruption allegations ...................................................................115

    3.10.1    Preliminary observations ........................................................................................115

    3.10.2    The Claimants did not corrupt Guinean officials .....................................................117

        a.     The Simandou North Permits, the Simandou South Permits and the
                     Memorandum of Understanding .....................................................................118

        b.     Blocks 1 and 2 Permit ....................................................................................119

        c.     The Base Convention and the Zogota Mining Concession ..............................121

    3.10.3    No involvement of Ms. Mamadie Touré .................................................................123

    3.10.4    No undue pressure by President Conté .....................................................................126

    3.10.5    Conclusions .............................................................................................................129

**IV.     JURISDICTION** ....................................................................................................**130**

4.1     Article 25(1) of the ICSID Convention .......................................................................130

4.2     The Dispute is a legal dispute ......................................................................................130

4.3     This Dispute arose directly out of an Investment .........................................................131

        a.     Mining Code ..................................................................................................131

        b.     Investment Code. ...........................................................................................132

        c.     BOT Act .........................................................................................................134

        d.     Base Convention .............................................................................................134

4.4     The Dispute is between a Contracting State and a National of another Contracting State ........136

4.5     The Parties have consented in writing to ICSID Arbitration .........................................138

    4.5.1     The Base Convention ...............................................................................................138

    4.5.2     The Investment Code ...............................................................................................140

    4.5.3     The Mining Code .....................................................................................................141

    4.5.4     The BOT Act ...........................................................................................................146

**V.     RELIEF SOUGHT** ...............................................................................................**147**

## I.    INTRODUCTION

### 1.1    Preliminaries

1.    This Statement of Claim is served on behalf of:

(i)    BSG Resources Limited ("**BSGR**");

(ii)    BSG Resources (Guinea) Limited ("**BSGR Guernsey**"); and

(iii)    BSGR Resources (Guinea) Sàrl ("**BSGR Guinea**"),

together, the "**Claimants**".

2.    Attached to this document are:

(i)    Witness statements of Beny Steinmetz (CWS-1), Marc Struik (CWS-2), Asher Avidan (CWS-3), Joseph Tchelet (CWS-4), Mahmoud Thiam (CWS-5), Patrick Saada (CWS-6) and Dag Cramer (CWS-7);

(ii)    Exhibits, marked [C-]; and

(iii)    Legal authorities, marked [CL-].

### 1.2    Summary of the Claimants' Claims

3.    In summary, the Claimants and their investments have been treated in an unlawful, unfair, inequitable and discriminatory manner by the Guinean State (including by its agencies and/or instrumentalities) and in a manner which demonstrated a blatant disregard and breach of both (a) the express undertakings the State itself had provided directly to the Claimants and (b) applicable Guinean and international law (which guaranteed protection to the Claimants and their investments).

4.    At the heart of this case is the unlawful and forcible withdrawal and revocation of certain highly valuable investments held and/or made by the Claimants, comprised in particular of the following vested rights:

(i)    An iron ore mining concession granted to BSGR Guinea on 19 March 2010 over an area of 1,024 square kilometres on Mount Younon in Simandou South, near the village of Zogota (the "**Zogota Mining Concession**").

(ii)    A mining and infrastructure agreement dated 16 December 2009 entered into by BSGR Guernsey and BSGR Guinea with the Republic of Guinea regarding largely (though not exclusively) the rights and obligations arising from the Zogota Mining Concession (the "**Base Convention**").

(iii)    A prospecting permit granted to BSGR Guinea over an area referred to as Simandou Blocks 1 and 2 (covering an area of 369 square kilometres in the prefecture of Kérouané) granted on 9 December 2008, giving rise to (i) an exclusive right to prospect for iron ore and (ii) a right to develop and operate the area (by way of operating permit or mining concession) upon completion of a feasibility study (the "**Blocks 1 and 2 Permit**").

5.    Those and other vested rights were expropriated and/or nationalised by the Republic of Guinea, principally by means of three executive orders: (i) a Presidential Order dated 17 April 2014 terminating the Zogota Mining Concession; (ii) a Ministerial Order dated 18 April 2014 terminating the Blocks 1 and 2 Permit; and (iii) a Ministerial Order dated 23 April 2014 terminating the Base Convention. The effect of these acts of expropriation and/or nationalisation was *inter alia* to strip BSGR Guinea of all of its relevant assets. Thus, as a further consequence, BSGR Guernsey's 100% shareholding in BSGR Guinea (and BSGR's shareholding in BSGR Guernsey and its indirect shareholding in BSGR Guinea), each of which represented a valuable investment held and/or made by BSGR Guernsey and BSGR respectively, was similarly expropriated and/or nationalised.

6.   The expropriation and/or nationalization of those rights was without justification and the Claimants are entitled to be compensated (and to the other relief claimed herein) for the loss of those vested rights.

7.   The purported justification for this unlawful expropriation and/or nationalization was given in a report of a committee (the "**Technical Committee**") dated 21 March 2014 (the "**Technical Committee Report**"). The Technical Committee had been established by the current President, Mr Alpha Condé, to investigate allegations of corruption against BSGR and its subsidiaries. The Report recommended the withdrawal of the vested rights identified above on the putative basis that those rights had allegedly been obtained by corruption. In particular, the Report incorrectly alleged that the BSGR group had obtained the rights enumerated above by bribing Ms Mamadie Touré, the alleged fourth wife of the former President (General Lansana Conté). General Conté was the President of Guinea from 5 April 1984 until his death on 22 December 2008.

8.   However, as explained below, the process adopted by the Technical Committee when investigating the allegations made against BSGR and in producing its report was fundamentally flawed and involved a violation of both Guinean and international standards of due process. Further, and in any event, the allegations made by the Technical Committee and its putative "recommendations" were and are demonstrably false and provided no basis whatsoever for the expropriation and/or nationalization that took place in April 2014.

9.   What is more, at the time of the entry into the Base Convention on 16 December 2009 and the granting of the Zogota Mining Concession on 19 March 2010, President Conté had been dead for over a year and Ms Touré (who was not in any case his fourth wife) was living in Sierra Leone, having fled following a military coup by Captain Moussa Dadis Camara. Ms Touré had no possible influence at that (or any other) time.

10.     As regards the Blocks 1 and 2 Permit granted on 9 December 2008, there was similarly no credible evidence put forward by the Technical Committee to support its allegation that this was obtained by corruption, and it is demonstrably untrue.

11.     Even if one goes further back in time (as the Technical Committee purported to do in its Report) to the granting of earlier mining rights to BSGR (known as the Simandou North Permits and the Simandou South Permits), there is no substance at all to the Technical Committee's allegations.

12.     The truth of the matter is that not only do BSGR's own witnesses testify that it did not obtain its expropriated and/or nationalised rights by corruption, but also the ministers and officials in the Guinean administration that were directly involved in their granting do so. **[PROTECTED]**

13.     Guinea's conduct in or around April 2014 resulted in the expropriation and/or nationalization, without compensation, of the Claimants' investments, including their very substantial and valuable mining and infrastructure rights and the valuable investments that BSGR Guernsey held and/or had made via its 100% shareholding in BSGR Guinea, and that BSGR held and/or had made via its shareholding in BSGR Guernsey and/or its indirect shareholding in BSGR Guinea.

14.     The Claimants have therefore brought this arbitration in order to obtain protection from and compensation for Guinea's unlawful conduct, and in particular for the violation of its duties and obligations under (a) the Guinean Investment Code, (b) the Guinean Mining Code, (c) the Act on the Financing, Construction, Exploitation, Maintenance and Transfer of Development Infrastructures by the Private Sector (the "**BOT Act**"), (d) the Base Convention and (e) international law. The Claimants have suffered and continue to suffer

very significant losses as a result of Guinea's unlawful conduct. In these proceedings, the Claimants therefore seek all available relief in respect of that unlawful conduct.

**1.3     The nature of the projects at issue in this case**

15.     Mining is a speculative business. Often, at the beginning of a project, significant investment is made and work carried out without any guarantee of a return (that is, without any guarantee of finding a deposit of an economically significant size). To succeed in the mining sector, a company must be willing to accept the risk that not all of its projects will bear fruit.

16.     While the risk is substantial, so too can be the reward. The discovery of a world-class deposit is rare, and has the potential to generate enormous profits for a mining company. Mining rights over such deposits can be highly valuable assets, and the competition to acquire them (and hold onto them) is fierce. For this reason, even when a mine could be operated profitably, some of the dominant mining companies sometimes decide to obtain mining rights which are then not exploited; leaving the commodity in the ground, unmined, can increase the market price of what has already been mined, and an unexploited right to mine has the effect of preventing a commercial competitor from mining on that site.

17.     BSGR does not operate in this way. BSGR is a smaller company than mining giants such as Rio Tinto, Vale and BHP Billiton and can therefore make decisions more quickly. Governments favour this, and BSGR has built up an excellent reputation.[1]

18.     Mining companies which operate in Africa bear a heavy responsibility. For many African countries, such as Guinea, natural resources represent their chief (if not their only) significant asset, and their route out of poverty. Wealth is created from these resources by their extraction and sale. It is incumbent on mining companies to deploy their rights and develop their projects

---

[1] Beny Steinmetz Witness Statement (CWS-1), para 11.

expeditiously, thereby creating wealth for their host country, as well as profit for themselves. BSGR has a proven track record in this regard, having brought mines in Sierra Leone, Zambia, the DRC, Macedonia, Kosovo and Guatemala into production. So far as BSGR's work in Guinea is concerned, prior to the improper intervention of President Alpha Condé's government, BSGR and its joint venture partner was on target to achieve its first production of iron ore by the end of 2012. This would have represented the first ever production of iron ore in Guinea since its independence in 1958. Instead, the people of Guinea are yet to derive any benefit from their vast reserves of iron ore, having been badly served both by international mining companies (in the form of both Rio Tinto and Vale) and their own government.

19.   In addition to the mining component of BSGR's activities in Guinea, there was also a very substantial and crucial infrastructure component so as to export the iron ore out of the country. This included but was not limited to the financing and construction or rehabilitation of three railways, the rehabilitation of an existing port and later the construction of new port.

20.   Until the events which are the subject of this arbitration, BSGR's operations had never been impugned.

### 1.4   Related proceedings

21.   The Brazilian mining company Vale and BSGR entered into a joint venture in April 2010 in relation to the BSGR group's investments in Guinea, as described more fully below. Vale has commenced LCIA arbitration proceedings (LCIA No.14283) against BSGR pursuant to the arbitration agreement contained in their joint venture agreement. If it were not for the unlawful actions of Guinea, the LCIA proceedings would not have been commenced.

### 1.5   The BSGR group

22.   BSGR is a company registered under the laws of the bailiwick of Guernsey with registration number 46565. Its principal office is in West Wing, Frances House, Sir William Place, St Peter Port, Guernsey.  BSGR was incorporated in

2003 as a limited company in Jersey; and migrated in March 2007 to Guernsey.[2]

23.   BSGR is part of an international diversified mining group with operations in multiple countries within the Beny Steinmetz Group ("**BSG**").  BSG is a group of companies ultimately owned by the Balda Foundation, a Liechtenstein trust of which Mr Beny Steinmetz is a beneficiary.[3] BSG has global operations in natural resources, real estate and the diamond industry. BSGR is BSG's natural resources company.[4] BSGR has been active in the natural resources sector since 1999. It has projects all over the world, but Africa and the Former Soviet Union have historically been a particular focus of its investments. Before BSGR's investment in the project in Guinea, its African mining experience included (i) a diamond mining operation in Sierra Leone; (ii) copper and cobalt production in Zambia and the DRC and (iii) an alumina smelting project in South Africa, as well as numerous other exploration projects in iron ore, coal and other commodities.[5] BSGR has a 15-year track record of developing, as well as executing, mining operations, employing over 8,000 people whilst creating value and prosperity both for its stakeholders and also for the host countries.[6]

24.   BSGR's investments were made principally through its shareholdings in three subsidiaries, the BVI company BSG Resources (Guinea) Limited ("**BSGR Guinea BVI**"), BSGR Guernsey and BSG Guinea.

25.   BSGR Guinea BVI is a company registered under the laws of the British Virgin Islands on 28 October 2005 with the registration number 682852 and with its registered office in the British Virgin Islands, Akara Building, 24 De Castro Street, Wickhams Cay I, Road Town, Tortola.

26.   BSGR Guernsey is a company registered under the laws of the Bailiwick of Guernsey on 10 February 2009 with the registration number 50001 and with its

---

[2] Yossie Tchelet Witness Statement (CWS-4), para 12.
[3] CWS-1, para 1.
[4] BSGR's Chronicle of Events and Overview of BSGR's Iron Ore Investment in Guinea in Response to the Technical Committee dated 26 December 2012 (Exhibit C-0001),  p.3-7.
[5] BSGR Presentation dated May 2005 (Exhibit C-0002).
[6] CWS-1, para 12.

registered office in Guernsey, West Wing Frances House, Sir William Place St
Peter Port Guernsey GY1 1GX.

27.     BSGR Guinea is a company incorporated in accordance with the laws of
        Guinea, registered in the Registre du Commerce et du Credit Mobilier de
        Guinée under number RCCM/GC-KAL/013.755A/2006 of 24 November 2006
        and with its registered offices at Immeuble Bleu, 5ème étage Résidence 2000,
        Moussoudougou-C/Matam, Conakry, Republic of Guinea, Post Box 6389.

28.     Up to November 2006,  BSGR held its investment as follows:



29.   As at November 2006, BSGR held its investment as follows:



30.   As at March 2008, the structure was streamlined and the investment was held as follows:



31.    As at January 2009, an internal re-structuring took place and BSGR Guernsey was inserted into the corporate structure. BSGR's shareholding was therefore structured as follows:



32.    Following a sale of 51% of the shares in BSGR Guernsey to Vale in April 2010, the position was as follows:



33.    As is evident from the above, following the sale of 51% of the shares in BSGR Guernsey to Value in April 2010, BSGR Guinea changed its name to VBG-Vale BSGR Sarl ("**VBG Guinea**") and BSGR Guernsey changed its name to VBG-Vale BSGR (Guinea) Guernsey ("**VBG Guernsey**").  On 14 June 2010 the Guinean Court of First Instance in Conakry formally registered "**VBG – Vale BSGR Guinea**" as the new name of BSGR Guinea. However, each company remained as the same corporate entity and, for consistency, each will continue to be referred to herein as BSGR Guernsey and BSGR Guinea respectively.

34.    Following the re-purchase of the Vale shareholding by BSGR on 13 March 2015, the position has reverted to that as at January 2009:



35.    Accordingly, BSGR Guinea is once again a wholly owned subsidiary of BSGR Guernsey.   Furthermore, VBG Guinea changed its name back to BSG Resources (Guinea) S.A.R.L. ("**BSGR Guinea**"); and VBG Guernsey changed its name back to BSG Resources (Guinea) Limited ("**BSGR Guernsey**").

## II.   BACKGROUND FACTS

36.   The factual background set out below (and in the accompanying witness evidence) will assist the Tribunal in understanding: (a) the process by which the Claimants initially held and/or made their substantial investments; (b) the nature of the highly valuable bundle of property and contractual rights held by the Claimants from time to time; and (c) the unlawful conduct and campaign waged by Guinea against the BSGR group, which ultimately resulted in April 2014 in the illegal expropriation and/or nationalization of those valuable rights without any compensation.

### 2.1   The geographical areas in question



37.    The mining rights and agreements in question in this arbitration covered two geographical areas in particular:

(i)      "**Simandou North and Simandou South**". This included (in Simandou South) an area on Mount Younon, near the village of Zogota which became known as the Zogota Project shown in the map above as Simandou South-Zogota; and

(ii)     An area referred to herein as "**Simandou Blocks 1 and 2**" shown in the map above as Block 1 and Block 2.

## 2.2    The Guinean opportunity

38.    By 2005, the BSGR group had assembled a significant and diverse portfolio of mining and metal assets and, in Africa, had invested in South Africa, Sierra Leone, Zambia and the DRC.[7] It had developed a reputation as an ambitious and accomplished investor in the African natural resources market.

39.    BSGR learned that large iron ore resources were thought to exist in the Simandou region of Guinea. However, no survey had ever identified the precise locations of these deposits.[8]

40.    BSGR, through its subsidiary BSGR Guinea BVI, set about preparing its application for prospecting permits over areas of Simandou North and Simandou South. Prospecting permits (also known as research permits or exploration permits) conferred on the holder the exclusive right to conduct exploratory (i.e. prospecting) work over the area they covered. They did not confer a right to mine any deposits which were discovered. The application process was governed by Guinea's 1995 Mining Code ("**the Mining Code**"). Article 28 of the Mining Code provided that a prospecting permit was issued by order of the Minister of Mines, on recommendation by the Agency for the Promotion and Development of Mining (the "Centre de Promotion et de

---

[7] Exhibit C-0001,  para.19.
[8] *Ibid*, para. 20.

Développement Minier" or "**CPDM**").[9] The applicant had to demonstrate that it was committed to carrying out the work and possessed sufficient technical and financial capability to do so.

41.     Perhaps because the Simandou region was widely rumoured to hold vast resources of iron ore, BSGR was not the only applicant for prospecting permits in the Simandou region. Rio Tinto, Vale (at the time known as Companhia Vale do Rio Doce or "**CVRD**"), Mitsubishi and BHP Billiton also submitted applications.

42.     All five companies were summoned separately for meetings with representatives of the Ministry of Mines and the CPDM. The purpose of the meetings was to assess each applicant's technical and financial capability to carry out the necessary works.[10]

43.     When BSGR attended its meeting with the Ministry of Mines and the CPDM, it gave a presentation highlighting its significant experience in exploration and mining in Africa.[11] BSGR was able to demonstrate not only that it had the technical and financial capabilities to carry out the prospecting works and Feasibility Studies, but also that it could (and would) do so more expeditiously than the larger mining companies. Mr Struik made clear at the meeting that BSGR regarded Simandou North and Simandou South as a core asset that required immediate capital investment in order to determine whether an operational iron ore mine could be established in these areas. By contrast, other companies regarded the Simandou project as a strategic future asset for their books (and to keep off the books of competitors) which would only require capital if developed in the long term. Mr Struik also demonstrated that BSGR, as a privately owned company, acted decisively and had the ability to make quick decisions. Its activities were not hampered by the corporate bureaucracy that affected most major mining companies.[12]

---

[9]  Mahmoud Thiam Witness Statement (CWS-5), para. 24.
[10] Exhibit C-0001, para. 29; Letter from Cesare Morelli to Marc Struik dated 15 June 2015 (Exhibit C-0003).
[11] Exhibit C-0002.
[12] Marc Struik Witness Statement (CWS-2), para 22.

**2.3**    **Prospecting permits over Simandou North and Simandou South**

44.     On 6 February 2006 the then Minister of Mines, Dr Ahmed Tidiane Souaré, issued two ministerial orders:

(i)     The first order granted BSGR Guinea BVI four prospecting permits covering 2047 square kilometres in the prefectures of Beyla, Macenta, Nzérékoré and Yomou (the "**Simandou South Permits**")[13.]

(ii)    The second order granted BSGR Guinea BVI three prospecting permits covering 1286 square kilometres in the prefecture of Kérouané (the "**Simandou North Permits**")[14].

45.     In accordance with Articles 29 and 30 of the Mining Code, these permits were each granted for a period of 3 years, renewable twice for periods of 2 years at a time. At each renewal, 50% of the area covered by the permits had to be retroceded to the Republic of Guinea.

46.     Amongst other things, the permits required (a) the submission of monthly activity reports and quarterly financial reports to the CPDM; (b) the carrying out of a work program and the completion of a Feasibility Study; and (c) payment of administration fees, stamp duty and land tax.

47.     Several senior Government officials have explained under oath how the BSGR group obtained these mining rights. The gist of their evidence is that these rights were obtained in accordance with the Mining Code and standard administrative proceedings.

48.     [PROTECTED]

---

[13] Decree No. 2006/706/MMG/SGG dated 6 February 2006 (Exhibit C-0004).
[14] Decree No. 2006/707/MMG/SGG dated 6 February 2006 (Exhibit C-0005).
[15] [PROTECTED]



49.     [PROTECTED]

50.     [PROTECTED]



**[PROTECTED]**

51.     As will be set out further below, when the allegation of corruption and the role of Ms Mamadie Touré will be specifically addressed, the gist of their evidence is that there was no corruption involved in this matter and that Mamadie Touré played no role in it. As their statements cover a longer period of time, including the time when the Simandou North Permits and Simandou South Permits were issued, it follows that, also according to these three officials, these rights were not obtained by corruption.

**2.4     The Memorandum of Understanding**

52.     On 20 February 2006 the BSGR group, through its BVI entity, entered into a Memorandum of Understanding with Guinea, which set out the framework for the parties' co-operation (the "**MOU**").[19]   The BSGR group committed to carrying out a Feasibility Study within 30 months of the date on which the prospecting permits were granted. The Feasibility Study was to include a detailed analysis of the infrastructures required, including communication networks, export facilities and the supply of electricity. Guinea, in turn, undertook to grant BSGR a mining concession within six months of the completion of the Feasibility Study, provided that BSGR had complied with the relevant regulations of the Mining Code.

---

[19]   Memorandum of Understanding between the Republic of Guinea and BSG Resources (Guinea) Limited dated 20 February 2006 (Exhibit C-0009).

53.    **[PROTECTED]**



54.    Not one of the witnesses has questioned the validity of the MOU or suggested that it was entered into following corruption on the part of BSGR.    This is unsurprising: the MOU was entirely valid and there was no corruption.

**2.5    Investment in Simandou North and Simandou South**

55.    BSGR then began to plan its exploration programme. In November 2006, BSGR Guinea was established as a local company in Guinea and a 100% subsidiary of BSGR Guernsey. All its activities were conducted out of the company office in Quartier Minière, Conakry.

56.    An exploration camp was established in Kérouané in late 2006 and geological mapping and drilling activities were commenced in Simandou North. Several contractors were engaged, including (i) MSA Geological Consultants, a well-known South African company, to conduct detailed field mapping and (ii) Fugro Airborne Surveys (Pty) Limited to conduct airborne geophysical surveys of the areas covered by its prospecting permits.

57.    Initial fieldwork in 2007 in Simandou South resulted in the discovery of an iron ore deposit on Mount Younon, near the village of Zogota. This became known as the Zogota Project. Consequently, it was decided to cease exploration work in Simandou North (as the initial drilling results were not encouraging) and to

---

[20]    **[PROTECTED]**

move the staff and equipment onto the Zogota Project.  A second exploration camp was established in N'Zérékoré (about an hour and a half's drive from Zogota).

58.     Foraco (a French drilling company) and another company, Geoprospects Ltd, were contracted to carry out the drilling activities in Zogota. An additional camp was set up in Simandou South, much closer to the drilling sites, in order to expedite progress on the Zogota Project.

59.     Foraco's and Geoprospects' work continued through 2008 and 2009 and a total of 180 holes and 16,173 metres were drilled.  In accordance with the Mining Code and the terms of the relevant permits, monthly activity reports were submitted to the CPDM throughout this period and the BSGR group worked towards the completion of a Feasibility Study in respect of the Zogota Project.

**2.6     Application for and grant of Blocks 1 and 2 Permit**

60.     On 28 July 2008, the Republic of Guinea withdrew the mining rights on Simandou Blocks 1 to 4 from Rio Tinto's subsidiary Simfer S.A ("**Simfer**"). These areas therefore became available to other interested mining companies, including BSGR.

61.     On 5 August 2008, BSGR Guinea submitted an application for a prospecting permit in respect of Simandou Blocks 1, 2 and 3.  At least two other companies (AfriCanada and a Chinese company) also submitted applications.

62.     On 9 December 2008, the Minister of Mines at the time, Dr Loucény Nabé, issued a decree granting BSGR Guinea a prospecting permit over Simandou Blocks 1 and 2, covering an area of 369 square kilometres in the prefecture of Kérouané. [21] In accordance with Articles 29 and 30 of the Mining Code the Blocks 1 and 2 Permit was issued for a term of three years and was renewable twice for maximum periods of two years each. Amongst other things, the Permit required (a) the submission of monthly activity reports and quarterly

---

[21] Decree No. 2008/4980/MMG/SGG dated 9 December 2008 (Exhibit C-0010).

financial reports to the CPDM; (b) the carrying out of a work program and the completion of a Feasibility Study; and (c) the payment of administrative fees, stamp duty and surface tax.

63. Several senior ministers and officials in the Guinean administration have given evidence on why Blocks 1 and 2 were first withdrawn from Simfer and on how the Blocks were issued to BSGR. The thrust of this evidence is that no undue influence was used, let alone that BSGR obtained those rights by corruption.

64. **[PROTECTED]**





[PROTECTED]

65. [PROTECTED]

[PROTECTED]

[22] [PROTECTED]



66.

67.

68.

**[PROTECTED]**

69.   The validity of the Blocks 1 and 2 Permit, issued by Minister of Mines Nabé under the presidency of the deceased General Lansana Conté, was further established by the confirmation of these rights by the regime that succeeded General Conté, i.e. by President Captain Camara and his Minister of Mines Mr Thiam.

70.   First, on 21 January 2009 BSGR Guinea applied to renew the Simandou North Permits and Simandou South Permits. 50% of each of Simandou South and Simandou North was retroceded, as required by the Mining Code. The renewal of these permits was granted by Minister Thiam on 10 June 2009.[27]

71.   Secondly, on 5 May 2009, Minister Thiam issued a certificate confirming the validity of the Blocks 1 and 2 Permit.[28] BSGR Guinea therefore commenced work on its drilling programme for Blocks 1 and 2 in May 2009.

**2.7   The Base Convention and the Zogota Mining Concession**

72.   Meanwhile, BSGR and the Claimants continued to work towards the completion of the Feasibility Study in respect of the Zogota Project. After much hard work, the Feasibility Study was completed and submitted to the CPDM on 16 November 2009.[29] Running to some 450 pages, it demonstrated the existence of a commercially operational iron ore deposit at Zogota. It was the first such Feasibility Study ever to be submitted to the CPDM.

---

[26]   **[PROTECTED]**

[27] Decree No. A 2009/1327/PR/MMEH/SGG dated 10 June 2009 (Exhibit C-0012). These permits were superseded when BSGR entered into the Base Convention and was granted the Zogota Mining Concession.
[28] Certificate of Validity of Permit No. 2008/I-4980/MMG/SGG issued by Mahmoud Thiam dated 5 May 2009 (Exhibit C-0013).
[29] Zogota Feasibility Study dated October 2009 (Exhibit C-0014).

73.     The CPDM conducted an initial review of the Feasibility Study and recommended to the Ministry of Mines that BSGR and its subsidiaries be invited to commence negotiations for a mining and infrastructure agreement. On 1 December 2009 Minister Thiam established a Commission to conduct these negotiations.[30]

74.     The Commission consisted of 20 members from numerous governmental departments, the Central Bank and the National Company of Mining Infrastructure.  Mr Avidan and Mr Struik led the negotiations on behalf of BSGR. They were assisted by Tania Rakitina (a financial manager working in BSGR Guinea's Conakry office), Mohamed Doumbia (BSGR Guinea's local counsel) and Ibrahima Sory Touré (BSGR Guinea's Director of External Relations).[31]

75.     The Commission met every day from around 9am to 6pm, and met with BSGR on several of those days. BSGR paid for the catering during these negotiations and also paid each member of the Commission a daily allowance, in line with standard practice.[32]

76.     It was very important to the BSGR group to obtain permission from Guinea to export iron ore through Liberia. Given the proximity of the Zogota Project to the Liberian border, and the existence of rail and port infrastructure in Liberia, the project's economic viability depended upon the ability to export the iron ore mined at Zogota from Liberia, rather than from Guinea.[33] The exportation of iron ore from Zogota through Liberia added an important infrastructure component to the deal with Guinea. This component included inter alia (i) the construction of a 102 km heavy cargo railway between the mine in Zogota and the village of Sanniquellie on the border with Liberia (the "**Sanniquellie railway**"), (ii) the rehabilitation of the existing cargo railway between Sanniquellie and the port of Buchanan on the Liberian coast and (iii) the rehabilitation of the port of Buchanan. In addition, BSGR agreed to reconstruct the 600 km passenger and light cargo railway between Conakry and Kankan

---

[30] Decree No. A 2009/3466/PRG/SGG/MMEH dated 1 December 2009 (Exhibit C-0015).
[31] CWS-2, para. 79.
[32] *Ibid.,* paras 82-83.
[33] *Ibid.,* paras 84-85.

(the "**Trans-Guinean railway**"). The details of this agreement formed part of the negotiations of the Base Convention.

77.     In return for also granting the right to export through Liberia the iron ore from Blocks 1 and 2 (should a mining concession later be granted for those areas), BSGR also agreed to extend the Trans-Guinean railway with another 200 km, to the city of Kérouané. To be able to export the expected additional 30 million tons of iron ore from Blocks 1 and 2, additional infrastructure works were required, including (i) the construction of a heavy cargo railway between Blocks 1 and 2 and Sanniquellie, (ii) the construction of a second heavy cargo railway between Sanniquellie and the port of Buchanan and (iii) the construction of a new deep-sea port southeast of Buchanan.

78.     The Base Convention was signed on 16 December 2009.  The relevant terms of the Base Convention are addressed in detail below. Broadly speaking, the Base Convention constituted a *"mining agreement"* for the purposes of the Mining Code and *"BOT agreement"* for the purposes of the BOT Act. The Base Convention defined the rights and obligations of the respective parties thereto and the conditions on which BSGR's mines would be operated.  In the words of Article 11 of the Mining Code, it was a *"guarantee to the mine title holder that these conditions will remain unvaried"*.  It also specified the terms on which BSGR Guinea was entitled to operate within the Zogota Mining Concession, including with regard to commercial production of iron ore and its sale.

79.     The Base Convention also spelt out the scale of the investments to be made by the BSGR group, over two "phases", and which included, in Phase I: (i) the building of an open cast iron ore mine at Zogota; (ii) the construction of the Sanniquellie railway; (iii) the reconstruction of 50% of the Trans-Guinean railway; and (iv) the construction of an industrial area at Zogota. In Phase II, BSGR was required to (v) construct a new railway from Blocks 1 and 2 to Sanniquellie; (vi) construct a second railway between Sanniquellie and Buchanan in Liberia; (vii) develop a new port southeast of Buchanan and (viii) complete the rehabilitation to the Trans-Guinean railway between Conakry and Kankan and (ix) extend the Trans-Guinean railway from Kankan to Kérouané.

80.     BSGR Guinea was also required to submit a Feasibility Study in respect of Blocks 1 and 2 within 24 months of the date of signature of the Base Convention. The conclusions and terms of the Feasibility Study would facilitate the negotiations for the grant of a Mining Concession over Blocks 1 and 2. By Articles 11 and 12 of the Base Convention, the BSGR group, and BSGR Guinea in particular, undertook to invest billions of dollars in *inter alia* the Zogota mine and the Trans-Guinean railway.

81.     On 19 March 2010, Guinea's new President, General Sékouba Konaté:

(i)     ratified the Base Convention by Presidential Decree[34]; and

(ii)    granted BSGR Guinea a mining concession in relation to the Zogota deposit (an area of 1,024 square kilometres within Simandou South), in accordance with Article 8 of the Base Convention.[35] In accordance with Article 41 of the Mining Code, the Zogota Mining Concession included the exclusive and valuable right to carry out all kinds of prospecting and development of deposits within the area of the concession. If substances other than iron were identified, BSGR Guinea was obliged to inform the Minister of Mines before carrying out any prospecting works. In this event, BSGR Guinea had a right of first refusal, with the operating terms to be defined in another agreement.

82.     Several members who were involved in the negotiation of the Base Convention and Zogota Mining Concession have given evidence on these negotiations.



83.

---

[34] Presidential Order No. 003/PRG/CNDD/SGG/2010 dated 19 March 2010 (Exhibit C-0016).
[35] Presidential Order No. D2010/024/PRG/CNDD/SGG dated 19 March 2010 (Exhibit C-0017).



**[PROTECTED]**

84. **[PROTECTED]**

85. **[PROTECTED]**

36 **[PROTECTED]**

37 **[PROTECTED]**



(i)   [PROTECTED]

[PROTECTED]

(ii)   [PROTECTED]

86.   [PROTECTED]

## 2.8   Joint Venture with Vale

87.   The award of the Blocks 1 and 2 Permit had dramatically increased the size of the iron ore project in Guinea, and the investment needed to sustain it had



[38] [PROTECTED]

[39] [PROTECTED]

[40] [PROTECTED]

increased correspondingly. Thus, the BSGR group began to look for a joint venture partner in April 2009.

88.    After a number of prospective partners were deemed unsuitable, the BSGR group eventually entered into negotiations with Vale in February 2010 regarding the creation of a joint venture and in particular, the potential sale to Vale of a stake in BSGR Guernsey.

89.    On 19 March 2010 Minister Thiam wrote to Vale, stating that the Government of Guinea welcomed the proposed joint venture and assuring Vale that BSGR held legal rights through a duly obtained mining concession.[41]

90.    On 16 April 2010, BSGR informed the Ministry of Mines that negotiations regarding a joint venture with Vale were taking place.[42] BSGR explained that *"the intention is that the Joint Venture will involve the purchase by Vale of a share of 51% in BSG Resources (Guinea) Limited and, consequently, an indirect share in BSG Resources (Guinea) SARL".* The letter explained that although no formal approval was required under the terms of the Mining Code or the Base Convention, both BSGR and Vale agreed that the obtaining of such approval for the implementation of the joint venture was an important element in its success.

91.    The Ministry of Mines confirmed, by countersigning BSGR's letter on the same day, that it had no objection to the proposed joint venture and specifically the acquisition of a 51% share of the share capital of BSG Resources (Guinea) Limited.[43]

92.    During this time the parties negotiated the detailed terms of a Framework Agreement and a Shareholders' Agreement, which were signed on 30 April 2010. This involved the purchase by Vale of a 51% stake in BSGR Guernsey. Vale agreed to pay a total of USD 2.5 billion for the stake, of which USD 500

---

[41] Letter from Minister of Mines Mahmoud Thiam to E Ledsham of Vale dated 19 March 2010 (Exhibit C-0023).
[42] Letter from BSGR to Minister of Mines Mahmoud Thiam with Endorsement from Minister of Mines Mahmoud Thiam dated 16 April 2010 (Exhibit C-0024).
[43] *Ibid.*

million was paid immediately and the USD 2 billion balance was to be paid as and when contractually agreed milestones had been met.

93.     BSGR Guernsey was renamed "VBG – Vale BSGR (Guinea) Guernsey" and its subsidiaries were also renamed to reflect the joint venture.

94.     On 14 June 2010 the Guinean Court of First Instance in Conakry formally registered "VBG – Vale BSGR Guinea" as the new name of BSGR Guinea[44]. However, as noted earlier, each company remained as the same corporate entity and, for consistency, each will continue to be referred to herein as BSGR Guernsey and BSGR Guinea respectively.

**2.9     Further investments in relation to Zogota and Blocks 1 and 2**

95.     At first, BSGR and its joint venture partner Vale were able to perform their obligations under the Base Convention and the Blocks 1 and 2 Permit without obstruction and work progressed quickly.

96.     On 2 July 2010, Minister Thiam directed BSGR Guernsey and BSGR Guinea to commence work on the feasibility study in respect of Sanniquellie railway.[45] On the same day, Minister Thiam also directed to commence work on the feasibility study for the Trans-Guinean railway.[46]

97.     On 25 October 2010 BSGR notified the Ministry of Mines that the name of BSGR Guinea had been changed.[47] On 1 November 2010 Minister Thiam acknowledged the change and *"wish[ed] the new company great success"*.[48]

98.     On 22 November 2010, Ministry of Mines Thiam authorized BSGR Guinea to commence work on the first 40 km of the Trans-Guinean railway.[49] Following

---

[44] Registration of change of name of VBG-VALE BSGR Guinea dated 14 June 2010 (Exhibit C-0025).
[45] Order of Service No. 0658/MMG/CAB issued by Mahmoud Thiam dated 2 July 2010 (Exhibit C-0026).
[46] Order of Service Re Reconstruction of the Conakry Kankan railroad issued by Mahmoud Thiam dated 2 July 2010 (Exhibit C-0027).
[47] Dag Cramer Judicial Review Witness Statement (Exhibit C-0028); Letter from BSGR to the Ministry of Mines dated 25 October 2010 (Exhibit C-0029).
[48] Letter from Ministry of Mines to BSGR dated 1 November 2010 (Exhibit C-0030).
[49] Letter from Minister of Mines Mahmoud Thiam and Minister of Transportation Mathurin Bangoura to BSGR Guinea dated 22 November 2010 (Exhibit C-0031).

this authorisation, the construction of the first 9km started and studies were commissioned for the following 330 km sections.

99.   Further activities included the completion of further social and environmental studies as well as the construction of camps, maintenance and paving access roads.

100.   After much hard work, on 14 September 2011 BSGR and its joint venture partner submitted a Feasibility Study in respect of Simandou Blocks 1 and 2, just three years after BSGR had been granted a prospecting permit in those areas. This was a very impressive accomplishment, and stood in contrast to Simfer S.A. (a subsidiary of Rio Tinto and which was the prior holder of a mining concession in those areas) which had failed to produce a feasibility study at all (and to date still have not produced such a study), despite having held permits for 11 years and for an additional 6 years following the return to Rio Tinto of Blocks 3 and 4 in December 2008 and granting of an exploration permit. The Feasibility Study demonstrated the existence of commercially operational deposits within Simandou Blocks 1 and 2. In accordance with its rights under Article 10 of the Blocks 1 and 2 Permit, Article 26 of the Mining Code and Article 10.2 of the Base Convention, BSGR Guinea applied for a mining concession to be issued.[50]

**2.10   Summary of investments held and/or made**

101.   Accordingly, by April 2014 (when, as described below, the Claimants' assets were expropriated by Guinea), the Claimants directly and indirectly held and/or had made very significant investments over the course of a number of years. Those investments included both large financial contributions (exceeding USD 62 million, together with an additional USD 600 million following the joint venture with Vale) and non-financial contributions, as explained in the attached

---

[50] Letter from VBG-VALE BSGR Guinea to the Ministry of Mines dated 14 September 2011 accompanying the feasibility study (Exhibit C-0032).

evidence.[51]

102.    In addition, a considerable amount (and effort) was spent in Liberia in relation to an Infrastructure Development Agreement that would connect Guinea to Liberia, enable the export of the iron ore form Zogota and Blocks 1 and 2 through Liberia and open up a free trade zone between the two countries with much positive impact on the Mano River Region.

103.    Furthermore, and against the background set out above, BSGR's direct and indirect shareholdings in its subsidiaries (including in particular BSGR Guinea BVI, BSGR Guernsey and BSGR Guinea) constituted a key investment held and/or made by BSGR, as was BSGR's Guernsey's 100% shareholding in BSGR Guinea. The economic value of those shareholdings in BSGR Guinea and BSGR Guernsey, respectively, was derived from the important assets held by BSGR Guinea, namely (a) the Zogota Mining Concession; (b) the Base Convention; and (c) the Blocks 1 and 2 Permit.

**2.11    The election of Alpha Condé and the campaign against the Claimants**

104.    President Alpha Condé was confirmed as the new President of Guinea by the Supreme Court on 3 December 2010.[52] This followed a challenge to the election result on the basis of fraud in some electoral districts. The Claimants' troubles began shortly thereafter.

105.    On 8 February 2011, the Claimants' local counsel and others met with President Condé and three members of the Ministry of Transportation. At that meeting President Condé and the Minister of Transportation, Ahmed Tidiane Traoré, made their position clear:[53]

---

[51] CWS-4, para. 46. BSGR also made a number of financial contributions which were related to and made pursuant to the projects described herein but which did not flow directly into Guinea. These investments will become particularly important at the quantum stage of the present proceedings.
[52] BBC, "*Guinea's Alpha Condé confirmed presidential poll winner*" dated 3 December 2010 (Exhibit C-0033).
[53] Email from Daniel Pollak to Asher Avidan dated 9 February 2011 (Exhibit C-0034).

(i)     President Condé refused to sign the Protocole d'Accord regarding the rehabilitation of the Trans-Guinean Railway. President Condé stated that he would not sign any final document before a new Mining Code was issued and there was an agreement regarding the time and cost of the initiative.

(ii)    President Condé stated that he would claim 50% of the money that BSGR received from Vale under the joint venture agreements. He commented, "*It is inconceivable that people get rich thanks to assets that should belong to the Guinean people*".

(iii)   Under a new Mining Code, the Government would get 20% free carry with the option to buy (at market value) an additional 15% of all mining projects in the country.

(iv)    All deals signed before the accession of President Condé's government which did not privilege the interests of the Guinean people would be revised and their terms amended.

(v)     Minister Traoré noted that the USD1 billion that had been committed to the rehabilitation of the Trans-Guinean railway may not be sufficient, and that BSGR might have to pay the difference, from the money it owed Guinea from the sale of its rights and concessions to Vale[54].

106.   The new Government's intention to extort money from the Claimants was clear. What followed can best be described as a campaign against the BSGR group, fought both on the ground in Guinea and in the international press and which culminated, in April 2014, in the forcible (and predetermined) taking by executive decree of the valuable mining and other rights which the Claimants had obtained by dint of their hard work and expertise, as outlined above.[55]

---

[54] *Ibid.*, p. 2.

107.    On 10 February 2011 legal adviser to the Ministry of Mines, Momo Sakho, issued a document entitled "Policy Information for the Guinean Mining Sector", essentially announcing a shake-up of current mining practices and the intention of the State to take profit from all phases of mining activity.[56]

108.    Mr Avidan, the President of BSGR, then held two meetings in early February 2011 with President Condé.  Mr Avidan was accompanied by Mr Saad (then CEO of BSGR Guinea) and Mr Touré.[57]  During these meetings, President Condé demanded a sum of USD 1.25 billion from BSGR to be paid to him; and threatened to halt the building of the Trans-Guinean railway and withdraw the consent to exporting iron ore through Liberia if BSGR did not make that payment.  The demand appears to have been made on the wholly unjustified basis that Guinea ought to be entitled to share in the monies BSGR received from Vale for participating in the joint venture. President Condé thought that BSGR had received a sum of USD 2.5 billion from Vale up front for the joint venture (the actual figure was USD 500 million). He wrongly considered that it was appropriate in such circumstances that he (or Guinea) ought to receive 50% of the monies received by BSGR pursuant to that joint venture. Significantly, there was no suggestion whatsoever during these meetings that BSGR had obtained its rights by corruption.

109.    Mr Avidan reported this demand back to BSGR's board and others. Unsurprisingly, it was rejected by both BSGR and Vale. There was simply no basis whatsoever for Guinea to demand any such payment; or for BSGR to pay it - particularly in circumstances where (i) Guinea had been aware of and had consented to the terms of the joint venture; and (ii) BSGR and its subsidiaries had obtained their rights in full compliance with the Mining Code.

110.    However, the fact that the President was himself prepared to make this demand for payment is significant. It demonstrates that, from the outset, the new government was - from the top down - prepared to make unlawful demands and threats against the BSGR group which had nothing to do with the group's

---

[56] Policy Information for the Guinean Mining Sector dated 10 February 2011 (Exhibit C-0035).
[57] Asher Avidan Witness Statement (CWS-3) paras 88-89.

performance or conduct in Guinea; but everything to do with the value extracted from its investments.[58]

111.   Moreover, not only was the President prepared to make threats, but he was also prepared to carry them out. In an effort to explain the background to the joint venture, the BSGR group wrote to the President on 14 March 2011 setting out the benefits the group's investments would have for Guinea and the reasons behind seeking external investment from a joint venture partner.[59]

112.   Guinea did not respond to this letter.   Rather, it subsequently began an unjustified investigation into BSGR and its subsidiaries. Its unlawful interference with BSGR, its subsidiaries and their individual and collective investments, was clearly linked to the refusal to accede to President Condé's unjustified demands for payment.

113.   According to the whistle-blower website Mediapart, the subsequent investigations into BSGR were directly linked to its refusal to accede to President Condé's demands for payment:

> *"The Steinmetz Group is certainly in trouble since it refused to put its hand in its pocket to preserve its rights in Simandou. Rio Tinto, which still owns half (but originally owned it in its entirety), has agreed to pay an additional 700 million dollars. It was when BSGR refused, that investigations into its dealings began."*[60]

114.   For example, thereafter:

(i)   On 4 March 2011 the Financial Times reported a senior official from the Ministry of Mines saying "*All contracts will be* reviewed *and reworked by the beginning of the second half of this year… The government will become a minority shareholder in all mining contracts*".[61] This was despite the fact that the government was not a

---

[59] Letter from BSGR to the President of Guinea dated 14 March 2011 (Exhibit C-0036).
[60] Mediapart, *"Guinea, mining paradise that makes the world's mouth water"* dated 7 October 2013 (Exhibit C-0037).
[61] Financial Times, "*Guinea to review mining licences*" dated 4 March 2011 (Exhibit C-0038).

shareholder under the Base Convention; and despite Article 167.2 of the Mining Code, which expressly provided that:

> "*Due to the degree of investment required, the State does not take free shares in the capital of a company operating substances of special interest. If the State wishes to have a share in such a company, the details are worked out with the investor within the scope of the mining agreement. In all cases the State's share in the capital of such a company will be limited to a level which does not hamper investors' control of their operations.*"[62]

(ii)     On 8 April 2011, the Ministry of Transportation wrongfully halted all work on the ground in respect of the Trans-Guinean railway and informed BSGR Guinea that the completion of the railway would be put out to tender.[63] There was no reason at all to do this.[64] Indeed, President Condé ignored the advice of his own Minister who on 20 April 2011 advised him that this course of action was not in the State's best interests.[65]

(iii)    On 9 September 2011 a new mining code was introduced and duly came into force ("the 2011 Mining Code"). However, by its own terms the 2011 Mining Code did not apply in respect of any of the rights held by the Claimants, including in particular the mining rights held by BSGR Guinea under the Base Convention, the Mining Concession and the Blocks 1 and 2 Permit. This is discussed in more detail below.

(iv)     On 4 October 2011 the Ministry of Mines wrongfully issued a notice to stop all of BSGR Guinea's works in Guinea, bizarrely claiming that they had been initiated *"without authorisation"* or by a company of which it was unaware named "VALE".[66]

---

[62] Mining Code of the Republic of Guinea, 1995, Article 167.2 (Exhibit CL-0001).
[63] Letter from Minister of Transport El Hadj Tidiane Traoré to BSGR Guinea dated 8 April 2011 (Exhibit C-0039).
[64] CWS-3, paras 94.1 - 94.2.
[65] Letter to the President of Guinea regarding the Memorandum on the joint enterprise between Vale and BSGR dated 20 April 2011 (Exhibit C-0040).
[66] Letter from the Ministry of Mines to BSGR dated 4 October 2011 (Exhibit C-0041); Exhibit C-0028, para. 71.2.

(v)     On 31 October 2011, the Ministry of Mines acknowledged receipt of the Feasibility Study in respect of Blocks 1 and 2 (submitted on 14 September 2011).  However, notwithstanding (a) that clear notice had been provided to the Ministry of Mines regarding the joint venture between Vale and BSGR; (b) the Ministry's own formal acknowledgment of this (e.g. on 16 April 2010 and 1 November 2010) and (c) the Conakry Court of Appeal Order of 14 June 2010, the Ministry inexplicably stated that it did not recognise the entity which had carried out the Feasibility Study:

> "*In addition, the department has received a feasibility study from a company named VBG (Vale BSGR Guinea) which is not the holder of any title issued by the State of Guinea.*"[67]

(vi)    In the same letter, the Ministry also spuriously claimed that the Feasibility Study was prepared *"without the competent technical services of the Department of Mines and Geology being involved for the validation of the various stages in conformance with the applicable laws and regulations."* Finally, the Ministry asked BSGR to provide an account of the wage status of all its Guinean and expatriate workers, in particular the engineers.[68]

(vii)   On 17 November 2011 the Ministry of Mines wrongfully repeated its earlier unlawful notice to stop the works.  It stated *inter alia* that:

> "*Following letter dated 4 October 2011, the Ministry of Mines…attracted the attention of [BSGR Guinea] regarding the executing of Mining works and civil engineering on a large scale by a certain company named VALE, in the zones where BSGR is present.*
>
> *In the absence of authorizations granting BSGR and VALE to undertake these works, the Ministry of Mines and Geology has given you formal notice to stop, or engage in stopping without any delay, the abovementioned works.*
>
> *Furthermore, in order for the Ministry of Mines to better*

---

[67] Letter from the Ministry of Mines to BSGR dated 31 October 2011 (Exhibit C-0042); Exhibit C-0028, para. 71.2.
[68] *Ibid.*

*understand the situation of your company, we have requested that you forward to us, within 48 hours, the totality of acts, agreements and conventions that connect you to the State of Guinea or any other partners"[69]*

(viii)   In the same document, the Ministry of Mines began to make substantial, detailed and unjustified inquiries of the Claimants.[70]

115.   Despite the significant disruption that this caused to its activities, the BSGR group responded to those queries in detail. In a letter to the Minister of Mines dated 28 November 2011, BSGR explained its activities in Guinea and its partnership with Vale and provided access to a data room containing documents supporting that explanation.[71]

116.   On 19 January 2012 the Ministry of Mines wrote again to BSGR, to complain that it had delayed submitting its Feasibility Study on Zogota, despite the fact that the original Feasibility Study had been submitted to the Ministry of Mines in November 2009 and was available in the data room.[72] Nevertheless, in an attempt to co-operate, BSGR agreed to provide the Feasibility Study again, in hard copy.[73]

117.   On 3 February 2012 BSGR's lawyers, Skadden Arps and Veil Jourde, submitted to the Ministry of Mines four copies of 15 lever arch files comprising 50,000 pages confirming the legality of BSGR Guinea's vested rights in Zogota and Blocks 1 and 2.[74] This was despite the fact that Guinea had already been kept fully abreast of the joint venture agreements. For example, ten hard copies of the complete Zogota Feasibility Study had been handed over to the CPDM and Ministry of Mines in November 2009. Moreover, and not withstanding that Guinea's requests fell outside any audit and inspection rights afforded by *inter*

---

[69] Letter from the Minister of Mines to VBG Vale BSGR dated 17 November 2011 (Exhibit C-0043).
[70] *Ibid.*
[71] Letter from BSGR to the Minister of Mines dated 28 November 2011 (Exhibit C-0044).
[72] Letter from the Minister of Mines Mohamed Fofana to BSGR dated 19 January 2012 (Exhibit C-0045); Exhibit C-0028, para. 71.3.2.
[73] Letter from BSGR to the Minister of Mines Mohamed Fofana dated 20 January 2012 (Exhibit C-0046).
[74] Letter from Veil Jourde to the Minister of Mines dated 3 February 2012 (Exhibit C-0047); Exhibit C-0028, para. 71.3.3.

*alia* the Mining Code and Base Convention, the BSGR group had provided all relevant documents to Guinea in electronic copy in the data room.

118.   However, notwithstanding the co-operation which the BSGR group sought to achieve with the Government, it continued to face disruption to its activities in Simandou, leading it to conclude that the objective of the State was to expropriate its assets.[75]

119.   Accordingly, on 28 February 2012, BSGR complained about this interference. It wrote to President Condé, raising its many concerns and calling for the President's personal intervention to *"take every possible measure to remove the obstacles"* faced.[76] This request was rebuffed: Mohamed Lamine Fofana, the Minister of Mines, replied on 20 March 2012, and accused BSGR of attempting to *"establish privileged communication links"* by writing directly to the President.[77]

### 2.12   The Technical Committee "investigation"

120.   Instead of assisting the BSGR group, Guinea did the precise opposite: on 26 March 2012 a National Mining Commission ("**NMC**") was established by Presidential decree.[78] The NMC was granted the power to examine *"the extension, renewal, lease and cancellation applications for mining titles on the basis of the provisions of the [2011] Mining Code"*.[79]

121.   This was shortly followed by a further Presidential decree, dated 29 March 2012, dividing the responsibilities of the NMC between two sub-committees[80]:

---

[76] Letter from BSGR to the President of Guinea dated 28 February 2012 (Exhibit C-0048); Exhibit C-0028, para. 71.4; CWS-3, para. 94.6.
[77] Letter from the Minister of Mines Mohamed Fofana to BSGR dated 20 March 2012 (Exhibit C-0049).
[78] Decree No. D/2012/041/PRG/SGG dated 26 March 2012 (Exhibit C-0050).
[79] *Ibid.*, Article 2.
[80] Decree No. D/2012/045/PRG/SGG dated 29 March 2012 (Exhibit C-0051).

(i)     the Strategic Committee, which was given responsibility for political and strategic issues related to the overall review programme for Mining Permits and Conventions;[81] and

(ii)    the Technical Committee, which was described as *"the operational arm of the [NMC] concerning the overall continuation, redevelopment or withdrawal [of mining rights]"*.[82] It was responsible for daily activities related to analyses of Mining Permits and Conventions.

122.    On 11 October 2012, Guinea stated that it would not grant BSGR Guinea a right to export the iron ore originating from Simandou blocks 1 and 2 through Liberia.[83] Guinea gave no justification for the decision, which was a material breach of the Base Convention. In addition, the Feasibility Study had made it clear that the export of ore via Liberia was central to the economic and technical viability of the project.

123.    On 30 October 2012, the Technical Committee wrote to BSGR Guinea (the **"Allegations Letter"**).[84] In that letter, the Technical Committee wrongfully accused the BSGR group of obtaining mining titles by bribery and corruption (but without providing disclosure of any of the evidence relied upon). The Technical Committee wrongfully alleged in particular that (i) BSGR Guinea had failed to co-operate with previous requests for information; (ii) the joint venture with Vale was illegal and (iii) that BSGR Guinea had obtained its mining rights by bribery and corruption.

124.    Each of the allegations made by the Technical Committee was (and is) demonstrably wrong. For the avoidance of doubt, each and every allegation against the Claimants and the BSGR group as recorded on 30 October 2012 is emphatically denied.

---

[81] *Ibid.,* Article 3.1.
[82] *Ibid.,* Article 3.2.
[83] Letter from Ministry of Mines to Ricardo Saad dated 11 October 2012 (Exhibit C-0052).
[84] Letter from the Technical Committee to VBG-VALE BSGR Guinea dated 30 October 2012 (Exhibit C-0053).

125. That letter also outlined a procedure for a "*Program of Review of Mining Titles and Agreements*" which was "*intended to detect any irregularities and make these titles and agreements consistent with the provisions of the Mining Code of 2011*". However, for the reasons explained below, the procedure adopted by the Technical Committee (and by Guinea in general) was both (i) unlawful under Guinean law and/or international law; and (ii) devoid of either procedural and/or substantive fairness. As such, not only was the process of investigation of the spurious allegations against BSGR entirely flawed, the eventual "*recommendations*" made by the Technical Committee itself were unsafe, wrong, and cannot be given any weight.

126. From this stage, the campaign against the BSGR group gathered momentum. The Allegations Letter itself stated that:

> "*The CTRTCM intends to maintain the strict confidentiality of this letter as well as the allegations appearing in it and the procedures that will follow. Nevertheless, any final decision or action by the Government as well as any explication of said decision or action will be made public upon completion. You are hereby requested to respect this confidentiality and avoid any public comments regarding this procedure until its conclusion. Failure to do so will be grounds for the CTRTCM to take any measure deemed appropriate.*"[85]

127. Despite this, on 3 November 2012, Tom Burgis of the Financial Times published an article based on the contents of the Allegations Letter. It was clear that the author had seen the Allegations Letter before it had even been provided to BSGR or to Mahmoud Thiam, who was implicated in the letter.[86]

128. BSGR responded to the Allegations Letter on 26 December 2012.[87] In the following months, BSGR made multiple requests to the Technical Committee for disclosure of the evidence that it purportedly relied upon.[88] It was not until 7 May 2013, over six months after the date of the Allegations Letter, that the

---

[85] *Ibid.*
[86] Dag Cramer Witness Statement, para. 31.3(CWS-7); CWS-5, paras 112-113.
[87] Letter from BSGR to the Technical Committee dated 26 December 2012 (Exhibit C-0054).
[88] CWS-7, paras 31.13-31.14; Exhibit C-0028, para. 79.1.

Technical Committee first provided BSGR with an (obviously incomplete) handful of documents.[89]

### 2.13   **The end game**

129.   The Technical Committee review ran in parallel with a campaign waged by Guinea in the local and international press which sought to prejudice BSGR's case. It also evidenced that the process itself had been pre-judged and that it was directed towards the specific goal of ousting BSGR. This was apparent even prior to the commencement of the review. For example, on 7 February 2012, the Minister of Mines, Mohamed Fofana, stated during the Investing in African Mining Indaba conference in Cape Town that BSGR "*didn't follow the law*" in reaching a deal with Vale.[90] In a letter dated 20 March 2012 to the Claimant, Mr Fofana does not deny having made such statements, nor that he harboured a prejudice against the company:

> "*It is regretful that my words may have thus been interpreted. Indeed, the eventual preoccupations that I may have cannot in any case lead the Ministry to pronounce itself on the validity of the titles and conventions that is outside the review process aforementioned*"[91]

130.   This prejudicial treatment continued and intensified after the Allegations Letter. By way of example:

(i)   In March 2013, Mr Avidan, the President of BSGR, had been declared *persona non grata* in Guinea.  He received no formal notice of this.[92]

(ii)   In April 2013, two BSGR employees in Guinea (Mr Bangoura and Mr Touré) were imprisoned without charge and held in appalling

---

[89] This was obviously not the entirety of the evidence and on 4 June 2013 Skadden Arps again requested that the Technical Committee produce all the evidence on which it relied. This request was ignored until a further six months later, when on 4 December 2013, the Technical Committee disclosed evidence it purported to rely on in support of its allegations, again in incomplete form. This was over one year since the date of the Allegations Letter, and only three working days before a hearing was scheduled to take place.

[90] Bloomberg, *"BSG Role in Guinea's Vale Venture Faces State Review"* dated 8 February 2012 (Exhibit C-0055).

[91] Exhibit C-0049.

[92] CWS-3, paras 102 - 103.

conditions.[93] Mr Bangoura was a security agent and Mr Touré was Director of External Relations. As identified in the evidence that Mr James Libson of Mishcon de Reya gave to the High Court in England, they were subjected to numerous human rights violations committed by Guinea, including the ordeal of being held in prison for seven months without charge (before they were released on bail) during which they were held in appalling conditions.

(iii)   On 14 June 2013, President Alpha Condé was interviewed at Chatham House during a question and answer session entitled "*Guinea in Transition: Reform, Resources and Regional Relations*".[94] In response to a question about declaring BSGR's President, Asher Avidan, a *persona non grata*, Alpha Condé accused BSGR of playing "*a role in some of the political turmoil faced in Guinea at the moment*" and, notwithstanding a hollow reference to remaining "*respectful of the principle of innocent until proven guilty*", commented that "*soon there should be some revelations that will allow more openness into the matter*".

(iv)   On 17 June 2013, in an interview with President Condé for the UK Channel Four News, BSGR was described as Condé's "*bête noire*". President Condé added that "*I don't see how this deal [the granting of rights to BSGR] is of any benefit to Guinea*".[95]

(v)   On 21 October 2013, Tom Burgis of the Financial Times reported that: "*In his clearest statement of intent to date, Mr Condé declared in a speech at the start of October that his government had "started a battle to recover our mines which were acquired fraudulently"*".[96]

---

[93] James Libson Witness Statement in support of BSGR's Judicial Review Application dated 26 November 2014, paras 12-41 (Exhibit C-0056).
[94] Transcript of Chatham House Q&A Session, "*Guinea in Transition: Reform, Resources and Regional Relations*" dated 14 June 2013 (Exhibit C-0057).
[95] Transcript of Channel 4 news broadcast of "*Guinea Corruption and diamonds*" dated 17 June 2013 (Exhibit C-0058).
[96] Financial Times, "*Guinea corruption probe advances but wait for Simandou goes on*" dated 21 October 2013 (Exhibit C-0059).

131.   Against the above background, Guinea's intention to strip the Claimants of their mining and infrastructure rights had become clear. But any lingering doubts were removed by the public views of the President during an interview on 4 November 2013, in which President Condé stated that:

> *"We are currently engaged in an extremely difficult battle, which you are following, since the international press has been publishing it. This is our battle to retrieve our wealth….I'm not fighting to retrieve this wealth for me; I'm fighting to retrieve this wealth for Guinea.*
>
> *Every Guinean patriot should make this his own fight.*
>
> *All people who are willing to fight with me to ensure that the riches of Guinea serve the people of Guinea, are people I'm ready to work with……. This Technical Committee is responsible for the review of the contract and makes proposals. We expect the Technical Commission to make proposals to the committee that I chair. We will make a decision based on the proposition that will be made by the Commission concerning the modules 1 and 2. It is very important that the world realizes that it is a scandal that someone may supposedly pay a few hundred million, and can make up to 5 billion on the back of the Guinean people. I believe that this is now something known worldwide."* [97]

132.   Although not explicitly named, it is plain that the "contract" under review was the Base Convention. The emotive language and the invocation of a patriotic call to arms – that too before having even seen the Technical Committee's recommendations – made it perfectly clear that President Condé (who was in control of the whole process) had already decided that BSGR Guinea's mining rights should be removed.  As he stated: "*We [the committee which he chairs] will make a decision"*.

133.   It should be noted that other mining companies were not subject to the same review process. For example:

(i)      On 22 April 2011, Rio Tinto announced that it and its subsidiary (Simfer) had entered into a "Settlement Agreement" with Guinea which

---

[97] Transcript of interview with Alpha Condé dated 4 November 2013 (Exhibit C-0060).

"*secure[d] Rio Tinto's mining title in Guinea*".[98]   The agreement related to Blocks 3 and 4 of Simandou, in respect of which Rio Tinto maintained prospecting permits.   In return for the "*resolution of all outstanding issues and finalisation of new investment agreement terms*" Simfer had agreed to pay USD 700 million to Guinea. The press announcement stated:

> "*The parties have agreed that the terms of the Settlement Agreement will not be affected by any changes introduced by the Government of Guinea as a result of its current review of the Mining Code or any future reviews.*
>
> *Sam Walsh. Chief executive, Rio Tinto Ore said "Today's agreement gives us the certainty we need to allow us to invest and move forward quickly... "*[99]

(ii)     In other words, Rio Tinto had paid a sum of USD 700 million in return for (a) the promise of a grant of a mining concession; (b) the approval of its joint venture and (c) to extract itself from any "*current review of the Mining Code or any future reviews*".[100]   In addition, the key terms of the Settlement Agreement included the grant to Guinea (at no cost) of a 15% stake in the project, with the right to take up a further 20% stake.[101] Moreover, and despite the clear terms of the Base Convention, and the advice of Minister Sakho, and despite the letter to BSGR which indicated that execution of the Trans-Guinean Railway would be put out to tender, the press announcement stated that a key term of the Settlement Agreement included *"A new rail line through Guinea"* with Simfer acting as a joint venture operator in the venture and with *"priority use"* of the infrastructure and in which the Government was able to hold a maximum 51% stake.

(iii)    Similarly, in or around March 2013 it appears that RusAl agreed to make a payment to Guinea of around USD 832 million which,

---

[98] Rio Tinto Press Release, "*Rio Tinto and Government of Guinea sign new agreement for Simandou iron ore project*" dated 22 April 2011 (Exhibit C-0061).
[99] *Ibid.*
[100] As explained below, Rio Tinto was not the only company that took this course.
[101] Exhibit C-0061.

according to a press report from that time, "*will reassure RusAl about its future both with regards resuming operations at the Friguia refinery and conserving its rights on the part of the giant Dian Dian bauxite deposit*" in a deal which "*brings to mind the $700 million that Rio Tinto laid out in 2011 in an out-of-court settlement with Conakry in order to maintain its rights on Simandou.*"[102]

(iv)  Similarly, it appears that Sable Mining Africa was granted lucrative mining rights by Guinea, including to the right to export through Liberia.[103]

134.  Throughout the process before the Technical Committee, BSGR complained about the lack of due process and apparent prejudice being shown to the company, including by reference to bringing ICSID proceedings. These complaints were not heeded.[104]

**2.14  Expropriation and/or nationalization of the Claimants' investments**

135.  Against that background, it was unsurprising when on 21 March 2014, the Technical Committee recommended to the Strategic Committee that it propose to the Minister of Mines:

(i)  the withdrawal of the Blocks 1 & 2 Permit;

(ii)  the withdrawal of the Zogota Mining Concession; and

(iii)  the cancellation of the Base Convention.[105]

---

[102] Africa Mining Intelligence, "*US RusAl to sign $832 million check for Conakry*" dated 26 March 2013 (Exhibit C-0062).

[103] Sable Mining Africa, "*Focusing on Iron Ore. Sable Mining Report and Accounts*", p.2 (Exhibit C-0063).

[104] CWS-7, para 31.7.

[105] The Technical Committee further recommended that (iv) BSGR Guinea be enjoined to "*communicate to the services of the Ministry of Mines all studies, reports, data, results samples etc. that would have been realised or obtained in the mining operations of VBG in Guinea*"; and (v) BSGR Guinea and members of the BSGR group be excluded "*from the proceedings of reattribution of the titles and agreement subject to this recommendation*"

136.   The Technical Committee made this recommendation on the alleged basis (which is emphatically denied) that BSGR and/or BSGR Guernsey and/or BSGR Guinea had allegedly obtained those rights by corruption and other unlawful means. It stated that:

> "*There is a series of precise and concurring indications that establish with sufficient certainty the existence of corrupt practices tarnishing the granting of mining titles and the mining agreement in question to BSGR; and*
>
> *Such corrupt practices nullify the mining titles and the mining agreement currently held by VBG"[106]*

137.   On 2 April 2014, the Strategic Committee issued its opinion to President Condé and the Minister of Mines and Geology, concurring with the Technical Committee's recommendation.

138.   On 17 April 2014, President Condé issued a Presidential Order terminating the Zogota Mining Concession[107] which stated that "*due to the fraudulent nature of the conditions of its enactment, Decree D/2010…dated March 19, 2010, granting BSG Resources (Guinea) Limited the mining concession for the zone known as Zogota…is revoked.*"

139.   On 18 April 2014, the Minister of Mines and Geology issued a Ministerial Order terminating the Blocks 1 and 2 Permit[108] which stated that "*due to the fraudulent nature of the conditions of its enactment, Ministerial Order….granting to BSGR Guinee Limited the mining exploration permit for Simandou blocks 1 & 2 encompassing a surface area of 369 km$^2$ in the Kerouane Prefecture…is revoked.*"

140.   On 23 April 2014, the Minister of Mines and Geology issued a Ministerial Order terminating the Base Convention which stated that "*as a consequence of*

---

[106] Technical Committee's recommendation concerning the titles and mining agreement held by the company BSGR Guinea dated 21 March 2014, p. 32 (Exhibit C-0064).
[107] Decree D/2014/98/PRG/SGG dated 17 April 2014 (Exhibit C-0065).
[108] Order No. A 2014/1204/MMG/SGG dated 18 April 2014 (Exhibit C-0066).

*Decree D/2014/098/PRG/SGG of April 17, 2014 concerning the revocation of Decree…dated March 19, 2010, granting a mining concession to BSG Resources (Guinea) Limited, the cancellation of the agreement entered into on December 16, 2009, between the Republic of Guinea and the companies BSG Resources (Guinea) Limited and BSG Resources (Guinea) Sarl for mining the Zogota/ N'Zérékoré iron ore deposits is certified."* [109]

141.   On 24 April 2014, the Government of Guinea informed the Claimants of the termination of the Base Convention, the Zogota Mining Concession and the Blocks 1 and 2 Permit, resulting in the expropriation and/or nationalization of their mining and infrastructure rights, without any compensation having been paid or even offered.[110]

142.   These actions of Guinea, which individually and collectively resulted in the unlawful revocation and/or termination of the Claimants' mining and infrastructure rights, including (i) the Zogota Mining Concession, (ii) the Blocks 1 and 2 Permit, and (iii) the Base Convention, will collectively be referred to herein as "**the Measures**".

143.   As a result of the Measures, the Claimants were illegitimately stripped of their investments, including the very significant mining and infrastructure rights which they had lawfully and painstakingly accumulated (as described above). As a further consequence, Guinea removed and deprived BSGR Guinea of all of its relevant assets. This in turn resulted in the permanent and substantial deprivation of the value of BSGR Guernsey's 100% shareholding in BSGR Guinea, and BSGR's shareholding in BSGR Guernsey and its indirect shareholding in BSGR Guinea, and thus the expropriation and/or nationalization of those valuable investments.

144.   Moreover, as a yet further consequence of the Measures, the Government of Guinea illegitimately retained the benefit of the investments made and/or work

---

[109] Order No. A 2014/1206/MMG/SGG dated 23 April 2014 (Exhibit C-0067).
[110] Letter from the Ministry of Mines to VBG-VALE BSGR Guinea dated 24 April 2014 (Exhibit C-0068).

done and/or services performed in Guinea to its benefit, including *inter alia* the Feasibility Studies that had been completed on the Trans-Guinean railway and on Blocks 1 and 2; the works that had been undertaken at Zogota (including building villages and roads for employees, environmental studies and construction of the mines); and the works that had been undertaken on the various railways. Guinea has to date provided no compensation in respect of these valuable investments.

**2.15    The Measures were politically motivated**

145.    The Claimants do not need to provide any explanation for the true motives behind Guinea's conduct in order to succeed in their claims in this arbitration. For example, it is enough that they establish that Guinea has expropriated their rights without providing compensation. They do not need to go on to identify (let alone prove) the reasons as to why Guinea wanted to expropriate those rights.

146.    However, the facts enumerated above demonstrate that there was a determined campaign of harassment waged by Guinea against the BSGR group; and that, contrary to the impression which Guinea sought to give, this campaign had nothing to do with the merits of the investments made by the Claimants or their conduct. What has now emerged is a substantial body of evidence which indicates that there was, in fact, an ulterior motive behind this campaign and the imposition of the Measures. This motive illuminates Guinea's conduct and clearly demonstrates that its complaints about the BSGR group were a mere fig leaf to distract from the true purpose behind the campaign which resulted in the Measures.

147.    The true explanation for Guinea's actions is that the mining and infrastructure rights which were validly held by the Claimants, and of which they were stripped in April 2014, had been promised by President Condé before his election, to other outside interests. Those interests fulfilled their side of the illicit bargain by assisting President Condé in coming to power.  Once he was

in power, he fulfilled his side of the bargain by stripping the BSGR group of its rights.

148.    The evidence is set out in full in the statement Dag Cramer made to the English High Court in respect of BSGR's judicial review application (the "Cramer Judicial Review statement").[111]   In summary, the available evidence suggests that, unbeknown to BSGR, in early 2010, the then Presidential candidate Alpha Condé entered into a series of secret and unlawful agreements pursuant to which he would be provided with funds and logistical support to rig the upcoming election, in exchange for providing those supports with rights in the country's mines, including Simandou.

149.    More specifically, the evidence strongly indicates that the election was rigged, resulting in a huge swing in Alpha Condé's favour from 18% of the vote in the first round of the election to 52% in the second round, securing victory. Funds were transferred to Alpha Condé by way of a recorded loan of USD 25million and further unrecorded transfers believed to be *"much much more"* to support this process.[112]

150.    In light of this, President Condé attempted to reward his backers. For example, he entered into an agreement known as the Palladino Contract, pursuant to which the provider of a USD 25million loan in funding for his election was put in a position where it could become entitled to a 30% share in the assets of SOGUIPAMI, the state mining company.[113]   Similarly, he promised Sable Mining Africa valuable mining concessions in return for providing logistical and financial assistance during the election. Accordingly, it was necessary for President Condé to nationalise or expropriate assets to fulfil these illicit deals. The actions taken against the BSGR group must be viewed against this background.

---

[111] Exhibit C-0028.
[112] Exhibit C-0048, p.6.
[113] Exhibit C-0028, paras 19.2 and 54-58.

151.    Moreover, the treatment of BSGR by Guinea contrasted strikingly with the treatment of (i) Rio Tinto, which in return for a payment of USD 700 million to Guinea and the granting of a 15% stake in its mines was excused from the entire review process;[114] (ii) RusAl, which similarly agreed to make a payment to Guinea of USD 836 million;[115] and (iii) Sable Mining Africa, which was granted lucrative mining rights by Guinea, including the right to export through Liberia.[116]

152.    This difference in treatment has raised suspicions that the deal with Sable Mining Africa was a cover to reward it for financial and logistical assistance provided to President Condé during his election campaign and to Sable's director, Aboubacar Sampil, who is implicated in the rigging of the election and remains a close associate of President Condé's son. That the three companies were treated so differently from the BSGR group – which refused to make a payment to President Condé – is a further indication of the political motivation behind the prejudicial review of the BSGR group's rights.[117] Thus, far from obtaining its rights by bribery and corruption, as alleged, it was BSGR's *refusal* to pay a bribe which ultimately led to the revocation of its rights.

153.    Furthermore, President Condé enlisted help from overseas supporters in order to cause BSGR maximum harm and prejudice. This extended to placing pressure upon the BSGR's UK PR advisors to terminate BSGR's retainer and the making and spreading of allegations that BSGR had repeatedly attempted to organise a coup d'état in Guinea.[118] This has also led to the questioning without foundation of unconnected businessmen in Guinea and the US about their links with BSGR, purely on the basis that they share the same nationality as Mr Steinmetz.[119]

---

[114] Exhibit C-0061.
[115] Exhibit C-0062.
[116] Exhibit C-0063, p.2.
[117] Exhibit C-0028, para. 19.4.
[118] *Ibid.*, paras 86-87.
[119] CWS-3, paras 104-105.

154.    In summary, the withdrawal of the Claimants' mining and infrastructure rights was a political process orchestrated by President Condé for his own interests.

## III.    THE CLAIMANTS' CLAIMS

### 3.1    Summary

155.    In summary, notwithstanding (i) Guinea's entry into the Base Convention; (ii) the grant of the Zogota Mining Concession; (iii) the issue of the Blocks 1 and 2 Permit; (iv) Guinea's confirmation by words and/or conduct of the validity of the investments in Zogota and in Blocks 1 and 2; and (v) the massive and highly successful investments the Claimants held and/or had made over the course of a number of years, Guinea unlawfully and without justification expropriated and/or nationalised the valuable investments that were held and/or had been made to date. It did so in a discriminatory fashion and without provision of any compensation. Put bluntly, the unjustified withdrawal and/or revocation of the Claimants' valuable investments including the mining and associated rights held by them was a patently political process orchestrated by President Condé for his own interests.

156.    This conduct gives rise to liability as a matter of both Guinean and international law, as explained below.  Specifically, Guinea's acts and omissions constituted breaches of the obligations it owed to the Claimants including under:

(i)        Articles 4(ii), 7, 8, 14.2(a), 22.1 (including sub-articles (a)-(l)), 29, 31, 32 and 36.2 of the Base Convention;

(ii)       Articles 5, 6 and/or 30 of the Investment Code;

(iii)      Articles 11, 21, 22, 26, 41 and/or 43 of the Mining Code;

(iv)      Articles 7.1, 7.2.2, 7.2.7 and 7.2.12 of the BOT Act; and

(v)    international law.

157.    Before addressing the breaches of Guinean and/or international law on which the Claimants rely, we identify below the nature of the mining rights and the infrastructure rights held by the Claimants and of which they were stripped as a result of the Measures.

**3.2    Mining Rights**

158.    By virtue of the operation of inter alia (i) the Mining Code, (ii) the Base Convention and (iii) the Zogota Mining Concession, the Claimants were granted and entitled to exercise a bundle of highly valuable contractual and proprietary rights.  Thus, a proper analysis of the nature and extent of these mining rights requires close scrutiny of both the Base Convention and the Mining Code in particular.

3.2.1    The Mining Code

159.    The Mining Code was in operation in Guinea at the material time at which the mining rights in questions were obtained.  The Mining Code addressed all aspects of reconnaissance, prospecting, operation, possession, holding, circulation, trade and transformation of mineral substances in Guinea, including iron ore.[120]

160.    The starting position under the Mining Code was that all minerals in its territory (whether on the surface or below ground) belonged to the State: see Article 3.  That provision went on to state:

> *"However, holders of operating titles acquire owner-ship of the substances they extract. The rights to extract substances are a particular form of property, distinct from rights to the surface." (emphasis added)*

---

[120] Exhibit CL-0001, Article 2.

161.   Title I to the Mining Code comprised Chapters I to VII.   Chapter IV
(containing Articles 8-11) set out who had the right to operate mines. Pursuant
to Article 8 of the Mining Code:

(i)    Any natural or legal person (including foreign natural or legal persons)
possessing the technical and financial capacity to do prospecting work
was entitled to apply for a reconnaissance licence or prospecting permit,
and to undertake those activities in accordance with the conditions set
out in the Mining Code.

(ii)   Mining substances could be "developed" (i.e. operated and/or exploited)
by (a) any natural or legal person constituted as a public or private
corporation under Guinean law (with sufficient technical and financial
capacity) or (b) any natural or legal person possessing Guinean
nationality. Thus, mining operation permits and mining concessions
could be granted to those persons.

162.   By virtue of Article 10, the right to carry out "*mining...operations*" could only
be acquired under a "*mining title*". Chapter V (Articles 12-14) then identified
the conditions for obtaining such a "*mining title*", which was defined in Article
1(20) as "*titles granting rights to search, prospect or operate/exploit mining
substances...*" Chapter VI set out certain obligations pertaining to those parties
that carried out mine operations; and Chapter VII provided those parties with
certain "General guarantees" including, by Article 21, certain "Fundamental
Freedoms" and a promise of non-discrimination in Article 22.

163.   Title II of the Mining Code identified the various mining titles available under
Guinean law. These were:

(i)    A reconnaissance licence – these conferred on the holder the right to
search for one or several mining substances.   This licence could be
issued for a maximum of 3 months.

(ii)    A prospecting permit – this conferred on the holder the exclusive right to "prospect" i.e. search for mining substances.  A prospecting permit could be issued for a maximum of 2 or 3 years (depending on whether the prospecting permit was industrial-scale or semi-industrial scale) and renewed twice.  The aim of a prospecting permit is to allow the holder to explore an area in the hope of discovering a commercially viable deposit. During the time when a prospecting permit is in force only its holder has the right to an operating permit or mining concession for the deposits found within the prospecting site.

(iii)    An operating permit – this conferred on the holder the right to search, prospect develop and freely dispose of the mineral substances for which they were issued.  An operating permit could be issued for a maximum of 5 or 10 years (depending on whether it applied to industrial or semi-industrial permit) and could be renewed for several 5-year periods.

(iv)    A mining concession – this conferred on the holder the exclusive right to carry out all kinds of prospecting and development of deposits of mining substances for which the concession is granted within the limits of its perimeter and without limits of depth.

164.    The two mining titles at issue in this case are a prospecting permit and a mining concession.

165.    Thus, the Blocks 1 and 2 Permit granted BSGR Guinea the exclusive right to search for mining substances in that area and the right to an operating permit or mining concession for the deposits found within the prospecting site.

166.    BSGR Guinea also held a mining concession in respect of the Zogota deposit. Under the Mining Code, a concession could be issued for a maximum of 25 years and could be renewed one or more times for a maximum period of 10 years each. A concession was issued where one or more commercially viable

deposits have been discovered upon evidence duly constituted by a feasibility study, and for which "operations require sizeable works and investments".[121]

167.   In other words, if commercially viable deposits have been proven in an area, the holder of a prospecting permit could apply for a mining concession to develop that deposit.

168.    More specifically, as regards a mining concession, Article 41 provided:

> *"Rights conferred*
>
> *Concession confers on its holder the exclusive right to carry out all kinds of prospecting and operating of deposits of mining substances for which the concession is granted, within the limits of its perimeter, and without limits of depth.*
>
> *Concessions may only be granted where one or more deposits are discovered upon evidence duly constituted by a feasibility study, and for which operations require sizable works and investments.*
>
> *Concessions are immoveable, divisible, assignable rights which can be pledged to secure the loan of operating funds."*

169.   Article 42 explained that "*granting of a concession cancels any prospecting or operating permit previously issued to the holder for the area defined in the concessions.*"

170.   The Mining Code expressly provided that the right to extract substances pursuant to an operating title (such as an operating permit or mining concession) was, as a matter of Guinean law, a species of property.

3.2.2   The Base Convention

171.   Turning to the Base Convention, Article 11 of the Mining Code explained how the Mining Code was intended to interact with the Base Convention. It provided:

---

[121] CL-0001, Article 41.

> *"Industrial mining operation permits and mining concessions are issued in conjunction with mining agreements, set out in standard form by decree.*
>
> *Mining agreements define the rights and obligations of the respective parties and set out the legal, financial, tax, and social conditions which govern operation for the duration of the agreement.*
>
> *They constitute a guarantee to the mine title holder that these conditions will remain unvaried.*
>
> *In cases where the State is party to one or more mining or quarrying operations with third parties, the nature and terms of the State's participation are expressly defined in advance in the mining agreement which accompanies the…mining concession.*
>
> *Mining agreements signed by the Minister of Mines and prospective title holders or their authorised representatives are executory and bind the parties after being approved by decree in the case of operation permits or after ratification in the case of concessions. Once in effect mining agreements can only be amended by written agreement of the parties, and the amendments take effect only when the above procedural steps have been followed."*

172.    The purpose of the Base Convention was identified in Article 4 thereof:

> *"In accordance with Article 11 of the Mining Code, the purpose of this Agreement is to define the rights and obligations of the Parties and the general economic, legal, administrative, financial, fiscal, customs and excise, mining, environmental, social, transport and shipping conditions according to which the Parties undertake to carry out the Project for working the iron deposits at Zogota in the N'Zérékoré prefecture~·.*
>
> *To this end it consists of:*
>
> *(i) For BSG Resources to design, finance, develop and operate an iron ore mine within the area of the Concession; transportation of the iron ore by railway over Guinean and Liberian territory; shipping the ore from the port of Buchanan in Liberia.*
>
> *(ii) For the Government, to grant the facilities and guarantees that it agrees to subscribe for BSG Resources to facilitate carrying out the Project (mine, accessories and subsidiaries, and the railway lines).*
>
> *(iii) For the Parties, to define the consequences of possible non-*

61

*compliance with their respective undertakings under the terms of this Agreement."*

173. By virtue of Article 5, the applicable law of the contract was the "*Applicable Laws of the Republic of Guinea*" which meant "*…the Mining Code and other laws, regulations and degrees, and any other legislative instrument of Guinean law, including rules, regulations, resolution or other directives or standards that require compliance, published officially, having the force of law, and in effect at the time of their application*". The "Mining Code" referred to herein was expressly defined as "*the act ratified by Law L/95/036/CTRN of 30 June 1995 representing the Mining Code of the Republic of Guinea including any amendment, modification, supplement or extension hereof as well as any related application decree*".

174. Article 8 provided that the Mining Concession "*granted under Order No. [*note: not specified*] shall be executed in accordance with the provisions of the Mining Code and this Agreement."* The "Mining Concession" was defined in clause 1 as:

> " "Mining Concession": refers to a mining concession granted to the company by the Government in virtue of the effective Mining Code and the conditions stipulated by the present agreement related to the area covered by the Mining Concession."

175. The Base Convention imposed certain positive obligations upon BSGR Guinea and/or BSGR Guernsey. In particular, they were required to construct a mine at Zogota and commence the commercial operation by 31 May 2012.[122] Pursuant to Article 15.3 the commercial operation was deemed to commence when the level of stocks at the mine and the port of Buchanan allowed for the export of 25,000 tons of iron ore for a consecutive period of 30 days. In addition, and this will be dealt with under a separate section, the Base Convention required BSGR Guinea and/or BSGR Guernsey to construct a wide range of development infrastructures. Finally, they were also required to submit a Feasibility Study in respect of Blocks 1 and 2 within 24 months of the date of

---

[122] Article 15.1 and 15.2 of the Base Convention dated 16 December 2009 (Exhibit C-0069).

signature of the Base Convention. The conclusions and terms of the Feasibility Study would facilitate the negotiations for the grant of a mining concession over Blocks 1 and 2.[123]

176.   The Base Convention also granted a number of wide-ranging and important rights. In particular, by virtue of Article 22.1(a) to Article 22.1(l) of the Base Convention:

(i)   the exclusive right to carry out the Mining Operations (as referred to and defined in the Base Convention);

(ii)   the right to freely arrange its assets and to organize the businesses as it sees fit;

(iii)   the freedom to recruit and dismiss, in accordance with current legislation in the Republic of Guinea;

(iv)   the free circulation in the Republic of Guinea of its staff, assets and products;

(v)   the right to unrestricted importation of goods and services, including insurance and the funds required for the Mining Operations;

(vi)   the freedom to export and to sell the Mining Produce from the Concession (as referred to and defined in the Base Convention) on the international and/or domestic market;

(vii)   the right to transport or have transported the Mining Produce to a storage, processing or loading location;

(viii)   the right to benefit from any agreement entered into between the Government and other Governments to facilitate the transport of the

---

[123] *Ibid.,* Article 10(2).

Mining Produce over the territory of these Governments;

(ix) the freedom to set up in Guinea processing plants and iron ore processing;

(x) the right to acquire, use and operate any means of communication, and type of aircraft or other means of transport as well as the auxiliary facilities or equipment required for the Mining Operations;

(xi) the freedom to carry out large-scale sampling and attempts at processing the Mining Produce from the Concession in order to determine the mining potential; and

(xii) the freedom to take, take out and export reasonable quantities, specimens or samples as part of the Prospecting Activities (as referred to and defined in the Base Convention).

177. Furthermore, the circumstances in which the rights granted under the Base Convention and/or the Zogota Mining Concession could be terminated or impinged upon were limited in a number of important respects.

178. First, by virtue of Article 31 of the Base Convention, Guinea was obliged in the event of an expropriation or nationalization of BSGR Guinea or any part of its assets to pay fair and equitable compensation based on the market value of the Mining Operations (i.e. all the operations and work carried out as part of Mining Work, including Prospecting Activities) at the date of the expropriation or nationalization.   Put simply, it could not simply seek to strip BSGR Guinea of its assets (or expropriate that company itself) without paying appropriate compensation.

179. Secondly, under Article 32 (first paragraph), Guinea warranted the stabilization of Current Legislation (i.e. all the valid legislative and regulatory texts of the Republic of Guinea) and of all provisions stipulated in the Base Convention, as from the date of the grant of the Concession and throughout its full duration.

Thus, this reinforced the promise and guarantee provided by Article 11 of the Mining Code, viz. that the Base Convention constituted "*a guarantee to the mine title holder that these conditions will remain unvaried.*"   In other words, Guinea promised that it would not change the rules of the game mid-way through the investment.

180.   Thirdly, the Base Convention contained a most-favoured-nation provision. Pursuant to Article 32 (fourth paragraph), Guinea promised that BSGR Guinea and/or BSGR Guernsey "*shall benefit from any more favourable Article granted in respect of the provisions of* this *Agreement that will be included in a mining agreement concluded at a later date with another mining company carrying out similar* activities.*"*

181.   Fourthly, the circumstances in which a contractual termination could take place were themselves limited. Clause 26.2 addressed "Cancellation" of the Base Convention. It provided as follows:

> *"The Government, in accordance with the Mining Code, can cancel the Company's Concession, which involves termination of this Agreement.*
>
> *Apart from the situations stated in the Mining Code, the Concession can be terminated if the Company refuses to carry out a final decision in arbitration in accordance with clause 38 of this Agreement."*

182.   Thus, there was (save in one limited respect) no independent contractual basis on which the Base Convention and/or the Zogota Mining Concession could be terminated above and beyond the provisions of the Mining Code. Save in that one (irrelevant) respect, it was to the Mining Code – and only to the Mining Code - that Guinea was entitled to look in order to effect a valid termination of the Base Convention and/or the Zogota Mining Concession.

183.   Article 60 of the Mining Code addressed "*revocation*" of a mining title, and itself provided a limited and exhaustive number of grounds on which the

issuing authority was entitled to exercise its discretion to revoke a mining title. Article 60 provided as follows:

> "Mining titles constituted under this Code may be revoked by the issuing authority for one of the following grounds:
>
> ● when the prospecting, operation or development period is suspended for more than six months in the case of explorations, and more than eighteen (18) months for operations, or severely restricted without legitimate grounds and in such a way as to be detrimental to the public interest;
>
> ● when the feasibility study shows the existence of an economically and commercially operable deposit with- in the perimeter set out in a prospecting permit but no development follows within for up to thirty-six (36) months;
>
> ● for violation of one of the provisions of this Code;
>
> ● mining or expenses of the title holder are less over a total of two consecutive years than the whole of the minimum program for works or the minimum amount of expenses forecast for such period by the mining title or documents of reference of the concession, except in cases of justifiable force majeure, providing they do not exceed eighteen (18) months.
>
> ● failure by the holder to keep registers of extraction, sales and shipping in a regular fashion and in accordance with standards established by the prevailing regulations, or refusal to produce such registers to the qualified agents of the Direction Nationale de Mines;
>
> ● failure to pay taxes or duties;
>
> ● prospecting or development activities carried out outside the perimeter of the mining title or for substances not designated therein; development undertaken with a prospecting permit;
>
> ● loss of financial guarantees or loss of technical capacity which constituted performance warranty by the holder;
>
> ● assignment, transfer or sub-leasing of mining rights without prior authorization as prescribed in article 62 below.
>
> ● Revocation cannot occur unless the Minister of Mines has sent a notice giving a delay which cannot be less than:
>
> ● two months for prospecting permits,
>
> ● three months for operating permits and concessions."

184.    At no material time were any of the Claimants ever in breach of any of the aforementioned (and limited) grounds on which revocation could potentially be ordered. Nor, importantly, did Guinea even purport to assert that the Claimants were so in breach; nor did Guinea ever seek to justify the Measures on the basis of an alleged right of revocation under Article 60 of the Mining Code or Clause 26.2 of the Base Convention.   We explore this in some detail below.

### 3.2.3   The new 2011 Mining Code

185.    As a matter of Guinean law, it is clear that the 2011 Mining Code did not and could not have any legitimate application whatsoever to either (i) the Base Convention; (ii) the Zogota Mining Concession or (iii) the Blocks 1 and 2 Permit (or any other rights held under any of those various instruments).

186.    This is made clear in Article 217 (Transitional Provisions) of the 2011 Mining Code itself. More specifically, Article 217-I provides that "*This Code* does *not affect the ownership and validity of mining titles existing before its adoption.*"

187.    That Code goes on to explain that it applies "*in full to the holders of Mining Titles and Authorizations which have not yet been the subject of a Mining Agreement.*" As regards mining concessions granted prior to the entry into force of the 2011 Mining Code, however, Article 217-I provides that:

> "*With regard to the holders of Mining Concessions signed in strict compliance with mining legislation in force at the time of signing, the provisions of this Code will be applied through amendments to the existing Agreement, in the form of supplementary clauses, which will not be valid and will not enter into force until after having been approved by the Council of Ministers, signed by the Minister responsible for Mines, been the subject of a legal opinion of the Supreme Court and ratified by the National Assembly.*

188.    Article 217-I provides that those amendments (which relate to three broad areas identified in the Article) "*shall be applicable from the date of ratification of the amendments to the basic Mining Agreement, for all Mining Activities*

*subsequent to this date. Until the date on which each amendment is ratified, the terms of the original Mining Agreement will apply."*

189.    Article 217-I also explained that such amendments would be agreed by a process of negotiation with titleholders:

> *"Negotiations between the Government and the titleholders of the aforementioned Mining Concessions will be undertaken as part of a comprehensive program for the review of Mining Concessions and Titles, initiated by the Technical Committee and a Strategic Committee, both of which were created by regulation. Existing mining rights and associated obligations of the State will be taken into account, as well as the particular circumstances surrounding the grant of each Mining Title, and any other relevant details, attributes or context necessary to guarantee the feasibility of the projects and the longevity of mining."*

190.    It provided a timeline for those anticipated negotiations:

> *"The mining companies concerned must fully cooperate with the review program in order to obtain, no longer than 24 months after the publication of this amended Code, amendments accepted and signed by all Parties. This deadline does not take into account the additional period necessary for the National Assembly to complete the ratification procedure of the negotiated supplementary clauses."*

191.    However, it also envisaged the possibility that the amendments could not be agreed between a concessionaire/permit holder and the State:

> *"At the end of the 24 month period, if no supplementary clause has been signed by the holder of a Mining Agreement, the Parties will meet to evaluate the points they agree and disagree on, and to produce, in as short a time as possible, mutually accepted supplementary clauses, adapted to the economic terms of the project or mining operation."*

192.    Thus, it was clear that, unless and until the procedure outlined in Article 217-I had been satisfied, including in particular (a) the negotiation of amendments to the relevant agreements; (b) the agreement of the terms as between the parties; and (c) the four-step constitutional processes outlined in Article 217-I had been completed (namely, approval by the Council of Ministers, signature by the

Minister responsible for Mines, a legal opinion from the Supreme Court, and ratification by the National Assembly), the provisions of the 2011 Mining Code had no application to any prior Mining Concession or Mining Agreement entered into before 9 September 2011.

193.    In this case, no amendment was made to the Base Convention or to the Zogota Mining Concession.[124]  In short, by its own terms the 2011 Mining Code had no application to the Base Convention or to the Zogota Mining Concession.

3.2.4   Conclusions

194.    In summary, by virtue of the express provisions of Guinean law discussed above, the nature, extent and duration of the rights held under the Base Convention, the Zogota Mining Concession and the Blocks 1 and 2 Permit was to be determined by the operation of the 1995 Mining Code, the Base Convention and the Zogota Mining Concession in particular; and not by the 2011 Mining Code.

195.    Moreover, the Claimants had a legitimate expectation that those valuable rights would be treated in accordance with and by reference to that contract and the legislation which was in force at the time it obtained those rights. Guinea not only promised to respect this expectation by virtue of, *inter alia*, Article 32 of the Base Convention but also more generally by Article 30 of the Investment Code, which provided in relevant part that:

> *"No law or regulation taking effect after the date of execution of the investment may restrict the guarantees referred to in the book 1 of this code regarding said investment. Similarly, no law or regulation taking effect after the effective date of approval may reduce or eliminate the benefits or impede the exercise of the rights that have been granted to the company and its investors."*

### 3.3 Infrastructure Rights

196. By virtue of the operation of the Base Convention, each of the Claimants were, pursuant to the BOT Act, granted and entitled to exercise a bundle of infrastructure rights. Thus, a proper analysis of the nature and extent of the Claimants' infrastructure rights requires close scrutiny of both the Base Convention and the BOT Act.[125]

### 3.3.1 The BOT Act

197. The BOT Act was the relevant legislation operative in Guinea at the material time at which the Claimants obtained their infrastructure rights.  The BOT Act addresses aspects of the financing, construction, operation, maintenance and transfer of development infrastructure projects, including mining infrastructures and transport infrastructures, such as railways and ports.

198. Article 1.1 of the BOT Act defines a " *BOT agreement*" as follows:

> "*Any operation of financing, construction, operation, maintenance, and potentially transfer of ownership of development infrastructures by the private sector, in all its different variants, as indicated in Article 1.4 below*".

199. Article 1.2 provides the following definition of "*development infrastructures by the private sector*":

> "*Any infrastructure and development project normally financed and operated by the public sector, but which will be now fully or partially undertaken by the private sector, including but not limited to the hydroelectric infrastructures such as dams and plants, mining infrastructures, transport infrastructures such as roads, ports, railways and airports, power installations, telecommunications installations, agricultural infrastructures and developments, public buildings, tourist projects, education and health projects, IT networks and free zones. This type of project must be undertaken under the contractual provisions defined hereunder, and in accordance with any successive modifications*

---

[125] Act L/97/012/AN on the Financing, Construction, Exploitation, Maintenance and Transfer of Development Infrastructures by the Private Sector dated 1 June 1998 (Exhibit CL-0002).

*approved by the President of the Republic of Guinea*" (emphasis added).

200. Articles 1.3 to 1.11 of the BOT Act then lists a number of variants and contractual arrangements under which development infrastructures may be financed, constructed, operated, maintained and potentially transferred. For the purpose of the present case, Article 1.3 and 1.4 are the most relevant ones, providing respectively:

(i) *"Build-Operate-Transfer" (BOT): An agreement through which an investor takes on the financing and construction of a given infrastructure or development project, and its operation and maintenance. The investor operates the infrastructure over a determined period during which it is authorized to receive fees, charges and miscellaneous costs from the user under user tariffs not exceeding the levels indicated in its bid or negotiated and included in the contract, to enable the investor to recover its investment and its costs of operation and maintenance of the project, including its profit margin. At the end of the initial predetermined period, which must not exceed the duration defined in Article 12 below, the investor transfers the infrastructure to the State, in its entirety and free of charge".*

(ii) *"Build-and-Transfer" (BT): an agreement through which an investor takes on the financing and construction of a given infrastructure or development project, and after its completion transfers it to the State, in exchange for reimbursement of the investment cost plus a reasonable profit margin, in accordance with a pre-established financing plan approved by the parties. This type of contract may be applied to any infrastructure construction or development project operation, including structures which, for strategic or security reasons, must be operated directly by the State or any entity designated by it".*

201. Article 1.13 of the BOT Act defines an "*investor*" as:

"*one or more legal entities, Guinean or foreign, concession holders of one or more structures belonging to a complex that they have constructed or rehabilitated at their cost in accordance with the terms of a BOT Agreement signed with the State*".

3.3.2   The Base Convention as a qualifying development infrastructure project

202. By virtue of the nature and duration of the rights granted to and obligations imposed by the Base Convention, (i) the Base Convention constitutes a "BOT agreement", (ii) the Claimants qualify as "investors" and (iii) the commitments undertaken in relation to the construction, reconstruction and rehabilitation of several railways and ports qualify as "development infrastructures".

203. The purpose of the Base Convention, *viz.* to set out the infrastructure arrangements, was set out at the very beginning of the agreement. The preamble provides that:

> *"Whereas in this framework the Republic of Guinea has informed the mining investors of [...] the principle that the mining infrastructures (railway and port) located on the national territory belong to the Government as well as any new mining infrastructure that would be implemented;*
>
> *[...] Whereas BSG Resources wishes to develop the areas at its disposal through the design, financing, development and construction in Guinea of a complex consisting of an iron ore mine and its dependencies (plants, storage areas, power stations, lodgings etc) and of a railway, with a nominal production capacity of 30 million ton a year of iron ore".*

204. Article 10(1) of the Base Convention detailed the development infrastructures that had agreed to construct in relation to the Zogota operation:

> *"The Company shall develop:*
>
> a) *An open cast iron ore mine at Zogota in the prefecture of N'Zérékoré;*
> b) *An industrial area at Zogota that shall include:*
> - *Storage and loading areas,*
> - *Workshops,*
> - *A railway line in Guinea 102 km long,*
> - *A railway depot,*
> - *Facilities and equipment,*
> - *Electrical power station with output of ..... MW,*
> - *Offices,*
> - *A water treatment station,*
> - *A residential area;*
> - *A hospital for employees.*
> c) *A port area in Buchanan, Republic of Liberia, which shall include:*

> - *Storage and loading areas,*
> - *Workshops,*
> - *Offices,*
> - *A residential area.*
> d) *The Conakry-Kankan railway*"

205.   Article 10(2) of the Base Convention detailed the development infrastructures that had been agreed to construct in relation to the operations in and around Blocks 1 and 2:

> "*The Company will develop in this phase:*
>
> - *Two iron ore mines,*
> - *Industrial facilities and equipment,*
> - *Suitable railway infrastructure required for removing the iron ore.*
> - *A residential area at Kerouane,*
> - *Extension of equipment and installations to the port of Buchanan*".

206.   Article 11 of the Base Convention provided the amounts of money that were required to invest in constructing the infrastructure in and around Zogota:

> "*The Company undertakes to invest as part of this Agreement the sum of USD 2,542,000,000 to carry out the project, broken down as follows:*
>
> *Mines: USD 243,000,000*
> *Industrial facilities and equipment: USD 496,000,000*
> *Residential areas and hospital: USD 71,000,000*
> *Railway and rolling stock: USD 845,000,000*
> *Port: USD 463,000,000*
> *Contingency (20%): USD 424,000,000*"

207.   Article 12 of the Base Convention imposed the obligation to construct the Trans-Guinean railway and invest USD 1 billion in it:

> "*The Company undertakes to rebuild this railway and will submit the feasibility study to the Government for approval. The cost of this reconstruction is budgeted at USD 1billion (1,000,000,000) plus 20% for contingencies.*
>
> *The Company undertakes to build 50% of this railway during the first phase of the project.*

73

*The Government undertakes to grant a full exemption from duties, taxes and fees on all the goods, materials, equipment and services required for creating this infrastructure."*

208.   Article 14.2 (a) of the Base Convention required the Republic of Guinea to provide BSGR Guinea with the authorisations required to construct a railway as to allow the exportation of the iron ore.

209.   Article 16.1.1 of the Base Convention set out the ownership structure of the Sanniquellie railway and the payment obligations:

> *"It is expressly agreed that the Government shall be the owner of the railway irrespective of its method of financing. The railway line of 102 km that will be constructed in Guinean territory outside of the Concession Perimeter shall be subject to a usage fee.*
>
> *The Company shall carry out the surveys, finance and construct the railway line and provide for its operation and maintenance. The Company shall allocate the agreed fees for use of the railway as a repayment for the investment it will have made.*
>
> *After complete repayment of the loans, the Company shall continue to provide maintenance of the railway and shall pay the Government fees for use of the railway. These fees shall be fixed according to the same principles as those used in similar infrastructure used under the same conditions in the Republic of Guinea"*

210.   Article 16.2.1 of the Base Convention stipulated the development and maintenance of the other infrastructures:

> *"Subject to compliance with the Applicable Law, the Company can build, use, improve and maintain any infrastructure, including roads, bridges, airfields, port or rail installations, and transport-related installations, as well as electrical power stations, telephone and other communications lines, pipelines, water pipes or other networks or installations necessary for the Mining Operations.*
>
> *At the Company's request, the Government and the Company must analyse such infrastructure or other requirements related to the Mining Operations, including but not limited to energy and transportation requirements with a view to entering into a fair agreement for the sharing of costs and profits from such infrastructure."*

211.   The arrangements in relation to the Sanniquelie railway constituted a classic Build-Operate-Transfer agreement: requiring the construction, finance, operation and maintenance of the railway and to pay a usage fee. Until the Claimants had recouped their investment in the railway, they were allowed to set-off the investment against the usage fee. Once the investment was recouped, the Claimants were required to pay the usage fee to the Republic of Guinea. It was the parties' understanding to put the same mechanism in place in relation to the other development infrastructures that were to be constructed and financed.

212.   The arrangements in relation to the Trans-Guinean railway were different in the sense that there was agreement to finance and construct the railway but not to operate and maintain it. Once the construction would be completed, there would be an immediate transfer of the railway to the Republic of Guinea. The Trans-Guinean railway arrangement therefore constituted a "Build-Transfer" agreement be it that Guinea was not required, contrary to what is provided in the classic definition of a classic Build-Transfer agreement, to reimburse the Claimants' investment cost.

**3.4**     **Breaches of the Base Convention**

3.4.1   Protections offered by the Base Convention

213.   The Base Convention provided BSGR Guernsey and BSGR Guinea individually and/or collectively with a number of important protections, including in particular those identified below.

214.   By virtue of Article 4(ii), Guinea undertook to grant BSGR Guernsey and BSGR Guinea facilities and guarantees to facilitate the carrying out of the Project (as defined in the Base Convention), including the construction of the mines and the railways.

215.   By virtue of Article 7, Guinea undertook to comply with the terms and conditions of the Base Convention and to act in good faith in the fulfilment of its obligations thereunder throughout the period of the agreement.

216.   By virtue of Article 8, Guinea undertook to execute the Zogota Mining Concession in accordance with the provisions of the Mining Code and the Base Convention.

217.   By virtue of Article 14.2(a), Guinea undertook to provide BSGR Guinea with the authorisation required to construct the railway to export the iron ore.

218.   By virtue of Article 22.1, Guinea promised that BSGR Guinea and/or (on a proper construction and as relevant) BSGR Guernsey would enjoy the rights conferred upon them under (i) the Base Convention; (ii) the Mining Code and (iii) the Mining Concession.

219.   By virtue of Article 22.1(a) to Article 22.1(l), Guinea was obliged to protect the following rights (*inter alia*) of BSGR Guinea and/or (on a proper construction and as relevant) BSGR Guernsey:

(i)     the exclusive right to carry out the Mining Operations (as defined in the Base Convention);

(ii)    the right to freely arrange its assets and to organize the businesses as it sees fit;

(iii)   the freedom to recruit and dismiss, in accordance with current legislation in the Republic of Guinea;

(iv)    the free circulation in the Republic of Guinea of its staff, assets and products;

(v)     the right to unrestricted importation of goods and services, including insurance and the funds required for the Mining Operations;

(vi)    the freedom to export and to sell the Mining Produce from the Concession (as defined in the Base Convention) on the international and/or domestic market;

(vii)    the right to transport or have transported the Mining Produce to a storage, processing or loading location;

(viii)    the right to benefit from any agreement entered into between the Government and other Governments to facilitate the transport of the Mining Produce over the territory of these Governments;

(ix)    the freedom to set up in Guinea processing plants and iron ore processing;

(x)    the right to acquire, use and operate any means of communication, and type of aircraft or other means of transport as well as the auxiliary facilities or equipment required for the Mining Operations;

(xi)    the freedom to carry out large-scale sampling and attempts at processing the Mining Produce from the Concession in order to determine the mining potential; and

(xii)    the freedom to take, take out and export reasonable quantities, specimens or samples as part of the Prospecting Activities (as defined in the Base Convention).

220.    By virtue of Article 29, Guinea gave a number of warranties to BSGR Guinea and/or (on a proper construction and as relevant) BSGR Guernsey, including *inter alia* that:

(i)    pursuant to paragraph c), prior to signature the Government satisfied itself that BSGR Guinea had all qualifications necessary under the Mining Code and that there was nothing to prevent the granting of a mining concession and the signature of the Base Convention;

(ii)     pursuant to paragraph d), signature of the agreement and execution of its obligations was not in violation of any law, regulation, decree or order of any national or local authority or Guinean court;

(iii)    pursuant to paragraph e), it would ensure that the administrative authorities provide all assistance necessary and provide all permits necessary for the Mining Operations (as defined) as stipulated in the applicable Guinean law;

(iv)    it would facilitate all administrative steps and procedures by all appropriate means in accordance with Guinean law and provide all reasonable assistance needed for carrying out the Project and the Project Installations.

221.   By virtue of Article 31, Guinea was obliged in the event of an expropriation or nationalization of assets to pay fair and equitable compensation based on the market value of the Mining Operations at the date of the expropriation or nationalization.

222.   Under Article 32 of the Base Convention, Guinea warranted:

(i)     pursuant to its first paragraph, that from the date of the grant of the Concession and throughout its full duration, the stabilization of Current Legislation (as referred to and defined in the Base Convention) and of all provisions stipulated in the Base Convention; and

(ii)    pursuant to its fourth paragraph, that BSGR Guinea would benefit from any more favourable provision in a mining agreement Guinea entered into with another mining company carrying out similar activities.

223.   Under Article 36.2, Guinea promised that any cancellation of the Mining Concession would be "*in accordance with the Mining Code*".

3.4.2   Summary of breaches of the Base Convention

224.     The Measures taken by Guinea as described above violated Guinea's obligations under the Base Convention.  In particular (but without limitation):

225.     In breach of its obligations under Article 4(ii), Guinea failed to grant and afford to BSGR Guernsey and BSGR Guinea the facilities and guarantees to facilitate the carrying out of the Project (as defined).

226.     In breach of its obligations under Article 7, Guinea failed to comply with the terms and conditions of the Base Convention and/or to act in good faith in the fulfilment of its obligations thereunder throughout the period of the agreement.

227.     In breach of its obligations under Article 8, Guinea failed to ensure that the Mining Concession was executed in accordance with the provisions of the Mining Code and the Base Convention.

228.     In breach of its obligations under Article 14.2(a), Guinea did not provide the authorisation to construct the railway to export the iron ore.

229.     In breach of its obligations under Article 22.1, Guinea failed to ensure that the BSGR Guernsey and BSGR Guinea enjoyed the rights conferred upon each of them under (i) the Base Convention and/or (ii) the Mining Code and/or (iii) the Zogota Mining Concession.

230.     In breach of its obligations under Article 22.1(a) to Article 22.1(l) of the Base Convention, Guinea failed to guarantee and to afford to BSGR Guinea and/or BSGR Guernsey:

     (i)     the exclusive right to carry out the Mining Operations (as referred to and defined in the Base Convention);

     (ii)    the right to freely arrange its assets and to organize the businesses as it sees fit;

(iii)     the freedom to recruit and dismiss, in accordance with current legislation in the Republic of Guinea;

(iv)     the free circulation in the Republic of Guinea of its staff, assets and products;

(v)     the right to unrestricted importation of goods and services, including insurance and the funds required for the Mining Operations;

(vi)     the freedom to export and to sell the Mining Produce from the Concession (as referred to and defined in the Base Convention) on the international and/or domestic market;

(vii)     the right to transport or have transported the Mining Produce to a storage, processing or loading location;

(viii)     the right to benefit from any agreement entered into between the Government and other Governments to facilitate the transport of the Mining Produce over the territory of these Governments;

(ix)     the freedom to set up in Guinea processing plants and iron ore processing;

(x)     the right to acquire, use and operate any means of communication, and type of aircraft or other means of transport as well as the auxiliary facilities or equipment required for the Mining Operations;

(xi)     the freedom to carry out large-scale sampling and attempts at processing the Mining Produce from the Concession in order to determine the mining potential; and

(xii)     the freedom to take, take out and export reasonable quantities, specimens or samples as part of the Prospecting Activities (as referred to and defined in the Base Convention).

231.    Further, Guinea breached its obligations under Article 29. In particular:

(i)  in breach of Article 29(c), Guinea acted on the illegitimate and unlawful basis that the grant of the Zogota Mining Concession and/or the signature of the Base Convention was inappropriate and/or unjustified (despite having no foundation for doing so);

(ii)  in breach of Article 29(d), Guinea acted on the illegitimate and unlawful basis that the signature of the agreement and/or the execution of its obligations was in violation of law (despite having no foundation for doing so);

(iii)  in breach of Article 29(e), Guinea failed to ensure that the administrative authorities provided BSGR Guinea (and/or BSGR Guernsey) with all assistance necessary and/or provided all permits necessary for the Mining Operations (as defined) as stipulated in the applicable Guinean law; and

(iv)  Guinea failed to facilitate all administrative steps and procedures by all appropriate means in accordance with Guinean law and/or provide all reasonable assistance needed for carrying out the Project.

232.  In breach of its obligations under Article 31, Guinea took measures of expropriation or nationalization against each of BSGR Guinea and BSGR Guernsey, and against their respective investments and/or assets (as described above), without payment of fair and equitable compensation based on the market value of the Mining Operations at the date of the expropriation or nationalization.

233.  In breach of its obligations under Article 32, Guinea failed to stabilize the Current Legislation and/or all provisions stipulated in the Base Convention in that *inter alia* it adopted measures, including by way of new legislation and/or laws, in order to take the Claimants' respective assets. Pending document production, the Claimants expressly reserve their right to rely on any more favourable provision in any mining agreement concluded at a later date, as referred to in Article 32 (fourth paragraph). The Claimants will require Guinea

to disclose all mining agreements concluded following the Base Convention in order that they can properly enforce their rights under Article 32.

234.   In breach of Article 36.2, Guinea failed to cancel the Zogota Mining Concession in accordance with the Mining Code (or on any lawful basis whatsoever). For the avoidance of any doubt, the Claimants aver that there was in fact no legitimate basis for the withdrawal or revocation of the Zogota Mining Concession (whether pursuant to the Mining Code or any other instrument).

235.   The breaches of the Base Convention as set out above give rise to liability on the part of Guinea to each of BSGR Guernsey and BSGR Guinea, including for losses suffered by each of BSGR Guernsey and BSGR Guinea as a result of these breaches.  Furthermore, by reason of the Republic of Guinea's conduct and/or omissions to date and threatened conduct and/or omissions, each of BSGR Guernsey and BSGR Guinea have suffered and/or will suffer a significant or total loss in the value of all or part of their investments.

**3.5   Breaches of the Investment Code**

3.5.1   Breach of Article 5 of the Investment Code

236.   Article 5 of the Investment Code provides:

> *"The Guinean government shall not proceed to any expropriation or nationalization of investments carried out by individuals or corporations, with exception of public interest cases as provisioned by law.*
>
> *In cases of public interest, expropriation measures must not be discriminatory and must provide for fair and adequate compensation, whose amount will be determined according to the rules and conventional practices of international law." [126]*

237.   By virtue of that provision, Guinea was and is obliged:

---

[126] See Article 5 of the Investment Code of the Republic of Guinea dated 30 June 1995 (Exhibit CL-0003).

(i)    not to proceed to any expropriation or nationalization of investments carried out by individuals or corporations unless the measures taken are (i) for public purposes determined in accordance with the law and (ii) non-discriminatory; and

(ii)   in the event of non-discriminatory expropriation or nationalization for public purposes determined in accordance with the law, to provide fair and adequate compensation according to principles of international law.[127]

238.   In this case, Guinea has taken measures of expropriation or nationalization against each of the Claimants and/or their investments (including *inter alia* the mining and infrastructure rights identified above; and/or the shareholding rights held by BSGR and BSGR Guernsey in BSGR Guinea (and BSGR's shareholding rights in BSGR Guernsey):

(i)    for purposes other than public purposes and/or other than as provisioned by law; and/or

(ii)   in a discriminatory fashion; and/or

(iii)  without providing fair and/or adequate (or any) compensation for its measures of expropriation or nationalization.

   a.    *"Investments carried out by…corporations"*

239.   Each of the Claimants has made qualifying investments under the Investment Code. As explained above, BSGR Guinea was a party to the Base Convention

---

[127] Note in this regard that general Guinean law similarly protected the Claimants' investments. Article 13 of the Guinean Constitution provides that "*The right to property is guaranteed. No one may be expropriated if it is not legally recognized in the interest of all, and subject to fair **and prior** compensation*" (Exhibit CL-0004); Article 534 of the Civil Code of Guinea (which itself refers to Article 13 of the Constitution) states that that "*we cannot force people to give up his property, except for a public purpose and with just compensation*" (Exhibit CL-0005).

with Guinea and had contractual rights thereunder, held the title to the Zogota Mining Concession; and held the Blocks 1 and 2 Permit.

240.   Under Guinean law, the title and rights granted to BSGR Guinea under the Zogota Mining Concession in particular constituted *in rem* proprietary rights. It is plain that BSGR Guinea had made substantial investments within the meaning of Article 5.

241.   Similarly, each of BSGR Guernsey and BSGR (via BSGR Guernsey) had themselves made an "investment", by virtue of (i) their shareholding in BSGR Guinea and/or BSGR's shareholding in BSGR Guernsey; and (ii) by financing all of the works that were carried out under or pursuant to its mining titles and agreement. Those shareholdings were held as follows:

(i)   From April 2006 until March 2008, BSGR held its interest in BSGR Guinea through its 82.35% shareholding in BSGR Guinea BVI. From March 2008, BSGR held the entire interest in BSGR Guinea BVI, and thus BSGR Guinea was its wholly owned subsidiary.

(ii)   From January 2009:

a)   BSGR owned and controlled BSGR Guinea as its wholly owned subsidiary, held via its 100% shareholding in BSGR Guernsey.

b)   BSGR Guernsey held 100% of BSGR Guinea.

(iii)   From April 2010 to 13 March 2015, BSGR owned 49% of BSGR Guernsey (which continued to hold 100% of BSGR Guinea).

(iv)   Since 13 March 2015, when BSGR bought out Vale's 51% interest in BSGR Guernsey, BSGR Guinea has reverted to a wholly owned subsidiary of BSGR.

242. It is plain that the shareholdings of BSGR and BSGR Guernsey in BSGR Guinea, and of BSGR in BSGR Guernsey, constituted an "*investment*" to which they were entitled to protection pursuant to Article 5 of the Investment Code (and entitled to the guarantees in Articles 21, 22 and 30 of the Mining Code).

(i)    First, and before turning to the text itself, whilst the term "investment" is not defined, it appears unrestricted in the Investment Code. It should therefore be given a wide rather than narrow reading. This comports with the policy objective in Article 1 of the Code which is "*intended to define the framework and conditions in which investments in Guinea are operated, the guarantees offered to investors, as well as the encouragement accorded to those who contribute significantly to the achievement of the priority economic and social development objectives.*"

(ii)   Secondly, and in a similar vein, Article 2(1) provides useful guidance that the term "investment" was intended to cover a very wide scope of activity. Article 2(1), contained in the "*General investment conditions and investor guarantees,*" provides that "*Any person is free to undertake a commercial, industrial, mining, agricultural or services activity in the territory of the Republic of Guinea.*"

(iii)  Thirdly, this analysis gains strong support from Article 3 of the Investment Code. Article 3 guarantees an investor's ability to make certain "transfers" out of Guinea. The "transfers" which are protected depend upon the investor having "carried out a capital investment originating from abroad". That term is defined as including inter alia purchases or provision of equity in a locally incorporated company. Thus, Article 3 considers a shareholding in a local company as a "capital investment originating from abroad" and an "investment" and protects (a) all income generated from that "investment"; (b) the liquidation proceeds of "said investment" and (c) the "compensation defined in Article 5 below". That is a reference to compensation payable under Article 5, i.e. pursuant to an expropriation and/or

nationalization. Thus, Article 3 expressly recognises that a (foreign) parent company's shareholding in a local company can be the subject of expropriation and/or nationalization. If the parent then receives compensation as a result, Article 3 protects the ability of that parent to extract the money from Guinea.

(iv)   Fourthly, in relation to BSGR's indirect shareholding, the Claimants' analysis follows the orthodox approach in investment treaty cases. Numerous investment treaty cases have recognised that an indirect shareholding of the type that BSGR held in BSGR Guinea constitutes an "investment" in the host state.[128] If the drafters of the Investment Code had intended for a far more restrictive notion of the concept of "investment" to be applied, they would have made that clear – particularly in circumstances where Article 5 expressly refers to "*conventional practices of international law*" in determining the amount of compensation for an expropriatory measure. It would be very odd, in those circumstances, if a shareholding was not recognised as an "*investment*", given that "conventional practices of international law" recognise this as a classic "*investment*" for which compensation ought to be granted.

243.   The Measures clearly constituted an "expropriation" and/or "nationalization" of the Claimants' investments within the meaning of Article 5. This raises two issues: (a) the nature and effect of the Measures on the Claimants' investments; and (b) whether Article 5 covers an expropriation and/or nationalization of the type suffered by BSGR and BSGR Guernsey.

> b.   *The Measures constituted an involuntary taking of the Claimants' investments*

---

[128] See, by way of example, *Daimler Financial Services AG v Argentina,* ICSID Case No. ARB/05/1, Award dated 22 August 2012, paras 76 and 89-91 (Exhibit CL-0006); *CMS v Argentina,* ICSID Case No. ARB/01/08, Annulment Decision dated 25 September 2007, paras. 58 *et seq* (Exhibit CL-0007)*; Noble Energy Inc. and Machalapower CIA Ltd v Ecuador*, ICSID Case No. ARB/05/12, Decision on Jurisdiction dated 5 March 2008, para. 77 (Exhibit CL-0008).

244.    It is clear that the Measures constituted an involuntary taking of the Claimants' investments and consequently an expropriation and/or nationalization of those investments.

245.    **First**, by way of the Zogota Mining Concession in particular, BSGR Guinea itself held property rights *in rem* in the Zogota Project (and not just contractual rights to operate the Concession and/or a licence to do so).  Thus, without more, the involuntary taking of those proprietary rights and the transfer of title to the Government was itself an act of expropriation and/or nationalization (at least in relation to those *in rem* rights).

246.    **Secondly**, the Measures were implemented by Guinea in the purported exercise of its sovereign powers. The evidence plainly shows that Guinea was not acting as a mere contractual counterparty to BSGR Guinea or as a prudent regulator of the mining industry. Far from it.[129]  The Measures were <u>not</u>, and did not even purport to be, the result of any contractual or regulatory right or power allegedly held under the Base Convention or the applicable Mining Code. Rather, they were simply the product of a sovereign state's discretionary decision to exercise its sovereign power so as to forcibly take valuable property and/or contractual rights.

247.    This is demonstrated by both (a) the campaign of harassment waged against the Claimants, as outlined above, which is fundamentally inconsistent with any suggestion that Guinea was acting pursuant to any purported contractual or regulatory right or power; and (b) the nature of the Measures themselves. The revocation of BSGR Guinea's rights was not pursuant to any contractual or regulatory termination procedure. Instead, the Measures were imposed via various executive Decrees. Furthermore, those Decrees, by which BSGR Guinea was stripped of its assets, did not themselves invoke any statutory or other legal justification for the course which Guinea had chosen to take. In truth, they were simply promulgated by the President and the Minister of Mines

---

[129] By way of example, there was no basis for the imposition of the NMC or its sub-committees under the Base Convention or the applicable Mining Code.

in the purported exercise of their executive discretion, acting on behalf of a sovereign State.

248.   In other words, Guinea did not even bother with the veneer of any contractual or other justification for its actions.  It simply decided that the logical end of its campaign against the Claimants would be the revocation of the mining rights and the termination of the Base Convention without compensation.

249.   In this regard, note the following observations of the ICSID Tribunal in *Vivendi v Argentina*:

> *"Turning to Respondent's proposition that an act of state must be presumed to be regulatory, absent proof of bad faith, this is incorrect. There is extensive authority for the proposition that the state's intent, or its subjective motives are at most a secondary consideration. While intent will weigh in favour of showing a measure to be expropriatory, it is not a requirement, because the effect of the measure on the investor, not the state's intent, is the critical factor. As Professor Christie explained in his famous article in the British Yearbook of International Law more than 40 years ago, a state may expropriate property where it interferes with it even though the state expressly disclaims such intention….international tribunals, jurists and scholars have consistently appreciated that states may accomplish expropriations in ways other than by formal decree…*
>
> *…As the tribunal in Santa Elena correctly pointed out, the purpose for which the property was taken "does not alter the legal character of the taking for which adequate compensation must be paid."*[130]

250.   The position is *a fortiori* where the state does in fact accomplish the expropriation by way of a 'formal decree'.

251.   **Thirdly**, even if the Measures *were* purportedly implemented by Guinea pursuant to an alleged contractual and/or regulatory power (which is denied), those Measures still constituted an expropriation and/or nationalization.

---

[130] *Vivendi v Argentina,* ICSID Case No. ARB/97/3, Award dated 20 August 2007, para 7.5.20 (Exhibit CL-0009).

252.   That is for two separate and free-standing reasons, both of which demonstrate that the Measures were made without any legal basis under Guinean or international law.

   (i)   First, the *process* by which Guinea reached the decision to implement the Measures was fundamentally flawed both in process and in substance and unlawful as a matter of Guinean law. As such, there was no valid justification under Guinean or international law for the implementation of the Measures; and

   (ii)   Secondly, there was (and is) no *substance* to the allegations made by Guinea in any event. They are and were wrong. Thus, leaving aside the flawed review process undertaken in Guinea, the Claimants never in fact engaged in any corruption or bribery, or other conduct, which could properly be said to justify implementation of the Measures under local or international law.

253.   In these circumstances, and whatever Guinea may say now in an *ex post facto* attempt to justify the imposition of the Measures, each of these reasons reveals that that their true nature and effect was indeed expropriatory.

254.   In light of their importance to this case, each reason will be addressed under a separate heading, respectively under heading 3.8 "Flaws in the process by which Guinea decided to implement the Measures" and under heading 3.9 "No substance to the corruption allegations" further below.

255.   **Finally**, even if (contrary to the foregoing submissions) the Measures were purportedly imposed by Guinea pursuant to the Base Convention and/or the Mining Code, and even if Guinea had some legitimate contractual or regulatory basis for imposing them (which is denied), the Measures *still* effected an expropriation and/or nationalization which deserves compensation under the Investment Code. This is for two separate reasons.

   (i)   First, the evidence discloses that Guinea in fact imposed the review process which culminated in the Measures with a pre-determined result

in mind, viz. to oust the Claimants from the mining operations. Thus, any attempt by Guinea to justify its conduct at the time by reference to a putative contractual and/or regulatory right was (and is) a mere fig leaf for what was, in reality, an *a priori* and politically motivated decision and/or one that was the product of unlawful discrimination on the part of Guinea against the Claimants. Any attempted justification for its conduct along those lines is, at best, a pretext. The reality is that Guinea acted in bad faith and/or abused whatever alleged contractual or regulatory right it may have had, in order to revoke BSGR Guinea's rights.  That is classic expropriatory conduct.

(ii)   Secondly, and in any event, the revocation of the Zogota Mining Concession and the Blocks 1 and 2 Permit and termination of the Base Convention constituted a wholly disproportionate reaction on the part of Guinea as compared with the harm allegedly said to have been caused by the Claimants. Accordingly it ought properly to be considered an expropriation and/or nationalization.

256.   This proportionality principle has been accepted by a number of international tribunals, which have demonstrated a ready willingness to consider whether, objectively, a State has been justified in imposing a severe penalty in response to the harm purportedly caused by the investor.[131]

257.   For example, in *Deutsche Bank v Sri Lanka* a majority of the Tribunal stated:

> *"The Tribunal does not agree with Sri Lanka that it has an extremely broad discretion to interfere with investments in the exercise of "legitimate regulatory authority". A number of tribunals, including Tecmed v. Mexico, Azurix v. Argentina, and LG&E v. Argentina have adopted a proportionality requirement in relation to expropriatory treatment. It prevents the States from*

---

[131] Exhibit CL-0001, this proportionality principle is reflected in the Mining Code, including by the use of the word "*may*" in Article 60 thereof. Moreover, under general Guinean law a declaration of public interest must precede a lawful expropriation, which can only be granted after a public inquiry that is required to analyse the proportionality of the envisaged taking: see Land and Federal Code at articles 54 et seq.

*taking measures which severely impact an investor unless such measures are justified by a substantial public interest.*"[132]

258.   As noted in *Occidental v Ecuador* this principle "*is applicable as a matter of general international law, and has been applied in many ICSID arbitrations in the past.*" The Tribunal analysed the concept in detail:

> "*As to this latter point, the Tribunal considers that the Respondent failed to properly appreciate the Claimants' argument. The argument is not that the State must prove harm, but that any penalty the State chooses to impose must bear a proportionate relationship to the violation which is being addressed and its consequences. This is neither more nor less than what is encapsulated in the Respondent's own constitutional rules about proportionality. In cases where the administration wishes to impose a severe penalty, then it appears to the Tribunal that the State must be able to demonstrate (i) that sufficiently serious harm was caused by the offender; and/or (ii) that there had been a flagrant or persistent breach of the relevant contract/law, sufficient to warrant the sanction imposed; and/or (iii) that for reasons of deterrence and good governance it is appropriate that a significant penalty be imposed, even though the harm suffered in the particular instance may not have been serious. The potential justification predicated on deterrence explains why, for example, it may be proportionate to give a heavy fine for speeding even where no accident occurred and where, plainly, the State suffered no direct "harm" from the driver's breach of the law. The potential for harm, and the need to deter others from acting in the same way, justifies the imposition of a penalty even though no identifiable harm was caused in the particular instance.*"[133]

259.   The Tribunal went on to note the importance of the link between the harm allegedly caused by an investor's conduct and the sanction imposed by the State when considering the issue of proportionality:

> "*The test at the end of the day will remain one of overall judgment, balancing the interests of the State against those of the individual, to assess whether the particular sanction is a proportionate response in the particular circumstances. Accordingly, while it is possible to envisage many instances where punishment is imposed for violations which have not directly caused harm, it is immediately apparent that such punishments tend to be at the lower*

---

[132]   *Deutsche Bank AG v. Democratic Socialist Republic of Sri Lanka*, ICSID Case No. ARB/09/2, Award dated 31 October 2012, Exhibit CL-0010, para 522.

[133]   *Occidental Petroleum Corporation v Ecuador,* ICSID Case No. ARB/06/11, Award dated 5 October 2012, para. 416 (Exhibit CL-0011).

*end of the scale – they are intended to educate and deter both the offender and the general populace. But more serious punishments are still usually reserved for instances where true harm has been suffered. And typically, the more serious the harm then the more serious the punishment. This is a familiar principle in all legal systems…"[134]*

260.   In this case, the Technical Committee did not establish either (i) that sufficiently serious harm was caused by BSGR Guinea; and/or (ii) that there had been a flagrant or persistent breach of any relevant contract or law sufficient to warrant the sanction imposed (indeed, no such contract or law was even cited); and/or (iii) that for reasons of deterrence and good governance it was appropriate that a significant penalty be imposed. The Technical Committee alleged – but did not prove – that BSGR was a company which *"did not have any significant experience in the mining sector"*, a proposition which is self-evidently and demonstrably wrong in light of the evidence proffered above and in this Memorial.

261.   As explained above, the imposition of the Measures by the President and/or Ministry of Mines required the exercise of its discretion. In exercising that discretion, it was incumbent upon the President and/or Ministry to act in a proportionate manner.  However, the reaction of the Guinean authorities was wholly disproportionate in completely revoking all of BSGR Guinea's valuable mining rights and terminating the Base Convention on the basis of the most flimsy and insubstantial evidence.

   c.   *Expropriation and/or nationalization of BSGR's and BSGR Guernsey's investment in BSGR Guinea*

262.   Article 5 applies to an *"expropriation or nationalization"* of an investment and to *"expropriation measures"*.

263.   Article 5 plainly protects a company against not only direct expropriation and/or nationalization (i.e. an outright taking), but also to an indirect

---

[134] *Ibid.*, para. 417.

expropriation and/or nationalization, including "*expropriation measures*", that is measures which have the effect of substantially depriving an investment of its value. This follows from the fact that the "*investment*" which is protected by Article 5 includes a shareholding in a local company (as explained above), such as BSGR Guernsey's direct shareholding in BSGR Guinea and BSGR's indirect shareholding (via BSGR Guernsey). If, as must be the case, Article 5 extends the scope of protection to such "*investments*", it must be the case that the term(s) "*expropriation or nationalization*" and/or "*expropriation measures*" was intended to cover the indirect expropriation and/or nationalization that occurred in this case to BSGR's (indirect) shareholding in BSGR Guinea and to BSGR Guernsey's direct shareholding in that same local company.

264.   Indirect expropriation has been said to include:

> "*...not only open, deliberate and acknowledged takings of property, such as outright seizure or formal or obligatory transfer of title in favour of the host State, but also covert or incidental interference with the use of property which has the effect of depriving the owner, in whole or in significant part, of the use or reasonably-to-be expected economic benefit of property even if not necessarily to the obvious benefit of the host State.*"[135]

265.   Modern tribunals almost invariably consider the test for indirect expropriation to be whether the investor has been "substantially deprived" of the economic benefit of its investment. As stated in *Deutsche Bank v Sri Lanka*:

> "*In general terms, a substantial deprivation of rights, for at least a meaningful period of time, is required. The required level of interference with rights has been variously described as "unreasonable"; "an interference that renders rights so useless that they must be deemed to have been expropriated"; "an interference that deprives the investor of fundamental rights of ownership"; "an interference that makes rights practically useless" "an interference sufficiently restrictive to warrant a conclusion that the property has been "taken""; "an interference that makes any form of exploitation of the property disappear"; "an interference such that the property can no longer be put to reasonable use".*"[136]

---

[135]   *Metalclad Corporation v United Mexican States,* ICSID Case No. ARB(AF)/97/1, Award dated 30 August 2000, para. 103 (Exhibit CL-0012).
[136]   Exhibit CL-0010, para. 503.

266.    The Measures clearly fit this description. Their overall (and intended) effect was to strip BSGR Guinea of all of its relevant assets, including in particular (a) the rights granted under the Zogota Mining Concession; (b) the rights granted under Blocks 1 and 2 Permit and (c) its contractual rights under the Base Convention. BSGR Guinea's title to the Zogota Mining Concession and the Blocks 1 and 2 Permit was immediately and involuntarily taken and returned to the Government. Any and all contractual rights that BSGR Guinea had under the Base Convention were similarly immediately and involuntarily taken from it.

267.    As stated above, the only assets of any note held by BSGR Guinea constituted (a) its rights under the Base Convention; (b) the Zogota Mining Concession (c) the Blocks 1 and 2 Permit and (d) assorted ancillary mining rights.

268.    As such, alongside the expropriation and/or nationalization of BSGR Guinea's investments, the Measures also resulted in the permanent and substantial deprivation of the value of BSGR's and BSGR Guernsey's shareholding in BSGR Guinea itself. That constituted a wholly unreasonable and unwarranted interference with the shareholding in BSGR Guinea and rendered those rights so useless, or so practically useless, that they must be deemed to have been expropriated. Thus, whilst title to that shareholding formally remained (indirectly) with BSGR and (directly) with BSGR Guernsey, Guinea's interference with the assets of BSGR Guinea meant that it became practically impossible for BSGR and BSGR Guinea any longer to exploit those property and other rights. Put bluntly, the effect of those Measures was to strip BSGR Guinea to the bone and leave BSGR and BSGR Guernsey holding an empty corporate shell.

269.    Accordingly, the entire value of the shareholding held by BSGR Guernsey, and the indirect shareholding held by BSGR in BSGR Guinea (and the shareholding held by BSGR in BSGR Guernsey) fundamentally depended upon the continued existence of these rights and assets and the ability of BSGR Guinea

to exploit those rights and assets.  As explained in the evidence of Mr Tchelet, when BSGR Guinea was stripped of its assets in April 2014, it had the effect of rendering BSGR's and BSGR Guernsey's shareholding entirely valueless.[137] Thus, in addition to the expropriation and/or nationalization of BSGR Guinea' investment, an expropriation and/or nationalization of BSGR's and BSGR Guernsey's investments has plainly occurred.

> d.   *The Measures constituted an illegal expropriation and/or nationalization*

270.   For the reasons stated above, the Claimants submit that the Measures constituted an illegal expropriation and/or nationalization in further breach of Article 5 of the Investment Code and international law, in that they were unjustified under applicable Guinean law and/or not in the public interest and/or (c) discriminatory.

> e.   *No compensation provided in respect of the expropriation and/or nationalization*

271.   In further breach of Article 5 of the Investment Code (and Articles 13 of the Constitution and/or Article 534 of the Civil Code), Guinea has failed to provide the Claimants with any compensation, let alone fair, adequate or effective compensation for the expropriation and/or nationalization of its investments.

### 3.5.2   Breach of Article 6 of the Investment Code

272.   Pursuant to Article 6(1) of the Investment Code, Guinea undertakes that a foreign company will "*receive the same treatment as Guinean nationals regarding applicable laws and obligations relating to their activities.*" In accordance with that provision, Guinea was and is obliged to afford to foreign nationals or companies the same treatment as Guinean nationals or companies as regards the applicable law and obligations relating to their activities.

---

[137] CWS-4, para. 55-56.

273.   In breach of its obligations under Article 6 of the Investment Code, Guinea has failed to afford each of the Claimants and/or their investments (including *inter alia* (i) their mining and infrastructure rights and/or (ii) the shareholding rights held by BSGR and BSGR Guernsey in BSGR Guinea, and by BSGR in BSGR Guernsey) the same treatment as Guinean nationals or companies as regards the applicable law and obligations relating to their activities.

274.   In particular, Guinea has acted in breach of this obligation by way of the Measures, which constituted an illegal expropriation and/or nationalization in breach of Article 5 of the Investment Code for the reasons set out above. It has further breached this obligation, for example by withdrawing BSGR's right to export iron ore through Liberia while it has granted this right to other companies, including Sable Mining Africa.

### 3.5.3   Breach of Article 30 of the Investment Code

275.   In addition to the material breaches of Article 5 outlined above, Guinea's conduct in respect of the Claimants' investments constituted a breach of Article 30 of the Investment Code.

276.   Article 30 provides that:

> *"No law or regulation taking effect after the date of execution of the investment may restrict the guarantees referred to in the book 1 of this code regarding said investment. Similarly, no law or regulation taking effect after the effective date of approval may reduce or eliminate the benefits or impede the exercise of the rights that have been granted to the company and its investors."*

277.   In breach of its obligations under Article 30 of the Investment Code:

(i)    Guinea failed to respect the benefits and guarantees to which the Claimants were entitled under *inter alia* Article 5 of the Investment Code;

(ii)   Guinea failed to apply the 1995 Mining Code to the Claimants and/or their investments; and

(iii)    Guinea purported to apply the 2011 Mining Code to the Claimants and/or their investments.

278.    For the reasons set out above, the Claimants benefited from the investment guarantees granted by Guinea in Book 1 of the Investment Code.

279.    Thus, Article 30 of the Investment Code guaranteed to the Claimants that no law or regulation imposed after the investments were made would either (a) "restrict the guarantees referred to in the book 1 of this code", including the guarantee against expropriation and/or nationalisation; or (b) reduce or eliminate the benefits or impede the exercise of rights that it had been granted.

280.    However, by the conduct described above, Guinea is in breach of its obligations to the Claimants in Article 30 of the Investment Code.

281.    **First**, Guinea wrongly expropriated BSGR Guinea' investments, and BSGR and BSGR Guernsey's investments in BSGR Guinea, without providing compensation. In doing so, Guinea has failed to respect the benefits and guarantees to which the Claimants were entitled under Article 5 and thus has also acted in breach of its obligations in Article 30.

282.    **Second**, the Claimants had a legitimate expectation, founded at the time of the Claimants' initial investments and/or by virtue of the Zogota Mining Concession and/or the Base Convention and/or Article 30(1) itself, that BSGR Guinea's mining rights would be determined by reference to and in accordance with the prevailing legislation in force at the time, i.e. the 1995 Mining Code. It was that legislation which mandated the limited circumstances in which the Mining Concession, Prospecting Permits and the Base Convention could be revoked or terminated.

283.    Thus, the failure of Guinea to apply the 1995 Mining Code to the Claimants' investments constituted a breach of Article 30 of the Investment Code.

284.    **Third**, if and insofar as Guinea seeks to justify the imposition of the Measures on the grounds that they were permitted under the 2011 Mining Code, that also constitutes a separate breach of Article 30(1). Guinea was in breach of Article 30(1) even if the Measures would have been justified under the new 2011 Mining Code (assuming, *arguendo,* that the 2011 Mining Code could somehow validly be applied to the Claimants and their investments).

285.    By Article 30, Guinea had promised that no law or regulation taking effect after the date of the Claimants' investments would restrict the guarantees under Article 5 or eliminate or reduce the benefits or impede the exercise of rights that had been granted to it in respect of its investments.   Thus, even if, *arguendo*, the 2011 Mining Code justified the imposition of the Measures (in contrast to the 1995 Mining Code), the application of that later legislation resulted in a reduction or elimination of benefits to which the Claimants were entitled (namely, the right to compensation under Article 5 of the Investment Code).

3.5.4   Conclusion

286.    The breaches of the Investment Code as set out above give rise to liability on the part of Guinea to each of the Claimants, including for losses suffered by each of the Claimants as a result of these breaches. Furthermore, by reason of Guinea's conduct and/or omissions to date and threatened conduct and/or omissions, each of the Claimants have suffered and/or will suffer a significant or total loss in the value of all or part of its investments.

**3.6    Breaches of the Mining Code**

287.    The Measures taken by Guinea as described above violate a number of Guinea's obligations under the Mining Code.

3.6.1   Breach of Article 21 of the Mining Code

288.    Article 21 of the Mining Code provides that:

> *"In accordance with international conventions, and subject to the laws and regulations of the Republic of Guinea, all persons designated in article 8 are guaranteed:*
>
> - *the right to dispose freely of their property and organize their enterprise as they wish;*
>
> - *freedom of hiring and firing, subject to [with] prevailing laws and regulations;*
>
> - *unlimited access to raw materials;*
>
> - *freedom of circulation of personnel and products within the Republic of Guinea;*
>
> - *freedom to import goods and services and any necessary funds;*
>
> - *freedom to dispose of their products on international markets, to export and dispose of products in foreign markets."*

289.    The Claimants were persons *"designated in article 8",* being persons (a) *"possessing the technical and financial capability to do prospecting work"*; and/or (b) in the case of BSGR Guernsey and BSGR, indirectly operating and/or exploiting mining substances via its end subsidiary BSGR Guinea, being a private *"corporation under Guinean law"*.

290.    Thus, Guinea was obliged to guarantee each of these 'fundamental freedoms' to the Claimants.  In breach of Article 21, by reason of the conduct set out above Guinea denied the Claimants:

(i)     the right to dispose freely of its property and organize their enterprises as they wished;

(ii)    freedom of hiring and firing;

(iii)   access to raw materials;

(iv)   freedom of circulation of personnel and products within the Republic of Guinea;

(v)   freedom to import goods and services and any necessary funds;

(vi)   freedom to export and/or dispose of their products on international markets.

### 3.6.2   Breach of Article 22 of the Mining Code

291.   By virtue of Article 22 of the Mining Code, Guinea was and is obliged not to discriminate against the Claimants as compared with Guinean nationals. Guinea has further breached this obligation, for example by withdrawing BSGR's right to export iron ore through Liberia while it has granted this right to other companies, including Sable Mining Africa.

292.   Furthermore, Guinea failed to comply with its obligations under the Mining Code to grant and maintain BSGR's Guinea's mining titles and/or BSGR Guernsey and BSGR Guinea's rights under the Base Convention, thereby substantially impacting on the Claimants' investment (including BSGR's and BSGR Guernsey's shareholding in and financing of BSGR Guinea and the other subsidiaries).

### 3.6.3   Breach of Article 11 of the Mining Code

293.   By Article 11 of the Mining Code, Guinea was and is obliged to perform its obligations under any mining agreements entered into by Guinea. The Base Convention was a "*guarantee to the mine title holder that the [legal, financial, tax and social conditions] will remain unvaried*" and thus once ratified it bound the parties and could only be amended by written agreement. In breach of Article 11, Guinea (i) failed to perform its obligations owed to each of

BSGR Guernsey and BSGR Guinea under the Base Convention and (ii) terminated the Base Convention without any legal or other justification.

### 3.6.4   Breach of Article 26 of the Mining Code

294.   By Article 26 of the Mining Code, Guinea was and is obliged to recognize (i) that the grant of an prospecting permit conferred on BSGR Guinea the exclusive right to prospect for iron ore and (ii) that BSGR Guinea, as holder of the Blocks 1 and 2 Permit, had the exclusive right to an operating permit or concession for the deposits found within the prospecting site. In implementing the Measures, Guinea acted in breach of Article 26, by failing to recognise and/or respect BSGR Guinea's exclusive right to prospect for iron ore and/or its exclusive right to an operating permit or mining concession.   Further or alternatively, on 14 September 2011, BSGR Guinea submitted a feasibility study which demonstrated the existence of commercially operational deposits of iron ore within Blocks 1 and 2. Notwithstanding that, Guinea failed to respond to the Feasibility Study, let alone grant BSGR Guinea an operating permit or concession in relation to those deposits. That conduct was also in breach of Article 26.

### 3.6.5   Breach of Article 41 of the Mining Code

295.   By Article 41 of the Mining Code, Guinea was and is obliged to recognise that the grant of a concession conferred on BSGR Guinea *inter alia* the exclusive right to carry out all kinds of prospecting and development of deposits of mining substances.   In particular, BSGR Guinea, as holder of the Zogota Mining Concession, had the *"exclusive right to carry out all kinds of prospecting and development of deposits of mining substances for which the concession is granted, within the limits of its perimeter, and without limits of depth"*. By implementing the Measures, Guinea failed to recognise and respect BSGR Guinea's exclusive right to carry out all kinds of prospecting and development of deposits of mining substances..

### 3.6.6   Breach of Article 43 of the Mining Code

296.   By virtue of Article 43, upon the filing of a feasibility study for Simandou Blocks 1 and 2, Guinea was obliged to negotiate a mining concession in order to determine the practical issues associated with the exploitation of Blocks 1 and 2.

297.   In breach of Article 43, Guinea (i) ignored the Feasibility Study submitted by BSGR Guinea for Simandou Blocks 1 & 2 in September 2011; and (ii) failed to grant a mining concession. Furthermore, the Claimants claim an indemnity pursuant to Article 44.

3.6.7   Conclusion

298.   The breaches of the Mining Code as set out above give rise to liability on the part of Guinea to each of the Claimants, including for losses suffered by each of them as a result of these breaches. Furthermore, by reason of Guinea's conduct and/or omissions to date and threatened conduct and/or omissions, each of the Claimants has suffered and/or will suffer a total loss in the value of all or part of its investments.

**3.7   Breaches of the BOT Act**

3.7.1   Breach of Article 7.1 of the BOT Act

299.   By Article 7.1 of the BOT Act, Guinea guarantees "*the free and peaceable use of the resources making it possible to exercise the activities subject of the project throughout the duration of the concession*".

300.   In breach of Article 7.1, Guinea did not provide the Claimants (or any of them) with the free and peaceful usage of their mining and transportation infrastructures. In particular:

(i)      the unlawful termination by Guinea of the Base Convention and the unlawful withdrawal of the Blocks 1 and 2 Permit and the Zogota

Mining Concession in or around 24 April 2014, violated the Claimants' right to the free and peaceful usage of the works it had undertaken at Zogota, including building villages and roads for the employees, the construction of the mine, and the works it had undertaken on the various railways.

(ii)     by letter of 8 April 2011, the Minister of Transport ordered BSGR Guinea to stop all the work on the ground in respect of the Trans-Guinean railway.[138]

(iii)    by letter of 4 October 2011, the Minister of Mines ordered BSGR Guinea to stop all of the BSGR group's works in Guinea, including the construction of the Zogota mine and the construction of the Sanniquellie railway.

### 3.7.2   Breach of Article 7.2.2 of the BOT Act

301.   By Article 7.2.2 of the BOT Act, Guinea guarantees "*to provide all permits and all authorisations necessary to exercise the rights guaranteed by this Law and by the BOT Agreement*".

302.   In breach of Article 7.2.2, Guinea did not provide all the permits and authorizations necessary to exercise the rights guaranteed by the BOT Act and the Base Convention. In particular:

(i)      by letter of 8 April 2011, the Minister of Transport ordered BSGR Guinea to stop all the work on the ground in respect of Trans-Guinean railway. BSGR Guinea was thus no longer authorized to work on the construction of the Trans-Guinean railway.

(ii)     by letter of 4 October 2011, the Minister of Mines ordered BSGR Guinea to stop all of BSGR's works in Guinea, including the

---

[138] Exhibit C-0039.

construction of the Zogota mine.[139] BSGR Guinea was thus no longer authorized to work on the construction of a mine in Zogota and the construction of the Sanniquellie railway.

### 3.7.3    Breach of Article 7.2.7 of the BOT Act

303.    By Article 7.2.7 of the BOT Act, Guinea guarantees "*the investor the non-expropriation of all its assets and capital subject of the BOT Agreement*".

304.    This provision entitled the Claimants, as corporations which had made investments in the infrastructure in Guinea, to be protected against any expropriation or any expropriation measure.

305.    In breach of its obligations under Article 7.2.7, Guinea expropriated each of the Claimants' valuable investments and assets described above, including in particular (i) the mining and infrastructure rights and agreements identified above; and/or (ii) the shareholding rights held by BSGR and BSGR Guernsey in BSGR Guinea (and held by BSGR in BSGR Guernsey).

### 3.7.4    Breach of Article 7.2.12 of the BOT Act

306.    By Article 7.2.12 of the BOT Act, Guinea guarantees "*the investor adequate compensation in the event where the retrocession to the State of the subject of the BOT Agreement is undertaken wholly or partly before the planned deadline*".

307.    Whilst the term "*retrocession*" is not defined in the BOT Act, it appears unrestricted in the BOT Act. It should therefore be given a wide rather than narrow reading. This comports with the policy objective in Article 2(2) of BOT Act according to which the Republic of Guinea "*encourages all forms of capital and technological investment made by means of a BOT Agreement in accordance with the principles and rules fixed in this Law*".

---

[139] Exhibit C-0041.

308. The common understanding of the term "*retrocession*" is the return, voluntary or not, of a right, a property or an asset. In the case at hand, as a result of the Measures, Guinea retained the benefit of *inter alia* the Feasibility Study the Claimants had completed on the Trans-Guinean railway, the Feasibility Study the Claimants had completed on Blocks 1 and 2, the works they had undertaken at Zogota (including villages and roads for employees, environmental studies, construction of mines) and the works they had undertaken on the various railways. Guinea has to date provided no compensation in respect of these works and studies in breach of Article 7.2.12 of the BOT Act.

3.7.5   Conclusion

309. The breaches of the BOT Act as set out above give rise to liability on the part of Guinea to each of the Claimants, including for losses suffered by each of the Claimants as a result of these breaches. Furthermore, by reason of the Republic of Guinea's conduct and/or omissions to date and threatened conduct and/or omissions, each of BSGR Guernsey and BSGR Guinea has suffered and/or will suffer a significant or total loss in the value of all or part of its investments.

**3.8   Breaches of international law**

310. Guinean law incorporates and/or applies customary international law. Many Guinean statutes refer to the "*customary practice of international law*", including expressly in Article 5 of the Investment Code which refers to *"the rules and conventional practices of international law"*. Furthermore, Article 21 of the Mining Code refers to fundamental freedoms guaranteed *"in accordance with international conventions*".

311. The minimum standard of treatment in customary international law is an umbrella concept which "*consists of a series of interconnecting and*

*overlapping elements or standards that apply to both the treatment of foreigners and their property*".[140]

312.   Accordingly, Guinea was bound as a matter of Guinean law, incorporating and/or applying customary international law, by the following obligations:

(i)   not to expropriate the Claimants' rights and investments unless the taking was for a public purpose, as provided by law, conducted in a non-discriminatory manner and with compensation in return;[141]

(ii)   to prevent arbitrary conduct in relation to the Claimants' investment;[142]

(iii)   to provide the Claimants' with full protection and security.[143]

(iv)   to accord to the Claimants fair and equitable treatment. In *Waste Management (No 2) v Mexico* (2004) 11 ICSID Reports 361, at 386 the Tribunal said: "*The minimum standard of fair and equitable treatment is infringed by conduct attributable to the State and harmful to the claimant if the conduct is arbitrary, grossly unfair, unjust or idiosyncratic, is discriminatory and exposes the claimant to sectional or racial prejudice, or involves a lack of due process leading to an outcome which offends judicial propriety – as might be the case with a*

---

[140] Newcombe & Paradell, *Law and Practice of Investment Treaties: Standards of Treatment* (Kluwer 2009), para 6.4 (Exhibit CL-0013).

[141] See e.g. Dumberry, *The Fair and Equitable Treatment Standard* (Kluwer 2013), para. 1.01E (Exhibit CL-0014).

[142] *Ibid.*, para. 1.01E; See Dolzer & Schreuer, *Principles of International Investment Law* (2nd Ed, 2012) p.195 ("*The traditional understanding of the customary minimum standard seems to have covered actions deemed arbitrary. It would follow that the treaty standard against arbitrariness is also covered by customary international law*") (Exhibit CL-0015). And see the ICJ in *Elettronica Sicula S.p.A. (ELSI) (United States of America v. Italy)*, Judgement dated 20 July 1989, para. 128 (referring to *"a willful disregard of due process of law, an act which shocks, or at least surprises, a sense of juridical propriety")* (Exhibit CL-0016).

[143] See *El Paso v Argentina*, ICSID Case No. ARB/03/15, Award dated 31 October 2011, para. 522 ("*The Tribunal considers that the full protection and security standard is no more than the traditional obligation to protect aliens under international customary law... The case-law and commentators generally agree that this standard imposes an obligation of vigilance and due diligence upon the government.")* (Exhibit CL-0017).

*manifest failure of natural justice in judicial proceedings or a complete lack of transparency and candour in an administrative process."[144]*

(v)     to prevent a denial of justice.[145]

(vi)    not to engage in an abuse of rights.[146]

313.    For the reasons set out above, Guinea's conduct amounted to a clear breach of each of those obligations owed to the Claimants, and for which the Claimants are each entitled to relief.

**3.9     Flaws in the process by which Guinea decided to implement the Measures**

314.    Guinea decided to expropriate the Claimants' mining rights by a process that lacked both procedural and substantive due process.

315.    The OECD Draft Convention on the Protection of Foreign Property is of some assistance in establishing what "*due process*" means in this context. The Commentary provides that due process:

> *"...implies that whenever a State seizes property, the measures taken must be free from arbitrariness. Safeguards existing in its Constitution or other laws or established by judicial precedent must be fully observed; administrative or judicial machinery used or available must correspond at least to the minimum standard required by international law"[147]*

316.    In *ADC v Hungary*, the Tribunal noted that:

---

[144] *Waste Management (No 2) v Mexico,* ICSID Case No. ARB(AF)/00/3, Award dated 30 April 2004, para. 98 (Exhibit CL-0018).

[145] Exhibit CL-0014, para. 1.01E; Bishop and Crawford, *Foreign Investment Disputes: Cases, Materials and Commentary* (2nd ed, Kluwer 2014), para. 8.05: ("*Under customary international law, states may be held liable for failing to provide foreign investors with due process…*") (Exhibit CL-0019).

[146] *Ibid.*, para. 8.06: ("*States that abuse their law making powers as a means of avoiding contractual obligations are acting contrary to international law").*

[147] OECD Draft Convention on the Protection of Foreign Property dated December 1962 (Exhibit CL-0020).

> "The Tribunal agrees with the Claimants that "due process of
> law", in the expropriation context, demands an actual and
> substantive legal procedure for a foreign investor to raise its
> claims against the depriving actions already taken or about to be
> taken against it. Some basic legal mechanisms, such as reasonable
> advance notice, a fair hearing and an unbiased and impartial
> adjudicator to assess the actions in dispute, are expected to be
> readily available and accessible to the investor to make such legal
> procedure meaningful. In general, the legal procedure must be of a
> nature to grant an affected investor a reasonable chance within a
> reasonable time to claim its legitimate rights and have its claims
> heard. If no legal procedure of such nature exists at all, the
> argument that "the actions are taken under due process of law"
> rings hollow. And that is exactly what the Tribunal finds in the
> present case."[148]

317.    The Technical Committee review process failed to meet this test and was in
        breach of Guinean and international law. It suffered from the following
        fundamental flaws.

### 3.9.1   The review process was ultra vires

318.    There was no justification at all under Guinean law for the imposition of a
        review process to be undertaken by the NMC and a Technical Committee
        constituted thereunder with regard to BSGR Guinea's mining rights or the Base
        Convention and allegations of bribery or corruption. From its inception the
        process was therefore *ultra vires* and of no legal effect as a matter of Guinean
        and/or international law. Furthermore, the purported imposition of that review
        regime on the Claimants' investments was itself a breach of Guinea's
        obligations.

319.    The NMC and its Technical Committee were established pursuant to the 2011
        Mining Code and the review of the Zogota Mining Concession and other
        mining rights was purportedly conducted pursuant to that Code (albeit that, as
        explained below, when imposing the Measures, Guinea did not rely upon any
        underlying legal basis for doing so). However, that raised a fundamental
        threshold problem with the entire process: the Zogota Mining Concession, the

---

[148] *ADC Affiliate Ltd & Anor v Hungary*, ICSID Case No. ARB/03/16, Award dated 2 October 2006,
para. 435 (Exhibit CL-0021).

Blocks 1 and 2 Permit and the Base Convention had all been granted <u>prior</u> to the introduction of the 2011 Mining Code. Thus, the 2011 Mining Code had no application to those rights. By its own terms, it did not apply in respect of mining titles (such as the Zogota Mining Concession or Blocks 1 and 2 Permit) or mining agreements (such as the Base Convention) all of which had been executed prior to 9 September 2011. Accordingly, the Technical Committee had no jurisdiction to review the legitimacy of the rights granted by those instruments.

320.    Despite this, by setting up the Technical Committee to review those rights Guinea purported to apply the 2011 Mining Code.   In doing so, Guinea therefore purported to apply its own legislation *retroactively*, in breach of Article 9 of the Guinean Constitution and Article 7-2 of the African Charter on Human Rights (which applied in Guinea by virtue of the Preamble and Article 151 of the Constitution).[149]

321.    Guinea's attempted reliance on the 2011 Mining Code was also a breach of Article 30 of the Investment Code and Article 32 of the Base Convention as explained hereabove.

322.    Finally, it is important to note that under the legislation which applied to the Zogota Mining Concession and the Base Convention, i.e. the 1995 Mining Code, a fraudulent misrepresentation carried a criminal sanction. But that legislation did *not* give the State the right to revoke a concession in such circumstances.

3.9.2    <u>The process was unfair, partial and dependent</u>

323.    The review process suffered from the inherent and systemic problem that it did not involve a fair, unbiased and impartial adjudication of the BSGR group's conduct.   This was due to (i) the manner in which the NMC and its two sub-committees was composed and controlled by President Condé, (ii) the process

---

[149] Legal Opinion of Bechillon and Labetoulle dated 9 December 2012 (Exhibit C-0070).

in which the Technical Committee in fact engaged was unfair and (iii) the fact that the end result of the review process was pre-determined.

> a.   *Composition of the review committees*

324.   The subcommittees of the National Mining Committee or NMC which were involved in the review process of the Claimants' mining rights were controlled directly or indirectly at every level by President Condé.

325.   Firstly, according to Article 5 of the 29 March 2012 decree, the four members making up the Strategic Committee were *"placed under the direct authority of the Head of State"*.[150] Furthermore, the members were four existing ministers of State, who were appointed to those roles by the President: the Minister for Mines and Geology, the Minister for Economy and Finance, the Minister for Justice and the Minister for Public Works and Transport. Accordingly, not only were the members of the Strategic Committee formally *"under the direct authority"* of President Condé, but their ministerial jobs depended on remaining in his favour.[151]  As President Condé himself stated in an interview dated 4 November 2013, "*We expect the Technical Commission to make proposals to the committee that I chair."*

326.   Secondly and according to the legal opinion of Daniel Labetoulle, Honorary Chair of the Litigation Division of the French Council of State, and Denys de Béchillon, Professor of Public Law, 16 of the 18 members of the Technical Committee were nominated by the President or members of his government.[152]

327.   Thirdly, the Technical Committee was placed under the authority of the Strategic Committee, and thus under the indirect authority of the President.[153]

328.   Fourthly, the decision of the Strategic and Technical Committees could only be executed after approval by the President.[154]

---

[150] Exhibit C-0051, Article 5.
[151] Exhibit C-0028, para 77.2.1.
[152] Exhibit C-0070; Exhibit C-0022, para 77.2.2.
[153] Exhibit C-0051, Article 6.

329.     Given the above, Labetoulle and de Béchillon concluded that:

> *"The closeness of this link with the executive branch poses a legal problem of primary importance… it is once again that guarantees of "objective" impartiality are imperatively required so that an authority of this kind can legitimately be asked to express an opinion on the allegations of corruption and on the maintenance or withdrawal of rights and good conferred by authentic acts. And yet, the system that has just been described does not offer – cannot offer – such guarantees. As a minimum, a firmly guaranteed statutory independence is necessarily required. It is clearly this statutory independence… that the organic features of this Commission do not present"*

> b.     *The process in which the Technical Committee engaged was unfair*

330.     The manner in which the Technical Committee in fact engaged in the review process was devoid of procedural fairness. This unfairness included the following fundamental flaws in basic due process.

331.     Firstly, the burden of proof was reversed with Guinea insisting that the BSGR group demonstrate why no corruption had taken place. This was notwithstanding that (i) the Committee admitted in the Allegations Letter that *"neither the validity, nor the probative force of these items has yet been evaluated"* and (ii) no evidence had been disclosed to support the allegations. This approach was all the more flawed since the Allegations Letter stated that if BSGR did not respond, the Committee would *"consider your conduct as recognition of the merits of the allegations… These omissions may therefore justify a decision contrary to your interests, regardless of any other evidence."* This was a highly prejudicial procedure and unlawful as a matter of Guinean law.

332.     Secondly, the allegations made by the Committee were unsupported by evidence, and/or the Committee failed to provide BSGR with the purported

---

[154] Exhibit C-0028, para 77.2.3.

evidence on which they were based or (where evidence was provided) that was patently incomplete. For example:

(i)     In its letter of 26 December 2012 and in the following months, BSGR made multiple requests to the Technical Committee for disclosure of the evidence that it purported to rely upon.[155] It was not until 7 May 2013, over six months after the date of the Allegations Letter, that the Technical Committee provided any documents, and even then it was only a handful of documents.[156] This was obviously not the entirety of the evidence and on 4 June 2013 Skadden Arps again requested that the Technical Committee produce all the evidence on which it relied.[157] This request was ignored until a further six months later, when on 4 December 2013, the Technical Committee disclosed evidence it purported to rely on in support of its allegations, again in incomplete form.[158] This was over one year since the date of the Allegations Letter, and only three working days before a hearing was scheduled to take place.

(ii)    The "evidence" that *was* disclosed by the Technical Committee was incomplete and relied on by the Technical Committee without question. It related in its entirety to the false allegation that BSGR colluded with Ms Mamadie Touré, presenting no evidence in respect of the multiple other allegations in the Allegations Letter. Furthermore, the main evidence to support this one allegation was an affidavit from Ms Touré, which BSGR had (and still has had) no opportunity to test by way of cross examination, and which, as stated by Skadden Arps on behalf of BSGR *"refers to a wholly incredible and unsupported set of events and our client considers this to be an entirely concocted, self-serving*

---

[155] Exhibit C-0054; Exhibit C-0028, para 79.1.
[156] Letter from the Technical Committee to VBG-VALE BSGR Guinea dated 7 May 2013 (Exhibit C-0071).
[157] Letter from Skadden Arps to the Technical Committee dated 4 June 2013 (Exhibit C-0072).
[158] Letter from the Technical Committee to VBG-VALE BSGR Guinea dated 4 December 2013 (Exhibit C-0073).

*statement by a witness who has previously (unsuccessfully) sought to extort money from BSGR".*[159]

(iii)   The Technical Committee relied as proof of the corruption allegations on the fact that BSGR did not appear at the hearing before the Technical Committee, which took place on one day (16 December 2013). At page 3 of the Allegations Letter, it stated that *"in the event that you do not provide the named witnesses or not attend the CTRTCM session of which you will have been notified, the CTRTCM may consider your conduct as recognition of the merits of the allegations hereby set forth against you. These omissions may therefore justify a decision contrary to your interests, regardless of any other evidence."* However, the Committee scheduled hearings in Guinea despite the fact that (as it knew or ought to have known) BSGR representatives were unable to attend. They were unable to attend because in particular (i) the President of BSGR had been wrongfully declared *persona non grata* in March 2013; (ii) two BSGR employees in Guinea had been imprisoned without charge and held in appalling conditions; and (iii) wholly false allegations had been made (and published) that Mr Steinmetz was involved in a coup and assassination attempt on the President. As early as 4 June 2013, Skadden Arps on behalf of BSGR had raised concerns about the safety of any BSGR employees or officers visiting Guinea.[160] However, only after the hearing took place did the Technical Committee suggest that BSGR representatives could have attended under a letter of safe passage from the Government, or by video link. As set out in Skadden's letter of 26 February 2014, *"It is telling that these suggestions have only now been made after the hearing and after the CTRTCM has made its decision."*[161]

(iv)   The hearings were organised to ensure that there was no opportunity to test the truth of the central witness relied up on by Guinea (Ms Touré).

---

[159] Exhibit C-0028, para 79.4; Letter from Skadden Arps to Technical Committee dated 8 December 2013, p.2 (Exhibit C-0074).

[160] Exhibit C-0072.

[161] Letter from Skadden to Technical Committee dated 26 February 2014, p.3 (Exhibit C-0075).

Ms Touré was not cross-examined or even called as a witness. BSGR's request to question Ms Touré in person was denied. Yet Ms Touré's evidence was central to the case put against the BSGR group.

(v)     The Technical Committee failed to address the BSGR group's substantive responses to the allegations, of 26 December 2012, 4 June 2013 and 8 December 2013. Specifically, Skadden's letter of 4 June 2013 (to which no substantive response had ever been received) was referred to only in passing and without any engagement as to its content. Skadden's letter of 8 December 2013 (which the Chairman dismissed as simply *"challenging the procedure"* of the Technical Committee) was entirely disregarded as regards the annex to that letter which responded point-by-point to the numerous allegations repeated or re-cast by the Technical Committee in its letter to BSGR Guinea/BSGR of 1 November 2013 (and to which annex no response has been forthcoming). Instead, the hearing was held on the pretence that the BSGR group did not have answers to Guinea's allegations.[162]

(vi)    The Technical Committee presided over the leaking of information to sympathetic members of the media, in order to cause prejudice to the BSGR group. On at least two occasions, documents appeared in the media before they had been provided to BSGR.[163] Leaked documents appeared in *The Financial Times*, and when on 7 May 2013 those documents were finally provided to BSGR, the Technical Committee relied on the fact that BSGR had refused to comment to *The Financial Times* regarding them.[164] That approach was all the more objectionable given that the allegations made by the Technical Committee in October 2012 effectively gagged the BSGR group from making any comment in respect of the review procedure, stating that it was required to maintain confidentiality and not make public any comments regarding the procedure. Failure to do so would be grounds for the Technical Committee to "take any measures that it deems appropriate".

---

[162] Exhibit C-0028, paras 80.6 to 80.7.
[163] *Ibid.*, para 81; CWS-5, para 110.
[164] Exhibit C-0071; Exhibit C-0028, para 81.6.

Notwithstanding that position, the Technical Committee itself relied on the fact that the Claimant had refused to comment on the leaked media reports.

333.    As will be demonstrated in the course of these proceedings, the exercise conducted by the Technical Committee and the Strategic Committee was not (and was not intended to be) an objective fact-finding mission. As a result, its 'findings' and 'conclusions' were fundamentally incorrect and based on wholly unreliable evidence.

   *c.    The conclusion was pre-determined*

334.    Even before the Technical Committee had completed its review and without providing BSGR, BSGR Guernsey or BSGR Guinea with all the evidence on which that committee relied, President Condé had declared his intention to expropriate the Claimants' rights and assets.

335.    On 21 October 2013, Tom Burgis of the Financial Times reported that:

   *"In his clearest statement of intent to date, Mr Condé declared in a speech at the start of October that his government had started a battle to recover our mines which were acquired fraudulently".[165]*

## 3.10   No substance to the corruption allegations

3.10.1   Preliminary observations

336.    Putting to one side the wholly flawed process that took place at the time, as described above, and turning to the allegations themselves, it is clear that they were and are demonstrably false. As such, the Measures were in any event not a legitimate contractual or regulatory response on the part of Guinea to a perceived issue, whether with the BSGR group or with the manner in which it had obtained its rights.  There had been no breach of the Base Convention or of the Zogota Mining Concession, or of any other relevant provision of Guinean

---

[165] Exhibit C-0059.

law, whether by BSGR Guinea or any other related entity that might have justified the revocation of BSGR Guinea's valuable rights. As such, given that there was *in fact* no basis for the revocation of those mining rights under Guinean law, the taking of BSGR Guinea's property was unlawful and expropriatory.

337. In this regard, it is important to note at the outset that neither the Technical Committee nor the Strategic Committee, nor the President, nor the Minister of Mines, purported to justify (or explain) any of the Measures on the basis of any alleged *breach* of either (a) the Base Convention and/or (b) the Zogota Mining Concession and/or (c) the applicable Mining Code.   In other words, Guinea simply relied upon alleged "indications" of corruption without relying or even purporting to rely upon any legal underpinning for the imposition of the Measures.

338. Be that as it may, the Claimants anticipate that Guinea will in this arbitration seek to rely upon some or all of the same allegations that were made by the Technical Committee in an attempt to justify the expropriation that took place.

339. However, those allegations were never properly pleaded against BSGR or proven within the Technical Committee process. As such, if and to the extent that Guinea wishes *now* to rely upon the allegations advanced by the Technical Committee, it is incumbent upon it properly to plead and prove those allegations in this arbitration.  See, in this regard, for example, the approach of the Tribunal in *Burlington v Ecuador* which investigated whether the taking at issue there was in fact justified under local law[166]; and the approach in *Vigotop v Hungary* where the Tribunal considered that it had to consider whether the contractual termination grounds proffered *"in fact existed"*.[167]

---

[166] *Burlington v Ecuador,* ICSID Case No. ARB/08/05, Award dated 14 December 2012, para 506 *et seq* (Exhibit CL-0022).
[167] *Vigotop Limited v. Hungary*, ICSID Case No. ARB/11/22, Award dated 1 October 2014, para. 329 (Exhibit CL-0023).

340.   In this context, therefore, if Guinea seeks to rely upon the allegations and putative 'findings' of the Technical Committee as a purported basis for justification of the Measures, the Claimants will respond to those (and any other) allegations in detail in their Reply, if and when they have been (finally) pleaded out in Guinea's Defence.  For the avoidance of doubt, however, the Claimants deny in the strongest terms the substance of the (un-particularised and unproven) allegations of corruption advanced by the Technical Committee and by Guinea more generally. If it becomes necessary to explore these matters in this arbitration, it will become apparent that those allegations were (and are) demonstrably false.

341.   Furthermore, this raises three further issues *if* Guinea is going to make allegations of corruption against the Claimants: (a) those allegations must be squarely put and pleaded in the present proceedings; (b) the Tribunal must apply an elevated standard of proof to such allegations; and (c) Guinea is not entitled (as a matter of law) to rely upon matters not previously raised in an attempt to justify the imposition of the Measures.

342.   As to issue (a) the Tribunal will no doubt bear these words of Professor Wälde firmly in mind (stated in his Separate Opinion in *Thunderbird v Mexico*) when considering allegations of corruption:

> *"Such insinuations are now frequently employed by both claimant investors and respondent governments. They should be disregarded – explicitly and implicitly, except if properly and explicitly submitted to the tribunal, substantiated with a specific allegation of corruption and subject to proper legal and factual debate for the tribunal. That is simply the implication of the "fair hearing" principle ... It is therefore particularly important for a tribunal not to get influenced, directly or indirectly, by "insinuations" meant to colour and influence the arbitrators' perception and activate a conscious or subconscious bias, but to make the decision purely on grounds that have been subject to a full and fair hearing by both parties. Cards should be placed, "face up", on the table rather than be waved around, with hints and suggestions...."[168]*

---

[168]  *Thunderbird v Mexico,* Separate Opinion of Professor Walde in the Arbitration under Chapter XI of NAFTA and UNCITRAL Arbitration Rules (Exhibit CL-0024).

343.     As to issue (b), the consistent practice of international tribunals has been to apply an elevated standard of proof of "clear and convincing evidence", i.e. beyond the balance of probabilities.[169]

344.     Finally, as to issue (c) it is important to note in this context that as a matter of Guinean law, Guinea cannot now seek to justify its conduct on the basis of a ground of complaint which it may *now* assert it was entitled to rely upon at the time, but in circumstances where it did not in fact do so. This poses a fundamental and insurmountable obstacle to any attempt by Guinea to construct an *ex post facto* justification for its unlawful conduct.

### 3.10.2    The Claimants did not corrupt Guinean officials

345.     At the heart of these proceedings is Guinea's allegation, that the Claimants' obtained their mining rights by corrupting Guinean officials. Guinea submits that "*there is a series of precise and concurring indications that establish with sufficient certainty the existence of corrupt practices tarnishing the granting of mining titles and the mining agreement in question to BSGR*".[170] These corrupt practices would nullify the mining titles and the mining agreement that were held by the Claimants.

346.     The Government further alleges that both prior to and in parallel with the award of its mining rights and the entry into the Base Convention, BSGR would have offered gifts and granted benefits to Guinean officials and their relatives.[171]

347.     Nothing is, however, more distant from the truth.   **[PROTECTED]**

---

[169] *EDF (Services) Limited v Romania*, ICSID Case No. ARB/05/13, Award dated 8 October 2009, paras. 221-224, 227 and 232 (Exhibit CL-0025); *Siag v Egypt* ICSID Case No. ARB/05/15, Award dated 1 June 2009, paras. 325-32 (Exhibit CL-0026).
[170] Exhibit C-0064, p. 3.
[171] *Ibid.*, para 27, p. 10.

348.    To paraphrase the Technical Committee, if there is a series of precise and concurring indications, they point in the opposite direction of what the Government is alleging: they establish that there was no corruption in the award of the Claimants' mining rights.

> *a.*    *The Simandou North Permits, the Simandou South Permits and the Memorandum of Understanding*



349.

(i)

(ii)

350.

(i) [PROTECTED]

(ii) [PROTECTED]

*b.    Blocks 1 and 2 Permit*

351.    [PROTECTED]

352.    [PROTECTED]

(i) [PROTECTED]

---
174 [PROTECTED]
175 [PROTECTED]
176 [PROTECTED]



(ii) **[PROTECTED]**

c.    *The Base Convention and the Zogota Mining Concession*

353.







356.   [PROTECTED]

357.   [PROTECTED]

---
182   [PROTECTED]

183   [PROTECTED]

184   [PROTECTED]

### 3.10.3  No involvement of Ms Mamadie Touré

358.    The spider in BSGR's alleged corruption web was, according to the Republic of Guinea, Ms Mamadie Touré. In the Technical Committee Report it is alleged that Ms Touré would repeatedly have intervened with the Guinean authorities, on behalf of the Claimants, to acquire both the Blocks 1 and 2 Permit, the Base Convention and the Zogota Mining Concession.

359.    [PROTECTED]

(i)     [PROTECTED]

(ii)    [PROTECTED]

(iii)   [PROTECTED]

(iv)    [PROTECTED]

(v)     [PROTECTED]

(vi)    [PROTECTED]

(vii)   [PROTECTED]



185   [PROTECTED]

186

187

188

189

190



**[PROTECTED]**

360.   **[PROTECTED]**

361.   **[PROTECTED]**

191 **[PROTECTED]**

192 **[PROTECTED]**



362.    In summary, this evidence establishes that the Claimants did not use Ms Mamadie Touré as their conduit to obtain mining rights. As established here-above, the Claimants obtained all of their rights in accordance with the Mining Code and the applicable administrative processes and on the basis of the commitments and investments that it was making on a daily basis to the benefit obviously of itself but also of the Republic of Guinea and its citizens.

### 3.10.4   No undue pressure by President Conté

363.    The final piece in the Government's corruption puzzle is that BSGR would have used Ms Mamadie Touré to exercise pressure on her alleged husband, President Conté, who would in turn have exercised pressure on his Ministers of Mines to grant mining rights to the Claimants.[194]

364.    Whereas the record undoubtedly establishes that President Conté was indeed taking an active interest in the status of the mining operations in his country (the opposite would be completely surprising, not to say odd, given the potential of Guinea's mineral deposits and the impact that successful mining

---

[193] 

[194] Exhibit C-0064, paras 126 and 127.

operations could have on the destiny of the country and its citizens), the record establishes that President Conté did not simply instruct his Ministers to grant the Claimants the rights that they were looking for but that he acted according to whatever guidance his senior officials were giving them.



365.   [PROTECTED]

(i)   [PROTECTED]

(ii)   [PROTECTED]

366.   [PROTECTED]

367.   [PROTECTED]



195   [PROTECTED]

196   [PROTECTED]

197   [PROTECTED]



**[PROTECTED]**



369.   **[PROTECTED]**

370.   Furthermore, President Conté died shortly after the award of the Blocks 1 and 2 Permit. The Base Convention and the Zogota Mining Concession were awarded more than a year later. Ms Mamadie Touré, let alone the deceased President Conté had no involvement whatsoever in the granting of those rights.

3.10.5   Conclusions

371.   Whilst the Technical Committee asserted that there were "*indications*" that established "*with sufficient certainty*" the existence of corrupt practices which were said to "*tarnish*" the mining titles and the Base Convention, and whilst Guinea purported to level corruption allegations against the Claimants, the reality is that (a) those allegations were never properly pleaded or proven, and the process by which the Technical Committee reached its conclusions was fundamentally flawed; and (b) the allegations lacked any merit in any event. As such, the Measures constituted an unlawful expropriation and/or nationalization.

**IV.**   **JURISDICTION**

**4.1**   **Article 25(1) of the ICSID Convention**

372.   Four conditions must be met in order for ICSID to have jurisdiction over a dispute. Those conditions are set out in Article 25(1) of the ICSID Convention, which provides as follows:

> *"The jurisdiction of the Centre shall extend to any legal dispute arising directly out of an investment, between a Contracting State (or any constituent subdivision or agency of a Contracting State designated to the Centre by that State) and a national of another Contracting State, which the parties to the dispute consent in writing to submit to the Centre. When the parties have given their consent, no party may withdraw its consent unilaterally."*

373.   Thus, the four conditions are:

(i)   the dispute must be "*legal*";

(ii)     it must be one "*arising directly out of an investment*";

(iii)    it must be "*between a Contracting State (or any constituent subdivision or agency of a Contracting State designated to the Centre by that State) and a national of another Contracting State*"; and

(iv)     the parties to the dispute must "*consent in writing to submit* [it] *to the Centre.*"

374.   The present dispute between the Claimants and Guinea fulfills each of these conditions for the reasons described above and set out below.

## 4.2     The Dispute is a legal dispute

375.   The subject matter of the present dispute is Guinea's breaches of each of the applicable investment laws, the BOT Act and the Base Convention, including its illegal and continued expropriation and/or nationalization of the Claimant's mining and infrastructure rights without providing prompt, adequate and effective compensation.

376.   The dispute is clearly legal in nature because it concerns the existence or scope of each of the Claimants' legal rights, and the nature and extent of the relief to be granted to the Claimants.

## 4.3     This Dispute arose directly out of an Investment

377.   As described above, this dispute principally concerns Guinea's expropriation and/or nationalization and maltreatment of the Claimants' investments, including in particular its unlawful withdrawal and/or termination of (i) the Blocks 1 and 2 Permit, (ii) the Base Convention and (iii) the Zogota Mining Concession; its expropriation and/or nationalisation of BSGR's and BSGR Guernsey's shareholding in BSGR Guinea, and BSGR's shareholding in BSGR Guernsey (each of which constituted a qualifying investment within the meaning of Article 25); and its consequent failure to comply with its obligations under (i) the Base Convention, (ii) the Investment Code, (iii) the

Mining Code, (iv) the BOT Act and (v) international law, in respect of each of those investments. Accordingly, it is clear that this condition is satisfied.

a.   <em>Mining Code</em>

378.   As regards the **Block 1 and 2 Permit,** it constitutes a mining prospecting permit under Article 10 of the Mining Code. By virtue of Article 26 of the Mining Code, the holder of a prospecting permit is conferred the exclusive right to (i) prospect for mining substances for which the permit is issued and (ii) an operating permit or concession for deposits found within the prospecting site. Article 26 further provides that a prospecting permit confers a moveable, indivisible and non-assignable right on the permit holder.

379.   As regards the **Zogota Mining Concession**, it constitutes a mining concession under Article 10 of the Mining Code.  By virtue of Article 41 of the Mining Code, a holder of a mining concession is conferred the exclusive right to carry out all kinds of prospecting and development of the mining deposits for which the concession is granted. The Article further provides that a mining concession requires "*sizable works and investments*" and confers an immoveable, divisible and assignable right on the concession holder. Article 3 of the Mining Code expressly provides that the right to extract substances pursuant to an operating title - such as a mining concession - is a species of property.

380.   As regards the **Base Convention**, it constitutes a mining agreement under Article 11 of the Mining Code which provides that such agreements "*define the rights and obligations of the respective parties and set out the legal, financial tax and social condition which govern operation for the duration of the agreement".* The Article further provides that a mining agreement "*constitutes a guarantee to the mine title holder that these conditions will remain unvaried*".

381.   Article 184 of the Mining Code refers to holders of mining titles and mining agreements as "*mining investors*".

382.   In other words, where holders of mining rights or mining agreements are considered to be "*investors*", the mining rights and agreements that they are holding must be considered "*investments*". Furthermore, the Claimants' analysis follows the orthodox approach in investment treaty cases. Numerous investment treaty cases have recognised that a mining title constitutes an "*investment*" in the host state.

        *b.*    *Investment Code*

383.   Whilst the Investment Code does not define the term "*investor*" or "*investment*", there can be no doubt that the Claimants are "*investors*" and that (i) their mining titles and mining agreements (specifically, the Blocks 1 and 2 Permit, the Base Convention and the Zogota Mining Concession); and (ii) BSGR's and BSGR Guernsey's shareholding in BSGR Guinea (and BSGR's shareholding in BSGR Guernsey), are each "*investments*".[200]

384.   **Firstly**, Book 1 of the Investment Code is entitled *"General conditions of investment and guarantees to investors"*. It contains Article's 2 to 7. Article 2 provides that "*any person is free to undertake a commercial, industrial, mining, agricultural or services activity in the territory of the Republic of Guinea, in compliance with the applicable laws and regulations of the Republic*".

385.   In other words, any person, natural or legal, that undertakes mining activities in Guinea is considered to be an "*investor*" and their mining activities are considered to be "*investments*".

386.   **Secondly**, Part A of the preamble to the Investment Code entitled "*General conditions of investment*" provides that "*to promote investment in Guinea, a very liberal [Investment] Code has been adopted in 1987 by Decree No. 001/PRG/87"* (emphasis added). This Code is still in place today. Taking into account the very liberal approach to investments in the Investment Code and without any indications to the contrary in the Investment Code, mining rights

---

[200] We have addressed the proper analysis of these shareholdings above.  In this section, we concentrate on the relevant mining rights.

and mining agreements such as the Blocks 1 and 2 Permit, the Base Convention and the Zogota Mining Concession constitute "investments".

387.    **Thirdly**, Part A of the preamble to the Investment Code lists the following fundamental principles which apply (subject to reciprocity) to investments:

-    *the freedom to do business for any person meeting the legal conditions, without any discrimination of whatever nature;*
-    *The equal treatment between natural and legal persons and Guineans;*
-    *The freedom to transfer funds [...]*
-    *The equality between the public and the private sector;*
-    ***The protection of rights acquired;***
-    *The freedom for all foreigners to conduct economic activities in Guinea without the obligation of an association with a Guinean"* (emphasis added)

388.    The fact that the protection of "*rights acquired*" is a fundamental principle of the Investment Code establishes that the rights themselves, such as the Blocks 1 and 2 Permit, the Base Convention and the Zogota Mining Concession, constitute "*investments*".

c.    *BOT Act*

389.    Whilst the BOT Act does not contain a definition of "*investment*", Article 1.13 does define an "*investor*" as "*one or more legal entities, Guinean or foreign, concession holders of one or more structures belonging to a complex that they have constructed or rehabilitated at their cost in accordance with the terms of a BOT Agreement signed with the State*".

390.    As indicated earlier, by virtue of the operation of the Base Convention, which qualifies as a BOT agreement, each of the Claimants were granted and entitled to exercise a bundle of infrastructure rights, including the granting of legal

concessions over the mines and railways (inter alia) which were to be constructed, financed, operated and maintained. Therefore, the Claimants are "*investors*" under the BOT Act and the infrastructures that they were constructing, until the Measures were implemented by the Government of Guinea, qualify as "*investments*".

   d.   *Base Convention*

391.   Whilst the Base Convention does not contain a definition of "*investment*", Article 1 does define "*the Investor*" as "*BSG Resources (Guinea) Limited, company under the law of Guernsey, with registered office in Guernsey*".  The Government of Guinea thus considered BSGR Guernsey to be an "*investor*" by virtue of (a) being a party to the Base Convention; and/or (b) its shareholding participation in BSGR Guinea. The rights and obligations that BSGR Guernsey undertook by signing the Base Convention must therefore be considered to constitute an "*investment*".   The same must apply *mutatis mutandis* to BSGR Guinea.

392.   Furthermore, it is clear that BSGR's and BSGR Guernsey's shareholding in and financing of BSGR Guinea and the other subsidiaries involved in the project (and BSGR's shareholding in BSGR Guernsey), constituted an "*investment*" within the meaning of Article 25 of the ICSID Convention. Numerous ICSID tribunals have accepted that an indirect shareholding, such as BSGR's, falls within the scope of the term "investment" in Article 25. As noted in the recent decision in *Levi v Peru*:

> "*Several Arbitral Tribunals have repeatedly stated that investors with an indirect interest, including a minority interest, may on the basis of the ICSID Convention request protection of the rights accorded to them by an investment treaty.*"[201]

393.   Further, for the reasons stated above, the Investment Code, the Mining Code and the Base Convention plainly considered BSGR's and BSGR Guernsey's

---

[201] *Levi v Peru,* ICSID Case No. ARB/10/27 Award dated 26 February 2014, para. 144 (Exhibit CL-0027).

shareholdings to be an "investment" under each of those instruments. The same applies in relation to the development of infrastructures under the BOT Act. The jurisdiction of the Tribunal is governed by the terms of the instruments expressing the parties' consent to ICSID arbitration, i.e. the Base Convention, the Investment Code, the Mining Code and the BOT Act. Given that Guinea considered BSGR's and BSGR Guernsey's shareholdings and infrastructure works to be an investment for the purposes of obtaining the protections guaranteed by its Investment Code, Mining Code and the BOT Act it is clear that it must similarly be considered an 'investment' for the purposes of Article 25 of the ICSID Convention.[202]

394.   It is also clear that the dispute arose "*directly*" out of BSGR's and BSGR Guernsey's investment in BSGR Guinea. A number of ICSID decisions have construed these words in Article 25 broadly, finding that the term "*directly*" in Article 25 relates to the "*dispute*" (rather than the investment).[203]   It is clear that the Measures, which were imposed against the BSGR group as a whole, and plainly with full knowledge of BSGR's and BSGR Guernsey's shareholdings in BSGR Guinea, give rise to a dispute "*arising directly out of an investment*".

### 4.4   This Dispute is between a Contracting State and a National of another Contracting State

395.   The present dispute is between BSGR, BSGR Guernsey and BSGR Guinea as Claimants and Guinea as Respondent.

396.   Guinea signed the ICSID Convention on 27 August 1968 and deposited instruments of ratification on 4 November 1968. The ICSID Convention entered into force in the Republic of Guinea on 4 December 1968.

---

[202] CL-0007, paras. 68-76.
[203] See e.g. *Fedax v Venezuela,* 5 ICSID Rep 183, Decision on Jurisdiction dated 1997, para. 192 (Exhibit CL-0028); *Siemens AG v Argentina,* ICSID Case No ARB/02/8, Decision on Jurisdiction dated 3 August 2004, para.150 (Exhibit CL-0029); *Metalpar SA & Buen Aire SA v Argentina,* ICSID Case No ARB/03/5, Decision on Jurisdiction dated 27 April 2006, paras 84-93 [Spanish only] (Exhibit CL-0030).

397.    BSGR is a company registered under the laws of the Bailiwick of Guernsey with the registration number 46565. BSGR was incorporated in 2003 as a limited company in Jersey; and migrated in March 2007 to Guernsey.

398.    As for BSGR Guernsey, it is a company registered under the laws of the Bailiwick of Guernsey on 10 February 2009 with the registration number 50001.

399.    Guernsey constitutes a British Crown dependency of the United Kingdom of Great Britain and Northern Ireland ("**the United Kingdom**"). The ICSID Convention entered into force in the UK on 18 January 1967. On 11 June 1973, the United Kingdom designated Guernsey as a constituent subdivision of the United Kingdom pursuant to Article 25(1) and Article 25(3) of the ICSID Convention and notified the Centre that Guernsey had approved its consent to ICSID jurisdiction. BSGR and BSGR Guernsey are therefore each a national of another Contracting State for the purposes and within the meaning of Article 25(2)(b) of the ICSID Convention.

400.    As for BSGR Guinea, it is a company incorporated under the laws of Guinea on 24 November 2006. However, BSGR Guinea and Guinea have agreed that, because of foreign control, BSGR Guinea should be treated as a national of another Contracting State for the purposes and within the meaning of Article 25(2)(b) of the ICSID Convention; and BSGR Guinea has been treated as such at all material times.

401.    More specifically, on 16 December 2009, BSGR Guinea, BSGR Guernsey and the Republic of Guinea entered into the Base Convention. On its true and proper construction, by the Base Convention the Parties agreed to treat BSGR Guinea as a national of another Contracting State within the meaning and for the purposes of Article 25(2)(b). The Claimants will rely upon all the terms of the Base Convention for their true meaning and full effect.

402.    In particular, the Claimants will rely (without limitation) upon:

(i)     Article 1 which defines "*control*" as the direct or indirect ownership by a company or any other entity of at least fifty percent (50%) of the shares providing a majority of the voting rights at the general meeting of another company or entity, or a holding providing  authority to determine policy and management;

(ii)    Article 7, under which Guinea provided a good faith undertaking to comply with the terms and conditions set out in the Base Convention (including its obligations contained in and/or revealed by Articles 36.2 and/or 38.2);

(iii)   Article 38.2, which, in addition to the reference to "*the Parties*" (including BSGR Guinea) making a request for arbitration to ICSID, specifically refers to the ability of "*the Company*", defined as BSGR Guinea, to appoint an arbitrator;

(iv)    Article 36.2, which refers to the fact that *"the Concession can be terminated if the Company refuses to carry out a final decision in arbitration in accordance with clause 38 of this Agreement."* Thus, Article 36.2 specifically contemplates BSGR Guinea being party to an ICSID arbitration, and thus bound by an ICSID arbitration award, pursuant to Article 38; and

(v)     Annex 1 of the Base Convention, according to which the parent company of BSGR Guinea and BSGR Guernsey, BSG Resources Limited, incorporated in Guernsey, confirmed on behalf of the BSGR group that BSGR Guinea was authorized to enter into the Base Convention.

403.    Further, and in any event, at all material times, BSGR Guinea has been wholly owned and/or controlled by BSGR Guernsey.

**4.5     The Parties have consented in writing to ICSID Arbitration**

404.    The requirements of Article 25 of the ICSID Convention are satisfied in relation to the disputes arising under each of (i) the Base Convention, (ii) the Investment Code, (ii) the Mining Code and (iv) the BOT Act.

4.5.1    The Base Convention

405.    Article 38 of the Base Convention is headed "*Settlement of Disputes*". Subsection 38(1) is entitled "*Amicable phase*" and provides:

> "*In the event of a dispute and/or conflict between the Parties in respect of this Agreement and/ or the Concession, including but not limited to its validity, interpretation, execution, non-compliance or termination, the Parties undertake in the first instance to try to resolve the dispute or conflict between them amicably.*
>
> *Failing an amicable settlement within a period of one hundred and twenty (120) Days from the date of receipt of the notice sent by one Party to the other of the dispute or conflict between them, the provisions of clause 38.2 shall apply*"

406.    Subsection 38(2) is entitled "*Binding Arbitration*" and provides:

> "*The Parties agree to submit to the arbitration of the ICC any dispute arising from or related to this Agreement that has not be [sic] resolved under clause 38.1, using the Arbitration Convention of this institution.*
> *In addition, the Parties agree to make all requests and submissions to ICSID or to the International Arbitration Court, depending upon the case, and to undertake any other actions and supply all information required to set up the arbitration proceedings.*
>
> *Unless the Parties agree otherwise, the arbitration procedure shall take place in Paris (France) and shall be conducted in French.*
>
> *There shall be three (3) arbitrators: one appointed by the Government, one appointed by the Company, and the third appointed by the two (2) arbitrators already chosen.*
>
> *One of the Parties can start the arbitration process by sending the other Party a notice to that effect, including:*

> a) *Reference to the provision in this Agreement that has led to the dispute;*
>
> b) *Reference to the mining rights issued as part of this Agreement;*
>
> c) *The nature of the dispute that has led to the complaint and, if applicable, any sum of the complaint for damages or compensation;*
>
> d) *The facts that cause any complaint, and*
>
> e) *The remedy sought.*
>
> *The Party that receives the notification must reply within thirty (30) Days, confirming or rejecting the complaint in whole or in part, and if applicable stating the nature and circumstances of any counter-complaint. Failure to reply within the period allocated is considered a refusal by this Party to accept the complaint and leads to the arbitration process provided for in this Agreement.*
>
> *The Parties recognize that the decision handed down following arbitration under this Agreement is binding, final and without appeal.*
>
> *The fact that one of the Parties does not take part in the arbitration is not a reason to reject the arbitration tribunal's jurisdiction or its decision. The Parties expressly waive any objections to arbitration procedures and the decision arising therefrom, unless the said arbitration does not comply with the requirements stipulated in this Agreement.*
>
> *The Parties hereby expressly waive any immunity of jurisdiction and any immunity of execution, for themselves and their respective employees (except those of the Government exclusively reserved for diplomatic work), for the requirements of executing any decision or judgment handed down in respect of this Agreement.*"

407.   Article 38(1) and (2) of the Base Convention grants jurisdiction to hear the present dispute on the ground that:

(i)   the dispute arises from and/or relates to the Base Convention and the Zogota Mining Concession;

(ii)   BSGR Guernsey and BSGR Guinea are each a party to the Base Convention; and

(iii) by letter dated 9 April 2015 to Guinea, the Claimants attempted to resolve this dispute amicably but have failed to do so.[204] The 120 period referred to in Article 38(1) thus expired on 10 August 2015 (being 120 days from the date of receipt of the notice by Guinea).

4.5.2   The Investment Code

408.   Article 28(2) of the Investment Code provides for ICSID arbitration as follows:

*"[...] Disputes between the Guinean government and foreign nationals regarding the application or interpretation of this Code, shall, unless otherwise agreed by the parties, be finally settled by arbitration conducted:*

*in accordance with the provisions of the Convention of 18 March 1985 for the "Regulation of Investment Disputes between States and Nationals of other States" established under the auspices of the International Bank for Reconstruction and Development, ratified by the Republic of Guinea November 4, 1986"*

409.   Article 28(2) of the Investment Code contains an offer by Guinea to arbitrate disputes arising between the Guinean government and foreign nationals.

410.   As stated above, BSGR and BSGR Guernsey are each a foreign national and, for the purposes of the Investment Code, BSGR Guinea is also a foreign national.

411.   In accordance with Article 28(2) of the Investment Code and the ICSID Convention, the Claimants are entitled to refer the present disputes to arbitration under the ICSID Arbitration Rules.

412.   Accordingly, by the filing of its Request for Arbitration, the Claimants each accepted the offer to arbitrate its dispute with Guinea in accordance with Article 25 of the ICSID Convention and within the meaning of Article 28(2) of the Investment Code.

---

[204] Letter from Mishcon de Reya to President Alpha Condé and others dated 9 April 2015 (Exhibit C-0083).

4.5.3   <u>The Mining Code</u>

413.   Article 184 of the Mining Code contains an offer by Guinea to arbitrate disputes arising between Guinea and "*mining investors*". It provides as follows:

> "*Disputes between one or several mining investors and the State with regard to the extent of their rights and obligations, the performance or non-performance of their undertakings at the end of their titles, assignment, transfer, or sub-leasing of their rights arising therefrom may be submitted to amicable settlement procedure.*
>
> *If one of the parties feels that amicable procedure has failed, the dispute is brought before either the appropriate Guinean court or international arbitration in accordance with the agreement of March 18 1965 for the settlement of disputes with respect to investments between States and nationals of other States, established under the aegis of the Banque Internationale pour la Reconstruction et de Développement.*
>
> *In cases where the Centre International pour le Reglement des Différends relatifs aux Investissements (CIRDI) declines jurisdiction over a dispute referred to it, the dispute shall be settled by the arbitration court of the Chambre de Commerce Internationale (CCI) according to its own rules and procedures…*"

414.   Each of BSGR Guernsey and BSGR Guinea is a mining investor within the meaning of the Mining Code.

415.   BSGR is also a mining investor within the meaning of the Mining Code.  Further, over an extended period of time, Guinea has always considered BSGR itself to be an investor.

416.   **First**, the preamble to the 2006 Memorandum of Understanding includes the following provisions:

> "*BSGR, who manifested interests for the for high mining potentials of the REPUBLIC OF GUINEA, initiated contacts with the Guinean authorities in order to set up a partnership for the development of a part of the SIMANDOU FERROUS DEPOSITS ("SIMANDOU FERROUS DEPOSITS");*

*BSGR is an international mining group dedicated to the prospecting, development and trading of mineral resources, and with respect to this project, BSGR has delegated to its subsidiary BSGR Guinea, the management of the SIMANDOU FERROUS PROJECT";*

*BSGR holds a majority interest in an engineering company named Bateman Engineering, dedicated to mining, metals and minerals engineering, construction and management"; and*

*BSGR has the will, the financial and technical capabilities to cooperate with the REPUBLIC OF GUINEA to take various commercial initiatives".[205]*

417.   Notwithstanding that the Memorandum of Understanding was, strictly speaking, entered into by BSGR's BVI subsidiary, the Government of Guinea saw itself as entering into a partnership with BSGR and by extension the BSGR Group.  There was no meaningful distinction drawn between BSGR and its wholly owned subsidiaries.  This document records that it was BSGR that first expressed an interest in Simandou's iron ore deposits, that BSGR BVI's role arose by way of delegated authority from BSGR, that the Government's interest was not limited merely to BSGR Guinea BVI but also to other group companies with a contribution to make and that it was BSGR which had the capabilities to bring Simandou's iron ore deposits to commercial production.

418.   **Second**, Annex 1 to the Base Convention contains a power of attorney, authorising Messrs Avidan and Struik to enter into "*documents, conventions or agreements involving* [BSGR Guernsey and/or BSGR Guinea] *with the relevant and* appropriate *Authorities in Guinea in connection with the BSGR Group's interest and activities in connection with the development and production of Iron Ore, including, but not limited to, the BSGR Group's concessions known as Simandou Blocks 1-2 and Simandou South*". [206] In other words, it was specifically agreed by BSGR and the Government of Guinea, on entering into the Base Convention, that the "*interest and activities*"  - ergo, the investments - covered by that convention were those of the BSGR Group.  Equally

---

[205] Exhibit C-0009.
[206] Exhibit C-0069.

importantly, it was also agreed and acknowledged that the concessions arising from Simandou South and Simandou Blocks 1 and 2 belonged to BSGR. By the incorporation of that power of attorney into the Base Convention, Guinea has expressly agreed that BSGR is an investor.

419.   **Third**, the report of the Technical Committee similarly indicates that the Government of Guinea saw itself as having entered into an agreement with BSGR. By way of example, that report states that:

(i)      as per the summary, that "*in the mining sector, BSGR obtained the benefit of several mining titles and one mining agreement…*", before referring to the exploration permits for Simandou North, Simandou South, Simandou Blocks 1 and 2 and the Base Convention;

(ii)     at paragraph 12 in the factual background section that "*in order to expand its activity in* [the natural resources] *sector, according to the information in the possession of the Committee, at the beginning of 2000, the BSGR Group decided to invest in the mining sector in the Republic of Guinea*" at paragraph 15 that "*the BSGR Group also resorted to several companies for the development of its activities (together 'BSGR')…created to carry the titles and agreements of which the BSGR Group could benefit*", and at paragraph 16 that "*legal representatives of BSGR…contacted the Guinean authorities in order to indicate to them the wish of the BSGR Group to invest in mines in Guinea*". [207]

420.   The report of the Technical Committee was the Government of Guinea's own review into the factual background whereby BSGR acquired its mining rights in Simandou. Taken together, it is clear from the extracts above that even the Government of Guinea accepts that it was entering into a relationship with BSGR, as the head company of what it considered to be the BSGR Group and that on that basis, BSGR was an investor for the purposes of the ICSID Convention.

---

[207] Exhibit C-0064.

421.     **Fourth**, at the First Session of this arbitration on 23 April 2015, Counsel for
          Guinea stated as follows:

> "*Just as at the beginning when they signed the base convention, it
> was clear that all decisions would be spearheaded by BSGR
> Limited, the party to this case. Annex 1 to the base convention that
> you have to the exhibits, I will circulate this now. This is the letter
> that should have been provided after the signature of the base
> convention, where the leaders of BSG Resources Limited confirmed
> their responsibility for the people singing under the subsidiaries.*
>
> *Here we have a situation where BSGR, for reasons that will
> become interesting in the follow up to this procedure, BSGR has
> decided to set up a company in the Cayman islands, in Guernsey,
> quite an opaque organisation for their own reasons they created
> several different companies. In any case it was BSGR, which is the
> party here in front of us which was the active party. When you look
> at the Request for Arbitration here, everything is BSGR through
> these two subsidiaries. They obtained rights through these
> subsidiaries, they ignored the separation between these two
> companies and still acting as the managers in this case, they are
> party to the Base Convention and there are obligations that they
> must uphold. I am not going to enter into the technical details of
> the Guinean Mining law since a Guinean mining company was the
> one that was supposed to sign this convention but in fact it was a
> company based in Guernsey that signed this agreement. We should
> not treat this company any differently.*
>
> *From a practical point of view to come back to an English
> sentence; BSGR is trying to use this convention as a sword and a
> shield; "we can attack Guinea by saying that you have not
> respected the obligations of this convention, but when there is
> something we do not like, we are hiding behind the fact it was our
> subsidiary which was 100% controlled by us that signed this." for
> all of these reasons, it is clear that BSGR led all of these
> operations, accepted the French language for this contract and
> now today for their own reasons, BSGR would like to conduct this
> in English*".[208]

422.     **Finally**, by a letter dated 15 March 2013 BSGR put the Republic of Guinea on
          notice that it intended to invoke the protections arising under the Investment
          Code and the Mining Code, and that it was an investor for the purposes of any
          arbitration arising.[209] In other words, as long ago as 15 March 2013, BSGR
          accepted Guinea's offer to arbitrate any dispute arising under the Investment

---

[208] Extract from the audio tapes (oral advocacy on behalf of Guinea) at [39:40].
[209] Letter from BSGR to the Government of Guinea dated 15 March 2013 (Exhibit C-0159).

Code and the Mining Code in accordance with the ICSID Arbitration Rules. Guinea has not to date taken issue with the points made by BSGR in that letter, and so has now waived any entitlement that it may have had to argue that BSGR is not an investor (the existence of that entitlement being denied in any event).

423.    It is established practice that a national of a Contracting State may accept an offer to arbitrate contained in the legal instrument by instituting proceedings and that this shall count as having satisfied Article 25 of the ICSID Convention.

424.    Accordingly, by the filing of its Request for Arbitration, the Claimants each accepted the offer to arbitrate its dispute with Guinea in accordance with Article 25 of the ICSID Convention and within the meaning of Article 184 of the Mining Code.

### 4.5.4   The BOT Act

425.    Article 13(2) of the BOT Act provides that "*the BOT Agreement may freely determine the bodies and the procedure for settlement of disputes between the State and the investor. Any institutional arbitration clause may be stipulated, with the State, through this Law, hereby waiving any immunity from jurisdiction*".

426.    In other words, by virtue of Article 13(2) of the BOT Act, Guinea consents to any dispute resolution mechanism incorporated in a BOT Agreement.

427.    Taking into account that (i) the Base Convention constitutes a BOT agreement and (ii) the Base Convention contains an ICSID arbitration clause, Guinea has offered to arbitrate disputes under the BOT Act under the ICSID Convention.

428.    It is established practice that a national of a Contracting State may accept an offer to arbitrate contained in the legal instrument by instituting proceedings and that this shall count as having satisfied Article 25 of the ICSID Convention.

429.   Accordingly, by the filing of its Request for Arbitration, the Claimants each accepted the offer to arbitrate its dispute with Guinea in accordance with Article 25 of the ICSID Convention and within the meaning of Article 13(2) of the BOT Act.

## V.   **RELIEF SOUGHT**

430.   The proceedings have been bifurcated, and the question of the remedies to which the Claimants are entitled (and the quantum of any damages) is for a separate phase of the proceedings.

431.   Notwithstanding this, and for the avoidance of doubt, the Claimants will be seeking all available relief, including (without limitation) an award:

(i)   Declaring that Guinea's termination of each of the Base Convention, the Zogota Mining Concession and the Blocks 1 & 2 Permit was illegal and unlawful;

(ii)   Declaring that Guinea's expropriation and/or nationalization of BSGR's indirect and BSGR Guernsey's direct shareholding in BSGR Guinea, and BSGR's shareholding in BSGR Guernsey, was illegal and unlawful;

(iii)   Declaring that Guinea unlawfully failed to ensure that the Claimants' rights were protected in accordance with Guinean and/or international law.

(iv)   Ordering that Guinea forthwith:-

a)   restore the Base Convention and observe the rights granted to BSGR Guinea and to BSGR Guernsey under the Base Convention;

b)   restore the Zogota Mining Concession and observe the rights granted to BSGR Guinea under the Zogota Mining Concession;

c)     restore the Blocks 1 and 2 Permit and observe the rights granted to BSGR Guinea under the Blocks 1 and 2 Permit;

d)     ensure that BSGR Guernsey's and BSGR Guinea's respective rights, assets and investments are protected in accordance with Guinean and international law;

e)     prevent BSGR Guernsey's and BSGR Guinea's respective rights, assets and investments from being further subject to expropriation and/or nationalization or to any measure having similar effect;

f)     ensure that BSGR Guernsey and BSGR Guinea and their respective investments are treated in a non-discriminatory manner.

g)     ensure that each of BSGR Guernsey and BSGR Guinea have:

      a.   the right to dispose freely of their property and to organize their enterprise as they wish;

      b.   the freedom of hiring and firing, subject to prevailing laws and regulations;

      c.   unlimited access to raw materials;

      d.   the freedom of circulation of personnel and products within the Republic of Guinea;

      e.   the freedom to import goods and services and any necessary funds; and

      f.   the freedom to dispose of their products on international markets and to export and dispose of products in foreign markets.

(v)     Ordering that Guinea:-

a)   ensure that an accurate summary of the Award is published in the Financial Times (in A3 size) within 30 days of the date of the Award and at the expense of Guinea; and

b)   submit the summary of the Award for approval to the Claimants 15 days before publication. Failing an agreement between the Claimants and Guinea on the text of the summary, the text of the summary will be determined by the Tribunal.

(vi)   Ordering that Guinea provide prompt, adequate and effective compensation to the Claimants for Guinea's unlawful conduct, described above, in an amount in US dollars to be quantified during this arbitration, as compensation for the losses suffered to date and for any future losses suffered by the Claimants.

(vii)   Ordering that Guinea provide an indemnity and/or prompt, adequate and effective compensation to BSGR, in respect of any losses which BSGR suffers (or might suffer) as a result of the claims brought by Vale against BSGR in LCIA Arbitration No. 14283.

(viii)   Ordering that Guinea provide prompt adequate and effective compensation and/or a *quantum meruit* in respect of the investments made and/or work done and/or services performed by the Claimants (or each of them), and for which Guinea has taken the benefit but (as yet) provided no compensation;

(ix)   Ordering that Guinea pay moral damages in the amount to be determined in the course of these proceedings.

(x)   Ordering that Guinea pay interest on such sums and for such periods as the Tribunal deems appropriate.

(xi)   Ordering that Guinea pay the Claimants' costs occasioned by this arbitration including, without limitation, arbitrators' fees, administrative

costs fixed by ICSID, the arbitrators' expenses, the fees and expenses of any experts, and the legal costs incurred by the parties.

(xii)   Granting the Claimants all other relief that the Tribunal deems appropriate.

432.   Notwithstanding any future protection, Guinea must pay the Claimants (and each of them) compensation for the losses suffered to date; and Guinea remains liable for any future loss suffered by the Claimants (and each of them).

433.   The Claimants reserve the right to add to, modify and/or amend their requested relief in due course and to add to, modify and/or amend the relief sought, including by reference to any further steps of Guinea (or agencies or instrumentalities or entities for which Guinea is responsible) that affect the Claimants' investments.

**Signed**

*Mishcon de Reya LLP*

**Mishcon de Reya LLP**

Submitted for and on behalf of BSG Resources Limited, BSG Resources (Guinea) Limited and BSG Resources (Guinea) SARL

29 February 2016

**Karel Daele**
**James Libson**
**Mishcon de Reya LLP**
**Africa House**
**70 Kingsway**
**WC2B 6AH**
**London**
**Tel: +44 (0) 203 321 7060**
**Fax: +44 (0) 203 761 1856**

**Counsel for the Claimants**
