UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

_____

| | |
|---|---|
| BSG Resources (Guinea) Limited, BSG Resources (Guinea) Sàrl, and BSG Resources Limited, | ) ) ) ) |
| | ) |
| Plaintiffs, | ) ) |
| -against- | ) ) |
| George Soros, Open Society Foundations, Open Society Institute, Foundation to Promote Open Society, Open Society Foundation, Inc., Alliance for Open Society International, Inc., Open Society Policy Center, and Open Society Fund, | ) ) ) ) ) ) ) ) |
| Defendants. | ) ) |

No. 1:17-cv-02726 (JFK) (AJP)

_____


**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS AMENDED COMPLAINT OR STAY ACTION**



Louis M. Solomon
GREENBERG TRAURIG, LLP
200 Park Avenue
New York, New York 10166
Telephone:  (212) 801-9200
Facsimile:  (212) 801-6400
*Attorneys for Plaintiffs BSG Resources
(Guinea) Limited, BSG Resources
(Guinea) Sàrl, and BSG Resources
Limited*



August 18, 2017

## <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT ................................................................................................1

FACTUAL ALLEGATIONS ................................................................................................4

      A.     BSGR and Its Contract With Guinea ......................................................4

      B.     Defendants and Their Misconduct – Motivating Forces Harming Plaintiffs..........5

ARGUMENT ................................................................................................10

I.     THE ACT OF STATE DOCTRINE DOES NOT APPLY HERE ....................................10

      A.     *Kirkpatrick* Bars Application of the Act of State Doctrine Here............................11

      B.     Alternatively, Dismissal Based on the Act of State Doctrine Is Premature..........13

II.     DEFENDANTS' PLEADING ARGUMENTS FAIL UNDER THE CORRECT LEGAL STANDARD................................................................................................14

III.     PLAINTIFFS ADEQUATELY PLEAD THEIR TORT CLAIMS ....................................16

      A.     The Complaint States a Claim for Tortious Interference......................................16

      B.     The Complaint States a Claim for Fraud ..............................................................20

      C.     The Complaint States Claims for Conspiracy and Prima Facie Tort....................24

      D.     The Complaint States a Claim for Commercial Defamation .................................25

IV.     THE COURT SHOULD NOT DISMISS THE CLAIMS AGAINST OSF ENTITIES................................................................................................25

V.     THE COURT SHOULD DENY DEFENDANTS' APPLICATION FOR A STAY ........29

CONCLUSION................................................................................................30

## **TABLE OF AUTHORITIES**

**Cases**

*Abu Ali v. Ashcroft,*
    350 F. Supp. 2d 28 (D.D.C. 2004) ........................................................................12

*ACR Sys. v. Woori Bank,*
    2017 WL 532300 (S.D.N.Y. Feb. 8, 2017) ...........................................................15

*AdvanFort Co. v. Cartner,*
    2015 WL 12516240 (E.D. Va. Oct. 30, 2015) .......................................................13

*Alfred Dunhill of London, Inc. v. Republic of Cuba,*
    425 U.S. 682 (1976) ..............................................................................................14

*Allied Bank Int'l v. Banco Credito Agricola de Cartago,*
    757 F.2d 516 (2d Cir. 1985) ..................................................................................11

*Amusement Indus. v. Stern,*
    2016 WL 6820744 (S.D.N.Y. Nov. 10, 2016) .......................................................21

*Anderson News, L.L.C. v. Am. Media, Inc.,*
    680 F.3d 162 (2d Cir. 2012) .............................................................................14, 15

*Antonios A. Alevizopoulos & Assocs., Inc. v. Comcast Int'l Holdings, Inc.,*
    100 F. Supp. 2d 178 (S.D.N.Y. 2000) ..................................................................16

*Anwar v. Fairfield Greenwich, Ltd.,*
    728 F. Supp. 2d 372 (S.D.N.Y. 2010) ..................................................................27

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009) ..............................................................................................19

*Baez v. Jet Blue Airways,*
    745 F. Supp. 2d 214 (S.D.N.Y. 2010) ..................................................................28

*Bank of Am. v. Jarczyk,*
    268 B.R. 17 (W.D.N.Y. 2001) ..............................................................................21

*Banque Arabe Et Internationale D'Investissement v. Maryland Nat'l Bank,*
    819 F. Supp. 1282 (S.D.N.Y. 1993), *aff'd,* 57 F.3d 146 (2d Cir. 1995) ..........22, 23

*BBS Norwalk One, Inc. v. Raccolta, Inc.,*
    117 F.3d 674 (2d Cir.1997) ...................................................................................29

*Biro v. Conde Nast,*
    963 F. Supp. 2d 255 (S.D.N.Y. 2013), *aff'd,* 622 Fed. Appx. 67 (2d Cir. 2015) ..............25

*Boykin v. Keycorp,*
    521 F.3d 202 (2d Cir. 2008) ..................................................................................22

*Bruce Supply Corp. v. New Wave Mech., Inc.,*
    4 A.D.3d 444 (2d Dep't 2004) ..............................................................................27

*Callejo v. Bancomer, S.A.*,
   764 F.2d 1101 (5th Cir. 1985) ...................................................................13

*Calvin Klein Trademark Trust v. Wachner*,
   129 F. Supp. 2d 248 (S.D.N.Y. 2001) ......................................................25

*Chang v. Lin*,
   824 F.2d 219 (2d Cir. 1987) .....................................................................30

*Computer Assocs. Int'l, Inc. v. Altai, Inc.*,
   126 F.3d 365 (2d Cir. 1997) .....................................................................30

*Concord Assoc., L.P. v. Entm't Props. Trust*,
   817 F. 3d 46 (2d Cir. 2016) ......................................................................15

*Daventree Ltd. v. Republic of Azerbaijan*,
   349 F. Supp. 2d 736 (S.D.N.Y. 2004) ............................................. 10-11, 13

*Dominicus Amercana Bokio v. Gulf & W. Indus. Inc.*,
   473 F. Supp. 680 (S.D.N.Y. 1979) ...........................................................14

*Donjon Marine Co. v. Water Quality Ins. Syndicate*,
   523 Fed. App'x 738 (2d Cir. 2013) ...........................................................29

*Enigma Software Grp. USA, LLC v. Bleeping Computer LLC*,
   194 F. Supp. 3d 263 (S.D.N.Y. 2016) ......................................................25

*Fisher v. APP Pharm., LLC*,
   783 F. Supp. 2d 424 (S.D.N.Y. 2011) ......................................................28

*Freihofer v. Hearst Corp.*,
   65 N.Y.2d 135 (1985) ..............................................................................24

*Giles v. City of N.Y.*,
   41 F. Supp. 2d 308 (S.D.N.Y. 1999) ........................................................30

*Goel v. Bunge, Ltd.*,
   820 F.3d 554 (2d Cir. 2016) ..........................................................15, 19, 24

*Green v. Beer*,
   2009 WL 911015 (S.D.N.Y. Mar. 31, 2009) ............................................23

*Greenlight Reinsurance, Ltd. v. Appalachian Underwriters, Inc.*,
   958 F. Supp. 2d 507 (S.D.N.Y. 2013) ......................................................29

*Hallmark Aviation Ltd. v. AWAS Aviation Servs.*,
   2013 WL 1809721 (S.D.N.Y. Apr. 30, 2013) ...........................................14

*Matter of Intelligent Bank Mgmt., Inc.*,
   207 A.D. 2d 760 (1st Dep't 1994) ............................................................27

*IOP Cast Iron Holdings, LLC v. J.H. Whitney Capital Partners, LLC*,
   91 F. Supp. 3d 456 (S.D.N.Y. 2015) ........................................................21

*IUE AFL-CIO Pension Fund v. Herrmann*,
   9 F.3d 1049 (2d Cir. 1993) .......................................................................22

*John Blair Comms., Inc. v. Reliance Capital Group, L.P.,*
   157 A.D.2d 490 (1st Dep't 1990) ...................................................................20

*Jovic v. L-3 Servs., Inc.,*
   69 F. Supp. 3d 750 (N.D. Ill. 2014) ...........................................................13

*Kadic v. Karadzic,*
   70 F.3d 232 (2d Cir. 1995)...........................................................................11

*Keep on Kicking Music, Ltd. v. Hibbert,*
   2016 WL 4386047 (S.D.N.Y. Aug. 17, 2016).............................................24

*Konowaloff v. Metro. Museum of Art,*
   702 F.3d 140 (2d Cir. 2012)........................................................................13

*Kronish Lieb Weiner & Hellman LLP v. Tahari, Ltd.,*
   35 A.D.3d 317 (1st Dep't 2006) ...........................................................12, 16

*Kronos, Inc. v. AVX Corp.,*
   81 N.Y.2d 90 (1993) ...................................................................................29

*Krupski v. Costa Crociere S. p. A.,*
   560 U.S. 538 (2010)....................................................................................28

*Lavastone Capital LLC v. Coventry First LLC,*
   2015 WL 1939711 (S.D.N.Y. Apr. 22, 2015)............................................22

*Lawrence v. Wilder Richman Sec. Corp.,*
   417 Fed. App'x 11 (2d Cir. 2010)..........................................................19, 24

*Le Metier Beauty Inv. Partners LLC v. Metier Tribeca, LLC,*
   2015 WL 769573 (S.D.N.Y. Feb. 24, 2015)..............................................15

*Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC,*
   797 F.3d 160 (2d Cir. 2015)........................................................................22

*Maloul v. Berkowitz,*
   2008 WL 2876532 (S.D.N.Y. July 23, 2008) ............................................23

*Mata v. Lynch,*
   135 S. Ct. 2150 (2015)................................................................................11

*Miele v. Am. Tobacco Co.,*
   2 A.D.3d 799 (2d Dep't 2003) ....................................................................22

*Mina Inv. Holdings Ltd. v. Lefkowitz,*
   16 F. Supp. 2d 355 (S.D.N.Y. 1998)..........................................................18

*Munno v. Town of Orangetown,*
   391 F. Supp. 2d 263 (S.D.N.Y. 2005).........................................................15

*Nat'l Fin. Partners Corp. v. USA Tax & Ins. Servs., Inc.,*
   145 A.D.3d 440 (1st Dep't 2016) ...............................................................16

*New Yuen Fat Garments Factory Ltd. v. August Silk, Inc.,*
   2009 WL 1515696 (S.D.N.Y. June 1, 2009) ..............................................16

*Padilla v. Yeshiva Univ.*,
  2017 WL 2347567 (2d Cir. June 2, 2017) (Summary Order)..................................14

*RSM Prod. Corp. v. Fridman*,
  387 F. App'x 72 (2d Cir. 2010), *aff'g* 643 F. Supp. 2d 382 (S.D.N.Y. 2009).........18

*S.A.R.L. Galerie Enrico Navarra v. Marlborough Gallery, Inc.*,
  2013 WL 1234937 (S.D.N.Y. March 26, 2013) ............................................27, 28

*Sea Breeze Salt, Inc. v. Mitsubishi Corp.*,
  2016 WL 8648638 (C.D. Cal. Aug. 18, 2016)........................................................13

*Sharma v. Skaarup Ship Mgmt. Corp.*,
  916 F.2d 820 (2d Cir. 1990)..................................................................................18

*Sharon v. Time, Inc.*,
  599 F. Supp. 538 (S.D.N.Y. 1984)................................................................... 12-13

*Spectrum Stores, Inc. v. Citgo Petroleum Corp.*,
  632 F.3d 938 (5th Cir. 2011) ................................................................................13

*Starr v. Sony BMG Music Entm't*,
  592 F.3d 314 (2d Cir. 2010)..................................................................................14

*Stevelman v. Alias Research Inc.*,
  174 F.3d 79 (2d Cir. 1999)....................................................................................20

*Stolow v. Greg Manning Auctions Inc.*,
  258 F. Supp. 2d 236 (S.D.N.Y. 2003)...................................................................24

*U.S. v. Int'l Bhd. of Teamsters*,
  954 F.2d 801 (2d Cir.1992)...................................................................................30

*W.S. Kirkpatrick & Co. v. Envtl. Tectonics Corp., Int'l*,
  493 U.S. 400 (1990)...............................................................................4, 11, 12, 13

*Walter Fuller Aircraft Sales, Inc. v. Republic of Philippines*,
  965 F.2d 1375 (5th Cir. 1992) ..............................................................................12

*World Wide Minerals Ltd. v. Republic of Kaz.*,
  116 F. Supp. 2d 98 (D.D.C. 2000), *aff'd in part, remanded in part*,
  296 F.3d 1154 (D.C. Cir. 2002) ...........................................................................12

## Other Authorities

Fed. R. Civ. P. 4(m) ....................................................................................................28

Fed. R. Civ. P. 8, 8(d)(2)......................................................................................19, 27

Fed. R. Civ. P. 9(b) ........................................................................................20, 21, 22, 27

Fed. R. Civ. P. 15(c)(1)(C) .........................................................................................28

Restatement (Second) of Torts, § 525 cmt. b...........................................................21

S.D.N.Y. Local Rule 26.1 .....................................................................................20, 27

Plaintiffs (collectively "BSGR") respectfully submit this memorandum in opposition to the motion of Defendants ("Soros" and the "OSF" entities) to dismiss or stay the action.

## PRELIMINARY STATEMENT

BSGR had a valuable mining contract with Guinea. The contract had been negotiated, finalized, or ratified by three Guinean governments (Amended Complaint ¶ 2 (hereafter "¶")). The contract protected BSGR from subsequent changes in the law, especially fiscal changes (¶¶ 90-92). BSGR directly or through a joint venture invested close to $1 billion in the project. Yet under Defendants' importunings, a new government supported by "'George Soros and his Open Society Foundations'" announced, jointly with Soros, that it would unilaterally increase its share of mining concessions and require contract holders to pay increased amounts. This blatant abrogation of BSGR's contract was instigated, masterminded, and puppeteered by Soros, working with and through OSF. BSGR was given an ultimatum – pay up, or its contract would be canceled. BSGR refused to pay up; Soros made good on his threat and destroyed BSGR.

Soros carried out his scheme both openly, himself, and clandestinely, through hired guns and paid agents. As reported to BSGR, "'Mr. Soros had a personal obsession about BSGR and is determined to ensure that [BSGR's joint venture's] mining license is withdrawn/cancelled'" (¶ 48). Through Soros's own thuggish misconduct he demanded money (BSGR's joint venture would have to pay $250 million just "'to have the right to sit with the government and discuss the agreement again'" and $250 million to have the agreement "'guaranteed'" by the new government (¶ 65)); maligned and demonized BSGR when it refused; and in the end – as avowed in a declaration of a first-hand account – caused tens and then hundreds of thousands of dollars of payments to be made to witnesses and to Guinean officials "to ensure" and "to influence proceedings in Guinea and cause the termination of the [BSGR] mining agreements" (¶¶ 152,

161-64).  Soros's clandestine conduct included hiring, paying, and directing others to carry out a scheme to co-opt and corrupt Guinean processes, trumping up supposed wrongdoing by BSGR and creating and staffing kangaroo committees to conduct an "investigation" targeting BSGR, which concluded (preannounced by Soros and his complicits before it even began) that BSGR had procured the mining contract illicitly; and then orchestrating a worldwide smear campaign through Soros's "direct advocacy" and indirect "advocacy coalitions" (¶¶ 75-82, 164 *et seq*.).

These allegations – and more – are detailed in BSGR's Amended Complaint ("Complaint").  The allegations state claims, some pled alternatively, for tortious interference, fraud, conspiracy, commercial defamation, and prima facie tort.

Defendants claim not to find a single "factual" allegation in the Complaint.  That claim is belied by the pleading.  The Complaint mentions Soros by name nearly 285 times in 110 paragraphs.  Defendants' brief ("MOL"), however, scrubs Soros from the scene.  One section of Defendants' brief (MOL 5-6) describes an alternative universe where Guinea increased the share of mining profits from BSGR and terminated the BSGR contract all by itself – a story nowhere told in the Complaint.  For example, Defendants' brief (MOL 5) says:

> Condé began an initiative to reform Guinea's mining industry, including the enactment of a revised mining code and the examination of existing mining contracts in Guinea. (¶¶ 67, 74).  At the time, a Guinean government official said that "[a]ll [mining] contracts [would] be reviewed and reworked" and "[t]he government will become a minority shareholder in all mining contracts." (¶ 83).

Yet here is what those very paragraphs of the Complaint actually say:  "**Soros called upon his OSF funded NGO empire and 'sent a first team'**" including RWI to Guinea, with **"'[o]ther aides from Soros' Open Society Institute' . . . expected soon thereafter**" (¶ 67); "Condé **and Soros held a joint press conference**"; **"they announced"** the mining code revision and contract examination; **"OSF and**" a Guinean official issued "**joint press releases**" on this topic (¶ 74); the article Defendants quote (¶ 83) "included a quote **a quote from Condé, stating that _Soros_**

had been invited by him 'to help shake up the mining license regime'" and "that **it was Soros 'who advised' Condé about this scheme**" (¶ 83); and other cites to the OSF joint press release, including that "**'George Soros and his Open Society Foundations'**" supported the initiative (¶ 75) and that "Guinea would retain **the Soros and OSF backed RWI** to provide legal advice in relation to the mining review and re-writing of the Mining Code, and that **OSF was to provide $5 million in outright grants to Guinea to support the process**" (¶ 76).

This is emblematic of Defendants' entire motion:  remove all mention of Soros and OSF, label every allegation non-factual, and demand "factual support" (MOL 8) when in reality they want the detailed evidence.  This is the antithesis of the governing legal standard, which accepts all pleaded facts as true, draws all reasonable inferences in plaintiffs' favor, and does not require the pleading of supporting evidence.  BSGR is entitled to have its factual allegations accepted fully and accurately, not whitewashed out of existence (*see* Point II).

We note that, while Defendants in their factual recitation take issue with allegations that Soros controlled his empire of agents (MOL 7-8), they make no legal argument in that regard. Such a legal argument featured prominently in Defendants' withdrawn motion to dismiss against the original complaint.  Given that they have withdrawn that argument – presumably due to the additional allegations set forth in BSGR's amended pleading – we do not address it here.

Defendants' motion improperly goes outside the pleading (*see* Point II).  Defendants' improper attachment of excerpts from an ongoing ICSID arbitration avails them not, since Soros/OSF have been mentioned many times in that arbitration as the "but-for" force without which BSGR would not have been harmed (Libson Decl. ¶¶ 4-6).  Defendants also improperly attach and misdescribe criminal proceedings against third parties – we note that, in all the criminal investigations Soros instigated (¶¶ 167-71), not a single indictment has issued against

BSGR or its adviser Beny Steinmetz; not a single finding of wrongdoing made (*see* ¶¶ 132-33).

Defendants' pleading arguments fail under any reasonable application of the Rules (Point III).  Defendants' post-pleading arguments are even weaker.  Their Act of State argument gives short shrift to the controlling Supreme Court case, *W.S. Kirkpatrick & Co. v. Envtl. Tectonics Corp.*, 493 U.S. 400 (1990), which rejects application of the defense where, as here, adjudicating the claims will not invalidate the foreign state's acts (Point I).  Defendants play a shell game regarding the OSF defendants, claiming OSF is not a legal entity but refusing to disclose any information about it – and now, having sown confusion, they seek to dismiss the OSF entities on various grounds.  Defendants in this amended motion ignore the evidence BSGR proffered in its original opposition, hoping to sandbag BSGR on reply.  Based on that evidence and the applicable law, the OSF entities are proper parties (Point IV).  And Defendants cannot justify a stay of ***several years*** in favor of an unrelated ICSID arbitration to which they are not parties, with the severe prejudice it will cause (Point V).

<u>**FACTUAL ALLEGATIONS**</u>

**A.**     **BSGR and Its Contract With Guinea**

BSGR is an international, diversified mining group employing thousands of people in many countries.  Over the past fifteen years, BSGR has invested hundreds of millions of dollars developing and successfully operating mines and related businesses worldwide, and has grown into one of the largest private investors in Africa (¶¶ 18-19).

Guinea has a rich iron ore deposit in the Simandou mountain range, the southern part of which is called Zogota (¶¶ 2, 29).  Several companies applied for prospecting permits; BSGR's application was granted in 2006 (¶¶ 20-22).  BSGR began prospecting work as soon as possible, drilling for over three years and investing over $160 million – plus completing a 450-page

feasibility study at the highest international standards regarding Zogota (¶¶ 24, 29).  By contrast, a competitor, Rio Tinto, had held permits since 1997 and had failed to do any significant exploratory work (¶ 25).  In December 2009, BSGR and Guinea signed the Basic Convention Agreement (together with other relevant agreements and permits, the "contract") (¶ 30).

Under the contract, BSGR obtained a mining concession and agreed to invest $10 billion in the project and on Guinean infrastructure, including a passenger railway (¶¶ 30-33, 42). BSGR entered into a joint venture with Vale, another mining company, to work the concession (¶¶ 37-40).  The joint venture spent over $800 million on this project.  In 2015, after Defendants' misconduct caused the joint venture's loss of value, BSGR purchased Vale's interest (¶¶ 41-43).

Prior governments of Guinea had ratified the contract, including the joint venture component (¶¶ 2, 36, 39).  Of prime importance, the contract specifically protected BSGR against post-contractual changes in Guinean law.  In "the event of a contradiction and/or difference" between the contract and Guinean law, the contract would control (¶ 90; ¶¶ 35, 75, 91).  It further explicitly provided for the "stabilization" of all contractual provisions, "particularly fiscal and/or concerning customs and excise" over contrary new laws (¶ 92).

### B.       Defendants and Their Misconduct – Motivating Forces Harming Plaintiffs

Soros, a multi-billionaire, controls a huge network of organizations and individuals to carry out his instructions (¶ 8).  He is chairman of the for-profit Soros Fund Management and also of OSF (*id.*).  OSF in turn funds organizations controlled or influenced by Soros, including Revenue Watch Institute ("RWI", and now known as the Natural Resource Governance Institute) and Global Witness (¶¶ 8-9, 11, 49-53, 67-71, 79-82, 130, 142).  Soros has a long-standing animus to BSGR and its adviser, Beny Steinmetz (¶¶ 46-48, 2).

Soros was a "'key'" supporter of Alpha Condé "'even before he was elected'" as President of Guinea in December 2010, particularly concerning Guinea's mining industry (¶¶ 54,

78).  In January 2011, Soros called upon his OSF-funded NGO empire and "'sent a first team'"
to Guinea, including an RWI official, to "'reform'" Guinea's mining industry.  "'Other aides
from Soros' Open Society Institute'" were expected soon thereafter.  RWI, part of Soros's team,
drafted the proposal to review mining contracts prior to "'renegotiating' better terms" – with
RWI specifically tasked to review BSGR's contract first (¶¶ 67-68).  Guinea could not do it
without Soros – as reported, *e.g.*, "'the country was turning to Soros because Guinea could not
afford to pay international consultants'" (¶ 73).  There would not have been a breach but for the
activities of Defendants (*e.g.*, ¶¶ 93, 165, 184).

Soros and Condé conjointly, and unjustifiably, demanded money from BSGR, including
through its joint venture, in 2011 (¶¶ 58-61).  Soros told the joint venture that it "should
anticipate US$250m to the government and as counterpart would get the agreement signed with
BSGR guaranteed".  After the draft agreement was ready, Soros said (either instead or in
addition), "we should pay US$250m to have the right to sit with the government and discuss the
agreement again" (¶ 65).  OSF and Chris Canavan, the Director of Global Policy Development at
Soros Fund Management, were instrumental in carrying out Soros's plan (¶¶ 61-62).

Soros "'and **his team**'" spent four days meeting with Condé in Feb-March 2011, for the
purpose of devising a scheme to strip the rights of companies – specifically BSGR – who refused
to acquiesce to the extortionist demands masterminded by Soros and his agents (¶¶ 72, 75).

Soros and Condé held a joint press conference at which they more formally announced
the forthcoming review of mining contracts and the enactment of a new mining code (¶ 74; ¶ 83
(contracts to be "reworked")).  In a March 2, 2011 press release, OSF and Condé's adviser
reported "'George Soros and his Open Society Foundations'" were behind making contract
holders "comply with the principles of EITI [Extractive Industries Transparency Initiative]"; that

"'Guinea will retain the Revenue Watch Institute . . . to provide legal advice'"; and that OSF was to provide $5 million in outright grants to Guinea to support the process.  It was in part through RWI and OSF's grants that Soros controlled removal of BSGR (¶¶ 74-82).

The next day, Soros spoke at an EITI conference, where he boasted of working with Condé, stating, "'all the mining claims are going to be re-examined and those who want to validate those claims will have to subscribe to the principles of EITI'" (¶ 78).  BSGR would have to accept new conditions and/or pay, in plain violation of the protections of its contract.  Condé stated, "Soros had been invited by him 'to help shake up the mining license regime'" (¶ 83), and "'the only adviser to the government at the time was the George Soros backed [RWI]'" (¶ 94).  Defendants through RWI controlled the new mining code that would then, unlawfully, be imposed on BSGR.  It provided for an additional 35% participation by Guinea – completely changing the royalties and tax structure in BSGR's contract (¶¶ 85-92).

OSF knew that EITI "'has not translated into positive change in the lives of citizens, or into improved development outcomes for the countries' populations'" (¶ 79).  Yet Soros and OSF utilized EITI to force breach of the BSGR contract in part because, as OSF internally admitted, Defendants could exercise control over Soros-funded members subscribing to EITI (including specifically RWI and Global Witness) through "'board participation'", "'softer influence of governing board members and the secretariat leadership'", convening calls and meetings "'to convince'" Soros-funded entities to "'forge a united position'" on their activities, and by "'direct advocacy and public outreach by George Soros personally'" (*id.*).

Not all mining companies would be subject to the new law.  Soros, OSF, and their agents were directly involved in discussions with Rio Tinto that led to a "settlement" whereby Rio Tinto would pay Guinea $700 million dollars – and in return, Rio Tinto would not be subject to review

or have its rights affected by changes to the mining code.  Rio Tinto admitted to bribery in connection with this transaction (¶¶ 94-96).

BSGR did not cave to Defendants' demands.  As reported, "'[BSGR] is certainly in trouble since it refused to put its hand in its pocket to preserve its rights in Simandou. . . . It was when BSGR refused, that investigations into its dealings began . . . [by] ***the battalions of lawyers and private investigators funded by George Soros, Alpha Condé's chief supporter***'" (¶ 60).

Soros himself held a meeting at his New York City apartment in or about September 2011 to discuss the future of Guinean mining with Condé, Canavan of Soros Fund Management, and executives from each of the mining companies with interests in Guinea.  Soros intentionally excluded BSGR.  A participant told BSGR that Soros spoke very negatively against BSGR and Beny Steinmetz (¶ 101).  Less than a month later, Guinea improperly challenged the validity of BSGR's joint venture with Vale, notwithstanding the government's prior approval (¶ 102).

BSGR was the only entity whose mining contracts were subject to an extreme level of scrutiny.  The Technical Committee, established in 2012 under the new mining code, purportedly conducted part of the review.  When it was suggested its review process be wound up in 2016, an observer noted this move "'gave the impression that the panel's unique objective had been to cancel the mining rights of [BSGR's joint venture]'" (¶¶ 84, 98).  That is not surprising; BSGR was advised in 2012 that "'Mr. Soros had a personal obsession about BSGR and is determined to ensure that [the joint venture's] mining license is withdrawn/cancelled'" (¶ 48).

Soros called upon his "'battalions of lawyers and private investigators'" to go after BSGR (*see* ¶ 60).  One investigator, the law firm of Heenan Blaikie, found no cause for any accusation of illegal conduct by BSGR (¶¶ 93, 106).  Not happy with this result, Soros made sure the government and later the Technical Committee relied on his long-time New York counsel at

DLA Piper, Scott Horton, to conduct a so-called investigation of BSGR.  Soros and OSF used Horton as an agent to assist in the delay and ultimate destruction of BSGR's investment in Guinea by revoking their valid contractual rights (¶ 108).  Not only did Soros pay for DLA Piper's investigation; he recommended that Horton and DLA Piper be retained in the first instance (¶ 106).  Horton in turn hired Steven Fox of Veracity Worldwide ("Veracity"), who had previously done work for Soros (¶ 109).  Soros, directly or via his controlled entities, paid for Veracity's work and controlled its conclusion suggesting corruption by BSGR (¶ 109).

Soros's attorneys at DLA then relied on Veracity's bogus report – which cited no supporting documents and was based on hearsay and innuendo – to prepare their own report (¶¶ 109-112), funded by Soros (¶ 106).  DLA then advised the Technical Committee, to which it was counsel, to use the DLA report as the basis for its Allegations Letter, to strip BSGR of its mining rights (¶¶ 108, 115-28, 150-51).  Pursuant to Defendants' scheme, DLA Piper thus had control over both sides of the "investigation" (¶ 116).  The Technical Committee was "'backed'" by Soros, and Horton, his lawyer.  *The New Yorker* reported that Nava Touré, who was tasked with running the Technical Committee, "'had no staff of trained inspectors, so he relied on DLA Piper, the law firm, and Steven Fox, the investigator. "It was outsourced," Touré told me'" (¶ 99).  Soros's organization, RWI, had been tasked with setting the order of the contracts to be renegotiated.  Horton and Soros's Chris Canavan were involved in the Technical Committee process (¶ 100).

To harm BSGR further and garner public support for their wrongful conduct, Soros and his coconspirators leaked the contents of the supposedly "confidential" Allegations Letter to the press prior to its being sent to BSGR.  They gave it to Misha Glenny of the *Financial Times*, who also sits on the advisory board of Global Witness (¶ 130).  Soros sought to prevent BSGR from

responding to the media attention that followed by pressuring its public relations firm, FTI, improperly to terminate its agreement with BSGR.  BSGR was told that "'George Soros had personally requested' that FTI 'cancel its contractual arrangements with BSGR'" (¶ 137).  Soros also caused the fact of the FTI contract's termination to be leaked to the *Financial Times* before BSGR was notified (¶ 138).  He instructed his agents, including Horton and Global Witness, to disseminate unfounded and untrue rumors concerning BSGR to the media (¶¶ 134, 140-49, 172).  According to individuals at FTI, Soros's plan all along was to "'key this thing up [*i.e.*, the investigation of BSGR] for the committee to review,'" and his efforts to cancel BSGR's agreement left BSGR, in FTI's words, "'up a creek without a paddle'" (¶ 139).

To make sure his plan worked, Soros resorted to arranging for hundreds of thousands of dollars to be paid personally to the Technical Committee's head, Nava Touré, and a member of the Strategic Committee to ensure that BSGR's rights were terminated, as set forth in a declaration of an avowed participant, on which we are entitled to rely (¶¶ 161-64).

The plan succeeded.  Based on the unsubstantiated allegations in the Veracity Report, repeated in DLA's report, and then in the Allegations Letter – and ignoring the 50,000 pages of documents BSGR provided (¶¶ 105, 128) – BSGR's contract was cancelled in April 2014 (¶¶ 114-128, 150-60).  But Defendants' campaign to harm BSGR continued, including causing Global Witness publicly to assert BSGR's alleged corruption in December 2016 (¶ 172).  Defendants also spawned several criminal investigations of BSGR (¶¶ 167-71).

## ARGUMENT

## I.   THE ACT OF STATE DOCTRINE DOES NOT APPLY HERE

Defendants bear the burden of establishing the affirmative defense of act of state – a defense "more appropriately raised in a motion for summary judgment".  *Daventree Ltd. v.*

*Republic of Azerbaijan*, 349 F. Supp. 2d 736, 755 (S.D.N.Y. 2004).  The act of state defense is a "judicially created doctrine [that] is not jurisdictional," *Allied Bank v. Banco Credito Agricola de Cartago*, 757 F.2d 516, 520 (2d Cir. 1985), but rather "prudential", *Kadic v. Karadzic*, 70 F.3d 232, 249 (2d Cir. 1995).  Where the federal court has jurisdiction, it "has a 'virtually unflagging obligation'" to exercise that authority.  *Mata v. Lynch*, 135 S. Ct. 2150, 2156 (2015).

The Supreme Court has ruled:  "In every case in which we have held the act of state doctrine applicable, the relief sought or the defense interposed would have required a court in the United States to declare invalid the official act of a foreign sovereign performed within its own territory".  *W.S. Kirkpatrick & Co. v. Envtl. Tectonics Corp.*, 493 U.S. 400, 405, 409-10 (1990) ("*Kirkpatrick*").  Where the court need not invalidate, "the doctrine has no application".  *Id.*

### A.   *Kirkpatrick* Bars Application of the Act of State Doctrine Here

Defendants argue that BSGR's tortious interference, fraud, and conspiracy claims are barred by the act of state doctrine because, they say, those claims require the Court to determine whether BSGR's contract was valid and breached (MOL 12).  Defendants' motion fails under the authoritative precedent of *Kirkpatrick* – a case Defendants relegate to a footnote (MOL 13 n.5).

**Tortious Interference**.  In *Kirkpatrick*, the plaintiff alleged, as a necessary element of its claim, that defendant bribed Nigerian officials so that it could obtain contracts from the Nigerian government.  493 U.S. at 402.  The defendant, a contractor, countered by arguing that the decisions of the Nigerian government concerning the allegedly improperly obtained contracts constituted acts of state that rendered plaintiff's claims unreviewable.  *Id.*  The Supreme Court rejected this argument; the plaintiff sought "only to obtain damages from private parties who had procured" the wrongdoing.  *Id.* at 407.  The Court found that the plaintiff's lawsuit "was not trying to undo or disregard the governmental action"; the plaintiff's claims on the contract did not require "a determination that Nigeria's contract with [defendant] was, or was not, effective".

11

*Id.* at 406; *accord Abu Ali v. Ashcroft*, 350 F. Supp. 2d 28, 59 (D.D.C. 2004) (declining to apply doctrine:  petitioners did not seek to undo government action "but rather are suing non-foreign entities . . . for the role they allegedly played in obtaining the actions of the Saudi government").

*Kirkpatrick* similarly rejected the argument that the act of state doctrine applied because "the facts necessary to establish [the] claim will also establish that the contract was unlawful" and would thus necessarily require a court finding that "the contract is invalid".  493 U.S. at 406. The Court found that, even were such findings required, the official action was not "being sought to be declared *ineffective* elsewhere".  *Id.* at 407 (emphasis in original).

Defendants' arguments here fail for precisely the rulings made in *Kirkpatrick*.  "[F]inding a breach here would not call into question the decision of [Guinea] … [as] all the public acts and decisions cited by the defendants may be valid and yet [Guinea] still may have breached the contract".  *Walter Fuller Aircraft Sales, Inc. v. Republic of Philippines*, 965 F.2d 1375, 1388 (5th Cir. 1992); *see World Wide Minerals Ltd. v. Republic of Kaz.*, 116 F. Supp. 2d 98, 105 (D.D.C. 2000) (noting doctrine would be inapplicable to tortious interference claim (Dkt. 19, ¶¶ 128-32) because while the claim "might suggest that the contract was invalid . . . Kazakhstan's governmental decrees would not be directly implicated").  Indeed, Guinea is not even a necessary party to this action.  *E.g.*, *Kronish Lieb Weiner & Hellman LLP v. Tahari, Ltd.*, 35 A.D.3d 317, 318 (1st Dep't 2006) (in tortious interference action, breaching party was "not a necessary party whose rights could be inequitably affected by a judgment in the main action").

**Fraud and Conspiracy.**  Nor does adjudication of Plaintiffs' fraud or conspiracy claims raise any issue as to the validity of the Technical Committee's actions (MOL 13).  BSGR is seeking relief solely against Defendants; accordingly, the "issue in this litigation is not whether [Guinea's] acts are valid, but whether they occurred".  *Sharon v. Time, Inc.*, 599 F. Supp. 538,

546 (S.D.N.Y. 1984) (declining to apply act of state doctrine), *cited with approval in Kirkpatrick*, 493 U.S. at 406.  (Defendants' arguments concerning BSGR's request for post-judgment equitable relief (MOL 13 n.6) fail for the same reason.)

Defendants' cases do not aid them.  Those cases are not against a purely private party seeking primarily money damages – the situation here and in *Kirkpatrick*.  *See AdvanFort Co. v. Cartner*, 2015 WL 12516240, *6 (E.D. Va. 2015) (doctrine applied in action against agent of the Marshall Islands Government); *Sea Breeze Salt, Inc. v. Mitsubishi Corp.*, 2016 WL 8648638, *5 (C.D. Cal. 2016) (doctrine applied where relief sought was declaration that foreign government's action violated U.S. antitrust law); *Spectrum Stores, Inc. v. Citgo Petroleum Corp.*, 632 F.3d 938, 944-45, 956 (5th Cir. 2011) (affirming dismissal of conspiracy claim naming foreign state actors where plaintiffs sought "injunctive relief against continued price-fixing" by state actors); *see also Konowaloff v. Metro. Museum of Art*, 702 F.3d 140, 147 (2d Cir. 2012) (injunctive and declaratory relief concerning the "right or title" of a painting allegedly expropriated by foreign sovereign).  Defendants' other cases are of little utility as they pre-date *Kirkpatrick*, which significantly narrowed the scope of the act of state defense.  *Compare, e.g.*, *Callejo v. Bancomer, S.A.*, 764 F.2d 1101, 1114 (5th Cir. 1985) (MOL 11) (noting concern of "insult[ing] the foreign sovereign"), *with Kirkpatrick*, 493 U.S. at 409 ("act of state doctrine does not establish an exception for cases and controversies that may embarrass foreign governments").

### B.    Alternatively, Dismissal Based on the Act of State Doctrine Is Premature

Even were this Court to find that the doctrine may be applied to situations like this, it would be inappropriate to dismiss this case on act of state grounds at this time given the sparse state of the record.  *See Daventree*, 349 F. Supp. 2d at 755 ("this court cannot determine whether or not defendants' acts are protected by the Act of State doctrine in the absence of a fuller record"); *see also Jovic v. L-3 Servs., Inc.*, 69 F. Supp. 3d 750, 766 (N.D. Ill. 2014) (denying

motion to dismiss on act of state grounds where record was undeveloped as to impact on U.S. foreign relations).  Dismissal would also be premature because further record development will support application of the corruption and commercial activity exceptions to the doctrine.  *See Dominicus Amercana Bokio v. Gulf & W. Indus. Inc.*, 473 F. Supp. 680, 690 (S.D.N.Y.1979) ("even an unrepudiated act of state may be scrutinized by the courts if it resulted from the corruption of government officials"); *Alfred Dunhill of London, Inc. v. Republic of Cuba*, 425 U.S. 682, 706 (1976) ("We decline to extend the act of state doctrine to acts committed by foreign sovereigns in the course of their purely commercial operations") (plurality opinion).

## II. DEFENDANTS' PLEADING ARGUMENTS FAIL UNDER THE CORRECT LEGAL STANDARD

Defendants repeatedly omit from their discussion allegations expressly in the Complaint, only to complain that the allegations aren't there; assume an unrealistic pleading standard and then complain that the Complaint is "conclusory"; and proffer extrinsic evidence rather than accepting the Complaint's allegations as true.  This is all improper on a motion to dismiss.

"The issue on a 12(b)(6) motion to dismiss is not whether the plaintiff will ultimately prevail, but whether she is entitled to offer evidence to support her claim".  *Hallmark Aviation Ltd. v. AWAS Aviation Servs.*, 2013 WL 1809721, *2 (S.D.N.Y. Apr. 30, 2013) (Keenan, J.) (court determines "'legal feasibility of the complaint'" and does not "'assay the weight of the evidence which might be offered in support thereof'").  A complaint "'does not need detailed factual allegations'", only "enough facts 'to raise a right to relief above the speculative level' and 'state a claim to relief that is plausible on its face'".  *Padilla v. Yeshiva Univ.*, 2017 WL 2347567, *1 (2d Cir. June 2, 2017) (Summary Order), citing *Starr v. Sony BMG Music Entm't*, 592 F.3d 314, 321 (2d Cir. 2010); *see also Anderson News, L.L.C. v. Am. Media, Inc.*, 680 F.3d 162, 189-90 (2d Cir. 2012) ("plausibility standard is lower than a probability standard, and there

may therefore be more than one plausible interpretation").  The complaint is to be read "'as a whole'", *id.* at 190, so even where defendant argues an individual "allegation is conclusory, the rest of the complaint supplies sufficient context to satisfy [plaintiff's] pleading burden".  *ACR Sys. v. Woori Bank*, 2017 WL 532300, *5 (S.D.N.Y. Feb. 8, 2017) (Keenan, J.). "[I]n addressing a 12(b)(6) motion, a court must accept the plaintiff's allegations of fact as true and draw all reasonable inferences in the plaintiff's favor".  *Le Metier Beauty Inv. Partners LLC v. Metier Tribeca, LLC*, 2015 WL 769573, *3 (S.D.N.Y. Feb. 24, 2015) (Keenan, J.); *Anderson*, 680 F.3d at 189 ("failure to assume the truth of reasonable inferences" is clear error).

Defendants rely on extrinsic documents from BSGR's pending ICSID arbitration against Guinea, purporting to show inconsistencies with the Complaint (MOL 2, 9-10, 15-16, 22, citing Def. Exs. 1-3).  This is legal error.  "A complaint that alleges facts related to or gathered during a separate litigation does not open the door to consideration, on a motion to dismiss, of any and all documents filed in connection with that litigation".  *Goel v. Bunge, Ltd.*, 820 F.3d 554, 560 (2d Cir. 2016) (dismissal reversed for taking into account plaintiff's own testimony).  "[E]ven offering 'limited quotation[s]' from the document is not enough".  *Id.* at 559.  Here, BSGR expressly **excluded** the pending arbitration proceeding from its Complaint (¶ 166).  Even for documents "properly the subject of judicial notice, judicial notice would not be appropriate because the plaintiffs did not rely on the documents in drafting the Complaint".  *Concord Assoc., L.P. v. Entm't Props. Trust*, 817 F. 3d 46, 51 n.2 (2d Cir. 2016).  *Munno v. Town of Orangetown*, (MOL 9 n.3), involved documents from a U.S. court proceeding after final judgment, not from an incomplete international arbitration.  391 F. Supp. 2d 263, 267 (S.D.N.Y. 2005).

Defendants also cite no authority permitting consideration of third-party criminal proceedings on a motion to dismiss (Def. Exs. 4-7), citing cases involving only a plaintiff's own

criminal proceedings (MOL 10 n.4).  Note one third-party even exonerated BSGR (¶¶ 132-33).

## III.   PLAINTIFFS ADEQUATELY PLEAD THEIR TORT CLAIMS

### A.   The Complaint States a Claim for Tortious Interference

Defendants' sole substantive attack on BSGR's tortious interference claim is the

purported failure to allege but-for causation (MOL 14-16).  Defendants' argument fails.

Defendants argue there can be no but-for causation because Guinea was involved in the

acts at issue, but that is not the law.  Contrary to Defendants' premise, there can be more than

one cause of tortious interference.  *Nat'l Fin. Partners Corp. v. USA Tax & Ins. Servs., Inc.*, 145

A.D.3d 440, 441 (1st Dep't 2016), citing *Kronish Lieb*, 35 A.D.3d at 318.  Moreover, "collusion

between the breaching party and the interfering party cannot be dispositive of the 'but for'

inquiry.  To the contrary, the allegation of collusion coupled with the allegation of wrongful

interference or inducement to breach, leads to the conclusion of tortious interference by the third-

party".  *Antonios A. Alevizopoulos & Assocs., Inc. v. Comcast Int'l Holdings, Inc.*, 100 F. Supp.

2d 178, 187 (S.D.N.Y. 2000); *see New Yuen Fat Garments Factory Ltd. v. August Silk, Inc.*,

2009 WL 1515696, *2, 7 (S.D.N.Y. June 1, 2009) (Keenan, J.) (permitting amendment to add

tortious interference claim alleging contracting party "had agreed" to take action with defendant

and provided indemnity).

Defendants' primary assertion – that Defendants cannot be the but-for cause because

Guinea was predisposed to breach – fails on both the facts and the law.

Defendants point to allegations that Condé requested that BSGR make a payment to

retain its contract rights in early 2011(MOL 15).  This is not evidence of pre-disposition.

*Antonios A. Alevizopoulos*, 100 F. Supp. 2d at 186 ("simple economic self-interest" is not

evidence of predisposition).  The contracting party is the Government of Guinea, and Guinea had

16

neither considered nor taken any steps to force a "pay up or be terminated" scheme before Defendants interfered (*see* ¶ 2).  Significantly, BSGR alleges that Soros was interested in Guinea's mining industry and "assist[ed]" Condé even **before** he was elected (¶¶ 54, 78), negating any inference of "predisposition" once he became President.  Moreover, Condé's request was already part of Defendants' inducement:  as the Complaint alleges, "Soros and OSF masterminded and orchestrated the attempted extortion of BSGR.  In fact, soon after the failed attempt to shake down BSGR, Soros and OSF engaged in secret negotiations with [BSGR's joint venture partner] seeking payment of $500 million" – allegations supported by citations to a draft agreement and reports of Soros directly seeking such payment (¶¶ 58, 61-62, 65).  With their pre-existing animus toward Plaintiffs (¶¶ 46-49), Defendants "ma[d]e sure that the government of Guinea would force BSGR" to pay up or be terminated (¶ 56).

Defendants then posit that post-election, Condé requested Soros' assistance – apparently out of the blue – with a scheme that Condé came up with all on his own (MOL 15).  The Complaint tells no such tale.  As noted, the Complaint alleges that the scheme was Defendants', not Condé's or Guinea's.  Moreover, Soros, having insinuated himself into Condé's confidence prior to the election, continued to "'advise[]'" Condé about how to "'shake up the mining license regime'" after Condé's election (¶ 83).  This is the antithesis of predisposition.  Guinea did not have the capacity to terminate the contract without Soros:  "'the country was turning to Soros because Guinea could not afford to pay international consultants'" (¶ 73) and OSF provided $5 million to start (¶ 76); the Technical Committee "'outsourced'" its activities to entities paid for and/or controlled by Soros, as it had no staff or trained inspectors (¶ 99); and this was "'Soros' initiative'" (¶ 72), "supported by 'George Soros and his Open Society Foundations'" (¶ 75) and his "'battalions of lawyers and private investigators'" (¶ 60).  Soros's payments to Guinean

officials and witnesses (based on a declaration under penalty of perjury) confirm the causal link
(¶¶ 161-64).  These facts and their inferences more than plausibly allege causation.  Unlike in
*Sharma v. Skaarup Ship Mgmt. Corp.*, here the Complaint specifically alleges that Defendants'
acts were the "'but for' cause of" the breach, and that Defendants were the "motivating force
behind [Guinea's] breach".  916 F.2d 820, 828 (2d Cir. 1990) (MOL 14) (*e.g.*, ¶¶ 56, 93, 165,
184, 191, 214).  That years into the scheme, government officials stated their intent to revoke
BSGR's rights (MOL 15) evidences nothing more than the success of Defendants' scheme.

The cases Defendants cite are inapposite, as the contracting parties there had taken
actions to obstruct performance and/or breach the contract "before" any alleged interference.
*RSM Prod. Corp. v. Fridman*, 387 F. App'x 72, 74-75 (2d Cir. 2010), *aff'g* 643 F. Supp. 2d 382,
391 (S.D.N.Y. 2009) (contracting party obstructed performance after bribery request was refused
in 1996, three years "before any alleged interference" or third party involvement); *Mina Inv.
Holdings Ltd. v. Lefkowitz*, 16 F. Supp. 2d 355, 360-61 (S.D.N.Y. 1998) (contracting party
breached contract "at least nine separate times" "before" subject transaction occurred).  Here, the
interference pre-dates any attempt to breach BSGR's contract.  As the Complaint summarizes:

> Thus, Soros exercised complete control over the process – he initiated the breach by
> his pay up or be terminated ultimatum and publicly announced it with Condé; Guinea
> couldn't afford the apparatus of its deceptive investigation without Soros, so he
> enlisted his funded organizations using his "direct advocacy and public outreach"
> strategy; he used his own investigator and lawyer to carry out his wishes, placing them
> in positions of influence over the ostensibly neutral Technical Committee; and to
> make sure it all worked as he designed it he paid off the people in the government to
> make sure the termination went through (¶ 164).

The Complaint adequately alleges but-for causation.

Defendants' related argument, that an allegation in the ICSID arbitration concerning the
activities of Alpha Condé <u>before</u> he became president somehow precludes any Soros wrongdoing
(MOL 15-16), fails for the same reasons and then some.  Defendants' use of extrinsic documents

is improper (*see* Point II).  Moreover, Guinea was the contracting party, not Condé; Defendants cite no authority that the actions of one nonsignatory (Condé) can vitiate the wrongdoing of another (Defendants), when Guinea itself was abiding by the contract.  In ICSID, BSGR alleges Soros's controlling involvement (*e.g.*, Def. Ex. 1, ¶¶ 58, 60-61; Def. Ex. 2, ¶ 153), including in many ICSID documents Defendants ignore (Libson Decl. ¶ 6).  *See Goel*, 820 F.3d at 560 (consideration of incomplete litigation papers improperly creates "a bespoke factual record, tailor-made to suit the needs of defendants").  Even were there inconsistencies between ICSID and the Complaint, *Ashcroft v. Iqbal* did not eliminate alternative pleading.  *Lawrence v. Wilder Richman Sec. Corp*., 417 Fed. App'x 11, 13 (2d Cir. 2010) (Rule 8(d)(2) permits inconsistent pleading between "arbitral forum" and court proceedings, as well as in same case).

Finally, Defendants argue that the Complaint fails to allege but-for causation against each defendant (MOL 16).  The Complaint clearly sets out the salient actions of Soros and the OSF entities.  For example, Soros influenced Condé regarding Guinea's mining industry when Condé was only a candidate, and focused on BSGR as a target (¶¶ 54-56).  Soros and OSF both were involved in the March 2011 draft memorandum of understanding between OSF and BSGR's joint venture, seeking a $500 million payment in derogation of BSGR's contract (¶¶ 61-63).  Soros himself similarly sought payment of $250-$500 million (¶ 65).  Given that BSGR's contract precluded any changes to its financial terms (¶¶ 90-92), this interference alone is sufficient to allege but-for causation as to Soros and OSF.  The Complaint goes on to detail Defendants' actions in ensuring that BSGR's contract was terminated once BSGR refused to pay up.  Both Soros and OSF were on the ground in Guinea and arranged for the process that was designed to lead to BSGR's contract's termination (*e.g.*, ¶¶ 67-78), a process, in OSF's own words, supported by "George Soros and his Open Society Foundations" (¶ 75).

19

To the extent Defendants are complaining about a lack of specificity as to the individual OSF entities, that is Defendants' own responsibility.  As set forth in more detail in Point IV (dealing with the remainder of Defendants' arguments for dismissal of the OSF entities), Defendants have deliberately played a shell game with OSF.  Despite all the evidence that OSF is a legal entity – a board, executives, a budget, asserting copyrights – Defendants claim it does not exist.  When asked to identify OSF's legal status and that of its members pursuant to Local Rule 26.1, Defendants outright refused – requiring BSGR to add additional defendants (*see* Declaration of Louis M. Solomon ("LMS Decl.") ¶¶ 5-8, 10, 14 & Exs. 6-10).  Accordingly, Defendants are the cause of any lack of clarity among the OSF entities.  The inequity of permitting Defendants to obtain a dismissal due to their own obfuscation is evident.  Discovery should proceed (*see also id.* ¶ 11; *infra* Point IV).

### B.    The Complaint States a Claim for Fraud

The Complaint identifies the "who, what, when, where, why" of its fraud claim sufficient to satisfy Rule 9(b).  *E.g.*, *Stevelman v. Alias Research Inc.*, 174 F.3d 79, 84 (2d Cir. 1999).  The Complaint alleges Soros and his agents made material misrepresentations directed to BSGR:  On March 2, 2011 Soros and Condé announced all "existing mining contracts" would be re-examined; on March 3 at EITI Soros repeated "those who want to validate those claims will have to subscribe the principles of EITI" (¶¶ 74, 78); on March 3 OSF issued a press release stating OSF had been enlisted to "help … put these [plans] into effect" with the support of "Soros and his Open Society Foundations" and Soros-backed RWI (¶¶ 74-77, 189).  These statements imply an <u>unbiased</u> review of "existing contracts," including BSGR's.  Soros and his agents made these statements publically and with knowledge that BSGR would rely on them as one of a small group possessing mining rights in Guinea. *See John Blair Comms., Inc. v. Reliance Capital Group, L.P.*, 157 A.D.2d 490, 492 (1st Dep't 1990) ("a party who commits intentional fraud is

liable to any person who is intended to rely upon the misrepresentation or omission").

Soros's other agents also made actionable misstatements. Soros provided and paid agents Horton and DLA Piper to serve as "'the operational arm'" of the Technical Committee, which was tasked with reviewing the mining contracts but could not afford and lacked the skills to do so (¶¶ 73, 99, 106). Horton and DLA Piper used the Technical Committee as a conduit to transmit false information about BSGR contained in its Soros commissioned DLA Report (¶¶ 111-13). The DLA Report relied on unfounded and incredible accusations contained in the Veracity Report, the content of which was provided by Soros's investigator, Steven Fox, and controlled by Soros himself (¶¶ 106-13, 150). Even though it knew it had no reliable support, DLA presented these allegations to the Technical Committee, which through DLA again relied on them without reservation in the Allegations Letter. That October 30, 2012 Letter used false information from Soros's agents to make unfounded accusations about BSGR – just as Soros intended – while falsely telling BSGR it would conduct an "objective and rigorous review" (¶¶ 114-28, 150). *See Amusement Indus. v. Stern*, 2016 WL 6820744, *3 (S.D.N.Y. Nov. 10, 2016) (sustaining fraud conduit claim under New York law); *IOP Cast Iron Holdings, LLC v. J.H. Whitney Capital Partners, LLC*, 91 F. Supp. 3d 456, 473 n.18 (S.D.N.Y. 2015) (under New York law, a party is liable for fraud if it "makes," "authorizes," or "causes" a misrepresentation). The statements were misleading because, by early 2011, Soros had targeted BSGR's contract for cancellation regardless of the results of the "review" (¶¶ 81-84). A "misrepresentation" denotes not only spoken or written words, but also can be implied through conduct. *Bank of Am. v. Jarczyk,* 268 B.R. 17, 21 (W.D.N.Y. 2001); Restatement (Second) of Torts, § 525 cmt. b.

Fed. R. Civ. P. 9(b) requires only that the plaintiffs plead with particularity "facts from which it is plausible to infer fraud; it does not require Plaintiffs to plead facts that make fraud

more probable than other explanations". *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 175 (2d Cir. 2015).  The Second Circuit has repeatedly held that where a fraudulent scheme involves facts "'peculiarly within the opposing party's knowledge'" and the plaintiff has no access to those facts, Rule 9(b) specificity standards are satisfied so long as plaintiff alleges the factual basis for its belief.  *See Boykin v. Keycorp,* 521 F.3d 202, 215 (2d Cir. 2008); *IUE AFL-CIO Pension Fund v. Herrmann*, 9 F.3d 1049, 1057 (2d Cir. 1993) (in such a case, "allegations may be based on information and belief").  Whether Soros and his agents duped the Technical Committee into relying on their false statements, or conspired with them in issuing the Allegations Letter instead (or both, at different points in time), is solely within Defendants' knowledge and will be determined in discovery.  *See Lavastone Capital LLC v. Coventry First LLC*, 2015 WL 1939711, *8-9 (S.D.N.Y. 2015) ("somewhat relaxed pleading requirements" justified where defendant's "role is alleged to have been behind the scenes").

The Complaint alleges actionable omissions.  A duty to disclose material information arises "'where the party has made a partial or ambiguous statement, on the theory that once a party has undertaken to mention a relevant fact to the other party it cannot give only half of the truth'", *Banque Arabe Et Internationale D'Investissement v. Maryland Nat'l Bank*, 819 F. Supp. 1282, 1290 (S.D.N.Y. 1993), *aff'd,* 57 F.3d 146 (2d Cir. 1995), or "where the party to be charged has superior knowledge or means of knowledge, such that the transaction without disclosure is rendered inherently unfair", *Miele v. Am. Tobacco Co.,* 2 A.D.3d 799, 803 (2d Dep't 2003).  The Complaint alleges partial statements by and through Soros's superior knowledge.  Soros and his agents publically announced a "review" of all mining contracts, yet failed to disclose to BSGR that the process was corrupted (¶¶ 79-84).  The Technical Committee stated that the review process was "objective" without disclosing that the cancellation of BSGR's contract was

preordained (¶¶ 127-29, 201), or that, as a declaration asserts, Soros had paid them to ensure they reached that result (¶¶ 161-64, 198).  These statements are incomplete half-truths as applied to BSGR.  *See Banque Arabe,* 819 F. Supp. at 1290.

The Complaint alleges reasonable reliance (*e.g.,* ¶¶ 3, 201).  A plaintiff's reasonable reliance raises issues of fact that cannot be resolved on a motion to dismiss.  *Green v. Beer*, 2009 WL 911015, *9 n.19 (S.D.N.Y. Mar. 31, 2009) ("At the motion to dismiss phase, it is enough that Plaintiffs have sufficiently alleged their reliance on these statements"); *Maloul v. Berkowitz*, 2008 WL 2876532, *2 (S.D.N.Y. July 23, 2008) (reasonable reliance "is intensely fact-specific and generally considered inappropriate for determination on a motion to dismiss").  Even assuming reliance is suitable for determination now, the reasonableness of BSGR's reliance in submitting its data and documentation to the Technical Committee for its "impartial" review is supported with detailed facts.  Upon receiving a November 17, 2011 letter questioning the BSGR joint venture's work in Simandou, BSGR provided a written explanation and access to a data room containing "a vast number of supporting documents" (¶ 104).  On February 3, 2012, BSGR submitted more than 50,000 pages of documents and authorizations supporting its mining activities to the Minister of Mines (¶ 105).  These documents were not considered by the Technical Committee, which rejected BSGR's response as inadequate in the Allegations Letter (¶¶ 114-28).  BSGR further provided exculpatory material that disproved the accusations, but this too was disregarded (¶ 150).  The Technical Committee continued to rely on the false accusations from the Veracity/DLA Reports in March, 2014, when its supposed "review" culminated in the improper cancellation of BSGR's contract (¶¶ 151, 154-158) and caused BSGR to expend millions both to defend itself and attempt to enforce its contract (*see* ¶ 204).

Defendants argue that BSGR's reliance could not be reasonable because it alleged in the

ICSID proceeding that the Technical Committee process was compromised from day one (MOL 22). Defendants' references to extrinsic documents should be rejected on this motion. *Goel*, 820 F.3d at 560; *supra* p.15. Further, voicing concerns about a government process in a document submitted years later does not mean BSGR did not rely on that process at the time (the relevant period) and at the most creates an issue of fact. Defendants' further argument that reliance was not reasonable after Condé's extortion attempt (MOL 22) is similarly a factual inference. BSGR was entitled to rely on the stated impartiality of the process, as alleged (¶¶ 201-02).

Defendants' cases (MOL 22) are distinguishable. *Stolow v. Greg Manning Auctions Inc.*, 258 F. Supp. 2d 236, 249 (S.D.N.Y. 2003), has nothing to do with pleading alternative theories of harm, which the Federal Rules plainly permit. *Keep on Kicking Music, Ltd. v. Hibbert*, 2016 WL 4386047, *5 (S.D.N.Y. Aug. 17, 2016), concerned a corporation's existence at the time misrepresentations were made, information that was publicly available. It is a far cry from BSGR's understanding as to whether a supposedly autonomous Committee was truly autonomous, where, as here, an extensive network of agents and actors was at the beck and call of Soros and worked secretly. Alternative pleading is permissible and routine. *Lawrence*, 417 Fed. App'x at 13. Defendants' motion to dismiss BSGR's claim for fraud should be denied.

We note that due to the confusion Defendants caused by challenging OSF's standing without providing support ( ¶¶ 9-14; LMS Decl. ¶ 14), BSGR now asserts the fraud claim solely against Soros, reserving the right to add other defendants when clarity is achieved.

### C. The Complaint States Claims for Conspiracy **and** Prima Facie Tort

BSGR's conspiracy and prima facie tort claims survive because BSGR has stated other tort claims. *See supra* §§ A-B; *Freihofer v. Hearst Corp.*, 65 N.Y.2d 135, 143 (1985) ("where a traditional tort remedy exists, a party will not be foreclosed from pleading [prima facie tort], as alternative relief"); ¶ 213. Defendants raise no other challenge to these claims (MOL 25-26).

### D.    The Complaint States a Claim for Commercial Defamation

"Because at least some of the allegedly defamatory statements fall within the limitations period" as Defendants admit (MOL 23; *see* ¶ 172), this claim "cannot be dismissed as untimely". *Enigma Software Grp. USA, LLC v. Bleeping Computer LLC*, 194 F. Supp. 3d 263, 277 (S.D.N.Y.  2016).  Also, BSGR has properly pled an agency relationship between Defendants and Global Witness, including via "'board participation'", funding, and other methods of control (¶¶ 9, 11, 49-51, 79-80, 130, 141-48).

Defendants cannot show on this motion that BSGR "must be" a limited purpose public figure.  *Enigma*, 194 F. Supp. 3d at 288.  Even were this motion not "premature", *id*. at 290, Defendants point to nothing showing that BSGR "invited public attention to its views in an effort to influence others" or any of the other requirements:  being "forced to respond publicly to the allegedly defamatory or libelous statements themselves" – which is the most that Defendants allege (MOL 24 n.11) – does not show BSGR "voluntarily injected [it]self" into a controversy. *Calvin Klein Trademark Trust v. Wachner*, 129 F. Supp. 2d 248, 252 (S.D.N.Y.  2001); *cf. Biro v. Conde Nast*, 963 F. Supp. 2d 255, 271-75 (S.D.N.Y. 2013) (MOL 23-24) (plaintiff had made "myriad high-profile public appearances", "written numerous" articles, "given lectures", and had been interviewed for documentaries and various news programs).  Even so, BSGR has pled actual malice sufficiently – the Complaint alleges Defendants' knowing dissemination of untrue allegations, including via Global Witness (*e.g*., ¶¶ 3, 142-47, 172).

## IV.    THE COURT SHOULD NOT DISMISS THE CLAIMS AGAINST OSF ENTITIES

**OSF/OSFI**.  Defendants say OSF and OSFI do "not exist" (MOL 26).  All public OSF descriptions suggests otherwise.  (The cited exhibits are annexed to the LMS Decl.)

OSF characterizes itself as a "network of foundations, partners, and projects in more than

100 countries" (*see* ¶ 9).  OSF's website claims that "The Open Society Foundations began in

1979", boasts that OSF "play[s] a role in every region of the world", and states that "[o]ver the

last 35 years, the Open Society Foundations has had expenditures of close to $14 billion" (*see*

LMS Decl. ¶ 13).  OSF has a board of directors and employs a multitude of executives and

officers.  OSF has a "Chairman" (Soros), a "President" (Christopher Stone), and many other C-

Suite executives (*id.*).  As with any legal entity, OSF claims "© 2017 Open Society Foundations"

on its website (*see id.*), and also claims the copyright to the book "The Philanthropy of George

Soros" (Ex. 2 at 2).  OSF releases a budget annually, recently stating the "total 2017 budget is

$940.7 million" (Ex. 3 at 1).  The budget notes that with "more than 1,600 staff . . . no other

philanthropic organization employs so many people in so many places" (*id.*).  OSF states, "***we***

***continue to set [funding] priorities within the fixed resources that George Soros, our founder,***

***has made available***" (*id.*).  According to OSF's board materials, "The Open Society Foundations

(OSF) is a 501c3 private operating foundation" (Ex. 4 at 53).  OSF sought to contract with

BSGR's joint venture to extort $500 million from it (¶¶ 61-66).  Defendants had all this

information but chose not to respond to it in their amended motion papers (LMS Decl. ¶ 10).

OSF has a history of corporate personhood via OSFI.  OSFI was a Delaware not-for-

profit corporation with its principal place of business at 224 West 57th Street, New York, New

York 10019 (*see* ¶ 9).  It stated a purpose in publicly-filed tax documents nearly identical to the

business purpose OSF claims today:  to "support the charitable activities & programs promoting

open, democratic societies globally" (Ex. 5 at 6-7).  While OSFI filed dissolution papers on

October 3, 2012 (*id.* 4-5), OSF/OSFI has since continuously held itself out as a going concern at

the same address in New York, and thus "may be held liable on a cause of action that accrues

after dissolution" since OSF "continued its operations, operated its premises, and held itself out

26

as a de facto corporation". *Bruce Supply Corp. v. New Wave Mech., Inc.*, 4 A.D.3d 444, 445 (2d Dep't 2004); *Matter of Intelligent Bank Mgmt., Inc.*, 207 A.D. 2d 760, 761 (1st Dep't 1994) ("fact that the respondent corporation was dissolved in another state is of no moment, as it continues as a *de facto* corporation"); ¶ 9.  OSF/OSFI is present in New York and was properly served by serving the N.Y. Secretary of State and/or in person (LMS Decl. ¶ 3; Dkt. 43).

BSGR served an S.D.N.Y. Local Rule 26.1 demand for OSF's status.  Defendants refused to respond (*see* LMS Decl. ¶¶ 5-9 & Exs. 6-10).  BSGR therefore has sued the additional OSF entities.  Discovery can sort it out (*see id.* ¶ 11).  Until then, no defendant should be dismissed.

**OSPC**.  As for OSPC (MOL 26 n.12), BSGR alleged its principal place of business in New York, which is supported by the address it placed on its IRS Form 990 (¶ 13; Ex. 11).

**Rule 8**.  BSGR has adequately pleaded against the new OSF defendants (*see* MOL 27). BSGR alleged the extraordinary overlap among the new OSF entities that Soros and OSF control – they share the same address, phone number, have overlapping boards and funding sources (¶ 52) – while Defendants have refused to provide Local Rule 26.1 clarification.  Even under the heightened pleading of Rule 9(b), BSGR does not have to allege matters "peculiarly" in Defendants' knowledge (*supra* p.22).  A similar result applies under Rule 8.  *Anwar v. Fairfield Greenwich, Ltd.*, 728 F. Supp. 2d 372, 423 (S.D.N.Y. 2010) ("Given that Plaintiffs clearly define Citco in the SCAC to include each of the Citco Defendants, as well as Plaintiffs' allegations regarding the relationship among the Citco Defendants, the Court finds that Plaintiffs have provided sufficient notice to each of the Citco Defendants of the claims against them").

**Relation Back**.  The tortious interference claim relates back for the new OSF defendants (MOL 16-19).  Courts apply the "more generous" of federal or state relation back law.  *S.A.R.L. Galerie Enrico Navarra v. Marlborough Gallery, Inc.*, 2013 WL 1234937, *3 n.5 (S.D.N.Y.

2013).  Federal law requires that the new party have received notice of the action within 90 days

of filing, and "knew or should have known that the action would have been brought against it,

but for a mistake concerning the proper party's identity".  Fed. R. Civ. P. 15(c)(1)(C), 4(m).

Service of the original complaint on OSF and Soros, their board member, should suffice (¶ 52).

Moreover, the new defendants were served with the amended complaint on July 11, 2017, 88

days from the April 14, 2017 filing date, further satisfying the notice requirement (Dkt. 34-44).

Defendants have disputed that OSF is the proper party, but have not identified a replacement

(Exs. 6-10), causing BSGR at worst to "harbor a misunderstanding about the [defendants'] status

or role in the events giving rise to the claims at issue".  *Krupski v. Costa Crociere S. p. A.,* 560

U.S. 538, 549 (2010).  Where companies are "related corporate entities with very similar names

. . . this interrelationship and similarity heighten the expectation" that a defendant should suspect

a mistake has been made.  *Id*. at 556-57; *S.A.R.L.*, 2013 WL 1234937, *6 (Rule 15 applies where

"plaintiff '[lacked] knowledge regarding the conduct or liability' of the newly added party").

Here, BSGR has alleged conduct engaged in by the entity defendants – from all evidence, OSF

should be the proper entity; since Defendants claim that is not the case, BSGR has named other

entities, all of whom fall under the OSF umbrella.

The New York requirement that the claims arise from the same conduct "is satisfied"

because the amended and original complaints allege virtually identical claims.  *Fisher v. APP

Pharm., LLC*, 783 F. Supp. 2d 424, 430 (S.D.N.Y. 2011) (MOL 17).  The mistake element is the

same as the federal.  NY also adds a requirement that new defendants be "united in interest" with

the original defendants.  For all the reasons set forth herein, the Complaint alleges such unity.

Discovery is appropriate if it is not clear at this early stage whether the relation back

elements are satisfied.  *See Baez v. Jet Blue Airways*, 745 F. Supp. 2d 214, 223 (S.D.N.Y. 2010).

**V.      THE COURT SHOULD DENY DEFENDANTS' APPLICATION FOR A STAY**

It is frankly unthinkable for Defendants to ask this Court to delay this case (MOL 27-30) in favor of the ICSID arbitration.  It could take *years* before a final and non-appealable award is made (Libson Decl. ¶¶ 9-11).  Even then that proceeding will not have the preclusive effects that Defendants speculate.  And any more delay would severely prejudice Plaintiffs.

To begin, Defendants have no proof, certainly nothing to undermine the simple fact that after completion of evidence in ICSID, further arguments, briefing, decision, and appeals will take several *years* (*see* Libson Decl. ¶¶ 10-11).  Defendants cannot carry their "heavy burden'" of establishing that "the arbitration may be expected to conclude within a reasonable time, and that such delay as may occur will not work undue hardship".  *Donjon Marine Co. v. Water Quality Ins. Syndicate*, 523 Fed. App'x 738, 738 (2d Cir. 2013) (denying stay); *accord Greenlight Reinsurance, Ltd. v. Appalachian Underwriters, Inc.*, 958 F. Supp. 2d 507, 521 (S.D.N.Y. 2013).

Second, Defendants speculate that issues that *might* be decided in the arbitration *will be* preclusive of issues here.  The causes of action are not the same.  Nor are the elements of the claims.  Defendants speculate that the arbitration *might* decide whether the Base Convention was valid or corrupt.  That fact is *irrelevant* to Plaintiffs' claims of fraud, prima facie tort, and commercial defamation.  Even as to the claim for unlawful interference, Defendants cite no case holding that they can avoid liability altogether for interfering with a contract that was valid and binding at the time of interference.  New York law does *not* require that Plaintiffs show a breached contract to prove unlawful interference.  *Kronos, Inc. v. AVX Corp.*, 81 N.Y.2d 90, 94 (1993) (elements of claim include "(3) defendant's intentional inducement of the third party to breach *or otherwise render performance impossible*").  There is no necessary factual identity even on the interference claim.  *See BBS Norwalk One, Inc. v. Raccolta, Inc.,* 117 F.3d 674, 677 (2d Cir.1997) ("'[i]ssue preclusion will apply only if it is quite clear that this requirement has

been met'"); *Computer Assocs. Int'l, Inc. v. Altai, Inc.*, 126 F.3d 365, 371 (2d Cir. 1997) (issues not identical when legal standards governing their resolution are different).

Every other element Defendants will have to prove – whether the legal standards are the same, whether the evidentiary and procedural rules will be sufficient, whether the Tribunal will actually issue an award with the requisite detail for application of discretionary estoppel – Defendants offer nothing but rank speculation on an issue that is discretionary, "not mandatory". *Giles v. City of N.Y.,* 41 F. Supp. 2d 308, 313-14 (S.D.N.Y. 1999); *U.S. v. Int'l Bhd. of Teamsters*, 954 F.2d 801, 809 (2d Cir.1992) (not bound by arbitrator's factual conclusions).

Finally, prejudice from any more delay would be serious and unfair. This action is against the motivating force causing BSGR's billions of dollars of loss and severely damaged reputation. Defendants have delayed Plaintiffs by causing proceedings the world over to be commenced against them (¶¶ 167-71). BSGR has not been found guilty or liable but indeed has been exculpated. BSGR can finally vindicate its rights. Soros's age (87) and the multi-national identities of witnesses to Defendants' scheme both counsel against a stay, due to the serious prejudice to BSGR. *Chang v. Lin,* 824 F.2d 219, 222 (2d Cir. 1987) (hardship includes danger that evidence may grow stale or become unavailable, particularly in international disputes).

## **CONCLUSION**

The Court should deny Defendants' motion in its entirety.

Dated: New York, New York
        August 18, 2017                          Respectfully submitted,

                                                 GREENBERG TRAURIG, LLP
                                                 By: /s/ Louis M. Solomon
                                                        Louis M. Solomon
                                                 200 Park Avenue
                                                 New York, New York 10166
                                                 (212) 801-6500
                                                 *Attorneys for Plaintiffs BSGR*