# EXHIBIT 8

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

_____

| | |
|---|---|
| BSG Resources (Guinea) Limited, BSG Resources (Guinea) Sàrl, and BSG Resources Limited, ) ) ) ) | Civil Action No. 1:17-cv-02726-JFK |
| Plaintiffs, ) ) | |
| -against- ) ) | |
| George Soros, Open Society Foundations, Open Society Institute, Foundation to Promote Open Society, Open Society Foundation, Inc., Alliance for Open Society International, Inc., Open Society Policy Center, and Open Society Fund, ) ) ) ) ) ) ) | |
| Defendants. ) | |

_____ )

## PLAINTIFFS' FIRST REQUESTS FOR PRODUCTION OF DOCUMENTS TO DEFENDANT OPEN SOCIETY FOUNDATIONS

Pursuant to Rules 34 and 26(e) of the Federal Rules of Civil Procedure, Plaintiffs BSG Resources (Guinea) Limited, BSG Resources (Guinea) Sàrl, and BSG Resources Limited (collectively "plaintiffs" or "BSGR"), hereby request that Defendant Open Society Foundations produce for inspection and copying at the offices of Greenberg Traurig, LLP, 200 Park Avenue, New York, New York 10166, the documents and information requested herein within 30 days of service of these requests.

### DEFINITIONS

The following definitions apply to each of the requests for documents set forth herein and are deemed to be incorporated in each of the requests:

1.      These Requests incorporate by reference the Uniform Definitions in Discovery Requests set forth in Local Civil Rule 26.3 of the Local Rules of United States District Courts for the Southern and Eastern Districts of New York.

2.      "BSGR" means BSG Resources Limited, BSG Resources Guinea Sàrl aka BSG Resources (Guinea) Sàrl, its officers, directors, employees, partners, corporate parents, subsidiaries or affiliates, including VBG-Vale BSGR Sàrl.

3.      "Steinmetz" means Benjamin Steinmetz, also known as Beny Steinmetz.

4.      "George Soros" means George Soros and any employees, affiliates or partners of George Soros.

5.      "Open Society Foundations" or "You" or "Your" means Open Society Foundations, and each of its officers, directors, employees, partners, corporate parents, subsidiaries or affiliates.

6.      "Open Society Institute" means Open Society Institute and each of its officers, directors, employees, partners, corporate parents, subsidiaries or affiliates.

7.      "Foundation to Promote Open Society" means Foundation to Promote Open Society and each of its officers, directors, employees, partners, corporate parents, subsidiaries or affiliates.

8.      "Open Society Foundation, Inc." means Open Society Foundation, Inc. and each of its officers, directors, employees, partners, corporate parents, subsidiaries or affiliates.

9.      "Open Society Policy Center" means Open Society Policy Center and each of its officers, directors, employees, partners, corporate parents, subsidiaries or affiliates.

10.     "Alliance for Open Society International, Inc." means Alliance for Open Society International, Inc. and each of its officers, directors, employees, partners, corporate parents, subsidiaries or affiliates.

11.     "Open Society Fund" means Open Society Fund and each of its officers, directors, employees, partners, corporate parents, subsidiaries or affiliates.

12.     "OSF" collectively means and includes Open Society Foundations, Open Society Institute, Foundation to Promote Open Society, Open Society Foundation, Inc., Open Society Policy Center, Alliance for Open Society International, Inc., and Open Society Fund.

13.     "Concern" or "concerning" means relating to, referring to, describing, evidencing or constituting.

14.      "Relevant Period" means January 1, 2005 through the present.

15.     "Republic of Guinea" or "Guinea" means the country in Western Africa whose capital is the city of Conakry.

16.     "Alpha Condé" means Alpha Condé, currently President of the Republic of Guinea, and/or any employee, agent, representative or consultant of Alpha Condé, and any of Alpha Condé's agents, attorneys, employees, subordinates, representatives, subsidiaries, managing agents, affiliates, or investigators.

17.     "Mohamed Alpha Condé" means Mohamed Alpha Condé, also known as Alpha Mohamed Condé, son of Alpha Condé, and any of Mohamed Alpha Condé's agents, attorneys, employees, subordinates, representatives, subsidiaries, managing agents, affiliates, or investigators.

3

18.     "Scott Horton" means Scott Horton, Senior Consultant at DLA Piper, and any employee, agent, representative or consultant of Scott Horton, and any of Scott Horton's agents, attorneys, employees, subordinates, subsidiaries, managing agents, affiliates, or investigators.

19.     "Chris Canavan" means Chris Canavan of Soros Fund Management LLC and any employee, agent, representative or consultant of Chris Canavan, and any of Chris Canavan's agents, attorneys, employees, subordinates, subsidiaries, managing agents, affiliates, or investigators.

20.     "Soros Fund Management" means Soros Fund Management LLC, the New York City-based hedge fund, and includes any officer, member, director, board member, shareholder, employee, partner, corporate parent, subsidiary, or affiliate.

21.     "Amended Complaint" means Plaintiffs' first Amended Complaint in this action, No. 1:17-cv-02726-JFK (S.D.N.Y.), filed June 30, 2017.

22.     "BSGR's First Set of Interrogatories" means the interrogatories Plaintiffs served to Defendants in this action on July 11, 2017.

23.     "ICSID Arbitration" means the arbitration hearing currently pending in Paris before the International Centre for Settlement of Investment Disputes, captioned *BSG Resources Limited, et al. v. Republic of Guinea*, Case No. ARB/14/22.

24.     "LCIA Arbitration" means the arbitration hearing before the London Court of International Arbitration, captioned *Vale S.A. v. BSG Resources Ltd.*, LCIA Arb. No. 142683.

25.      "Including" means "including but not limited to" and "including without limitation".

26.     "Simandou" refers to the Simandou Range in the southeastern Region of Guinea.

27.     "Simandou Blocks 1 and 2" refers to the northern half of the Simandou range in the Nzerekoré Region of southeastern Guinea which Rio Tinto was ordered to relinquish in 2008.

28.     "Simandou Blocks 3 and 4" refers to the southern half of the Simandou range in the Nzerekoré Region of southeastern Guinea which was controlled by Rio Tinto for all or part of the Relevant Period.

29.      "Zogota Mining Concession" means the iron ore mining concession granted by the Republic of Guinea to BSGR in March 19, 2010, covering an area of 1,024 kilometers near the village of Zogota, in Guinea.

30.     "Base Convention" means the iron and infrastructure agreement dated December 16, 2009, entered into by BSGR with the Republic of Guinea.

31.     "Blocks 1 and 2 Permit" means the prospecting permit granted to BSGR by the Republic of Guinea over Simandou Blocks 1 and 2, granted on December 9, 2008 giving rise to (i) an exclusive right to prospect for iron ore and; (ii) a right to develop and operate the area (by way of operating permit or mining concession) upon completion of a feasibility study.

32.     "Mining Rights" refer to BSGR's interest in the Zogota Mining Concession, the Base Convention, the Blocks 1 and 2 Permit, and/or any other relevant mining agreement.

33.     "Rio Tinto" means the Australian-British international mining firm Rio Tinto Group, and includes Rio Tinto plc, Rio Tinto limited, Simfer S.A., as well as any officer, director, board member, shareholder, employee, partner, corporate parent, subsidiary, or affiliate of any of the foregoing.

34.     "Vale" means Vale S.A., the Brazilian multinational mining corporation, and includes any officer, director, board member, shareholder, employee, partner, corporate parent, subsidiary, or affiliate.

35.    "Sable Mining" means Sable Mining Africa Limited, now known as Consolidated Growth Holdings Limited, and includes any officer, director, board member, shareholder, employee, partner, corporate parent, subsidiary, or affiliate.

36.    "Veracity" means Veracity Worldwide, a private investigation firm, and includes any officer, director, board member, shareholder, employee, partner, corporate parent, subsidiary, or affiliate.

37.    "Veracity Report" means the report or reports issued by Veracity in 2011, 2012 or 2013 about BSGR and/or its mining rights.

38.    "Steven Fox" means Steven Fox, founder and Chief Executive Officer of Veracity, and any employee, agent, representative or consultant of Steven Fox, and any of Steven Fox's agents, attorneys, employees, subordinates, subsidiaries, managing agents, affiliates, or investigators.

39.    "DLA Piper" means the international law firm DLA Piper, inclusive of DLA Piper International LLP and DLA Piper LLP, and each of its divisions, subsidiaries, affiliates, controlled entities, joint ventures, related companies, predecessors, successors and assigns; and present and former officers, directors, partners, employees, agents, attorneys, accountants, and representatives of any of the entities listed above, and any other person who currently or formerly acted or purported to act on its behalf, or who is or has been subject to the direction or control of, any of the entities listed above.

40.    The "DLA Piper Report" means the undated memorandum titled "RE: Report on investigations relating to the acquisitions and transfer of rights to Simandou by BSGR" drafted by DLA Piper.

6

41.     "Orrick" means the international law firm Orrick, Herrington & Sutcliffe LLP, and includes each of its divisions, subsidiaries, affiliates, controlled entities, joint ventures, related companies, predecessors, successors and assigns; and present and former officers, directors, partners, employees, agents, attorneys, accountants, and representatives of any of the entities listed above, and any other person who currently or formerly acted or purported to act on its behalf, or who is or has been subject to the direction or control of, any of the entities listed above.

42.     "Heenan Blaikie" means Heenan Blaikie LLP, a defunct Canadian law firm, and includes each of its divisions, subsidiaries, affiliates, controlled entities, joint ventures, related companies, predecessors, successors and assigns; and present and former officers, directors, partners, employees, agents, attorneys, accountants, and representatives of any of the entities listed above, and any other person who currently or formerly acted or purported to act on its behalf, or who is or has been subject to the direction or control of, any of the entities listed above.

43.     "New Mining Code" means the mining code adopted by the Republic of Guinea in 2011.

44.     "SOGUIPAMI" means Société Guinéenne du Patrimoine Minier, the Guinean state-owned mining company created pursuant to the New Mining Code.

45.     "National Mining Commission" means the commission established by the Republic of Guinea on or about March 26, 2012 that was granted the power to examine "the extension, renewal, lease and cancellation applications for mining titles on the basis of the Mining Code".

46.     "Draft Memorandum of Understanding" means the draft contract attached to a March 3, 2011 email between Chris Canavan and Daniela Chimisso (Vale's Deputy General Counsel) entitled "Regarding a Possible Advance Payment of Tax on Mining Substances from Projects in the Republic of Guinea".

47.     "Technical Committee" means the committee established by the Republic of Guinea, pursuant to the National Mining Commission, to investigate allegations of corruption against BSGR.

48.     "Strategic Committee" means the committee established by the Republic of Guinea, pursuant to the National Mining Commission, to review the recommendations of the Technical Committee.

49.      "Allegations Letter" means the October 30, 2012 letter sent by the Technical Committee to BSGR accusing it of obtaining its Mining Rights wrongfully.

50.     "Technical Committee Report" means the March 21, 2014 Report of the Technical Committee recommending termination of BSGR's Mining Rights.

51.     "Mamadie Touré" means Mamadie Touré, also known as Mamady Touré, a Guinean national alleged to be formerly associated with the former President of Guinea, Lansana Conté, and/or any employee, agent, representative or consultant of Mamadie Touré, including any of Mamadie Touré's agents, attorneys, employees, subordinates, subsidiaries, managing agents, affiliates, or investigators, including Matinda.

52.     "Matinda" means Matinda and Co. Ltd., the purported business entity controlled by Mamadie Touré.

53.     "Guinea's Revocation" means the Republic of Guinea's termination of BSGR's Mining Rights in April of 2014.

54.     "FTI" means FTI Consulting LLP, a United Kingdom Limited Liability Partnership, and includes each of its divisions, subsidiaries, corporate parents, affiliates, controlled entities, joint ventures, related companies, predecessors, successors and assigns, and present and former officers, directors, partners, employees, agents, attorneys, accountants, board, board members, and representatives of any of the entities listed above, and any other person who currently or formerly or purported to act on behalf, or who are or have been subject to the direction or control of, any of the entities listed above.

55.     "Nava Touré" means Nava Touré, current or former Chairman of the Technical Committee, and and/or any employee, agent, representative or consultant of Nava Touré, and any of Nava Touré's agents, attorneys, employees, subordinates, subsidiaries, managing agents, affiliates, or investigators.

56.     "Lounceny Nabé" means Lounceny Nabé, former Minister of Mines of Guinea, and and/or any employee, agent, representative or consultant of Lounceny Nabé, and any of Lounceny Nabé's agents, attorneys, employees, subordinates, subsidiaries, managing agents, affiliates, or investigators.

57.     "Yansane Kerfalla" means Yansane Kerfalla, former Minister of Mines of Guinea, and current or former member of the Strategic Committee, and and/or any employee, agent, representative or consultant of Yansane Kerfalla, and any of Yansane Kerfalla's agents, attorneys, employees, subordinates, subsidiaries, managing agents, affiliates, or investigators.

58.      "Barrick Gold" means "Barrick Gold Corporation", a Canadian corporation, and includes each of its divisions, subsidiaries, corporate parents, affiliates, controlled entities, joint ventures, related companies, predecessors, successors and assigns, and present and former officers, directors, partners, employees, agents, attorneys, accountants, and representatives of any

of the entities listed above, and any other person who currently or formerly acted or purported to act on its behalf, or who is or has been subject to the direction or control of, any of the entities listed above.

59.      "EITI" means the intergovernmental organization Extractive Industries Transparency Initiative, and includes each of its divisions, subsidiaries, corporate parents, affiliates, controlled entities, joint ventures, related companies, predecessors, successors and assigns, board, advisory board and present and former officers, directors, partners, employees, agents, attorneys, accountants, advisory council, pro-bono consultants and representatives of any of the entities listed above, and any other person who currently or formerly acted or purported to act on its behalf, or who is or has been subject to the direction or control of, any of the entities listed above.

60.      "OECD" means the intergovernmental organization the Organization for Economic Cooperation and Development, and includes the OECD working group on bribery, OECD Secretary General's High Level Advisory Group on Anti-corruption and Integrity, and includes each of its divisions, subsidiaries, corporate parents, affiliates, controlled entities, joint ventures, related companies, predecessors, successors and assigns, board, advisory board and present and former officers, directors, partners, employees, agents, attorneys, accountants, advisory council, pro-bono consultants and representatives of any of the entities listed above, and any other person who currently or formerly acted or purported to act on its behalf, or who is or has been subject to the direction or control of, any of the entities listed above.

61.      "Global Witness" means the international nongovernmental organization Global Witness, and includes each of its divisions, board, advisory board, subsidiaries, corporate parents, affiliates, controlled entities, joint ventures, related companies, predecessors, successors

10

and assigns, present and former officers, directors, partners, employees, agents, attorneys, accountants, advisory council, pro-bono consultants and representatives of any of the entities listed above, and any other person who currently or formerly acted or purported to act on its behalf, or who is or has been subject to the direction or control of, any of the entities listed above.

62.    "Natural Resource Governance Institute" or "NRGI" means the international non-governmental organization formerly known as the "Revenue Watch Institute," and includes each of its divisions, subsidiaries, corporate parents, affiliates, controlled entities, joint ventures, related companies, predecessors, successors and assigns, board, advisory board, and present and former officers, directors, partners, employees, agents, attorneys, accountants, advisory council, pro-bono consultants and representatives of any of the entities listed above, and any other person who currently or formerly acted or purported to act on its behalf, or who is or has been subject to the direction or control of, any of the entities listed above.

63.    "International Senior Lawyering Project" means the International Senior Lawyering Project, a Washington D.C. nonprofit corporation, and includes each of its divisions, subsidiaries, board, advisory board, corporate parents, affiliates, controlled entities, joint ventures, related companies, predecessors, successors and assigns; and present and former officers, directors, partners, employees, agents, attorneys, accountants, advisory council, pro-bono consultants and representatives of any of the entities listed above, and any other person who currently or formerly acted or purported to act on behalf, or who are or have been subject to the direction or control of, any of the entities listed above.

64.    "ALSF" means the African Legal Support Facility, a public international institution hosted by the African Development Bank Group, and includes each of its divisions,

subsidiaries, board, advisory board, corporate parents, affiliates, controlled entities, joint ventures, related companies, predecessors, successors and assigns; and present and former officers, directors, partners, employees, agents, attorneys, accountants, advisory council, pro-bono consultants and representatives of any of the entities listed above, and any other person who currently or formerly acted or purported to act on its behalf, or who is or has been subject to the direction or control of, any of the entities listed above.

65.    "Transparency International" means Transparency International, the international nongovernmental organization based in Berlin, Germany, and includes each of its divisions, subsidiaries, board, advisory board, corporate parents, affiliates, controlled entities, joint ventures, related companies, predecessors, successors and assigns; and present and former officers, directors, partners, employees, agents, attorneys, accountants, advisory council, pro-bono consultants and representatives of any of the entities listed above, and any other person who currently or formerly acted or purported to act on its behalf, or who is or has been subject to the direction or control of, any of the entities listed above

66.    "Public Eye" means the international nongovernmental organization Public Eye, also known as Déclaration de Berne, based in Switzerland, and includes each of its divisions, subsidiaries, board, advisory board, corporate parents, affiliates, controlled entities, joint ventures, related companies, predecessors, successors and assigns; and present and former officers, directors, partners, employees, agents, attorneys, accountants, advisory council, pro-bono consultants and representatives of any of the entities listed above, and any other person who currently or formerly acted or purported to act on its behalf, or who is or has been subject to the direction or control of, any of the entities listed above

67.    "Basel Institute on Governance" means the international nongovernmental organization headquartered in Switzerland, Basel Institute on Governance, and includes each of its divisions, subsidiaries, board, advisory board, corporate parents, affiliates, controlled entities, joint ventures, related companies, predecessors, successors and assigns; and present and former officers, directors, partners, employees, agents, attorneys, accountants, advisory council, pro-bono consultants and representatives of any of the entities listed above, and any other person who currently or formerly acted or purported to act on its behalf, or who is or has been subject to the direction or control of, any of the entities listed above.

68.    "PWYP" means "Publish What You Pay", the international nongovernmental organization headquartered in London, United Kingdom, and includes each of its divisions, subsidiaries, board, advisory board, corporate parents, affiliates, controlled entities, joint ventures, related companies, predecessors, successors and assigns; and present and former officers, directors, partners, employees, agents, attorneys, accountants, advisory council, pro-bono consultants and representatives of any of the entities listed above, and any other person who currently or formerly acted or purported to act on its behalf, or who is or has been subject to the direction or control of, any of the entities listed above.

69.    "Tony Blair African Governance Initiative" means the Tony Blair African Governance Initiative, and includes each of its divisions, subsidiaries, board, advisory board, corporate parents, affiliates, controlled entities, joint ventures, related companies, predecessors, successors and assigns; and present and former officers, directors, partners, employees, agents, attorneys, accountants, advisory council, pro-bono consultants and representatives of any of the entities listed above, and any other person who currently or formerly acted or purported to act

13

on its behalf, or who is or has been subject to the direction or control of, any of the entities listed above.

70.     "ACET" means the African Center for Economic Transformation, and includes each of its divisions, subsidiaries, board, advisory board, corporate parents, affiliates, controlled entities, joint ventures, related companies, predecessors, successors and assigns; and present and former officers, directors, partners, employees, agents, attorneys, accountants, advisory council, pro-bono consultants and representatives of any of the entities listed above, and any other person who currently or formerly acted or purported to act on its behalf, or who is or has been subject to the direction or control of, any of the entities listed above.

71.     "U.K. Department for International Development" refers to the branch of the government of the United Kingdom and includes each of its divisions, subsidiaries, board, advisory board, corporate parents, affiliates, controlled entities, joint ventures, related companies, predecessors, successors and assigns; and present and former officers, directors, partners, employees, agents, attorneys, accountants, advisory council, pro-bono consultants and representatives of any of the entities listed above, and any other person who currently or formerly acted or purported to act on its behalf, or who is or has been subject to the direction or control of, any of the entities listed above.

72.     "ICIJ" means the International Consortium for Investigative Journalists, and includes each of its divisions, subsidiaries, board, advisory board, corporate parents, affiliates, controlled entities, joint ventures, related companies, predecessors, successors and assigns; and present and former officers, directors, partners, employees, agents, attorneys, accountants, advisory council, pro-bono consultants and representatives of any of the entities listed above,

and any other person who currently or formerly acted or purported to act on its behalf, or who is or has been subject to the direction or control of, any of the entities listed above.

73. "CCPR" means the Centre for Civil and Political Rights, and includes each of its divisions, subsidiaries, board, advisory board, corporate parents, affiliates, controlled entities, joint ventures, related companies, predecessors, successors and assigns; and present and former officers, directors, partners, employees, agents, attorneys, accountants, advisory council, pro-bono consultants and representatives of any of the entities listed above, and any other person who currently or formerly acted or purported to act on its behalf, or who is or has been subject to the direction or control of, any of the entities listed above.

74. "FACT" means the Financial Accountability and Corporation Transparency coalition headquartered in Washington D.C., and includes each of its divisions, subsidiaries, board, advisory board, corporate parents, affiliates, controlled entities, joint ventures, related companies, predecessors, successors and assigns; and present and former officers, directors, partners, employees, agents, attorneys, accountants, advisory council, pro-bono consultants and representatives of any of the entities listed above, and any other person who currently or formerly acted or purported to act on its behalf, or who is or has been subject to the direction or control of, any of the entities listed above.

## **INSTRUCTIONS**

1. These requests are made pursuant to this Court's July 7, 2017 Order denying a request for a stay of all discovery, and ordering that "[d]ocument discovery and interrogatories shall proceed according to the deadlines listed in the parties' June 26, 2017 Joint Discovery Statement (ECF No. 21) or otherwise negotiated by the parties". (ECF No. 30 at 1).

2.      In producing documents and other materials, You are requested to furnish All Documents and Communications or things in Your possession, custody or control, regardless of whether such documents or materials are possessed directly by You or Your directors, officers, agents, employees, representatives, subsidiaries, managing agents, affiliates, investigators, or by Your attorneys or their agents, employees, representatives or investigators.  For the avoidance of doubt, unless expressly stated otherwise, e-mails and other communications internal to a party are included within the "Documents" requested hereby.

3.      These Requests shall be deemed continuing in nature so as to require prompt supplementation should further information become available to the answering party, its representatives, agents or attorneys.

4.      If any Document or Communication is withheld from production on claims of privilege or attorney work-product grounds, You shall comply with and provide the information required by Local Civil Rule 26.2.

5.      Each and every non-identical copy of a document, whether different from the original because of stamps, indications of the recipient(s), handwritten notes, revisions, marks, attachments, or any other reason, is a separate document that must be produced.

6.      All Documents and Communications produced must be produced in their entirety, including all attachments, enclosures, cover letters, exhibits and transmittal sheets. Whenever a document or group of documents is removed from a file folder, binder, file drawer, file box, notebook or other cover or container, a copy of the label or such cover or other container must be attached to the document.

7.      Electronically stored information ("ESI") shall be produced in the form in which it is ordinarily maintained – *i.e.,* in its "native" format – including all metadata (including but not

limited to information reflecting characteristics such as origin, usage, structure and alteration)

associated with such documents.

8.     All Documents and Communications produced in response hereto shall be

provided in their entirety, notwithstanding the fact that portions thereof may contain information

not requested.  All interim as well as final versions of the Document shall be produced.  If any

requested document cannot be produced in full, it shall be produced to the extent possible,

indicating what document or portions of documents are being withheld and the reasons why such

documents are being withheld.

9.     The fact that a Document may be produced by another person does not relieve

You of the obligation to produce Your copy of the same Document, even if the two documents

are identical in all aspects.  If any Document requested herein that was formerly in Your

possession, custody or control has been destroyed, discarded, or otherwise lost, the Document

shall be identified by stating:  (a) the nature of the Document, the number of pages (if

applicable), its subject matter and its contents, including but not limited to any attachments or

appendices; (b) the author or creator of the Document and all persons to whom it was sent,

including but not limited to cover copies or blind copies (if applicable); (c) the date on which the

Document was prepared or transmitted; (d) the date on which the Document was lost, discarded,

or destroyed; (e) the person who authorized and carried out the destruction; and (f) the name of

any custodian of any existing copies of the Document.

10.     If no Documents exist that are responsive to a particular request, so state in

writing.  If, in responding to these Requests, You claim that a request is overly broad or unduly

burdensome, You shall respond to that portion of the request that is unobjectionable and

specifically identify the respect in which You contend the request is overly broad or unduly burdensome.

11.     Unless otherwise indicated, the time period applicable to this document request is January 1, 2005, to the present (the "Relevant Period"); provided, however, that if the period applicable to the document request to be served by You on Plaintiffs commences prior to January 1, 2005, "Relevant Period" as used herein shall mean and include such longer period.  All Documents and Communications that relate to the Relevant Period must be produced, even if prepared or published outside of that period.

12.     Plaintiffs have tailored their requests to their view of the scope of their claims in this action.  Additionally, in the interest of expediting discovery and judicial economy, Plaintiffs have included certain requests that relate to defenses that Defendants have indicated they intend to assert in this action.  Plaintiffs' requests are made without waiver of any objections Plaintiffs may make to the propriety of those "defensive" requests, and Plaintiffs preserve any and all objections to any use to be made by Defendants concerning the same issues.

## REQUESTS FOR PRODUCTION

1.     Documents and Communications sufficient to show Your business structure and Your relationship to any member entities You may have, if any, including the entities that comprise OSF.

2.     All Documents and Communications sufficient to show the basis for Your position that that Open Society Foundations "does not exist".  (June 2, 2017 Memorandum of Law In Support of Defendants' Motion to Dismiss at 27).

3.     All Documents and Communications concerning BSGR, or any persons known or believed to be associated with BSGR.

4.     All Documents and Communications concerning Steinmetz or his family.

18

5.      All Documents and Communications concerning investigations of (i) Steinmetz; (ii) BSGR; or (iii) any entities associated with Steinmetz or BSGR, by any governmental body anywhere in the world.

6.      All Documents and Communications concerning investigations of (i) Steinmetz; or (ii) BSGR by any non-governmental entity anywhere in the world, including Veracity.

7.      All Documents and Communications collected for production or produced or otherwise made available to, or received by or from, any governmental agency investigating any of the issues or matters alleged or referred to in the Amended Complaint.

8.      All Documents and Communications concerning Mamadie Touré, including any payments made, directly or indirectly, by You, OSF, George Soros or any other person to Mamadie Touré.

9.      Documents and Communications sufficient to show all of the email addresses or email domains You or OSF used during the Relevant Period.

10.      All Documents and Communications concerning the funding or reimbursement, directly or indirectly, of the Republic of Guinea's legal costs concerning the ICSID Arbitration by (i) You; (ii) OSF; (iii) George Soros; (iv) any person associated with You, OSF or George Soros.

11.      All Documents and Communications concerning the funding or reimbursement, directly or indirectly, of DLA Piper's and/or Scott Horton's or Orrick's or Heenan Blaike's legal fees related to iron ore mining in Guinea by (i) You; (ii) OSF; (iii) George Soros; (iv) any person associated with You, OSF or George Soros.

12.    All Documents and Communications concerning the retention of DLA Piper or Scott Horton related to iron ore mining in Guinea, by (i) the Republic of Guinea; (ii) George Soros; (iii) You; or (iv) OSF.

13.    All Documents and Communications concerning Your, OSF's, or George Soros's Communications with DLA Piper or Scott Horton concerning iron ore mining in Guinea, including documents sufficient to show the basis for Your statement that DLA Piper and Scott Horton are not agents of You or George Soros (see June 2, 2017 Memorandum of Law In Support of Defendants' Motion to Dismiss at 9, 17).

14.    All Documents and Communications concerning BSGR's Mining Rights.

15.    All Documents and Communications concerning Communications with the press concerning BSGR, Steinmetz, or iron ore mining in the Republic of Guinea, including any Documents concerning Communications with ICIJ and FACT.

16.    All Documents and Communications concerning BSGR's joint venture with Vale, VBG-Vale BSGR Sàrl.

17.    All Documents and Communications concerning Chris Canavan and/or Soros Fund Management that concern (i) BSGR; (ii) Steinmetz; or (iii) iron ore mining in the Republic of Guinea.

18.    All Documents and Communications concerning Alpha Condé.

19.    All Documents and Communications concerning Mohamed Alpha Condé.

20.    All Documents and Communications concerning the 2010 Guinean Presidential election.

21.    All Documents and Communications concerning interactions between (i) You, OSF, George Soros, or any other person associated with You, OSF or George Soros on the one

hand; and (ii) BSGR, Steinmetz, or any person associated with BSGR or Steinmetz, on the other hand.

22.     All Documents and Communications concerning FTI concerning (i) BSGR; (ii) Steinmetz; or (iii) iron ore mining in the Republic of Guinea.

23.     All Documents and Communications concerning any payments solicited or received from mining companies or their principals by the Republic of Guinea.

24.     All Documents and Communications concerning the Draft Memorandum of Understanding, including all Documents and Communications concerning the drafting and negotiation of the terms of the Draft Memorandum of Understanding.

25.     All Documents and Communications concerning Murilo Ferreira that concern iron ore mining in Guinea, including all Documents and Communications concerning Communications in June 2011 between or among Murilo Ferreira and (i) You; (ii) OSF; (iii) George Soros; or (iv) any person associated with You, OSF, or George Soros.

26.     All Documents and Communications concerning communications with Vale that concern iron ore mining in Guinea, including all Documents concerning (i) Roger Agnelli; or (ii) Daniela Chimisso.

27.     All Documents and Communications concerning any assistance with respect to the Guinean mining industry, including Alpha Condé's invitation(s) or request(s) re the same, provided by, or to, (i) You; (ii) OSF; (iii) George Soros; or (iv) any person associated with You, OSF, or George Soros, including any Documents concerning Communications with Patrick Heller, Paul Collier, Jeffrey Sachs, Columbia Center for Sustainable Development, Karin Lissakers, RWI or NRGI.

28.    All Documents and Communications concerning the joint press conference George Soros held with Alpha Condé in March of 2011.

29.    All Documents and Communications concerning the representations in the joint press release issued by Open Society Foundations and Mamoudou Kouyaté, "George Soros and President Alpha Condé of Guinea Hold Joint Press Conference", that "All existing contracts will be re-examined. Contract holders and the countries to whose jurisdictions they belong will have to comply with the principles of EITI [the Extractive Industries Transparency Initiative] and a code of conduct which will include a willingness to cooperate in criminal investigations. Guinea will retain the Revenue Watch Institute and the International Senior Lawyers Project to provide legal advice".

30.    All Documents and Communications concerning the legality of Guinea revoking mining concession contracts.

31.    All Documents and Communications concerning the "enlist[ment]" of RWI by George Soros, as reported in the article "Buried Secrets", published in the July 8, 2013 edition of *The New Yorker*.

32.    All Documents and Communications concerning any strategic coordination between You, OSF or George Soros and (i) RWI; (ii) NRGI; or (iii) Global Witness (*see* Amended Complaint at 26-27).

33.    All Documents and Communications concerning the funding, directly or indirectly, of Global Witness by (i) You; (ii) OSF; (iii) George Soros; or (iv) any person associated with You, OSF or George Soros.

34.     All Documents and Communications concerning the funding, directly or indirectly, of the Natural Resource Governance Institute by (i) You; (ii) OSF; (iii) George Soros; or (iv) any person associated with You, OSF or George Soros.

35.     All Documents and Communications concerning the funding, directly or indirectly, of International Senior Lawyering Project by (i) You; (ii) OSF; (iii) George Soros; or (iv) any person associated with You, OSF or George Soros.

36.     All Documents and Communications concerning the funding, directly or indirectly, of ALSF by (i) You; (ii) OSF; (iii) George Soros; or (iv) any person associated with You, OSF or George Soros.

37.     All Documents and Communications concerning the funding, directly or indirectly, of Revenue Watch Institute by (i) You; (ii) OSF; (iii) George Soros; or (iv) any person associated with You, OSF or George Soros.

38.     All Documents and Communications concerning iron ore mining in Guinea that also concern (i) Transparency International; (ii) EITI; (iii) Public Eye; (iv) Basel Institute on Governance; (v) CCPR; (vi) ACET; (vii) Tony Blair African Governance Initiative; (viii) the U.K. Department for International Development; (ix) PWYP; (x) ICIJ; (xi) FACT; or (xii) ALSF.

39.     Documents sufficient to identify any overlap in management, including any overlap in the membership in the respective boards of directors of OSF and (i) Global Witness; (ii) RWI; (iii) NRGI; (iv) Transparency International; (v) EITI; (vi) Public Eye; (vii) Basel Institute on Governance; (ix) CCPR; (x) ACET; (xi) Tony Blair African Governance Initiative; (xii) or the U.K. Department for International Development; (xiii) PWYP; (xiv) ICIJ; (xv) FACT; or (xvi) ALSF**.**

40.     All Documents and Communications concerning iron ore mining that concern strategy for influencing EITI board member organizations, including NRGI and Global Witness.

41.     Documents and Communications sufficient to show the basis for the statement of OSF that EITI "has not translated into positive change in the lives of citizens, or into improved development outcomes for the countries populations".

42.     All Documents and Communications concerning the New Mining Code, including all Documents and Communications concerning SOGUIPAMI.

43.     All Documents and Communications concerning any grants or other financial support provided directly or indirectly by You, OSF or George Soros to the Republic of Guinea to support the mining contract review process or the New Mining Code.

44.     All Documents and Communications concerning (i) the March 2011 Fifth Conference of EITI in Paris; and/or (ii) any other EITI event that also concerned BSGR, Steinmetz or iron ore mining in Guinea.

45.     All Documents and Communications concerning Alpha Condé's statement, as reported in the March 4, 2011 edition of the FINANCIAL TIMES, that he invited George Soros "to help shake up the mining license regime".

46.     All Documents and Communications concerning the clause in the Base Convention that "in the event of a contradiction and/or difference between Current Legislation and the provisions of this Agreement, the latter shall take precedence".

47.     All Documents and Communications concerning Heenan Blaikie that concern iron ore mining rights in Guinea, including any Documents concerning any reports detailing the results of its investigation(s) concerning BSGR.

48.     All Documents and Communications concerning Communications with Rio Tinto that concern BSGR or Steinmetz, including all such Documents and Communications concerning Debra Valentine.

49.     All Documents and Communications concerning Francois de Combret, including all Documents and Communications concerning the $10.5 million payment made to him by Rio Tinto, and the resulting termination or suspension of Rio Tinto executives, Alan Davies, Sam Walsh and Debra Valentine, as reported in the November 16, 2016 BLOOMBERG article, "Rio Tinto Fires Two Senior Executives Amid Payment Probe".

50.     All Documents and Communications concerning the renegotiation of mining rights to Simandou Blocks 3 and 4, including all Documents concerning settlement negotiations with Rio Tinto concerning Simandou Blocks 3 and 4.

51.     All Documents and Communications concerning Sable Mining that concern (i) BSGR; (ii) Steinmetz; or (iii) mining in the Republic of Guinea.

52.     All Documents and Communications concerning the establishment of the National Mining Commission, including any Documents and Communications concerning the establishment of the Technical Committee or the Strategic Committee.

53.     All Documents and Communications concerning the statement that the Technical Committee was "backed" by George Soros, as reported in the FINANCIAL TIMES article, *Guinea's first freely elected government reignites $2.5bn mining tussle*, 11/2/2012.

54.     All Documents and Communications concerning any Communications with the Technical Committee or the Strategic Committee by (i) You; (ii) OSF; (iii) George Soros; or (iv) any person acting on Your, OSF's or George Soros's behalf.

25

55.     All Documents and Communications concerning any meetings held with mining company executives with interests in the Republic of Guinea that You, OSF or George Soros attended, including the meeting held in September of 2011 at George Soros's residence in New York.

56.     All Documents and Communications concerning any Communications You, OSF or George Soros had with DLA Piper or Scott Horton concerning the Technical Committee's investigation of BSGR.

57.     All Documents and Communications concerning the retaining of Veracity to investigate iron ore mining in Guinea by (i) the Republic of Guinea; (ii) DLA Piper; (iii) George Soros; (iv) You; or (v) OSF.

58.     All Documents and Communications concerning the funding, directly or indirectly, of the work performed by Steven Fox and/or Veracity concerning iron ore mining in the Republic of Guinea.

59.     All Documents and Communications concerning the Veracity Report.

60.     All Documents and Communications concerning iron ore mining in Guinea that concern Steven Fox.

61.     All Documents and Communications concerning the DLA Piper Report.

62.     All Documents and Communications concerning the reliability of the work of Steven Fox and Veracity, including any documents related to the arbitration before the Common Court of Justice and Arbitration concerning the Republic of Guinea and the logistics company, GETMA.

63.     All Documents and Communications concerning the sources of the DLA Piper Report, including (i) Documents sufficient to identify the sources cited by the DLA Piper Report;

and (ii) all Documents and Communications concerning the credibility or reliability of the sources cited by the DLA Piper Report.

64.     All Documents and Communications concerning the Allegations Letter.

65.     All Documents and Communications concerning Communications with the FINANCIAL TIMES that concern iron ore mining in Guinea, including any communications with the journalists Misha Glenny, Tom Burgis or Helen Thomas.

66.     All Documents and Communications concerning Samuel Mebiame that concern (i) BSGR; (ii) Steinmetz; or (iii) iron ore mining in the Republic of Guinea.

67.     All Documents and Communications concerning Ben Brewerton of FTI that concern (i) BSGR; (ii) Steinmetz; or (iii) mining in the Republic of Guinea.

68.     All Documents and Communications concerning Lord Malloch Brown of FTI that concern (i) BSGR; (ii) Steinmetz; or (iii) mining in the Republic of Guinea.

69.     All Documents and Communications concerning the article entitled "Buried Secrets", published in the July 8, 2013 edition of THE NEW YORKER, including any communications with its author, Patrick Radden Keefe, before or after the article's publication.

70.     All Documents and Communications concerning Global Witness that concern (i) BSGR; (ii) Steinmetz; or (iii) mining in Guinea.

71.     All Documents and Communications concerning the International Senior Lawyering Project that concern (i) BSGR; (ii) Steinmetz; or (iii) iron ore mining in the Republic of Guinea.

72.     All Documents and Communications concerning ALSF that concern (i) BSGR; (ii) Steinmetz; or (iii) iron ore mining in the Republic of Guinea.

73.     All Documents and Communications concerning NRGI that concern (i) BSGR; (ii) Steinmetz; or (iii) the Republic of Guinea, including iron ore mining in Guinea.

74.     All Documents and Communications concerning RWI that concern (i) BSGR; (ii) Steinmetz; or (iii) the Republic of Guinea, including iron ore mining in Guinea.

75.     All Documents and Communications concerning EITI that concern (i) BSGR; (ii) Steinmetz; or (iii) mining in the Republic of Guinea.

76.     All Documents and Communications concerning BSGR's responses to the Allegations Letter.

77.     All Documents and Communications concerning Guinea's response to BSGR's responses to the Allegations Letter, including all Documents related to the letter sent by the Technical Committee to BSGR, dated November 1, 2013.

78.     All Documents and Communications concerning the Technical Committee Report.

79.     All Documents and Communications concerning the funding of, directly or indirectly, the Technical Committee, including any Documents and Communications concerning payments made, directly or indirectly, to members of the Technical Committee or the Strategic Committee, and including any payments made by You, OSF or George Soros or any member of his family, directly or indirectly, to the Technical Committee or the Strategic Committee.

80.     All Documents and Communications concerning any payments You, OSF, George Soros, or any member of George Soros's family made, directly or indirectly, to the Guinean government or to officials of the Guinean government, including any Documents and Communications concerning payments made, directly or indirectly, to members of the Technical Committee or any other senior officials within the Guinean government.

28

81.     All Documents and Communications concerning Guinea's Revocation.

82.     All Documents and Communications concerning Mamadie Touré, including any payments made to Mamadie Touré or any person associated with Mamadie Touré, by (i) George Soros; (ii) You; (iii) OSF; (iv) the Republic of Guinea; or (v) any other person.

83.     All Documents and Communications concerning Lounceny Nabé, including any payments made, directly or indirectly, to Lounceny Nabé by (i) George Soros; (ii) You; (iii) OSF; (iv) the Republic of Guinea; or (v) any other person.

84.     All Documents and Communications concerning Nava Touré, including any payments made, directly or indirectly, to Nava Touré by (i) George Soros; (ii) You; (iii) OSF; (iv) the Republic of Guinea; or (v) any other person.

85.     All Documents and Communications concerning Communications that concern You, George Soros or OSF on the one hand, and any person that served as an official in the Guinean government during the Relevant Period on the other hand, including any Documents concerning Communications with Mamoudou Kouyaté, or any members of the Technical Committee or Strategic Committee.

86.     All Documents and Communications concerning iron ore mining in Guinea that concern Communications between You or OSF on the one hand, and Jonathan Soros, Alexander Soros or Robert Daniel Soros, or any other immediate family member of George Soros, on the other hand.

87.     All Documents and Communications concerning Yansane Kerfalla, including any Documents and Communications concerning payments made, directly or indirectly, to Yansane Kerfalla, by (i) George Soros or a member of his family; (ii) You; (iii) OSF; (iv) the Republic of Guinea; or (v) any other person.

29

88. All Documents and Communications concerning Barrick Gold that concern mining in Guinea.

89. All Documents and Communications concerning the economic impact Guinea's Revocation has had on Guinea.

90. All Documents and Communications concerning the current state of iron ore mining in the Republic of Guinea.

91. All Documents and Communications concerning any meetings between Alpha Condé and President Obama.

92. All Documents and Communications concerning Prime Minister Tony Blair's involvement in Guinea, including all such Documents and Communications that concern mining issues.

93. All Documents and Communications concerning any criminal investigations of BSGR in Guinea, including any Documents and Communications concerning the arrest of Mr. Issiaga Bangoura and Mr. Ibrahima Sory Touré.

94. All Documents and Communications concerning the complaint filed by Mr. Issiaga Bangoura and Mr. Ibrahima Sory Touré with the ECOWAS Community Court of Justice.

95. All Documents and Communications concerning OECD concerning (i) BSGR; (ii) Steinmetz; or (iii) iron ore mining in the Republic of Guinea.

96. All Documents and Communications concerning the legality of Guinea's Revocation.

97. All Documents and Communications concerning any potential restoration of BSGR's Mining Rights or the granting of new rights to BSGR to mine in Guinea.

98. All Documents and Communications concerning the ICSID Arbitration.

99.     All Documents and Communications concerning the LCIA Arbitration.

100.    All Documents and Communications concerning iron ore mining rights that concern any alleged payments made, directly or indirectly, by BSGR or Steinmetz to the Republic of Guinea or its officials.

101.    All Documents and Communications concerning any tender of BSGR's mining rights to any third party, including the drafting of the tender documents, the negotiation with mining companies or the funding of any related activities.

102.    All Documents and Communications concerning the subject matter of any document request You intend to serve or in the future do serve on BSGR, including any contracts allegedly entered to between BSGR and/or Pentler on the one hand, and Mamadie Touré and/or Matinda on the other hand.

103.    All Documents and Communications You identified or relied on in responding to BSGR's First Set of Interrogatories.

104.    All Documents and Communications You intend to use in Your defense of this action.

Dated: July 11, 2017
New York, New York

GREENBERG TRAURIG, LLP

By: _____
       Louis M. Solomon

200 Park Avenue
New York, New York 10166
(212) 801-9200

Attorneys for Plaintiffs
BSG Resources (Guinea) Limited,

31

BSG Resources (Guinea) Sàrl and
BSG Resources Limited