H91HBSGC

```
1   UNITED STATES DISTRICT COURT
    SOUTHERN DISTRICT OF NEW YORK
2   ------------------------------x

3   BSG RESOURCES (GUINEA)
    LIMITED, et al.,
4
                     Plaintiffs,
5
             v.                              17 Civ. 2726 (JFK)(AJP)
6

7   GEORGE SOROS, et al.,

                                             Conference
8
                     Defendants.
9
    ------------------------------x
10                                           New York, N.Y.
                                             September 1, 2017
11                                           10:30 a.m.

12  Before:

13                      HON. ANDREW J. PECK,

14                                           Magistrate Judge

15                       APPEARANCES

16  GREENBERG TRAURIG, LLP
            Attorneys for Plaintiffs
17  BY:  MICHAEL LAZAROFF
         NANCY L. SAVITT
18       ANNE C. REDDY

19  WILLKIE FARR & GALLAGHER LLP
            Attorneys for Defendants
20  BY:  ELIZABETH J. BOWER
         BENJAMIN P. McCALLEN
21       JIM FITZMAURICE

22

23

24

25
```

1           (Case called)

2           THE COURT:  All right.  Let's start with Willkie's

3    letter, both because it came in on ECF first and because they

4    were nice enough to now give me a copy with all the exhibits

5    and tabs and all that fun stuff.  First --

6           MR. LAZAROFF:  We'll still let them go first, your

7    Honor, but if your Honor would like a copy, here you go.

8           THE COURT:  Excellent.  I'm regretting more and more

9    the 150 pages I printed this morning of the exhibits that

10   seemed relevant.

11          All right.  With respect to the declaration, the first

12   issue, my inclination is that you need to produce it.

13          MR. LAZAROFF:  Your Honor, I believe when we were here

14   last time your Honor had pointed out that the reason we put

15   forth the declaration was simply to show there's a good faith

16   basis for the allegations.  It's not our intention to use that

17   document.  It's not our intention to rely on it, file it.  We

18   intend to try to depose the witness jointly, if defendants want

19   to do that, and try to call them for trial, or if we're unable

20   to do that, to get the evidence that defendants or third

21   parties have that would show those types of things.  In those

22   circumstances, I believe there's a case from the Southern

23   District which is *Institute for Development of Earth Awareness*

24   *v. People for Ethical Treatment of Animals,* 272 F.R.D 124.

25          THE COURT:  Why don't you hand a copy of it up.

1          MR. LAZAROFF:  Yes.  Which says that the executed --

2          THE COURT:  Hang on.

3          MR. LAZAROFF:  Sure.

4          THE COURT:  Let me read it.

5          MR. LAZAROFF:  Sure, page 125 is the quote.  It's not

6     particularly long.

7          THE COURT:  All right.  But most of this seems to deal

8     drafts, not the final affidavit.

9          MR. LAZAROFF:  Correct.  If you look at on page 125

10    the sentence it says:  "The executed affidavits of nonparty

11    witnesses remained work product until the lawyer elected to

12    serve and file them."  That is the line that we were focused

13    on.  That's one case.  And then a second case for your Honor is

14    *Stokes* v. City of New York, 2006 WL 2061976, Eastern District

15    of New York.

16          THE COURT:  OK.

17          MR. LAZAROFF:  In that case, your Honor, defendants

18    had obtained the affidavit of the nonparty deponent prior to

19    the deposition.  Plaintiff sought a copy prior to deposing the

20    witness.  The court denied plaintiff's request, finding the

21    affidavit was "protectable work product," and said "if and when

22    the affidavit is filed in this action or otherwise publicly

23    disclosed, then work product protection clearly will be

24    waived."

25          This is different, your Honor, than in the cases that

1  the defendants cited.  There they cited *A.F.L. Falck v. E.A.*

2  *Karay Co*. In that case it was already at the summary judgment.

3  Evidently they had -- it was much further along in the

4  discovery process, and the only way to get at the particular

5  factual confirmation of the -- was from the father.  There was

6  no other way.  Here, discovery, we believe, will show the

7  documents that will sustain what is in the complaint based on

8  the declarations that we don't intend to use it, to rely upon

9  it.  And in the *Vazquez* case --

10           THE COURT:  Why did you get it?

11           MR. LAZAROFF:  As your Honor had noted and as

12  Mr. Solomon said when we were here last time, because the

13  allegations were such that we felt we needed to have a good

14  faith basis for doing that.  We've given the name of the

15  intermediary to defendants, as it's in the declaration as well

16  as the address that's in the declaration.  Given that we're

17  just at the beginning of discovery, your Honor, we feel at this

18  point it would be not within the rules to go ahead and order it

19  produced.

20           THE COURT:  One, I don't want to be devious on

21  defendants' behalf, but if they file a Rule 11 motion against

22  you, you would then file this affidavit saying it's your good

23  faith basis or among other good faith bases, and then they'd

24  withdraw their Rule 11 motion.

25           MR. LAZAROFF:  We would probably ask in that context,

1    your Honor, for it to be shown in camera to the judge.

2           THE COURT:  I guess on all of this my question is if

3    this were somebody in the United States who, once they have the

4    name and address they could easily depose, that's one thing.  I

5    can't say I'm up to speed on Malawi law, but somehow I doubt

6    that a deposition of this person is likely to happen.

7           MR. LAZAROFF:  It is our understanding that he is not

8    opposed to that.  Obviously, not going to -- can't confirm and

9    affirm that.  That's why we asked to get A declaration as sort

10   of an indication that a person would be willing to testify.

11   And I would respectfully submit that maybe we should try the

12   process and see if we are able to get him to be deposed, and

13   if, in fact, it turns out we've given the information that

14   should permit that, we're happy to work with defendants to try

15   to get such a deposition.  We would like it also, and then if

16   that fails, we can at that point revisit the issue.

17          THE COURT:  Isn't this just a timing question?  If the

18   witness is deposed, presumably one side or the other is going

19   to want the affidavit.

20          MR. LAZAROFF:  Well, as --

21          THE COURT:  One of the -- look, I mean --

22          MR. LAZAROFF:  That's the *Stokes* case, in the *Stokes*

23   case, there was the affidavit prior to the deposition, and the

24   Court denied that because it is work product and you're going

25   to depose them.  That's why I believe at this point, given that

```
 1    we just gave them the name at the meet and confer when they
 2    requested -- initially we had called the name confidential.
 3    They asked us to reconsider that, and we did.  And they asked
 4    for the address, and we gave them what we have, at least we can
 5    only give them what we know, obviously.
 6              THE COURT:  What's the work product here?  You're
 7    going in circles.
 8              MR. LAZAROFF:  The work product, your Honor, was that
 9    in order to help us develop the allegations and make sure there
10    was a basis, we had reached out to try to make sure there was
11    some basis for it, and we got something that we felt gave us
12    that good faith basis but not something we intended to use.
13              THE COURT:  That's fact information; right?
14              MR. LAZAROFF:  It was -- we were also involved in the
15    process of, you know, making sure because the process was one
16    we wanted to make sure that we had what we were --
17              THE COURT:  Is there any opinion work product in it?
18              MR. LAZAROFF:  From the perspective, your Honor, of
19    this, that we wanted to make sure that the types of allegations
20    that we were being told had a basis.  And just to make sure, we
21    had that and --
22              THE COURT:  But that's not opinion work product.
23              MR. LAZAROFF:  Yeah.
24              THE COURT:  That's protecting yourself from --
25              MR. LAZAROFF:  Very least ask your Honor if we could
```

1    show it to your Honor in camera, and then if your Honor's

2    inclined in that direction --

3          THE COURT:  Do you have it here?

4          MR. LAZAROFF:  We don't have it here, your Honor.

5    We'd be happy to submit it just as soon as your Honor would

6    want it, if that's your Honor's inclination.

7          THE COURT:  Submit it, but unless there is something

8    in your cover letter -- obviously, they don't get a copy of the

9    affidavit -- but your cover letter should point out to me what

10   it is that is opinion work product, because otherwise, I think

11   even if getting the affidavit is work product, the facts in it,

12   in light of the fact that the witness is in Malawi and may or

13   may not be deposed voluntarily or otherwise, I think there is a

14   good faith and a good basis, substantial need under the case

15   law for them to see what this person told you.

16         MR. LAZAROFF:  Of course we'll do what your Honor

17   directs.  We do disagree in terms of the fact that they haven't

18   attempted to get the deposition yet.  If they had, then

19   their -- you might be right.  It might be a timing issue, but

20   it may be that he would be deposed, and then *Stokes* would rule.

21         THE COURT:  Well, the reason lawyers get affidavits,

22   generally -- I've not forgotten what it was like to be on your

23   side of the bench -- is so that if the witness says something

24   different later, they can be impeached.  So the fact that you

25   went the affidavit route instead of an interview with the

1   witness and notes may have been for that reason.

2          MR. LAZAROFF:  Your Honor, it's not our intention to

3   get it in that capacity.

4          THE COURT:  All right.  Understood.  I'm happy to look

5   at it in camera to give you -- because it is a privilege,

6   albeit work product, issue, I'm willing to give you the benefit

7   of the doubt.  But unless there is something in there that

8   clearly shows your opinion work product, I'm going to order it

9   produced.

10          MR. LAZAROFF:  OK, your Honor.

11          THE COURT:  All right.  Second -- oh, I had said

12   previously we would do one and one in fairness.  Also, so you

13   know the schedule here, I've got an 11:00 o'clock conference

14   call preparing for a new discovery program I'm going to be

15   doing, and I plan to break from this to do that and bring you

16   back at 11:15 or 11:30 when I finish that call, to the extent

17   we're not done before then, and I think at the rate we're

18   going, we won't be done.

19          MR. LAZAROFF:  Your Honor, just one thing.

20   Defendants' counsel had conferred with us prior to your coming

21   in this morning, and on our 1B, they've withdrawn their

22   objections to limiting the production to iron ore mining.

23          Is that correct?

24          MS. BOWER:  Yes, with respect to the --

25          MR. LAZAROFF:  1B.

H91HBSGC

1          MS. BOWER:  -- 1B, the payments to the individuals

2     identified by plaintiffs, we had through a meet-and-confer

3     process withdrawn that objection.  They have since given us a

4     list of government officials to search.  We've agreed to search

5     those.  Depending on the search results, we will assess burden

6     at that time.

7          THE COURT:  All right.  The structure and control

8     requests, 1A, my inclination is, unless you can tell me that

9     there is some burden that will be alleviated here, the

10    restrictions to iron ore should not apply.

11         MS. BOWER:  Thank you, your Honor.  I think it's

12    helpful to understand the context in which these claims are

13    arise.  In 2010, Guinea completed its first democratic

14    election, and after that new government took office, they

15    undertook a review of mining licenses which had been granted in

16    the prior military regime.  That review ultimately led to the

17    determination that BSGR, which had obtained lucrative mining

18    rights in large part with Guinea, had used bribery and

19    corruption to procure those rights.  The Guinean government

20    then stripped BSGR of its rights and its ability to conduct

21    mining operations in that country.  Since then BSGR and its

22    principal, Mr. Steinmetz, along with various of his associates,

23    have been the subject of criminal investigations around the

24    world relating to the bribery in Guinea.

25         In this case plaintiffs seek to impose liability on

1    the defendants for what they perceive as the defendants'

2    efforts, direct and indirect, to influence the outcome and

3    facilitate that review process.  Each of the claims in this

4    complaint are tied to the activities by the defendants, direct

5    and indirect, in Guinea, including the contract that was

6    purportedly tortiously interfered with and the iron ore mining

7    contracts in Guinea.  The allegedly defamatory statements

8    relate to BSGR's procurement of those mining rights by

9    corruption or bribery, and the alleged misrepresentations

10   relate to the review process.

11          By these requests in item 1A, plaintiffs seek to go

12   much further and seek all communications and documents

13   concerning coordination between the defendants and the handful

14   of NGOs.  Now, looking just at RWI and NRGI -- excuse me,

15   Global Witness and NRGI -- RWI is now NRGI -- for example,

16   those organizations currently work in more than dozens of

17   countries around the world.  Global Witness currently works in

18   27 different countries according to their website.  NRGI

19   currently works in 20 countries and tracks information relevant

20   to their mission in 54 other countries, again according to

21   their website.

22          THE COURT:  How much communication and/or funding does

23   Mr. Soros give to that entity, regardless of how much work

24   Global Witness and NRGI are doing?

25          MS. BOWER:  There is a lot of work in between these

H91HBSGC

1    organizations, given their overlapping missions around the

2    world.  But this isn't about funding levels, your Honor.  We

3    know that because plaintiffs' complaint already alleges what

4    the funding levels from defendant to these organizations are

5    for the prior few years.  This is about literally all documents

6    concerning any funding activity between the defendant and these

7    organizations at any point around the world.  And regardless of

8    whether -- we could come back and say 90 percent -- I'm making

9    this up.  This is not reality -- but we could come back and say

10   90 percent of the funding to RWI is by defendants, but

11   zero percent in Guinea, and it's not going to advance their

12   claims at all.  They still need to, under the current rules,

13   tie the discovery requests that they're seeking to the claims

14   in this case, and that's why we've requested that it be limited

15   to iron ore mining activities in Guinea.

16          We would consider, as a fallback, you know, activities

17   funding or communications concerning Guinea if their concern is

18   iron ore mining isn't sufficiently broad, but activities

19   involving these organizations around the world is just too

20   broad, your Honor, and not tethered to the claims in this case

21   and would be burdensome.

22          THE COURT:  Let me hear from plaintiff.  What is it

23   you're trying to show through this?

24          MR. LAZAROFF:  One of their defenses, your Honor, is

25   that they do not control these entities.  Our complaint

1    alleges, based on documents and information that we have, that

2    NRGI and Global Witness were part of the scheme that Mr. Soros

3    and the other defendants used to create a process to improperly

4    deny our clients their rights, the paragraph 80 through 84 and

5    85, in addition to 76 to 77.  Part of that process, for

6    example, in Guinea was to review mining contracts, not iron ore

7    mining contracts, and then target it at BSGR, certainly, iron

8    ore mining.

9         But, your Honor, these particular requests are about

10   funding, and while there is some publicly available -- with the

11   exception of the strategic coordination, let's leave that one

12   to the side -- the funding, as an initial matter, they say,

13   well, yeah, NGRI does what it does.  We talked to them.  We do

14   some overlapping mission work, but they do what they do and we

15   do what we do.  We have indications from public documents that

16   that's not the case, by the level of funding, the overlapping

17   boards and other statements, but we'd like to get at the

18   reality.

19        THE COURT:  Instead of communications and documents,

20   how about the amount of funding?

21        MR. LAZAROFF:  Documents sufficient to show the direct

22   or indirect funding would be helpful.  The other aspect, in

23   addition to the funding, is the control.  The control documents

24   related to the funding would show we're giving you, for

25   instance, $500 million, and so we expect you to also do what we

1    say.

2            THE COURT:  All right.  But that would --

3            MR. LAZAROFF:  So documents that relate to the -- your

4    Honor, you think about funding for -- it's a grant

5    organization.  So there's an application, an application.

6    There should be a file that they go through the application and

7    they talk about it and they decide yes or no, and they give it.

8            THE COURT:  But if that's --

9            MR. LAZAROFF:  The burden seems minor, but in there --

10           THE COURT:  Whoa, whoa, whoa.  Slow down.  If that's

11   what you're looking for -- and I don't know if you've talked

12   about this with each other -- that to me strikes me as a

13   different issue than any and every email between Mr. Soros or

14   one of his people and each of these entities.

15           MR. LAZAROFF:  The point I was trying to make, your

16   Honor, you're correct, was that if it were just the standard

17   grant-giving organization to a third party, that's what you

18   would expect.  That's not what we claim happened.  In

19   paragraph 70 in a document -- we cite a document posted in an

20   online news site that says, "To the extent" -- it was a

21   document from George Soros outlining his plan to conscript

22   various agents from the alleged associated entities in

23   furtherance of his mission.  And quoting from the document:

24   "To the extent we don't have the capacity, we must acquire it.

25   I shall ask Chris Canavan to take charge.  Our initial mission

1   will arrive in Conakry on January 2 consisting of Abdul

2   Tejan-Cole, a representative of OSIWA, and Patrick Heller from

3   Revenue Watch.  Chris Canavan will join them as soon as

4   possible," and then it goes on, your Honor.

5          The point is that emails showing that Mr. Soros is, in

6   fact, not just providing some third-party funding, but that

7   funding comes with strings and control and direction is what

8   we're trying --

9          THE COURT:  But then those strings, to be relevant,

10  have to do with either BSGR or mining in Guinea in order to be

11  relevant here.

12         MR. LAZAROFF:  Well, it depends, your Honor.  So,

13  certainly, in order to be relevant to some aspects of the

14  claim, their claim is -- if their claim is, in general, we're

15  independent organizations.

16         THE COURT:  OK.  Then we're going to take this in baby

17  steps.  Documents sufficient to show or considered in

18  interrogatory direct or indirect funding by Soros or the other

19  indicated people on that side of the request and these

20  organizations as an absolute dollar amount and, to the extent

21  you have it, a percentage of all of their funding.  All right.

22  Is that doable?

23         MS. BOWER:  Yes, your Honor.

24         THE COURT:  OK.

25         MR. LAZAROFF:  Then the strategic coordination, your

H91HBSGC

1    Honor?

2              THE COURT:  That would seem to me is related only to

3    iron ore mining in Guinea.

4              MR. LAZAROFF:  But, your Honor, as I pointed out, one

5    of the central allegations we have is that the whole mining

6    review process -- it's a mining program.  It's not an iron ore

7    mining code, it's a mining code.

8              THE COURT:  OK.  Mining, does that work?

9              MS. BOWER:  Honestly, your Honor, I don't know the

10   burden, right.  There are no allegations and plaintiffs

11   certainly haven't suggested that these companies were involved

12   in gold or some other sort of mining in Guinea.  The only

13   allegations relate to --

14             THE COURT:  Well, if they're --

15             MS. BOWER:  -- their activities in iron ore.

16             THE COURT:  -- somebody on your side should know that,

17   then presumably the difference between mining and iron ore

18   mining is meaningless.  So I'm ordering it with respect to

19   mining activities in Guinea.  If you find out from your client

20   or the documents that they were involved in uranium mining,

21   gold mining, to use your example, then you can come back to me

22   and ask for that to be excluded.

23             MS. BOWER:  Thank you, your Honor.

24             THE COURT:  This is without prejudice once you get the

25   funding information, etc., to say you want more with a new

1    targeted request.

2              MR. LAZAROFF:  Thank you, your Honor.

3              THE COURT:  All right.  That is my secretary telling

4    me it's time to come downstairs for the conference call.  So

5    that takes care of 1B -- 1A.  1B you agreed on.  Is there -- to

6    try to knock off 1C, are there communications with President

7    Condé that don't relate to mining?  I mean, are we dancing on

8    the head of a pin here?

9              MS. BOWER:  We don't believe we are, your Honor.

10   We've agreed to go back to 1995, so -- excuse me, 2005.  So

11   we're talking about a 12-year period, five years before the

12   election.  We believe that there -- it's our understanding, at

13   least, that there was a relationship.  What the extent of that

14   relationship is, I'm not certain, your Honor.

15             THE COURT:  All right.  Is there any reason, with

16   respect to this to deal, with any communications before he

17   became president from the plaintiffs' side?

18             MR. LAZAROFF:  Our allegations, your Honor, are that

19   President Condé was used in part of the scheme from external

20   sources, and we've alleged it began around the time he was

21   elected.  A little before, a little after.  So maybe, just to

22   make sure we're covering the ground, if we could go back maybe

23   a year prior to the election.  We, obviously, don't know what

24   we don't know.  We know there was a relationship.  We have

25   indications of manipulation.

H91HBSGC

1          THE COURT:  Manipulation of what?

2          MR. LAZAROFF:  Condé in order to -- the allegations in

3    the complaint, your Honor, are that defendants, in order to

4    target our clients, manipulated by funding -- providing funding

5    and rewriting the mining code and purposely targeting only

6    BSGR.  They control --

7          THE COURT:  All of that --

8          MR. LAZAROFF:  They all controlled these various

9    officials or duped them, more likely, though we don't know.

10         THE COURT:  Couldn't have done anything before they

11   were elected.  Might have set the stage.

12         MR. LAZAROFF:  Might have set the stage, which is why

13   I thought maybe a year prior to that seemed reasonable.  And

14   they claim --

15         THE COURT:  Counsel.

16         MR. LAZAROFF:  Yes.

17         THE COURT:  When I start to talk, you stop.

18         MR. LAZAROFF:  I'm sorry, your Honor.

19         THE COURT:  All right.  If we limit it to the time

20   when Condé was president, meaning president forward, is there

21   any issue of mass communicating other than about mining

22   activities?

23         MS. BOWER:  There are other activities in Guinea, your

24   Honor.  We know that there were serious issues post --

25   post-replacement of the military regime and the democratic

1    election.  We know there were issues with respect to rice

2    production, for example, some civil rights issues and other

3    economic development.  So there are other communications

4    relating to Guinea between Mr. Soros and President Condé.

5              THE COURT:  All right.  Limit it to iron ore -- well,

6    to mining activities or general things; meaning, if it's rice

7    production, you don't have to produce it.  If it's general

8    conditions in Guinea, or whatever, you do have to produce it,

9    again, subject to coming back and saying that there is so much.

10   And presumably -- and I may be a little simplistic here -- but

11   presumably this is easy to find communications with Condé.

12   It's then only a question of reviewing them.

13             MR. LAZAROFF:  Your Honor, if we could just ask also

14   for any mentions of BSGR or Steinmetz.

15             THE COURT:  Yes, that makes sense.

16             MS. BOWER:  We've already agreed to that, your Honor.

17             MR. LAZAROFF:  Just making sure.

18             MS. BOWER:  We've agreed not to limit references to

19   them.

20             THE COURT:  Why don't you all try to work your way

21   through 1D while I take care of my conference call, and we will

22   resume as soon as I'm done with that, hopefully 15 minutes to

23   half an hour.

24             MS. BOWER:  Thank you, your Honor.

25             MR. LAZAROFF:  Thank you, your Honor.

1        (Recess)

2            THE COURT:  All right.  Did you manage to resolve 1D?

3            MR. LAZAROFF:  We did, your Honor.

4            THE COURT:  Good.  So now we flip over to a defense

5    issues.  Why don't you explain to me what the relationship is

6    with Pentler, and we'll go from there.

7            MR. LAZAROFF:  Sure.  Your Honor, there is no current

8    relationship with Pentler or any of these other individuals.

9    We told the defendants that.  The articles that they brought

10   simply show that at some point almost a decade ago he may have

11   been a shareholder to the best of my -- we won't be producing,

12   but actually from ICSID there is publicly available documents

13   that can show the organizational structure and show that, I

14   believe, that those shares were then bought back by BSGR.  But

15   they were never employees, never had their documents.

16           To the extent anything is on the BSGR computer systems

17   or in anybody's data and it's there, we would not hold any of

18   it back.  The only problem we have is there were documents, and

19   if they're a third party, produced by and in the LCIA where

20   there, both by rules of LCIA as well as by a confidential

21   confidentiality order, we're not allowed to produce, and

22   they've objected in the past to that production.  So that is,

23   if you will, the Pentler side.  All the other entities, they're

24   not our employees, haven't been.  Cilins wasn't -- even his

25   plea in that case doesn't show that he was.  We told them that.

H91HBSGC

```
 1   I don't think they've met any burden they have to require us to
 2   do anything more at this point.
 3              THE COURT:  All right.  You referred to LCIA.  Is that
 4   the London arbitration?
 5              MR. LAZAROFF:  Correct, yes.
 6              THE COURT:  So who's documents --
 7              MR. LAZAROFF:  Pentler's documents, and we put this in
 8   our response to their document requests.  They were
 9   Pentler-produced documents in the LCIA proceedings subject to a
10   confidentiality order generally of LCIA and, evidently,
11   particularly with regard to that proceeding which, I'm told, is
12   itself confidential.  I don't know -- yes.
13              THE COURT:  All right.  On the defense side.
14              MS. BOWER:  Your Honor, significant public references
15   tying Pentler Holdings and one of its apparent principals,
16   Mr. Cilins, directly to the allegations underlying this case
17   and directly to BSGR as either some sort of affiliate or
18   subsidiary within the family of BSGR-related companies, and
19   Mr. Cilins specifically as a representative or agent on behalf
20   Mr. Steinmetz.
21              THE COURT:  Why don't you subpoena Mr. Cilins, since
22   he is perhaps still in the Southern District of New York,
23   probably at the MCC across the street.  And if not, you can
24   find out what prison he's in and subpoena him and cut out the
25   middleman.  Obviously, and let me be clear, to the extent BSGR
```

1      has any Pentler- or Cilins-related information other than what

2      came through the London arbitration, which we will talk about

3      separately, you have to produce it.

4              MS. BOWER:  Obviously, your Honor, we will now pursue

5      efforts to obtain discovery directly from Mr. Cilins, and

6      hopefully he is still in the United States and that is a

7      possibility.  But given his relationship, frankly, it's

8      something we think is an unfair burden to put on the defendants

9      to pursue that.  And if discovery is afforded to us and it

10     becomes clear that there was a relationship and this was just

11     an end run around the party discovery, we may be back.

12             THE COURT:  The query -- there are relationships and

13     there are legal issues.  Mr. Cilins may well have been an

14     associate of Mr. Steinmetz.  That doesn't mean, as a matter of

15     law, that Mr. Steinmetz has control over Mr. Cilins' documents.

16             MS. BOWER:  Understood, your Honor.

17             THE COURT:  Obviously, if discovery from whatever

18     forum proves any of the allegations that lawyers are making to

19     me to be untrue, there will be consequences.

20             MR. LAZAROFF:  Your Honor, if I --

21             THE COURT:  Let me just ask, Ms. Bowers, anything you

22     want to argue about the confidentiality with respect to the

23     London arbitration?

24             MS. BOWER:  It's a little difficult to argue when we

25     don't know the confidentiality provision.  We believe that

1    there's a need for these documents in this case and would ask

2    that, to the extent that there is relief available under the

3    confidentiality order, that we be entitled to apply for that

4    relief and that you enter an order directing plaintiffs to

5    produce any documents received in the arbitration proceeding in

6    this case subject to the confidentiality agreement that is

7    entered in this case.

8          THE COURT:  But if it were another district court

9    order, we have ways informally and formally to work it out.

10   With respect to the London arbitration, to the extent there is

11   a representation -- and I assume that's what I've just

12   gotten -- that they do not have the authority to give you the

13   Pentler documents; correct?

14         MR. LAZAROFF:  Yes, your Honor.

15         THE COURT:  Then, you know, query whether you have the

16   right to intervene in the London arbitration for purposes of

17   getting that material.  My guess is there's no way to do that.

18   Where is Pentler located?

19         MS. BOWER:  We believe they're registered in the

20   British Virgin Islands, your Honor.

21         THE COURT:  Usually we do much better with British

22   entities than others in terms of Hague Convention.  Any idea

23   what the Hague Convention is with respect to BVI?

24         MS. BOWER:  Members of my team know the answer to that

25   question, your Honor, but I do not presently know the answer to

1      that question.

2                      THE COURT:  I have no problem with you issuing a

3      request through the Hague or whatever is the appropriate way to

4      do it.  I have had great success with Hague requests to the UK.

5      I can't speak about BVI.  And I will require, if you do go that

6      route, for you to work with plaintiffs' counsel and eliminate,

7      either through your negotiations or bringing it back to me, any

8      objections that plaintiffs may have so that it can be presented

9      to BVI authorities as all the parties to this case agree to the

10     request, subject only to whatever Pentler may object over

11     there.

12                     MS. BOWER:  Thank you, your Honor.

13                     With respect to the confidentiality order, may we ask

14     whether there is a provision in that order allowing for

15     documents to be produced pursuant to an order of the court?

16                     MR. LAZAROFF:  Your Honor, I have not seen the

17     confidentiality order.  I'm not sure I'm allowed to.  I haven't

18     seen it.

19                     THE COURT:  Well, BSGR is in that proceeding?

20                     MR. LAZAROFF:  I can inquire.

21                     THE COURT:  Inquire.  And if there is a way -- I mean,

22     if it says, for example, you may not produce it unless ordered

23     by a court of competent jurisdiction, that's a different

24     situation.  So find that out, find out if it allows you to move

25     on behalf of Mr. Soros for a waiver of that confidentiality or

H91HBSGC

1        whatever would be the procedural way to go about this before

2        the arbitration.

3               MR. LAZAROFF:  Will do so, your Honor.

4               THE COURT:  Now, in our rotating we go to -- all

5        right.  Does the defendant have any other relationship with FTI

6        or the two individuals from FTI?

7               MS. BOWER:  Your Honor, we actually resolved

8        plaintiffs' item No. 2 as well.

9               THE COURT:  So I guess we should go to plaintiffs'

10       issue 3.  Not resolved, I take it?

11              MS. BOWER:  No, your Honor.

12              THE COURT:  OK.  Is there a real issue?  In other

13       words, does Mr. Soros have relations with the people covered by

14       the sort of miscellaneous requests other than with respect to

15       the mining issues in Guinea?

16              MS. BOWER:  Well, your Honor, some of these requests

17       are quite broad and not specific to individuals.  So if we're

18       looking at request No. 23, it asks defendants to produce all

19       documents and communications concerning any payments solicited

20       or received from mining companies or their principals in the

21       Republic of Guinea.  That would, as I've explained to

22       plaintiffs, literally capture any reference there may be to any

23       contract in the mining industry in Guinea, even if it's just a

24       news report that some mining company paid X amount of money for

25       their mining rights.

1          THE COURT:  Well, let me understand this request.  Are

2     these payments to Soros, from Soros, or what is 23 asking for?

3          MR. LAZAROFF:  It's payments -- first of all, let me

4     just clarify on this particular one, we don't need publicly

5     available newspaper articles on that one.  But having said

6     that, I believe we're looking for documents and communications

7     that would concern payments made or directed to or from Soros

8     or OSF-related entities, to or from mining companies and their

9     principals by the Republic of Guinea.

10         THE COURT:  Does that help?

11         MS. BOWER:  I believe that helps, your Honor.  I would

12    be willing to take a look at that and assess burden, to the

13    extent that there are significant relationships with other

14    mining companies in Guinea.

15         THE COURT:  One might ask, other than that you didn't

16    have enough time, why this sort of meet and confer in front of

17    the Court is necessary; meaning, why you didn't all figure out

18    what he meant by this request through your discussions?

19         MS. BOWER:  I mean, I can represent for probably both

20    sides, we did spend a significant amount of time going back and

21    forth.

22         THE COURT:  More time, obviously, would have helped.

23         MS. BOWER:  I think it's also helpful when you sort of

24    have the guidance of the Court that we received this morning on

25    some of these issues to have greater clarity on where we're

1    headed with discovery in this case.

2              THE COURT:  How do you want to handle -- I mean, there

3    are, I don't know, ten requests here, and it sounds like what

4    is the issue with one is not necessarily the issue with the

5    other.

6              MR. LAZAROFF:  Your Honor, most of these -- and I

7    acknowledge there may be one or two outliers of this -- most of

8    these are trying to get at the allegations in paragraph 80 of

9    our amended complaint and elsewhere that there was a

10   manipulation of the mining review, mining contract, and process

11   where ended up being targeted to our client.  So Mr. Mebiame,

12   in paragraph 86, in his criminal -- the affidavit related to

13   that says that the whole mining review process was a sham.  We

14   have other documents indicating that it was -- and comments

15   from other people that it was targeted at our client.  So we

16   would like -- most of these requests, we're looking at 30, 31,

17   42, those ones in particular are focused on that as well as, I

18   guess, 27.  And then there's requests which go to the financial

19   support, directly or indirectly, of the Republic of Guinea to

20   support -- the same mining contract review process or the new

21   mining codes.  It's actually very specific to a particular

22   process.  And then their meetings should also be --

23             THE COURT:  Stop, stop.

24             MR. LAZAROFF:  Sorry.

25             THE COURT:  Stop.  Is there a real distinction between

H91HBSGC

1    mining and iron ore mining here?

2              MS. BOWER:  Our understanding of the review process is

3    that defendants were involved in and that affected plaintiffs

4    was iron ore mining, your Honor.  So we --

5              THE COURT:  But the question is, were you involved in

6    any other mining that wasn't iron ore mining?  Because that's

7    what you're fighting over.  And if those two mean one in the

8    same, why are we having this discussion?  So unless you can

9    tell me that, yes, you had discussions not just about the new

10   mining code, which would cover iron ore mining and perhaps

11   something else, but you had discussion about the gold mining,

12   why are we having this discussion?

13             MS. BOWER:  Your Honor, we're willing to track your

14   prior ruling and look at documents concerning mining in Guinea,

15   and unless there's some burden, we will proceed on that front.

16             THE COURT:  All right.  Does that, on the plaintiffs'

17   side, take care of all of these, or is there anything else?

18             MR. LAZAROFF:  Yes, your Honor.  Thank you very much.

19             THE COURT:  All right.  So that takes care of all of

20   plaintiffs' requests.  So now we're back to the defendants'

21   letter.  You want to clarify what your definition of Steinmetz

22   is and isn't for this purpose.

23             MR. LAZAROFF:  Your Honor, we've actually resolved

24   that issue.

25             THE COURT:  All right.  No. 4.

1          MS. BOWER:  Well, I'm sorry, your Honor.  I just want

2     to make sure we understand, for the sake of the record, that we

3     understand that plaintiffs are agreeing to produce

4     Mr. Steinmetz's data, not just with respect to data that may be

5     possessed by the named plaintiffs in this case, but rather, any

6     device or entity where they believe there is relevant

7     information to these claims relating to Mr. Steinmetz.  Is that

8     a fair representation?

9          MR. LAZAROFF:  That is, your Honor.

10          THE COURT:  Good.  No. 4, is that moot other than the

11     London --

12          MR. LAZAROFF:  I'm sorry.  Go ahead, your Honor.

13          THE COURT:  Item 4, production from prior litigations,

14     other than the London arbitration we've already talked about,

15     what are we talking about here?

16          MR. LAZAROFF:  Your Honor, if I could just add one

17     amendment to the issue of No. 3, which I don't think defendants

18     will disagree with, is that that was a reciprocal understanding

19     of devices and searches; that we're going to go to the places

20     that we believe the custodians are likely to have had relevant

21     documents.

22          MS. BOWER:  That is correct, your Honor.  The lack of

23     clarity was because plaintiffs have told us that Mr. Steinmetz

24     is not a principal of any of the plaintiffs.

25          THE COURT:  OK.  No. 4.

```
1            MR. LAZAROFF:  No. 4, your Honor, so the defendants
2    have asked for 60 requests -- or close to 60, 58 -- getting at
3    the relevant issues.  The issues in LCIA, just for example,
4    which I can't fully tell you, but there's a contract dispute
5    between business partners, and there are issues that are not
6    related to here.  So to simply blanket assert without even
7    trying to show -- which I realize they can't do because they
8    don't know what it's about -- however, to blanketly assert
9    anything produced there by our client should be relevant here
10   when we have the 58-plus requests that get at in, I think, a
11   very effective, maybe sometimes overly broad way, these
12   documents in those disputes would be improper, and the same is
13   true in some of the other -- the two other actions, the ICSID
14   and Rio Tinto.  ICSID also involved disputes and certain
15   aspects of the contract between Guinea and BSGR that aren't
16   related to the allegations in the complaint.  By the way, the
17   majority of ICSID, I believe, is public, available on their
18   website.  We'll produce anything that's public.  We're not
19   trying to hold anything back that's relevant.  There are
20   some --
21           THE COURT:  Slow.  The London arbitration is
22   between --
23           MR. LAZAROFF:  Vale, BSGR.
24           THE COURT:  That's the one that the Pentler documents
25   are --
```

1          MR. LAZAROFF:  Correct, correct, your Honor.

2          THE COURT:  All right.  As to that arbitration,

3    anything you have produced there that is relevant to any of the

4    requests here need to be produced.  No disagreement on that;

5    right?

6          MR. LAZAROFF:  No disagreement, your Honor.

7          THE COURT:  Anything you have received from other

8    parties in that arbitration besides Pentler that you are free

9    to produce that are relevant, you will do so.

10          MR. LAZAROFF:  Correct, your Honor.  I don't believe

11    there are any that fall into that category.  I'll go check

12    that.

13          THE COURT:  All right.  So now we go to the BSGR

14    litigation with Rio Tinto.  Produce whatever you have.

15          MR. LAZAROFF:  Without regard to the confidentiality

16    order there, or anything that we produced in that action?

17          THE COURT:  The confidentiality order would have been

18    entered by me.

19          MR. LAZAROFF:  Correct.

20          THE COURT:  Give notice to the other parties.

21    Certainly anything you produce is not protected by the

22    confidentiality order.  Anything they produced to you, produce

23    subject to the same limitations that existed in that

24    confidentiality order, but only after notice to Vale, Rio

25    Tinto, whoever.  My recollection --

1          MR. LAZAROFF:  I believe they've been destroyed,

2    actually, the third-party documents per the confidentiality

3    order, but --

4          THE COURT:  Then if you actually did what the

5    confidentiality order required, which half the time people

6    don't do, just tell them that.

7          MR. LAZAROFF:  OK.

8          THE COURT:  All right.  Does that finish the issue of

9    No. 4 from both sides' points of view?

10         MS. BOWER:  Well, our request with respect to four,

11   your Honor, is that we receive whatever plaintiffs produced.

12   We weren't trying to pry behind productions by other parties,

13   just --

14         THE COURT:  Then that's even easier.

15         MS. BOWER:  Just for clarity.  But they have told us

16   that they're only going to produce what is otherwise responsive

17   to our other requests, and our request was produce what you've

18   provided in these proceedings.

19         THE COURT:  As to the Vale/Rio Tinto, produce

20   everything you've produced regardless.

21         MR. LAZAROFF:  Your Honor, with all due respect, there

22   are issues that were raised there that are irrelevant here.

23   When your Honor said it before, you said "relevant," which

24   we're happy to embrace because we want to produce everything

25   that is relevant.  But it's understanding that there are

1    documents, because there were issues raised there and fights

2    between the parties, that have nothing to do with the issues

3    here.

4              THE COURT:  Such as?

5              MR. LAZAROFF:  One second, your Honor.

6              THE COURT:  Frankly, my recollection is some of the

7    discovery there had to do with whether BSGR was subject to

8    jurisdiction here, which, obviously, is moot because you're the

9    plaintiff, but --

10             MR. LAZAROFF:  Are you talking about Rio Tinto or

11   LCIA?

12             THE COURT:  Rio Tinto.

13             MR. LAZAROFF:  Rio Tinto.  We don't have -- your

14   Honor, I thought you were talking about the LCIA.

15             THE COURT:  LCIA, I know may have things, but do a

16   rough equivalent of a privilege log for what you are not

17   producing from your production there.

18             MR. LAZAROFF:  In Rio Tinto?

19             THE COURT:  The London arbitration.  You will produce

20   what you produced there that is otherwise relevant to their

21   discovery.  To the extent you say there are aspects of that

22   arbitration that are not relevant here, you will do, not on a

23   document-by-document basis but on a category basis, what you

24   produced in the London arbitration that you don't think you

25   have to produce here because they're on subjects not relevant

```
 1    to this litigation, and then you all can fight about that, and
 2    I'm sure I'll see you all again.
 3              As to what you've produced in the Southern District,
 4    Rio Tinto against Vale litigation, everything you've produced,
 5    produce.
 6              MR. LAZAROFF:  Thank you, your Honor.  The only caveat
 7    I add -- and I don't know if I need to add it, so I just beg
 8    your Honor's forbearance -- is that I'm not -- we should be
 9    able to describe the documents, I believe -- I just have to
10    check -- because that's just describing our documents.  I
11    remain very concerned about whatever the confidentiality
12    concerns are they have, as I've been told a number of times.
13    If there's any issue for some reason, we'll bring it to
14    defendants' attention and, if we need to, to your Honor's
15    attention.
16              THE COURT:  OK.
17              MS. BOWER:  Your Honor, if I could just have a
18    clarification.  There were three proceedings at issue in these
19    requests, the third one is the ICSID arbitration currently
20    pending between plaintiffs and the Republic of Guinea.  And we
21    would ask that the same rules apply to that proceeding as well
22    and that they produce whatever's been produced by them in that
23    proceeding.
24              MR. LAZAROFF:  I believe, to the extent that there are
25    documents in ICSID that are responsive, relevant, and not
```

1    covered by any confidentiality concerns --

2              THE COURT:  They're your documents.  They can't be

3    covered by a confidentiality concern.

4              MR. LAZAROFF:  We're talking only about our documents,

5    plaintiffs' document.

6              THE COURT:  Yes.

7              MR. LAZAROFF:  So to the extent they're responsive and

8    relevant, we will produce them.

9              THE COURT:  Again, any reason why you shouldn't

10   produce at all?  Is there something --

11             MR. LAZAROFF:  Again, I understand that there are some

12   issues that go to whether they had qualifying investments under

13   the investment code of the Republic of Guinea from 1995, issues

14   related to Liberia in relation to an infrastructure development

15   agreement that I don't think have anything to do with the

16   issues here.  It does overlap very strongly with some of the

17   issues here, but not --

18             THE COURT:  Produce it all unless there is something

19   so sensitive that you give them enough information about it,

20   and either they agree or you're willing to take your chance

21   coming back to me on it.  But right now, basically, since your

22   argument is that Soros interfered with your rights in Guinea

23   and you're otherwise fighting with Guinea as to your rights in

24   Guinea, seems to me the overlap is sufficiently significant

25   that a full production makes more sense.

H91HBSGC

1          MR. LAZAROFF:  If I can just confer with my colleague

2     for one second?

3          THE COURT:  You can even perhaps let them speak

4     directly.

5          (Pause)

6          MR. LAZAROFF:  Nothing else, your Honor.  Thank you

7     very much.

8          THE COURT:  All right.  Anything else from the

9     defense?

10          MS. BOWER:  No, your Honor.  Thank you.

11          THE COURT:  When do you all think you have a need to

12     come see me again?

13          MR. LAZAROFF:  Maybe, your Honor, we should set a

14     tentative date which, if we don't need it, we won't.  If your

15     Honor's amenable, you said the next two weeks are not good for

16     you, maybe the week -- I think it's the week where Thursday and

17     Friday are Rosh Hashanah, the 21st.  Monday, Tuesday, or

18     Wednesday, we'll see if the Court's available.

19          MS. BOWER:  I'm sorry.  I had to give up my device, so

20     I'm not sure which week we're referring to.

21          MR. LAZAROFF:  The 21st, I believe.

22          THE COURT:  I guess my question for all of you is,

23     really?  Every two weeks you're coming back to see me?

24          MS. BOWER:  My response was going to be, your Honor, I

25     don't think we have a need at this point to schedule another

1    conference.  So defendants will leave it at that.

2            THE COURT:  All right.

3            MR. LAZAROFF:  If it were possible, it doesn't have to

4    be the week of -- that's actually the 18th -- or the 25th?

5    Your Honor, I think it helps the parties move if they know

6    there's a date we may come see you.  We hope not to.

7            THE COURT:  Let's try to get you to get along for

8    almost a full month and put you down for September 27 at 10:00

9    a.m.  And, obviously, the usual drill, if you have a problem

10   before then, write a letter via ECF.  Whether I'm here or not,

11   all those letters find me, unfortunately or fortunately, in

12   this connected world.  And if you don't need the conference,

13   two business days before, jointly write a letter saying,

14   Believe it or not, Judge, we're getting along.  Don't need to

15   see you -- this is Friday sarcasm at work -- and suggest a week

16   or time that you would like it adjourned to.

17           For the future, get your smart pass so you can bring

18   your phone in to make your schedule more accessible, or if not,

19   print your calendar for the next weeks to month, month and a

20   half after you're seeing me so you'll know when you can come

21   back.

22           All right.  Usual drill, parties are ordered to

23   purchase the transcript, getting you a 50/50 split when you

24   both order it.  With that, we are adjourned.

25           (Adjourned)