# EXHIBIT B

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

BSG RESOURCES (GUINEA) LIMITED, BSG
RESOURCES (GUINEA) SÀRL, and BSG RESOURCES
LIMITED,

               Plaintiffs,

    v.

GEORGE SOROS, OPEN SOCIETY FOUNDATIONS,
OPEN SOCIETY INSTITUTE, FOUNDATION TO
PROMOTE OPEN SOCIETY, OPEN SOCIETY
FOUNDATION, INC., ALLIANCE FOR OPEN SOCIETY
INTERNATIONAL, INC., OPEN SOCIETY POLICY
CENTER, and OPEN SOCIETY FUND,

               Defendants.

No. 1:17-cv-02726 (JFK) (AJP)

---

**REQUEST FOR INTERNATIONAL JUDICIAL ASSISTANCE (LETTER ROGATORY)**

To the Appropriate Judicial Authority of the Federative Republic of Brazil:

        The United States District Court for the Southern District of New York (the "Court") presents its compliments to the appropriate judicial authority of the Federative Republic of Brazil, and respectfully requests international judicial assistance to obtain evidence to be used in a civil proceeding before this Court in the above-captioned matter.  This Court requests the assistance described herein as necessary in the interests of justice.

        Specifically, this Court requests that the appropriate judicial authority of the Federative Republic of Brazil compel the production of documents by the below named entity:

        Vale S.A.
        700, Avenida das Américas
        Bloco 8
        Loja 318
        Barra da Tijuca
        Rio de Janeiro, RJ 22640-100
        Brazil

The production of documents is intended for use at trial and, in the view of this Court, the evidence sought through the present request is directly relevant to the issues in dispute. A trial date has not yet been set, but, per the order of this Court, document discovery is underway.

## FACTS

This action, captioned *BSG Resources (Guinea) Limited et al. v. George Soros et al.*, Case No. 1:17-cv-02726 (JFK) (AJP), is a civil litigation brought in the Southern District of New York (the "Action"). On June 30, 2017, Plaintiffs filed an amended complaint (the "Amended Complaint") in this Court against George Soros, Open Society Foundations, Open Society Institute, Foundation to Promote Open Society, Open Society Foundation, Inc., Alliance for Open Society International, Inc., Open Society Policy Center, and Open Society Fund (collectively, "Defendants"). The Amended Complaint alleged, among other things, that Defendants caused the termination of Plaintiffs' mining contract with the Republic of Guinea ("Guinea") and related iron ore mining rights in that country on the on the basis of allegedly false allegations that Plaintiffs engaged in bribery and corruption to procure those rights. Plaintiffs have asserted claims against all of the Defendants for tortious interference with contract, conspiracy to commit tortious interference with contract, and commercial defamation, as well as claims for fraud, conspiracy to commit fraud, and prima facie tort against Mr. Soros. Plaintiffs seek at least $10 billion in damages from Defendants. In response to the Amended Complaint, on July 28, 2017, Defendants filed a motion to dismiss or, in the alternative, a motion to stay in favor of a pending arbitration between Plaintiffs and Guinea concerning the contract and mining right at issue in the Action (the "Motion").

Through this application, Defendants seek discovery from Vale S.A. ("Vale") concerning Plaintiffs' claims and Defendants' defenses. Vale is a multinational corporation

incorporated in the Federative Republic of Brazil.  Initially, in or around 2005 and 2006, Vale

was a competitor with Plaintiffs for the mining rights at issue in the Action.  (Amended

Complaint at ¶¶ 20-21.)  In April 2010, after Plaintiffs procured their alleged contract and mining

rights in Guinea, Plaintiffs entered into a joint venture with Vale related to the exploitation of

Plaintiffs' mining rights in Guinea.  (*Id.* at ¶¶ 36-37.)  In 2014, while Vale was still Plaintiffs'

partner in the joint venture, Guinea effected the termination of the joint venture's contract and

mining rights for which Plaintiffs seek to hold Defendants responsible in the Action.  (*See id.* at

¶¶ 156-159, 181-184.)  After the termination, in March 2015, Plaintiffs purchased Vale's portion

of the joint venture along with all rights and interests that Vale had in the joint venture.  (*Id.* at ¶

43.)

Plaintiffs further allege that Vale was intimately involved in the events leading to

the termination of Plaintiffs' contract and mining rights, including through communications with

Guinean officials, Defendants, and Defendants' purported agents concerning the possible

renegotiation of the mining rights at issue in this case.  (*See id.* at ¶¶ 58, 61-65, 101.)  Plaintiffs

also allege that a component of Plaintiffs' alleged damages is the purported $5 billion value of

Plaintiffs' terminated contract with Guinea, which Plaintiffs "calculated by doubling the amount

paid for half of the rights [under the contract] by Vale in 2011."  (*Id.* at ¶ 217.b.)   Another

component of Plaintiffs' alleged damages are the joint venture's alleged capital expenditures in

Guinea, which allegedly exceeded $800 million (*id.* at ¶¶ 42, 217.b), and for which Vale is

alleged to have pledged approximately $10 billion.  (*Id.* ¶ 38.)

Based on these allegations, Defendants believe that Vale possesses information

and documents relevant to their defenses.  Specifically, Defendants seek documents from Vale

concerning Plaintiffs' alleged damages and the circumstances that led to Plaintiffs' procurement

and eventual loss of their alleged contract and mining rights in Guinea.

This Court, therefore, respectfully requests, for the purpose of justice and for due

determination of the matters in dispute between the parties, the proper judicial authority of the

Federative Republic of Brazil's assistance in collecting the documents set forth in this request

believed to be in the possession, custody, or control of Vale for use at trial in this Action.

### DOCUMENTS TO BE PRODUCED

The documents requested are set forth in the attached Schedule A.

### SPECIAL PROCEDURES

This Court requests submission of a declaration by the custodian of records,

attesting to the authenticity of documents produced.  Under the Federal Rules of Civil Procedure

and the Federal Rules of Evidence of the United States, which apply in this lawsuit and in all

civil proceedings in the United States district courts, certain records may be received into

evidence only if a competent representative appears at trial as a witness and testifies as to the

authenticity of the records and the manner in which they are prepared and maintained.  However,

with respect to foreign business records, the appearance and testimony at trial of a representative

of a foreign entity may not be required if the records (or true copies thereof) are accompanied by

a written declaration certifying the authenticity of the records.  Therefore, this Court considers it

necessary in the interests of justice that written declarations certifying the authenticity of all

records be obtained from the producing entity and/or its representatives.  To be of value to this

Court, the written declaration(s) must be signed in a manner that, if falsely made, would subject

the maker to a criminal penalty in the country where the certification is signed.  A proposed

declaration is attached to this request as Exhibit 1.

4

## <u>RECIPROCITY AND COSTS</u>

The Courts of the United States are authorized by statute codified at Title 28 of the United States Code, Section 1782 to extend assistance to foreign and international judicial authorities.  The United States District Court for the Southern District of New York respectfully expresses its willingness to provide similar assistance to the judicial authorities of the Federative Republic of Brazil.  The fees and costs incurred in executing this request that are reimbursable pursuant to applicable law will be borne by Defendants:

> George Soros and Open Society Institute
> c/o
> WILLKIE FARR & GALLAGHER LLP
> Joseph T. Baio
> 787 Seventh Avenue
> New York, New York 10019
> USA
> Telephone:  (212) 728-8000
> Facsimile:  (212) 728-8111

**Date of Request: _____, 2017**  _____

The Honorable Magistrate Judge Andrew J. Peck

**Requesting Authority**

**(Seal of Court)**

5

**Schedule A**

The judicial authority of the Federative Republic of Brazil is kindly requested to instruct Vale S.A. to keep all documents segregated by the file in which the documents are contained in the normal course of business and to indicate the name or subject of the file in which the documents are contained, or, alternatively, to organize and label the documents to correspond with the categories in this document request.

Finally, it is requested that the following counsel of record for the parties be notified of the time and place where the documents will be produced:

**Counsel for Defendants:**

WILLKIE FARR & GALLAGHER LLP
ATTN:        Joseph T. Baio

787 Seventh Avenue
New York, New York 10019
USA
Telephone:  (212) 728-8000
Facsimile:  (212) 728-8111

**Counsel for Plaintiffs:**

GREENBERG TRAURIG, LLP
ATTN:        Louis M. Solomon
                   Michael Lazaroff

200 Park Avenue
New York, New York 10166
USA
Telephone: (212) 801-9200
Facsimile: (212) 805-5529

**<u>DEFINITIONS</u>**

1.        "Action" shall mean and refer to the above-captioned action, proceeding number 1:17-cv-02726 (JFK) (AJP), currently pending in the United States District Court for the Southern District of New York.

2.        "Agreements" shall mean and refer to (i) BSGR's prospecting permits in the Guinean regions of Beyla, Macenta, Nzérékoré, and Yomou ("Simandou South") and the Guinean region of Kérouané ("Simandou North"), referenced in paragraph 22 of the Amended Complaint; (ii) BSGR's memorandum of understanding with Guinea, referenced in paragraph 23

of the Amended Complaint; (iii) BSGR's prospecting permits in Simandou Blocks 1 and 2, referenced in paragraph 26 of the Amended Complaint; (iv) the Basic Convention Agreement, referenced in paragraph 30 of the Amended Complaint; (v) BSGR's mining concession for the Zogota deposit in Simandou South, referenced in paragraph 36 of the Amended Complaint; or (vi) any other documents evidencing BSGR's mining rights in Guinea.

3.      "Alliance for Open Society International, Inc." means Alliance for Open Society International, Inc. and each of its officers, directors, employees, partners, corporate parents, subsidiaries or affiliates.

4.      "Amended Complaint" shall mean the first amended complaint, dated June 30, 2017, or any amendments thereto, filed in this Action.  For ease of reference, the Amended Complaint is attached hereto as Exhibit 2.

5.      The terms "all," "any," and "each" shall each be construed as encompassing any and all.

6.      The connectives "and" and "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of the discovery request all responses that might otherwise be construed to be outside of its scope.

7.      The term "BSGR" shall mean and refer to BSG Resources (Guinea) Limited, including Beny Steinmetz, its advisers, officers, directors, employees, partners, corporate parents, subsidiaries, or affiliates (including any existing or defunct entity by that name that is or was registered or organized under the laws of Guernsey or the British Virgin Islands, BSG Resources (Guinea) Sàrl, BSG Resources Limited, BSGR Guinea BVI, Onyx Financial Advisors, Margali Management Corp., and Pentler Holdings).

8.      "Communication" means the transmittal of information (in the form of facts, ideas, inquiries or otherwise).

9.      "Concerning" means relating to, referring to, describing, evidencing, or constituting.

10.     "Control" means possession, custody, or control, and includes constructive possession, provided that You, Your attorneys, agents, or representatives have a right to compel production of the document or communication from a source with possession thereof.

11.     "Document" is defined to be synonymous in meaning and equal in scope to the usage of the term "documents or electronically stored information" in Fed. R. Civ. P. 34(a)(1)(A). A draft or non-identical copy is a separate document within the meaning of this term.

12.     "Foundation to Promote Open Society" means Foundation to Promote Open Society and each of its officers, directors, employees, partners, corporate parents, subsidiaries or affiliates.

13.     "George Soros" means George Soros and any employees, affiliates or partners of George Soros.

14.     "Guinea" shall mean and refer to the country in West Africa with the capital city of Conakry and, for the purposes of these Requests, shall also mean and refer to the country's government, officials, committees, commissions, affiliates, divisions, agents, members, employees, attorneys, consultants, and representatives, past, present, or future, in their individual or representative capacities.

15.     "ICSID Arbitration" shall mean and refer to the arbitration before the International Centre for Settlement of Investment Disputes, captioned BSG Resources Limited et al. v. Republic of Guinea, Case No. ARB/14/22.

16.     "Including" means "including but not limited to" and "including without limitation."

17.     "Joint Venture" shall mean and refer to BSGR's joint venture with Vale S.A. as described in paragraphs 37 through 43 of the Amended Complaint.

"LCIA Arbitration" shall mean and refer to the arbitration before the London Court of International Arbitration, captioned *Vale S.A. v. BSG Resources Ltd.*, LCIA Arb. No. 142683.

"Margali" shall mean and refer to Margali Management Corp., a subsidiary of Onyx Financial Advisors Limited, which was appointed as a corporate director of BSGR Steel Holding Limited from November 15, 2004 to May 2, 2011 and of BSGR (Liberia) Ltd. on September 5, 2007 and resigned on March 6, 2015.

18.     "Matinda and Co. Limited" shall mean and refer to any company with "Matinda" in its name, including, but not limited to, Matinda and Co. Limited, Matinda Partners and Co. Ltd.," "Matinda and Co. Ltd. Sàrl," and "Matinda & Co. Ltd," and its principals, parents, subsidiaries, partners, and affiliates.

19.     "Onyx" shall mean and refer to Onyx Financial Advisors Limited and its principals, parents, subsidiaries, partners, and affiliates, including, but not limited to Onyx Financial Advisors (UK) Limited, which was initially incorporated as BSG Management Services (London) and has provided Plaintiffs with financial management services.

20.     "Open Society Fund" means Open Society Fund and each of its officers, directors, employees, partners, corporate parents, subsidiaries or affiliates.

21.     "Open Society Foundation, Inc." means Open Society Foundation, Inc. and each of its officers, directors, employees, partners, corporate parents, subsidiaries or affiliates.

22.     "Open Society Foundations" means Open Society Foundations and each of its officers, directors, employees, partners, corporate parents, subsidiaries or affiliates.

23.     "Open Society Institute" means Open Society Institute and each of its officers, directors, employees, partners, corporate parents, subsidiaries or affiliates.

24.     "Open Society Policy Center" means Open Society Policy Center and each of its officers, directors, employees, partners, corporate parents, subsidiaries or affiliates.

25.     "OSF" collectively means and includes Open Society Foundations, Open Society Institute, Foundation to Promote Open Society, Open Society Foundation, Inc., Open Society Policy Center, Alliance for Open Society International, Inc., and Open Society Fund.

26.      "Pentler" means Pentler Holdings Ltd. and refers to the company established by Mossack Fonseca & Ass. SA for Onyx, which Onyx sold to Frédéric Cilins, Michael Noy, and Avraham Lev Ran thereafter.

27.     "Person" is defined as any natural person or any legal entity, including, without limitation, any business or governmental entity or association.

28.     "Vale," "You," or "Your" shall mean and refer to Vale, S.A., the Brazilian multinational mining corporation, including its officers, directors, employees, partners, corporate parents, subsidiaries, or affiliates.

29.     The use of the singular form of any word includes the plural and vice versa.

30.     All terms defined herein shall have the meanings set forth in Definition Nos. 1 through 31 above, whether such terms are capitalized in these Requests or not.


## DOCUMENTS TO BE PRODUCED

1.     All Communications between or among Vale and Guinea concerning any pursuit by Vale of iron mining or prospecting rights in the Simandou region of Guinea.

2.     All Documents or Communications concerning the formation of the Joint Venture, including, but not limited to, any Documents or Communications concerning any amounts paid by Vale to BSGR in connection with the formation of the Joint Venture.

All Documents or Communications concerning Plaintiffs' allegation that Vale agreed to pay BSGR $2.5 billion for a 51% share in the Joint Venture.

All Documents or Communications concerning the value of the Agreements or BSGR's iron mining rights in Guinea.

3.     All Documents or Communications concerning the termination of the Joint Venture.

All Documents or Communications concerning BSGR's allegation that in March 2015 BSGR purchased Vale's portion of the Joint Venture along with all rights and interests that Vale had in the Joint Venture.

4.     All Documents or Communications concerning any work undertaken by BSGR or You in Guinea pursuant to the Joint Venture and/or the Agreements.

All Documents and Communications concerning Plaintiffs' allegation that the Joint Venture spent in excess of $800 million related to the exploitation of the Joint Venture's mining rights in Guinea.

All Documents and Communications concerning Plaintiffs' allegation that Vale committed to spending an additional $10 billion on the exploitation of BSGR's or the Joint Venture's mining rights in Guinea and on Guinean infrastructure.

All Documents and Communications concerning expenditures by Vale relating to the exploitation of BSGR's or the Joint Venture's mining rights in Guinea.

5.      All Documents or Communications concerning the Agreements, including, but not limited to, the Agreements, any amendments to the Agreements, any applications to Guinea submitted by BSGR or You concerning the Agreements, any Documents or Communications concerning the negotiation or procurement of the Agreements, and any Documents or Communications created or transmitted by BSGR or You pursuant to the terms of the Agreements.

6.      All Documents or Communications concerning the BSGR's iron mining rights in Guinea.

7.      All Documents or Communications concerning Guinea's examination, confirmation, ratification, review, or termination of the Agreements.

8.      All Documents or Communications relating to the investigation or review of the Agreements undertaken by the Technical Committee.

9.      All Documents or Communications concerning the facts or circumstances that formed the basis for Guinea's termination of BSGR's contract or mining rights in Guinea.

10.     All Documents or Communications concerning Communications or meetings between You, on the one hand, and (i) Beny Steinmetz, (ii) Roy Oron, (iii) Asher Avidan, (iv) BSGR, (v) Frédéric Cilins, (vi) Michael Noy, (vii) Avraham Lev Ran, (viii) Pentler Holdings, (ix) Dag Cramer, (x) Sandra Merloni-Horemans, (xi) Onyx Financial Advisors, (xii) Mamadie Touré or Matinda and Co. Limited, and (xiii) Mahmoud Thiam on the other hand.

11.     All Communications or Documents concerning Communications or meetings between or among Vale, BSGR, or the Joint Venture, on the one hand, and Guinea, on the other hand.

12.     All Documents or Communications concerning acts or allegations of corruption or bribery by BSGR in Guinea, including, but not limited to, any payments or gifts made to (i) secure meetings with Guinea, (ii) procure the Agreements, (iii) obtain mining rights in Guinea, and (iv) cause the destruction of evidence relevant to allegations that BSGR engaged in corruption or bribery in Guinea.

13.     All Documents or Communications concerning any payments, expenditures, investments, gifts, or bribes made, transmitted, or offered by BSGR, either directly or indirectly, to any entity or individual in connection with the Agreements or BSGR's dealings in Guinea.

14.     All Documents or Communications produced to or by Vale in connection with any governmental or non-governmental investigation of BSGR's conduct in Guinea, including, but not limited to, investigations by authorities in Guinea, Switzerland, Israel, and the United States.

15.     All Documents or Communications produced by Vale in *Rio Tinto PLC v. Vale S.A.*, et al., No. 14-CV-03042 (S.D.N.Y.).

16.     All Documents or Communications produced by Vale in the LCIA Arbitration.

17.     All Documents submitted by Vale in the LCIA Arbitration, including, but not limited to briefs, witness statements, expert reports, and transcripts of testimony.

# EXHIBIT 1

## CERTIFICATION OF BUSINESS RECORDS

The undersigned certifies that:

        1.     I am subject to criminal penalty under the laws of the Federative Republic of Brazil for an intentionally false declaration.

        2.     I am a duly authorized or qualified witness of the business records of _____ and have the authority to make the certification.

        3.     I further declare that the documents attached hereto were made at or near the time of the occurrence of the matters set forth therein, by (or from information transmitted by) a person with knowledge of those matters; were made and kept in the course of regularly conducted business activity; and, if not original records, are duplicates of original records.

        4.     The originals or duplicates of these records are maintained in the country of _____.

_____

Signature

_____

Print Name

Date of execution:     _____

Place of execution:     _____

# EXHIBIT 2

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

_____
                                                    )
BSG Resources (Guinea) Limited, BSG               )
Resources (Guinea) Sàrl, and BSG Resources        )      Civil Action No. 1:17-cv-02726
Limited,                                           )
                                                    )      **AMENDED COMPLAINT**
                    Plaintiffs,                     )
                                                    )      **JURY TRIAL DEMANDED**
              -against-                             )
                                                    )
George Soros, Open Society Foundations,           )
Open Society Institute, Foundation to             )
Promote Open Society, Open Society                 )
Foundation, Inc., Alliance for Open Society        )
International, Inc., Open Society Policy            )
Center, and Open Society Fund,                     )
                                                    )
                    Defendants.                     )
_____                )

      Plaintiffs BSG Resources (Guinea) Limited, BSG Resources (Guinea) Sàrl, and BSG

Resources Limited (collectively "plaintiffs" or "BSGR") as and for their Amended

Complaint ("Amended Complaint") against defendants George Soros ("Soros") and Open

Society Foundations, Open Society Institute, The Foundation to Promote Open Society,  The

Alliance for Open Society International, Inc., Open Society Policy Center, and Open Society

Fund ("OSF"; with Open Society Institute, Foundation to Promote Open Society,  and Alliance

for Open Society International, Inc., Open Society Policy Center, and Open Society Fund, the

"OSF Entities") (collectively "defendants"), hereby allege, on personal knowledge as to

themselves and for elements of fraud and on information and belief as to all other matters, as

follows:

<u>**NATURE OF THE CASE**</u>

    1.    George Soros epitomizes in the 21st Century what Lord Acton observed two

centuries ago:  Power tends to corrupt; absolute power corrupts absolutely. Soros has spent

untold millions fabricating a positive public image of himself and the organizations he controls. Yet in reality Soros is a racketeer billionaire who acts in utter disregard of the rule of law and the rights of others.  This lawsuit will put an end to Soros's illegal enterprise.

2.      Soros employed five types of predicate illegalities, described in paragraph 3 below, to savage plaintiffs' business and destroy their reputation in two ways:

- First, Soros, himself and through his minions, used his enormous financial clout and influence through his network of organizations to delay, damage, and destroy an investment worth at least $5 billion that plaintiffs lawfully held to mine some of the world's most valuable deposits of iron ore located in the Simandou mountain range in the African nation of Guinea.  Through fraud, illegality, defamation, bribery, and criminal misconduct, Soros interfered with and induced the breach of plaintiffs' iron ore concession and related agreements, denominated a "Basic Convention" Agreement (together with related agreements, permits, and concessions, the "Convention").  The Convention was negotiated, finalized, and ratified over the course of many years by and with three independent governments of Guinea.  Before the 2014 breach of the Convention induced by Soros, plaintiffs had invested close to $1 billion in the socially constructive project, which would have brought jobs and wealth to Guinea, one of the world's poorest countries, as well as a nearly $1 billion consumer rail system.  Soros's mendacious and illegal conduct destroyed plaintiffs' Guinea investment.  Nothing has been done to develop the resource.  Guinean workers, consumers, and population are the losers.

- Second, having delayed, damaged, and destroyed plaintiffs' investment in Guinea, Soros and his coconspirators trained Soros's unbridled animus towards plaintiffs

2

(and an adviser to plaintiffs whose name is associated with these companies, Israeli Beny Steinmetz), to damage plaintiffs' reputation worldwide, destroying other of plaintiffs' business opportunities and those of its affiliates in the process. Plaintiffs' damage from these other losses similarly runs into the billions.

3.      Soros and his controlled entities (summarized in <u>Exhibit A</u> hereto) used five categories of predicate illegality to devastate plaintiffs' business and reputation, each set forth in detail in this Amended Complaint:

- **Soros's Actual and Threatened Extortion of Plaintiffs and Others**.  Soros and his controlled entities sought to extort billions of dollars from plaintiffs and others wanting to do business in Guinea.  Plaintiffs refused Soros's illegal inducements. In punishment for plaintiffs' refusal to be shaken down, Soros ratcheted up the illegal conduct against them.

- **Soros Grossly Manipulated Otherwise Valid and Lawful Processes.**  Soros and his controlled entities puppeteered the government of Guinea, misled other elected officials and governmental entities including President Obama (para. 168 below) as well as the OECD (para. 171 below), misused Civil Society Organizations (CSOs), distorted and violated the law, tampered with witnesses, manipulated the press – anything and everything he could control to attack plaintiffs and falsely accuse them of corruption in securing the Convention. Soros's scheme included his plan to "shake up the mining license regime" and "rework[]" all existing mining contracts in Guinea.  Masquerading as a legitimate public initiative, thereby defrauding various Guinean officials as well, Soros's shake up and rework constituted brutish and insolent interference with plaintiffs'

3

valid contract rights.  Soros's shake up and rework plan, supposedly directed at

the industry as a whole, was in reality a witch hunt directed solely at plaintiffs.

Soros trumped up new and onerous contract terms as well as new and onerous

extra-contractual obligations – all with the purpose and effect of killing plaintiffs'

contracts and expropriating their value.

- **Soros Fabricated, Uttered, and Repeated Savagely False Accusations About Plaintiffs.**  Soros and his controlled entities are grandmasters of **The Big Lie** – taking false or unsubstantiated allegations of wrongdoing and circulating, recirculating, and repeating them until they go viral and pass for something substantiated.  The illegal Soros enterprise was pressed into overtime to attack and damage plaintiffs.  Soros funded a private investigator, one Fox, whose fabrication talents were exposed and condemned by a neutral arbitral tribunal in 2016.  Yet despite Fox's total incredibility, Soros-funded law firm DLA Piper – a different firm hired to review the same issues found nothing illegal – further embellished Fox's lies, knowingly and intentionally repeating them to a Soros-funded panel in Guinea, which repeated and further embellished the lies in a report, which a Soros-induced government administrative body was then duped (or its members conspired with Soros) to repeat and rely on to terminate the Convention.  Defendants began with groundless asseverations and then piled on layer upon layer of additional falsity and distortion.  What resulted, an outrageous display of Fake News worsening the reputational harm by the equivalent of the children's game of Telephone, allowed the false information to gain both traction

and momentum from Soros-funded or fed press publishing leaked snippets of the falsehoods.

- **Soros Sealed His Corrupt Scheme by Bribing Guineans, Including Government Officials.** Not satisfied that the "rework" plan would be effective against BSGR's legitimately procured Basic Convention and related mining contracts, the validity of which was confirmed by many, including reputable law firms and numerous Guinean officials, Soros, himself and through his own sons, paid intermediaries to transmit hundreds of tens if not hundreds of thousands of dollars in bribes to witnesses as well as Guinean government officials in charge of the review of BSGR's contracts to make sure that the scheme resulted in the only acceptable outcome for Soros: the delay or destruction of plaintiffs' investment. See paras. 152, 161- 163 below.

- **Soros Spread His Destruction of Plaintiffs' Reputation and Business Still Further.** Soros's hatred of plaintiffs did not stop in Guinea. Having killed plaintiffs' investment in Guinea, Soros stalked plaintiffs around the world. The illegal Soros enterprise, having fabricated and spread lies, infiltrated other venues and governments, including in the United States, Switzerland, and Israel. Soros's continued illegality led to further harm to plaintiffs' reputation, and plaintiffs' loss of other profitable business opportunities worth at least as much in the aggregate as the Guinea investment.

4.       Plaintiffs' losses at the hand of Soros measure at least $10 billion. It is time for Soros to pay for that damage. It is also time to dismember the illegal Soros enterprise.

## THE PARTIES

5.      Plaintiff BSG Resources (Guinea) Limited ("BSGR Guernsey") is registered under the laws of the Bailiwick of Guernsey, registration number 50001.  Its principal place of business is the West Wing, Frances House, Sir William Place, St. Peter Port, Guernsey.  Between April 2010 and March 13, 2015, BSGR Guernsey was named VBG-Vale BSGR (Guinea) Guernsey and BSGR Guinea was named VBG-Vale BSGR Sàrl.  References to BSGR Guernsey and BSGR in this Amended Complaint, including as part of "plaintiffs" as defined herein, include the period between April 2010 and March 13, 2015 and refer to the joint venture during that period.  BSGR Guernsey is wholly owned by plaintiff BSG Resources Limited.

6.      Plaintiff BSG Resources (Guinea) Sàrl ("BSGR Guinea") is registered under the laws of the Republic of Guinea with registered offices at Immeuble Bleu, 5ème étage Résidence 2000, Moussoudougou-C/Matam, Conakry, Republic of Guinea, Post Box 6389.  BSGR Guinea is a wholly owned subsidiary of BSGR Guernsey.

7.      Plaintiff BSG Resources Limited ("BSGRL") is a company registered under the laws of the Bailiwick of Guernsey, registration number 46565. Its principal office is in West Wing, Frances House, Sir William Place, St Peter Port, Guernsey. BSGRL was incorporated in 2003 as a limited company in Jersey and migrated in March 2007 to Guernsey.

8.      Defendant George Soros is a financier who resides and is domiciled in the State of New York.  Soros is a Hungarian-American businessman and multi-billionaire, among the world's wealthiest individuals.  He serves as chairman of the Soros Fund Management LLC (a for-profit hedge fund), and related for-profit entities, as well as for OSF, all of which are based and do business in New York City.  Soros controls a huge network of organizations and

6

individuals to carry out his instructions. As reported in the press, "**Soros is a convicted felon. Soros was convicted of insider trading in France . . . .**" (dailywire.com).

9.     Defendant OSF is a de facto corporation that regularly does business in New York, with its principal place of business at 224 West 57th Street, New York, New York 10019, with a phone number of 212-548-0600. Open Society Foundation, Inc. was a not-for-profit corporation organized under the laws of the state of Delaware, founded in 2007, that filed dissolution papers on October 5, 2012. At the time it filed its dissolution papers, its principal place of business was 224 W. 57 Street, New York, New York 10019. Open Society Foundation, Inc. purported to support charitable activities and programs promoting open, democratic societies globally. After the dissolution and until today, OSF has continued to operate out of 224 W. 57th Street, supporting the same goals as the Open Society Foundation, Inc. In a December 2012 Board Meeting presentation, OSF described itself as a "501c3 private operating foundation". Soros is the founder and chairman of OSF. OSF in turn funds a number of NGOs controlled or influenced by Soros, including Global Witness, the Natural Resource Governance Institute (formerly Revenue Watch Institute), Publish What You Pay, and Human Rights Watch, whose roles in the scheme included carrying out the strategies and tactics of defendants. OSF's budget is set annually by George Soros (INSIDE PHILANTHROPY, *Philanthropy v. Tyranny: Inside the Open Society Foundations' Biggest Battle Yet,* 9/14/2015). OSF claims that "no other philanthropic organization employs so many people in so many places" https://www.opensocietyfoundations.org/sites/default/files/open-society-foundations-2017-budget-overview-20170202.pdf

10.     Defendant Open Society Institute is a charitable trust organized under the laws of the state of New York and an IRS private operating foundation, with its principal place of

business at 224 W. 57 Street, New York, New York 10019 with a phone number of 212-548-
0600 (the same number OSF lists on its website).

11.     Defendant Foundation to Promote Open Society is a not-for-profit corporation

organized under the laws of the state of Delaware and an IRS private foundation, with its

principal place of business at 224 W. 57 Street, New York, New York 10019 with a phone

number of 212-548-0600 (the same number OSF lists on its website).  Defendants admit that

Foundation to Promote Open Society "directly or indirectly provided" funding "as described in

the complaint for Guinea, Revenue Watch Institute and Global Witness" during the time period

of the allegations.

12.     Defendant Alliance for Open Society International, Inc. is a not-for-profit

corporation organized under the laws of the state of Delaware and an IRS 501(c)(3) public

charity with its principal place of business at 224 W. 57 Street, New York, New York 10019

with a phone number of 212-548-0600 (the same number OSF lists on its website)..

13.     Defendant Open Society Policy Center is a not-for-profit corporation organized

under the laws of the District of Columbia and an IRS 501(c)(4) Civic League/Social Welfare

Organization with its principal place of business at 224 W. 57 Street, New York, New York

10019 with a phone number of 212-548-0600 (the same number OSF lists on its website).

14.     Defendant Open Society Fund, Inc. is a not-for-profit corporation organized under

the laws of the state of New York, with its principal place of business at 224 W. 57 Street, New

York, New York 10019 with a phone number of 212-548-0600 (the same number OSF lists on

its website).

15.     At all relevant times, Soros and OSF including the OSF Entities, their agents, and

other Soros related entities identified herein acted in concert with the same purpose and goal of

carrying out defendants' schemes and harming BSGR.  As such, the acts of each are, for

purposes of this Amended Complaint, the acts of all.

## JURISDICTION AND VENUE

16.     This Court has subject matter jurisdiction over the action pursuant to 28 U.S.C. §

1332(a)(2) because there is complete diversity of citizenship between the parties and the amount

in controversy exceeds $75,000 exclusive of interest and costs.

17.     Venue is properly placed in this district pursuant to 28 U.S.C. § 1391(b)(1) and

(2).  A substantial part of the events giving rise to BSGR's claims occurred in this district, and

Soros and the OSF Entities reside and do business in this district.

## FACTUAL ALLEGATIONS

I.   **Background**

A. **Plaintiffs' Mining Background**

18.     BSGR is an international, diversified mining group that, at all relevant times,

employed several thousand people in many different countries.  Over the past fifteen years,

BSGR has invested hundreds of millions of dollars developing and successfully operating mines

and related businesses worldwide.  By and through its in-house technical and financial expertise,

BSGR had or has created value for its international stakeholders in numerous countries,

including the Balkans and former Soviet Union, South Africa, Zambia, Botswana, Tanzania,

Nigeria, Sierra Leone, the Democratic Republic of Congo, and Guinea.

19.     Through this expertise, BSGR has grown rapidly into one of the largest private

investors in Africa.  Prior to Soros's wrongdoing in Guinea, BSGR had completed expansion,

exploitation, prospecting, and development projects in the areas of metals and mining, oil, gas,

and power.  Its track record of operating and executing successful projects in these fields was

driven by, among other things, strong engineering capabilities derived from its affiliates, global companies specializing in processing solutions and engineering, procurement, and construction contracting for the mining, minerals and metals, oil and gas, and chemical industries.

**B. Prospecting in the Simandou Region of Guinea**

20.     In 2005 BSGR (through its subsidiary BSGR Guinea BVI) submitted an application for prospecting permits over available areas in the north and south regions of Simandou.  If awarded, the prospecting permits would confer on BSGR the exclusive right to conduct exploratory work in both regions, in an effort to locate and unearth iron ore deposits.

21.     BSGR was not the only mining company that submitted an application seeking prospecting permits over those regions.  Applications were also submitted by Rio Tinto, Vale, Mitsubishi Corporation, and BHP Billiton Ltd.  Each company was summoned separately for meetings with representatives of the Guinean Ministry of Mines and the Guinean Agency for the Promotion and Development of Mining (the "CPDM"), an entity acting for the Ministry of Mines.

22.     On February 6, 2006, the Guinean Minister of Mines granted BSGR's application in two orders.  The first granted BSGR Guinea BVI four prospecting permits, covering 2,047 square kilometers in the Guinean region of Beyla, Macenta, Nzérékoré, and Yomou ("Simandou South").  The second granted BSGR Guinea BVI three prospecting permits, covering 1,286 square kilometers in the region of Kérouané ("Simandou North").  Pursuant to those permits, BSGR was required to submit monthly activity reports and quarterly financial reports to the CPDM and to remit certain administration fees, stamp duties, and land taxes to the government of Guinea.  BSGR complied with these requirements.

23.     On February 20, 2006, BSGR Guinea BVI entered into a memorandum of understanding with Guinea, which set forth a framework for cooperation regarding future iron ore mining in both regions.  Under that memorandum, and as required by the Mining Code then in existence, before a concession could be granted, BSGR agreed to conduct a feasibility study to determine the commercial viability of mining iron ore in those regions, including an assessment of what infrastructure would be required to extract any iron ore.  Completion of a feasibility study typically entails detailed geological, mining, hydrogeological, metallurgical, environmental, infrastructural, and financial assessments regarding the extent to which mining projects are physically possible and economically feasible.

24.     BSGR began prospecting work in these regions as soon as it was possible.  In November 2006, BSGR Guinea established exploration camps in Simandou North and Simandou South to begin geological mapping and prospective drilling.

25.     The international mining company, Rio Tinto, had been responsible for conducting similar exploratory work in an area referred to as Simandou Blocks 1-4, where it had held mining rights since 1997.  Rio Tinto failed to do any significant exploratory work in these regions, particularly with regard to Blocks 1 and 2, which were located near Simandou North.  As a result of Rio Tinto's failure adequately to prospect these blocks, and on the basis that its delay in conducting exploratory work breached the Mining Code, the Guinean government required Rio Tinto to relinquish its rights in Blocks 1 and 2 altogether.

26.     In 2008, the Government of Guinea decided to retrocede Blocks 1 and 2.  During that process, BSGR applied for a prospecting permit for Simandou Blocks 1, 2, and 3.  On December 9, 2008, that application was granted as to Simandou Blocks 1 and 2 (the "Blocks 1 and 2 Permit") by the then-Minister of Mines Louceny Nabé.

11

27.     Guinean President Lansana Conté died two weeks later, on December 22, 2008. And although his death created some political instability – marked by military coups and a transitional government – the legitimacy of the Blocks 1 and 2 Permit was confirmed after a thorough examination by the Minister of Mines in the successor government and the Interim President, Moussa Dadis Camara.

28.     BSGR Guinea began exploratory drilling in Blocks 1 and 2 in April 2009.

**C. The Basic Convention Agreement**

29.     On November 16, 2009 – after drilling for over three years and investing over $160 million – BSGR completed and submitted to the CPDM a 450-page feasibility study of the highest international standards with over 1,000 pages of annexes regarding the viability of mining operations in Simandou South, also called Zogota.  Based on BSGR's lengthy assessment and willingness to invest capital in the region, the CPDM recommended to the Ministry of Mines that BSGR be invited to negotiate a mining and infrastructure agreement.

30.     Thereafter, the parties entered into intense, arms-length negotiations, which resulted in the signing of the Basic Convention Agreement (defined above as part of, along with other relevant agreements, including the Blocks 1 and 2 Permit and Zogota Mining Concession, the "Convention") on December 16, 2009.

31.     In exchange for the right commercially to mine iron ore found in Simandou South, BSGR agreed among other things to invest billions of dollars in capital investments in Guinea.  Apart from the infrastructure necessary to mine and export iron ore, BSGR agreed to invest capital that was not directly related to developing, mining, or exporting iron ore, but instead was intended to benefit the Guinean people.

12

32.     For example, BSGR agreed to reconstruct a 600-kilometer trans-Guinean passenger railway between the Guinean cities of Conakry and Kankan, and extend the railway another 200 kilometers to the Guinean area of Kérouané as a show of good will to the Guinean people.

33.     Additionally, BSGR was required to undertake costly capital improvements to certain existing infrastructure in Guinea necessary to export iron ore from Simandou South and Blocks 1 and 2.  Specifically, BSGR agreed to (1) construct a heavy cargo railway between the mine in Simandou South and the village of Sanniequellie on the border with Liberia, (2) construct a second heavy cargo railway between Blocks 1 and 2 and Sanniequellie, (3) construct a third heavy cargo railway between Sanniequellie and the port of Buchanan, (4) renovate the existing cargo railway between Sanniequellie and the port of Buchanan on the Liberian coast, (5) renovate the port of Buchanan itself, and (6) construct a new deep-sea port southeast of Buchanan.

34.     The Convention was a legal, valid, and binding agreement.  Under the Convention, BSGR was granted the exclusive right to conduct commercial mining activities in the Simandou South region of Guinea and to export and sell on the international market all iron ore located therein.  The Convention also specified the terms under which BSGR Guinea was entitled to develop within Blocks 1 and 2 if and when it was awarded a mining concession for those areas.  BSGR Guinea was also required to submit a feasibility study with respect to Simandou Blocks 1 and 2 within twenty-four months after the Basic Convention was executed. The conclusions and terms of that feasibility study would facilitate the negotiations for the grant of a mining concession over Blocks 1 and 2.

13

35.     In the Convention, the parties agreed that plaintiffs' rights and entitlements were secured even as against subsequent changes in law.  The government of Guinea further warranted among other things that:

- Prior to the signature of this Agreement, the Government satisfied itself that the Company has all the qualifications necessary, as defined in the Mining Code, and that there is nothing to prevent the granting of a Concession and the signature of this Agreement.

- Signature by the Government on this Agreement and the execution of the obligations arising, are not in violation of any law, regulation, decree or order of any national or local authority or of any ruling handed down by a Guinean court.

36.     On March 19, 2010, Guinea's new president Sékouba Konaté ratified the Convention by Presidential Decree and granted to BSGR Guinea a mining concession for the Zogota deposit ("Zogota Mining Concession") – an area covering 1,024 square kilometers of Simandou South.

**D.  BSGR's Joint Venture With Vale**

37.     In April 2010, BSGR entered into a joint venture agreement with Vale related to the development and operation of BSGR's mining rights in Simandou and particularly to help BSGR with the massive investment that was necessary to enter into the Convention.

38.     Pursuant to the agreement with Vale, BSGR sold 51% of BSGR Guernsey to Vale for $2.5 billion, with $500 million paid up-front and the remainder to be paid by Vale according to milestones.  Vale agreed to commit capital expenditures in Guinea of around $10 billion.  It was highly valuable for the joint-venture to receive such a capital commitment since external financing was complicated and difficult to obtain given the economic and political risks associated with the project and the region at the time.

39.     BSGR kept the government of Guinea fully informed during the negotiations with Vale.  The government of Guinea confirmed that it had no objection to the joint venture; indeed, in a March 19, 2010 letter, the Minister of Mines welcomed the proposed joint venture.  By letter dated April 16, 2010, BSGR formally notified Guinea of the contemplated joint venture, explaining in detail its structure and purpose.  This was followed by a meeting with the senior ministers of the Government of Guinea including the Prime Minister and the President and representatives of BSGR and Vale.  The letter also explained that, even though no formal governmental approval was required under the terms of the Mining Code or the Convention, both BSGR and Vale believed such approval would be prudent.  That same day, Guinea counter-signed BSGR's letter, again confirming that it had no objection to the joint venture.

40.     Two months later, BSGR Guinea formally changed its name to VBG-Vale BSGR Guinea ("VBG" or "BSGR").

41.     Work in Zogota progressed quickly thereafter.  Substantial progress was made on certain projects; camps and roads were constructed; and a project to link the sites of Zogota and Blocks 1 and 2 was undertaken.

42.     In all, prior to Soros's interference inducing the termination of the Convention in April 2014, as described in greater detail below, the joint venture spent in excess of $800 million related to this project (an amount equal to more than 15% of Guinea's 2010 gross domestic product) and committed to spending an additional $10 billion on the project and on Guinean infrastructure (an amount which is more than double Guinea's gross domestic product over the preceding three years).  BSGR has not been repaid or received any compensation for this investment.

15

43. In March 2015, BSGR, having lost the value and benefits of the Vale joint venture because of defendants' misconduct, purchased Vale's portion of VBG along with all rights and interests that Vale had in the joint venture.

### E. The 2010 Presidential Election

44. There were elections for a new president of Guinea in 2010. Alpha Condé, who previously had twice failed to win the presidential election – first in 1993 and then in 1998 – announced his bid to run once again for president in the 2010 election.

45. Recent United States enforcement activities have targeted corruption in Guinea during periods before and after the 2010 election. For example, in 2016, Samuel Mebiame, an influential Gabonese national and "fixer," was arrested by U.S. federal authorities in New York for, among other things, the payment of bribes to senior Guinean government officials involving mining rights. In a related development, the hedge fund Och-Ziff Capital Management Group LLC and its subsidiary, OZ Management LP, agreed to pay a criminal penalty of $213 million for "corruption of a foreign public official" and almost $200 million by way of disgorgement for its involvement in, among other matters, a criminal conspiracy in order to obtain mining business in Africa, including in Guinea.

### F. Defendants' Hatred of Plaintiffs

46. Soros has a long standing antipathy toward Beny Steinmetz – dating as far back as 1998 when Soros falsely concluded that Steinmetz was responsible for a significant Soros business loss in Russia. In his personal capacity, Beny Steinmetz supports many charities, including youth and education programs both inside and outside of Israel, while almost all of the Soros-founded NGOs are aggressive in opposition to the Israeli army and its activities. To

Soros, Steinmetz's success, as well as his active, passionate promotion of Israeli life, business, and culture, are anathema.

47.     Soros is also well known for his long-standing animus toward the State of Israel, and plaintiffs (as well as Steinmetz) are seen as Israeli (*see, e.g.,* JewishPress.com, *DC Leaks Publishes George Soros' Files Showing Millions Contributed to Anti-Israel Causes*, 8/14/2016; THE ALGEMEINER, *George Soros' Israel-Hatred Spills Out into the Open*, 9/28/2016).

48.     In 2012, John Waples of FTI Consulting LLP ("FTI") (whose independent contract with plaintiffs Soros also interfered with and induced the breach of – *see infra* ¶¶ 134-139) stated that "Mr. Soros had a personal obsession about BSGR and is determined to ensure that VBG's mining license is withdrawn/cancelled."

49.     Soros set up OSF in 1979.  The majority of OSF's activities remain covert (*see* D. Horowitz and R. Poe, "The Shadow Party" (Thomas Nelson 2007)), and Soros has used the organization to exert tremendous influence on international politics, particularly through funding organizations adverse to Israel.  OSF funds many of the NGOs Soros supports, including Global Witness, Revenue Watch Institute ("RWI") (now called Natural Resource Governance Institute ("NRGI")), and Human Rights Watch ("HRW"), whose roles in the scheme included carrying out the strategies and tactics of defendants.  In 2016, OSF provided RWI with $4.5 million in donations, about 70% of its overall funding.  Similarly, in 2010-2015, OSF provided significant funding to RWI.  On its website, OSF explains that it "established the Revenue Watch Institute in 2006".  At conception, RWI had three directors, two from OSI and one from Soros Fund Management.

50.     On average, OSF provided 50% of the funding for Global Witness for the years 2014 and 2015 and significant amounts in the years between 2010 and 2014.  In 2016, OSF

Entities provided approximately 40% of its funding. Soros has also provided significant annual funding to HRW since 2010. Soros and OSF – and as a result, almost all of the NGOs funded by OSF and influenced by Soros – have expressly anti-Israel positions and policies. Soros claimed in 2011 that "[o]ver thirty years I have contributed more than $8 billion to the worldwide network of Open Society Foundations".

(https://www.georgesoros.com/essays/my_philanthropy/). OSF, in a recent budget, claims that "we continue to set [funding] priorities within the fixed resources that George Soros, our founder, has made available."

51.     Soros's and OSF's control of these entities includes control over board members, whose board affiliations largely overlap among OSF Entities. As just a few examples, Aryeh Neier, president of OSF from 1993 to 2012 (and still president emeritus) is an Honorary Chair of the Advisory Board of Global Witness. Karin Lissakers, a member of the Advisory Council of NRGI (RWI's successor entity), is or was a member of the Fiscal Governance Program Advisory Board of OSF and a former adviser to Soros Fund Management. Alexander Soros (George Soros's son) is both a board member of Global Witness and a board member of OSF. Julie McCarthy is director of the Open Society Fiscal Governance Program (FGP) and a member of the NRGI Advisory Council. Mabel van Oranje is a member of the Advisory Board of Global Witness and of the Global Board of OSF.

52.     Soros and OSF also control the OSF Entities. All of the OSF Entities share the same phone number and business address. Their leadership structures are similarly overlapping. For example, all of the trustees of added defendant Open Society Institute are members of OSF's Board of Directors. In addition, both Soros and Christopher Stone serve on the boards of 3 of the OSF Entities, while Soros's son, Jonathan, is on the board of all but

18

one.  Soros's daughter, Andrea, sits of the boards of 5 of the OSF Entities.  The OSF Entities received most of their funding from Soros or Soros entities during the relevant period.  The OSF Entities were often the conduit for the funding described in this Amended Complaint.

53.     OSF describes the effectiveness of this conduit strategy in a recent budget, using RWI as a specific example: "*[W]e can make a very large, long-term grant to a single organization or initiative, whether new or previously established, able to lead that change.  Examples from earlier years include our founding support for* ... *Revenue Watch Institute, now the Natural Resource Governance Institute*. . . . Examples of similarly large grants to organizations OSF did not found include our support to Human Rights Watch. . . . The other way in which we make a very large investment in a single strategy is to coordinate the separate efforts of many programs and foundations across our network in a 'shared framework.'"

II.     **Predicate Illegality 1:  Soros and OSF Interfere With Plaintiffs' Contract Rights Through Actual and Attempted Extortion**

A.  **Soros and OSF Conspire to Influence Others to Interfere With or Breach the Convention**

54.     Soros knows Guinea President Condé.  Soros became involved in Guinea during the 2010 election, when Condé turned to him in March 2010 "to ask for help in meeting his electoral pledges," as was reported in Insiders Mining, by AFRICA MINING INTELLIGENCE, which further says of Soros: "One of Alpha Condé's key outside supporters before his election to the presidency, the American billionaire philanthropist George Soros, was quick to take an interest in Guinea's energy and mining industries."  Soros has acknowledged meeting with Condé prior to the election.

55.     One company stood out as a target for Soros in Guinea from the start:  BSGR.

56.     Defendants importuned Condé, duping him to make sure that the government of Guinea would force BSGR improperly to pay significantly more money to the government than was called for by the Convention or lose its contracts altogether.  Defendants were the motivating force behind Guinea's breach of the Convention.

**B.  The Shake Down of BSGR Induced by Defendants**

57.     The first stage of implementing the scheme was an attempt to force mining companies either to make huge payments to keep their rights or to force the expropriation of stakes in their assets by government controlled entities.

58.     In early 2011, Asher Avidan (then-president of BSGR Guinea's parent entity), Ricardo Saad (then-CEO of VBG), and Ibrahima Touré (a BSGR employee) attended meetings with Condé.  At those meetings, Condé, pursuing defendants' unlawful scheme, demanded without justification that BSGR pay $1.25 billion to maintain its contractual mining rights.

59.     BSGR refused to acquiesce to this extortionist demand and instead attempted to work with Condé in a constructive manner.  To do so, on March 14, 2011, Avidan sent a letter to Condé, explaining, among other things, the work going forward in Zogota and Blocks 1 and 2, and reiterating BSGR's commitment to Guinean infrastructure projects, including up to $1.2 billion to rehabilitate the Transguinean railway.

60.     As reported by MEDIAPART, a French investigative and opinion journal, subsequent investigations into BSGR by the Guinean government were a direct result of its refusal to pay the $1.25 billion demanded pursuant to defendants' unlawful conspiracy:

> The Steinmetz Group [BSGR] is certainly in trouble since
> it refused to put its hand in its pocket to preserve its rights in
> Simandou.  Rio Tinto, which still owns half (but originally owned
> it in its entirety), has agreed to pay an additional 700 million
> dollars.  It was when BSGR refused, that investigations into its
> dealings began . . . [by] ***the battalions of lawyers and private***

20

*investigators funded by George Soros, Alpha Condé's chief supporter* (emphasis added).

61.     Soros and OSF masterminded and orchestrated the attempted extortion of BSGR. In fact, soon after the failed attempt to shake down BSGR, Soros and OSF engaged in secret negotiations with Vale seeking payment of $500 million.  This is reflected in a March 3, 2011 email between Chris Canavan (the Director of Global Policy Development at Soros Fund Management LLC, a for-profit entity founded and run by Soros), based in New York, and Daniela Chimisso (Vale's Deputy General Counsel).  Attached to that email was a draft memorandum of understanding between OSF and VBG (the joint venture between BSGR and Vale), entitled "Regarding a Possible Advance Payment of Tax on Mining Substances from Projects in the Republic of Guinea."  The terms of the draft agreement provided that the joint venture would be required to pay the government of Guinea $500 million, which was falsely characterized as a supposed advance payment on taxes.

62.     This document demonstrates the direct involvement from New York of Soros and OSF in attempting to extort mining companies.  Further, the draft memorandum of understanding states:  "The Company has been approached by the [Open Society Foundation], acting on behalf of the Republic, in order to discuss possibilities of aiding the Republic in meeting a portion of its current and anticipated revenue shortfalls".

63.     The draft memorandum of understanding also shows how Soros and OSF were bent on interfering with BSGR's rights.  First, any required pre-payment of taxes would itself constitute a violation of BSGR's contracts.  Moreover, the MOU appears to allow for negotiation with Vale alone on behalf of the joint venture.  For instance, the memorandum states in the second whereas clause that "the Parties are dedicated to ensuring *Vale's* successful long term investment in the country" (emphasis added).  Furthermore, the only parties to the transmittal e-

mail are affiliated with either Vale or Soros; there is no reference to the fact that BSGR still held substantial mining rights in Simandou. This clear evidence of Soros's intent predates the purported "process" later used to justify cancelling the Convention. The conclusion was foregone before any "process" even started.

64.     In an email in June 2011, Murilo Ferreira (then the CEO of Vale) explained:

> Soros called me at 6:00PM. . . . I said that we are ready to continue the project and share the Brazilian experience in mining. He said that it is the **President Alpha Condé that does not recognize the agreement with the negotiator [dealer- translation error] Steinmetz**. An ongoing investigation is being held. **However, the relationship with Vale should not be affected by the result of this investigation.** In this context it is necessary to open **a parallel channel of negotiation** (emphasis added) .

65.     In a later email that same day, Ferriera stated:

> I don't know if I commented to you that in the first week of March Roger and I were in London with Soros, where he suggested that Vale should anticipate US$250m to the government and as counterpart would get the agreement signed with BSGR guaranteed. One week later, after the draft agreement was ready, he changed position saying that we should pay US$250m to have the right to sit with the government and discuss the agreement again??? (*Id.*)

66.     BSGR rejected these proposed terms. Thereafter Soros, OSF, and their agents employed other illegal means to destroy BSGR's mining rights.

III.    **Predicate Illegality 2: Soros and OSF Conspire to Corrupt and Manipulate Lawful Processes to Delay, Damage, and Destroy Plaintiffs' Investment in Guinea**

A.     **Soros and OSF Conspire to Alter the Mining Code to Interfere With Plaintiffs' Valid Convention and Harm BSGR**

67.     In January 2011, shortly after his election was ratified, Condé affirmed what Soros had advocated behind the scenes, when he officially "requested" Soros's assistance to "reform" the mining industry. In response to this "request", Soros called upon his OSF funded

NGO empire and "sent a first team composed of lawyer Patrick Heller from the Revenue Watch Institute and economist **Paul Collier**", who has worked on many studies financed by Soros (AFRICA INTELLIGENCE, *How Soros is backing new leader*, 1/19/2011), and who under the directive of Karin Lissakers of OSF and together with others, initiated the Natural Resources Charter (NRC) which later merged with RWI to form NRGI. "Other aides from Soros' Open Society Institute" were expected soon thereafter (*id.*). Paul and other members of NRC are today on the advisory council of NRGI. Following this visit to Guinea, later in January 2011 RWI published "*Preliminary Recommendations for the mining concessions' review process*", for the expressed purpose of assisting Guinea in "renegotiating" better terms for the mining agreements. As Soros explained in THE NEW YORKER, he personally "enlisted" RWI.

68.     In its preliminary recommendations [informally translated from French], RWI advocated for immediate review and renegotiation of existing mining contracts, on the premise that the "coincidence" between the new regime and the "higher prices of raw materials" gave the government of Guinea "the legitimacy and responsibility" to rework the contracts. RWI set out a formula for how to "maintain public support" as it implemented this review, including by explaining the review "as an initiative to create stable long-term agreements" and by "systematic use of semantics and references to the stability of investor relations". RWI specifically recommended that the government of Guinea form "a Committee composed of a technical team and a General Committee of the members of the various ministries" and mobilize "a team of lawyers" to start the renegotiations. In furtherance of defendants' scheme, RWI was specifically tasked in the report with reviewing BSGR's mining rights first.

69.     As George Soros himself explained in 2011, his intent was to "pull out all the stops" for his "latest engagement in Guinea" because, among other things, the Soros-funded and

controlled "Revenue Watch Institute is well situated to help the new administration …renegotiate

the contracts that had been obtained through bribery." (The Philanthropy of George Soros:

Building Open Societies, 2011).  Soros made this statement before any investigation had

occurred.

      70.    Also prior to any investigation, in a document posted on an online news site in

2011 that claims to be a confidential document from George Soros, he outlined his plan to

conscript various agents and associated entities in furtherance of his "mission":

> "To the extent we don't have the capacity, we must acquire it.  . . . . I shall ask . . . Chris
> Canavan [of Soros Fund Management] to take charge. . . . Our initial mission will arrive
> in Conakry on January 2nd consisting of Abdul Tejan-Cole, a representative of OSIWA
> [Open Society Initiative for West Africa], and Patrick Heller from Revenue Watch.  Chris
> Canavan will join them as soon as possible.  Paul Collier will visit before January 9th.
> Patrick Heller should establish contact with him immediately and prepare for his visit. . . .
> Revenue Watch and OSIWA should maintain a more or less permanent presence for the
> next few months.  That should be a good start. (http://guineeactu.info/HTML/document-
> confidentiel-la-complicite-averee-entre-alpha-conde-bernard-kouchner-et-le-milliardaire-
> americain-georges-soros.htm).

      71.    As RWI recommended, in furtherance of defendants' "mission," defendants

employed a team of at least four attorneys from the International Senior Lawyers Project

("ISLP") paid for by one of the OSF Entities, Foundation to Promote Open Society ("FPOS"), to

consult and provide hundreds of thousands of dollars' worth of legal services for, among other

things, the ISLP attorneys to analyze and draft "legal and regulatory frameworks" in Guinea.

(FPOS Schedule O, form 990 for 2015).  ISLP's website reports that it partnered with "NGO

Revenue Watch Institute," in drafting "regulations implementing" various provisions of the

Mining Code.

      72.    Following RWI's recommendations, in late February and early March 2011 Soros

and his agents, including various OSF representatives, met with Condé for four days, supposedly

to discuss a comprehensive review of all Guinean mining licenses and contracts currently in

place.  However, the true purpose of those meetings was to effectuate the scheme to strip the

rights of companies – specifically plaintiffs – who refused to acquiesce to the extortionist

demands masterminded by Soros and his agents.  According to AFRICA INTELLIGENCE, this was

"Soros' initiative" for Guinea and included "an eventual and mandatory government acquisition

of a 33% holding in all companies operating in the country" including "BSG Resources"

(AFRICA INTELLIGENCE, *How Soros is backing new leader*, 1/19/2011).

73.     A March 1, 2011 article stated that Guinea had enlisted the help of Soros to

"review" the mining code, including "revis[ing] the country's mining code to give the state a 33

percent stake in mining projects, from 15 percent now" and that "the country was turning to

Soros because Guinea could not afford to pay international consultants" (REUTERS, *Guinea's*

*Condé enlists Soros aid with mining code*, 3/2/2011).  Soros's financial clout gave him power

over Guinea's processes of government, which he then thoroughly abused.

74.     Condé and Soros held a joint press conference at which they announced more

formally that all existing mining contracts in Guinea would be re-examined and a new Mining

Code would be enacted.  Thereafter, OSF and the special advisor to President Alpha Condé

Mamoudou Kouyaté issued joint press releases on March 2, 2011, announcing the future

enactment of a new Mining Code and the review of all mining contracts.  This press release

stated that:

> All existing contracts will be re-examined**. Contract holders and
> the countries to whose jurisdictions they belong <u>will have to
> comply with the principles of EITI</u>** [the Extractive Industries
> Transparency Initiative] and a code of conduct which will include
> a willingness to cooperate in criminal investigations. Guinea will
> retain the Revenue Watch Institute and the International Senior
> Lawyers Project to provide legal advice (emphasis added).

25

75.     This initiative was said to be supported by "George Soros and his Open Society Foundations".  "George Soros, founder of the Open Society Foundations, and his team spent four days in Guinea" discussing this initiative.  The Convention did not comply with the economic principles of EITI, and any attempt to force BSGR to adhere to these principles was wrongful interference.  This was just one of the clear cases of Soros's contractual interference and illegal racketeering behavior, since nothing permitted Guinea much less Soros to impose post-contractual terms on plaintiffs, especially since the Convention itself called for its terms to continue to govern even if Guinea law changed after the Convention was entered into.

76.     In addition, the press release confirmed that Guinea would retain the Soros and OSF backed RWI to provide legal advice in relation to the mining review and re-writing of the Mining Code, and that OSF was to provide $5 million in outright grants to Guinea to support the process.  RWI was also part of the process of reviewing the existing contracts that included the Convention.  It was through RWI and OSF's grants that Soros was able to control the plan to remove BSGR from Guinea.

77.     Thus, RWI reported in its 2012 Form 990 that in 2012, it received $5.8 million in funding from FPOS.  In turn, RWI reported that it made disbursements in 2012 for "management of mining resources in Guinea" and to promote "contracts transparency and monitoring" through engagement with "EITI's Strategy Review Process."  In its 2013 Form 990, then-NRGI reported that NRGI in Guinea "worked hand-in-hand with the ministry of mines" and "provided strategic and substantive support to the technical committee responsible for reviewing the country's existing mining projects" and  "secure a full roster of legal support for the [mining] review."

78.     On March 3, 2011, Soros spoke at the fifth conference of EITI in Paris, France. In that speech, he said that Condé "turned to me for assistance even before he was elected . . . ."

26

He also repeated that Condé would be "introducing a new mining code . . . and all the mining claims are going to be re-examined and **those who want to validate those claims will have to subscribe to the principles of EITI** . . ." (emphasis added).  This is yet another example of Soros's contractual interference and illegal racketeering behavior.

79.     Defendants controlled the manner and substance of their agents' performance.  In documents recently available online, OSF internally recognized that EITI "has not translated into positive change in the lives of citizens, or into improved development outcomes for the countries' populations".  Yet Soros and OSF nonetheless utilized the vehicle of EITI to force breach of the BSGR contract because, as OSF internally admitted, defendants could 1) exercise control over Soros-funded members subscribing to EITI (including NRGI and Global Witness) through "board participation," "softer influence of governing board members and the secretariat leadership," by convening calls and meetings "to convince" Soros-funded entities to "forge a united position" on their activities, and by "direct advocacy and public outreach by George Soros personally", and 2) defendants were able to control the conduct of other intermediaries, such as Fox, Horton, and DLA to carry out their scheme to breach BSGR's contract and either extort payments or terminate the contract.

80.     Internal OSF documents further explain that NRGI and Global Witness "have seats on the EITI board" and attend "strategic retreats" organized by OSF for the purpose of sustaining the "strategic coordination" that is necessary to achieve "unity" in carrying out defendants' agenda.  Other internal OSF documents similarly describe Soros's direct involvement in "partnerships" with RWI on programs such as EITI specifically to force "contract renegotiations".  This and other internal OSF documents recognize Soros's and OSF's

"aggressive and targeted grant making strategies" to entities such as RWI and Global Witness as well as the formation, funding, and control of "advocacy coalitions" to achieve Soros's agenda.

81.     Soros's statements that the mining claims would be "re-examined" implied a fair and impartial review.  Because he never intended to undertake such a review, these statements – and those of his agents operating under his control – were misleading and incomplete.  In fact, the results of any "review" of BSGR's contracts had been preordained.

82.     Defendants gave clear marching orders to their agents and intermediaries to carry out their scheme.  For example, in response to Soros' speech at EITI, an ISLP attorney (funded through FPOS) revealed the specific task ISLP had been assigned: to focus on **the Simandou mine**.  This was long before any supposed investigation by the Technical Committee.

83.     In an article dated March 4, 2011, the FINANCIAL TIMES reported on the press conference and confirmed Soros's wrongdoing, the breach of the Convention, and the pretextual nature of the "investigation" that followed.  The article included a quote from Condé, stating that Soros had been invited by him "to help shake up the mining license regime," and that it was Soros "who advised" Condé about this scheme.  The article also quoted a senior official from Guinea's Ministry of Mines, who stated that "[a]ll [mining] contracts [would] be reviewed and reworked … [t]he government will become a minority shareholder in all mining contracts." (FINANCIAL TIMES, *Guinea to review mining licenses*, 3/4/2011).

84.     Although the government represented that it would review "all mining contracts", this was disingenuous.  As RWI had been directed, Guinea's review was principally concerned with the mining rights of BSGR.  In fact, BSGR was the only entity whose mining contracts were subject to an extreme level of scrutiny.  Not surprisingly, as BSGR was the only entity that refused to "pay to play," BSGR was also the only entity to have its mining rights revoked, under

the guise of bribery allegations.  No other mining company's reviews were leaked to the press.

Significantly, the current Minister of Mines, Abdoulaye Magassouba, recently urged the

Technical Committee (the panel purportedly in charge of the review, *see* ¶¶ 98-105) to wind up

its review process – a move which "gave the impression that the panel's unique objective had

been to cancel the mining rights of VBG . . . ." AFRICA MINING INTELLIGENCE, *Review panel to*

*close in March*, 3/1/2016).

85.    In April 2011, a small working group, close to President Condé, was formed

around Ahmed Kanté, the Minister-Advisor to the Presidency on mining matters.  This working

group circulated a "presidential draft" of a new Mining Code, which included major

modifications and new strategies for the Guinean mining industry, to the Soros supported and

OSF funded RWI for its review.  Confirming their continued participation in defendants'

scheme, RWI submitted its comments and a new version of the draft circulated during the

summer of 2011.  However, this "revision" of the Mining Code was merely a pretext for

improperly expropriating mining assets contracted away or for receiving large payments.

86.    The complaint issued in the U.S. criminal proceedings against Mr. Mebiame

("Mebiame Complaint") shows that the new Mining Code was part of a scheme to get money or

assets from the mining companies who had existing agreements with the government of Guinea.

The complaint explains that:

> 40. . . . MEBIAME sent e-mail messages to Coconspirator #1,
> which stated that he (MEBIAME) had "exclusivity" over such
> opportunities in Guinea. According to MEBIAME, a senior
> Guinean government official ("Guinea Official # 1"), an individual
> whose identity is known to your deponent, requested MEBIAME's
> assistance in setting up the SOMC [state owned mining company].
>
> 41. E-mail records show that in or about and between February and
> March 2011, Coconspirator #1 and MEBIAME, among others,
> were involved in re-writing the Guinean mining code.

29

> Coconspirator #1 and MEBIAME prepared and transmitted draft
> correspondence, to be printed on "Republic of Guinea Conakry
> Letterhead" and signed by a Guinean minister, which would be
> used to notify existing permit holders of legal issues with their
> mining permits.

87.     The new Mining Code was presented by Soros as a step taken by President Condé

to increase transparency and legitimacy in the state mining industry. Yet the Mebiame Complaint

(supported by email records seen and examined by U.S. federal agents) puts the lie to that ruse.

The new Guinean Mining Code imposed financial and economic burdens on BSGR that were

inconsistent with its contractual limitations on additional financial obligations.  It determined

what share of the mining operations would be taken by SOGIUPAMI, the state owned mining

company, and provided for a "systematic review of all mining conventions," all part of the

scheme to either extort money or take mining assets from their contractual partners including and

specifically BSGR.

88.     Indeed it was in purported compliance with the new Mining Code that the actions

of the Technical Committee (of the National Mining Committee of Guinea) against BSGR were

founded (*infra* ¶¶ 98-105).

89.     The final new Mining Code was heavily criticized, including by SOFRECO, the

organization retained by Guinea in 2009 specifically for its experience in the reform of mining

legislation.  In its final report, SOFRECO expressed major reservations about the new Mining

Code, including that the creation of SOGUIPAMI to manage the government's stakes in mining

projects has "potentiel de conflit" (potential for conflict), and that the 15% free carry to Guinea,

with the addition that Guinea could acquire an additional participation of 35%, was not in line

with mining legislation in other countries, and was counter-productive to Guinea's interests.

That Soros and OSF controlled the drafting of the new Mining Code – through their agents RWI – shows their intent to cause the government of Guinea to breach its commitments to BSGR.

90. In fact, these changes – including the 35% described above – completely altered the royalties and tax structure applicable under the Convention. As such, the application of the new Mining Code to BSGR would be a blatant violation of the Convention, which specifically protected BSGR against post-contractual changes in Guinean law. As the Convention says: "[I]n the event of a contradiction and/or difference between Current Legislation and the provisions of this Agreement, the latter shall take precedence".

91. In turn, "Current Legislation" is defined to mean "all the valid legislative and regulatory texts of the Republic of Guinea (laws, Regulations, Decrees, Orders, Decisions, Instructions, jurisprudence etc)", to include not just legislation then in force but any subsequent legislation as well.

92. In addition, clause 32 of the Convention states:

> The Government warrants the Company from the date of grant of the Concession and throughout its full duration the stabilization of Current Legislation and of all provisions, particularly fiscal and concerning customs and excise, stipulated in this Agreement.
>
> Accordingly, all changes to Current legislation, particularly fiscal and/or concerning customs and excise, after the date of grant of the Concession that would as a result increase, whether directly or indirectly, the Company's tax and/or customs and excise charges would not be applicable for it.

93. It was during this time period that Guinea had hired the established law firm of Heenan Blaikie, specifically the qualified lawyer Jean-Francois Mercadier in Paris, to investigate the issues concerning BSGR's securing of the Convention as well as BSGR's compliance with both law and contract. The conclusions reached by this firm, set forth in a detailed, 47-page report issued December 20, 2011, included (i) no finding or recommendation of action based on

any actual or alleged illegality by BSGR in obtaining the Convention, (ii) a smattering of trivial arguments claiming noncompliance by BSGR with technical requirements, and (iii) advice that Guinea be very cautious in even trying to revoke BSGR's rights – which, the report euphemistically said, presented "a delicate action of implementation and might lead to the involvement of the State's responsibility". That is where matters would have lain but for defendants' illegal acts.

### B. Mining Companies Who Acquiesced to Defendants' Illegal Demands for Payment Maintained Their Rights

94.      The illegal scheme to strip BSGR of its rights stands in stark contrast to how those mining companies who acquiesced to the extortionist demands were treated. For example, a competitor, Rio Tinto entered into a "settlement" with Guinea whereby it agreed to pay Guinea $700 million as a supposed pre-payment of taxes. In exchange, Rio Tinto was able to maintain its rights in Blocks 3 and 4, which were not made subject to review by the Technical Committee, and its rights would not be affected by any changes to the Mining Code. This agreement also was intended to better position Rio Tinto to obtain rights in Blocks 1 and 2. Soros, OSF, and their agents were directly involved in discussions with Rio Tinto that led to this agreement. It is noteworthy that Rio Tinto left the country after 20 years sitting on unexploited rights. BLOOMBERG, reporting on an interview with President Condé, recounted that Condé said "that the only adviser to the government at the time was the George Soros backed Revenue Watch Institute. 'I have many friends in France. They come some time to Guinea and we talk. None of them has a role, not adviser anything'" (BLOOMBERG, *Rio Executive Firing Linked to Internal CEO Feud, Says Condé*, 1/20/2017).

95.      In connection with the Rio Tinto agreement, Rio Tinto paid a $10.5 million bribe to Francois de Combret, a "fixer" for Rio Tinto under the watch and knowledge of the former

CEO, Tom Albanese, as well as the head of iron ore, Sam Walsh (to become the CEO). Rio

Tinto's payment to de Combret and to people connected with the President of Guinea remained a

well-kept secret until internal emails were leaked on the internet on August 29, 2016, forcing Rio

Tinto to conduct both an internal investigation and an external one. These investigations led to

the firing of Mr. Alan Davies (Energy and Minerals chief executive), the suspension of Sam

Walsh's retirement payment, the suspension of Debra Valentine (Legal & Regulatory Affairs

Group executive), and more importantly to Rio Tinto reporting itself to the UK, Australian, and

U.S. anti-corruption authorities (Press Release, Rio Tinto, *Rio Tinto contacts regulatory

authorities*, 11/9/2016).

96.     A couple of days after the dismissal of Rio Tinto's top executives, the news

agency France 24 broke the news that it had a recording of a conversation with Mr. de Combret

in which he gave the following account of a conversation he had with the Guinean president:

"Rio Tinto is a huge company . . . . But the president told them, 'Listen, if there's no

downpayment, I'll cancel the concession.' And he would have done it." (FRANCE 24, *Audio

recordings drag Guinea president into mine bribery scandal*, 12/1/2016).

97.     At least one company decided to leave Guinea altogether. In July 2012, shortly

after the new Mining Code's free carry provision was introduced, BHP Billiton, the world's

largest mining company, announced its intention to pull out of its Mount Nimba iron ore project,

which was then one of the country's largest. Media reports speculated that BHP Billiton's

decision to leave was motivated, at least in part, by concerns over "whether Guinea should be

able to have a 15 percent free stake in projects" (REUTERS, *Analysis: Investor cheers fade as

Guinea tightens grip on mining*, 9/18/2012). The Soros-driven confiscation and bullying efforts

have led not only to plaintiffs' harm but to leaving Guinea bereft of any significant development or monetization of its valuable resources.

### C. Defendants Conspire to Increase the Pressure on BSGR

98.     Acting in accordance with defendants' strategy, set out in specifically in RWI's recommendations (written before any investigation had taken place), the government of Guinea then established a National Mining Commission ("NMC") on or about March 26, 2012.  The NMC was granted the power to examine the "extension, renewal, lease and cancellation applications for mining titles on the basis of the [2011] Mining Code."  As RWI had specifically instructed, NMC's responsibilities were divided among two subcommittees:  a Strategic Committee and a Technical Committee.

99.     The Technical Committee, "backed" by Soros, and his lawyer, Scott Horton, was designed to serve as "the operational arm of the [NMC] concerning the overall continuation, redevelopment or *withdrawal*" of mining licenses (FINANCIAL TIMES, *Guinea's first freely elected government reignites $2.5bn mining tussle*, 11/2/2012).  Despite being the supposed "operational arm" of the NMC, the Technical Committee was entirely lacking in the resources to handle this role.  Indeed, Nava Touré, a former professor of engineering, was tasked with running the Technical Committee, even though he had no staff, let alone trained inspectors.  As THE NEW YORKER reported, "when he [Touré] turned his focus on Simandou he had no staff of trained inspectors, so he relied on DLA Piper, the law firm, and Steven Fox, the investigator. 'It was outsourced,' Touré told me".  Veracity and DLA Piper, whose roles in the scheme included carrying out the strategies and tactics of defendants, were funded by Soros or entities controlled by Soros (THE NEW YORKER, *Buried Secrets*, 7/8/2013).

100. An internal memorandum discussing the procedural calendar of the Technical Committee review reveals that, in February 2012, it was Soros's organization, RWI, which was tasked with setting the order of the contracts to be renegotiated as well as drafting the questionnaires to be answered by the mining rights' holders. The memorandum also confirms the involvement of Scott Horton and Chris Canavan (of Soros Fund Management LLC) in the Technical Committee process, specifically providing for consultations by both individuals. Later correspondence from the Technical Committee to VBG was copied to Scott Horton, further evidencing the central role of Horton in the process, as an agent to Soros and OSF.

101. Pursuant to the conspiracy to delay and destroy BSGR's investment under the Convention, Soros held a meeting at his New York City apartment in or about September 2011 to discuss the future of Guinean mining. In attendance were, among others, Soros, Canavan, Karin Lissaker, Condé, Condé's son, and executives from each of the mining companies with interests in Guinea (including Vale and Rio Tinto), with the notable exception of BSGR. Soros did not invite BSGR to attend this meeting. The representative of Vale, Pedro Rodrigues, told BSGR that Soros spoke very negatively against BSGR and Beny Steinmetz.

102. Less than a month after the meeting in New York City, and pursuant to the conspiracy, Guinea improperly challenged the validity of BSGR's joint venture with Vale, notwithstanding the government's prior approval of the transaction.

103. On November 17, 2011, BSGR received a letter from the Minister of Mines and Geology, which claimed that there were supposed issues with BSGR's mining permits, set forth a lengthy list of information requests and questioned why Vale was supposedly working in Simandou without authorization, despite the government's prior acknowledgment and consent to the Vale/BSGR joint venture.

35

104. On November 28, 2011 BSGR, believing the process legitimate and without the pressured and overriding interference of defendants, wrote to the Minister explaining its activities in Guinea and provided access to a data room containing a vast number of supporting documents.

105. On February 3, 2012, BSGR submitted to the Minister of Mines four copies of 15 lever arch files containing numerous supporting documents comprising 50,000 pages. Yet, there is no indication that these documents were ever considered. Ultimately, plaintiffs became concerned about procedural irregularities in the Technical Committee proceedings, but defendants never disclosed their corruption of the Committee or the fact that any conclusion was foregone, having been dictated by Soros in advance.

IV. **Predicate Illegality 3: Soros and OSF Fabricate and Spread Unfounded and Untrue Accusations Of and Concerning Plaintiffs**

A. **Commissioning the Misleading and Untruthful "Veracity" and DLA Piper Reports**

106. Soros needed the camouflage of a veneer of legitimacy in carrying out his smear campaign. He plainly could not use the untainted work done by Heenan Blaikie, the law firm who investigated the matter and found no cause for any accusation of illegal conduct by BSGR and no cause to pull the concession or terminate the Convention. Instead he caused the government and later the Technical Committee to retain his long-time counsel at DLA Piper, Scott Horton (who is located in New York), to conduct an "investigation" of BSGR. According to DLA Piper's website, among Horton's "significant clients" are "the governments of . . . Guinea . . . and financier George Soros." As reported by BLOOMBERG, DLA Piper "was hired by Guinea at the recommendation of hedge fund billionaire George Soros, 82, who's advising the government through his foundations. Soros . . . funded the initial DLA Piper investigation" (BLOOMBERG, *Guinea Bribe-Probe Defendant Pleads Not Guilty in NYC*, 5/16/2013).

36

107.     Soros conspired with members of the Technical Committee (or alternatively duped them) to perpetrate the fraud of appearing to conduct an impartial and fair investigative process.  In reality, the process was intended simply to mouth the conclusion that BSGR should have its contract terminated.

108.     Soros and OSF used Horton as an agent tortiously to carry out the delay and ultimate destruction of plaintiffs' investment in Guinea by the revocation of their valid contractual rights.  During a conference organized by OSF, Horton himself explained, "in some cases anti-corruption campaigns are used as a political tool".  That is exactly what unfolded in relation to BSGR:  false corruption allegations were fabricated and circulated to provide justification for removing BSGR from Guinea.

109.     Horton retained Steven Fox, the New York based private investigator with the misnamed Veracity Worldwide ("Veracity"), who had previously done work for Soros.  Soros, directly or via his controlled entities, funded Veracity's work and controlled its conclusion.  Fox dutifully and with the intent to harm plaintiffs issued a report (the "Veracity Report") concluding that BSGR had obtained its rights through bribery and corruption.

110.     The Veracity Report's findings were based on nothing more than hearsay and innuendo, and it cited no supporting documents.  Indeed, in a recent arbitration, a panel of arbitrators of the Common Court of Justice and Arbitration ("CCJA") found that a report by Mr. Fox and Veracity, who were also in this instance retained by Guinea to conduct an investigation (in this case to investigate whether the logistics company GETMA had obtained a port concession by bribing the former government of Guinea) was worthless and totally unreliable.  Specifically, the panel found that "Mr Steven Fox was neither a direct or indirect witness of corruption he relates", "he has not made reference to any document", and "[t]he omissions of

which Mr Fox is guilty do not allow for knowledge or verification of his sources, his methods
and the content of the information he relates. They do not allow for the Court to verify his
allegations." (The decision of this panel was annulled on procedural grounds without disturbing
these credibility determinations.)

111.    Soros' attorneys at DLA Piper purported to prepare their own report about BSGR
(the "DLA Piper Report"). Yet that report relied heavily on the bogus Veracity Report. The
DLA Piper Report admitted that it relied on certain sources whose credibility was "non-tested"
(some of the same "sources" relied on by Fox in the Veracity Report).

112.    Before any Technical Committee investigation (which never occurred) and based
on these "non-tested" sources, the DLA Report concluded that "sufficient evidence exists to
affirm that BSGR acquired its first rights and interests in Simandou and obtained the necessary
approvals for the transfer of these rights to Vale by means of acts of corruption, such that an
official inquiry led by the competent Guinean authorities in order to confirm these preliminary
conclusions would be justified."

113.    The DLA Report mouthed repeatedly that its conclusions were not "definitive"
and that plaintiffs should "enjoy the opportunity to respond" to these allegations.   In reality,
such an opportunity was never contemplated nor provided.

**B. The 2012 Technical Committee Allegations Letter Continues the Scheme by
Repeating the Unfounded and Untrue Allegations Concerning BSGR**

114.    On October 30, 2012, the Technical Committee sent a letter to BSGR Guinea (the
"Allegations Letter"), accusing BSGR of obtaining its mining rights through bribery and
corruption.

115.    The Allegations Letter was entirely unsubstantiated, as it did not provide the
sources of its allegations and did not identify or attach the "evidence" from which it reached its

conclusions.  Nor is there any indication from the Allegations Letter that the Technical Committee conducted any of its own investigation, which is not surprising since the work of the Technical Committee was almost entirely outsourced to Soros funded agents.  On the contrary, the Allegations Letter relied on and reiterated the conclusions of the unreliable DLA Piper Report that had been funded by Soros and prepared by Horton.  In turn, the DLA Piper Report relied on and reiterated the conclusions of the unreliable Veracity Report, also funded by Soros and whose reporting with regard to other Guinean government contracts has been discredited.

116.     Importantly, DLA Piper was both the author of the report and advising the Technical Committee in its investigatory role that resulted in the Allegations Letter.   In other words, it wrote the report and then controlled how the conclusions in that report would be used by the Technical Committee in the Allegations Letter.  Pursuant to defendants' scheme, DLA Piper thus had control over both sides of the "investigation."

117.     Although the DLA Piper report did not identify its sources, it gave them codenames and assigned each source a "credibility level" from 1-4.  Remarkably, the DLA Piper Report relied on sources to which DLA itself assigned the lowest credibility level of "1".  According to the DLA Report's own legend, a credibility level of "1" means the source is "non-tested," and thus unreliable.  Yet, the DLA Piper Report relied on the conclusions of these sources in critical aspects of its report.  In turn, the Allegations Letter simply repeated the assertions of these dubious sources though it dropped any indication that the source was deemed unreliable even by DLA Piper.

118.     The abuse of process and amplification of lies represented by the multistep Fox-DLA-Technical Committee, all deliberately relying on the same untrustworthy sources to create

and republish The Big Lie is manifest proof of defendants' racketeering misconduct directed towards plaintiffs.  To give some examples:

119.     The DLA Piper Report relied on a Level 1 (incredible) source for the following: "An official of the Guinean Ministry of Mines (Source G4) reported that Mamady Touré (the alleged fourth wife of President Conté) had played a role with Lounceny Nabé, Minister of Mines at that time, to facilitate the transfer of the Simandou licenses from Rio Tinto to BSGR in November or December 2008, before President Conte's death."  The Allegations Letter uncritically repeats this accusation in Allegation 12, reporting that "Ms. Touré became actively engaged with high-level officials of the Republic of Guinea organizing meetings with key officials and her husband … [where] instructions for the rights to the mineral deposits in Simandou to be stripped from the company Rio Tinto, and transferred to BSGR."

120.     The sources that DLA assigned a "credibility level" of 4, the highest score and supposedly representing a source that DLA has "tested and [has] great confidence in the source's value," are in fact not any more trustworthy.  For instance, one such source is described by DLA in the following way:

> A mining company executive based in Paris and Conakry, in charge of major Simandou mining operations and having access to the results of an independent inquiry carried out for his employers into transaction relating to Simandou.

121.     This description leaves no doubt that the source was a Rio Tinto executive.  No other company would have allocated resources to investigate transactions relating to Simandou, and Rio Tinto would not deny that it had carried out many "inquiries" into Simandou-related transactions.  Rio Tinto had offices in Paris and Conakry at that time.  In reality, therefore, one of the most "trusted" and "credible" sources in the DLA Piper Report was a high-level executive of BSGR's largest competitor for the mining rights at issue with a clear motive to cause BSGR to

40

lose its Simandou rights. And the recent scandal which led to the firing or suspension of two of Rio Tinto's senior executives, Debra Valentine and Alan Davies, for their involvement in clandestine dealings and corrupt payments to a government official related to the Simandou mining rights in Guinea, confirms that DLA Piper were actionably complicit in treating Rio Tinto sources as capable of acting honestly or impartially.

122.    As further evidence of the DLA Piper Report's credibility scores' lack of utility, Source 03 "a private investigator based in New York state" could not be anyone else other than Fox. Fox, whose work has been found non-credible and unreliable by a neutral arbitration panel, was scored a 3, which the DLA Piper Report describes itself as being "Tested and confident in source's value."

123.    The DLA Piper Report also indicates that it relied on purported contracts with Madamie Touré, and information about whom was provided by Mebiame, who recently pleaded guilty to bribing the Government of Guinea, and who was after mining rights in Guinea himself (including BSGR's rights).

124.    On any objective view, the allegations made against BSGR in the DLA Piper Report, which were based in part on the Veracity Report issued by the discredited Fox, ought to have carried little to no weight. In practice, however, that report became the cornerstone of the entire pretextual "review process".

125.    The unreliable and misleading claims in Fox's Veracity report went into the DLA Piper Report and from there were transported into the formal allegations made by the government of Guinea against BSGR in the Allegations Letter, without any critical scrutiny along the way. The following paragraphs are just a few examples:

  a.  Without evidence, the Veracity Report claimed that Frederic Cilins caused pharmaceuticals to be imported into Guinea and donated to the Henriette Conté

41

Foundation (a charity of one of President Conté's wives). The report claimed these pharmaceuticals "cost between US$3,000 to US$4,000 per unit. However, the donated medicine had a perceived value far greater . . . The perceived value was in the tens of thousands of dollars." The DLA Piper Report restated but amplified the irresponsible statement: "Frederic Cilins procured a cargo of pharmaceutical products having a value of approximately 10,000 USD for Henriette Conté's foundation." In the Allegation Letter, Allegation 3 of the Allegations Letter simply repeated this accusation: "Mr. Cilins tried to develop a special relationship with Ms. Henriette Conté, the first wife of the former President of the Republic, Mr. Lansana Conté. He obtained pharmaceutical products with a market value of about USD10,000 and donated them to a charitable foundation headed by Ms. Conté."

b.  Similarly, the Veracity Report claimed that a BSGR employee "presented a scale model of a Formula 1 race car covered in diamonds under a Plexiglas cover to the Minister [of Mines] as a gift … The 'toy' car was presented during a televised ceremony. [Cilins] has no idea what became of the diamond-covered car, which was likely a 1/24 scale." The DLA Piper Report again repeats but embellishes. The DLA Piper Report says that in 2005 the Minister of Mines was delivered "a miniature reproduction of a Formula 1 racecar (1/24 scale) in gold and set with diamonds, under a protective plexiglas cover. . . The value of this gift, and what became of it, is unknown. . . The delivery of this gift was made during a public ceremony." Allegation 7 simply repeats that that employee "offered a miniature Formula 1 race car to the Ministry of Mines, this car which had been rendered at a scale of 1:24, in gold and set with diamonds, under Plexiglas." Intolerably missing by the third iteration is the fact that the whole episode, done on TV, was obviously not a bribe and was entirely anodyne.

126.  Additionally, the Allegations Letter included numerous statements that the DLA

Piper Report itself said had little or no support, including:

a.  The DLA Piper Report said about alleged cash payments to military leaders in Guinea in 2009-2010, that "information […] is limited" and that there was "no clear information that would make it possible to establish a connection between cash payments […] involving BSGR's rights to Simandou". But it was included in the Allegations Letter at Allegation 22.

b.  The DLA Piper Report concluded about an alleged delivery of a cheque by BSGR to Ms Touré for "10 or 7 million USD", which apparently bounced, that it was "unusual for payments of this type to be made [i.e. by cheque]" and "it appears strange that the cheque was refused". The report was unable to identify any evidential basis for this allegation. But this was included in the Allegations Letter at Allegation 10.

c.  As to one of the central allegations of bribery, the DLA Piper Report conceded: "Currently, no evidence has been found, but it is certain that monetary benefits offered during this period would have reached into the several millions of dollars." If

42

there is no evidence, as the report claimed, it was wholly inappropriate to make this assertion. Yet, it is included in the Allegations Letter at Allegation 23.

127. Simply put, the Technical Committee's "investigation" was a farce, spewing the "Garbage Out" from the Soros-driven "Garbage In"; it served merely to establish the illusion of legitimacy in the illicit campaign to rid BSGR of its rights (BLOOMBERG, *Steinmetz $9 Billion Fortune at Risk in Soros-Backed Probe*, 5/9/2013).

128. This was all part of defendants' use of its agents DLA Piper and Veracity as a conduit to transmit misleading statements to the Technical Committee, while at the same time making the process appear to be objective and impartial. In fact, in the Allegations Letter (which relied on DLA Piper and Veracity's false reporting) the Technical Committee falsely told plaintiffs that the purpose of the letter was for an "**objective and rigorous review of all of the records . . . before making its recommendations to the Strategic Committee** . . . ." Yet, in the very same letter, the Technical Committee stated that BSGR had not provided an "adequate response" to the November 17, 2011 letter from the Minister of Mines. This despite the detailed response, access to a data room, and production of over 50,000 pages of hard copy documents in response to that letter.

129. Indeed, despite being charged with investigating all of the mining companies, the Technical Committee focused only on BSGR and did not apply similar scrutiny to its "investigations" of any other mining companies.

130. To cause BSGR further damage, Soros and his coconspirators leaked the contents of the Allegations Letter to the press prior to its being sent to BSGR (and despite the fact that it was supposed to be confidential). Soros and his agents arranged the leak to Misha Glenny of the FINANCIAL TIMES, who then co-authored the article (*see* FINANCIAL TIMES, *Guinea's first freely elected government reignites $2.5bn mining tussle*, 11/2/2012). Notably, Glenny sits on the

43

advisory board of Global Witness, a non-governmental organization that derives approximately 50% of its income from Soros-related entities, including OSF. Global Witness was later used by Soros and his agents improperly to continue to spread the unfounded and untrue allegations concerning BSGR.

131. The publication of the Allegations Letter caused Mebiame to approach Thiam (former Minister of Mines for Guinea). According to a transcript of a December 2, 2012 conversation between Mebiame and Thiam, Mebiame admitted to Thiam that he had been directly involved in trying to take shares in Guinean state mining assets away from the companies who contractually owned those assets. Mebiame told Thiam that BSGR was the first "case" that he was given.

132. Recent evidence from the criminal trial of Thiam in the United States provides further confirmation that while companies like Rio Tinto and BHP offered bribes to gain influence, BSGR did not. For example, in a publically available tape recorded interrogation of Thiam by the FBI concerning his acceptance of bribes relating to Guinean mining, Thiam stated that Steinmetz "never offered me anything. He had no reason." He explained that BSGR:

> **was not in violation . . . . [Steinmetz] was in a position where the private government had legally awarded him that permit. . . .** He was doing his work. He was actually working faster than the others. And the only thing he needed is when he was under attack that the government or the ministry comes and makes sure that the law is applied. So he had no reason to pay anyone.

133. Thiam later added, "When I came in, [BSGR] had the permit legally in hand. It went through every single step required by the mining process to get to where he was. He had all the approvals and decrees. . . . According to Guinean law, the permit was legally obtained. It was illegally seized. It was legally obtained according to the Guinean mining law." By contrast, in the same interrogation, Thiam reported receiving offers of bribes from Rio Tinto, Rusal and

BHP.  This same evidence was given by several Guinean officials in various of the proceedings that Soros has caused to be initiated against BSGR.

### C.  Soros and OSF Cause FTI to Cancel Its Contract With BSGR

134.    Once the Allegations Letter was leaked, Soros sought to prevent BSGR from adequately responding to the media attention which followed, by pressuring its public relations firm, FTI, improperly to terminate its agreement with BSGR, and instructing his agents to continue to disseminate unfounded and untrue rumors concerning BSGR to the media.

135.    BSGR had retained FTI as its communications consultant in May 2009 to defend and protect BSGR's interests after it became aware of untrue allegations being made by a competitor, Rio Tinto.  Yet, on November 14, 2012, a point at which BSGR had its greatest need for FTI's expertise, FTI terminated the contract without notice.  FTI provided little to no explanation, stating only that "circumstances have created a business conflict which cannot be allowed to continue."

136.    Those "circumstances" were precipitated by the continued pressure exerted on FTI by Soros, OSF, and their agents to cancel the contract.  They did so through a close friend of Soros, who sat on the boards of several non-governmental organizations sponsored by Soros.  At the same time, that person also served as FTI's Chairman of Europe, Middle East, and Africa. At or around the same the Soros-driven Allegations Letter was leaked to the FINANCIAL TIMES, Soros or his agents frequently called and effectively forced his friend at FTI to cancel the BSGR contract.  According to FTI, Soros requested that the agreement be terminated on the basis of several unspecified allegations regarding the integrity of BSGR's business practices, and even went as far as to claim to FTI that individuals affiliated with BSGR were involved in a plot to assassinate Condé in 2011 without citing any evidence for this scurrilous allegation.

137.     On October 29, 2012, Mr. Brewerton, the head of the FTI account team for BSGR, told Mr. Dag Cramer of Onyx, an agent for BSGR, that "George Soros had personally requested" that FTI "cancel its contractual arrangements with BSGR." Additionally, Soros' friend at FTI, Lord Malloch Brown, informed OSF that FTI had terminated its retainer with BSGR, even before that issue had been discussed with BSGR itself.  A financial advisor to BSGR was informed by a Managing Director contact at FTI, Ben Brewerton, that "George Soros had requested directly of [Lord Malloch Brown] that [FTI] cancel its contractual arrangements with BSGR."

138.     Making matters worse, Soros also caused the fact of the contract's termination to be leaked to the FINANCIAL TIMES before BSGR was notified.  An individual at FTI informed BSGR that a journalist for the FINANCIAL TIMES, who had previously been involved with articles making allegations against BSGR, knew that BSGR lost its contract at least nine days before it was terminated.

139.     These efforts were intentionally done by Soros, OSF, and their agents, and were strategically timed to cause maximum damage to plaintiffs.  According to individuals at FTI, Soros's plan all along was to "key this thing up [*i.e.*, the investigation of BSGR] for the committee to review," and his effort to interfere with BSGR's agreement left BSGR, in FTI's words, "up a creek without a paddle."

### D.  Soros and OSF Continue Spreading Unfounded and Untrue Accusations Of and Concerning Plaintiffs

140.     Soros, OSF, and its agents, including DLA Piper, continued to spread these unfounded and untruthful allegations concerning BSGR.  For example, during a radio interview on July 5, 2013, Horton described the Simandou deal as "fundamentally wrong", "one of the most astonishing corruption plays" he had ever seen and that there was "little factual doubt" in

46

the truth of the allegations.   Similarly, suggesting the guilt of individuals associated with BSGR, in an article in THE NEW YORKER, dated July 8, 2013, Horton states that "Steinmetz's future travel options may be limited".  Horton made these statements notwithstanding the lack of factual basis of the DLA Piper Report and the Allegations Letter, and even though the Technical Committee "review" (as to which DLA Piper was purportedly "advising" the Committee, at the behest of Soros) was still underway.

141.    While one Soros-controlled NGO was providing legal and framework assistance (*see* ¶¶ 76-77), Soros' mouthpiece Global Witness (which Soros heavily funded and still does) launched a media attack against BSGR, publishing Horton's unfounded and untruthful allegations in a series of press releases.  This is indicative of defendants' strategy:  to orchestrate Soros' alter egos – his controlled NGOs – to work in unison toward a common goal or purpose, in this case to discredit BSGR and create an echo chamber of false allegations about its legitimate business activities.

142.    Soros used Global Witness as part of his scheme.  In fact, as reported in the press "Soros is one of the biggest contributors to Global Witness's financial basket. . . . [A]nd there is a report stating that an investigation by Global Witness into corruption in Guinea was largely influenced by George Soros himself" (*See* HUFFINGTON POST, *George Soros' Machination and the Left's Hypocrisy*, 6/9/2017).

143.    In furtherance of defendants' scheme, which rested in part on "buy-in" from the public at large (including the Guinean people, who stood to lose the most), while the Technical Committee was conducting its "review," Soros-controlled Global Witness issued a series of releases and reports that falsely accused BSGR of corruption.  For example, on November 9, 2012, Global Witness issued a press release about BSGR stating that "Global Witness believes

that the Guinean government should seek redress for any large-scale corruption that has taken

place in relation to the blocks covering Simandou or any other asset."

144.    On April 16, 2013, Global Witness issued a further press release headed

"Corruption arrest in US puts Beny Steinmetz Group Resources in the frame."  It noted that "If

BSGR wishes to put an end to this controversy it should publicly address these questions in

detail."

145.    On April 19, 2013, Global Witness published a report based on documents

purported to be evidence of BSGR's bribery.  The Global Witness report comments that ". . . we

have seen three **leaked** letters from BSGR to the review committee" (documents submitted to the

Technical Committee were deemed confidential under the "terms of Reference for Guinea

Contract review process" attached to the Allegations Letter).  Global Witness concluded: "it's

time BSGR stopped dodging the questions – and started providing answers."

146.    On July 18, 2013, Corinna Gilfillan, a director at Global Witness, testified at a

hearing before the U.S. House of Representatives' Subcommittee on Africa, Global Health,

Global Human Rights, and International Organizations, a subcommittee of the Committee on

Foreign Affairs.  Ms. Gilfillan's false testimony concerning Guinean mining – which mentioned

only BSGR by name – concluded "[t]he evidence suggests that BSGR may have obtained its

rights to one of the world's most important mining assets through bribery."

147.    On August 15, 2013, Global Witness issued a press release headed "New

evidence ties BSGR to company behind Guinea mine bribery", attaching a 12-page briefing

containing allegations against BSGR.  This demonstrated that Global Witness had been given

access to the Technical Committee's information notwithstanding the fact that the Technical

Committee information was to be kept confidential.

148.     As a lynchpin to forging their "united position", defendants used Global Witness to encourage international authorities to criminally investigate BSGR.  On September 5, 2013, Global Witness issued a press release headed "SFO should act to investigate London link in BSGR's Guinea mine scandal".  It called upon both the UK Serious Fraud Office and the Guinean authorities to commence criminal investigations into BSGR and carry out searches on their premises.  It said that: "The UK Serious Fraud Office should take action following police raids in Switzerland and France on properties linked to Onyx Financial Advisors . . . . Officials in the dependency of Guernsey should also move to secure evidence from BSGR's official headquarters on the island . . . . Global Witness calls on the SFO to act swiftly before evidence is lost."

149.     Additionally, the July 8, 2013 article in THE NEW YORKER that accuses Steinmetz of securing Simandou through corrupt means includes quotes from Soros and Horton and other Soros related individuals.

### E.  Soros and OSF's Scheme is Successful in Delaying, Damaging, and Destroying Plaintiffs' Guinea Investment

150.     BSGR presented the government of Guinea exculpatory material proving the falsity of the allegations against it.  In addition to the material provided earlier in response to the letter from the Minister of Mines, on December 26, 2012, BSGR responded to the Allegations Letter.  On numerous occasions, BSGR asked the Technical Committee to disclose its evidence. It was not until May 7, 2013, that the Technical Committee provided a handful of documents, and only after these documents had been leaked to the press.  The Technical Committee repeated the allegations in an Allegations Letter dated November 1, 2013.  Then, after additional requests for disclosure, the Technical Committee disclosed more documents on December 4, 2013.  In the December 4, 2013 letter, the Technical Committee stated that it was relying upon the Veracity

Report "to confirm the allegations contained in the successive letters previously sent by the CTRTCM [Technical Committee]". BSGR responded to the allegations by letter again on December 8, 2013.

151.    Yet, despite this, on March 21, 2014, the Soros funded Technical Committee – without justification – recommended that the Minister of Mines (1) withdraw the Blocks 1 and 2 Permit; (2) withdraw the Zogota Mining Concession; and (3) cancel the Convention. The Technical Committee continued to rely upon the Veracity report, the DLA Piper report and it also improperly relied on an unreliable affidavit of Mamadie Touré dated December 2, 2013, as well as on forged contracts shown to DLA Piper by Mebiame. DLA Piper was also in the chain of custody concerning the contracts.

152.    In 2013 Mamadie Touré received at least $50,000 in checks from Mamoudou Kouyaté (special advisor to President Alpha Condé) and thereafter a possible $80,000 more from an agent or associate of Soros. These payments alone make the affidavit unreliable.

153.    Kouyaté later authored an affidavit in which he makes clear that he served as an agent of DLA Piper: "On 6 July 2013, I met with Ms. Yarié Touré . . . I met her at the request of the DLA office to obtain information on the relationship maintained by her sister, Mamadié Touré with the late General Lansana Conté, former President of the Republic of Guinea."

154.    The Technical Committee did not discuss or reference any of the evidence provided by BSGR.

155.    On April 2, 2014, the Strategic Committee issued an opinion to President Alpha Condé and the Minister of Mines and Geology agreeing with the Technical Committee's report and recommendation.

156. On April 17, 2014, President Condé issued an Order terminating the Zogota Mining Concession to BSGR.

157. On April 18, 2014, the Minister of Mines and Geology of Guinea terminated the Block 1 & 2 Permit to BSGR.

158. On April 23, 2014, the Minister of Mines and Geology of Guinea terminated the Convention with BSGR.

159. On April 24, 2014, the government of Guinea informed BSGR of the acts of revocation and termination.

160. This was a *fait accompli*. Prior to even the commencement of the review, it is obvious that Guinea viewed the removal of BSGR's contractual rights as a foregone conclusion. Well before the Technical Committee had completed its review, both the Minister of Mines and President Condé had made it clear that BSGR's mining rights were going to be revoked, as did Soros's agent DLA Piper through Horton's public statements in 2013 impugning BSGR and Steinmetz. In October 2013, President Condé declared in a speech that his government had "started a battle to recover our mines that were acquired fraudulently." In an interview in November 2013 he likewise made it clear that he had decided that BSGR's mining rights should be removed and that he was very closely involved in the Committee process.

V. **Predicate Illegality 4: Soros Seals the Interference, and BSGR's Fate, Through Bribing Guinean Officials**

161. To make sure it all worked as he designed it, Soros paid Mamadie Touré (para. 151, supra) as well as Guinean officials to influence proceedings in Guinea and cause the termination of the BSGR mining agreements. Based on the duly executed declaration of an intermediary involved in the transactions, who avows to first-hand knowledge, Soros arranged

for money to be paid personally to the head of the Technical Committee and a member of the Strategic Committee to ensure that BSGR's rights were terminated.

162.     Specifically, Soros' son Robert Daniel Soros, through the intermediary, who served as a coordinator for the government of Guinea, made payments to the head of the Technical Committee with the purpose and intent to influence the Technical Committee review process and cause the termination of BSGR's mining agreements, permits, and licenses.  On or about April 2, 2013, through his son Robert Daniel Soros, Soros transferred $93,000 to the government coordinator who, on the following day, made a payment of the $93,000 to Mr. Nava Touré, the chairman of the Technical Committee.  Robert Daniel Soros told the coordinator that the payment was to ensure that the Technical Committee would terminate BSGR's mining agreements.

163.     Similarly, on or about March 26, 2014, Soros' son Jonathan Soros contacted the intermediary and instructed him to transfer $1,270,000 that had been deposited into the intermediary's account to the account of Mr. Yansané Kerfalla, the Minister of Finances and a member of the Strategic Committee that reviewed the recommendations of the Technical Committee as to BSGR's mining agreements.  The intermediary was told by or on behalf of Soros that this payment was intended to influence the Strategic Committee to terminate BSGR's mining rights.

164.     Thus, Soros exercised complete control over the process – he initiated the breach by his pay up or be terminated ultimatum and publicly announced it with Condé; Guinea couldn't afford the apparatus of its deceptive investigation without Soros, so he enlisted his funded organizations using his "direct advocacy and public outreach" strategy; he used his own investigator and lawyer to carry out his wishes, placing them in positions of influence over the

ostensibly neutral Technical Committee; and to make sure it all worked as he designed it he paid off the people in the government to make sure the termination went through.

165.    The terminations of BSGR's agreements with the government of Guinea breached BSGR's contractual rights and harmed BSGR. There would not have been a breach but for the activities of defendants. The terminations were the culmination of the lengthy scheme by Soros, the OSF Entities, and their agents to interfere with its contractual rights and remove it from Guinea.

166.    These terminations not only harmed BSGR by removing from it a contract worth at least $5 billion, but they also ensured that the investment of at least $800 million by BSGR was lost. To date, Guinea has not compensated BSGR for its $800 million investment in Guinea. What is more, Guinea kept the fruits of BSGR's capital and labor – including the feasibility studies for Zogota and Simandou Blocks 1 & 2, the work undertaken at Zogota, the progress made on various railways, and the camps and expensive equipment at BSGR's sites, estimated at an over $5 billion loss. BSGR has since challenged Guinea's conduct in an arbitration currently pending in Paris before the International Centre for Settlement of Investment Disputes, the allegations of which are not repeated here. *See BSG Resources Limited, et al. v. Republic of Guinea*, Case No. ARB/14/22.

## VI.    Predicate Illegality 5: Soros and OSF Continue to Harm BSGR Even After Delaying, Damaging, and Destroying Plaintiffs' Investment in Guinea

167.    Soros and OSF used their wide networks to place worldwide pressure on BSGR, including provoking the unjustified opening of criminal investigations, in furtherance of their conspiracy to harm plaintiffs.

168.    For example, Soros used his political connections with President Obama and the U.S. Administration to organize a meeting between Condé and President Obama that is believed

to have taken place in 2011.  Shortly thereafter, as Soros intended and through the use of his law

firm and agent DLA Piper, an investigation was opened into BSGR and connected entities.

169.    As a result of Soros's wrongdoing, a criminal investigation in Guinea was

commenced into BSGR and its employees.  As a result, Guinea arrested and prosecuted two of

BSGR's employees, Mr. Issiaga Bangoura and Mr. Ibrahima Soury Touré.  These arrests were

made respectively on April 16, 2013 and April 19, 2013 on the ground of passive corruption.

The employees were held without trial or due process for seven months.

170.    On November 13, 2013, both employees filed a complaint of violation of human

rights at the Registry of the ECOWAS Community Court of Justice. They relied inter alia on

Articles 9 and 14 of the International Convention on Civil and Political Rights (ICCPR), Articles

7, 9 and 10 of the Universal Declaration of Human Rights (UDHR) and Articles 6 and 9 of the

African Charter on Human and Peoples' Rights (ACHPR).  On February 16, 2016, the

ECOWAS Court of Justice delivered a verdict against Guinea in relation to its so-called

corruption investigation.  In particular, Guinea was found guilty of arbitrary detention, violating

the right to an effective recourse, and violating the principles of adversarial proceedings and

equality of arms.  To repair Guinea's violations, the ECOWAS Court of Justice ordered Guinea

to indemnify Mr. Bagoura and Mr. Touré and pay them respectively CAF 15 million and 30

million.

171.    The pressure placed on Israel by the Organization for Economic Cooperation and

Development ("OECD") based on these unfounded and untrue allegations ultimately led to the

opening of a criminal investigation into Mr. Steinmetz.  As the Israeli authorities made clear in

their statement to the media, "*[t]he investigation is being carried out in cooperation with law

enforcement authorities in the United States, Switzerland, Guinea and Israel, **as part of an***

***international effort led by the OECD*** *against the bribing of public officials worldwide*"

(emphasis added). It is noteworthy that the OECD High-Level Advisory Group on Anti-

Corruption is made up of individuals who are intimately related to Soros and the OSF Entities as

well as NRGI (formerly RWI) and other NGOs working closely with each other and Rio Tinto.

Mr. Neville Tiffen is a member of the Board of Transparency International Australia (and former

global head of Compliance for Rio Tinto reporting to Debra Valentine, Rio Tinto former head of

legal and compliance, suspended in relation to de Combret scandal) and Nancy Boswell is the

former CEO of Transparency International ("TI") in the United States, which is supported by

OSF, Daniel Kaufmann is the President and CEO of NRGI (formerly RWI, which was intimately

involved in Guinea's revocation of BSGR's rights) and a member of the Advisory Board of TI,

Peter Eigen is the founder of TI, a previous chairman of EITI (and today a special representative

of EITI) and a member of the advisory council of NRGI, and Huguette Labelle is the former

Chairman of the Board of Directors of TI. The OECD Advisory Council acted as agents for

defendants to pressure Israeli authorities to open their investigation, causing yet further damage

to plaintiffs and providing a cloak of legitimacy to Guinea's revocation of BSGR's rights.

172.    Defendants continued to spread the untrue and unfounded allegations including

within the past twelve months. For example, a December 19, 2016 article stated, "[a]ccording to

Global Witness, which investigated the case, BSGR and its affiliates engaged in a 'sophisticated

corruption scheme' over Simandou cloaking their activities through secretive companies in the

British Islands" (ASSOCIATED PRESS, *Israeli police arrest tycoon suspected of bribery in Guinea*,

12/19/2016).

173.    This continued campaign by Soros and OSF and their agents against plaintiffs has

caused BSGR to lose many business opportunities.

174.    For example, recently a Steinmetz related entity spent three years negotiating the purchase of certain assets sold by the largest gas company in Israel.  The parties had reached agreement subject to governmental approval.  The Israeli Minister of Petroleum refused to approve the sale because of the unfounded rumors and investigations instigated by Soros and the OSF Entities.  As a direct, proximate result of Soros and the OSF Entities' actions, this entity lost at least $500 million.  This BSGR entity has transferred its rights to bring this action to BSGR.

175.    Plaintiffs have complied with their obligations under the Convention and related agreements and have satisfied any and all conditions precedent to suit on any contract or other claims herein, except those that have been waived.  In the exercise of reasonable diligence, plaintiffs did not and could not have found out the fraud and other wrongdoing acted upon them until within any applicable limitations period.

## CLAIMS FOR RELIEF

### Count 1:  Tortious Interference With Contract
### (Against all Defendants)

176.    BSGR repeats and realleges all other paragraphs of this Amended Complaint as if fully set forth herein.

177.    On December 9, 2008, the Republic of Guinea granted the Blocks 1 and 2 Permit, pursuant to which BSGR was granted the right to prospect for iron ore in Simandou Blocks 1 and 2.

178.    On December 16, 2009, BSGR Guernsey, BSGR Guinea, and the Republic of Guinea entered into the Convention, pursuant to which BSGR was granted the exclusive right to conduct commercial mining activities in the Simandou South region of Guinea, and which permitted BSGR to export and sell on the international market all iron ore located therein.

179.    On March 19, 2010, Guinea, under its new president General Sékouba Konaté, ratified the Convention through the Zogota Mining Concession, which granted to BSGR Guinea an exclusive mining concession in Simandou South.

180.    The Convention and related agreements constitute valid, legal, binding, and enforceable contracts.

181.    At all relevant times, Soros (individually and in his capacity as founder and chairman of OSF) and other of Soros's agents were fully aware of the Convention and related agreements and of plaintiffs' rights thereunder.

182.    At all relevant times, Soros (individually and in his capacity as founder and chairman of OSF) and other of Soros's agents also were fully aware of BSGR's rights under the Convention and related agreements, as demonstrated by (among other things) a March 3, 2011 draft memorandum of understanding between OSF and a Vale entity, titled "Regarding a Possible Advance Payment of Tax on Mining Substances from Projects in the Republic of Guinea," which expressly referred to those rights.

183.    Soros and the OSF Entities utilized wrongful means to induce the Government of Guinea to breach the Convention and related agreements and delay, damage, and terminate BSGR's rights thereunder in April 2014.

184.    The intentional acts described above, by and on behalf of Soros and the OSF Entities, were the direct, proximate, and foreseeable cause of Guinea's breach of the Convention and related agreements pursuant to which BSGR was unlawfully stripped of its valuable mining and prospecting rights in Guinea.  But for the intentional acts undertaken by defendants and their agents, the Convention would not have been breached.

185.    The aforementioned acts of Soros, the OSF Entities, and their agents were willful,

wanton, oppressive, fraudulent, and malicious, demonstrating such a dishonesty as to imply a

criminal indifference to their private and public civil obligations and thereby warranting an

award of punitive damages, in addition to the actual damages suffered by BSGR.

186.    As a result of the foregoing, BSGR has sustained severe economic injury for

which it is entitled to compensatory, exemplary, and punitive damages in amounts to be

determined at trial as well as equitable relief including without limitation an injunction directing

defendants to cease and desist from the improper activity including the dissemination of the

unfounded and untrue allegations described in this Amended Complaint and a constructive trust

and overseer over Soros's controlled or influenced organizations as well as an order directing

defendants to take all steps necessary to secure the return of all rights wrongfully interfered with

or converted.

### Count 2:  Conspiracy to Commit Tortious Interference With Contract and Other Illegal Acts (Against all Defendants)

187.    BSGR repeats and realleges all other paragraphs of this Amended Complaint as if

fully set forth herein.

188.    Defendants Soros and the OSF Entities, knowingly, intentionally, and corruptly

acted in concert and conspired to delay, damage, and terminate BSGR's rights under the

Convention and related agreements, and to that end, tortiously interfered with BSGR's

contractual rights as alleged herein.

189.    Their agreement to interfere with plaintiffs' rights began earlier than March 2011

when Soros and advisors, including those from the OSF Entities, met with Condé in Guinea, and

announced their "support" for Condé's plan to re-examine existing mining contracts and desire

to "help President Condé put these [plans] into effect".  (Press Release, Open Society

58

Foundations, *George Soros and President Alpha Condé of Guinea Hold Joint Press Conference*, 3/2/2011.)

190.    Soros and the OSF Entities intentionally participated in, and took overt acts in furtherance of, their agreement, demonstrating their shared corrupt purpose.

191.    These and other intentional acts actually, directly, and proximately caused Guinea to breach the Convention and related agreements, thereby unlawfully stripping BSGR of its rights.  But for the intentional acts undertaken by Soros and the OSF Entities and their agents and coconspirators, the Convention and related agreements would not have been breached.

192.    The aforementioned acts of Soros and the OSF Entities were willful, wanton, oppressive, fraudulent, and malicious, demonstrating such a dishonesty as to imply a criminal indifference to their private and public civil obligations and thereby warranting an award of punitive damages, in addition to the actual damages suffered by BSGR.

193.    As a result of the foregoing, BSGR has sustained severe economic injury for which it is entitled to compensatory, exemplary, and punitive damages, jointly and severally from each defendant, in amounts to be determined at trial as well as equitable relief including without limitation an injunction directing defendants to cease and desist from the improper activity including the dissemination of the unfounded and untrue allegations described in this Amended Complaint and a constructive trust and overseer over Soros's controlled or influenced organizations as well as an order directing defendants to take all steps necessary to secure the return of all rights wrongfully interfered with or converted.

**Count 3:  Fraud, Misrepresentation, and
Conspiracy to Commit Fraud and Misrepresentation
(Against George Soros)**

194.    BSGR repeats and realleges all other paragraphs of this Amended Complaint as if fully set forth herein.

59

195.     Soros conspired with others, including members of the Technical Committee, fraudulently to induce the Technical Committee to make it appear that it was conducting an impartial and fair review when in fact it was carrying out defendants' illegal racketeering activities.

196.     Soros publically announced that "all mining contracts" would be "re-examined and **those who want to validate those claims will have to subscribe to the principles of EITI** . . . ." These statements implied a fair and impartial review of BSGR's Convention and related agreements.

197.     Soros's statements were false or misleading. In fact, the process was rigged to reach the conclusion that BSGR's Convention and related agreements should be terminated and its valuable rights revoked. Soros knew upon making these statements that the conclusion of the Technical Committee was pre-ordained and that his statements were false or materially misleading.

198.     In order to ensure that the Technical Committee and then the Strategic Committee achieved the desired result and terminated the mining agreements, permits, and licenses of BSGR, George Soros directed certain of his sons (acting as his agent for these purposes) to pay money to directly to members of the committees. For example, in or around April 2013, he directed his son Robert Daniel Soros to pay money to Nava Touré (head of the Technical Committee) through an intermediary. He also directed his son Jonathan Soros to ensure that payments of more than one million dollars were made to Yansane Kerfalla (then the Minister of Finances and a member of the Strategic Committee) through intermediaries in or around March, 2014.

199.    Soros conspired with and/or misled members of the Technical Committee, with

the intention and effect of defrauding plaintiffs, and the Technical Committee did not disclose to

BSGR that the process was rigged, though defendants and they had a duty to do so.

200.    To the contrary, the Technical Committee stated that it would be conducting a

legitimate, fair, and impartial investigation.

201.    Soros never disclosed his corruption of the Committee or the fact that any

conclusion by the Committee was dictated by Soros in advance and continued to mislead

plaintiffs.  Despite plaintiffs' concerns about procedural irregularities, they expended significant

resources and effort in reliance on the independence of the Committee and its obligation to

consider plaintiffs' evidence provided in rebuttal to the irresponsible allegations of wrongdoing,

and to demonstrate that there was no basis for these claims.  It was never disclosed to plaintiffs

that because the Committee's conclusion was preordained by Soros, it never considered – and

never planned to consider – this evidence.

202.    In addition, BSGR spent money on developing its mining capability and rights.

203.    The aforementioned acts of Soros were willful, wanton, oppressive, fraudulent,

and malicious, demonstrating such a dishonesty as to imply a criminal indifference to their

private and public civil obligations and thereby warranting an award of punitive damages, in

addition to the actual damages suffered by plaintiffs.

204.    As a result of the foregoing, plaintiffs have sustained severe economic injury for

which they are entitled to compensatory, exemplary, and punitive damages, jointly and severally

from each defendant in amounts to be determined at trial including by expending funds to defend

itself and to continue to invest in Guinea as well as equitable relief including without limitation

an injunction directing defendants to cease and desist from the improper activity including the

dissemination of the unfounded and untrue allegations described in this Amended Complaint and

a constructive trust and overseer over Soros's controlled or influenced organizations as well as

an order directing defendants to take all steps necessary to secure the return of all rights

wrongfully interfered with or converted.

### Count 4:  Commercial Defamation
### (Against all Defendants)

205.    BSGR repeats and realleges all other paragraphs of this Amended Complaint as if

fully set forth herein.

206.    Soros and the OSF Entities made statements about BSGR's alleged corruption

that Soros and the OSF Entities knew or should have known were unfounded and untrue.

207.    These statements were published to the media and government organizations with

the intention to impact and harm BSGR.

208.    As a direct and proximate result of these statements, BSGR was injured by losing

business opportunities that but for the defamatory statements it would have obtained.

209.    The aforementioned acts of Soros and the OSF Entities were willful, wanton,

oppressive, fraudulent, and malicious, demonstrating such a dishonesty as to imply a criminal

indifference to their private and public civil obligations and thereby warranting an award of

punitive damages, in addition to the actual damages suffered by plaintiffs.

210.    As a result of the foregoing, plaintiffs have sustained severe economic injury for

which they are entitled to compensatory, exemplary, and punitive damages, jointly and severally

from each defendant, in amounts to be determined at trial including by expending funds to

defend itself and to continue to invest in Guinea as well as equitable relief including without

limitation an injunction directing defendants to cease and desist from the improper activity

including the dissemination of the unfounded and untrue allegations described in this Amended

Complaint and a constructive trust and overseer over Soros's controlled or influenced organizations as well as an order directing defendants to take all steps necessary to secure the return of all rights wrongfully interfered with or converted.

### Count 5:  Prima Facie Tort
### (Against George Soros)

211.     BSGR repeats and realleges all other paragraphs of this Amended Complaint as if fully set forth herein.

212.     Soros and the OSF Entities intentionally sought to harm BSGR through the actions described above.  Soros has a long standing antipathy towards BSGR and Mr. Steinmetz and wanted BSGR's contracts with Guinea to be delayed and terminated or heavily curtailed.

213.     Solely for the purposes of this cause of action, and in the alternative, plaintiffs plead that Soros was motivated solely by malice, as there was no economic interest he had in Guinea.

214.     The intentional acts described above, by and on behalf of Soros, were the direct, proximate, and foreseeable cause of Guinea's breach of the Convention and related agreements pursuant to which plaintiffs were unlawfully stripped of their valuable rights in Guinea.  But for the intentional acts undertaken by Soros, OSF and their agents, the Convention and related agreements would not have been breached.

215.     The aforementioned acts of Soros and OSF were willful, wanton, oppressive, fraudulent, and malicious, demonstrating such a dishonesty as to imply a criminal indifference to their private and public civil obligations and thereby warranting an award of punitive damages, in addition to the actual damages suffered by plaintiffs.

216.     As a result of the foregoing, plaintiffs have sustained severe economic injury for which they are entitled to compensatory, exemplary, and punitive damages in amounts to be

determined at trial including by expending funds to defend itself, to be determined at or after trial, and to continue to invest in Guinea as well as equitable relief including without limitation an injunction directing defendants to cease and desist from the improper activity including the dissemination of the unfounded and untrue allegations described in this Amended Complaint and a constructive trust and overseer over Soros's controlled or influenced organizations as well as an order directing defendants to take all steps necessary to secure the return of all rights wrongfully interfered with or converted.

217. As a result of the foregoing, BSGR has sustained specific damages as follows:

   a. BSGR invested $883,286,336.87 in investing in Guinea on infrastructure and setting up the mining procedure based on its existing contractual rights prior to termination. Specifically: (a) $581,197,104 to develop the iron ore concession and for infrastructure building; (b) $84,400,000 in funding for the Simandou feasibility study; and (c) $80,400,000 for management and control of the day-to-day business activities consisting of $44,800,000 for personnel, $20,200,000 for travel, $15,000,000 for services and $400,000 on miscellaneous expenses. In addition, between 2006 and 2010: (i) $47,519,203.83 for contractors and suppliers; (ii) $2,492,655 for salaries; (iii) $15,412,251,32 for headquarters and expenses for mining camps; (iv) $541,274.47 converting dollars into Guinean Francs; $73,848.25 for the country manager; and (v) $71,250,000 for accounting, financial, tax, advisory, legal, technical, geological and mining services, information technology and administration services.

   b. The contract itself is conservatively worth $5 billion calculated by doubling the amount paid for half of the rights by Vale in 2011.

**WHEREFORE**, BSGR demands judgment against defendants, jointly and severally, awarding plaintiffs:

(a) On the claims for tortious interference, civil conspiracy, fraud and misrepresentation, and conspiracy to commit fraud and misrepresentation, compensatory damages of not less than $10 billion, jointly and severally against each defendant, together with interest accrued thereon, in total amounts to be determined at trial;

(b) On the claim for commercial defamation, compensatory damages of not less than $10 billion, jointly and severally against each defendant, together with interest accrued thereon, in total amounts to be determined at trial.

(c) On the alternative claim for prima facie tort, relief  specifically of $5,883,286,336.87  together with interest accrued thereon, in total amounts to be determined at trial;

(d) On all claims for relief, exemplary and punitive damages in amounts to be determined at trial;

(e) Pre-judgment and post-judgment interest;

(f) Its costs in the prosecution of this action, including reasonable attorneys' fees and expenses;

(g) On all claims for relief, an injunction directing defendants to cease and desist from the improper activity including the dissemination of the unfounded and untrue allegations described in this complaint;

(h) On all claims for relief, equitable relief including without limitation a constructive trust and overseer over Soros's controlled or influenced organizations as well as

65

an order directing defendants to take all steps necessary to secure the return of all

rights of plaintiffs wrongfully interfered with or converted; and

(i)  Such other and further relief as this Court deems just and proper.

**TRIAL BY JURY**

Trial by jury is demanded on all issues so triable.

Dated: June 30, 2017
New York, New York

GREENBERG TRAURIG, LLP

By:  ___/Louis M. Solomon___
     Louis M. Solomon

200 Park Avenue
New York, New York 10166
(212) 801-9200

Attorneys for Plaintiffs
BSG Resources (Guinea) Limited,
BSG Resources (Guinea) Sàrl and
BSG Resources Limited

# EXHIBIT A

# George Soros's Illegal Enterprise



**The Targets of Soros's Direct and Indirect Illegalities (Tortious Interference With Contract, Defamation, Fraud, Misrepresentation, Conspiracy, Prima Facie Tort):**



BSGR
BSG Resources

**COMPANIES RELATED TO STEINMETZ AND/OR BSGR**

**Intermediaries Misused By Soros (2 pictured here): Guinea and the OECD**

**Government of Guinea**

**Soros Causes Massive Harm**

OECD

**Organisation for Economic Co-Operation and Development**

**George Soros and His Army of NGOs**



OPEN SOCIETY FOUNDATIONS



TRANSPARENCY INTERNATIONAL

Extractive Industries Transparency Initiative

global witness

Natural Resource Governance Institute

EITI

Publish What You Pay

Open Government Partnership

**NGOs Controlled by Soros – e.g.,**