# EXHIBIT E

# Part VIII of VIII

Pièce n° 4

## Free Checking

WACHOVIA   01   1010278213492   036   60   0   11

Electronic Delivery

FREDERIC CILINS
BRIGITTE BURE
252 CHEMIN DES INDICAS
JUANLES PINS 06160
FRANCE                                    PB

---

## Free Checking

7/20/2010 thru 8/17/2010

Account number:   1010278213492
Account owner(s):   FREDERIC CILINS
BRIGITTE BURE

### Account Summary

| | |
|---|---|
| Opening balance 7/20 | $4,269.49 |
| Deposits and other credits | 151,290.00 + |
| Checks | 150,300.00 - |
| Other withdrawals and service fees | 1,780.64 - |
| Closing balance 8/17 | $3,458.85 |

### Deposits and Other Credits

| Date | Amount | Description |
|---|---|---|
| 7/22 | 93,970.00 | FUNDS TRANSFER (ADVICE 2010072200010415) RCVD FROM WELLS FARGO NY IMBANK LEUMI LE IS ORG=CILINS FREDERIC RFB=B14-05-0038659MU OBI= REF=1007221242005803 07/22/10 08:36AM ET |
| 8/04 | 7,350.00 | COUNTER DEPOSIT |
| 8/06 | 49,970.00 | FUNDS TRANSFER (ADVICE 2010080600007959) RCVD FROM WELLS FARGO NY IN/BANK LEUMI LE IS ORG=CILINS FREDERIC RFB=B14-05-0038917MU OBI= REF=1008051774002788 08/06/10 07:45AM ET |
| Total | $151,290.00 | |

### Checks

| Number | Amount | Date | Number | Amount | Date | Number | Amount | Date |
|---|---|---|---|---|---|---|---|---|
| 0096 | 100,000.00 | 8/02 | 0098 | 300.00 | 8/09 | | | |
| 0097 | 50,000.00 | 8/06 | Total | $150,300.00 | | | | |

REQUEST 00005377208000000 100000.00
ROLL ECIA   20100802 500001730524868
JOB ECIA  P  ACCT 4091010276213432
REQUESTOR U217693
6331170  05/21/2013

Subpoena Processing Philadelphia
Y1372-110
Philadelphia PA  19101

GJ-WF04-000174



RFDB Page 7 of 32

097

5th August 2010
Date

Pay to the Order of AMADIE TOURE    $ 50,000.00

fifty thousand dollars    Dollars

WACHOVIA
Wachovia Bank, a division of Wells Fargo Bank, N.A.

For

⑆067006432⑆ 10102762134 32⑈  0097  000 5000000

JUN 22 10

⑈063107513⑆
WACHOVIA    SWC055 5105
ORLANDO FL

323392810 7

REQUEST 00005377203000000 50000.00
ROLL HCIA  201008009 000003233928187
JOB HCIA P  ACCT 4001010276213432
REQUESTOR U217693
4331170 05/21/2013

Subpoena Processing Philadelphia
Y1372-110
Philadelphia PA 19101

GJ-WFB4-000178

Pièce n° 5

# MATINDA & CO. LTD

*11 Glasgow Street*
*Wilberforce, Freetown*

DATE: 22ᵀᴴ AUGUST 2009

INVOICE

| No | Item | Quantity | Unit Cost (USD) | Amount (USD) |
|----|------|----------|-----------------|--------------|
| 1 | New Caterpillar D9R Track-Type Tractor | 1 | 703,000 | 703,000 |
| 2 | New Caterpillar 336DL Track Excavator | 1 | 295,000 | 295,000 |
| | TOTAL | | | US $ 998,000 |

AMOUNT IN WORD:   ... ...ndred and Ninety Eight Thousand United States Dollars

STANDARD CHARTERED BANK, LONDON, ENGLAND
SWIFT A:    :SS: SCP" GB2I

TO CREDIT THE ACC... ... OF
FIRST INTERNATIONAL BANK (SL) Ltd
ACCOUNT No. 01 2527189 50
BENEFICIARY'S ACCOUNT No. 302124 - 01

Authorized Signature

Conakry le 3 Septembre 2009

A Mr Le Directeur Général de la F.I.B

Objet : Demande de changement du nom
de bénéficiaire d'un ordre de virement

Monsieur,

Je viens par la présente vous demander de bien vouloir procéder au changement du nom de
bénéficiaire de l'ordre de virement d'un montant de Neuf cent quatre vingt dix huit mille
dollars 998,000.00 USD.

Vous voudrez bien mettre MAMADIE TOURE comme bénéficiaire et le N° de compte :
1762717 de l'ordre de virement au lieu de MATILDA LTD initialement fait le 20 Aout 2009.

Vous en souhaitant bonne réception, veuillez croire Monsieur le Directeur Général à
l'expression de notre considération distinguée.

Ghassan Boutros
Directeur Général



REF: 10234/LP8130

INVOICE 489

DATE: 20/12/2009                    TO: L.M.S

| 01 | reparation circuit de control/Caterpillar s/n: cat4592032Ng23 | 01 | 2000 | 2000 |
|----|-----------------------------------------------------------------|----|------|------|
|    | TOTAL AMMOUNT (USD) | | US $ | 2000 |

Ammount in words : Two  Thousand United States Dollars.

ROKEL COMMERCIAL BANK (SL) LTD

25/27 SIAKA STEVENSSTREET,FREETOWN,SIERRA LEONE

SWIFT CODE: RCBKSLFR

BENEFICIARY'S A/C NO.   1732915



Authorized Signature



Pièce n° 6

Approved: _____
ELISHA J. KOBRE/STEPHEN SPIEGELHALTER
Assistant United States Attorney/
Trial Attorney, Criminal Division, Fraud Section

Before:   HONORABLE JAMES C. FRANCIS
          United States Magistrate Judge
          Southern District of New York

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK                       13 MAG 975
- - - - - - - - - - - - - - - - - - - - - - - -x

                                        COMPLAINT
UNITED STATES OF AMERICA,          :
                                        Violations of
          - v. -                   :    18 U.S.C. §§ 1512(c)(2),
                                        1510, 1519
FREDERIC CILINS,                   :

          Defendant.               :    COUNTY OF OFFENSE:
                                        NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - -x
SOUTHERN DISTRICT OF NEW YORK, ss.:

          PETER KILPATRICK, a Special Agent with the Federal Bureau
of Investigation ("FBI"), being duly sworn, deposes and states:

                           COUNT ONE
          (Tampering With A Witness, Victim, or Informant)

          1.   From at least in or about March 2013 through on or about
April 14, 2013, in the Southern District of New York and elsewhere,
FREDERIC CILINS, the defendant, willfully, knowingly, and
corruptly, did obstruct, influence, and impede official proceedings
and attempt to do so, to wit, CILINS offered money to another
person to cause that person to deliver to CILINS, for destruction,
documents required to be produced pursuant to a grand jury
subpoena.

          (Title 18, United States Code, Sections 1512(c)(2) and 2.)

                           COUNT TWO
          (Obstruction of a Criminal Investigation)

          2.   From at least in or about March 2013 through on or about
April 14, 2013, in the Southern District of New York and elsewhere,
FREDERIC CILINS, the defendant, willfully and knowingly, endeavored
by means of bribery to obstruct, delay, and prevent the

                                1

communication of information relating to a violation of criminal statutes of the United States by a person to a criminal investigator, to wit, CILINS offered money to another person in exchange for that person's agreement to provide to CILINS, for destruction, documents requested from that person by agents of the Federal Bureau of Investigation conducting an investigation relating to violations of criminal statutes.

(Title 18, United States Code, Sections 1510 and 2.)

COUNT THREE
(Destruction, Alteration, and Falsification of
Records in A Federal investigation)

3.    From at least in or about March 2013 through on or about April 14, 2013, in the Southern District of New York and elsewhere, FREDERIC CILINS, the defendant, willfully and knowingly, and with the intent to impede, obstruct, and influence the investigation and proper administration of a matter within the jurisdiction of a department and agency of the United States, namely the United States Department of Justice, and in relation to and in contemplation of such matter, did knowingly alter, destroy, mutilate, conceal, cover up, falsify, and make false entries in records, documents, and tangible objects, to wit, CILINS directed an individual, from whom agents of the Federal Bureau of Investigation conducting an investigation regarding potential violations of federal criminal law, had requested certain documents, to destroy those documents.

(Title 18, United States Code, Sections 1519 and 2.)

4.    I have been a Special Agent of the FBI for approximately 4 years.  During my time with the FBI, I have participated in public corruption and other white-collar investigations.  I am presently assigned to Squad C4, a public corruption and civil rights unit.  This squad investigates, among other things, white-collar crime, including violations of the Foreign Corrupt Practices Act, wire fraud, election crimes, and public corruption in and around New York.

5.    I have participated in the investigation of this matter, and I am familiar with the information contained in this Complaint based on my own personal participation in the investigation, my review of documents, conversations I have had with other law enforcement officers about this matter, my training and experience, and discussions I have had with other law enforcement personnel. Because this Complaint is being submitted for the limited purpose of establishing probable cause to arrest the defendant, I have not

2

included the details of every aspect of the investigation. Where actions, conversations and statements of others are related herein, they are related in substance and in part, except where otherwise indicated.

### THE DEFENDANT

6. From immigration records and from my participation in this investigation, I know that FREDERIC CILINS, the defendant, is a citizen of France who has identified himself as a representative of a particular business entity not based in the United States engaged in the mining industry (the "Entity"), as further described below.

### OVERVIEW OF THE DEFENDANT'S CRIMES

7. As described below, FREDERIC CILINS, the defendant, has made repeated efforts to obstruct an ongoing federal grand jury investigation in this District concerning potential money laundering violations and potential violations of the Foreign Corrupt Practices Act ("FCPA"), including such violations by a domestic concern as defined by the FCPA, relating to bribes to officials of a former government of the country of Guinea for the purpose of obtaining valuable mining concessions in Guinea. During monitored and recorded phone calls and face-to-face meetings with a cooperating witness assisting in this investigation, CILINS, among other things, agreed to pay large sums of money to the cooperating witness to induce the cooperating witness to: (1) provide to CILINS, for destruction, documents CILINS knew had been requested from the cooperating witness by special agents of the FBI and which were to be produced before a federal grand jury; and (2) sign an affidavit containing numerous false statements regarding matters within the scope of the grand jury investigation. CILINS repeatedly told the cooperating witness that the documents needed to be destroyed "urgently" and that CILINS needed to be present to personally witness the documents being burned.

### THE GRAND JURY INVESTIGATION

8. From my participation in this matter, I know that, from in or about January 2013 through the present, a federal grand jury in this District has been conducting a criminal investigation regarding potential violations of criminal law, including money laundering and conspiracy to commit money laundering, in violation of Title 18, United States Code, Sections 1956 and 1957; and violations of the Foreign Corrupt Practices Act, Title 15, United States Code, Section 78dd-3 (the "Grand Jury Investigation"). Among other things, the Grand Jury Investigation concerns the

3

transfer into the United States from outside the United States of payments in furtherance of a scheme to corruptly obtain valuable mining concessions in Guinea, including a particular valuable mining concession in Guinea's Simandou region (the "Simandou Concession").   Subjects of the Grand Jury Investigation include one or more "domestic concerns" within the meaning of the Foreign Corrupt Practices Act and certain of the proceeds of potential bribes were wired to or through this District.

9.    Based, among other things, upon my review of publicly-available press articles, I know that the current government of Guinea is conducting an investigation into potential corruption in Guinea by, among others, a particular business entity not based in the United States engaged in the mining industry (the "Entity"). The investigation by the government of Guinea concerns, among other things, whether the Entity or its affiliates obtained the Simandou Concession by means of bribes paid to officials of a former government of Guinea.  For example, a November 2, 2012 article in the <u>Financial Times</u> (the "FT Article") reported that "a [Guinean] government committee has launched a corruption probe and is demanding answers about how [the Entity] secured in 2008 the rights to the half of Simandou that had earlier that year been stripped from [another mining enterprise]."  The FT Article further stated that the committee conducting the government of Guinea Investigation had made "graft allegations" relating to the Entity's acquisition of interests in Simandou and a smaller deposit nearby. According to the FT Article, the committee conducting the government of Guinea Investigation is considering "reclaiming the rights" to the Simandou Concession from the Entity.

10.   Beginning in or about March 2013, as part of the Grand Jury Investigation, the Government has been working with a cooperating witness (the "CW").[1]  The CW is the former wife of a now deceased high-ranking official in the government of Guinea (the "Guinean Official").  From another special agent with the Federal Bureau of Investigation ("Agent-1"), I know that, on or about February 2, 2013, before the Government began working with the CW, Agent-1 served upon the CW a grand jury subpoena, dated February 2, 2013, requiring the CW to testify before the grand jury and provide

---

[1] The CW is cooperating in the Government's investigation in the hopes of obtaining immunity for the CW's own potential criminal conduct within the scope of the Grand Jury Investigation.  Information provided by the CW has proven accurate and reliable and has been corroborated by, among other things, phone records, physical surveillance, and consensually recorded phone conversations and meetings.

4

documents to the grand jury relating to the Grand Jury Investigation (the "Grand Jury Subpoena"). With respect to the production of documents, the Grand Jury Subpoena required the CW to produce before the grand jury, among other things:

> Any and all documents – including but not
> limited to contracts, bank or other financial
> records, records of cash payments or gifts,
> transaction records, . . . and any other
> records – reflecting or otherwise concerning:
> the Simandou concession, . . . [the Entity]
> and related entities . . .

11.  From the CW, I learned that, while the CW was the wife of the Guinean Official, who was then still in office and empowered to influence the award of mining concessions, the CW was visited by several individuals including FREDERIC CILINS, the defendant, who identified themselves as representatives of the Entity. According to the CW, these individuals told the CW, on behalf of the Entity, that they wished to invest in mines in Guinea and asked the CW for help with the Guinean Official, who was then CW's spouse. CILINS offered the CW $12 million, to be distributed to the CW and ministers or officials within the government of Guinea who might be needed to secure the mining rights if all went well after their introduction to the Guinean Official. The CW later arranged and was present for a meeting between CILINS and the Guinean Official. The CW described further meetings with CILINS and others identifying themselves as being associated with the Entity concerning bribe payments by representatives of the Entity to officials of the government of Guinea. The CW also described personally receiving money from the Entity through an individual the CW described as associated with the Entity as part of the Entity's scheme to corruptly influence the Guinean Official and other officials in an effort to obtain mining contracts for the Entity.

12.  The CW also referenced a series of contacts which the CW entered into with the Entity and its affiliates setting forth the terms of payments by the Entity and its affiliates by which the Entity intended to corruptly influence those necessary to its scheme to secure for the Entity mining rights in Guinea, including the Simandou Concession. From Agent-1 I know that the CW told Agent-1 that FREDERIC CILINS, the defendant, was present when some of these contracts were signed.

13.  From a source assisting the Grand Jury Investigation (the "Source"), among other sources, I have received photocopies, but not originals, of several contracts between the Entity and its

5

affiliates, on the one hand, and the CW and companies controlled by the CW, on the other, as described by the CW (collectively, the "Contracts").   From Agent-1 I know that copies of two of the Contracts were also separately provided to Agent-1 by the CW. Because the Contracts are in French, I have relied upon draft English translations of the Contracts in describing some of the Contracts below.   As described by the CW and as set forth in the Contracts, the Contracts set forth the terms of payments by the Entity, through a wholly owned subsidiary of the Entity, to the CW for the CW's assistance in securing for the Entity mining rights in Guinea, including the Simandou Concession.   From my review of the Contracts, I know that the Contracts concern, among other things, the Entity and related entities and the Simandou Concession and are therefore documents required to be produced by the Grand Jury Subpoena.   The following paragraphs briefly describe some of the Contracts, each of which was, from at least February 2, 2013, under subpoena by the grand jury.

        a.   I have reviewed a draft English translation of a document titled "Protocole D'Accord" ("Protocol-1"), which is dated June 20, 2007.   Protocol-1, which is in French, appears to be a contract between an entity I know is a company controlled by the CW (the "CW's Company") and a Guinea-based wholly owned subsidiary of the Entity (the "Guinea Subsidiary").   According to Protocol-1, "[Guinea Subsidiary] approached the Guinean authorities with a view to establishing a partnership for the development and exploitation of part of the iron deposits of SIMANDOU, and also the [CW's Company] in order that the latter might assist it in the ways and means which would allow it to obtain permits for mining research." Protocol-1 further recounts that "with the combined efforts" various mining research permits were granted by the Ministry of Mines and Geology to the Guinea Subsidiary. Moreover, Protocol-1 sets forth that "[i]n order to remunerate the efforts provided, the [Guinea Subsidiary] agrees to transfer 5% of all its shares of stock to the [CW's Company], which agrees to this."   Protocol-1 appears to be signed by CW, as "The Manager" of the CW's Company and by an individual listed as the "Chief Executive" of the Guinea Subsidiary.

        b.   I have reviewed another document titled "Protocole D'Accord" ("Protocol-2").   From Agent-1, I know that the CW provided a copy of Protocol-2 to Agent-1.   From my review of a draft English translation of Protocol-2, which is in French and is dated February 28, 2008, I know that Protocol-2 also appears to be a contract between the CW's Company and the Guinea Subsidiary. Protocol-2 provides that "[t]he [Entity] commits to giving 5% of the shares of stock of blocks 1 and 2 of simandou, situated in the Republic of Guinea."   Protocol-2 appears to be signed by only the

6

CW, on behalf of the CW's Company, and by a representative of the Entity ("Individual-1").

    c.   I have reviewed another of the Contracts titled, in French, "Contrat De Commission" (the "Commission Contract"). From Agent-1, I know that the CW provided a copy of the Commission Contract to Agent-1. From my review of a draft English translation of the Commission Contract, which is in French and is dated February 27, 2008, one day before the date of Protocol-2, I know that the Commission Contract states, in pertinent part, the following:

> [The CW's Company] commits for its part to taking all necessary steps to obtain from the authorities the signature for the obtaining of the aforementioned blocks [of the Simandou mine] on behalf of [the Guinea Subsidiary].

> [The Guinea Subsidiary] proposes to distribute the commission above as follows:

> The amount of two (2) million for the [CW's Company] with attribution of one hundred (100) USD already paid out as an advance. The remainder of the amount will be distributed among persons of good will who may have contributed to facilitating the granting of the aforementioned blocks, regarding which [the Guinea Subsidiary] will be conscientious with respect to the quality of the contribution of each party. The totality of the amount will be paid out without delay after signature of the aforementioned document.

The Commission Contract appears to be signed by the CW, on behalf of CW's Company, and by Individual-1, on behalf of [the Guinea Subsidiary].

    d.   I have reviewed another of the Contracts, which is titled "Lettre D'Engagement" (the "Engagement Letter") and is undated. From my review of a draft English translation of the Engagement Letter, which is in French, I know that the Engagement Letter is addressed to the CW from a particular holding company (the "Holding Company"). The Engagement Letter recounts that "[the Guinea Subsidiary] approached the Guinean authorities in view of establishing a partnership for the development and exploitation of part of the iron deposits of SIMANDOU" and that "[i]n the context

7

of this project, [the Guinea Subsidiary] submitted a proposal to the Guinean authorities, which allows shareholding . . . up to 5% by [the CW] as a local partner." The Engagement Letter further states, among other things, that "[i]n order to incorporate the shareholding of [the CW], [the Guinea Subsidiary] will transfer 17.65% of its capital to the [Holding Company], of which 33.30% of the capital will be attributed to [the CW]."

e.   I have reviewed another of the Contracts, which is untitled and dated August 3, 2010 (the "August 3, 2010 Contract"). From Agent-1, I know that the CW provided a copy of the August 3, 2010 Contract to Agent-1. From my review of a draft English translation of the August 3, 2010 Contract, which is in French, I know that the August 3, 2010 Contract is signed by the Holding Company. In the August 3, 2010 Contract, the Holding Company agreed to pay the CW, subject to "the favorable pursuit, good functioning, and positive outcome of the operations that [the Holding Company] and its partners carry out in all their activities in Guinea (commerce, medicine, mining, etc.) . . . . the additional amount of 5 million US dollars, payable in two parts (each payment being 2.5 million US dollars)." The first payment was to be made "24 months after the signature of this document" and the second "24 months after the first payment." The August 3, 2010 Contract required the CW to conceal the CW's relationship with the Holding Company, reciting that the CW and the CW's company "commit herewith to make no use of this document, in any manner whatever, directly or indirectly, and to not use this document against the [Holding Company] and/or its partner and/or its associates in Guinea or elsewhere."

14.   From the CW, I know that some of the money paid to the CW by the Entity and its affiliates or agents was wired to a bank account in Florida controlled by the CW.

## THE DEFENDANT'S OBSTRUCTION OF THE GRAND JURY PROCEEDING AND THE FBI INVESTIGATION

15.   From Agent-1, I have learned that in or about early March 2013, Agent-1 learned from the CW that FREDERIC CILINS, the defendant, contacted the CW by phone in an effort to reach an agreement with the CW under which CILINS would pay money to the CW in exchange for the CW providing CILINS with originals of the Contracts. CW thereafter participated in a number of consensually recorded and monitored phone calls with CILINS and several consensually monitored and recorded face-to-face meetings with CILINS, which are described below. These phone calls and meetings were all conducted in French and the descriptions below of these phone calls and meetings are therefore based upon my review of

8

draft English summaries of the recordings.  As further detailed below, during the course of these phone calls and meetings, CILINS, referencing documents evidencing payments from the Entity and its affiliates to the CW, including the Contracts, told the CW that the documents needed to be "destroyed" and agreed to pay the CW money for originals of the documents and for signing a statement denying that the CW had ever entered into any contracts with the Entity or received any money from the Entity.

15.   Either Agent-1 or I was present for each of the telephone calls between the CW and FREDERIC CILINS, the defendant, described below.  From Agent-1, I learned that Agent-1 learned from the CW that prior to the phone calls described below, the CW had discussions with CILINS regarding potential payments by CILINS to the CW in exchange for documents concerning the Entity and its affiliates, including the Contracts.  Each call was recorded and, for each call, either I, if I was not present, or Agent-1 verified that the CW's call was placed to a particular phone number that I know, based upon records from T-Mobile, is subscribed to by "Frederic Cilins."

a.   On or about March 15, 2013, the CW called CILINS.  During this phone call, which was monitored and recorded, CILINS told the CW that he wanted to meet the CW the following week.  The CW asked CILINS what CILINS was going to offer the CW. CILINS replied that he needed to see the CW in person.  CILINS again reiterated that he needed to speak to the CW, but did not want to speak on the phone.  The CW asked CILINS whether, when they meet, the CW should bring "the documents."  CILINS responded that it was up to the CW whether to bring the documents to that meeting, but said that they first needed to meet to go over the details and then execute it.  Based upon information from the CW and my familiarity with this investigation, I believe that the "documents" referenced during this phone call include the Contracts and other agreements between the CW and the Entity or the Guinea Subsidiary concerning bribe payments for mining concessions in Guinea.

b.   On or about March 16, 2013, the CW spoke again with CILINS.  During this call, which was monitored and recorded, the CW and CILINS discussed when the CW and CILINS would be able to meet in person.  When the CW said that the CW would be unavailable to meet that week, CILINS responded that it was in the CW's interest to meet as there might be a great deal of discussion of money during the meeting.  The CW asked how much money CILINS would give the CW, and CILINS responded by referencing a previous discussion during which CILINS and the CW had discussed money. CILINS reiterated that they needed to meet, as the money question was one which they could not resolve on the telephone.

9

c.    On or about March 20, 2013, the CW again called CILINS.  During this call, which was monitored and recorded, the CW and CILINS discussed their plans for an upcoming, face-to-face meeting in Jacksonville, Florida.  The CW told CILINS that the CW wanted an agreement during the meeting and asked whether another individual ("CC-1") who, based upon publicly available information, I know is a high-ranking individual within the Entity, had agreed to the sum of money that CW had requested.  CILINS responded, "Of course."  CILINS stated that, after the meeting in Jacksonville, Florida, CILINS would work with an attorney to draft papers concerning their agreement.  CILINS again stated that he did not want to discuss details of the arrangement by telephone.

17.  Based upon information from the CW, my familiarity with this investigation, and my training and experience, I believe that during the foregoing phone conversations, FREDERIC CILINS, the defendant, was discussing plans to meet with the CW to offer the CW money to either destroy, or provide to CILINS for destruction or concealment, documents relating to the Simandou concession and the Entity and related entities, including the Contracts described above, which were, and remain, the subject of the Grand Jury Subpoena.

18.  Based upon my conversations with Agent-1 and other special agents of the FBI, I know that, on or about March 25, 2013, following the phone conversations described above in which FREDERIC CILINS, the defendant, discussed with the CW paying the CW money in exchange for documents relating to the Simandou Concession and the Entity and related entities, including the Contracts, the CW met with CILINS at an airport in Jacksonville, Florida (the "March 25 Meeting").  Agents from the FBI conducted physical surveillance of the March 25 Meeting, which was recorded by a recording device in the CW's possession.  Because the March 25 Meeting was conducted in French, the description below of what occurred during the March 25 Meeting is based upon my review of draft English summaries of the recordings.  Based upon my review of these draft English summaries, I know that, in substance and among other things, the following occurred during the March 25 Meeting:

a.    CILINS told the CW, in substance and in part, that the CW will receive $300,000 while the remainder, which the CW will receive when it is over, will be somewhere else.  After the CW asked how they will proceed with this agreement, CILINS replied that he, CILINS, would need to come back so that they can destroy the papers.  CILINS told the CW that, at the same time, some of the funds intended for the CW will be invested with a lawyer, while the rest would go to the CW.  After the CW told CILINS that the CW did not understand, CILINS reiterated that after he, CILINS, returns to

10

destroy the papers, part of the money will be held by the lawyer
and the rest would go immediately to the CW. Based upon what I
have learned from the CW and my familiarity with this
investigation, I believe that the documents CILINS refers to during
this portion of the conversation include the Contracts and any
other documents relating to the Entity and related entities
concerning payments to the CW and others to secure mining rights in
Guinea, including the Simandou Concession. Moreover, I believe
that, when CILINS tells the CW that the CW will receive additional
money when it is over, CILINS is referring to additional payments
that CILINS and his co-conspirators will give to the CW for
delivering to CILINS the documents after the government of Guinea's
corruption investigation into the Entity has concluded favorably
for the Entity.

b.     CILINS described that CILINS was visited by a
private investigative agency and questioned regarding documents
relating to the Entity's mining contracts in Guinea and other
documents in which, according to CILINS, the CW is mentioned. When
the CW asked what to do if the CW were to be questioned by the same
private investigative agency, CILINS, in substance, directed the CW
to reply that the CW has no involvement in the matter, has never
received any money, and that the CW does not have anything to do
with the contract. CILINS further told the CW that CILINS would
return with a document which the CW could refer to for answers in
case the CW is ever questioned.

c.     The CW asked CILINS what to do if the
American government got involved. CILINS asked, in substance and
in part, whether the CW is currently being bothered by officials
from the government, to which the CW replied no. CILINS told the
CW that he, CILINS, hoped that they would never come. The CW
recounted that CILINS had told the CW, during a previous
conversation, that they could come knock at the door and therefore
the CW should destroy the papers. CILINS posited that the papers
must be in the United States and that the next time CILINS comes
they will need to destroy the papers. Based upon information from
the CW, my conversations with Agent-1, and my familiarity with this
investigation, I believe that when CILINS told the CW, in the
context of discussion regarding a potential investigation by the
United States Government, that they could come at any time and that
the CW should destroy the papers, CILINS is expressing concern
regarding a potentially imminent investigation by the government of
the United States and directing the CW for that reason to destroy
documents, including the Contracts.

d.     CILINS told the CW that CILINS needed to
return to France the next day, but that he, CILINS, would return to

11

the United States, arriving in Miami, on April 8, 2013. CILINS further told the CW that CILINS would come to Jacksonville, Florida to meet with the CW between April 8, 2013 and April 16, 2013.

19. Based upon my conversations with Agent-1 and other special agents of the FBI, I know that, on or about April 11, 2013 the CW met again with FREDERIC CILINS, the defendant, at the same airport in Jacksonville, Florida (the "April 11 Meeting"). Prior to the April 11 Meeting, Agent-1 directed the CW to advise CILINS that the FBI, along with a federal grand jury, were conducting a grand jury investigation by providing CILINS with a ruse account of having recently been approached by FBI agents concerning that investigation, as further described below.

20. An FBI surveillance team conducted physical surveillance of the April 11 Meeting, which was recorded by a recording device in the CW's possession. Because the April 11 Meeting was conducted in French, the description below of what occurred during the April 11 Meeting is based upon my review of draft English summaries of the recordings, which were prepared by French speakers. Based upon my review of these draft English summaries, I know that, in substance and in part, the following took place during the April 11 Meeting:

a. The CW began the meeting by describing to CILINS that, during a recent visit by the CW to the United States immigration office to obtain an extension for the CW's visa, the CW was approached by two individuals who identified themselves as FBI agents. The agents told the CW that they are currently investigating bribe payments and mining contracts in Guinea. The CW further told CILINS that the CW was told by the agents that if the CW does not want to talk, the CW would receive a subpoena after which the CW would be required to appear in front of the grand jury, testify and turn over all the documents. CILINS asked whether the CW told the agents that the CW did not have any documents, to which the CW replied that the CW did tell the FBI agents that the CW had no documents.

b. CILINS replied that the documents need to be destroyed very urgently. CILINS repeated the word "urgently" multiple times. The CW told CILINS that the CW believes that the documents they want to destroy are the same documents that the U.S. government is after, and that the CW does not know what to do at this point. CILINS replied that he, CILINS, told the CW a long time ago that the CW should not keep anything here and that the CW should destroy absolutely everything.

c. CILINS asked whether the agents left the CW with a

12

paper. The CW replied that they left the CW with a phone number. CILINS asked for the phone number and told the CW that CILINS will need to get that phone number.

       d.   The CW then asked CILINS what a grand jury is, and added that the CW went online to find out and brought CILINS a paper explanation. Based upon my conversation with Agent-1, I know that at this point the CW took out and showed to CILINS a printout that the CW told CILINS the CW had gotten from the internet, but that had previously been provided to the CW by Agent-1. This document described, in French, the nature and functions of a grand jury in the United States. From Agent-1, I know that CILINS was observed by FBI agents reading the printout. CILINS then stated that there is only one thing that needs to be done immediately, and that thing is what CILINS had already told the CW.

       e.   CILINS told the CW that CILINS had a report (the "Report") regarding an investigation performed by a particular law firm which, in substance, described the CW's participation in a bribery scheme involving mining concessions in Guinea. CILINS told the CW that, according to the Report, evidence of the commission paid to the CW in connection with the Guinean mining concessions awarded to the Guinea Subsidiary consists of nine documents bearing the letterhead of the Entity, including, among other things, a series of draft agreements and a final sealed document stipulating that $2.5 Million were promised to the CW for services guaranteeing the rights to the Simandou Concession.

       f.   After reading another short portion of the Report, CILINS stopped reading and told the CW that they need to destroy the papers urgently. CILINS again repeated the word "urgently" several times. CILINS stated that he was surprised that the FBI agents came to see the CW rather than calling the CW to come to them. CILINS told the CW, in substance, that the CW will need to be firm with the CW's story. CILINS told the CW that when they ask whether the CW knows the Entity or has been a participant in any activity, the CW can claim that the CW knows them as they are a company like many others in Conakry, which is the capital of Guinea, but that the CW has never been involved in anything else.

       g.   CILINS asked the CW whether the CW has the documents at home and told the CW that it is certain that they have to do it, which I understand, based upon my knowledge of this investigation, to mean destroying the documents, urgently. After the CW explained to CILINS that the documents were in a vault, CILINS told the CW that the CW absolutely needs to do it this afternoon when the CW goes back home. CILINS asked whether the CW has anybody else who the CW can send to get the documents in order

for them to be destroyed.  The CW replied that only the CW has
access to the documents.

       h.    CILINS told the CW that it is important for the CW
to issue a statement in the legal proceeding regarding the Entity.
CILINS told the CW that, in the statement, the CW needs to
stipulate that the CW has nothing to do with the matter.  CILINS
asked the CW whether that is clear, to which the CW replied yes.
CILINS also suggested that the CW may want to deny that the CW had
been married to the Guinean Official.

       i.    CILINS asked the CW, in substance, whether the FBI
agents appeared to know about the documents.  The CW replied that
the CW does not know.  CILINS directed the CW not to talk about
anything over the phone and that, whenever the CW is talking about
something, the CW should move the phone far away as "they" are
listening to everything.

       j.    CILINS then told the CW that there should not be
many documents left and that they need to find a place to burn all
of them, adding that they cannot do it at the CW's house.  CILINS
again told the CW that they need to take care of it fast now as in
the past they delayed too much.  CILINS further told the CW that
the matter is serious and that if the original documents are found
the CW could lose everything the CW owns in the United States and
be sued and deported.  CILINS further stated that what is done is
done and was a significant mistake.

       k.    CILINS told the CW that CILINS was asked to be
present in person to witness the documents being burned in order to
guarantee that nothing is left behind.  When the CW suggested that
the CW could take care of it without CILINS, CILINS repeated that
CILINS was instructed to see it happen in person and that CILINS
cannot lie when he is asked whether he, CILINS, saw the papers
being burned.

       l.    CILINS stated that, based upon what the CW had told
him, the situation is now very urgent.  CILINS told the CW that he
was willing to return to meet with the CW on Saturday, April 13, or
Sunday, April 14, to complete what they have to do.  Based upon my
participation in this investigation and prior conversation during
the April 11 Meeting, I believe that CILINS' reference to what the
CW previously told him is a reference to what the CW had previously
described to CILINS as a visit by FBI agents and the agents'
mention of returning with a grand jury subpoena.

       m.    CILINS then also discussed with the CW money CILINS
would pay the CW.  CILINS told the CW that the CW would receive $1

14

million, with $200,000 to be paid now and $800,000 at a later date. CILINS further told the CW that, once the case is complete and the group is not forced out, the CW will receive "five." Based upon my participation in this investigation and my training and experience, I believe that the case CILINS refers to is the corruption investigation by the government of Guinea, the group CILINS refers to is the Entity or the Guinea Subsidiary, and "five" refers to $5 million. CILINS later reiterated that the CW will receive $5 million if they are not kicked out and the $1 million regardless of the outcome.

n.   CILINS then presented to the CW for the CW to sign a document CILINS referred to as an attestation (the "Attestation"). CILINS read the Attestation to the CW and told the CW that they needed to write "Jacksonville" on the Attestation, and date and sign it. The CW signed the Attestation after which I know from Agent-1 that the CW and CILINS walked together to a business center within the airport to make a copy of the Attestation for the CW.

o.   As CILINS and the CW walked to the business center, CILINS reiterated that it is very important for CILINS to be present when the documents are destroyed and that CILINS has strict orders to be present for the destruction of the documents. The CW and CILINS agreed that the CW would go home to get the documents and call CILINS with a place where they could meet.

21.   From Agent-1 I know that, after the conclusion of the April 11 Meeting, the CW provided Agent-1 with a copy of the Attestation, which had been presented to the CW for the CW's signature by FREDERIC CILINS, the defendant, during the April 11 Meeting. The Attestation is written in French and is titled "ATTESTATION." Because the Attestation is in French, my description of the Attestation below is based upon a draft English translation of the Attestation prepared by a French translator. The Attestation, which purports to be a document issued by the CW, contains, among other things, the following statements, each of which I know based, among other things, upon information from the CW and my review of the Contracts described above, is false:

a.   "I have never signed a single contract with the Entity, neither directly or indirectly through anyone else."

b.   "I never intervened with Guinean officials in favor of [the Entity] . . ."

c.   "I have never received any money from [the Entity],

15

neither directly or indirectly. . . . [The Entity]
never gave me . . . any money, neither directly to
me nor to anyone else on my behalf.  They did not
either promise to pay me anything, neither to me,
nor to anyone else on my behalf."

22.  Based upon my conversations with Agent-1 and other
special agents of the FBI, I know that, later on or about April 11,
2013, the CW again met with FREDERIC CILINS, the defendant, at an
airport in Jacksonville, Florida (the "Second April 11 Meeting").
An FBI surveillance team conducted physical surveillance of the
Second April 11 Meeting, which was recorded by a recording device
in the CW's possession.  Because the Second April 11 Meeting was
conducted in French, the description below of what occurred during
the Second April 11 Meeting is based upon my review of draft
English summaries of the recordings, which were prepared by French
speakers.  Based upon my review of these draft English summaries,
I know that, in substance and among other things, the following
occurred during the Second April 11 Meeting:

a.    The CW expressed concern to CILINS that the CW
was being asked to lie to the FBI and told CILINS that the CW
wanted money now.  CILINS replied that he would see what he could
do and would try to get $50,000 to give to the CW.   CILINS
expressed that he would need to seek permission from a senior
operative within the Entity to pay the CW the money.   CILINS
stated, in substance, that the CW needed to lie to the FBI.

b.    CILINS told the CW, who had brought to the Second
April 11 Meeting copies of some of the Contracts, that the CW
needed to bring the originals.  CILINS told the CW that CILINS
would call the CW the next day to arrange a time for them to meet
again.

23.  Based upon my conversations with Agent-1, I know that, on
or about April 14, 2013, the CW again met with FREDERIC CILINS, the
defendant,  at the same airport in Jacksonville, Florida (the
"April 14 Meeting").   Agents from the FBI conducted physical
surveillance of the April 14 Meeting, which was recorded by a
recording device in the CW's possession.  From Agent-1, I know that
shortly after CILINS left the April 14 Meeting, CILINS was arrested
in possession of envelopes from Wells Fargo bank containing
approximately $20,000 in United States currency.

16

WHEREFORE, deponent respectfully requests that the defendant be imprisoned, or bailed, as the case may be.

_____
PETER KILPATRICK
Special Agent
Federal Bureau of Investigation

Sworn to before me this
__th day of April, 2013

_____        APR 15 2013
HONORABLE JAMES C. FRANCIS
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK

17

**p. 215**

Pièce n° 7



## PROTOCOLE D'ACCORD

### ENTRE LES SOUSSIGNES

Société MATINDA AND CO.LIMITD-SARL Unipersonnelle en abrégé "MACO" dont le siège social se trouve à Dubreka, République de Guinée

D'une part

Et

La Société BSGR Ressources Guinée SARL de droit guinéen, dont le siège social est sis à Conakry

D'autre part

Etant préalablement exposé que

La Société BSGR Guinée s'est rapprochée des autorités guinéennes en vue d'établir un partenariat pour le développement et l'exploitation d'une partie des gisements de fer de SIMANDOU d'une part, et de la Société MATINDA AND CO-LIMITED –SARL afin que celle –ci l'assiste dans les voies et moyens permettant l'obtention des permis de recherches minières

Sur ce, et des efforts conjugués par arrêté N°A2007/582/MMG/SGG du 28 Février 2007, du Ministère des Mines et de la Géologie, quatre permis de recherches minières pour l'uranium couvrant une superficie total de 1413 km² ont été accordés à la Société BSGR Ressources Guinée dans les Préfectures de Lola et N'zérékoré ;

Ainsi, les parties conviennent librement de ce qui suit :

Afin de rétribuer les efforts fournis, la Société BSGR Guinée accepte de transférer 5% de toutes ses actions à la société MATINDA AND CO-LIMITED-SARL qui l'accepte

Le présent protocole qui vaut loi entre les parties entre en vigueur dès sa date de signature

Signé à Conakry le 20 JUIN . 2007

Fait en 2 exemplaires originaux

La Société BSGR                    La Société MATINDA AND CO LIMITED Sarl
Ressources Guinée

                                   La Gérante

                                   Mme Mamadie TOURE

Pièce n° 8

# CONTRAT DE COMMISSION

Entre les soussignées :

La société **BSG Resources** représentée par Monsieur ASHER AVIDAN, directeur des opérations ayant le pouvoir à l'égard des présentes.

Et,

La société **MATINDA AND CO LIMITED**, représenté par Madame MAMADIE TOURE, femme d'affaires à DUBRÉKA.
Il a été convenu ce qui suit :

# ENGAGEMENT

La société **BSG Resources** s'engage de donner une somme totale de quatre millions de dollars à titre de commission pour l'obtention des blocs 1 et 2 de simandou situé en République de Guinée et couvrant les préfectures de KEREOUANE et BEYLA.

La société **MATINDA AND CO LIMITED** s'engage pour sa part de faire toutes les démarches nécessaires pour obtenir des autorités la signature pour l'obtention des dits blocs en faveur de **la société BSG RESOURCES GUINEE.**
La société **BSG Resources** se propose de repartir la commission ci-dessus comme suit :
Une somme de deux (2) millions pour la société **MATINDA AND CO LIMITED** avec imputation de cent (100) USD déjà versée à titre d'avance.

Le reste de la somme sera repartie entre les personnes de bonne volonté qui auraient contribué à la facilitation de l'octroi des dits blocs, dans lequel **la société BSG Resources Guinée** diligentera en raison de la qualité de la contribution de chaque partie.
La totalité de la somme sera versée sans délai après la signature du dit document.
En outre, **la société BSG Resources s'engage** dans un délai raisonnable à la réalisation des infrastructures scolaires sous la propriété de Matinda and co limited en République de Guinée.

### Fait en double exemplaire

Conakry le 27 février 2008

Pour la société BSG  Resources Guinée.            Pour la société MATINDA AND CO LIMITED

Le Directeur
des Opérations

Mr AVIDAN ASHER                                          Mme MAMADIE TOURE

Pièce n° 9

# PROTOCOLE D'ACCORD

Entre les soussignés

La société BSG Resources Guinée représentée par Monsieur AVIDAN ASHER, directeur des opérations.

Et,

La société **MATINDA AND CO LIMITED**, représentée par Madame MAMADIE TOURE, femme d'affaires à DUBREKA.

Il a été convenu ce qui suit :

La société **BSG Resources** s'engage à donner 5% des actions des blocs 1 et 2 de simandou situé en République de Guinée et couvrant les préfectures de kerouané et beyla.

Fait en deux exemplaires

Conakry, le 28 février 2008

Pour la société BSG Resources Guinée          Pour la société MATINDA AND CO LIMITED

Monsieur AVIDAN ASHER                          Madame MAMADIE TOURE

Pièce n° 10



## PROTOCOLE D'ACCORD

Entre les soussignés

Madame Mamadie TOURE, femme d'affaires, de nationalité guinéenne, domiciliée à Dubreka

d'une part

Et

La Société PENTLER HOLDINGS LTD, domiciliée à Akara Building, 24 de Castro Street, Wickhams Cay 1, Road Town, Tortola, British Virgin Islands, représentée par Monsieur Avraham LEV RAN

d'autre part

Etant préalablement exposé que

La Société BSGR Guinée s'est rapprochée des autorités guinéennes en vue d'établir un partenariat pour le développement et l'exploitation d'une partie des gisements de fer de SIMANDOU.

Dans le cadre de ce projet, BSGR Guinée a soumis aux autorités guinéennes une proposition qui permet l'actionnariat de la République de Guinée à hauteur de 15% et l'actionnariat de Madame Madadie TOURE en tant que partenaire locale à hauteur de 5%. A cet effet, la société BSGR Guinée constituera avec la République de Guinée, une société anonyme à participation publique, qui sera dénommée Compagnie Minière de SIMANDOU.

Afin d'intégrer l'actionnariat de Madame Mamadie TOURE la société BSGR Guinée transférera 17,65% de son capital à la Société Pentler Holdings Ltd dont 33,30% du capital seront attribués à Madame Mamadie TOURE.

Il est convenu que

### Article 1ᵉʳ :

La société Pentler Holdings Ltd s'engage à transférer à Madame Mamadie TOURE une participation gratuite de 33,30% de son capital, dès que la Compagnie Minière de SIMANDOU aura été constituée et aura obtenu les titres miniers nécessaires à l'exploitation de la zone minière de SIMANDOU, qui lui sera attribuée par la République de Guinée.

Page 1 sur 2

**p. 224**



## Article 2

Madame Mamadie TOURE bénéficiera du versement de dividendes par la société Pentler Holdings Ltd de sa participation de 33,30% au même titre que les autres actionnaires, dès que les dettes contractées par la Compagnie Minière de SIMANDOU pour les besoins de l'exploitation de la zone minière par ladite société auront été remboursées et les premiers dividendes versés à la société Pentler Holdings Ltd.

## Article 3

Le présent protocole qui vaut loi entre les parties entre en vigueur dès sa date de signature

Signé à Conakry en date du 20 février 2006

Fait en 2 exemplaires originaux

Madame Mamadie TOURE

La société Pentler Holdings Ltd, représentée par Monsieur Avraham LEV RAN



Pièce n° 11-1



# LETTRE D'ENGAGEMENT

**Envers :**

Madame Mamadie TOURE, femme d'affaires, de nationalité guinéenne, domiciliée à Dubreka.

**De :**

La Société PENTLER HOLDINGS LTD, domiciliée à Akara Building, 24 de Castro Street, Wickhams Cay I, Road Town, Tortola, British Virgin Islands, représentée par Monsieur Avraham LEV RAN

**Etant préalablement exposé que**

La Société BSGR Guinée s'est rapprochée des autorités guinéennes en vue d'établir un partenariat pour le développement et l'exploitation d'une partie des gisements de fer de SIMANDOU.

Dans le cadre de ce projet, BSGR Guinée a soumis aux autorités guinéennes une proposition qui permet l'actionnariat de la République de Guinée à hauteur de 15% et l'actionnariat de Madame Mamadie TOURE en tant que partenaire locale à hauteur de 5%. A cet effet, la société BSGR Guinée constituera, avec la République de Guinée, une société anonyme à participation publique, qui sera dénommée Compagnie Minière de SIMANDOU.

Afin d'intégrer l'actionnariat de Madame Mamadie TOURE la société BSGR Guinée transférera 17,65% de son capital à la Société Pentler Holdings Ltd dont 33,30% du capital seront attribués à Madame Mamadie TOURE.

Les éléments exposés ci-dessus ont fait l'objet d'un Protocole d'Accord signé entre Madame Mamadie TOURE d'une part et Société Pentler Holdings Ltd, d'autre part, en date du 20 février 2006.

**Nouveau Projet**

Dans le cadre du développement de ses activités en Guinée la Société BSGR Guinée a obtenu des permis de recherche pour la bauxite sur les zones de Tougué, Kénicba, Bafing Makana et Dinguiraye selon les coordonnées géographiques ci-après.

Page 1 sur 4

**p. 227**



Permis I : (500 Km²) - Préfecture de Koubia.

| POINTS | LATITUDE NORD | LONGITUDE OUEST |
|--------|---------------|------------------|
| A | 12° 00' 00'' | 11° 45' 00'' |
| B | 12° 00' 00'' | 11° 30' 13'' |
| C | 11° 50' 00'' | 11° 30' 13'' |
| D | 11° 50' 00'' | 11° 45' 00'' |

Permis II : (500 Km²) - Préfecture de Koubia.

| POINTS | LATITUDE NORD | LONGITUDE OUEST |
|--------|---------------|------------------|
| A | 12° 09' 45'' | 11° 44' 31'' |
| B | 12° 09' 45'' | 11° 29' 21'' |
| C | 12° 00' 00'' | 11° 29' 21'' |
| D | 12° 00' 00'' | 11° 44' 31'' |

Permis III : (500 Km²) - Préfecture de Mali.

| POINTS | LATITUDE NORD | LONGITUDE OUEST |
|--------|---------------|------------------|
| A | 12° 09' 33'' | 12° 00' 00'' |
| B | 12° 09' 33'' | 11° 44' 31'' |
| C | 12° 00' 00'' | 11° 44' 31'' |
| D | 12° 00' 00'' | 12° 00' 00'' |

Permis IV : (500 Km²) - Préfecture de Mali.

| POINTS | LATITUDE NORD | LONGITUDE OUEST |
|--------|---------------|------------------|
| A | 12° 18' 07'' | 12° 00' 00'' |
| B | 12° 18' 07'' | 11° 42' 43'' |
| C | 12° 09' 45'' | 11° 42' 43'' |
| D | 12° 09' 45'' | 12° 44' 31'' |
| E | 12° 09' 33'' | 11° 44' 31'' |
| F | 12° 09' 33'' | 12° 00' 00'' |

Permis V : (500 Km²) - Préfecture de Mali.

| POINTS | LATITUDE NORD | LONGITUDE OUEST |
|--------|---------------|------------------|
| A | 12° 20' 00'' | 11° 42' 43'' |
| B | 12° 20' 00'' | 11° 26' 27'' |
| C | 12° 09' 45'' | 11° 29' 26'' |
| D | 12° 09' 45'' | 12° 42' 43'' |

**p. 228**



Permis VI : (500 Km²) - Préfecture de Koubia.

| POINTS | LATITUDE NORD | LONGITUDE OUEST |
|--------|---------------|------------------|
| A | 12° 09´ 45´´ | 11° 29´ 21´´ |
| B | 12° 02´ 40´´ | 11° 20´ 56´´ |
| C | 11° 50´ 00´´ | 11° 20´ 56´´ |
| D | 11° 50´ 00´´ | 11° 30´ 13´´ |
| E | 12° 00´ 00´´ | 11° 30´ 13´´ |
| F | 12° 00´ 00´´ | 11° 29´ 21´´ |

Permis VII : (500 Km²) - Préfecture de Tougué.

| POINTS | LATITUDE NORD | LONGITUDE OUEST |
|--------|---------------|------------------|
| A | 11° 50´ 00´´ | 11° 30´ 13´´ |
| B | 11° 50´ 00´´ | 11° 15´ 26´´ |
| C | 11° 40´ 00´´ | 11° 15´ 26´´ |
| D | 11° 40´ 00´´ | 11° 30´ 13´´ |

Permis VIII : (500 Km²) - Préfectures de Tougué et Dinguiraye.

| POINTS | LATITUDE NORD | LONGITUDE OUEST |
|--------|---------------|------------------|
| A | 11° 49´ 35´´ | 11° 15´ 26´´ |
| B | 11° 49´ 35´´ | 11° 00´ 00´´ |
| C | 11° 40´ 00´´ | 11° 00´ 00´´ |
| D | 11° 40´ 00´´ | 11° 15´ 26´´ |

Permis IX : (500 Km²) - Préfectures de Tougué, Dinguiraye et Koubia.

| POINTS | LATITUDE NORD | LONGITUDE OUEST |
|--------|---------------|------------------|
| A | 12° 02´ 38´´ | 11° 20´ 55´´ |
| B | 12° 05´ 30´´ | 11° 07´ 58´´ |
| C | 12° 05´ 28´´ | 11° 07´ 33´´ |
| D | 11° 49´ 35´´ | 11° 07´ 33´´ |
| E | 11° 49´ 35´´ | 11° 15´ 26´´ |
| F | 11° 50´ 00´´ | 11° 15´ 26´´ |
| G | 11° 50´ 00´´ | 11° 20´ 55´´ |

Permis X : (500 Km²) - Préfectures de Dinguiraye et Tougué.

| POINTS | LATITUDE NORD | LONGITUDE OUEST |
|--------|---------------|------------------|
| A | 12° 05´ 24´´ | 11° 07´ 32´´ |
| B | 12° 12´ 13´´ | 11° 02´ 39´´ |
| C | 12° 12´ 17´´ | 11° 00´ 00´´ |
| D | 11° 49´ 35´´ | 11° 00´ 00´´ |
| E | 11° 49´ 35´´ | 11° 07´ 32´´ |



**p. 229**



Permis XI : (422 Km²) - Préfecture de Dinguiraye.

| POINTS | LATITUDE NORD | LONGITUDE OUEST |
|--------|---------------|-----------------|
| A | 12° 12' 17'' | 11° 00' 00'' |
| B | 12° 00' 12'' | 10° 47' 00'' |
| C | 12° 00' 12'' | 11° 00' 00'' |

La ligne A-B est tracée parallèle à la frontière Guinée Malienne à environ 200 m.

Permis XII : (500 Km²) - Préfecture de Dinguiraye.

| POINTS | LATITUDE NORD | LONGITUDE OUEST |
|--------|---------------|-----------------|
| A | 12° 00' 12'' | 11° 00' 00'' |
| B | 12° 00' 12'' | 10° 46' 58'' |
| C | 11° 49' 51'' | 10° 45' 00'' |
| D | 11° 49' 51'' | 11° 00' 00'' |

Permis XIII : (500 Km²) - Préfecture de Dinguiraye.

| POINTS | LATITUDE NORD | LONGITUDE OUEST |
|--------|---------------|-----------------|
| A | 11° 49' 51'' | 11° 00' 00'' |
| B | 11° 49' 51'' | 10° 45' 00'' |
| C | 11° 40' 00'' | 10° 45' 00'' |
| D | 11° 40' 00'' | 11° 00' 00'' |

Il est entendu que la délivrance de ces permis de recherche au profit de la Société BSGR Guinée entraîne, de fait, l'actionnariat de Madame Mamadie TOURE dans ce projet de par la participation gratuite de 33,30% prévue selon des termes du Protocole d'Accord signé entre Madame Mamadie TOURE d'une part et Société Pentler Holdings Ltd. d'autre part, en date du 20 février 2006.

Fait en 2 exemplaires originaux

La société Pentler Holdings Ltd. représentée par Monsieur Avraham LEV RAN

PENTLER HOLDINGS Ltd.
Akara Building, 24 De Castro Street,
Wickhams Cay I, Road Town,
Tortola, B.V.I.
reg. n° 682814

Page 4 sur 4

Pièce n° 11-2



# LETTRE D'ENGAGEMENT

Envers :

Madame Mamadie TOURE, femme d'affaires, de nationalité guinéenne, domiciliée à Dubreka

De :

La Société PENTLER HOLDINGS LTD, domiciliée à Akara Building, 24 de Castro Street, Wickhams Cay 1, Road Town, Tortola, British Virgin Islands, représentée par Monsieur Avraham LEV RAN

Etant préalablement exposé que

La Société BSGR Guinée s'est rapprochée des autorités guinéennes en vue d'établir un partenariat pour le développement et l'exploitation d'une partie des gisements de fer de SIMANDOU.

Dans le cadre de ce projet, BSGR Guinée a soumis aux autorités guinéennes une proposition qui permet l'actionnariat de la République de Guinée à hauteur de 15% et l'actionnariat de Madame Madadie TOURE en tant que partenaire locale à hauteur de 5%. A cet effet, la société BSGR Guinée constituera, avec la République de Guinée, une société anonyme à participation publique, qui sera dénommée Compagnie Minière de SIMANDOU.

Afin d'intégrer l'actionnariat de Madame Mamadie TOURE la société BSGR Guinée transfèrera 17,65% de son capital à la Société Pentler Holdings Ltd dont 33,30% du capital seront attribués à Madame Mamadie TOURE.

Les éléments exposés ci-dessus ont fait l'objet d'un Protocole d'Accord signé entre Madame Madadie TOURE d'une part et Société Pentler Holdings Ltd. d'autre part, en date du 20 février 2006.

Nouveau Projet

Dans le cadre du développement de ses activités en Guinée la Société BSGR Guinée a déposé une demande de permis de recherche pour la bauxite sur les zones de Tougué Nord, Boké et Télémélé Nord selon les coordonnées géographiques ci-après.



ZONE BAUXITE 1

| | Latitude | | | Longitude | | |
|---|---|---|---|---|---|---|
| A | 12 | 24 65 | N | 12 | 0 | W |
| B | 11 | 56 30 | N | 10 | 45 | W |
| C | 11 | 30 | N | 10 | 45 | W |
| D | 11 | 30 | N | 10 | 30 | W |
| E | 11 | 12 | N | 10 | 30 | W |
| F | 11 | 12 | N | 11 | 5 | W |
| G | 11 | 16 17 | N | 11 | 5 | W |
| H | 11 | 17 | N | 11 | 35 | W |
| I | 11 | 40 | N | 11 | 35 | W |
| J | 11 | 40 | N | 11 | 45 | W |
| K | 12 | 0 | N | 11 | 45 | W |
| L | 12 | 0 | N | 12 | 0 | W |

ZONE BAUXITE 2

| | Latitude | | | Longitude | | |
|---|---|---|---|---|---|---|
| A | 11 | 20 | N | 13 | 36 | W |
| B | 11 | 20 | N | 13 | 17 | W |
| C | 11 | 10 | N | 13 | 16 | W |
| D | 11 | 10 | N | 13 | 36 | W |

ZONE BAUXITE 1

| | Latitude | | | Longitude | | |
|---|---|---|---|---|---|---|
| A | 11 | 0 | N | 14 | 40 | W |
| B | 11 | 0 | N | 14 | 10 | W |
| C | 10 | 55 | N | 14 | 10 | W |
| D | 10 | 55 | N | 13 | 54 | W |
| E | 10 | 40 | N | 13 | 55 | W |
| F | 10 | 40 | N | 14 | 14 28 | W |

Il est entendu que la délivrance de ces permis de recherche au profit de la Société BSGR Guinée entraînera de fait l'actionnariat de Madame Mamadie TOURE dans ce projet de par la participation gratuite de 33,30% prévue selon des termes du Protocole d'Accord signé entre Madame Madadie TOURE d'une part et Société Pentler Holdings Ltd. d'autre part, en date du 20 février 2006.

Fait en 2 exemplaires originaux.

La société Pentler Holdings Ltd. représentée par Monsieur Avraham LEV RAN

PENTLER HOLDINGS Ltd
Akara Building, 24 De Castro Street
Wickhams Cay I, Road Town
Tortola, B.V.I.
reg. n° 682814

Page 2 sur 2

Pièce n° 12

Sujet a la bonne déroulement et a la bonne fonctionnement   et la suite de l'opération mené par nos partenaires au projet de Simandu en Guinée, la société Paentier Holdings Ltd s'engage a payer a madame Mamadie Toure la somme supplémentaire de 5 millions USD payable en deux parties (chaque payement de 2.5 million USD).

Les dates  définitives de ces deux payements seront communiquées en maximum 48 heures après la date de signature de ce document.

Signé à Freetown en date du  8 – 7 – 2010

Madame Mamadie Toure                          Pentier Holdings Ltd.

Pièce n° 13

Sujet au bon déroulement et au bon fonctionnement  et la bonne suite des
opérations menés par Pentler et ses partenaires dans toues les activités en
Guinée (commerciales, médicaments, minières etc), la société Pentler Holdings
Ltd s'engage a payer a madame Mamadie Toure la somme supplémentaire de 5
millions USD payable en deux parties (chaque payement de 2.5 million USD).
Le premier payement sera effectué 24 mois après la signature de ce document.
Le deuxième payement de 2.5 millions sera effectué 24 mois après le premier
payement.
La société Matinda & Co. Ltd et madame Mamadie Toure s'engage par la
présente de ne pas faire usage de ce document de quelque manière que ce soit
directement ou indirectement et ne pas utiliser ce document contre la société
Pentler et/ ou ses partenaires et/ou ses associes en Guinée ou ailleurs.
Madame Mamadie Toure s'engage par la présente de prendre toutes les
responsabilités sur toutes actions mené en Guinée par toute tierce partie contre
Pentler et/ ou ses associées.

Signé à Freetown en date du....................................

Pour Malinda & Co. Ltd
Mme Mamamdie Toure

Pentler Holdings Ltd

PENTLER HOLDINGS LTD

EDITAYO PARS-GARNEM

Sujet au bon déroulement et au bon fonctionnement  et la bonne suite des
opérations menés par Pentler et ses partenaires dans toues les activités en
Guinée (commerciales, médicaments, minières etc), la société Pentler Holdings
Ltd s'engage a payer a madame Mamadie Toure la somme supplémentaire de 5
millions USD payable en deux parties (chaque payement de 2.5 million USD).
Le premier payement sera effectué 24 mois après la signature de ce document.
Le deuxième payement de 2.5 millions sera effectué 24 mois après le premier
payement.
La société Matinda & Co. Ltd et madame Mamadie Toure s'engage par la
présente de ne pas faire usage de ce document de quelque manière que ce soit
directement ou indirectement et ne pas utiliser ce document contre la société
Pentler et/ ou ses partenaires et/ou ses associes en Guinée ou ailleurs.
Madame Mamadie Toure s'engage par la présente de prendre toutes les
responsabilités sur toutes actions mené en Guinée par toute tierce partie contre
Pentler et/ ou ses associées.

Signé à Freetown en date du………………………………

Pour Matinda & Co. Ltd
Mme Mamamdie Toure

Pentler Holdings Ltd

PENTLER HOLDINGS LTD

EDrAYO PAES-GARNOU

Pièce n° 14-1

Contrat entre:


Pentler Holdings Ltd.                                Matinda & Co. Ltd et


                                                     Mamadie Toure



Notre contrat de collaboration signé en 2005 est arrivé à son terme.
Notre rôle de conseiller et d'apporteur d'affaire pour tous nos projets en Guinée
dans les domaines commerciaux, minier et médical ont été mené de manière
professionnelle et avec grand succès.

Le rôle de la société Matinda & Co. Ltd a contribué à la grande réussite de nos
affaires mutuelles.
Suite à votre décision d'arrêter vos activités en Guinée, nous sommes arrivés à
un accord comme suit :

La société Matinda & Co. Ltd recevra la somme de 3.1 millions pour sa part dans
toutes les activités menées en Guinée.

Les deux sociétés Pentler Holdings Ltd. et la société Matinda & Co. Ltd, Mme
Mamadie Toure, ses partenaires et conseillers s'engagent irrévocablement à
assurer la confidentialité absolue sur toutes nos affaires communes menées en
Guinée et à ne pas dévoiler directement ou indirectement une affaire ou des
affaires communes.

La société Matinda & Co. Ltd, Mme Mamadie Toure, ses partenaires et
conseillers s'engagent à ne pas publier directement ou indirectement des
contrats signés avec une partie tierce, à respecter l'entière responsabilité de nos
activités en Guinée et de ne pas faire l'usage directement ou indirectement
d'aucun document, contrat ou accord signé ou pas signé, écrit ou verbal.

La société Matinda & Co Ltd s'engage par la présente à ne pas prendre contact
directement ou indirectement, verbalement ou par écrit, avec aucunes des
sociétés en Guinée avec lesquelles nous avons eu des collaborations, des
contrats, des accords verbaux ou écrits ; de ne pas utiliser directement ou
indirectement la voix de la justice sans avoir l'accord préalable écrit de la société
Pentler et ses associés.

La société Matinda & Co. Ltd, Mme Mamadie Toure, ses partenaires et conseillers se désistent par la présente, irrévocablement et d'une manière définitive, sans réserves et conditions, de toute sorte d'engagement ou obligation contractés avec la société Pentler Holdings Ltd et ses partenaires d'affaire.

La société Matinda & Co. Ltd et Mme Mamadie Toure certifient par signature de ces documents son accord irrévocable et s'engagent irrévocablement à ne pas faire l'usage de ces documents avec une tierce partie.

La société Matinda & Co. Ltd, Mme Mamadie Toure, ses partenaires et conseillers s'engagent à prendre toute la responsabilité concernant les réclamations, actes, plaintes ou toutes autres demandes de la part des institutions, sociétés, personnes guinéen à l'encontre de la société Pentler Holdings Ltd et / ou ses partenaires.

La société Pentler Holding Ltd vous remercie pour cette collaboration depuis l'année 2005 et pour tout le soutien que la société Matinda & Co. Ltd nous a apporté.

Ce contrat remplace et annule irrévocablement tout accord écrit ou verbal signé entre la société Matinda & Co. Ltd, Mme Mamadie Toure, ses partenaires et conseillers, et Pentler Holdings Ltd et/ ou ses partenaires ou toutes autres entités avec lesquelles Pentler Holdings Ltd et Matinda & co Ltd ont été en relation d'affaire en Guinée durant la période 2005 – 2010.

Signé à Freetown en date du..... .......... .. ...........

Madame Mamadie Toure          Matinda & Co. ltd          Pentler Holdings Ltd.

PENTLER HOLDINGS LTD

Témoin...........................................

Témoin...........................................

Pièce n° 14-2

Declaration

Je, soussignée, Madame Mamadie Toure, représentante de la société Matinda & Co. Ltd déclare par la présente avoir reçu de la part de la société Pentler Holdings Ltd. la somme de 2 400 000 USD (deux millions quatre cents milles dollars) dans le cadre de notre contrat de collaboration signée en 2005.

Signé à Freetown en date du..............................

Madame Mamadie                                    Matinda & Co. Ltd
Toure

Témoin.............................................................

Témoin.............................................................