# EXHIBIT F

# Part III of VIII

CONFIDENTIAL

FC:     Well listen, that's good.

MT:     The restaurant isn't easy. But when it gets going... [inaudible].

FC:     Yes, no, I agree with you. It's a bit complicated, maybe, the restaurant.

MT:     Yes, it's complicated, yes.

FC:     And then you need equipment. Isn't there anything already in the place where you're going to put the restaurant? Or is the kitchen already there? Or is there nothing there?

MT:     No, there's nothing there. I'm going to install everything.

FC:     Everything?

MT:     Yes.

FC:     And do you already have the kitchen license? The license for cooking... opening the restaurant?

MT:     I need to do that. I need to try all of that.

FC:     Wow, wow. But you know, it takes a long time to get a restaurant license, it's not easy, is it?

MT:     Oh really?

FC:     I think so. You don't just get one straight away, a restaurant license.

MT:     I don't think so.

FC:     Because then they have to come, they have to check the kitchen, if it's properly made, to the standards, with this, that and the other. They have to come and inspect everything, the whole kitchen, because if you do hot food, there are the grills, the fridges, there are...

MT:     Yes. There's all that, I've taken, I need to take a [inaudible].

FC:     Yes, no, but... all that is going to cost a lot of money.

MT:     Yes, but Frédéric, I don't have a choice. The small amount I have, if I don't invest it, who is going to feed me? That's the thing.

FC:     I wouldn't have started both at the same time. I would have started the fruit and vegetables and the fish, but I wouldn't have started the restaurant straight away.

MT:     The community... everyone is waiting for the restaurant.

FC:     Oh yes?

MT:     Yes. They are waiting for the restaurant and the market. They are asking me all the time, when, when, when? They are excited about it.

FC:     Yes, yes. The community, what is that?

MT:     Because there isn't a restaurant there.

CONFIDENTIAL

FC:     In the area there?

MT:     Yes.

FC:     Well listen, that's good. It's good to have plans. And over there, how does it work with... school? Is it open, or not open?

MT:     It's not open.

FC:     Have you already opened part of it though? Where the shops are, those things...

MT:     Yes, yes.

FC:     Is it open?

MT:     Yes. The shops are open, yes.

FC:     And if one day Alpha says, says he wants to take it back... that he wants to take it back from you because... hasn't that ever happened?

MT:     No. It belongs to me. It belongs to me.

FC:     Yes, but if he says to you, it, it was given by, uh... because before, who did it belong to? To the State? Or who?

MT:     No. There, it's for the [inaudible]. He gave me it, everyone knows that.

FC:     Yes. I agree [inaudible].

MT:     [Inaudible] was behind that.

FC:     That's not what I'm saying. The land... who did it belong to?

MT:     To the boss.

FC:     Personally?

MT:     Yes.

FC:     Ah OK.

MT:     Didn't you know?

FC:     No, I didn't know, I didn't know, if it belonged to the State...

MT:     It did, but they gave it to me...

FC:     No, I didn't know, I didn't know, if it belonged to the State or if it belonged to the boss personally.

MT:     It belonged to the boss, personally, then he gave it to me. But... the First Lady was jealous of that, because the boss gave, uh... but he gave, he gave it. She said "But why?", because when the Prefect told me that the First Lady called him, to ask why it was like that, I immediately went to see the boss. (...)

CONFIDENTIAL

FC:     Oh yes?

MT:     I said, your First Lady wants that land. I don't understand why the Prefect spoke to me about that. And then the President, I was angry, I told him that if I see her there, I will buy a machete and things will go badly for her. So, I was sitting, I was waiting for a reply, and that's when he gave me an answer, he said, I will give you more money, go, buy 50 more machetes and you will work. I have a lot of land because they aren't using this land, why...

FC:     What do you mean, machetes?

MT:     Machetes! I was talking garbage, that when I see her, I will cut her, cut her foot or hand off... something like that. So he said no, don't start a fight. Here, go and buy 50 machetes, those you see over there, do what you want. I have a lot of land, why don't they take this land, except the land I gave you. He said that, it's jealousy. And everyone there laughed. And then he said, go, go and build. But don't cut.

FC:     Ah OK. And the Prefect, he was... because the First Lady went to see him...

MT:     Yes, but he said to the First Lady, I've given, I've given [inaudible]

FC:     No, what is important is, because I thought that before that land, the idea wasn't his own personal property...

MT:     It was his personal property [inaudible].

FC:     Listen to what I'm going to say to you, because here, in this business, they can also say to you: you have... we've given you something from the State, because you were...

MT:     In, in this business...

FC:     No, but they can mix everything up, because actually, Alpha tried for a while to mix it and he said...

MT:     No, hang on, I'm going to tell you, when the other Prefect was there, I... you know he went to tell Daddis that the group had come, they wanted to do something, the land, like that, like that. But Daddis, he said I can't. I searched, I looked at the land, her husband gave it to her, what am I supposed to do, I can't take that from her now. And he threw [inaudible] out of his office, he said you are trying to create problems for me, I said, I can't do that. Take, uh, the little one, what has she done? She hasn't done anything, I can't...

FC:     Because Alpha said this land, it belongs to the State, it was given to her for free and so we have to take it back. I guarantee that Alpha said that.

MT:     No.

FC:     Just as well, just as well.

**p. 172**

CONFIDENTIAL

MT:    He can't, I have all the papers. You know that in the country we have rules, when you have a title, even the President, even the President can't take it away. When you have the land title, no-one can take it away from you.

FC:    I agree with you.

MT:    Because you don't give a land title to two people.

FC:    I'm... of course. But Alpha said, he said something, he said, as I told you, he said... I spoke about that, six or eight months ago... he said, and that's why, he said that he wanted to take it back, because that, the land title, it had been given, but previously it belonged to the State. Maybe he hadn't looked yet, and maybe in the meantime he found that actually, it didn't belong to the State, it belonged to the boss personally. Do you see?

MT:    Frédéric, that's impossible. You don't give a land title to two people, Alpha...

FC:    No, you haven't understood what I meant.

MT:    Hang on, the President... When I was in Conakry, I did [consultations?], you know, there was land next to me, next to me which, the land belonged to the State, but they didn't touch my land. They destroyed people's houses, there were fences and everything. But President Alpha said that all houses, if a person has consulted, which are on State land, that they should not be destroyed... that the person should pay the price of the land, but they should not be destroyed. Because actually, someone is going to say... why destroy it? That's, that's how it is. I was there. He said it. And the fences next to me, were, were, belonged to the land of the State. So they took down all the fences. But mine, no-one touched it, because everyone knows. Is... is it... I don't think that it's something which will... something which belonged... when you're the President, you can give it to whoever you want.

FC:    Of course, it's...

MT:    It's not a bad thing to do.

FC:    No. I know it's not a bad thing to do. But if it belonged to me, because... Imagine, I'm the President [inaudible] there's no problem...

MT:    Frédéric... Frédéric, in cases like that, it's bad, no-one is going, everyone will say that it is bad. You will see a woman, uh, who wants to invest in things like that, all of that, can you imagine how much I have put into it so far?

FC:    How did he tell everyone that he was going to take it back? At the time... a few months ago, he said it.

MT:    No, no. Daddis came, he didn't take it back. Konaté came, he didn't take it back. Who is going to take it back? You know, when Daddis was there, he was... they ruined my house, they took a lot of things from my house, my brothers, my sisters, they destroyed everything we had there, in Dapopa [?], but they didn't touch that... it's not normal, the way I see it, that's not normal, it's not normal. It's not normal. This land which he signed for, he was the one who signed, he gave me it because the First Lady was jealous about it, so he signed, he

CONFIDENTIAL

gave it to me. He said, it's for you. Go and do what you have to do and I will support you. He was talking about that to get me back, to get it back. The others didn't do it, because the truth is there. It's like him, he can give land to someone, and it's not a crime. Is it a crime? If a President of the Republic gives land to someone, that isn't a crime, is it? It's not a crime.

FC:   Yes but, him uh, you know, all the mess that's been made, what do you think? You know, he's a... a guy that you know you can't trust.

MT:   And when Daddis was there, you know very well what he did. He pretended, you know very well what he did, but then he told the truth. Her husband gave and gave, even I can give land to someone, why take it from her? It's bad. And he looked for [Bonabo] [?]. That's it. He looked. Uh, I helped a soldier, then. He called me to tell me that. I said it's bad, why did he, [Bonabo] [?], when his brother was ill, my dad saved him because my dad was a medical officer. Did you know that? He was a medical officer.

FC:   Yes, he was in the army?

MT:   He was in the army, and the... the French taught him. He studied as a doctor.

FC:   Really?

MT:   Yes.

FC:   Oh, I didn't know that.

MT:   He saved the, one of Bonabo's brothers. Yes, he did that.

FC:   Bonabo [inaudible], you mean?

MT:   Yes. It's impossible... is it a crime?

FC:   Who is still at your house? (...) Of your family, who is in Conakry?

MT:   My family is there... are there.

FC:   In Forécariah, in Forécariah, who is in Forécariah now, in your house?

MT:   Forécariah? I don't have a house in Forécariah.

FC:   The little house where you were? I mean, the house where you were. The house in Forécariah...

MT:   No, I didn't have...

FC:   Ah sorry... Forécariah... in, in Dubréka?

MT:   In Dubréka, I've got my mom who went for [inaudible]. And my sister is there.

FC:   The house that I know in Dubréka, who lives there? Is your mom there now?

MT:   Yes. She went to [inaudible] for the death of [inaudible], and then she stayed there.

FC:   So she's in Dubréka, now?

MT:   Yes, she's going to come back.

FC:   And now, is she with her?

MT:   Yes, she's with her, because her...

FC:   What do you want? Do you want ketchup or something?

MT:   No, I'm OK.

A waitress:   Do you need anything? Mayonnaise, mustard, anything like that?

CONFIDENTIAL

| | | |
|---|---|---|
| | FC: | Mayonnaise? |
| | MT: | No, I'm OK. |
| | FC: | It's OK, thank you. |
| A waitress: | | Enjoy. |
| | FC: | Now is she with your mom in Dubréka then? |
| | MT: | Yes. But who told you these things, that they supposedly want to take my land? |
| | FC: | I can't remember what he said, at the Presidential residence... |
| | MT: | Who to? |
| | FC: | I don't know who to exactly, but at the Presidential residence, they said that they definitely wanted to take it from you... |
| | MT: | That's awful. Something that my husband gave, and then I... I've invested in it. It's awful. |
| | | [Sound of cutlery] |
| 0h43m02s | FC: | You've heard from Ahmed, haven't you? |
| | MT: | No. You know, one day I was with, uh, the President, and the sister of the late, the late Sékou Touré was there, and she had a problem with her land. But straight away the President gave the order to, to go and... return it to her. |
| | FC: | What do you mean return it? |
| | MT: | Because the men took it, they thought that when they went to help him to take Sékou Touré's sister's land. So as you said, no, give her her land back, immediately. It's polite. Give it back to her, why take it? |
| | FC: | Of course. |

**p. 175**

CONFIDENTIAL

MT:     For the time being, they have left. They have done... You know, even the land, one of the boss's sons, he wanted that land too.

FC:     Yes, a long time ago. I remember that.

MT:     He wanted it, but he didn't get it.

FC:     Do these people... I'm moving onto something completely different, OK? The people who asked you the questions the other day, did they leave you a card?

MT:     A card?

FC:     A business card?

MT:     They left their number.

FC:     Just the telephone number? No business card?

MT:     Yes, that's what I'm saying, a business card.

FC:     Do you have the business card with you?

MT:     No, I haven't brought it.

FC:     Ah, that's a shame.

MT:     Not now. Why?

FC:     To see who it was. You, know, if you can, you'll take a picture with your phone, you will send it to me with your phone.

MT:     OK. I won't let anyone take that land away from me, it's my keepsake.

FC:     I know. No but I think that, if, seeing that since he said that, he hasn't done anything. I don't think he'll touch it.

MT:     You know why he didn't give any to the others? He said that the others would sell it and not re-use it. That's why, he said... I can confirm that. He said I have faith in you, I know that you can do it.

        [Background noise]

FC:     People say he sacrificed his brother. Do you think it's true? Alpha?

MT:     I haven't heard that.

FC:     You've never heard that?

MT:     No.

FC:     You've never, ever heard that?

MT:     Never heard it.

FC:     You know, his brother that died just after he was elected.

MT:     Yes, I heard. He died. One of his brothers.

CONFIDENTIAL

FC:        What about Ousmane? Ousmane Conté?

MT:        He's fine.

FC:        Where is he? Is he still in Conakry?

MT:        Yes.

FC:        Who's looking after the rice fields and everything?

MT:        Like what?

FC:        The rice fields. Where they grew rice? Who is looking after that?

MT:        No one.

FC:        You mean that where the boss used to grew rice and everything, they aren't doing anything anymore?

MT:        No.

FC:        That's impossible. No one is doing it anymore?

MT:        No one. The people are divided. The villagers are doing it.

FC:        They're doing it for themselves now.

MT:        Yes. They know how to do it. Maybe with money.

FC:        Well yes, but we all need to work.

MT:        Yes.

FC:        You know, once I went to see, because there was a... he worked in the... what's it called? I was at Beaufort there. There was, uh... sugar cane. To make sugar and all that... but no one was working. It's complicated... it's complicated. Those are good projects. Sugar cane. Because from sugar cane you can make sugar. We watched it, what is left of the sugar cane, you burn it. You make [inaudible] with it. Those are good projects.

MT:        Yes.

FC:        Now, you see, the Ministry of Agriculture and all that, they should help people to do that. What can you do?

MT:        They want to do that now.

FC:        Now?

MT:        Yes. They're going to do that now.

FC:        Oh no, oh no. No one wants to do anything there now. You'd have to be crazy to go and do something there. In Conakry. Who do you think is going to go and do something there? With that guy, nothing's happening. You know, in this country now that guy just needs to go and something normal needs to happen. It's crazy. You know,

105

CONFIDENTIAL

Guinea could be a country like Equatorial Guinea—not Guinea-Bissau, Equatorial Guinea, it could be a wonderful, wonderful country. Do you realize how many years have been lost since 2005? I'm not talking about before, when there was just Rio Tinto. I'm talking about 2005, 2006. Since the group has been there, since 2006 - now it's 2013 - nothing has happened. Nothing, nothing. For a year, a year and a half, uh, the group have been planning to start to evacuate Zogota or something. The other deposit. They haven't done anything, everything has stopped. Not only have they stopped everything, but they have also broken all the lorries, all the machines, everything. Millions and millions of damage has been caused. It's, it's awful to see that the country is like that. Because the people, unfortunately, who have, who have suffered the most from all of this, are the population. Because nothing is happening, there are no investments, there are no trains, there is no, there is no... there is nothing. And you know, it could be, uh, I'm telling you, it could be a country like Equatorial Guinea. With lots of activity, with lots of, lots of things. Look, even Freetown with the few mines they've got, it's already a lot better. And they have, they have... if you like, compared with Conakry, it's already, compared with Guinea, it's as if Guinea was the whole table, Freetown is that big. It's ridiculous what they've got compared with, compared with Guinea. But in spite of everything, they are working. Such a shame, that guy, it's... What can you do? It's sickening, it breaks your heart. It breaks your heart. I'm going to eat all your fries! And, what's his name, Seny, he's staying here but he doesn't have a visa to stay here?

MT:     He's here...

FC:     He's just here. He should be careful...

MT:     Why?

FC:     Well because when you don't have a visa somewhere, if you're stopped, they'll... you'll have problems, won't you?

MT:     No, he'll have his green card soon.

FC:     Really? How did he do that?

MT:     He, he, he applied... so they'll give it to him soon.

FC:     Ah that's good, that's good news. That's good. And, uh... his wife Florence, she has a daughter too, doesn't she? She's still in France, isn't she?

MT:     Yes.

FC:     Well, her daughter must be big now. She must be, what, 14, 15? How old is she?

MT:     No, no, no.

FC:     She was already four or five when we saw her. She might not be 14 but she must be 12, mustn't she?

MT:     I don't think so, you know she's 12.

FC:     How long has she been here now? I remember helping her. I send some, a little something to Florence, to Florence... the little one

106

CONFIDENTIAL

was already born. I don't know how old she was, I think she was already two or three... That was in 2006, she was three, six, yes you're right, she must be nine or ten, nine or ten. Yes, you're right, nine or ten. Dear me. Do you want another cranberry juice? Do you want a dessert or something? I don't know what they've got. I'm going to ask what desserts they have. What did you want? I'm going to ask what she has. Do you like life here?

MT:    It's not like...

FC:    It can't be like Conakry, like Guinea... it's so different. Between Africa and the United States it can't be the same.

MT:    Yes, that's true. It's beautiful here. But... there isn't family to come and visit... that's the only difference. And you can't go to people's houses without arranging it in advance.

FC:    Yes.

MT:    The customs are different.

FC:    That's for sure. But if you have African friends here, you can act the same way as in Africa.

MT:    Yes.

FC:    The important thing is that you're not alone. There's starting to be a little community.

MT:    But I like it here.

FC:    It's good, it's good, that's for sure. Ah, America, it's America, isn't it? You can do what you want. I couldn't come here, because I have my family in France and everything, but otherwise, hey. It's nice though. And there isn't winter here, that's a good thing. Mind you, here in Jacksonville it's colder than Miami though.

MT:    Is it?

FC:    There's no difference [inaudible] in winter here.

MT:    Yes, a bit, a bit.

FC:    It's colder here than in the south in Miami.

MT:    Really? But you said it was warm here.

FC:    No, it's warm, but I think that in the south it's warmer now, isn't it? No, it's warm in summer, but I'm talking about winter. There still is winter here, for a bit.

MT:    Yes, for a bit. But it doesn't snow. It doesn't snow.

FC:    Of course it doesn't. It's definitely not like life in London. In London. But why didn't your mom stay in London, why [inaudible]...

A waitress:    How's everything? Cranberry?

FC:    Yes another cranberry, and which dessert you have today? The dessert of the day is?

CONFIDENTIAL

A waitress:    [Inaudible]

FC:    Uh, chocolate, lemon and... the other one?

[Inaudible]

FC:    Ah, cheesecake.

[Inaudible]

A waitress:    And cranberry juice?

FC:    Two please.

A waitress:    OK.

FC:    Thank you. Hmm. Yes, she left with Ahmed, for London, didn't she?

MT:    Yes.

FC:    Didn't she like it? She was supposed to stay there initially, wasn't she?

MT:    Well actually, seeing as she didn't have her children there, I think that it was good, but she was missing something. That's what it was...

FC:    Who is there in London? There's Ahmed and his wife, and...?

MT:    Ahmed wasn't even comfortable there.

FC:    Ahmed was in Conakry. And then there's his wife there and the children.

MT:    His wife did take very good care of her though.

FC:    He's nice, Ahmed, he's a nice boy. He's kind, you know he tries to be honest. He's not someone who tries to play around.

MT:    Yes, he's like that, he's very nice.

FC:    Did you come by taxi?

MT:    Yes, I came in a taxi, yes.

0102m00s  FC:    So those people, they gave you a card. A business card?

MT:    Yes.

FC:    With their names. And what was written on it?

MT:    There was writing on it (...) the writing, and then the telephone number.

FC:    Yes but wasn't there a name though, the name of the people?

MT:    They hadn't put that. I didn't pay attention, but there's the number, their number.

FC:    Was it the woman who was speaking French?

CONFIDENTIAL

MT:    Yes. But her French was...

FC:    Not brilliant...

MT:    Yes. It was a bit like English. There was a bit of English in it.

FC:    But they were nice. They weren't aggressive, were they?

MT:    No, they weren't aggressive with me. They weren't aggressive with me.

FC:    Did they say they were carrying out an investigation?

MT:    Yes.

FC:    On what subject exactly, did they say?

MT:    They said that they were carrying out an investigation, concerning mining contracts and bribes in Guinea. That's what they said. And they asked if I had any documents. I said "no, I don't have any documents." They said if I don't tell them about the documents, they'll take me to appear before the Grand Jury and give me a subpoena. Give me a subpoena. They're going to give me, sorry, they're going to give me a subpoena and take me to court before a Grand Jury.

FC:    What's a subpoena?

MT:    I've no idea. No idea. I've no idea. And they're going to take me to court and then before the Grand Jury.

FC:    I'm going to write that down. I'm going to find out what a subpoena is, I've never heard of that.

MT:    And also, they said I'm going to give all the papers to the court. All the documents to the court. At least... So I said to them... I didn't say anything, OK? I didn't say if I had the documents.

FC:    You said you have nothing at all.

MT:    I didn't say anything, and then... they left their telephone number, but as I said, I think that the file which we want from everyone is the same file that the American government wants.

FC:    Anyway, it's just the file of, of, of photocopies which have ended up in Alpha's hands, that's all.

A waitress:    (...) When you're ready. No rush.

FC:    Thank you.

MT:    Excuse me.

A waitress:    Thank you.

01h05m40s MT:    And the Grand Jury, what's that?

FC:    It's a jury which... for all those sorts of operations, for all those things. That's why I'm saying, it's a good idea to leave. It's a good idea to leave. I don't know what a subpoena is. [Pause] Well then, I did say to you though, the

CONFIDENTIAL

last time we saw each other, I said to you, don't keep anything at home. You don't listen to me. You were lucky. You were lucky it was... that they asked you when you were there because if they come to your house, what are you going to do? Even if it's photocopies, things like that, then you can't say to them that you don't know anything. Do you have photocopies at home? Why do you have photocopies at home? You see.

MT:   Do you think that photocopies are valid? Even if [inaudible]...

FC:   Photocopies aren't valid, but it doesn't matter. That's not the point. The point is, if you tell someone that you don't know anything and you don't have anything to do with all that, but there are documents or photocopies with your name and everything, you can't say that you don't know anything, because your name is on it. Why do you have that at your house? You know you need to destroy everything, it's simple. [Pause] Also, you're lucky because with your diplomatic passport there are certain things they can't do. So that's a good thing... Legal definition is writ commanding a [inaudible]... I think that a subpoena is an official summons to go to court. That's what I think. [Pause] I think that's what it is. I think that's what it is. I'll find out some more about it. But I think that's what it is. [Pause] That's why the best thing is to leave, because if they summon you officially to go there, you can't refuse. If you aren't there, you aren't there. If you aren't there, they can't ask you to do anything. Do you understand? It's better that... Look. If you leave do you have to leave with Ma?

MT:   Yes.

FC:   Ah that's it, I think, it's a... it's an official request for information. [Pause] It's an order. It's an order to appear before the court. If you go... if you don't respond to the request to go to court, you're arrested. Actually, it's spelled S U B P O E N A. That's it, subpoena. It's not written "supina." It's a more complicated spelling. It's spelled like that.

MT:   What about the Grand Jury?

FC:   The Grand Jury are the ones who ask you questions. Once you receive the subpoena you can't (...) talk. It's an official thing. [Pause] It can be done. They can ask you for it, either on the phone, or by... or in person, during a meeting with you. You need to destroy it quickly. Bad luck. Because they say, there's another type of subpoena which obliges you to come, and it says "I want you to bring proof of this, that and the other"... and obliges you to [inaudible] but then if you don't have them, well you don't have them. If it doesn't exist [inaudible] to make copies of documents... They can also ask for them to be sent by mail, they'll say send them to us, we think that you have such and such a document, send it to us. [Pause] Do you want us to look at that now?

MT:   Mmm.

FC:   Huh?

MT:   What?

FC:   Do you want us to look at it now, or what do you want to do?

MT:   What? I thought I had 50, I know I said that.

CONFIDENTIAL

| | |
|---|---|
| FC: | I know. What do you want? You know, I'm not a magician! Uh, I'll see, I'll see if I can still find them. Not here, here I won't have them anymore, that's certain. But I'm leaving the day after tomorrow... uh, no, I don't know what to say to you. That's the note, the note from... When you travel, where do you go through? Do you go through Jacksonville? Where do you go through? |
| MT: | Through Brussels. |
| FC: | Do you do Jacksonville – Brussels directly? No? Through New York? |
| MT: | No. It's Brussels. Washington, sometimes Chicago. |
| FC: | Now, if you travel, will you go alone? I mean, with Ma? |
| MT: | Yes, with Ma. |
| FC: | Listen, I don't, I don't, I don't know what to say to you. Here and now I don't have another solution. I'm going to... let me... I'm not saying yes or no. Let me think about what solution I can find. But then the problem is that... |
| A waitress: | I got you some change. |
| FC: | No, thank you very much. Thank you, thank you. |
| A waitress: | Oh, thank you so much, have a great one. |
| FC: | Anyway, even if... anyway you need it for here, don't you? |
| MT: | Yes. |
| FC: | If I manage to do something else, there will still be Mado here. |
| MT: | Yes, Mado is here. |
| FC: | OK, well we'll still manage to... even if you aren't here, we'll still manage to organize something. Do you see what I mean? |
| MT: | Yes. |
| 01h19m04s FC: | I'll do my best. I'm telling you, I'm telling you, but anyway, anyway all that, like I say, it's an extra. It's not something I'm deducting, or subtracting from anything. |
| FC: | But you know, don't get everything mixed up in your head. There's one thing, which is this urgent business to make sure that you're safe. Because, these people don't mess about, if they come tomorrow, they won't mess about. |
| MT: | Really? |
| FC: | No. Were you at ease when you were with those people, when they were interrogating you? |
| MT: | No. |
| FC: | Ah well then, you see, do you think these people are calm, of course they aren't. Of course they aren't. So it's urgent that you're cut off from all that. |

CONFIDENTIAL

|     |     |
| --- | --- |
|     | Cut yourself off from that, leave for a while, that's urgent. Your project, your project with the restaurant and things, OK, but... that's urgent, urgent, urgent, it's really urgent. [Pause] But also, if you want to receive less over there, you want to get 150 over there and I try to find a way to get 50 here, let me know. That's easier. |
| MT: | What's that? |
| FC: | If you prefer, over there in Sierra, instead of getting 200, you could get 150 and I could organize, I could try to get 50 here, let me know. Do you understand what I'm saying? |
| MT: | Mm hmm. You mean, from the 200, you take 50 and give it to me? |
| FC: | So you can have it here. I won't have it straight away, it'll take some time, but that's it, you have to let me know. What do you prefer? If you need more here, more than over there, I don't know. It's up to – how can I know – it's up to you to tell me. |
| MT: | Frédéric, we've talked about that, I'm telling you that I need something for here, you said that now you're going to send it, that now you're going to send it. |
| FC: | No, no, no, I didn't say that. I didn't say that if I come here I'll come with 50. I said, I'll see what I can do. I didn't say yes, I'm coming with 50. And again, I'm not deducting it from anywhere. It's something I'm giving you as an extra. What do you... You can't... be angry with me for that. OK? Now I'm asking you, it's your decision. You have 200. Either you want it there, or you want it here, or you want half and half, it's up to you. Now I'm asking you, it makes no difference to me, it's up to you. What's best for you? |
| MT: | I wanted 50 for here. |
| FC: | I don't have it. There you go, I don't have it. At any rate, I won't have it before I leave. I won't have it. So I'm telling you, I can try. Now, do you want me to deduct them from over there or do you want me not to deduct them from over there, what do you want to do? |
| MT: | I really don't understand. You said you would try for 50 and now it's 20... |
| FC: | Because I wasn't able to get it. If I say to you tomorrow, hey, find me 50 and you can't find it, you can only find 20, what would you do? You'd bring me 20. That's how it is. I didn't make a commitment. I didn't say 100% yes. Do we agree? I said "I'll do what I can, I'll do my best", I said "I'll have to deal with that, that thing, I'll check with... I'll see what I can do". I managed to get 20, what am I supposed to say to you? Well, if, uh... I tell you what, if I can still organize something and Mado is there, I can send it to Mado. I don't even have Mado's number, but you can give it to me. |
| MT: | And what if Mado is travelling, because Mado told me that she was going... she has to go to the Ivory Coast in Africa. |
| FC: | Oh, she's in Africa now? |
| MT: | She has to go. |

CONFIDENTIAL

FC:     When is she leaving?

MT:     She was talking to me about that... as soon as she wants to go. I don't think that... seeing as she has to go there, I don't know.

FC:     Ok, well listen, anyway is there someone who can receive it here or not, if I can find something?

MT:     How long? How long, though?

FC:     I don't know. I'm not saying anything, I'm not saying how much or when because then you'll think that it's certain and then you'll give me the same old story as today for the 50 the day before yesterday. And the 50, I'm telling you, I'm not... so I don't know. But you know, Mamadie, you can't change like that. You need it, and that's that. The deal, initially, was one million. In one million there is 200 and 800, that was the initial deal. All the rest is extra, you can't hold that against me. You can't hold it against me. Do you understand?

MT:     I understand.

FC:     You can't be angry with me for any of that, because I'm doing my best. [Pause] Why don't you travel with Mado then?

MT:     Because she's going to Ivory Coast. I'm going to Sierra.

FC:     But after that you're going to Abidjan, you're taking a flight to Abidjan, there's one every day.

MT:     Because I've got no reason to be in Ivory Coast.

FC:     But you're not going to Ivory Coast. Ah, because you're passing through Brussels, from Brussels you're going direct... yes, OK, OK. Yes, you're right. [Pause]. Right, shall we try to move on?

MT:     Yes. [Pause] And the 200, who's guaranteeing the 200?

FC:     Have I ever told you something which didn't happen? When I tell you yes, 100%, have I ever told you something which didn't happen?

MT:     But the problem is, you're not in charge, that's the thing.

FC:     No, it's... who is it?

MT:     You're not in charge.

FC:     I'm telling you, yes, I am in charge, I'm telling you, I'm in charge and it's 100% certain that you will have your 200 in Sierra. It's 100% sure. Have I ever lied to you?

MT:     We said 300, now it's 200 I'm seeing...

FC:      Mamadie, listen, you know, I'm tired of all this. I'm going to... I didn't say 300, it's 300. I told you, I'll see.

MT:     You said it was... You said everyone had agreed on 300...

CONFIDENTIAL

FC:     No, no, no. I said I was going to...

MT:     You told me that.

FC:     Well... listen, you know, I'm tired of this Mamadie...

MT:     But you need to remember, you told me it.

FC:     No, I never said that. I said to you, I'll... You asked me for part of it. I said, a part, I'll see which part... if it will be possible or not. Because originally there was no 200, 300, 800. There was one and that's all. It was like that. You said to me, no, no, no, we were sitting there, with Cissé, you said we need to try to see if there is...

MT:     The last time we spoke. The last time we spoke, you said to me...

FC:     Before you disappear, listen to me carefully.

MT:     But after that we saw each other again...

FC:     No, we didn't see each other again. When we saw each other again, it was, it was here...

MT:     Frédéric, I told you, when we saw each other again, I told you... You told me it's a yes, it's a yes, it's a yes. Why did you say it's a yes, it's a yes, it's a yes?

FC:     What did I say?

MT:     I asked why.

FC:     And then it was 200?

MT:     And you came back and you said 200.

FC:     I didn't come back... this, last week I said...

MT:     You said 300, Frédéric. I'm not a child... You said you would have 300, just like that, we talked about that.

FC:     Ok. Listen, so do you mean that I've lied to you? What do you want to do? I'm tired of this, Mamadie. What do you want to do? Tell me what you want to do. I'm, I'm tired. You're blaming me. I come, I bring you money, I find solutions for you, I do this, that and the other. I'm tired. So tell me what you want to do. It's up to you, and that's that. You want to, you want to. You don't want to, you don't want to. I'm not a child either and I'm not your servant. So I'm telling you, I'm telling you that...

MT:     Frédéric, I'm more tired than you... A woman with a child, I'm more tired than you.

FC:     So? I have to put up with everything that you put me through.

MT:     No, I'm more tired. When you tell me how it is, it should be like that.

FC:     Ok, well, I lied to you then. I'm sorry, I lied to you.

MT:     When you tell me... When you tell me it's one thing, later, it's something else.

114

CONFIDENTIAL

FC: So, when I said 50, it was... I promised to give you 50, is that it? But it's money that's coming from my own pocket. What are you angry about? I'm not deducting it from anywhere.

MT: Frédéric, I have a good memory. You said 300, you said everything is agreed. You said that. I heard you, you said that.

FC: No.

MT: And it was over there that you said that. It was over there.

FC: Not at all. It's not true at all. It was when we were here.

MT: No, it was over there. If you remember, it was over there.

01h29m00s FC: Listen to me carefully. Before disappearing, we were here. You said to me – Cissé was here – you said to me, listen, the business with the ones and all that, here and there, I absolutely must have part of it. I said I don't know, I'll see. What do you want, you asked me for 300 and everything, I want something. I said look, I don't know, I'll see what I can get. When I told you that I'd had a positive response, afterwards when we saw each other, I said to you, you've disappeared, I've had a positive response. The positive response, the positive response was that you could have a part. Now, the part, it's a part of the 200 which I was given. What do you want me to say to you? I've been given it, I'm giving it to you. If you want it then you want it, if you don't want it then you don't want it. I don't know what to say to you. That's all. That's all I can say. Now, those papers, if you want to keep them and take them to the people, go and do it. It's you who they'll take, who they'll put in prison, it's your business... So anyway it's in your interests to destroy them, so I don't even understand what your problem is with that. Because, at any rate, all that, it's like an atomic bomb for you. That's what it is. Why do you think I want to help you to go to Sierra? It's because they're going to take you, they're going to take you, they're going to make a face like this, ask you questions and questions and more questions, and it's going to be terrible for you. That's why I absolutely want to help you, so that you can go there and be left in peace. Because your fruit and vegetables, if you're here, and they do, they send you the subpoena and all of that, and they take you over there... you can forget about your fruit and vegetables. Your restaurant, you can forget about that. Your house here, you can forget about that. Do you think they're going to leave you like that? I've been telling you that for a long time, so listen... You know, I'm not a child either.

MT: And me? Am I a child?

FC: No. No. Actually yes, you are a child because you make very bad decisions. Yes. It's a good idea to go and see Samy. It's a very very good idea to go and give photocopies to Samy. The reason you're in a mess now with subpoenas, with people who want... your thing, it's because of that.

MT: No.

FC: Oh, isn't it? Why is it then?

MT: If you had... If you had organized things like you should have, it wouldn't have happened. It wouldn't have happened.

FC: Ok, ok.

CONFIDENTIAL

MT:     Today people say to me, we'll pay you this, and tomorrow they say we'll pay you that. Today people say we'll pay you this, tomorrow they say we'll pay you that. It's always been like that, Frédéric. Be reasonable.

FC:     Well listen, I don't know what to say to you.

MT:     When you tell someone, I'm going to do that for you, and you change. Once, twice, three times. I'll give you two, and you bring, uh, one. I'll give you three, and you bring, uh... do you see what that does?

FC:     OK.

MT:     It's not...

FC:     It's not because of that that there's an investigation, you know. The reason that there's an investigation is because Samuel went walking around with everything you gave him.

MT:     I didn't ask him to, to...

FC:     Oh, I'm not saying that you asked him, but anyway, you gave them to him. If you hadn't given them to him, he wouldn't have gone to see... he wouldn't have gone to see Fofana, he wouldn't have gone to the boss, and he wouldn't have gone to see Soros and company. There you have it.

MT:     Who is Fofana?

FC:     Fofana is the Minister of mines. Oh yes, Mamadie, you can do what you want, the reason... the reason there's a great big mess at the moment is because Samy has been here. Believe me, believe me, I know exactly what I'm saying, because I do know a bit about the case. There you go. I'm not saying that you're a child, but I'm saying that you have made bad decisions. That's it. [Pause] I'm just going to look at the screen, I'll be back, I just need to see what time my flight is.

        [Pause]

Unidentified man:     Stand up. Put your hands behind your back [inaudible]

01m35m32s     END OF RECORDING

# Exhibit No. 4

REDE Page 117 of 128



**Free Checking**

WACHOVIA   01   1018278213492   036   50   0   11

Electronic Delivery

FREDERIC CILINS
BRIGITTE BURE
252 CHEMIN DES INDICAS
JUANLES PINS 06190
FRANCE

PS

## Free Checking

7/20/2010 thru 8/17/2010

Account number:   1018278213492
Account owner(s):   FREDERIC CILINS
BRIGITTE BURE

### Account Summary

| | |
|---|---|
| Opening balance 7/20 | $4,269.49 |
| Deposits and other credits | 151,290.00 + |
| Checks | 150,300.00 - |
| Other withdrawals and service fees | 1,790.64 - |
| Closing balance 8/17 | $3,468.85 |

### Deposits and Other Credits

| Date | Amount | Description |
|---|---|---|
| 7/22 | 99,970.00 | FUNDS TRANSFER (ADVICE 20100722060010416) RCVD FROM WELLS FARGO NY IN/BANK LEUMI LE IS ORG=CILINS FREDERIC RFB=814-05-0038659MU OBI= REF=1007221242003808 07/22/10 03:36AM ET |
| 8/04 | 1,350.00 | COUNTER DEPOSIT |
| 8/06 | 49,970.00 | FUNDS TRANSFER (ADVICE 20100806060007959) RCVD FROM WELLS FARGO NY IN/BANK LEUMI LE IS ORG=CILINS FREDERIC RFB=814-05-0038917MU OBI= REF=1008051774002788 08/06/10 07:45AM ET |
| Total | $151,290.00 | |

### Checks

| Number | Amount | Date | Number | Amount | Date | Number | Amount | Date |
|---|---|---|---|---|---|---|---|---|
| 0096 | 100,000.00 | 8/02 | 0098 | 300.00 | 8/09 | | | |
| 0097 | 50,000.00 | 8/09 | Total | $150,300.00 | | | | |

**p. 190**

REDB Page 5 of 32

096
63-843/670

27th July 2/0
Date

Pay to the Order of  MAMADIE TOURE                    $ 100.500,00

One hundred thousand dollars ————        Dollars

WACHOVIA.
Wachovia Bank, a division of Wells Fargo Bank, N.A.

For _____

⑆08700643⑈ ⑆010 1027621 34 32⑈   0096   ⑈0010000000⑈

Mamadie Toure

►0631075134
MAGNETIA      SWC0A6  465T
OKLAHOMA FL #9122016  02FK

1730924868

REQUEST 00005377203000000 100000.00
ROLL BCIA   20100802  500001730924868
JOB BCIA  P  ACCT 4001010276213432
REQUESTOR U217693
6331170  05/21/2013

Subpoena Processing Philadelphia
Y1372-110
Philadelphia PA  19101

GJ-WF04-000174

**p. 191**



REDIB Page 7 of 32

REQUEST 0000537720300000 50000.00
ROLL ECIA   201008009 000009233928187
JOB ECIA P  ACCT 4001010276213432
REQUESTOR U217693
4331170  05/21/2013

Subpoena Processing Philadelphia
Y1272-110
Philadelphia PA 19101

GJ-WIT04-000176

Exhibit no. 5

# MATINDA & CO. LTD

*11 Glasgow Street*
*Wilberforce, Freetown*

DATE: 28TH AUGUST 1999

INVOICE

| No. | Item | Quantity | Unit Cost (USD) | Amount (USD) |
|-----|------|----------|-----------------|--------------|
| 1 | New Caterpillar D9R Track-Type Tractor | 1 | 703,000 | 703,000 |
| 2 | New Caterpillar 326DL Track Excavator | 1 | 295,000 | 295,000 |
| | TOTAL: | | | US $ 998,000 |

AMOUNT IN WORDS: Nine Hundred and Ninety Eight Thousand United States Dollars

STANDARD CHARTERED BANK, LONDON, ENGLAND
SWIFT A/.      ISS: SCP: GB2L

TO CREDIT THE ACCOUNT OF:
FIRST INTERNATIONAL BANK (SL) Ltd
ACCOUNT No. 01 2527189 50
BENIFICIARY'S ACCOUNT No. 302126   01

Authorised Signature

[illegible]

Conakry, September 3, 2009

To the Managing Director of the F.I.B

<u>Subject</u>: Request to change the name of the
recipient of a transfer order

Dear Sir,

I am writing to ask you to please change the name of the recipient of the transfer order of a total of
nine hundred and ninety-eight thousand dollars, 998,000.000 USD.
Please put MAMADIE TOURE as recipient and the account number 1762717 on the transfer order,
instead of MATILDA LTD which was initially written on 20 August 2009.

Yours sincerely,

[stamp:] illegible

Ghassan Boutros
Managing Director

**p. 195**

REF: 10234/LP8130

INVOICE 489

DATE: 20/12/2009                    TO: L.M.S

| 01 | Repair of control circuit/Caterpillar | 01 | 2000 | 2000 |
|---|---|---|---|---|
| | s/n: cat4592032Ng23 | | | |

TOTAL AMMOUNT (USD)              US $  2000

Ammount in words : Two  Thousand United States Dollars.

ROKEL COMMERCIAL BANK (SL) LTD

25/27 SIAKA STEVENSSTREET,FREETOWN,SIERRA LEONE

SWIFT CODE: RCBKSLFR

BENEFICIARY'S A/C NO.  1732915



Authorized Signature

Exhibit no. 6

ORIGINAL

Approved: _____
ELISHA J. KOBRE/STEPHEN SPIEGELHALTER
Assistant United States Attorney/
Trial Attorney, Criminal Division, Fraud Section

U.S. DISTRICT COURT
FILED
APR 15 2013
S.D. OF N.Y.

Before:   HONORABLE JAMES C. FRANCIS
          United States Magistrate Judge
          Southern District of New York

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------x

UNITED STATES OF AMERICA,          :

        - v. -                     :

FREDERIC CILINS,                   :

        Defendant.                 :

--------------------------------x
SOUTHERN DISTRICT OF NEW YORK, ss.:

**13 MAG    975**

**COMPLAINT**

Violations of
18 U.S.C. §§ 1512(c)(2),
1510, 1519

COUNTY OF OFFENSE:
NEW YORK

**DOC #** _____1_____

        PETER KILPATRICK, a Special Agent with the Federal Bureau
of Investigation ("FBI"), being duly sworn, deposes and states:

COUNT ONE
(Tampering With A Witness, Victim, or Informant)

        1.   From at least in or about March 2013 through on or about
April 14, 2013, in the Southern District of New York and elsewhere,
FREDERIC CILINS, the defendant, willfully, knowingly, and
corruptly, did obstruct, influence, and impede official proceedings
and attempt to do so, to wit, CILINS offered money to another
person to cause that person to deliver to CILINS, for destruction,
documents required to be produced pursuant to a grand jury
subpoena.

        (Title 18, United States Code, Sections 1512(c)(2) and 2.)

COUNT TWO
(Obstruction of a Criminal Investigation)

        2.   From at least in or about March 2013 through on or about
April 14, 2013, in the Southern District of New York and elsewhere,
FREDERIC CILINS, the defendant, willfully and knowingly, endeavored
by means of bribery to obstruct, delay, and prevent the

1

**13 CRIM 315**

communication of information relating to a violation of criminal statutes of the United States by a person to a criminal investigator, to wit, CILINS offered money to another person in exchange for that person's agreement to provide to CILINS, for destruction, documents requested from that person by agents of the Federal Bureau of Investigation conducting an investigation relating to violations of criminal statutes.

(Title 18, United States Code, Sections 1510 and 2.)

<u>COUNT THREE</u>
(Destruction, Alteration, and Falsification of Records in A Federal investigation)

3.    From at least in or about March 2013 through on or about April 14, 2013, in the Southern District of New York and elsewhere, FREDERIC CILINS, the defendant, willfully and knowingly, and with the intent to impede, obstruct, and influence the investigation and proper administration of a matter within the jurisdiction of a department and agency of the United States, namely the United States Department of Justice, and in relation to and in contemplation of such matter, did knowingly alter, destroy, mutilate, conceal, cover up, falsify, and make false entries in records, documents, and tangible objects, to wit, CILINS directed an individual, from whom agents of the Federal Bureau of Investigation conducting an investigation regarding potential violations of federal criminal law, had requested certain documents, to destroy those documents.

(Title 18, United States Code, Sections 1519 and 2.)

4.    I have been a Special Agent of the FBI for approximately 4 years.  During my time with the FBI, I have participated in public corruption and other white-collar investigations.  I am presently assigned to Squad C4, a public corruption and civil rights unit.   This squad investigates, among other things, white-collar crime, including violations of the Foreign Corrupt Practices Act, wire fraud, election crimes, and public corruption in and around New York.

5.    I have participated in the investigation of this matter, and I am familiar with the information contained in this Complaint based on my own personal participation in the investigation, my review of documents, conversations I have had with other law enforcement officers about this matter, my training and experience, and discussions I have had with other law enforcement personnel. Because this Complaint is being submitted for the limited purpose of establishing probable cause to arrest the defendant, I have not

2



included the details of every aspect of the investigation.  Where actions, conversations and statements of others are related herein, they are related in substance and in part, except where otherwise indicated.

## THE DEFENDANT

6. From immigration records and from my participation in this investigation, I know that FREDERIC CILINS, the defendant, is a citizen of France who has identified himself as a representative of a particular business entity not based in the United States engaged in the mining industry (the "Entity"), as further described below.

## OVERVIEW OF THE DEFENDANT'S CRIMES

7. As described below, FREDERIC CILINS, the defendant, has made repeated efforts to obstruct an ongoing federal grand jury investigation in this District concerning potential money laundering violations and potential violations of the Foreign Corrupt Practices Act ("FCPA"), including such violations by a domestic concern as defined by the FCPA, relating to bribes to officials of a former government of the country of Guinea for the purpose of obtaining valuable mining concessions in Guinea.  During monitored and recorded phone calls and face-to-face meetings with a cooperating witness assisting in this investigation, CILINS, among other things, agreed to pay large sums of money to the cooperating witness to induce the cooperating witness to: (1) provide to CILINS, for destruction, documents CILINS knew had been requested from the cooperating witness by special agents of the FBI and which were to be produced before a federal grand jury; and (2) sign an affidavit containing numerous false statements regarding matters within the scope of the grand jury investigation.  CILINS repeatedly told the cooperating witness that the documents needed to be destroyed "urgently" and that CILINS needed to be present to personally witness the documents being burned.

## THE GRAND JURY INVESTIGATION

8.   From my participation in this matter, I know that, from in or about January 2013 through the present, a federal grand jury in this District has been conducting a criminal investigation regarding potential violations of criminal law, including money laundering and conspiracy to commit money laundering, in violation of Title 18, United States Code, Sections 1956 and 1957; and violations of the Foreign Corrupt Practices Act, Title 15, United States Code, Section 78dd-3 (the "Grand Jury Investigation").  Among other things, the Grand Jury Investigation concerns the

3

transfer into the United States from outside the United States of payments in furtherance of a scheme to corruptly obtain valuable mining concessions in Guinea, including a particular valuable mining concession in Guinea's Simandou region (the "Simandou Concession").   Subjects of the Grand Jury Investigation include one or more "domestic concerns" within the meaning of the Foreign Corrupt Practices Act and certain of the proceeds of potential bribes were wired to or through this District.

9.   Based, among other things, upon my review of publicly-available press articles, I know that the current government of Guinea is conducting an investigation into potential corruption in Guinea by, among others, a particular business entity not based in the United States engaged in the mining industry (the "Entity"). The investigation by the government of Guinea concerns, among other things, whether the Entity or its affiliates obtained the Simandou Concession by means of bribes paid to officials of a former government of Guinea.   For example, a November 2, 2012 article in the Financial Times (the "FT Article") reported that "a [Guinean] government committee has launched a corruption probe and is demanding answers about how [the Entity] secured in 2008 the rights to the half of Simandou that had earlier that year been stripped from [another mining enterprise]."   The FT Article further stated that the committee conducting the government of Guinea Investigation had made "graft allegations" relating to the Entity's acquisition of interests in Simandou and a smaller deposit nearby. According to the FT Article, the committee conducting the government of Guinea Investigation is considering "reclaiming the rights" to the Simandou Concession from the Entity.

10.   Beginning in or about March 2013, as part of the Grand Jury Investigation, the Government has been working with a cooperating witness (the "CW").[1]   The CW is the former wife of a now deceased high-ranking official in the government of Guinea (the "Guinean Official").   From another special agent with the Federal Bureau of Investigation ("Agent-1"), I know that, on or about February 2, 2013, before the Government began working with the CW, Agent-1 served upon the CW a grand jury subpoena, dated February 2, 2013, requiring the CW to testify before the grand jury and provide

_____

[1] The CW is cooperating in the Government's investigation in the hopes of obtaining immunity for the CW's own potential criminal conduct within the scope of the Grand Jury Investigation.   Information provided by the CW has proven accurate and reliable and has been corroborated by, among other things, phone records, physical surveillance, and consensually recorded phone conversations and meetings.

4

documents to the grand jury relating to the Grand Jury Investigation (the "Grand Jury Subpoena"). With respect to the production of documents, the Grand Jury Subpoena required the CW to produce before the grand jury, among other things:

> Any and all documents – including but not limited to contracts, bank or other financial records, records of cash payments or gifts, transaction records, . . . and any other records – reflecting or otherwise concerning: the Simandou concession, . . . [the Entity] and related entities . . .

11.   From the CW, I learned that, while the CW was the wife of the Guinean Official, who was then still in office and empowered to influence the award of mining concessions, the CW was visited by several individuals including FREDERIC CILINS, the defendant, who identified themselves as representatives of the Entity. According to the CW, these individuals told the CW, on behalf of the Entity, that they wished to invest in mines in Guinea and asked the CW for help with the Guinean Official, who was then CW's spouse. CILINS offered the CW $12 million, to be distributed to the CW and ministers or officials within the government of Guinea who might be needed to secure the mining rights if all went well after their introduction to the Guinean Official. The CW later arranged and was present for a meeting between CILINS and the Guinean Official. The CW described further meetings with CILINS and others identifying themselves as being associated with the Entity concerning bribe payments by representatives of the Entity to officials of the government of Guinea. The CW also described personally receiving money from the Entity through an individual the CW described as associated with the Entity as part of the Entity's scheme to corruptly influence the Guinean Official and other officials in an effort to obtain mining contracts for the Entity.

12.   The CW also referenced a series of contacts which the CW entered into with the Entity and its affiliates setting forth the terms of payments by the Entity and its affiliates by which the Entity intended to corruptly influence those necessary to its scheme to secure for the Entity mining rights in Guinea, including the Simandou Concession. From Agent-1 I know that the CW told Agent-1 that FREDERIC CILINS, the defendant, was present when some of these contracts were signed.

13.   From a source assisting the Grand Jury Investigation (the "Source"), among other sources, I have received photocopies, but not originals, of several contracts between the Entity and its

affiliates, on the one hand, and the CW and companies controlled by the CW, on the other, as described by the CW (collectively, the "Contracts"). From Agent-1 I know that copies of two of the Contracts were also separately provided to Agent-1 by the CW. Because the Contracts are in French, I have relied upon draft English translations of the Contracts in describing some of the Contracts below. As described by the CW and as set forth in the Contracts, the Contracts set forth the terms of payments by the Entity, through a wholly owned subsidiary of the Entity, to the CW for the CW's assistance in securing for the Entity mining rights in Guinea, including the Simandou Concession. From my review of the Contracts, I know that the Contracts concern, among other things, the Entity and related entities and the Simandou Concession and are therefore documents required to be produced by the Grand Jury Subpoena. The following paragraphs briefly describe some of the Contracts, each of which was, from at least February 2, 2013, under subpoena by the grand jury.

    a.   I have reviewed a draft English translation of a document titled "Protocole D'Accord" ("Protocol-1"), which is dated June 20, 2007. Protocol-1, which is in French, appears to be a contract between an entity I know is a company controlled by the CW (the "CW's Company") and a Guinea-based wholly owned subsidiary of the Entity (the "Guinea Subsidiary"). According to Protocol-1, "[Guinea Subsidiary] approached the Guinean authorities with a view to establishing a partnership for the development and exploitation of part of the iron deposits of SIMANDOU, and also the [CW's Company] in order that the latter might assist it in the ways and means which would allow it to obtain permits for mining research." Protocol-1 further recounts that "with the combined efforts" various mining research permits were granted by the Ministry of Mines and Geology to the Guinea Subsidiary. Moreover, Protocol-1 sets forth that "[i]n order to remunerate the efforts provided, the [Guinea Subsidiary] agrees to transfer 5% of all its shares of stock to the [CW's Company], which agrees to this." Protocol-1 appears to be signed by CW, as "The Manager" of the CW's Company and by an individual listed as the "Chief Executive" of the Guinea Subsidiary.

    b.   I have reviewed another document titled "Protocole D'Accord" ("Protocol-2"). From Agent-1, I know that the CW provided a copy of Protocol-2 to Agent-1. From my review of a draft English translation of Protocol-2, which is in French and is dated February 28, 2008, I know that Protocol-2 also appears to be a contract between the CW's Company and the Guinea Subsidiary. Protocol-2 provides that "[t]he [Entity] commits to giving 5% of the shares of stock of blocks 1 and 2 of simandou, situated in the Republic of Guinea." Protocol-2 appears to be signed by only the

CW, on behalf of the CW's Company, and by a representative of the Entity ("Individual-1").

    c.   I have reviewed another of the Contracts titled, in French, "Contrat De Commission" (the "Commission Contract").   From Agent-1, I know that the CW provided a copy of the Commission Contract to Agent-1.   From my review of a draft English translation of the Commission Contract, which is in French and is dated February 27, 2008, one day before the date of Protocol-2, I know that the Commission Contract states, in pertinent part, the following:

> [The CW's Company] commits for its part to taking all necessary steps to obtain from the authorities the signature for the obtaining of the aforementioned blocks [of the Simandou mine] on behalf of [the Guinea Subsidiary].
>
> [The Guinea Subsidiary] proposes to distribute the commission above as follows:
>
> The amount of two (2) million for the [CW's Company] with attribution of one hundred (100) USD already paid out as an advance.   The remainder of the amount will be distributed among persons of good will who may have contributed to facilitating the granting of the aforementioned blocks, regarding which [the Guinea Subsidiary] will be conscientious with respect to the quality of the contribution of each party.   The totality of the amount will be paid out without delay after signature of the aforementioned document.

The Commission Contract appears to be signed by the CW, on behalf of CW's Company, and by Individual-1, on behalf of [the Guinea Subsidiary].

    d.   I have reviewed another of the Contracts, which is titled "Lettre D'Engagement" (the "Engagement Letter") and is undated. From my review of a draft English translation of the Engagement Letter, which is in French, I know that the Engagement Letter is addressed to the CW from a particular holding company (the "Holding Company").   The Engagement Letter recounts that "[the Guinea Subsidiary] approached the Guinean authorities in view of establishing a partnership for the development and exploitation of part of the iron deposits of SIMANDOU" and that "[i]n the context

of this project, [the Guinea Subsidiary] submitted a proposal to the Guinean authorities, which allows shareholding . . . up to 5% by [the CW] as a local partner." The Engagement Letter further states, among other things, that "[i]n order to incorporate the shareholding of [the CW], [the Guinea Subsidiary] will transfer 17.65% of its capital to the [Holding Company], of which 33.30% of the capital will be attributed to [the CW]."

e.   I have reviewed another of the Contracts, which is untitled and dated August 3, 2010 (the "August 3, 2010 Contract"). From Agent-1, I know that the CW provided a copy of the August 3, 2010 Contract to Agent-1. From my review of a draft English translation of the August 3, 2010 Contract, which is in French, I know that the August 3, 2010 Contract is signed by the Holding Company. In the August 3, 2010 Contract, the Holding Company agreed to pay the CW, subject to "the favorable pursuit, good functioning, and positive outcome of the operations that [the Holding Company] and its partners carry out in all their activities in Guinea (commerce, medicine, mining, etc.) . . . . the additional amount of 5 million US dollars, payable in two parts (each payment being 2.5 million US dollars)." The first payment was to be made "24 months after the signature of this document" and the second "24 months after the first payment." The August 3, 2010 Contract required the CW to conceal the CW's relationship with the Holding Company, reciting that the CW and the CW's company "commit herewith to make no use of this document, in any manner whatever, directly or indirectly, and to not use this document against the [Holding Company] and/or its partner and/or its associates in Guinea or elsewhere."

14.   From the CW, I know that some of the money paid to the CW by the Entity and its affiliates or agents was wired to a bank account in Florida controlled by the CW.

## THE DEFENDANT'S OBSTRUCTION OF THE GRAND JURY PROCEEDING AND THE FBI INVESTIGATION

15.   From Agent-1, I have learned that in or about early March 2013, Agent-1 learned from the CW that FREDERIC CILINS, the defendant, contacted the CW by phone in an effort to reach an agreement with the CW under which CILINS would pay money to the CW in exchange for the CW providing CILINS with originals of the Contracts. CW thereafter participated in a number of consensually recorded and monitored phone calls with CILINS and several consensually monitored and recorded face-to-face meetings with CILINS, which are described below. These phone calls and meetings were all conducted in French and the descriptions below of these phone calls and meetings are therefore based upon my review of

8

draft English summaries of the recordings.  As further detailed below, during the course of these phone calls and meetings, CILINS, referencing documents evidencing payments from the Entity and its affiliates to the CW, including the Contracts, told the CW that the documents needed to be "destroyed" and agreed to pay the CW money for originals of the documents and for signing a statement denying that the CW had ever entered into any contracts with the Entity or received any money from the Entity.

16.  Either Agent-1 or I was present for each of the telephone calls between the CW and FREDERIC CILINS, the defendant, described below.  From Agent-1, I learned that Agent-1 learned from the CW that prior to the phone calls described below, the CW had discussions with CILINS regarding potential payments by CILINS to the CW in exchange for documents concerning the Entity and its affiliates, including the Contracts.  Each call was recorded and, for each call, either I, if I was not present, or Agent-1 verified that the CW's call was placed to a particular phone number that I know, based upon records from T-Mobile, is subscribed to by "Frederic Cilins."

a.  On or about March 15, 2013, the CW called CILINS.  During this phone call, which was monitored and recorded, CILINS told the CW that he wanted to meet the CW the following week.  The CW asked CILINS what CILINS was going to offer the CW.  CILINS replied that he needed to see the CW in person.  CILINS again reiterated that he needed to speak to the CW, but did not want to speak on the phone.  The CW asked CILINS whether, when they meet, the CW should bring "the documents."  CILINS responded that it was up to the CW whether to bring the documents to that meeting, but said that they first needed to meet to go over the details and then execute it.  Based upon information from the CW and my familiarity with this investigation, I believe that the "documents" referenced during this phone call include the Contracts and other agreements between the CW and the Entity or the Guinea Subsidiary concerning bribe payments for mining concessions in Guinea.

b.  On or about March 16, 2013, the CW spoke again with CILINS.  During this call, which was monitored and recorded, the CW and CILINS discussed when the CW and CILINS would be able to meet in person.  When the CW said that the CW would be unavailable to meet that week, CILINS responded that it was in the CW's interest to meet as there might be a great deal of discussion of money during the meeting.  The CW asked how much money CILINS would give the CW, and CILINS responded by referencing a previous discussion during which CILINS and the CW had discussed money.  CILINS reiterated that they needed to meet, as the money question was one which they could not resolve on the telephone.

9

      c.   On or about March 20, 2013, the CW again called CILINS.  During this call, which was monitored and recorded, the CW and CILINS discussed their plans for an upcoming, face-to-face meeting in Jacksonville, Florida.  The CW told CILINS that the CW wanted an agreement during the meeting and asked whether another individual ("CC-1") who, based upon publicly available information, I know is a high-ranking individual within the Entity, had agreed to the sum of money that CW had requested.  CILINS responded, "Of course."  CILINS stated that, after the meeting in Jacksonville, Florida, CILINS would work with an attorney to draft papers concerning their agreement.  CILINS again stated that he did not want to discuss details of the arrangement by telephone.

    17.   Based upon information from the CW, my familiarity with this investigation, and my training and experience, I believe that during the foregoing phone conversations, FREDERIC CILINS, the defendant, was discussing plans to meet with the CW to offer the CW money to either destroy, or provide to CILINS for destruction or concealment, documents relating to the Simandou concession and the Entity and related entities, including the Contracts described above, which were, and remain, the subject of the Grand Jury Subpoena.

    18.   Based upon my conversations with Agent-1 and other special agents of the FBI, I know that, on or about March 25, 2013, following the phone conversations described above in which FREDERIC CILINS, the defendant, discussed with the CW paying the CW money in exchange for documents relating to the Simandou Concession and the Entity and related entities, including the Contracts, the CW met with CILINS at an airport in Jacksonville, Florida (the "March 25 Meeting").  Agents from the FBI conducted physical surveillance of the March 25 Meeting, which was recorded by a recording device in the CW's possession.  Because the March 25 Meeting was conducted in French, the description below of what occurred during the March 25 Meeting is based upon my review of draft English summaries of the recordings.  Based upon my review of these draft English summaries, I know that, in substance and among other things, the following occurred during the March 25 Meeting:

      a.   CILINS told the CW, in substance and in part, that the CW will receive $300,000 while the remainder, which the CW will receive when it is over, will be somewhere else.  After the CW asked how they will proceed with this agreement, CILINS replied that he, CILINS, would need to come back so that they can destroy the papers.  CILINS told the CW that, at the same time, some of the funds intended for the CW will be invested with a lawyer, while the rest would go to the CW.  After the CW told CILINS that the CW did not understand, CILINS reiterated that after he, CILINS, returns to

destroy the papers, part of the money will be held by the lawyer and the rest would go immediately to the CW. Based upon what I have learned from the CW and my familiarity with this investigation, I believe that the documents CILINS refers to during this portion of the conversation include the Contracts and any other documents relating to the Entity and related entities concerning payments to the CW and others to secure mining rights in Guinea, including the Simandou Concession. Moreover, I believe that, when CILINS tells the CW that the CW will receive additional money when it is over, CILINS is referring to additional payments that CILINS and his co-conspirators will give to the CW for delivering to CILINS the documents after the government of Guinea's corruption investigation into the Entity has concluded favorably for the Entity.

b.   CILINS described that CILINS was visited by a private investigative agency and questioned regarding documents relating to the Entity's mining contracts in Guinea and other documents in which, according to CILINS, the CW is mentioned. When the CW asked what to do if the CW were to be questioned by the same private investigative agency, CILINS, in substance, directed the CW to reply that the CW has no involvement in the matter, has never received any money, and that the CW does not have anything to do with the contract. CILINS further told the CW that CILINS would return with a document which the CW could refer to for answers in case the CW is ever questioned.

c.   The CW asked CILINS what to do if the American government got involved. CILINS asked, in substance and in part, whether the CW is currently being bothered by officials from the government, to which the CW replied no. CILINS told the CW that he, CILINS, hoped that they would never come. The CW recounted that CILINS had told the CW, during a previous conversation, that they could come knock at the door and therefore the CW should destroy the papers. CILINS posited that the papers must be in the United States and that the next time CILINS comes they will need to destroy the papers. Based upon information from the CW, my conversations with Agent-1, and my familiarity with this investigation, I believe that when CILINS told the CW, in the context of discussion regarding a potential investigation by the United States Government, that they could come at any time and that the CW should destroy the papers, CILINS is expressing concern regarding a potentially imminent investigation by the government of the United States and directing the CW for that reason to destroy documents, including the Contracts.

d.   CILINS told the CW that CILINS needed to return to France the next day, but that he, CILINS, would return to

11

the United States, arriving in Miami, on April 8, 2013.  CILINS further told the CW that CILINS would come to Jacksonville, Florida to meet with the CW between April 8, 2013 and April 16, 2013.

19.  Based upon my conversations with Agent-1 and other special agents of the FBI, I know that, on or about April 11, 2013 the CW met again with FREDERIC CILINS, the defendant, at the same airport in Jacksonville, Florida (the "April 11 Meeting").  Prior to the April 11 Meeting, Agent-1 directed the CW to advise CILINS that the FBI, along with a federal grand jury, were conducting a grand jury investigation by providing CILINS with a ruse account of having recently been approached by FBI agents concerning that investigation, as further described below.

20.  An FBI surveillance team conducted physical surveillance of the April 11 Meeting, which was recorded by a recording device in the CW's possession.  Because the April 11 Meeting was conducted in French, the description below of what occurred during the April 11 Meeting is based upon my review of draft English summaries of the recordings, which were prepared by French speakers.  Based upon my review of these draft English summaries, I know that, in substance and in part, the following took place during the April 11 Meeting:

    a.  The CW began the meeting by describing to CILINS that, during a recent visit by the CW to the United States immigration office to obtain an extension for the CW's visa, the CW was approached by two individuals who identified themselves as FBI agents.  The agents told the CW that they are currently investigating bribe payments and mining contracts in Guinea. The CW further told CILINS that the CW was told by the agents that if the CW does not want to talk, the CW would receive a subpoena after which the CW would be required to appear in front of the grand jury, testify and turn over all the documents.  CILINS asked whether the CW told the agents that the CW did not have any documents, to which the CW replied that the CW did tell the FBI agents that the CW had no documents.

    b.  CILINS replied that the documents need to be destroyed very urgently.  CILINS repeated the word "urgently" multiple times.  The CW told CILINS that the CW believes that the documents they want to destroy are the same documents that the U.S. government is after, and that the CW does not know what to do at this point.  CILINS replied that he, CILINS, told the CW a long time ago that the CW should not keep anything here and that the CW should destroy absolutely everything.

    c.  CILINS asked whether the agents left the CW with a

12

paper.  The CW replied that they left the CW with a phone number.
CILINS asked for the phone number and told the CW that CILINS will
need to get that phone number.

       d.    The CW then asked CILINS what a grand jury is, and
added that the CW went online to find out and brought CILINS a
paper explanation.  Based upon my conversation with Agent-1, I know
that at this point the CW took out and showed to CILINS a printout
that the CW told CILINS the CW had gotten from the internet, but
that had previously been provided to the CW by Agent-1.  This
document described, in French, the nature and functions of a grand
jury in the United States.  From Agent-1, I know that CILINS was
observed by FBI agents reading the printout.  CILINS then stated
that there is only one thing that needs to be done immediately, and
that thing is what CILINS had already told the CW.

       e.    CILINS told the CW that CILINS had a report (the
"Report") regarding an investigation performed by a particular law
firm which, in substance, described the CW's participation in a
bribery scheme involving mining concessions in Guinea.  CILINS told
the CW that, according to the Report, evidence of the commission
paid to the CW in connection with the Guinean mining concessions
awarded to the Guinea Subsidiary consists of nine documents bearing
the letterhead of the Entity, including, among other things, a
series of draft agreements and a final sealed document stipulating
that $2.5 Million were promised to the CW for services guaranteeing
the rights to the Simandou Concession.

       f.    After reading another short portion of the Report,
CILINS stopped reading and told the CW that they need to destroy
the papers urgently.  CILINS again repeated the word "urgently"
several times.  CILINS stated that he was surprised that the FBI
agents came to see the CW rather than calling the CW to come to
them.  CILINS told the CW, in substance, that the CW will need to
be firm with the CW's story.  CILINS told the CW that when they ask
whether the CW knows the Entity or has been a participant in any
activity, the CW can claim that the CW knows them as they are a
company like many others in Conakry, which is the capital of
Guinea, but that the CW has never been involved in anything else.

       g.    CILINS asked the CW whether the CW has the
documents at home and told the CW that it is certain that they have
to do it, which I understand, based upon my knowledge of this
investigation, to mean destroying the documents, urgently.  After
the CW explained to CILINS that the documents were in a vault,
CILINS told the CW that the CW absolutely needs to do it this
afternoon when the CW goes back home.  CILINS asked whether the CW
has anybody else who the CW can send to get the documents in order

13

for them to be destroyed.  The CW replied that only the CW has access to the documents.

   h. CILINS told the CW that it is important for the CW to issue a statement in the legal proceeding regarding the Entity. CILINS told the CW that, in the statement, the CW needs to stipulate that the CW has nothing to do with the matter.  CILINS asked the CW whether that is clear, to which the CW replied yes. CILINS also suggested that the CW may want to deny that the CW had been married to the Guinean Official.

   i. CILINS asked the CW, in substance, whether the FBI agents appeared to know about the documents. The CW replied that the CW does not know.  CILINS directed the CW not to talk about anything over the phone and that, whenever the CW is talking about something, the CW should move the phone far away as "they" are listening to everything.

   j. CILINS then told the CW that there should not be many documents left and that they need to find a place to burn all of them, adding that they cannot do it at the CW's house.  CILINS again told the CW that they need to take care of it fast now as in the past they delayed too much.  CILINS further told the CW that the matter is serious and that if the original documents are found the CW could lose everything the CW owns in the United States and be sued and deported.  CILINS further stated that what is done is done and was a significant mistake.

   k. CILINS told the CW that CILINS was asked to be present in person to witness the documents being burned in order to guarantee that nothing is left behind. When the CW suggested that the CW could take care of it without CILINS, CILINS repeated that CILINS was instructed to see it happen in person and that CILINS cannot lie when he is asked whether he, CILINS, saw the papers being burned.

   l. CILINS stated that, based upon what the CW had told him, the situation is now very urgent.  CILINS told the CW that he was willing to return to meet with the CW on Saturday, April 13, or Sunday, April 14, to complete what they have to do.  Based upon my participation in this investigation and prior conversation during the April 11 Meeting, I believe that CILINS' reference to what the CW previously told him is a reference to what the CW had previously described to CILINS as a visit by FBI agents and the agents' mention of returning with a grand jury subpoena.

   m. CILINS then also discussed with the CW money CILINS would pay the CW.  CILINS told the CW that the CW would receive $1

14

million, with $200,000 to be paid now and $800,000 at a later date. CILINS further told the CW that, once the case is complete and the group is not forced out, the CW will receive "five." Based upon my participation in this investigation and my training and experience, I believe that the case CILINS refers to is the corruption investigation by the government of Guinea, the group CILINS refers to is the Entity or the Guinea Subsidiary, and "five" refers to $5 million. CILINS later reiterated that the CW will receive $5 million if they are not kicked out and the $1 million regardless of the outcome.

       n.    CILINS then presented to the CW for the CW to sign a document CILINS referred to as an attestation (the "Attestation"). CILINS read the Attestation to the CW and told the CW that they needed to write "Jacksonville" on the Attestation, and date and sign it. The CW signed the Attestation after which I know from Agent-1 that the CW and CILINS walked together to a business center within the airport to make a copy of the Attestation for the CW.

       o.    As CILINS and the CW walked to the business center, CILINS reiterated that it is very important for CILINS to be present when the documents are destroyed and that CILINS has strict orders to be present for the destruction of the documents. The CW and CILINS agreed that the CW would go home to get the documents and call CILINS with a place where they could meet.

    21.   From Agent-1 I know that, after the conclusion of the April 11 Meeting, the CW provided Agent-1 with a copy of the Attestation, which had been presented to the CW for the CW's signature by FREDERIC CILINS, the defendant, during the April 11 Meeting. The Attestation is written in French and is titled "ATTESTATION." Because the Attestation is in French, my description of the Attestation below is based upon a draft English translation of the Attestation prepared by a French translator. The Attestation, which purports to be a document issued by the CW, contains, among other things, the following statements, each of which I know based, among other things, upon information from the CW and my review of the Contracts described above, is false:

       a.    "I have never signed a single contract with the Entity, neither directly or indirectly through anyone else."

       b.    "I never intervened with Guinean officials in favor of [the Entity] . . ."

       c.    "I have never received any money from [the Entity],

15

neither directly or indirectly. . . . [The Entity]
never gave me . . . any money, neither directly to
me nor to anyone else on my behalf.  They did not
either promise to pay me anything, neither to me,
nor to anyone else on my behalf."

22.  Based upon my conversations with Agent-1 and other
special agents of the FBI, I know that, later on or about April 11,
2013, the CW again met with FREDERIC CILINS, the defendant,  at an
airport in Jacksonville, Florida (the "Second April 11 Meeting").
An FBI surveillance team conducted physical surveillance of the
Second April 11 Meeting, which was recorded by a recording device
in the CW's possession.  Because the Second April 11 Meeting was
conducted in French, the description below of what occurred during
the Second April 11 Meeting is based upon my review of draft
English summaries of the recordings, which were prepared by French
speakers.  Based upon my review of these draft English summaries,
I know that, in substance and among other things, the following
occurred during the Second April 11 Meeting:

a.    The CW expressed concern to CILINS that the CW
was being asked to lie to the FBI and told CILINS that the CW
wanted money now.  CILINS replied that he would see what he could
do and would try to get $50,000 to give to the CW.   CILINS
expressed that he would need to seek permission from a senior
operative within the Entity to pay the CW the money.   CILINS
stated, in substance, that the CW needed to lie to the FBI.

b.    CILINS told the CW, who had brought to the Second
April 11 Meeting copies of some of the Contracts, that the CW
needed to bring the originals.   CILINS told the CW that CILINS
would call the CW the next day to arrange a time for them to meet
again.

23.  Based upon my conversations with Agent-1, I know that, on
or about April 14, 2013, the CW again met with FREDERIC CILINS, the
defendant,  at the same airport in Jacksonville, Florida (the
"April 14 Meeting").   Agents from the FBI conducted physical
surveillance of the April 14 Meeting, which was recorded by a
recording device in the CW's possession.  From Agent-1, I know that
shortly after CILINS left the April 14 Meeting, CILINS was arrested
in possession of envelopes from Wells Fargo bank containing
approximately $20,000 in United States currency.

16

WHEREFORE, deponent respectfully requests that the defendant be imprisoned, or bailed, as the case may be.

                                        _____
                                        PETER KILPATRICK
                                        Special Agent
                                        Federal Bureau of Investigation

Sworn to before me this
__th day of April, 2013

APR 15 2013

_____
HONORABLE JAMES C. FRANCIS
UNITED STATES MAGISTRATE JUDGE
SOUTHERN DISTRICT OF NEW YORK

17

Exhibit no. 7

[illegible stamp]
[duty stamp:] REPUBLIC OF GUINEA
                    DUTY STAMP
                    1,000 FRANCS
                        [illegible]

## MEMORANDUM OF UNDERSTANDING

## BY AND BETWEEN THE UNDERSIGNED

**MATINDA AND CO.LIMITED-SARL**, single-member company, hereinafter abbreviated "MACO", with its head office in Dubréka, Republic of Guinea.

Party of the first part

And

**BSGR Ressources Guinée SARL**, company governed by the Guinean law, with its head office in Conakry

Party of the second part

Whereas

The Company named BSGR Guinea has approached the Guinean authorities to establish a partnership for the development and mining of part of the iron deposits of SIMANDOU on the one hand, and the Company named MATINDA AND CO-LIMITED –SARL so that the latter assists it in the process of obtaining the mining exploration permits.

Thereupon, as a result of joint efforts, by the Order No. A2007/582/MMG/SGG of February 28, 2007 of the Ministry of Mines and Geology, four mining exploration permits for uranium mining covering a total area of $1,413 \text{ km}^2$ were granted to BSGR Ressources Guinea in the Prefectures of Lola and N'zérékoré;

Thus, the parties freely agree to the following:

In order to reward the efforts provided, BSGR Guinea agrees to transfer 5% of all its shares to MATINDA AND CO-LIMITED-SARL which accepts the transfer.

This Memorandum, which is binding on the parties, enters into force on the date of its signature.

Signed in Conakry on [hw:] *JUNE 20*, 2007

Drawn up in 2 original copies

BSGR Ressources Guinée                     MATINDA AND CO LIMITED Sarl
[signature]                                                          Manager
[hw:] *MANAGING DIRECTOR*                   Mrs. Mamadie TOURE
                                                                  [signature]
                    [square stamp:] SEEN FOR THE PHYSICAL
                    AUTHENTICATION OF THE SIGNATURES
                          CONAKRY, [hw:] *07/20/07*
                                CHIEF CLERK

                [round stamp:] Court of 1st Instance of Konakry 2
                                  Republic of Guinea
                                      Chief Clerk
                                      [Signature]

[blank page]