Hb7dbsgm

```
 1   UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ------------------------------x

 3   BSG RESOURCES (GUINEA)
     LIMITED, et al.,
 4
                   Plaintiffs,            New York, N.Y.
 5
              v.                          17 Civ. 2726(JFK)
 6
     GEORGE SOROS, et al.,
 7
                   Defendants.
 8
     ------------------------------x
 9
                                         November 7, 2017
10                                       11:25 a.m.

11   Before:

12                   HON. JOHN F. KEENAN,

13                                       District Judge

14                       APPEARANCES

15   GREENBERG TRAURIG, LLP
          Attorneys for Plaintiffs
16   BY:  LOUIS SOLOMON
          MICHAEL LAZAROFF
17        NANCY SAVITT
          ANNE REDDY
18        NICHOLAS NORDEN

19   WILLKIE FARR & GALLAGHER LLP
          Attorneys for Defendants
20   BY:  JOSEPH BAIO
          JAMES FITZMAURICE
21        ELIZABETH BOWER

22

23

24

25
```

1          THE COURT:  This is in the matter of BSGR against

2     George Soros, et al., and this is a motion either to dismiss

3     or, alternatively, to stay pending the outcome of an

4     arbitration proceeding between the plaintiffs, the arbitration,

5     that is, and the Nation of Guinea.

6          So, as I understand it, Mr. Baio, you are going to

7     argue, is that correct?

8          MR. BAIO:  Yes, your Honor, I am.

9          THE COURT:  Fine.  If you would use the lectern, I

10    would appreciate it, and that way when Mr. Solomon argues he

11    can use the lectern also.

12         MR. SOLOMON:  Yes, your Honor.

13         THE COURT:  Fine.  And each side has 40 minutes.

14         And as I understand it, you want five minutes

15    rebuttal?

16         MR. BAIO:  Yes, your Honor.

17         THE COURT:  Fine.  Go ahead.  I will hear you.

18         MR. BAIO:  Thank you, your Honor.

19         THE COURT:  Thank you.

20         MR. BAIO:  May it please the Court and good morning.

21         THE COURT:  Good morning to you.

22         Good morning also to the plaintiffs.  Good.

23         MR. BAIO:  I'm Joseph Baio, and along with my

24    colleagues at Willkie Farr & Gallagher, we represent George

25    Soros and various charitable organizations who are defendants

1   in this action.  We are before you today, your Honor, as you

2   said, on defendants' motion to dismiss the amended complaint

3   for a variety of reasons, including the application of the

4   Act-of-State Doctrine, which holds that the acts by a foreign

5   sovereign within its own boundaries become an unchallengeable

6   rule of decision for the courts of the United States.  It

7   precludes the courts of this country from inquiring as to the

8   validity of public acts of a foreign sovereign within its own

9   territory.  In the alternative, your Honor, defendants have

10  moved for a stay of the proceedings based on the initiation and

11  near completion of an arbitration that the plaintiffs have

12  brought against the Republic of Guinea.  That arbitration was

13  initially brought in 2014, almost three years before this

14  action was commenced, and will certainly impact and perhaps

15  obviate the need for any proceedings by the foreign plaintiffs

16  against defendants here.

17        The action has been brought by various foreign

18  corporate entities affiliated with Mr. Beny Steinmetz.  I will

19  refer to those foreign corporate plaintiffs collectively as

20  BSGR or the BSGR entities.

21        This case arises out of a series of actions taken by

22  the Republic of Guinea, a West African country, concerning the

23  exploration and mining of iron ore deposits within Guinea's

24  border.  According to the amended complaint, the BSGR entities

25  were granted the right to test, prospect, mine, and hopefully

profit from certain iron ore sites within Guinea.  Plaintiffs

allege that they received permits, licenses and governmental

permissions to mine the properties from 2006 through early 2010

from the military regimes that controlled the Republic of

Guinea at the time.  In 2010 Mr. Alpha Conde was elected

president of the Republic of Guinea, replacing the former

military ruler.  The amended complaint alleges claims against

the defendants here based on a series of official actions that

were taken by the government about which plaintiffs complain

and that those actions led to and included the revocation of

the foreign permits and the termination of the alleged contract

rights and other rights that the BSGR entities claim they had

received under the prior regime.

        The Guinea government took these steps after

conducting an investigation into Mr. Steinmetz and his cohorts

and based on allegations that they used bribes and other

corrupt means to secure the permits and the mining rights.

According to plaintiffs, the governmental actions leading up to

and including the revocations and terminations were improper,

unenforceable and illegal and constituted breaches of the

permits and rights that were described.

        Plaintiffs allege in this case that the defendants

improperly influenced and guided the Guinean government to take

the actions it did, including the revocations of permits and

the termination of plaintiffs' mining rights.  They seek to

Hb7dbsgm

1  hold Mr. Soros and the charitable entities liable for the

2  losses and damages they purportedly suffered by alleging five

3  causes of action against the defendants -- tortious

4  interference with contract, conspiracy with an arm of the

5  Guinean government to do the same, prima facie tort, fraud, and

6  commercial defamation.  All of these caution causes of action,

7  we submit, your Honor, should be dismissed, because, as noted

8  in our brief, a variety of problems and pleading impediments

9  stand in the way.

10         THE COURT:  Now --

11         MR. BAIO:  Yes, your Honor.

12         THE COURT:  This is an amended complaint you are

13  attacking, right?

14         MR. BAIO:  Yes, your Honor.  Indeed.

15         THE COURT:  All right.  Now, don't infer anything from

16  my question.

17         MR. BAIO:  I won't.

18         THE COURT:  Nor should the plaintiffs infer anything

19  from my question.

20         Were I to grant your motion -- were I to --

21         MR. BAIO:  Yes.

22         THE COURT:  -- do I give them leave to amend again?

23         MR. BAIO:  Your Honor, I think not because I believe

24  it would be futile.  I do think that since the centerpiece of

25  their case -- for two reasons, at least.  The centerpiece of

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

1   the case is the actions that were taken by the Guinean

2   government.  Those provide the foundation for every claim

3   against us.  Those must be taken by your Honor -- those acts,

4   the creation of the mining statutes, the actions of the

5   technical committee and the strategic committee, they all must

6   be taken on face value, and they concluded that the contracts

7   in question and the permits are invalid.  That doesn't change

8   by pleading a new cause of action.  So I think on that front,

9   if the Act-of-State Doctrine applies, it fails.

10          Separately, your Honor, on our motion to stay pending

11   arbitration, the arbitration is already -- has been underway

12   for -- well, since 2014.

13          THE COURT:  Yes.  It is three years, the arbitration.

14          MR. BAIO:  Yes, before ours, your Honor, almost three

15   years before they brought the case against us.  Testimony has

16   been given, documents have been produced, and they are waiting

17   for, obviously, some additional briefing as described in

18   Mr. Libson's affidavit, but they are close to the end.

19          Now, perhaps it will take whatever time it will take

20   to be resolved, but the resolution of that arbitration resolves

21   many of the issues that they are asking your Honor to decide,

22   and at a minimum we should wait until that arbitration is

23   concluded and a decision is made as to whether in fact

24   Mr. Steinmetz bribed officials.

25          THE COURT:  Well, on the arbitration --

1          MR. BAIO:  Yes, your Honor.

2          THE COURT:  -- before we get to the Act-of-State

3     Doctrine, how can I stay this if the parties and claims are not

4     identical to those in the arbitration, and they are not

5     identical?  Won't a stay of our action here cause hardship to

6     the plaintiffs, undue hardship?

7          MR. BAIO:  I don't think so, your Honor, because the

8     issues that are raised in the arbitration I submit are outcome

9     determinative as to what can happen here.  For example, the

10    arbitration is saying Mr. Steinmetz did not secure the

11    underlying contracts and permits through fraud and corrupt

12    practices.  That will be decided adversely or favorably.  He

13    has asked for a finding that the terminations of the contracts

14    were wrong, they were baseless, and they should be reversed,

15    and he's litigating that against the State of Guinea.  If he

16    prevails on that, he will get his contractual rights reinstated

17    and he is seeking -- or the BSGR entities are seeking damages

18    from the Guinean government for the very thing that Mr. Soros

19    and the charitable objections purportedly did.

20         So he selected and his entity selected a specific

21    vehicle to preserve and secure the rights that either they will

22    win or they will lose.  If they win, they get the recovery from

23    the State of Guinea.  If they lose, they have no claim against

24    my clients.  There does not need to be under the law an

25    identity of the parties and the issues.  It is just a question

1    of whether there is an overlap and whether that overlap -- the

2    resolution of the overlap issues will impact this case, perhaps

3    even eliminate this case.  And when you look at the arbitration

4    that was commenced with the allegations of improper action by

5    the part of the technical committee, the strategic committee,

6    the president, the ruling on termination, those are all

7    foundational issues that relate directly to the claims that are

8    alleged against Mr. Soros.

9          So, they are not being denied any recourse.  They have

10   the recourse that they have selected.  They waited all these

11   years to bring this particular action, and now they say we need

12   to hurry up when in fact there may be conflicting decisions if

13   you, your Honor, go forward and make whatever conclusions that

14   you or the jury makes and then the arbitration award comes down

15   and says Mr. Steinmetz is a crook, or Mr. Steinmetz engaged in

16   bribery, or Mr. Steinmetz is properly under house arrest in

17   Israel.  So all of the principles that support a stay pending

18   arbitration are applied here.  Even though the issues, as you

19   correctly point out, are not exactly the same, they don't need

20   to be.

21         THE COURT:  Go ahead.

22         MR. BAIO:  All right.  So, your Honor, let's turn to

23   the Act-of-State Doctrine.

24         The Act-of-State Doctrine, according to the Supreme

25   Court of the United States, has held that the doctrine bars a

1    U.S. Court from entertaining a cause of action where the relief

2    sought would require the Court to declare invalid the official

3    act of a foreign sovereign performed within its own boundaries.

4    That's in the Kirkpatrick case.

5            Similarly, the Court has held that acts taken by a

6    foreign state within its own boundaries becomes a rule of

7    decision in this court, in the courts of this country.

8            Finally, the Court in Kirkpatrick held that the

9    doctrine requires that in the process of a U.S. court deciding

10   a cause of action or claim, the acts of the foreign sovereigns

11   taken within their own jurisdiction shall be deemed valid.

12   Courts in the United States will not look behind or inquire

13   about the reasons why a state, a foreign sovereign, did what it

14   decided to do.

15           THE COURT:  Well, now, let me ask you this.

16           MR. BAIO:  Yes.

17           THE COURT:  How does the Act-of-State Doctrine bar

18   their fraud claim if they allege, as they apparently do, that

19   Mr. Soros made actionable misstatements or omissions?

20           MR. BAIO:  Your Honor, I think that is a fair

21   question, and one needs only to look at what they have actually

22   pleaded in their fraud claim.  As we pointed out, what is the

23   misrepresentation that they claim in the fraud action?  It is a

24   single sentence, and let me see if I can find it.

25           (Pause)

Hb7dbsgm

1          THE COURT:  It is a pretty long complaint.  You

2     don't --

3          MR. BAIO:  Oh, I know, your Honor, but this is one

4     sentence; I think it is paragraph 117.  And all it says is, in

5     words or substance, Mr. Soros declared that the claimants who

6     have permits must satisfy the standards of the IETI, which is

7     an international organization that sets forth standards before

8     claimants can -- and it may not be 117, I apologize, maybe

9     someone knows, but if I get to it, it is important, your Honor,

10    because --

11         THE COURT:  All right.

12         MR. BAIO:  -- that statement, that's it.  That is the

13    supposed misstatement.  OK?  And they recognize in their

14    complaint that it is not a misstatement on its face, it simply

15    is making a statement of fact.  But what they say is it implies

16    that the procedure that the technical committee would pursue

17    was fair.

18         Now, we think that as a pleading matter, the statement

19    that this is what will apply, to imply that that is an

20    indication of fairness rather than a statement of fact, there

21    is no basis for that, and we cite law that says inferential

22    misstatements should not be the basis of a fraud claim.

23         But let's go to the next thing, your Honor.  What is

24    the detrimental reliance on that supposed implied false

25    statement?  In the complaint, they say that although the BSGR

Hb7dbsgm

1  entities believed that the functioning of the government was

2  fraudulent and flawed, they nevertheless supposedly

3  detrimentally relied upon Mr. Soros's statement to participate

4  in the technical committee and identify why the allegations of

5  fraud were wrong.  That is the detrimental reliance.

6          THE COURT:  All right.  Well, on this reliance

7  issue --

8          MR. BAIO:  Yes, your Honor.

9          THE COURT:  -- isn't it enough at this stage of the

10  litigation for them to allege that they reasonably relied on

11  the defendants' misstatements or omissions?

12          MR. BAIO:  Your Honor, when you look at what the

13  allegations are -- and we're just sticking to the

14  allegations -- I believe that, one, the BSGR entities said they

15  believed from the beginning this was a flawed and sham process.

16  They yet simultaneously are saying they relied on one sentence

17  by Mr. Soros, believing somehow that his inference that it

18  would be fair was true, and that's why they submitted the

19  documents to the technical committee.  That makes no sense on

20  its face.  It is undercut by the very allegation that they

21  believed from the beginning that the whole process was phony.

22          So, detrimental reliance must be reasonable.  And what

23  I am saying is that your Honor can evaluate that claim based

24  upon the language specifically in the amended complaint.  You

25  don't have to look anywhere else.

Hb7dbsgm

```
 1            But there is more.  What are the damages that
 2    supposedly flowed from the detrimental reliance on the
 3    statement that Mr. Soros made to a newspaper that there would
 4    be a process that followed?  Even if all those other links do
 5    not fall down -- and we believe they do -- the damages are the
 6    cost of having submitted into the technical committee contrary
 7    documents and the conclusion of the technical committee that
 8    Mr. Steinmetz and BSGR engaged in a fraud.  That is the source
 9    of the damages, which is an element of the claim.  That, your
10    Honor, under the Act-of-State Doctrine, is exactly what you
11    should not do.
12            THE COURT:  Well, is there any element of the claim
13    here that would require me to rule on the validity of Guinea's
14    sovereign acts?
15            MR. BAIO:  Yes, your Honor.
16            THE COURT:  What?
17            MR. BAIO:  The conclusion of the technical committee.
18    What are the damages that were incurred by Mr. Steinmetz and
19    his companies as a result of this supposed misrepresentation?
20    It's that the technical committee denied him the right in
21    supposedly a sham transaction.  But that must be a given.  So,
22    the fact that they lost the contract is the result of an act of
23    the sovereign of Guinea.  Accordingly, the damage theory falls
24    apart, and damages are an element of the claim.  If you can't
25    look behind what the technical committee did, and shouldn't,
```

Hb7dbsgm

1    based on Supreme Court rulings, then their claim falls apart.

2            So independent from the pleading problems and

3    frailties, the Act-of-State Doctrine sort of hits the punch

4    line.  What supposedly did they suffer as a result of the

5    supposed misstatement?  And what they suffered was a

6    termination of their agreements, which leads directly to the

7    act of state.  Those are the links, your Honor, that we think

8    apply to the fraud claim, which is limited to one statement and

9    supposed detrimental reliance on that statement.

10           THE COURT:  All right.  Go ahead.

11           MR. BAIO:  OK.

12           THE COURT:  I have one more question --

13           MR. BAIO:  Yes, your Honor.

14           THE COURT:  -- that I want to ask.

15           On the commercial defamation --

16           MR. BAIO:  Yes.

17           THE COURT:  All right.

18           -- on a 12(b)(6) motion, isn't it enough for the

19   plaintiffs to raise a sufficient inference that some sort of

20   agency relationship existed between defendants and Global

21   Witness in connection with the defamatory statement?

22           MR. BAIO:  Your Honor, on the agency point, we believe

23   that it is not enough to simply allege that statement, and the

24   authorities that we've cited say you can't just say that.

25   There must be a pleaded basis for the connection between the

Hb7dbsgm

1    declarant and the supposed related party.

2            Now, what they have said was that Mr. Soros had

3    provided money to Global Watch and served on the board.  That,

4    we submit, under the authorities, is insufficient to put on

5    Mr. Soros the blame of something that Global Watch purportedly

6    did.  And that will either carry the day or not.

7            But on the defamatory statements, there are other

8    infirmities, your Honor.  Right?  All of the claims, except the

9    Global Watch statement -- the only one that's carved out -- has

10   to be dismissed, the claim on those statements, because they

11   fail to meet the statute of limitations.  They don't even argue

12   that point, your Honor.  Everything before that one statement

13   by the Global Watch person is out.  So, the defamatory case

14   turns on that statement.  We believe they have not shown the

15   proper relationship in order to attribute that language to

16   Mr. Soros, but there's more.

17           What the statement is, as laid out in the paragraphs

18   of the amended -- one paragraph of the amended complaint,

19   according to Global Witness, which investigated the case, BSGR

20   and its affiliates engaged in a, quote, sophisticated

21   corruption scheme over Simandou, cloaking their activities

22   through secretive companies in British Virgin Islands.  Now,

23   your Honor, we know that the technical -- that's the only

24   statement.  We know that the technical committee, in reaching

25   its conclusion, found that Mr. Steinmetz and his companies

1    engaged in corrupt practices.  So how can there be a libelous

2    statement if you must take that as a given?  And they made the

3    statement independent from whether it can be attributed to

4    Mr. Soros.  They made the statement, and it is consistent with

5    what the technical committee found, which is a given for you.

6    So we say that combination of events knocks out the defamation

7    claim as well.

8              Some other things on the --

9              THE COURT:  I never hold it against anybody if they

10   don't use all their time.

11             MR. BAIO:  Will you hold it in my favor if I don't,

12   your Honor?

13             THE COURT:  I'm just saying it's neutral.

14             MR. BAIO:  I get it.  I understand.  And I'm going to

15   turn to see how I am doing.

16             THE COURT:  You are fine.  You've got another 12

17   minutes if you want it.

18             MR. BAIO:  12 minutes.  First of all, do you have any

19   other questions on anything that I have said?

20             THE COURT:  I don't anything else right now.  Go

21   ahead.

22             MR. BAIO:  Thank you.

23             OK.  So I will just highlight, your Honor, the actions

24   of the Guinean government that plaintiff is challenging --

25   improperly -- in this proceeding.  They challenge, in paragraph

1    90, that the Guinean government passed a new mining code, which

2    they say was a sham design to take away their rights.  That, as

3    under the Act-of-State Doctrine, is not part of this case and

4    cannot be.

5         They said that the application of the new mining code

6    to BSGR would be a blatant violation of the convention.  Your

7    Honor, that is not really, with respect, your job under the

8    Supreme Court precedence.

9         In paragraph 151, plaintiffs challenge and attack the

10    work of the governmentally established technical committee as

11    part of their claim against the defendants.  They state there

12    the technical committee, without justification, recommended

13    that the Minister of Mines withdraw the permits and the

14    contract.  Again, an act that this Court should not look behind

15    but must take as valid.

16         In paragraphs 159 -- 155 through 159, they attack the

17    Minister of Mines' rulings, President Conde's rulings, the

18    strategic committee rulings and the technical committee

19    rulings, all of which are the foundation for their claim

20    against Mr. Soros.

21         The damages that the foreign plaintiffs hope to

22    achieve from you are depended upon this Court finding that the

23    foregoing actions were invalid.  If you look at the complaint,

24    they state, in paragraph 165, "The termination of BSGR's

25    agreements with the government of Guinea breached BSGR's

Hb7dbsgm

1    contractual rights and harmed BSGR."  That's out under the

2    Act-of-State Doctrine.

3            What does that have to do with these defendants?  They

4    go on to say there would not have been a breach but for the

5    activities of the defendants.  The terminations were the

6    culmination of the lengthy scheme by Soros and the OSF entities

7    and their agents to interfere with contractual rights.  The

8    culmination is something that the act -- that the Republic of

9    Guinea determined in its own jurisdiction as to the

10   exploitation and use of its own mining precious resources.

11           Classic act of state.

12           Your Honor, I'm prepared to rest on the papers on why

13   the prima facie tort is just a fancy dressed up version of the

14   failed tortious interference claim, and the conspiracy claim

15   falls for the same reasons that the tortious interference claim

16   falls, in addition to the conspiracy is supposedly between

17   Mr. Soros, the defendants and the technical committee, and we

18   cite authority that such alleged conspiracies with a foreign

19   government will not provide the basis for a claim against

20   someone in the United States.

21           At bottom, your Honor, we say to Mr. Steinmetz and

22   BSGR and your Honor, let them proceed with the arbitration.

23   They have a few steps left.  They speculate that it may take

24   years before there is an award.  They don't tell you under what

25   circumstances it will be nonappealing or that one can appeal.

Hb7dbsgm

```
 1    So that is not a valid basis in order to have this Court and
 2    these litigants go through an entire proceeding based on what
 3    you describe as a very long document when, in fact, that may be
 4    completely unnecessary.
 5              Accordingly, your Honor, we ask that you both -- we
 6    ask first that you dismiss the complaint.  We think that it
 7    should be without leave to replead, and if they replead, well,
 8    we'll deal with that when that comes down.
 9              THE COURT:  Then there will be another motion.
10              MR. BAIO:  I think that's likely, your Honor, I would
11    say.  That's another motion.
12              Separately, the stay, pending the resolution of the
13    arbitration, keeps everything in abeyance.  That proceeds.
14    They should do that with diligence.  And then we'll see what's
15    left.  That's what we propose, your Honor.
16              THE COURT:  All right.
17              MR. BAIO:  Thank you.
18              THE COURT:  Thank you.
19              All right.  Mr. Solomon.
20              MR. SOLOMON:  Thank you, your Honor.
21              THE COURT:  Go ahead.
22              MR. SOLOMON:  May it please the Court?
23              THE COURT:  Yes.
24              MR. SOLOMON:  First, we have sought leave to replead.
25    We don't think it is necessary because we've asked your Honor
```

Hb7dbsgm

```
 1   to deny the motion but we haven't waived that.  We also would

 2   like at the end of the proceedings when your Honor denies -- if

 3   as and when your Honor denies their motion -- to lift the stay

 4   that's in effect in this case.  Your Honor wants us to focus on

 5   documents.  We now have document being produced.  We'd like to

 6   move through the rest of the discovery so that we can get this

 7   case tried.

 8           I will talk about a couple of --

 9           THE COURT:  We'd better get an answer before we worry

10   about discovery if I deny the motion.

11           MR. SOLOMON:  We'll take their answer any time they

12   can give it to us.

13           THE COURT:  OK.  Go ahead.

14           MR. SOLOMON:  I'd like to talk about a couple of

15   introductory remarks, the act of state, the stay, and then any

16   questions --

17           THE COURT:  One thing -- let me interrupt you for the

18   court reporter.

19           For the court reporter, Mr. Baio used a term that I

20   didn't give you before.  It's a place in Guinea, Simandou,

21   S-i-m-a-n-d-o-u.

22           Go ahead.  I'm sorry to interrupt you.

23           MR. SOLOMON:  No, that is OK.  Please interrupt with

24   any questions that your Honor has.

25           THE COURT:  OK.  Go ahead.
```

1          MR. SOLOMON:  Counsel said that they were sticking to

2     the facts as alleged, but they're not sticking to the facts as

3     alleged, Judge.  It is a big problem with their motion.

4          The argument here is really what they did in their

5     brief.  They have a lot of good, strong, active voice sentences

6     about Guinea, and then there is this muted, passive voice when

7     it comes to Mr. Soros.  Counsel said that the centerpiece of

8     this action is acts by Guinea.  The centerpiece of this action

9     has nothing to do with the acts of Guinea; it has everything to

10    do with the acts of Mr. Soros.  Guinea is not a party here.

11    Nothing that your Honor does in this case or the jury does in

12    this case is going to affect Guinea.  And I do think that

13    disposes of act of state.  But the focus here is on Mr. Soros.

14          They've also gone outside --

15          THE COURT:  You say that should dispose of the act of

16    state.

17          MR. SOLOMON:  Yes, Judge.

18          THE COURT:  Well, doesn't the tortious interference

19    claim require a finding by me as to whether the contract

20    between BSGR and Guinea was valid and binding?  Doesn't it?

21          (Pause)

22          I'll ask it again.

23          MR. SOLOMON:  An element of the tortious interference

24    claim, Judge, is breach of contract or rendering performance of

25    that contract unenforceable.  That is what the Court of Appeals

Hb7dbsgm

1    in Kronos said.  It hasn't been reversed.  And so, yes, that

2    doesn't require your Honor to render ineffective any act by

3    Guinea.

4            THE COURT:  Don't I have to make a finding as to

5    whether the contract between the plaintiffs and Guinea was

6    valid and binding?

7            MR. SOLOMON:  Well, no, I don't think so, your Honor.

8    I think that the element of a tortious interference claim, I

9    don't know what they're going to plead in defense, but let me

10   try to explain the reason we think that the Act-of-State

11   Doctrine has nothing at all to do -- this is not a close case.

12   Our case is much stronger for not applying act of state than

13   the Supreme Court decision in Kirkpatrick and other cases that

14   I will cite to your Honor.  OK?  We have to focus on what and

15   on whom.  What is being sought in this case and against whom,

16   or who, is it being sought against?

17           In the event that we are asking your Honor to undo --

18   I'm using language from the cases -- undo, render ineffective,

19   render invalid, an act of the Guinean government, that raises

20   the specter of act of state.  When we are asking instead to

21   find a breach, to say that the contract was illegal, to say

22   that the Guinean government did something wrong and may be

23   embarrassed, that the Supreme Court has told us does not

24   implicate act of state.

25           Everything counsel said about our case is on all fours

1    with the Kirkpatrick decision.  It's the most recent Supreme

2    Court case.  In their initial motion to dismiss, your Honor,

3    they didn't cite Kirkpatrick so it is not something that they

4    thought a lot about.  It's a recent view on their part.

5          So first we look at the remedy.  What remedy are we

6    seeking from this Court?  Your Honor, it's a stunning and

7    incorrect proposition of the law that a U.S. citizen, a New

8    York citizen, a New York resident, can go to a foreign country,

9    corrupt the processes of that country, and harm a plaintiff who

10   wants to come to this court but that plaintiff has no redress.

11   No case has held that.

12         Their cases fall into two categories.  The bulk of

13   them involve claims against the foreign sovereign.  So that in

14   the Galu case, in the Spectrum case, in the AdvanFort case in

15   the Cayago case and in the Seabreeze case, those were cases

16   against the sovereign or against entities that were found to be

17   the sovereign.  So, Citgo was found to be a sovereign entity.

18   And the relief in that case, in those cases, would have been to

19   render ineffective or to find invalid acts of those sovereigns.

20   And in those cases the specter of acts of state governs.

21         THE COURT:  Is the technical committee part of the

22   Guinean government?

23         MR. SOLOMON:  It is.  Having corrupted the technical

24   committee, Judge, the issue before your Honor is not whether

25   what the technical committee did was valid and effective -- we

1  take that as we find it -- but who is responsible for it?  Just

2  like in Kirkpatrick.  Your Honor, there was bribery in

3  Kirkpatrick.

4          THE COURT:  I know.

5          MR. SOLOMON:  OK.  And in Kirkpatrick, the Supreme

6  Court -- what the Supreme Court said, that in every case in

7  which we've held acts of state applicable, the Court, in the

8  United States, was being asked to declare invalid the official

9  act of a foreign sovereign government.  We are not asking for

10 your Honor to declare invalid anything --

11         THE COURT:  So you're saying --

12         MR. SOLOMON:  -- that Guinea did.

13         THE COURT:  -- that I'm not going to be required to

14 rule on the validity of the sovereign acts of the Nation of

15 Guinea.

16         MR. SOLOMON:  The one word I didn't hear is your Honor

17 does not think that your Honor has to do that.  We agree, your

18 Honor does not have to rule --

19         THE COURT:  That's what you are saying.

20         MR. SOLOMON:  -- on the validity of though acts.  Your

21 Honor does not have to rule on the effectiveness of those acts.

22 Our contract was terminated --

23         THE COURT:  Do I have to rule on the validity of the

24 acts?

25         MR. SOLOMON:  Your Honor does not have -- your Honor

Hb7dbsgm

1    does not have to rule on the validity of those acts.  Your

2    Honor has to rule who was responsible for the breach of

3    contract that arose.  We were thrown out of Guinea.  A New York

4    resident and a U.S. citizen caused us to be thrown out of

5    Guinea.  We don't have a claim against the Guinean government.

6              THE COURT:  That's what you are alleging.

7              MR. SOLOMON:  My argument today -- and I would like to

8    be clear on this -- my argument today is solely based on the

9    allegations we have made in the complaint and their motion to

10   dismiss is to dismiss those, the allegations of those

11   complaints.

12             So, I packaged up all of their cases as best I could

13   with the only exception being there are cases that deal with

14   title, where the question is -- and that's the Konowaloff case

15   and the Glen case, your Honor.  There, because you go back in

16   time to decide who had title to in one case it was a piece of

17   property that was taken because of a 1959 Cuban edict and in

18   the other case it was a painting that was usurped during

19   Bolshevik Russia.  In those cases what the Court said is we

20   would have to decide whether the acts of those countries and

21   those periods were effective, and that is not what we are

22   asking for here.  It is not what our claim is about here.

23             What our claim is about here, Judge, is, as the

24   Supreme Court says, petitioners point out that the facts

25   necessary to establish respondent's claim will also establish

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

Hb7dbsgm

1   that the contract was unlawful.  Specifically, they note that

2   in order to prevail, respondent must prove that petitioner Kirk

3   made, and the Nigerian officials received, payments that

4   violate Nigerian law, which would they assert support a finding

5   that the contract is invalid under Nigerian law, says the

6   Supreme Court.  Assuming that to be true, it still does not

7   suffice, meaning the Supreme Court denied application of act of

8   state even though to prove a RICO case you have to show the

9   predicate act of bribery, you have to show -- and just like in

10   our case -- to show interference with contract, you have to

11   show that the Guinean government breached the contract.

12        But that's no different, your Honor, from -- having

13   cited the Supreme Court cases, it is not clear why we cited the

14   other cases, but in the other cases that are cited, in the

15   Oceanic case, which is a case that was cited for the first time

16   in reply against us --

17        THE COURT:  Does that make it less valid, the fact

18   that it is cited in the reply?

19        MR. SOLOMON:  I just didn't have a chance to respond

20   to it in our opposition, so that's why I wanted to call it to

21   your Honor's attention, because I think it is a case that we

22   can learn from.  Because in that case the Court dismissed the

23   sovereign under act of state grounds and did not dismiss the

24   private party on act of state grounds.  And the reason -- and

25   even though there was an intentional interference with

1   prospective economic relations, which is the same -- the sister

2   tort, the tort that we are asserting, and even though the claim

3   was bribing the government, what the Court finds is -- I am

4   going to read it to your Honor, if your Honor may --

5           THE COURT:  Well, after you find it, I want to switch

6   to another subject here and ask you a question about it.

7           Go ahead.  Tell me what you want to tell me.

8           MR. SOLOMON:  What the Court in Oceanic, which they

9   cite, says plaintiffs rely on Kirkpatrick, and then the Court

10  says it rejects the application of act of state to the private

11  defendant.  And it cites Kirkpatrick and says:  "The Court

12  noted that the plaintiff was not trying to undo or disregard an

13  act of the government but only to obtain damages from private

14  parties who had procured it."  That is exactly and only what we

15  are trying to do in this case, and the allegations of our

16  complaint support that.  We are not trying to undo or disregard

17  an act of the Guinean government but only to obtain damages

18  from private parties who had procured it.  And that's the --

19          THE COURT:  I said I wanted to change the subject for

20  a second.

21          MR. SOLOMON:  Yes.  You are in charge, Judge.

22          THE COURT:  You are alleging fraud claims, right?

23          MR. SOLOMON:  We are, your Honor.

24          THE COURT:  And they are based on statements allegedly

25  made by DLA Piper and by Horton to the technical committee.

Hb7dbsgm

1    None of those people -- none of them are parties to the action,

2    are they?

3           MR. SOLOMON:  They are not parties.  We allege that

4    they acted as agents.  We don't agree that there is a super

5    high standard that we have to show.  Although our complaint, as

6    your Honor points out, in too many paragraphs, identifies the

7    factual basis that we already have to allege that Horton and

8    DLA were acting as agents.  Mr. Soros paid them.  Mr. Soros

9    hired them.  It was pursuant to the agreement that he had with

10   the Guinean government that we were going to either have a

11   billion dollars extorted from us or we were going to be thrown

12   out, that they did this.  They corrupted the technical

13   committee as a result.  And we did try, with as much evidence

14   as we now have, to show in detail how that corruption happened,

15   because they took statements that they themselves knew were

16   unreliable, passed them on to the technical committee, and then

17   passed them off as reliable.  We think that that was

18   fraudulent.

19          The claim, by the way, of fraud is only against

20   Mr. Soros, it is not against the others.  We at this point had

21   a basis to plead against Mr. Soros and we did.

22          With your Honor's permission, I think I would -- let

23   me -- I am happy to talk further about act of state, but, your

24   Honor, our case is stronger for denying the act of state than

25   Kirkpatrick, than the Oceanic case, than the Worldwide

1   Materials case, which we also cite, than the Hernandez case,

2   which is 2008 WL 4537817, which also says, "The claim in this

3   matter is against a third party who allegedly caused the

4   Mexican government to act in a way harmful to the plaintiff.

5   It is the acts of the third party which are at issue, not the

6   acts of the Mexican government."

7          And in Worldwide Materials, it is Judge Lambert who

8   said that even though findings that are made by the Court in a

9   case not against the government -- the foreign government --

10  would find, or suggest, that the contract was invalid, the

11  Pakistan's government decrees are not directly implicated,

12  we're not seeking to render them ineffective in this

13  proceeding, we take those as given, and we're looking for

14  recompense from the party who is responsible for that.  And

15  when you ask the what question, we don't have any relief at all

16  against the Guinean government.  Indeed, we are seeking damages

17  and that is essentially what we are seeking.

18         We also in our pleadings ask for an injunction against

19  the defendant here to take steps, whatever steps he is able to

20  take, to help repair the damage that he has done.  That shows

21  that we're not looking for anything against the Guinean

22  government.  And since this is not a case where we have the

23  Guinean government even as a party, we think that there is

24  really no basis for act of state at all.

25         THE COURT:  All right.  Well, now let me ask you this.

1          MR. SOLOMON:  Yes, Judge.

2          THE COURT:  What have you alleged which shows that

3    Global Witness either knew their statement was false or

4    recklessly regarded its falsity?  What part of the complaint

5    makes those allegations?

6          MR. SOLOMON:  I can try to pull those specific

7    allegations.  But Global Witness -- Global Witness, right,

8    acting as their agent, not only is there overlapping board

9    participation, not only is there funding, OK, but there are

10   other methods of control.  They were part of the entire

11   process.

12         I will try to pull the specific allegations.  But they

13   were part of the entire process to expand the harm done in

14   Guinea to the rest of the world.  And let me ask for your

15   Honor's leave to try to pull those very specific statements for

16   your Honor.

17         I want to address the stay issue, because there is a

18   reason why not a single case that they cite involves staying a

19   U.S. proceeding for an international arbitration.  And the

20   reason is -- and I do international arbitrations from time to

21   time.  And the reason is because they are long and labored and

22   you have no idea how they're going to come out and you have no

23   idea what law is going to be applied to them, and there's no

24   way to say that the claims are identical, that the relief is

25   going to be identical.  There is no way to say that any issue

Hb7dbsgm

```
 1    is actually going to be litigated.  There's no way to say what

 2    the ultimate opinion is going to actually say.  And that's why

 3    they cite no case.

 4              THE COURT:  Now, are you saying that in order to stay,

 5    I would have to make a finding that they are identical?

 6              MR. SOLOMON:  No, your Honor.  No.  But the fact that

 7    they are so different leads to the problem here.  In the cases

 8    that stay, there are three things.  There is a high likelihood

 9    that a judgment is going to actually dispose of the matter --

10              THE COURT:  Wait a minute.  Wouldn't the determination

11    of the validity of the contract between the plaintiffs and the

12    Guinean government in the arbitration action, wouldn't that

13    resolve the underlying issues in this case?

14              MR. SOLOMON:  It would not, your Honor, because George

15    Soros could render performance impossible.  When he did,

16    between 2011 and 2014, the Guinean government, even if that

17    contract were procured by fraud -- and there were three

18    different governments over a five-year period that said that

19    government -- that those contracts were not procured by fraud,

20    but even if now the arbitration panel were to decide that, it's

21    not binding for two separate reasons.  It's substantive and

22    it's procedural.  It's not binding as a substantive reason

23    because New York law does not allow the tortfeasor to get away

24    with the tort even if there is a defense to the underlying

25    contract.
```

Hb7dbsgm

1          As I mentioned before, your Honor, the Guinean

2     government is not even a necessary party to this interference

3     claim.  That's why nothing that your Honor does will bind them.

4     They are not even -- you don't have to have the contract party

5     when the two people -- when the plaintiff and defendant allege

6     interference with that contract.  And so we do not even know,

7     whatever they say, whether the Guinean government can ratify a

8     contract that it entered into, and we don't know whether or not

9     they are going to do that.

10          BSGR spent over $800 million that hasn't been

11     compensated.  That's going to have to be compensated by the

12     Guinean government even if the contracts were procured by

13     corruption, and obviously we don't agree with that.  But

14     there's a procedural problem here also, Judge.  And the idea of

15     waiting years -- and the only evidence your Honor has in the

16     record is Mr. Libson.  And they can't use an arbitral award

17     until it goes through the appeal process.  It is not collateral

18     estoppel, it is not res judicata until it is a judgment of a

19     Court, so we have to go through that.  The only evidence in the

20     record is Mr. Libson, who said it's going to take years.  It's

21     taken -- it will take a full year, Judge, in that arbitration

22     for the arbitrators to find out what procedure they're going to

23     use to determine if the contracts at issue were genuinely

24     signed.  I'm not taking any issue with the arbitral process --

25          THE COURT:  But you brought the arbitration, right?

Hb7dbsgm

```
 1              MR. SOLOMON:  We did, against the Guinean government.

 2    Even there, by the way, we identified Mr. Soros as the

 3    motivating force behind the --

 4              THE COURT:  You brought the action against the Guinean

 5    government in the arbitration, right?

 6              MR. SOLOMON:  We did, your Honor.

 7              THE COURT:  OK.  Fine.

 8              Now, what are you seeking in the arbitration?

 9              MR. SOLOMON:  I think there is injunctive relief being

10    sought and damages are being sought.

11              THE COURT:  Injunctive relief?

12              MR. SOLOMON:  And damages, your Honor.

13              THE COURT:  And damages?

14              MR. SOLOMON:  Yes, your Honor.

15              THE COURT:  So you want that -- you gave a number of

16    800 million?

17              MR. SOLOMON:  The 800 million is going to have to

18    be -- we believe even if the contract is voided, the

19    $800 million, because it was unjust enrichment, is going to

20    have to get paid.  But we are looking --

21              THE COURT:  That is going to come out of the

22    arbitration.

23              MR. SOLOMON:  Your Honor, the one case that they cite

24    stayed because of a U.S. arbitration stayed it for six months.

25    OK?  Your Honor, we going to be here three, four years before
```

1   there is a judgment that is appealable.

2            THE COURT:  How do you know that?

3            MR. SOLOMON:  Because I know how long it has taken.

4   By the way, I know there is an answer to that.  It is not just

5   speculative, your Honor.  We asked --

6            THE COURT:  Why did you bring the action in Guinea

7   anyhow if you knew it was going to take eight years?

8            MR. SOLOMON:  Well --

9            THE COURT:  Because you are telling me it is eight

10  years.

11           MR. SOLOMON:  I'm telling you that the evidence in the

12  record -- the only evidence that your Honor has from the

13  counsel who was counsel in that case -- it has not been

14  disagreed with or rebutted by the other side -- is that the

15  case is now going into its fourth year, and it is going to take

16  several years more, and that's true.  And the harm to us is

17  palpable.  Mr. Soros is dissipating his assets.  One of the

18  entities that they have moved to dismiss, OSF, the newspapers

19  were just full of the fact that Mr. Soros has transferred $18

20  billion to this nonexistent entity, which of course exists.

21  $18 billion.  So he's now left, according to the newspapers,

22  only -- I don't know, we haven't had discovery -- but he's now

23  left with less fewer funds than our ad damnum.  He's doing that

24  while this case is going on.

25           And we need to get to a trial as fast as possible.

Hb7dbsgm

1    He's 87.  I hope he stays in good health.  But the fact is this

2    is going to take a very long time.  Mr. Steinmetz has not been

3    able to bring this case because of various criminal

4    proceedings, none of which has ever found that he did anything

5    wrong, that were procured by Mr. Soros.  Those are now at a

6    point --

7            THE COURT:  You are talking about the stuff in Israel?

8            MR. SOLOMON:  The stuff in Israel was also procured by

9    the OECD, which he procured.  It's the same people, your Honor.

10    We will show it is the same people --

11            THE COURT:  The animosity between Mr. Steinmetz and

12    Mr. Soros, am I supposed to take that into account here?  There

13    is animosity, that's obvious.

14            MR. SOLOMON:  There is animosity.  I think it has very

15    little to do with what we're doing here today.  I think it's

16    part of his motivation.  You know why I think it is relevant,

17    your Honor, it's relevant because they suggest that on a motion

18    to dismiss your Honor can decide that Guinea was predisposed to

19    breach.  I think your Honor can do none of this on a motion to

20    dismiss.  But they were predisposed to breach, and I think for

21    those purposes, the animosity is real.

22            But, first of all, there is no animosity between

23    counsel.  We have a serious claim, and we want to go through

24    discovery.  We think we will survive summary judgment.  We

25    think a jury is entitled to hear the facts here and ferret out

1    who caused what and who caused what damages.  But staying this

2    while we wait for Godot, OK, your Honor, they haven't even

3    decided in the arbitration what law governs.  And as the Second

4    Circuit said -- and it was just reiterated by the Fourth

5    Circuit last month, SAS Institute.  It's 2017 WL 4781380, where

6    they say, "Issue preclusion applies when the issues are

7    identical, and the issues are not identical when the law

8    governing their resolution is significantly different."  We

9    have no idea what law is going to govern the arbitration

10   between Guinea and BSGR.  That's going to be decided by an

11   arbitration panel in Paris.  They haven't even decided that

12   yet, Judge.

13           So the idea of forcing BSGR to wait when assets are

14   being dissipated, when people are getting old -- older, when

15   proof is being lost is unfair, it is unjust, and that's why

16   they have no case that supports the discretion that they're

17   asking your Honor to apply.

18           Now, I did promise paragraphs, and in paragraphs 141

19   through 149, we talk about Global Witness and the specific role

20   that they played.  I think counsel had it backwards when he

21   said that only one claim is not time-barred so all the rest of

22   the statements are time-barred.  No.  If one claim is not

23   time-barred, then the statute of limitations defense is -- if

24   they were to make it in their answer -- is rejected, and then

25   your Honor will decide through trial which of the statements is

Hb7dbsgm

independently actionable -- those that are outside the statute
of limitations or not, which of the statements can be used as
part of the actionable statements, and at least one of them is.
So the correct -- I think the correct approach at this point,
given their acknowledgment that one of the statements took
place within the limitations period, is to deny their motion to
dismiss.

The Global Witness directors and the Global Witness
facts that we rely on are on 141 to 149 of our amended
pleading, Judge.  Thank you.

(Pause)

Your Honor, they've moved to dismiss a number of the
OSF entities.  If your Honor wants to hear any of that, I'm
happy to address it.  But the entity that they say doesn't
exist has a board and has a budget of about $900 million, is a
copyright holder to a book by the name of Philanthrope of
George Soros, claims that it is a 501(c)(3) private operating
foundation, and is the recipient, says The New York Times and
the Wall Street Journal and the Financial Times and a whole
bunch of others, of $18 billion, this entity that they say
doesn't exist.

With respect to the other entities, we have identified
the confusion that everybody in the world has, because they are
all named Foundation for Open Society or Open Society this or
Open Society that.  They are all in the same place.  They are

Hb7dbsgm

1   all at the same address.  They all have the same phone number.

2   They have overlapping and interlocking directors.

3          At this point I think we've done enough to plead and

4   are entitled to discovery, which, as your Honor knows, we have

5   not gotten evidentiary discovery or oral discovery as of yet.

6   We actually haven't gotten any document discovery.  That's just

7   happening -- that's just happening now.

8          I think I might also be ready to sit down early if

9   your Honor will give me just one moment.

10         THE COURT:  Take your time.

11         (Pause)

12         MR. SOLOMON:  Your Honor, I will close with two short

13  points.  The first is that some of what was being read to your

14  Honor by counsel even today is not in our pleading.  They've

15  gone outside the pleading, and it was the Second Circuit last

16  year who said --

17         THE COURT:  You are not allowed to go outside the

18  pleading on a 12(b)(6) motion.  I understand that, OK.

19         MR. SOLOMON:  Thank you.

20         THE COURT:  That is pretty elemental.  OK.

21         MR. SOLOMON:  And then the second is a request for

22  caution before we try to figure out at this motion to dismiss

23  stage what Mr. Soros was responsible for and sifting through

24  causation.  The New York Court of Appeals has decided in this

25  context that that's not appropriate on a motion to dismiss;

1   that's for the jury to decide.

2         Mr. Soros, before Mr. Conde was ever elected, was

3   talking to Mr. Conde about mining.  And whether he singled out

4   BSGR because of his animus or because he thought it was an easy

5   mark because they were Israeli, I do not know, but the

6   allegations are clear that he singled out BSGR.  And he stood

7   up and he said anybody who wants to stay in this country, we're

8   going to amend your contracts and the economics are going to

9   change.  And you're going to go from a 15 percent carry to a

10  33 percent carry, and you're going to do a lot of other stuff

11  that we're going to tell you.  All right?

12        Now, at the time we had a contract.  We had a contract

13  that said it couldn't be changed and wasn't going to be

14  changed.  And I think the principal point that they're trying

15  to get your Honor to agree with, inconsistent with every

16  case -- and there is no case that supports what they're

17  doing -- is that this U.S. citizen can go and hurt us overseas

18  by manipulating and interfering with a foreign government, yet

19  we have to accept at face value -- it is a stunning

20  statement -- accept at face value everything that the foreign

21  government did and not go against this defendant.  And that is

22  wrong.  We will accept at face value.  We will not ask your

23  Honor to render ineffective, to render invalid, to undo

24  anything that the foreign government did, but that, as Justice

25  Scalia said repeatedly and as every court has followed since

Hb7dbsgm

1    Kirkpatrick, that doesn't absolve this private party of paying

2    up if it is responsible for the damages.

3            I think I'm finished with that.

4            If it please, your Honor, thank you.

5            THE COURT:  Mr. Baio, you might as well, first of all,

6    address the issue of the existence or nonexistence of these

7    foundations.

8            MR. BAIO:  Oh, your Honor, the ones that exist, we

9    have identified.  There are two that did not.  They have the

10   defendants that they need, if it is to proceed.  We made

11   inquiry, and it turns out one dissolved and we identified the

12   facts that support it.  Another one is a name that is used as a

13   trademark and a copyright, and the other five exist.  And we

14   said as much.

15           So, I hope that resolves it.  There are entities that

16   don't exist, and that simply is a statement of fact.  It's not

17   that the others don't exist.  They've named them.

18           So I hope that addresses that.

19           THE COURT:  All right.  Go ahead.  You've saved timed

20   for rebuttal.

21           MR. BAIO:  Yes, your Honor.

22           Rather than rely on counsel's purported statements as

23   to what Mr. Libson said that it's three years, four years, it's

24   an eternity, we're waiting for Godot, rather than that, let's

25   look at what Mr. Libson said.  He doesn't mention Godot, of

Hb7dbsgm

1    course.

2              THE COURT:  That's not in his affidavit.

3              MR. BAIO:  No.  And he doesn't mention that it will

4    take three years and that it's an unbelievably difficult

5    process and blah, blah, blah.

6              Here's what he says:  "Although the closing of the

7    evidentiary phase of the ICSID proceeding will take place at

8    some stage in the foreseeable future" -- so, the foreseeable

9    future has the close of the evidentiary phase, nothing like us

10   -- "it could take years before a final and nonappealable award

11   is made."  Period.

12             He's the advocate for the plaintiff.  He's their

13   lawyer in that proceeding.  They started it, and all he says in

14   this magical affidavit is it could take years before it's

15   nonappealable and a final award is made.  That's not evidence

16   of this outrageous delay in a proceeding that they started

17   almost three years before this case.

18             So I would like your Honor and hope that your Honor

19   will focus on the words that are said.  The same thing with me.

20   Whatever I said about the complaint doesn't count, it's what

21   the complaint says.  And that's why when opposing counsel says

22   that the pleadings do not ask this Court to find that the

23   actions of the foreign sovereign were illegal, improper, a

24   breach, there are 30 instances in the amended complaint that

25   say exactly that, and we've cited them in our briefs.

Hb7dbsgm

1           The concluding paragraph makes it clear that

2      everything is based on the termination, which they claim was a

3      breach.  And it's paragraph 165.  This is their language, not

4      mine, not reading outside, not anywhere else:  "The

5      terminations of BSGR's agreements with the government of Guinea

6      breached BSGR's contractual rights and harmed BSGR."  They're

7      claiming it was a breach.  Here they say it wasn't a breach,

8      you don't have to find it is a breach.  The pleading says the

9      opposite.  There would not have been a breach but for the

10     activities of defendants.  The terminations were the

11     culmination of the lengthy scheme.  That's their allegation.

12          You must -- you absolutely must not pass on whether

13     the government breached the agreements, and that's essentially

14     what they are asking.  And, by the way, that is exactly what

15     they're asking in the arbitration against the party that

16     supposedly breached.  And that's behind Tab 2 of our moving

17     affidavit, your Honor.

18               Now, the Kirkpatrick case.  The Kirkpatrick --

19               THE COURT:  Finish up with Kirkpatrick.

20               MR. BAIO:  That is my final point, your Honor.

21               THE COURT:  All right.  Go ahead.

22               MR. BAIO:  Kirkpatrick, very briefly.

23          In that case, you have to look at who the parties were

24     and what the claims were.  In that case, the defendant

25     improperly, through bribes, secured a contract with the

Hb7dbsgm

1   Nigerian government.  The plaintiff was a competing applicant

2   for the construction contract.  The defendant pleaded guilty to

3   Foreign Corrupt Practices Act violations.  That was a given.

4   The claim that was brought by the other competitor was not that

5   you breached our agreement, that you terminated a contract that

6   we otherwise would have, it was a RICO claim under federal RICO

7   and state RICO.

8           And what Justice Scalia and the Fitzpatrick Court

9   concluded was we don't need to determine whether the state did

10  anything improper.  We have a pleading from a litigant that he

11  engaged in a fraud that violated the Foreign Corrupt Practices

12  Act, and that will be the basis of the claim.  We don't have to

13  look beyond that.

14          That is not the case in this matter.  In this matter,

15  you are asked repeatedly to look at what the government did and

16  that it did it improperly.  And we believe that that

17  distinction is massive, and that the other cases that we've

18  cited against individuals and nonsovereigns eliminate that

19  argument that is being advanced.

20          Your Honor, with that, I will conclude.

21          (Continued on next page)

22

23

24

25

Hb7dbsgm

1              THE COURT:  Thank you very much.

2              And thank you, Mr. Solomon, also.

3              I reserve decision.

4              MR. BAIO:  Thank you.

5              THE COURT:  And we are in recess, so you don't have to

6    wait until I get off the bench.  We are in recess.

7

8                              -   -   -

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25