# Exhibit 1

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 11/29/2017

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------- X
BSG RESOURCES (GUINEA) :
LIMITED, BSG RESOURCES :
(GUINEA) SÀRL, and BSG :
RESOURCES LIMITED, :
:
           Plaintiffs, :
  -against- :
: No. 17 Civ. 2726 (JFK)
GEORGE SOROS, OPEN SOCIETY : **OPINION & ORDER**
FOUNDATIONS, OPEN SOCIETY :
INSTITUTE, FOUNDATION TO :
PROMOTE OPEN SOCIETY, OPEN :
SOCIETY FOUNDATION, INC., :
ALLIANCE FOR OPEN SOCIETY :
INTERNATIONAL, INC., OPEN :
SOCIETY POLICY CENTER, and :
OPEN SOCIETY FUND, :
:
           Defendants. :
-------------------------------- X

APPEARANCES

FOR PLAINTIFFS:
    Louis M. Solomon
    Michael Lazaroff
    GREENBERG TRAURIG, LLP

FOR DEFENDANTS:
    Joseph Thompson Baio
    Benjamin Patrick McCallen
    Elizabeth J. Bower
    WILLKIE FARR & GALLAGHER LLP

**JOHN F. KEENAN, United States District Judge:**

    Before the Court is Defendants' motion to dismiss Plaintiffs' amended complaint, or, in the alternative, to stay this action pending the outcome of an arbitration proceeding between Plaintiffs and the African nation of Guinea. For the

reasons stated below, Defendants' motion to stay this action pending the outcome of the arbitration is granted.

## I. Background

The following facts and allegations are taken from the amended complaint. Plaintiffs BSG Resources (Guinea) Limited, BSG Resources (Guinea) Sárl, and BSG Resources Limited (collectively "Plaintiffs" or "BSGR") together form an international, diversified mining group. (Am. Compl. ¶ 18.) Defendant George Soros ("Soros") is a financier who resides in the State of New York. (Id. ¶ 8.) Defendant Open Society Foundations ("OSF") is a "de facto corporation" with its principal place of business in New York City. (Id. ¶ 9.) Soros is the founder and chairman of OSF. (Id.) Defendant Open Society Institute is a charitable trust organized under the laws of the State of New York. (Id. ¶ 10.) Defendants Foundation to Promote Open Society, Open Society Foundation, Inc.,[1] Alliance for Open Society International, Inc., Open Society Policy Center, and Open Society Fund, Inc. are all not-for-profit corporations with principal places of business at 224 W. 57th Street in New York City. (Id. ¶¶ 9-14.)

This case involves a dispute over mining rights in the Simandou region of Guinea. In 2005, BSGR, through its

---

[1] Open Society Foundation, Inc. filed dissolution papers on October 5, 2012. (Am. Compl. ¶ 9.)

2

subsidiary BSGR Guinea BVI, submitted an application for prospecting permits over available areas in the north and south regions of Simandou that would grant BSGR the exclusive right to conduct exploratory work in an effort to locate and unearth iron ore deposits. (Id. ¶ 20.) On February 6, 2006, the Guinean Minister of Mines granted BSGR's application. (Id. ¶ 22.)

On November 16, 2009, after drilling for over three years and investing over $160 million, BSGR submitted a feasibility study regarding the viability of mining operations in the southern portion of Simandou ("Simandou South"). (Id. ¶ 29.) The Guinean Agency for the Promotion and Development of Mining ("CPDM") then recommended to the Ministry of Mines that BSGR be invited to negotiate a mining and infrastructure agreement. (Id. ¶¶ 21, 29.) On December 16, 2009, BSGR and Guinea entered into the Basic Convention Agreement (the "Convention"), in which BSGR agreed to invest billions of dollars in capital investments in Guinea in exchange for the exclusive right to commercially mine iron ore in Simandou South, and a potential future grant of mining rights in other Simandou regions. (Id. ¶¶ 30-34.) On March 19, 2010, Guinea's then-president Sékouba Konaté ratified the Convention and granted BSGR a mining concession for a deposit in Simandou South. (Id. ¶ 36.) In April 2010, BSGR entered into a joint venture with another mining company, Vale,

3

related to the development and operation of BSGR's mining rights in Simandou. (Id. ¶ 37.)

Presidential elections took place in Guinea in 2010. (Id. ¶ 44.) Soros became involved in the 2010 election to support Alpha Condé, who became President of Guinea. (Id. ¶¶ 54, 67.) In January 2011, Condé requested Soros' assistance to reform Guinea's mining industry. (Id. ¶ 67.) Condé and Soros held a joint press conference at which they announced that all existing mining contracts in Guinea would be "re-examined" and a new mining code would be enacted. (Id. ¶ 74.) On March 3, 2011, Soros publicly stated that Condé would be "introducing a new mining code . . . and all the mining claims are going to be re-examined and those who want to validate those claims will have to subscribe to the principles of [the Extractive Industries Transparency Initiative]." (Id. ¶ 78.)

Through this review process, Defendants "importuned" President Condé into forcing BSGR to improperly pay significantly more money than was agreed to under the Convention, or lose its contracts altogether. (Id. ¶ 56.) Plaintiffs allege that Defendants first masterminded an attempted extortion of BSGR. (Id. ¶¶ 57-61.) In early 2011, Condé, while "pursuing defendants' unlawful scheme," demanded that BSGR pay $1.25 billion to maintain its contractual mining rights. (Id. ¶ 58.) After BSGR refused this demand, Defendants

4

"engaged in secret negotiations with Vale seeking payment of $500 million" which was characterized as a prepayment of taxes. (Id. ¶¶ 59, 61.) BSGR also rejected these terms. (Id. ¶ 66.)

Defendants then employed other means to "destroy BSGR's mining rights." (Id. ¶ 66.) On or about March 26, 2012, the government of Guinea established a National Mining Commission ("NMC") which was "granted the power to examine the 'extension, renewal, lease and cancellation applications for mining titles on the basis of the [2011] Mining Code.'" (Id. ¶ 98.) NMC's responsibilities were divided among two subcommittees: a Strategic Committee and a Technical Committee. (Id.) Plaintiffs allege that the Technical Committee, which was designed to serve as the operational arm of the NMC, was "entirely lacking in the resources to handle this role," and the work was eventually outsourced to other entities that were "funded by" or "controlled by" Soros. (Id. ¶ 99.)

On November 17, 2011, BSGR received a letter from the Minister of Mines and Geology which claimed that there were issues with BSGR's mining permits, set forth a lengthy list of information requests, and questioned why Vale was supposedly working in Simandou without authorization. (Id. ¶ 103.) Despite BSGR's "detailed response" and presentation of "exculpatory material," on October 30, 2012, the Technical Committee, relying on the conclusions of "Soros[-]funded

5

agents," sent a letter to BSGR (the "Allegations Letter") accusing BSGR of obtaining mining rights through bribery and corruption. (Id. ¶¶ 114-15, 128, 150.) To "cause BSGR further damages," Defendants leaked the contents of the Allegations Letter to the press prior to its being sent to BSGR. (Id. ¶ 130.) In 2012 and 2013, Defendants and their agents—including Global Witness, an organization that Soros "heavily funded"— continued spreading "untrue accusations" suggesting that BSGR obtained its mining rights in Guinea through bribery. (Id. ¶¶ 140-49.) In addition, Soros paid Guinean officials to influence proceedings in Guinea and cause the revocation of BSGR's mining rights. (Id. ¶¶ 161-64.)

Plaintiffs allege that Defendants were ultimately successful in their campaign to have Plaintiffs' mining rights revoked. (Id. ¶ 160.) On March 21, 2014, the Technical Committee recommended that the Minister of Mines revoke BSGR's mining rights and cancel the Convention. (Id. ¶ 151.) On April 2, 2014, the Strategic Committee issued an opinion to President Condé and the Minister of Mines agreeing with the Technical Committee's report and recommendation. (Id. ¶ 155.) Later in April of 2014, pursuant to the Technical and Strategic Committees' recommendations, President Condé and the Minister of Mines terminated the Convention and BSGR's mining rights. (Id. ¶¶ 156-58.) To date, Guinea has not compensated BSGR for its

6

$800 million investment in Guinea. (Id. ¶ 166.) BSGR has since challenged Guinea's conduct before the International Centre for Settlement of Investment Disputes ("ICSID") in an arbitration proceeding currently pending in Paris (the "Arbitration"). (Id.) Plaintiffs seek in the Arbitration an award declaring that Guinea's termination of the Convention was unlawful and restoration of their mining rights. (See "Claimant's Memorial," Fitzmaurice Decl. Ex. 2 ¶ 431, ECF No. 57-3 (filed July 28, 2017).) Defendants are not a party to the Arbitration.

On April 14, 2017, Plaintiffs filed their initial complaint in this action against Soros and OSF only. (See Complaint, ECF No. 1 (filed Apr. 14, 2017).) On June 30, 2017, Plaintiffs filed an amended complaint, adding the remainder of the OSF entities as Defendants. The amended complaint alleges five causes of action: (1) tortious interference with contract, (2) conspiracy to commit tortious interference with contract, (3) fraud, misrepresentation, and conspiracy to commit fraud and misrepresentation (against Soros only), (4) commercial defamation, and (5) prima facie tort (against Soros only).

On July 28, 2017, Defendants moved to dismiss the amended complaint, or in the alternative to stay this action pending the outcome of the Arbitration between BSGR and Guinea. (See Mot. to Dismiss, ECF No. 55 (filed July 28, 2017).)

7

## II. Discussion

### A. Stay Pending Arbitration

Defendants argue that, in lieu of dismissal, the Court should stay this action pending resolution of the Arbitration, which will dispose of or significantly narrow the issues at stake. (Defs.' Mem. of L. in Supp. of Mot. to Dismiss at 27.)

#### 1. Legal Standard

Within the "Court's inherent power to manage its docket" is the discretion to stay "nonarbitrable claims" in favor of a "pending arbitration," even where the parties in the litigation and the arbitration are not identical. Alghanim v. Alghanim, 828 F. Supp. 2d 636, 664-65 (S.D.N.Y. 2011). The movant seeking a stay must show "there are issues common to the arbitration and the court proceeding," and that "those issues will be finally determined by arbitration." American Shipping Line, Inc. v. Massan Shipping Indus., Inc., 885 F. Supp. 499, 502 (S.D.N.Y. 1995). If this requirement is met, then the movant must show that that "the non-arbitrating party will not hinder the arbitration, that the arbitration will be resolved within a reasonable time, and that such delay that may occur will not cause undue hardship to the non-moving parties." Id. (citing Sierra Rutile Ltd. v. Katz, 937 F.2d 743, 750 (2d Cir. 1991)). "Stays are particularly appropriate where they promote judicial economy, avoidance of confusion and possible inconsistent

8

results." Birmingham Assocs. Ltd. v. Abbott Labs., 547 F. Supp. 2d 295, 302 (S.D.N.Y. 2008) (internal quotation marks omitted).

## 2. Analysis

Defendants have established that the same key issues underlie Plaintiffs' allegations in the Arbitration and the claims in this action. Plaintiffs seek in the Arbitration an award "[d]eclaring that Guinea's termination of . . . the Base Convention[] [and] the . . . Mining Concession . . . was illegal and unlawful" and ordering that Guinea "restore the Base Convention and observe the rights granted to BSGR." (See "Claimant's Am. Memorial," Fitzmaurice Decl. Ex. 2 ¶ 431, ECF No. 57-3 (filed July 28, 2017).) Plaintiffs there allege that "there was in fact no legitimate basis for the withdrawal or revocation of their [mining rights]" and that Guinea breached the Convention. (Id. ¶¶ 234-35.) Plaintiffs further claim that "[a]t the heart of these proceedings is Guinea's allegation, that the Claimants' obtained their mining rights by corrupting Guinean officials . . . [t]hese corrupt practices would nullify the mining titles and the mining agreement that were held by [Plaintiffs]." (Id. ¶ 345.) Here, the core issue underlying Plaintiffs' claims is whether Guinea, induced by Defendants, breached a valid contract with BSGR, or whether the Convention and BSGR's mining rights were procured through corruption.

9

Thus, it is clear that there are common issues between this action and those to be decided in the Arbitration.

The resolution of these issues in the Arbitration proceeding will "likely provide significant insight into, if not actually resolve, the claims asserted in this action." Orange Chicken, L.L.C. v. Nambe Mills, Inc., No. 00 CIV. 4730 (AGS), 2000 WL 1858556, at *9 (S.D.N.Y. Dec. 19, 2000). To prove their claims for tortious interference and conspiracy to commit tortious interference, Plaintiffs must show that there was a breach of contract. See Samsung Display Co. v. Acacia Research Corp., No. 14-CV-1353 JPO, 2014 WL 6791603, at *4 (S.D.N.Y. Dec. 3, 2014) ("New York law is clear: nothing short of actual breach gives rise to a claim for tortious interference with contractual relations."). Courts have granted stays where a pending arbitration was likely to determine the validity of the underlying contract and whether that contract was breached. See, e.g., Geo Vantage of Ohio, LLC v. GeoVantage, Inc., No. 2:05-CV-1145, 2006 WL 2583379, at *12 (S.D. Ohio Sept. 6, 2006) (staying case where issues in the arbitration were "all related to the interpretation of the [contract] and the question of whether or not it has been breached," and plaintiff, without a stay, "would proceed to court on the issue[] of tortious interference . . . without knowing whether Defendants had breached the contract at issue"); Orange Chicken, 2000 WL 1858556, at *9 (stay was

10

particularly appropriate where claims in arbitration arose out of the same acts and resolution of contractual disputes would provide clarity and avoid inconsistent results); Andrews v. Lasser Marshall, Inc., No. 97 Civ. 3827 (JGK), 1997 WL 624986, at *1 (S.D.N.Y. Oct. 6, 1997) (staying plaintiff's action for tortious interference pending arbitration of plaintiff's claim for breach of the underlying contract with non-parties). The Arbitration Tribunal's examination of the validity of the Convention and determination of whether Guinea breached its agreement with BSGR will directly implicate, and may be dispositive of, Plaintiffs' tortious interference claim here.

A resolution of the issues in the Arbitration will also directly implicate the viability of Plaintiffs' claims for fraud and commercial defamation. Plaintiffs' commercial defamation claims rely on the falsity of statements about BSGR's alleged corruption and bribery in procuring its mining rights in Guinea. (Am. Compl. ¶ 206.) Similarly, Plaintiffs allege in their fraud claim that Soros made false statements that implied an "impartial" review by the Technical Committee, despite his alleged knowledge that the process was "rigged to reach the conclusion that BSGR's Convention and related agreements should be terminated and its valuable rights revoked." (Id. ¶¶ 196-97.) Thus, the determination of key issues in the Arbitration— including whether BSGR and Guinea had an enforceable contract or

11

whether BSGR's mining rights were, as the Technical Committee found, obtained through corruption—will have some bearing on all of Plaintiffs' claims in this action. Accordingly, judicial economy weighs in favor of a stay to allow for resolution of these underlying issues and to avoid inconsistent results.

Plaintiffs argue that the outcome of the Arbitration will not have a preclusive effect here because the causes of action and the elements of the claims are not the same. (See Pls.' Mem. of L. in Opp'n to Mot. to Dismiss at 29.) Although the claims in this action and the Arbitration are not identical, courts have granted stays where "the arbitration of the plaintiff's claims against a defendant party to the arbitration would at least partially determine the issues which form the basis of the claim against [the] non-arbitrating defendant." Hikers Indus., Inc. v. William Stuart Indus. Ltd., 640 F. Supp. 175, 178 (S.D.N.Y. 1986); see also Andrews, 1997 WL 624986, at *1 (stay granted where result of arbitration between plaintiff and non-party could "substantially resolve issues in th[e] case"). Plaintiffs also contend that Defendants offer only "rank speculation" that the Arbitration Tribunal will issue an award "with the requisite detail for application of discretionary estoppel." (See Pls.' Mem. of L. in Opp'n to Mot. to Dismiss at 30.) However, "in the Second Circuit, the doctrine of collateral estoppel has long been applied to arbitrator's

12

decisions . . . and the effects of foreign arbitration are no less preclusive than domestic arbitration." Alghanim, 828 F. Supp. at 665; see also Weizmann Inst. of Sci. v. Neschis, 421 F. Supp. 2d 654, 676–83 (S.D.N.Y. 2005) (finding plaintiffs collaterally estopped from re-litigating issue decided in arbitration proceedings in Lichtenstein).

Moreover, there is no indication that Defendants, who are not parties to the Arbitration, will hinder its progress or that the Arbitration will not proceed in a reasonable time. Finally, a stay will not create undue hardship for Plaintiffs. Plaintiffs selected the ICSID as the forum to challenge Guinea's alleged breach of contract. Plaintiffs commenced the Arbitration on August 1, 2014, a hearing on the merits was completed on June 1, 2017, and "the closing of the evidentiary phase . . . will take place at some stage in the foreseeable future." (See "Request for Arbitration," Fitzmaurice Decl. Ex. 1, ECF Nos. 57-1, 57-2 (filed July 28, 2017); Libson Decl. ¶¶ 6, 11, ECF No. 70 (filed Aug. 18, 2017).) Plaintiffs argue that a stay would cause undue hardship as it could take several years "before a final and nonappealable award is made" in the Arbitration and there is a danger that evidence may grow stale if a stay is imposed. (See Libson Decl. ¶ 11; Pls.' Mem. of L. in Opp'n to Mot. to Dismiss at 30.) However, the Arbitration is substantially further along than this action, in which document

13

discovery has only recently begun.  Thus, it is not clear that a stay of this proceeding would cause substantial prejudice to Plaintiffs.  See Andrews, 1997 WL 624986, at *1 ("In these circumstances, where the result of the arbitration may substantially resolve issues in this case thereby saving the resources of the parties and the Court, where the arbitration is moving expeditiously and there is no showing of any prejudice from a brief stay to allow the arbitration to conclude, the stay of this action is warranted.").  In addition, "because many, if not all, of the issues in the action will be touched on in the arbitration, there is little risk that the evidence supporting [Plaintiffs'] case may grow stale, become unavailable, or be lost." Orange Chicken, 2000 WL 1858556, at *10 (internal quotation marks omitted).

## CONCLUSION

For the reasons stated above, Defendants' motion to stay this action pending the outcome of the Arbitration between Plaintiffs and Guinea is GRANTED.  The parties are directed to advise the Court no later than June 15, 2018 as to the status of the Arbitration, or when there has been a decision in the Arbitration, whichever is earlier.  The Clerk of Court is respectfully directed to terminate the motion docketed at ECF No. 55 and stay this case.

**SO ORDERED.**

Dated:   New York, New York
         November 29, 2017

　　　　　　　　　　　　　　　　　　　/s/ John F. Keenan
　　　　　　　　　　　　　　　　　　　John F. Keenan
　　　　　　　　　　　　　　　　　　United States District Judge

15