UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

_____

BSG Resources (Guinea) Limited, BSG
Resources (Guinea) Sàrl, and BSG Resources
Limited,

                Plaintiffs,

                -against-

George Soros, Open Society Foundations,
Open Society Institute, Foundation to
Promote Open Society, Open Society
Foundation, Inc., Alliance for Open Society
International, Inc., Open Society Policy
Center, and Open Society Fund,

                Defendants.

_____

No. 1:17-cv-02726 (JFK) (OTW)


**PLAINTIFFS' MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANTS' RENEWED MOTION TO DISMISS
PLAINTIFFS' AMENDED COMPLAINT**

Louis M. Solomon
Michael S. Lazaroff
REED SMITH, LLP
599 Lexington Avenue
New York, New York 10022
(212) 549-0400
*Attorneys for Plaintiffs BSG Resources
(Guinea) Limited, BSG Resources
(Guinea) Sàrl, and BSG Resources
Limited*

October 26, 2020

## <u>TABLE OF CONTENTS</u>

PRELIMINARY STATEMENT ..................................................................................................1

THE FACTUAL ALLEGATIONS OF THE AMENDED COMPLAINT ..................................4

      A.     BSGR and Its Contract With Guinea .......................................................4

      B.     Defendants and Their Misconduct – Motivating Forces Harming Plaintiffs...........5

ARGUMENT .............................................................................................................................9

I.      THE LCIA DECISION IS IRRELEVANT AND NOT PRECLUSIVE ...........................9

      A.     LCIA 2008 Corruption Finding Is Not Identical to Issues in the Complaint Here and Is Not Sufficient to Warrant Dismissal of the Entire Complaint ...........10

      B.     LCIA Itself Found No Preclusion ...........................................................12

      C.     LCIA Corruption Finding Is Dicta and Hence Not Preclusive .............................12

      D.     LCIA Corruption Finding is Not Preclusive Because It is Contradicted by a Later and More Encompassing Guinean Judgment ...............................................15

      E.     LCIA Corruption Finding Is Not Preclusive As It is Against One Plaintiff.........15

II.     THE ACT OF STATE DOCTRINE DOES NOT APPLY HERE ...................................16

      A.     *Kirkpatrick* Bars Application of the Act of State Doctrine Here...........................16

      B.     Alternatively, Dismissal Based on the Act of State Doctrine Is Premature...........20

III.    DEFENDANTS' PLEADING ARGUMENTS FAIL UNDER THE CORRECT LEGAL STANDARD...................................................................................................21

IV.    PLAINTIFFS ADEQUATELY PLEAD THEIR TORT CLAIMS .................................23

      A.     The Complaint States a Claim for Tortious Interference.......................................23

      B.     The Complaint States a Claim for Fraud ..............................................................27

      C.     The Complaint States Claims for Conspiracy and Prima Facie Tort....................30

      D.     The Complaint States a Claim for Commercial Defamation .................................30

V.     THE COURT SHOULD NOT DISMISS THE CLAIMS AGAINST OSF .....................31

CONCLUSION.........................................................................................................................33

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Abu Ali v. Ashcroft*,
  350 F. Supp. 2d 28 (D.D.C. 2004) .........................................................................17

*ACR Sys. v. Woori Bank*,
  232 F. Supp. 3d 471 (S.D.N.Y. 2017).....................................................................22

*AdvanFort Co. v. Cartner*,
  2015 WL 12516240 (E.D. Va. 2015).......................................................................20

*Alesayi Bev. Corp. v. Canada Dry Corp.*,
  947 F. Supp. 658 (S.D.N.Y. 1996)..........................................................................10

*Alfred Dunhill of London, Inc. v. Republic of Cuba*,
  425 U.S. 682 (1976).................................................................................................21

*Allied Bank v. Banco Credito Agricola de Cartago*,
  757 F.2d 516 (2d Cir. 1985).....................................................................................16

*Amusement Indus. v. Stern*,
  2016 WL 6820744 (S.D.N.Y. 2016).........................................................................28

*Anderson News, L.L.C. v. Am. Media, Inc.*,
  680 F.3d 162 (2d Cir. 2012).....................................................................................22

*Antonios A. Alevizopoulos & Assocs. v. Comcast Int'l Holdings*,
  100 F. Supp. 2d 178 (S.D.N.Y. 2000)...............................................................23, 24

*Anwar v. Fairfield Greenwich, Ltd.*,
  728 F. Supp. 2d 372 (S.D.N.Y. 2010)......................................................................32

*Baez v. Jet Blue Airways*,
  745 F. Supp. 2d 214 (S.D.N.Y. 2010)......................................................................33

*Bank of Am. v. Jarczyk*,
  268 B.R. 17 (W.D.N.Y. 2001) ..................................................................................28

*Bear, Stearns & Co. v. 1109580 Ontario, Inc.*,
  409 F.3d 87 (2d Cir. 2005).......................................................................................10

*Biro v. Conde Nast*,
  963 F. Supp. 2d 255 (S.D.N.Y. 2013)......................................................................31

*Boykin v. Keycorp*,
  521 F.3d 202 (2d Cir. 2008) .................................................................................28

*Bruce Supply Corp. v. New Wave Mech., Inc.*,
  4 A.D.3d 444 (2d Dep't 2004) ..............................................................................31

*C.D.S., Inc. v. Zetler*,
  288 F. Supp. 3d 551 (S.D.N.Y. 2017) ...................................................................13

*Callejo v. Bancomer, S.A.*,
  764 F.2d 1101 (5th Cir. 1985) ..............................................................................20

*Calvin Klein Trademark Trust v. Wachner*,
  129 F. Supp. 2d 248 (S.D.N.Y. 2001) ...................................................................30

*CBF Indústria de Gusa S/A v. AMCI Holdings, Inc.*,
  850 F.3d 58 (2d Cir. 2017) ...............................................................................9, 12

*Conason v. Megan Holding, LLC*,
  25 N.Y.3d 1 (2015) .........................................................................................10, 12

*Concord Assoc., L.P. v. Entm't Props. Trust*,
  817 F. 3d 46 (2d Cir. 2016) ..................................................................................23

*Daventree Ltd. v. Republic of Azerbaijan*,
  349 F. Supp. 2d 736 (S.D.N.Y. 2004) ..............................................................16, 20

*Dominicus Amercana Bokio v. Gulf & W. Indus. Inc.*,
  473 F. Supp. 680 (S.D.N.Y. 1979) ........................................................................21

*Domino Window Cleaning, Inc. v. Acting Secy. of Labor*,
  536 Fed. Appx. 96 (2d Cir. 2013) .........................................................................13

*Enigma Software Grp. USA, LLC v. Bleeping Computer LLC*,
  194 F. Supp. 3d 263 (S.D.N.Y. 2016) ...................................................................30

*Fisher v. APP Pharm., LLC*,
  783 F. Supp. 2d 424 (S.D.N.Y. 2011) ...................................................................33

*Flair Broad Corp. v. Powers*,
  1998 WL 247521 (S.D.N.Y. 1998),
  *clarified on reconsideration*,
  1999 WL 6363 (S.D.N.Y. 1999) .......................................................................10, 14

*Freihofer v. Hearst Corp.*,
  65 N.Y.2d 135 (1985) ...........................................................................................30

*Ft. Howard Paper Co. v. William D. Witter, Inc.*,
787 F.2d 784 (2d Cir. 1986)..................................................................................27

*Gherardi v. New York*,
161 F. App'x 60 (2d Cir. 2005) ..........................................................................14

*Goel v. Bunge, Ltd.*,
820 F.3d 554 (2d Cir. 2016)...............................................................22, 26, 29

*Green v. Beer*,
2009 WL 911015 (S.D.N.Y. 2009)......................................................................29

*Int'l Code Council, Inc. v. UpCodes, Inc.*,
2020 WL 2750636 (S.D.N.Y. 2020)....................................................................10

*In re Intelligent Bank Mgmt., Inc.*,
207 A.D. 2d 760 (1st Dep't 1994) ......................................................................31

*In re Livent, Inc. Noteholders Sec. Litig.*,
151 F. Supp. 2d 371 (S.D.N.Y. 2001)..................................................................23

*IOP Cast Iron Holdings, LLC v. J.H. Whitney Capital Partners, LLC*,
91 F. Supp. 3d 456 (S.D.N.Y. 2015)....................................................................28

*Jaffe v. Fitzgerald*,
2009 WL 804740 (E.D.N.Y. 2009)......................................................................14

*Jennings v. Hunt Cos.*,
367 F. Supp. 3d 66 (S.D.N.Y. 2019)....................................................................22

*John Blair Comms., Inc. v. Reliance Capital Grp., L.P.*,
157 A.D.2d 490 (1st Dep't 1990) ......................................................................27

*Jovic v. L-3 Servs., Inc.*,
69 F. Supp. 3d 750 (N.D. Ill. 2014) ....................................................................20

*Kadic v. Karadzic*,
70 F.3d 232 (2d Cir. 1995)..................................................................................16

*Konowaloff v. Metro. Museum of Art*,
702 F.3d 140 (2d Cir. 2012).........................................................................20, 21

*Kronish Lieb Weiner & Hellman LLP v. Tahari, Ltd.*,
35 A.D.3d 317 (1st Dep't 2006) ...................................................................17, 23

*Krupski v. Costa Crociere S. p. A.*,
560 U.S. 538 (2010)............................................................................................33

iv

*La Liberte v. Reid*,
  966 F.3d 79 (2d Cir. 2020)..................................................................................30

*Lavastone Capital LLC v. Coventry First LLC*,
  2015 WL 1939711 (S.D.N.Y. 2015)...................................................................28

*Lawrence v. Wilder Richman Sec. Corp.*,
  417 Fed. App'x 11 (2d Cir. 2010).................................................................26, 29

*Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*,
  797 F.3d 160 (2d Cir. 2015)................................................................................28

*Malloy v. Trombley*,
  50 N.Y.2d 46 (1980)...........................................................................................14

*Mata v. Lynch*,
  576 U.S. 143 (2015)............................................................................................16

*McCord v. Agard (In re Bean)*,
  252 F.3d 113 (2d Cir. 2001)................................................................................13

*Metromedia Co. v. Fugazy*,
  983 F.2d 350 (2d Cir. 1992)................................................................................15

*Mina Inv. Holdings Ltd. v. Lefkowitz*,
  16 F. Supp. 2d 355 (S.D.N.Y. 1998)..................................................................25

*Mt. Crest SRL, LLC v. Anheuser-Busch InBev SA/NV*,
  937 F.3d 1067 (7th Cir. 2018) ......................................................................18, 19

*Munno v. Town of Orangetown*,
  391 F. Supp. 2d 263 (S.D.N.Y. 2005)................................................................23

*Nat'l Fin. Partners Corp. v. USA Tax & Ins. Servs.*,
  145 A.D.3d 440 (1st Dep't 2016) .......................................................................23

*New Yuen Fat Garments Factory Ltd. v. August Silk, Inc.*,
  2009 WL 1515696 (S.D.N.Y. 2009)...................................................................23

*Oceanic Expl. Co. v. ConocoPhillips, Inc.*,
  2006 WL 2711527 (D.D.C. 2006) ......................................................................19

*Padilla v. Yeshiva Univ.*,
  691 F. App'x 53 (2d Cir. 2017) ..........................................................................22

*Petersen Energía Inversora S.A.U. v. Argentine Republic*,
  895 F.3d 194 (2d Cir. 2018)....................................................................3, 20, 21

*Pilkington N. Am., Inc. v. Mitsui Sumitomo Ins. Co. of Am.*,
  2020 WL 2521562 (S.D.N.Y. 2020)......................................................................28, 29

*Postlewaite v. McGraw-Hill, Inc.*,
  333 F.3d 42 (2d Cir. 2003)....................................................................................13

*Rich v. Fox News Network, LLC*,
  939 F.3d 112 (2d Cir. 2019)..................................................................................24

*RSM Prod. Corp. v. Fridman*,
  387 F. App'x 72 (2d Cir. 2010), *aff'g* 643 F. Supp. 2d 382 (S.D.N.Y. 2009)........................25

*S.A.R.L. Galerie Enrico Navarra v. Marlborough Gallery, Inc.*,
  2013 WL 1234937 (S.D.N.Y. 2013).......................................................................32, 33

*Sea Breeze Salt, Inc. v. Mitsubishi Corp.*,
  899 F.3d 1064 (9th Cir. 2018) ..............................................................................19

*Sharma v. Skaarup Ship Mgmt. Corp.*,
  916 F.2d 820 (2d Cir. 1990)..................................................................................25

*Sharon v. Time, Inc.*,
  599 F. Supp. 538 (S.D.N.Y. 1984)........................................................................19

*Spectrum Stores, Inc. v. Citgo Petroleum Corp.*,
  632 F.3d 938 (5th Cir. 2011) ................................................................................20

*Starr v. Sony BMG Music Entm't*,
  592 F.3d 314 (2d Cir. 2010)..................................................................................22

*Stevelman v. Alias Research Inc.*,
  174 F.3d 79 (2d Cir. 1999)....................................................................................27

*Stolow v. Greg Manning Auctions Inc.*,
  258 F. Supp. 2d 236 (S.D.N.Y. 2003)....................................................................29

*Tydings v. Greenfield, Stein & Senior, LLP.*,
  11 N.Y.3d 195 (2008)...........................................................................................14

*Utica Mut. Ins. Co. v. Munich Reinsurance Am., Inc.*,
  2018 WL 1737623 (N.D.N.Y. 2018) .....................................................................13

*Veleron Holding, B.V. v. Stanley*,
  2014 WL 1569610 (S.D.N.Y. 2014).................................................................10, 14

*Venture Capital Props. LLC v. Related Cos.*,
  2020 WL 554350 (Sup. Ct. N.Y. 2020)..................................................................27

*W.S. Kirkpatrick & Co. v. Envtl. Tectonics Corp.*,
    493 U.S. 400 (1990)............................................................................................ 3, 16-20

*Walter Fuller Aircraft Sales, Inc. v. Republic of Philippines*,
    965 F.2d 1375 (5th Cir. 1992) .............................................................................17

*World Wide Minerals Ltd. v. Republic of Kaz.*,
    116 F. Supp. 2d 98 (D.D.C. 2000) .......................................................................17

## Other Authorities

Fed. R. Civ. P. 4(m) ...........................................................................................................32

Fed. R. Civ. P. 8(d)(2).......................................................................................................26

Fed. R. Civ. P. 9(b) .....................................................................................................27, 28

Fed. R. Civ. P. 15(c)(1)(C) ...............................................................................................32

Restatement (Second) of Judgments § 29(4), cmt. f.........................................................15

Restatement (Second) of Torts, § 525 cmt. b....................................................................28

S.D.N.Y. Local Rule 26.1 .................................................................................................26

Plaintiffs (collectively "BSGR") respectfully submit this memorandum in opposition to the motion of Defendants ("Soros" and "OSF") to dismiss Plaintiffs' Amended Complaint.

## PRELIMINARY STATEMENT

After years of effort, BSGR secured a valuable mining contract in Guinea. The contract had been negotiated, finalized, or ratified by 3 successive Guinean governments (Am. Compl. ¶ 2 ("Complaint" or "¶")). The contract explicitly protected BSGR from subsequent changes in the law, especially fiscal changes (¶¶ 90, 92). BSGR directly or through a joint venture invested close to $1 billion in the project. Defendants, for their own illegal ends, then importuned new Guinean officials. With the financial clout and public relations adroitness of "'George Soros and his Open Society Foundations'", the new Guinean government, jointly with Soros, announced that Guinea would unilaterally increase its share of mining concessions at BSGR's expense. Soros, working with and through OSF, instigated, masterminded, and puppeteered this blatant abrogation of BSGR's contract. When BSGR refused to pay up, Soros made good on his threat, forced cancellation of the BSGR mining contract, and destroyed BSGR's reputation.

Soros carried out his scheme both openly and clandestinely, directly and through hired guns and paid agents. As reported to BSGR, "'Mr. Soros had a personal obsession about BSGR and is determined to ensure that [BSGR's joint venture's] mining license is withdrawn/ cancelled'" (¶ 48). Through Soros's own thuggish misconduct he demanded money from BSGR (¶ 65), maligning BSGR when it refused (¶ 101). Soros's secretive conduct included hiring, paying, and directing others to carry out a scheme to co-opt and corrupt Guinean processes, trumping up supposed wrongdoing by BSGR and creating and staffing kangaroo committees to conduct an "investigation" targeting BSGR, which concluded (preannounced before it even began) that BSGR had procured the mining contract illicitly. Soros then orchestrated a

worldwide smear campaign against BSGR (¶¶ 75-82, 167-75 *et seq*.).  These allegations are detailed in the Complaint.  They fully and properly state claims, some pleaded in the alternative, for tortious interference, fraud, conspiracy, commercial defamation, and prima facie tort.

Defendants try to avoid responsibility or even disclosure of their actions by hiding behind other proceedings.  In their 2017 motion to dismiss the Complaint, Defendants hid behind an ICSID arbitral proceeding pending between BSGR and Guinea, which they claimed involved "the same issues essential to adjudication of this action" (2017 Reply in Support of Motion to Dismiss, Dkt. 87, at 6 ("2017 Reply")).  This Court stayed this action pending what it was told would be an imminent ICSID decision.  Defendants no longer seek relief from ICSID's outcome.

Defendants now try to evade scrutiny by hiding behind a decision from a different arbitral Tribunal (not mentioned in the previous motion), the London Court of International Arbitration, in an arbitration between an unrelated entity, Vale S.A., and one of the plaintiffs, BSG Resources Limited (Def. Ex. 2, "LCIA").  Defendants wrongly argue that, on a motion to dismiss, this Court should use its discretion to treat certain findings from that LCIA as preclusive and, in an even greater erroneous leap, dismiss the entire Complaint.  The LCIA arbitration is between different parties and about different issues.  The issues are so different that the LCIA held there could be no preclusion between the LCIA arbitration and the ICSID one, which Defendants claimed contained the same issues as here.  The LCIA factual findings relied on by Defendants are dicta, certainly are not necessary to that case, and are not preclusive.  The specific LCIA findings concerning alleged 2008 corruption are factually, logically, and legally irrelevant to the central claims alleged here.  BSGR's claims relate to Soros's tortious interference with a *different* 2009 mining contract – one that was subsequently ratified by a *different* successor governments – and with permits that were confirmed as legitimate by a *different* government.

Finally, there is a post-LCIA decision from a Guinean court exonerating the same person (Mme. Touré) that Defendants assert the LCIA found was involved in the claimed 2008 corruption. Inconsistent prior decisions are not preclusive.  If anything, the later one controls (Point I).

The Act of State doctrine does not preclude adjudicating a claim in federal court against a New York resident for interfering with a contract between a private plaintiff and the Government of Guinea (Point II).  The defense fails because the controlling Supreme Court case, *W.S. Kirkpatrick & Co. v. Envtl. Tectonics Corp.*, 493 U.S. 400 (1990), rejects application of the defense where, as here, adjudicating the claims will not invalidate the foreign state's acts. Moreover, the Act of State defense is premature as there are many factual issues to be discovered prior to its application.  It should be raised (if at all) on summary judgment.  *See, e.g. Petersen Energía Inversora S.A.U. v. Argentine Republic,* 895 F.3d 194 (2d Cir. 2018).

Defendants' motion improperly goes outside the pleading (*see* Point IIIII).  Defendants' improper attachment of excerpts from the ongoing ICSID arbitration avails them not, since Soros/OSF have been mentioned many times in that arbitration as the "but-for" force without which BSGR would not have been harmed (Point IVII).

Defendants' motion ignores the Complaint's actual allegations, which state valid claims. This Court must accept well-pleaded facts as true and draw all reasonable inferences in BSGR's favor.  Supporting evidence need not be pleaded.  BSGR is entitled to have its factual allegations accepted fully and accurately, not whitewashed out of existence (*see* Point IV).

Defendants play a shell game with the OSF defendants, claiming OSF is not a legal entity but refusing to disclose any information about it.  Now, having sown confusion, they seek to dismiss the OSF entities on various grounds.  Defendants ignore the evidence BSGR proffered in its 2017 opposition.  Based on that evidence, the OSF entities are proper parties (Point V).

## THE FACTUAL ALLEGATIONS OF THE AMENDED COMPLAINT

### A.      BSGR and Its Contract With Guinea

BSGR is an international, diversified mining group employing thousands of people in many countries.  Over fifteen plus years, BSGR had invested hundreds of millions of dollars developing and successfully operating mines and related businesses worldwide, growing into one of the largest private investors in Africa (¶¶ 18-19).

Guinea has a rich iron ore deposit in the Simandou mountain range, including Zogota (¶¶ 2, 29).  Several companies applied for prospecting permits; BSGR's application was granted in 2006 (¶¶ 20-22).  On February 20, 2006, BSGR entered into a memorandum of understanding with Guinea about future iron ore mining (¶ 23).  In December 2008, BSGR was granted a prospecting permit for Simandou Blocks 1 and 2 (¶ 26).  This permit was later "confirmed after a thorough examination by the Minister of Mines in the successor government and the Interim President, Moussa Dadis Camara" (¶ 27).  In November 2009, after drilling for over three years and investing $160+ million, BSGR completed a 450-page feasibility study at the highest international standards regarding Zogota (¶¶ 24, 29).

In December 2009, BSGR and Guinea signed a Basic Convention Agreement (together with other relevant agreements, the "contract" (¶ 30)).  Under the contract, BSGR obtained a mining concession and agreed to invest $10 billion in the project and on Guinean infrastructure (¶¶ 30-33, 42).  BSGR entered a joint venture with Vale, a mining company, to work the project (¶¶ 37-40).  The joint venture spent over $800 million on this project.  BSGR purchased Vale's interest in 2015, after Defendants' misconduct caused the project's failure (¶¶ 41-43).

A subsequent Guinean government ratified the 2009 agreement (¶¶ 2, 36, 39).  Of prime importance, the contract specifically protected BSGR against post-contractual changes in Guinean law.  In "the event of a contradiction and/or difference" between the contract and

Guinean law, the contract would control (¶ 90; ¶¶ 35, 75, 91).  The contract's provisions were primary over any new laws, "particularly fiscal and/or concerning customs and excise" (¶ 92).

### B.        Defendants and Their Misconduct – Motivating Forces Harming Plaintiffs

Soros, a multi-billionaire, controls a huge network of organizations and individuals to carry out his instructions (¶ 8).  He is chairman of the for-profit Soros Fund Management and also of OSF (*id.*).  OSF in turn funds organizations controlled or influenced by Soros, including Revenue Watch Institute ("RWI", and now known as the Natural Resource Governance Institute) and Global Witness (¶¶ 8-9, 11, 49-53, 67-71, 79-82, 130, 142).  Soros has a long-standing animus to BSGR and its adviser, Beny Steinmetz (¶¶ 46-48, 2).

Soros was a "'key'" supporter of Alpha Condé "'even before he was elected'" as President of Guinea in December 2010 (¶¶ 54, 78).  In January 2011, Soros called upon his OSF-funded NGO empire and "'sent a first team'" to Guinea, including an RWI official, to "'reform'" Guinea's mining industry.  "'Other aides from Soros' Open Society Institute'" were expected soon thereafter.  RWI, part of Soros's team, drafted the proposal to review mining contracts prior to "'renegotiating' better terms" – with RWI specifically tasked to review BSGR's contract first (¶¶ 67-68).  Guinea could not do it without Soros – as reported, *e.g.*, "'the country was turning to Soros because Guinea could not afford to pay international consultants'" (¶ 73).  There would not have been a breach but for the activities of Defendants (*e.g.*, ¶¶ 93, 165, 184).

Soros unjustifiably demanded money from BSGR, including through its joint venture, in 2011 (¶¶ 58-61).  Soros told the joint venture that it "should anticipate US$250m to the government and as counterpart would get the agreement signed with BSGR guaranteed".  After the draft agreement was ready, Soros said "[BSGR] should pay US$250m to have the right to sit with the government and discuss the agreement again" (¶ 65).  OSF and Chris Canavan (of Soros Fund Management) were instrumental in carrying out Soros's plan (¶¶ 61-62).

Soros "'and his team'" spent four days with Condé in Feb-March 2011.  The purpose was to devise a scheme to strip the rights of companies, specifically BSGR, who refused to acquiesce in the extortionist demands designed and carried out by Soros and his agents (¶¶ 72, 75).

Soros and Condé held a joint press conference formally announcing the forthcoming review of mining contracts and the enactment of a new mining code (¶ 74; ¶ 83 (contracts to be "reworked")).  In a March 2, 2011 press release, OSF reported "'George Soros and his Open Society Foundations'" were behind making contract holders "comply with the principles of EITI [Extractive Industries Transparency Initiative]"; that "'Guinea will retain [RWI] . . . to provide legal advice'"; and that OSF was to provide $5 million in outright grants to Guinea to support the process.  Soros controlled removal of BSGR in part through RWI and OSF's grants (¶¶ 74-82).

The next day, Soros spoke at an EITI conference, where he boasted, "'all the mining claims are going to be re-examined and those who want to validate those claims will have to subscribe to the principles of EITI'" (¶ 78).  In a flat and unequivocal abrogation of the express protections of BSGR's contract, BSGR would have to accept new conditions and/or pay.  Condé said that "'the only adviser to the government at the time was the George Soros backed [RWI]'" (¶ 94).  Defendants through RWI controlled the new mining code that would then, unlawfully, be forced on BSGR.  It provided for an additional 35% participation by Guinea – radically changing the royalties and tax structure that BSGR's contract said could not be changed (¶¶ 85-92).

Soros and OSF utilized EITI to force a breach of the BSGR contract in part because, as OSF internally admitted, Defendants could exercise control over Soros-funded members subscribing to EITI (including specifically RWI and Global Witness) through "'board participation'", "'softer influence of governing board members and the secretariat leadership'", convening calls/meetings "'to convince'" Soros-funded entities to "'forge a united position'" on

their activities, and "'direct advocacy and public outreach by George Soros personally'" (¶ 79).

Not all mining companies would be subject to the new law. Soros, OSF, and their agents were directly involved in discussions with Rio Tinto that led to a "settlement" whereby Rio Tinto would pay Guinea $700 million – and in return, Rio Tinto would not be subject to review or have its rights affected by changes to the mining code. Rio Tinto later admitted to bribery in connection with this transaction (¶¶ 94-96).

BSGR did not cave to Defendants' demands. As reported, "'[BSGR] is certainly in trouble since it refused to put its hand in its pocket to preserve its rights in Simandou. . . . It was when BSGR refused, that investigations into its dealings began . . . [by] *the battalions of lawyers and private investigators funded by George Soros, Alpha Condé's chief supporter*'" (¶ 60).

Soros himself held a meeting at his apartment on or about September 2011 to discuss the future of Guinean mining with Condé, Canavan of Soros Fund Management, and executives from the mining companies with interests in Guinea. Soros intentionally excluded BSGR. A participant told BSGR that Soros spoke very negatively against BSGR (¶ 101). Less than a month later, Guinea improperly challenged the validity of BSGR's joint venture with Vale, notwithstanding the government's prior approval (¶ 102).

BSGR was the only entity whose mining contracts were subject to an extreme level of scrutiny. The Technical Committee, established in 2012 under the new mining code, purportedly conducted part of the review. In 2016, an observer noted there was "'the impression that the panel's unique objective had been to cancel the mining rights of [BSGR]'" (¶¶ 84, 98). That is not surprising; BSGR wouldn't knuckle under to Soros's unlawful demands and was advised in 2012 that "'Mr. Soros had a personal obsession about BSGR and is determined to ensure that [its] mining license is withdrawn/cancelled'" (¶ 48).

Soros called upon his "'battalions of lawyers and private investigators'" to go after BSGR (*see* ¶ 60).  A prior investigation had not accused BSGR of illegal conduct (¶¶ 93, 106).  Soros then made sure the government and later the Technical Committee relied on his long-time New York counsel at DLA Piper ("DLA"), Scott Horton, to conduct another "investigation" of BSGR.  Soros and OSF used Horton as an agent to assist in the destruction of BSGR's investment in Guinea (¶ 108).  Not only did Soros pay for DLA's investigation; he recommended that Horton and DLA be retained (¶ 106).  Horton in turn hired Steven Fox of Veracity Worldwide ("Veracity"), who had previously worked for Soros (¶ 109).  Soros, directly or via his controlled entities, paid for Veracity's work and controlled its conclusion (¶ 109).

DLA then relied on Veracity's bogus report – which cited no supporting documents and was based on hearsay and innuendo – to prepare its own report (¶¶ 109-112), funded by Soros (¶ 106).  DLA then advised the Technical Committee to use the DLA report as the basis for its Allegations Letter, to strip BSGR of its mining rights (¶¶ 108, 115-28, 150-51).  DLA thus had control over both sides of the "investigation" (¶ 116).  The Technical Committee was "'backed'" by Soros and his lawyer.  The press reported that the Technical Committee, "'had no staff of trained inspectors'"; so it "outsourced" and relied on DLA and Steven Fox, the investigator (¶ 99).  Soros's organization, RWI, set the order of the contracts to be renegotiated.  Horton and Chris Canavan were involved in the Technical Committee process (¶ 100).

To harm BSGR further and garner public support for their wrongful conduct, Soros and his coconspirators leaked the contents of the supposedly "confidential" Allegations Letter to the press prior to its being sent to BSGR.  They gave it to Misha Glenny of the *Financial Times*, who also is on the advisory board of Global Witness (¶ 130).  Soros sought to prevent BSGR from responding by pressuring its public relations firm, FTI, improperly to terminate its agreement

with BSGR.  BSGR was told that "'George Soros had personally requested' that FTI 'cancel its contractual arrangements with BSGR'" (¶ 137).  Soros also caused the fact of the FTI contract's termination to be leaked to the *Financial Times* before BSGR was notified (¶ 138).  He instructed his agents to disseminate unfounded and untrue rumors concerning BSGR to the media (¶¶ 134, 140-49, 172).  According to individuals at FTI, Soros's plan all along was to "'key this thing up [*i.e.*, the investigation of BSGR] for the committee to review,'" and his efforts left BSGR, in FTI's words, "'up a creek without a paddle'" (¶ 139).

The plan succeeded.  Based on the unsubstantiated allegations in the Veracity Report, repeated in DLA's report, and then in the Allegations Letter – and ignoring the 50,000 pages of documents BSGR provided (¶¶ 105, 128) – BSGR's contract was cancelled in April 2014 (¶¶ 114-128, 150-60).  But Defendants' campaign to harm BSGR continued, including causing Global Witness publicly to assert BSGR's alleged corruption in December 2016 (¶ 172).

**ARGUMENT**

**I.    THE LCIA DECISION IS IRRELEVANT AND NOT PRECLUSIVE**

Defendants' primary argument is that a finding by the LCIA that BSGR engaged in "bribery or corruption in relation to benefits granted to Mme. Toure" in 2008 (LCIA ¶¶ 642, 676.10; MOL 11) estops this Court from hearing this entire case and requires dismissal of this entire action.  This is wrong.  The Second Circuit has explained:

> "An arbitration decision may effect [issue preclusion] in a later litigation ... [only] if the proponent can show with ***clarity and certainty*** that the same issues were resolved.". "[Issue Preclusion] is permissible as to a given issue if[:] (1) the identical issue was raised in a previous proceeding; (2) the issue was actually litigated and decided in the previous proceeding; (3) the party had a full and fair opportunity to litigate the issue; ... (4) the resolution of the issue was necessary to support a valid and final judgment on the merits[;] ... [and (5)] application of the doctrine is fair."

*CBF Indústria de Gusa S/A v. AMCI Holdings, Inc.*, 850 F.3d 58, 77 (2d Cir. 2017) (citations

omitted, emphasis added) (estoppel from ICC arbitration); *Conason v. Megan Holding, LLC,* 25 N.Y.3d 1, 17 (2015).  Courts "have broad discretion to determine when this doctrine [estoppel] should be applied."  *Int'l Code Council, Inc. v. UpCodes, Inc.,* 2020 WL 2750636, *29 (S.D.N.Y. 2020).  "The party asserting collateral estoppel bears the burden of demonstrating that it is entitled to this relief."  *Bear, Stearns & Co. v. 1109580 Ontario, Inc*., 409 F.3d 87, 93 (2d Cir. 2005).  As Defendants' acknowledge, "the principles of collateral estoppel are the same whether federal or New York law applies".  *Flair Broad Corp. v. Powers,* 1998 WL 247521, *5 (S.D.N.Y. 1998) (Keenan J.); MOL 10 n.5.  Defendants have not met their burden of proof.

### A.     LCIA 2008 Corruption Finding Is Not Identical to Issues in the Complaint Here and Is Not Sufficient to Warrant Dismissal of the Entire Complaint

Defendants have not met their burden of proving that the issue from which they are seeking estoppel is identical to any issue here or that any such finding (even if preclusive) can lead to dismissal of the *entire* Complaint.  Defendants argue estoppel only from the LCIA finding about the 2008 bribery of Mamadie Touré, the wife of then President Conté, involving Pentler Holdings and Frederic Cillins (MOL 9, 11; LCIA ¶¶  642, 676.10, 595, 631, 634-5, 637, 742, 773).  This episode related allegedly to influencing President Conté in actions helping BSGR in 2008 (LCIA ¶¶ 631, 642).  The LCIA made this finding in determining that BSGR's representation to Vale during due diligence, that "it had not engaged in bribery or corruption in relation to benefits granted to Mme. Toure", was not true (LCIA ¶ 676.10).  The LCIA did not consider tortious interference with the BSGR/Guinea agreements or related claims of fraud and defamation.  The LCIA applied English law (LCIA ¶ 170.3).  *See, e.g., Alesayi Bev. Corp. v. Canada Dry Corp.,* 947 F. Supp. 658, 666 (S.D.N.Y. 1996) ("Issues are not identical when the standards governing them are significantly different"); *see also Veleron Holding, B.V. v. Stanley*, 2014 WL 1569610, *13 (S.D.N.Y. 2014) (no estoppel from LCIA due to limited discovery).

Importantly, Mamadie Touré, Pentler, and Frederic Cillins are not mentioned in the Complaint here.  President Conté died at the end of 2008 (¶ 27; LCIA ¶ 243).  The Complaint here alleges that the legitimacy of the permit granted in 2008 was "confirmed after a thorough examination by the Minister of Mines in the successor government and the Interim President, Moussa Dadis Camara" (¶ 27).  There is no LCIA finding of any corruption related to that confirmation.  A contract, the Basic Convention Agreement, was executed with this new government in December 2009 (after submission of a feasibility study in November 2009) (¶¶ 29-30; LCIA ¶¶ 265-66).  This contract was then ratified by yet a different government in March 2010 (¶ 36; LCIA ¶¶ 271, 243).  The LCIA corruption finding does not relate to the 2009 contract or its ratification by successive governments.  Defendants here seek preclusion for interference with *all* of BSGR's rights whenever created as well as related fraud and defamation.  Defendants have not established how this one finding concerning 2008 bribery can lead to dismissal on the pleadings (which must be assumed to be true) of all or any of the claims here concerning breach of the independent and subsequent Convention.  There is nothing in the Complaint that would support such a dismissal.  At the very least, there needs to be discovery to determine any connection between the LCIA corruption finding and the allegations here.

Defendants cite to Complaint ¶¶ 25-26 (MOL 11 n.6).  Those paragraphs allege, as background, that the Guinean government required Rio Tinto to relinquish certain mining rights and granted BSGR a 2008 prospecting permit.  These are not necessary to any pleaded claim.  Defendants also misleadingly cite to this Court's stay order where the Court found that the ICSID arbitration and this litigation were similar as both dealt with the issue of "whether the Convention and BSGR's mining rights were procured through corruption" (MOL 11). But, the Court there is addressing the "Convention", the 2009 contract, and the related mining rights.  The

Court in the stay order was not even addressing the one limited 2008 corruption finding.

### B.     LCIA Itself Found No Preclusion

This case and the LCIA are *very* different.  The LCIA arbitration was between different

parties (Vale and BSGR) with different claims (*i.e.*, fraudulent misrepresentations to Vale during

due diligence/breach of certain contractual warranties) concerning a different contract (the joint

venture between Vale and BSGR, not at issue here) applying different law (LCIA ¶¶ 294, 170.3).

The LCIA itself ruled that that there was **no** "risk of conflicting decisions [between the

LCIA and ICSID arbitrations] based on rules of claim or issue preclusion" (LCIA ¶ 1001).  This

is the very ICSID arbitration between BSGR and Guinea that Defendants told this Court raised

"the same issues essential to adjudication of this action" (2017 Reply at 6) and thus warranted a

stay.  In granting the stay, this Court found that "Defendants have established that the same key

issues underlie Plaintiffs' allegations in the [ICSID] Arbitration and the claims in this action"

(Dkt. 136 at 9).  Critically, because the LCIA found that its award posed no risk of conflict with

ICSID, then it cannot be preclusive here where Defendants claim "the same issues" are raised.

Defendants erroneously argue that this holding from the LCIA is (a) dictum, and (b)

irrelevant because it dealt with the ICSID arbitration, not this action (MOL 12 n.7).  To begin,

LCIA was asked to reopen its proceedings to include evidence from the ICSID arbitration (LCIA

¶ 167).  It refused to do so *because* the arbitrations were so distinct that there could be no

preclusion between the two (LCIA ¶ 1001).  This is not dicta.  But, even were it dicta,

Defendants successfully secured a stay here based on the assertion of an identity between the

ICSID arbitration and this litigation.  They are now estopped from claiming otherwise.

### C.     LCIA Corruption Finding Is Dicta and Hence Not Preclusive

The LCIA corruption finding is not preclusive as it is dicta and not "necessary to

support" the final award of the LCIA.  *CBF,* 850 F.3d at 77; *Conason,* 25 N.Y.3d at 17.

Defendants claim estoppel from the LCIA's single finding that BSGR's representation to Vale that "it had not engaged in bribery or corruption *in relation to benefits granted to Mme. Toure*" in 2008 was false and misleading (LCIA ¶ 676.10).  Even with regard to Mme. Touré, the Tribunal found only a single episode, from 2008, of the six episodes Vale alleged (LCIA ¶¶ 593, 600-625).  The LCIA found that this one episode resulted in Mme. Touré influencing President Conté in 2008 to dismiss the Prime Minister and the Minister of Mines "because they both opposed the transfer of the mining rights from Rio Tinto to BSGR. . . . The Council of Ministers implemented President Conte's wish of revoking Rio Tinto's rights and giving them to BSGR on the same day (4 December 2008)" (LCIA ¶ 633).  The LCIA explicitly stated that this corruption finding was not necessary to its judgment:

> [T]he Tribunal has found multiple misrepresentations by BSGR during the pre-contractual due diligence process, ***other than*** the misrepresentation as to the absence of corruption . . . Consequently, even absent a finding of corruption, the multiple remaining misrepresentations would warrant the Tribunal's conclusions and its decision as to Vale's primary prayer for relief regarding fraudulent misrepresentation.

(LCIA ¶ 169) (emphasis added).  The Tribunal also stated that its judgment could be made "without making inquiries and findings on bribery" (LCIA ¶ 1002).  Thus, the LCIA itself said that the findings to which Defendants point were not necessary to its decision.  Statements not necessary to an award are not preclusive.  *See, e.g., Postlewaite v. McGraw-Hill, Inc.,* 333 F.3d 42, 49, 51 (2d Cir. 2003) ("if the arbitrators made both findings, either of which would have been a colorable basis for the award, neither finding may properly be said to have been essential to the award"); *McCord v. Agard (In re Bean)*, 252 F.3d 113, 118 (2d Cir. 2001) (dicta has no estoppel effect); *Domino Window Cleaning, Inc. v. Acting Secy. of Labor*, 536 Fed. Appx. 96, 98 (2d Cir. 2013) (same); *Utica Mut. Ins. Co. v. Munich Reinsurance Am., Inc.*, 2018 WL 1737623, *18 (N.D.N.Y. 2018) (no estoppel with two "equally plausible" grounds for the decision); *C.D.S., Inc. v. Zetler*, 288 F. Supp. 3d 551, 559 (S.D.N.Y. 2017) (statement "not 'a necessary element of

13

the court's conclusion'"); *Veleron*, 2014 WL 1569610 at *12 (no estoppel from LCIA dicta).

Defendants twist the LCIA's words to claim that the Mme. Touré 2008 bribery finding was "needed" or essential to the LCIA's holding (MOL 11). This is wrong. The quotes above show that the LCIA explicitly stated that this finding was *not* necessary. The LCIA's use of the word "needed" (LCIA ¶ 1002) does not implicate estoppel principles. That paragraph says that the Tribunal could have avoided "making inquiries and findings on bribery" but "chose not do so" "in order to give justice to the case in view of Vale's narrative as well as BSGR's narrative. . . . A central plank of BSGR's case was, thus, that it had not engaged in bribery in procuring its mining rights, and this plank needed to be addressed by this Tribunal." (LCIA ¶ 1002). The finding is dictum. The Tribunal "chose" to consider the corruption issue; it was not necessary.

Defendants argue that the finding of 2008 bribery/corruption is really an "alternative holding" that can sometimes estop (MOL 13, citing *Flair Broad Corp.,* 1998 WL 247521, at *5 and *Gherardi v. New York,* 161 F. App'x 60, 61 (2d Cir. 2005)). But in neither *Flair* nor *Gherardi* did the underlying court explicitly say that the finding was not necessary to its holding (as the LCIA did here), and neither dealt with an arbitration. The LCIA did not state that the 2008 corruption finding was an "alternate holding" or a separate ground for its award; it said that its judgment could be made without the corruption finding. Also, even if an alternate holding, it is insufficient. *Gherardi* is based on *Malloy v. Trombley*, 50 N.Y.2d 46, 52-53 (1980). The Court of Appeals later emphasized that *Malloy* did not "enunciate any broad rule" and was tied to its own "particular facts and circumstances". *Tydings v. Greenfield, Stein & Senior, LLP.,* 11 N.Y.3d 195, 199 (2008). *Malloy* was a "limited" exception to the general rule *against* preclusion from alternate holdings. *Jaffe v. Fitzgerald,* 2009 WL 804740, *7 (E.D.N.Y. 2009) (no preclusion - not part of limited exception). Here, where the corruption finding was not necessary

and is contradicted by a Guinean judgment, *infra* Point I.D, there is no basis for estoppel.

**D.     LCIA Corruption Finding is Not Preclusive Because It is Contradicted by a Later and More Encompassing Guinean Judgment**

The LCIA finding is itself contradicted by a 2020 Guinean court judgment (Declaration of Louis M. Solomon ("LMS Decl.") Exs. 12-13; Declaration of Mody Oumar Barry ("Barry Decl." Ex. 1).  On March 30, 2020, a Guinean court issued an order exonerating Mamadie Touré and five others from charges of bribery and corruption during 2006 to 2010 related to BSGR's obtaining its Guinean mining rights.  The Guinean Court held that the withdrawal of all charges "implies that, following the investigations into the case brought before the court, the Public Prosecutor's Office *has no evidence that could lead the court to convict the defendants*"; as a result, the court found the defendants "not guilty".  *Id.* (emphasis added).  In Guinea, this "not guilty" judgement is a substantive decision on the merits; the defendants cannot be retried for these matters criminally or civilly (Barry Decl. ¶ 8).  This exoneration by the Guinean government and a Guinean court is for claims of corruption from 2006 to 2010; it is much broader than the narrow finding of the LCIA.  It undermines any preclusion from any earlier contrary LCIA finding.  *See, e.g.,* Restatement (Second) of Judgments § 29(4), cmt. f. ("Where a determination relied on as preclusive is itself inconsistent with some other adjudication of the same issue, that confidence [in the correctness of the decision] is generally unwarranted.").  If anything, deference should be given to the later opinion.  *Metromedia Co. v. Fugazy*, 983 F.2d 350, 366 (2d Cir. 1992) (courts usually follow the more recent of inconsistent results).

**E.     LCIA Corruption Finding Is Not Preclusive As It is Against One Plaintiff**

The LCIA's decision is only against one of the three plaintiffs here, BSG Resources Limited.  It would be inequitable to give preclusive effect against the other two plaintiffs who were not parties to the LCIA arbitration but are parties to the Soros Litigation.

There is no legal or discretionary basis for Defendants to have this Court deprive BSGR of access to this Court to redress its grievances against Soros.  LCIA does not estop this action.

## II.   THE ACT OF STATE DOCTRINE DOES NOT APPLY HERE

Defendants bear the burden of establishing the affirmative defense of act of state – a defense "more appropriately raised in a motion for summary judgment".  *Daventree Ltd. v. Republic of Azerbaijan*, 349 F. Supp. 2d 736, 755 (S.D.N.Y. 2004).  The act of state defense is a "judicially created doctrine [that] is not jurisdictional," *Allied Bank v. Banco Credito Agricola de Cartago*, 757 F.2d 516, 520 (2d Cir. 1985), but rather "prudential", *Kadic v. Karadzic*, 70 F.3d 232, 249 (2d Cir. 1995).  Where the federal court has jurisdiction, it "has a 'virtually unflagging obligation'" to exercise that authority.  *Mata v. Lynch*, 576 U.S. 143, 150 (2015).

"In every case in which we have held the act of state doctrine applicable, the relief sought or the defense interposed would have required a court in the United States to declare invalid the official act of a foreign sovereign performed within its own territory".  *W.S. Kirkpatrick & Co. v. Envtl. Tectonics Corp.*, 493 U.S. 400, 405, 409-10 (1990) ("*Kirkpatrick*").  Where (like here) the court need not invalidate an official foreign act, "the doctrine has no application".  *Id.*

### A.   *Kirkpatrick* Bars Application of the Act of State Doctrine Here

Defendants argue that BSGR's tortious interference, fraud, and conspiracy claims are barred by the act of state doctrine because, they say, Plaintiffs' claims require the Court to determine whether BSGR's contract with Guinea was valid and breached (MOL 14-17).  As set forth below, Defendants' motion fails under the authoritative precedent of *Kirkpatrick* (which Defendants did not even cite in their 2017 motion to dismiss).

**Tortious Interference**.  In *Kirkpatrick*, the plaintiff alleged, as a necessary element of its claim, that defendant bribed Nigerian officials so that it could obtain contracts from the Nigerian government.  493 U.S. at 402.  The defendant, a contractor, countered by arguing that the

decisions of the Nigerian government concerning the allegedly improperly obtained contracts constituted acts of state that rendered plaintiff's claims unreviewable. *Id.* The Supreme Court rejected this argument; the plaintiff sought "only to obtain damages from private parties who had procured" the wrongdoing. *Id.* at 407. The Court found that the plaintiff's lawsuit "was not trying to undo or disregard the governmental action"; the plaintiff's claims on the contract did not require "a determination that Nigeria's contract with [defendant] was, or was not, effective". *Id.* at 406; *accord Abu Ali v. Ashcroft*, 350 F. Supp. 2d 28, 59 (D.D.C. 2004) (declining to apply doctrine: petitioners did not seek to undo government action "but rather are suing non-foreign entities . . . for the role they allegedly played in obtaining the actions of the Saudi government").

    *Kirkpatrick* similarly rejected the argument that the act of state doctrine applied because "the facts necessary to establish [the] claim will also establish that the contract was unlawful" and would thus necessarily require a court finding that "the contract is invalid". 493 U.S. at 406. The Court found that, even were such findings required, the official action was not "being sought to be declared *ineffective* elsewhere". *Id.* at 407 (emphasis in original).

    Defendants' arguments here fail for precisely the reasons in *Kirkpatrick*. "[F]inding a breach here would not call into question the decision of [Guinea] … [as] all the public acts and decisions cited by the defendants may be valid and yet [Guinea] still may have breached the contract". *Walter Fuller Aircraft Sales, Inc. v. Republic of Philippines*, 965 F.2d 1375, 1388 (5th Cir. 1992); *see World Wide Minerals Ltd. v. Republic of Kaz.*, 116 F. Supp. 2d 98, 105 (D.D.C. 2000) (noting doctrine would be inapplicable to tortious interference claim because while the claim "might suggest that the contract was invalid . . . Kazakhstan's governmental decrees would not be directly implicated"). Indeed, Guinea is not even a necessary party to this action. *E.g.*, *Kronish Lieb Weiner & Hellman LLP v. Tahari, Ltd.*, 35 A.D.3d 317, 318 (1st Dep't 2006) (in

tortious interference action, breaching party was "not a necessary party whose rights could be inequitably affected by a judgment in the main action").

Likewise, more recently, the Seventh Circuit applied *Kirkpatrick* to deny dismissal of a similar claim.  In *Mt. Crest SRL, LLC v. Anheuser-Busch InBev SA/NV*, 937 F.3d 1067 (7th Cir. 2018), plaintiff brought antitrust claims against a larger competitor for conspiring to restrain the export of beer to Ontario in violation of the Sherman Act.  The lower court dismissed the claims concerning agreements with a Canadian governmental agency implementing a regulation (the six-pack rule).  *Id.*  The Seventh Circuit reversed in part and explained that in *Kirkpatrick*:

> the Court was confronted with a situation where the plaintiffs, unsuccessful bidders for a Nigerian government construction contract, brought an action under the Racketeer Influenced and Corrupt Organizations Act ("RICO") alleging that the defendants had obtained the bid by bribing Nigerian officials. Nigerian law prohibited the payment and acceptance of bribes in connection with a government contract. *Id.* at 402.
>
> . . . .
>
> The Supreme Court [in *Kirkpatrick*] . . . readily admitted that, in the course of adjudicating the RICO claim, a United States court might well make factual findings that would establish the illegality of the contract under Nigerian law. *Id.* at 406. But this was, in effect, no more than a collateral consequence of the court's task in adjudicating the RICO action because the Nigerian contract's "legality wa[s] simply not a question to be decided" in the suit.

*Id.* at 1082 (citations omitted).  The Seventh Circuit explained that it must determine, "does the 'relief sought or the defense interposed' by Mountain Crest 'require[] a court in the United States to declare invalid the official act[s]' of the Ontario government, and thus render them 'ineffective as a rule of decision for the courts of this country?'" *Id.* at 1084.  The Court reversed the dismissal of the claim that defendants violated the Sherman Act by conspiring to bring about the government's approval of the six-pack rule, as this claim "did not implicate the act of state doctrine." *Id.*  The Seventh Circuit held that plaintiff was not trying to undo government action but was trying to obtain damages from the private parties that procured the illegal behavior:

> Mountain Crest sets forth facts that, if accepted by a trier of fact, might demonstrate that the defendants took concerted action to bring about the Ontario legislation.   Holding Anheuser-Busch and Molson Coors liable for their antecedent and allegedly deliberate acts to bring about the six-pack rule and requiring them to pay damages to Mountain Crest would not, on its face, invalidate Ontario's chosen regulatory scheme.

*Id.* at 1086; *see also Oceanic Expl. Co. v. ConocoPhillips, Inc.,* 2006 WL 2711527, *15 (D.D.C. 2006) ("None of the claims or defenses asserted by either the plaintiffs or ConocoPhillips require this Court to determine that ConocoPhillips' . . . contracts with the TSDA is ineffective.  The legality or the illegality of the contracts is not a question to be determined in this suit . . . . Rather the focus lies in ConocoPhillips' unlawful conduct and how that conduct resulted in harm to the plaintiffs.  Therefore, the act of state doctrine is not a bar to plaintiffs' claims . . . .").

Here, too, BSGR is trying to hold Soros/OSF liable for their antecedent and deliberate acts causing the behavior of terminating the contract.  An order by the court requiring Soros/OSF to pay damages would not, on its face, invalidate the governmental action of terminating the contract.  Hence, there is no grounds to apply the Act of State defense to this case.

**Fraud and Conspiracy.**  Nor does adjudication of Plaintiffs' fraud or conspiracy claims raise any issue as to the validity of the Technical Committee's actions (MOL 16).  BSGR is seeking relief solely against Defendants; accordingly, the "issue in this litigation is not whether [Guinea's] acts are valid, but whether they occurred".  *Sharon v. Time, Inc.*, 599 F. Supp. 538, 546 (S.D.N.Y. 1984) (declining to apply act of state doctrine), *cited with approval in Kirkpatrick*, 493 U.S. at 406.  (Defendants' arguments concerning BSGR's request for post-judgment equitable relief (MOL 15 n.9) fail for the same reason.  To the extent that the Court feels the request is objectionable, we are prepared to withdraw it).

Defendants' cases do not aid them.  Those cases are not against a purely private party seeking primarily money damages – the situation here and in *Kirkpatrick*.  *See Sea Breeze Salt,*

*Inc. v. Mitsubishi Corp.*, 899 F.3d 1064 (9th Cir. 2018) (relief sought was declaration that foreign government's action violated U.S. antitrust law); *AdvanFort Co. v. Cartner*, 2015 WL 12516240, *6 (E.D. Va. 2015) (action against agent of the Marshall Islands Government); *Spectrum Stores, Inc. v. Citgo Petroleum Corp.*, 632 F.3d 938, 944-45, 956 (5th Cir. 2011) (plaintiffs sought "injunctive relief against continued price-fixing" by state actors); *see also Konowaloff v. Metro. Museum of Art*, 702 F.3d 140, 147 (2d Cir. 2012) (injunctive and declaratory relief concerning the "right or title" of a painting allegedly expropriated by foreign sovereign).  Defendants' other cases are of little utility as they pre-date *Kirkpatrick*, which significantly narrowed the scope of the act of state defense.  *Compare, e.g.*, *Callejo v. Bancomer, S.A.*, 764 F.2d 1101, 1114 (5th Cir. 1985) (MOL 14) (noting concern of "insult[ing] the foreign sovereign"), *with Kirkpatrick*, 493 U.S. at 409 ("act of state doctrine does not establish an exception for cases and controversies that may embarrass foreign governments").

### B.  Alternatively, Dismissal Based on the Act of State Doctrine Is Premature

Even were this Court to find that the doctrine may be applied to situations like this, it would be inappropriate to dismiss this case on act of state grounds on the pleadings alone.  *See, e.g., Petersen,* 895 F.3d at 212; *Daventree*, 349 F. Supp. 2d at 755; *see also Jovic v. L-3 Servs., Inc.*, 69 F. Supp. 3d 750, 766 (N.D. Ill. 2014) (denying motion to dismiss on act of state grounds where record was undeveloped as to impact on U.S. foreign relations).  In *Petersen*, the Second Circuit affirmed denial of a motion to dismiss based on the act of state doctrine as it was premature.  In that case, Petersen owned 25% of shares of an Argentinian company.  Argentina expropriated from another company voting stock of the Argentinian company and then repudiated certain contractual obligations to Petersen.  Petersen sued for breach of contract.  Argentina argued for dismissal of the claim under the act of state doctrine.  The district court denied the motion.  The Second Circuit affirmed, explaining:

> The act of state doctrine provides an affirmative defense and was raised below on a motion to dismiss . . . . Dismissal was warranted only if the doctrine's applicability was "shown on the face of the complaint." *Konowaloff v. Metro. Museum of Art*, 702 F.3d 140, 146 (2d Cir. 2012); *accord Daventree Ltd. v. Republic of Azerbaijan*, 349 F. Supp. 2d 736, 755 (S.D.N.Y. 2004) ("As a substantive rather than a jurisdictional defense, the Act of State doctrine is more appropriately raised in a motion for summary judgment than in a motion to dismiss."). As discussed above, the face of Petersen's complaint makes clear that it is not challenging Argentina's official acts -- the expropriation of property -- and the complaint's allegations that Argentina and YPF breached their obligations by failing to engage in a tender offer did not require the district court to rule on the validity of any of Argentina's official acts. . . . Whether the act of state doctrine bars Petersen's claims is a merits determination that turns on the facts.

*Id.* at 212. Here, too, any act of state defense should be determined after discovery. The face of the Complaint shows that BSGR entered agreements that were "negotiated, finalized, and ratified over the course of many years by and with three independent governments of Guinea" (¶ 2). The Complaint alleges that Soros/OSF tortiously interfered with these contracts, causing the government of Guinea to breach the agreements. The Complaint does not on its face require the court to issue an order that any of the government of Guinea's official acts were invalid. Discovery and further proceedings will make clear whether any such order will be necessary.

Dismissal would also be premature because further record development will support application of the corruption and commercial activity exceptions to the act of state doctrine. *See Dominicus Amercana Bokio v. Gulf & W. Indus. Inc.*, 473 F. Supp. 680, 690 (S.D.N.Y. 1979) ("even an unrepudiated act of state may be scrutinized by the courts if it resulted from the corruption of government officials"); *Alfred Dunhill of London, Inc. v. Republic of Cuba*, 425 U.S. 682, 706 (1976) ("We decline to extend the act of state doctrine to acts committed by foreign sovereigns in the course of their purely commercial operations") (plurality opinion).

## III. DEFENDANTS' PLEADING ARGUMENTS FAIL UNDER THE CORRECT LEGAL STANDARD

Defendants repeatedly omit from their discussion allegations expressly in the Complaint,

only to complain that the allegations are not there; and then complain that the Complaint is "conclusory"; and proffer extrinsic evidence rather than accepting the Complaint's allegations as true.  This is all improper on a motion to dismiss.

"The Court's charge in ruling on a Rule 12(b)(6) motion 'is merely to assess the legal feasibility of the complaint, not to assay the weight of the evidence which might be offered in support thereof.'"  *Jennings v. Hunt Cos.*, 367 F. Supp. 3d 66, 69 (S.D.N.Y. 2019) (Keenan, J.). A complaint needs only "enough facts 'to raise a right to relief above the speculative level' and 'state a claim to relief that is plausible on its face'".  *Padilla v. Yeshiva Univ.*, 691 F. App'x 53, 55 (2d Cir. 2017), citing *Starr v. Sony BMG Music Entm't*, 592 F.3d 314, 321 (2d Cir. 2010). The "plausibility standard is lower than a probability standard, and there may therefore be more than one plausible interpretation".  *Anderson News, L.L.C. v. Am. Media, Inc*., 680 F.3d 162, 189-90 (2d Cir. 2012).  The complaint is to be read "'as a whole'".  *Id*. at 190.  The complaint as a whole "supplies sufficient context to satisfy [plaintiff's] pleading burden".  *ACR Sys. v. Woori Bank*, 232 F. Supp. 3d 471, 478 (S.D.N.Y. 2017) (Keenan, J.). "The Court must construe the complaint in the light most favorable to the plaintiff".  *Jennings*, 367 F. Supp. 3d at 69; *Anderson*, 680 F.3d at 189 ("failure to assume the truth of reasonable inferences" is clear error).

Defendants rely on extrinsic documents from BSGR's pending ICSID arbitration against Guinea, purporting to show inconsistencies with the Complaint (MOL 4, 7-8, 19, 25, citing Def. Ex. 1).  This is legal error.  BSGR's Complaint expressly **excluded** the ICSID arbitration (¶ 166).  Even had it been included, this would "not open the door to consideration, on a motion to dismiss, of any and all documents filed in connection with that litigation".  *Goel v. Bunge, Ltd*., 820 F.3d 554, 560 (2d Cir. 2016).  "[E]ven offering 'limited quotation[s]' from the document is not enough".  *Id*. at 559.  Even for documents "properly the subject of judicial

notice, judicial notice would not be appropriate because the plaintiffs did not rely on the documents in drafting the Complaint". *Concord Assoc., L.P. v. Entm't Props. Trust*, 817 F. 3d 46, 51 n.2 (2d Cir. 2016). Defendants' cases (MOL 8 n.3) are inapposite. *Munno v. Town of Orangetown*, 391 F. Supp. 2d 263, 267 (S.D.N.Y. 2005), involved documents from a U.S. court proceeding after final judgment, not from an incomplete international arbitration. *In re Livent, Inc. Noteholders Sec. Litig.*, 151 F. Supp. 2d 371, 405 (S.D.N.Y. 2001), was concerned with self-contradictory "pleadings in the complaint" itself, not allegations in other actions.

## IV.   PLAINTIFFS ADEQUATELY PLEAD THEIR TORT CLAIMS

### A.   The Complaint States a Claim for Tortious Interference

Defendants' sole substantive attack on BSGR's tortious interference claim is the purported failure to allege but-for causation (MOL 18-20). Defendants' argument fails.

Defendants incorrectly argue there can be no but-for causation because Guinea was involved in the acts at issue. There can be more than one cause of tortious interference. *Nat'l Fin. Partners Corp. v. USA Tax & Ins. Servs.*, 145 A.D.3d 440, 441 (1st Dep't 2016), citing *Kronish Lieb*, 35 A.D.3d at 318. Also, "collusion between the breaching party [here Guinea] and the interfering party [here Defendants] cannot be dispositive of the 'but for' inquiry. To the contrary, the allegation of collusion coupled with the allegation of wrongful interference or inducement to breach, leads to the conclusion of tortious interference by the third-party [here Defendants]". *Antonios A. Alevizopoulos & Assocs. v. Comcast Int'l Holdings*, 100 F. Supp. 2d 178, 187 (S.D.N.Y. 2000); *see New Yuen Fat Garments Factory Ltd. v. August Silk, Inc.*, 2009 WL 1515696, *2, 7 (S.D.N.Y. 2009) (Keenan, J.) (permitting tortious interference claim).

Defendants' assertion – that Defendants cannot be the but-for cause because Guinea was predisposed to breach – fails on both the facts and the law. Defendants point to allegations including that Condé requested BSGR make a payment to retain its contract rights in early 2011

23

(MOL 18-19).  This does not show pre-disposition.  *Antonios A. Alevizopoulos*, 100 F. Supp. 2d at 186 ("simple economic self-interest" not evidence of predisposition).  The contracting party is the Government of Guinea, and it had not even considered a "pay up or be terminated" scheme before Defendants interfered (*see* ¶ 2).  Significantly, Soros was interested in Guinea's mining industry and "assist[ed]" Condé even ***before*** he was elected (¶¶ 54, 78), negating any inference of "predisposition" once he became President.  Condé's request was induced by Defendants: "Soros and OSF masterminded and orchestrated the attempted extortion of BSGR.  In fact, soon after the failed attempt to shake down BSGR, Soros and OSF engaged in secret negotiations with [BSGR's joint venture partner] seeking payment of $500 million" – there was a draft agreement and reports of Soros directly seeking such payment (¶¶ 58, 61-62, 65).  Defendants "ma[d]e sure that the government of Guinea would force BSGR" to pay up or be terminated (¶ 56).

Defendants then posit that post-election, Condé requested Soros' assistance with a scheme that Condé came up with all on his own (MOL 18-19).  The Complaint says otherwise, alleging that the scheme was Defendants', not Condé's or Guinea's.  Also, Soros, advised Condé before the election and continued to "'advise[]'" Condé about how to "'shake up the mining license regime'" after his election (¶ 83).  Guinea could not have terminated the contract without Defendants:  "'the country was turning to Soros because Guinea could not afford to pay international consultants'" (¶ 73); OSF provided $5 million to start (¶ 76); the Technical Committee "'outsourced'" to entities paid for or controlled by Soros (¶ 99); this was "'Soros' initiative'" (¶ 72), "supported by . . . his Open Society Foundations'" (¶ 75) and his "'battalions of lawyers and private investigators'" (¶ 60).  This more than plausibly alleges "that, but for the [Defendants'] conduct . . ., the breach would not have occurred. . . . [T]he degree to which the contract would have been breached anyway is a question properly left for discovery . . . ."  *Rich*

*v. Fox News Network, LLC*, 939 F.3d 112, 127 (2d Cir. 2019) (reversing dismissal).

Unlike in *Sharma v. Skaarup Ship Mgmt. Corp.*, here the Complaint specifically alleges that Defendants' acts were the "'but for' cause of" the breach, and that Defendants were the "motivating force behind [Guinea's] breach".  916 F.2d 820, 828 (2d Cir. 1990) (MOL 14) (*e.g.*, ¶¶ 56, 93, 165, 184, 191, 214).  That, years into the scheme, government officials stated their intent to revoke BSGR's rights (MOL 18-19) shows only the success of Defendants' scheme. Defendants' other cases are likewise inapposite, as the contracting parties there had obstructed performance and/or breached the contract "before" any interference.  *RSM Prod. Corp. v. Fridman*, 387 F. App'x 72, 74-75 (2d Cir. 2010), *aff'g* 643 F. Supp. 2d 382, 391 (S.D.N.Y. 2009) (contracting party obstructed performance three years "before any alleged interference"); *Mina Inv. Holdings Ltd. v. Lefkowitz*, 16 F. Supp. 2d 355, 360-61 (S.D.N.Y. 1998) (contracting party breached contract "at least nine separate times" "before" interference).  Here, the interference pre-dates any attempt to breach BSGR's contract.  As the Complaint summarizes:

> Thus, Soros exercised complete control over the process – he initiated the breach by his pay up or be terminated ultimatum and publicly announced it with Condé; Guinea couldn't afford the apparatus of its deceptive investigation without Soros, so he enlisted his funded organizations using his "direct advocacy and public outreach" strategy; [and] he used his own investigator and lawyer to carry out his wishes, placing them in positions of influence over the ostensibly neutral Technical Committee[.]

(¶ 164).  The Complaint adequately alleges but-for causation.

Defendants' related argument, that an allegation in the ICSID arbitration about Condé from <u>before</u> he became president precludes any Soros wrongdoing (MOL 19), fails.  Defendants' use of extrinsic documents is improper (Point III).  Also, Guinea (not Condé) was the contracting party; Defendants cite no authority that the actions of one non-signatory (Condé) can vitiate the wrongdoing of another (Defendants), when Guinea itself was abiding by the contract.  In ICSID, BSGR alleges Soros's controlling involvement (*e.g.*, Def. Ex. 1, ¶¶ 58, 60-61), including in

many ICSID documents Defendants ignore (LMS Decl. Ex. 1 ¶¶ 4-6).  *See Goel*, 820 F.3d at 560

(incomplete litigation papers improperly creates "a bespoke factual record, tailor-made to suit the

needs of defendants").  *Ashcroft v. Iqbal* did not eliminate alternative pleading, even if

inconsistent.  *Lawrence v. Wilder Richman Sec. Corp.*, 417 Fed. App'x 11, 13 (2d Cir. 2010)

(Rule 8(d)(2) permits inconsistent pleading between "arbitral forum" and court proceedings).

Finally, Defendants argue that the Complaint fails to allege but-for causation against each

defendant (MOL 19).  The Complaint clearly sets out the salient actions of each Defendant.  For

example, Soros influenced Condé regarding Guinea's mining industry when Condé was only a

candidate, and focused on BSGR as a target (¶¶ 54-56).  Soros and OSF both were involved in

the March 2011 draft memorandum of understanding between OSF and BSGR's joint venture,

seeking a $500 million payment in derogation of BSGR's contract (¶¶ 61-63).  Soros himself

similarly sought payment of $250-$500 million (¶ 65).  Since BSGR's contract precluded any

changes to its financial terms (¶¶ 90-92), this interference alone is sufficient to allege but-for

causation.  The Complaint details Defendants' actions in ensuring that BSGR's contract was

terminated once BSGR refused to pay up.  Both Soros and OSF were in Guinea and arranged for

the process that was designed to lead to the contract's termination (*e.g.*, ¶¶ 67-78), a process, in

OSF's own words, supported by "George Soros and his Open Society Foundations" (¶ 75).

Defendants are responsible for any alleged vagueness they claim about the individual

OSF entities.  Defendants have deliberately played a shell game with OSF (*infra* Point V).

Despite all the evidence that OSF is a legal entity – a board, executives, a budget, asserting

copyrights – Defendants claim it does not exist except as a wordmark.  Defendants outright

refused to identify OSF's legal status and that of its members under Local Rule 26.1, requiring

BSGR to add additional defendants (LMS Decl. ¶¶ 5-10 & Exs. 6-10).  Defendants are thus the

cause of any lack of clarity among the OSF entities.  The inequity of permitting Defendants to obtain a dismissal due to their own obfuscation is evident.  Discovery should proceed (*id.* ¶ 11).

### B.     The Complaint States a Claim for Fraud

The "who, what, when, where, why" of the fraud claim satisfy Rule 9(b).  *Stevelman v. Alias Research Inc.*, 174 F.3d 79, 84 (2d Cir. 1999).  The Complaint alleges Soros and his agents made material misrepresentations directed to BSGR:  On March 2, 2011 Soros and Condé announced all "existing mining contracts" would be re-examined; on March 3, Soros repeated "those who want to validate those claims will have to subscribe to the principles of EITI", and OSF issued a press release stating OSF had been enlisted to "help … put these [plans] into effect" with the support of "Soros and his Open Society Foundations" (¶¶ 74-78, 189).  These statements imply an <u>unbiased</u> review of "existing contracts," including BSGR's.  Soros and his agents made these statements publically knowing that BSGR would rely on them.  *John Blair Comms., Inc. v. Reliance Capital Grp., L.P.*, 157 A.D.2d 490, 492 (1st Dep't 1990). Fraud claims can be based on "'implicit representations'" (contra MOL 23).  *Ft. Howard Paper Co. v. William D. Witter, Inc*., 787 F.2d 784, 794 (2d Cir. 1986); *Venture Capital Props. LLC v. Related Cos.*, 2020 WL 554350, *5 (Sup. Ct. N.Y. 2020) ("statement implies" representation relied upon).

Soros's other agents also made actionable misstatements.  Soros provided and paid agents Horton and DLA to be "'the operational arm'" of the Technical Committee to review the mining contracts (¶¶ 73, 99, 106).  Horton and DLA used the Technical Committee to transmit false information about BSGR through its Soros-commissioned DLA Report (¶¶ 111-13).  The DLA Report relied on unfounded accusations from the Veracity Report, which were provided by Soros's investigator, Steven Fox (¶¶ 106-13, 150).  Despite knowing it had no reliable support, DLA presented these allegations to the Technical Committee, which through DLA again relied on them in the Allegations Letter.  That October 30, 2012 Letter used the false information from

Soros's agents to make unfounded accusations about BSGR – while falsely telling BSGR the review would be "objective and rigorous" (¶¶ 114-28, 150). *See Amusement Indus. v. Stern*, 2016 WL 6820744, *3 (S.D.N.Y. 2016) (sustaining fraud conduit claim); *IOP Cast Iron Holdings, LLC v. J.H. Whitney Capital Partners, LLC*, 91 F. Supp. 3d 456, 473 n.18 (S.D.N.Y. 2015) (party liable if it "makes," "authorizes," or "causes" a misrepresentation). The statements were misleading; by early 2011, Soros had targeted cancelling BSGR's contract regardless of any "review" (¶¶ 81-84). A "misrepresentation" can also be implied through conduct. *Bank of Am. v. Jarczyk,* 268 B.R. 17, 21 (W.D.N.Y. 2001); Restatement (Second) of Torts, § 525 cmt. b.

Rule 9(b) requires only that plaintiffs plead with particularity "facts from which it is plausible to infer fraud; it does not require Plaintiffs to plead facts that make fraud more probable than other explanations". *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 175 (2d Cir. 2015). Where a fraud involves facts "'peculiarly within the opposing party's knowledge'" to which the plaintiff lacks access, Rule 9(b) is satisfied by allegations on information and belief. *Boykin v. Keycorp,* 521 F.3d 202, 215 (2d Cir. 2008). The extent of Defendants' control over Technical Committee is solely known by them. *Lavastone Capital LLC v. Coventry First LLC*, 2015 WL 1939711, *8-9 (S.D.N.Y. 2015) ("somewhat relaxed pleading requirements" where defendant's "role is alleged to have been behind the scenes").

The Complaint alleges actionable omissions. A duty to disclose material information arises "'where the party has made a partial or ambiguous statement, on the theory that once a party has undertaken to mention a relevant fact to the other party it cannot give only half of the truth'" or "'where one party possesses superior knowledge, not readily available to the other, and knows that the other is acting on the basis of mistaken knowledge.'". *Pilkington N. Am., Inc. v. Mitsui Sumitomo Ins. Co. of Am*., 2020 WL 2521562, *6-7 (S.D.N.Y. 2020) (Keenan, J.). The

Complaint alleges partial statements by and through Soros's superior knowledge.  Soros and his agents publically announced a "review" of all mining contracts, without disclosing that the process was corrupted (¶¶ 79-84).  The Technical Committee stated that the review process was "objective" without disclosing that the cancellation of BSGR's contract was preordained (¶¶ 127-29, 201).  These statements are incomplete half-truths as applied to BSGR.  *See id.*

The Complaint alleges reasonable reliance (*e.g.,* ¶¶ 3, 201), which "is a quintessential question of fact".  *Pilkington*, 2020 WL 2521562 at *9; *Green v. Beer*, 2009 WL 911015, *9 n.19 (S.D.N.Y. 2009).  The reasonableness of BSGR's reliance in submitting data to the Technical Committee for its "impartial" review is well supported.  BSGR provided access to a data room with "a vast number of documents (¶ 104), and submitted 50,000+ pages supporting its mining activities (¶¶ 104-105).  The Technical Committee ignored these documents, rejected BSGR's response (¶¶ 114-28), and disregarded BSGR's further exculpatory material (¶ 150). The Technical Committee relied on false accusations from the Veracity/DLA Reports in March, 2014, when its "review" caused the improper cancellation of BSGR's contract (¶¶ 151, 154-58) and caused BSGR to spend millions defending itself (¶ 204).

Defendants argue that BSGR cannot allege reasonable reliance because before ICSID it alleged that the Technical Committee process was compromised from day one (MOL 25).  This argument improperly relies on extrinsic evidence, *Goel*, 820 F.3d at 560, *supra* Point III; ignores permissible alternate pleading, *Lawrence*, 417 Fed. App'x at 13; and makes the unwarranted leap that voicing concerns years later negates reliance during the relevant period.  At most, this raises a factual issue, as does the argument that reliance was not reasonable after Condé's extortion attempt (MOL 25).  BSGR could still rely on the stated impartiality of the process, as alleged (¶¶ 201-02).  *Stolow v. Greg Manning Auctions Inc.*, 258 F. Supp. 2d 236, 249 (S.D.N.Y. 2003)

(MOL 25), involved a direct acknowledgement in the complaint that plaintiff was aware of bid-rigging, negating reliance on a fair bidding process.  There is nothing like that here.  Defendants' motion to dismiss BSGR's claim for fraud should be denied.

We note that due to the confusion Defendants caused by challenging OSF's standing without providing support (¶¶ 9-14; LMS Decl. ¶ 14), BSGR now asserts the fraud claim solely against Soros, reserving the right to add other defendants when clarity is achieved.

### C.       The Complaint States Claims for Conspiracy **and** Prima Facie Tort

BSGR's conspiracy and prima facie tort claims survive because BSGR has stated other tort claims.  *See supra* §§ A-B; *Freihofer v. Hearst Corp.*, 65 N.Y.2d 135, 143 (1985) ("where a traditional tort remedy exists, a party will not be foreclosed from pleading [prima facie tort], as alternative relief"); ¶ 213.  Defendants raise no other challenge to these claims (MOL 28-29).

### D.       The Complaint States a Claim for Commercial Defamation

"Because at least some of the allegedly defamatory statements fall within the limitations period" as Defendants admit (MOL 26; *see* ¶ 172), this claim "cannot be dismissed as untimely".  *Enigma Software Grp. USA, LLC v. Bleeping Computer LLC*, 194 F. Supp. 3d 263, 277 (S.D.N.Y. 2016).  Also, BSGR has properly pleaded an agency relationship between Defendants and Global Witness, including via board participation, funding, controlling influence over the "investigation" at issue, and other indicia of control (¶¶ 9, 11, 49-51, 79-80, 130, 141-48).

Defendants cannot show that BSGR "must be" a limited purpose public figure.  *Enigma*, 194 F. Supp. 3d at 288.  Even were this not "premature", *id*. at 290, Defendants cannot show that BSGR "invited public attention" or any of the other requirements:  "defend[ing its] reputation," *La Liberte v. Reid*, 966 F.3d 79, 92 (2d Cir. 2020), and being "forced to respond publicly to the allegedly defamatory" statements (*see* MOL 27 n.13) does not show BSGR "voluntarily injected [it]self" into a controversy.  *Calvin Klein Trademark Trust v. Wachner*, 129 F. Supp. 2d 248, 252

(S.D.N.Y. 2001); *cf. Biro v. Conde Nast*, 963 F. Supp. 2d 255, 271-75 (S.D.N.Y. 2013) (MOL 26-27).  Even so, BSGR has pleaded actual malice sufficiently (*e.g.*, ¶¶ 3, 142-47, 172).

## V.      THE COURT SHOULD NOT DISMISS THE CLAIMS AGAINST OSF

**OSF/OSFI**.  Defendants say OSF and OSFI do "not exist" (MOL 29).  All public OSF descriptions suggests otherwise.  (The cited exhibits are annexed to the LMS Decl.)

OSF's website notes that it started in 1979, boasts that OSF is "active . . . around the world", with "total expenditures" of "$16.8B" (*see* LMS Decl. ¶ 13).  OSF has a board of directors, with Soros as "Chair," and employs numerous executives and officers (*id.*).  OSF claims "© 20[xx] Open Society Foundations" on its website (*see id.*), and also claims the copyright to the book "The Philanthropy of George Soros" (Ex. 2).  OSF releases a budget annually; its "total 2017 budget [was] $940.7 million" (Ex. 3 at 1).  The 2017 budget notes that with "more than 1,600 staff . . . no other philanthropic organization employs so many people in so many places" (*id.*).  OSF states, "***we continue to set [funding] priorities within the fixed resources that George Soros, our founder, has made available***" (*id.*).  OSF's board materials state, "The Open Society Foundations (OSF) is a 501c3 private operating foundation" (Ex. 4 at 53).  OSF sought to contract with BSGR's joint venture to extort $500 million from it (¶¶ 61-66).

OSF has a history of corporate personhood via OSFI.  OSFI was a Delaware not-for-profit located at 224 West 57th Street in New York (*see* ¶ 9).  It publicly stated a purpose nearly identical to OSF's claimed business purpose (Ex. 5 at 6-7).  While OSFI filed dissolution papers in 2012 (*id.* 4-5), OSF/OSFI has since continuously held itself out as a going concern at the same address, and thus "may be held liable on a cause of action that accrues after dissolution" since OSF "continued its operations, operated its premises, and held itself out as a de facto corporation".  *Bruce Supply Corp. v. New Wave Mech., Inc.*, 4 A.D.3d 444, 445 (2d Dep't 2004); *In re Intelligent Bank Mgmt., Inc.*, 207 A.D. 2d 760, 761 (1st Dep't 1994) ("fact that the respondent

31

corporation was dissolved … is of no moment, as it continues as a *de facto* corporation"); ¶ 9. OSF/OSFI is present in New York and was properly served (LMS Decl. ¶ 3; Dkt. 43).

BSGR served an S.D.N.Y. Local Rule 26.1 demand for OSF's status.  Defendants refused to respond (*see* LMS Decl. ¶¶ 5-9 & Exs. 6-10).  BSGR therefore has sued the additional OSF entities.  Discovery can sort it out (*see id.* ¶ 11).  Until then, no defendant should be dismissed.

**OSPC**.  As for OSPC (MOL 29 n.14), BSGR alleged its principal place of business in New York, which is supported by the address it placed on its IRS Form 990 (¶ 13; Ex. 11).

**Rule 8**.  BSGR has adequately pleaded against the new OSF defendants (*see* MOL 29-30).  BSGR alleged the extraordinary overlap among the new OSF entities that Soros and OSF control – they share the same address, phone number, have overlapping boards and funding sources (¶ 52) – while Defendants have refused to provide Local Rule 26.1 clarification.  BSGR does not have to allege matters "peculiarly" within Defendants' knowledge.  *Anwar v. Fairfield Greenwich, Ltd.*, 728 F. Supp. 2d 372, 423 (S.D.N.Y. 2010).

**Relation Back**.  The tortious interference claim relates back for the new OSF defendants and is timely (MOL 20-22).  Courts apply the "more generous" of federal or state relation back law.  *S.A.R.L. Galerie Enrico Navarra v. Marlborough Gallery, Inc.*, 2013 WL 1234937, *3 n.5 (S.D.N.Y. 2013).  Federal law requires that the new party have received notice of the action within 90 days of filing, and "knew or should have known that the action would have been brought against it, but for a mistake concerning the proper party's identity".  Fed. R. Civ. P. 15(c)(1)(C), 4(m).  Service of the original complaint on OSF and Soros, their board member, should suffice (¶ 52).  The new defendants were served with the amended complaint 88 days from filing (Dkt. 34-44).  Defendants have disputed that OSF is the proper party but have not identified a replacement (Exs. 6-10), causing BSGR at worst to "harbor a misunderstanding

about the [defendants'] status or role in the events giving rise to the claims at issue". *Krupski v. Costa Crociere S. p. A.,* 560 U.S. 538, 549 (2010).  Where companies are "related corporate entities with very similar names . . . this interrelationship and similarity heighten the expectation" that a defendant should suspect a mistake has been made.  *Id*. at 556-57; *S.A.R.L.*, 2013 WL 1234937, *6 (Rule 15 applies where "plaintiff '[lacked] knowledge regarding the conduct or liability' of the newly added party").  Here, BSGR has alleged conduct by the entities – from all evidence, OSF should be the proper entity; since Defendants claim that is not the case, BSGR has named other entities that all fall under the OSF umbrella.

The New York requirements are also satisfied; the claims arise from the same conduct because the amended and original complaints allege virtually identical claims.  *Fisher v. APP Pharm., LLC*, 783 F. Supp. 2d 424, 430 (S.D.N.Y. 2011) (MOL 20).  The mistake element under New York law is the same as the federal.  New York adds one element, that new and old defendants be "united in interest".  The Complaint alleges such just such a unity.

Discovery is appropriate if it is not clear at this early stage whether the relation back elements are satisfied.  *See Baez v. Jet Blue Airways*, 745 F. Supp. 2d 214, 223 (S.D.N.Y. 2010).

## <u>CONCLUSION</u>

The Court should deny Defendants' motion to dismiss in its entirety.

Dated: New York, New York
      October 26, 2020

                Respectfully submitted,

                REED SMITH, LLP
                By: <u>/s/ Louis M. Solomon</u>
                     Louis M. Solomon
                Michael S. Lazaroff
                599 Lexington Avenue
                New York, New York 10022
                (212) 549-0400
                *Attorneys for Plaintiffs*