KBOPBSGO

1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x

3  BSG RESOURCES (GUINEA)
   LIMITED, ET AL.,
4
                Plaintiffs,
5
           v.                          17 CV 2726 (JFK)
6
   GEORGE SOROS, ET AL.,
7
                Defendants.
8
   ------------------------------x
9                                      New York, N.Y.
                                       November 24, 2020
10                                     11:08 a.m.

11 Before:

12                    HON. JOHN F. KEENAN,

13                                     District Judge

14                         APPEARANCES

15 REED SMITH, LLP
        Attorneys for Plaintiffs
16 BY:  LOUIS SOLOMON
        MICHAEL LAZAROFF
17
18 WILLKIE, FARR & GALLAGHER, LLP
        Attorneys for Defendants
19 BY:  BENJAMIN McCALLEN
        JAMES FITZMAURICE
20      GABRIELLE ANTONELLO
21
22
23
24
25

KBOPBSGO

```
1         (In open court)

2         (Case called)

3         THE COURT:  So this is in the matter of BSG Resources

4    and others, against George Soros and others, and it's a motion

5    by the defendant or defendants, I should say, to dismiss.  I'll

6    hear oral argument.  Who is going to argue for the defense,

7    Mr. McCallen?

8         MR. McCALLEN:  Good morning, your Honor.  Yes.

9         THE COURT:  Okay, good.  Please use the lectern and

10   spread the papers out.  It seemed to me, having read all of

11   this, and there's a lot to read, that you may require a little

12   bit of time.  So as far as I'm concerned, each side has a half

13   hour, if you want it.  If you don't use it, I won't hold it

14   against you.

15        MR. McCALLEN:  Of course, your Honor.

16        THE COURT:  If you want to use it, you can, and since

17   you're the movant, if you want to take five minutes to rebut,

18   that's fine with me.

19        All right.  I'll hear you.

20        MR. McCALLEN:  Thank you, your Honor, and I want to

21   ask at the beginning, this is my first --

22        THE COURT:  You know what, I don't think, since you're

23   over there, that you're anywhere near ten feet or at least six

24   feet.  I don't think you're even ten feet from anybody, and I

25   think it's going to be easier to hear you if you take the mask
```

KBOPBSGO

1    off just during the argument.

2              MR. McCALLEN:  I'm fine with that, your Honor.  If

3    everybody else is comfortable, that's fine with me.

4              THE COURT:  So I can hear you better.  You're far

5    enough away.  Go ahead.

6              MR. McCALLEN:  I can also move the podium back, if

7    that's helpful.  Good morning, your Honor.

8              THE COURT:  Good morning.

9              MR. McCALLEN:  Thank you.  May it please the Court,

10   for the record, Benjamin McCallen from Willkie, Farr and

11   Gallagher on behalf of defendants.

12             I know we've been in front of the Court on this matter

13   now on several occasions, even though we're still at the

14   motion-to-dismiss phase, and the Court is familiar with the

15   facts.  So I am going to endeavor to keep my remarks brief and

16   to skip a prolonged background in this action because I know

17   the Court is familiar with it.

18             I, instead, want to focus my time today really on two

19   legal bases that defendants offer to dismiss the case, the

20   first being act of state and the second being collateral

21   estoppel.  And, of course, I'm available to answer any other

22   questions your Honor has.

23             THE COURT:  I'm more interested in collateral

24   estoppel.  Go ahead.

25             MR. McCALLEN:  I'm sorry, your Honor.

KBOPBSGO

1          THE COURT:  I'm more interested in collateral

2     estoppel.

3          MR. McCALLEN:  Okay.  Would you like me to begin with

4     that, your Honor?

5          THE COURT:  Whatever you want.

6          MR. McCALLEN:  So I will going to keep it brief.  I'm

7     going to do act of state for a couple of minutes, and then

8     we'll go to collateral estoppel.

9          Your Honor, the Supreme Court has held that the

10    act-of-state doctrine prevents a U.S. court from deciding a

11    cause of action where the relief sought requires the Court to

12    declare invalid the official act of a foreign sovereign, and

13    that's the *Kirkpatrick* case, your Honor.  That is exactly what

14    plaintiffs ask the Court to do here.

15         Plaintiffs' claims will require the Court to rule on

16    the validity of official acts of the Guinean government

17    regarding the exploitation of one of the country's most

18    valuable resources, which is a quintessential sovereign

19    activity.

20         Plaintiffs' theory of liability, as set forth in their

21    amended complaint, your Honor, is based on a series of official

22    acts by the Guinean government.  It's all right there in the

23    complaint, your Honor.

24         Plaintiffs allege that prior to 2008, rights to

25    develop and prospect iron ore in the Simandou region of Guinea

KBOPBSGO

belonged to Rio Tinto.  That's paragraph 25 of their complaint.

        In 2008, those rights to prospect and mine in Simandou
were rescinded by the Guinean government and given to BSGR.
That's paragraph 26.

        In 2009, a contract was entered into between BSGR and
Republic of Guinea that further memorialized those rights and
granted BSGR the right to exploit iron ore in certain areas of
Simandou.  Again, that's paragraph 30 of their amended
complaint.

        Subsequently, your Honor, there was a democratic
election, the first ever in Guinea, and President Alpha Condé
was elected.  And as plaintiffs allege in their complaint, one
of the first actions of President Condé was to order that the
government re-evaluate the existing mining contracts, including
BSGR's, and to make sure that it complied with the law.  And
that's paragraph 74 of the plaintiffs' complaint.

        Subsequently, your Honor, the government of Guinea
established a body, known as the Technical Committee, that
conducted an investigation of the process by which BSGR
obtained its mining rights, BSGR among other companies.  And
the Technical Committee and another committee, the Strategic
Committee, acting in their official capacity determined that
those rights were obtained via bribery.  That's in paragraph
114, 151 and 155.  Finally, those rights were terminated by the
Guinean government, again in its official capacity, at 156 to

KBOPBSGO

1    158.

2          Now, your Honor, plaintiffs allege that all of this

3    was manipulated or orchestrated by defendants.  Obviously, the

4    defendants don't believe that is true and dispute that as a

5    factual matter, but even if plaintiffs' allegations are taken

6    to be true at this phase, their claims will require the Court

7    to determine that the Guinean government entered into a legally

8    binding contract with BSGR, breached that contract when it

9    stripped BSGR of its mining rights, and did so on the basis of

10   a sham administrative process.

11         It will not be possible for the Court to decide the

12   claims alleged by BSGR in its favor without deciding that the

13   Guinean government's decision to terminate those mining rights

14   was improper and, therefore, invalid.  That, as a result, the

15   claims should be dismissed now.

16         THE COURT:  Let me ask you a couple of questions about

17   the so-called act-of-state doctrine.

18         MR. McCALLEN:  Yes.

19         THE COURT:  The plaintiffs aren't seeking any damages

20   from Guinea, are they?

21         MR. McCALLEN:  In this action, they are not seeking

22   any damages.

23         THE COURT:  All right.  So they're not in this action?

24         MR. McCALLEN:  Correct.

25         THE COURT:  Okay.  And do any of their prayers for

KBOPBSGO

1   relief seek to undo or disregard an official act by the Guinean

2   government?

3          MR. McCALLEN:  They seek to render an official act

4   invalid.  They seek a finding from this Court that an official

5   act was invalid, yes, your Honor.  And that's precisely what

6   the court in *Kirkpatrick* said that the act-of-state doctrine

7   prohibits.

8          Obviously, Guinea is not in front of this court, your

9   Honor.  So in terms of, can the Court invalidate an action?  Of

10  course, that's not within the Court's jurisdiction, but that's

11  always the case in an act-of-state case, your Honor.  That's

12  the quintessential element in an act-of-state situation, is

13  there is a claim being brought in front of the Court and in

14  many cases -- and we've cited these cases, your Honor -- where

15  the state agency or body is not a defendant to the action.

16  It's a civil action between private parties and, nevertheless,

17  the courts will dismiss claims on the basis of act of state.

18         Because here, your Honor, in using the best examples

19  of tortious interference claim, your Honor, an element of the

20  tortious interference claim is that there is a breach of

21  contract by the Guinean government.  And so in order to find

22  that there is tortious interference, the Court will have to

23  find a breach of contract by the Guinean government.

24         And so what will that entail?  That will entail as

25  part of that breach of contract element, we are going to argue

KBOPBSGO

```
1    that the contract was, No. 1, never valid because it was

2    obtained via bribery and corruption; and No. 2, that Guinea was

3    justified in breaching that contract because there was that

4    same bribery and corruption.

5            And so the Court, in order to rule in plaintiff's

6    favor, would have to reach that issue, would have to determine

7    whether the Guinean government breached its agreement with

8    BSGR.  And that is straight from Kirkpatrick.  That is, you

9    would have to declare invalid an official act of a foreign

10   sovereign performed within its own territory.  That's WS

11   Kirkpatrick, 493 U.S. 400 at 405.  That is exactly what

12   Kirkpatrick is talking about, your Honor.

13           I can continue, your Honor, but I didn't know if you

14   had more questions.

15           THE COURT:  Go ahead.

16           MR. McCALLEN:  I think we have more or less covered

17   tortious interference, your Honor.

18           THE COURT:  What about the argument that the

19   plaintiffs make with regard to the state doctrine, the

20   act-of-state doctrine?  They make the argument that this is

21   better for summary judgment than for a motion to dismiss on the

22   pleadings.  What about that?

23           MR. McCALLEN:  Yes, your Honor.  They do make that

24   argument, and in some cases that might be the case, but let me

25   explain why that's not the right approach here.  The reason is
```

KBOPBSGO

1   is that for the reasons I was discussing a minute ago, your

2   Honor, you can see now that this issue is unavoidable in order

3   to decide in plaintiff's favor.

4            Now, the case could ultimately be dismissed later on

5   for a variety of reasons that don't reach the issue of breach

6   of contract and whether the Guinean government breached the

7   agreement in invalidating the contract with BSGR.

8            But in order to decide in plaintiff's favor, that is a

9   threshold that will have to be crossed later.  It will have to

10  be crossed.  And the Court can see that now, and that's why

11  dismissal on a motion to dismiss is appropriate now because the

12  act-of-state issue that defendants are highlighting for your

13  Honor is clear now and it's unavoidable.

14           There's no amount of discovery that's going to change

15  the fact that, at the end of the day, the Court is going to

16  have to determine that the Guinean government breached its

17  agreement with BSGR when it invalidated the contract, and when

18  that's the case, dismissal at this phase is appropriate.

19           Mindful of the time, your Honor, I think I will skip

20  forward, unless your Honor has further questions --

21           THE COURT:  No, go ahead.

22           MR. McCALLEN:  -- on act of state.  I'll move on to

23  collateral estoppel, and I will also endeavor to address your

24  Honor's questions raised in the order that your Honor issued

25  last week regarding conversion to a Rule 56.

KBOPBSGO

1        THE COURT:  I don't see how, if you're going to rely

2  on what happened down in Florida and on the London arbitration,

3  that's not part of the pleadings, is it?

4        MR. McCALLEN:  Well, your Honor, it's obviously a

5  document outside the complaint, however -- and with respect to

6  the arbitration pleadings, we cited authority in our brief

7  explaining why the Court can take notice of those and rely upon

8  them in a motion under rule 12(b)(6).

9        THE COURT:  Wouldn't it be -- assume, and I don't want

10  the plaintiffs to draw any conclusions from this question

11  because no conclusion should be drawn.

12        Assume, for sake of argument, that I rule for you and

13  dismiss.  Okay?  Assume that.  They're going to appeal me,

14  obviously.  Okay?  Aren't you safer if it's converted to

15  summary judgment?

16        I mean, it's my case, one of the cases that was

17  involved here, the Union Carbide case involving the question of

18  remediation of the land near the Bhopal factory over in India.

19  Isn't it so much better if we do this as a summary judgment,

20  and you have discovery on the issue of the Florida thing?

21        Because I have a couple of questions about Florida and

22  also the London arbitration.  Isn't it better, if you're going

23  to get involved in those things and they're going to be the

24  reasons for the collateral estoppel, isn't it better to do it

25  as summary judgment?

KBOPBSGO

1          MR. McCALLEN:  The reality is, your Honor, I think

2     your decision would withstand either way.  I agree that

3     converting to rule 56 would make sense, given the evidence

4     that's being brought in.  Frankly, plaintiffs brought in the

5     evidence --

6          THE COURT:  It's my fault.  If you hit the microphone,

7     it creates a major explosion.  Why don't you start over.

8          MR. McCALLEN:  Sure, your Honor.  What I was saying is

9     I believe the Court's decision would withstand an appeal, were

10    an appeal to occur, whether decided under rule 12(b)(6) or

11    under rule 56.

12         It's certainly within the Court's discretion, and I

13    understand the reasons why it would make sense to convert it to

14    a rule 56 motion.  I also have with me today additional

15    authority that I'm happy to provide to the Court as to why we

16    believe it could withstand an appeal on a 12(b)(6) motion, but

17    certainly, your Honor, we would be comfortable converting it to

18    a rule 56 motion.

19         THE COURT:  Okay.  Now, this action *in rem* down in

20    Florida by the government which involved the wife of the late

21    president, paragraph 2 of that complaint in Florida says that

22    the action seeks the forfeiture of three real properties and

23    approximately a hundred items of restaurant and market

24    equipment held by or for the benefit of Mamadie Touré, the

25    fourth wife of former Guinean President Lansana Conté and so

KBOPBSGO

1    forth.

2         And then over on paragraph 15 of that *in rem*

3    complaint, it reads:  "As described in this section, in her

4    signed declaration, Mamadie Touré" -- that's T-o-u-r-e, to the

5    court reporter, and M-a-m-a-d-i-e -- "admitted receiving

6    payments from the company in Guinea, Sierra Leone, and Florida

7    in furtherance of the company's corrupt scheme to influence

8    President Conté to award it the iron ore mining rights in

9    Guinea."

10        Now, how do I know that's BSGR?  It doesn't say it is.

11   That's what you're arguing, but how do I know that?

12        MR. McCALLEN:  Well, your Honor, so I think it's

13   important to take a step back and realize this is --

14        THE COURT:  I mean, both sides argue that they got

15   their deals because of bribes.  Basically, the two that the

16   plaintiff is arguing are a big bribe and a relatively small

17   bribe, one is 90-some-odd thousand and one is a lot more.

18        Now, but how do I know, in your case, that what the

19   complaint down in Florida was talking about is BSGR?  It just

20   calls it "the company."  It never tells me who it is.

21        MR. McCALLEN:  Sure, and the reality is, your Honor,

22   when you look at the facts that are being alleged here, Mamadie

23   Touré was the wife of the --

24        THE COURT:  I know that.  I mean, at least I know it

25   from the papers.

KBOPBSGO

1          MR. McCALLEN:  -- Guinean president.  And this maps

2     onto the facts of this case as alleged in the complaint.

3          But if I could just give your Honor a little bit of

4     context for this here, because I think this is important.  When

5     we made our motion to dismiss on the basis of the collateral

6     estoppel of the LCIA award, right, we pointed the Court to the

7     award, and we discuss it in the context of the amended

8     complaint.  And we said there was a finding in that action of

9     bribery and corruption that was binding on BSGR here.

10         Now, in response to that, BSGR has come back and they

11    introduce an order from a Guinean court which they claim shows,

12    look, a Guinean court has looked at this issue and decided that

13    there was actually no bribery and so, you know, your Honor, you

14    should take that into consideration when you're considering the

15    strength of the collateral estoppel argument.

16         And so we've offered this, your Honor, in response to

17    that, which is to say there is evidence in the record, in the

18    public record, related to the very same facts that show Mamadie

19    Touré admitting to accepting bribes.  So it directly undercuts

20    any reliance that the Court could or should have on the

21    proceedings in Guinea.

22         Now, your Honor, that court order in Guinea doesn't

23    really say anything other than that the prosecution has decided

24    to dismiss the action against, among others, Mamadie Touré.

25    And so we cite to it here, your Honor, to basically contrast

KBOPBSGO

1    the facts as they exist here in this action that we're pointing

2    to in the Southern District of Florida versus what plaintiffs

3    say can be inferred based upon the Guinean court decision.

4            THE COURT:  Is there anywhere in the Florida case

5    where specifically BSGR is named, or do they just talk about,

6    as I read there, "the company"?

7            MR. McCALLEN:  Your Honor, I don't have that answer

8    for you right now.

9            THE COURT:  All right.

10           MR. McCALLEN:  I can check.

11           THE COURT:  That's an honest answer.  Okay.  See,

12   that's one of the reasons that if you want me to dismiss on

13   these grounds, it's better to have discovery on it and to go to

14   a rule 56 motion instead of a rule 12 motion.

15           MR. McCALLEN:  To be clear, your Honor, you don't need

16   to look at this to dismiss on the basis of collateral estoppel.

17   You do not.  This was offered basically in response to their

18   citation of the Guinean court decision, to say that should not

19   be given any weight.

20           THE COURT:  In other words, in order for you to

21   prevail on the collateral estoppel argument, all I have to

22   consider is the London arbitration?

23           MR. McCALLEN:  The LCIA arbitration, yes, your Honor.

24           THE COURT:  That's the London arbitration?

25           MR. McCALLEN:  I believe it sat in London, correct,

KBOPBSGO

1    your Honor.

2                 THE COURT:  Okay.  Go ahead.

3                 MR. McCALLEN:  Yes.  To be clear, this is not

4    necessary.  We are not seeking collateral estoppel on the basis

5    of the *in rem* action in Florida or the settlement of that

6    action.  We're seeking on the basis solely of the LCIA award in

7    the action between Vale and BSGR.

8                 So let me talk about that, your Honor, and mindful of

9    the time, I'll try to wrap up quickly.  I recognize that the

10   LCIA award is a very long decision, but the key portions of it

11   are relatively limited, from pages 155 to 186.

12                Your Honor, Vale, which was the claimant in that

13   arbitration, had identified six episodes of bribery, and the

14   panel found sufficient evidence of the second episode of

15   bribery to support a judgment against BSGRL.

16                The tribunal found that, among other things, BSG

17   interposed an intermediary between itself and Mamadie Touré so

18   that the intermediary could be used to grant shares in BSGR

19   Guinea to Mamadie Touré.  That's paragraph 602 of the LCIA

20   award.

21                Then, at paragraph 629, the tribunal finds that the

22   facts show that on a balance of probabilities that Mamadie

23   Touré has exercised influence on President Conté and his

24   decision making from late 2005 to September 2008.

25                Later, at paragraph 631, the evidence also indicates

KBOPBSGO

1    that Mamadie Touré assisted in influencing President Conté's

2    decision to revoke Rio Tinto's rights and give them to BSGR.

3    That is the same revocation that we talked about, I talked

4    about, a minute ago in the context of the act-of-state doctrine

5    in plaintiffs' complaint.

6         And at paragraph 637, the tribunal finds that BSGR

7    knew that the offer of shares under the Touré memorandum of

8    understanding was for the purpose of securing her assistance in

9    influencing President Conté, and concludes that BSGR made a

10    false representation in declaring that there had not been any

11    bribery of Mamadie Touré.  Based on that finding, your Honor,

12    the tribunal found in favor of Vale and awarded it over

13    $2 billion.

14         As your Honor well knows, collateral estoppel bars

15    claims when it resolves the same issue as in this -- as exist

16    in another proceeding.  That's the case here.  The issue is

17    whether BSGR's mining rights were procured through corruption.

18    The tortious interference claim depends on that, your Honor.

19         The tribunal's finding that BSGRL procured its rights

20    through bribery negates the existence of a valid contract and

21    shows that defendants were not the "but for" cause of that

22    contract, and there was no breach of that contract by Guinea

23    when it canceled the mining rights.

24         Plaintiffs' fraud claim also fails if BSGRL committed

25    bribery.  Their fraud claim depends on the allegation that the

KBOPBSGO

1    Technical Committee's investigation was rigged and that its

2    findings against BSGR were false.  If the LCIA's decision is

3    applied in this case, that claim falls as well.

4              Plaintiffs' commercial defamation claim cannot proceed

5    because the tribunal's findings establish that the alleged

6    defamatory statement here about BSGR engaging in corruption is

7    true.

8              Your Honor, plaintiffs make a couple arguments in

9    response to explain why the collateral estoppel should not

10   apply.  I have addressed one of them, your Honor, which is

11   related to the Guinean court decision related to the dismissal

12   by the prosecutor of the criminal charges.  I'm going to

13   address at least one more, your Honor, time permitting here,

14   which is that --

15             THE COURT:  Your time is up, but go ahead and finish

16   in the next three minutes.  Go ahead.

17             MR. McCALLEN:  Sure.  Your Honor, plaintiffs

18   effectively argue, and I think this is their primary argument

19   in response to the LCIA award collateral estoppel issue, is

20   they say the LCIA award should not are have preclusive effect

21   because the tribunal didn't find enough bribery.  The tribunal

22   found that there was bribery in connection with the initial

23   revocation of the Rio Tinto rights in 2008 in giving those to

24   BSG in the same year.

25             But, plaintiffs argue, there was subsequent

KBOPBSGO

memorialization of those rights in the written agreement, but it's called the basic convention agreement, and they say it was ratified by the later government.

In its complaint, though, your Honor, BSGR describes the Guinean's government decision to strip Rio Tinto of its mining rights and give them to BSGR.  And in its complaint, BSGR describes that and the basic convention agreement it entered into a year later as one big interrelated process, which it defined.  It gives it a defined term; it calls a convention.  That's at paragraph 30 of their complaint.

Now, they say, no, even if the bribery occurred in 2008, the subsequent ratification, the subsequent memorialization of that by the government is something entirely different, and you have no finding of bribery in connection with that.

The BSGR is stuck with their allegations in their complaint that it was all part of the same process, and moreover, the argument itself, defendants respectfully contend, is illogical, your Honor.  What they're effectively arguing is that if the Technical Committee, when it looked at this issue, had found that the bribery occurred in 2008, the same -- if it makes the same findings that the LCIA tribunal made with respect to bribery in 2008, that that would have been insufficient for them to revoke BSGR's rights.  And I think that's patently untrue.

KBOPBSGO

```
 1              THE COURT:  All right.  Wrap it up.  Go ahead.

 2              MR. McCALLEN:  They would have been well within their

 3     rights to do that, your Honor, and so it's the exact same issue

 4     as was -- it's the exact same issue in this case, your Honor,

 5     as in that case.

 6              I will now sit down, your Honor, and reserve any

 7     remaining time I may have for rebuttal.  Thank you.

 8              THE COURT:  All right.  And I take it that you're

 9     going to argue, Mr. Solomon?

10              MR. SOLOMON:  I am, your Honor.  Thank you.

11              THE COURT:  All right.  Fine.  Would you use the

12     lectern too?

13              MR. SOLOMON:  I'd be happy to use the lectern.  Just

14     before I --

15              THE COURT:  Take your time and spread your papers.

16              MR. SOLOMON:  -- take my gloves off and my mask off,

17     we have a couple of demonstratives that I'd like to hand up.

18     Thank you.

19              I hope your aerosols are disbursed out.

20              May it please the Court, Lou Solomon, Reed Smith for

21     the plaintiffs.  This motion to dismiss should be denied

22     promptly.  There is no basis for it.

23              I'm going to start with the LCIA, just what your Honor

24     wanted to start with.  I'm going to spend a minute on why the

25     Court should deny the motion to dismiss and not convert.  I
```

KBOPBSGO

```
1    think it would be error to do so.  And then I will talk

2    about --

3              THE COURT:  It would be error to convert?

4              MR. SOLOMON:  It would be error to convert without

5    giving us an opportunity for discovery and the opportunity to

6    offer the facts --

7              THE COURT:  I agree you have the right to discovery on

8    limited issues that I was taking it for.  Go ahead.

9              MR. SOLOMON:  I see, your Honor.

10             THE COURT:  I understand what rule 56 says, yes.

11             MR. SOLOMON:  The law is agreed on the collateral

12   estoppel issue.  The Second Circuit has adumbrated it and

13   repeated it repeatedly.  The issues need to be found by your

14   Honor with clarity and certainty and that, of course, is the

15   only thing that would justify doing this on a motion to

16   dismiss.  That's the CBF case, which we cite, the Second

17   Circuit from 2017, clarity and certainty.

18             The issues have to be identical.  The issue decided in

19   the arbitration needs to have been necessary for the result of

20   that arbitration.  There needed to be a full and fair

21   opportunity to litigate the issue, and in a case where we will

22   show, your Honor, that there are inconsistent findings

23   elsewhere, collateral estoppel should not be given.  All of

24   those grounds justify denying the motion.

25             On page 1 of the hand out that I just handed up, your
```

KBOPBSGO

Honor, and the demonstrative is a time line.  What my learned

colleague says is that what we define for ease of reference in

the complaint, the whole bundle of rights that we got in

Guinea, that doesn't determine collateral estoppel.

          The issue that was found by the LCIA is the one issue

in 2008, which I have dictum on dictum, which I will show your

Honor in a moment, that was we were granted –– BSGR was granted

a prospecting permit and there was a suggestion that –– and

there was a finding that that was a breach of a representation

to Vale, not because it had any impact –– I'll show your Honor

that in a moment, right out of the mouth of the LCIA –– but

that because it was done with the purpose of influencing

Mamadie Touré.

          The LCIA made no finding with respect to what happened

before, that we were given an MOU.  They made no finding with

respect to what happened under two other successive

governments, where there was confirmation of our rights.  The

LCIA makes no finding about what happened in 2009, after over

three years of investigation, $160 million.  We completed a

450-page feasibility study.  This is after the alleged

influence of Mamadie Touré, your Honor, who, your Honor, was

not the decision maker in 2008.

          No finding by the LCIA that there was any influence

with respect to the contract that we're suing on here, no

finding by the LCIA that there was any influence in connection

KBOPBSGO

1    with the convention agreement, which is what we are suing on

2    here.

3            And on the basis of what defendant is claiming the

4    LCIA said, not only is this fact to be precluded, but the

5    entire complaint is to be dismissed.  There is no basis for

6    that.  The issues were not identical.

7            I know that, your Honor, if you turn to the second

8    page here, by just quoting what the -- in the small handouts

9    that I gave on the demonstratives, on page 2.  The question

10   before the LCIA is whether there was a representation in a deal

11   with Vale that related to the benefits granted to Mamadie

12   Touré.  That breached, according to the LCIA, a representation,

13   which I have quoted here from LCIA paragraph 579, in the center

14   of page 2, that there was benefits given for the purpose of

15   influencing.  It's very important language.

16           In order to breach the representation to Vale, the

17   only thing the LCIA needed to find was that payments were made

18   for the purpose of influencing Mamadie Touré, who was not the

19   decision maker in the government.  And they found that there

20   was payment made for that purpose, but nothing else in the

21   thousand-plus paragraphs of the LCIA decision was necessary to

22   this issue.

23           Once they found purpose, they did not have to find

24   impact.  They did not have to go any step further.  Finding

25   impact that Mamadie Touré did something with the influence was

KBOPBSGO

1   dictum, and they acknowledge that it was dictum.

2          And the reason we offered the Guinean judicial

3   decision -- and by the way, it's not tit for tat, Judge.  I'm

4   going to show your Honor in a moment that the Florida

5   settlement under the Supreme Court guidance cannot be looked at

6   for collateral estoppel purposes.  We cite the judgment in

7   Guinea because it is the definitive word on Guinean law.

8          We offered it explicitly under rule 44.1, which allows

9   the Court to determine Guinean law, and it was for that

10  purpose.  And it wasn't a prosecutorial discretion decision.

11  The Barry declaration that we put in tells this Court that, as

12  a matter of Guinean law, it is game over.  Guinea finds that

13  the Mamadie Touré episode did not constitute bribery.  End of

14  story.

15         Now, the LCIA understood that it was not -- that it

16  did not have to find anything about whether the purposeful

17  benefits given to Mamadie Touré had any affect in Guinea.  And

18  if your Honor will look at the next slide, the next page of the

19  demonstrative, we quote there LCIA paragraph 1002, where in the

20  middle of all of this meandering, the arbitral panel says that,

21  you know, "Vale presented its case as one of bribery initially

22  but gradually qualified its narrative to emphasize that its

23  claim was not dependent on proving bribery...."

24         The claim there was not dependent on proving bribery

25  because they only had to prove that benefit was conferred for

KBOPBSGO

1    the purpose, without any impact.

2            The tribunal then goes on, and in the bolded paragraph

3    that I have here, it says, look, we could have avoided

4    addressing this issue "without making inquiries into the

5    finding of bribery.  The tribunal chose not to do so in order

6    to give justice" to the view.  That is the classic definition

7    of dictum.  The cause of action did not require it.  This

8    tribunal chose to do that.

9            The next page, I think, is probably the most

10   important, if I could quote it to your Honor, paragraph 169.

11   In the LCIA, BSGR wanted to offer the proof of the absence of

12   bribery.  In fact, I brought much of that proof with me on

13   the -- so we can persuade your Honor not to convert.  But the

14   LCIA rejected BSGR's effort to adduce that proof, and it says

15   here, right in the center:  "...the tribunal is convinced that

16   the overall outcome of the arbitration, as expressed" --

17           THE COURT:  Just a little slower for the court

18   reporter.

19           MR. SOLOMON:  Yes, of course.  I apologize.

20           The tribunal here, in paragraph 169, which is quoted

21   on page 4 of the demonstrative says that:  "...the overall

22   outcome...would not be altered by the ICSID evidence, given

23   that the tribunal has found multiple misrepresentations by BSGR

24   during the pre-contractual due diligence process, other than

25   the misrepresentation as to the absence of corruption, to which

KBOPBSGO

1    BSGR suggests the ICSID transcripts relate."

2           So they go on and say:  "...the tribunal has decided

3    not to accept the ICSID transcripts and post-hearing briefs

4    into the record."  And on the face of the LCIA decision, the

5    LCIA is telling your Honor that BSGR was not given a full and

6    fair opportunity to contest the bribery issue because the LCIA

7    tribunal concluded that it wasn't necessary for their decision.

8    This is a classic case of why there shouldn't be collateral

9    estoppel.

10          I want to spend a minute on -- you know, this is the

11   rare case where I don't mind your Honor stealing my thunder.  I

12   also read the Florida pleading.  There's no reference to BSGR

13   in there.  I couldn't find it.  If I couldn't find it,

14   Mr. Lazaroff couldn't find it, I think we can conclude that

15   it's not there, and so the inference that they're trying to

16   draw is improper.

17          There are four other reasons why the Court should not

18   look at that evidence, four other reasons why the matter

19   should -- this motion should not be converted.  The first, we

20   have not had --

21          THE COURT:  Let me ask you this on the conversion.

22          MR. SOLOMON:  Yes, sir.

23          THE COURT:  You're all hot and bothered if I convert

24   it.  This demonstrative that you're giving, is that part of the

25   pleadings?  Is it appropriate for me to consider this on the

KBOPBSGO

1    motion to dismiss?

2          MR. SOLOMON:  The reason it is, your Honor, is because

3    the defendant offered all thousand-plus paragraphs of the LCIA

4    decision, and we're here quoting from the LCIA decision.

5          But, frankly, I don't think the standard of clarity

6    and certainty is remotely met here.  And I think a suggestion

7    that there should be collateral estoppel in a case where you

8    have the Guinean government completely inconsistent with what

9    the LCIA seems to have said, it's decided Guinean law

10    inconsistently.  Every other tribunal, every other case has

11    been allowed to go forward, but ours, all of a sudden, has to

12    stop.

13          There's litigation all over the world, your Honor.

14    This is the only one where the defendant has said, no, no, stop

15    the whole thing because I found in one paragraph, of a

16    thousand, over in another proceeding, something that should

17    estop and throw the entire case out.  No, I think the whole

18    thing should be denied on that basis.

19          I was trying to react only to your Honor's 12(d)

20    order, and I think we just have not had an opportunity for

21    discovery.  The *Chambers* decision, 282 F.3d 147, the Second

22    Circuit says that, obviously, we're permitted a reasonable

23    amount of time, including discovery, before there's conversion.

24          THE COURT:  I know that.

25          MR. SOLOMON:  Okay.

KBOPBSGO

1          THE COURT:  I said about ten minutes ago that if I do

2     convert, obviously, there's going to be discovery on the issues

3     on which I convert.  There's no question about that.  I

4     understand that.  Let me ask you a couple of questions.

5          The 2009 basic convention agreement, does that include

6     your mining rights in box one and two, which allegedly,

7     according to you, may have been obtained through corruption?

8          MR. SOLOMON:  It does, your Honor.  It was not

9     obtained through corruption, and the only thing that happened

10    in 2008, which is the only thing the LCIA finds, is a

11    prospecting permit.  And that permit does not give us all of

12    the rights that we are suing on in this case.

13          I do acknowledge that the convention and the contract

14    do involve the two blocks that we are suing on.  Both of those

15    were ratified by subsequent governments, and there's no

16    evidence that there were any improper payments made to those

17    subsequent governments.  And that's yet another reason why

18    there shouldn't be any preclusion here.

19          THE COURT:  What is this Extractive Industries

20    Transparency Initiative, the so-called EITI?  Is that

21    affiliated with the defendants in any way?

22          MR. SOLOMON:  It is exactly the defendants, your

23    Honor.

24          THE COURT:  How --

25          MR. SOLOMON:  It's George Soros' efforts to interfere

KBOPBSGO

1    with the contract.  Our contract, the convention, and the

2    contract not only say nothing about EITI, but specifically said

3    that our rights and our entitlements survive even if there is a

4    subsequent legislation in Guinea.  When George Soros then stood

5    up and said, if you want to do business here, you have to

6    follow EITI, that was, right then and there, an unlawful

7    interference with our contract, and that is what we intend to

8    prove.

9           THE COURT:  Now, let me ask you a couple of more

10   questions.  If it is established that BSGR corruptly obtained

11   certain of its mining rights, isn't that fatal to all the

12   causes of action in the complaint?

13          MR. SOLOMON:  It is not fatal to all of the causes of

14   action, your Honor.  I don't think it's fatal to any of the

15   causes of action --

16          THE COURT:  Even if they establish that there was

17   bribery?

18          MR. SOLOMON:  If they establish that there was bribery

19   with respect to a 2008 permit that had nothing to do with the

20   contracts that we're suing on, it doesn't make any difference.

21   Indeed, it won't even get before the jury.  Your Honor will

22   keep it out as being prejudicial.

23          And what I brought, your Honor, and I would like to

24   make as a proffer, is the evidence that the LCIA decided not to

25   admit because it was a different case.  Because they weren't

KBOPBSGO

1    ruling on it, it was not necessary.  The evidence that we have

2    that there was absolutely no bribery.

3            And so I acknowledge that the defendant asserts that

4    there was bribery, but we dispute it.  It's one of the issues

5    that if they think they have an affirmative defense, I'm not

6    even sure as a matter of law it works, your Honor.  Because

7    George Soros made our performance impossible because of his

8    corruption of what was going on in Guinea, he has to stand

9    trial for that here, under New York law --

10           THE COURT:  We're talking about what his sons

11   allegedly did.

12           MR. SOLOMON:  No, I'm talking about what George Soros

13   and his --

14           THE COURT:  What about the two things that his sons

15   have allegedly done?

16           MR. SOLOMON:  I believe they were also wrongful.  We

17   pleaded them as clearly as we could.  The only point I wanted

18   to make is that we have ample proof that there was no bribery.

19   But your Honor has asked the hypothetical question if you find

20   bribery, if your Honor finds bribery, it has to be bribery with

21   respect to the correct contract.

22           The contract that we're seeking damages on is not a

23   permit from 2008.  I don't believe there's going to be any

24   evidence that supports the statement that there was bribery.

25   Guinea looked into it and found, on the merits, there is no

KBOPBSGO

1   bribery.

2          THE COURT:  So, therefore, the next question that I

3   had, you maintain is an irrelevant question.  If I converted

4   this to summary judgment on the issue of whether your client

5   bribed Mamadie Touré, whether you have admissible evidence to

6   establish that no genuine dispute exists doesn't make any

7   difference because the bribe that she apparently or allegedly

8   accepted is a different bribe for a different thing; is that

9   what you're saying?

10          MR. SOLOMON:  We will also address the bribery issue

11   factually, but it is what I am saying, your Honor, yes.  What I

12   think I'm understanding your Honor saying is, should you allow

13   discovery on a very narrow issue, we've been constrained in

14   this case for three years.  There shouldn't be any more, in our

15   judgment, slicing and dicing.  We should move forward into

16   discovery.  They haven't even answer.  So I'd like to see

17   whether they actually --

18          THE COURT:  I understand that is a 12(b)(6) motion.

19   Yes, I fully understand they haven't answered.

20          MR. SOLOMON:  No, all I'm saying, your Honor, is I

21   don't know what all of their defenses are, and I don't think

22   that bribery is part of our proof.  It may be part of their

23   defenses if, as and when they assert it, but they haven't even

24   alleged it.  They're asking your Honor to do all of this on a

25   motion, which I think is improper, and I don't think there

KBOPBSGO

```
 1   should be any narrow -- any more narrowing of discovery.  We'd
 2   like to get to the bottom of what George Soros did so we can
 3   get our case --
 4            THE COURT:  Did you plead inconsistent facts in the
 5   ICSID arbitration --
 6            MR. SOLOMON:  We did not plead --
 7            THE COURT:  Wait a minute.  I didn't finish the
 8   question.
 9            MR. SOLOMON:  I'm sorry.  Then I'm having a little
10   trouble hearing, your Honor.  I apologize.
11            THE COURT:  That's all right.  You're well prepared,
12   and you've got your finger on the trigger.  Fine.  No problem.
13            What I want to know is, did you plead inconsistent
14   facts in the arbitration, that's the Paris arbitration, and in
15   this case regarding President Conté's motivation to determine
16   your mining rights?  Did you plead anything inconsistent?
17            MR. SOLOMON:  To the point that we were making in our
18   papers, even if it is inconsistent, we are entitled, under rule
19   8 to plead inconsistently.  I do not believe they are
20   inconsistent at all.
21            What the defendant has done is taken some snippets
22   from ICSID, all extrinsic, all improper on a motion to dismiss,
23   and has plucked some statements about what President Conté did.
24   But I believe that if you read our complaint as a whole, you
25   will see we don't believe President Conté, out of our
```

KBOPBSGO

1    complaint, nor does that have any relevance at all to whether

2    we can plead a tortious interference claim against George

3    Soros.  George Soros had in mind to come in -- there was

4    personal an animus against BSGR, as advisor Benny Steinmetz --

5        THE COURT:  Mr. Steinmetz --

6        MR. SOLOMON:  And we can even set that aside for right

7    now.  He came in, we had a contract that wasn't entitled to be

8    interfered with.  He then said -- he then importuned President

9    Conté, and President Conté and Mr. Soros then set up -- stood

10   up and said, everybody has to follow EITI, unless you pay us a

11   half a billion dollars, by the way, and if you do pay us the

12   half a billion dollars, then, like Rio Tinto, you're going to

13   get sued and indicted and convicted for bribery.  So we're

14   going to leave you that choice.  You can either pay us the half

15   a billion, or you can follow this, and we're going to change

16   your contract.  And if you don't do that, then we're going to

17   bring the full brunt of George Soros down on you, George Soros

18   and his minions and the people who then -- the allegations are

19   clear, your Honor.

20       President Conté could not do this himself.  He could

21   not take action against BSGR himself.  He needed George Soros

22   to do it.  That is sufficient, in our mind and under the cases,

23   to show that he is a "but for" cause.

24       I see that I have just a couple of minutes, your

25   Honor.  I would like to spend a minute on act of state because

KBOPBSGO

1        here, although we seem to have agreement on what the law is on

2        collateral estoppel, I am mystified by why the defendant

3        continues to make this argument.

4                He made it three years ago without ever citing

5        *Kirkpatrick*.  In their motion to dismiss three years ago, they

6        didn't cite *Kirkpatrick*, and they've been trying to play

7        catch-up and twist our allegations into something that fits

8        under *Kirkpatrick* that was unjustified then -- though I love

9        them; they're a very good firm -- it's totally unjustified now

10       because the development of the law has made it so clear that if

11       we are not seeking relief to declare invalid the official act

12       of a foreign sovereign, then there is no act-of-state doctrine.

13               I'm quoting from *Kirkpatrick* who says:  "In every

14       case" -- I did have a slide on this, your Honor; it's further

15       in -- "In every case" -- slide six -- "in which we have held

16       act of state...applicable, the relief sought or the defense

17       interposed would have required the court...to declare invalid

18       the official act of a foreign sovereign...."

19               Now, there has been no defense interposed here.  That

20       is why your Honor is correct.  They are doing this prematurely,

21       and the Second Circuit in *Petersen* I think is a very clear

22       indication that the District Court should not be doing this on

23       a motion to dismiss.  And so the only other thing they have to

24       look at is the relief sought.

25               Now, my learned colleague admitted there is no relief

KBOPBSGO

sought against Guinea, nor could there be.  They are not a
party.  And under the *Kronish* decision from New York, they
don't even have to be a party in this case.

         And so what the Supreme Court said is that when the
plaintiff is not trying to undo or disregard the government
action but only to obtain damages from private parties who had
procured it, there is no act-of-state doctrine available.  And
that is exactly what we are doing, your Honor.  There's nothing
inconsistent with that in our complaint, and if there's
anything inconsistent, I've already sought leave to amend.
We'll seek it again.  We are seeking damages from the private
party who procured the wrongdoing.  We are not seeking relief
against Guinea.

         Now, as if this wasn't clear enough, in 2018, the
Seventh Circuit addressed this same issue in *Mount Crest*, and I
do not know why, since we called this case to their attention
over the summer, I don't know why their motion to dismiss
doesn't take it on.  Maybe because it's the Seventh Circuit;
although, it's absolutely on point.

         In *Kirkpatrick*, the issue was RICO, and as part of the
RICO case, the plaintiff was going to show that there was an
illegal contract.  And even though the plaintiff was going to
show it was an illegal contract and it was inconsistent with
Nigerian law, the Supreme Court said there's no act-of-state
bar.

KBOPBSGO

1              In *Mount Crest*, the plaintiff intended to show that

2     the two defendants conspired to violate the antitrust laws in

3     the United States by manipulating the law of Ontario, the

4     Ontario antitrust laws.

5              And even though the antitrust case in the United

6     States would show that there was a problem of corruption,

7     improper influence in Canada, the Seventh Circuit follows

8     *Kirkpatrick* and says that where the plaintiff is not trying to

9     undo or disregard governmental action, it may obtain damages

10    from the private parties that procured it illegally.

11             That is exactly what we are doing.  And it is only in

12    the case where, on its face our complaint were to say we are

13    looking to overturn what the Guinean government did, that there

14    would even be an issue, and that is why *Petersen*, which was

15    2018 in the Second Circuit, which addresses the issue of

16    prematurity -- and I think is pretty good guidance to this

17    Court about whether we should be doing this on a motion to

18    dismiss -- it does say it's more appropriately raised in a

19    motion for summary judgment.

20             I think the money point there, your Honor, is Judge

21    Winter dissents, respectfully, and he says, we shouldn't put

22    this off.  We should reject the act-of-state doctrine right

23    now.  The reason being exactly what the Supreme Court said in

24    *Kirkpatrick* and exactly what the Seventh Circuit said in *Crest*.

25    And that is, the face of *Petersen's* complaint makes clear that

KBOPBSGO

1   it is not challenging Argentina's official acts.

2          And BSGR is not challenging Guinea's acts.  We are

3   challenging the wrongdoer who illegally procured those acts.

4          THE COURT:  All right.  Why don't you wrap it up.

5          MR. SOLOMON:  Thank you, your Honor.

6          THE COURT:  Oh, you're finished.  Okay.  Thank you

7   very much.

8          All right.  Mr. McCallen, I'll hear you briefly in

9   rebuttal.  Keep it to the five minutes.

10         MR. McCALLEN:  Of course, your Honor.  I'll keep it

11  very brief.  Just a couple of points, your Honor.  First, you

12  know, I think it's interesting to note the smaller and smaller

13  box that BSGR keeps putting themself in.  They came to this

14  Court saying that they're owed $10 billion in damage because

15  there's this widespread conspiracy against them manufactured by

16  George Soros.

17         Then, as the case progresses, there's people getting

18  arrested affiliated with BSGR all over the world.  We now have

19  an LCIA tribunal finding saying that there was bribery and

20  corruption in connection with the process by which the Simandou

21  blocks one and two, the exact same geographical area, the exact

22  same mining area, it was given to Rio Tinto.  They had it until

23  2008.

24         The LCIA tribunal has found that there was bribery

25  that was done by BSGR in order to get the wife of the president

KBOPBSGO

1    to convince her husband to give those rights from Rio Tinto to

2    BSGR.  That's been found here.

3           Now, plaintiff is putting themselves in --

4           THE COURT:  What about the point that your opponent

5    makes that she isn't the president or wasn't?

6           MR. McCALLEN:  Well, your Honor, she isn't the

7    president but -- and I can go back --

8           THE COURT:  I know wives have an influence on their

9    husband, and depending upon the husband-and-wife relationship,

10   is it a greater or a lesser influence.  Husbands sometimes even

11   have an influence on their wives.  Am I supposed to take that

12   into consideration too?

13          MR. McCALLEN:  No, your Honor.  We --

14          THE COURT:  Assume that she took bribes.  How is that

15   binding on him?  And how is that binding on the plaintiffs?

16          MR. McCALLEN:  Well, I come back, your Honor, is we

17   ask you to look at the LCIA decision and the findings that the

18   LCIA tribunal made.  And in the finding of the LCIA tribunal,

19   this is paragraph 629, the tribunal finds that the facts show,

20   on a balance of probability, that Mamadie Touré had exercised

21   influence on President Conté and his decision making from late

22   2005 to 2008.

23          Paragraph 631, the evidence also indicates that

24   Mamadie Touré assisted in influencing President Conté's

25   decision to revoke Rio Tinto's rights and give them to BSGR.

KBOPBSGO

1          And then at 637, the tribunal finds that BSGR knew

2     that the offer of shares to Ms. Touré was for the purpose of

3     securing her assistance in influencing President Conté.

4          So, you know, your Honor, what we are asking is that

5     the Court, when you take the findings against BSGR, which they

6     had a full and fair opportunity to litigate, when those

7     findings are construed against BSGR, that's it.  There was a

8     finding of bribery.  That's collateral estoppel.  They're stuck

9     with it.  They can't come back in now, your Honor, and make

10    arguments about, well, there was this finding of bribery but

11    there's some other bit that you have to find.

12         If you take that finding as against BSGR, which we

13    believe you have to, that is sufficient to defeat the claims

14    that they have alleged here.  And I won't go into it in detail

15    with your Honor because our briefs are long.  I know it's all

16    in there and the Court has read it, but each one of their

17    claims falls with a finding of bribery in this case.

18         Your Honor, with respect to act of state, we cited

19    multiple cases where private parties are seeking damages, and

20    they are dismissed on the basis of act of state.  I do think it

21    is ironic, I guess, that in this case the plaintiffs are

22    arguing, on the one hand, Judge, you have to give this great

23    deference to the Guinean court and their finding of bribery

24    with respect to Mamadie Touré.  Even though when you read the

25    decision, that they're effectively just relying on the decision

KBOPBSGO

1   of the prosecution to dismiss that case, which could have been,

2   as your Honor knows as in this country, for any number of

3   reasons.

4           And at the same time, there's a finding by the Guinean

5   Technical Committee and Strategic Committees, bodies that were

6   put in place to investigate these very issues, that BSGR

7   obtained its rights through bribery and corruption, and they're

8   saying, oh, your Honor, the act of state doesn't preclude you

9   in any way from undercutting those findings.

10          THE COURT:  Okay.  Wrap it up.

11          MR. McCALLEN:  Okay.  Your Honor, just to come back on

12  the final point that your Honor raised, and I want to confirm

13  with my colleagues.  On the face of the pleadings in the

14  Florida action, your Honor, BSGR is not named.  It's obvious,

15  reading from context, exactly who the company is, your Honor.

16          And with respect to summary judgment, as I said

17  before, just to make sure the record is clear.  We do not think

18  that the Court needs to consider those pleadings in order to

19  grant the motion in our favor under 12(b)(6), but were the

20  Court to convert it to summary judgment, we think it can be

21  granted under rule 56 now; and were the Court to allow

22  discovery, it should certainly be limited to the narrow issue

23  of whether plaintiff engaged in the bribery, as discussed in

24  the LCIA tribunal decision and in the Florida case.

25          And that, unless your Honor has any further questions,

KBOPBSGO

1    defense rests on the motion.  Thank you, your Honor.

2              THE COURT:  Thank you very much.  Thank you.

3              MR. SOLOMON:  Your Honor?

4              THE COURT:  No.  I mean, if you want to say good

5    morning or good bye, or don't get the virus, you're welcome to.

6    But I don't take surrebuttal.

7              MR. SOLOMON:  I wasn't going to be arguing.  I was

8    going to be asking the Court.  We have the offer of proof that

9    I made reference to in my argument.  If the fact that goes

10   beyond what your Honor wants to hear, we can just submit it.

11             THE COURT:  All right, fine.  Thank you.  Okay.

12   Thanks very much.  Decision is reserved.

13             MR. SOLOMON:  Thank you, your Honor.

14             MR. McCALLEN:  Thank you, your Honor.

15             MR. SOLOMON:  And I do hope everyone stays safe.

16             THE COURT:  Thanks.  Yes, so do I.

17             (Adjourned)

18

19

20

21

22

23

24

25