**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------ X
BSG RESOURCES (GUINEA) LIMITED, :
BSG RESOURCES (GUINEA) SÀRL,    :
and BSG RESOURCES LIMITED,      :
                                :
            Plaintiffs,         :
                                :
    -against-                   :
                                :
GEORGE SOROS, OPEN SOCIETY      :
FOUNDATIONS, OPEN SOCIETY       :
INSTITUTE, FOUNDATION TO        :
PROMOTE OPEN SOCIETY, OPEN      :
SOCIETY FOUNDATION, INC.,       :
ALLIANCE FOR OPEN SOCIETY       :
INTERNATIONAL, INC., OPEN       :
SOCIETY POLICY CENTER, and OPEN :
SOCIETY FUND, INC.,             :
                                :
            Defendants.         :
------------------------------ X

> USDC SDNY
> DOCUMENT
> ELECTRONICALLY FILED
> DOC #: _____
> DATE FILED: __01/25/2021__

No. 17 Civ. 2726 (JFK)

**OPINION & ORDER**

APPEARANCES

FOR PLAINTIFFS:
    Louis M. Solomon, Michael S. Lazaroff, REED SMITH LLP

FOR DEFENDANTS:
    Benjamin P. McCallen, Joseph T. Baio, James Fitzmaurice,
    Elizabeth J. Bower, WILLKIE FARR & GALLAGHER LLP

**JOHN F. KEENAN, United States District Judge:**

    Before the Court is a renewed motion by Defendants George

Soros and certain non-profits and other organizations that he

allegedly controls (collectively, "Defendants") to dismiss the

Amended Complaint ("the AC") brought by Plaintiffs BSG Resources

(Guinea) Limited, BSG Resources (Guinea) Sàrl, and BSG Resources

Limited (collectively, "BSGR" or "Plaintiffs").  For the reasons

set forth below, Defendants' motion to dismiss will be converted

1

into one for summary judgment pursuant to Federal Rule of Civil
Procedure 12(d).  Before ruling on Defendants' motion, however,
the Court will allow the parties to conduct limited discovery
into whether Plaintiffs engaged in bribery in connection with
their claims in this action, and it reserves decision on the
instant motion until after the parties have had the opportunity
to submit all pertinent material.

### I.  Background

This action arises out of the African nation of Guinea's
2014 decision to terminate an agreement its government had
entered with Plaintiffs ("the Convention") related to certain
lucrative mining rights in the country.  Plaintiffs seek
compensation from Defendants for the loss of their multi-
billion-dollar mining operation on the grounds that Defendants
fraudulently interfered with and induced Guinea to breach the
Convention.  Plaintiffs further allege that Defendants' wrongful
conduct continued even after Guinea terminated Plaintiffs'
mining rights, which caused further harm to Plaintiffs'
reputation and caused them to lose other profitable business
opportunities around the world.

Plaintiffs initiated this action on April 14, 2017.  (ECF
No. 1.)  On June 30, 2017, Plaintiffs filed the AC, which
Defendants moved to dismiss on July 28, 2017, or, in the
alternative, to stay these proceedings pending the outcome of an

arbitration between Plaintiffs and Guinea before the
International Centre for Settlement of Investment Disputes ("the
ICSID Arbitration"). (ECF Nos. 22, 55.) On November 29, 2017,
the Court granted Defendants' alternate request for a stay
pending the outcome of the ICSID Arbitration. See BSG Res.
(Guinea) Ltd. v. Soros, No. 17 Civ. 2726 (JFK), 2017 WL 5897450,
at *5 (S.D.N.Y. Nov. 29, 2017). The stay remained in effect
through July 28, 2020, when the Court held a telephonic
conference with the parties, during which it deferred deciding
Plaintiffs' July 21, 2020 letter request to terminate the stay
but allowed Defendants the opportunity to renew their motion to
dismiss the AC. Defendants filed their renewed motion on August
28, 2020. (ECF No. 170.)

### A. Factual Overview

The following is taken from the AC. (Am. Compl., ECF No.
22.) Plaintiffs are an international, diversified mining group.
(Id. ¶ 18.) BSG Resources Limited owns BSG Resources (Guinea)
Limited, which owns BSG Resources (Guinea) Sàrl. (Id. ¶¶ 5-6.)

Defendant George Soros ("Soros") is a well-known financier
who resides in the State of New York; Defendant Open Society
Foundations ("OSF") is a "de facto corporation" with its
principal place of business in New York City. (Id. ¶¶ 8-9.)
Soros is the founder and chairman of OSF. (Id. ¶ 9.) Defendant
Open Society Institute is a charitable trust organized under the

laws of the State of New York; Defendants Foundation to Promote
Open Society, Alliance for Open Society International, Inc.,
Open Society Policy Center, and Open Society Fund, Inc. are not-
for-profit corporations that share OSF's same phone number and
business address in New York City.  (Id. ¶¶ 9–14, 52.)
Defendant Open Society Foundation, Inc. was a similar not-for-
profit which filed dissolution papers in October 2012.  (Id. ¶
9.)

     Plaintiffs' claims against Defendants center on a dispute
over mining rights in the Simandou region of Guinea.  In 2005,
BSGR, through its subsidiary, BSGR Guinea BVI, applied for
prospecting permits in the north and south regions of Simandou
that would allow BSGR to have the exclusive right to conduct
exploratory work in those areas to locate and unearth iron ore
deposits.  (Id. ¶ 20.)  On February 6, 2006, the Guinean
Minister of Mines granted BSGR's application.  (Id. ¶ 22.)

     In 2008, the Guinean government ordered Rio Tinto—an
international mining company that, since 1997, had held mining
rights to areas in Simandou—to relinquish its rights to certain
parts of Simandou known as "Blocks 1 and 2."  (Id. ¶¶ 25–26.)
On December 9, 2008, the Guinean government awarded a
prospecting permit to BSGR for Blocks 1 and 2, which BSGR began
exploring in April 2009.  (Id. ¶¶ 26, 28.)  As discussed below,
Defendants assert that BSGR obtained these mining rights from

4

Rio Tinto by bribing Mamadie Touré, the fourth wife of the
Guinean President at the time, Lansana Conté.  (Defs.' Mem. of
L. at 8–14, ECF No. 171; Defs.' Reply at 1–2, 5, ECF No. 185.)
Conté died approximately two weeks later, on December 22, 2008.
(Am. Compl. ¶ 27.)

On November 16, 2009, after drilling for over three years
and investing more than $160 million, BSGR submitted a
feasibility study regarding the viability of mining operations
in the southern portion of Simandou ("Simandou South").  (Id. ¶
29.)  The Guinean Agency for the Promotion and Development of
Mining subsequently recommended to the Guinean Ministry of Mines
that BSGR be invited to negotiate a mining and infrastructure
agreement.  (Id. ¶¶ 21, 29.)  On December 16, 2009, BSGR and
Guinea entered into a Basic Convention Agreement ("the
Convention"), in which BSGR agreed to invest billions of dollars
in Guinea in exchange for the exclusive right to commercially
mine iron ore in Simandou South and a potential future grant of
mining rights in other Simandou regions.  (Id. ¶¶ 30–34.)  The
Convention provided that BSGR's rights and entitlements were
secured even as against subsequent changes in Guinean law.  (Id.
¶ 35.)  The Convention included the mining rights that BSGR had
previously obtained to Blocks 1 and 2.  (Id. ¶ 30; Nov. 24, 2020
Oral Arg. Tr. ("Tr.") at 27:5–18, ECF No. 190.)

On March 19, 2010, Guinea's then-president, Sékouba Konaté, ratified the Convention and granted BSGR a mining concession for a deposit in Simandou South.  (Am. Compl. ¶ 36.)  The following month, BSGR entered into a joint venture with a separate mining company, Vale S.A., to develop and operate BSGR's mining rights in Simandou.  (Id. ¶ 37.)

Presidential elections took place in Guinea in 2010.  (Id. ¶ 44.)  During the elections, Soros became involved in Guinea in support of Alpha Condé, who eventually was elected President of Guinea.  (Id. ¶¶ 54, 67.)  In January 2011, shortly after Condé's election was ratified, Condé requested Soros's assistance to reform Guinea's mining industry.  (Id. ¶ 67.)  Subsequently, Condé and Soros held a joint press conference during which they announced that all existing mining contracts in Guinea would be "re-examined" and a new mining code would be enacted.  (Id. ¶ 74.)  On March 3, 2011, Soros publicly stated that Condé would be "introducing a new mining code . . . and all the mining claims are going to be re-examined and those who want to validate those claims will have to subscribe to the principles of [the Extractive Industries Transparency Initiative ("EITI")]."  (Id. ¶ 78.)  Plaintiffs assert that EITI is affiliated with Defendants.  (Tr. at 27:19-23.)

The AC alleges that, through this review process, Defendants "importuned" President Condé into forcing BSGR to

6

either improperly pay significantly more money than was agreed under the Convention or lose its contracts altogether. (Am. Compl. ¶ 56.) Plaintiffs allege that Defendants masterminded this attempted extortion of BSGR and, in early 2011, Condé, while "pursuing [D]efendants' unlawful scheme, demanded without justification that BSGR pay $1.25 billion to maintain its contractual mining rights." (Id. ¶¶ 57–61.) After BSGR refused Condé's demand, Defendants "engaged in secret negotiations with Vale seeking payment of $500 million," which was falsely characterized as a prepayment of taxes. (Id. ¶¶ 59, 61.) BSGR also rejected those terms. (Id. ¶ 66.)

Plaintiffs allege that Defendants then employed "other illegal means to destroy BSGR's mining rights." (Id.) On or about March 26, 2012, the Guinean government established a National Mining Commission ("NMC") which was "granted the power to examine the 'extension, renewal, lease and cancellation applications for mining titles on the basis of the [2011] Mining Code.'" (Id. ¶ 98.) NMC's responsibilities were divided among two subcommittees: a Strategic Committee and a Technical Committee. (Id.) Plaintiffs allege that the Technical Committee, which was designed to serve as the operational arm of the NMC, was "entirely lacking in the resources to handle this role," and the work was outsourced to other entities that were "funded by" or "controlled by" Soros. (Id. ¶ 99.)

7

On November 17, 2011, BSGR received a letter from the Guinean Minister of Mines which claimed that there were issues with BSGR's mining permits, set forth a lengthy list of information requests, and questioned why Vale was supposedly working in Simandou without authorization. (Id. ¶ 103.) Despite BSGR's "detailed response" and presentation of "exculpatory material," on October 30, 2012, the Technical Committee, allegedly relying on the conclusions of "Soros funded agents," sent a letter to BSGR ("the Allegations Letter") accusing BSGR of obtaining its mining rights through bribery and corruption. (Id. ¶¶ 114–15, 128, 150.) The AC alleges that Defendants leaked the contents of the Allegations Letter to the press prior to its being sent to BSGR to "cause BSGR further damages." (Id. ¶ 130.) Plaintiffs further allege that, in 2012 and 2013, Defendants and their agents—including Global Witness, an organization that Soros "heavily funded"—continued spreading "untrue accusations" suggesting that BSGR obtained its mining rights in Guinea through bribery. (Id. ¶¶ 140–49.) Further, Plaintiffs allege that Soros, himself and via his adult sons, bribed Guinean officials to influence proceedings in Guinea and cause the revocation of BSGR's mining rights. (Id. ¶¶ 161–64.)

The AC asserts that Defendants were ultimately successful in their campaign to have Plaintiffs' mining rights revoked. (Id. ¶¶ 159–60.) On March 21, 2014, the Technical Committee

recommended that the Minister of Mines revoke BSGR's mining rights and cancel the Convention. (Id. ¶ 151.)  On April 2, 2014, the Strategic Committee issued an opinion to President Condé and the Minister of Mines agreeing with the Technical Committee's report and recommendation. (Id. ¶ 155.)  Later that month, and pursuant to the Technical and Strategic Committees' recommendations, President Condé and the Minister of Mines terminated the Convention and BSGR's mining rights. (Id. ¶¶ 156–58.)  To date, Guinea has not compensated BSGR for its $800 million investment in the country. (Id. ¶ 166.)  BSGR has since challenged Guinea's conduct before the International Centre for Settlement of Investment Disputes in an arbitration proceeding currently pending in Paris ("the ICSID Arbitration"). (Id.)  Plaintiffs seek an award in the ICSID Arbitration declaring that Guinea's termination of the Convention was unlawful and a restoration of their mining rights. (Ex. 2 to Fitzmaurice Decl. ¶ 431, ECF No. 57-3.)  Defendants are not a party to the ICSID Arbitration.

"[H]aving delayed, damaged, and destroyed [P]laintiffs' investment in Guinea," the AC further alleges that Defendants then trained "unbridled animus" towards Plaintiffs and Beny Steinmetz, "an adviser to [P]laintiffs whose name is associated with the[] companies," by damaging Plaintiffs' reputation around

the world and destroying other of Plaintiffs' business opportunities.  (Am. Compl. ¶ 2.)

### B.  Procedural History

On April 14, 2017, Plaintiffs initiated this action by filing a complaint against Soros and OSF only.  (Compl., ECF No. 1.)  On June 30, 2017, Plaintiffs filed the AC, which added the six remaining defendants, all of which are allegedly not-for-profit entities affiliated with OSF, which Soros allegedly controls.

As in the original complaint, the AC asserts five counts against Defendants for (1) tortious interference with contract; (2) conspiracy to commit tortious interference with contract and other illegal acts; (3) fraud, misrepresentation, and conspiracy to commit fraud and misrepresentation (against Soros only); (4) commercial defamation; and (5) prima facie tort (against Soros only).  The AC also adds allegations that Soros "sealed his corrupt scheme" by paying intermediaries to transmit thousands of dollars in bribes to witnesses and Guinean government officials in charge of the review of BSGR's contracts to ensure the scheme "resulted in the only acceptable outcome for Soros: the delay or destruction of [P]laintiffs' investment."  (Am. Compl. ¶ 3.)  Plaintiffs contend that Soros paid $93,000 and $1.27 million to Guinean government officials in furtherance of the scheme.  (Id. ¶¶ 162–163.)

Plaintiffs seek relief in the form of (1) $10 billion in damages for Counts One, Two, and Three; (2) $10 billion in damages for Count Four; (3) approximately $5.9 billion in damages for Count Five; (4) exemplary and punitive damages in amounts to be determined at trial; (5) pre- and post-judgment interest; (6) costs and attorneys' fees; (7) an injunction directing Defendants to cease and desist from the improper activity described in the AC; and (8) equitable relief, including a constructive trust over Soros's controlled or influenced organizations, and an order directing Defendants to take all steps necessary to secure the return of Plaintiffs' wrongfully interfered with or converted rights.

On July 28, 2017, Defendants moved to dismiss the AC or, in the alternative, to stay this action pending the outcome of the ICSID Arbitration between BSGR and Guinea. (Mot. to Dismiss, ECF No. 55.) On November 29, 2017, the Court granted Defendants' request for a stay pending resolution of the ICSID Arbitration after finding that the ICSID Arbitration may dispose of Plaintiffs' tortious interference claim, and it would have some bearing on Plaintiffs' other claims for fraud and commercial defamation. (ECF No. 136.)

On June 18, 2018, the Court continued the stay because the ICSID Arbitration was proceeding towards a resolution. (ECF No. 149.) The Court scheduled a status conference for October 16,

2018, which was later adjourned to November 19, 2018.  (ECF No. 150.)  On November 16, 2018, Defendants informed the Court that all argument and evidence had been fully submitted to the ICSID tribunal and "[a]ll that remains is for the tribunal to issue an award."  (ECF No. 151.)  The Court continued the stay until the next conference, which was scheduled for July 2019.

On June 20, 2019, Plaintiffs filed a letter, with the consent of Defendants, requesting an adjournment of the July 18, 2019 conference to a date in September or November 2019.  (ECF No. 153.)  The Court granted the parties' request, adjourning the conference to September 10, 2019.  (ECF No. 154.)  On August 23, 2019, the parties jointly requested that the conference be adjourned to December 2019; on November 25, 2019, the parties again requested that the conference be adjourned, this time to March 2020; and on March 5, 2020, the parties again requested that the conference be adjourned, this time to a date in June 2020.  (ECF Nos. 155, 157, 159.)  The Court granted all three requests.  (ECF Nos. 156, 158, 160.)

On May 27, 2020, the parties requested an adjournment of the upcoming conference to late-July 2020.  (ECF No. 161.)  The Court granted the request but informed the parties that it would be the final adjournment without counsel appearing before the Court.  (ECF No. 163.)  On July 14, and July 21, 2020, respectively, Defendants and Plaintiffs filed letters updating

the Court on the status of the ICSID Arbitration and other
relevant matters.  (ECF Nos. 164, 165.)  Defendants requested
that the stay be continued because the parties to the ICSID
Arbitration—namely, Plaintiffs and Guinea—had reportedly reached
a settlement in principle and had agreed more than a year prior
to stay that action.  In the alternative, Defendants requested
that the Court dismiss Plaintiffs' claims for the reasons set
forth in Defendants' original motion to dismiss.  Plaintiffs, on
the other hand, requested that the Court reject Defendants'
requests and lift the stay to allow this action to proceed to
discovery.

The parties appeared for a telephonic conference on July
28, 2020, during which the Court declined to lift the stay at
this time but set a briefing schedule for Defendants to renew
their motion to dismiss the AC.  Defendants filed their motion
on August 28, 2020; Plaintiffs filed their opposition on October
26, 2020; and Defendants filed their reply on November 9, 2020.
(ECF Nos. 170, 181, 185.)  On November 18, 2020, the Court
notified the parties that it was considering whether to treat
Defendants' motion to dismiss as one for summary judgment
pursuant to Federal Rule of Civil Procedure 12(d) on the issue
of whether Plaintiffs may be estopped from arguing that BSGR did
not procure certain of its mining rights through bribes paid to
Mamadie Touré.  (ECF No. 186.)  The Court ordered the parties to

be prepared to discuss the issue during the upcoming oral argument.

On November 24, 2020, the Court heard argument on Defendants' motion to dismiss during an in-person hearing. Later that day, Plaintiffs filed a declaration with a "partial offer of proof" which attached a series of documents and asserted that substantial evidence exists refuting any allegation of bribery by BSGR. (ECF No. 187.) On November 30, 2020, Defendants filed a letter objecting to Plaintiffs' partial offer of proof. (ECF No. 188.) Shortly thereafter, Plaintiffs filed a letter objecting to Defendants' letter. (ECF No. 189.)

On January 24, 2021, Defendants filed a letter explaining that, on January 22, 2021, a Swiss court convicted Beny Steinmetz—the adviser to Plaintiffs whose name is associated with the companies—of bribery in connection with BSGR's acquisition of certain mining rights in Guinea. (ECF No. 192.) Defendants' letter explained that Steinmetz had been indicted on the grounds that, between 2005 and 2010, he paid, or caused to be paid, approximately $10 million in bribes to Mamadie Touré.

## II.  Legal Standard on a Motion to Dismiss

"Federal Rule of Civil Procedure 8(a)(2) requires only a short and plain statement of the claim showing that the pleader is entitled to relief, in order to give the defendant fair notice of what the claim is and the grounds upon which it rests.

Consequently, to survive a motion under Rule 12(b)(6), a complaint does not need to contain detailed or elaborate factual allegations, but only allegations sufficient to raise an entitlement to relief above the speculative level." Keiler v. Harlequin Enters. Ltd., 751 F.3d 64, 70 (2d Cir. 2014) (citations omitted).

"[I]n deciding a Rule 12(b)(6) motion to dismiss a complaint, [the Court] is required to accept all 'well-pleaded factual allegations' in the complaint as true." Lynch v. City of New York, 952 F.3d 67, 74-75 (2d Cir. 2020) (quoting Ashcroft v. Iqbal, 556 U.S. 662, 679 (2009)). "Although allegations that are conclusory are not entitled to be assumed true, when there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." Id. at 75 (alterations, citations, and internal quotation marks omitted). "The court must also 'construe all reasonable inferences that can be drawn from the complaint in the light most favorable to the plaintiff.'" Id. (quoting Arar v. Ashcroft, 585 F.3d 559, 567 (2d Cir. 2009) (en banc), cert. denied, 560 U.S. 978 (2010)). "The assessment of whether a complaint's factual allegations plausibly give rise to an entitlement to relief 'does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery

will reveal evidence of illegal' conduct." Id. (quoting Bell
Atlantic Corp. v. Twombly, 550 U.S. 544, 556 (2007)).

In considering a motion to dismiss, a court is generally
"limited to the facts as asserted within the four corners of the
complaint, the documents attached to the complaint as exhibits,
and any documents incorporated in the complaint by reference."
McCarthy v. Dun & Bradstreet Corp., 482 F.3d 184, 191 (2d Cir.
2007). "[W]here matter outside the pleadings is offered and not
excluded by the trial court, the motion to dismiss should be
converted to a motion for summary judgment" in accordance with
Federal Rule of Civil Procedure 12(d). Nakahata v. New York-
Presbyterian Healthcare Sys., Inc., 723 F.3d 192, 202 (2d Cir.
2013). Pursuant to Rule 12(d), "[w]hen a district court
converts a motion to dismiss into one for summary judgment,
'[a]ll parties must be given a reasonable opportunity to present
all the material that is pertinent to the motion.'" Sahu v.
Union Carbide Corp., 548 F.3d 59, 67 (2d Cir. 2008) (quoting
Fed. R. Civ. P. 12(d)).

**III. Discussion**

Defendants move to dismiss the AC in its entirety on three
principal grounds: collateral estoppel, the act of state
doctrine, and failure to plausibly allege certain required
elements of Plaintiffs' claims. The Court addresses each ground
for dismissal in reverse order below.

### A.   Failure to Plausibly Allege Certain Elements of Each Claim

Defendants argue that Plaintiffs' claims should be dismissed because the AC does not plausibly allege "but for" causation, fraud with the requisite particularity, and a defamatory statement attributable to Defendants.  Plaintiffs counter that Defendants' arguments go beyond the pleadings and rely on counterfactual arguments which are improper at this procedural stage.  The Court agrees with Plaintiffs.

As discussed in Part C below, Defendants' motion to dismiss incorporates and relies on matter outside the pleadings—namely, the factual assertion that, in 2008, Plaintiffs acquired certain mining rights in Simandou by bribing Mamadie Touré, the fourth wife of the Guinean President at the time.  Accordingly, the Court will convert Defendants' motion to dismiss into one for summary judgment on the question of whether there is any genuine dispute that Plaintiffs engaged in such bribery, and whether the Guinean government was permitted to, and did, terminate the Convention because of Plaintiffs' misconduct.  In doing so, the Court will not rule on Defendants' objections to the AC at this time—including whether the AC plausibly alleges the elements of each cause of action—so that both sides may have the opportunity to engage in limited discovery on the above issues and present

all material that is pertinent to whether Defendants are
entitled to dismissal of Plaintiffs' claims.

### B.  Act of State Doctrine

Independent of whether Plaintiffs engaged in bribery,
Defendants argue that the AC may be dismissed pursuant to the
act of state doctrine, which precludes courts in the United
States from adjudicating claims that require a determination of
the validity of a foreign government's sovereign acts, such as
Guinea's decision to terminate BSGR's mining rights and the
process by which that decision was made.  Plaintiffs counter
that the doctrine does not apply in this case because they are
not seeking to invalidate any act by the Guinean government, but
rather, to hold Defendants liable for Defendants' misconduct.
In the alternative, Plaintiffs argue that application of the
doctrine is premature at this procedural stage without the
benefit of discovery.

"The act of state doctrine bars U.S. courts from declaring
invalid, and thus ineffective as a rule of decision, the
official act of a foreign sovereign." Kashef v. BNP Paribas
S.A., 925 F.3d 53, 58 (2d Cir. 2019) (citing W.S . Kirkpatrick &
Co. v. Envtl. Tectonics Corp., Int'l, 493 U.S. 400, 405 (1990)).
"[W]hen the validity of a foreign state's action is not the
question being litigated, and the inquiry is simply whether the
conduct in question occurred, the act of state doctrine is not

implicated." Id. at 59 (citing Kirkpatrick, 493 U.S. at 405).
"In other words, the doctrine applies only when 'the relief
sought or the defense [raised] would have required a court in
the United States to declare invalid the official act of a
foreign sovereign performed within its own territory.'" Id.
(alterations in original) (quoting Kirkpatrick, 493 U.S. at
405).  "[W]here the plaintiff is 'not trying to undo or
disregard governmental action,' it may 'obtain damages from
[the] private parties that procured it' illegally." Mountain
Crest SRL, LLC v. Anheuser-Busch InBev SA/NV, 937 F.3d 1067,
1085 (7th Cir. 2019) (second alteration in original) (quoting
Kirkpatrick, 493 U.S. at 407).  "The burden of establishing the
applicability of the act of state doctrine rests on the party
invoking the doctrine." Id. at 1083 (citing Alfred Dunhill of
London, Inc. v. Republic of Cuba, 425 U.S. 682, 694 (1976)).

     Defendants argue that Plaintiffs' claims bear upon Guinea's
decision to enter into the Convention and later terminate that
agreement, which, Defendants assert, are quintessential
sovereign acts that will have to be declared invalid in order
for Plaintiffs to succeed in this action.  The Court disagrees.
Although Plaintiffs' tortious interference and fraud claims do
require a finding that Guinea breached the terms of the
Convention or engaged in a fraudulent process to terminate
Plaintiffs' mining rights, "[t]he issue in this litigation is

not whether such acts are valid, but whether they occurred."
Kashef, 925 F.3d at 59-60 (quoting Sharon v. Time, Inc., 599 F.
Supp. 538, 546 (S.D.N.Y. 1984)).  This, the Supreme Court has
ruled, does not implicate the act of state doctrine. Id. at 59
(explaining further that the act of state doctrine is not
triggered "even if it 'would impugn or question the nobility of
a foreign nation's motivations'") (quoting Kirkpatrick, 493 U.S.
at 408).  Indeed, Plaintiffs are not seeking to reverse, undo,
or disregard any official action by Guinea, nor to deny legal
effect to any of Guinea's sovereign acts.[1]  Rather, Plaintiffs
seek to hold Defendants liable for their antecedent and
allegedly deliberate acts which, Plaintiffs assert, improperly
procured official action by the Guinean government—here, breach
of the terms of the Convention and termination of Plaintiffs'
mining rights under false pretenses—which caused Plaintiffs'
damages.  Such an "inquiry into occurrence rather than validity
is precisely what the Supreme Court in Kirkpatrick held was not
precluded by the act of state doctrine." Id. at 60; see also
Mountain Crest, 937 F.3d at 1085-86 (holding the act of state
doctrine did not apply to a plaintiff's antitrust claims against
two private companies that allegedly conspired to bring about

---

[1] To the extent the AC seeks relief against Guinea, Plaintiffs
explained that they were prepared to withdraw the request.  (Pls.'
Opp'n at 19, ECF No. 181.)

certain discriminatory Canadian legislation).  Accordingly, the
act of state doctrine does not require dismissal of Plaintiffs'
claims.

### C.  Collateral Estoppel

"The doctrine of collateral estoppel . . . precludes a
party from relitigating in a subsequent action or proceeding an
issue clearly raised in a prior action or proceeding and decided
against that party or those in privity, whether or not the
tribunals or causes of action are the same." Ryan v. New York
Tel. Co., 467 N.E.2d 487, 490 (N.Y. 1984); see also Conopco,
Inc. v. Roll Int'l, 231 F.3d 82, 86–87 (2d Cir. 2000)
(explaining dismissal under Federal Rule of Civil Procedure
12(b)(6) is appropriate where "it is clear from the face of the
complaint, and matters of which the court may take judicial
notice," that a plaintiff's claims are precluded).  Collateral
estoppel is often, and more appropriately, referred to as issue
preclusion. See CBF Indústria de Gusa S/A v. AMCI Holdings,
Inc., 850 F.3d 58, 62 n.2 (2d Cir. 2017).  "An arbitration
decision may effect issue preclusion in a later litigation only
if the proponent can show with clarity and certainty that the
same issues were resolved." Id. at 77 (brackets, ellipsis, and
quotation marks omitted).  "Issue preclusion is permissible as
to a given issue if: (1) the identical issue was raised in a
previous proceeding; (2) the issue was actually litigated and

decided in the previous proceeding; (3) the party had a full and
fair opportunity to litigate the issue; (4) the resolution of
the issue was necessary to support a valid and final judgment on
the merits; and (5) application of the doctrine is fair." Id.
(brackets, ellipsis, and quotation marks omitted).  "The party
seeking to invoke the doctrine bears the burden of establishing
its applicability." Tracy v. Freshwater, 623 F.3d 90, 99 (2d
Cir. 2010).

Defendants argue that Plaintiffs' claims are collaterally
estopped by a final award that was issued in a 2019 arbitration
between BSGR and Vale, BSGR's joint venturer in the failed
mining project.  After Guinea terminated BSGR's mining rights in
2014, Vale initiated an arbitration before the London Court of
International Arbitration ("the LCIA Arbitration") on the
grounds that BSGR fraudulently induced Vale to enter into the
joint venture by, among other misrepresentations, falsely
warranting how BSGR had obtained its mining rights.  (Defs.'
Mem. of L. at 8, ECF No. 171.)  In April 2019, the LCIA tribunal
found BSGR liable for fraudulent misrepresentation and breaches
of certain warranties based, in part, on a finding that BSGR had
procured its mining rights by bribing Mamadie Touré.  (Id. at
9.)  The tribunal awarded Vale more than $1.24 billion in
damages.  (Id. at 10.)

Defendants argue that each of Plaintiffs' claims is collaterally estopped by the LCIA Arbitration's determination that BSGR engaged in bribery because it "conclusively resolves the same set of facts" at issue in this action: namely, (1) whether a valid contract existed between Guinea and Plaintiffs such that Defendants were the "but for" cause of any purported breach; (2) whether Guinea, at the direction of Defendants, made false findings that Plaintiffs corruptly secured their mining rights; (3) whether Defendants committed fraud in assisting Guinea to terminate the Convention; and (4) whether Defendants' purportedly defamatory statement in a 2016 news report was in fact true.

Plaintiffs counter that the LCIA Arbitration cannot have preclusive effect in this action because (1) the tribunal's findings of bribery are not identical to the issues in this case, which concern the Convention, not simply BSGR's receipt of a mining permit in 2008; (2) the tribunal's findings of bribery were not necessary to support the tribunal's award where the tribunal found multiple other misrepresentations by BSGR during the due diligence process and expressly provided that "even absent a finding of corruption, the multiple remaining misrepresentations would warrant the Tribunal's conclusions"; (3) Plaintiffs did not have a full and fair opportunity in the LCIA Arbitration to litigate the issue of whether bribery

occurred; and (4) the tribunal's findings of bribery are
contradicted by the Guinean government's subsequent decision in
March 2020 to drop bribery charges against Mamadie Touré and
others.  Accordingly, Plaintiffs argue, Defendants have not
established that the LCIA Arbitration warrants dismissal of the
AC.

In their reply brief, Defendants cite to publicly filed
documents in a case in the Middle District of Florida where, in
2016, Mamadie Touré reached a settlement with the United States
Department of Justice which included her forfeiture of certain
properties and her acknowledgment that those properties were
derived from bribes that she received from an unnamed company.
See United States v. Real Property Located at 4866 Yacht Basin
Drive, No. 14 Civ. 1428 (M.D. Fla.), Dkt. Nos. 26 (Amended
Verified Complaint for Forfeiture In Rem), 36 (Stipulated
Settlement Between United States and Mamadie Toure).  Defendants
assert that the unnamed company is BSGR and offer Mamadie
Touré's admission to rebut Plaintiffs' argument that the
preclusive effect of the LCIA Arbitration is undermined by
Guinea's decision to drop bribery charges against her.

As discussed above, courts generally are not permitted to
consider matters outside the pleadings in deciding a motion to
dismiss for failure to state a claim.  See Nakahata, 723 F.3d at
202.  Rather, where such matter "is offered and not excluded by

24

the trial court, the motion to dismiss should be converted to a motion for summary judgment." Id.

In light of the LCIA Arbitration tribunal's findings and Mamadie Touré's apparent admission to receiving bribes from BSGR, the Court will convert Defendants' motion to dismiss into one for summary judgment on the issues of (1) whether Plaintiffs bribed Mamadie Touré; (2) whether that bribery was connected to Plaintiffs' acquisition of mining rights included in the Convention; and (3) whether the Guinean government was permitted to, and did, terminate Plaintiffs' mining rights because of Plaintiffs' bribery of Mamadie Touré.

In converting Defendants' motion, the Court will give both sides "a reasonable opportunity to present all the material that is pertinent to the motion." Fed. R. Civ. P. 12(d). Accordingly, the Court will allow the parties to engage in limited discovery on the three issues described in the preceding paragraph.  Following the close of discovery, the parties may submit all material that is pertinent to a motion to dismiss under the summary judgment standard of Federal Rule of Civil Procedure 56, including Local Civil Rule 56.1 statements of material facts.

**IV. Conclusion**

For the reasons set forth above, Defendants' motion to dismiss will be treated as one for summary judgment pursuant to

Federal Rule of Civil Procedure 12(d).  The Court reserves decision on the motion until after the parties have submitted all pertinent material.

It is FURTHER ORDERED that the stay on discovery is LIFTED on the limited questions of (1) whether Plaintiffs bribed Mamadie Touré; (2) whether that bribery was connected to Plaintiffs' acquisition of mining rights included in the Convention; and (3) whether the Guinean government was permitted to, and did, terminate Plaintiffs' mining rights because of Plaintiffs' bribery of Mamadie Touré.  The parties are to proceed to such limited discovery under the supervision of Magistrate Judge Ona T. Wang and to confer and file a joint-proposed case management order by no later than February 25, 2021, which is to include an agreed upon cutoff date for discovery.  If no agreed upon cutoff date is fixed, this Court will impose one.

**SO ORDERED.**

Dated:  New York, New York
        January 25, 2021

_____
                    John F. Keenan
          United States District Judge