1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x

3  BSG RESOURCES (GUINEA)
   LIMITED, *et al.*,
4
                  Plaintiffs,
5
             v.                          17 CV 2726 (JFK)(OTW)
6
   GEORGE SOROS, *et al.*,
7
                  Defendants.            Telephone Conference
8
   ------------------------------x
9                                        New York, N.Y.
                                         February 5, 2021
10                                       11:00 a.m.

11 Before:

12                        HON. ONA T. WANG,

13                                       U.S. Magistrate Judge

14                            APPEARANCES

15 REED SMITH LLP
        Attorneys for Plaintiffs
16 BY:  MICHAEL S. LAZAROFF
        LOUIS M. SOLOMON
17      -and-
   KATTEN MUCHIN ROSENMAN, LLP
18 BY:  DAVID J. STAGMAN

19 WILLKIE FARR & GALLAGHER LLP
        Attorneys for Defendants
20 BY:  BENJAMIN P. McCALLEN
        GABRIELLE K. ANTONELLO
21

22

23

24

25

1            (Case called)

2            MR. SOLOMON:  Good morning, your Honor, for the

3   plaintiffs, this is Lou Solomon for Reed Smith.

4            MR. LAZAROFF:  Good morning, your Honor, for the

5   plaintiffs this is also Michael Lazaroff from Reed Smith.

6            MR. STAGMAN:  Good morning, your Honor, for the

7   plaintiffs, also David Stagman from Katten.

8            MR. McCALLEN:  Good morning, your Honor, Benjamin

9   McCallen, Willkie Farr & Gallagher, on behalf of defendants.

10           MS. ANTONELLO:  Good morning, Gabrielle Antonello from

11  Willkie Farr & Gallagher on behalf of defendants.

12           THE COURT:  Good morning, everyone.  This is Judge

13  Wang.

14           We are here for -- I am not sure what to call this,

15  it's not really an initial case management case, but we will

16  treat it like one.

17           In this case we are proceeding by telephone due to the

18  COVID-19 pandemic.  This is a public line and should be treated

19  like my virtual courtroom.  I expect the same decorum on the

20  line that I expect in my courtroom and because this is a public

21  line, we should all expect that members of the press or public

22  may be on the line on a listen-only basis.  In fact, I think

23  there are at least four guests on the line.

24           We are proceeding with a court reporter, so I expect

25  that he will have all your information and spellings, but it is

extremely important that we make sure that the transcript is

clear for the court reporter.  That means that if you are not

on mute because you are speaking, you should really try to

minimize your background noise.  Try not to interrupt each

other.  Try not to speak over each other.  Please say your name

when you start speaking.  Again, please stay on mute when you

are not talking.  The nature of the telephone conferences is

that I will also put myself on mute so there are sometimes

there will be a short delay if I come in.  Occasionally, I will

interrupt.

        Any recording or rebroadcasting by anyone else on this

line is strictly prohibited.

        Again, if for any tech reasons you get disconnected,

just dial back in.  I will be able to see, and I think we will

hear beeps if someone comes in or out of the room.  But I will

only interrupt you all if it's somebody who is speaking.  There

may be people who come in and out if they are just listening.

        This case has been proceeding for three years, if we

don't count the period when it was stayed.  I have been wading

through the docket, reading your status letters, which have

been helpful.  I have a general sense of this case and also

about the overall facts as I am also the magistrate judge on

the 1782 petition by Vale.  So I do have some familiarity with

the underlying facts.

        However, I think it would be really helpful for the

1    parties to give me a 30,000-foot view of the whole dispute,

2    maybe one sentence each about proceedings that may be relevant

3    or may relate because I have a feeling we will be talking about

4    some of those.  Those would be helpful for me -- I haven't been

5    living with this case for as many years as you all have -- to

6    understand how each of those different proceedings plays into

7    this case.  Just very quickly, if you can do that.

8            I'll ask plaintiffs to start and then once plaintiffs

9    are done, defendants, you can give me your 30,000-foot view,

10   and I will go on mute for this entire time unless somebody goes

11   on for too long.  Let's try to keep it quick and just give me a

12   quick background.

13           MR. SOLOMON:  Your Honor, thank you.  I thank you for

14   seeing the parties so quickly.

15           BSGR is in the mining business.  It went to Guinea at

16   the cost of several hundreds of millions of dollars.  It did

17   the work necessary to see that there were some potentially

18   valuable deposits of iron ore there if BSGR then put in the

19   half billion to a billion dollars in capital to try to extract

20   it.  It went to the Guinean government and it received, first,

21   permits to do the exploratory work and then a convention or

22   contract to do the work on the site.  As a result of that

23   contract, the contract on its face said that here are the

24   economics between BSGR and the government, and they cannot be

25   changed and they won't be changed, even if there is a change of

1  regime.

2          There were several different governments over the time

3  period that we are talking about and each of them authorized or

4  approved the mining convention until George Soros got involved

5  with a new president of Guinea.  Their names are a little bit

6  similar.  Sometimes only an aigu differentiates them.  But the

7  new president of Guinea and George Soros stood up with this

8  president and said, we are going to review all of the mining

9  rights that have been given, and we are going to change them in

10  a way that these principles that George Soros was favored to

11  require.

12          At that point, that was obviously a breach of our

13  contract.  At that point George Soros -- and in each case I

14  mean George Soros or his agents or his minions -- came to us

15  and said that for a sufficient amount of bribe, for a

16  sufficient amount of extorted money we could continue to have

17  the mining rights and to pursue them.

18          We refused.  He made a threat and said, I am going to

19  terminate you.  He made good on that.  Through his minions he

20  created a process in Guinea, corrupting a process in Guinea, as

21  Judge Keenan rightly described our allegations.  Through false

22  pretensions, this kangaroo proceeding in Guinea determined that

23  the rights were procured by bribery and, therefore, terminated

24  those rights.

25          So we have brought suit against George Soros and

1    several of his agent companies here in the United States.  We

2    do not have claims here against the government of Guinea.  The

3    principal defense that the defendants have asserted in all

4    these years is an act-of-state defense.  In the decision that

5    Judge Keenan just rendered he rejected that by the law, not by

6    prematurity, so that is out of the case.

7           And the other distraction, I maintain, that the

8    defendants have asserted in their motions to dismiss have been,

9    look every place other than George Soros and go and find an

10   answer there.

11          There are several other proceedings there.  There is

12   an ICSID proceeding, which is a public proceeding that relates

13   to investors and governments.  That case was tried.  It was not

14   resolved by award of any panel because I believe there is an

15   in-principle settlement in place.

16          There was another case, also not relevant to our

17   proceeding, not involving George Soros, involving Vale, and I

18   think it's in the aftermath of that that your Honor may have

19   the 1782 proceedings, which, in our view, do not relate to

20   anything here.

21          There have been press reports, no judgment, of a

22   proceeding in Switzerland concerning Beny Steinmetz, who is not

23   BSGR but is an advisor to BSGR.  We don't deny that.  But he's

24   not the BSGR.

25          Then there is a proceeding in Guinea, which also went

1    through all of these facts and, on the merits, dismissed claims

2    of bribery against the very people that George Soros says

3    committed bribery.

4         I think I'll pause.  I'm happy to go into what brings

5    us here today, but your Honor asked for the introduction.

6    That's where we are.  I hope that was helpful.

7         THE COURT:  Thank you.  Before we switch over to the

8    defendant, I just had a couple of questions.

9         V-a-l-e is actually pronounced Vale, not Vale?

10        MR. SOLOMON:  Yes, your Honor.

11        THE COURT:  And then you mentioned the Guinea

12   proceeding that you said also went through all the facts and

13   dismissed the claims of bribery against the very people that,

14   you know, Mr. Soros says did the bribery.

15        Is that the same Guinean government that plaintiffs

16   allege were trying to extort money to continue the mining

17   rights for BSGR and that you also called the government that, I

18   guess, was presiding over, you know -- had the power over what

19   you called the kangaroo proceeding in Guinea?

20        MR. SOLOMON:  I think we are going to need to give

21   your Honor some discovery, and I'm going to need a little bit

22   of an education also.

23        There continue to be, even in defendants' portion of

24   its letter to you, statements made outside the record about

25   which government we are talking about.

1          The proceeding that I am speaking of, what happened

2     was, there was, early on, before 2013, 2014, an investigation

3     done by someone advising the government who found no

4     wrongdoing.

5          Then George Soros came on the scene with President

6     Condé.  The proceeding that I was just talking about, which

7     went -- in fact, there was no trial.  I want to be clear with

8     your Honor.  There was no trial in Guinea, but it was a 2020

9     decision by a Court in Guinea, not an administrative body in

10    Guinea, finding that there was insufficient proof of bribery,

11    and we have already submitted an affidavit to Judge Keenan from

12    a Guinean lawyer who goes through the statutory framework to

13    underscore the fact that that's a decision on the merits, and

14    so I am talking about a 2020 decision by a judicial body, not

15    an administrative body.  Does that help?

16         THE COURT:  Yes.  You said that sometimes there was a

17    corrupting process in Guinea, there is alleged to be a

18    corrupting process in Guinea that somehow, under false

19    pretenses, got the convention revoked.  I think that's when you

20    used the term kangaroo court.  I'm trying to figure out where

21    that fits in your chronology.

22         MR. SOLOMON:  I see.  If I used court, it was my

23    error.  It was a kangaroo tribunal and that was during the

24    period 2013, 2014.  That's the period when George Soros had his

25    impact on BSGR.

1          THE COURT:  Let me ask defendants to talk, and maybe

2     you can clarify that timeline there and whether it was the same

3     or different iterations of government officials in that period

4     because I think I'm still missing something, but I think it

5     might be helpful to hear from defendants now.  Thanks.

6          MR. SOLOMON:  Thank you, your Honor.

7          MR. McCALLEN:  Good morning, your Honor.

8          Your Honor, please interrupt if at any point you have

9     any questions because I recognize there is a lot of background

10     here that goes back many years and in fact involves a lot of

11     parties who are not before your Honor today.  Let me do my best

12     to try to distill it for you.  Again, please ask me any

13     questions that you do have.

14          Your Honor, plaintiffs in this case are three BSGR

15     entities who are affiliated with an individual named Beny

16     Steinmetz.  From 2002 to 2009, these BSGR entities were granted

17     permits to mine iron ore in Guinea.  At the time the country

18     was under the rule of a different government, a military

19     regime.

20          But in 2010 that changed.  Guinea held its first

21     democratic elections, and the newly elected president, his name

22     is Alpha Condé, took office in December 2010.  And when he did,

23     he set out to reform various aspects of the country, including

24     its mining code.

25          Now, as part of the reforms, Guinea established

1    committees to examine the prior mining contracts and to

2    consider a path forward with respect to the mining of their

3    natural resources.  This is what Mr. Solomon referred to as the

4    kangaroo court or the kangaroo committee.  In fact, there were

5    two committees established by the Guinean government.  They had

6    a different scope and different issues they were looking at.

7             I think for our purposes the more important of the two

8    committees was called the technical committee.  The technical

9    committee investigated BSGR, investigated the circumstances

10   surrounding BSGR's acquisition of the mining rights that it

11   held in Guinea, and it determined that BSGR had bribed,

12   obtained those rights by bribery, by bribing Mamadie Touré, and

13   she is the fourth wife of the former president of Guinea, to

14   obtain its rights.

15            Now, this committee ties directly into the

16   act-of-state doctrine that you heard about reference before.

17   The committee ultimately issued a report recommending to the

18   government of Guinea that BSGR's mining rights be cancelled and

19   the government of Guinea, including the administer of mines and

20   the president, as we understand it, ultimately chose to cancel

21   BSGR's rights.  That happened in 2014.

22            What Mr. Solomon seeks to describe as a kangaroo

23   tribunal or a kangaroo court is actually an official act by the

24   state government of Guinea.

25            Now, we argued that that official act, by virtue of it

being an official act, barred plaintiffs' claims here.  Judge

Keenan disagreed.  That motion was denied.  That portion of the

motion was denied.  There was an agreement about what Judge

Keenan did with respect to that issue.  Obviously, we disagree

with Judge Keenan's decision, but that is what it is.

        In 2017, plaintiffs brought this case in front of

Judge Keenan seeking to blame defendants for the loss of their

mining rights.  They allege various claims.  They have a claim

for tortious interference of contract.  They have a claim for

conspiracy to commit tortious interference of contract, fraud,

and defamation.  I think there is also a *prima facie* tort.  But

those were the claims that were alleged against our clients.

        In 2017, we moved to dismiss or stay the action, and

Judge Keenan did not decide the motion to dismiss but instead

stayed the action.  At the time he stayed it in favor of the

ICSID tribunal.  I think I'd like to talk a little bit about

those other cases to give your Honor that context.

        I think there are a couple of proceedings your Honor

should be aware of.  Prior to commencing litigation against

defendants in this action, there had been an arbitration

commenced between BSGR and Guinea.  That related to the

termination of BSGR's rights.  BSGR brought claims seeking to

have those rights returned or damages claiming that Guinea had

breached the contract between BSGR and Guinea.

        The parties engaged in a lengthy arbitration,

1    including, I believe, a nine or ten-day merits hearing, did

2    posttrial briefing.  But before the case could be decided by

3    the arbitration panel, the parties there, BSGR and Guinea,

4    agreed to stay the action.  There were public reports about

5    there being a settlement in principle.  As far as I know, that

6    case remains pending.  I don't believe it has been dismissed.

7    So there was no final adjudication from that court.  But the

8    Court has stayed our proceedings pending that proceeding.

9           While all of that was going on, there was a separate

10   action taking place in front of the LCIA and that's the Vale

11   action.  In that action Vale had sued BSGR claiming that Vale,

12   who was BSGR's partner in a joint venture to exploit the mining

13   rights, had been fraudulently induced or misrepresentations had

14   been made by BSGR to induce them into that arrangement.

15          Among other things, BSGR had represented that they did

16   not obtain their rights in Guinea via bribery or corruption.

17   So one of the issues in that arbitration was whether in fact

18   bribery or corruption had occurred.

19          Ultimately, the Vale arbitration or the LCIA

20   arbitration panel found in favor of Vale, found that bribery

21   and corruption had occurred and awarded Vale, I believe it was

22   $1.2 billion in damages, which, when you add interest and

23   feasible, is currently around $2 billion in damages.  That is

24   the proceeding that I believe in some form is currently before

25   your Honor.

1          In addition to those proceedings, there has been other

2    actions around the world, including various criminal

3    proceedings and investigations.  I am just going to highlight a

4    couple of them.

5          The first, your Honor, is in Florida there was an in

6    rem proceeding to recover property brought against Ms. Touré.

7    If you recall, Ms. Touré, I mentioned her before.  She was the

8    former wife of the former president of Guinea.  And after the

9    government fell in Guinea, she ultimately made her way to the

10   United States and was living in Jacksonville, Florida, and

11   there was an in rem proceeding brought against her to seize

12   certain property obtained illegally.  In the context of that

13   proceeding she stipulated to having had accepted these bribes

14   from BSGR to assist them in obtaining their mining rights.

15         Relatedly, an agent of BSGR, Frédéric Cilins, was

16   ultimately indicted and, I believe, pled guilty in a proceeding

17   in the United States as well for coming to the United States

18   and seeking to bribe Mamadie Touré or to pay her to destroy

19   evidence related to those bribery payments, including the

20   underlying contracts that she had in her possession related to

21   the payments she received from BSGR.  Those proceedings, I

22   believe, took place in 2007 and 2008, your Honor.

23         Most recently, there has been additional criminal

24   proceedings in Switzerland where three individuals associated

25   with BSGR have been prosecuted and convicted of the exact same

1    conduct, of bribing Ms. Touré to assist BSGR in obtaining its

2    mining rights.  That includes Mr. Steinmetz, Mr. Cilins, who

3    was the same individual who was previously prosecuted in the

4    United States, and a third individual associated with BSGR.  I

5    believe the name is Horemans.  A lot of the names are difficult

6    to pronounce in this case.

7          All of those proceedings directly go to the issue, and

8    we will talk about this in a minute, the issue of limited

9    discovery, which is what bribery occurred in this case.

10          I believe, your Honor, I've hit on all of the various

11   proceedings that have gone on or, in some cases, continue to go

12   on.  I'm happy to answer any questions that you may have.

13          THE COURT:  Thank you.  No.  I think that was a really

14   did overview.  We have been trying to put everything in context

15   as well and just make sure I understand and see where all the

16   potential facts are.

17          Now I am going to go back to procedure.  I understand

18   that there was some discovery at least proceeding before the

19   case was stayed, and I was wondering -- we can go plaintiff and

20   then defendant in the same order -- what your thoughts were on,

21   A, whether any of it is outstanding, and just generally what

22   the status is of pre-stay discovery.

23          MR. SOLOMON:  Your Honor, I think Mr. McCallen

24   articulated his client's narrative.  We saw in the judge's

25   opinion he has both narratives.

 1          With your permission, I would take a minute just to

 2     fill out the facts on our side of the narrative.  If your Honor

 3     doesn't feel you need them, then I will just move to answering

 4     your Honor's question.

 5          THE COURT:  Briefly.

 6          MR. SOLOMON:  Yes, briefly, your Honor.

 7          The president of Guinea, when the alleged bribe took

 8     place, was President Conté.  That was in 2008.

 9          In 2008, 2009, December 2008, a new president, Moussa

10     Dadis Camara, granted BSGR -- new president, so we are talking

11     about regimes, new president -- granted a permit to BSGR having

12     nothing to do with the prior regime.  And then in November of

13     2009, after spending the $160 million on that project, BSGR

14     then completed its feasibility study.

15          And then, in December of 2009, another regime, another

16     president ratified the convention, and the president at that

17     time was Konaté, with an aigu at the back.

18          And all of that then took place before Alpha Condé

19     became president in 2010, and it was President Condé's

20     conspiracy with George Soros that led to the threatened

21     extortion that led to the kangaroo tribunal.

22          We spend 50 or 60 paragraphs in our amended complaint

23     identifying and articulating all of the means that George Soros

24     used to corrupt that process.  He paid for it.  He controlled

25     the law firms who were creating the evidence that the tribunal

 1    then used.

 2         If you fast forward -- I just looked online.  I

 3    believe this president, Alpha Condé, remains the president.

 4    But the proceeding that I was talking about in 2020 was a

 5    judicial proceeding, not an administrative proceeding, and I

 6    think I had mentioned that before.  That, I think, clarifies

 7    the date that your Honor wanted.

 8         With respect to the LCIA, none of those findings that

 9    Mr. McCallen was talking about have anything to do with

10    anything after 2008.  Your Honor was clear.  All the subsequent

11    ratifications by all the subsequent governments occurred after

12    the only thing that the LCIA was interested in because in the

13    LCIA the issue was Vale versus BSGR.  The issue there related

14    to a representation before that partnership agreement joint

15    venture was entered into.  So the LCIA never addressed any of

16    the issues that actually have to do with our case, and that is

17    what took place after 2008.

18         If that's clear to your Honor, then what I want to say

19    is that the parties did exchange document demands, and there is

20    a lot of international discovery that is needed, and we were in

21    the process of doing a lot of that.

22         I will tell your Honor, very little documentary

23    discovery actually has taken place.  And if we are right, that

24    we should be focused on the three issues, then I think it's

25    fair to say that those issues are covered by the served

1    discovery, but there are a number of other issues that are also

2    covered by that discovery.  Thank you, your Honor.

3              THE COURT:  Thank you.

4              It's helpful for me to understand the background, and

5    I recognize that I am possibly a victim of be careful of what

6    you ask for because I really just did want to know how they all

7    fit in.  But as far as I understand, I am not deciding any of

8    the collateral estoppel issues in this case, so I don't really

9    need to hear the argument right now other than understanding

10   the different proceedings and, you know, which part of the

11   timeline or the chronology that they were aimed at that they

12   were examining.

13             Mr. McCallen, can you talk to me a little bit about

14   the status of what I'll call the old discovery and if the

15   parties have discussed how you want to proceed with the

16   document demands that have already been served.

17             MR. McCALLEN:  Sure, your Honor.

18             With regards to the status of discovery, I think that

19   Mr. Solomon has correctly described what has happened to date.

20   The parties served discovery requests on each other, served

21   responses and objections and began the process -- not began the

22   process.  Had substantial meet and confers regarding the scope

23   of the discovery back in what would have been, I think, 2017,

24   if my memory is correct.  And then the case was subsequently

25   stayed by Judge Keenan prior to any substantial document

1    productions taking place and before any depositions took place.

2         With regard to where we are now, I think while,

3    obviously, the parties serve requests, my view is that's all

4    out the window, frankly.  We now have an order from the Court,

5    which I know we will spend time discussing now, about what the

6    scope of discovery is.

7         I think in terms of how we move from here, I really

8    don't think there can be any dispute between the parties about

9    what the discovery that's been ordered by the Court is.  I

10   think we are going to have some disputes about what the

11   language means, which we will discuss about, but the scope of

12   discovery has been defined by the Court.

13        If I could, your Honor, I just want to respond very

14   quickly to Mr. Solomon's last comment before we went into this,

15   which is their theory of the case.  I know your Honor is not

16   going to hear the merits on this, so I am not going to belabor

17   the point.

18        But the reality of that is, plaintiffs' theory is to

19   try to put things from the bribery perspective into a smaller

20   and smaller box.  It's, oh, look, the government changed, so

21   all that really matters is what is after this period.

22        The reality is, we now have criminal courts in

23   Switzerland that have found that bribery occurred.  We have an

24   arbitration panel in the Vale case that's found that bribery

25   occurred.  There has been admissions of guilt in the U.S. by

1   Ms. Touré.  Mr. Cilins was convicted for trying to get

2   Ms. Touré to destroy documents in the U.S.

3          I know that the issue of collateral estoppel is not

4   before your Honor, but I just wanted to put that on the record

5   in response to Mr. Solomon's last comment.

6          THE COURT:  You all think that we are going to be

7   talking fairly extensively about the scope of discovery, but

8   here is the problem I have.

9          Normally, when I have an initial discovery conference

10  or initial discovery status conference, whether it's a newly

11  filed case where anything and everything is open for discovery,

12  or something like this, where there is a limited scope of what

13  the discovery is going to be, we usually would have had a 26(f)

14  report and case management plan to discuss.  I'm wondering,

15  other than talking about what Judge Keenan's three limited

16  topics actually mean, whether you have had any meaningful meet

17  and confers since Judge Keenan issued his order to talk about

18  how you intend to or how you would like to proceed with

19  discovery.

20         One of the things that I am somewhat concerned about

21  is that there were letters rogatory and third-party discovery

22  served in 2017.  I'm wondering, rather than start back at

23  square one, what progress or whether you can agree to use or

24  limit some of the discovery that you have already done some

25  work on so that you are not starting from scratch.  At the same

1    time, if you can agree, then we will maybe start from scratch.

2    But I wanted to hear if you had any discussions about this and

3    if there are any areas where you can agree, any areas that you

4    do agree on.

5         MR. SOLOMON:  Your Honor, I think I can address some

6    of that.

7         First, with respect to third parties, to the extent

8    that we can resurrect some of those letters rogatory and either

9    expand or narrow them, I hope that is going to save both time

10   and money.  We are quite amenable to doing that.  I can't

11   imagine that there would be an objection to that, unless some

12   third party has an objection to that.

13        We also did have a meet and confer about the scope of

14   discovery, and the reason we presented our three pages

15   collectively to your Honor the way we did is because from

16   plaintiffs' perspective we see the judge articulated a couple

17   of different times the three issues.

18        To our way of thinking, they are very straightforward.

19   What I think the judge did is, he took the narrative that the

20   defendants gave and the basis which they said they could get

21   summary judgment, and he wasn't agreeable to that.

22        He then took our narrative on those same issues; not

23   on other issues, but on those same issues.  That is, our

24   narrative that it was Mr. George Soros who was responsible for

25   the termination of the mining rights that he importuned the

1  government there, that it was a process that he controlled, and

2  he put them into the three issues.

3      So when we spoke to defendants, they said, well, we

4  are going to want the evidence that is in the other proceedings

5  about the issue of bribery.  I think at one point they may have

6  said, we want everything in those proceedings, and that

7  obviously is too broad because those proceedings went beyond

8  the issue of bribery.  To the extent those other proceedings

9  involved bribery, and there is already evidence collected, then

10  we are not going to object.  To the extent that we control

11  those, we are not going to object to producing them.

12      I then, in turn, asked defendants' counsel, OK.  But

13  Mr. Soros also has and his agents also have relevant discovery.

14  At least it's not impossible to believe that he does.  These

15  are issues that go to both what happened with respect to

16  Mamadie Touré, but, also, were the mining rights actually

17  terminated because of that alleged bribery, which, of course,

18  includes our issue that they were not terminated because of the

19  alleged bribery.  They were terminated because of George Soros

20  and his agents and carrying through on a threat when they

21  didn't extort the money from BSGR.

22      So it was at that point that Mr. McCallen said,

23  though, they don't think they have to give any discovery at

24  all, and he says that in his portion of the letter, right.

25  They say they have no information related to the bribery of

1    Mamadie Touré.  It's on page 3 of the letter to your Honor.

2    And they say that the issue concerning termination of the

3    mining rights, because of the bribery, he said that resides in

4    Guinea with Guinea officials and only Guinea officials.

5            And I think this is a big issue, from our perspective.

6    I think this is completely inconsistent with what Judge Keenan

7    said.  And I think the guidance from your Honor that we are not

8    going to impose artificial limitations on Judge Keenan's words,

9    I think, would help us move forward to create the case

10   management order.  Thank you.

11           THE COURT:  Mr. McCallen, can you help clarify,

12   please.

13           MR. McCALLEN:  Sure.  Thank you, your Honor.

14           THE COURT:  Let me interrupt you for a minute.  I

15   notice that your colleague is on the line.  To the extent that

16   Ms. Antonello is also able to speak to these matters, I didn't

17   mean to shut her out or to silence her.  I just realized that

18   I'm turning to you because you spoke first.  To the extent that

19   Ms. Antonello wishes or needs to speak, I am in no way

20   suggesting that you are the only one who should be speaking.  I

21   apologize.

22           MR. McCALLEN:  Of course, your Honor.  Thank you.

23           I think this began with your Honor asking a question

24   about nonparty discovery.  Let me just briefly answer that

25   before I address Mr. Solomon's points.

 1          We are in agreement that there was nonparty discovery

 2     served, including international discovery, and both parties

 3     have discussed this in our meet and confer, my recollection is.

 4     And I think we are in agreement, as Mr. Solomon said, to the

 5     extent we can use that prior served discovery to not have to

 6     reinvent the wheel on that front, that's something that the

 7     parties, I think, both are amenable to doing.

 8          Let me now speak to the broader issue which

 9     Mr. Solomon got to in his presentation.

10          Your Honor, as I said before, and as everybody

11     recognizes, the three categories of discovery are set forth in

12     Judge Keenan's order.  Each of the categories relates to

13     bribery and the role bribery played in Guinea's decision to

14     terminate the mining rights.

15          The issue we have here is that plaintiffs are trying

16     to stretch the limited discovery that Judge Keenan ordered to

17     include discovery into their claims of tortious interference,

18     conspiracy, and fraud.  I don't think there is a dispute,

19     Mr. Solomon will correct me if I'm wrong, but I don't think

20     they are claiming that we have any documents on categories 1

21     and 2., category 1 being whether plaintiffs bribed Ms. Touré

22     and category 2, whether that bribery was connected to

23     plaintiffs' acquisition of mining rights included in the

24     convention.  That information resides with plaintiffs and other

25     nonparties.

1              What plaintiffs do is, they latch onto issue 3.  I

2    think we should look at what issue 3 says because Judge Keenan,

3    I think, was careful in what he said, and the words matter.

4    Issue 3 says whether the Guinean government was permitted to

5    and did terminate plaintiffs' mining rights because of

6    plaintiffs' bribery of Mamadie Touré.

7              Now, there is kind of two pieces to this.

8              The first relates to the authority of the Guinean

9    government, and I think, your Honor, we talked about this

10   briefly in our letter.  That might involve expert testimony or

11   other expert opinions related to that issue, legal opinions of

12   that nature.  I think plaintiffs are going to challenge and say

13   that Guinea didn't have the authority to do that.  So I think

14   that's going to be an issue of Guinean law.

15             Putting that aside, the latter part of this would be

16   whether the Guinean government terminated plaintiffs' mining

17   rights because of plaintiffs' bribery of Mamadie Touré.  What

18   they are arguing today and what they argued in their filing

19   this week was when Judge Keenan wrote those words, he didn't

20   just mean those words, whether Guinea terminated plaintiffs'

21   mining rights because of plaintiffs' bribery of Mamadie Touré,

22   but it means any other potential reason or cause that Guinea

23   terminated those rights.  In other words, we should conduct

24   discovery into plaintiffs' theories as to why they believe the

25   Guinean government terminated those rights, i.e., all of their

claims about tortious interference, conspiracy, and fraud.

When you look at their letter, I think this is very telling, their primary support for this position -- this is at the very top of their letter in the second sentence -- when I say their letter, I am referring to their position in the parties' joint letter from earlier this week. They quote Judge Keenan's order and they say, plaintiffs seeks to hold defendants liable for their antecedent and allegedly deliberate acts which plaintiffs assert. Then they put in bold, improperly procured official action by the Guinean government.

The sentence that they are quoting from, your Honor, that comes from section B of Judge Keenan's order where he is discussing the act-of-state doctrine. Mr. Solomon said in his initial presentation, the act-of-state doctrine has been decided. We respectfully disagree with the Court's opinion, but I agree that it's been decided for purposes of the motion to dismiss.

So if there is going to be any discovery on act of state or any issues related to act of state, that's for later. That's not for the limited discovery now. What the Court found with respect to the act of state is that the issue is not whether the acts of Guinea are valid, but whether those acts in fact occurred.

Where the Court does discuss what the limited discovery is is in section C, which is collateral estoppel.

1          Now, your Honor, defendants had argued in their motion

2     that plaintiffs were estopped from arguing in this case that no

3     bribery occurred because the LCIA tribunal had found that such

4     bribery had occurred in a proceeding that they had the full and

5     fair opportunity to participate in and did.

6          In the context of that motion in front of Judge

7     Keenan, we had attached documents to our motion, including

8     documents from the civil forfeiture action in Florida related

9     to Mamadie Touré.  The Court specifically discusses those on

10    page 24 of its decision, and it talks about the in rem

11    complaint.  And the Court says, which is true, which is that in

12    the in rem complaint in that action, it says that Ms. Touré

13    accepted bribes from an unnamed company.

14          I think it's pretty clear that, among other things,

15    the Court wants discovery on whether BSGR is in fact that

16    unnamed company before it can rule on our collateral estoppel

17    motion.

18          But if plaintiffs have their way, your Honor, and

19    category 3 is converted into discovery of defendants on what

20    they call in their letter causation issues, the limited

21    discovery is going to become full merit discovery, and I think

22    that's clear that is not what Judge Keenan contemplated.

23          If Judge Keenan had wanted discovery into all of

24    plaintiffs' theories about defendants' conduct, that they tried

25    to bribe Guinea, that they tried to bribe whoever, he would

1    have said that.  He could have easily framed category 3 as

2    discovery into the cause of Guinea's position to terminate the

3    mining rights.  But he didn't do that.

4          He said, for category 3, that it's whether the Guinean

5    government was permitted to and did terminate the mining rights

6    because of plaintiffs' bribery of Mamadie Touré.  All of Judge

7    Keenan's questions are focused on bribery, your Honor, did it

8    occur and what was the purpose and were the rights terminated

9    because of that bribery.  Discovery into plaintiffs' theories

10   about tortious interference, fraud, and conspiracy will come at

11   a later time.

12         That is the issue that Mr. Solomon was raising in his

13   point and I think, your Honor, as a result of that, that is why

14   we believe that discovery at this point with regard to issues 1

15   and 2 are going to be directed at plaintiffs and their agents

16   and other third parties who have documents about the underlying

17   bribery that has been found to have occurred by several courts,

18   including the Swiss criminal court.

19         With regard to issue 3, that's a question for Guinea,

20   to determine that they did terminate the rights because of the

21   bribery.

22         Thank you, your Honor.

23         MR. SOLOMON:  Your Honor, may I respond briefly?

24         THE COURT:  No.  Because we don't have a case

25   management plan.  We don't have a 26(f) report.  I'm not going

1    to decide the scope of discovery in a vacuum.

2           Here is what we are going to do.  I direct that the

3    parties meet and confer and file a joint proposed 26(f).  I was

4    going to say by February 12, but that is Lunar New Year, so you

5    get one day less.  You are going to file it by close of

6    business February 11, a 26(f) report.

7           The 26(f) report will discuss what agreement you have

8    on limiting the third-party discovery and letters rogatory.  I

9    think Mr. Solomon used the word resurrect.  But let's see what

10   you can agree on there.  And then, also, you will talk about

11   whether you need initial disclosures on these three issues.

12          And I am going to have you propound new discovery

13   requests on, party discovery requests, because I don't want to

14   be reworking what my predecessor did with your prior discovery

15   requests that were much broader.  Let's have you focus on

16   propounding new written discovery, setting a timeline for that,

17   limited to these three issues that Judge Keenan articulated.

18          I am certain, given what you have said today, that

19   there are going to be disputes about the discovery that is

20   going to be sought and particularly disputes over what

21   plaintiffs are going to be seeking from defendant on issue No.

22   3.  But I am not going to decide this in a vacuum.

23          I will tell you, though, that I tend to agree that,

24   reading the plain language of issue 3, as articulated by Judge

25   Keenan, as to whether the Guinean government was permitted to

1  and did terminate plaintiffs' mining rights because of

2  plaintiffs' bribery of Mamadie Touré.

3        I think the first part of that issue, whether the

4  government was permitted to and whether they did relate to the

5  power of the Guinean government and its act.  And I'm not sure

6  how anything that Mr. Soros and his related entities did with

7  the government could change the powers or the authority of the

8  government to act the way that it did and whether it did indeed

9  terminate mining rights because of bribery.  I just am not

10 seeing it.

11       However, I am going to let you and your, I'm sure,

12 vast teams of associates work on drafting discovery requests

13 that fall within this limited scope.  I'm sure there will be

14 disputes, and at that point I think I'll take a directed

15 approach toward looking at the discovery requests themselves.

16 I want to let you at least have your shot.

17       I will, however, add that unnecessarily multiplying

18 the proceedings and litigating over issues that should be

19 fairly clear can result in cost shifting for discovery motions

20 under Rule 37.  The Court also has other tools in its toolbox

21 to make sure that fishing expeditions don't happen; and that if

22 they do, or if there is unnecessary litigation about fishing

23 expeditions, that the party responsible for multiplying the

24 proceedings ends up paying the cost.  But I am not going to

25 decide this before seeing what you have, what you are able to

1  do in good faith working together, and seeing what you are able

2  to propound on each other.

3        I would like to see a case management plan by February

4  11 and a joint status letter by close of business February 26

5  outlining the disputes that may or may not have arisen by then.

6  I will probably be able to discern your disputes in your 26(f)

7  report.  But in the event that those are not quite ripe or

8  aren't quite clear yet, I will see them in the February 26

9  status letter.  I am not going to set another conference date

10  until I see your submissions.

11        And I send you off with some hope that you are able to

12  work together to resolve some of these issues.  I think Judge

13  Keenan was pretty clear in his order and in the oral argument

14  transcript what he thought should happen.  I am going to review

15  them again myself as well and get even more familiar with your

16  case.

17        I am also going to direct the party to order a copy of

18  the transcript and share the costs.

19        Is there anything else that we need to address today?

20        MR. SOLOMON:  The two items of clarification, just on

21  the schedule, Judge Keenan wanted the case management order by

22  the 25th.  As I'm understanding it, what we will be submitting

23  to your Honor will satisfy that directive?

24        THE COURT:  Yep.  I'm moving your date up by two

25  weeks.

1              MR. SOLOMON:  That's helpful.  Thank you.

2              In terms of discovery that's not disputed, there is no

3      reason that can't get started, I assume.

4              THE COURT:  Yes.  Exactly.  If you agree on something,

5      by all means, go for it.

6              MR. SOLOMON:  Thank you very much.  Nothing else from

7      the plaintiff.

8              THE COURT:  Anything from defendant?

9              MR. McCALLEN:  No, your Honor.  Thank you.

10             THE COURT:  Thank you very much.

11             Thank you very much, Mr. Greenblum.

12             We are adjourned.

13             (Adjourned)

14

15

16

17

18

19

20

21

22

23

24

25