# EXHIBIT G

```
                                                    Page 1

 1    UNITED STATES BANKRUPTCY COURT

 2    SOUTHERN DISTRICT OF NEW YORK

 3    Case No. 19-11845-shl

 4    - - - - - - - - - - - - - - - - - - - - - - - - - - x

 5    In the Matter of:

 6

 7    BSG RESOURCES LIMITED (in administration) and WILLIAM

 8    CALLEWAERT and MALCOM COHEN, as JOINT ADMINISTRATORS,

 9

10          Debtors.

11    - - - - - - - - - - - - - - - - - - - - - - - - - - x

12

13                   United States Bankruptcy Court

14                   One Bowling Green

15                   New York, NY  10004

16

17                   October 3, 2019

18                   11:21 AM

19

20

21    B E F O R E :

22    HON SEAN LANE

23    U.S. BANKRUPTCY JUDGE

24

25    ECRO:  F. FERGUSON
```

Page 2

```
 1    HEARING re Status Conference

 2

 3    HEARING re Doc. #45 Letter Filed On Behalf Of William

 4    Callewaert And Malcom Cohen, As Joint Administrators

 5

 6    HEARING re Doc. #46 Letter In Response Filed On Behalf Of

 7    Vale S.A.

 8

 9    HEARING Re Doc. #47 Letter Seeking Court's Approval Of A

10    Protocol To Guide Disclosure Of Personal Information Under

11    The General Data Protection Regulation In Discovery Filed On

12    Behalf Of Vale S.A.

13

14    HEARING re Doc. #48 Letter In Response To The Letter Seeking

15    Court's Approval Of A Protocol To Guide Disclosure Of

16    Personal Information Under The General Data Protection

17    Regulation In Discovery, Filed On Behalf Of William

18    Callewaert and Malcom Cohen, as Joint Administrators

19

20    HEARING re Doc. #50 Letter In Response To Joint

21    Administrators Letter Filed On Behalf Of Vale S.A.

22

23    HEARING re Doc. #50 Letter In Response To Joint

24    Administrators Letter Filed On Behalf Of Vale S.A.

25
```

1    HEARING re Doc. #53 Letter In Response Filed On Behalf Of

2    William Callewaert And Malcom Cohen, As Joint Administrators

3

4    HEARING re Doc. #54 Letter In Response Filed On Behalf Of

5    William Callewaert and Malcom Cohen, as Joint Administrators

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25    Transcribed by:  Sonya Ledanski Hyde

Page 4

```
 1   A P P E A R A N C E S :

 2

 3   CLEARY GOTTLIEB STEEN & HAMILTON LLP

 4         Attorneys for Vale

 5         One Liberty Plaza

 6         New York, NY 10006

 7

 8   BY:   JEFFREY A. ROSENTHAL

 9         LISA M. SCHWEITZER

10         EMILY J. BALTER

11

12   DUANE MORRIS LLP

13         Attorneys for the Joint Administrators

14         1540 Broadway

15         New York, NY 10036

16

17   BY:   FREDERICK D. HYMAN

18         JARRET HITCHINGS

19

20   ALSO PRESENT TELEPHONICALLY:

21

22   WILLIAM CALLEWAERT

23   MALCOLM COHEN

24   PATRICK J. HOLOHAN

25
```

Page 5

```
 1                    P R O C E E D I N G S

 2                    P R O C E E D I N G S

 3              THE COURT:  We're here for BSG Resources Limited,

 4    a Chapter 15 case.  Let me get appearances from counsel.

 5              MR. HYMAN:  Good morning, Your Honor.  Fred Hyman

 6    from Duane Morris on behalf of the joint administrators.  I

 7    have with me my colleague, Jarret Hitchings.  I also have in

 8    the courtroom, Your Honor, Stephen Peters, who joined us

 9    last time, who is a forensic accounting partner at the firm

10    of BDO.

11              MR. ROSENTHAL:  Good morning, Your Honor.  Jeffrey

12    Rosenthal of Cleary Gottlieb on behalf of Vale.  I'm with my

13    partner, Lisa Schweitzer and my associates, Emily Balter and

14    Sam Levander.

15              THE COURT:  All right.  Good morning to you all.

16    So let me just set the stage.  So we're here in connection

17    with a variety of filings.  A letter -- this is not

18    exclusive.  On the one hand, we had the motion; that is, the

19    motion was filed regarding discovery, seeking a protective

20    order, responses to that, a hearing that took place July

21    30th.  There has been numerous proceedings dealing with

22    discovery since.  We got together August 29th for a

23    conference, and there's a transcript of that.

24              There are letters on August 27th, September 9th,

25    September 12th, September 13th, September 16th, September
```

Page 6

1    17th, September 18th, September 25th that fill out the

2    ongoing discussions back and forth.  And just for brevity in

3    the record, I'm not going to identify each -- each -- who

4    sent each letter and the extent of the letters.  I think

5    they're all in the docket.  So at a certain point, I think

6    they are the docket.  So I think one's 45, one's 46, one's

7    47, one's 48, 50, 54, 58.

8            And then we had an amended notice of hearing that

9    is on Docket 60 that set today as a hearing on document

10   production and GDPR issues.  We really are on everything

11   that's been filed back and forth, and that actual item ended

12   notice of hearing actually identifies the various things

13   that had been filed, I think gets all of them, but so many

14   filings, it's hard tell who was.

15           So I have read everything, and we have a variety

16   of matters to talk about.  So the one thing I will not do

17   here -- I will not do today is I will not leave here without

18   an order, because the lack of an order has just led to

19   further mischief and lack of progress, and I'm not trusting

20   anybody.  I will draft the order myself if necessary and

21   without input from anybody, but I'm tired of this.

22           It just -- I've never seen a case with these kind

23   of discovery problems in my nine years plus on the bench.

24   And in a Chapter 15 case, where COMI is clearly an issue and

25   what people are doing and where they're doing it is so

Page 7

1    clearly an issue, I have just -- it boggles the mind.

2            So with that said, since we have a requesting

3    party and essentially an ongoing opposing party to

4    discovery, I think it makes sense from hear from Vale, who

5    is a creditor of BSGR, as they call it.  I think I've been

6    calling it BSG, but they're really the same thing and just

7    occasionally, the different terms pop up in the papers.

8            So the first question is whether to do this

9    seriatim issue-by-issue.  I suspect that that's the way to

10   go, because if we go through everything, who will remember

11   what we talked about at the beginning by the time we get to

12   the end.

13           MR. ROSENTHAL:  I think that makes sense, Your

14   Honor.  I had thought that just setting the stage for

15   ourselves, I would just lay out the issues that we expected

16   to cover today.  We thought we would just start with an

17   update on the production for Your Honor.

18           THE COURT:  All right, that will be helpful.  I

19   know that's one of the issues.

20           MR. ROSENTHAL:  And then we have three issues in

21   dispute regarding sources of production: one has been Beny

22   Steinmetz; two is from officers and directors and Onyx,

23   their back office; and three is the current directors,

24   including Mr. Cramer.  And then last, we have the GDPR

25   issues, which my colleague, Ms. Balter is going to address.

1           THE COURT:  All right.  I think that's pretty much

2      how I had outlined it in my own preparation for today.

3           MR. ROSENTHAL:  So with regard to the production

4      update, Your Honor.  One of the letters that you had cited

5      was the August 27th letter by the joint administrators'

6      counsel to the Court.  It set the stage for the Court

7      conference several days later, in which the joint

8      administrators laid out kind of a tri-part type of schedule,

9      right.

10          So they had 320 documents that they were going to

11     be producing the following week.  They had 37,730 documents

12     that would be reviewed, produced on a rolling basis with a

13     target competition of September 27th, and the remainder

14     would be reviewed with -- produced on a rolling basis with a

15     target completion of October 26th.

16          We did get the 320 documents a couple of weeks

17     later than we were told we would get it, but we did get it.

18     There were actually 211 unique documents; the rest were

19     duplicates.

20          With regard to the 37,730 that would be produced

21     on a rolling basis with a competition of September 27th,

22     today is October 3rd, we haven't seen one document.

23     Needless to say, therefore, the documents that the rolling

24     completion would be done by October 26th, we have not seen a

25     document either.  We have agreed -- and this kind of helped

Page 9

1    them release the first batch of 320 -- we said that until

2    the Court addresses the GDPR protocol, we'll accept

3    provisionally their protocol so that that's not an excuse to

4    delay any productions.  They then released the 320.  We've

5    heard no explanation at all, and in the letters to the

6    Court, there's been no explanation for the lack of those.

7              And unless the Court wants to address that before

8    the three issues in dispute.

9              THE COURT:  Let's deal with the three issues in

10   dispute, and then we'll loop back to the schedule.

11             MR. ROSENTHAL:  So with regard to the three

12   issues, Your Honor, the first one is Beny Steinmetz, you

13   know, the number one, the big boss, the beneficial owner of

14   BSGR.  And the Court made a lot of statements that was

15   really spot on to the law back at the last conference, in

16   which Your Honor said, for example, at Page 44, if somebody

17   is conducting business and enterprise through personal

18   email, you can just read the headlines in the "New York

19   Times" to figure out it's not protected as personal email.

20   And I will -- and nobody's going to cite anything to me for

21   that.

22             If he's conducted business and he's conducted

23   business and wrote emails, and it sounds like there are

24   emails, then there are emails and is conducting business,

25   then he needs to turn over what needs to be turned over.

Page 10

1    And if he's a principal, he's part of the Debtor.

2            So the Court posed several questions.  We provided

3    you with some law to back up what Your Honor was saying to

4    begin with.  But Your Honor was really focused on the

5    factual issues, because the law is so well settled here in

6    the Southern District.  And the factual issues are: number

7    one, is he the beneficial owner, because if he is, that's

8    the end of the story; and number two, if he's not the

9    beneficial owner, was he out there negotiating the

10   settlement with Guinea?  Because then if he did that, that's

11   an issue relating to COMI and acting as an agent for the

12   company.  It's also subject to discovery here.

13           So we addressed those factual issues.  And,

14   frankly, Your Honor, there's no dispute.  We set forth the

15   evidence that we have, that Beny Steinmetz is the beneficial

16   owner, through Nysco the parent, and then that's owned by

17   the Balda Foundation, which is his family's trust to say

18   that he's the beneficial owner.  There's been no engagement

19   or dispute on that issue in the papers.

20           And with regard to negotiation, we got back the

21   same response that Your Honor's been hearing.  Well,

22   actually, the story has changed.  We told Your Honor, since

23   June, that Mr. Steinmetz was the principal negotiator the

24   settlement with Guinea; that was denied repeatedly.  In the

25   latest letter, the joint administrators have acknowledged

```
 1    now that Mr. Steinmetz did negotiate it, but stand on the

 2    idea that they still have final approval authority.

 3              THE COURT:  Well, I was dismayed to see the issue

 4    sort of resurface at the end of the letters back and forth.

 5    The letters initially seemed to move on to some details

 6    about things that we hadn't completely nailed down.  You

 7    could argue that they had been discussed in sort of general

 8    principals, but the devil's always in -- often in the

 9    details.

10              But I was dismayed to see his questions about

11    what's appropriate for him or not still being raised, given

12    the facts that I have.  So perhaps, I mean, if there's

13    anything else that you briefly wanted to add, but I'd like

14    to hear from the foreign representative on that.

15              MR. ROSENTHAL:  Well, I mean, I would just say

16    that the law is quite clear on this, Your Honor.  And I

17    think all the Court needs to do is read the Royal Park

18    decision, in which there's five different reasons given by

19    the Court there that all apply here as to why discovery of

20    Mr. Steinmetz is appropriate.

21              And critically, what the joint administrators have

22    done is they have looked at quote, literal control -- do

23    they literally have the ability to force him to do this --

24    as opposed to the test that is in the Southern District and

25    the Second Circuit, which is practical ability.  And the
```

```
 1    Court goes through what practical ability is, and it's clear
 2    they have it here.  Here is -- there's a financial interest;
 3    that alone is practical ability.  He was their agent; that
 4    alone is practical ability.
 5            The other thing, Your Honor, that isn't set forth
 6    in the letters, but I think is very relevant to this, is the
 7    Royal Park court talks about the fact that the subjects of
 8    the requested discovery had participated in prior discovery
 9    when it suited the party that was resisting it, and we have
10    that here.
11            Mr. Steinmetz and virtually everybody we're
12    seeking discovery from here produced documents in connection
13    with the arbitration, submitted witness testimony in the
14    LCIA arbitration in favor of BSGR, submitted witness
15    testimony, and came to Paris and testified on behalf of BSGR
16    in the ICSID arbitration.
17            And, you know, we even have and we can hand up to
18    the Court two items: one is an email from Mr. Steinmetz
19    confirming that he checked his files in connection with the
20    LCIA arbitration and the documents requests; and we have a
21    list of all of the custodians that were checked in the LCIA
22    that BSGR's counsel, now the joint administrators' counsel,
23    prepared for us and gave us.  Dag Cramer, we checked his
24    phone, we checked his tablet, we checked his home drive.
25    Beny Steinmetz, we checked his BlackBerry, we checked his
```

 1    backup data.

 2              So, you know, the notion that they now don't have

 3    a practical ability to obtain this is preposterous, and they

 4    certainly have not met their burden of proof of avoid a

 5    court order here.  And that's all I have to say on Mr.

 6    Steinmetz for now.  I'm happy to hand up these two documents

 7    that I just referred to.

 8              THE COURT:  Good.  Just make sure they're shared

 9    with the other side.  Thank you.  All right.  Let me hear

10    from the foreign administrators.

11              MR. HYMAN:  Good afternoon, Your Honor.  If you

12    wouldn't mind, we'd like an opportunity to address issues

13    relating to the current status of production and what we

14    anticipate going forward.  We're hopeful that Mr. Peters

15    could present to Your Honor, since he is on the ground and

16    is overseeing --

17              THE COURT:  I want to deal with Mr. Steinmetz

18    first.

19              MR. HYMAN:  Sure, Your Honor.  Your Honor, the

20    context of discovery shouldn't relate to COMI.  We

21    understand the order from this Court requiring the joint

22    administrators and BSGR to seek documents back from the date

23    of 2014.  Certainly, COMI itself is judged as either the

24    date of the joint administration or the date that the

25    Chapter 15 was filed.  The documents that we were just

Page 14

```
 1    handed all predate the issues relating to either one of
 2    those dates.
 3              THE COURT:  Well, they're submitting them to show
 4    his involvement in BSG.  So -- and I've yet to hear any
 5    dispute of the core facts about him being the guy, for lack
 6    of a more legal term.  And the foreign representatives were
 7    appointed and that's nice, but they don't control him,
 8    pretty clearly if the allegations in the factual proffers
 9    that have been given to me, are evidence in terms of what
10    he's doing or not doing on behalf of BSG, which is, after
11    all, named for him.
12              And so, without any dispute about any of those
13    facts, why are we still talking about this having talked
14    about this at numerous prior hearings?
15              MR. HYMAN:  There is no dispute as to what is in
16    press reports.  The joint administrators themselves do not
17    know if Beny Steinmetz and his family ultimately own and
18    control Balda, but we have no reason -- they have no reason
19    to believe that he doesn't.
20              THE COURT:  That actually doesn't even necessarily
21    matter if he's out doing things for BSG holding himself out
22    and negotiating deals, which is all relevant to COMI in
23    terms of him being a central figure in the ongoing business.
24    So he could actually have sold every bit of his beneficial
25    interest.  If he is -- if he is holding himself out and
```

Page 15

```
1    negotiating deals on behalf of BSG, that's just another way

2    to get to the same place.  So what is it that you are not

3    willing to do in connection with producing things relating

4    to Mr. Steinmetz?

5           MR. HYMAN:  The joint administrators do not have

6    control over Mr. Steinmetz in order to require him to

7    produce documents to this Court; they simply don't.

8           THE COURT:  So when this came up last -- the

9    problem with this, with the discussions we've been having

10   about this is, it's -- we address one thing and then

11   something else -- it's a variation on a theme -- comes up.

12   So am I understanding that you now concede, after having

13   talked about it numerous times, that Mr. Steinmetz is fair

14   game for purposes of subject matter of what he was doing or

15   not doing for purposes of the COMI in this Chapter 15?

16          MR. HYMAN:  I think that what we've provided, Your

17   Honor, in connection with our most recent letter was a

18   Declaration of William Callewaert, who happens to be on the

19   phone today listening in.  He's one of the joint

20   administrators located in Guernsey.

21          THE COURT:  Can I get an answer to my question?

22          MR. HYMAN:  Yes.  What we are focused on, Your

23   Honor, is what has happened following the administration

24   when the joint administrators were appointed, at which time,

25   nobody other than the joint administrators had any authority
```

1    to bind BSGR, nor to act as agent for BSGR.

2            THE COURT:  Okay.  I have heard this argument

3    numerous times, and I think I have overruled this argument

4    numerous times, saying that the foreign administrators can

5    say what they want to say in terms of administration in

6    Guernsey and in terms of getting Court approval in Guernsey

7    to act.  That clearly may or may not have any effect on what

8    Mr. Steinmetz apparently is doing in terms of negotiating

9    settlement agreements.

10           We talked about this in detail last time.  And you

11   said, but those settlement agreements can't get ultimately

12   approved without Court approval in Guernsey and that's the

13   foreign administrators job.  That's fine.  That doesn't

14   change the fact that he's involved up to his eyeballs in the

15   business of BSG.

16           So unless you have something else, I'm not looking

17   for a concession anymore.  I will just tell you, I am making

18   a ruling and it will be memorialized in an order that Mr.

19   Steinmetz, anything he has done is fair game for purposes of

20   determining COMI.  And COMI tells the relevant times

21   periods.  There's plenty of cases on that.  We'll get to

22   that.

23           But we still keep talking about the foreign

24   representatives versus Mr. Steinmetz, and he can sort of do

25   his thing, but they have the ultimate authority.  It doesn't

1    matter for purposes of COMI.  It is not a basis to restrict

2    discovery.

3            MR. HYMAN:  But it does, Your Honor, if it's COMI

4    of BSGR at the time that the joint administration was -- it

5    was connected.

6            THE COURT:  The time period for COMI is a

7    different issue, right, and I have zero briefing on that,

8    despite the voluminous things that I have here.  And this,

9    again, goes to the whack-a-mole nature of what we've had

10   with discovery.  We get through one issue and then views

11   shift, and then we go to another issue and then views shift,

12   and then we end up talking about other issues.

13           So now we're talking about COMI and timeframe.

14   I've dealt with that plenty.  I'm not alone in this

15   courthouse.  You can look, there's plenty of opinions to

16   talk about the relevant time for considering COMI.  What I'm

17   saying is that I am overruling your objection to Mr.

18   Steinmetz saying he's not -- discovery relating to him and

19   his actions is not relevant.  COMI and the cases in this

20   jurisdiction tell us what time period is relevant.  It is

21   what it is what it is.

22           What I'm saying is that I am overruling your

23   objection as to Mr. Steinmetz and his involvement and,

24   therefore, the appropriateness of discovery as to what he

25   has been doing on behalf of BSG.

Page 18

1          MR. HYMAN:  And to be clear, because maybe I

2    wasn't.  I don't think, and I know that we aren't contesting

3    -- or the joint administrators are not contesting that

4    whether Beny Steinmetz was out purporting to represent BSGR

5    and other entities is not relevant for Your Honor's

6    consideration in terms of COMI.

7          THE COURT:  Well, it doesn't matter at this point.

8    I asked you whether you conceded that.  I couldn't get an

9    answer.  I've now made a ruling.  So the ruling that will be

10   memor- -- and we're going to keep track of these -- that

11   will be memorialized in the order is that discovery relating

12   to Mr. Steinmetz's activities on behalf of the Debtors are

13   relevant, period full stop, for COMI.

14          All right.  So what else do we need to talk about

15   in connection with Mr. Steinmetz?

16          MR. HYMAN:  Can I just clarify that for one

17   moment?

18          THE COURT:  No, because it's a ruling, and it's

19   not your ruling, so you don't need to clarify it.  What else

20   do you have?

21          MR. HYMAN:  Is the -- can I ask if the ruling

22   requires the joint administrators to produce documents that

23   Beny Steinmetz personally has?

24          THE COURT:  It -- okay, so now we're moving onto

25   the issue of control --

1        MR. HYMAN:  Yes.

2        THE COURT:  -- which is a separate issue and

3  separately briefed.  So the rules about control -- and

4  that's what's frustrating about this ongoing discovery

5  dispute that we've been talking about for months -- is I'm

6  only applying well-established rules, right?  So the rules

7  about COMI and timing; well established.  The rules about

8  what's fair game when somebody's acting on behalf of a

9  corporation and/or the beneficial owner; well established.

10     The rules about control are equally well

11  established.  And I have one of your articles sitting on my

12  library that talk about them, and they're 25 years old and

13  the law hasn't really changed all that much.  So if they

14  have an ability to obtain those documents through the

15  exercise of their positions  -- and so, you know, I'm going

16  to flummox the actual standard, but it's all the papers.

17     So if they have the ability as a legal matter and

18  possession, custody or control.  And what's normally ignored

19  by folks is control.  You may not have it, but you have the

20  ability to get it and ask for it; that is control.  And so,

21  I can deal with that in more detail if people need, but,

22  again, I'm not reinventing the wheel.  I'm not issuing any

23  sort of decisions on an issue that is unclear out there in

24  the law.  It's -- this horse has been beaten to death in so

25  many opinions, I can scarcely count them.

```
 1              So I'm not going to rely on what I've been hearing
 2      thus far, which is a more myopic view of what the foreign
 3      representatives have.  So if they have it sitting in their
 4      office, that is not pro-extensive with possession, custody
 5      or control for purposes of producing documents in this
 6      Chapter 15.
 7              The other problem I have with all of this is that
 8      you need to reach your burden of proof for purposes of
 9      getting recognition.  So the other way this goes is if you
10      don't produce things, and there's plenty of stuff that they
11      can raise and say we have every reason to believe X, Y and
12      Z, they haven't met their burden.  You say, well, we don't
13      have this stuff, we don't really know; you're not going to
14      satisfy the burden for recognition.
15              I've never seen a case that was filed where there
16      was such a desire to not move forward with recognition.  So
17      that's the other problem you're ultimately going to face, is
18      your ability to satisfy your burden for proving recognition,
19      which is, again, well established and applicable.  There's
20      tons of decisions, so I won't beat that horse to death.
21              So is there anything specifically on possession,
22      custody or control that we  need to address here today?
23              MR. HYMAN:  All right.  If your ruling is as it
24      stood, Your Honor, I don't believe that there is, but I
25      think that we will take Your Honor's ruling to heart.  There
```

```
 1    has never, notwithstanding the appearances and the delay in

 2    discovery, there has never been intend on anybody's part to

 3    delay discovery.  We absolutely know what the burden is.  I

 4    think you will hear --

 5             THE COURT:  Well, that -- I never know what's

 6    going on behind the scenes.  I only see what positions

 7    people take in course and the progress of the case.  I --

 8    that's a hazard of the job.  But all I can say is, this case

 9    has not moved forward in the way that other Chapter 15s do;

10    it's in the statute, the need for speed in Chapter 15.  And

11    most parties come, consistent with that, and say we have

12    issues about COMI; and, therefore, what do you need, we're

13    going to get it done, we're going to come in.

14             And so, there's just been a series of positions

15    taken by the administrators that basically really don't seem

16    to have a whole lot of merit to slow discovery down and it

17    really just involved me applying in detail very well-

18    established principles of law.  And then we leave, I think

19    we have an understanding, and then people come back and say,

20    well, nothing was produced or well, Mr. Steinmetz, we

21    thought we solved it, but we didn't solve it.

22             And so, that's why this order is going to be blow-

23    by-blow-by-blow, because I think it's not -- it's just not

24    the way the system is supposed to work.  So the order should

25    contain a ruling that -- that the Petitioners are required
```

Page 22

1    to produce documents under the possession, custody and

2    control.  Please find the most pedestrian well-traveled

3    version of this standard that I'm applying here, but that

4    you can quote it for an applicable; if not, I'll find one.

5    And, again, I'm just applying the applicable law.

6              MR. HYMAN:  We appreciate that, Your Honor.

7              THE COURT:  All right.  Now, before we go on to

8    the next issue, I know you did want to talk about the status

9    of documents and scheduling and where things are, and I know

10   he had addressed it, so I didn't want to leave something on

11   Mr. Steinmetz.

12             MR. ROSENTHAL:  Just on Mr. Steinmetz, Your Honor,

13   just because, again, I'm just kind of trying to head off the

14   next roadblock, which is, you know, for them to come back

15   and say, well, we actually don't have the practical ability.

16   And there is -- there's four factors that the Royal Park

17   court cited, and they're all applicable here.  They all

18   exist here.

19             And the Royal Park court basically then said,

20   okay, I'm entering a finding that you have a practical

21   ability; go do it.  Because I don't want them to come back

22   and say -- and the Royal Park court, in fact, said this

23   isn't a serial opportunity to kind of keep raising a new

24   roadblock each time.

25             And the four factors are: number one, financial

Page 23

1    interest.  I think the Court can find that he has a

2    financial interest based on the record; this is not

3    contested.  Number two, did things acting as agent on behalf

4    of the company.  We've put in the record; it hasn't been

5    contested.  Number three, the fact that this person has

6    participated in discovery voluntarily on behalf of the

7    corporation in the past; we've put in that record.

8         And number four -- and actually, this is what

9    really disturbed the court in Royal Park -- is they never

10   even asked prior to coming to court and saying that we don't

11   have control.  And we said, the least that you can do is,

12   before coming to court, is to show us evidence that you've

13   asked them to cooperate and they refused.

14        And I think we have all four of those factors

15   here; that just to avoid kind of a serial re-litigation of

16   this, I think it's appropriate for the Court to say, look,

17   this test is met under these circumstances.

18        MR. HYMAN:  Your Honor, Royal Park was determined

19   in the context of five directors that were currently

20   directors.  There were the economic interests; was the

21   economic interest or ability of the defendant to hire or

22   fire those directors.

23        This is, while there may be or not be an economic

24   interest on the part of Beny Steinmetz, it doesn't come

25   close to meeting the standards in Royal Park.  And to say so

 1    is disingenuous.

 2            THE COURT:  Well, let me ask you, does he have a

 3    financial interest?  I have seen a lot of information

 4    provided to me at various hearings addressing that issue and

 5    going through, in detail, him being the beneficial owner

 6    through various different entities; and, therefore, having a

 7    financial interest would -- which would explain his

 8    extensive level of involvement.  And, indeed, nobody on your

 9    side has ever identified anybody else who's acting on behalf

10    of BSGR.

11            MR. HYMAN:  The joint administrators are.

12            THE COURT:  No, no.  Before the joint

13    administrators leading up to the joint administration, you

14    haven't identified anybody at the company who seems to be

15    doing anything, other than the joint administrators.  My

16    understanding of joint administrators is that they are not

17    necessarily the only people acting and so, you've never

18    named somebody else.

19            And so, but I backtrack.  So I do have information

20    that has been provided on all the four factors that are just

21    identified, do you have any information factually about the

22    financial interest question; do you have anything to say

23    factually on that?  Do you dispute he has a financial

24    interest?

25            MR. HYMAN:  Ultimately, we read the press reports.

Page 25

1   He may have an ultimate financial interest in his

2   subsidiary.  However, when you look at Royal Park, the

3   financial interest went to control, and for the ability of

4   the party that was requesting those documents to exercise

5   some leverage over the party that had to comply.  Here, that

6   isn't the case.

7            THE COURT:  Are you saying, so he's involved in

8   negotiating the original deal with Guinea.  He's involved in

9   negotiating the purported settlement, which I know you say

10  the foreign representatives need to approve -- I don't

11  disagree with that for purposes of the proceeding in

12  Guernsey -- but you say somehow, he doesn't have any degree

13  of control?

14           Again, you're -- so what I'm hearing is that

15  you're telling me right now that when you say he may have a

16  financial, that you don't dispute what's been provided to me

17  that he has a beneficial financial interest in the Debtor.

18           MR. HYMAN:  We do not dispute that he may be the

19  ultimate beneficiary.

20           THE COURT:  No, may be doesn't help me.  May be is

21  -- may be is conditional.  It means nothing.  A lot of

22  things may be.  The Mets may be better next year, but I know

23  better than to actually hook my wagon to that.

24           MR. HYMAN:  So do I, Your Honor.

25           THE COURT:  So I can't work with that.  So I

1    haven't been presented with anything that disputes the

2    factual picture that's been presented to me about his

3    beneficial financial interests.

4              MR. HYMAN:  We do not know that there is anybody

5    else that owns the equity interests or beneficial interests

6    of Balda.

7              THE COURT:  And as to the second one, I'm not

8    hearing anything that disputes that he's acted as an agent

9    of BSG.

10              MR. HYMAN:  He certainly is not authorized to act

11    as an agent, and he's not authorized to act as an agent

12    today.

13              THE COURT:  Okay.  But, again, we keep having

14    these discussions, and then you bring me back to a

15    particular characterization of an issue that's where you

16    want to fight this battle, which is after the Chapter 15 was

17    filed.

18              My understanding is that you don't dispute that he

19    negotiated the ultimate deal with Guinea, that is really

20    kind of the Debtors' business, or that he is involved in

21    trying to reach a settlement of the dispute with Guinea.

22    Again, a settlement you say he cannot -- that cannot be

23    finalized without the approval of the foreign

24    representatives, but that he was doing the negotiating.

25              MR. HYMAN:  And may never be finalized.

Page 27

```
 1              THE COURT:  No, no.  I'm asking factual questions,
 2     so I'm not asking for you to give me your gloss on what they
 3     all mean.  I'm asking very specific factual questions.
 4              MR. HYMAN:  Nobody denies that Mr. Steinmetz was
 5     off negotiating a deal that he was not authorized to
 6     negotiate.  That settlement ultimately needs to be approved
 7     -- I know that Your Honor is aware of that -- and reviewed
 8     and revised.  It may be ultimately agreed to in its current
 9     form; it may never be agreed to.  It may be agreed to in an
10     alternative form.
11              THE COURT:  But he's holding himself out as BSG in
12     the context of those settlement discussions.
13              MR. HYMAN:  But not with any authorization from
14     the joint administrators or BSG.
15              THE COURT:  That's fine.  I understand that
16     position.  But it doesn't change the facts that he's holding
17     himself out, and clearly has apparent authority to anybody
18     who's talking to him, including the -- an independent
19     sovereign country.
20              So let me move on to number three.  I realize you
21     were just presented with information dealing with his
22     involvement in discovery and complying with discovery in
23     other proceedings, including the tribunal -- and I don't
24     want to misstate.  Could you remind me what the exact title
25     of the proceeding is?
```

```
 1              MR. ROSENTHAL:  Sure.  So he provided documents or
 2       searched for documents in connection with the LCIA
 3       arbitration.  He also provided live testimony in the ICSID
 4       arbitration, and he provided multiple witness statements as
 5       a witness in both the LCIA and the ICSID arbitration.  I
 6       think these are facts.  I can't imagine they don't know
 7       because it's been so part of the history of this company for
 8       the last few years.
 9              THE COURT:  All right.  Do you dispute any of
10       that?
11              MR. HYMAN:  Only to point out that the dates are
12       prior to the joint administration, at which time nobody
13       other than the joint administrators have any ability to rule
14       or act on behalf of the company.
15              THE COURT:  I understand that.  All right.  But
16       it's pretty clear he participated in the past in discovery
17       on behalf of the company in other proceedings.  And so last,
18       but not least, the fourth factor: have the administrators
19       ever asked him to cooperate and provide documents that are
20       requested?
21              MR. HYMAN:  To my knowledge, the joint
22       administrators are not in contact with Beny, not in contact
23       by email or by phone.  There have been less than a handful
24       of meetings at which they have met Mr. Steinmetz, but that
25       is the full extent of the contact.
```

1                THE COURT:  All right.  So what I'm hearing is

2      that they have not asked him to cooperate and so -- in terms

3      of discovery sought.  And so, I think all the -- I'll make a

4      finding that all four of the factors in Royal Park are

5      satisfied here, and we'll see where that gets us or doesn't

6      get us in the future.

7                All right.  You wanted to talk about the status of

8      documents that are being produced and the schedule?

9                MR. HYMAN:  Yup.  If you wouldn't mind, Your

10     Honor, if Mr. Peters could address the Court in terms of

11     current production.

12               MR. PETERS:  Your Honor, thank you again for

13     giving me an opportunity to address the Court.  I just

14     thought it would be helpful really, just to understand where

15     we've got to in terms of the document production since the

16     hearing on the 29th of August.

17               As you'll recall, there's a lot of discussion

18     about the 321 documents at that hearing.  And subsequent to

19     that hearing, those documents were available for production.

20     There is, as Cleary mentioned, you know, there was a lot of

21     toing and froing about the protocol, which meant that the

22     production of those documents was delayed.

23               However, we had a call with Cleary on the 12th of

24     September to try and resolve the issues over protocol.  And

25     when it was clear that that wasn't going to go anywhere, and

Page 30

1    it's part of the reason why we're here today, we actually

2    did agree to release the documents in conjunction with

3    authorization of the protocol, and those documents were

4    released the following day.

5            Now, subsequent to that, we've been working on

6    getting more documents to disclose.  We've now got a second

7    tranche of documents, comprising 425, that are ready to go,

8    and they've been based on a targeted search on issues that

9    we know would respond directly to the 68 requests that have

10   been put to us.  They deal with Asher Avidan, Capital

11   Markets, BSG Real Estate, and the (indiscernible)

12   investigations that we've undertaken.

13           There's also a third tranche of documents, and

14   that's a third of 516 documents that are going to be ready

15   to go in the next day or so, and they relate to the Standard

16   Charter Security.  And there are a number of invoices that

17   clearly demonstrate that COMI is guaranteed and, again, are

18   responsive.

19           Now, I suppose you ask, what about the rest?

20   Well, we've uploaded 1.2 million documents to relativity;

21   that's significantly more than the 38,000 that were referred

22   to earlier.

23           Now, we're going through each of the 68 requests,

24   line by line individually, and coming up with key words that

25   will respond to the requests to identify responsive

```
 1    documents.   Now, that's an interesting process.  When we
 2    first do that, we get thousands and thousands of hits, tens
 3    of thousands of hits for each request, which clearly, it's
 4    just not realistic.  And when we look behind that, there are
 5    a significant portion that aren't responsive documents.  So,
 6    therefore, we need to look at ways to reduce that down to
 7    documents that are purely responsive.  So it's a step-by-
 8    step process.
 9            As things stand, we've identified documents that
10    are responsive for 35 of the 68 requests, and that's 28,000
11    documents.  So that's -- you know, some of those documents
12    can be hundreds of pages long.  We've now got a team of 15
13    specialist document reviewers going through the GDPR and
14    relevance and sorting and sifting on that basis.  These are
15    then going to Duane Morris for them to check for legal
16    privilege, before coming back to us for final QC, at which
17    point, they can be prepped and made available.
18            Now, we expect to start that flow of documents in
19    the next week.  And once it's started -- that's not the full
20    38,000 documents -- it will be a conveyor belt.  So we've
21    been releasing documents for Cleary on a daily basis.
22            Now, in parallel to that, we're also looking at
23    the remaining 30 odd document requests.  And by the time
24    that the 28,000 have been sifted, we will have uploaded
25    further documents that are responsive at the back end of
```

1    that, so the conveyer belt will continue.

2              And we expect to have all of those documents

3    disclosed, the relevant documents that have been reviewed

4    for GDPR that have been reviewed for relevant and have been

5    reviewed for legal privilege to be made available to Cleary

6    within 20 days of now.

7              Now, I'd just like to briefly touch on costs,

8    because, you know, it is relevant from our perspective.  In

9    terms of the work that we're currently doing, we expect our

10   own costs, excluding our attorneys, to be somewhere in the

11   region of $850,000 for this process.  Now I know that Cleary

12   has asked that redactions are done in a particular way, and

13   we've done a few tests on that to see the effect of doing

14   that.

15             And if we go down the route that they want,

16   whereby they're asking us to redact and then put on an

17   individual redaction-by-redaction basis of description,

18   we're looking at costs in excess of $2 million, and that's

19   obviously hugely significant.  And, you know, the reality is

20   that it's not going to give them any additional information

21   that's relevant to COMI.

22             THE COURT:  Well, I think we had had a discussion

23   about an attorneys-eyes-only process and order that would

24   give you an order that is important for purposes of any GDPR

25   issues and the privacy issues under the European regime, but

Page 33

```
 1    at the same time, allows a process that may be less
 2    extensive and less costly.
 3            And I think -- I think I had hoped, and I think I
 4    said on the 29th, the parties should work on a joint
 5    proposed order that would minimize regarding this process by
 6    providing for attorneys-eyes-only, and hoped you would get
 7    something to me in 10 days.  And at the time we were
 8    discussing it, I thought -- I had the sense that people
 9    thought that would be useful.  But, you know, that was more
10    than a month ago, and I never did get anything.
11            So my understanding is that a court order that
12    says what's necessary for purposes of the case takes things
13    out of the category 2 that we've been using as a framework
14    and would move into category 1, meaning that they've been
15    determined to be relevant for purposes of the case.  And
16    essentially what it does is say that in order to deal with
17    the case efficiently, we've come up with a procedure to
18    safeguard privacy information, not make it generally
19    available and not widely disseminated.
20            And I know it's -- it probably is an American
21    concept to do attorneys-eyes/professional-eyes only, but
22    that it might be one, at least -- again, I didn't hear at
23    the time of the August 29th hearing anybody say that that
24    idea was dead in the water.  But that was something I don't
25    think I've heard anything further about.
```

1           MR. ROSENTHAL:  Your Honor, we were hopeful that

2    ultimately when we get an agreed-upon protocol, that that

3    would have the same effect.  We thought we were very close.

4    We think we still are very close, with the exception of two

5    different issues.  We don't think that there's an order of

6    this Court that just freely allows discovery of all GDPR

7    without some -- of all GDPR material without some

8    redactions.

9           THE COURT:  No.  I don't think anybody is

10   suggesting that an order resolves all GDPR issues.  But I

11   think the idea was that, to the extent there was discussion

12   of different levels of redaction, that that might provide a

13   way to address that without having to redact, re-redact,

14   change redaction procedures, and provide more information so

15   as to resolve their objection without waiving your rights as

16   to how something was ultimately used or whether it was

17   ultimately made public.

18           And certainly, I don't think anybody -- and

19   certainly, I didn't and I don't think anybody took the

20   comments to mean that we're going to waive away GDPR issues

21   by virtue of that kind of an order.  But rather than when

22   you began to get into very specific redaction procedures

23   that are very costly, that that's where that could be useful

24   and that the order would contain a number of very specific

25   findings about the case: involves the following parties;

1    COMI is an issue; COMI looks at the following things in

2    order to.

3          COMI, discovery in a case involving COMI would

4    include the following categories of information: the parties

5    have -- you know, there is some information that is being

6    clearly protected by GDPR that is being redacted or not

7    produced; and that this information, I think even in your

8    own papers, that said that it's less clear what's protected

9    and what's not protected.

10          And, frankly, if you're in those circumstances,

11   you really have no choice but to take the more cautious

12   route.  But that, given that circumstance, the Court finds

13   that a showing has been made, for purposes of discovery,

14   that it is necessary to produce that information, but in

15   order to minimize any privacy issues, that this is the

16   procedure.

17          So that's what I had envisioned doing.  Again, I'm

18   not trying to -- and I don't think anybody is, we've spent a

19   lot of time briefing GDPR issues, so I'm not trying to waive

20   away GDPR issues.  I understand they're significant.  I

21   appreciate counsel being here from across the pond to

22   discuss these issues, and so, I'm not -- I'm not trying to

23   waive them away.

24          But we often deal with, as you know, in Bankruptcy

25   Court, instances where there's litigation pending in many

Page 36

```
 1   forums.  And so, I think what we try to be is helpful to the
 2   extent that there are ways to -- that a Bankruptcy Court can
 3   assist parties to not have to -- take some items off their
 4   to-do list and some things that you can resolve by virtue of
 5   findings in an order.
 6           MR. ROSENTHAL:  Your Honor, and we're going to get
 7   to the protocol issues and this is one of the protocol
 8   issues.  What you'll find -- we think the issues with
 9   respect to the protocol are relatively minor and easily
10   resolved.  There are only two categories, that there is a
11   question as to whether it should be generally redacted or
12   generally unredacted; that is personal email addresses and
13   nationalities.
14           And it may be helpful in the event that Your Honor
15   rules one way or the other in respect to one of those two
16   things to include a ruling on that point.  But as it relates
17   to all of the other categories, there's no dispute between
18   the parties.
19           THE COURT:  All right.  Because, again, I am
20   sensitive to costs.  We're supposed to be in Bankruptcy
21   Court, right?  People are filing for insolvency because they
22   have financial issues, whether it's an individual or a
23   company, series of companies.  So certainly, I understand
24   that, and, in fact, the American discovery rules consider
25   that in terms of proportionality.  And recently, that
```

1    concept sort of got a refresh in the rules, even though it

2    was always in the rules, just to remind folks that use of --

3    in a traditional domestic case, but I don't see why that

4    would be any different here.  So certainly, that's part and

5    parcel of a protocol that's a court order.

6            But even if there are some issues that are

7    unresolved and parties essentially say, Judge, we just want

8    to reserve our rights, an order making certain findings

9    about how discovery should -- needs to proceed in a case

10   may allow parties to ultimately reserve their rights, not

11   spend unnecessary time on redaction procedures, which are

12   enormously expensive, and give you some comfort that you're

13   not going to be sued tomorrow on the basis of GDPR.

14           So that's why I was trying to sort of pitch it.  I

15   know you're trying to, you know, trying to ultimately

16   resolve all issues of protocol and GDPR.  But my sense is

17   what an order can do is finding this necessary for purposes

18   of the case than, you know, but I'm still not trying to

19   trample on anyone's rights, that attorneys-eyes-only is a

20   way to do that.  So that's certainly the hope.

21           And I still think that would be true -- I know

22   there's a couple of categories that remain outstanding, but

23   there may be a way to produce those documents under the more

24   fulsome version, less redacted, and still preserve your

25   rights for purposes of GDPR in a finding that's saying for

```
 1    purposes of discovery in this case, it's necessary to

 2    proceed this way, consistent with Chapter 15s concerns about

 3    expediting proceedings and costs, all sorts of things.

 4              And, again, there are GDPR experts in the room.  I

 5    am not one of them.  So you would tell me what that kind of

 6    order, what it needs to look like and what's appropriate.

 7    But certainly, I can think of some findings that we've

 8    already gone through that would get us a lot of the way

 9    there.

10              MR. PETERS:  Thank you, Your Honor.  That's really

11    helpful.  I just -- and I know that Mr. Hyman says that

12    we're going to come on to a protocol.  But the issues around

13    the protocol, you know, they're not about the

14    categorization.  The difficulty we have isn't about the

15    categorization, per se; it's more about what Vale and Cleary

16    are asking us to do in terms of the redaction.  And for

17    every single redaction, and we are talking hundreds of

18    thousands of redactions, they are asking us to put an

19    individual text box against each one to say what that

20    redaction is.

21              THE COURT:  All right.  No, I understand and we're

22    going to get there shortly.  My thought is there are some

23    things, like personal emails is one of the categories, that

24    if I find for purposes of the case that they should be

25    produced attorneys-eyes-only, then they are -- and not
```

1     provided generally to the clients, to the public without

2     further order of the court -- that that's a level of

3     protection and a level of finding that still allows you to

4     preserve the issue, ultimately, while also not having you

5     even redact them in the first instance.  And so, if you

6     don't redact them, even under their view of the world, no

7     redaction means no text box.

8              So even before I made a ruling on that, it would

9     sort of take that issue off the table.  And also, frankly,

10    even if you don't put it in an individual text box, you'd

11    have to address it in sort of a general explanation of

12    things, and it would take that part of the process off --

13    off the list of things to do.

14              MR. PETERS:  We have taken that into account in

15    our assessments of the additional time involved and then

16    have a search on that basis.  But we know, obviously, you

17    know, you're fully aware of the issues and we'll deal with

18    it.

19              That's all I have to say on where we are in terms

20    of discovery.  I would have liked the change -- but

21    obviously, you've made no (indiscernible) -- rebut the

22    misrepresentations based on inaccurate press reports around

23    Mr. Steinmetz's role.  But, unfortunately, you've made --

24              THE COURT:  Well, again, I read everything that

25    was provided to me, and I take that very seriously.  So,

1    again, in discovery, it's not a trial, so I'm not making a

2    finding, but I'm making -- of any particular level of

3    involvement or particular acts.  What I'm finding is that

4    there's been a basis given to me that says that Mr.

5    Steinmetz is fair game for discovery.

6            That's the way the American system works, which,

7    frankly, is different than the way a lot of other systems

8    work.  And for some systems, discovery is a lot more

9    curtailed, and I recognize that.  But for the American

10   system, essentially, you have a good-faith basis to say we

11   have a -- we want to know about this, this may be very

12   relevant.

13           And I found that that's satisfied.  So that's --

14   and the only specific findings I think I'm making to Mr.

15   Steinmetz are the ones dealing with that Royal Park case,

16   which are very specific and really aren't necessarily --

17   they're not COMI related; they're sort of a control issue in

18   terms of what's appropriate for discovery.

19           MR. PETERS:  Sure, Your Honor.  I'd just like to

20   make a point regarding the repeated statements about the

21   role that Mr. Steinmetz in negotiating a deal with Guinea.

22   That is just clearly -- that is untrue.  He may -- he may

23   have been involved in assisting discussions, but we got

24   notification from Dag Cramer --

25           THE COURT:  You're talking about the settlement.

Page 41

```
 1              MR. PETERS:  Yeah.  So we got notification from

 2    Dag Cramer --

 3              THE COURT:  Okay.  No, I think what I meant was in

 4    the underlying transaction to begin with, right?  So there

 5    was originally in a relationship, then Guinea terminated the

 6    relationship, and then I know there's a settlement.  And

 7    what my comment was about his role in the initial

 8    transaction.

 9              And just to be clear, and I know he's been --

10    again, to use an often-referenced legal principle from

11    Broadway -- in the room where it happens as to settlement;

12    he's been involved.  I'm not saying who had the pen and who

13    had ultimate authority, so I'm not casting any aspersions on

14    anything while the foreign representatives have been in

15    place.  But I don't even, again, need to go there.

16              If he's -- when I look at COMI, I need to look at

17    where has business been going on, who's been doing what,

18    sort of going back in time.  And so, that's -- I think

19    enough of a showing has been made on that.  So I'm not

20    trying to be -- to parse that too finely because, frankly, I

21    don't have enough record to do that.  I have enough record

22    to say he's involved enough that he's a fair game for

23    discovery.

24              MR. PETERS:  Okay.  Can I just ask, Your Honor,

25    please?  If the Cleary's do bring this back onto the table,
```

1    we would like the opportunity to respond vigorously against

2    the allegations regarding settlements.

3            THE COURT:  Well, I think what's been put on for

4    right now is a basis for discovery.  I've made a ruling.  So

5    I certainly hope, for purposes of discovery, we don't have

6    it come back on.  If it ultimately becomes an issue at

7    trial, everybody preserves their rights to present as full

8    and complete and fulsome a record as you want on those

9    issues, so I'm not making any findings on the merits of any

10   of that.  COMI is not in front of me today, and we'll get

11   there eventually.

12           MR. PETERS:  Okay.  Well, thank you for giving me

13   the opportunity to address the Court.  Thank you.

14           THE COURT:  Thank you.

15           MR. ROSENTHAL:  Your Honor, addressing the

16   document issue.  I have to say I'm extremely distressed here

17   because, you know, while Mr. Peters is not an Officer of the

18   Court, the Court has given an opportunity to address his

19   counsel rather than have him address the Court through

20   witness testimony.

21           And what we've heard today is, unfortunately,

22   quite different from what Mr. Peters stood up and told you

23   last hearing.  And it's really distressing, in light of some

24   of the representations that were made leading up to these

25   hearings.

1      THE COURT:  Well, here, I want to go through the

2      other merits issues and then loop back to production

3      schedule and where we are and all that stuff, right, because

4      I think the legal issues inform the production schedule.  So

5      everybody reserves their rights.  And, frankly, as you know,

6      judges generally are less concerned with the history of

7      discovery than they are with how do we get to the end.

8      MR. ROSENTHAL:  Absolutely, Your Honor.  I agree

9      with that complete.  Ms. Balter is going to address the GDPR

10     issues that were most of his argument.  I would address,

11     when we're done with the discovery categories, the

12     production information that we learned in some of the --

13     well, not just inconsistencies.

14     THE COURT:  And I think we also have the former

15     and current directors in Onyx and that's going to involve

16     it.  So let me ask, there are some nice folks who are in the

17     courtroom for an 11:30 matter.  I think we are going to be

18     here for a while in this case.  So my question is whether

19     now is an appropriate time to take a break or how do you

20     want to handle that, because I think we -- I mean, I'd be

21     stunned if we didn't have at least an hour.  And I think,

22     you know, what beyond that, I'm not -- I have no powers of

23     prediction.

24     MR. ROSENTHAL:  What I'd recommend, Your Honor,

25     just because I think that the former officers and the

```
 1    current officers issues, the legal issues are really no

 2    different in many respects that what you've already decided

 3    with respect to Mr. Steinmetz.  I think we could probably

 4    move through those pretty quickly.

 5             THE COURT:  All right.  So why don't we do those

 6    then and take a break?  All right, yeah.  My understanding

 7    is that -- and you can correct me if I'm wrong -- that you

 8    want documents, to the extent that they're in the

 9    possession, custody or control and deal with former or

10    current directors and officers, as well as Onyx, Nysco and

11    Balda, to the extent that they involve the business of BSG.

12             MR. ROSENTHAL:  Exactly.  And in terms of the

13    possession, custody and control standards, again, we're in

14    the Second Circuit, it's the practical ability standard, and

15    the case law is very clear that they have the --

16             THE COURT:  I think we've sort of beaten that to

17    death.  So let me hear from the other side because, again,

18    what I thought was important to just clarify for the record

19    before we have this conversation.  It's to the extent that

20    they have possession, custody or control over those

21    documents to be practical matter and they relate to the

22    business of BSG.

23             So it's not -- if there is a document of a former

24    or current director, that they have possession, custody and

25    control of that, that does not deal with the business of
```

1    BSG, you're not asking for that.

2              MR. ROSENTHAL:  But it has to fit within one of

3    the categories that the Court has already sustained as being

4    appropriate for discovery as being relevant.

5              THE COURT:  Right.

6              MR. ROSENTHAL:  But, Your Honor, one caveat.  To

7    the extent that I think under the factual record that exists

8    before the Court and is, frankly, uncontested because

9    they've chosen to argue separate issues.  Under the factual

10   record, I think that the Court should find, as other courts

11   have done, they have the practical ability to obtain this.

12   And, therefore, it's no longer this is just round one, and

13   round two is later on when they say, sorry, Judge, we don't

14   control this.  They've already argued that control issue.

15             MR. HYMAN:  Your Honor, regarding that.  It's

16   impossible to rule on practicality unless there has been an

17   effort made to seek discovery of the docket and make a

18   request.  So I --

19             THE COURT:  Well, let me take the scope of

20   discovery, what's asked for first, and then we'll deal with

21   the control issue.  So they've asked for things that would

22   fit into the discovery request, meaning it deals with BSG,

23   the business of BSG, such that it would be relevant for

24   purposes of COMI under sort of the American standard of

25   discovery.  Do you have any quibble with that?

```
 1              MR. HYMAN:  Not with the scope of discovery, Your
 2      Honor, but, you know, we talk about the facts that are in
 3      the record.  The facts that are in the record are the
 4      articles that have been attached to the first letter, that
 5      was a letter dated --
 6              THE COURT:  But I don't need to get into the
 7      articles, if everyone agrees about the appropriate scope of
 8      discovery and your argument is about control.  So my thought
 9      is that I've made a ruling as to Mr. Steinmetz about the
10      Royal Park factors.  Again, this is pretty well-established
11      stuff.  I don't normally make rulings about control when
12      people have discovery obligations because it's assumed, it's
13      part of the air we breathe in terms of civil cases and
14      discovery, so everyone understands what their obligation
15      are.
16              And if the foreign representative on behalf of the
17      Debtor has an ability to, as a practical matter, to get
18      documents that relate to the conduct of BSG from the former
19      directors, current directors, Onyx, Nysco and Balda, then
20      they're obligated to do that.  So that's just the way it
21      works.  So what is it that you want to talk about with that
22      context?
23              MR. HYMAN:  Because I think that we've gotten a
24      little bit twisted in terms of economic relationship.  I
25      think when you look at the cases, the economic relationship
```

```
 1    is, again, the ability of the party that's requesting

 2    production on a third party to exercise some leverage in an

 3    economic basis over that party.  Here, I think this is all

 4    of the converse as it relates to the former directors.

 5    There is no continuing economic relationship between BSG or

 6    the joint administrators and the former -- and the former

 7    directors and officers.

 8              THE COURT:  But that's not the test.

 9              MR. HYMAN:  That's a part of the test.

10              THE COURT:  You've made it -- you've made it very

11    clear repeatedly, even when dealing with Mr. Steinmetz, that

12    from your client's -- from the foreign representatives point

13    of view, they are in control and other folks don't matter.

14    But for purposes of COMI, I'm supposed to look at who's

15    actually done what business and how things have developed

16    and what the center of main interest is and what's actually

17    been going on, what's the economic substance.

18              And even instances talking about change of COMI

19    from one venue to another, I have to have some understanding

20    of sort of historical things to compare it to new things to

21    find out whether that purported change in COMI is legit, is

22    done for any improper purpose, what the legal standards are

23    what they are.

24              So, again, to the extent you're relying on the

25    fact that everything changes, and the only people who are
```

Page 48

1    relevant are the foreign representatives once they're

2    approved and, therefore, that's the lens in which to

3    understand discovery, I reject that premise.

4              MR. HYMAN:  But typically, in a COMI shifting

5    case, as I understand them, Your Honor, if it's a shifting

6    of what looked like COMI in the first instance to a new

7    jurisdiction created for purposes of filing.  That's not

8    what we have here.

9              THE COURT:  No, I know.  But what I'm saying is,

10   cases -- COMI shifting cases are relevant to the extent that

11   you're talking about people talking about timeframe and

12   saying you can cut off, this is what I do right this second,

13   and I don't anyone to look beyond that.  And courts do look

14   beyond that because they look to see, well, what changed and

15   why did it change and how did it develop.

16             So, again, this is discovery.  Everybody has a

17   right to be heard on the merits when and if we ever get to

18   the merits of this case.  And so, again, I usually don't

19   have this kind of issues just come up repeatedly.  If

20   there's emails dealing with BSG and you want to talk about

21   the relevant COMI time period, we can have that discussion.

22             But, frankly, if you look up any of the cases,

23   that will tell you what the relevant time periods are.  I'm

24   not changing that; that is what it is.  So through that

25   lens, whatever exists as to these category of people dealing

Page 49

```
 1      with the business of BSG, it's fair game.
 2             MR. HYMAN:  Except that we, you know -- in order
 3      to establish possession, custody or control, we believe that
 4      the burden is on the party seeking that discovery.
 5             THE COURT:  Do you really want to go there?
 6             MR. HYMAN:  No, I don't.  I don't.  But I want to
 7      address, though, is some of the evidence that they've been
 8      relying on which --
 9             THE COURT:  I am not taking in news articles, bits
10      of information for purposes of making value judgments in
11      this life or the next.  I am looking at things to try to get
12      through discovery; that's all.  So everybody reserves their
13      rights.  I'm not -- judges are remarkably facile at saying
14      here's discovery and then they get to trial, just as we are
15      facile in separating our personal views and any frustrations
16      in the case leading up to trial.  So it is what it is.
17      We'll get there.  Everybody will get a fair shake on the
18      merits of anything they want to argue.
19             But for purposes of discovery, my ruling is just
20      what I said, which is that viewed through the lens of COMI
21      and the relevant time period -- that is well-established in
22      cases in the Southern District, and including a few that
23      I've issued, decisions on Chapter 15 cases, everybody knows
24      what the period is; that if there's information within the
25      possession, custody or control under the Second Circuit
```

1    standards that deals with these folks -- current and former

2    directors, officers, Onyx, Nysco, Balda -- that is relevant

3    to the business of BSG and COMI, I find that's appropriate

4    to produce and that I'm ordering to be produced.

5              And so, I'd ask that that go into the proposed

6    order that's going to be submitted after today's hearing.

7              MR. HYMAN:  Your Honor --

8              THE COURT:  So for that, given that I have less

9    information, I'm going to decline to get into Royal Park

10   issues for right now, in terms of it's a more complicated

11   web of things to figure out, but I can't imagine anybody

12   wants to have further discussions about what I think.

13   Again, we're making something overly complicated that, for

14   purposes of discovery, is just not that complicated.

15             So if a deal -- I mean, so Onyx was alleged to be

16   back office support.  My understanding of the record is that

17   they used to be called BSG Management Services, Ltd.  So, I

18   mean, some of these things are just -- I'm not sure why

19   we're fighting about them.  So, again, you view them through

20   the lens of COMI and the relevant time periods for COMI,

21   fine, but it's fair game.

22             MR. HYMAN:  Your Honor, as it relates to Onyx,

23   there is no contractual relationship with Onyx.

24             THE COURT:  I know --

25             MR. HYMAN:  If Onyx wants --

Page 51

1          THE COURT:  -- because you always talk about the

2     present tense, right now.  I understand that, but, again,

3     I'm repeating myself.  There are plenty of other issues to

4     get through.  My ruling is my ruling, and it serves nobody's

5     interest to go back and forth on these things.  So you all

6     are entitled to a decision.  You may agree with it, you may

7     not agree with it -- that's what Courts of Appeals are for,

8     but we've got to move the case forward.

9          So I think with that, we've gotten through those

10    two issues that are related -- Mr. Steinmetz and the one we

11    just discussed.  We need to go through the GDPR protocol

12    issues.

13          MR. ROSENTHAL:  The third one, Your Honor, is

14    actually subsumed within the last one.  But we have an

15    additional argument, which was the current directors -- you

16    lumped the current and former together.  But there is a

17    current director, which is Mr. Cramer, who, in addition to

18    everything else is a current director of the company.

19          THE COURT:  Well, I'll say what I said to him.

20    There's -- it's well established what the relevant time

21    period is for COMI.  And so I have nothing new or, you know,

22    of value to add to what's well established in Circuit

23    precedent and in this Court's --

24          MR. ROSENTHAL:  I'll just -- if I can just note on

25    the record, Your Honor, just with respect to Onyx because

1    maybe Mr. Hyman isn't aware, but Onyx is run by Mr. Cramer,

2    their director.

3              THE COURT:  Well, I've already made a ruling.  I

4    don't think we need to go there, wo here's what I'd like to

5    do.  We do need to talk about the other issues, which I

6    think are somewhat different than the ones we've covered

7    thus far.  My thought is to talk to you nice people after

8    lunch, so why don't we come back at 2:00, rather than have

9    you come back and wait around.  And so, I think that that'll

10   work.

11             And so, unless anybody has any parting wisdom

12   where it would actually be of use to you before you go off

13   to lunch, we'll just circle back at that point.  All right.

14   Thank you very much.  All right.

15             And CourtCall Operator, I'm going to keep the line

16   open, obviously because we have another matter that's on for

17   11:30, and that matter will be done before 2:00.  And we

18   will then call back at 2:00, and anybody who is on the phone

19   for the BSG matter can call back.  You can either just stay

20   on the line or call back in at that time.  All right?

21             COURTCALL OPERATOR:  Yes, Your Honor.

22             THE COURT:  Thank you very much.

23             COURTCALL OPERATOR:  Thank you.

24             THE COURT:  I sometimes forget to give that speech

25   and there's confusion that results, so I have to remind

Page 53

1    myself that that's an important thing to straighten out.

2        (Recess)

3            THE COURT:  We're back on the record in BSG

4    Resources Limited, a Chapter 15 case to continue our

5    discussion about the issues raised in discovery in

6    connection with initially the motion for a protective order

7    and then the extensive letters back and forth on a variety

8    of issues.

9            We got through a number of issues this morning and

10   so I think we were going to pick up with the GDPR protocol

11   and the issues that are identified in the letters on that.

12           MR. ROSENTHAL:  That's right, Your Honor.  And as

13   I mentioned, my colleague Ms. Balter will address that.

14           MS. BALTER:  Good morning, Your Honor.  We wrote

15   to Your Honor after an extensive back and forth because

16   we're at an impasse on several GDPR issues.  There are three

17   issues that are principally in dispute.  The first issue

18   concerns the joint administrator's responsibility to

19   identify on a specific basis the categories of personal data

20   that they've adapted.  The joint administrators have agreed

21   that where a document contains redacted personal information

22   they will provide a log and that log will identify the

23   category of personal information.

24           The issue comes up where a single document would

25   have multiple redactions.  In that case the log would

Page 54

1    identify the various categories of redactions that the joint

2    administrators say that they won't identify for us which

3    category concerns which redaction.  They're now saying that

4    this would add an additional million dollars to discovery.

5    Your Honor, we think that's inconceivable.  This is work

6    that has to be done in the first place for them to simply

7    identify the category of data that's been redacted.

8            THE COURT:  Well, let me ask you.  I heard a

9    question before about text boxes and I wasn't quite sure if

10   that was the same issue or from a different angle or a

11   different issue.  Because, obviously, we've all seen

12   privileged logs and privileged logs may say Page 20, Line 2,

13   this redaction -- or people can do it on documents, they can

14   do it lots of different ways.  So, maybe you can help me

15   through that issue.

16           MS. BALTER:  Your Honor, we'd be happy for them to

17   do it in either way.  Either to specify directly on the

18   document itself that they're redacting -- you know, do the

19   redaction box and write in the category of personal data

20   that's being redacted on the document if they'd prefer to do

21   it with a log.  We just want to make sure that that log does

22   identify the page and the particular redaction that

23   corresponds with that category so that we don't have to go

24   back and reinvent the wheel.

25           THE COURT:  So you can see the context.

         1                MS. BALTER:  Exactly.

         2                THE COURT:  All right.  Would you be okay with, as

         3      might be the case, certain things that if you can tell by

         4      the context -- so, for example, if you have an email and you

         5      have a CC, and you have a blacked out thing -- let's just

         6      use that as a hypothetical for a second, you could pretty

         7      much tell from the context that that's an email that's been

         8      redacted and that whatever your general -- their general

         9      comment about it, it would be covered by -- you know, they

        10      could say all email address redacted are based on this,

        11      that, and the other thing.

        12                So, I would assume that if there was certain

        13      circumstances where it's very clear by context.  Now, that

        14      may obviously not be all circumstances but there might be a

        15      limited number where that would be true.

        16                MS. BALTER:  I can see that circumstance where

        17      you'd have a CC box in there and numerous redactions and

        18      they say we've redacted all of these because they're

        19      personal emails.  That would be the category.  I think the

        20      issue comes up where there's something in the CC box,

        21      there's something on Page 3 of the document, there's

        22      something on Page 5 of the document and it listed out two to

        23      three categories of information and we have to go back and

        24      reconstruct them.

        25                As we say, we can figure out that one is an email

Page 56

1   address but for the other two we'd have to, again, just

2   reinvent the wheel.  That's information that they know when

3   they're doing the redaction itself, so it's easy enough for

4   them to just identify it for us so that we don't have the

5   burden.  The burden should be on the redacting party.

6           THE COURT:  All right.  So, let me ask, does it

7   makes sense to go back and forth in each one of these until

8   we sort of get an answer on each rather than take them as a

9   group?  What would you prefer?  I don't know how long your -

10  -

11          MS. BALTER:  I think that makes sense, Your Honor.

12          THE COURT:  All right.  I don't want to -- if your

13  whole presentation is not too long, I'm happy to take them

14  all it once.  But it sounds like we'll do it one at a time.

15  So, let's talk about this issue about specific data, and

16  logs, and text boxes and all sorts of exciting things that

17  everybody loves to talk about.

18          MR. HYMAN:  Absolutely, Your Honor.  And in

19  advance to today, we made an example of two documents, one

20  which would be produced in the format that the joint

21  administrators have been going through and doing their

22  production to date, and another as would be produced under

23  the suggestion.

24          THE COURT:  All right.  Do you have a copy for

25  counsel?

1            MR. HYMAN:  I do, I do.

2            THE COURT:  All right, great.  Thank you.

3            MR. HYMAN:  May I approach?

4            THE COURT:  Thank you.  All right.  So I have the

5     documents and I just have this ticket that says Vale

6     Proposal and JA Proposal.

7            MR. HYMAN:  All right.  So, this is, Your Honor,

8     an example of just one of thousands and thousands of

9     documents that are being produced.  And you can see,

10    obviously, this is an example that has quite a bit of

11    personal data in it.

12            As those parties that are going through the

13    documents in the first instance to review them for GDPR

14    information, on their screen it shows a drop box, which is

15    what you were referring to.  The drop box allows them to

16    check a box for a specific category of personal data that

17    they are redacting.  It does not require them when they

18    redact it to go in and type specifically for each redaction

19    what that type of information is.

20            When we're talking about thousands of documents in

21    the form of the Vale proposal, that requires for each

22    redaction, rather than just hitting a box that redacts the

23    information and clicking another box that has the category

24    of information, it requires them to go in manually for each

25    one of the redactions and identify it.

Page 58

```
 1            THE COURT:  Now, let me ask you.  This is a form
 2    so this may not be very illuminating for other more
 3    narrative documents.  But certainly this form, to the extent
 4    it has a date of birth line, and a nationality line, and a
 5    column for signatures, you can tell from the context what
 6    these are.  So, and that's why I ask the question.  I think
 7    I'd be fine and I suspect the other side would be fine when
 8    in that context it's very clear, so you don't need to
 9    specify that it's somebody's date of birth because, in fact,
10    you can tell that from the context.  It's very clear.
11            I guess the harder thing is when you have a memo.
12    And so you have a memo and it has sort of an ongoing
13    narrative discussion, perhaps lengthy and it has various
14    things redacted and you can't tell what a various thing is
15    from the context.
16            MR. HYMAN:  In our proposal, in the joint
17    administrator's proposal of the redactions this would still
18    be accompanied by a log and the log would identify the
19    different types of categories -- of --
20            THE COURT:  Would it identify it by page so you
21    can actually tell what's what?  I mean, I think that that's
22    right.
23            MR. HYMAN:  It does not because that is another
24    level of expense to go through.  The way --
25            THE COURT:  But if you can't tell from the context
```

1    what it is that's redacted, then I think -- isn't that

2    relevant information for purposes of the privileged log when

3    you have an invocation of privilege?  And we're not even

4    talking about Chapter 15, we're just talking about standard

5    -- standard privileged stuff and the local rules on that.

6    That you'd be able to identify and say, well, this is what's

7    redacted because we're telling you what it is because you

8    wouldn't know from the context and you can't...

9           So, for example, if somebody's reading a paragraph

10   in a memo and that paragraph turns out to either, on the one

11   hand, be incredibly relevant to various things that the

12   other side is interested in or not at all relevant, they

13   might say, I'm curious what it was that was redacted from

14   the paragraph.  Or given that it's not very exciting and the

15   redaction is this kind of redaction, I could care less.

16          MR. HYMAN:  For these types of documents and these

17   types of redactions, which are -- they're set forth in the

18   proposal for the protocol, right?  They're very limited

19   types of information.  It doesn't recall -- it doesn't

20   require blocks of redaction that would not otherwise be

21   relatively obvious from the context.

22          THE COURT:  My hypothetical assumes that you can't

23   figure out from the context what it is.  So, if a memo said,

24   we met with an individual, comma, redacted two words and an

25   initial, comma, at so-and-so place and whatever to

1    discuss...  Well, you could tell from the context what that

2    is.  But if you had, say, two lines redacted and the lines

3    are completely redacted and you couldn't tell what they are,

4    do they contain information that's names?  Is it privileged

5    legal information?  What is it?  And you don't tie what the

6    justification is to the area of the document, then people

7    completely see as to what it is.

8            MR. HYMAN:  To the extent that it was privileged

9    information, that is absolutely included in the log and

10   identified specifically, is that correct?

11           MR. HITCHING:  Your Honor, Jarret Hitching.  To

12   the extent something's being redacted for privilege, that is

13   receiving a separate designation that says Redacted For

14   Privilege versus Redacted for GDPR.

15           THE COURT:  Right, but what I'm saying is if you

16   can't tell -- so privilege is fine, but if you can't tell

17   what the GDPR redaction is from the context, I would think

18   that it makes sense to identify that.  Again, this sample is

19   sort of the -- kind of the layup, right?  Because you can

20   tell date of birth, nationality, signature, so you know.

21           So, you had me at hello on this.  I'm fine with

22   this kind of form of redaction, your proposal with this kind

23   of document.  But I am thinking about ones that are not

24   essentially forms where the box you're filling in tells you

25   the answer of what's redacted.  And I don't know -- do you

Page 61

1   have any other samples of things that are redacted that

2   might be harder calls?

3              MR. HYMAN:  I don't have any samples with me, Your

4   Honor, though.  But what would accompany our version of the

5   protocol would be a schedule, a log at the end that

6   identifies the types of personal information.  We think it's

7   unlike --

8              THE COURT:  I understand that.  But that isn't...

9   Again, what the whole point of a log is, which is often

10  overlooked, is that it gives enough information so people

11  can decide what they want to go to war over, right?  And so

12  some things they may say, well, I really don't care about

13  this.  That's what discovery is always about.  Which is

14  saying you can either write about things theoretically, in

15  which case we'd all have to quit our day jobs and just do

16  that, or you can say what is a practical matter do I really

17  care about?  And so that's why producing documents is

18  usually helpful when fighting about what's in the documents.

19             And that's why when talking about privilege, the

20  additional -- the only real point for those logs is that

21  somebody can say, well, I can gauge what that is and whether

22  I care enough to fight about it.  Or if I'm going to fight

23  about it, whether I can lump in it with other things or

24  whether it's a one-off, it informs the rest of the process.

25             So, for this stuff I'm fine.  When you can look at

1    it and say I know what's been redacted, I have no problem

2    with it.  But if -- and, again, see, the problem is without

3    some example I don't really know how this would play out.

4    But so my concern is instances where the other side can't

5    figure out what was redacted and, therefore, isn't in a

6    position to make an informed decision.  And so that'll lead

7    to further discovery in litigation.  And so that's what I'm

8    worried about.

9              Again, this doesn't bother me.  If there are forms

10   that are like this, again, I don't think -- she'll correct

11   me if I'm wrong, but I don't think that's what they're

12   worried about that.

13             MR. HYMAN:  No, I appreciate that, Your Honor.  We

14   don't think that's what they're worried about either.  I

15   think that we would argue, though, for virtually all

16   instances you should -- in matching it up with the log that

17   attends it, you should very easily be able to determine what

18   information was redacted.

19             We do include a proposal or procedure in the

20   protocol to the extent there are any disputes as to whether

21   information should have been excluded or not excluded to

22   designated certain individuals, and somebody has a direct

23   phone line to somebody and can answer a question.  I guess

24   the concern that I have is, in an effort to try to save some

25   costs and "expediate" the production --

1          THE COURT:  I understand that, I understand that.

2     But it's hard for me to evaluate what you're saying without

3     seeing the documents.  Again, if the context is clear, then

4     the context is clear.  Then nobody needs to waste the time.

5     But if the context is not clear, then the question is well,

6     would it be helpful?  And, frankly, to comply with a -- what

7     a privileged log is supposed to do, which gives you -- i.e.,

8     gives me enough information so I can assess the basis of the

9     privilege.  If you have a context that doesn't inform the

10    redaction and you might challenge it if it's certain kinds

11    of information but you might not challenge it if it's

12    others, I don't know how you'd make that decision without

13    it.

14          So, my thought is to say that where context is

15    clear, I'm fine with the way you're doing it.  But where

16    context is not clear and nobody will be able to figure out

17    what's redacted, that the log -- you can do it any way you

18    want but I would imagine it's least expensive to just have

19    the log say Page 28, personal information, you know, and

20    just identify what the personal information is just so we

21    don't have to spend -- so this isn't the opening salvo of

22    another extensive fight on discovery, which is also

23    expensive.  So, that's what...

24          Now, if you want to prepare a couple of samples

25    where you think there's some specific guidance you want from

Page 64

1    the Court and say, hey, look, in this sample we can tell you

2    this is the kind of thing we don't want to do and we think

3    we can demonstrate that to you, I'm happy to look at the

4    samples.  But if it can't -- again, my hypothetical assumes

5    that you can't tell by the context.

6           MR. HYMAN:  Yeah, I think that what we're

7    concerned about is that we will have a dispute as to

8    judgment calls, and there will be just a continuing effort

9    to require us to go through and identify information.  But I

10   take your point, Your Honor.  Unfortunately, the way the

11   system works today is it would be very easy if when the log

12   was produced, the log identified the types of personal

13   information in the order in which they were redacted from

14   the document.  That would eliminate all issues.

15   Unfortunately --

16          THE COURT:  Listen, there's lots of ways to do

17   this.  And so, for example, you don't produce a privileged

18   log that says Privileged and that's all it says.  There are

19   different kinds of privilege.  And so you've got to give

20   enough information to somebody to make an intelligent

21   decision to think about the issues.

22          Now, I don't know if there's any distinction

23   between what people have been talking about for Category 1

24   versus Category 2 on this and whether that distinction is --

25   let me ask Vale's counsel if that distinction is anything we

Page 65

1    can use in this context to try to advance the ball.

2            MS. BALTER:  Your Honor, I don't think that

3    distinction will advance the ball here because for Category

4    1 data there's a presumption that it's relevant to the

5    dispute and that they can redact it.  For Category 2 data,

6    the presumption is the opposite.  That it is relevant to the

7    dispute and that it should not generally be redacted.  And

8    where they do redact that, they have to provide an

9    explanation.

10            So, this is largely going to be about Category 1

11   data.  And in that case, it's (indiscernible) burden to

12   raise any kind of objection.  And so as the redacting party,

13   we think that the onus should be on them to facilitate our

14   understanding and to make sure that we can raise an

15   objection where necessary.

16            THE COURT:  Well, let me ask you.  Right, there's

17   a lot of different ways judges deal with discovery and some

18   of it has to do with what parties are willing to live with

19   in terms of re-review and re-redacting, which is sort of a

20   nightmare scenario that I daily not like to be in, but

21   sometimes people are willing to assume that risk.

22            So, if Category 1 is about things that clearly are

23   covered by the GDPR and so there's not really a debate about

24   that, so from their point of view it's in a stronger

25   position, does it make sense to at least let them go ahead

1    and do some tranches that way and then we can have a further

2    conversation?  But it's caveat emptor.  This is what they're

3    suggesting.  And if it turns out it doesn't work, then it

4    doesn't work and we're going to have to go -- we're going to

5    have to take one step forward to take, you know -- I mean,

6    we're going to have to take a step back before we take

7    another step forward.

8            MS. BALTER:  I think the issue, Your Honor, is we

9    just don't want to kick the can down the road any further.

10   We've been negotiating this issue for over a month at the

11   very least now.  As you said, we're fine with this kind of

12   document but this is for layup.  We have received so few

13   documents that it's hard for us to look at a lot of

14   examples.  But we don't want to --

15           THE COURT:  Do you have anything handy that I

16   could look at?  Again, I'm putting you on the spot.  Fine if

17   you don't.  But where -- again, because the devil's in the

18   details, and I'm -- it's always -- I always talk to lawyers

19   about how it's terrible to have to fight about theoretical

20   rights rather than practical things because then you really

21   have to raise issue.  But it's the same for judges, right?

22   If I can't sort of figure out what it looks like as a

23   practicality, then I'm sort of theoretically doing

24   something.  And then my utility and my -- what I hope for is

25   accuracy in trying to figure out a just result goes down

Page 67

```
 1    considerably.  So, my batting average isn't as good.  So, I
 2    don't know if you have anything that might inform this
 3    particular discussion.
 4            MS. BALTER:  Your Honor, we don't right now.  I
 5    think that's largely a product of the fact that only 211
 6    documents have been produced to us and not many of them
 7    implicated GDPR issues to begin with.  So, we just haven't
 8    had the kind of production that gives us the insight we
 9    need.  But we also are concerned about a situation where
10    we'd be asking them to reproduce things, we can imagine,
11    like the joint administration will come back and complain
12    about the expense there.
13            THE COURT:  Yeah.  Well, but --
14            MS. BALTER:  So, we want to get this resolved so
15    that we can really move forward with document production.
16            MR. HYMAN:  Your Honor, the argument that they
17    made in their letter with respect to personal email
18    addresses and nationality was that it was so crucial to the
19    determination of Comey.  Personal information or personal
20    email addresses and nationality could relate to numerous
21    people, whether they're connected to this case or
22    unconnected to this case.
23            THE COURT:  We've segued off to a different topic,
24    right?
25            MR. HYMAN:  Okay.  We have.  So, let's go --
```

```
 1              THE COURT:  I mean, right?  Because we're talking
 2    -- I think we were talking about redaction and now we're
 3    going to substance, which is can we redact this stuff and
 4    what's the presumption and all that sort of stuff in terms
 5    of whether it's tied to the case.
 6              MR. HYMAN:  Right.
 7              THE COURT:  So, here let me make a suggestion and
 8    you'll tell me whether you can live with it.  I'm willing to
 9    go along with your proposal as an interim step but with one
10    large caveat, which is if it becomes a problem and they say
11    we can't -- so they can take a document and they can say I
12    have this letter and here are some things that are redacted,
13    and we can't figure it out, and this is exactly what we were
14    worried about, then you may have to reprocess that document
15    or categories of documents that are like that document.
16              MR. HYMAN:  Your Honor, Jarret Hitchings is more
17    than available to answer any phone calls as it relates in
18    that regard.
19              THE COURT:  No, no, no, but that -- you're not
20    answering my question.  You're answering a question I didn't
21    ask that's a better question for you.  So, I'm telling you
22    if that happens and then it turns out they say this is the
23    problem, we addressed it at the hearing, it turns out it
24    really is a problem.  This is redacted.  We don't know among
25    the laundry list of things that are identified what the
```

1    redaction is.  We can't make an intelligent decision.

2    Looking at this document, it implicates a lot of things we

3    care about and we can imagine a whole bunch of scenarios,

4    and this is not the only document.  We've got a couple

5    samples, and we need to go back -- we need them to go back

6    and reprocess the documents.

7            MR. HYMAN:  Absolutely.

8            THE COURT:  All right.  Because that's -- and,

9    again, that means that sometimes you can pay upfront or you

10   can pay later.  I don't know.  But that does leave you

11   vulnerable to that problem.

12           MS. BALTER:  Your Honor, just to clarify one

13   point.  That wouldn't be just for the particular documents

14   that we use.  I mean --

15           THE COURT:  Well, if you come back and you say --

16   and it's always great as a lawyer to be able to do this, by

17   the way.  So, for your own personal career moment where you

18   can say, Judge, the thing we told you was going to happen,

19   it has happened.  And so then you can make your case.  And

20   so I'm not going to preclude you from doing that.  What I'm

21   hearing is they think it's not going to be that big an issue

22   and that if you pick up the phone and there may be a stray

23   thing here or there, that you can work through it.

24           And if that's the case, that's the case.  But if

25   it's not the case, then you pick up the phone and you say,

1    I've got 200 of these documents and I can't -- it's the same

2    problem over and over again.  It's exactly what we said.

3    Then I will not hold it against you that they were already

4    processed a particular way.  Again, it's caveat emptor.  You

5    know, buyer beware.  If you make this suggestion and it

6    works out the way you want, great.  If it doesn't, then you

7    have every right to come back and say we told you this was

8    going to -- we suspected this was going to be a problem and

9    we're back.

10            So, it would not be necessarily limited to one

11    document.  It would be limited to whatever -- whatever the

12    shoe fits.  That well-known legal doctrine.

13            MS. BALTER:  We'll make sure that if it's --

14    whatever shoe fits doctrine goes to -- if this seems like

15    it's going to be a problem, that we're making sure that it's

16    applied.

17            THE COURT:  Yes, and here's --

18            MS. BALTER:  And not just twisting our document --

19    if they don't come back and say, well, we can't apply this

20    to all the rest of the documents.  We have to process all

21    the documents we processed before.

22            THE COURT:  No, you reserve all your rights.  And

23    what I would suggest is that because all of you have better

24    things to do than to sort of be mired endlessly in discovery

25    that -- I heard a mention of tranches of documents being

Page 71

1    produced.  That as the documents are produced, that you all

2    talk to one another about it.  And so if this -- if you get

3    documents and say this is a really big problem, we need to

4    get in front of this, you talk to each other and you say,

5    hey, what are you going to do to fix the concern we have?

6    Maybe you fix it, maybe you don't.  If you don't and it's a

7    big problem, then you call chambers, set up a call and we'll

8    essentially continue this same discussion.

9         So, that would -- and it sounds like they can live

10   with that because they think as it goes forward it won't be

11   that kind of a problem.  You have your doubts and I,

12   frankly, don't know enough to make an intelligent decision.

13   But as long as they're willing to live with the "we need to

14   take a step back" approach and reserve your rights on that,

15   then I think we'll see how it goes.

16        MR. HYMAN:  Thank you, Your Honor.

17        THE COURT:  All right.  So, I think -- let me then

18   hear from Vale's counsel.  There were three issues.  That's

19   number one.

20        MS. BALTER:  Right.  The second issue --

21        THE COURT:  By the way, I would think we could put

22   this all -- everything in an order.  So, we could -- you

23   know, so we've addressed the things this morning, they're

24   going to go into an order.  This would go as to the

25   redaction of personal data on a specific rather than general

1    basis under GDPR protocols.  Joint administration proposes

2    the following.  The Court will provisionally -- it will use

3    -- will adopt the joint administrator's proposal with Vale

4    reserving all of its rights if the lack of more specific

5    identifying a thing for each bit of information is

6    problematic for purposes of protecting your rights to assert

7    the challenge to privilege or something else, then you

8    reserve the right and the Court will make any rulings in the

9    future on that as if the matter was raised in the first

10   instance.

11          I'm sure you can wordsmith that better than what I

12   just threw out there.  But I think, again, just so we all

13   have our own go-by going forward, I think the order will

14   sort of become, hopefully, one stop shopping so that we

15   don't end up mired endlessly in discovery, which is nobody's

16   goal.  So, all right, as to Issue Number 2?

17          MS. BALTER:  Right.  So, the second issue, Your

18   Honor, is whether personal email addresses and nationality

19   or association with country should fall under Category 1 or

20   Category 2 of personal data.  I touched on this.  Category 1

21   is data that is presumed unnecessary to resolution of the

22   dispute.  And so as a general matter that data will be

23   redacted.

24          Category 2 of personal data is data that is

25   presumed to be necessary to resolution of the issues in

Page 73

1    dispute and so that data (indiscernible) will generally not

2    be redacted.  We're talking about one stop shopping and you

3    had mentioned something similar to this earlier.  I think

4    this entire issue could be resolved if Your Honor has an

5    order that says that these issues, personal email addresses

6    and nationality or association with country are relevant to

7    the resolution of the dispute, that would provide all the

8    protection that they need under GDPR and we don't even have

9    to worry about redaction in that circumstance.

10           THE COURT:  All right.  All right, anything else

11   from Vale on that issue?

12           MS. BALTER:  Yes, Your Honor.  That said, both

13   subjects are critical to Comey and they're also critical

14   subjects of discovery.  The joint administrators have, in

15   fact, not even tried to argue that nationality or

16   association with country is not relevant.  They merely say

17   that it's inconceivable that Vale wouldn't know the

18   nationality of the directors, officers, and other employees

19   of BSGR.

20           Now, Your Honor, even if that were true, which is

21   impossible for us to assess because right now the joint

22   administrators have not even provided us with documents

23   sufficient to identify the directors and officers of BSGR.

24   But even if that were true, it doesn't change the fact that

25   this is directly relevant to the Comey inquiry, and that it

1    doesn't justify presumptively redacting this data for

2    purposes of GDPR.

3              THE COURT:  What about personal email?  I was a

4    little less clear what the specific email is going to tell

5    you about Comey.  It will tell you, I guess -- who's on the

6    email is one thing, but the precise email, I'm not sure that

7    it tells you anything about nationality or location

8    necessarily.  So, what's your thinking on that?

9              MS. BALTER:  So, I think there are two issues with

10   that.  The first is that it will -- it is relevant to the

11   scope of discovery, as we've been discussing earlier today.

12   We do need to know the personal email addresses.  Those do

13   need to be searched for for the directors and officers, and

14   we don't have that information.

15              The joint administrators have said that the

16   production of documents would be -- it would identify people

17   who are -- have little connection to the historical

18   operations of BSGR.  But the only example that they've given

19   of that is an email of that redacts the email address of

20   Asher Avedon, who was actually the president and the CEO of

21   BSGR Guinea, a key subsidiary of BSGR.  So, that's clearly a

22   person with a major connection to the historical operations

23   of BSGR.

24              And then I think Your Honor asked also about

25   Comey.  For example, we know that personal email addresses

Page 75

1    of Dag Cramer are being used from a company called Norn

2    Vernandi.  Where that's located, where he's sending that

3    from, that's information that is important and that goes

4    directly to the Comey inquiry about where a director of BSGR

5    is actually conducting his BSGR-related business through

6    this other country.  So, that kind of information is

7    actually relevant to Comey.

8            MR. HYMAN:  Mr. Kramer's email addresses or the

9    one that was just referenced are business email addresses

10   and those are not being redacted.  We are also happy to

11   stipulate to the identities of various members of the board

12   of directors at certain points of time and where they're

13   located.  What we're talking about here, though, is personal

14   email addresses of anybody that may be mentioned in any one

15   of these documents and their nationality.

16           All we are saying is that the general rule for

17   that type of information, which we really -- other than in

18   some very certain -- you know, particular circumstances

19   might be relevant, although whether somebody's Swedish or

20   not, I'm not sure that that's more relevant than where

21   they're actually operating --

22           THE COURT:  No, but it might give you some

23   indication as to where they may conduct business, right?  I

24   mean, so I don't think when you think about discovery, the

25   old test used to be reasonably calculated to lead discovery

Page 76

```
 1    of admissible evidence that's been thrown over the transom.
 2    But the idea is it doesn't make sense.  Would it be helpful
 3    when weighting all the costs and burdens?
 4              So, I mean, the way I think of it is if you were
 5    doing this in a domestic case, you'd have the email
 6    addresses on there.  You might have them for attorneys' eyes
 7    only because you wouldn't want to have an unwarranted
 8    personal intrusion.  But otherwise, everybody's in the
 9    situation where you're going to have to assess the email
10    circumstances and the address email by email, person by
11    person.  And that sounds like a bad thing for you, it sounds
12    like a bad thing for them because it's contextual -- in the
13    case it may be contextual.  In the email -- and so I don't
14    know that you...
15              So, for example, if there's a personal email of
16    somebody who's on a CC, who never shows up other documents,
17    well, in hindsight, that will turn out to not be necessary
18    for the case.  But if there are personal emails that recur
19    numerous times from folks who were involved in BSG business,
20    and there's a question for purposes of Comey as to well,
21    where are they doing things?  Are they in Israel?  Are they
22    in Guernsey?  Are they in Switzerland?  Are they somewhere
23    else?  Where are they actually doing things?  And there's
24    just where their personal residence is, and we have to put
25    together sort of a mosaic picture of things, then it would
```

1    be relevant.

2          And so, I think as a matter of discovery because

3    you can't figure this stuff out ahead of time, it seems in a

4    domestic case to be perfectly appropriate, but I would take

5    protections so that people's individual emails are not

6    floating around everywhere in the record of the case because

7    that would be, I would think, in appropriate.  It would be

8    our own little American domestic version of protecting

9    somebody's privacy.

10          So, but I do think that as a general matter, when

11    you have emails and they're business emails, and then

12    somebody's personal information because they have a person

13    email but it deals with BSG business, we've generally viewed

14    it as fair game.

15          MR. HYMAN: Your Honor, in virtually every context

16    we're not talking about eliminating or redacting the

17    person's name.  All we're talking about is redacting an

18    email address and references to nationality.

19          THE COURT:  No, I know, but that wouldn't happen

20    in a domestic case.

21          MR. HYMAN:  We don't have GDPR to contend with in

22    a domestic case.

23          THE COURT:  Yeah, but I can make a finding that

24    it's relevant and appropriate because I would make that

25    finding in a civil case if somebody required me to make a

```
 1    finding one way or the other.
 2              MR. HYMAN:  But is it as to somebody that has
 3    nothing to do with Comey whatsoever --
 4              THE COURT:  But your hypothetical picks your set
 5    of facts that you want.  They can pick a hypothetical that
 6    picks their set of facts and say we have somebody who's
 7    doing a lot of BSG business.  It turns out they use a
 8    personal email, and it turns out their location is actually
 9    relevant to Comey.  I don't know.  So, that's why in
10    discovery you would permit it and you would take protection.
11              So, unless there's something I'm missing, I will
12    make that finding and then I will say (indiscernible) to
13    establish United States law despite finding that it is
14    appropriate and necessary for the case to proceed as a
15    matter of discovery, that all personal emails will be
16    treated as if they're under seal so that their private
17    information is protected, and that we will have a discussion
18    when we got to the merits to talk about how to use or not
19    use any individual.
20              Because, for example, I can't imagine that every
21    single personal email in any of the documents that are going
22    to be produced is going to turn out to be relevant.  It's
23    going to be a much smaller subset, if at all, and then we'll
24    talk about that in a context that's appropriate.
25              MR. HYMAN:  Yeah.  I think, Your Honor, our
```

```
 1    position was not that we'd never produce personal email
 2    addresses where they might be relevant.  What we were
 3    suggesting is that it should be the exception rather than
 4    the rule --
 5              THE COURT:  I didn't hear a proposal that would
 6    allow...  I mean, then it becomes something where you get to
 7    decide where you think it's appropriate or not, and I don't
 8    know how to police that.  And I don't even know, in my
 9    thinking about it, how you do that ahead of time.  You can
10    look at it and say, well, it seems to be kind of an
11    important person so it's in the yes pile.  Well, this person
12    seems to be less important so it's in the no pile.  And then
13    that might be in the initial phases of review.  By the time
14    you do your later phases of the review, the person who's in
15    the yes pile turns out to be not so yes, and the person in
16    the no pile turns out to be not such a strong no.  So --
17              MR. HYMAN:  But that person will be identified in
18    the document.  Again, we're just talking about the personal
19    email addresses.
20              THE COURT:  I know but then we're talking about
21    huge amounts of money to re-review everything for reasons
22    that -- again, we wouldn't do in a domestic case because we
23    would find that to be not valuable and not an efficient use
24    of anybody's time.  So, again, I'm going to make that
25    finding that for purposes of the case, and that will go in
```

1    the order, and then I think that addresses the GDPR issue.

2    But notwithstanding the fact that I find it necessary for

3    the case and, therefore, to address the GDPR protocol, I

4    think it is nonetheless appropriate to treat those personal

5    emails as things under seal for purposes of the case, and

6    any request to use them in open court will require

7    permission and we'll have an appropriate vetting process

8    when we get closer to the merits.

9            All right, so that's my ruling about Dispute

10   Number 2.  And then I think we have Dispute Number 3.

11           MS. BALTER:  The third issue just has to do with

12   what the partly redacted information under Category 2, the

13   circumstances under which they provide redaction.  The joint

14   administrators have now agreed to provide an explanation

15   when a category two redaction is made, but they've objected

16   to specific language in Vale's protocol which says that such

17   redactions should only be made in limited and exceptional

18   circumstances.  (indiscernible) is perfectly appropriate and

19   necessary to define the circumstances under which Category 2

20   redactions can be made.  They haven't really articulated a

21   basis for their objection to that language.

22           THE COURT:  So, Category 2 is the one where

23   there's already been a finding of the information that's

24   relevant to the case and so -- but there's a then -- what we

25   think of as a more extraordinary or unusual invocation, say,

Page 81

1  notwithstanding it's relevant to the case.  So it really

2  isn't covered by GDPR's protocol at this point because

3  there's been a finding that's necessary or a concession

4  that's necessary to the case -- that it is still nonetheless

5  appropriate to redact.

6        MS. BALTER:  Right.  And they're required to

7  provide an explanation under that kind of circumstance where

8  they think it's not relevant and necessary.  And we want to

9  just make very clear that that's a limited and exceptional

10  circumstance, and so that's why we've included that

11  language.

12        MR. HYMAN:  Your Honor, it's a subjective

13  characterization.  We're agreeing.  I don't know that we've

14  come across any instance where we've redacted Category 2

15  information.  What we're objecting to, though -- it's not

16  describing our reasons for doing so, it's just the

17  characterization of it being extraordinary...  I'm not

18  forgetting the language.  Limited and exceptional.

19        THE COURT:  I don't want to get hung up on an

20  adjective but at the same time I do think if it's necessary

21  for the case, I'll use what I think is legally appropriate.

22  The presumption is it's going to be produced.  So I'm not

23  going to call it extraordinary and unusual but that's the

24  presumption because that means that there is no GDPR issue

25  because there is a concession and, if necessary and you want

Page 82

1    to put it in the order, I'll make a finding, that this is

2    appropriate and necessary for the case.

3              So, if that's the circumstance, then the

4    presumption is it should be produced.  And where the

5    presumption is something -- that means there is a burden on

6    the side who wants to rebut that presumption to come forward

7    with specific evidence and explanation as to why that's not

8    the case.

9              So, I won't require the adjective but I will have

10   described it in court as such and I think that that,

11   hopefully, should moot out that issue.  So, for purposes of

12   the order, I think what you could say is that if something

13   is in Category 2, which means it's understood to be

14   necessary for the case, there's a presumption it's going to

15   be produced.  And to the extent that the foreign

16   representatives, the joint administrators believe that it

17   should not be produced, they will justify their withholding

18   of the information.

19             MR. HYMAN:  I think that's what the protocol

20   already says, Your Honor.

21             THE COURT:  All right, so that's that.  So, what

22   else do we have to -- after going through our long list --

23   and I'm very happy that my list of things mirrored your

24   list.

25             MR. ROSENTHAL:  So, Your Honor, I think now we

Page 83

```
 1    just have some miscellaneous things with regard to the

 2    productions, many of which are kind of red flags that came

 3    up when Mr. Peters was speaking that I wanted to address

 4    with the Court, and also some proposals in terms of going

 5    forward that we have by some of the things that were said.

 6              I think to start with, I was a little surprised,

 7    Your Honor, that Mr. Peters isn't here now.  He never said

 8    this morning after he spoke and we deferred it to this

 9    afternoon, that he wouldn't --

10              THE COURT:  I don't want to -- again, every side

11    gets to present their case how they want to present their

12    case.  And if I find it to be a problem that somebody's not

13    here, then it's a problem and I'm not going to stand on

14    ceremony, so I don't want to get bogged down in that.

15              MR. ROSENTHAL:  That's fine, Your Honor.  This is

16    my segue into saying what I did say this morning briefly

17    before we got into other issues, that there are some serious

18    inconsistencies with what the Court continues to be told

19    over time, you know, both in the letters, by Mr. Peters when

20    he stood up -- not as an officer of the Court but not under

21    oath.  And maybe that's something that in the future we need

22    to rectify, and today --

23              THE COURT:  Well, I will say I understand him to

24    be counsel, is that correct?

25              MR. HYMAN:  I don't think he's a lawyer.  No, Your
```

Page 84

1     Honor, he is a forensic partner at BDO in the Accounting

2     Group.

3             THE COURT:  I consider that to essentially be a

4     proffer by the joint administrators as to what the truth is.

5     And so if somebody stands up in court and represents

6     something and they do so -- to the extent it turns out not

7     to be accurate, they do so at their peril.  So, I don't know

8     that I need to go crazy on the evidentiary aspect of it.

9     When we're talking about discovery, if we did that for

10    discovery we'd all be out on the ledge very, very quickly.

11            MR. ROSENTHAL:  That's totally fine.  I just

12    wanted to point out, Your Honor, that there are some things

13    and I do want to mention them now.

14            THE COURT:  Right, yeah, so let's get to the meat

15    of that.

16            MR. ROSENTHAL:  So, what Mr. Peters said is, he

17    said that there's a team of 15 people with (indiscernible)

18    for GDPR and then it goes to Duane Morris after that for

19    privilege.  And Your Honor may recall that at our last

20    hearing, before I had a chance to raise some concern, the

21    Court sua sponte expressed concern that documents were

22    having a GDPR cut or redaction before counsel was looking at

23    them.

24            And Your Honor said on Page 14 -- you said, "Let

25    me back up for a second.  So, does that mean for the

Page 85

1    categories of documents that Duane Morris does not have yet,

2    that they are going to eventually obtain possession of those

3    in un-redacted form?  I mean, then there's no falter between

4    what exists and what Duane Morris will eventually have

5    access to." And Mr. Hyman said, "That's absolutely correct,

6    Your Honor."

7              But now we're being told that the GDPR review is

8    coming before the Duane Morris review, so it seems exactly

9    what the Court was concerned about we were concerned about

10   last time, and that we were all assured was not happening.

11             The second and related thing --

12             THE COURT:  Well, let me sort of see if I can

13   drill down on that.  So, the idea is that there's counsel in

14   the case and counsel is in a position to do things like make

15   proffers and make representations to officers of the Court.

16   And my comment notwithstanding about not standing on

17   ceremony as to evidence in discovery disputes, we did talk

18   about what Duane Morris is going to see as counsel and what

19   that looked like and how it was going to work so that they

20   basically were in a position to make representations because

21   they really had knowledge of things from sort of the

22   beginning to the end.  So, what can you tell me about that?

23             MR. HITCHING:  Your Honor, Jarret Hitching.  Just

24   to address the first point.  Documents that are coming to

25   Duane Morris for purposes are -- we can see what is flagged

1    for redaction.  So, the text -- the redaction text is

2    shaded, we can see the underlying information that is being

3    masked.

4              THE COURT:  So, you know what's been flagged but

5    you can see what's been flagged?

6              MR. HITCHING:  Correct.  Correct.  And, in fact,

7    we have the ability to take that designation away if we deem

8    it inappropriate.

9              MR. ROSENTHAL:  So, that's obviously reassuring,

10   but then the other thing is, Your Honor -- and I saw it

11   again last time we tried to drill down and get a sense of

12   the sequencing -- it seems to me like if it's already being

13   redacted from GDPR with the shading and not the full blacked

14   out redaction and then they're looking at it for whatever

15   purposes, that -- who's doing the review?  Because it's

16   inconceivable --

17             THE COURT:  You don't get to tell him how to do

18   things.  I want to make sure that counsel in the case has

19   enough information, they can make their appropriate

20   representations and that there's not any sort of wall that

21   means that they're sort of all buying sort of

22   representations and nobody's sort of checked them.

23             But I am not going to micromanage how they do

24   this.  It's not a good place for a court to be.  It's not,

25   frankly, something that... What I care about is the

Page 87

1    results.  And so I think as to the substantive issues we've

2    talked about, you've raised a number of issues, I've agreed

3    with, frankly, most of it, and so that's what I'm going to

4    worry about.  I'm going to worry generally about that I have

5    counsel on the case who can speak authoritatively.  I'm

6    satisfied with the statement that's been made.  If there's a

7    specific cause or reason in the future to revisit that,

8    we'll take a look at it.  But I have no desire to start

9    finding out in what sequence they're doing things.  That's

10   not -- it's just not a productive conversation.  We have

11   enough things to get through.

12            MR. ROSENTHAL:  My apologies, Your Honor.  I think

13   I was unclear in the way I spoke then.  Because my

14   understanding from what was being said is that therefore

15   counsel is only being given the documents that BDO has

16   already decided are relevant to be shown to counsel.  That's

17   where my concern lies, because --

18            THE COURT:  My understanding is that -- is,

19   listen, people hire out folks to review documents and

20   there's also AI that goes on these days as opposed to

21   associates or contract attorneys sitting in large warehouse

22   for months on end.  And so that is what it is.  And, again,

23   when you are -- the way that discovery responses are

24   supposed to be done -- there's a certification and the

25   person who certifies is the person who steps up to the plate

Page 88

1    as to the process.  And so I assume that the discovery

2    responses here will be no different.  Somebody will have to

3    certify what those responses are.  If it's a BDO person or

4    it's a BSG, whoever the person is, and then there are fair

5    questions in discovery, in depositions, if you want to go

6    that route, need to go that route about the process.

7              But, again, I don't think now is the time to --

8    you can talk offline but I don't think now is the time in

9    court to have sort of an open inquiry about well, how are

10   you complying with your discovery obligations?  It sort of

11   echoes some of whatever I said before, which is, you know,

12   there are things that are the backdrop there and the very

13   air we breathe and the world we live in about how -- what

14   people's obligations are.  And so that is what it is, and if

15   people don't behave accordingly then things go badly.

16   Eventually.  Maybe not now, but that's how it goes.

17             MR. ROSENTHAL:  Well put, Your Honor.  And I just

18   think that it just caught us by surprise in light of

19   representations made last time, but we'll move on.

20             THE COURT:  All right.

21             MR. ROSENTHAL:  The other thing that concerned us

22   with regards to what Mr. Peters said when we were first told

23   there would be 37,000 documents reviewed and then produced

24   by a week ago, and now they have 425 ready now, in a week

25   another 516.  And then he said that as they're reviewing the

Page 89

1    next 28,000 they'll start uploading the next batch of it,

2    was what he said.

3            And, again, it just concerns us that this is being

4    drawn out.  We're going to have production going on to next

5    year.  Because last time, on Page 71, we were specifically

6    told it's all uploaded and the review's underway, and just,

7    you know --

8            THE COURT:  Well, I have the language of the

9    letter on August 27th saying it will then be reviewed and

10   gathered.  Here's my concern.  My concern was profound when

11   I read that things were going to be produced next week and

12   then things weren't produced.  Because the purest -- the

13   surest way to make progress in a discovery dispute is to

14   start producing things so we can actually have substantive

15   discussions.  It's like the surest way to deal with a

16   secured creditor is to start paying them.  They don't want

17   to talk to you until you start paying them.

18           And so my thought is -- I'm not naive enough to

19   think this is the last discovery conference we're going to

20   have, but that I want to see production and that should also

21   go in the order which is that what was said about what was

22   going to be produced is actually in the order.  Because,

23   frankly, there were things that were said last time and it

24   didn't happen, and we need to have these things in an order

25   because I don't want to -- it can't be a moving target.

```
 1              And so my goal is to get documents produced,
 2    reviewed and produced so that we can get to the end.  So,
 3    there has still been a very, very modest production.  We're
 4    talking about 211 new documents.  So, and then other
 5    conversations you're talking about 1.2 million, 28,000,
 6    37,000, all sorts of very -- much larger numbers that,
 7    frankly, are hard to even fathom given that we have 211
 8    documents thus far.  So, substantial production needs to
 9    happen soon, it needs to happen now.  Nothing seems to be
10    done on a rolling basis, which is what was represented was
11    going to happen.  I have representations from BDO today that
12    they were start producing things daily.  You know, the
13    representations are there so that courts don't have to be
14    make rulings, but then if the representations are made and
15    they aren't followed through on, then courts need to make
16    rulings.
17              So, rolling production is so ordered.  It is
18    required and must occur.  And it will occur on the schedule
19    that was represented in open court by BDO, who's working for
20    the joint administrators, and that's what the order will
21    reflect.
22              And so I understand you're understandably nervous
23    about this and I don't know how to square what's gone on in
24    this case with the notion of a Chapter 15 proceeding
25    expeditiously, but Chapter 15 cases I'm discovering are much
```

Page 91

```
 1    like Chapter 11 cases.  They all have their own

 2    personalities and we deal with what we -- what the case

 3    presents.

 4           And so the elephant in the room that has not yet

 5    been mentioned today is what happens with the District Court

 6    and the request to -- that's been made that hasn't been

 7    ruled on, presumably, and the agreement to stay that through

 8    August -- through October 31st?  And the answer is I don't

 9    know.  And everybody preserves all their rights as to make

10    any arguments based on everything that's gone on.  And so

11    the only thing I assume is that if the October 31st date

12    comes and goes, that you all will figure out how you want to

13    handle it so we can have some sort of -- we know what the

14    process looks like.  Are people running here?  Are they

15    running to District Court?  How are we doing it?  And to

16    work that all out.  That's so -- that -- we need to talk

17    about that.  Maybe now is as good a time as any, or maybe we

18    need to get together towards the end of the month.

19           MR. ROSENTHAL:  Well, I mean, on that issue Vale's

20    position is clear, given all that's transpired or the lack

21    of transpiring.  We don't consent and we think that there's

22    not anywhere near a basis for the Court to enter any kind of

23    injunctive relief.

24           But on the subject of the productions, we actually

25    have a proposal, Your Honor, that hopefully removes as much
```

```
 1    of this as possible from the Court.

 2            THE COURT:  Well, before we segue from the

 3    injunction issue --

 4            MR. ROSENTHAL:  Yeah.

 5            THE COURT:  -- their -- right, so everything that

 6    is sent to this Court is sent to us from the District Court

 7    on an order of reference.  So, here you have a live District

 8    Court proceeding, a live proceeding in the Bankruptcy Court,

 9    which begs the question where should the issue of injunctive

10    relief be addressed if it needs to be addressed?  And so we

11    need to work our way through that.  So, my desire is to

12    certainly -- if the District Court -- the District Court

13    will no doubt be familiar with the dispute based on the fact

14    that it has things presented to it.  It doesn't have the

15    discovery issues that we've been dealing with here, but

16    there's plenty of record of that.

17            If it's choosing to not recognize things, well,

18    then we're in one world.  If it chooses to recognize the

19    judgment, it would seem, since that would -- that the

20    District Court should decide the first instance, whether it

21    wants to refer that -- any injunctive request down here or

22    certainly address it itself.

23            And so my thought is that when you -- that that

24    probably is something to tee up with the District Court when

25    you hear from the District Court as to how to address that.
```

Page 93

```
 1    That would be my -- that's sort of my -- been my assumption,

 2    but I realize the only person I had expressed that to is

 3    myself internally, not out loud, and that I should share

 4    that with you.  I think I've sort of hinted at that in the

 5    past, just because that's kind of the way it sort of makes

 6    sense in terms of -- we're a court that really gets our

 7    jurisdiction from the District Court, and if the District

 8    Court has a live case.

 9            And I think Judge Glenn has done a similar thing.

10    He said you should go to the District Court.  I think it was

11    another Chapter 15 where there -- and I don't remember the

12    name of the case, where there was a question about

13    injunctive relief pending something that the District Court

14    was doing.  And he said, well, the District Court would know

15    I have the case.  They are well-versed, so we don't have

16    some of the -- necessarily all of the time saving economies

17    where a District Court is sort of -- you're trying to

18    withdraw the reference and they say, listen, you've been

19    dealing with this forever.  I just met you people and it

20    makes sense to stay in Bankruptcy Court.  But even then, the

21    District Court gets to decide when there's a motion to

22    withdraw the reference.

23            So, my -- again, this is my default, which is

24    almost treated like a motion to withdraw the reference.  You

25    mentioned that the District Court -- if the District Court
```

 1    thinks it would be helpful for the Bankruptcy Court to do

 2    it, I'm happy to do it.  But at the same time the District

 3    Court will have its own independent basis of knowledge, and

 4    then there'll be other things you would talk about.  But,

 5    frankly, it may work the other way, too -- is if I dealt

 6    with it, you may be telling me something about what the

 7    district Court's decision and various things.

 8              So, that's my default.  If somebody wants to make

 9    a run at it, you can let me know but --

10              MR. HYMAN:  Your Honor, the status in the District

11    Court action has not changed.  There has never been a

12    hearing before Judge Broderick.  He has --

13              THE COURT:  But I don't know that he's required to

14    have a hearing.

15              MR. HYMAN:  And he may not be, but I'm not sure

16    that there's a real venue to seek injunctive relief there.

17    I suppose -- I suppose we could but --

18              THE COURT:  Well, but there's no venue to seek it

19    here because there's nothing right now for you to...  I

20    mean, this is all going to come up when the District Court

21    issues a decision if the decision is to recognize a judgment

22    which allows them to move forward.  At that point, you'd

23    have to run somewhere.  You'd have to run here or you'd have

24    to run there.

25              And so what I want to avoid is the unnecessary

1   process related fire drill where -- well, we're going to run

2   to both courts and we'll see what happens, or we're going to

3   make a guess and we don't really know what Judge Lane may

4   think or what Judge Broderick may think.  And so I'm trying

5   to avoid that kind of inefficiency by telling you what my

6   default is and to say that if you get a decision from Judge

7   Broderick that would trigger a need to file such a motion,

8   that I would think that you would -- whatever his procedures

9   are -- find a way to tee that up and ask him and say, we'd

10  like to seek.  Right?  Because you can do that in a civil

11  case.  We want to seek a stay.

12          And so it's not something the District Court is

13  unfamiliar with.  And just say, we -- just to fill out the

14  picture, we've been doing these things in Bankruptcy Court,

15  and the bankruptcy judge said he'd certainly be happy to

16  help but certainly recognized that in the first instance the

17  District Court should get to decide if it wants to address

18  the injunctive piece itself.

19          And there's certainly -- there's a civil

20  injunction piece to any judgment.  There's also a -- you

21  know, there's an injunctive piece to Chapter 15.  There's a

22  couple ways to do this.  So, but again, all my jurisdiction

23  flows from up the street.  And so respectful of that fact,

24  and trying to -- I want to raise it now because I don't want

25  to impose on the parties or Judge Broderick in -- if we

1    don't talk about it and then we all find ourselves in a

2    moment of panic running around figuring out what are we

3    doing and where are we doing it?  That doesn't serve

4    anybody's interests.

5              MR. HYMAN:  Yeah.  I think the only concern that

6    we have, Your Honor, is just given the lack of attention

7    that we've gotten from Judge Broderick, I don't know that

8    we're going to get a response.  We can certainly try and --

9              THE COURT:  Well, I don't know that they -- for

10   them to respond to at this point.  The matter's briefed and

11   he's going to get to it, and he may be in the middle of a

12   large criminal trial, he could be doing any number of

13   things.  And so I'm unaware of any pending request, and I'm

14   sure he'll deal with it completely appropriately.  And so,

15   you know, you may want to write all your letters and have

16   them ready to go for whenever -- if that eventuality comes

17   up.

18              You also -- again, I won't tell you how to

19   practice, you know what you're doing.  But, you know, I can

20   imagine a circumstance where if he permits letters to

21   chambers to say, Judge, we want to make you aware of -- and

22   give you a refresh on where we were.  We've already told you

23   we had an original deadline of an agreement.  We updated

24   that and we told you about that too.  And now we're telling

25   you that we don't have an agreement as of October 31st.  If

Page 97

```
 1    this happens, then the Debtor is going to seek a stay, Vale
 2    will seek to oppose it.  There's a question about what
 3    appropriate forums that should all be heard.  This is what
 4    we can tell you about that.  And you want to do that to be a
 5    snowplow and clear the way for the eventual discussion on
 6    the merits.
 7              And, again, I'm happy to be -- to address things
 8    as is appropriate.  But, again, I'm very respectful of where
 9    my jurisdiction comes from and the fact that he has a case
10    between these two parties on the merits and has the ability
11    to grant a stay or not grant a stay based on his considered
12    judgment and looking at issues.  So, that's why.  And so
13    I'll let you address that as you think appropriate.
14              MS. SCHWEITZER:  Your Honor, I appreciate you
15    raising it ahead of time and we particularly would want to
16    avoid a TRO type situation given we all know (indiscernible)
17    looming.  I think the one thing just to put out there, and I
18    completely respect your view of looking toward the District
19    Court, is that there is a lot of history here.  And the
20    original stay that we sought was a TRO pending
21    (indiscernible) commission hearing, things like balance of
22    the equities and uproot merits and all of that to flow into
23    it.
24              And to go to this forum, I think the one thing
25    that I would not want to be perceived is that you were
```

 1    neutral or had no view on those types of positions.

 2            THE COURT:  No, I think you can safely represent -

 3    - and there's a transcript -- that if called upon to make a

 4    ruling, I would make a ruling.  I'd be happy to do so.  And

 5    certainly if the District Court thinks it would be of

 6    assistance for me to do so, I'd be happy to have that matter

 7    added to my calendar.

 8            And so -- but at the same time, my -- I wouldn't

 9    say reluctance but my raising it now is to express my sort

10    of respect for sort of the different overlapping

11    jurisdictions and, again, where the Bankruptcy Court

12    jurisdiction comes from.  So, my thought is the appropriate

13    -- and I am putting something in a sense on Judge

14    Broderick's plate in the sense of then you're going to go

15    ask Judge Broderick, presumably, how he wants to handle it.

16    But I think -- that, I think, is appropriate in the sense of

17    -- given all the facts and circumstances.

18            But, no, I'm not reluctant.  I'm just trying to be

19    respectful.  And, again, I think it's in everyone's interest

20    to know what the process looks like because it seems pretty

21    clear based on things that have been said over the last

22    couple of hearings, that if something happens after October

23    31st, there's going to be a bit of a fire drill on this

24    particular issue and people want to know what forum, where

25    they should go and how to handle that.

 1          So, I think I'll trust you all on your considered

 2   professional judgment to tee that up as you think

 3   appropriate, whether it's a letter or something else, or

 4   your request for a status conference.  And, again, that goes

 5   to Judge Broderick's ways of doing business and I'm not

 6   familiar with his local rules and his procedures for his

 7   chambers.

 8          MR. ROSENTHAL:  Ultimately, Your Honor, it's the

 9   joint administrators' decision on whether to file any kind

10   of motion and how they would want to proceed.  You know, we

11   would just file an opposition and go from there to wherever

12   it is, because, frankly, there's been a history.

13          THE COURT:  No, no, but what I'm trying to do is

14   I'm trying to give you the speech that I would give you if

15   somebody filed that motion here, and then I got you all on

16   the phone and I said, well, here's my issue.  And so this is

17   my -- I have very few powers of prophecy, but this is my

18   prediction as to what exactly that speech would look like.

19   And so then you would not only -- they would have that

20   motion, but then you would all be running to the District

21   Court to say the Bankruptcy Court says, what would you like

22   to do?  And so I'm trying to cut that off and essentially

23   tell you where I'm going to be, because I can predict that

24   with almost -- almost certainly at this point, just given

25   the circumstances.

Page 100

```
 1              MR. ROSENTHAL:  I mean, ultimately, Your Honor, if
 2    they wind up filing somewhere, that would probably put them
 3    on a clock that they haven't put themselves on so far.
 4              THE COURT:  Well, again, we'll get to it.  I'm
 5    just -- you all do what you think is appropriate but I don't
 6    want anyone to be surprised if a motion gets filed here and
 7    nobody's talked to the District Court, you pretty much know
 8    exactly what I'm going to say.  And so that was my reason
 9    for raising it.  All right, so --
10              MR. ROSENTHAL:  I have a proposal now, Your Honor.
11              THE COURT:  Sure.
12              MR. ROSENTHAL:  Because I do think that it is
13    probably not the most exciting part of the Court's calendar
14    to have monthly check-ins whereby things happen.
15              THE COURT:  We do whatever walks in the door.  But
16    listen, I recognize it's also not, frankly, what you want to
17    be spending your time on either.
18              MR. ROSENTHAL:  And it also shouldn't be where we
19    get those through documents briefed out to us the week after
20    the hearing and we get maybe a (indiscernible) for the three
21    weeks subsequent, and we kind of are wondering when's the
22    rest coming?
23              So, what I would propose and I think this is
24    pretty low-hanging fruit, Your Honor, is if the joint
25    administrators at the end of every week give us a weekly
```

1    report on where things are in discovery.  What's been done

2    so far, what's in progress, what hasn't been started, and

3    what their estimate is on the completion date of discovery.

4            So, that way we are not kept in the dark.  We

5    don't have to wait and write a letter to the Court and say

6    we've heard nothing over the past month.  So, that's kind of

7    low-hanging fruit number one that I would suggest, just to

8    keep the trains moving and communications open.

9            THE COURT:  All right.  Any thoughts?

10           MR. ROSENTHAL:  I can read those again if you want

11   that list of four.

12           MR. HYMAN:  Your Honor, I think that you were

13   clear in what you were ordering when you were ordering

14   rolling production.

15           THE COURT:  I know but things haven't happened

16   that way.

17           MR. HYMAN:  And I understand that.

18           THE COURT:  So --

19           MR. HYMAN:  And we will now have an order --

20           THE COURT:  Well, I know, but I thought we had an

21   order before.  So, it was from the bench but it was still an

22   order and it didn't seem to get the trick done.

23           In a former life, I was involved in a Freedom of

24   Information Act case that was enormous.  And while the judge

25   was incredibly patient in the case, he also didn't want to

```
 1    have dealings every day with the parties.  And so status

 2    reports were a useful thing to do, so that hearings didn't

 3    trigger the exchange of information that should've otherwise

 4    been occurring.

 5              So, I'm inclined to think that a short letter that

 6    refreshes what we've been talking about -- we essentially

 7    have three categories that are in the August 27th letter.

 8    You sort of gave a refresh today as to that.  And Category

 9    1, presumably, is done and then we're on to Categories 2 and

10    3.  I've seen different -- I've heard different numbers, but

11    I would think that that makes sense and is not a big...

12    Frankly, it'll save as much attorney time as it'll cost in

13    terms of requests for updates.

14              I mean, I've gotten plenty of letters in this

15    case.  And so my thought is that this is a letter that

16    actually may save the need to write future letters.  So, I'm

17    inclined to do that.  But I realize this is the first of

18    several proposals.  So, maybe -- hear them all so we can

19    figure out where we are.

20              MR. ROSENTHAL:  So, Proposal Number 1 was the

21    weekly status reports that, hopefully, just opens a line of

22    communications.  The second thing was, because I don't want

23    to have a dispute down the road that leads to, you know,

24    requiring court intervention and be assured of well, we're

25    far along on this process -- is there should be an exchange
```

```
 1    with us, as happens in a lot of cases, of what are the
 2    search terms that they're using, given that Mr. Peters
 3    mentioned that they're using search terms and they're trying
 4    to figure out how to tweak the search terms to get the right
 5    number of documents to review.
 6           I just think within a week, let's get a list of
 7    those search terms so that we can have a dialogue if there
 8    are any concerns or things that we'd like to propose before
 9    we wind up in a dispute in two months when we first find out
10    them.  So, I think that, again, is just relatively low-
11    hanging fruit that's not uncommonly done.
12           THE COURT:  So, that's two.  What's three?
13           MR. ROSENTHAL:  And then the third thing is, and I
14    recognize this won't be a weekly thing given that now
15    they're going to have go back and gather the documents from
16    the other custodians that they had not started to gather
17    from.  But I think let's say three weeks from today, I think
18    that weekly update should have a status support on where
19    they are with gathering the documents from these other
20    custodians so we don't, in two months, have to go to the
21    Court and find out that they're nowhere yet, especially if
22    we might be hit with a TRL in a month.  So, again, just
23    trying to anticipate things.
24           I think these are all pretty low-grade, low-impact
25    requests that just, hopefully, avoids disputes that have to
```

Page 104

1   come to the Court while waiting for a Court dispute to find

2   out information.

3           THE COURT:  All right.  And did you have three or

4   four?  I thought I heard four.  I'm not soliciting a fourth

5   if you don't have a fourth currently.

6           MR. ROSENTHAL:  Well, those are the only three.

7   The only fourth suggestion that I have is in the event that,

8   you know, next time we're met with new factual claims that

9   somehow affect what the discovery obligations should be.

10  They put in affidavits this time from Mr. Callewart.  And I

11  think next time --

12          THE COURT:  I'm not going to micromanage future

13  disputes.  So, it's hard enough to manage present disputes.

14  So, we'll see how it goes.

15          But as to the first three, those sound reasonable.

16  After all, people in discovery, if you have -- after you get

17  your document discoveries, you wait to take your deposition

18  and introduce your civil case, and then you depose the

19  person who signed the discovery responses and you say, when

20  you looked, how did you look?  Where did you look?  What

21  search terms did you look?  So, that seems to be fair game

22  for purposes of civil discovery.

23          And the other one seems to me just -- we're going

24  to end up having that conversation at some point.  And as

25  part of the ongoing meet and confer obligation under the

1     Federal Rules of Civil Procedure that really come into play

2     for any contested matter, which this pretty clear is -- that

3     seems to be consistent with that.  But let me hear anything

4     from the --

5             MR. HYMAN:  I don't think we have any objection,

6     Your Honor.  You know, we will provide weekly updates.  I

7     don't know whether a less formal email is acceptable rather

8     than a formal letter but --

9             THE COURT:  Yeah, I think it's exchange of

10     information.

11             MR. HYMAN:  We're happy to provide an update.  We

12     will -- in those weekly updates, we'll provide updates on

13     what the joint administrators have done to request and seek

14     and produce documents from all the other parties that we

15     spoke to today.  As it relates to search terms, we've got to

16     speak to the client but I don't anticipate a problem.  I

17     don't know that we can get that done by tomorrow.  Mr.

18     Rosenthal mentioned the end of the week...

19             THE COURT:  It's designed to prevent a possible

20     redo down the road, which is a disaster for everyone.

21             MR. HYMAN:  That's not something we've ever tried

22     -- we're not trying to hide that from anybody.  That isn't

23     an issue.

24             One clarification, though, I might ask Your Honor.

25     You made the ruling earlier related to personal email

Page 106

1    addresses and nationality.  There have been a lot of

2    discovery that had been undertaken and redactions that had

3    been undertaken as -- through today, which were on reliance

4    of the last set of documents that they had agreed to do.

5         THE COURT:  Yeah, but you decided to produce it

6    while they had their argument pending, and that's what

7    people did to move past it.  I'll let you try to work the

8    practicalities of that out and you'll come to me if you

9    can't figure it out.  But that's a practical problem that

10   involves, you know, numbers, how many documents, how many

11   redactions, can you give them what they need in a narrative

12   description as opposed to going back and re-redacting?

13   There's lots of ways to skin that cat, so I'm going to let

14   you have that conversation in the first instance.

15        I'm not going to -- I'm not going to sit here

16   today and say you need to go back and re-redact.  That's the

17   traditional method of doing it.  But I'm going to require

18   you to meet and confer and propose suggestions on how for

19   anything you've produced that implicates that ruling, how

20   you're going to sort of true up the knowledge involved so

21   that they have what I think is -- what's appropriate and

22   consistent with the ruling.

23        So, re-redaction is one way to do that.  It may or

24   may not be the exclusive way to do that, depending on how

25   things work and what the documents are.  So, I'll ask you to

1    meet and confer on that, and everybody reserves their rights

2    if, in fact, the true up process is not something that

3    people can agree upon.

4            MR. ROSENTHAL:  Your Honor, two more hopefully

5    very quick issues.  One is, in this first batch of 211

6    documents that we got, there are a number of redactions not

7    for GDPR but just simply redacted commercially sensitive and

8    confidential information.

9            THE COURT:  It's subject to the usual -- I mean,

10   you know -- I don't know what to tell you.  I don't have any

11   briefing on it.  You should meet and confer and, again, I

12   don't -- I don't know what to tell you.  There obviously

13   needs to be a basis for it.  If it's the business dealings

14   of BSG, I don't know how it's not relevant, even if it needs

15   to be subject to a protective order because it's

16   confidential.

17           MR. ROSENTHAL:  So, Your Honor, we resolved this I

18   thought months ago when they were able to designate

19   sensitive documents as AEO.  And if there's not a privilege

20   and there's not a GDPR issue, I don't know why anything is

21   being -- it's just the confidentiality order doesn't

22   contemplate it at all.

23           MR. HYMAN:  Your Honor, we're happy to meet and

24   confer with Cleary with respect to anything that's been

25   redacted for those types of purposes.

```
 1              THE COURT:  I know, but this is -- the idea is
 2    that -- what are the rules of the road, right?  So, if the
 3    rules of the road are flawed, then you're going to have to
 4    meet and confer about everything and then we're going to
 5    have 8 million more of these hearings.  That's actually not
 6    the way the rules of the road are supposed to work.
 7              So, if the rules of the road is that there's no
 8    appropriate basis to redact it, then there's no appropriate
 9    basis to redact it.  So, that sounds like it's subject to
10    potentially the bankruptcy rule that allows for sealing of
11    confidential business information.  But you file motions to
12    address that and then we have discussions.
13              I'm not aware of any privilege, and I think we've
14    already talked about an attorneys' eyes only procedure.  So,
15    I don't know why that wouldn't be used for that.  That just
16    seems to be a stubborn refusal to conform conduct to what
17    we've already been talking about.
18              MR. HYMAN:  We will go back and we'll take a look
19    at those documents and we'll meet and confer.
20              THE COURT:  All right.  Well, you're going to go
21    back and you're going to produce them attorneys' eyes only
22    with that information un-redacted.
23              MR. ROSENTHAL:  So, the last issue, Your Honor, is
24    just to give the Court a heads up on something that I fully
25    expect that we will have a productive conversation with
```

1    counsel for from the joint administrators.  But I think last

2    week, we got served with document requests and contention

3    interrogatories asking for our evidentiary basis essentially

4    for what we intend to present to the Court probably many

5    months from now in our ultimate opposition, and for

6    contention of interrogatories that are incredibly premature

7    and ultimately will be revealed in our objection that we

8    file.  I've got to talk to him about timing but --

9            THE COURT:  I'm not -- A, you're going to meet and

10   confer.  I don't have any -- listen, I prepare for hearings

11   just the way everybody else prepares for hearings.  I have

12   numerous pages of notes and notes on notes.  I'm not going

13   to go on the fly.  So, we're going to have to deal with it.

14   You should talk to each other.  But this is what happens

15   with discovery, is -- is if there are real problems in

16   discovery, and there have been real problems with discovery

17   here, people are -- there's not the level of cooperation and

18   ability to work effectively past these issues.

19            So, again, I'm not telling you what you have to

20   do.  I'm saying you need to meet and confer.  But --

21            MR. ROSENTHAL:  Absolutely.  We plan to.  I just

22   wanted to give the Court a heads up in case we have to file

23   a Protective Order Motion next week.

24            THE COURT:  I know.  It's just that since we've

25   gone through a lot of things, there's only so much we can

1    really do without a more developed record.

2             MR. ROSENTHAL:  I'm not expecting any guidance or

3    any decisions.  I'm just -- I don't want the Court to be

4    surprised if we file a Protective Order Motion.  But,

5    hopefully, they recognize that contention interrogatories

6    are premature and we agree to a date in the future.

7             THE COURT:  I thought there's some authority about

8    when in the process that should happen, but I don't have

9    sort of the sort of Black's Law Dictionary kind of rule

10   handy rattling around in my brain.  But I mean, the practice

11   is generally to have those things come later after

12   discovery.  But, again, you all will fill me in as I need to

13   be.

14            So, I want to make sure I understand what's coming

15   out of today's proceedings.  So, there's going to be an

16   order that's going to be a discovery order, and it's going

17   to go through the rulings that were made on each of the -- I

18   think it was four but perhaps it was five issues that were

19   addressed starting with Mister...  Starting with production

20   of documents going to Mr. Steinmetz, going to other former

21   and current directors and officers, as well as other

22   companies that were identified, going to the GDP protocol,

23   and also going to the issue -- I guess it's with Mr.

24   Steinmetz, but maybe it's with others, about control --

25   possession, custody, and control and how that's interpreted.

Page 111

```
 1            So, those are my rulings.  So, I will get that

 2     order, proposed order that should be served on the other

 3     side.  If there's any comments, they need to be provided

 4     promptly.  Obviously, you should share it, try to reach an

 5     agreement.  I'm not hopeful that there will be an agreement

 6     but it's my ruling so I will -- I'm happy to take comments,

 7     but as it's ultimately my ruling, I will just -- I have the

 8     pen.  So, that's -- so, while you may make comments, you may

 9     not necessarily hear from me as to have any further

10     discussion because a ruling is a ruling.

11            As to that order and rationale, I don't think the

12     rationale needs to really be in there.  I think you can say

13     for the reasons set forth in detail on the record of today.

14     That way it prevents you from having to characterize things.

15     But in terms of the practicalities, that's really what the

16     order should be addressed.  The Court rules this and this is

17     what is required to be done.

18            MR. ROSENTHAL:  Your Honor, in terms of timing,

19     we'd like to wait for the transcript to (indiscernible) that

20     way we can be sure that it conforms.

21            THE COURT:  Yeah, that's fine.  That's fine.  I'm

22     going to so order it from the bench so that we have a go-by

23     going forward.  But that's fine.

24            The thing that's sort of a bit of a hanging chad

25     is the issue about attorneys' eyes only.  Right?  And so the
```

1    order is going to address that in some context, which is

2    things that need to be produced, but notwithstanding the

3    fact that they're necessary for the case, there are privacy

4    protections which we will accord to individuals and we will

5    treat them as attorneys' eyes only.  And I think that came

6    up in the context of personal emails.

7            You may want to fold in the confidential business

8    information as well into that, that an issue was also

9    raised, I made a ruling.  It sort of didn't come up in the

10   context of what was briefed but it came up.  So, maybe that

11   also goes into the order as to confidential business

12   information that it's shared attorneys' eyes only and/or

13   under seal.  I'll let you work out the details of that.  And

14   that it can't be used publically without further order of

15   the Court.

16           And I'm trying to figure out if there's anything

17   else where the attorneys' eyes only protocol could be of use

18   or that should be contained in the order.

19           MS. SCHWEITZER:  There are only ministerial things

20   that we'll obviously attach to the GDPR protocol itself so

21   that you can so order and approve the protocol as part of

22   that.

23           THE COURT:  All right.  Yeah, anything obviously

24   that you agree to I'm 1,000 percent behind.  So, that's

25   fine.  And so just to make it very clear on the record, it's

1    represented to me that there is a GDPR protocol.  There are

2    a couple of issues that were in dispute that were raised

3    today that I made rulings on but that you've done the lion's

4    share of the work on that.  You have an agreement that

5    you're going to submit as a joint protocol and that you're

6    asking for me to approve and that I will approve.  And so

7    you can put that in the order as well.

8             I'm trying to make this order one stop shopping.

9    And so if there's anything else that you, after consultation

10   back and forth, think, jeez, this would be good to put in

11   the order so that everybody understands the rules of the

12   road, if you agree upon it, I will -- I'd be stunned and

13   amazed if I didn't also think it was appropriate and useful

14   to put in the order.  Because, again, this is -- the idea is

15   that this is supposed to go -- work forward for the parties

16   on things.

17            So, I think the only thing left then that we

18   talked about but didn't do it in specific detail is to

19   schedule for production.  I'm really using what was put on

20   the record by the gentleman from BDO, from across the

21   Atlantic, who works for the joint administrators as to

22   what's going to happen.  I'm adopting his schedule for

23   production, and that's without prejudice to anybody's rights

24   to come in and say the production's not happening fast

25   enough or to seek relief because certainly there's a concern

Page 114

1    about the volume of documents.

2             So, maybe what may be the way this works, and I'm

3    thinking out loud here so I'm hoping not to muddle the

4    record, but maybe what this works is what the order should

5    talk about is the near term.  There was a discussion about

6    the second tranche and the third tranche, that the order

7    addresses those tranches.  And that for other things that

8    there's been a proposal made as to how the schedule worked

9    forward, everybody reserves their rights and that we will --

10   the parties will continue to meet and confer about things

11   beyond those immediate tranches that were represented on the

12   record.  Maybe that's the way to do it.

13            MS. SCHWEITZER:  We'll go back and look at the

14   record.  I thought he had actually given expectations to the

15   outside date for total completion so that if we were in

16   agreement with that outside date, then we can --

17            THE COURT:  Yeah, so take a look at it, at what

18   exactly he said, but that really is the go-by.  Essentially,

19   if you all can live with it, I'm happy to adopt it as, you

20   know, basically the way I thought we sort of adopted the

21   earlier discussion about timeframe.  So, that's -- but I'll

22   let you look at the transcript of what he said, but that

23   really is the point of the realm in terms of what we're

24   going to do in terms of scheduling.  So --

25            MS. SCHWEITZER:  And a procedural question.  How

Page 115

1    would you like us -- whether we agree or disagree, would you

2    like us to file forms of order and letters on the docket or

3    to email to you, or what procedure what you --

4           THE COURT:  I don't think it needs to be sort of

5    notice to all.  I mean, I'm happy if you wanted to do that.

6    I don't know that it's necessary.  Because while this would

7    be relevant for other folks, it's really a discovery dispute

8    between two parties so I think it's appropriate to just, if

9    you want to submit the letter -- you want to submit the

10   order, send it to email and say, here's what we've come up

11   with.

12          And then if there is going to be an objection, I

13   would say that needs to be done within 48 hours, if you can

14   live with that timeframe, just because I'd like to get this

15   order entered before fall turns to winter.  So -- and,

16   again, I know I'm so ordering it but I know that doesn't

17   give the level of clarity that is useful for attorneys and

18   for the Court, frankly, too.  So, I would say that that's

19   where we'd end up.

20          So, I think you can submit just essentially a

21   letter with the proposed order, which you'll also attach to

22   the GDR protocol, and that should do it.

23          MS. SCHWEITZER:  That's fine.  All right, do I

24   dare ask about another hearing date?

25          MR. ROSENTHAL:  Yeah, that's what I was going to

Page 116

1    ask -- when you'd like to see us again.  Or not like to see

2    us.

3              THE COURT:  I don't know that I would phrase it

4    exactly like that, with all due respect.

5              MS. SCHWEITZER:  When shall we return?

6              THE COURT:  So, give me one minute here.  So, what

7    are we thinking in terms of an appropriate date?  How far

8    out?

9              MR. HYMAN:  A month from now?

10             THE COURT:  That's what I was thinking.  Does that

11   work for everybody?

12             MS. SCHWEITZER:  Yes.

13             THE COURT:  All right, so here's what I asked you

14   to do.  I, unfortunately, don't have my calendar and program

15   open.  So, rather than wait as the Windows icon spins, why

16   don't I ask you to go to talk to Ms. Ebanks and get a date

17   about 30 days out, and since you're both here -- you're all

18   here, that way you can get a day that works for all your

19   schedules.

20             MS. SCHWEITZER:  Great.

21             THE COURT:  And if -- because it's always good to

22   be optimistic in life -- if everything is going so

23   swimmingly that we don't need to talk in a month, you'll

24   call and say we don't need to talk in a month and you'll

25   pick another date, if everybody agrees that that's the way

Page 117

1  to go.  And so you'll let me know.  And if for some reason

2  there is something that is of a more fire drill nature like,

3  hypothetically, something issued by the District Court, and

4  there's sort of a need to have a conversation quickly -- I'm

5  trying to avoid that by my comments earlier today -- you'd

6  just get everybody on the phone and work out with Ms. Ebanks

7  a date and time for us to talk.

8            As you know from prior -- or you may know from

9  prior things, I usually deal with those kinds of things

10 within 24 hours and 36 if we're in the middle of something

11 crazy here in terms of getting you a time to chat.

12            MS. SCHWEITZER:  Thank you, Your Honor.

13            THE COURT:  All right.

14            MS. SCHWEITZER:  And thank you for your time

15 today.

16            MR. HYMAN:  Your Honor, we would just like an

17 opportunity to talk to our clients before trying to schedule

18 the date for a month out.  So, if --

19            THE COURT:  Yeah, that's fine.  If you want to do

20 that, that's fine.  Why don't you do that?  What you might

21 do, though, I would suggest is maybe get a couple of

22 possible dates from Ms. Ebanks, and then that way you can

23 circulate them to folks and then you can pick among them and

24 figure out which one works.

25            MR. HYMAN:  That sounds good.  Thank you, Your

```
                                                        Page 118

 1      Honor.

 2                THE COURT:  All right.

 3                MS. SCHWEITZER:  Thank you, Your Honor.

 4                THE COURT:  All right, thank you very much.

 5      (Whereupon these proceedings were concluded at 3:47 PM)

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

Page 119

```
 1                    C E R T I F I C A T I O N

 2

 3         I, Sonya Ledanski Hyde, certified that the foregoing

 4     transcript is a true and accurate record of the proceedings.

 5
            Sonya              Digitally signed by Sonya
                               Landanski Hyde
 6          Landanski          DN: cn=Sonya Landanski Hyde, o,
                               ou, email=digital1@veritext.com,
                               c=US
 7          Hyde               Date: 2019.10.08 16:13:50 -04'00'

 8     Sonya Ledanski Hyde

 9

10

11

12

13

14

15

16

17

18

19

20     Veritext Legal Solutions

21     330 Old Country Road

22     Suite 300

23     Mineola, NY 11501

24

25     Date:  October 8, 2019
```