# EXHIBIT O



CL-2019-000269

**IN THE HIGH COURT OF JUSTICE**
**BUSINESS AND PROPERTY COURTS OF ENGLAND AND WALES**
**COMMERCIAL COURT (QBD)**

**[2020] EWHC 2021 (Comm)**

Royal Courts of Justice
Rolls Building, Fetter Lane, London EC4A 1NL

Before:

**MASTER DAVISON**

- - - - - - - - - - - - - - - - - - - -

Between:

| | |
|---|---|
| **VALE SA** | **Claimant** |
| - and - | |
| **BSG RESOURCES LIMITED (IN ADMINISTRATION)** | **Defendant** |
| -and- | |
| **DAG LARS CRAMER** | **Additional Respondent** |

- - - - - - - - - - - - - - - - - - - -
- - - - - - - - - - - - - - - - - - - -

**Mr James Willan** (instructed by **Cleary Gottlieb Steen & Hamilton LLP**) for the **Claimant**
**Mr Robert Weekes** and **Mr Carmine Conte** (instructed by **Covington & Burling LLP**) for the **Additional Respondent**

Hearing date: 3 July 2020
- - - - - - - - - - - - - - - - - - - -
**Approved Judgment**
I direct that pursuant to CPR PD 39A para 6.1 no official shorthand note shall be taken of this Judgment and that copies of this version as handed down may be treated as authentic.

**Covid-19 Protocol:** This judgment was handed down by the judge remotely by circulation to the parties' representatives by email and release to BAILII. The date and time for hand-down is deemed to be 30 July 2020 at 3pm

.............................

Master Davison
Approved Judgment

CL-2019-000269

### Introduction

1. This is an application to set aside an order made under CPR Part 71 that the director of a company which is a judgment debtor attend court to provide information for the purpose of enabling the judgment creditor to enforce the judgment debt.

2. The proceedings are enforcement proceedings brought by Vale S.A. ("Vale") against BSG Resources Limited ("BSGR") for the purposes of enforcing an arbitration award made in London on 4 April 2019 requiring BSGR to pay Vale an amount of approximately US$2.2 billion. The award was issued by an arbitration tribunal in the London Court of International Arbitration Case No. 142683 (the "Award").

3. Both parties are international mining companies. Vale is a Brazilian company. BSGR is based in Guernsey and is associated with the billionaire entrepreneur, Benjamin Steinmetz. The Award found that BSGR was liable for fraudulent misrepresentation arising from a joint venture mining project in Guinea. The tribunal found that BSGR made false or misleading statements to Vale during the due diligence process, including a representation that it had not engaged in bribery or corruption when it had in fact done so.

4. BSGR has not paid any part of the Award. Since 6 March 2018, it has been in voluntary administration on the application of its directors. The order was made by the Royal Court of Guernsey. The Joint Administrators of BSGR are Mr William Callewaert and Mr Malcolm Cohen of the firm of accountants BDO. There has been no application for the Administration to be recognised in England and Wales.

5. The Award was recognised in England by the order of Mr Justice Bryan dated 9 May 2019, granting Vale permission to enforce in the same manner as a High Court judgment (the "Enforcement Order"). In May 2019, BSGR brought an application challenging the Award under sections 24 and 68 of the Arbitration Act 1996 on the basis of allegations of serious irregularity and made a further application seeking to set aside or stay the Enforcement Order pending the outcome of its challenge.

6. The application to set aside or stay the Enforcement Order was dismissed by way of the order of Mrs Justice Moulder dated 20 September 2019.

7. BSGR's challenge to the Award was heard on 28 November 2019 and dismissed by Sir Michael Burton GBE.

### The Part 71 Order

8. By an application notice dated 12 February 2020, Vale applied without notice for an order under Part 71 against Mr Dag Lars Cramer, who is a director of BSGR. On 13 February 2020 – and without a hearing – Mr Registrar Kay QC, sitting as a Deputy Master, made an order (the "Part 71 Order" or the "Order") requiring that Mr Cramer (a) attend before a Master for examination relating to BSGR's means of paying the judgment debt owed to Vale and any other information needed to enforce the Award, and (b) produce all documents in his control relating to such matters, including certain specified categories of documents in a schedule to the Order. The Part 71 Order was personally served on Mr Cramer on 22 February 2020.

9. There followed a lengthy exchange of correspondence between Mr Cramer's solicitors, Covington & Burling LLP, and Vale's solicitors, Cleary Gottlieb Steen & Hamilton LLP, in which Mr Cramer objected to the making of the order but, notwithstanding those objections, put forward certain proposals as to how it might be complied with. Those proposals were rejected.

10. On 6 March 2020, Mr Cramer applied for an extension of time to apply to vary or challenge the Part 71 Order. That application was granted by way of my order dated 20 March 2020.

Case 1:19-cv-01845-SHL-DTW Document 270-18 Filed 09/02/20 Entered 09/02/20 15:20:16 Exhibit D
Pg 4 of 13
Case 1:17-cv-02726-JFK-OTW Document 231-15 Filed 04/30/21 Page 4 of 13

Master Davison
Approved Judgment

CL-2019-000269

11. By an application notice dated 19 March 2020, Mr Cramer applied to set aside or vary the Part 71 Order (the "Set Aside Application"). Both sides submitted evidence.

12. The grounds advanced by Mr Cramer in the Set Aside Application are set out below but, in very brief summary, are (i) that the application should have been on notice to him, (ii) that having been made without notice Vale failed to comply with its duty of full and frank disclosure and (iii) that the Order is oppressive.

13. Additionally, if the Part 71 Order were to be upheld, Mr Cramer has a number of fallback positions as to how the aspects of the order said to be oppressive to him might be mitigated.

### Other proceedings

14. There is a number of other proceedings involving BSGR and Vale, principally the following:-

15. On 23 April 2019, Vale applied to enforce the Award in the United States.

16. On 3 June 2019, BSGR applied for recognition of the Administration in the United States (the "Chapter 15 Proceedings"). Vale has opposed the Chapter 15 Proceedings which remain pending in the United States, where the process is approaching the completion of the discovery phase. Vale's evidence is that this discovery relates to the issue of BSGR's centre of main interests and not its assets or enforcement of the award generally.

17. On 3 December 2019, Vale and its subsidiaries Vale Holdings B.V. and Vale International S.A. brought proceedings against Mr Cramer and seven other defendants in the Commercial Court under claim number CL-2019-000723 (the "2019 Proceedings"). The 2019 Proceedings allege that Mr Cramer, along with his co-defendants, are liable to the claimants in fraudulent misrepresentation and conspiracy in relation to the joint venture mining project in Guinea between Vale and BSGR. The defendants deny those claims. On 3 December 2019, Sir Michael Burton GBE also granted a Worldwide Freezing Order against Mr Cramer and the other defendants in a maximum sum of US$1.85 billion in support of the 2019 Proceedings. None of the defendants to the 2019 Proceedings applied to set aside the Worldwide Freezing Order. A CMC has been listed for 22 October 2020.

18. The above is intended to stand as a short introduction. Further facts and observations relevant to the particular grounds relied upon by Mr Cramer are set out in the discussion that follows.

### CPR rule 71

19. In relevant part, the rule provides:-

    *71.2 –*
    *(1) A judgment creditor may apply for an order requiring—*
        *(a) a judgment debtor; or*
        *(b) if a judgment debtor is a company or other corporation, an officer of that body,*
        *to attend court to provide information about—*
            *(i) the judgment debtor's means; or*
            *(ii) any other matter about which information is needed to enforce a judgment or order.*
    *(2) An application under paragraph (1)-*
        *(a) may be made without notice;* […]
    *(3) The application notice must -*
        *(a) be in the form; and*
        *(b) contain the information*
    *required by Practice Direction 71.*
    *(4) An application under paragraph (1) may be dealt with by a court officer without a hearing.*
    *(5) If the application notice complies with paragraph (3), an order to attend court will be issued in the terms of paragraph (6).*

Case 1:19-cv-02726-JPO-OTW   Document 231-15   Filed 04/30/21   Page 5 of 13
Case 1:17-cv-02726-JPO-OTW   Document 231-15   Filed 04/30/21   Page 5 of 13

Master Davison
Approved Judgment

CL-2019-000269

> (6) A person served with an order issued under this rule must—
>   (a) attend court at the time and place specified in the order;
>   (b) when he does so, produce at court documents in his control which are described in the order; and
>   (c) answer on oath such questions as the court may require.
> (7) An order under this rule will contain a notice in the following terms, or in terms to substantially the same effect—
>   *"If you the within-named [ ] do not comply with this order you may be held to be in contempt of court and imprisoned or fined, or your assets may be seized.*

20. As set out in rule 71.2(3), the application notice must be in the prescribed form. The form is N316 or N316A. There is also a standard form of order, which is contained in Form N39. The court officer considering the application notice will refer it to a judge for consideration if the judgment creditor requests the officer of the judgment debtor be questioned before a judge: see PD71, paragraph 1.3(2).

21. If a person against whom an order has been made under rule 71.2 fails to attend court, refuses at the hearing to take the oath or answer any question, or otherwise fails to comply with the order, he or she is liable to committal for contempt of court: see rule 71.8(1) & (2).

**Mr Cramer's objections to the Part 71 Order**

22. The narrative set out above is, on the face of it, unexceptional. There is a judgment debt; it has not been paid; Mr Cramer is an officer of the judgment debtor within the jurisdiction; the conditions of making a Part 71 order were fulfilled and Mr Registrar Kay QC duly made the Order. On an ordinary reading of rule 71.2(5), which says that if an application notice complies with the form "an order to attend court <u>will be issued</u>", making the Order was mandatory.

23. But, in correspondence and now by way of the Set Aside Application dated 19 March 2020, Mr Cramer has offered a formidable body of objections to the Order. These I must now set out in more detail by reference to counsel for Mr Cramer, Mr Weekes', submissions.

24. First, Mr Weekes submitted that the application for the Part 71 order should not have been made without notice to Mr Cramer. The fact that rule 71.2(2)(a) permitted the application to be made without notice conferred no entitlement to do so. It was a basic principle of fairness that a court should not make an order against a party without giving that party an opportunity to be heard. This was submitted to be a universal requirement such that derogation from the principle was exceptional. It was only in circumstances where the giving of notice would defeat the purpose of the order (for example, the case of a freezing order) or where there was simply no time to give notice that the court would or should entertain a without notice application. In this case, there was added reason for notice to have been given because the nature of the order sought was a mandatory order compelling Mr Cramer to attend and compelling him to produce a range of documents of "staggering breadth". Reference was made to the judgment of Lightman J in *Re Murjani (A Bankrupt)* [1996] 1 WLR 1498 (Ch) where, at 1509 D, he referred to the requirement of notice being "stricter where mandatory orders, e.g. to attend for examination or to produce documents, are to be made".

25. Even if the application was correctly made without notice, Mr Weekes submitted that Vale should have requested a hearing so that Mr Registrar Kay QC could be more fully informed of the particular circumstances and so that Vale could more easily and fully comply with its duty of full and frank disclosure, (see further below).

26. Mr Weekes submitted that it was no answer to these points to contend that the Part 71 procedure conferred entitlement to an order "as of right". Correctly analysed, the making of an order was discretionary. Reliance was placed on what Sir Anthony Clarke MR said in *Masri v. Consolidated Contractors* [2008] EWCA Civ 876 at paragraphs 36 and 37:-

4

Case 1:17-cv-02726-JFK-OTW Document 231-15 Filed 04/30/21 Page 6 of 13
19-11845-shl Doc 726-18 Filed 09/02/20 Entered 09/02/20 15:20:16 Exhibit D Pg 6 of 13

Master Davison
Approved Judgment

CL-2019-000269

> "I do not think that it can have been intended that, on an application to set aside the order, the court should not have a discretion whether or not, in all the circumstances of the case, to uphold the order or set it aside."

27. Finally, under this heading, Mr Weekes submitted that the conditions for an order were not in fact met because if the judgment creditor wished the judgment debtor to produce "specific documents", those documents had to be "identified"; see rule 71.2(3) as read with PD71 paragraph 1.2(6). The documents scheduled to the order were not specific documents but broadly drawn classes of documents.

28. Second, Mr Weekes submitted that Vale's duty of full and frank disclosure had not been complied with. The omissions were said to be that:-

    i) Since the date that BSGR went into administration (6 March 2018) Mr Cramer had had no right of access to the company's books and records and therefore would be unable to provide documents beyond those which he personally had retained.

    ii) Via the Chapter 15 proceedings, Vale already had access to thousands of documents many of which went to enforcement. Whilst those documents were subject to a confidentiality stipulation, Vale could seek to be released from that stipulation by the Joint Administrators and/or could apply to the court here or in the USA for it to be lifted.

    iii) There was a risk of oppression arising out of the 2019 proceedings, namely that Mr Cramer could be cross-examined on matters that went beyond enforcement and trespassed into the issues that arose in those proceedings.

29. Third, as set out immediately above, Mr Weekes contended that the order was oppressive because it put Mr Cramer in jeopardy of undergoing what would, in effect, be a "dry run" of the cross-examination that he could expect to be subjected to in the 2019 proceedings. In those proceedings, Vale was bringing personal and proprietary claims in which they were claiming he was guilty of deceit and unlawful means conspiracy and liable in damages in a sum of around US$2 billion. It was all but inevitable that several of the principal issues in dispute in the fraud claim could or would be the subject of cross-examination under the Order. An example of this was the issue of whether he was or had been the *de facto* CEO of BSGR. This was relevant to the extent of the information he could supply in the enforcement proceedings, but also relevant to the allegation that he had been a key protagonist in and had personally promoted the fraud.

30. Fourth, Mr Weekes took a variety of points against the Order. The Order, he submitted, should have contained "carve outs" for documents that Vale already had / had access to and for documents that were privileged. The order should also have contained a statement pursuant to CPR rule 23.10 that Mr Cramer had the right to apply to have it set aside or varied. Beyond these technical objections, he contended that the Order was oppressive in scope. The standard form of order under CPR Part 71 was limited to just three categories of documents: bills or invoices owed to the judgment debtor; two years' balance sheets and profit and loss accounts; current management accounts. By contrast, the "bespoke" schedule to the Order ran to four pages and some sixty categories or sub-categories of documents, which was so broad and intrusive as to be oppressive – the more so because the schedule and the need for the documents were not supported by any witness evidence.

31. Fifth, Mr Weekes took me in detail to the exchanges of correspondence between solicitors in which Mr Cramer had made what he said was a reasonable proposal to resolve the enforcement proceedings. The essence of the proposal was that Vale should identify the documents in its possession via the Chapter 15 proceedings and how those documents corresponded to the documents they sought from Mr Cramer in the schedule to the Order, then he would be in a position to ascertain what documents "were already under [Vale's] control and which documents could and should be provided by the Joint Administrators" (which process he offered to facilitate by writing to the Administrators to "canvass their

5

19-11845-shl Doc 2726-18 Filed 09/02/20 Entered 09/02/20 15:20:16 Exhibit 13
Case 1:17-cv-02726-JFK-OTW Document 231-15 Filed 04/30/21 Page 7 of 13
Pg 7 of 13

Master Davison
Approved Judgment

CL-2019-000269

views"). Mr Cramer "would then be willing carefully to consider requests by [Vale] for the disclosure of documents that are not under its control and which the Joint Administrators have been unable to provide" (letter from Covington & Burling dated 5 March 2020). The proposal did not include Mr Cramer submitting to the oral examination before a Master. This was opposed on the grounds already mentioned.

32. Mr Weekes submitted that the proposal was fair and reasonable, that it represented the kind of cooperation or attempted cooperation between the parties that the Overriding Objective, in particular rule 1.3, sought to promote and that it had rendered the Order unnecessary so that it ought to be discharged. Further, as set out at paragraph 28 ii) above, Vale could seek the documents from the Joint Administrators in New York or here by way of an application under CPR rule 31.17 (disclosure against non-parties). The existence of this option provided an additional impetus to discharge the Order.

**Vale's response**

33. Counsel for Vale, Mr Willan, subjected the objections set out above to a searching analysis. I am in broad agreement with his analysis, which is reflected in the discussion below.

**Discussion**

34. I will take the points in the same order as set out above, (but noting that there is a degree of overlap between them).

**Application without notice**

35. It was, to my mind, surprising that Mr Cramer complained that the application was made without notice. CPR rule 71.1(2)(a) expressly permits the application to be made without notice. It is one of a small number of rules in this category where the Civil Procedure Rules Committee have judged it appropriate for the application to be made in that way. The Commercial Court Guide at paragraph F2.1(a) states explicitly that an application can be made without notice "where any rule or Practice Direction" so provides. This part of the Guide replicates paragraph 3(6) of Practice Direction 23A. In these cases, the protection for the party affected lies in that party's right to apply to set aside the order (as Mr Cramer has done in this case) and in the fact that the examination takes place before the court and is subject to the control of the court. The rule does not say that the application may *with good reason* be made without notice. To import such a restriction would be to rob the provision of its practical effect.

36. Quite apart from the wording of the rule, which is clear and straightforward, CPR Part 71 is "intended to be a summary and straightforward process allowing the judgment creditor to obtain information"; see *Deutsche Bank AG v Sebastian Holdings Inc* [2015] EWHC 2773 (QB) at [33] per Cooke J. Hundreds of applications are made every week and are usually dealt with by court officers. It would render that summary process very much more complex and cumbersome if the application had to be made on notice unless the judgment creditor had a good reason to apply without notice. It would also make the process one that was generally unsuitable to be dealt with by court officers. Both things are undesirable and contrary to the objective identified by Cooke J in the short passage quoted.

**Full and frank disclosure**

37. Mr Weekes was on stronger ground when he said that the duty of full and frank disclosure applied. This was a correct proposition which Vale has not disputed. Such dispute as there was concerned the extent of the duty and whether it was complied with.

38. The facts that fall to be disclosed are those which it is material for the judge to know in dealing with the application as made; see *Brink's Mat Ltd v Elcombe* [1988] 1 W.L.R. 1350 at 1356–1357. To put that slightly differently, facts are material if they would be capable of

influencing the court in the decision to be made. Thus, the nature of the decision will shape the parameters of the duty of full and frank disclosure.

39. Here, the court was not making a decision, such as a freezing injunction, which involved a broad exercise of discretion and the weighing up of a range of competing factors. The exercise was somewhat more mechanical than that. The court had to decide (perhaps "ascertain" would be a better word) whether the application was in the proper form and contained the requisite information, i.e. the information mandated by paragraph 1 of the Practice Direction to Part 71. In the case of a judgment debtor which was a company or corporation (as here) that required Vale to identify the name and address of the officer of the company, the details of the judgment debt and the amount owing. Upon provision of that information, the effect of rule 71.2(5) was to render the making of an order automatic because that rule says *If the application notice complies with paragraph (3) an order to attend court <u>will be issued</u> in the terms of paragraph (6)*.

40. The matters that were material to this – essentially "tick-box" – exercise were matters going to the identification of the officer of the judgment debtor and to whether there was a judgment debt "owing". (I will come separately to (a) the documents that Mr Cramer was ordered to produce and (b) before whom the examination was to take place, both of which involved the exercise of a true discretion.) There was and is no issue that Mr Cramer was and remains an officer of BSGR. As to the judgment debt that was owed, Vale rightly drew the attention of the court to the Guernsey Administration. It was incumbent on them to do so because an administration usually places a moratorium on debt recovery against the company concerned. Here, that was not the case because the Administration had not been recognised in the UK and because Bryan J had given permission to enforce the Award. These matters were drawn to the attention of the court and explained in paragraph 6 of the Application Notice.

41. The matters relied upon by Mr Cramer as material non-disclosures cannot be so described because they could not properly have influenced the making of the order. Specifically:

    i) It is in no sense a prerequisite of an order under Part 71 that the officer of the debtor company has retained access to the company's books and records. A judgment creditor is still entitled to ask questions and seek information from a director. But there was, in fact, no issue that Mr Cramer had personally retained at least some relevant documents. These were identified by Mr Willan in his skeleton argument as the following:

        a) An inbox for his email account at Norn Verdandi Ltd (a company which provided administration services to BSGR), which contained around 100,000 emails. Mr Cramer received emails relating to BSGR into this email account, which would have included emails from other individuals using non-BSGR email addresses (and which will therefore not be found on BSGR's own email system), including to/from the eponymous principal of BSGR, Benjamin Steinmetz.

        b) Electronic files held by Norn Verdandi, about which he had provided no details save that they were held in the cloud (from 2014) and in back-up files (pre-2014).

        c) A work laptop (acquired about two years ago) to which he had saved some, but apparently relatively few, documents.

        d) 50 boxes of hard copy documents, at his offices and in offsite storage, including materials "…provided to him by other employees of the BS Group following their departure from their roles…". This may include hard copy documents provided by departing employees of BSGR and/or involved in BSGR's affairs which will not be held within BSGR's own records.

7

Case 1:17-cv-02726-JFK-OTW Document 231-15 Filed 04/30/21 Page 9 of 13
Case 1:19-11845-shl Doc 270-18 Filed 09/02/20 Entered 09/02/20 15:20:16 Exhibit 13
Pg 9 of 13

**Master Davison**
**Approved Judgment**

CL-2019-000269

          Furthermore, the court's attention had specifically been drawn to the Administration and Mr Registrar Kay QC would therefore have known the implications for Mr Cramer's access to the company's books and records.

ii)     The fact that Vale had access to documents in the Chapter 15 proceedings was similarly irrelevant to the decision; they were still entitled to question Mr Cramer; see above. And they were still entitled to disclosure from him. In an application under Part 71 a judgment creditor is not under an obligation to disclose what documents he already has in his possession relating to enforcement. But anyway (and as discussed further below) those documents were caught by a confidentiality stipulation which rendered them unavailable to Vale in the enforcement proceedings, they went to the issue of where BSGR's centre of main interests lay, not, or not specifically, to enforcement and (as noted above) they did not by any means completely overlap with the documents which Mr Cramer had retained.

iii)    As addressed in more detail immediately below, there was in fact no risk to Mr Cramer that the Order would operate oppressively because of the 2019 proceedings against him. But, in any event, the 2019 proceedings and their potential impact on the proper bounds of the questioning were mentioned in the context of the request contained in the Application Notice that the questioning should take place before a judge.

**Oppression – overlap with / trespass on to the 2019 proceedings**

42.    I have already observed that one of the safeguards for the judgment debtor / officer of the judgment debtor under Part 71 is that the examination takes place under the control of the court. Where there are good reasons, the examination will take place before a judge rather than a court officer. Vale requested that the examination of Mr Cramer should take place before a judge and, in paragraph 6 of the Application Notice, gave reasons for that request. Under paragraph 1.3(2) of the Practice Direction to the rule, that meant that the application had to be referred to a judge. The reasons given were (i) that Mr Cramer might be obstructive, (ii) that he might seek to impede the examination and (iii) that he was a defendant to the 2019 proceedings and that it was possible that "disputes will arise … as to the questions that may properly be asked".

43.    That such disputes might arise was, of course, not a reason to refuse the order. The issues relating to enforcement and the issues arising in the 2019 proceedings are not the same. Where there is overlap, it will be for the judge conducting the examination to control the proceedings in a way that is fair, proportionate and in accordance with the law. That is likely to involve striking a balance between the right of the judgment creditor to seek information as to enforcement of the judgment debt and the right of Mr Cramer to object to questions that trespass or trespass too far into issues that are for the 2019 proceedings. A good example is the one given by Mr Weekes, namely whether Mr Cramer was the *de facto* chief operating officer of BSGR. That topic cannot (as it seems to me) be ruled "off limits" within the Part 71 examination simply because the answers might also go to Mr Cramer's alleged role in the fraud which took place in 2009/2010. But it is easy to envisage particular lines of questioning that it might be unfair to allow the judgment creditor to pursue. The judge is there precisely to prevent oppressive questioning and hence it cannot be said that there is any real risk of oppression to Mr Cramer.

44.    In relation to this point, it is relevant to observe that judges regularly hear cross-examinations about assets in aid of freezing injunctions in cases where there is a pending fraud claim. It cannot be suggested that that gives rise to any particular difficulty. There is also specific authority (*Lakatamia Shipping Co Ltd v Su* [2020] EWHC 426 (Comm)) to the effect that a risk of self-incrimination arising out of an examination under CPR Part 71 is "classically a matter for the judge who will be conducting the cross-examination; it is not a reason not to order a cross-examination"; see the judgment of Waksman J at paragraph 39.

**Oppression – the scope of the documents sought**

8

Case 1:17-cv-02726-JFK-OTW Document 231-13 Filed 04/30/21 Page 10 of 13
Case 1:17-cv-02726-JFK-OTW Document 231-13 Filed 04/30/21 Page 10 of 13
Pg 10 of 13

Master Davison
Approved Judgment

CL-2019-000269

45. This ground of objection sub-divided into a number of separate points.

46. First and foremost, objection was taken to the "staggering breadth" of the disclosure sought which it was said would require a "team of solicitors", expert valuation advice and the expenditure of large sums in legal costs. (I detected some tension between this submission and the amount of money which Mr Cramer has spent on his application to set aside the order. His schedule of costs for this application comes to £254,465, a sum of money that I would have thought sufficient to have paid for the disclosure exercise objected to many times over.)

47. Mr Cramer's objection regarding the breadth or burden of the disclosure is flatly at variance with the evidence filed on his behalf. He can only disclose the documents which are in his control and he has said variously that these are "very limited", "(relatively) few" in number and as regards the "vast majority" likely to be irrelevant. The email account and electronic documents mentioned above can be the subject of a keyword search. Even if that took the involvement of an e-disclosure expert (which, given the expertise of his solicitors, seems to me unlikely) the cost could not be regarded as disproportionately high in the context of a $2 billion judgment debt and the costs expended so far.

48. Even if it were the case that the order imposed a heavy burden upon him, the standard form of order requires "all documents" that confirm the assets of the business and the notes to the standard form of application record that the officer of the company will be told to "produce all relevant documents". As Mr Willan pointed out, it could not be right that such an order was unobjectionable in the case of a modest debt owing from a company with few assets, but fell to be set aside as oppressive in the case of a $2 billion debt from a company which (at the time of the fraud at any rate) had very extensive assets (the balance sheet in 2014 exceeded US$1 billion) and whose affairs and business structure were complex. There is, indeed, specific authority to this effect; see *Mubarak v Mubarak* [2002] EWHC 2171 (Fam) where Hughes J, as he then was, in response to a submission that the Part 71 procedure was usually concise and uncomplicated, said:-

> "That, however, is not to say that the process is not available in and adaptable to the very complex case, such as the present, where the debt and the assets are counted in millions and the potential relevant documents require a trolley rather than an envelope to bring them to court. Indeed, it may be all the more important a process in cases of that kind." (See Part 2 of the judgment.)

49. Second, Mr Cramer took objection to the schedule to the Order which called for 60 odd categories of documents. He maintained that the schedule was both intrusive in its scope and insufficiently precise to comply with paragraph 1.2(6) of the Practice Direction which stated that if a judgment creditor wished the judgment debtor to be ordered to produce "specific documents" then those had to be identified in the application notice.

50. Both these points are completely without merit. A judgment creditor will not generally be in a position to identify specific documents in the sense that Mr Weekes invited me to interpret the Practice Direction. The purpose of paragraph 1.2(6) is to enable the judgment creditor to assist the judgment debtor (and the court) by identifying classes or categories of documents relevant to the particular situation or business of that debtor; it is artificial to suggest that "specific documents" means anything else. Identifying relevant classes of documents is what the schedule to this Order does and it cannot be said to be intrusive because the categories and the range of documents are wide-ranging. That merely reflects the complexity of BSGR's situation and business structure, which, as already observed, was no reason not to make the Order.

51. Mr Weekes took numerous more specific points about the schedule, some of which went wider than his written skeleton argument. Partly because Mr Willan wanted to digest the material and partly due to lack of time I directed that the various points be reduced to a "Scott Schedule". This was supplied to me after the hearing and runs to 27 pages. Notwithstanding the work that has gone into the Scott Schedule I have come to the conclusion that it is only

Case 1:17-cv-02726-JFK-OTW Document 231-15 Filed 04/30/21 Page 11 of 13
Case 1:19-cv-02726-JFK-OTW Filed 09/02/20 Entered 09/02/20 15:20:16 Exhibit D
Pg 11 of 13

**Master Davison**
**Approved Judgment**

CL-2019-000269

the opening or "headline" point made by Mr Willan that I need consider. That point was phrased as follows:

> "The purpose of the list attached was to assist Mr Cramer by identifying specific categories of documents which would fall within his obligation, but it does not restrict or prejudice his general duty as the officer of a defaulting judgment debtor to provide all documents relevant to enforcement. The nature of the exercise that has been spawned by Mr Cramer's line-by-line objection to each and every category or document provides a powerful illustration in itself as to why the approach argued for by Mr Cramer is inappropriate and should not be followed by the Court. In this, or indeed any, case it gives rise to satellite disputes, endless appeals to "proportionality", and arguments as to relevance that CPR 71 does not contemplate or provide for, all in an attempt to relieve an officer of the very responsibility imposed upon him under CPR 71 by dint of his office and associated knowledge."

52. I agree with that submission. In the context of the purpose of providing the list I can find no valid objection to any of the categories of documents sought and I would uphold this part of the Order.

53. Lastly, Mr Weekes took a number of what I might call "technical" points, all of which stem from or relate to the use of standard forms for the application and order.

54. The standard form of application (which is mandatory) does not contemplate or make provision for the filing of evidence in support. Like all application notices, it concludes with a Statement of Truth. The statement attests to the truth of the matters set out in the form. And those are the specific matters listed in paragraph 1 of the Practice Direction to Part 71. In particular, those parts of the form dealing with specific questions and specific documents beyond the standard ones do not contemplate the filing of evidence in support. There is no space or "prompt" on the form to do so. The reasons for this economy lie, once again, in the "summary and straightforward" nature of the process. It was not intended that judgment creditors should be required to support a request for specific documents with a witness statement such as, for example, would be required to support an application for specific disclosure under CPR rule 31.12. In most cases, the basis of the request will be apparent from the list of documents itself. The safeguard for the judgment debtor is the right to apply to set aside or narrow the scope of any list of documents ordered. Thus, Mr Weekes' criticism of the lack of a witness statement in support of the application was misplaced.

55. Similarly misplaced were his criticisms of the lack of "carve outs" or exceptions for documents that the judgment debtor might refuse to produce on grounds of legal privilege or the privilege against self-incrimination. As Waksman J held in the *Lakatamia Shipping* case (see above), these are matters for the judge controlling the examination.

56. Lastly, complaint was made that the order did not contain a notice under CPR rule 23.9(3) that, the application having been made without notice, the judgment debtor had "the right to apply to set aside or vary the order under rule 23.10". In my view, no such notice was formally required because this was not an application which "the court … permitted to be made without service of a copy of the application notice"; see rule 23.9(1). The permission to make the application without notice derived from the rules, not the court. This would explain why the standard form of order (form N39) contains no rule 23.9(3) statement. Be this as it may, Mr Cramer knew of his right to apply to set aside the order and has suffered no detriment or disadvantage.

**Order unnecessary in the light of Mr Cramer's offers of cooperation**

57. Mr Cramer's position at the end of the exchange of correspondence summarised at paragraphs 31 & 32 above was that it should be Vale, not him, who made a list of the documents which related to enforcement that were in their possession, that Vale should try to obtain those documents from the Joint Administrators and, if unsuccessful, that he, Mr Cramer, would "consider" requests for documents. Whilst offers of cooperation are to be

Case 1:17-cv-02726-JFK-OTW Document 231-15 Filed 04/30/21 Page 12 of 13
19-11845-shl Doc 726-1 FR-4 Filed 09/02/20 Entered 09/02/20 15:20:16 Exhibit D Pg 12 of 13

Master Davison
Approved Judgment

CL-2019-000269

encouraged, this offer was hopelessly unrealistic and, in my view, a recipe for prevarication, delay and obstruction. I will state the reasons briefly:-

i) The stance of the Joint Administrators is that the documents disclosed in the Chapter 15 proceedings are confidential and that it is not open to Vale to deploy them in the enforcement proceedings. By Motion dated 15 May 2020 in the US Bankruptcy Court for the Southern District of New York, the Joint Administrators have, indeed, applied to affirm the designation of the documents as confidential. Whilst they have indicated that they may be prepared to relax that stance, they will only do so on a document by document basis – plainly a lengthy, cumbersome and costly process. Any challenge would involve Vale embarking on legal proceedings in New York or the UK (or possibly Guernsey) which would involve a significant expenditure in legal costs and the outcome of which would be uncertain.

ii) Even if the Joint Administrators were to take a more liberal stance than they have, it remains the case that the documents disclosed in the Chapter 15 proceedings are limited to the centre of main interests issue. It is not open to Vale, in those proceedings, to seek disclosure in aid of execution or enforcement.

iii) Vale would legitimately wish to seek disclosure against Mr Cramer anyway, because (as already noted) the documents he retains are different from / additional to the documents held by the Joint Administrators.

iv) Quite apart from the above, Vale is fully entitled to pursue parallel remedies or routes of enforcement; see the remarks of Cooke J in the *Deutsche Bank* case at paragraphs 32 and 45. It is not for Mr Cramer to dictate how he would prefer Vale to go about it. His suggestion that Vale should, as a prior step, list out the documents it already holds would be to turn the Part 71 procedure on its head and would, anyway, result in no saving to him in cost or inconvenience. He would still have to review and, where appropriate, disclose the documents within his control.

58. For these reasons, I am unable to characterise Mr Cramer's proposals as cooperative and they are no basis to set aside or review the Order.

59. By way of conclusion to this part of my judgment, I should also state that even if there was substance in Mr Cramer's objections to the disclosure aspect of the Order, that would not be a reason to set aside the Order in its entirety. Vale would remain entitled to an oral examination.

**The fallback positions**

60. It remains to deal with Mr Weekes' fallback arguments. I can do so with similar brevity. Mr Cramer is not entitled to be given a list of the questions that Vale propose to ask him in advance of the hearing. That would likely result in carefully pre-scripted answers. I am not confident that in those circumstances the answers would advance the purpose of the examination. The same goes for a list of topics for the examination – though the categories of documents sought already stand as a kind of agenda. Lastly, Mr Cramer is not entitled to a modification of the order such that he is only obliged to comply on payment of his costs by Vale. Such an order would be unprecedented and wrong in principle. His obligation to comply rests on his status as an officer of a company that is a judgment debtor. It is absurd to suggest that the unpaid judgment creditor should have to pay the judgment debtor's costs of the enforcement process, or those of the judgment debtor's officers. If Mr Cramer is entitled to look to anyone for payment of costs that fall on him as an incident of his office of director, that person is the judgment debtor, i.e. BSGR.

**Conclusion**

61. All the objections to the Order fail and I will dismiss Mr Cramer's Set Aside Application.

Case 1:17-cv-02726-JFK-OTW Document 231-13 Filed 04/30/21 Page 13 of 13
19-11845-shl Doc 726-18 Filed 09/02/20 Entered 09/02/20 15:20:16 Exhibit D
Pg 13 of 13

Master Davison
Approved Judgment

CL-2019-000269

62. In *Navigator Equities Ltd & Ors v Deripaska* [2020] EWHC 1798 (Comm) Andrew Baker J made the following remarks (see paragraph 161):-

> "In the working generation of 30 years or so during which I have been engaged in commercial dispute resolution in this jurisdiction, principally in this court and in London arbitrations, there has been a significant general increase in hostility and aggressiveness in the conduct of disputes. The taking of any and every point, good or bad, and other failures to display proper independence from the litigating client is treated too often as if it were a normal or appropriate adjunct of well-funded, hard fought, business disputes, particularly if there are issues of dishonesty involved."

63. Those remarks have a certain resonance in this case. The points taken on Mr Cramer's behalf were not a mixture of good and bad; they were all bad. Further, the language of the correspondence and submissions was inappropriate to Mr Cramer's situation. He is an officer of a company which owes the claimant a sum in excess of US$2 billion, none of which has been paid. He has been made the subject of a routine procedure which the claimant was entitled to follow and to which he could not reasonably object. Some recognition of that would have been preferable to the tones of outrage and indignation which were employed. The expenditure of £254,465 on this application was inappropriate and disproportionate both in amount and object. Whilst in form offering cooperation, the substance and reality of Mr Cramer's approach has been quite the opposite. Where the precise responsibility for these matters lies is not something that I can or need determine. All I will say is that parties to litigation and their professional advisers are not bound to take bad or hopeless points; they are not bound to adopt a needlessly antagonistic stance to their opponents, and both things are likely in the end to operate directly contrary to their interests.