# EXHIBIT LL



REPUBLIC AND                       CANTON OF GENEVA

POST TENEBRAS LUX

JUDICIARY

**JUDGMENT**

**OF THE CRIMINAL COURT**

**Chamber 7**

**January 22, 2021**

**THE PUBLIC PROSECUTOR**

against

**Mr. A_____**, born on _____, 1962, domiciled c/o ALPHA, _____, Esq., defendant, represented in the proceedings by Mr. ALPHA

**Ms. B_____**, born on _____, 1970, domiciled c/o BETA, _____, Esq., defendant, represented in the proceedings by Ms. BETA, Esq.

**Mr. C_____**, born on _____, 1956, domiciled c/o GAMMA, _____, Esq., defendant, represented in the proceedings by GAMMA, Esq. (Lead Attorney) and DELTA, Esq.

**Composition of the Court: Ms. Alexandra BANNA, President of the Court; Ms. Delphine GONSETH and Mr. Antoine HAMDAN, Judges; Mr. Timothée REYMOND, Registrar and Legal Expert; Mr. Alain BANDOLLIER, Registrar**
**P/12914/2013**

## A. FINAL SUBMISSIONS OF THE PARTIES

The Public Prosecutor's Office has determined that Mr. A_____, Ms. B_____, and Mr. C_____ are guilty of corruption of foreign public officials (Criminal Code, Article 322-seventh) and of forgery (Criminal Code, Article 251 in conjunction with Article 255). It asks that the following sentences be given:

    –    To Mr. A_____, a prison sentence of 4 years,

    –    To Ms. B_____, a prison sentence of 2 years, fully suspended,

    –    To Mr. C_____ a prison sentence of 5 years.

It requests the imposition of a claim of compensation:

    –    Against Mr. A_____, in the amount of USD 11,000,000.00,

    –    Against Ms. B_____, in the amount of USD 150,000.00

    –    Against Mr. C_____ in the amount of CHF 50,000,000.00.

Finally, it requests that the defendants be ordered to pay the costs of the proceedings and that the assets held in Mr. C_____'s account no. 1_____ at Bank 1_____ be allocated to the payment of the costs of the proceedings.

**Mr. C._____**, through his counsel, pleads for his acquittal, and that the claim for compensation be rejected. He makes no claims for compensation.

**Mr. A_____**, through his counsel, pleads for his acquittal, and that the claim for compensation be rejected. He requests that the State of Geneva be ordered to pay him the sum of CHF 335,376.65 in application of Article 429(1)(a) of the Code of Criminal Procedure.

**Ms. B_____**, through her counsel, pleads for her acquittal, and that the claim for compensation be rejected. She requests that the State of Geneva be ordered to pay her the sum of CHF 389,846.90 in reimbursement of her legal fees.

Thus, every reasonable effort was made to ensure that these persons could be heard in Geneva by the Tribunal, and there would be no point in summoning them again. Indeed, there is no reason to believe that these persons would respond to a new summons served on them. It is therefore up to the Tribunal to rule on the merits of the case on the basis of the file submitted thereto, taking into account the absence of those summoned to the proceedings, if necessary, as part of the evaluation of the evidence.

From the foregoing, it follows that the supplementary application is dismissed.


# C. INDICTMENT

**a)** By indictment of August 8, 2019, Mr. C_____, Ms. B_____, and Mr. A_____ are accused of having jointly acted to promise, as early as 2005, and having granted as early as 2006, improper advantages to AAO_____, then President of the Republic of Guinea, and Ms. E_____, then his fourth wife and a very influential person in his entourage; they did so in order to obtain, without right and for the benefit of CGR_____, concessions for the exploration and exploitation of mining deposits in the Simandou region of the Republic of Guinea; and they are accused of having paid to Mrs. E_____ the sum of at least USD 8.5 million, in eleven payments,

which are acts defined as corruption of foreign public officials, within the meaning of Article 322-seventh of the Criminal Code.

**b.a.)** By this same indictment, Mr. C_____ and Ms. B_____ are accused of having coordinated in Switzerland, Israel, and elsewhere since 2009 to falsely issue the following:

– on June 9, 2009, a share certificate designating D_____ as a shareholder of L_____,

– a contract dated June 15, 2009, entitled "Sale and Purchase Agreement," and an amendment to this contract dated August 2010,

– a rental contract for the vessel *M_____* from July 1 to 15, 2011,

– an addendum to the contract for this yacht dated June 29, 2011,

and to have had these documents handed over by D _____ to his bankers in Switzerland, who requested explanations therefrom, the fabrication and use of these documents having had the objective of hiding from the banks and the authorities that Mr. C _____ financed and ordered all these payments passing through the Swiss accounts of D _____, including the payment of bribes to Ms. E _____

# D. MATTERS OF FACT

**D.A. Facts defined as corruption**

a.)



Mr. C_____ **
|
V_____ */**/***
|
W_____ ***
|
CGR (Guernsey) */**
|
CGR Steel*
|
CGR GUINEA (BVI)*
|
CGR GUINEA SARL

\* Ms. B_____
 – Secretary of the Board of Trustees of V_____ (member of the Board of Trustees for one year via X_____)
 – Director of:
   ○ W_____, via X_____
   ○ CGR_____ (Guernsey)
   ○ CGR_____ Steel
   ○ CGR_____ GUINEA (BVI)

\*\* Mr. C_____
 – Primary beneficiary of V_____
 – Consulting agreements with:
   ○ V_____ (USD 250,000–400,000/year)
   ○ CGR_____ (Guernsey) (USD 700,000/year)

\*\*\* GAMMA_____, Esq.
 – Attorney for Mr. C_____
 – Member of the Board of Trustees of V _____
 – Director of W_____

**a. a.)** *Mr. C._____*

**a. a. a.)** *CG_____*

In 2013, Mr. C_____ was considered the richest man in Israel, his fortune estimated at the time to be several billion US dollars. He built his fortune in the diamond industry. To third parties, he is presented by his companies as the head of CG_____, for C_____ Group, a conglomerate of companies, with CG_____'s activity concentrated in four sectors:

– diamonds (C_____ DIAMOND GROUP of which Mr. C_____ was the Chair of the Board of Directors in 2005),

– natural resources (CG_____ RESOURCES) (in other words CGR_____),

– real estate investments (Y_____ renamed CGR_____ REAL ESTATE LTD),

– technology, finance, and asset management,

(see CG_____ INVESTMENTS presentation of May 2005, page 5,000,092; see also CGR_____ presentation of July 2007, page 5,002,012).

**a. a. b.)** *Foundation V_____*

Mr. C_____ is the primary beneficiary of all assets and income of the discretionary foundation V_____, established irrevocably under Liechtenstein law (see Articles of Association, Appendix to the Articles of Association of the foundation, clause B.2.1.5).

Mr. GAMMA, Esq. has been one of the three members of the foundation board of V_____ since its creation in 1997 and is the shareholder representative of CGR_____ on the foundation board in his capacity as director of W_____. The second member of the board of trustees is a lawyer from Liechtenstein. The third member was Z_____ and then, for a few months between 2004 and 2005, X_____ MANAGEMENT CORP, the director of which was Ms. B_____, before being replaced by AA_____ (see B.2.1.13-14).

The purpose of the foundation is as follows:

"*The foundation shall hold and manage the Foundation Fund for the benefit of the members of the Class of Beneficiaries as specified in the By-Laws, inter alia, for their livelihood, health, accommodation, education, and other needs as shall be required from time to time and subject always to the discretion of the Foundation Council and the provisions of these Statutes*" (See Articles of Association as of June 15, 2009, p. 306,796).

In accordance with its purpose, the foundation has, among other things, distributed the following amounts to Mr. C_____ as housing and living expenses. (*housing costs and living expenses*):

| | | |
|---|---|---|
| – | February 2010 | USD 3 million (p. 310,208) |
| – | May 2010 | USD 3 million (p. 306,494) |
| – | August 2010 | USD 2 million (p. 306,484) |
| – | September 2010 | USD 1 million (p. 306,480) |
| – | October 2010 | USD 1 million (p. 306,478) |
| – | November 2010 | USD 2 million (p. 306,760) |
| – | December 2010 | USD 300,000 (p. 306,758) |

Total 2010                              USD 12.3 million

| | | |
|---|---|---|
| – | February 2011 | USD 2 million (p. 306,753) |
| – | March 2011 | USD 6 million (p. 306,703) |
| – | May 2011 | USD 2 million (p. 306,742) |
| – | July 2011 | USD 2 million (pp. 306,738-9) |
| – | July 2011 | USD 300,000 (p. 306,737) |
| – | July 2011 | USD 2 million (p. 306,735) |
| – | September 2011 | USD 1 million (p. 306,733) |
| – | November 2011 | USD 15 million (p. 306,729) |

Total 2011                              USD 30.3 million

| | | |
|---|---|---|
| – | February 2012 | USD 500,000 (p. 306,714) |
| – | April 2012 | USD 2 million (p. 306,710) |
| – | May 2012 | USD 5 million (p. 306,699) |
| – | December 2012 | USD 1 million (p. 306,707) |

Total 2012                              USD 8.5 million

**a. a. b.)** *AB_____*

Mr. C_____ is the sole shareholder of AB_____ REAL ESTATE (hereinafter AB_____), an Israeli company, which invests in real estate in the countries...

Mr. C_____ does not officially exercise any managerial or administrative function in any of the companies held, directly or indirectly, by the V_____ foundation. He provides advice to the companies of the CG_____ group and also assumes, in certain circumstances, the role of "ambassador" of the group to third parties.

Between January 1, 1998, and December 31, 2011, Mr. C_____ was bound by a mandate contract with the V_____ foundation, remunerated at USD 250,000 and USD 400,000 per year (USD 350,000 in 2010 and USD 400,000 in 2011).

**a. a. d.)** *Email addresses*

Mr. C_____ had several email addresses, including:

- c_____@c_____g-investments.com (pp. 4,010,988; 5,010,816),

- c_____@ad_____-suisse.com (p. 5,010,990),

- advisor@ad_____fa.com (p. 500,677).

**a. a. e.)** *W_____*

The V_____ foundation makes all strategic decisions for the group and is the sole shareholder of the holding company W_____ MANAGEMENT CORP (hereafter: W_____) (p. 3,951,024).

W_____ is a British Virgin Islands company created on November 4, 1998; its postal address was AD_____ FINANCIAL ADVISORS SA, in Geneva (p. 360,252), whose accounts it approved (see search of AD_____). Mr. GAMMA was the sole administrator of W_____ as of 2001 (p. 3,951,024), before X_____, whose administrator was Ms. B_____, was also appointed (cl. B.2.1.7). Ms. B_____ has had individual signing authority on the accounts of W_____ since 2002 (p. 360,252, Bank 2_____).

Mr. C_____ is considered by the banks as the beneficial owner of W_____ (pp. 360,129, 360,132, 360,241, 360,248, bank 2_____).

He also personally guaranteed a loan of ZAR 222,000,000 (equivalent to CHF 150 million) granted to W_____ by bank 2_____ (cf. PP 360,290 and 03/1744.offer letter, in USB key B0_10 in folder B0_10).

W_____ holds many companies, all incorporated in the British Virgin Islands, with the exception of CG_____ INVESTMENTS LTD, which is incorporated in the Bahamas:

- CG_____ INVESTMENTS LTD incorporated in 2003, and deregistered in 2009

- CG_____ STEEL HOLDINGS LTD incorporated in 2004

- CG_____ RESOURCES LTD incorporated in 2003

- CG_____ ENERGY LTD incorporated in 2005

- CG_____ RACING LTD incorporated in 2005

- CGR_____ TREASURY SERVICES LTD incorporated in 2005

- CGR_____ METAL AND MININGS LTD incorporated in 2003

- CGR_____ (LIBERIA) LTD incorporated in 2007.

- CG_____ RESOURCES (LIBERIA) LTD (p. 3,002,108)

- CGR_____ DIAMOND EXPLORATION LTD incorporated in 2012

- CGR_____ PETROLEUM HOLDINGS LTD incorporated in 2005

- CGR_____ GOLD BVBA SA incorporated in 2002

- AE_____ incorporated in 2004 and deregistered in 2014.

All the above companies have their postal address at AD_____ FINANCIAL ADVISORS SA, in Geneva. Since the creation of AF_____ ADVISORY SA in 2014, domiciled then at the same Geneva address as AD_____ FINANCIAL ADVISORS SA, W_____ and all these companies have had their postal address at AF_____ ADVISORY SA.

**a. a. f.)** *Airplanes and boats*

The foundation also owns, through three companies in the Cayman Islands (p. 306,587 and see figure IV),

- an aircraft purchased for USD 24.5 million and owned by AG _____,

- another plane bought for USD 32.2 million and owned by AH_____,

- a yacht purchased for USD 25.7 million and owned by AI _____.

Mr. C_____ regularly uses these planes and boat for private and professional purposes. He personally took care of the yacht purchase project, F_____ being responsible for the legal aspects (see folder B_2_1_20).

**a. b.)** CG_____ RESOURCES LTD (hereafter CGR_____ GUERNESEY) (formerly RESOURCES ADVISORY SERVICES LTD) is a company incorporated in 2003 in Jersey and then moved to Guernsey in 2007 (p. 5,010,216). This company is active in the field of natural resources (copper, cobalt, oil, gas, diamonds, etc.) through various subsidiaries (see p. 3,951,075).

CG_____ GUERNESEY is owned by W_____ (see p. 3,951,023 for the evolution of the shareholding). AC_____, Ms. B_____ (since 2003) and AJ_____ (since 2007) were directors of CGR_____ GUERNESEY (p. 3,951,020).

CGR_____ GUERNESEY is financed by shareholder loans (see financial statements as of December 31, 2009, p. 3,951,064), mainly through CGR_____ TREASURY SERVICES LTD. The loan granted by W_____ in 2007 totaled USD 322 million in 2009 (cl. B.2.1.11). In these proceedings (PV, p. 500,351), Mr. C_____ stated that W_____ financed CGR_____ GUERNESEY on demand.

Under Guernsey law, the directors of CGR_____ GUERNESEY are responsible for the preparation of the company's financial statements (see p. 3,951,049) and for approving the accounts (see p. 3,951,048). Ms. B_____ signed the company's financial statements in her capacity as director (see pp. 3,051,045, 3,951,048). All bank correspondence was copied to Ms. B_____, at AD_____ FINANCIAL ADVISORS SA, who was also an authorized signatory on certain bank accounts.

Mr. C_____ was bound by a contract of mandate to CGR_____ GUERNESEY, signed by Ms. B_____ and AJ_____. He was paid USD 700,000 per year (p. 300,750).

**a.c)** CG_____ RESOURCES (GUINEA) LTD (hereafter CGR_____ GUINEE) is a British Virgin Islands company, created in 2005 (p. 5,002,080-1). It was owned by CG_____ STEEL (p. 350,831), itself owned by CGR_____ GUERNESEY. CGR_____ GUINEE has a service contract with CGR_____ GUERNESEY (see financial statements as of December 31, 2009, p. 3,951,064; p. 5,002,101).

**a.d)** CG_____ RESOURCES (GUINEA) LTD - SARL is a limited liability company under Guinean law (cf. articles of association: PP 5,002,084), owned by CGR_____ GUINEA until the restructuring of the companies in February 2009 (cf. recital "Restructuring"). The corporate documents of this company were kept at AD_____ GE.

Ms. B_____, in her capacity as director of CGR_____ GUINEE, approved the accounts of CGR_____ GUINEE SARL (cl. B.2.1.6), whereas the auditors noted that the documents provided did not make it possible to verify the appropriateness of the expenses (cf. accounts as of December 31, 2008, cl. B.2.1.6)

[Sentence continued from page 32:]

"*...It will be necessary to establish systematic research and prospecting permits to prove that there are really buried deposits that would require exploitation, even underground, why not?*" (p. 5,010,664)

The map entitled "*Domaine objet de visite par la société CGR_____ (02/12/2005)*" [Area visited by the CGR company, December 2, 2005] refers to the North and South Simandou areas (p. 5,010,665).

When notified of this mission, Minister AAI_____ summoned CGR_____, whose representatives came accompanied by K_____ and Ms. E_____, who pleaded for him to grant to CGR_____ part of the Simandou under concession (p. 500,236).

Minister AAI_____ reminded them that they could not go to the AAL_____ area, but invited them to apply for a research permit for any unlicensed area (such as the North and South zones) (AAI_____ report dated July 9, 2015, p. 3).

**b.d.)** On January 6, 2006, CGR_____, in other words AAA_____, sent a letter to the Minister of Mines, AAI_____, resending the memorandum of understanding dated November 24, 2005. The letter was aimed at "*the promotion and development of the North and South Simandou iron ore deposits, as well as the related infrastructure*" (p. 5,008,387). The area covered by this protocol was the North and the South Simandou (p. 5,008,392).

Between January 8 and February 22, 2006, Ms. B_____ exchanged numerous emails with AAG_____ and AX_____ in particular (exhibit 4, Ms. B_____'s dossier for January 11, 2021). Ms. B_____ was notified of the signing of a memorandum of understanding with the Guinean government and the urgent need to have a company incorporated in the BVI available ("*We are trying to sign an MOU with the Guinea government for operation of an iron ore field in Guinea*"), because they were all in Guinea (email dated January 17), and were in the process of finalizing a memorandum of understanding with the Guinean President ("*the above fax is urgent please if you can handle ASAP it will really help. AAG_____, AAA_____, etc. are all in Guinea now and finalizing an MOU with Guinea president so receipt of the above fax is critical*").

Ms. B_____ first proposed the company AAR_____, before AX_____ instructed her to use AAS_____ INVESTMENTS LTD BVI COMPANY (email dated January 16, 2006) and then to change the name to Z so that the *brand name* of CG would appear ("*it is critical that the name CGR_____ appears*").

On January 15, 2006, Mr. C_____ left Tel Aviv and landed in London on January 16, 2006 (pp. 300,819 and 300,823).

On January 16, 2006, the plane used by Mr. _____ left London to go to Conakry (departure time 11:45 p.m.), while Mr. _____ seems to have remained at the

whose shareholding was to be distributed at the rate of 15% for Guinea and 85% for CGR_____ GUINEE, while Guinea was to ensure that the permits were assigned to CGR_____.

The area covered by this memorandum of understanding was actually defined in its annexes 1 and 2 (article 1.3.2.). Appendix 1, entitled "coordinates of the research area," contains the latitudinal and longitudinal references of blocks 1 and 2, as well as of the North and South zones (p. 5,006,811).

Article 1.3.3. of the Memorandum of Understanding provides that the Republic of Guinea agrees not to grant any mining permit or concession to a third party for the mining area described in Annexes 1 and 2 during the period of validity of said Memorandum.

Art. 2.3. provides that within six months of the completion of the feasibility study, the parties shall designate the most appropriate independent operator for the Simandou Iron Ore Project, said operator to be selected by CGR_____ GUINEA, after consultation with the Republic of Guinea.

According to art. 3.2.2.7, if any area of the Simandou site becomes free of all mining rights, said area will be offered in priority to CGR_____ GUINEE for its exploration and development.

In their second Witness Statement (p. 349,695), AAB_____ explained that they had suggested that if AAL_____'s blocks on Simandou were to be taken away, they should be given to CGR_____. ("*I recall suggesting to him that he try to add a promise to the effect that the Simandou blocks held by AAL_____ would be given to CGR_____ if they were removed from AAL_____.*")

He also stated that it was because of this "priority proposal" that AAG_____ refused to sign the MOU. ("*He felt that the terms were inadequate.*")

AAB_____ added that. at that time, CGR_____ was aware that it was the jewel in the Guinean crown. ("*Indeed CGR_____ was aware that this was the jewel in the Guinea crown.*")

**c.e.d)** The signing of the contract, on February 20, 2006, between Guinea and CGR _____ was the subject of a small ceremony during which AAM_____, K_____, and AAF_____ were present (photograph attached to the letter of August 15, 2018, from Mr. ALPHA_____), as were Ms. E_____, Mr. A_____, and AM_____, Mr. C_____'s brother-in-law and head of CGR_____'s diamond sector (AM_____ LCIA, p. 500,901).

This contract was legalized by a clerk of the Conakry Court of First Instance on July 20, 2007.

On June 20, 2007, Mr. C_____, who was not in Guinea, left Tel Aviv to go to Kiev (pp. 300,888 and 300,890).

Mr. A_____ and his partners invoiced CGR_____ for their assistance in obtaining the uranium permits for USD 163,000 (pp. 500,131, 350,625, 350,625).

**n)** *Waiver*

On May 25, 2007, AAF_____ waived all of their shareholder rights in AAV_____ (p. 500,584). In a notary's certificate dated September 13, 2007 (the original of which is included in the case record, CRI AAB_____, file B.2.8), AAF_____ renounced their shares in AAV_____ and the remuneration promised in the contract dated February 20, 2006.

By an unsigned amendment (the original of which is included in the case record, CRI AAB_____, folder B.2.8), AAM_____ and K_____ also waived their rights arising from the contract signed on February 20, 2006, and transferred all their claims to ABD_____ "in formation" (see dispute AAM_____).

**n)** *CGR_____ GUERNSEY*

In July 2007, CGR_____ GUINEA submitted applications for exploration permits for Blocks 1 and 2, which were still awarded to AAL_____.

In August 2007, AAU_____ and K_____ met with the Minister of Mines, ABG_____, to reiterate CGR_____'s interest in mining Blocks 1 and 2 (LCIA Award, pp. 3,002,064 and 3,002,170; PV ABG_____, p. 500,203).

Minister ABG_____ was not in favor, as these were awarded to AAL_____ (LCIA award). (LCIA award, pp. 3,002,064; ABG_____ report, p. 500,203). On August 29 and 30, 2007, a strategic meeting was held in Guernsey with the board of directors and management of CGR_____ GUERNESEY, including Ms. B_____ who took the meeting minutes, as well as AC_____, in their capacity as directors, AX_____ and Mr. C_____ (p. 500,329). From this meeting, it is clear that:

- Mr. C_____ has full knowledge of all the group's projects and is very involved in the financial aspects;

In line with its business model, CGR_____ began looking for partners for the development of the Simandou iron deposits (p. 5,000,075). Mr. C_____ met with several potential buyers. Discussions were initiated with ABU_____ (Stone project), ABV_____ (Sunshine project, in December 2009; Mr. C_____ went to China with AAU_____, AAA_____, and AX_____ to finalize the terms of the agreement, p. 300,615), ABW_____, ABX_____ and, later, ABY_____ (Hills project). Indeed, CGR_____ had to secure the support of a financial partner large enough to carry out all the projects (p. 300,614).

In this context, CGR_____ modified its structure in two steps (February 2009 and March 2010) and gave instructions not to reveal the intermediaries used (AAV_____, ABZ_____) during the due diligence procedures that would be carried out by the contractual partners.

AX_____ submitted a proposed restructuring plan to Ms. B_____ for completion on certain points (see CGR_____ GUINEA: Proposed restructuring and step plan, p. 306,391; emails, p. 306,396).

**s.b.)** *Step 1: Transfer of mining rights*

Step 1

Transfer of mining rights



In a first step, CGR_____ GUERNESEY bought a company, incorporated on February 10, 2009, with the same name as the existing company CG_____ RESOURCES (GUINEA) LTD, but domiciled in Guernsey and not in the BVI. CGR_____ GUERNESEY owned CGR_____ GUINEA (Guernsey), which will be the co-contractor of ABY_____ (arbitration award, p. 3,002,068; folder B.2.1.4).

Ms. B_____ signed the transfer contract on March 31, 2010, on behalf of the seller company CGR_____ GUERNESEY, and on behalf of the buyer company CG_____MM (File B.2.1.10).

Ms. B_____, in her capacity as administrator of X_____, administrator of CGR_____ GUINEA (BVI), voted (File B.2.1.1):

- to dissolve CGR _____ GUINEA (BVI),

- to appoint herself as liquidator of CGR _____ GUINEA (BVI), and

- to confirm the liquidation of CGR_____ GUINEA (BVI).

The unaudited accounts of CGR_____ GUINEA (Guernsey) as of March 31, 2010, are misleading (p. 4,900,147). Indeed, they show a deliberate confusion between CGR_____ GUINEA (BVI), party to the basic agreement of December 2009, and CGR_____ GUINEA (Guernsey), which took over the mining rights. Indeed, the accounts do not mention that these are the accounts of the Guernsey entity, which was not a party to the basic agreement or the transfer.

**t)** *ABP_____*

By decision of May 5, 2009, ABP_____ confirmed the validity of the permit granted to CGR_____ on blocks 1 and 2 (p. 5,000,207).

From emails exchanged between May 24 and 26, 2009, it appears that Mr. C_____ had a close direct relationship with ABP_____ (pp. 5,010,988 et seq; see also the email dated November 5, 2010, p. 5,002,276), in particular in connection with future contractual partners (p. 5,010,988)

By order of June 10, 2009, signed by ABP_____, the research permits on blocks 1 and 2 were renewed (p. 5,000,207).

In August 2017, ABP_____ was sentenced to 7 years in prison in the United States for accepting bribes of up to USD 8,500,000 in connection with mining titles granted to a Chinese company.

In the London arbitration proceedings (LCIA), ABY_____ claimed that ABP_____ received various financial benefits and gifts from CGR_____, including money to purchase three real estate properties in New York for a total of USD 5.27 million (p. 3,002,067). The Tribunal will consider as established the payment of large sums of money to ABP_____, without considering that it was bribery in connection with Guinea (see Award, nos. 643 ff, p. 3,002,177).

The Court notes the coincidence, which is improbable to say the least, that ABZ_____ has turned, without the knowledge of CGR_____, to Ms. E_____ to buy construction machinery.

ABZ_____ did not know Ms. E_____ and had no business relationship with her prior to the two payments (i.e., the USD 1 million and the USD 2 million, discussed below).

Furthermore, CGR_____ has taken pains to delete or remove all references to ABZ_____ and to keep its role in the sale to ABY_____ secret (see Award Nos. 434 ff., on the role of ABZ_____ 452 ff).

ABZ_____ would be used as an intermediary a second time in the payment of a sum of money to Ms. E_____ (transaction 3).

In addition to the payments of USD 1.3 million and USD 2 million (discussed below), numerous payments were made by CGR_____ to ABZ_____, sometimes through an intermediary, ACC_____, and a bank account in Belgium. The payments are in contradiction with the real activity of ABZ_____ (supplier in Guinea versus consulting), on different accounts from those mentioned on the contract, the payments in question being urgent and in "*rounded*" amounts (cf. p. 500,645 ff; arbitration award nos. 434 ff, on the role of ABZ_____ 452 ff; pp. 304, 1445x and y).

Finally, the statements by ABZ_____ and Ms. E_____ about the origin of the funds are credible, insofar as they are corroborated by other evidence in the proceedings.

It follows from the above that CGR_____ knew that the payment of USD 1 million to ABZ_____ was intentional.

ABZ_____ acted as an intermediary for CGR_____ in the payment of USD 1 million to Ms. E_____, an amount due in execution of the agreement signed for the repurchase of Ms. E_____'s interest in the Simandou project (USD 4 million, payable in 4 installments in exchange for the 5% interest).

**y.)** *Granting of concessions on blocks 1 and 2*

**y.a.)** On September 17, 2009, Mr. C_____'s daughter's wedding took place in Israel. The following guests were invited (see the list of guests from abroad, p. 5,011,001)

- ABS_____ (cf. statement of Mr. C_____),

- ABP_____,

of 1 share on a fiduciary basis for W_____ (File B.2.1.11). However, ERNST & YOUNG had been appointed for this purpose (minutes of September 18, 2009, B.2.1.11). Ms. B_____ and AJ_____ approved the accounts (File B.2.1.11) on the basis of a recommendation from the audit committee, in which AX_____ participated.

The same was true for the accounts as of December 31, 2010. By resolution signed by Ms. B_____, CGR_____ GUERNESEY has not audited its accounts as of December 31, 2010 (File B.2.1.11).

On the other hand, CGR_____ GUERNESEY drafted consolidated accounts for the first time for fiscal year 2010, which are incorrect with regard to payments to AAV_____. These accounts were signed by Ms. B_____, which will be discussed below (p. 500,136).

**y.d.)** *Sale to ABY_____*

In accordance with its business model, CGR_____ needed a partner who could invest and offer the technical experience necessary to develop the project. ABY_____ had already shown interest in the Simandou project and was already in contact with AAL_____ (an offer had been made on November 14, 2008, to AAL_____ and presentation made by AAL_____ on November 14, 2008, strategic aspects presented, then continued into subsequent meetings; p. 3,000,253 ff). CGR_____ approached ABY to negotiate the takeover of mining concessions and a possible joint venture.

On February 22, 2010, the parties signed a nondisclosure agreement and ABY_____ began its due diligence process, which included, among other things, an anti-bribery compliance certificate from F_____ and a certificate personally produced by Mr. C_____ (arbitration award, p. 3,002,072). Meetings were held between the parties in Rio de Janeiro, at the premises of ABY_____, to discuss the proposed joint venture, in which Mr. C_____, AAU_____, AX_____, and F_____ took part. CGR_____ gave ABY_____ a guarantee that the concessions had been obtained in accordance with the law (arbitration award, p. 3,002,072).

It should be noted that ABY_____ is listed on the NY Stock Exchange and must therefore comply with the FCPA (Foreign Corrupt Practices Act). In a letter dated March 19, 2010, Minister ABP_____ welcomed the future joint venture between CGR_____ and ABY_____ and confirmed that CGR_____ validly holds the concessions on Blocks 1 and 2 and on Zogota (p. 5,000,730).

On April 15, 2010, CGR_____ entered into an agreement with Liberia to develop rail and deepwater port infrastructure

to export iron ore (*Liberian Transport Solution*) (p. 300,619). The companies CGR_____ (LIBERIA) LTD and CG_____ RESOURCES (LIBERIA) LTD, owned by CGR_____ GUERNSEY, were involved in the project (p. 3,002,108; contract of April 15, 2010, found on the premises of AD_____GE, File B 2.1.2). At the hearing, Mr. C_____ stated that he met with the President of Liberia on three occasions in connection with this solution (PV, p. 500,565).

On April 16, 2010, ABP_____ approved the proposed joint venture (p. 5,000,731).

On April 28, 2010, the V_____ Foundation agreed to the transaction (p. 306,496).

An anti-corruption compliance program was signed (see copy at AD _____, File B.2.1.6).

On April 30, 2010, CGR_____ GUERNESEY, which owned CGR_____ GUINEA (Guernsey), and ABY_____ entered into a Joint-Venture Framework Agreement and a Shareholder Agreement. The former sold 51% of its shares in exchange for a payment of USD 2.5 billion, of which USD 500 million was to be paid immediately.

ABY_____ paid the USD 500 million to CGR_____ GUERNESEY (consolidated accounts, p. 500,135) and USD 349,500,717 of this amount was paid to W_____ as "repayment of a loan," according to the consolidated accounts of CGR_____ GUERNESEY (p. 500,135)

The newly created entity was renamed ACD_____ GUINEA (p. 5,000,735). AC_____ was the administrator.

AAA_____ was hired by CGR_____ GUERNESEY, i.e. Ms. B_____ and AJ_____, paid USD 254,020 per year (File B.2.1.10).

As a result of this agreement, bonuses were paid to CGR_____ employees (p. 500,139), including:

   –   USD 450,000 to K_____

   –   USD 150,000 to Ms. B_____

   –   USD 3,000,000 to AC_____ via an offshore account

   –   USD 2,000,000 to AAA_____ via an offshore account

   –   USD 2,500,000 to AAU_____

– USD 600,000 to F_____ via an offshore account

– USD 800,000 to AX_____ via AZ_____ (pp. 5,006,192 and 4,901,021)

– USD 180,000 to AJ_____ and

– between USD 90,000 and USD 200,000 to accountants (ACE_____, ACF_____, ACA_____).

It should be noted that AX_____ received USD 800,000 as an agent of CGR_____, while in 2010 it provided services through its company AZ_____ for only USD 177,058 (p. 500,138).

AAU_____ stated that it received a bonus of USD 7 million from the sale to ABY_____ in June 2010 (Israeli police statement, p. 4,900,037).

Furthermore, on July 1, 2010, the V_____ foundation agreed to pay a bonus to AD_____ BVI of USD 2.5 million, or 0.5% of the 500 million paid by ABY_____ to CGR_____ (p. 306,491) (note: 0.5% x 500 million = 2.5 million).

As for Mr. C_____, in 2010 he received USD 94 million from the V_____ foundation to be invested in his company AB_____ REAL ESTATE (p. 306,477), excluding donations for current expenses that amounted to USD 9.3 million from May to December 2010 (File B.2.1.4.). Added to this are the remuneration of USD 400.00 per year for V_____ (PP File B.1.1.21) and USD 700,000 per year for CGR_____ GUERNESEY (PP 300,750).

**y.e.) Payment to AAV_____**

In light of the agreement signed with ABY_____, CGR_____ paid the balance of the installments due to AAV_____, totaling USD 22 million (cf. agreement of March 24, 2008, subsequently amended), or USD 14 million (5 million balance, 3rd installment + 9 million, 4th installment), to which was added the planned bonus of USD 8 million in the event of a profit in excess of USD 1 billion (clause 5), i.e., a total amount of USD 22 million.

In addition, AAB_____ negotiated with Mr. C_____ an additional payment of USD 4.5 million, the organizers of AAV_____ reproaching CGR_____ for a "cheap" purchase of AAV_____'s 17.65% stake (p. 300,616).

AX_____ communicated directly with ABE_____, the protector of AAV_____, for the administrative formalities related to this payment (see email of May 14, 2010, from ABE_____ to MOSSACK FONSECA & CO, p. 357,2229).

On July 30, 2010, ACJ_____ wrote that "*as a result of the negotiations carried out by agreement of the parties and the settlement deed of July 8, 2010*" the denunciation of the certificate of August 2, 2009, was null and void (p. 5,002,010).

Ms. E_____ stated that the money transferred above by Mr. A_____, AAB_____ and AAE_____ was the CGR_____'s money (p. 500,721). AAB_____ had come to visit him in Miami and told him that "Mr. C_____" had asked them to pay him the money. AAB_____ and Mr. A_____ had advised him to invest in the purchase of houses in Miami (see CRI AAB_____ for real estate projects, B.2.8, B.2.11).

At the hearing, Mr. C_____ and Ms. B_____ stated that they were unaware of these movements of funds and had nothing to do with these operations (PV, p. 500,489).

**χ.)** *Transaction 7*

The second installment, mentioned as "1900 GUI" in the account of AAB_____, was paid by the remittance in cash of USD 1.9 million to ABR_____, husband of Ms. E_____, on September 17, 2010, to the aforementioned's account at Bank 9_____, in Conakry (pp. 503,264, 503,284-5)

Ms. E_____ signed a certificate confirming the receipt of USD 2.4 million, thus including these USD 1.9 million (250K + 150K + 100K + 1.9 million) (p. 500,971). A new contract was signed for the balance of USD 3.1 million (USD 2.4 + 3.1 =5.5) (p. 500,968).

At the hearing, Mr. C_____ and Ms. B_____ stated that they did not know ABR_____ and knew nothing about this payment (report, p. 500,490).

**δ.)** *ACK_____ payment*

The third installment of USD 100,000, mentioned as "100 GUI" in AAB_____'s statement, was transferred to Ms. E_____ to her account in Guinea by ACK_____, a Florida real estate broker (cf. "I saw the 100M that you sent me," pp. 503,281 and 503,281 from MT to FC "I received the email from ACK_____"; p. 348,759)

At the hearing, Mr. C_____ and Ms. B_____ stated that they did not know ACK_____ (report, PP 500,490).

**ε.)** *Transactions 8, 9, 10, 11*

representative of the "Boss," i.e., Mr. C_____, as it appears from an email of March 1, 2012, while "AC" refers to President ACQ_____ (see p. 4,707,154 and also Mr. A_____'s recorded conversation of April 11, 2013)

On March 26, 2012, President ACQ_____ established the National Mining Commission, consisting of a Technical Committee and a Strategic Committee (p. 5,000,893).

On March 29, 2012, it established the terms and conditions for the commission's implementation of a program to review existing securities and agreements (p. 5,000,903).

The Government of Guinea commissioned the law firm DLA PIPER to investigate the circumstances surrounding the acquisition by CGR_____ GUINEA of the rights to Blocks 1 and 2 and the approval of the transfer of these rights to ABY_____ (p. 349,790). The report concluded that the rights and the approval of the transfer of these rights were acquired through corrupt acts (p. 349,790).

An administrative procedure was initiated.

**γ. b.)** On May 8, 2012, Mr. A_____ traveled to Florida to meet with Ms. E_____. He did not meet with her, but with her husband, ABR_____, and her brother, ACP_____, and was able to speak with her briefly on the phone at the end of the meeting, while Ms. E_____ was in Florida. This meeting was recorded by the FBI (p. 3,002,113 recording p. B.4.7.13 audio files; transcript, p. 500,497). From this meeting, it emerged that:

Ms. E_____ received the promised USD 5.5 million (p. 500,500) because "*Mr. C_____ said so*" (pp. 500,500-1), Mr. A_____ adding "*when Mr. C_____ says something, he does it*" (p. 500,501);

– Ms. E_____ wanted a written financial proposal from CGR_____ on the payment of an additional sum, to which Mr. A_____ objected on the grounds that Mr. C_____ would never commit himself in writing to pay an amount to Ms. E_____, even though he was confronted with the existence of compromising written documents, but that the payment of USD 5 million had been agreed upon, a sum that would be increased once the problems related to the mining concessions had been resolved (pp. 500,497-8, "*Mr. C_____ will never say, I will commit to this, this, and this, Mr. C_____ not Mr. C_____ or CGR_____; that's all he is fighting at the moment (...) He is not going to draw up new papers!*")

– there was no point in Mr. A_____ personally committing himself in writing to pay these amounts as the funds did not come from him;

– Mr. C_____ would ask about the status of his initiatives regarding Ms. E_____ ("*I received a message from Mr. C_____ (...), who asked me,*

> *Mr. A_____, I know you went to see Ms. E_____, what's going on?"* p. 500,499);

– Mr. A_____ wanted to have Ms. E_____ sign an affidavit in which she denied having received bribes or having signed contracts with illegal content concerning the activities of CGR_____.

The affidavit in question was prepared by a collaborator of Mr. Jean VEIL, Mr. C_____'s Parisian lawyer (see summary of the findings of the internal investigation for the board of trustees of V_____, p. 300,547).

Subsequently, Ms. E_____ did sign the affidavit in question, but in two instances, on April 27, 2012, allegedly in Dubreka and on May 5, 2012, in the United States (pp. 348,788 and 348,790). These affidavits were consistent with what Mr. A_____ advocated for during the meeting of May 8, 2012. Indeed, Ms. E_____ stated that she resided in Dubreka and had never sent any contracts that she had signed and had seen false contracts signed in her name. Furthermore, she claimed that ACJ_____ did not act on her behalf, but was the perpetrator of an extortion attempt based on false documents, which she reported when she learned about it, to "repair her name and reputation" (p. 5,001,683).

At the hearing, Mr. C_____ contested having made the statements that Mr. A_____ attributed to him. Mr. A_____ had used his name to gain credibility with his interlocutor (report, p. 500,473). He added "*we never paid Ms. E_____. By we, I mean me or CGR_____.*" If Ms. E_____ was paid, it was in relation to other matters that did not concern CGR_____ (report, p. 50,475).

On October 30, 2012, the Technical Committee informed ACD_____ that ACD_____ had failed to cooperate in the proceedings and that the mineral rights had been obtained illegally.

Mr. A_____ signed a written statement dated November 26, 2012 (p. 3,000,067). He stated that he met, on two or three occasions, with President AAO_____, in the context of CGR_____'s mining projects and offered him a watch worth less than USD 5,000, in accordance with local custom. He specified that he had met the first wife of the President, AAJ_____, as well as K_____, who had introduced him to his half-sister Ms. E_____. Mr. A_____ had met Ms. E_____ on several occasions at her home in Dubreka, who had told him that she had a diamond site in the Forécariah region, a site which, after analysis of the soil by CGR_____, had not proved interesting, which is why Ms. E_____'s offer had been turned down. The relationship between CGR_____ and Ms. E_____ was limited to this business opportunity and Mr. A_____ had never

By decrees of April 17, 18, and 24, 2014, President ACQ_____ withdrew the concessions granted on December 9, 2008, and March 19, 2010, to CGR_____ (pp. 5,001,369 and 5,001,373) and terminated the mining agreement (basic agreement) of December 16, 2009 (p. 5,001,377).

CGR_____ argued that by revising the mining titles, the newly elected ACQ_____ was actually intending to pay the large sums of money that he needed to reimburse people who had helped him in his accession to the presidency.

**η.)** *U.S. Procedure*

**η.a)** In January 2013, while the mining title review process was underway in Guinea, a case was opened in the United States for money laundering and bribery in connection with the payment of bribes to members of the former government of Guinea in connection with the awarding of mining concessions, particularly at Simandou. Ms. E_____ agreed to cooperate with the investigation in the hope of obtaining immunity from prosecution ("immunity for the Cooperating Witness's own potential criminal conduct," FBI complaint, ch. 10). At that time, Ms. E_____ was living in the United States, in Jacksonville, Florida, had only Guinean nationality, had a diplomatic passport and a simple visa valid until August 27, 2013 (see meeting of March 25, 2013, Ms. E & Mr. A). She was in the process of setting up a beverage and fast-food business with the money received from ABF_____ ("*Who financed all this? The money that ABF_____ had sent me*").

In March and April 2013, Mr. A_____ went to meet with Ms. E_____ in Florida with the aim of convincing her to destroy original documents, including contracts signed with AAV_____ or CGR_____ and to lie to the American investigators, or even to leave the country in order to avoid answering their questions, in return for the payment of sums of money and the signing of an affidavit prepared by CGR_____ or its attorneys (see email below of April 5, 2013, from ACR_____ to Mr. C_____, pp. 500.676-7).

These interviews were recorded. The following emerged:

– On March 15 and 16, 2013, Mr. A_____ asked to meet with Ms. E_____, with Ms. E inquiring beforehand what Mr. A_____ would give her in the way of money (Ms. E: "*First, what are you offering me first? Before I see you. What do you have for me?*" Mr. A: "*That's quite a lot of money that can come in like that.*" Ms. E: "*How much do you have to give me*?")

&ndash; On March 20, 2013, the parties involved spoke again on the phone to set up the terms of the meeting. To Ms. E_____'s question of whether "*Mr. C_____*" had asked Mr. A_____ to meet with her and if he agreed that Mr. A_____ would give him "*this amount,*" the aforementioned replied "*of course.*"

&ndash; On March 25, 2013, they met at the airport and Mr. A_____ specified that, as agreed, USD 2 million would be paid to Ms. E_____. USD 300,000 of the first million would be paid immediately and the balance later, while the second million would be set aside with a lawyer, who will not be "ABF_____" (Ms. E: "*the last time, it was ABF_____*"; Mr. A: "*ABF_____ has done nothing but crap*"). In exchange, "*the papers*" were to be destroyed ("*we have to destroy these papers*"; "*these famous papers are here in the United States? Because the next time we meet, we have to destroy that stuff*"). Afterwards, Mr. A_____ gave advice on how Ms. E_____ should behave if questioned, and recommended that she say that she had nothing to do with it, adding "*like we did on the affidavit.*" Mr. A_____ added: "*fortunately Mr. C_____ had the intelligence to insist that this be done in a very, very regular way so that he could not be attacked later. .... Even ABN_____ was in it ... there are 20 signatures, 30 signatures on the CGR_____ contract.*"

By email dated April 5, 2013 (pp. 500,676-7), ACR_____ sent to Mr. C_____, at his address advisor@ad_____fa.com, the affidavit, to be signed by Ms. E_____, with the notation "*STRICTLY CONFIDENTIAL,*" which reads as follows:

*AFFIDAVIT*

*My name is Ms. E_____. I am a Guinean national, I have lived most of my life in Guinea and now live in the United States.*

*Representatives of the company CGR_____ came to see me and told me that the Republic of Guinea was accusing them of actions in which I had been involved. They told me what these actions were, and asked me if I agreed to say what I thought about them. I agreed because what they told me was false and I wish to attest to the following today.*

*My family situation*

*I am K_____'s half sister, not his sister. We have never been very close, but rather rivals.*

Case 1:17-cv-02726-JKB-BWD   Document 29-1   Filed 05/04/21   Page 25 of 270
Case 1:19-cv-07619-VSB   Document 142   Filed 05/11/22   Page 25 of 270

- 108 -

Roughly translated: "*Hi ACR_____, you sent me the message below, which has nothing to do with me? I assume it is J VEIL's suggestion to have it as part of CGR_____'s response to the so-called CT, which I think makes sense. Anyway, I can't help or give advice on this and I leave this entirely to our lawyers. I have only met her once in my life for five minutes, while she was present in the room, but we did not discuss anything together, etc., so I have nothing to do with her or any knowledge of her. Best, Mr. C_____.*"

It is noted that "CT" must be understood as being the Technical Committee and that Mr. Jean VEIL is the Parisian lawyer of Mr. C_____ and CGR_____.

Mr. C_____ explained (hearing on May 4, 2017, p. 500,640) that this affidavit had been drawn up in response to the serious accusations made by the Technical Committee and based on the false statements by Ms. E_____, who he described as a "criminal." A meeting had taken place at the home of Jean VEIL, in Paris, to prepare CGR_____'s response in his presence as well as in the presence of ACR_____. Mr. C_____ imagined that the draft affidavit that had been sent to him should be signed by Ms. E_____, but that was a matter for the lawyers and not for him; the affidavit denied one of the false accusations made by the aforementioned before the Technical Committee.

Two other meetings took place between Mr. A_____ and Ms. E_____, from which the following was noted:

- On April 11, 2013, Ms. E_____ and Mr. A_____ met again at the airport. Ms. E_____ informed Mr. A_____ that she had been questioned by the FBI. Mr. A_____ replied that it was urgently necessary to destroy the documents, as he had requested for a long time, and to deny having played a role in the assignment of the Simandou mining rights.

- Mr. A_____ also addressed Ms. E_____'s marital status, a question that was "very important" to him because if Ms. E_____ was officially married to AAO_____, she would fall into "*a category that is very, shall we say, dangerous, exposed, because as husband and wife (...), you are entering into the family network.*" She would be assuming an "*additional risk,*" whereas if it was as a family friend that the President knew Ms. E_____, this was different, and he recommended that she say so. He added that lawyers in Paris and England were looking into the matter. Ms. E_____ indicated that it was possible to marry four women in Guinea without the need to make it official, and that she could not lie about her status as the wife of the President.

Within these proceedings (report, p. 500,295), Mr. C_____ has always denied having had any contact with Mr. A_____ prior to the aforementioned meetings with Ms. E_____. Mr. A_____ affirmed this to Ms. E_____ to be credible.

**η.b)** *Mr. A*_____

On April 15, 2013, the FBI filed a complaint against Mr. A_____ in the U.S. District Court for the Southern District of New York (p. 3,000,190) for tampering with a witness, victim, or informant, obstructing a criminal investigation, and destroying, altering, and falsifying records in a federal investigation.

On March 10, 2014, Mr. A_____ pleaded guilty to obstructing a criminal investigation and was sentenced to two years in prison and a fine of USD 75,000. He admitted to having offered money to Ms. E_____ to induce her to leave the United States in order to avoid having to answer the FBI's questions.

He was sentenced on July 29, 2014, and was released from prison on January 9, 2015.

On June 29, 2015, Mr. A_____ signed a written affidavit filed in the LCIA arbitration proceedings, in which he states that he did not act on Mr. C_____'s instructions (p. 500,328).

**η.c)** *Payment by check from ABH*_____ *to Ms. E*_____

While the proceedings in the United States were pending, ABH_____ signed six checks in favor of Ms. E_____ for a total of USD 50,000 (p. 501,013 et seq).

**η.d)** *Ms. E*_____

By an act dated November 21, 2014 (Verified Complaint for Forfeiture in Rem, https://star.worldbank.org), amended by an act dated March 18, 2015 (Amended Verified Complaint for Forfeiture in Rem), the United States sought forfeiture of the three properties and the restaurant acquired by Ms. E_____ in Florida with the proceeds of corruption.

It was established that Ms. E_____ had received millions of dollars from CGR_____ and its representatives in connection with a bribery scheme aimed at influencing her husband, AAO_____, to grant mining titles to CGR_____, as CGR_____ continued to execute its promises to pay Ms. E_____ after her husband's death.

In January 2016, an agreement was reached between the United States and Ms. E_____. Ms. E_____ admitted that she had acquired these assets with the proceeds of corruption, two of the properties and the restaurant were confiscated by the United

States, while she kept the residence located _____, where she lived (*Stipulated Settlement Between United States and Ms. E_____*, agreement endorsed by *Consent Order for Judgment of Forfeiture of April 4, 2016,* *https://star.worldbank.org*).

**η.e)** *Hearing of Ms. E_____*

On February 23, 2017, Ms. E_____ was heard by the American authorities (pp. 500,755 et seq). She stated that she had no professional activity on the day of her hearing and was taking care of her children. She stated that she married President AAO_____ in 2000. It was a customary marriage, where "the father gave the girl to the man," in accordance with tradition.

She explained that AAN_____ had worked with her father at the Central Bank of Guinea. Through his sister, AAN_____ had asked Ms. E_____ to meet with the people at CGR_____, in particular Mr. A_____.

In 2005 or 2006, she had met with Mr. C_____ who had promised her 5% in exchange for obtaining a share of Simandou, which the President knew. She said that he had given her USD 200,000 in cash through his brother K_____, before stating that Mr. C_____ was not present, but had given the order to give the money (p. 58). He also gave her a diamond necklace.

AAV_____ was arranged because Mr. C_____ did not want to pay Ms. E_____ directly. Mr. A_____ was an intermediary between CGR_____ and her.

She had not received the promised share, but payments in exchange for that share.

Regarding the meetings that had taken place in 2013 with Mr. A_____, Ms. E_____ explained that Mr. C_____ had requested that all documentation, that is, all signed contracts, be destroyed or burned, both the originals and the photocopies. She knew that it was Mr. C_____ who had requested this because when Mr. A_____ came to see her, as well as AAU_____ or AAB_____, it was because Mr. C_____ had asked them. Mr. A_____ had offered her money in exchange for the destruction of the documents. He also asked her to sign a statement, but it contained lies.

All the contracts that were signed were authentic.

As for ABH_____, who she thought was working for the Guinean government, he had offered to pay for her trip to the United States.

She did not know if the above-mentioned had any contact with ACU_____ and she did not have to do anything for the money received.

**ι.)** *Guinean proceedings*

Shortly after the U.S. proceedings were initiated, Guinean authorities initiated proceedings against K_____ and ACB_____, who were arrested and jailed on April 16 and 19, 2013, respectively.

The Guinean judiciary ordered the release of the individuals on August 6, 2013. However, they were only discharged on November 29, 2013. K_____ left the territory.

Several people were interviewed by Guinean authorities.

On March 30, 2020, the Court of First Instance of Kaloum, Conakry, acquitted six key players in the Simandou and Zogota mining corruption case (see judgment attached to the letter dated April 6, 2020, from GAMMA_____, Esq.). The judgment mentions that the civil party withdrew its action because of a settlement reached between it and the defendants, and the main public prosecutor abandoned the proceedings against the defendants, which proved that this public prosecutor had no evidence that could lead to a conviction of the defendants, for which reason the Court declared the defendants Ms. E_____, K_____, ABP_____, AAM_____, ACB_____ and AAF_____ not guilty of the facts with which they were charged.

**φ.)** *Israeli proceedings*

The Israeli judicial authorities opened criminal proceedings against Mr. C_____.

They requested mutual assistance for this from the Swiss authorities, the procedure being referenced under CP/401/2015.

The Swiss authorities also requested the assistance of the Israeli authorities in these proceedings (see Files B.4.5.4 to 6).

Several people were interviewed by the Israeli authorities.

**κ.)** *LCIA proceedings*

On April 17, 2014, President ACQ_____ withdrew the concession granted to CGR_____.

On April 28, 2014, ABY_____ filed an arbitration claim against CGR_____ before the Arbitral Tribunal of the London Court of International Arbitration (LCIA) for payment of USD 1.25 billion. In substance, it accused CGR_____ of having entered into the joint venture contract and the shareholder agreement on the basis of false guarantees, CGR_____ having concealed the fact that it obtained the mining concession through acts of corruption that led to the revocation of that concession. Thus, CGR_____ had corrupted Ms. E_____ and ABP_____ by paying them millions of dollars as well as the President AAO_____ by offering him gifts (a watch and a miniature car in gold, encrusted with diamonds).

Ms. B_____, Mr. A_____ and Mr. C_____ were not parties to these proceedings and were not heard by the arbitral tribunal.

In the course of these proceedings, the parties submitted several written statements.

By arbitral award dated April 4, 2019 (280 pages, pp. 3,002,000), CGR_____ was ordered to pay ABY_____ the sum of USD 1.247 billion. The Tribunal held that CGR_____ had knowingly (nos. 677 ff) given (10) false or misleading warranties during the due diligence process (no. 676):

– by not revealing the existence of consultants or agents (including AAV_____, Mr. A_____, ABZ_____ and ACS_____) and by not transmitting the contracts that obligated her thereto,

– by not transmitting the documents and information related to the transfer of shares on February 17, 2009, between CGR_____ GUINEE BVI and CGR_____ GUERNESEY,

– by not revealing the existence of disputes with AAM_____ and ABS_____,

– by not revealing the existing links with K_____ and Ms. E_____ and by falsely claiming that K_____ and Ms. E_____ were not related (see declaration AAU_____),

– by giving a misleading description of its role in the withdrawal of AAL_____'s mining titles,

– by not communicating the existence of its professional and financial relations with Ms. E_____ and ABD_____,

– by claiming not to have corrupted Ms. E_____.

**µ.a.)** The V_____ foundation ordered an audit by private experts Pepper Hamilton LLP- Kasowitz Benson Torres & Friedman LLP Freeh Group International Solutions, LLC. CGR_____ did the same by commissioning the private experts CROWE HORWATH.

According to the report from Louis Joseph FREEH and Joseph Isadore LIEBERMAN issued on July 29, 2015 (p. 300,545), the experts found no direct credible evidence that would demonstrate that Mr. C_____, or any of the employees, officers, or directors of CGR_____, or its related entities, violated U.S. laws, particularly the FCPA and the Obstruction of Justice Act, in connection with obtaining mining licenses and conducting business operations in Guinea. There is also no direct credible evidence that anyone at CGR_____ ordered influence peddling payments to Guinean government officials in connection with CGR_____'s mining activities. Similarly, there is no credible evidence that anyone at CGR _____ participated with Mr. A _____ in obstructing a U.S. investigation.

According to the CROWE HORWATH report issued on March 20, 2016 (p. 301,000), in which the experts were asked whether the costs submitted to them were proportionate and pertinent to the Simandou project, there was no evidence that would lead them to believe, in any material respects, that the costs incurred by the project were illegitimate as of December 31, 2012. The authors of the report relied in particular on documents transmitted by the foundation and on written affidavits from Mr. AAE_____, Mr. AAB_____, Mr. A_____, Mr. AAU_____, Mr. AJ_____, Mr. AAA_____, and Mr. AX_____.

**µ.b)** *Assessment of the facts*

The public prosecutor's office or the courts have recourse to one or more experts when they do not have the necessary knowledge and ability to ascertain or judge a factual situation (art. 182 CPP).

In this case, the contracted experts did not give an opinion on technical points that the Tribunal could not resolve itself. They gave their opinion on the documents submitted to them by a party and drew their own conclusions. It is up to the Tribunal to determine the facts on which it bases its conclusions. Furthermore, it should be noted that the contracted experts did not have knowledge of all the documents submitted to the Tribunal (emails, statements) and did not examine the merits of the financial transactions submitted to them (e.g., the economic reality of the invoices or contracts supporting the transactions).

Accordingly, the Tribunal makes its own assessment of the facts of the case, departing, where appropriate, from the conclusions of private experts.

**v.)** *Current Swiss criminal procedure*

**v.a.)** On August 27, 2013, the Office of the Geneva Public Prosecutor initiated these proceedings.

On February 24, 2017, Guinea filed a criminal complaint and became a complaining party to these proceedings. On June 26, 2019, after a settlement was reached with CGR_____ (p. 304,793), Guinea withdrew its standing as a complaining party in these proceedings.

Several people were heard in Geneva or by commissions requested to provide judicial assistance.

**v.b.)** Ms. E_____ was heard by a commission in Florida on July 6 and 7, 2017 (pp. 500,687 ff). In substance, she confirmed her statements made on February 23, 2017, before the American authorities (pp. 500,755 et seq).

In summary, she stated that she met President AAO_____ through her sister, who worked for him when her father knew him. On her father's instructions, in 2000, she married the president and stopped her studies. It was a customary marriage; her father gave her to her husband (p. 500,729).

With AAO_____, she acted as an advisor and was known to have the President's trust. In 2005, her sister had asked her to take a phone call from AAN_____, who had informed her that she wanted to meet with her. The aforementioned had come to meet her at her home in Dubreka accompanied by Ms. E_____'s half brother, K_____ and Mr. A_____, who had introduced himself as CGR_____'s representative. AAN_____ introduced her to Mr. A_____ as the last wife of the President and told him that CGR_____ wanted help and was ready to pay her and people of goodwill USD 12 million. Mr. A_____ confirmed this and said that he would take care of the contracts. They wanted her to persuade the President to give them Simandou. She had to "open the door."

She told the President that "*they*" wanted to see him; the President agreed. Mr. A_____ met with President AAO_____, who called Minister of Mines AAI_____ and asked him to facilitate CGR_____. She said that the President agreed to favor CGR_____ because CGR_____ had promised him help.

CGR_____ obtained the permits for the North and South Simandou zones. CGR_____ then organized a meeting in the courtyard of the Presidential Palace

between the President, Mr. C_____, Mr. A_____, AAB_____, K_____, AAA_____, and AM_____.

On that occasion, in 2006, Mr. C_____ promised him the 5% and K_____ gave him USD 200,000 in cash, Mr. A_____ having previously told him that Mr. C_____ had brought him money.

She was then invited by AAU_____ to the reception organized by CGR_____, the aforementioned wishing that the population see her with CGR_____ to gain credibility in Guinea.

In February 2007, she helped CGR_____ obtain the uranium licenses by calling the Minister of Mines and inviting him to meet with her half brother. CGR_____ promised her 5%, as it did for the bauxite licenses. A memorandum of understanding dated June 20, 2007, was signed in the presence of Mr. C_____, who was eating a small salad without oil at the time.

In early 2008, she met with AAU_____ and ACB_____, who asked for her help signing new contracts. On this occasion, AAU_____ called Mr. C_____ on his phone and put him on speakerphone. Mr. C_____ had asked AAU_____ to give Ms. E_____ everything she wanted. Then ACB_____ picked up the contracts signed by AAU_____ and handed them to her for signature.

In April 2008, AAU_____ and K_____ went to meet the President. Ms. E_____ was present. The President had ABI_____ called, who was afraid to take away the concessions from AAL_____.

Later, AAU_____ called Ms. E_____ to complain that the blocks had still not been awarded to CGR_____. A new meeting took place with the President in the presence of the new Minister of Mines, ABM_____, who could not refuse what the President asked him to do, i.e., to award blocks 1 and 2 to CGR_____.

At some point, CGR_____ stopped paying her what she was owed. She told the Chief of Staff, who turned to ABP_____. The Chief of Staff and then President ABT_____ summoned AAU_____ and asked him to pay what CGR_____ owed. AAU_____ and AAB_____ went to meet her and proposed a sort of amicable contract, which she signed. This contract ended the dispute by providing for the payment of millions.

As for the contract of February 20, 2006, Mr. A_____ had presented it to him already signed by AAE_____. AAV_____ was "*in the middle*" between Ms. E_____ and CGR_____ because Mr. C_____ did not want anyone to see that CGR_____ was doing business with Ms. E_____. Two letters of commitment had also been...

that she claimed from Mr. A_____. The same was true for the amounts that passed through ABF_____ (transactions 9 to 11).

In all, she had received USD 10 million, an amount she deserved insofar as she had "*done her part*," i.e., she had "*pushed*" her husband, President AAO_____ so that CGR_____ could obtain the permits.

She added that Mr. A_____ and CGR_____ had advised her to create a company. Mr. A_____ had told her that it was important to have a company. A company ABD_____ & CO LTD had therefore been created for her in Geneva to "*pass the money through*."

She had never done any business with Mr. A_____ in the field of pharmaceutical products. On the other hand, he had helped her find sugar and chicken, without charging for his services.

Everyone in Guinea knew that CGR_____ was buying all the people they needed.

It was true that she had received USD 50,000 from the government of Guinea as reimbursement for the costs of her flight to Freetown. She was not asked for anything in return.

Finally, Ms. E_____ refused to talk about her meetings with Mr. A_____ in the United States or about the person who paid her legal fees, invoking the confidentiality clause in the "non prosecution agreement."

**v.c.)** *Defendants*

**v.c.a.)** Ms. B_____ has always denied any knowledge of corruption in the context of the granting of mining concessions in Guinea. If she had signed documents that could be linked to possible acts of corruption, she was totally unaware that these documents could have such a purpose. She had never been to Guinea, had never met the leaders of AAV_____ except on one occasion, during a courtesy visit, two of them in Geneva, nor Ms. E_____, or AAO_____.

**v.c.b.)** Mr. C_____ has always challenged any corruption in the attribution of mining concessions in Guinea. In any case, he was not aware of it. In reality, it was a plot to withdraw the concessions legally granted to CGR_____.

Regarding AAV_____'s contribution, the theses of Mr. C_____ and Mr. A_____ are contradictory.

On the one hand, Mr. A_____ indicates that he was a business contributor and that his role consisted of making his time, his network, and his relational know-how available in Africa. However, Mr. A_____ and his associates were well remunerated and paid, separately, by CGR_____ for this activity.

On the other hand, Mr. C_____ argued that AAV_____ should contribute to the costs of the Simandou iron project to the extent of its participation. However, AAV_____ clearly did not have the financial capacity to do so.

Finally, the contract of February 14, 2006, does not mention a business contributor.

This alleged lack of consensus on AAV_____'s role and contribution demonstrates that, in reality, AAV_____ was intended to serve as a screen for CGR_____ in the acquisition of blocks 1 and 2.

It follows from the above that AAV_____ served as an intermediary and screen between CGR_____ and Ms. E_____.

## D.B. Facts defined as forgery

**a)** *D_____*

D_____, an Israeli citizen domiciled in Ukraine and a former military pilot in the Israeli army, was considered by Mr. C_____ to be a friend and business partner until D_____'s hearing before the Geneva Public Prosecutor's Office (cf. in particular, report of C_____, pp. 500,340, 500,533-4).

**b)** *Acquisition of land in Romania*

As a preliminary point, it should be noted that the funds paid to Ms. E_____ (transaction 8a) did not come from D_____'s personal Rotweiler account, as stated in the indictment, but from D_____'s personal account at Bank 11 in Kiev (p. 353,421) (D_____/Bank 11_____, O_____, N_____/Bank 13_____, Ms. E_____ + ACL_____)



**b.a.)** *AB_____*

ACW_____, an employee of AB_____, was involved in the acquisition of land in Romania, in the municipality of Snagov, through the Romanian company SC ACX_____ INVEST SRL (hereinafter: ACX_____) (p. 502,588; pp. 502,595 ff., p. 304,229), whose director, ACY_____, was paid EUR 1,000 per month until the transfer of the ACX_____ shares (p. 502,588; see testimony of ACY_____, director and shareholder of ACX_____, p. 502,610).

The acquisition of Romanian land could not be done by a foreigner, as this is prohibited under Romanian law (see p. 502,612 = 4,801,635).

Thus, under the cover of false loans granted by ACZ_____ to ACX_____ (p. 502,612 and pp. 502,589, 502,591 and 502,715 et seq), the Romanian lands were purchased by ACW_____ on behalf of AB_____ (cf. request for financing of EUR 570,000 from ACW_____ to F_____, p. 502,588; p. 502,612)

Mr. C_____ confirmed that ACW_____, who worked for AB_____, had brought this "*case*" (report, Mr. C_____, p. 501,028; cf. also the email dated July 28, 2010 from Mr. Robert ROSU, who mentions that ACW_____ handles ACX_____)

D_____ never appeared in this acquisition, either in discussions, negotiations, or financing.

**b.b.)** *Intermediary/screen*



V_____ holds W_____, which holds ADA_____, which holds 50% of ADB_____, which holds J_____ INC. (p. 501,385), which in turn owns I_____ (see diagram dated June 13, 2005).

I_____ set up a shell company L_____ (hereinafter "L_____"), in order to acquire the Romanian land.

However, _____, the only son of ADC _____ and nephew of Mr. C _____, who actually runs I _____, did not want to invest in these Romanian lands (see p. 502,615).

Ms. B_____ took care of all the administrative and corporate steps to do so (cf pp. 502,588–502,636; 502,640 et seq, 502,696).

She turned to MOSSACK FONSECA & CO, in Geneva, and purchased the company L_____ (report of Ms. B_____, p. 502,579), a British Virgin Islands company, incorporated on April 21, 2009 (p. 501,140).

L_____, by resolution of June 5, 2009, and represented by a Romanian lawyer, decided to acquire the company ACX_____ (p. 502,635) for the price of RON 200, which is the equivalent of CHF 71, also taking over de facto the debts of the company (see loans ACZ_____).

By email dated June 9, 2009, Ms. B_____ asked MOSSACK FONSECA & CO, in Geneva, to send her the deed of incorporation and the articles of association of the company L_____, to issue L_____'s share certificate and to send these documents to her office in Geneva (pp. 502,659, 501,125). Furthermore, she asked, through her assistant, to send her a power of attorney in order to allow the transfer of the assets the same day (p. 501,141).

A share certificate was then issued stating that D_____ held the 50,000 shares of L_____ (p. 502,660). This share certificate was however dated April 21, 2009, whereas its issuance had been requested on June 9, 2009.

On August 31, 2010, I_____ transferred to D_____, in its account at Bank 15_____, in Zurich, the sum of USD 3,187,500 (p. 6,000,022), equivalent to EUR 2.5 million.

Building rights on the land were never secured.

Subsequently, D_____ contractually assumed the debt that ACX_____ owed to ACZ_____ (pp. 502,719 ff, 502,724, 502,589). D_____ gave authority to ACW_____ to sign the related contract (pp. 502,725). Ms. B_____ has been involved in the process of reviewing the terms of the debt assumption and implementing said terms (pp. 502,589; 502,728).

**b.c.)** *Israeli proceedings*

D_____ and Mr. C_____ were heard in Israeli criminal proceedings.

A hearing of the two parties was held on August 17, 2017. When asked by the Public Prosecutor's Office to transmit the minutes of this hearing (see the Court's CRI [international rogatory commission letter] dated November 16, 2018), and subsequently by the Directorate of Proceedings of the Criminal Court (see CRI dated February 28, 2020), the Israeli authorities did not comply with these requests.

AX_____ and F_____ were heard, on several occasions, by the Israeli authorities (p. 4,901,639). The minutes of their hearings were transmitted to the Swiss authorities by way of mutual assistance (see File B.4.5.1 to 8).

**b.d.)** *Geneva procedure*

When questioned by the Geneva Public Prosecutor's Office, D _____ declared that the acquisition was made with the EUR 9 million loaned by CG _____ (handwritten affidavit dated June 12, 2009, p. 6,000,0005; report of D _____, p. 501,971). He had never owned, directly or through a company, any land in Romania. In order to justify the transfer of the EUR 9 million, Mr. C_____ had asked him to sign the contract of June 15, 2009, and then the amendment, which he did in the office of the aforementioned in Herzliya. He had never been a shareholder of L _____ and was unaware that he had been designated as such on the share certificate. Subsequently, Mr. C_____ had asked him to make various transfers of assets to third parties, deducting the EUR 9 million received.

As for Mr. _____, he declared that the land had been acquired for EUR 3 to 4 million, or USD 5 million. D_____ had acted on his behalf, but CG_____ was...

The affidavit dated August 2, 2009, signed by Ms. E_____ was unrelated to the contract dated February 20, 2006. When AAV_____ had obtained an agreement on its remuneration, Mr. A_____ and his associates had to honor their commitments to the local partners, namely AAM_____ / K_____, and AAF_____. ABD_____ was the assignee of the local partners' rights, which explains the agreement on the payment of USD 4 million in his favor. Mr. A_____ did not know whether Ms. E_____ had received part of this USD 4 million and was unaware of the payments of USD 1 million and 2 million made by ABZ_____ to Ms. E_____.

Mr. A_____ was not aware that Ms. E_____ was asking for more money. He had objected to AAB_____ going to meet her in July 2010 in Freetown. He was not aware of the content of their discussions and had no knowledge of the contract of July 8, 2010.

Prior to this trip to Freetown, AAB_____ had asked her and AAE_____ to make advances to Ms. E_____ in the amount of USD 500,000, which corresponded to approximately 10% of the final sum that was to be paid to her in her capacity as assignee of the local partners' rights. In the end, a total amount of USD 3,404,336 was paid to Ms. E_____ in this capacity. When asked why the money was used to purchase a property in Florida for Ms. E_____, Mr. A_____ replied that she did what she wanted with her money.

With regard to the money that had passed through N_____'s account, Mr. A_____ indicated that he did not know D_____. AAB_____ had asked him to issue an invoice for USD 1.5 million from N_____ to O_____ and had explained to him that this was a compensation mechanism between ABJ_____ and CG_____MM in relation to projects in southern Africa.

He had gone to meet Ms. E_____ in Florida to try to find a solution to the dispute concerning the award of mining concessions to CGR_____ GUINEE. He had mentioned the name of Mr. C_____, whom he had called "*Mr. C_____*," the "*number 1*," "*big boss*," or "*the one at the top*," with Ms. E_____, to gain credibility.

**b.)** None of the eleven witnesses called by the Tribunal appeared.

**c.)** The parties have pleaded and made the submissions set out in the header of this judgment.

# F. PERSONAL CIRCUMSTANCES

**a.a.)** Ms. B_____ was born on _____ 1970, in Belgium, of which she is a national. In 2005, she married AQ_____ with whom she had two children, born in 2003 and 2004. In 2018 she moved with her family to Italy. She is the owner of a children's park, from which she earns about EUR 1,000 per month. She owns a house in France, in Thoiry, which is rented.

She has no criminal record.

**a.b.)** Mr. C_____ was born on _____ 1956, in Israel. He is a dual French-Israeli national. He is married and has four adult children.

In 2004, he leased an apartment in Geneva, and was granted a lump-sum tax benefit with his wife in Geneva, initially taxed on the basis of annual expenses of CHF 380,000, which increased several times (in 2013 it was CHF 1,000,000). In 2016, he waived the lump sum tax benefit.

He lives with his family in Israel.

Mr. C_____ was sentenced by a Romanian court, in the final instance and in absentia, to a prison sentence of 5 years, on _____ 2020.

**a.c.)** Mr. A_____ was born on _____ 1962, in France, of which he is a national. He is married and has four adult children from two different unions.

He states that he works in the boat trade, from which he earned EUR 250,000 in 2019 and 2020.

In 2013, he disposed of all his assets, keeping only the usufruct of the house in which he lives and the one inherited from his father, from which he receives a rental income of EUR 1,500 per month.

On July 29, 2014, in the United States, Mr. A_____ was given an immediate sentence of 2 years and a fine of USD 75,000 for obstructing a criminal investigation.


## G. MATTERS OF LAW

1.  Jurisdiction

    **1.1.** *Jurisdiction/Corruption*

It emerges from the email from AX_____ to Ms. B_____ dated January 17, 2006, that CGR_____ was then negotiating with President AAO_____ for an agreement with Guinea.

In the agreement to be signed with Guinea on February 20, 2006, there was already mention of a right of pre-emption for CGR_____ in the event of the revocation of half of AAL_____'s mining permits.

It will be noted that Ms. E_____ did not play any other role for CGR_____. However, several meetings were organized between Ms. E_____ and the directors of CGR_____. Several meetings also took place with AAO_____, in the presence of Ms. E_____.

In the end, Ms. E_____ received sugar from CGR_____ for nearly USD 100,000 and USD 8,500,000. However, there was no justification for CGR_____ to pay such benefits to Ms. E_____ other than because of the influence that her husband, the President of Guinea, could have had on the state process for the assignment of mining rights.

President AAO_____ knew that his fourth wife would be richly rewarded for influencing the state's process of awarding mining rights, even if he did not know exactly how much would be paid.

It should be added that it is not clear what interest Guinea had in granting concessions on one of the world's largest untapped iron reserves to a group, CGR_____, which had no previous experience in iron mining, which was not known in Guinea (which is why presentations of the group had to be made) and, above all, which did not have the capacity to operate the concessions alone.

CGR_____ had no other purpose than to resell the mining concessions once they were obtained, making an immediate profit.

In this case, CGR_____ invested approximately USD 160 million to obtain the mining concessions, which it assessed at USD 5 billion.

This operation did not benefit Guinea, which could only benefit from the operation of the mines at a later stage, precisely during the development of the project and to a lesser extent.

In this situation, President AAO_____ had no interest in withdrawing the rights from AAL_____ so that CGR_____ could claim them. With this coming just before his death, he would not have done so except to gain a personal interest or to favor a third party.

"*Mr. C_____*," to be understood as Mr. C_____ according to the above.

**2.5.1.** There must be a relationship of equivalence (relationship of connection) between an undue advantage and a public official's conduct (CR-CP II [Commentary on the French-Language section of the Criminal Code, Special Part], op. cit., Article 322-seventh, No. 36). The Federal Court (in application of former Article 288 of the Swiss Penal Code) defines this relationship as a sufficient link between the benefit and one or more of the public official's future acts, determinable in a generic way (ATF [Main Decisions of the Federal Court] 126 IV 141, Recital 2a; JdT [Journal of the Courts] 2001 IV 10/CR-CP II, op. cit., Article 322-third, No. 56). This link may be analyzed in the light of objective auxiliary criteria such as the amount of the advantage, the proximity in time, the frequency of contact between the donor and the recipient and, more particularly, the relationship between the professional situation of the author and the function exercised by the public official (FF 1999 5045, 5081)

**2.5.2.** The promise of remuneration, in the form of the granting of shares, a promise kept by subsequent payments, is obviously linked to President AAO_____'s behavior to influence the state process of assigning mining titles. In fact, the fact that CGR_____ offers sugar and pays millions of US dollars to Ms. E_____ demonstrates, if proof were needed, that her husband, President AAO_____, did indeed use his influence during his lifetime. Otherwise, no money would certainly have been paid.

**2.6.** The violation is intentional. Possible fraud is sufficient (Criminal Code Article 12(2)(2)), in particular with regard to the expected influence of the undue advantage (Bernard CORBOZ, op. cit., Criminal Code Article 322-seventh, No. 13). This constitutive element will be dealt with in the following recital.

### 3. Imputation of acts to defendants

It is now necessary to examine the defendants' role in this corrupt process, that is, to examine whether the acts committed can be attributed to them on both an objective and subjective level.

**3.1.** *Ms. B_____*

**3.1.1.1.** *Role within CGR_____* First of all, regarding Ms. B_____'s role within the structure of the group, she has worked for Mr. C_____'s family since she was 19 years old, since 1989. She is a director of AD_____ BVI, since its creation in 1998. AD_____ BVI is bound by a mandate contract with the V_____ foundation, which bears all of AD_____ BVI's expenses. Ms. B_____ is also the secretary of the

V_____ foundation. She is not only a director of AD_____ BVI, but also of all the of all the companies of the CGR_____ group, in particular CGR_____ GUERNESEY, CGR_____ GUINEE (BVI), CGR_____ GUINEA (GUERNSEY) or CGR_____ STEEL.

Ms. B_____ is responsible for the entire corporate and administrative structure of the CGR_____ group and has a privileged position in all the companies of the group companies owned by the V_____ foundation, as well as within V_____ itself, having acquired valuable experience over the years.

The importance of her role can also be deduced from her remuneration, which is not that of a simple executor, given its notable evolution over the years.

In this capacity, Ms. B_____ will set up the necessary structure for the corrupting corrupt process and to erase the evidence of corruption.

### 3.1.1.2. *Setting up the AAV intermediary*_____

Ms. B_____ will set up the intermediary and the screen between CGR_____ and Ms. E_____.

While she was aware of the Guinean project, notably for having translated some of the agreements and for having set up CGR_____ GUINEE, of which she was the administrator, on February 13, 2006, Ms. B_____ sold an offshore company, namely AAV_____, to Mr. A_____ and his associates, The same day, but before the conclusion of the contract between CGR_____ and AAV_____ of the following day, Mrs. B_____ certified to hold, on behalf of AAV_____, the shares of CGR_____ GUINEE.

In this context, on February 15, 2006, the secretary of AAB_____ sent, via X_____, the memorandum of understanding with the local partners to be signed by her, in her capacity of administrator of AAV_____.

Ms. B_____ had several telephone conversations with AAB_____, and the two memoranda of understanding of February 20, 2006, between AAV_____ and AAM_____/K_____, respectively between AAV_____ and Ms. E_____, were sent to her.

She delegated her signing authority, issuing a power of attorney to AAE_____, via AAB_____, to sign these memoranda of understanding, before immediately resigning. Fake administrators were then appointed.

Ms. B_____ carried out all the necessary administrative and corporate procedures for the removal of the intermediary AAV_____.

She was responsible for the restructuring plan at the administrative and corporate level. She signed almost all the documents allowing the two-stage restructuring of CGR_____, in 2009 and 2010, in her capacity as director of all the companies involved in the restructuring, namely:

- CGR_____ GUERNSEY,

- CGR_____ STEEL,

- CGR_____ GUINEA (BVI),

- CGR_____ GUINEA (Guernsey).

Thus, she initially purchased a company with the same name as the one that held the mining rights, but domiciled in Guernsey and no longer in the BVI. She thus allowed the transfer of the mining permits from one company to another.

She signed the transfer of CGR_____ GUINEE SARL from one company to another. She signed the loan transfer contracts and signed the loan contracts. She voted to dissolve CGR_____ GUINEA BVI, former holder of the mining rights, a share of which had been transferred to AAV_____. She appointed herself as liquidator of this company and noted the liquidation.

As for AX_____, she made sure to delete any compromising remarks in the accounting.

Also relating to the accounting, Ms. B_____ enabled the role of AAV_____ to be hidden.

Ms. B_____, in fact, signed the resolutions not to audit the 2009 and 2010 accounts of CGR_____ GUERNSEY. On the other hand, she signed the consolidated accounts for CGR_____ GUERNSEY, although they falsely stated that the payments of USD 22 million and USD 3 million to AAV_____ were related to the sale of a steel mill in Baku.

In the meantime, whereas the payments to AAV_____ had previously been made by CGR_____ TREASURY SERVICES, after the sale to ABY_____, AE_____ made payments to a company doing business outside the scope of that of CGR_____, which

owns a company operating a steel mill in Azerbaijan.

For this purpose, AAV_____ opened a new account in Israel. After the last payment, AAV_____ was written off and AE_____ will be written off in 2014.

By doing so, Ms. B_____ has made it possible to remove any link with the intermediary in the promises made for corrupt purposes and the corrupt payments made or to be made.

Finally, Ms. B_____ received a performance bonus when the operation was completed, further proof of her involvement in the smooth running of the project. Similarly, AD_____ BVI, of which Ms. B_____ was a director, received 0.5% of the USD 500 million paid by ABY_____ to CGR_____.

**3.1.1.6.** Thus, Ms. B_____ has, objectively, actively participated in the setting up and erasing of the intermediary and screen AAV_____. She set up the corruption scheme in its corporate and administrative aspects.

**3.1.2.** In view of her role within the CGR_____ companies, Ms. B_____ occupied a privileged position and was familiar with the CGR_____ business model, as recalled during the strategic meeting in Guernsey.

In terms of her state of mind, Ms. B_____ was already aware in 2005 of the Guinean project to acquire concessions on one of the world's largest untapped iron ore reserves in a very risky geographical region. At the beginning of 2006, she was informed of the signing of a memorandum of understanding with the Guinean President.

The day before signing the agreement with AAV_____, she stated that she held, on behalf of AAV_____, the shares of CGR_____ GUINEA which were to be transferred the following day. Ms. B_____ has, however, conditioned the execution of the agreement with AAV_____, i.e., the transfer of the shares, on the execution of the contract between CGR_____ GUINEA and the government of the Republic of Guinea, which demonstrates her understanding and her involvement in the current operation.

Ms. B_____ knew, as she indicated in the proceedings, that the granting of a share would allow the subsequent payment of a commission in the event of a successful operation.

On February 14, 2006, the contract between AAV_____ and CGR_____ was signed. This one mentioned, indeed, the 17.65% share, mentioned by Ms. B_____ the day before, and provided for the payment of the USD 19.5 million, according to a very specific schedule.

However, these payments and this schedule were only the counterpart of the remuneration promised to AAM_____/K_____ and AAF_____, which allowed CGR_____ access to President AAO_____ through his fourth wife.

Specifically, the contract between AAV_____ and AAM_____/K_____ was sent, on February 15, 2006, to Ms. B_____ for signature given that she was, at the time, still an AAV_____ director, through X_____. However, she refused to sign it, preferring, at first, to delegate her power of signature, before resigning from her duties as soon as the power of attorney was issued.

Subsequently, Ms. B_____ hid the names of the individuals behind AAV_____ through a trust report.

Finally, before transferring the shares of CGR_____ GUINEA to AAV_____, of which she remained the fiduciary owner through AD_____, Ms. B_____ made sure that the agreement signed between CGR_____ and Guinea was properly executed.

By doing so, she demonstrated that she was fully aware of the situation, while maintaining control of the operation. She has taken care not to appear personally or to be linked in any way to the corrupt pact, and to hide the names of the individuals behind the shell company used by CGR_____.

Furthermore, it should be noted that the contract between AAV_____ and Ms. E_____, which was sent to Ms. B_____, did not provide for the payment of money, but rather for the granting of a stake in the project. However, the granting of a share demonstrates that a consideration is required from the co-contractor, in this case influencing President AAO_____, so that he in turn influences the process of granting mining rights.

Furthermore, Ms. B_____ was involved in the settlement of the dispute with AAM_____, which claimed the execution of the agreement signed on February 20, 2006, which had been submitted specifically to Ms. B_____ for signature (see the exchange of letters dated June 2009; recourse to attorneys; Ms. B_____ is the contact for the AAV_____, the Geneva attorney; translation of letter dated March 15, 2010). She was not surprised or concerned, despite the terms used by the person concerned, which further demonstrates her involvement in the corrupt scheme and her perfect knowledge of it.

Ms. B_____ has also demonstrated, through her subsequent actions, her participation in the corrupt scheme.

She still actively worked on the restructuring of the group aimed at the removal of the intermediary and screen AAV_____.

In this context, she was in close contact with AX_____, who took care of all the payments to the intermediary AAV_____ and to the beneficiary of the corrupt funds Ms. E_____ (see "*Proposed restructuring and step plan*" drafted by AX_____, p. 306,391).

While she had personally signed the resolutions not to audit the 2009 and 2010 accounts of CGR_____ GUERNSEY, Ms. B_____ signed the false consolidated accounts of CGR_____ GUERNSEY, the falsified nature of which she could not be ignorant.

Indeed, Ms. B_____ has a thorough knowledge of the structure of the group and its companies. Nevertheless, she signed accounts that falsely stated:

–   The nature of the amount paid to AAV_____, which was listed as an investment, which is false, and which only she could know;

–   The reason for payment to AAV_____: the sale of a steel plant in Baku, which is false, and which only she could know;

–   An additional payment of USD 3 million: under AE_____, after a reference to an amount paid to the CEO of ACG_____, owned by AE_____, ACH_____, which is false, and which only she could know.

By her actions, Ms. B_____ has shown her willingness to hide the role played by AAV_____ in the corrupt scheme put in place.

If the intervention of AAV_____ was legal, if the payments were made to intermediaries independent of the government, there would be no reason to falsify the accounts.

Finally, Ms. B_____ could not have been unaware of the hidden role of AX_____, who took care of all the payments related to the corruption, as well as erasing all traces of the corruption. Ms. B_____ is a director of CGR_____, which is bound by an agency agreement with AZ_____, AX_____'s company. In this capacity, there is no way she would not have known that the status of AX_____ changed in 2010. However, she lied about this, falsely claiming that he was subordinate to AJ_____, which only she could have known given her links with him and his role within CGR_____.

Moreover, after the sale to ABY_____, AX_____ received a substantial bonus of USD 800,000, representing 4.5 times the services invoiced, even though he was only an agent of CGR_____, which Ms. B_____ knew since she had approved the bonuses granted in her capacity as director of CGR_____ GUERNESEY

It follows from the above that Ms. B_____ will be acquitted of bribery of foreign public officials with regard to the facts mentioned under point B.b.I.1.1. of the indictment.

**3.2.** *Mr. C_____*

**3.2.1.** *Chief Executive Officer*

Mr. C_____ is officially the primary beneficiary of the V_____ foundation, which owns, through the holding company W_____, all the companies of the CG_____ group active in natural resources. The foundation V_____ makes all strategic decisions for the group, while the chair of the board of trustees, Mr. C_____'s lawyer in the present proceedings, is also the representative of the holding company W_____ as sole director.

As for AD_____ BVI, it is bound by a contract of mandate to the V_____ foundation, which approves its budget and handles all its expenses.

Between 2004 and 2010, AD_____ BVI was owned by AC_____, through the offshore AN_____. AC_____ was also CEO and CIO of CG_____MM, owned by the AR_____ foundation, of which Mr. C_____ is also the primary beneficiary. AC_____ stated that he was hired by the V_____ Foundation after several discussions with Mr. C_____ and had a close relationship with Mr. C_____ to make things work (p. 502,158).

Ms. B_____ was a director of AD_____ BVI and of all the companies in the CGR_____ group, as well as being the secretary of the board of trustees. She has worked for Mr. C_____'s family since she was 19 years old and has worked for AD_____ BVI since its creation.

AC_____ and Ms. B_____ were directors of CGR_____, based in Guernsey, which owned CGR_____ GUINEA, the future holder of the mining rights.

Mr. C_____ benefits from distributions of funds from the foundation for his personal needs, but also for professional needs (distribution of funds to AB_____ REAL ESTATE, whose sole shareholder is Mr. C_____). He is paid between USD 250,000 and 400,000 per year by the V_____ foundation and also USD 700,000 per year by CGR_____ for his consulting activities.

After the transaction with ABY_____ in 2010, of the USD 500 million paid by ABY_____ between 2010 and 2012, USD 350 million will be returned to W_____ and

USD 150 million will be distributed by the V_____ Foundation, to support the company AB_____ REAL ESTATE, directly owned by Mr. C_____.

As for AD_____ BVI, it received 0.5% of the USD 500 million paid by ABY_____. AC_____ received USD 3 million and Ms. B_____ received USD 150,000.

As part of his "consulting" activities, as he calls them, Mr. C_____ travels aboard one of the two airplanes ultimately owned by the V_____ foundation.

The companies active in natural resources in Africa all bear the name of Mr. C_____ under the brand name of CGR_____, in other words C_____ GROUP RESOURCES, which was of primary importance according to the email of January 17, 2006, from AAG_____ to Mrs. B_____.

Furthermore, it appears from his statements in these proceedings that Mr. C_____ sometimes confuses himself with the group before correcting himself (i.e., "we have never paid Ms. E_____; by we I mean me or CGR_____," p. 500,475).

Mr. C_____ also describes himself as the ambassador of the group that bears his name and indicates that he introduces himself under this name, thus implying to his interlocutors that he is the head thereof. He meets with heads of state, ministers and other leaders. He is present at all of the group's important negotiations and at all strategic meetings. The minutes of the strategic meeting of the board of directors and management of CGR_____ in August 2007, in Guernsey, show that Mr. C_____ is very involved in the group's strategy, which he comments on, including financial aspects, projects, the group's business model, or the hiring of new executives, whose appointments he proposes (in this case a new head of human resources in charge of remuneration policy).

Toward the outside world, Mr. C_____ is presented as the owner of the CGR_____ group, reference being made here to the activity report of CGR_____ in Guinea, written by AAU_____.

He is also informed and involved in litigation concerning CGR_____ (i.e., AAM_____, Ms. E_____, the Guinean administrative procedure, ICSID, LCIA).

Mr. C_____ is also considered, both inside and outside of CGR_____, as the head of CGR_____. Thus, Mr. C_____ is referred to as the "big boss" or "No. 1" (see Mr. A_____ conversation of April 11, 2013; p. 4,707,154; email dated May 10, 2006, from AAA_____).

His position within CGR_____ is also evident from Mr. A_____'s comments to Ms. E_____ in Florida (conversation on April 11, 2013: "*there is only one who decides, you have to understand that all the people are in the middle, there is no one who decides, there is only one, he's the one at the top, and he's the only one (...)*").

In addition, Mr. C_____ has surrounded himself with loyal and faithful people in the established structures, including:

– His Geneva lawyer, Mr. GAMMA, Esq., senior partner of the foundation, of which Mr. C_____ is the primary beneficiary and advisor. Mr. GAMMA, Esq. is also the sole administrator of W_____, the holding company that owns all the companies in the CGR_____ group;

– AC_____ as stated;

– Ms. B_____ as stated;

– AX_____, CFO of CGR_____ before becoming an agent of CGR_____ Guernsey, as a strategic financial advisor, based in Israel;

– F_____, in-house counsel, based in Israel, before becoming outside counsel.

==The structure put in place, whether at the financial, corporate, or human level, allows Mr. C_____ to exercise his decision-making power within the group that bears his name.==

This power is highlighted by the Guinean project, which is the matter at hand.

Indeed, Mr. _____ has been involved in all of the major stages of the mining concession award process:

– He was informed of the Guinean project in the spring of 2006, as indicated in the email dated May 10, 2006;

– He was put in contact with AAB_____ as early as June 2006, a meeting that can only be explained in connection with the Guinean project;

– He was present at the meeting of CGR _____ Guernsey's strategic council, during which:

  ○ He provided strategic advice related to the viability of the Guinean project (i.e., the transportation issue),

  ○ CGR_____'s business model was discussed, with Mr. C_____ highlighting the strong points of CGR_____, namely its contacts in the political establishment;

– He gave clear instructions regarding the position to adopt, especially towards AAL_____;

– He was informed about the meetings with the "*key people*," including "*The Lady*";

– He met five times in 2008 with the President AAO_____, including in the presence of Ms. E_____;

– He met three times with the President of Liberia, when the "*Liberian Transport Solution*," i.e., the removal of the ore through Liberia, was one of the conditions for the economic viability of the Guinean project;

– He met with successive presidents and ministers;

– He has maintained close ties with ABP_____;

– He is involved in negotiations with future partners, including ABY_____;

– He is involved in the resolution of the dispute with the Technical Committee of Guinea.

The statements from AX_____ and AAU_____ confirm these elements. AX_____ stated that Mr. C_____ was the decision-maker in CGR_____ and that he approved each of the major payments (p. 4,901,628). As for AAU_____, he indicated that Mr. C_____ was his real "boss" and that he presented himself as a consultant for "tax schemes" (p. 4,900,065).

It follows from the above that Mr. C_____ is officially neither representative nor member of an organization, nor a partner or an employee of the V_____ foundation or of the companies owned by this foundation. However, it is clear from his position within this structure and his activities that he has decision-making power within the CGR_____ group and that he is therefore in a position of effective management.

### 3.2.2. *Remuneration of intermediaries*

It has emerged from the proceedings that Mr. C_____ was in charge of the remuneration of Mr. A_____ and his associates, who acted under the cover of AAV_____.

Thus, as early as June 2006, Mr. C_____ had discussions with AAB_____, with whom the intervention of Mr. A_____ and his associates was discussed. On this occasion, it was expressed that CGR_____ wanted to strictly dissociate AAV_____ from CGR_____. In other words, AAV_____ should not, under any circumstances, appear to be acting on behalf of CGR_____.

for work done in the field and for expenses incurred. Thus, the share granted by Mr. C_____ to Mr. A_____ and his associates was the counterpart to the influence requested from the Guinean President.

In addition, Mr. C_____ intervened directly in one of the corrupt payments by soliciting the services of a friend and business partner, D_____.

Furthermore, the direct involvement of Mr. C_____ in the corrupt payments is evident from conversations recorded by the FBI in Florida. Mr. C_____ was directly involved in the payment of USD 5.5 million to Ms. E_____. Mr. A_____ specified that Mr. C_____ was directly involved in the corrupt process, emphasizing the "*intelligence*" of Mr. C_____ in the implementation of the corrupt process aimed at the assignment of mining concessions.

In this respect, the "*name dropping*" defense does not stand up to scrutiny.

Indeed, considering the chronology of events and the involvement of Mr. C_____, the mention of his name in the discussions between Ms. E_____ and Mr. A_____ is obviously not a coincidence. Moreover, if Mr. C_____ was not at all involved in the corruption process, the mention of his name was unnecessary. If the USD 3.4 million received by Ms. E_____, as Mr. A_____ maintains, had been paid by Mr. A_____ and his associates, there would have been no need to appeal on behalf of Mr. C_____, which makes this scenario all the more plausible. Similarly, mentioning Mr. C_____ would be unnecessary had Ms. E._____ received the USD 3 million from ABZ_____. Finally, Mr. A_____ clearly differentiates between the money paid by his associates and himself and that paid by Mr. C_____. He also specifies that the USD 20,000 he was holding on him at the time of his arrest was from "*his own pocket*."

By his subsequent behavior, Mr. _____ has also demonstrated his involvement in the corruption process put in place.

Mr. C_____ was personally involved in the response to the Guinean Technical Committee by meeting with his Parisian lawyer Jean VEIL, in the presence of ACR_____ (p. 500,640). During this meeting, the drafting of an affidavit to be signed by Ms. E_____ was discussed. This affidavit was sent to Mr. C_____ by ACR_____. While claiming not to be concerned, he agreed to this course of action ("*I think it make sense.*") On April 11, 2013, Mr. A_____ went to Miami with this affidavit to have Ms. E_____ sign it. The purpose of this affidavit was to present Ms. E_____ as an intermediary independent of the power. These elements show that Mr. C_____ actively collaborated to try to hide the role played by...

Moreover, as already mentioned, Mr. C_____ had control over the remuneration of the intermediaries, Mr. A_____ and his associates. To this extent, he had control over the corruption process. He was also aware of any disputes that might affect the compensation provided. In this respect, it is not insignificant that AAB_____ contacted Mr. C_____ (see the email dated June 7, 2009, p. 349,012) to inform him that AAM_____, who had called for the February 20, 2006, agreement to be implemented, had reached an agreement with ABD_____, "*a company owned by Ms. E_____, wife of the late President of Guinea.*"

Mr. C_____ personally intervened in the payment of USD 1.5 million to Ms. E_____, using the services of a business partner at the time, who was also his friend, namely D_____. He tried to hide the real reason for this payment by sending documents in support of his explanations to justify the transfer of funds, which are contradicted by items in the file.

Finally, he participated in the attempt to hide the intervention and the role played by Ms. E_____.

**3.2.4.** CGR_____ obtained mining concessions in one of the most corrupt countries in the world, which it calls a very risky geographical area, by investing some USD 160 million, without having the capacity to develop them, but with the objective of reselling them as its business model envisaged. The immediate profit of several billion that was made is extraordinary. Of this amount, not a single cent has benefited the Guinean state, especially since no participation of the Guinean state was foreseen, contrary to what had been agreed in the February 20, 2006, agreement. Mr. C_____ benefited directly from this transaction by several million dollars, notably through the distribution of funds intended to be injected directly into the company AB_____, of which he is the sole shareholder. This fact alone is a strong indication of corruption.

V_____ distributed the subsequent funds to Mr. C_____, but in order that they... [sentence fragment]

The above shows that not only were the mining concessions obtained through the corruption of President AAO_____, but that Mr. C_____ intentionally and decisively collaborated with others in the corrupt process that made possible the withdrawal of the concessions to AAL_____ and the granting of the permits to CGR_____ GUINEA.

The fact that Mr. C_____ was not kept informed of all the details of the plan put in place does not change anything. This was not part of his role

in the corruption process. As he says himself (p. 500,296), Mr. C_____ does not deal with the operational, technical details; he is "*at the top*."

**3.2.5.** These facts constitute bribery of foreign public officials and Mr. C_____ will be found guilty of this offence.

### 3.2.5. *Transaction 1: sugar*

By contrast, the sugar purchased from Ms. E_____ is not directly related to the agreement of February 20, 2006, and subsequent agreements, which is why it must be treated separately for the following reasons:

CGR_____ could only suspect that at least part of the USD 250,000 was intended to reward Ms. E_____ or even other local partners, as was in fact the case.

However, the participation of Mr. C_____ in this payment is not objectively established. Subjectively, it does not appear from the file that he was specifically informed of the payment to AAD_____ of the USD 250,000 in question, nor is it established that he knew or had envisaged that part of this amount would ultimately benefit Ms. E_____ and other local partners.

This situation is not comparable to the one that would come about in 2008 and 2009, when Mr. C_____ himself settled the issue of the repurchase of AAV_____'s stake. This repurchase of the shares held by AAV_____ in CGR_____ GUINEA is linked to the success of the operation, that is, to the influence effectively exercised over the President in the process of assignment of mining rights.

It follows from the above that Mr. C_____ will be acquitted of bribery of foreign public officials with regard to the facts mentioned under point B.a.I.1.1 of the indictment.

### 3.3. *Mr. A_____*

### 3.3.1. *Access to the President*

With regard to Mr. A_____, in 2005 he had no experience in mining and no knowledge of Guinea. However, he drew his strength from his networks and interpersonal skills. He was tasked with identifying and approaching "*key people*," as AAU_____ calls them, in order to influence the state decision-making process.

These actions distort the decision-making process within the administration, are detrimental to the public interest, and weaken the state (cf. in this respect ruling 6B_908/2009 of November 3, 2010, recital 2.3.2).

The defendants have called into question the community's confidence in the impartiality and objectivity of the state decision-making process. The method used distorted competition, with harmful consequences for Guinea's economy. It also undermines the foundations of democracy by compromising the impartiality of the authorities and the free formation of will. It threatens the very existence of the rule of law.

The acts took place from 2006, with the promise of undue benefits, through 2012 when the last money was paid.

The defendants have used several stratagems and complex arrangements to hide and erase their criminal actions.

They used companies with multiple domiciles, and diverse, opaque international financial circuits. They opened various bank accounts in several countries, in the name of differently domiciled companies or natural persons. They paid in cash, by bank transfer, or by check. They used several intermediaries. Long and arduous international judicial cooperation was necessary to identify the financial circuits used.

The defendants also sought to erase all traces of their actions by deregistering the companies used, restructuring the companies in the group, falsifying the consolidated accounts, having the beneficiary of the funds sign false certificates, and seeking to destroy evidence.

They acted as co-perpetrators. Their respective roles in the commission of the crime were well defined.

**5.2.1.** *Mr. C_____*

Mr. C_____'s fault is significant.

He supervised the bribery operation by agreeing to decisions in principle and providing instructions. He was the privileged contact of Mr. A_____'s associate, AAB_____, who acted as a screen and intermediary between CGR_____ and the beneficiary of the corrupted funds. Mr. C_____ had control over the remuneration of this screen and intermediary, and therefore over the corruption operation. He intervened in a corrupt payment, the real motive for which he tried to hide by inventing a compensation operation; and he tried to silence the beneficiary of the funds, by making him sign an affidavit drafted by his Parisian attorney.

[…]

He was prepared to use forged title documents to justify a fictitious sale of land, which enabled him to transfer large sums of money. In doing so, he undermined the trust that is placed in titles as evidence of legal relationships.

His motives are eminently selfish. He acted to extract large sums of money from his crimes.

The accused has cooperated poorly in the proceedings. The defendant has always denied any involvement in the corrupt acts. He gave fanciful explanations about AAV_____'s role and invented justifications for his actions by claiming a nonexistent clearing transaction.

The defendant has shown no self-awareness. He continues to deny any corruption and any role in corrupt acts. He posed as a victim of a global conspiracy orchestrated by ACU _____ and presented himself as Africa's benefactor.

With regard to his criminal record, the defendant was sentenced on _____ 2020, in the last instance and in absentia, by a Romanian Court, to a prison term of 5 years. However, this conviction is subsequent to the facts under consideration and there can be no real retrospective competition in the case of a judgment pronounced abroad (see ATF [Main Decisions of the Federal Court]142 V 551, Recital 4.1, ATF 142 IV 329, Recital 1.4.1).

There are no mitigating circumstances.

According to Article 48(e) of the Swiss Criminal Code, the judge shall mitigate the sentence if the interest in punishment has significantly decreased due to the time that has elapsed since the offence, and the perpetrator has behaved well in the meantime. This provision does not set a time limit. According to the case law, the mitigation of the sentence due to the time elapsed since the offence is based on the same idea as the statute of limitations. The healing effect of the passage of time, which reduces the need for punishment, must also be taken into account if the statute of limitations has not yet expired, if the offence was committed long ago, and if the offender has behaved well in the meantime. This presupposes that a relatively long time has elapsed since the offence.

This condition is in any case fulfilled when two thirds of the statutory limitation period for criminal charges has expired (ATF 140 IV 145, Recital 3.1 p. 148).

In this case, the statute of limitations runs from the date of the last culpable act, which is the date of the last payment on May 14, 2012. The 15-year statute of limitations (see Article 97(b), Article 2(2), and Article 389 of the Swiss Criminal Code, in conjunction with Article 322-seventh of the Swiss Criminal Code) will expire in May 2027, such that two thirds of the statute of limitations for a criminal case has not yet expired.

To this extent, the mitigating circumstance of elapsed time does not apply.

A publication prejudging the guilt of a suspect in press reports should be taken into account as a sentencing factor, depending on the seriousness of the violation (ATF 128 IV 97, Recital 3b/aa, p. 104). The Federal Court admitted this in a case where a press conference was given by the Federal Prosecutor, leading to a serious prejudice of the guilt of the accused, resulting in a quasi-criminal sanction effect. In this decision, the Federal Court found that this major prejudice had heavily influenced the prosecuting authorities, although it later turned out that the published suspicions were largely unfounded (Decree 9X.1/1998 of October 29, 1999, Recital 25b, cited in Decree 6B_206/2015 of October 8, 2015, Recital 2.3.1.).

It is up to the defendant to show how the media coverage he is complaining about led to him being prejudiced and caused him significant harm (see ATF 128 IV 97, Recital 3b/bb, p. 106, and the references cited; Decree 6B_339/2011 of September 5, 2011, Recital 9.2.1.).

The Tribunal notes that the proceedings were indeed covered by the media. However, this element should not be taken into account in the context of sentencing. The possible media consequences on the defendants are more the result of their own actions or are unrelated to these criminal proceedings. Moreover, the defendants do not argue, let alone demonstrate, that this media coverage might have caused them any concrete harm.

Within the meaning of Article 49(1) of the Criminal Code, there is a combination of offenses, which is grounds for an increase in the sentence.

The offense of bribery of foreign public officials, like that of forgery, is punishable by a prison term of up to 5 years or a fine. Because of the combined offenses, the maximum penalty is thus increased to 7 years and 6 months.

It is the defendant Mr. _____ who benefits primarily from the crime. He is the effective director of CGR_____, and the corruption activities would not have taken place without his agreement. Once the mining rights were obtained, he sold them and made a huge profit.

The above elements lead to the pronouncement of a prison term of 5 years.

**5.2.2.** *Mr. A_____*

Mr. A_____'s fault is significant.

He was the man on the ground responsible for finding a way to access AAO_____ in order to influence the state's process for granting mining titles. He was then the privileged contact of the beneficiary of the funds, Ms. E_____, throughout the years. He allowed the corrupt pact to be signed and the sums of money to be paid. He also sought to destroy the evidence of corruption by meeting with Ms. E_____.

His motives are eminently selfish. He acted to extract large sums of money from his crime.

The defendant's cooperation in the proceedings is poor. Throughout the proceedings, the defendant has remained silent, refusing to give any explanation for the acts of which he is accused. His written explanations through his counsel did not make up for his lack of cooperation. His attitude made the investigation more difficult and slowed it down. Moreover, his explanations during the trial were largely fanciful. Following the advice of a foreign lawyer, if he received any, not to speak out because of the possible consequences of his statements on foreign proceedings does not justify his behavior. Indeed, it is difficult to see how collaborating in a criminal investigation could be harmful to the defendant, given that he denies any illegal conduct. In any case, the defendant could have distanced himself from his lawyer's advice, which he did at the trial.

The defendant showed no self-awareness. The defendant refused to provide any explanation on any subject during the trial, and his statements at the sentencing hearing indicate a lack of awareness. In this regard, it is recalled that the right not to incriminate oneself does not exclude the possibility of considering the accused's behavior as an aggravating factor during sentencing; in this case the accused made the criminal investigation more difficult by stubborn denials, from which one can deduce a lack of remorse and awareness of his fault (ATF 129 IV 6, Recital 6.1 p. 20; 118 IV 21, Recital 2b p. 25; 117 IV 112 , Recital 1 p. 114, and more recently Decrees 6B_866/2010 of July 19, 2011, Recital 1.4 and 6B_660/2013 of November 19, 2013, Recital 2.2).

Regarding his criminal record, the defendant was sentenced on July 29, 2014, in the United States to 2 years in prison and a fine of USD 75,000 for obstructing the

## 6. Compensation claim

**6.1.1.** If the unlawful benefit is to be confiscated, but the resulting assets are no longer available (because they have been consumed, concealed, or disposed of), the judge orders that they be replaced by a compensatory claim from the state in an equivalent amount (Criminal Code, Article 71(1)).

The purpose of this is to prevent a person who has disposed of objects or things of value subject to confiscation from being favored above a person who kept them. It is only a substitute for confiscation in kind and should therefore not give rise to any advantage or disadvantage compared to the latter. Because of its subsidiary nature, the compensatory claim can only be ordered if, assuming the assets had been available, confiscation would have been ordered: it is then subject to the same conditions as this measure. However, a link between the seized assets and the offense committed is not required (ATF 140 IV 57, Recital 4.1.2. and references cited).

The compensation claim can be recovered from any of the debtor's assets, even those of licit origin, and this asset can be temporarily seized (LOMBARDINI, *Banques et blanchiment d'argent* [Banks and Money Laundering], 3rd ed., p. 139, note 535).

**6.1.2.** Property obtained from a legal transaction, concluded by means of corruption, may also be subject to confiscation, without necessarily being a direct and immediate consequence of the corruption. The assets obtained through a legal transaction based on bribery must have a natural and adequate causal link to the offense. The objective legality of a legal transaction obtained through corruption is not relevant in this decision. Confiscation also covers the proceeds of crime, the acquisition of which goes beyond the actual formulation of the offense. In principle, there is nothing to prevent the confiscation of property acquired in a purely indirect manner (decision of the Federal Court of August 19, 2015, Recital 2.2. and references cited; ATF 137 IV 79, Recital 3.2.; Marc PIETH, "Korruptionsgeldwäsche" [Money Laundering of corruption proceeds], in *Wirtschaft und Strafrecht, Festschrift für Niklaus Schmid* [Economy and Criminal Law, Festschrift for Niklaus Schmid], 2001, p. 449; Bernard BERTOSSA, "Confiscation et corruption" [Confiscation and Corruption], [Law Weekly] 131/2009, p. 378).

If success consists of influencing a discretionary decision, the only option is an estimate based on the totality of the circumstances, in accordance with Article 70(5) of the Criminal Code (decision of the Federal Court of August 19, 2015, Recital 2.2. and references cited; Florian BAUMANN, in *BK*, *Strafrecht* [Criminal Law], vol. I, 3rd ed. 2013, notes 42 and note 72 on Article 70/71 of the Swiss Criminal Code).

**6.2.1.** In this case, CGR_____ did not have the capacity to operate the awarded concessions on its own and had to call on the services of a large mining group capable of doing so.

CGR_____ acquired the mining concessions for USD 160 million and sold just over half (51%) of the shares for USD 2.5 billion. The direct benefit of the transaction made possible by the corruption is therefore several billion US dollars. Of this amount, USD 500 million was paid immediately by ABY_____ to CGR_____, which paid USD 349,500,717 to its holding company W_____, owned by the V_____ foundation. Of this amount, distributions of USD 94 million in 2010, USD 41 million in 2011, and USD 15 million in 2012 were made directly by the V_____ foundation to AB_____ REAL ESTATE, of which Mr. C_____ is the sole shareholder. It is specified that these distributions are distinct from those made, in the amount of a few million per year in total, for Mr. C_____'s current expenses. Therefore, Mr. C_____ has enriched himself directly through a legal transaction obtained through corruption in the amount of at least USD 150 million.

Mr. C_____ estimates his fortune at between USD 50 and 80 million. This does not include the assets held by the V_____ and AR_____ foundations, which is at his disposal upon a request to the foundation board for his personal, professional, or philanthropic needs. According to several specialists on the economy, in 2013, Mr. C_____ was the richest man in Israel with an estimated fortune of USD 9 billion. At present, his fortune is estimated at hundreds of millions of dollars, or even a billion (USD 800 billion as of July 3, 2020, https://www.challenges.fr/classements/fortune/Monsieur C_____-Monsieur C_____2746; USD 1 billion as of April 3, 2019, https://www.forbes.com/profile/Monsieur C_____-Monsieur C_____/).

In view of the above, a compensatory claim of CHF 50 million will be made against him.

**6.2.2.** *Mr. A_____*

**6.2.2.1.** His remuneration for his corrupt activity was USD 34.5 million, to be divided equally among his partners. He was therefore personally enriched by the commission of the offense in the amount of USD 11.5 million.

Insofar as this sum is no longer directly available, a compensatory claim will be pronounced, in accordance with the defendant's financial situation.

**6.2.2.2.** *Revenues*

The defendant currently receives an income of EUR 143,000 per year (EUR 250,000/2 + EUR 1,500 x 12).

**FOR THESE REASONS,**

**THE CRIMINAL COURT**

**ruling inter partes,**

Acquits **Mr. C_____** of bribery of foreign public officials with regard to the facts mentioned under B.a.I.1.1 of the indictment (payment of USD 94,038) (Criminal Code, Article 322-seventh) and of forgery of securities with regard to the facts mentioned under B.a.II, except for the share certificate mentioned under B.a.I.1.2 (Criminal Code, Article 251).

Finds **Mr. C_____** guilty of bribery of foreign public officials (Criminal Code, Article 322-seventh) and of forgery of securities with regard to the share certificate mentioned under point a.II.2 (Article 251 in conjunction with Article 255 of the Criminal Code).

Sentences Mr. C_____ to a prison term of 5 years (Article 40 of the Criminal Code).

Pronounces against Mr. C_____ in favor of the State of Geneva a compensatory claim in the amount of CHF 50,000,000, which will be automatically reduced by the amount of Mr. C_____'s payment (Article 255 of the Criminal Code).

Acquits **Mr. A_____** of securities forgery (Article 251 of the Criminal Code).

Finds Mr. A_____ guilty of bribery of foreign public officials (Criminal Code, Article 322-seventh).

Sentences Mr. A_____ to a prison term of 3 years and 6 months (Article 40 of the Criminal Code).

Pronounces against Mr. A_____ in favor of the State of Geneva a compensatory claim of CHF 5,000,000, which will be automatically reduced by the amount of Mr. A_____'s payment (Article 71(1) of the Criminal Code).

Orders the sequestration of the shares of the companies ADJ_____ and ADK_____ in view of the execution of the compensation claim (Article 71(1) of the Criminal Code).

Dismisses Mr. A_____'s claim for compensation (Article 429 of the Criminal Code).

# TRANSLATION CERTIFICATION

Date: May 12, 2021

To whom it may concern:

This is to certify that the attached translation is an accurate representation of the documents received by this office. The translation was completed from:

- French

To:

- English

The documents are designated as:

- 01. p. 1
- 02. p. 3
- 03. p. 15
- 04. p. 18 - 20
- 05. pp. 22 - 24
- 06. p. 41
- 07. p. 53
- 08. p. 61
- 09. p. 64
- 10. p. 73
- 11. pp. 75 - 77
- 12. p. 85
- 13. pp. 102 - 103
- 14. pp. 105 - 106
- 15. p. 108
- 16. pp. 111 - 114
- 17. pp. 118 - 120
- 18. p. 122
- 19. pp. 130 - 132
- 20. p. 134
- 21. p. 145
- 22. p. 159
- 23. pp. 163 - 164
- 24. pp. 166 - 169
- 25. pp. 171 - 174
- 26. p. 176
- 27. pp. 178 - 179
- 28. pp. 190 - 193
- 29. pp. 196 - 197
- 30. p. 206
- PJ_TPN_COMMUNIQUE_JUGEMENT_ST EINMETZ_2021_01_22

Eugene Li, Project Manager in this company, attests to the following:

"To the best of my knowledge, the aforementioned documents are a true, full and accurate translation of the specified documents."

_____

Signature of Eugene Li

# TRANSLATION CERTIFICATION

Date: May 14, 2021

To whom it may concern:

This is to certify that the attached translation is an accurate representation of the documents received by this office. The translation was completed from:

- French (France)

To:

- English (USA)

The documents are designated as:
- '2021 01 22 Redacted Judgment Page 33.pdf'


Sarah Hall, Project Manager in this company, attests to the following:

"To the best of my knowledge, the aforementioned documents are a true, full and accurate translation of the specified documents."


_Sarah Rhall_

Signature of Sarah Hall



RÉPUBLIQUE ET  CANTON DE GENÈVE

POUVOIR JUDICIAIRE

# JUGEMENT

## DU TRIBUNAL CORRECTIONNEL

### Chambre 7

## 22 janvier 2021

**MINISTÈRE PUBLIC**

contre

**Monsieur A_____**, né le _____ 1962, domicilié c/o Me ALPHA, _____, prévenu, assisté de Me ALPHA

**Madame B_____**, née le _____ 1970, domiciliée c/o Me BETA, _____, prévenue, assistée de Me BETA

**Monsieur C_____**, né le _____ 1956, domicilié c/o Me GAMMA, _____, prévenu, assisté de Me GAMMA (représentant principal) et Me DELTA

**Siégeant : Mme Alexandra BANNA, présidente, Mme Delphine GONSETH et M. Antoine HAMDAN, juges, M. Timothée REYMOND, greffier-juriste délibérant, M. Alain BANDOLLIER, greffier**

**P/12914/2013**

**TABLE DES MATIERES**

A. CONCLUSIONS FINALES DES PARTIES

B. QUESTIONS PREJUDICIELLES ET INCIDENTS

C. ACTE D'ACCUSATION

D. FAITS

    D.A. Corruption

    D.B. Faux dans les titres

E. AUDIENCE DE JUGEMENT

F. SITUATION PERSONNELLE

G. DROIT

   1. Compétence

   2. Art. 322septies CP

   3. Imputation des actes aux prévenus

   4. Faux dans les titres

   5. Peine

   6. Créance compensatrice

   7. Frais et indemnités

H. SCHEMAS

I. DISPOSITIF

### A.  CONCLUSIONS FINALES DES PARTIES :

Le **Ministère public** conclut à un verdict de culpabilité de Monsieur A_____, de Madame B_____ et de Monsieur C_____ de corruption d'agents publics étrangers (art. 322$^{\text{septies}}$ CP) et de faux dans les titres (art. 251 *cum* 255 CP). Il requiert le prononcé:

- à l'encontre de Monsieur A_____ d'une peine privative de liberté de 4 ans,

- à l'encontre de Madame B_____ d'une peine privative de liberté de 2 ans, assortie du sursis complet,

- à l'encontre de Monsieur C_____ d'une peine privative de liberté de 5 ans.

Il requiert le prononcé d'une créance compensatrice :

- à l'encontre de Monsieur A_____ de USD 11'000'000.-,

- à l'encontre de Madame B_____ de USD 150'000.- ,

- à l'encontre de Monsieur C_____ de CHF 50'000'000.-.

Enfin, il demande que les prévenus soient condamnés aux frais de la procédure et que les avoirs séquestrés sur le compte no 1_____ de Monsieur C_____ auprès de la Banque 1_____ soient affectés au paiement des frais de la procédure.


**Monsieur C_____**, par la voix de ses conseils, conclut à son acquittement et au rejet de la créance compensatrice réclamée. Il ne fait pas valoir de prétentions en indemnisation.

**Monsieur A_____**, par la voix de son conseil, conclut à son acquittement et au rejet de la créance compensatrice réclamée. Il demande la condamnation de l'Etat de Genève à lui verser la somme de CHF 335'376.65 en application de l'art. 429 al. 1 let. a CPP.

**Madame B_____**, par la voix de son conseil, conclut à son acquittement et au rejet de la créance compensatrice réclamée. Elle demande la condamnation de l'Etat de Genève à lui verser la somme de CHF 389'846.90 à titre de remboursement de ses honoraires d'avocat.

## B. QUESTIONS PREJUDICIELLES ET INCIDENTS

**A.**    **a)** *Audition de Claudio MASCOTTO et des analystes financiers du Ministère public*

Après l'ouverture des débats, lors du traitement des questions préjudicielles, les prévenus ont sollicité l'audition de l'ancien Procureur Claudio MASCOTTO et des analystes financiers du Ministère public, en qualité de personnes appelées à donner des renseignements, afin de déterminer le but des voyages entrepris en Israël et aux Etats-Unis et de pouvoir identifier les preuves obtenues de manière illicite.

Le juge ne peut apprécier librement que le résultat de preuves exploitables juridiquement (ATF 133 I 33 consid. 2.1 p. 36 p. s.; THOMAS HOFER, in Basler Kommentar, Strafprozessordnung, 2e éd. 2014, nos 42 et 63 ad art. 10 CPP). Il convient dès lors d'examiner si tel est le cas.

Le Tribunal procède à l'administration de nouvelles preuves ou complète les preuves administrées de manière insuffisante (art. 343 al. 1 CPP).

Il n'y a pas lieu d'administrer des preuves sur des faits non pertinents, notoires, connus de l'autorité pénale ou déjà suffisamment prouvés (art. 139 al. 2 CPP).

Aux termes de l'art. 141 al. 2 CPP, les preuves qui ont été administrées d'une manière illicite ou en violation de règles de validité par les autorités pénales ne sont pas exploitables, à moins que leur exploitation soit indispensable pour élucider des infractions graves.

Selon l'art. 178 CPP, est entendu en qualité de personne appelée à donner des renseignements, quiconque s'est constitué partie plaignante (let. a), n'a pas encore quinze ans au moment de l'audition (let. b), n'est pas en mesure de comprendre pleinement la déposition d'un témoin en raison d'une capacité de discernement restreinte (let. c), sans être soi-même prévenu, pourrait s'avérer être soit l'auteur des faits à élucider ou d'une infraction connexe, soit un participant à ces actes (let. d), doit être interrogé comme co-prévenu sur un fait punissable qui ne lui est pas imputé (let. e), a le statut de prévenu dans une autre procédure, en raison d'une infraction qui a un rapport avec les infractions à élucide (let. f), a été ou pourrait être désigné représentant de l'entreprise dans une procédure dirigée contre celle-ci, ainsi que ses collaborateurs (let. g).

Les analystes financiers du Ministère public revêtent la qualité d'experts officiels (art. 183 al. 2 CPP *cum* art. 25 let. h LaCP).

- 5 -

Ni l'ancien Procureur Claudio MASCOTTO ni les analystes financiers du Ministère public ne sont des personnes appelées à donner des renseignements, au sens de l'art. 178 CPP. Leur audition n'est prévue par aucune disposition du code de procédure pénale.

Cette requête fait partie d'une série de demandes adressées au Tribunal de céans tendant à élucider les circonstances des voyages de Claudio MASCOTTO pour ultérieurement fonder un grief d'inexploitabilité des preuves en raison de la manière, par hypothèse illicite, dont elles auraient été recueillies.

Dans son arrêt 1B_118/2020 du 27 juillet 2020, consid. 3.4., par lequel le Tribunal fédéral a rejeté les recours tendant à la récusation du Procureur Claudio MASCOTTO, notre Haute Cour a rappelé qu'il appartiendrait au juge du fond de se prononcer, le cas échéant, sur la licéité et l'exploitabilité des moyens de preuves peut-être obtenus par le biais de ces échanges en violation des règles sur l'entraide et du CPP.

Or, il ne ressort pas de la procédure que des moyens de preuve auraient été obtenus illicitement. Au contraire, toutes les preuves figurant à la procédure ont été obtenues conformément aux règles sur l'entraide et du CPP.

La défense n'indique pas quelle preuve aurait été obtenue illicitement.

Au demeurant, les auditions requises ne sont pas prévues par le Code de procédure pénale.

Ainsi, les auditions requises, que ce soit en qualité de personnes appelées à donner des renseignements ou de témoins, ne sont pas nécessaires au prononcé du jugement.

La question préjudicielle est rejetée.

**b)** *Production des notes de Claudio MASCOTTO et de toute trace de contacts informels avec les autorités israéliennes*

Les prévenus sollicitent la production de tous documents et notes en mains du Ministère public relatifs aux contacts entre Claudio MASCOTTO et les autorités israéliennes.

Les dépositions des parties et les prononcés des autorités ainsi que tous les actes de procédure qui ne sont pas accomplis en la forme écrite sont consignés au procès-verbal (art. 76 al. 1 CPP).

Par acte de procédure, on entend les décisions qui ont un effet sur le déroulement de la procédure pénale et, à ce titre, exercent une influence sur la situation du justiciable (L. MOREILLON / A. PAREIN-REYMOND, *Petit commentaire du Code de procédure pénale,* Bâle 2016, n. 7 et 10 ad art. 393 CPP).

Le dossier doit contenir les procès-verbaux de procédure et les procès-verbaux des auditions (art. 100 al. 1 let. a CPP).

En droit administratif et notamment en matière d'entraide, la coopération judiciaire, qui relève des activités ordinaires d'une autorité pénale, n'est pas publique (décision du TPF SK 2016.30 du 23 février 2017).

Il a, par ailleurs, été jugé que l'administré ne peut exiger la consultation des documents internes à l'administration, à moins que la loi ne le prévoie. Cela concerne notamment les notes de l'autorité, les copies des courriers électroniques ou les notes relatant des conversations téléphoniques. L'accès au dossier est accordé dans la mesure nécessaire à la sauvegarde des intérêts de l'ayant droit, qui peut consulter uniquement les pièces qui le touchent directement et personnellement (arrêt du TPF RR.2018.342-347 du 22 février 2019, consid. 3.2 et 3.3).

Dans son arrêt ACPR/584/2019 du 2 août 2019, la Chambre pénale de recours de la Cour de justice de Genève a rejeté le recours de Monsieur C_____ contre le refus du Ministère public de l'autoriser à accéder aux documents et notes relatifs à ses contacts avec les autorités israéliennes. En substance, la Cour de justice a retenu que les échanges entre autorités de poursuites destinés à coordonner et assurer l'avancement des procédures d'entraide (actives) ne revêtent pas la qualité d'"*actes de procédure*", au sens de l'art. 76 al. 1 CPP, et le refus du Ministère public, de formaliser ces échanges et de les porter à la connaissance de Monsieur C_____ ou des autres parties, était fondé.

Le recours au Tribunal fédéral contre cet arrêt a été déclaré irrecevable (arrêt du Tribunal fédéral 1B_444/2019 du 10 mars 2020).

Il n'y a pas lieu de s'écarter de l'arrêt ACPR/584/2019. Les éventuelles notes prises par Claudio MASCOTTO, de même que les échanges informels avec les autorités israéliennes, ne sont pas des actes de procédure, au sens de l'art. 76 al. 1 CPP, et n'ont donc pas à être versés au dossier.

Enfin, la production d'éventuelles notes écrites de Claudio MASCOTTO ou de toute trace écrite d'échanges informels avec les autorités israéliennes n'est pas nécessaire au prononcé du jugement.

La question préjudicielle est rejetée.

**c)** *Déclaration de nullité de tous les actes de procédure après le premier voyage de Claudio MASCOTTO en Israël, du 7 au 9 mars 2017*

Les prévenus demandent que tous les actes de procédure effectués après le premier voyage de Claudio MASCOTTO en Israël, entre les 7 et 9 mars 2017, soient déclarés nuls et retirés de la procédure.

Cette conclusion a trait à une procédure de récusation et aux conséquences attachées à celle-ci, référence étant faite à l'art. 60 al. 1 CPP. Or, le Tribunal fédéral a, dans son arrêt 1B_118/2020 du 27 juillet 2020, rejeté les recours des prévenus tendant à la récusation du Procureur Claudio MASCOTTO.

Au surplus et comme déjà mentionné, les prévenus n'indiquent pas quel moyen de preuve aurait été obtenu en violation des règles de l'entraide et du CPP et il n'apparaît pas que tel soit le cas.

La question préjudicielle est rejetée.

**d)** *Inexploitabilité des auditions de D_____ et retrait de la procédure des procès-verbaux d'audition du précité, annulation du mandat de comparution à l'audience de jugement de D_____*

Les prévenus soutiennent que les procès-verbaux des auditions de D_____ à Genève, les 3 et 5 septembre 2018, sont inexploitables en raison des promesses préalables dont l'intéressé aurait bénéficié de la part des autorités israéliennes et suisses. Les procès-verbaux doivent, partant, être retirés de la procédure et le mandat de comparution pour l'audience de jugement doit être annulé.

Les prévenus demandent, également, que les procès-verbaux d'auditions de D_____ en Israël, le 18 août 2017, soient retirés de la procédure pour les mêmes raisons.

Le législateur a renoncé à introduire dans le CPP l'institution du "témoin de la couronne", soit l'admission, comme moyen de preuve, du témoignage d'un co-auteur qui, en échange d'une promesse d'exemption de peine ou de tout autre avantage procédural, accepte de témoigner contre ses co-prévenus (cf. Message du 21 décembre 2005 relatif à l'unification du droit de la procédure pénale, FF 2006 1086). Cependant, rien ne s'oppose, dans un procès pénal se déroulant en Suisse, à ce que l'autorité de jugement prenne en considération, pour former son opinion, des dépositions émanant d'auteurs d'infractions qui, ayant reconnu leurs crimes et s'étant engagés à collaborer avec l'autorité pour établir les faits pouvant mettre en cause d'autres auteurs, ont bénéficié, de la part de l'autorité étrangère, d'un traitement favorable en raison de cette collaboration (ATF 117 Ia 401 consid. 1c p. 404; arrêt 6B_360/2008 du 12 novembre 2008 consid. 3.1). La Cour européenne des droits de l'homme considère, pour sa part, que la procédure de transaction pénale (*Plea Bargain*), conduisant à ce qu'il soit statué sur une accusation pénale à l'issue d'un examen judiciaire simplifié, ne contrevient pas en soi à l'art. 6 CEDH (Natsvlishvili et Togonidze c. Géorgie du 29 avril 2014, § 91).

- 8 -

Par ailleurs, l'utilisation comme moyen de preuve de déclarations émanant d'un "témoin de la couronne", auquel l'impunité a été garantie, n'est pas davantage jugée en tant que telle contraire à cette disposition (arrêt de la CommEDH Baragiola Alvaro c. Suisse du 21 octobre 1993, JAAC 106/1994 p. 731) (Arrêt du Tribunal fédéral 6B_1269/2016 du 21 août 2017, consid. 3.4).

D_____ s'est présenté, spontanément, devant le Ministère public genevois avec un classeur de pièces, lesquelles ont été versées à la procédure. L'intéressé a été entendu, en présence des parties et de leurs avocats, soit de manière contradictoire, à Genève, en qualité de personne appelée à donner des renseignements, alors qu'il semble bénéficier du statut de "*cooperating witness*" octroyé par les autorités israéliennes.

Comme susmentionné, rien ne s'oppose, dans un procès pénal se déroulant en Suisse, à ce que l'autorité de jugement prenne en considération des dépositions émanant de "témoins de la couronne" et l'utilisation comme moyens de preuve de ces déclarations n'a pas été jugée contraire à l'art. 6 CEDH.

Par ailleurs, l'affirmation de la défense selon laquelle l'absence de mise en prévention de D_____ par les autorités suisses laisse supposer que des promesses de non poursuite auraient été faites à l'intéressé par le Ministère public genevois ne repose sur aucun élément tangible. L'accusation appartient au Ministère public, qui décide, en application des règles du CPP et en fonction de considérations stratégiques, quelle personne il entend mettre en prévention.

Dans cette mesure, le témoignage devant les autorités suisses de D_____ et les pièces versées par celui-ci sont exploitables.

Autre est la question de la force probante des déclarations de D_____ et des pièces versées. Il appartiendra au Tribunal, dans le cadre de l'appréciation des preuves, de tenir compte de toutes les circonstances et du contexte entourant les dépositions de D_____ et le dépôt des pièces, tel que soulevé par les prévenus.

Il ne se justifie, par ailleurs, pas d'annuler le mandat de comparution de D_____ pour le 13 janvier 2021. Au demeurant, les prévenus n'indiquent pas ce qui justifierait l'annulation de l'audition de l'intéressé qu'ils ont eux-mêmes sollicitée dans le cadre de leurs réquisitions de preuve.

Enfin, les procès-verbaux des auditions de D_____, en Israël, ont été obtenus par le Ministère public conformément aux règles de l'entraide. Il ne se justifie dès lors pas de les retirer de la procédure.

La question préjudicielle est rejetée.

**e)** *Classement de la procédure de faux dans les titres en raison d'un empêchement de procéder, suspension de la procédure dans l'hypothèse où le Ministère public s'engagerait à poursuivre D_____ ou classement de la procédure si le Ministère public refuse.*

Les prévenus soutiennent qu'il existe un empêchement de procéder (art. 329 al. 2 CPP *cum* art. 319 al. 1 let. d CPP) s'agissant de l'infraction de faux dans les titres dans la mesure où D_____ n'a pas été poursuivi par le Ministère public genevois pour les mêmes faits. Ils invoquent l'art. 32 CP.

Selon l'art. 32 CP, si un ayant droit a porté plainte contre un des participants à l'infraction, tous les participants doivent être poursuivis.

L'art. 32 CP garantit non pas l'indivisibilité de la poursuite, mais l'indivisibilité de la plainte (arrêt du Tribunal fédéral 6B_106/2015 du 10 juillet 2015, consid. 3.2.). Le but de cette disposition est d'empêcher que le lésé puisse choisir arbitrairement de faire punir un participant à l'infraction à l'exclusion d'un autre (ATF 121 IV 150 consid. 3/a/aa p. 151 s.; 97 IV 1 consid. 2 p. 2 s.; 81 IV 273 consid. 2 p. 275). Cette norme est sans portée s'agissant des infractions poursuivies d'office.

L'art. 9 CPP consacre la maxime d'accusation. Selon cette disposition, une infraction ne peut faire l'objet d'un jugement que si le ministère public a déposé auprès du tribunal compétent un acte d'accusation dirigé contre une personne déterminée sur la base de faits précisément décrits. La mise en accusation incombe au ministère public, qui l'assume seul. Elle n'est pas sujette à recours (art. 324 al. 2 CPP).

En l'occurrence, aucune procédure pénale n'a été ouverte par le Ministère public genevois à l'encontre de D_____. Le précité n'a, par voie de conséquence, pas été mis en prévention et n'a donc pas bénéficié d'un classement pour les faits sur lesquels il a témoigné.

Il n'existe donc pas d'empêchement de procéder et la présente procédure n'a pas à être classée en ce qui concerne l'accusation de faux dans les titres dirigée contre les prévenus.

La question préjudicielle est rejetée.

**f)** *Apport à la procédure de la procédure d'entraide avec Israël CP/401/2015 et de la procédure d'entraide avec les Etats-Unis B 237'192*

Les prévenus sollicitent l'apport à la présente procédure de la procédure d'entraide (passive) avec Israël, référencée sous CP/401/2015, et de l'intégralité de la procédure d'entraide (active) avec les Etats-Unis, référencée par l'Office fédéral de la justice sous

B 237'192, y compris toutes les notes et état de frais du Procureur, afin d'obtenir des informations sur les voyages de Claudio MASCOTTO dans ces deux pays.

La procédure CP/401/2015 est une procédure distincte de la présente procédure nationale. Quant à la procédure d'entraide adressée par la Suisse aux Etats-Unis, elle figure déjà à la présente procédure (classeurs B.4.1.3 ainsi que B.4.7.1 à B.4.7.16). En tant que la requête des prévenus tend à la production de documents ou de notes en mains du Ministère public et qui ne figureraient pas dans ces procédures, il est renvoyé au considérant A.b.

La question préjudicielle est rejetée.

**g)** *Inexploitabilité de toutes les auditions de Madame E_____ et retrait du dossier des procès-verbaux y relatifs*

**g.a)** *En lien avec le statut de "cooperating witness" de Madame E_____*

Les prévenus concluent à l'inexploitabilité des auditions de Madame E_____ aux Etats-Unis, effectuées dans la présente procédure les 6 et 7 juillet 2017 et dans la procédure états-unienne (classeur B4_7_14), en raison de son statut de *"cooperating witness"*.

Madame E_____ a accepté de coopérer à l'enquête américaine dans l'espoir d'obtenir une immunité de poursuite (*immunity for the Cooperating Witness's own potential criminal conduct*, plainte du FBI, ch. 10). Elle a signé avec le Département de justice américain un *non prosecution agreement* soumis à une clause de confidentialité (PP 500'694). A ce moment, elle vivait alors aux Etats-Unis et disposait de la seule nationalité guinéenne. Les biens immobiliers et le restaurant de Madame E_____ ont été confisqués par la justice américaine, à l'exception de sa résidence sur _____ (cf. *Consent Order of Forfeiture filed in April 2016*).

Comme déjà mentionné, rien ne s'oppose, dans un procès pénal se déroulant en Suisse, à ce que l'autorité de jugement prenne en considération, pour former son opinion, des dépositions émanant de "témoins de la couronne" (appelés aussi "repentis"), à savoir d'auteurs d'infractions qui, ayant reconnu leurs crimes et s'étant engagés à collaborer avec l'autorité pour établir les faits pouvant mettre en cause d'autres auteurs, ont bénéficié, de la part de l'autorité étrangère, d'un traitement favorable en raison de cette collaboration (ATF 117 Ia 401 consid. 1c p. 404). L'utilisation comme moyens de preuve de déclarations émanant d'un « témoin de la couronne », auquel l'impunité a été garantie, n'est pas jugée contraire à l'art. 6 CEDH (arrêt de la CommEDH Baragiola Alvaro c/ Suisse du 21 octobre 1993, JAAC 106/1994 p. 731).

- 11 -

Ainsi, les procès-verbaux d'audition de Madame E_____ sont, en tant que tels, exploitables, étant relevé que ceux-ci ont été produits à la présente procédure conformément aux règles sur l'entraide. Autre est la question de la force probante des déclarations de la précitée qui est du ressort de l'appréciation des preuves.

La question préjudicielle est rejetée.

**g.b)** *En lien avec l'absence des avocats de la défense lors de l'audition de Madame E_____ aux Etats-Unis les 6 et 7 juillet 2017*

Les prévenus soutiennent que les procès-verbaux d'audition de Madame E_____ par Claudio MASCOTTO aux Etats-Unis, les 6 et 7 juillet 2017, sont inexploitables, les avocats n'ayant pas pu participer à cette audition et Madame E_____ ne s'étant pas présentée à l'audience de jugement pour son audition par le Tribunal.

Cette question comporte deux aspects: la conformité de l'audition visée au droit de procédure applicable (*Infra g.b.a*) et l'appréciation du caractère globalement équitable de la procédure malgré la présence éventuelle du procès-verbal litigieux au dossier (*Infra g.b.b.*).

**g.b.a)** *Conformité au droit de procédure applicable*

La participation des parties à l'administration des preuves requises à l'étranger par voie de commission rogatoire fait l'objet d'une disposition spécifique à l'art. 148 CPP.

Le Code de procédure pénale suisse ne règle l'octroi de l'entraide judiciaire internationale et la procédure d'entraide que dans la mesure où d'autres lois fédérales ou des accords internationaux ne contiennent pas de disposition en la matière (art. 54 CPP).

En l'occurrence, la Suisse a conclu un accord avec les Etats-Unis d'Amérique, soit le Traité entre la Confédération suisse et les Etats-Unis d'Amérique sur l'entraide judiciaire en matière pénale (TEJUS; RS 0.351.933.6), dès lors seul applicable.

L'art. 12 al. 2 TEJUS subordonne le droit de prendre part à l'administration des preuves requises à l'étranger à la demande expresse de l'Etat requérant.

La question est celle de savoir si la faculté de l'Etat requérant, en l'occurrence le Ministère public genevois, de donner suite à une demande de participation à l'administration des preuves et de saisir l'Etat requis d'une telle requête est purement discrétionnaire.

Dans un arrêt ATF 118 Ib 436, rendu par le Tribunal fédéral dans le cadre d'une demande d'entraide provenant des Etats-Unis vers la Suisse, notre Haute Cour a retenu

que la requête de l'Etat requérant était discrétionnaire et aucun grief ne pouvait être fondé sur le refus de l'Etat requérant de formuler une telle demande.

Selon ZIMMERMAN (ZIMMERMANN, La coopération judiciaire internationale en matière pénale, 5e édition, Berne 2019, page 524 N 485), le droit de participer à l'exécution de la demande peut être restreint. Sous l'angle de l'art. 12 par. 2 TEJUS, il est limité au cas où l'Etat requérant autorise la présence de l'inculpé ou de l'accusé, de son conseil ou des deux (Robert ZIMMERMANN, idem).

Dans un arrêt plus récent 6B_947/2015 du 29 juin 2017 consid. 5.3.2., le Tribunal fédéral a retenu, alors qu'aucun accord n'avait été conclu avec l'Etat requis, soit le Guatemala, qu'une interprétation conforme à l'art. 6 § 3 let. d CEDH n'exigerait pas non plus nécessairement que le procès-verbal de commission rogatoire soit exclu au motif que le droit de l'Etat étranger permettait la confrontation au stade de la commission rogatoire, mais que celle-ci n'a pas eu lieu.

Par ailleurs, la loi suisse (art. 148 CPP) n'octroie aucun droit aux parties d'assister à l'administration des preuves à l'étranger (SCHMID/JOSITSCH, Schweizerische Strafprozessordnung/Praxiskommenar, 3ème édition, 2018, art. 148 CPP; Commentaire romand du CPP, 2e édition, Bâle 2019, MOREILLON; Petit commentaire du CPP, 2e édition, Bâle 2016).

En l'espèce, le Ministère public a renoncé à déposer une telle demande. Cette demande étant purement discrétionnaire, aucun grief ne peut être fondé sur le refus du Ministère public de formuler cette demande.

L'audition de Madame E_____ aux Etats-Unis les 6 et 7 juillet 2017 s'est donc déroulée de manière conforme au droit de procédure applicable.

Le procès-verbal n'a donc pas à être retiré du dossier.

**g.b.b)** *Equité de la procédure dans son ensemble*

Pour que la procédure reste globalement équitable, malgré la présence au dossier du procès-verbal de Madame E_____, trois conditions doivent être remplies (arrêt du Tribunal fédéral 6B_947/2015 du 29 juin 2017 consid. 5.5.1).

La première condition consiste à déterminer si l'absence de Madame E_____ aux débats repose sur des motifs sérieux. Le Tribunal fédéral en a déduit une obligation du Tribunal d'effectuer des démarches positives afin de convoquer les témoins. Madame E_____ ayant été convoquée par la voie de l'entraide par le Tribunal de céans, son absence repose sur des motifs sérieux.

Il convient ensuite d'examiner la place des dépositions de Madame E_____ parmi les autres éléments de preuves présents au dossier. En l'espèce, les déclarations de Madame E_____ ne sont qu'un élément au sein d'une importante masse probatoire, de sorte qu'il ne s'agit pas d'une preuve unique. Cette condition est également respectée.

Enfin, il convient d'analyser les moyens offerts aux prévenus compensant les entraves à leurs droits de la défense. En l'espèce, le double tour de questions écrites, le fait que les prévenus ont ensuite été interrogés sur les propos tenus par Madame E_____ et l'attention particulière qui sera portée à ses propos en raison de son statut de *"cooperating witness"* constituent des éléments compensateurs suffisants.

Au vu de ces éléments, la présence dans le dossier du procès-verbal des auditions de Madame E_____ aux Etats-Unis les 6 et 7 juillet 2017 n'a pas pour effet de rendre la procédure globalement inéquitable.

Les déclarations de Madame E_____ ne seront dès lors pas écartées de la procédure. Il appartiendra toutefois au Tribunal de tenir compte des éléments soulevés par la défense, soit l'absence de contradictoire, les promesses faites à l'intéressée par l'autorité étrangère, les versements d'argent effectués à celle-ci, dans le cadre de l'appréciation de ses déclarations.

**h)** *Audition de F_____. A défaut, constatation de l'inexploitabilité des procès-verbaux d'audition de F_____ et retrait de ceux-ci de la procédure*

Les prévenus sollicitent l'audition par le Tribunal, subsidiairement par voie de commission rogatoire, de F_____. Ils soutiennent que les conditions dans lesquelles les auditions de F_____, en Israël – défaut de contradictoire et heure tardive – se sont déroulées, rendent celles-ci inexploitables et requièrent leur retrait de la procédure.

F_____ a été entendu les 18 et 22 août 2017 par la police israélienne (classeur B4_5_8). Les procès-verbaux en question ont été obtenus et produits à la présente procédure pénale en conformité des règles sur l'entraide en matière pénale. Monsieur C_____ a été confronté par le Ministère public auxdites déclarations et a pu s'exprimer à leur propos lors de son audition du 23 mai 2019 (PP 503'104ss).

Ces procès-verbaux sont dès lors exploitables. Autre est la question de la force probante des déclarations de F_____ devant la police israélienne, ce qu'il appartiendra au Tribunal d'apprécier conformément au principe de la libre appréciation des preuves.

L'audition de F_____ n'apparaît dès lors pas nécessaire au prononcé du jugement au vu des éléments figurant déjà à la procédure.

La question préjudicielle est rejetée.

**i)** *Audition de G_____*

Les prévenus sollicitent l'audition par le Tribunal, subsidiairement par commission rogatoire, de G_____.

L'audition de l'intéressé n'apparaît pas nécessaire au prononcé du jugement eu égard aux autres éléments figurant à la procédure, notamment les contrats, les factures et les éléments de la procédure roumaine (classeur B4_8_4) versés au dossier, qu'il appartiendra au Tribunal d'apprécier librement.

La question préjudicielle est rejetée.

**j)** *Audition de H_____*

Les prévenus sollicitent l'audition, par le Tribunal, subsidiairement par commission rogatoire, de H_____.

L'audition de l'intéressé n'apparaît pas nécessaire au prononcé du jugement. Il appartiendra au Tribunal d'apprécier les preuves en sa possession, selon le principe de libre appréciation des preuves, outre que la structure (actionnariat) des sociétés I_____ et J_____ peut être établie autrement que par l'audition de cet avocat.

La question préjudicielle est rejetée.

**k)** *Renvoi des débats vu l'absence des témoins*

Vu l'absence aux débats des témoins dûment convoqués par le Tribunal, les prévenus sollicitent le renvoi des débats.

Par courrier du 28 février 2020, la direction de la procédure du Tribunal correctionnel a partiellement donné suite aux réquisitions de preuve des prévenus en indiquant que le Tribunal procéderait à l'audition de douze personnes, pour autant que celles-ci puissent être atteintes et qu'elles se déplacent à Genève pour leur audition. Les prévenus n'ont pas donné suite à l'invitation qui leur a été faite de collaborer à la localisation de ces personnes. Un mandat d'acte d'enquête a été adressé à la police genevoise dans le même sens.

Malgré les efforts déployés, il n'a pas été possible de localiser K_____.

Quant aux onze autres personnes, des mandats de comparution leur ont été adressés par voie de commission rogatoire et par email, en cas d'échec de la notification par voie de commission rogatoire.

Tous les efforts raisonnables ont ainsi été déployés afin que ces personnes puissent être entendues, à Genève, par le Tribunal et il serait vain de les convoquer à nouveau. En effet, rien ne permet de penser que ces personnes donneraient suite à un nouveau mandat de comparution qui leur serait notifié. Il appartient dès lors au Tribunal de statuer sur le fond de la cause sur la base du dossier qui lui est soumis, en tenant compte, le cas échéant, dans le cadre de l'appréciation des preuves, de l'absence aux débats des personnes convoquées.

Il résulte de ce qui précède que l'incident est rejeté.

## C. ACTE D'ACCUSATION

**a)** Par acte d'accusation du 8 août 2019, il est reproché à Monsieur C_____, Madame B_____ et Monsieur A_____, d'avoir, en coactivité, promis dès 2005 et octroyé dès 2006, des avantages indus à AAO_____, alors président de la République de Guinée, et Madame E_____, alors sa quatrième épouse et une personne très influente de son entourage, en vue d'obtenir sans droit et au profit de CGR_____ des concessions d'exploration puis d'exploitation des gisements miniers de la région de Simandou en République de Guinée, et d'avoir versé respectivement fait verser à Madame E_____, en onze versements, à tout le moins USD 8.5 millions,

faits qualifiés de corruption d'agents publics étrangers, au sens de l'art. 322septies CP.

**b.a)** Par ce même acte d'accusation, il est reproché à Monsieur C_____ et Madame B_____ d'avoir, en coactivité, dès 2009, en Suisse, en Israël et ailleurs, établi ou fait établir et ce, contrairement à la réalité :

– le 9 juin 2009, un certificat d'actions désignant D_____ comme actionnaire de L_____,

– un contrat du 15 juin 2009, intitulé *Sale and Purchase Agreement* ainsi qu'un amendement à ce contrat d'août 2010,

– un contrat de location du bateau le *M_____* du 1er au 15 juillet 2011,

– un addendum à la location de ce yacht du 29 juin 2011,

et d'avoir fait remettre ces documents par D_____ à ses banquiers, en Suisse, qui lui réclamaient des explications, la fabrication et l'utilisation de ces documents ayant eu pour objectif de cacher aux banques et aux autorités que Monsieur C_____ finançait et ordonnait tous ces paiements passant par les comptes suisses de D_____, au nombre desquels le versement de pots-de-vin à Madame E_____;

faits qualifiés de faux dans les titres, au sens de l'art. 251 CP.

**b.b)** Par le même acte d'accusation, il est reproché à Monsieur C\_\_\_\_\_ et Monsieur A\_\_\_\_\_ d'avoir, en coactivité, dès 2011, en Suisse, en Israël et ailleurs, établi ou fait établir une facture de N\_\_\_\_\_. à O\_\_\_\_\_ GLOBAL LTD (ci-après O\_\_\_\_\_), du 13 juin 2011, cette facture étant contraire à la réalité;

et d'avoir fait remettre ces documents par D\_\_\_\_\_ à ses banquiers, en Suisse, qui lui réclamaient des explications, la fabrication et l'utilisation de ces documents ayant eu pour objectif de cacher aux banques et aux autorités que c'était en réalité Monsieur C\_\_\_\_\_ qui finançait et ordonnait tous ces paiements passant par les comptes suisses de D\_\_\_\_\_, au nombre desquels le versement de pots-de-vin à Madame E\_\_\_\_\_;

faits qualifiés de faux dans les titres, au sens de l'art. 251 CP.

**b.c)** Par ce même acte d'accusation, il est reproché à Monsieur C\_\_\_\_\_ d'avoir, dès 2010, en Suisse, en Israël et ailleurs, établi ou fait établir et ce, contrairement à la réalité:

- un contrat de prêt du 11 juin 2010 entre O\_\_\_\_\_ et P\_\_\_\_\_,
- un contrat de prestations de services du 1er mars 2011 entre Q\_\_\_\_\_ INC. et O\_\_\_\_\_,
- une facture du 5 avril 2011 de Q\_\_\_\_\_,
- un contrat du 1er mars 2011 entre T\_\_\_\_\_ et O\_\_\_\_\_,
- une facture du 5 avril 2011 de T\_\_\_\_\_ à O\_\_\_\_\_,
- un contrat du 1er juin 2011 entre Q\_\_\_\_\_ et O\_\_\_\_\_,
- un contrat entre Q\_\_\_\_\_ et O\_\_\_\_\_,
- une facture du 14 septembre 2011 de Q\_\_\_\_\_ à O\_\_\_\_\_,
- un contrat de conseil entre R\_\_\_\_\_ et O\_\_\_\_\_,
- un contrat du 3 janvier 2011 entre S\_\_\_\_\_ SARL et O\_\_\_\_\_ et une facture du 15 octobre 2011 de S\_\_\_\_\_ à O\_\_\_\_\_,
- un contrat du 1er janvier 2012 entre T\_\_\_\_\_ et O\_\_\_\_\_,
- une offre de service de U\_\_\_\_\_ et une facture du 12 décembre 2012 de U\_\_\_\_\_ à O\_\_\_\_\_,

et d'avoir fait remettre ces documents par D\_\_\_\_\_ à ses banquiers, en Suisse, qui lui réclamaient des explications, la fabrication et l'utilisation de ces documents ayant eu pour objectif de cacher aux banques et aux autorités que c'était en réalité Monsieur

C_____ qui finançait et ordonnait tous ces paiements passant par les comptes suisses de D_____, au nombre desquels le versement de pots-de-vin à Madame E_____,

faits qualifiés de faux dans les titres au sens de l'art. 251 CP.

- 18 -

## D. EN FAIT

### D.A. Faits qualifiés de corruption

**a)**



* MADAME B_____

– Secrétaire du conseil de fondation de V_____ (membre du conseil de fondation durant un an via X_____)

– Administratrice de

o W_____, via X_____

o CGR_____ (Guernesey)

o CGR_____ STEEL

o CGR_____ GUINEE (BVI)

** Monsieur C_____

– Premier bénéficiaire de V_____

– Contrats de conseil avec

o V_____ (USD 250'000.- à 400'000.-/an)

o CGR_____ (Guernesey) (USD 700'0000.-/an)

*** Me GAMMA_____

– Avocat de Monsieur C_____

– Membre du conseil de fondation de V_____

– Administrateur de W_____

**a.a)** *Monsieur C_____*

**a.a.a)** *CG_____*

Monsieur C_____ était considéré, en 2013, comme l'homme le plus riche d'Israël, sa fortune étant alors estimée à plusieurs milliards de dollars américains. Il a construit sa fortune dans l'industrie du diamant. Il est présenté par ses sociétés vis-vis des tiers comme étant à la tête de CG_____, pour C_____ Group, un conglomérat de sociétés, l'activité de CG_____ se concentrant dans quatre secteurs:

- les diamants (C_____ DIAMOND GROUP dont Monsieur C_____ était le Président du Conseil d'administration en 2005),
- les ressources naturelles (CG_____ RESOURCES) (soit CGR_____),
- les investissements immobiliers (Y_____ renommée CGR_____ REAL ESTATE LTD),
- la technologie, la finance et la gestion d'avoirs,

(cf. présentation de CG_____ INVESTMENTS de mai 2005, PP 5'000'092; voir également présentation de CGR_____ de juillet 2007, PP 5'002'012).

**a.a.b)** *Fondation V_____*

Monsieur C_____ est le premier bénéficiaire de tous les avoirs et revenus de la fondation irrévocable et discrétionnaire de droit liechtensteinois V_____ (cf. statuts - annexes aux statuts de la fondation, cl. B.2.1.5).

Me GAMMA est, depuis sa constitution en 1997, un des trois membres du conseil de fondation de V_____ et le représentant de l'actionnaire de CGR_____ au sein du conseil de fondation, en sa qualité d'administrateur de W_____. Le deuxième membre du conseil de fondation est un avocat liechtensteinois. Le troisième membre était Z_____ puis, durant quelques mois, entre 2004 et 2005, X_____ MANAGEMENT CORP - dont l'administratrice était Madame B_____ -, avant d'être remplacée par AA_____ (cl. B.2.1.13-14).

Le but de la fondation est le suivant:

"*The foundation shall hold and manage the Foundation Fund for the benefit of the members of the Class of Beneficiaries as specified in the By-Laws, inter-alia, for their livelihood, health, accommodation, education and other needs as shall be from time to time and subject always to the discretion of the Foundation Council and the provisions of these Statutes*" (cf. statuts au 15 juin 2009, PP 306'796).

Conformément à son but, la fondation a, notamment, distribué à Monsieur C_____ les sommes suivantes à titre de frais de logement et d'entretien (*housing costs and living expenses*):

– Février 2010     USD 3 millions (PP 310'208),

– Mai 2010     USD 3 millions (PP 306'494),

– Août 2010     USD 2 millions (PP 306'484),

– Septembre 2010     USD 1 million (PP 306'480),

– Octobre 2010     USD 1 million (PP 306'478),

– Novembre 2010     USD 2 millions (PP 306'760),

– Décembre 2010     USD 300'000.- (PP 306'758),

Total 2010     USD 12.3 millions

– Février 2011     USD 2 millions (PP 306'753),

– Mars 2011     USD 6 millions (PP 306'703),

– Mai 2011     USD 2 millions (PP 306'742),

– Juillet 2011     USD 2 million (PP 306'738-9).

– Juillet 2011     USD 300'000.- (PP 306'737).

– Juillet 2011     USD 2 millions (PP 306'735).

– Septembre 2011     USD 1 million (PP 306'733).

– Novembre 2011     USD 15 millions (PP 306'729).

Total 2011     USD 30.3 millions

– Février 2012     USD 500'000.- (PP 306'714)

– Avril 2012     USD 2 millions (PP 306'710)

– Mai 2012     USD 5 millions (PP 306'699)

– Décembre 2012     USD 1 million (PP 306'707)

Total 2012     USD 8.5 millions

**a.a.b)** *AB_____*

Monsieur C_____ est le seul actionnaire de AB_____ REAL ESTATE (ci-après AB_____), une société israélienne, qui investit dans l'immobilier dans les pays

d'Europe de l'est. AB_____ n'a aucun lien avec la fondation V_____ si ce n'est son actionnaire, respectivement premier bénéficiaire.

En 2005, V_____ a octroyé à un prêt de USD 25 millions à AB_____ (PP 313'355).

En 2009, AB_____ a connu des problèmes de liquidités et un défaut de paiement des créanciers aurait pu causer un sérieux dommage réputationnel à Monsieur C_____, en Israël et à l'étranger (PP 306'508).

Monsieur C_____ a, dès lors, personnellement demandé un soutien financier à la fondation V_____ (cf. réunion du conseil de fondation du 15 septembre 2009, PP 306'508). Me GAMMA a informé Monsieur C_____ que des distributions de fonds à des tiers n'entraient pas "strictement" dans le but de la fondation, mais, compte tenu du dommage réputationnel mis en avant, la fondation pouvait entrer en matière.

Une semaine après (cf. réunion du conseil de fondation du 21 septembre 2009, PP 306'506), AC_____ a proposé que I_____, détenue par V_____, nantisse (*pledge*) ses biens en faveur d'une banque israélienne, ce qui permettrait à celle-ci d'apporter le soutien financier dont AB_____ avait besoin. Me GAMMA a rappelé le but de la fondation, tel que susmentionné. Il a insisté sur le fait que le but de la fondation n'était pas de nantir ses biens en faveur de tiers, qui ne faisaient pas partie des bénéficiaires. Toutefois, AB_____ étant personnellement détenue par Monsieur C_____, cela pouvait être considéré comme un soutien indirect personnel au précité et, dans la mesure où le nantissement était requis pour une durée limitée, celui-ci ne pouvait pas être considéré comme une distribution à Monsieur C_____.

Madame B_____ a pris le procès-verbal de ces deux réunions du Conseil de fondation (PP 306'506 et 306'508).

En 2010, 2011 et 2012, malgré les rappels de Me GAMMA en lien avec le but de la fondation, V_____ a distribué les fonds suivants à Monsieur C_____ afin que ceux-ci soient spécifiquement et directement injectés dans la société AB_____ :

– USD 94 millions en novembre 2010 (PP 306'477),

– USD 20 millions en mars 2011 (PP 306'747, 306'748),

– USD 6 millions en novembre 2011 sur demande de AC_____ (PP 306'751, 306'703),

– USD 15 millions en juin 2012 sur demande de AC_____ (PP 306'690, 306'692).

**a.a.c)** *Contrat de mandat*

Monsieur C_____ n'exerce, officiellement, aucune fonction dirigeante ou administrative dans aucune des sociétés détenues, directement ou indirectement, par la fondation V_____. Il se prévaut de dispenser des conseils aux sociétés du groupe CG_____ et également d'assumer, dans certaines circonstances, le rôle "*d'ambassadeur*" du groupe vis-à-vis de tiers.

Entre les 1er janvier 1998 et 31 décembre 2011, Monsieur C_____ était lié par un contrat de mandat avec la fondation V_____, rémunéré USD 250'000.- puis USD 400'000.- par an (USD 350'000.- en 2010 et USD 400'000.- en 2011).

**a.a.d)** *Adresses email*

Monsieur C_____ disposait de plusieurs adresses emails, dont notamment:

- c_____@c_____g-investments.com(PP5'010'988, 5'010'816),
- c_____@ad_____-suisse.com (PP 5'010'990),
- advisor@ad_____fa.com (PP 500'677).

**a.a.e)** *W_____*

La fondation V_____ prend toutes les décisions stratégiques du groupe et est l'unique actionnaire de la holding W_____ MANAGEMENT CORP (ci-après: W_____) (PP 3'951'024).

W_____ est une société des Iles Vierges Britanniques créée le 4 novembre 1998 et avait pour adresse postale AD_____ FINANCIAL ADVISORS SA, à Genève (PP 360'252), dont elle approuvait les comptes (cf. perquisition AD_____). Me GAMMA était l'unique administrateur de W_____, depuis 2001 (PP 3'951'024), avant que X_____, dont l'administratrice était Madame B_____, ne soit également désignée (cl. B.2.1.7). Madame B_____ disposait de la signature individuelle sur les comptes de W_____ dès 2002 (PP 360'252, Banque 2_____).

Monsieur C_____ est considéré vis-à-vis des banques comme l'ayant-droit économique de W_____ (PP 360'129, 360'132, 360'241, 360'248, banque 2_____.

Il s'est également personnellement porté garant, à concurrence de USD 30 millions, d'un prêt de ZAR 222'000'000.- (équivalent de CHF 150 millions) octroyé à W_____ par la banque 2_____ (cf. PP 360'290 et 03/1744.offer letter dans clé USB B0_10 dans classeur B0_10).

W_____ détient une multitude de sociétés constituées toutes aux Iles Vierges Britanniques, à l'exception de CG_____ INVESTMENTS LTD constituée aux Bahamas:

- CG_____ INVESTMENTS LTD constituée en 2003 et radiée en 2009
- CG_____ STEEL HOLDINGS LTD constituée en 2004
- CG_____ RESOURCES LTD constituée en 2003
- CG_____ ENERGY LTD constituée en 2005
- CG_____ RACING LTD constituée en en 2005
- CGR_____ TREASURY SERVICES LTD constituée en en 2005
- CGR_____ METAL AND MININGS LTD constituée en 2003
- CGR_____ (LIBERIA) LTD constituée en 2007.
- CG_____ RESOURCES (LIBERIA) LTD (PP 3'002'108)
- CGR_____ DIAMOND EXPLORATION LTD constituée en 2012
- CGR_____ PETROLEUM HOLDINGS LTD constituée en 2005
- CGR_____ GOLD BVBA SA constituée en 2002
- AE_____ constituée en 2004 et radiée en 2014.

Toutes les sociétés susmentionnées ont leur adresse postale chez AD_____ FINANCIAL ADVISORS SA, à Genève. Depuis la création de AF_____ ADVISORY SA en 2014, domiciliée alors à la même adresse genevoise que AD_____ FINANCIAL ADVISORS SA, W_____ et toutes ces sociétés ont eu leur adresse postale chez AF_____ ADVISORY SA.

**a.a.f)** *Avions et bateau*

La fondation est, également, propriétaire, via trois sociétés des Iles Cayman (PP 306'587 et cf. schéma IV) de:

- un avion acheté USD 24.5 millions et détenu par AG_____,
- un autre avion acheté USD 32.2 millions et détenu par AH_____,
- un yacht acheté USD 25.7 millions et détenu par AI_____.

Monsieur C_____ utilise régulièrement ces avions et bateau à des fins privées et professionnelles. Il s'est occupé personnellement du projet d'achat du yacht, F_____ étant responsable des aspects légaux (cf. classeur B_2_1_20).

- 24 -

**a.b)** CG_____ RESOURCES LTD (ci-après CGR_____ GUERNESEY) (anciennement RESOURCES ADVISORY SERVICES LTD) est une société constituée, en 2003, à Jersey puis déplacée, en 2007, à Guernesey (PP 5'010'216). Cette société est active dans le domaine des ressources naturelles (cuivre, cobalt, pétrole, gaz, diamant, etc.) au travers de diverses filiales (cf. PP 3'951'075).

CG_____ GUERNESEY est détenue par W_____ (cf. PP 3'951'023 pour l'évolution de l'actionnariat). AC_____, Madame B_____ (dès 2003) puis AJ_____ (depuis 2007) étaient administrateurs de CGR_____ GUERNESEY (PP 3'951'020).

CGR_____ GUERNESEY est financée par des prêts actionnaire (cf. états financiers au 31.12.2009, PP 3'951'064), principalement via CGR_____ TREASURY SERVICES LTD. Le prêt octroyé par W_____, en 2007, s'élevait à USD 322 millions en 2009 (cl. B.2.1.11). Dans le cadre de la présente procédure (PV, PP 500'351), Monsieur C_____ a déclaré que W_____ finançait CGR_____ GUERNESEY à la demande.

Conformément au droit de Guernesey, les administrateurs de CGR_____ GUERNESEY sont responsables de l'établissement des états financiers de la société (cf. PP 3'951'049) et approuvent les comptes (cf. PP 3'951'048). Madame B_____ signait les états financiers de la société en sa qualité d'administratrice (i.e. PP 3'051'045, 3'951'048). Toute la correspondance bancaire était envoyée, en copie, à Madame B_____, chez AD_____ FINANCIAL ADVISORS SA, la précitée étant au demeurant signataire autorisée sur certains comptes bancaires.

Monsieur C_____ était lié par un contrat de mandat à CGR_____ GUERNESEY, signé par Madame B_____ et AJ_____. Il était rémunéré USD 700'000.- par an (PP 300'750).

**a.c)** CG_____ RESOURCES (GUINEA) LTD (ci-après CGR_____ GUINEE) est une société des Iles Vierges Britanniques, créée en 2005 (PP 5'002'080-1). Elle était détenue par CG_____ STEEL (PP 350'831), elle-même détenue par CGR_____ GUERNESEY. CGR_____ GUINEE est liée par un contrat de service à CGR_____ GUERNESEY (cf. états financiers au 31.12.2009, PP 3'951'064; PP 5'002'101).

**a.d)** CG_____ RESOURCES (GUINEA) LTD - SARL est une société à responsabilité limitée de droit guinéen (cf. statuts: PP 5'002'084), détenue par CGR_____ GUINEA jusqu'à la restructuration des sociétés en février 2009 (cf. consid. "restructuration"). Les documents sociaux de cette société étaient conservés chez AD_____ GE.

Madame B_____, en sa qualité d'administratrice de CGR_____ GUINEE, approuvait les comptes de CGR_____ GUINEE SARL (cl. B.2.1.6), alors que les auditeurs ont relevé que les documents fournis ne permettaient pas de vérifier l'adéquation des dépenses (cf. comptes au 31.12.2008, cl. B.2.1.6).

**a.e)**



     * MADAME B_____ = administratrice

     ** MADAME B_____ = secrétaire du conseil de fondation

     *** MADAME B_____ = employée et directrice

AD_____ FINANCIAL ADVISORS LTD (ci-après AD_____ BVI) est une société des Iles Vierges Britanniques, créée le 4 novembre 1998. Entre 1998 et 2003, elle était détenue par AK_____ et AL_____ (cf. formulaire A, PP 350'028), tous deux employés du CG_____ puis, en 2003, par AM_____, beau-frère de Monsieur C_____ (cf. formulaire A, PP 350'052). Entre 2004 et 2010, AD_____ BVI était détenue par AN_____. – dont AC_____ était l'actionnaire unique – avant que AC_____ ne devienne actionnaire unique, en personne, le 1er janvier 2011 de AD_____ BVI (PP 350'1115). Dès sa constitution, Madame B_____ était administratrice de AD_____ BVI (PP 350'061).

Le jour de la constitution de AD_____ BVI, la fondation V_____, soit pour elle Me GAMMA, a signé un contrat de mandat avec AD_____ BVI, soit pour elle Madame B_____ (contrats du 04.11.1998, PP 306'905 et cl. B.2.1.14). Par ce contrat, AD_____ BVI s'engageait à fournir tous les services administratifs, dont les sociétés détenues par la fondation avaient besoin. La fondation s'engageait à rembourser les frais de AD_____ BVI, plus 10 % (*cost plus ten basis*). Le budget de AD_____ était approuvé par le conseil de fondation (i.e. procès-verbaux du conseil de fondation de V_____, cl. B.2.1.4).

AD_____ BVI était gérée par Madame B_____ depuis les locaux genevois de AD_____ FINANCIAL ADVISORS SA où elle travaillait (cf. notamment PP 349'099). Dès la création de AF_____, AD_____ FINANCIAL ADVISORS LTD et AN_____ ont été domiciliées chez AF_____, qui a la même adresse genevoise que AD_____ FINANCIAL ADVISORS SA.

**a.f)** AD_____ FINANCIAL ADVISORS SA (actuellement en liquidation) (ci-après AD_____ GE) est une société de droit suisse constituée en 1999 et domiciliée à Genève. Elle est détenue par AD_____ BVI. AO_____ (CFO de CGR_____ DIAMOND HOLDINGS LTD, qui détient AP_____) était administrateur jusqu'en 2014. Madame B_____ a été engagée par AD_____ GE dès sa constitution et travaillait dans les locaux genevois de AD_____. Elle a été désignée directrice en février 2008, administratrice en mars 2009, et administratrice-présidente en mai 2014, fonction qu'elle quittera en mars 2016. Elle était également administratrice-présidente de AF_____ ADVISORY SA dès sa création jusqu'à février 2017, à l'exception d'un an, en 2015, où elle a été remplacée par son mari, AQ_____.

AD_____ GE s'occupe du *corporate back office* des sociétés détenues *in fine* par la fondation V_____ et s'occupait, jusqu'en 2007, de la comptabilité des sociétés qu'elle hébergeait (PP 5'010'216; AC_____ CIRDI, audition 23.05.2017, p. 88; PV AC_____, PP 502'160; PV MADAME B_____, 500'541; PV MADAME B_____, PP 500'072).

**a.g)** CG_____ MANAGEMENT SERVICES LTD a été renommée AD_____ FINANCIAL ADVISORS (UK) LTD le 7 mars 2011 (PV LCIA, AC_____). AC_____ est le CEO et l'administrateur de CG_____MS, société détenue par AD_____ BVI. Il gérait cette société depuis Londres. AC_____ est également le CEO de CG_____ CAPITAL MARCETS PCC LTD, société sise à Guernesey et détenue par la fondation AR_____, et non par la fondation V_____ (PP 3'950'539).

**a.h)** Madame B_____ est une proche de la famille de Monsieur C_____ pour laquelle elle travaille depuis ses 19 ans, soit dès 1989, originellement à Anvers, pour le compte de R. C_____ & SONS.

Elle a rejoint CG_____ en 1994 puis elle est allée travailler pour AD_____ BVI et AD_____ GE, dans les locaux genevois, dès 1999.

Au début de son activité, à Genève, son salaire mensuel brut s'élevait à CHF 8'000.- pour atteindre CHF 19'000.- à son départ en 2016, outre des bonus représentant un à trois mois de salaire (cf. audience de jugement).

Madame B_____ était, lors de l'ouverture de la présente procédure en 2013, secrétaire du Conseil des fondations V_____ et AR_____ et assistait aux séances des Conseils de fondation à ce titre (classeurs issus de la perquisition AD_____, not. B.2.1.4; PV MADAME B_____, PP 500'072, 500'298). Elle conservait dans les bureaux de AD_____, à Genève, tous les documents corporatifs en lien avec les fondations V_____ et AR_____ et avec toutes les sociétés détenues par les fondations.

En 2013, elle était administratrice, notamment, de:

- AD_____ FINANCIAL ADVISORS LTD
- AD_____ FINANCIAL ADVISORS SA
- AF_____ ADVISORY SA
- AS_____ ENGINEERING NV
- CG_____ STEEL HOLDINGS LTD
- CG_____ RESOURCES LTD (Guernsey)
- CG_____ CAPITAL MARCETS PCC LTD (PP 3'950'474)
- AT_____, la société propriétaire du yacht le *M_____*.
- X_____ MANAGEMENET CORP (ci-après X_____) (détenue pas AD_____ BVI), administratrice de :

  o CGR_____ TREASURY SERVICES LTD
  o CG_____ RESOURCES (GUINEA) LTD - BVI
  o CG_____ RESOURCES (LIBERIA) LTD
  o AU_____
  o AV_____
  o AW_____ (PP 500'631)
  o ainsi qu'une dizaine d'autres sociétés.

Son rôle dans les conseils d'administration était d'assurer les intérêts des bénéficiaires des fondations et s'assurer que les décisions prises restaient dans les limites imposées par le conseil de fondation (PV MADAME B_____, PP 500'298).

En sa qualité d'administratrice, Madame B_____ recevait les états financiers annuels pour approbation, soit les bilans et comptes d'exploitation (PV, PP 500'547).

Tous les contrats ou documents signés par CGR_____ étaient conservés en original par Madame B_____ dans les locaux de AD_____ GE (cf. perquisition AD_____, classeurs B.2.1.1 à B.2.1.28; PV, PP 500'627, 500'630).

Dans son travail quotidien, Madame B_____ était décrite comme étant totalement indépendante (WS LCIA AC_____, PV 24.06.15, p. 4, no 12; PV AC_____, PP 502'159 et 502'168: CIRDI AC_____, p. 88).

**c)** AC_____ a été engagé après plusieurs discussions avec Monsieur C_____, par CG_____ MANAGEMENT SERVICES LTD.

Il est également l'ayant-droit économique de AN_____., le CEO et le CIO de CG_____ CAPITAL MARCETS PCC LTD. Il était administrateur de CGR_____ GUERNESEY. Il a indiqué avoir une relation étroite avec Monsieur C_____ pour que les choses fonctionnent (AC_____ CIRDI, audition 23.05.2017, p. 97; PV AC_____, PP 502'156ss).

**a.i)** Me GAMMA_____, Madame B_____ et AC_____ ont été invités au mariage de la fille de Monsieur C_____, lequel a eu lieu le 17 septembre 2009 en Israël (PP 5'011'001).

**a.j)** AX_____ a rejoint CGR_____, en septembre 2003, en qualité d'auditeur interne et de comptable, employé par AY_____, avant de devenir le CFO de CGR_____ (PP 315'945). En septembre 2008, il a changé de statut pour devenir *strategic financial specialist* de CGR_____ en qualité de mandataire, via sa société AZ_____ (PP 5'006'192, 5'000'119, 500'139). Il a alors déménagé d'Afrique du Sud en Israël (PP 5'006'192; PV AAA_____, PP 502'229).

Il a été désigné auditeur interne du groupe CG_____ par la fondation V_____ en juin 2009 (cl. B.2.1.4).

**a.k)** Monsieur A_____ est un homme d'affaires français actif en Afrique. Ses partenaires en affaires sont AAB_____, franco-israélien domicilié au Sud de la France, et AAE_____, israélien domicilié en Afrique du Sud.

Les précités étaient actifs, en Afrique, dans l'import-export de marchandises, principalement de médicaments, au travers des sociétés AAC_____, AAD_____ ou ABJ_____ (PP 358'471). En 2005, ils ne disposaient d'aucune connaissance en matière minière (i.e. PP 349'759, 3'002'054, AAA_____, PP 502'221). Selon AAA_____, Monsieur A_____ n'était pas capable de lire une carte géologique (AAA_____, PP 502'224).

**b.a) Guinée**

Durant le premier semestre de 2005, AAG_____, CEO de CGR_____ GUERNESEY, a rencontré AAB_____ – leurs pères étant amis de longue date (PP 300'600) et AAD_____ étant domiciliée dans le même immeuble que CGR_____, en Afrique du Sud – et ses partenaires AAE_____ et Monsieur A_____.

Ils ont évoqué les possibilités d'investissement dans les ressources naturelles de Guinée, en particulier son potentiel minier, Monsieur A_____ ayant eu connaissance des richesses minières de la Guinée par AAF_____, un homme d'affaires malien (PV audience 13 janvier 2021) et en ayant parlé à ses associés.

En 2005, CGR_____ ne disposait d'aucune implémentation en Guinée et n'avait aucune expérience préalable dans l'exploitation de gisements de fer.

A cette époque, la Guinée était classée 160$^{\text{ème}}$ sur 163 dans l'index de perception de la corruption établi par l'organisation *Transparency International* (Année 2006, *Corruption Perceptions Index, Transparency International*).

Le 21 juin 2005, AAG_____ s'est adressé au premier Ministre AAH_____ pour lui présenter CGR_____ GUERNESEY (pièce 2 chargé de pièces de Madame B_____ du 11 janvier 2021). Il était indiqué que CGR_____ GUERNESEY s'intéressait "*tout particulièrement aux gisements de minerai de fer du Mont Nimba et du Mont Simandou, aux gisements de bauxite de Dabola Tougué et aux infrastructures associées*". Madame B_____ a reçu cette lettre par courriel de AAG_____ du 21 juin 2005, l'a mise en page avec l'en-tête de CGR_____ et l'a renvoyée à AAG_____ pour signature.

Le 8 juillet 2005, le Ministre des mines et de la Géologie AAI_____ a répondu – en français – à AAG_____ et lui a indiqué qu'il recevrait, à Conakry, une équipe de dirigeants de CGR_____ la semaine du 18 juillet 2005. Madame B_____ a traduit ces courriers (pièce 2 chargé de pièces de Madame B_____ du 11 janvier 2021).

Dans une lettre d'intention du 14 juillet 2005 adressée à Monsieur A_____, CGR_____ GUERNESEY, soit pour elle AAG_____, a manifesté l'intérêt particulier de la société dans l'exploitation du fer de Simandou et du Mont Nimba, ainsi que de toute autre réserve similaire en Guinée (PP 349114).

Le 15 juillet 2005, trois projets de contrats entre CGR_____ GUERNESEY et la République de Guinée ont été préparés par CGR_____ (pièce 2 chargé de pièces de Madame B_____ du 11 janvier 2021).

Le premier contrat concernait le fer du Simandou et du Mont Nimba et était intitulé "*Guinea ferrous project*".

Le deuxième contrat concernait les ressources en minerai de bauxite le long des voies ferrées de la région de Dabola et de Tougue de la République de Guinée.

Le troisième contrat concernait les ressources en diamants de la République de Guinée.

Ces contrats étaient rédigés en anglais et ont été envoyés à Madame B_____ afin qu'elle les fasse traduire en français.

Le 20 juillet 2005, Monsieur A_____ a organisé et a participé à une rencontre entre AAG_____ et le Ministre des mines et de la Géologie, AAI_____ (PP 349'339; sentence arbitrale PP 3'002'111).

AAF_____ connaissait AAJ_____ – la première épouse de AAO_____ car il travaillait pour sa fondation et distribuait des produits pharmaceutiques au travers de la Pharmacie centrale de Guinée. AAF_____ et Monsieur A_____ ont contacté AAJ_____ et lui ont demandé s'il était possible de rencontrer le Président pour le compte d'un grand groupe minier (PV d'audition du 13 janvier 2021, page 4). Ces démarches ont échoué.

A la suite de ces visites, par courrier du 2 août 2005, AAG_____ a réitéré auprès de AAI_____ l'intérêt de CGR_____ GUERNESEY d'investir dans l'exploitation des réserves naturelles de Guinée, en particulier le fer de Simandou. Il a sollicité son accord pour l'envoi d'ingénieurs de la société AS_____ B.V., société d'ingénierie du groupe CG_____ (PP 349'339). Aucune suite n'a été donnée à ce courrier ni à ses relances (PP 350'398).

Le courrier du 2 août 2005 indiquait que la gestion administrative de CGR_____ GUERNESEY était à Genève: "*administrative head office*, Port Franc, 1211 Genève 5, *Switzerland*, téléphone 022 788 14 60" (PP 349'339). Il s'agit de l'adresse de AD_____ BVI et du numéro de téléphone de Madame B_____ au sein de AD_____ GE et AD_____ BVI (PP 349'099 et 349'339).

Le 29 septembre 2005, AAG_____ a pris une participation dans CGR_____ GUERNESEY par le biais de AAK_____ (PP 350'318, 3'951'023).

Dans un échange de courriels des 10 et 11 octobre 2005 (PP 349080 - 349082) :

- Monsieur A_____ a demandé à AAG_____ si le projet du fer était valide uniquement si CGR_____ obtenait les zones de AAL_____, ce à quoi AAG_____ a répondu "*YES*";
- Il a émis l'idée d'un projet commun incluant le Mali et la Guinée et AAG_____ a répondu que les projets guinéens étaient beaucoup plus grands et attractifs ("*The projects in Guinea are much bigger and sexier*");
- AAG_____ a, ensuite, affirmé que CGR_____ ne visait que les réserves de fer de Simandou et qu'en cas de réussite, le projet se suffisait à lui-même ("*We are after Simandu Iron Ore deposit. It is very simple, either we can get it or not, if we can it's a stand alone business*") (PP 349082).
- AAG_____ a, enfin, rappelé à Monsieur A_____ que les réserves de fer de Simandou était leur cible et que les autres projets n'étaient pas aussi excitants ("*Remember, this is our target all the rest is not so excited !*").

En novembre 2005, AAG_____ et AAA_____ se sont rendus en Guinée, durant cinq jours. Ils ont rencontré Monsieur A_____ et K_____ (cf. infra). AAA_____ a passé du temps au Centre de promotion et de Développement Miniers (ci-après: CPDM).

Durant ses discussions avec le CPDM, AAA_____ a compris que les zones Nord et Sud de Simandou étaient libres de tout droit minier et que AAL_____ détenait des droits sur les blocs 1 à 4 de Simandou (PP 3'002'055).

Le 24 novembre 2005, AAG_____ a fait parvenir un protocole d'accord de partenariat entre CGR_____ GUERNESEY et l'Etat Guinéen en vue de promouvoir et développer les gisements de fer de Simandou (PP 5'010'647). Il s'agissait d'un "*deuxième projet, pour discussion seulement*". Le protocole faisait référence à une annexe, qui mentionnait la zone minière visée, cette annexe n'était toutefois pas jointe au protocole. Aucune suite n'a été donnée à cette proposition.

Interrogé sur le courrier accompagnant le protocole d'accord du 24 novembre 2005 (PP 500'236), le ministre AAI_____ a expliqué que cette lettre était totalement irrecevable, car la concession d'exploration et d'exploitation du Simandou accordée à AAL_____ avait été préparée par ses soins et signée par le Président le 30 mars 2006.

Dans une note interne non datée, le CPDM a résumé les propositions de CGR_____ (PP 5'012'753). Il en ressort notamment que CGR_____ "*souhaite établir l'Etude de faisabilité de tout le Simandou sur financement au moyen de prêt additionnel et faire la promotion du gisement auprès de grands groupes miniers*".

Monsieur A_____ s'est dès lors tourné vers un homme d'affaires malien, AAF_____, qui l'a introduit auprès d'un homme d'affaire guinéen, AAM_____ (PP 5'010'658). Grâce à ceux-ci, Monsieur A_____ a été introduit auprès du ministre AAN_____, qui les a présentés à K_____, journaliste, et à la demi-sœur de celui-ci, Madame E_____ (PP 500'101, PP 5'010'658), quatrième épouse de AAO_____ (cf. consid. o).

Après des mois de réseautage en Guinée, Monsieur A_____ a compris que la seule et unique personne qui comptait dans ce pays était le Président AAO_____ (PP 5'010'587). Il voyait également les blocs Nord et Sud de Simandou comme un point d'entrée en Guinée (PP 5'010'588).

**b.b)** Le 1er décembre 2005, Monsieur A_____ et AAG_____ ont pu rencontrer le Président AAO_____.

La sentence LCIA retient que Madame E_____ était présente (sentence LCIA, PP 3'002'055, 3'002'168).

Le rapport établi par Veracity mentionne la présence du Président, de Monsieur A_____ et de K_____ (PP 5'010'588).

Madame E_____ a déclaré qu'au moment de cette réunion, Monsieur A_____ "*voulait le nord et le sud*" (PP 500'697). À ce moment, elle n'avait pas encore dit au

Président que CGR_____ lui avait promis beaucoup d'argent si elle les aidait (PP 500'697). Elle était restée silencieuse pendant la réunion car elle avait déjà fait son travail, à savoir présenter CGR_____ au Président et le persuader (PP 500'697). Pour persuader le Président, Madame E_____ lui avait dit que CGR_____ allait se montrer généreuse avec elle. Par la suite, elle avait montré les contrats au Président et il avait su combien lui était promis (PP 500'697). Après la réunion, Madame E_____ avait suivi Monsieur A_____ et K_____ dans le bureau du ministre AAI_____, qui leur avait indiqué qu'il fallait faire en sorte qu'ils obtiennent Simandou Nord et Sud (PP 500'698).

**b.c)** Le lendemain 2 décembre 2005, une équipe composée de AAP_____ (ingénieur des mines et cartographe du CPDM, chef de mission), de AAQ_____ (expert géologue de CGR_____) d'un interprète, d'un pilote et d'un copilote, a effectué une mission de reconnaissance du site de Simandou avec l'hélicoptère présidentiel (PP 5'010'662).

Il ressort du "*rapport de mission*" que CGR_____ s'était adressée aux autorités guinéennes pour effectuer une "*expertise rapide et systématique des richesses*" des Monts Simandou. Avant de quitter Conakry, le vendredi 2 décembre 2005, à 10h00, les zones ciblées ont été répertoriées, géo-référencées et intégrées au GPS par l'équipe "*afin de positionnements corrects au sol pour des prises d'échantillons pendant le trajet*". Ce document indique qu'en raison des permis déjà octroyés à AAL_____ sur les blocs 1 à 4, les zones visées étaient le Sud et le Nord de Simandou.

Le vol a commencé par le Sud Simandou. Le premier positionnement pour observations et prises d'échantillons a été fait dans la zone du Sud Simandou, "*hors du site de AAL_____*" (PP 5'010'663). L'hélicoptère est ensuite reparti s'est posé une première fois à l'intérieur du bloc 4 de AAL_____, ou "*des prises d'échantillons à partir des roches altérées*" ont été effectuées. Puis "*le survol de la chaîne de Simandou sur toute sa longueur et à très faible altitude a commencé, pour une observation très franche des manifestations et gîtes ferrugineux de ladite chaîne*". La curiosité de l'équipe a, ensuite, conduit à un atterrissage dans le bloc 1. Un dernier arrêt a été effectué dans la zone Nord Simandou, "*où la densité et la hauteur des herbes n'ont pas permis d'observer les roches en place*".

Le rapport est arrivé à la conclusion que la mission était trop courte mais qu'elle avait "*permis à l'équipe de toucher du doigt les réalités du terrain de Simandou et ses environs*". Le parcours de près de 150 km du Sud au Nord de la chaîne de Simandou et à très faible altitude, accompagné d'observations ponctuelles, a permis d'affirmer qu'il y avait des ressources importantes à expertiser, "*pour une décision finale de mise à disposition, afin de mise en valeur*".

Concernant les "*Secteurs cibles (le Sud et le Nord)*", le rapport est arrivé à la conclusion suivante: "*les quelques échantillons prélevés çà et là ne permettent pas une décision d'investissement. Il faudra absolument établir des permis de recherches et de*

*prospections systématiques pour prouver qu'il y a réellement des gisements enfouis qui demanderaient une mise en exploitation, même de manière souterraine, pourquoi pas ?*" (PP 5'010'664).

La carte intitulée "*domaine objet de visite par la société CGR_____ (02/12/2005)*" vise les zones Nord et Sud Simandou (PP 5'010'665).

Informé de cette mission, le ministre AAI_____ a convoqué CGR_____, dont les représentants sont venus accompagnés de K_____ et de Madame E_____, lesquels ont plaidé pour qu'il accorde à CGR_____ une partie du Simandou sous concession (PP 500'236). Le ministre AAI_____ leur a rappelé qu'ils ne pouvaient se rendre sur la zone de AAL_____, mais les a invités à solliciter un permis de recherche pour toute zone libre de tout permis (e.g. les zones Nord et Sud) (PV 09.07.15 AAI_____, p. 3).

**b.d)** Le 6 janvier 2006, CGR_____, soit AAA_____, a envoyé un courrier au Ministre des mines, AAI_____, lui transmettant à nouveau le protocole d'accord du 24 novembre 2005. Le courrier visait "*la promotion et le développement des gisements de minerais de fer de Simandou Nord et Sud, ainsi que les infrastructures y afférentes*" (PP 5'008'387). La zone visée selon ce protocole était le Nord ainsi que le Sud Simandou (PP 5'008'392).

Entre les 8 janvier et 22 février 2006, Madame B_____ a échangé de nombreux courriels avec AAG_____ et AX_____ notamment (pièce 4 chargé de pièces de Madame B_____ du 11 janvier 2021). Madame B_____ a été informée de la signature d'un protocole d'accord avec le gouvernement guinéen et du besoin urgent de disposer d'une société incorporée aux BVI ("*We are trying to sign an MOU with the Guinea government for an exploration of Iron ore field in Guinea*"), du fait qu'ils étaient tous en Guinée (courriel du 17 janvier) en train de finaliser un protocole d'accord avec le président guinéen ("the *above fax is urgent please if you can attend ASAP it will really help. AAG_____, AAA_____, etc are all in Guinea now and finalising an MOU with Guinea president so receipt of the above fax is critical*").

Madame B_____ a, d'abord, proposé la société AAR_____, avant que AX_____ l'instruise d'utiliser AAS_____ INVESTMENTS LTD BVI COMPANY (courriel du 16 janvier 2006) puis d'en changer le nom en CGR_____ GUINEE afin que le *brand name* de CG_____ apparaisse ("*it is critical that the name CGR_____ appears*").

Le 15 janvier 2006, Monsieur C_____ a quitté Tel Aviv et a atterri à Londres le 16 janvier 2006 (PP 300'819 et 300'823).

Le 16 janvier 2006 (départ 23h45), l'avion utilisé par Monsieur C_____ a quitté Londres pour se rendre à Conakry, alors que Monsieur C_____ semble être resté *au*

*Four Seasons Hotel* de Londres, jusqu'au 18 janvier 2006 (PP 300'825), date à laquelle il est retourné à Tel Aviv, avec cet avion (PP 300'819 et 300'825).

Le 17 janvier 2006, une réunion a eu lieu, à Conakry, avec le gouvernement de Guinée, en présence de AAG_____, Monsieur A_____ et AAB_____ pour discuter d'un protocole d'accord avec la Guinée sur l'exploitation des blocs 1 et 2 de Simandou (PP 300'819, 300'823, 3'002'056). Plus tard, le même jour, AAG_____, Monsieur A_____ et AAB_____ se sont rendus au Palais Présidentiel où ils ont rencontré le Président, alors que K_____ et Madame E_____ étaient également présents (sentence arbitrale, PP 3'002'112, PP 3'002'169).

**b.e)** *CGR_____ GUINEE*

Le 30 janvier 2006, Madame B_____, agissant pour le compte de AD_____, a effectué les démarches nécessaires pour que la société AAS_____ INVESTMENTS LTD BVI COMPANY, créée le 28 octobre 2005, dont elle était alors l'administratrice unique via X_____, soit renommée CGR_____ RESOURCES (GUINEA) LTD. Le 20 juillet 2006, AAA_____ a été désigné administrateur aux côtés de X_____, tous deux disposant d'un pouvoir de signature individuel (cl. B 2.1.1.).

Les 50'000 actions de CGR_____ GUINEE étaient détenues par CGR_____ STEEL HOLDINGS LTD (PP 350'831), laquelle exerçait le management de CGR_____ GUINEE, alors que CGR_____ GUINEE était liée par un contrat de conseil à CGR_____ (GUERNESEY).

CGR_____ GUINEE était financée par des prêts octroyés par CGR_____ TREASURY SERVICES (i.e. les contrats y relatifs sont signés par Madame B_____ pour le compte des trois sociétés parties au contrat, soit CGR_____ TREASURY SERVICES, CGR_____ GUERNESEY et CGR_____ GUINEE; classeur B.2.1.1; prêt de USD 26 millions le 1er février 2006, augmenté par la suite et ascendant à USD 63 millions au 31.12.2009).

**c.a)** *AAT_____*

Par courrier du 2 février 2006, CGR_____ GUINEE, soit pour elle AAA_____, a établi un accord de coopération avec AAT_____ (PP 349'118), société des Iles Vierges Britanniques, dont les ayant-droit économiques et animateurs sont Monsieur A_____ et AAB_____ (PP 358'753). Cette société était alors utilisée par ces derniers pour d'autres projets.

Par cet accord, CGR_____ GUINEE octroyait à AAT_____ une participation de 15% dans le projet de Simandou, soit 17.65% de l'actionnariat de CGR_____ GUINEE, outre des versements selon un échéancier convenu.

En échange, AAT_____ devait continuer: "*à fournir tous les efforts possibles aux fins d'obtenir un contrat d'acquisition des blocs 1 et 2.*"

**c.b)** *Permis de recherches zones Nord et Sud*

Le 6 février 2006, sept permis de recherches ont été octroyés à CGR_____ GUINEE sur les zones Nord et Sud de Simandou, alors libres de tout permis.

Ces permis seront ultérieurement abandonnés par CGR_____, lors de sa demande d'octroi de permis sur les blocs 1 et 2 (cf. courrier du 06.11.2008 de AAU_____ au Ministre des mines).

**c.c)** *AAV_____*

CGR_____ ne souhaitant pas que Monsieur A_____, AAB_____ et AAE_____ utilisent l'une de leurs sociétés existantes pour la prise de participation dans CGR_____ GUINEE, AAG_____ leur a demandé d'acquérir une nouvelle société à cette fin (courrier Me ALPHA_____ du 15 août 2018, p. 4), laquelle se substituerait à AAT_____.

Sur conseils de AX_____, AAB_____ s'est alors tourné vers Madame B_____ pour acheter une société (PP 349'098).

Le 28 octobre 2005, AD_____ BVI avait acheté, à MOSSECK FONSECA & CO. (BVI) LTD, la société AAV_____ HOLDING LTD (ci-après AAV_____), constituée le même jour aux Iles Vierges Britanniques (cl. B.2). L'administratrice de AAV_____ était Madame B_____, via X_____.

Le 13 février 2006, Madame B_____ a, dès lors, vendu AAV_____ à AAD_____ INTERNATIONAL TRADING (PTY) LTD (ci-après AAD_____), société domiciliée en Afrique du Sud et dont les ayant-droits économiques sont Monsieur A_____ (F), AAB_____ (M) et AAE_____ (A) (d'où AAD_____). Une facture datée du 14 février 2006 a dès lors été établie par AD_____ BVI (PP 5'010'675).

Le même jour, soit avant même la conclusion du contrat entre CGR_____ et AAV_____, Madame B_____, en sa qualité d'administratrice, a attesté que AD_____ BVI détenait 17.65 % de CGR_____ GUINEE pour le compte de AAV_____ (PP 349'327, 5'010'673) :

"*et ce sous réserve de l'exécution du contrat entre CG_____ RESSOURCES (GUINEA) LIMITED et le gouvernement de la République de Guinée (…)*".

Les actions de AAV_____ sont restées propriété de AD_____ BVI durant toute l'année soit jusqu'au 15 décembre 2006 (cl. B.2, pièces MOSSACK FONSECA). Ce

n'est que le 10 janvier 2007 que les actions de AAV_____ seront transférées en faveur de AAW_____, une fondation agissant par le biais d'une société de droit panaméen AAX_____ (cl. B.2), AAY_____ SA - la société de gestion de fortune sise à Genève de Monsieur A_____ - étant désignée *protector* et premier bénéficiaire de la fondation, alors que deux administrateurs de paille (AAZ_____ et ABA_____) étaient désignés.

Ainsi, Monsieur A_____, AAB_____ et AAE_____ ne sont jamais apparus en qualité d'ayant-droits économiques de AAV_____.

Une fois AAV_____ acquise, CG_____MM, soit pour elle Madame B_____, et AAV_____, ont signé un *Services and Cooperation Agreement*, qui a été antidaté au 15 octobre 2005.

**c.d)** *Accord du 14 février 2006*

Le 14 février 2006, AAT_____ a été substituée par AAV_____ et un nouvel accord de coopération, identique au précédent, a été conclu avec CGR_____ GUINEE (PP 349'035).

Ainsi, AAV_____ s'engageait à continuer ses efforts pour arriver à un accord sur les blocs 1 et 2 et à assister CGR_____ GUINEE de toutes les manières possibles pour arriver à son objectif.

En échange, il était prévu, en faveur de AAV_____:

  – l'octroi d'un *free carry* par le biais de l'octroi d'une participation de 17.65% dans CGR_____ GUINEE et

  – le versement de USD 19.5 millions conformément à l'échéancier ci-dessous:

| Milestone | Total Success Fee | |
|---|---|---|
| | Zones North and South | Blocks 1 and 2 |
| Signing of the MOU and issuing of corresponding prospecting permits | USD500,000 | USD1,500,000 |
| Completion of a satisfactory feasibility study and registration of "Companie Minière de Fer de Simandou" | USD500,000 | USD1,000,000 |
| Signing of "Convention de Base" | USD500,000 | USD1,000,000 |
| Signing of "Decret Presidentiel de la Concession" and issuing of corresponding mining permits | USD1,000,000 | USD1,000,000 |
| Commercial production and export of first tonne of iron ore product from Simandou | USD2,000,000 | NIL |
| Commercial production and export of first 10 million tonnes of iron ore product from Simandou | USD4,000,000 | NIL |
| Repayment of all investments by CGR (Guinea) Limited | USD6,500,000 | NIL |
| Total | USD15,000,000 | USD4,500,000 |

A ce moment, AAV_____ n'était qu'une coquille vide, sans compte bancaire (son premier compte bancaire sera ouvert en mai 2010) et ses réels ayant-droits économiques n'ont jamais eu ni l'intention ni la possibilité d'investir dans un projet minier.

AAA_____, responsable du projet en Guinée, a déclaré, dans le cadre de la présente procédure que, dès le début, il n'était pas prévu que AAV_____ et ses animateurs investissent.

Madame B_____, administratrice de CGR_____ GUINEE, était au courant de l'accord du 14 février 2006 dès la signature de celui-ci. Elle précisera dans la procédure (PP 500'078):

"*CGR_____ agit toujours par des joint-venture et ne verse pas de commission*".

**c.e)** *Accords du 20 février 2006*

**c.e.a)** Sur la base de l'accord du 2 février 2006 entre CGR_____ GUINEE et AAT_____, Monsieur A_____ et ses associés ont préparé trois protocoles d'accord entre, d'une part, AAV_____ et, d'autre part, AAM_____ / K_____, AAF_____ et Madame E_____.

L'accord entre AAV_____ et AAM_____ / K_____ prévoyait les paiements suivants (PP 348'965):

| Phase | Evolution | Zones Nord et Sud | Blocs 1 et 2 |
|---|---|---|---|
| 1 | Signature du Protocole d'Accord et délivrance des Permis de Recherche correspondants | 425.000 USD | 1.200.000 USD |
| 2 | Etude de faisabilité et création de la Société Mixte | 400.000 USD | 800.000 USD |
| 3 | Signature de la Convention de Base pour les zones Nord et Sud et blocs 1 et 2 | 400.000 USD | 800.000 USD |
| 4 | Signature du Décret Présidentiel de la Concession et délivrance des permis correspondants | 800.000 USD | 800.000 USD |
| 5 | Exportation de la 1ère tonne de minerai de fer | 1.600.000 USD | |
| 6 | Exportation de 10 millions de minerai de fer | 3.200.000 USD | |
| 7 | Retour sur investissement | 5.200.000 USD | |
| | TOTAL | 12.025.000 USD | 3.600.000 USD |

L'accord entre AAV_____ et AAF_____ prévoyait les paiements suivants (PP 500'582, l'original du contrat: cf. perquisition AAB_____):

| Phase | Evolution | Zones Nord et Sud | Blocs 1 et 2 |
|---|---|---|---|
| 1 | Signature du Protocole d'Accord et délivrance des Permis de Recherche correspondants | 75.000 USD | 300.000 USD |
| 2 | Etude de faisabilité et création de la Société Mixte | 100.000 USD | 200.000 USD |
| 3 | Signature de la Convention de Base pour les zones Nord et Sud et blocs 1 et 2 | 100.000 USD | 200.000 USD |
| 4 | Signature du Décret Présidentiel de la Concession et délivrance des permis correspondants | 200.000 USD | 200.000 USD |
| 5 | Exportation de la 1ère tonne de minerai de fer | 400.000 USD | |
| 6 | Exportation de 10 millions de minerai de fer | 800.000 USD | |
| 7 | Retour sur investissement | 1.300.000 USD | |
| | TOTAL | 2.975.000 USD | 900.000 USD |

Ainsi, les protocoles d'accord entre AAV_____ et AAM_____ / K_____ et AAF_____ prévoyaient le versement total de USD 19.5 millions, soit la somme promise à AAV_____, selon un échéancier de paiements identiques, dont la première échéance de paiement totalisait USD 500'000.-. La seule différence consiste dans la langue de rédaction (français – anglais).

Quant au protocole d'accord avec Madame E_____ (PP 348'757), il ne prévoyait pas le versement de sommes d'argent, mais l'intéressée, en tant que "*partenaire locale*" de l'exploitation des gisements de Simandou, devait recevoir une participation indirecte de 5 % dans la société exploitante, soit la *Compagnie minière de Simandou*, sous la forme d'une participation de 33 % des 17.65 % de AAV_____ dans CGR_____ GUINEE (note: 33 % x 17.65 % = 5 %), dès l'obtention des concessions d'exploitation, alors que la Guinée recevrait 15% de l'actionnariat de cette société.

**c.e.b)** Le 15 février 2006, à 16h23, soit le lendemain de la signature de l'accord entre AAV_____ et CGR_____ GUINEE, l'assistante de AAB_____ a envoyé à Madame B_____, pour signature (PP 5'010'684 et 5'010'686), le courriel suivant:

"*Pour faire suite à notre conversation veuillez trouver ci-joint le protocole d'accord.*

*Dans l'attente de votre réponse*".

Il s'agissait du protocole d'accord entre, AAV_____ et AAM_____ / K_____, qui prévoyait la signature de Madame B_____ en sa qualité d'administratrice de X_____, elle-même administratrice de AAV_____.

La signature de Madame B_____ figurait sur la même page que l'échelonnement de paiement.

A réception de cet email, Madame B_____ s'est alors entretenue au téléphone avec AAB_____ ("*As per your discussion with AAB_____…*", PP 5'010'688) et a proposé de délivrer une procuration pour signer l'accord à sa place.

A 17h13, l'assistante de AAB_____ a écrit à Madame B_____ ce qui suit (PP 500'377):

"*As per your discussion with AAB_____ please find attached the new version of the Protocole d'Accord. Thanks to send us Power of Attorney for Mr AAE_____ (…)*".

Soit en traduction libre: "*Conformément à la discussion que vous avez eue avec AAB_____, veuillez trouver ci-joint la nouvelle version du Protocole d'accord. Merci de nous envoyer la Procuration en faveur de M. AAE_____ (…)*".

Le contrat a ainsi été modifié pour prévoir la signature de AAE_____, et non plus celle de Madame B_____ pour le compte de X_____ (PP 5'010'690).

A 17h17, l'assistante de AAB_____ a envoyé un nouveau courriel à Madame B_____, lequel précisait (PP 500'087):

"*As per your discussion with AAB_____ please find attached **both** Protocole d'Accord. Thanks to send us Power of Attorney for Mr. AAE_____ (…)*".

Soit en traduction libre: "*Conformément à la discussion que vous avez eue avec AAB_____, veuillez trouver ci-joint **les deux** Protocoles d'accord. Merci de nous envoyer la Procuration en faveur de M. AAE_____ (…)*".

A 17h19, l'assistante de AAB_____ a renvoyé à Madame B_____ le même courriel que celui de 17h17, *avec* cette fois les pièces jointes, soit les *deux* protocoles d'accord suivants (PP 500'082):

– le protocole d'accord *modifié* entre AAV_____ et AAM_____ / K_____ daté du 20 février 2006 et

– le protocole d'accord avec Madame E_____ daté du 20 février 2006.

A 17h24, Madame B_____ a transmis à la secrétaire de AAB_____ la procuration qu'elle avait établie au nom de AAE_____, lui permettant d'engager AAV_____ au nom de X_____ (PP 500'087).

Ce même 15 février 2006, après avoir envoyé la procuration, Madame B_____, pour le compte de X_____, a démissionné, avec effet immédiat, de sa qualité d'administratrice unique de AAV_____ et des administrateurs de paille ont été désignés à sa place (PP B.2).

Entendue dans le cadre de la procédure, Madame B_____ a déclaré ignorer qui étaient les personnes mentionnées sur les protocoles d'accord. Elle ne les avait pas signés elle-même pour éviter tout conflit d'intérêts avec son travail pour CGR_____ (PP 500'142).

**c.e.b)** Le matin du 20 février 2006, l'avion utilisé par Monsieur C_____ a atterri en Guinée en provenance de Malte et est reparti le soir même à destination de la Macédoine.

Monsieur C_____ se trouvait alors en Israël. En effet, il était en Côte d'Ivoire et en Afrique du Sud, entre les 5 et 10 février 2006, puis en Israël, du 10 au 17 février 2006. Le 18 février 2006, il s'est rendu à Aman, avant de retourner en Israël, le 19 février 2006, où il est resté jusqu'au 25 février 2006, date à laquelle il est allé à Aman puis à Goa, le lendemain.

C'est AAG_____ (déclaration de Monsieur A_____ et courrier de AAM_____) qui a notamment voyagé avec l'avion utilisé par Monsieur C_____.

AAG_____ a apporté avec lui USD 500'000.- et les protocoles d'accord, datés du 20 février 2006 et envoyés le 15 février 2006 à Madame B_____ (cf. déclarations de Monsieur A_____ à l'audience de jugement et courrier de AAM_____).

Les trois protocoles d'accord entre, d'une part, AAV_____ et, d'autre part, AAM_____ / K_____, AAF_____ et Madame E_____ ont ainsi été signés le 20 février 2006.

**c.e.c)** Le même jour, soit le 20 février 2006, un protocole d'accord a été conclu entre la Guinée et CGR_____ GUINEE, soit pour elle AAA_____, celui-ci ayant été autorisé à représenter la société par résolution signée par Madame B_____ pour le compte de X_____ le même jour (PP 5'006'806 et cl. B.2.1.1).

Par ce protocole d'accord, CGR_____ GUINEE s'engageait (i) à effectuer une étude de faisabilité dans un certain délai dès l'obtention des permis de recherche couvrant des zones minières décrites dans des annexes (ces zones comprennent les blocs 1 et 2 de Simandou) (PP 5'006'811), (ii) à créer la société la *Compagnie minière de Simandou*,

dont l'actionnariat devait être réparti à raison de 15 % pour la Guinée et de 85 % pour CGR_____ GUINEE, alors que la Guinée devait faire en sorte que les permis soient attribués à CGR_____.

En effet, la zone visée par ce protocole d'accord était définie dans ses annexes 1 et 2 (article 1.3.2.). L'annexe 1, intitulée "*coordonnées de la zone de recherche*", contient les références latitudinales et longitudinales des blocs 1 et 2, de même que des zones Nord et Sud (PP 5'006'811). La seconde annexe, intitulée "*Plan de la zone de recherche*", est le plan de vol du 2 décembre 2005 (PP 5'006'812).

L'article 1.3.3. du protocole d'accord prévoit que la République de Guinée s'engageait à ne pas accorder de permis d'exploitation ou de concession à une tierce partie pour la zone minière décrite en annexes 1 et 2 pendant la durée de validité dudit protocole.

L'art. 2.3. prévoit que dans les six mois suivant la fin de l'étude de faisabilité, les parties devront désigner l'exploitant indépendant le plus approprié pour le Projet des Mines de Fer Simandou, un tel exploitant devant être sélectionné par CGR_____ GUINEE, après consultation de la République de Guinée.

D'après l'art. 3.2.2.7., si une quelconque zone du site de Simandou devenait libre de tous droits miniers, ladite zone serait proposée en priorité à CGR_____ GUINEE en vue de son exploration et / ou de son exploitation.

Dans son second Witness Statement (PP 349695), AAB_____ a expliqué qu'il avait suggéré que si les blocs de AAL_____ sur Simandou devaient lui être retiré, ceux-ci soient donnés à CGR_____ ("*I recall suggesting to him that he try to add a promise to the effect that the Simandou blocks held by AAL_____ would be given to CGR_____ if they were retroceded by AAL_____*").

Il a également exposé que c'était en raison de cette "proposition prioritaire" que AAG_____ avait refusé de signer le protocole d'accord ("*He felt that the terms were inadequate*").

AAB_____ a ajouté qu'à cette époque, CGR_____ était consciente qu'il s'agissait du bijou de la couronne guinéenne ("*Indeed CGR_____ was aware that this was the jewel in the Guinea crown*").

**c.e.d)** La signature du contrat, ce 20 février 2006, entre la Guinée et CGR_____ a fait l'objet d'une petite cérémonie lors de laquelle AAM_____, K_____ et AAF_____ étaient présents (photographie annexée au courrier du 15.08.18 de Me ALPHA_____), tout comme Madame E_____, Monsieur A_____ et AM_____, beau-frère de Monsieur C_____ et responsable du secteur diamant de CGR_____ (AM_____ LCIA, PP 500'901).

A cette occasion, AAG_____ a offert une voiture miniature en or au ministre AAI_____, qui l'a remise au Président (AAA_____ LCIA, PP 500'903; PV 09.07.15 AAI_____, p. 3; attestation Monsieur A_____ 26.11.12, PP 3'000'069; sentence arbitrale, no 673).

AAF_____, respectivement AAM_____ / K_____, ont reçu de AAG_____ les sommes dues selon la phase 1 des accords conclus (USD 75'000.- et USD 425'000.-, cf. attestation des intéressés PP 348'969, attestation originale dans classeur B.2.8; copie PP 348'969, et sentence LCIA, PP 3'002'061, no 212),

AAV_____ n'a pas reçu la somme de USD 500'000.- (75'000 + 425'000 = 500'000) due selon le contrat signé (cf. également PP 3'002'061, no 212 à 214 et PP 349'149/500'131/350'625) ni aucun des montants totalisant USD 19.5 millions conformément à l'échéancier prévu.

En revanche, Monsieur A_____ et AAB_____ ont facturé à CGR_____ leurs frais déboursés dans le cadre de leur assistance pour la signature du protocole d'accord, soit USD 125'000.-, montant payé le 6 mars 2006 par CGR_____ TREASURY SERVICES (cf. factures des 27 février 2006 de USD 60'000.- respectivement USD 65'000.-; PP 349'149; décompte AAC_____, PP 348'770; sentence arbitrale no 404.6 PP 3'002'112).

Ainsi, les USD 19.5 millions (15 mio + 4.5 mio) prévus dans le contrat avec AAV_____ équivalaient aux sommes dues à AAM_____ / K_____ et AAF_____ (USD 19'500'000 = 2'975'000 + 900'000 + 12'025'000 + 3600'000 ), alors que Madame E_____ devait percevoir une participation de 5 % dans le projet par le biais du tiers de la participation de AAV_____ dans le même projet.

**c.f)** *Appréciation des faits: blocs 1 et 2*

Sur la base des faits susmentionnés, le Tribunal retient que, dès 2005, CGR_____ visait les blocs 1 et 2 de Simandou. Il s'agissait de la cible, selon les termes employés et l'intention clairement exprimée par AAG_____ dans ses courriels des 10 et 11 octobre 2005, de même que dans les contrats des 2 février 2006 avec AAT_____ et 14 février 2006 avec AAV_____, lesquels mentionnaient expressément les blocs 1 et 2.

Les zones Nord et Sud ne représentaient que peu d'intérêt pour CGR_____, comme en témoigne l'abandon des permis sur ces zones le 6 novembre 2008. Il s'agissait surtout d'un point d'entrée en Guinée, à l'instar des permis de bauxite et d'uranium.

Cette intention est confortée par le courriel du 28 février 2006 de Monsieur A_____ à AAG_____, dans lequel il indique qu'il accélérera le processus pour les blocs 1 et 2 après avoir montré des activités de la société en Guinée. En d'autres termes, il s'agissait d'abord de montrer de quoi CGR_____ était capable afin d'obtenir les blocs 1 et 2.

Le plan de vol du 2 décembre 2005, soit du sud au nord, ne pouvait que passer au-dessus des zones de AAL_____. Le fait de voler à basse altitude et de s'y arrêter à deux reprises a été planifié et anticipé.

Par ailleurs, lorsque les accords du 20 février 2006 ont été conclus, les permis de recherches sur les zones Sud et Nord avaient déjà été octroyés. Par conséquent, CGR_____ n'avait aucun intérêt à octroyer et à promettre des rémunérations substantielles à des partenaires locaux en lien avec ces zones.

Monsieur A_____ a compris que la seule et unique personne qui comptait en Guinée était le Président AAO_____.

Les premières tentatives d'accéder au Président en 2005 se sont soldées par un échec. Ce n'est que par le biais de Madame E_____, que la situation s'est débloquée.

Ainsi, le but ultime de CGR_____ et, partant de Monsieur A_____, était d'obtenir les droits sur les blocs 1 et 2 de Simandou

**d)** *Transfert des actions*

Par courriel du 28 février 2006 adressé à AAG_____, Monsieur A_____ a résumé les actions à entreprendre et précisé que, concernant les blocs 1 et 2 de Simandou, ils étaient en contact permanent avec leur "*partenaires locaux*" (PP 349'074). Il demandait le transfert des actions de CGR_____ GUINEE tel que convenu.

Le 1er mars 2006, AAA_____ a demandé à Madame B_____ quelle était la procédure à suivre pour transférer les actions de CGR_____ GUINEE (PP 5'010'775). Cette dernière s'est enquise de savoir qui en était le contrat qui devait être conclu entre CGR_____ GUINEE et le gouvernement guinéen et, si celui-ci avait été conclu, de lui communiquer l'original (PP 5'010'775). AAA_____ a répondu que la lettre d'intention (*Memorandum of Understanding*) avait été conclue et les permis de prospection délivrés (une copie scannée lui étant réservée); le transfert des actions pouvait donc avoir lieu (PP 5'010'775).

L'original du contrat entre CGR_____ GUINEE et le gouvernement guinéen a été envoyé à Madame B_____ et conservé par celle-ci dans les locaux de AD_____ GE.

Par décision du 10 mars 2006, Madame B_____, administratrice de X_____, elle-même administratrice de CGR_____ GUINEE, a transféré 17.65 % des actions de CGR_____ GUINEE à AAV_____ (PP 350'831, signature du certificat d'actions y relatif par MADAME B_____, PP 5'010'778). Il est à relever que le certificat d'actions n'a pas été antidaté, contrairement à ce qui a été plaidé lors de l'audience de jugement.

Une convention d'actionnaires a été signée le 19 juillet 2007, avec effet rétroactif au 10 mars 2006, entre AAV_____, CGR_____ STEEL et CGR_____ GUINEE, de même qu'un contrat de management, par lequel CGR_____ STEEL se voyait conférer la gestion de CGR_____ GUINEE (PP 3'002'062). Madame B_____ a signé pour le compte de CGR_____ STEEL et a donné une procuration à AAA_____ pour le signer pour le compte de CGR_____ GUINEE (cl. B.2.2.2.).

**e)** *Concessions*

Malgré les efforts de CGR_____ et de ses partenaires, le 30 mars 2006, la Guinée a octroyé quatre concessions à AAL_____ portant sur les blocs 1 à 4.

AAH_____ était alors premier ministre et AAI_____ ministre des mines. Le décret de concession, qui devait encore être signé par le Présidente AAO_____, ne l'a jamais été (PP 5'008'204).

Le 5 avril 2006, le premier ministre AAH_____ a été limogé pour "*faute grave*". Quant au ministre des mines AAI_____ - après avoir accepté, le 12 mai 2006, de reporter la date de soumission de l'étude de faisabilité de AAL_____, PP 5'008'205 -, il a été remplacé un mois plus tard, soit le 29 mai 2006.

**f)** *Installation de CGR_____ SARL*

K_____ a été chargé d'effectuer les démarches nécessaires à l'établissement de CGR_____, en Guinée, soit notamment trouver une villa et l'aménager, constituer une société guinéenne et rencontrer les autorités locales (PP 349'054, 349'078, 349'050, 349'070, 349'066).

Il était alors employé et rémunéré par CGR_____ GUINEE (PP 349'072) l'équivalent de CHF 800.- par mois (GNF 3'000'000.-, PP 349'054), dans un premier temps par débit d'un compte bancaire détenu par Monsieur A_____, à Conakry (PP 349'056, 349'066). Il a, en outre, bénéficié de paiements supplémentaires de la part de Monsieur A_____ et de ses associés.

En avril 2006, CGR_____ a pris à bail une villa dans le quartier de La Minière, à Conakry, afin d'y établir ses bureaux.

**g)** *Transaction 1 - sucre*

**g.a)** Le 9 mai 2006, CGR_____ a obtenu treize permis d'exploration de bauxite dans la zone nord de la Guinée, à la frontière avec le Mali, étant rappelé que la bauxite n'était pas l'objectif premier de CGR_____.

Le lendemain 10 mai 2006 (PP 500'303), AAA_____ a informé AAG_____ que CGR_____ avait obtenu les treize permis pour la bauxite et a ajouté:

"*The Lady phoned Monsieur A_____ today (he is back in France) asking him whether I was happy now with these permits. AAB_____ also phoned me saying that we need to process the "first payment" now, hence the invoice attached (which I asked for).*

*You asked to other day how we can make No 1 happy; let's pay this and then focus on Bouke and Forecariah*".

Soit (en traduction libre):

"*The Lady a téléphoné à Monsieur A_____ aujourd'hui (il est de retour en France) et lui a demandé si j'étais content maintenant avec ces permis. AAB_____ m'a également téléphoné pour me dire que nous devions effectuer le premier paiement, raison de l'envoi de la facture jointe (celle que j'ai demandée).*

*Tu m'as demandé l'autre jour comment on pouvait rendre le No 1 heureux; payons cela et ensuite focalisons nous sur Boke et Forecariah*".

A relever que AAL_____ disposait d'une autorisation de reconnaissance sur la zone de Forékariah (fer) (P 5'008'201).

*The Lady* est Madame E_____ (déclaration AAU_____ CIRDI, PP 500'957, LCIA, AAC_____S-3, § 115, p. 32; déclaration AAA_____ LCIA, AAC_____S-12, § 11 p. 4, PP 5'006'260).

Le 10 mai 2006, AAD_____ a émis une facture de USD 250'000.- à l'attention de CGR_____ GUINEE pour son assistance et ses conseils dans le cadre de l'octroi des permis de bauxite (PP 500'304, 503'232).

Le même jour, AAG_____ a demandé à AX_____ de contrôler l'adéquation de la facture et de la payer (PP 500'303). AX_____ a répondu qu'il comprenait que cela concernait CGR_____ GUINEE, mais demandait des précisions sur la raison de ce paiement (PP 500'303). AAG_____ et AAA_____ ont, tous deux, répondu qu'il s'agissait des commissions (*services and success fee*) de Monsieur A_____ (PP 500'302).

Le lendemain, AAA_____ a remercié Monsieur A_____ d'avoir "*sécurisé les permis*" ("*First of all, thank once again for all your input during the last week in securing those permits*", soit en traduction libre: "*Avant tout, merci encore pour votre intervention au cours de la semaine passée pour sécuriser les permis*", PP 349'067) et l'a informé que AAG_____ avait approuvé la facture de AAD_____ (PP 349'067).

- 46 -

Le 15 mai 2006 (PP 500'301), AX_____ a demandé au service de comptabilité de comptabiliser le paiement via un prêt de CGR_____ STEEL et de mentionner comme code comptable "*Guinée minerai de fer*". Sur requête de AK_____, AX_____ a confirmé que le paiement ne concernait pas seulement les permis de bauxite, mais également le projet de fer en Guinée (PP 500'301).

Le 17 mai 2015, le compte de AAD_____, auprès de la banque 3_____, à Genève, a été crédité de USD 250'000.-, montant payé par CGR_____ TREASURY SERVICES (PP 503'233 et 503'226). Le compte était, avant ce paiement, créditeur de USD 88'000.-.

A cet égard, il est relevé que la comptable de Monsieur A_____ et AAB_____ a fait remarquer aux intéressés qu'ils utilisaient les sociétés AAC_____ FRANCE, AAD_____ et AAV_____, mais qu'une société était utilisée pour les paiements et les montants étaient reçus par une autre société. Il en résultait une confusion au niveau comptable et il leur était demandé de régulariser les comptes de ces sociétés (cf. paiements faits à AAC_____, AAD_____ et AAV_____, PP 348'770).

Dans les jours suivants, le compte de AAD_____ a été débité d'un total de USD 66'000.- en faveur de K_____, montant partiellement extourné (PP 300'915, 503'226-7). A cet égard, il est relevé que Monsieur A_____ a précisé à AAG_____ que K_____ faisait partie du projet Simandou et que le salaire versé à l'intéressé n'était qu'un complément à ce qui lui était donné "*à côté*", il s'agissait de la seule manière d'avancer, c'était ainsi que cela fonctionnait (cf. courriel du 20 juin 2006, PP 500'578 ss).

Le 21 mai 2006, AAV_____ a facturé ses services USD 62'000.- (PP 348'770). Il est rappelé qu'à ce moment, AAV_____ ne disposait pas de compte bancaire.

Le 2 juin 2006, AAA_____ a informé K_____ que son salaire de mai 2006 (GNF 3'000'000.-, soit environ CHF 800.-) ainsi que celui de *Ben* étaient disponibles sur le compte de Monsieur A_____, en Guinée (PP 349'054).

Le 9 juin 2006, l'assistante de Monsieur A_____ s'est renseignée auprès de ABB_____ sur l'achat de sucre. Le 13 juin 2006, elle a commandé 202 tonnes de sucre brésilien, qui devaient être livrées à Conakry. La facture devait être établie au nom de Madame E_____ (pièce 32 chargé de pièce de Me ALPHA_____ devant le TCO).

Le 15 juin 2006, Monsieur A_____ a instruit la banque de payer la facture de Madame E_____ concernant un achat de sucre.

Le 16 juin 2006, AAD_____ a payé le sucre commandé par Madame E_____ à concurrence de USD 94'000.- (+ USD 38.- de frais), sur instructions de AAB_____, par débit du compte de AAD_____ (cf. PP 500'305, 503'228).

Dès août 2006, le compte de AAD_____ auprès de la banque 3_____ était vide et n'a plus été utilisé (classeur B.3.6a).

Le versement de USD 250'000.- à AAD_____ n'apparaît pas sur la liste des paiements effectués par CGR_____ à Monsieur A_____, AAB_____ et AAE_____ au titre de leur rémunération (via ABC_____ et AAV_____) (PP 500'131 et 350'625; PP 349'149, les USD 250'000.- sont un *paiement* et non une facture).

Enfin, entendue dans le cadre de la présente procédure, Madame E_____ a déclaré que le sucre commandé par Monsieur A_____ avait été payé par CGR_____ (PP 500'716).

Dans le cadre de la présente procédure (PV, PP 500'296, 500'480, 500'485), Monsieur C_____ a déclaré ne jamais avoir vu les courriels et documents en lien avec le versement de USD 250'000.- Il ne connaissait pas *The Lady* et ignorait qui était le *No 1* évoqué dans l'email.

Madame B_____ a apporté la même réponse (PV, PP 500'297, 500'480, 500'486).

**g.b)** *Transaction 1 / Appréciation des faits*

La défense soutient que CGR_____ n'avait pas connaissance de l'affectation ultérieure de la somme de USD 250'000.- versée à AAD_____. Cette allégation n'est pas crédible et est démentie par les éléments suivants.

**g.b.a)** Il ressort du courriel du 10 mai 2006 que le premier paiement devait être effectué, soit USD 250'000.-. Cet argent servira à payer les partenaires locaux, en l'occurrence K_____ et sa demi-sœur Madame E_____.

Ce montant a été octroyé sans contrepartie à Madame E_____. Le soi-disant partenariat conclu entre Monsieur A_____ et Madame E_____, avec une répartition des bénéfices, ne trouve aucune assise dans la procédure, aucun élément ne le confirme, notamment pas les documents retrouvés chez AAB_____. Ce partenariat en lui-même ne fait aucun sens.

Certes, il apparaît que Monsieur A_____, AAB_____ et AAE_____ ont acheté pour Madame E_____, ultérieurement, du poulet surgelé au Brésil, mais il ne s'agissait pas d'un partenariat, la marchandise ayant été prépayée par Madame E_____ et Monsieur A_____, AAB_____ et AAE_____ ont perçu au passage un peu plus de USD 10'000.- de commission (cf. pièces 35, 36, 37 chargé de Me ALPHA_____ au TCO).

Au demeurant, AAD_____ ne disposait pas sur le compte des fonds nécessaires pour payer le sucre et K_____, sans l'argent de CGR_____.

**g.b.b)** Il ressort des courriels échangés que, le lendemain de la délivrance des permis de bauxite, Madame E_____ a téléphoné à Monsieur A_____ pour savoir si les représentants de CGR_____ étaient contents. AAB_____ a, immédiatement, téléphoné à CGR_____ pour leur demander de payer les USD 250'000.-, ce qui a été fait. CGR_____ a alors remercié Monsieur A_____ pour son intervention et pour avoir "*sécurisé les permis*". Il sera relevé que, dans le contexte et la chronologie des faits, "*sécurisé les permis*" ne peut signifier éviter qu'un concurrent n'obtienne ceux-ci avant eux, mais ne peut se comprendre que par "*obtenir*" lesdits permis.

Il faut comprendre, par ces messages, que CGR_____ savait que les permis étant délivrés, il fallait payer les personnes qui avaient rendu possible leur obtention, spécifiquement *The Lady*, mentionnée dans le courriel du 10 mai 2006, soit Madame E_____. Il sera, au demeurant, relevé que les USD 250'000.- n'étaient pas en lien avec la rémunération de Monsieur A_____, AAB_____ et AAE_____. En effet, ce paiement n'apparaît pas sur la liste des paiements effectués par CGR_____ à Monsieur A_____, AAB_____ et AAE_____ au titre de leur rémunération.

CGR_____ savait donc qu'une partie des USD 250'000.- était destinée à Madame E_____.

Madame E_____ a confirmé, dans le cadre de la présente procédure, que le sucre commandé par Monsieur A_____ avait été payé par CGR_____. Ces déclarations sont crédibles dans la mesure où elles sont corroborées par d'autres éléments figurant au dossier.

Il sera relevé que le paiement à Madame E_____ ne concernait pas seulement la bauxite (cf. courriel de AX_____, PP 500'301), mais bien le projet de fer visé par CGR_____ et qui a fait l'objet du contrat conclu entre AAV_____ et Madame E_____, le 20 février 2006. En effet, l'objectif premier de CGR_____ n'était pas l'exploitation de la bauxite, mais celle du fer de Simandou. D'ailleurs, CGR_____ abandonnera les permis de bauxite. Ainsi, la sollicitation des permis de bauxite et le paiement du sucre à Madame E_____ n'était qu'une première étape vers l'obtention des permis d'exploitation des blocs 1 et 2.

Il résulte de ce qui précède que CGR_____ savait que le paiement de USD 250'000.- à AAD_____ devait servir, en partie, à la rémunération des partenaires locaux, dont Madame E_____, en particulier.

AAD_____ a agi comme un intermédiaire de CGR_____ dans le paiement du sucre livré pour USD 94'000.-, montant versé pour sécuriser les permis de bauxite, mais également comme une première étape vers l'exploitation du fer de Simandou.

**h)** *Mission de contacts en Guinée*

Le 29 mai 2006, AAA_____ s'est rendu en Guinée (PP 349'066) et une mission de prise de contact a été organisée sur huit jours avec les autorités locales en présence de AAA_____, K_____ et Monsieur A_____ (PP 349'066 et 349'060ss). K_____ avait établi au préalable la liste des *colas* (sur le mot colas cf. attestation MONSIEUR A_____ du 26.11.12, p. 2 3ème §), soit des enveloppes d'argent à distribuer aux diverses autorités, à savoir aux gouverneurs, sous-préfets, sages (courriel de IST à Monsieur A_____, PP 349'050).

En juin 2006, AAU_____, qui travaillait au Ministère des affaires étrangères d'Israël, a rencontré, en Afrique du Sud, AAG_____ et AAA_____, lesquels recherchaient un responsable de projet pour la Guinée (AAU_____ LCIA, PP 300'927). AAU_____ a dès lors été désigné en qualité de *country manager* pour les projets guinéens et président de la société guinéenne nouvellement constituée, CG_____ RESOURCE (GUINEA) LTD SARL (ci-après CGR_____ GUINEA SARL).

Le 19 juin 2006, AAB_____ a rencontré Monsieur C_____ et AAG_____ ("*following AAB_____'s meeting with Roy and Monsieur C_____*", PP 349'072).

Le 20 juin 2006, en référence à la réunion entre AAB_____ et Monsieur C_____ (*following AAB_____'s meeting*), des courriels de mise au point ont été échangés entre AAG_____, Monsieur A_____ AAE_____, AX_____ et AAU_____. AAG_____ a clairement rappelé que Monsieur A_____ et ses associés ne devaient pas agir pour le compte de CGR_____. Monsieur A_____ a confirmé que c'était clair.

Par ailleurs, AAG_____ a attribué à CGR_____ la paternité du projet de Simandou, en s'exprimant en ces termes (PP 350'505, 500'577):

"*I don't think that you can go after projects that were pointed by us to you. But it is your decision*."

Fin août ou début septembre 2006, AAU_____ a rencontré Madame E_____ à son domicile à Dubréka (AAU_____ CIRDI, PP 500'908; GUINEE, PP 500'908; WS AAU_____, § 37; sentence arbitrale, no 226, PP 3'002'064).

**i)** *Bauxite*

Pour rappel, le 9 mai 2006, CGR_____ avait obtenu treize permis d'exploration de bauxite.

Le 21 juillet 2006, ABD_____ & CO LTD SARL, soit pour elle Madame E_____, et AAV_____, soit pour elle AAE_____, ont conclu deux lettres d'engagement en lien avec les permis de bauxite.

Il était rappelé que CGR_____ GUINEE s'était rapprochée des autorités guinéennes en vue d'établir un partenariat pour le développement et l'exploitation d'une partie du gisement de fer de Simandou, CGR_____ avait soumis une proposition de participation à la Guinée, à hauteur de 15 %, et à Madame E_____, comme "*partenaire locale*", à hauteur de 5 %. Afin d'intégrer l'actionnariat de Madame E_____, CGR_____ GUINEE s'était engagée à transférer 17.65 % de son capital à AAV_____, dont 33 % seraient attribués à Madame E_____, ces éléments ayant fait l'objet de l'accord du 20 février 2006. Dans ce nouvel accord, il était entendu que la délivrance des permis de bauxite entraînerait de fait l'actionnariat de Madame E_____ dans ce projet par le biais de sa participation de 33 % prévue par contrat du 20 février 2006.

Monsieur A_____ a facturé à CGR_____ son activité et ses frais en Guinée USD 40'000.-, montant payé, le 31 août 2006, par CGR_____ TREASURY SERVICES (PP 349'149 et 348'770).

CGR_____ renoncera aux permis de bauxite (PP 5'000'060). Monsieur C_____ s'est opposé à ce projet, à tout le moins en 2008, car il ne croyait pas à l'exploitation de la bauxite et à la production de l'aluminium (PV, PP 500'296).

**j)** *Lancement officiel des activités / réception CGR_____ à la villa de La Minière*

Le 17 septembre 2006, l'avion de Monsieur C_____ a quitté Tel Aviv pour Conakry, en passant par Malte (arrêt de 30 mn) et est arrivé, à Conakry, le 18 septembre 2006, à 7h10 (PP 300'821). Il est reparti de Conakry le 19 septembre 2006, à 23h00, pour Frankfort-Genève-Nice puis Tel Aviv (arrivée le 22.09.06) (PP 300'821). Monsieur C_____ se trouvait en Israël du 15 au 19 septembre 2006, date à laquelle il est sorti du pays avant d'y revenir le 22 septembre 2006 (PP 300'885).

Monsieur A_____ a organisé pour AAG_____, AAA_____ et AAU_____ un survol avec l'hélicoptère présidentiel qui a eu lieu lundi 18 septembre 2006 (cf. courriel Monsieur A_____, PP 500'581).

Le 19 septembre 2006, CGR_____ a organisé une conférence de presse pour présenter ses activités en Guinée (cf. film, PP 3'001'000). AAG_____, AAA_____, AAU_____, Monsieur A_____ et K_____ étaient assis à la table des conférenciers, Monsieur A_____ officiant comme interprète de AAA_____.

S'en est suivie une réception officielle à la villa du quartier de la Minière, à laquelle Madame E_____ était présente. Elle est venue escortée des bérets rouges, soit de la garde présidentielle, et est arrivée aux côtés de son demi-frère K_____, frère et sœur étant les seuls à être vêtus de blanc. Elle a salué tous les invités et a été présentée par K_____ à AAG_____ et à AAA_____, alors que AAU_____ et Monsieur

A_____ se tenaient à côté. Par la suite, AAG_____, dont les propos étaient également traduits par Monsieur A_____, a fait une présentation, alors que Madame E_____ écoutait assise (cf. film, PP 3'001'000; le Tribunal arbitral en a déduit: *Madame E_____ was the President's wife and acted in that capacity at public functions*, no 548, PP 3'002'147).

Il ressort clairement de la vidéo de la réception que Madame E_____ était une invitée de marque et était encadrée par les bérets rouges, qui l'accompagnaient dans ses déplacements, de sorte que ces derniers assuraient spécifiquement sa protection et non celle du Ministre AAI_____, voire de la réception en général.

Monsieur A_____ a facturé à CGR_____ ses frais environ EUR 15'040.- et ses prestations pour USD 100'000.- (PP 349'149 et 348'770; facture du 3 octobre 2006, payée le 10 octobre 2006 par CGR_____ TS, PP 349'149-50).

**k)** *ABD_____*

En 2007, Monsieur A_____ a contacté ABE_____, son gestionnaire de fortune alors chez AAY_____ SA, une société de gestion de fortune sise à Genève, et lui a demandé d'ouvrir un compte bancaire pour Madame E_____, expliquant qu'il s'agissait de la quatrième épouse du Président de Guinée et qu'il peinait à trouver une banque disposée à ouvrir un compte pour cette personne, selon ce que le gestionnaire a rapporté (PV ABE_____ du 17.10.2013, PP 500'042; documentation de la société, classeur B.2).

ABE_____ a déclaré que Monsieur A_____ lui avait expliqué que AAV_____ avait conclu un contrat avec CGR_____ et que Madame E_____, qui était impliquée, allait recevoir de l'argent. Il avait précisé être en relation avec Monsieur C_____ concernant des mines en Guinée. Le gestionnaire avait fait remarquer à Monsieur A_____ qu'il serait difficile pour Madame E_____ d'ouvrir un compte bancaire en raison de sa qualité de PEP (personne exposée politiquement), mais qu'il l'accompagnerait volontiers dans ses démarches auprès d'une banque. Monsieur A_____ l'avait informé qu'il viendrait avec Madame E_____ et lui a envoyé la carte d'identité de l'intéressée (cf. copie certifiée conforme par notaire le 19.10.2006 du passeport de Madame E_____, classeur B.2.8) en lui demandant d'acheter à celle-ci une société de domicile. ABE_____ a effectué les démarches demandées et a acheté auprès de MOSSACK FONSECA, à Genève, la société ABD_____ PARTNERS & CO LTD, sise aux Iles Vierges Britanniques. Il avait reçu toute la documentation sociale, sans que Monsieur A_____ ne se manifeste. La société n'avait jamais eu d'activité ni ouvert de compte bancaire et avait été radiée (PV ABE_____ du 17.10.2013, PP 500'042; documentation de la société, classeur B.2).

A la même période, Madame E_____ a acheté une autre société dénommée ABD_____ AND CO LTD SARL (ci-après ABD_____), constituée le 12 avril 2007,

en Guinée (déclaration modificative retrouvée chez AAB_____, classeur B.2.8). Cette société n'a en commun avec la société susmentionnée ABD_____ PARTNERS & CO LTD que son ayant-droit économique, Madame E_____.

Une troisième société ABD_____ & CO LLC a été constituée, en Floride, par ABF_____, l'avocat américain de Monsieur A_____ et de ses associés (PP 503'336). Elle n'a en commun avec les sociétés susmentionnées que son ayant-droit économique, Madame E_____. Elle serait propriétaire de la maison de Madame E_____ à _____, à Jacksonville, en Floride.

Il ne sera question dans le présent jugement que de la société ABD_____, sise en Guinée.

**l)** *Rencontres Madame E_____ – AAU_____*

En 2007, AAU_____ a rencontré Madame E_____ à cinq reprises (AAU_____ CIRDI, PP 500'908; Guinée, PP 500'908; Israël, PP 4'900'016). Il l'a notamment rencontrée dans sa maison de Dubréka, rencontre lors de laquelle Madame E_____ a parlé du projet de Simandou comme étant "*son projet*" (AAU_____, LCIA PP 3'002'064). Il a admis lui avoir offert une vue miniature de Jérusalem (WS, PP 501'006).

Le 20 mars 2007, CGR_____ GUERNESEY a changé ses statuts. A la même période, AAG_____ a quitté CG_____ et a vendu sa participation dans CGR_____ GUERNSEY qu'il détenait via la société AAK_____ (PP 350'318, 3'951'023, 350'308); W_____ est devenue seule actionnaire (PP 3'951'023 et 3'950'997). AAA_____ est devenu le CEO à la place de AAG_____ (AAU_____ LCIA, PP 300'927).

**m)** *Uranium*

Le 5 février 2007, CGR_____ GUINEE SARL a sollicité la délivrance de permis de recherche d'uranium.

Le 28 février 2007, quatre permis de recherche d'uranium ont été délivrés à CGR_____ GUINEE SARL.

Le 20 juin 2007, ABD_____, soit pour elle Madame E_____, a conclu un protocole d'accord avec CGR_____ GUINEE SARL directement, sans passer par AAV_____. Il était mentionné que CGR_____ GUINEE SARL s'était rapprochée des autorités guinéennes en vue d'établir un partenariat pour le développement et l'exploitation d'une partie du gisement de fer de Simandou, ABD_____ l'assistant dans ses démarches visant l'obtention des permis de recherches y relatifs. Sur ce, quatre permis de recherche d'uranium avaient été délivrés. Pour rétribuer ABD_____ pour les efforts fournis, CGR_____ GUINEE SARL s'engageait à transférer 5 % de ses actions à ABD_____.

Ce contrat a été légalisé par un greffier du Tribunal de première instance de Conakry le 20 juillet 2007.

Le 20 juin 2007, Monsieur C_____, qui ne se trouvait pas en Guinée, a quitté Tel Aviv pour se rendre à Kiev (PP 300'888 et 300'890).

Monsieur A_____ et ses partenaires ont facturé à CGR_____ leur service pour leur assistance dans l'obtention des permis d'uranium USD 163'000.- (PP 500'131, 350'625, 350'625).

**n)** *Renonciation*

Le 25 mai 2007, AAF_____ a renoncé à tous ses droits d'actionnaire dans AAV_____ (PP 500'584). Par attestation devant notaire du 13 septembre 2007 (dont l'original figure à la procédure, CRI AAB_____, classeur B.2.8), AAF_____ a renoncé à son actionnariat dans AAV_____ et à la rétribution promise par contrat du 20 février 2006.

Par avenant non signé (dont l'original figure à la procédure, CRI AAB_____, classeur B.2.8), AAM_____ et K_____ ont également renoncé à leurs droits découlant du contrat signé le 20 février 2006 et ont transféré toutes leurs prétentions à ABD_____ "*en formation*" (cf. litige AAM_____).

**n)** *CGR_____ GUERNESEY*

En juillet 2007, CGR_____ GUINEE a déposé des demandes de permis d'exploration pour les blocs 1 et 2, alors toujours attribués à AAL_____.

En août 2007, AAU_____ et K_____ ont rencontré le ministre des mines, ABG_____, pour réitérer l'intérêt de CGR_____ d'exploiter les blocs 1 et 2 (sentence LCIA, PP 3'002'064 et 3'002'170; PV ABG_____, PP 500'203). Le ministre ABG_____ n'était pas favorable, dans la mesure où ceux-ci étaient attribués à AAL_____ (sentence LCIA, PP 3'002'064; PV ABG_____, PP 500'203).

Les 29 et 30 août 2007, une réunion stratégique a eu lieu, à Guernesey, réunissant le conseil d'administration et la direction de CGR_____ GUERNESEY, dont Madame B_____ - qui a pris le procès-verbal de la réunion – ainsi que AC_____, en leur qualité d'administrateurs, AX_____ et Monsieur C_____ (PP 500'329).

Il ressort de cette réunion que:

– Monsieur C_____ connaît parfaitement tous les projets du groupe et est très impliqué dans les aspects financiers;

– AAA_____ a fait une présentation des activités du groupe en Guinée et Monsieur C_____ a mis en exergue la problématique du transport du fer;

– Le *business model* de CGR_____ est d'acquérir des concessions après la phase d'exploration et de sortir du projet avant le début des activités d'exploitation, ceci dans des régions géographiques très risquées;

– AC_____ et ADN_____ ont suggéré que CGR_____ cherche à se diversifier dans des pays moins risqués;

– AAA_____ a mentionné qu'une autre faiblesse de CGR_____ était le manque de personnel technique et de compétences et qu'il en découlait un manque de proposition d'affaires;

– Quant à Monsieur C_____, il a souligné les points forts de CGR_____, soit :"*ses contacts dans l'industrie et dans l'establishment politique*".

Début septembre 2007, une nouvelle réunion a eu lieu, en Guinée, en présence de AAU_____, K_____ et du Président AAO_____, qui a fait appeler le Ministre ABG_____ (PV ABG_____, PP 500'203; sentence LCIA, PP 3'002'064). Le Ministre ABG_____ a, alors, expliqué que les blocs convoités étaient attribués à AAL_____ (PV ABG_____, PP 500'203; sentence LCIA, PP 3'002'064). Le Ministre ABG_____ est parti dans la foulée. Une heure plus tard, AAU_____ et K_____ se sont présentés au Ministère des mines. ABG_____ a répété que les blocs 1 et 2 étaient déjà attribués et que l'octroi de concessions minières n'était pas de la compétence du Ministre, mais de celle du Président (PV ABG_____, PP 500'203; sentence LCIA, PP 3'002'064).

Dans un courriel du 17 septembre 2007 (PP 5'010'816), AAU_____ a informé AAA_____ et Monsieur C_____ des dernières nouvelles obtenues le jour même du ministre des mines.

Le lendemain, AAU_____ a informé Monsieur C_____, AAA_____ et AM_____ des nouvelles reçues le jour même du ministre des mines. Afin de disposer d'un argument solide au retrait des permis octroyés à AAL_____, le ministre avait suggéré à CGR_____ de faire une présentation des investissements et des travaux effectués par CGR_____ l'année écoulée. Enfin, AAU_____ a indiqué qu'il allait rencontrer, dans les jours suivants, les personnes clés ("*key people*") dans le pays, soit le premier ministre, "*the Lady*" et, peut-être, le Président afin de faire avancer les choses (PP 5'010'816).

Le jour même, Monsieur C_____ a abondé dans le sens de la présentation suggérée, tout en soulignant que le nom de AAL_____ ne devait absolument pas être mentionné par écrit ("*should NOT*", PP 5'010'816).

En décembre 2007, une nouvelle réunion a eu lieu entre le Président AAO_____, le premier ministre ABH_____, le ministre des mines ABG_____ et Madame E_____, lors de laquelle le ministre ABG_____ a, de nouveau, objecté que les blocs 1 et 2 étaient déjà attribués (PV ABG_____, PP 500'203; CIRDI ABG_____, PP 500'917; sentence LCIA, PP 3'002'065 et 3'002'170 ).

AAU_____ a, encore, rencontré Madame E_____ peu avant les fêtes de Noël (AAU_____, PP 500'908).

**o)** *Année 2008*

Début 2008, AAU_____ a rencontré, une nouvelle fois, Madame E_____ (AAU_____, LCIA, PP 500'919). Il l'a également vue à plusieurs reprises durant l'année 2008, en présence du Président AAO_____ (cf. ci-après et WS AAU_____, PP 500'919).

Monsieur C_____ s'est rendu, quant à lui, pour la première fois, en Guinée, en 2008 et s'y rendra cinq fois durant l'année (deux fois en février, une fois en avril, en mai et en septembre).

Début février 2008, Monsieur C_____ s'est rendu, personnellement, en Guinée et a rencontré le Président AAO_____ pour manifester l'intérêt de CGR_____ dans l'exploitation des blocs 1 et 2 (selon le compte rendu de la visite des 25 et 26 février 2008 établi par CGR_____, il s'agissait de la seconde visite en Guinée de Monsieur C_____, PP 500'294; sentence arbitrale, nos 560.6 PP 3'002'150; déclaration police israélienne AAU_____, PP 4'900'016). AAA_____, Monsieur A_____ et Madame E_____ étaient également présents (sentence arbitrale no 236, PP 3'002'065).

Du 25 au 26 février 2008, avant d'aller au Liberia (le 26.02.08 à 10h30), Monsieur C_____ s'est, à nouveau, rendu en Guinée (passeport, PP 300'899ss). Lors de sa venue, il a rencontré le secrétaire général à la Présidence, ABI_____, en compagnie de AAA_____, AAU_____ et Monsieur A_____ (cf. photographie PP 500'294).

**p.a)** *Contrats 27 et 28 février 2008*

Dans la mesure où CGR_____ allait racheter la participation de 17.65 % de AAV_____ dans CGR_____ GUINEE, de nouveaux contrats devaient être conclus afin d'assurer la participation de Madame E_____ dans le projet.

Ainsi, le 27 février 2008, CGR_____ GUINEE SARL, soit pour elle AAU_____, a conclu un contrat de commission avec ABD_____, soit pour elle Madame E_____. CGR_____ s'engageait à verser USD 4 millions à ABD_____ à titre de commission pour l'obtention des blocs 1 et 2, la moitié devant être versée à ABD_____ – sous

imputation de USD 100'000.- déjà versés – et l'autre moitié devait être répartie entre les personnes de bonne volonté ayant facilité l'octroi desdits blocs.

Le 28 février 2008, un nouveau protocole d'accord a été conclu entre les mêmes personnes: CGR_____ GUINEE SARL s'engageait à céder à ABD_____ 5 % de ses actions.

**p.b)** *Rachat des actions détenues par AAV_____*

Par accord du 24 mars 2008, signé le 28 mars 2008 par Madame B_____ (PP 5'001'681), CGR_____ STEEL s'est engagée à racheter la participation de 17.65 % de AAV_____ au prix de USD 22'000'000.- selon l'échéancier suivant:

– USD 3'000'000.- le 15 avril 2008,

– USD 1'000'000.- le 15 juin 2008,

– USD 9'000'000.- le 15 avril 2009,

– USD 9'000'000.- le 15 avril 2010.

Par ailleurs, un montant de USD 8'000'000.- devait être payé en sus si CGR_____ réalisait un profit supérieur à USD 1 milliard (clause 5).

Le 28 mars 2008, le Conseil d'administration de CGR_____ GUINEE a voté le rachat de la participation de AAV_____ et le Conseil d'administration de CGR_____ GUERNESEY a appuyé la décision prise (PP 350'927, cl. B.2.12).

Le même jour, Madame B_____, pour le compte de CG_____ STEEL, a signé le contrat de cession des actions et a annulé, pour le compte de CGR_____ GUINEE, le certificat d'actions en faveur de AAV_____ (cl. B.2.1.1).

Par courrier du 8 avril 2008, AAE_____, agissant pour AAV_____, a demandé à AX_____ l'exécution du premier versement sur le compte ABJ_____ (ci-après ABJ_____) auprès de la banque 4_____, en Israël (PP 350'593). Ce courrier a été remis à Monsieur C_____ (cf. PP 315'785, courrier retrouvé dans l'avion et dans les affaires de Monsieur C_____).

Le 15 avril 2008, CGR_____ TREASURY SERVICES a versé USD 3 millions à ABJ_____ (PP 500'131 et 350'625).

Par courrier du 4 juin 2008, AAE_____ a sollicité de AX_____ le versement du second montant sur le même compte (PP 350'594). Ce courrier a été remis à Monsieur C_____ (cf. PP 315'791, courrier retrouvé dans l'avion et dans les affaires de Monsieur C_____).

Le 16 juin 2008, CGR_____ TREASURY SERVICES a versé USD 1 million (PP 500'131 et 350'625).

**q)** *Rencontres Monsieur C_____ – AAO_____*

**q.a)** Entre les 9 et 11 avril 2008, Monsieur C_____ s'est rendu en Guinée (PP 300'903ss). Il a rencontré le Président AAO_____ en présence de AAU_____, Madame E_____ (sentence arbitrale, PP 3'002'065-6, 3'002'150, 3'002'170; CIRDI AAU_____, PP 500'922; ABG_____, PP 500'202) et K_____ (AAU_____, PP 300'938). Le but de la rencontre était de discuter de la révocation des droits de AAL_____ sur les blocs 1 et 2 et de l'octroi de ceux-ci à CGR_____ (sentence arbitrale, PP 3'002'066 et 3'002'150; AAU_____, PP 300'938bis). Le Président AAO_____ a ensuite appelé le secrétaire général à la Présidence, ABI_____, et a demandé que les permis octroyés à AAL_____ soient réexaminés.

Après cette rencontre, Monsieur C_____ et AAU_____ sont allés rencontrer le premier Ministre ABH_____ pour l'informer avoir parlé avec le Président qui avait évoqué la possibilité de retirer les permis à AAL_____. ABH_____ n'était pas favorable à un retrait des droits de AAL_____ (AAU_____, PP 300'938bis et 500'946).

**q.b)** Monsieur C_____ est revenu en Guinée, du 20 au 22 mai 2008, après être passé par le Sierra Leone et le Liberia (PP 300'894ss).

Le 20 mai 2008, ABH_____, opposé au retrait des droits de AAL_____, a été limogé (AAU_____, PP 500'946, sentence arbitrale no 633).

Le 22 mai 2008, sur l'avis de droit de ABK_____, des griefs ont été notifiés à AAL_____ pour invalider le décret du 30 mars 2006 (PP 500'160 et 500'165).

**q.c)** Par décret présidentiel du 28 juillet 2008, AAL_____ s'est vue retirer 50 % de ses concessions de Simandou, soit les blocs 1 et 2 (PP 500'175 ou 5'001'862). Les parties intéressées à les exploiter pouvaient déposer une demande de permis. Ce décret a été adressé à AD_____ GE et classé dans ses dossiers (B 2.1.2).

Entendu dans le cadre de la présente procédure, ABL_____, ingénieur des mines et conseiller au ministère des mines en 2008, a déclaré que ce décret avait été rendu par le Président AAO_____. Ni le ministre des mines ni ses autres collègues au Ministère n'avaient évoqué ce décret auparavant. Un tel décret était "*une première*" pour lui (PP 500'196).

Le lendemain, soit le 29 juillet 2008, ABI_____, secrétaire général de la Présidence, a été limogé. Il sera désigné ministre d'Etat chargé des activités Présidentielles avant d'être limogé le lendemain, soit le 4 août 2008, pour la deuxième fois en quatre jours.

Le 5 août 2008, CGR_____ a déposé des demandes de permis de recherche sur les blocs 1 à 4 (PP 3'002'066).

Le 15 août 2008, ABK_____ a été limogé.

Le 27 août 2008, le Président AAO_____ a limogé le Ministre des mines ABG_____, opposé au retrait des droits de AAL_____ (PV ABG_____, PP 500'203; sentence arbitrale, no 633), et a désigné à sa place ABM_____. ABG_____ a déclaré dans la présente procédure qu'il pensait que son intégrité constituait un obstacle pour certaines personnes (PV, PP 500'207).

**q.d)** Début septembre 2008 (AAU_____ parle de septembre ou octobre 2008, PP 300'938bis; ABM_____ parle du 4 ou 5 septembre 2008, PP 500'924), Monsieur C_____ et AAU_____ ont rencontré, une nouvelle fois, le Président AAO_____. La rencontre s'est déroulée dans la maison du Président dans le village de Buramaya. Il a été question de l'exploitation des blocs de Simandou, le Président ayant ajouté qu'il était juste de retirer les permis octroyés à AAL_____, mais que cette décision était plus du ressort du gouvernement que du sien. Le Président a, alors, appelé le Ministre des mines nouvellement désigné, ABM_____, afin que les blocs 1 et 2 soient attribués à CGR_____ (PV ABM_____ GE, p. 2, PP 500'217; PV ABM_____ Cour d'appel de Conakry, p. 2, PP 4'200'119; ABM_____ LCIA, sentence arbitrale no 563, PP 3'002'151, 3'002'171).

ABM_____ a déclaré (PV ABM_____, p. 2, PP 500'217, PV ABM_____ Cour d'appel de Conakry, p. 2; WS ABM_____ § 6-22, sentence arbitrale no 564 PP 3'002'151 et no 628.5 PP 3'002'171) que Madame E_____, l'épouse du Président, était présente à cette réunion et qu'elle mettait la pression sur le Président, tout comme K_____, pour que les permis soient retirés à AAL_____ et octroyés à CGR_____. Même si elle ne disait rien, Madame E_____ était présente car elle était démarchée par CGR_____ (PV ABM_____, p. 2, PP 500'217; CIRDI ABM_____, PP 500'926).

Le Ministre AAI_____ (WS AAI_____, § 40, sentence arbitrale no 562, PP 3'002'151) a relevé le niveau d'interférence inhabituel de CGR_____ et du Président sur les affaires du Ministère en regard des blocs 1 et 2 (First WS AAI_____, § 40, sentence arbitrale no 562, PP 3'002'151).

Par courrier du 6 novembre 2008, AAU_____, pour le compte de CGR_____ GUINEE, a sollicité du Ministre des mines l'octroi des concessions retirées à AAL_____ en application du protocole d'accord conclu le 20 février 2006 avec la

Guinée et l'a informé du désintérêt de CGR_____ sur les zones Nord et Sud de Simandou (PP 5'001'871).

Le 4 décembre 2008, conformément aux instructions donnée par le Président (cf. ci-dessus; déclaration ABM_____ dans la procédure arbitrale: "*le Conseil des Ministres n'aurait pas pris cette décision si le Président n'avait pas donné les instructions de le faire*", sentence arbitrale no 563, PP 3'002'151), le Conseil des Ministres a ordonné au ministère des mines le retrait de la moitié des concessions de AAL_____, soit des blocs 1 et 2, et leur octroi à CGR_____ GUINEE.

**q.e)** Par arrêté 2008/4080 daté du 9 décembre 2008, signé par ABM_____, CGR_____ GUINEE s'est vu octroyer les permis de recherche sur les blocs 1 et 2 (PP 5'006'815verso).

Le lendemain, l'avion utilisé par Monsieur C_____ s'est rendu en Guinée (PP 300'814).

Le 11 décembre 2008, AAU_____ a demandé à AX_____ de payer USD 100'000.- à ABN_____, alors Ministre des finances (ancien ministre du budget, futur ministre des mines et actuel premier ministre de Guinée), en lui communiquant les coordonnées bancaires et en précisant:

"*Has [been] approved by _____.*", soit "*a été approuvé par _____*".

Dans le cadre de la procédure CIRDI, AX_____ a précisé que "_____" était Monsieur C_____ (AX_____ CIRDI, p. 58 no 44-45, PP 5'013'782).

Le 15 décembre 2008, CGR_____ TREASURY SERVICES a payé à ABN_____ USD 100'000.- pour des frais de consulting (*consulting fees*) sur son compte bancaire, en France, auprès de la Banque 5_____ (PP 5'010'962). CGR_____ a également payé à ABN_____ des frais de voyage pour sa famille et lui à hauteur de USD 23'592.10 (sentence arbitrale, no 465.2, PP 3'002'131) ainsi que des frais de consulting de EUR 80'000.-, le 5 février 2009 et, enfin, des frais de voyage, entre avril 2009 et février 2010, pour USD 18'536.76 (sentence arbitrale, no 465, PP 3'002'131; WS AX_____, PP 5'006'253, p. 9).

ABN_____ a, par la suite, demandé à Monsieur C_____ d'engager sa fille au sein de ses sociétés; Monsieur C_____ s'est tourné vers AC_____ et lui a demandé de faire le nécessaire (PP 5'010'965; PP 301'628). Quant à Madame B_____, elle s'est occupée du visa de ABN_____ lors de sa venue en Europe (WS LCIA Madame B_____, PP 301'628).

- 60 -

Le 22 décembre 2008, le Président AAO_____, gravement malade depuis plusieurs mois, est décédé. Madame E_____ a quitté la Guinée et est partie en exil à Freetown, en Sierra-Leone.

Avant de partir de Guinée, Madame E_____, qui craignait que les accords conclus ne soient pas respectés, a transmis une copie de ceux-ci à ABO_____, qui en a informé ABN_____ (conversation ABP_____-ABO_____, PP 350'318; rapport DLA PIPER, PP 349'790; mémo retrouvé chez AAB_____, PP 350'540, p. 2; conversation Monsieur K_____ du 08.05.12; ABO_____ a également, à son tour, donné une copie des contrats à ABQ_____, qui les a montrés à AAU_____, AC_____ CIRDI audition 23.05.2017 p. 104).

Par la suite Madame E_____ épousera et aura deux enfants avec le sergent-chef ABR_____ (PP 500'966), neveu de ABN_____ (PP 4'200'068 et conversation du 02.12.2012 ABP_____-ABO_____, 46:29; PV Madame E_____, PP 500'691).

**r)** *Année 2009*

Après la mort du Président AAO_____, les militaires ont pris le pouvoir en Guinée, sous la direction du Capitaine ABS_____ et, après la tentative d'assassinat manquée du précité le 3 décembre 2009 et le "massacre du stade" le 28 septembre 2009, sous la direction du Général ABT_____.

ABN_____ a recruté le banquier américano-guinéen ABP_____, résidant alors à New-York, pour être ministre des mines et celui-ci est entré en fonction le 15 janvier 2009.

**s)** *Restructuration et effacement des intermédiaires*

**s.a)** *Etape 0: constitution de CGR_____ GUINEA (Guernesey)*



Conformément à son *business model*, CGR_____ a commencé à chercher des partenaires pour l'exploitation des gisements de fer de Simandou (PP 5'000'075). Monsieur C_____ a rencontré divers potentiels repreneurs. Ainsi, des discussions ont été entamées avec ABU_____ (projet Stone), ABV_____ (projet Sunshine, en décembre 2009, Monsieur C_____ s'est rendu en Chine avec AAU_____, AAA_____ et AX_____ pour finaliser les termes de l'accord, PP 300'615), ABW_____, ABX_____ puis, ultérieurement, ABY_____ (project Hills). En effet, CGR_____ devait s'assurer le soutien d'un partenaire financier suffisamment important pour mener à bien l'ensemble des projets (PP 300'614).

Dans cette perspective, CGR_____ a modifié sa structure, en deux étapes (février 2009 et mars 2010) et donné des instructions afin que les intermédiaires utilisés (AAV_____, ABZ_____) ne soient pas dévoilés dans le cadre des procédures de due diligence qui seraient menées par les partenaires contractuels.

AX_____ a soumis un plan de proposition de la restructuration notamment à Madame B_____ pour qu'elle le complète sur certains points (cf. CGR_____ GUINEA: *Proposed restructuring and step plan*, PP 306'391; emails, PP 306'396).

**s.b)** *Etape 1 : transfert des droits miniers*



Dans une première étape, CGR_____ GUERNESEY a acheté une société - constituée le 10 février 2009 - au nom identique à la société existante CG_____ RESOURCES (GUINEA) LTD, mais domiciliée à Guernesey et non aux BVI. CGR_____ GUERNESEY détenait CGR_____ GUINEE (Guernesey), qui sera la cocontractante de ABY_____ (sentence arbitrale, PP 3'002'068; classeur B.2.1.4).

Madame B_____, déjà administratrice de CGR_____ GUINEE (BVI), a été désignée administratrice de la nouvelle société CGR_____ GUINEE (Guernesey) (PP 305'118; cl. B.2.1.3 et B.2.1.4).

Le 17 février 2009, les permis miniers ont été transférés de CGR_____ GUINEE (BVI) à CGR_____ GUINEE (Guernesey). De la sorte, CGR_____ STEEL et CGR_____ GUINEE (BVI) (lesquelles avaient interagi avec AAV_____) n'étaient plus parties au projet Simandou (sentence arbitrale, PP 3'002'068).

Madame B_____ s'est occupé de tous les aspects corporatifs de la restructuration (cf. i.e. courriel du 10.02.2009 à AX_____, Cl. B.2.1.4). Elle a signé, à Genève, et conservé tous les documents nécessaires pour ce faire, soit:

– La cession des actions de CGR_____ SARL appartenant à CGR_____ GUINEE (BVI) à CGR_____ GUINEE (Guernesey) (PP 305'111 et ss, PP 305'118);

– Le transfert du prêt de CGR_____ TREASURY SERVICES envers CGR_____ GUINEE (BVI) à CGR_____ GUINEE (Guernesey), Madame B_____ signant pour les trois sociétés (PP 305'124).

Le 23 février 2009, CGR_____ GUINEE (Guernesey), soit pour elle Madame B_____ et AJ_____, ont octroyé un prêt de USD 50 millions à CGR_____ GUINEE SARL, soit pour elle AAU_____, prêt augmenté à USD 75 millions, le 25 août 2009, montants financés par CGR_____ TREASURY SERVICES (contrat signé par Madame B_____ pour le compte de CGR_____ TREASURY SERVICES et de CGR_____ GUINEE (Guernesey) (cl. B.2.1.4).

Par courriel du 21 avril 2009 (PP 5'011'053), AX_____ a exigé que toute trace relative aux deux premiers versements effectués à AAV_____ soit effacée des rapports. Ainsi, il a instruit son service de comptabilité (ACA_____) de retirer immédiatement ("*ASAP*") du rapport sur les coûts en Guinée les montants de USD 3 millions et USD 1 million. Il a insisté sur le fait qu'aucune référence ne soit faite sur le rachat des 17.65 %, demandant à son interlocutrice avec fermeté (le message étant en gras) si l'instruction était claire. Par ailleurs, ce message comportait l'inscription manuscrite suivante (PP 5'011'053, voir également PP 5'011'056; à relever qu'une série de paiements a été effectuée par CGR_____ TS à ABZ_____ entre les 18 février 2009 et juillet 2009 totalisant plus de USD 630'000.-, PP 3'002'122; pour les paiements ultérieurs cf. transactions 2 et 3 sufra, PP 500'645 et 3'002'129):

- "*remove ABZ_____'s name from Guinea Spreadsheet*"

soit en traduction libre: "*retirez le nom de ABZ_____ du rapport sur la Guinée"*.

Dans un message ultérieur (PP 5'011'055), AX_____ a précisé au service de comptabilité, à Guernesey (AJ_____ et ACA_____), qu'aucun nom de consultant ne devait être mentionné et a ajouté:

"*Also under no circumstances should any details relating to payments to AAV_____, past or pending or future be sent to anyone inside Guinea without speaking with me first*",

soit en traduction libre: "*En aucune façon, des informations concernant des paiements en faveur de AAV_____, faits en cours ou à faire, ne devaient être communiquées à quiconque en Guinée sans m'en parler en premier*".

Dans des messages des 26 et 27 avril 2009, AX_____ a rappelé à AJ_____ et ACA_____ que le nom des personnes auxquelles des frais de consulting étaient payés était une question sensible (par exemple ABZ_____) et qu'il convenait dès lors de lui demander son avis avant de mentionner ce genre de détails dans des rapports ("*What is sensitive is the names in respect of consulting fees paid (...) I am referring to cases where CGR_____ TS pay on behalf of newco consulting fees to for eg ACZ_____ or others (...)*".

**s.c)** *Etape 3 : vente de CGR_____ STEEL et CGR_____ GUINEE (BVI) à CG_____MM*

Etape 2

**Vente CGR STEEL et CGR GUINEA (BVI) à CGMM**



```
                    Monsieur C_____
                         |
                    V_____
                         |
                         W
              _____
             |                       |
      CGR (Guernesey)*            CGMM*
             |                       |
                                 CGR STEEL*
                                     |
      CGR GUINEA (Guernesey)*     CGR GUINEA
             |                      (BVI)*
      CGR GUINEA SARL
```

Dans la mesure où ABY_____ avait étendu le champ de sa procédure de due diligence (sentence arbitrale, no 685, PP 3'002'189), fin mars 2010, CGR_____ STEEL et CGR_____ GUINEE (BVI) ont été transférées à CG_____ METALS & MINING (CG_____MM), détenue par W_____. De la sorte, elles ne seront pas impliquées dans la vente à ABY_____ (sentence arbitrale, PP 3'002'068).

Madame B_____ a signé le contrat de cession du 31 mars 2010 pour le compte de la société venderesse CGR_____ GUERNESEY et pour le compte de la société acquéreuse CG_____MM (cl. B.2.1.10).

Madame B_____, en sa qualité d'administratrice de X_____, administratrice de CGR_____ GUINEE (BVI), a voté (classeur B.2.1.1):

- – la dissolution de CGR_____ GUINEE (BVI)
- – s'est désignée liquidatrice de CGR_____ GUINEE (BVI) et
- – a constaté la liquidation de CGR_____ GUINEE (BVI).

Les comptes non audités au 31 mars 2010 de CGR_____ GUINEE (Guernesey) sont trompeurs (PP 4'900'147). En effet, ils font apparaître une confusion voulue entre CGR_____ GUINEE (BVI), partie à la convention de base de décembre 2009, et CGR_____ GUINEE (Guernesey), qui a repris les droits miniers. En effet, les comptes ne mentionnent pas qu'il s'agit des comptes de l'entité de Guernesey, qui n'était pas partie à la convention de base ni la cession intervenue.

**t)** *ABP_____*

Par décision du 5 mai 2009, ABP_____ a confirmé la validité du permis octroyé à CGR_____ sur les blocs 1 et 2 (PP 5'000'207).

Il ressort notamment de courriels échangés, entre les 24 et 26 mai 2009, que Monsieur C_____ entretenait des rapports directs étroits avec ABP_____ (PP 5'010988ss; voir également le courriel du 05.11.10 PP 5'002'276), notamment en lien avec de futurs partenaires contractuels (PP 5'010'988).

Par arrêté du 10 juin 2009 signé par ABP_____, les permis de recherches sur les blocs 1 et 2 ont été renouvelés (PP 5'000'207).

En août 2017, ABP_____ a été condamné à 7 ans de prison aux Etats-Unis pour avoir accepté des pots-de-vin à hauteur de USD 8'500'000.- en lien avec des titres miniers octroyés à une société chinoise.

Dans le cadre de la procédure arbitrale londonienne (LCIA), ABY_____ a soutenu que ABP_____ avait reçu divers avantages financiers et cadeaux de la part de CGR_____, dont de l'argent lui ayant permis d'acheter trois propriétés immobilières à New-York pour une somme totale de USD 5.27 millions (PP 3'002'067). Le Tribunal tiendra pour établi le versement d'importantes sommes d'argent à ABP_____, sans considérer qu'il s'agissait de corruption en lien avec la Guinée (cf. sentence arbitrale, nos 643ss, PP 3'002'177).

**u.a)** *Non-respect de l'accord du 24 mars 2008*

CGR_____ ne s'est pas acquittée de la troisième échéance de USD 9 millions due à AAV_____, selon accord du 24 mars 2008 (rachat des 17.65%). Un litige s'en est suivi.

Par courriel du 8 avril 2009 (PP 5'011'120), AAB_____ s'est adressé directement à Monsieur C_____ pour l'informer que ses associés et lui-même n'entendaient pas modifier les termes de "*notre accord*" et qu'une facture serait adressée dans les deux ou trois jours. Il a ainsi écrit:

"*Dear Monsieur C_____,*

*Following your request to change the terms of payment of our contract i have consulted my partners and after reviewing all the aspects and all our commitments, we have decided not to change or to amend the terms, the amount and the dates of payment as per our agreement. We will send you an invoice in a day or two.*

*Wish you Hag Sameach.*

*AAB_____*"

Par courrier du 21 avril 2009 adressé à CG_____ STEEL, AAV_____ (PP 5'011'121), soit pour elle AAE_____, a rappelé la troisième échéance désormais due. En réponse, par courrier du 8 mai 2009, Madame B_____, pour le compte de CGR_____ STEEL, a dénoncé des violations des obligations contractuelles de AAV_____ (PP 5'011'123), ce qu'a contesté AAE_____, pour AAV_____ (PP 5'011'124). S'en sont suivis des échanges de courriers entre AAE_____ et Madame B_____ (PP 5'011'125, 5'011'143).

Dans les jours qui ont suivi, un nouvel échéancier de paiement a été discuté et négocié entre AAB_____ et Monsieur C_____ (*Monsieur C_____ asked me to give AAE_____ a call*, PP 5'011'145; *he (AAB_____) needs to talk to AAB_____*, PP 5'011'145; *AAB_____ will then call Monsieur C_____*, PP 5'011'145).

**u.b)** *Litige AAM_____*

Parallèlement, AAM_____ s'est plaint du non-respect de l'accord conclu le 20 février 2006.

Ce courrier a été transmis à Monsieur C_____ (PP 349'012).

Début juin 2009, AAB_____ et Monsieur C_____ se sont rencontrés pour discuter de ce problème (PP 349'012). Monsieur C_____ lui a alors montré la lettre reçue de AAM_____ (PP 349'012).

Par courrier du 4 juin 2008, AAE_____ a demandé à AX_____ l'exécution du second versement dû, selon leur accord du 24 mars 2008. AX_____ a transmis ce courrier à Monsieur C_____, qui a été retrouvé dans l'avion de l'intéressé (PP 315'791).

A la suite de leur rencontre, le 7 juin 2009, AAB_____ a écrit à Monsieur C_____ ("*Dear Monsieur C_____*", PP 349'012), sur l'adresse email de F_____, pour lui confirmer s'être chargé de ce problème et que CGR_____ n'encourrait aucune responsabilité vis-à-vis de AAM_____. Le même jour, AAM_____ et K_____ ont signé un avenant au contrat du 20 février 2006, au terme duquel ils se désistaient de tout engagement pris avec AAV_____ au profit de ABD_____, AAV_____ étant ainsi désormais liée à ABD_____ (PP 5'011'148).

Le 8 juin 2009, AAB_____ a confirmé, "*comme promis à Monsieur C_____*" ("*as promised to Monsieur C_____*", PP 349'011), que CGR_____ était responsable des partenaires locaux, mais non de ceux hors Guinée, dont AAM_____ faisait partie.

Le jour même (PP 349'011), F_____ lui a répondu avoir parlé à Monsieur C_____, qui se trouvait alors en voyage en hélicoptère en Roumanie, et le rencontrer à la première heure le lendemain pour finaliser la résolution du problème. AAB_____ a alors répondu qu'il était inutile de le rappeler dans la mesure où Monsieur C_____ aurait dû le rappeler le matin même et que, malgré diverses rencontres avec Monsieur C_____, CGR_____ ne s'était pas acquittée du paiement dû à AAV_____.

Le 11 juin 2009, des échanges de courriers ont encore eu lieu entre AAE_____ et Madame B_____, agissant tant pour le compte de CGR_____ GUINEE (PP 5'011'158) que pour CGR_____ STEEL (PP 5'011'156).

Le 15 juin 2009, AAB_____ s'est entretenu au téléphone avec Monsieur C_____ et s'est engagé à ce que AAV_____ assume toute responsabilité vis-à-vis de AAM_____ (PP 5'011'161). Un engagement écrit a été finalisé entre F_____ et AAB_____ (PP 5'011'163); Monsieur C_____, qui se trouvait en Afrique, en a été informé (PP 5'011'163).

Le 17 juin 2009, AAE_____, pour le compte de AAV_____, s'est adressé à Madame B_____ et a invalidé l'accord du 28 mars 2008 (PP 5'011'170). CGR_____ a dès lors recouru à ses avocats et AAV_____ en a fait de même (PP 5'011'189). L'avocat suisse de AAV_____ s'est adressé à Madame B_____ chez AD_____ FINANCIAL ADVISORS SA, à Genève (PP 5'011'179).

Le 20 juillet 2009, Monsieur C_____ a rencontré le Président de Guinée, soit le Capitaine ABS_____ (PP 5'011'189).

Le 25 juillet 2009, AAV_____ s'est engagé à assumer la responsabilité du litige avec AAM_____ et, le lendemain 26 juillet 2009, un nouvel accord a été conclu entre CGR_____ et AAV_____ au sujet de sa rémunération. Ainsi, les USD 9 millions dus, selon accord du 24 mars 2008, seraient payés en deux fois, soit USD 4 millions immédiatement et USD 5 millions d'ici au 31 décembre 2009. Le dernier versement de USD 9 millions devait être payé au 15 avril 2011.

Par facture du 26 juillet 2009, AAE_____, agissant pour AAV_____, a sollicité le versement du montant sur le compte ABJ_____ auprès de la banque 4_____, en Israël (PP 350'595). Le 28 juillet 2009, CGR_____ TREASURY SERVICES a versé les USD 4 millions.

Par courrier du 30 novembre 2009 (PP 349'015), AAM_____ s'est adressé à "*AAA_____, PDG de CGR_____, et à Monsieur A_____, directeur de AAV_____*" pour réclamer le solde dû selon le contrat du 20 février 2006, alors même qu'il avait renoncé à ses droits précédemment. Il a sollicité le paiement du solde de USD 15.2 millions et, à défaut, il actionnerait CGR_____ en justice.

Ce courrier du 30 novembre 2009, traduit en anglais (PP 349'013) par courrier du 3 décembre 2009, a fait l'objet d'une réponse de AJ_____, par lequel il a nié tout lien entre l'intéressé et CGR_____ (courrier retrouvé chez AD_____ GE, cl. B.2.1.11).

Le 31 décembre 2009, CGR_____ a suspendu le paiement dû à AAV_____, selon accord du 24 mars 2008, modifié le 16 juin 2009, vu le litige avec AAM_____.

Par courriel du 31 décembre 2009, AAB_____ a informé AJ_____ et Monsieur C_____ que ses partenaires et lui-même s'occupaient du litige avec AAM_____. Il a souligné que le précité n'avait rien à voir avec le contrat conclu entre AAV_____ et CGR_____. Le nécessaire était fait pour que l'intéressé n'importune pas CGR_____ et les opérations de CGR_____, "*comme promis à Monsieur C_____*" ("*as part of our promise to Monsieur C_____*", PP 349'009).

Le 15 mars 2010 (PP 500'101), se référant à son courrier du 30 novembre 2009, AAM_____ a réitéré auprès de AAE_____ et de Monsieur A_____ sa requête en paiement. Il a mentionné avoir signé le contrat avec AAV_____ en raison des liens qui unissaient cette société à CGR_____. Il a rappelé qu'à l'époque, Monsieur A_____ s'était présenté dans ses bureaux de Bamako avec AAF_____. Il les avait présentés à son tour au Ministre AAN_____, qui les avait introduits auprès de Madame E_____ et de K_____. Ainsi, les activités de CGR_____ avaient pu être mises en place grâce à son réseau, ce qui justifiait l'exécution de l'accord conclu.

- 68 -

Par courriel du 16 mars 2010, AX_____ a demandé à Madame B_____ de traduire ce courrier du 15 mars 2010 (PP 500'100).

Le 26 mars 2010, se référant aux requêtes de AAM_____, AAA_____ a informé AJ_____, en parlant du précité, que "*ce con*" ("*schmuck*") du Mali avait envoyé un courrier à tout le monde pour réclamer de l'argent (sentence arbitrale, no 533, PP 3'002'144).

Madame B_____ a admis avoir reçu de la correspondance de AAM_____, qu'elle avait envoyée à CGR_____.

Le 4 mai 2010, Monsieur A_____ s'est entretenu au téléphone avec AAM_____ pour tenter de trouver une issue au différend (PP 5'011'205).

Par engagement du 10 mai 2010 ("*indemnity letter*"), AAE_____ et AAB_____ se sont engagés vis-à-vis de CGR_____ STEEL et de toutes les sociétés affiliées à assumer toute responsabilité vis-à-vis de AAM_____ (PP CRI AAB_____).

Le 12 mai 2010, AAM_____ s'est adressé à Monsieur A_____ pour refuser la proposition de paiement de USD 1 million pour solde de tout compte et a menacé de divulguer la manière dont CGR_____ avait été introduite en Guinée, "*comment Madame E_____ et toi, vous avez manipulé et fait chanter tout le monde par vos méthodes mafieuses et criminelles*" (PP 5'011'205).

Le Tribunal ignore la suite qui a été réservée aux prétentions de AAM_____.

**v)** *Arrestation de AAU_____*

AAU_____ a été arrêté durant quelques heures par un général ayant servi sous le régime de AAO_____, lequel soutenait que CGR_____ devait à Madame E_____ et à lui-même de l'argent en exécution des accords conclus avec la précitée. Il a rapporté l'incident à ABP_____ (First WS AAU_____, §105, 108; PP 300'618, § 177).

**w)** *Rachat des 5 % de Madame E_____ / USD 4'000'000.-*

La participation promise à Madame E_____ n'a jamais été transférée à l'intéressée.

Début août 2009, l'adjudant-chef ACB_____, responsable de la sécurité pour CGR_____, et le sergent-chef ABR_____ – futur époux de Madame E_____ - ont rencontré Madame E_____ à Freetown pour lui faire signer un accord sur la reprise de sa participation (PP 500'966).

Le 2 août 2009, Madame E_____ a signé une attestation (PP 5'011'031), au terme de laquelle elle indique avoir finalisé avec CGR_____ le paiement d'un montant de USD 4 millions en échange de sa participation de 5 % en lien avec ses "*prestations fournies pour l'obtention des titres miniers en faveur de la société CGR_____ en terre guinéenne*", montant payable en quatre échéances de USD 1 million chacune.

**x)** *Transaction 2*

**x.a)** ABZ_____ est un homme d'affaire libanais actif en Guinée. Il possède la société S_____ SARL (S_____), active dans les télécommunications, l'électricité, les infrastructures et les équipements en Guinée (PP 500'188).

Par courriel du 17 août 2009, AX_____ a informé AJ_____ qu'un paiement de USD 1'300'000.- devait être effectué en faveur de ABZ_____ en lien avec les "*charges en Guinée*" ("*Guinea-pls load*") (PP 5'011'056). Une heure après, le même jour, il a transmis les coordonnées bancaires à utiliser pour ce "*consultant*" ("*consulting fees*") avec la précision que le code ordinaire ne devait pas être utilisé ("*... NOT the regular ones-code ...*", PP 5'011'057).

Le lendemain 18 août 2009, CGR_____ TREASURY SERVICES a versé USD 1'300'000.- (dont à déduire les frais) sur le compte de S_____, soit la société de ABZ_____, auprès de la Banque 6_____ (PP 503'250-1). De ce montant, USD 1 million a été reversé à Madame E_____ de la manière suivante:

–   Le 20 août 2009, ABZ_____ a instruit sa banque de verser USD 998'000.- à "*MATILDA*" (PP 503'251), son compte ayant été débité du même montant (PP 503'250). Il a justifié ce versement par l'achat de deux engins de chantiers (facture sans en tête du 25 juillet 2009 avec mention des coordonnées bancaires, soit la Banque 8_____, à Freetown, mais sans nom du bénéficiaire, PP 503'252; déclaration d'importation des engins, avec la mention du fournisseur comme étant MITILDA&CO LTD, PP 503'253, avec un délai de livraison des machines, mais qui n'atteste pas de la livraison effective des machines (cf. en ce sens également sentence arbitrale no 452.6 PP 3'002'127).

–   Le 28 août 2009, soit 11 jours après le courriel de AX_____, ABD_____ & CO LTD a établi une facture sur papier en-tête de la société portant sur deux engins de chantiers pour un total de USD 998'000.- à créditer sur son compte auprès, cette fois, de la Banque 8_____, à Freetown (PP 503'256).

–   Le paiement n'ayant pu être effectué, ABZ_____ a changé le nom du bénéficiaire et a demandé à sa banque que les USD 998'000.- soient versés à Madame E_____, au lieu de "*MATILDA LTD*" (PP 503'255). L'ordre a été exécuté.

– ABD_____ a établi une deuxième facture, datée du 20 décembre 2009, de USD 2'000, portant sur la réparation d'un circuit de contrôle pour un engin de chantier, à créditer sur son compte auprès de Banque 8_____, à Freetown (PP 503'262). L'ordre a été exécuté le 30 décembre 2009.

Le 4 novembre 2009, Madame E_____ a transféré des fonds d'Afrique aux Etats-Unis pour acheter au prix de USD 489'900.- la résidence dans laquelle elle réside actuellement sur _____, en Floride (www. https://star.worldbank.org; annexe au courrier de Me ALPHA_____ du 15.08.18).

AAU_____ a déclaré (First WS AAU_____, § 121) que CGR_____ avait demandé à S_____ SARL de lui fournir deux engins de chantier et ignorait que la précitée s'était tournée vers Madame E_____ pour les obtenir.

Il n'existe pas d'instructions d'achat d'engins de chantier de CGR_____.

Entendue dans le cadre de la présente procédure (PP 500'717), Madame E_____ a déclaré n'avoir jamais rencontré ni fait d'affaires avec ABZ_____. AAU_____ lui avait dit qu'il allait lui verser USD 1 million immédiatement, sur les USD 4 millions convenus. Madame E_____ s'était rendue à la Banque 8_____, à Freetown, pour ouvrir un compte à son nom puisque sa société ABD_____ n'avait pas encore été créée. Un monsieur l'avait aidée à fabriquer les deux factures à l'en-tête de ABD_____ et avait regardé sur internet le nom des Caterpillar en anglais.

Quant à ABZ_____, il a déclaré (CRI Suisse en Guinée PP 500'187 et procédure guinéenne PP 4'200'093) ne pas connaître Monsieur A_____, AAB_____, AAE_____ ou la société AAV_____. CGR_____ lui avait proposé d'acheter des machines de chantiers, qui auraient servies à l'ouverture de routes en Guinée. Il avait reçu une facture de ABD_____, dont CGR_____ lui avait indiqué qu'il s'agissait du fournisseur des machines, facture reçue dans les locaux de CGR_____, en Guinée. Il avait reçu USD 1 million sur le compte de S_____ et avait donné l'instruction d'en transférer USD 998'000.- sur le compte indiqué sur la facture. Il y avait eu un problème de bénéficiaire. CGR_____ lui avait alors transmis les coordonnées bancaires de Madame E_____. Il n'avait jamais reçu livraison des machines de chantier et n'avait pas payé les taxes d'importation en Guinée de ces machines. Aucun contrat n'avait été signé concernant la vente de ces machines de chantier.

Entendu dans le cadre de la présente procédure, Monsieur C_____ a déclaré ignorer l'existence de cette transaction. Il ne connaissait pas ABZ_____ et, au surplus, il rappelait qu'il n'avait pas de tâches opérationnelles au sein de CGR_____, dont il n'était qu'un conseiller (PV, PP 500'487, 500'550).

Quant à Madame B_____, elle n'était pas non plus au courant de cette transaction, précisant au demeurant, que ce genre d'opérations n'était pas de sa responsabilité (PV, PP 500'488, 500'548).

**x.b)** *Transaction 2 / Appréciation des faits*

Les prévenus soutiennent que le montant de USD 1 million reçu par Madame E_____ de ABZ_____ n'a pas été payé par CGR_____ et que CGR_____ n'avait pas connaissance de l'affectation ultérieure de cette somme à Madame E_____. Cette allégation n'est pas crédible et est démentie par les éléments suivants.

**x.b.a)** Il ressort des mouvements bancaires que le paiement de USD 1 million à Madame E_____ par ABZ_____ provient de CGR_____.

**x.b.b)** Les cinq contrats ont été conclus les 14 et 20 février 2020 et sont intrinsèquement liés entre eux. Ainsi, CGR_____ s'est engagée à céder une participation à AAV_____, sous la forme de 17.65 % de l'actionnariat de la société qui serait détentrice des droits miniers, en gardant néanmoins la maîtrise des actions par le biais d'un rapport de fiducie.

Madame E_____ se voyait céder une participation de 5 % dans la société exploitante, par le biais d'une participation dans AAV_____.

Dans le même temps, USD 19.5 millions étaient promis par CGR_____ à AAV_____, alors que AAV_____ promettait ces mêmes USD 19.5 millions à des intermédiaires (AAM_____/ K_____/AAF_____) selon le même échéancier que celui prévu dans le contrat entre AAV_____ et CGR_____. Enfin, un accord était conclu entre CGR_____ et la Guinée, le même jour, portant sur le même objectif que les trois contrats conclus entre, d'une part, AAV_____ et, d'autre part, AAM_____/K_____, AAF_____ et Madame E_____, soit le fer de Simandou. Une cérémonie a suivi la signature de ce contrat en présence de AAM_____/K_____ et AAF_____.

CGR_____ était informée de la conclusion de ces accords. En effet, comme mentionné, ces contrats étaient intrinsèquement liés, la première échéance avait été payée à AAM_____/K_____ et AAF_____, mais non à AAV_____, alors que les contrats entre AAV_____ et AAM_____/K_____ et entre AAV_____ et Madame E_____ avaient été transférés à Madame B_____, qui avait préféré octroyer une procuration à AAE_____, plutôt que de signer elle-même les contrats (sur cette question de la connaissance par Madame B_____ de ces contrats, cf. supra).

D'ailleurs, pour assurer la participation de Madame E_____ dans le projet, de nouveaux contrats ont été signés, les 27 et 28 février 2008, directement par CGR_____

GUINEE SARL avec Madame E_____, via sa société ABD_____, dans la mesure où CGR_____ s'apprêtait à racheter la participation de AAV_____.

Les actions de CGR_____ GUINEE ont été transférées à AAV_____, avant d'être rachetées par CGR_____, alors que les actions promises à Madame E_____ n'ont jamais été transférées.

L'attestation du 2 août 2009 s'inscrit dans la logique des accords préalablement conclus.

Dans cette attestation du 2 août 2009, Madame E_____ a indiqué avoir trouvé un accord avec CGR_____ portant sur la reprise de sa participation, soit un versement de USD 4 millions, comme le prévoyait le contrat du 27 février 2008. Le même mois, CGR_____ a fait verser à Madame E_____, par l'intermédiaire ABZ_____, la première tranche des USD 4 millions promis. Restait dès lors à verser à Madame E_____ le solde de USD 3 millions.

Ainsi, le versement de USD 1 million par ABZ_____ a consisté en l'exécution des accords des 20 février 2006, 27 février 2008 et de l'attestation du 2 août 2009.

Aucun autre motif ne peut expliquer ce versement.

A cet égard, il sera relevé que les USD 1.3 million versés par CGR_____ à ABZ_____ auraient été payés à titre de frais de consultant, mais des frais de consultant ne se justifient pas. En effet, ABZ_____, via S_____, s'occupe de logistique et de fourniture, mais en aucun cas de consulting.

Par ailleurs, AX_____ a cherché à cacher le motif de ce paiement dans la comptabilité.

Le Tribunal relève, également, les factures successives avec de faux noms pour arriver au paiement voulu (MATILDA puis directement Madame E_____).

Il n'existe aucune preuve de la livraison des machines de chantier. La déclaration descriptive guinéenne d'importation du 17 août 2009 (PP 503'273) n'est pas une preuve d'importation, dès lors qu'elle n'atteste pas de l'import effectif des machines Caterpillar.

Il n'apparait pas que Madame E_____, alors en exil en Sierra Leone, fournissait des machines de chantier. D'ailleurs, Madame E_____ n'a jamais fourni de machines de chantier ou été active dans ce domaine. Tout au plus, l'intéressée a reçu, à une reprise, du sucre et, à une reprise, du poulet surgelé.

Les USD 2000.- ne sont que le complément des USD 998'000.- pour arriver à USD 1 million et la justification avancée (la réparation d'un circuit de contrôle pour un engin de chantier) est absurde.

Le Tribunal relève la coïncidence, pour le moins improbable, que ABZ_____ se soit précisément tourné, à l'insu de CGR_____, vers Madame E_____ pour acheter des machines de chantier.

ABZ_____ ne connaissait pas Madame E_____ et n'avait pas de relations d'affaires avec elle, préalablement aux deux versements (soit celui de USD 1 million et celui de USD 2 millions, dont il sera question ci-après).

Par ailleurs, CGR_____ s'est attachée à effacer ou supprimer toute référence à ABZ_____ et à garder son rôle secret dans le cadre de la vente à ABY_____ (cf. sentence arbitrale nos 434ss, sur le rôle de ABZ_____ 452ss).

ABZ_____ sera utilisé une seconde fois pour agir comme intermédiaire dans le versement d'une somme d'argent à Madame E_____ (transaction 3).

Outre le versement de USD 1.3 million et de USD 2 millions (dont il sera question ci-après), de nombreux versements ont été effectués par CGR_____ à ABZ_____, parfois en passant par un intermédiaire, ACC_____, et un compte bancaire en Belgique. Les versements sont en contradiction avec l'activité réelle de ABZ_____ (fournisseur en Guinée versus conseils), sur des comptes différents de ceux mentionnés sur le contrat, les paiements en question étant urgent et "*ronds*"(cf. PP 500'645ss; sentence arbitrale nos 434ss, sur le rôle de ABZ_____ 452ss; PP 304'1445x et y).

Enfin, les déclarations de ABZ_____ et de Madame E_____ sur l'origine des fonds sont crédibles, en tant qu'elles sont corroborées par les autres éléments de preuve figurant à la procédure.

Il résulte de ce qui précède que CGR_____ savait que le paiement de USD 1 million à ABZ_____ était destiné à Madame E_____.

ABZ_____ a agi comme un intermédiaire de CGR_____ dans le paiement de USD 1 million à Madame E_____, montant dû en exécution de l'accord conclu sur le rachat de la participation de Madame E_____ dans le projet Simandou (USD 4 millions, payables en 4 tranches en échange de la participation de 5 %).

**y)** *Octroi des concessions sur les blocs 1 et 2*

**y.a)** Le 17 septembre 2009 a eu lieu le mariage de la fille de Monsieur C_____ en Israël. Ont été invités (cf. liste des invités venant de l'étranger, PP 5'011'001):

- ABS_____ (cf. déclaration Monsieur C_____),
- ABP_____,

- 74 -

   – Me GAMMA_____,

   – AC_____,

   – Madame B_____,

   – AAA_____.

Par ailleurs, CGR_____ TREASURY SERVICES a payé le billet d'avion de ABP_____ pour s'y rendre et pour se rendre ensuite à Hong-Kong (PP 5'011'003-4).

**y.b)** Le 17 novembre 2009, CGR_____ a soumis à la Guinée une étude de faisabilité de 450 pages du gisement de fer de Zogota, qui concluait à l'exploitabilité dudit gisement (Simandou Sud, distinct de la zone Sud Simandou) (PP 5'000'072, 5'000'217).

Par arrêté du 1$^{er}$ décembre 2009 pris par ABP_____ (PP 5'000'671, retrouvé également dans les locaux de AD_____ GE, cl. B.2.1.2), une commission a été chargée d'examiner l'étude de faisabilité déposée. Des enveloppes d'argent ont été distribuées aux membres de la commission. La commission a conclu, le 6 décembre 2009, à l'attribution d'une concession à CGR_____ et à l'adoption d'une convention minière (PP 5'000'072, vice-président de la commission: ABK_____; ABK_____ est avocat de CGR_____ en 2012, PP 5'000'690, et est l'avocat de K_____ dans le cadre de la procédure guinéenne).

Le 16 décembre 2009, la convention de base (convention minière) a été conclue entre CGR_____ GUERNESEY, CGR_____ GUINEE et la Guinée, laquelle octroyait les concessions d'exploitation sur les blocs 1 et 2 et sur la zone de Zogota. Par ailleurs, il était prévu d'évacuer le minerai par le Libéria, la viabilité économique du projet dépendant de la possibilité d'exporter le minerai de fer par ce pays plutôt que par la Guinée (PP 300'613).

Le 19 mars 2010, la convention de base a été ratifiée par décret présidentiel du Général ABT_____ (PP 5'000'677) et les concessions ont été octroyées (PP 5'000'679).

Les originaux de la convention de base et le décret y relatif ont été conservés par Madame B_____ dans les locaux de AD_____ GE.

Le même jour, soit le 19 mars 2010, par décret 2010/024, une concession a été octroyée sur le gisement de Zogota.

**y.c)** *Comptes de CGR_____ GUERNESEY*

Par résolution du 30 décembre 2009, Madame B_____ a décidé de ne pas auditer les comptes de CGR_____ GUERNESEY au 31 décembre 2009. Ainsi, elle a signé les résolutions, pour le compte de W_____ et pour le compte de AD_____ BVI, titulaire

de 1 action à titre fiduciaire pour W_____ (cl. B.2.1.11). Pourtant, ERNST & YOUNG avait été désigné à cet effet (PV du 18.09.09, B.2.1.11). Madame B_____ et AJ_____ ont approuvé les comptes (cl. B.2.1.11) sur la base d'une recommandation du comité d'audit, à laquelle AX_____ a participé.

Il en a été de même s'agissant des comptes au 31 décembre 2010. Par résolution signée par Madame B_____, CGR_____ GUERNESEY n'a pas audité ses comptes au 31 décembre 2010 (cl. B.2.1.11).

En revanche, CGR_____ GUERNESEY a établi des comptes consolidés pour la première fois pour l'exercice 2010, lesquels sont erronés s'agissant des paiements à AAV_____. Ces comptes ont été signés par Madame B_____, il en sera question ci-après (PP 500'136).

**y.d)** *Vente à ABY_____*

Conformément à son business model, CGR_____ avait besoin d'un partenaire pouvant investir et offrir l'expérience technique nécessaire au développement du projet. Elle a approché ABY_____, qui s'était déjà montrée intéressée par le projet Simandou et était déjà en contact avec AAL_____ (offre faite le 14.11.2008 à AAL_____ et présentation faite par AAL_____ le 24.11.2008: aspects stratégiques présentés - transport puis réunions ultérieures. PP 3'000'253ss), pour négocier la reprise des concessions minières et une éventuelle joint-venture.

Le 22 février 2010, les parties ont signé un "*non disclosure agreement*" et ABY_____ a entamé sa procédure de due diligence, laquelle comprenait, entre autres, une attestation établie par F_____ de non-corruption et une attestation produite personnellement par Monsieur C_____ (sentence arbitrable, PP 3'002'072). Des réunions ont eu lieu entre les parties à Rio de Janeiro, dans les locaux de ABY_____, pour discuter de la joint-venture envisagée, réunions auxquelles Monsieur C_____, AAU_____, AX_____ et F_____ ont pris part. CGR_____ a donné la garantie à ABY_____ que les concessions avaient été obtenues conformément à la loi (sentence arbitrable, PP 3'002'072).

A relever que ABY_____ est cotée à la NY Stock Exchange et doit donc se conformer au FCPA (*Foreign Corrupt Practices Act*).

Dans un courrier du 19 mars 2010, le ministre ABP_____ a salué la future joint-venture entre CGR_____ et ABY_____ et confirmé que CGR_____ détenait valablement les concessions sur les blocs 1 et 2 et sur Zogota (PP 5'000'730).

Le 15 avril 2010, CGR_____ a conclu un accord avec le Libéria visant le développement d'infrastructures de chemin de fer et portuaire en eau profonde afin

d'exporter le minerai de fer (*Liberian Transport Solution*)) (PP 300'619). Les sociétés CGR_____ (LIBERIA) LTD et CG_____ RESOURCES (LIBERIA) LTD, détenues par CGR_____ GUERNSEY, étaient impliquées dans le projet (PP 3'002'108; contrat du 15 avril 2010 retrouvé dans les locaux de AD_____ GE, cl. B 2.1.2). Entendu dans le cadre de la présente procédure, Monsieur C_____ a déclaré avoir rencontré la Présidente du Libéria à trois reprises en lien avec cette solution (PV, PP 500'565).

Le 16 avril 2010, ABP_____ a donné son accord à la joint-venture envisagée (PP 5'000'731).

Le 28 avril 2010, la fondation V_____ a donné son accord à la transaction (PP 306'496).

Un programme de conformité anti-corruption a été signé (cf. copie chez AD_____, cl. B.2.1.6).

Le 30 avril 2010, CGR_____ GUERNESEY, qui détenait CGR_____ GUINEE (Guernesey), et ABY_____ ont conclu un contrat de joint-venture (*Joint-Venture Framework Agreement*) et une convention d'actionnaire. La première citée cédait 51 % de ses actions moyennant versement de USD 2.5 milliards, dont USD 500 millions à verser immédiatement.

ABY_____ a versé les USD 500 millions à CGR_____ GUERNESEY (comptes consolidés, PP 500'135) et, sur ce montant, USD 349'500'717 ont été reversés à W_____ en "*remboursement d'un prêt*", selon les comptes consolidés de CGR_____ GUERNESEY (PP 500'135).

L'entité nouvellement créée a été renommée ACD_____ GUINEA (PP 5'000'735). AC_____ en était l'administrateur.

AAA_____ a été engagé par CGR_____ GUERNESEY, soit pour elle Madame B_____ et AJ_____, payé USD 254'020.- par an (cl. B.2.1.10).

A la suite de cet accord, des bonus ont été versés aux "*employee*" de CGR_____ (PP 500'139), soit notamment:

- USD 450'000.- à K_____

- USD 150'000.- à Madame B_____

- USD 3'000'000.- à AC_____ via une off-shore

- USD 2'000'000.- à AAA_____ via une off-shore

- USD 2'500'000.- à AAU_____

- USD 600'000.- à F_____ via une off-shore

- USD 800'000.- à AX_____ via AZ_____ (PP 5'006'192 et 4'901'021)

- USD 180'000.- à AJ_____ et

- entre USD 90'000.- et USD 200'000.- aux comptables (ACE_____, ACF_____, ACA_____).

Il sera relevé que AX_____ a reçu USD 800'000.- comme mandataire de CGR_____, alors qu'en 2010, il n'a fourni, via sa société AZ_____, des services que pour USD 177'058.- (PP 500'138).

AAU_____ a précisé avoir reçu un bonus de USD 7 millions résultant de la vente à ABY_____, en juin 2010 (déclaration police israélienne, PP 4'900'037).

Par ailleurs, le 1er juillet 2010, la fondation V_____ a accepté de verser un bonus à AD_____ BVI de USD 2.5 millions, soit 0.5 % des 500 millions payés par ABY_____ à CGR_____ (PP 306'491) (note: 0.5% x 500 mio = 2.5 mio).

Quant à Monsieur C_____, en 2010, il a reçu de la fondation V_____ USD 94 millions destinés à être investis dans sa société AB_____ REAL ESTATE (PP 306'477), hors donations pour les dépenses courantes qui se sont élevées, de mai à décembre 2010, à USD 9.3 millions (classeur B.2.1.4.). A cela s'ajoute sa rémunération de USD 400'00.- l'an pour V_____ PP classeur B.1.1.21) et de USD 700'000.- l'an pour CGR_____ GUERNESEY (PP 300'750).

*y.e) Paiement AAV_____*

Vu l'accord conclu avec ABY_____, CGR_____ a payé le solde des échéances dues à AAV_____ totalisant USD 22 millions (cf. accord du 24 mars 2008, modifié ultérieurement), soit USD 14 millions (5 mio solde 3ème échéance + 9 mio 4ème échéance), auxquels s'est ajouté le bonus prévu de USD 8 millions en cas de profit supérieur à USD 1 milliard (clause 5), soit un montant total de USD 22 millions.

Par ailleurs, AAB_____ a négocié avec Monsieur C_____ un paiement supplémentaire de USD 4.5 millions, les animateurs de AAV_____ reprochant à CGR_____ un rachat "*au rabais*" de la participation de AAV_____ de 17.65 % (PP 300'616).

AX_____ s'est entretenu, directement, avec ABE_____, le *protector* de AAV_____, pour les formalités administratives en lien avec ce paiement (cf. courriel du 14.05.2010 de ABE_____ à MOSSACK FONSECA & CO, PP 357'2229).

Le 5 mai 2010, AAV_____ a ouvert son premier compte bancaire en Israël (PP 350'596).

Par facture du 10 mai 2010, AAE_____, agissant pour AAV_____, a sollicité le versement des USD 22 millions sur le compte de AAV_____ nouvellement ouvert (P 4'500'600).

Le 17 mai 2010, AE_____, une société de CGR_____ détentrice in fine d'une aciérie à Bakou via ACG_____, a payé les USD 22 millions et, le lendemain, ce montant a été distribué, à parts égales, entre Monsieur A_____ et ses associés (3 débits de USD 7 mio, PP 4'500'593).

Ce paiement de USD 22 millions est apparu dans les comptes consolidés de CGR_____ GUERNESEY comme étant un investissement et relatif à l'achat d'une aciérie à Baku (cf. note 11 des comptes, "*purchase of ACG_____ plant*") en lien avec un contrat passé avec CGR_____ STEEL (PP 500'135-6).

Le 5 août 2010, AAE_____, agissant pour AAV_____, a sollicité le versement des USD 3 millions sur le même compte de AAV_____, en Israël (facture, PP 350'598). Par courriel du 5 août 2010, AAE_____ a envoyé sa facture à AX_____ pour paiement, lequel a instruit AJ_____ et ses comptables de payer la facture, en précisant que AE_____ paierait pour le compte de CGR_____ STEEL (PP 5'011'423). Le 5 août 2010, AE_____ a payé la somme due à AAV_____ (PP 5'011'423 courriel, 5'011'424-5-6, 5'011'428); les instructions de paiement à la banque mentionnent que ce montant est relatif à des frais de consulting sur des opportunités d'investissement pour CGR_____ en Afrique (PP 5'011'426).

Ce paiement de USD 3 millions est apparu dans les comptes consolidés de CGR_____ GUERNESEY comme étant en lien avec l'achat de l'aciérie à Baku et avec le CEO de ACG_____, ACH_____ (cf. note 18 des comptes, *ACH_____ consulting expense USD 170K general funding plus USD 3m funding for AAV_____ deal*, PP 500'135-6).

Par facture du 13 mars 2011, AAE_____, agissant pour AAV_____, a sollicité le versement des USD 1.5 million sur le même compte de AAV_____ (PP 350'600). Le 22 mars 2011, AE_____ a payé la somme due à AAV_____ (PP 5'011'475, 5'011'476, 5'011'479).

Entendue dans le cadre de la présente procédure, Madame B_____ a expliqué que AE_____ détenait la société ACG_____, qui elle-même détenait une aciérie en Azerbaïdjan (note: ACG_____ COMPANY LLC est la plus grande société de métallurgie du Caucase) (cf. WS AX_____ dans le même sens, PP 5'006'255). Elle ne comprenait toutefois pas cette référence relative à l'achat d'une aciérie à Baku. Il n'avait jamais été question de vendre cette aciérie à AAV_____. Il n'y avait aucun lien entre

ACG_____, respectivement le CEO de cette société, ACH_____, et le projet de CGR_____ (PP 500'129).

Au total, CGR_____ a payé à Monsieur A_____, AAB_____ et AAE_____ USD 34.5 millions:

- USD 3'000'000.- le 15 avril 2008        par CGR_____ STEEL
- USD 1'000'000.- le 16 juin 2008        par CGR_____ STEEL
- USD 4'000'000.- le 28 juillet 2009        par CGR_____ STEEL

➢ *Fin mars 2010: fin de la restructuration de CGR_____*

➢ *30 avril 2010: vente à ABY_____*

➢ *5 mai 2010, ouverture nouveau compte auprès de la banque 4_____, en Israël*

- USD 22'000'000.- le 17 mai 2010        par AE_____
- USD 3'000'000.- le 5 août 2010        par AE_____
- USD 1'500'000.- le 22 mars 2011        par AE_____

        --------------------

        USD 34'500'000.-

(cf. note manuscrite retrouvée chez M. AAB_____ fait état de USD 34'663'000.-, somme totale reçue de CGR_____, PP 350'625 et détail des paiements PP 500'131).

Dans le cadre de la procédure arbitrable, AAB_____ a déclaré avoir reçu la plupart des USD 30 millions en échange de la participation dans CGR_____ GUINEE. Dans la mesure où Madame E_____ devait recevoir 33% des actions de AAV_____ (donc une participation de 5 % dans le projet Simandou), il trouvait juste que Madame E_____ reçoive environ USD 10 millions (WS AAB_____, sentence arbitrale PP 3'002'076).

Quant à Monsieur C_____, il a déclaré, dans la présente procédure, avoir été informé que AAV_____ ne payait pas "*sa part de l'investissement*", alors qu'elle s'était engagée à investir à hauteur de 17.65 % dans le projet, et elle estimait ne rien devoir. Il devait y avoir un "*malentendu*" et il avait conseillé au Conseil d'administration de se défaire d'un associé qui ne voulait pas payer sa part et racheter celle-ci (cf. PV, PP 500'271). Il y avait eu de nombreuses discussions sur la valeur de la participation de AAV_____. AAB_____ s'était rendu en Israël en parler avec lui. A une reprise, il était même venu le voir accompagné de AAE_____. Le prix de USD 22 millions avait été fixé après estimation d'une valeur potentielle de CGR_____ GUINEE de USD 150 millions et un

bonus de USD 8 millions avait été négocié en cas de rachat supérieur à USD 1 milliard de CGR_____ GUINEE (cf. PV, PP 500'272).

Le 1er mai 2011, AAV_____ a été radiée.

En 2014, AE_____ a été radiée.

**z)** *Transaction 3*

**z.a)** Le 18 mai 2010, USD 2 millions ont été déposés, en espèces, sur le compte de Madame E_____ auprès de la Banque 9_____, à Conakry (PP 503'265).

ABZ_____ a effectué ce versement (PP 503'263).

ABZ_____ a déclaré (CRI Suisse en Guinée PP 500'187 et procédure guinéenne) que CGR_____ l'avait informé vouloir arrêter ses activités au Libéria et rapatrier l'argent du Libéria en Guinée. Un directeur des opérations de CGR_____ l'avait informé qu'un certain ACI_____ viendrait le trouver pour verser des espèces sur le compte de CGR_____ auprès de la Banque 9_____, à Conakry. ABZ_____ devait convaincre la banque, qui le connaissait, d'accepter les fonds. Une fois à la banque, ACI_____ lui avait demandé de signer une quittance de dépôt faisant ainsi croire que ABZ_____ versait les USD 2 millions. Il n'avait pas vérifié l'identité du bénéficiaire des fonds, qu'il savait désormais être Madame E_____. Il avait remis la quittance à la comptabilité de CGR_____.

A la suite de cette audition, par courrier du 2 août 2016, le conseil de Monsieur C_____ a produit à la procédure une attestation écrite, rédigée en français et datée du 1er août 2016 (PP 301'313) dans laquelle ACF_____, citoyenne russe et ancienne comptable de CGR_____ SARL, à Conakry, a déclaré avoir lu la déclaration de ABZ_____ et n'avoir jamais entendu parler d'un certain ACI_____. CGR_____ SARL n'avait jamais demandé à quiconque de verser de l'argent en espèces à des tiers.

Bien que dûment convoquée à deux reprises par le Ministère public genevois pour être entendue, ACF_____ ne s'est jamais présentée (PP 502'154 et 502'215).

**z.b)** *Transaction 3 / Appréciation des faits*

La défense soutient que les 2 millions reçus de ABZ_____ par Madame E_____ n'ont rien à voir avec CGR_____. Cette allégation n'est pas crédible et est démentie par les éléments suivants.

**z.b.a)** Ce versement de USD 2 millions intervient dans le prolongement du versement préalable de USD 1 million effectué par CGR_____ par l'intermédiaire de ABZ_____.

Il est effectué en exécution des accords des 20 février 2006, 27 février 2008 et de l'attestation du 2 août 2009.

Pour le surplus, certains des éléments mentionnés dans le versement précédent de USD 1 million (transaction 2) peuvent être repris, soit:

– Aucun autre motif ne peut expliquer ce versement;

– La coïncidence pour le moins improbable que ABZ_____ se soit précisément tourné, à l'insu de CGR_____, vers Madame E_____;

– L'absence de relations d'affaires préalables entre les intéressés;

– L'utilisation préalable de ABZ_____ dans le versement de la première échéance due à Madame E_____ (transaction 2);

– L'utilisation de ABZ_____ dans d'autres versements;

– Le soin mis par CGR_____ pour effacer ou supprimer toute référence à ABZ_____ et garder son rôle secret dans le cadre de la vente avec ABY_____;

– Aucune documentation contractuelle ne justifie ce versement;

– La crédibilité des déclarations de ABZ_____ et de Madame E_____ sur l'origine des fonds en tant qu'elles sont corroborées par les autres éléments de preuve figurant à la procédure.

L'attestation établie par ACF_____ doit être examinée avec retenue. Aucun des paiements effectués à Monsieur A_____, AAB_____ et AAE_____ ou à Madame E_____ ne l'a été par CGR_____ GUINEE SARL. ACF_____ n'a jamais été impliquée dans les versements effectués aux précités et des instructions claires avaient été données par AX_____ sur le fait qu'aucune référence ne devait être faite des paiements effectués à des "*consultants*", tel que ABZ_____. Par conséquent, le fait que ACF_____ n'ait pas été au courant, le cas échéant, du dépôt en espèces de USD 2 millions sur le compte de Madame E_____ et sur la remise éventuelle à CGR_____ de la quittance de dépôt, comme avancé par ABZ_____ dans sa déclaration, n'ébranle pas la crédibilité des explications de ABZ_____ sur ce point, qui sont confirmées, au demeurant, par la réception des fonds sur le compte de Madame E_____.

Enfin, il sera relevé que le versement de USD 2 millions, et non de USD 1 million comme prévu dans l'accord (versement de USD 4 millions en quatre échéances de USD 1 million), peut éventuellement s'expliquer par l'écoulement du temps et possiblement le

non-respect d'une échéance antérieure, étant relevé que le 31 décembre 2009, CGR_____ avait suspendu le paiement dû à AAV_____ en raison du litige avec AAM_____.

Ainsi, il doit être retenu que CGR_____ a utilisé l'intermédiaire ABZ_____ pour verser USD 2 millions à Madame E_____.

Le solde de USD 1 million (4 – 1 – 2 = 1) ne sera pas versé eu égard à la dénonciation de l'accord du 2 août 2009 par Madame E_____ et à la conclusion d'un nouvel accord portant sur le versement de USD 5.5 millions. En effet, Madame E_____ aura connaissance de l'accord conclu avec ABY_____ et réclamera, à l'instar de AAM_____ ainsi que de Monsieur A_____ et de ses associés, le versement d'un montant supplémentaire à celui initialement convenu. Il en sera question ci-après.

α) *Dénonciation de l'accord*

Le 8 juin 2010, Madame E_____, par le biais d'un huissier de justice, ACJ_____, a écrit à CGR_____ pour dénoncer l'accord conclu le 2 août 2009. Elle a sollicité l'exécution des accords des 27 et 28 février 2008 (PP 349'017).

Par courrier du 20 juin 2010 (PP 348'795 et 300'617), K_____ - sollicité par AAU_____ - a répondu à ACJ_____ et a nié tout accord conclu entre CGR_____ et ABD_____.

Le 23 juin 2010 (PP 349'023), ACJ_____ a retiré ses propos et soutenu que Madame E_____ avait détruit les "*documents inventés*".

AAB_____ s'est rendu à Freetown négocier un montant supplémentaire avec Madame E_____.

Le 8 juillet 2010, deux contrats ont été signés, le premier prévoyant le versement de USD 5.5 millions par AAV_____ à ABD_____ (PP 348'800) et le second un montant supplémentaire de USD 5 millions en lien avec l'opération menée par "*nos partenaires au projet Simandou*" (PP 500'975). Le contrat portant sur USD 5.5 millions était libellé de la manière suivante:

> "*Notre contrat de collaboration signé en 2005 est arrivé à son terme.*
>
> *Notre rôle de conseiller et d'apporteur d'affaire pour tous nos projets en Guinée dans les domaines commerciaux, minier et médical ont été menés de manière professionnelle et avec grand succès.*
>
> *Le rôle de la société ABD_____ & CO LTD a contribué à la grande réussite de nos affaires mutuelles.*

*Suite à votre décision d'arrêt de vos activités en Guinée, nous sommes arrivés à un accord comme suit:*

*La société ABD_____ & CO LTD recevra la somme de 5.5 millions pour sa part dans toutes les activités menées en Guinée. (...)*

*La société ABD_____ & CO LTD, Mme Madame E_____, ses partenaires et conseillers s'engagent par la présente à remettre tous les originaux & copies des documents et contrats signés avec la société AAV_____ HOLDING LTD & ses partenaires concernant le projet SIMANDOU en Guinée".*

Par courriel du 26 juillet 2010, Monsieur A_____ a adressé à AAB_____ une attestation qui devait être signée par Madame E_____ concernant le versement des USD 5.5 millions (PP 349'346), texte effectivement signé par la précitée (PP 348'804).

Les deux contrats du 8 juillet 2010 ont ensuite été remplacés par deux nouveaux contrats datés du 3 août 2010 (PP 500'979 et 500'977) qui ne faisaient cette fois plus référence au projet Simandou (cf. projet avec annotations, PP 348'816; contrat original signé et texte original signé retrouvé chez AAB_____, classeur B.2.8).

Madame E_____ a confirmé avoir reçu 2.4 millions (PP 500'971) et un nouveau contrat a été conclu pour le solde de USD 3.1 millions (PP 500'968) (2.4 + 3.1 = 5.5).

La somme de USD 5.5 millions devait être versée en cinq fois, selon l'échéancier suivant retrouvé chez AAB_____ (PP 349'148), soit :

| | | | |
|---|---|---|---|
| 500'000 | USA | 1st | *transactions 4, 5, 6* |
| 1'900'000 | GUIN | 2nd | *transaction 7* |
| 100'000 | ? | 3rd | *ACK_____ (pas dans l'AA)* |
| 2'000'000 | ABF | 4th | *transactions 8, 9, 10, 11* |
| 1'000'000 | GUIN | 5th | *transaction 8* |
| 5.5 | | | |

D'autres notes manuscrites de AAB_____ (cf. PP 348'760, 348'759) précisent que les montants de USD 1.9 millions et USD 100'000.- ont été versés en espèces.

AAB_____ a établi d'autres notes sur la manière dont cette somme serait versée, distinguant les paiements reçus de AX_____, soit de CGR_____, de ceux dus à Madame E_____ (cf. notamment PP 500'596 ou 348'760-1). Ainsi AX_____ (soit AX_____, CFO de CGR_____) devait verser:

– **500 AAV**

➢ *Transactions 4, 5, 6, montants versés via les trois associés de AAV_____*

    – **1'900**     **GUI**

    ➢ *Transaction 7, montant versé en Guinée*

    – **100**     **GUI**

    ➢ *Transaction qui ne figure pas dans l'AA, versement via ACK_____*

    – **1'500**     **AAV**

    ➢ *Transactions 9, 10, 11, montants versés via ACL_____*

    – **1'500**     **ACM**

    ➢ *Transaction 8, montant versé via N_____*

Ces montants correspondent à ceux qui seront versés à Madame E_____ (en italique ci-dessus et décrits ci-après).

β) *Transactions 4, 5 et 6*

La première tranche, mentionnée "*500 AAV*" dans le décompte de AAB_____, de USD 500'000.- a été versée de la manière suivante:

– Le 21 juillet 2010, AAE_____ a transféré USD 150'000.- (note: USD 150.- de frais, PP 503'268) depuis son compte auprès de la banque 4_____ en Israël en faveur de Madame E_____ sur son compte auprès de Banque 10_____, à Miami (PP 503'269),

– Le 5 août 2010, AAE_____ a transféré USD 100'000.- (note: USD 150.- de frais, PP 503'268) depuis son compte auprès de la banque 4_____ en Israël en faveur de Madame E_____ sur son compte auprès de Banque 10_____, à Miami (PP 503'270),

– Le 22 juillet 2010, Monsieur A_____ a transféré USD 100'000.- (note: USD 150.- de frais, PP 503'271) depuis son compte auprès de la banque 4_____ en Israël sur son compte auprès de Banque 10_____, à Miami (PP 503'272) et un chèque a été tiré en faveur de Madame E_____ le 2 août 2010 (PP 503'274, 503'275),

– Le 5 août 2010, Monsieur A_____ a transféré USD 50'000.- (note: USD 150.- de frais, PP 503'271) depuis son compte auprès de la banque 4_____ en Israël sur son compte auprès de Banque 10_____, à Miami (PP 503'272) et un chèque a été tiré en faveur de Madame E_____ le 8 août 2010 (PP 503'274, 503'276),

– Le 21 juillet 2010, AAB_____ a transféré USD 100'000.- (note: USD 150.- de frais, PP 503'277) depuis son compte auprès de la banque 4_____ en Israël sur son compte auprès de Banque 10_____, à Miami (PP 503'278) et un chèque a été tiré en faveur de Madame E_____ le jour même (PP 503'279).

- 85 -

Le 30 juillet 2010, ACJ_____ a écrit que "*suite aux négociations menées d'accord parties et de l'acte de règlement du 08/07/2010*" la dénonciation de l'attestation du 2 août 2009 était nulle (PP 5'002'010).

Madame E_____ a déclaré que l'argent transféré ci-dessus par Monsieur A_____, AAB_____ et AAE_____ était l'argent de CGR_____ (PP 500'721). AAB_____ était venu lui rendre visite à Miami et lui avait dit que "*Monsieur C_____*" leur avait demandé de lui verser l'argent. AAB_____ et Monsieur A_____ lui avaient conseillé d'investir dans l'achat de maisons à Miami (cf. CRI AAB_____ pour les projets immobiliers, B.2.8, B.2.11).

Entendus dans le cadre de la procédure, Monsieur C_____ et Madame B_____ ont déclaré ignorer ces mouvements de fonds et être étrangers à ces opérations (PV, PP 500'489).

χ) *Transaction 7*

La deuxième tranche, mentionnée "1900 GUI" dans le décompte de AAB_____, a été versée par la remise en espèces de USD 1.9 millions à ABR_____, mari de Madame E_____, le 17 septembre 2010, sur le compte de la précitée auprès de la Banque 9_____, à Conakry (PP 503'264, 503'284-5).

Madame E_____ a signé une attestation confirmant la réception de USD 2.4 millions, comprenant donc ces USD 1.9 millions (250K + 150K + 100K + 1.9 mio) (PP 500'971). Un nouveau contrat a été conclu pour le solde de USD 3.1 millions (USD 2.4 + 3.1 = 5.5) (PP 500'968).

Entendus dans le cadre de la procédure, Monsieur C_____ et Madame B_____ ont déclaré ne pas connaître ABR_____ et ne rien savoir sur ce versement d'argent (PV, PP 500'490).

δ) *Versement ACK_____*

La troisième tranche de USD 100'000.-, mentionnée "100 GUI" dans le décompte de AAB_____, a été transférée à Madame E_____ sur son compte en Guinée par ACK_____, un courtier immobilier de Floride (cf. "*j'ai vu 100M que vous m'avez envoyé*", PP 503'281 et 503'281 de MT à FC "*j'ai bien reçu l'email de ACK_____*"; PP 348'759).

Entendus dans le cadre de la procédure, Monsieur C_____ et Madame B_____ ont déclaré ne pas connaître ACK_____ (PV, PP 500'490).

ε) *Transactions 8, 9, 10, 11*

Cinquième tranche
18.07.11     1 mio à Conakry                    Transaction 8a

Quatrième tranche
11.10.2011     500'000          ABF___          Transaction 8b
11.01.2012     250'000          ABF___          Transaction 9
11.01.2012     150'000          ABF___          Transaction 10
14.05.12       936'451          ABF___          Transaction 11

**ε.a.a)** *Transaction 8a et 8b N_____*



S'agissant des 1500 N_____ mentionnés dans le décompte de AAB_____, soit la cinquième tranche, ils correspondent aux USD 1.5 million qui sont parvenus par le biais de N_____ à Madame E_____. A cet égard, le Tribunal fait les développements qui suivent.

Le 8 octobre 2008 (PP B.2), la société N_____ a été constituée aux Iles Vierges Britanniques par MOSSACK FONSECA & CO. (BVI) LTD. Deux administrateurs de paille ont été désignés, alors que l'actionnaire était une fondation de droit panaméen, ACN_____, agissant par le biais d'une société de droit panaméen, AAW_____. La même société de gestion de fortune que celle utilisée pour AAV_____ - AAY_____ SA, agissant par le biais de ABE_____ -, était désignée *protector*, alors que Monsieur A_____ était désigné premier bénéficiaire de la fondation et s'est vu attribuer une procuration générale avec signature individuelle.

Par courriel du 15 juin 2011 (PP 502'056bis), AAB_____ a fait parvenir à D_____ une facture datée 13 juin 2011 de N_____ à O_____ GLOBAL LTD (ci-après: O_____) pour des services de conseil ("*advisory et consulting work in Southern Africa*", PP 4'300'388) au sud de l'Afrique pour 2010-2011 pour USD 1.5 million.

- 87 -

AAB_____ faisait référence à une conversation téléphonique qu'il avait eue avec AX_____:

"*Following my telephone conversation with AX_____ find attached our invoice*".

En traduction libre: "*faisant suite à la conversation téléphonique avec AX_____ , ci-joint notre facture*".

D_____ a demandé à son directeur financier, ACO_____, de payer la facture (email du 16 juin 2011, PP 502'056bis).

Le lendemain 16 juin 2011, le compte personnel de D_____ auprès de la banque 11_____, à Kiev (PP 503'287, 4'104'069) a payé cette somme de USD 1.5 million en faveur de O_____, dont D_____ est l'ayant-droit économique, auprès de Banque 12_____, à Zurich (PP 353'003, 503'289).

Le 20 juin 2011, ce même montant (aucun mouvement entre les deux dates, PP 353'421) a été transféré à N_____ sur son compte auprès de la Banque 13_____, à Nassau (ci-après Banque 13_____) (PP 353'004, instructions PP 503'290, auxquelles était jointe la facture du 13 juin 2011).

A ce moment, Banque 12_____ n'a posé aucune question relative à ce transfert.

**ε.a.b.a)** *S_____*

Il convient de faire un détour par S_____, la société de ABZ_____, en Guinée, l'intermédiaire utilisé pour le paiement de USD 3 millions à Madame E_____ (transactions 2 et 3) et à ACC_____.

Le 30 novembre 2011 (PP 502'037), AAU_____ a fait parvenir au directeur financier de D_____, ACO_____, un nouveau contrat de conseil pour approbation avant que le consultant ne le signe. AAU_____ a relancé son interlocuteur le 1er décembre 2011.

Le 1er décembre 2011, le directeur financier a demandé à AAU_____ de lui transmettre les coordonnées du bénéficiaire et la facture.

Le 13 décembre 2011 (PP 502'038), AAU_____ a informé ACO_____ que tous les documents lui avaient été envoyés et l'a relancé le 15 décembre 2011.

Le 16 décembre 2011 (PP 502'038), ACO_____ a informé AAU_____ que les instructions avaient été données à la banque, mais que l'ordre n'avait pas été exécuté car le contrat joint n'était pas lisible. Le 19 décembre 2011, il lui a demandé de lui renvoyer le contrat par télécopie, ce qui a été fait le lendemain.

Le 20 décembre 2011, O_____ a payé USD 625'000.- à S_____. Le gestionnaire du compte de Banque 12_____ a expliqué à son service compliance que le transfert était en lien avec des conseils sur des possibilités d'investissements en Afrique (PP 3'534'599).

**ε.b.b)** *Facture et contrat S_____*

Selon une facture du 15 octobre 2011 (PP 502'036), S_____ a facturé à O_____ ses services USD 625'000.- pour des conseils en lien avec des projets d'investissements en Guinée ("GUINEA"). Le montant devait être payé auprès de la Banque 8_____, à Conakry.

Selon un contrat du 3 novembre 2011 (PP 502'034), soit postérieur à l'établissement de la facture, S_____ a conclu avec O_____ un contrat de conseil moyennant le paiement de USD 625'000.-, en lien avec de nouvelles opportunités d'investissement en Afrique, contrat de durée indéterminée qui prenait effet en janvier 2011.

**ε.a.c)** *N_____ - Madame E_____*

Le 6 juillet 2011, Madame E_____ a demandé à Monsieur A_____ de lui transférer USD 1 million (PP 503'303 ou 500'988), étant précisé qu'elle avait déjà formulé sa requête le 16 juin 2011 auprès de ACK_____, à charge pour lui de transmettre l'information à AAB_____ (PP 349'093).

Monsieur A_____ a instruit Banque 13_____ de débiter le compte de N_____ de USD 1 million (transaction 8a) en faveur de Madame E_____ auprès de Banque 9_____, à Conakry (PP 4'300'390; débit PP 503'296; crédit de USD 991'495.25, PP 503'304). Sur demande du service compliance de Banque 13_____, ABE_____, le gestionnaire de fortune de Monsieur A_____, a expliqué que Madame E_____ était la personne en Guinée à qui Monsieur A_____ payait une commission (PP 4'300'390), après que Monsieur A_____ l'a informé que ce paiement était en rapport avec le contrat dont il lui avait parlé quelques années auparavant (note: entre AAV_____ et CGR_____, cf. PP 500'048), que ABE_____ n'avait pas vu (PV ABE_____ du 17.10.2013, PP 500'048-9).

Entendue par le Ministère public genevois (PP 500'722), Madame E_____ a déclaré que le montant de USD 1 million demandé à Monsieur A_____ faisait partie de l'argent que CGR_____ lui devait. De manière générale, tout l'argent reçu de AAV_____, Monsieur A_____, AAB_____ ou AAE_____ était l'argent que CGR_____ lui devait.

Le 12 septembre 2011, Monsieur A_____ a instruit Banque 13_____ de débiter le compte de N_____ de USD 500'000.- en faveur de ACL_____, dont l'ayant droit économique est ABF_____ (PP 4'300'377).

Par courriel du 18 septembre 2011, Madame E_____ a demandé à Monsieur A_____ de lui verser USD 500'000.- sur son compte aux Etats-Unis (PP 503'325). Monsieur A_____ lui a répondu que l'argent se trouvait chez l'avocat et qu'il convenait de lui adresser une instruction en ce sens (PP 503'325), lui envoyant ensuite un modèle d'instruction (PP 503'326), ce qui sera fait à l'aide du cousin de ACP_____ (PP 503'329, 503'328).

En janvier 2012, Madame E_____ a acheté deux propriétés immobilières à Jacksonville en Floride, sur Pierce Arrow Drive et sur Fern Hammock Drive, au prix de USD 128'000.- respectivement USD 128'750.- (www. https://star.worldbank.org; annexe au courrier de Me ALPHA_____ du 15.08.18).

Entre février et décembre 2013, Madame E_____ a acheté du matériel pour ouvrir un marché et un restaurant pour un peu plus de USD 300'000.- (www. https://star.worldbank.org; annexe au courrier de Me ALPHA_____ du 15.08.18).

ε.a.d) *Procédure genevoise P/12914/2013*

Le 26 septembre 2014, alors que la procédure pénale genevoise était ouverte, le Ministère public genevois a ordonné à Banque 12_____ de produire la documentation du compte O_____.

Le service compliance de Banque 12_____ s'est alors tourné vers le gestionnaire du compte O_____ pour lui demander des clarifications sur les mouvements de fond (les USD 625'000.- ou les USD 1.5 millions, cf. PP 6'000'148).

Le 19 février 2015 (PP 6'000'148), le gestionnaire du compte O_____ s'est, à son tour, tourné vers ACO_____ pour avoir ces informations.

Le 1$^{er}$ mars 2015 (PP 500'263), le Ministère public genevois a précisé la mise en prévention des prévenus en lien notamment avec ce versement de USD 1.5 million.

Le 1$^{er}$ mars 2015, également (PP 6'000'151), ACO_____ a répondu au gestionnaire du compte O_____. Il lui a expliqué que N_____ et S_____ faisaient partie du groupe de sociétés de CGR_____. D_____ avait avec CGR_____ des projets immobiliers et dans le métal en Ukraine ainsi que dans le pétrole et le gaz en Israël. Les deux transferts de USD 1.5 million et USD 625'000.- avaient été effectués sur instructions de CGR_____ pour payer des consultants dans le cadre de possibles projets en Tanzanie,

au Mozambique, au Nigeria, au Zimbabwe et dans les Iles Comores, projets qui n'avaient pas aboutis.

**ε.a.e)** *Audience du 3 mars 2016*

Entendu par le Ministère public genevois le 3 mars 2016, Monsieur C_____ a déclaré que D_____ était un ami depuis 10 à 15 ans et qu'il faisait des affaires avec lui depuis 10 ans dans le pétrole en Ukraine, le gaz en Israël, l'agriculture en Ukraine, les mines de charbon et de fer en Ukraine. "*Ils*" avaient, soit CGR_____, une "*joint-venture pour l'Afrique*" avec D_____, sans société commune ni contrat, laquelle était basée sur "la confiance et l'amitié" (joint-venture non documentée et off balance sheet, PV Monsieur C_____ du 22.05.2019, PP 502'799). D_____ avait investi, sous forme de dépenses, USD 5 à 7 millions et CGR_____ entre USD 10 et USD 15 millions. Il a précisé que tout était comptabilisé. A sa connaissance, Monsieur A_____ n'avait pas d'affaires en commun avec D_____.

Madame B_____ a déclaré ignorer que D_____ était un partenaire en Afrique. Elle ne pensait pas qu'un investissement de 5 ou 10 millions avait été fait, elle aurait été au courant si tel avait été le cas. Elle ignorait que D_____ était partenaire dans les projets que Monsieur C_____ lui mentionnait. Elle n'avait pas connaissance d'un accord écrit avec D_____ ni que des procès-verbaux de conseils d'administration mentionnent celui-ci dans des projets communs.

Interrogé sur le paiement effectué par O_____, Monsieur C_____ a déclaré que son avocat, Me GAMMA, l'avait informé qu'une demande / enquête avait été faite à propos de D_____ et d'une de ses sociétés au nom chinois. Il lui avait expliqué que AAV_____ avait introduit CGR_____ dans des pays voisins de l'Afrique du Sud, alors que CGR_____ avait une joint-venture avec D_____. Par conséquent, D_____ avait payé AAV_____. A l'époque, il avait su que AAV_____ avait été payée, mais en ignorait les modalités.

Quant à Madame B_____, elle ne se souvenait pas du contrat évoqué par Monsieur C_____, soit l'accord avec AAV_____.

**ε.a.f)** *Audience du 27 janvier 2017*

Entendu par le Ministère public le 27 janvier 2017, (PP 500'491), Monsieur C_____ a confirmé que la "*joint-venture*" entre D_____ et CG_____MM tenait une comptabilité. D'ailleurs, les USD 625'000.- versés à ABZ_____ pour le travail qu'il avait accompli pour D_____ en Tanzanie étaient comptabilisés. Il n'avait pas d'explication sur le fait que la facture du 13 juin 2011 mentionnant du travail en Guinée et non en Tanzanie.

Le Procureur a invité Monsieur C_____ à produire les documents à l'appui de ses dires.

**ε.a.g)** *Production contrats*



Par courrier du 2 mars 2017 (PP 302'026), Me GAMMA a fait parvenir au Ministère public (i) un courrier du 27 février 2017 de AC_____ à son intention, (ii) un contrat du 4 janvier 2010 entre CG_____MM et ABJ_____, (iii) un amendement à celui-ci daté du 11 mai 2011 et (iv) un résumé des activités de la "*joint-venture*".

Ces documents ne figurent pas dans la documentation conservée par AD_____ ni dans aucun de ses serveurs informatiques. En revanche, le contrat et son amendement ont été retrouvés au domicile de AAB_____ lors de la perquisition du 14 mars 2017 (classeur B.2.10).

(i) Dans son courrier du 27 février 2017, AC_____ a expliqué donner suite à la demande de Me GAMMA, laquelle était en lien avec l'audience de janvier 2017 et avoir examiné un certain nombre de documents, en particulier les documents susmentionnés sous (i) à (iii). Il a mis en avant la relation personnelle et de confiance qui prévalait entre D_____ et Monsieur C_____, laquelle avait conduit à des affaires communes, notamment un partenariat en Afrique, conduit sous la houlette exclusive de CG_____MM, sur des projets dont aucun n'avait abouti.

(ii) Selon le contrat, CG_____MM devait à ABJ_____ un "*carried interest*" pour avoir apporté des opportunités d'investissements dans le sud de l'Afrique, "*carried interest*" que CG_____MM pouvait décider d'acheter au prix de USD 500'000.- par projet au stade de la phase exploratoire des projets en question.

(iii) Selon son addendum du 11 mai 2011, CG_____MM a fait valoir son droit et devait donc une somme de USD 1.5 million à ABJ_____.

(iv) Selon le résumé des activités déployées dans le cadre de la joint-venture entre D_____ et CG_____MM (PP 302'037), la période d'activité s'étendait de juin 2011 à juillet 2013 en lien avec des projets dans neuf pays africains, dont aucun en Guinée.

CG_____MM avait investi USD 12'644'451.- (soit 71.5 % du total des investissements) et D_____ USD 5'036'586.- (soit 28.5 % du total).

Le projet en Tanzanie avait débuté le 01.02.2012 (cf. également P 6'000155), et s'était terminé le 01.07.2013.

Le projet au Zimbabwe avait débuté le 01.09.2010 et s'était terminé le 01.11.2012 (voyage de D_____ à Harare du 21 au 23.11.2011, PP 502'866ss).

Le projet en Sierra Leone avait débuté le 01.05.2011 et s'était terminé fin 2011.

Le projet en Zambie avait débuté le 01.11.2011 et s'était terminé, avant (sic!), le 01.09.2011.

Sur la base de ces documents, Me GAMMA a expliqué que CG_____MM avait demandé à D_____ de payer USD 1.5 million à N_____ et USD 620'000.- à S_____ pour le travail exécuté en Tanzanie, ce qui correspondait à sa part des investissements dans les projets en Tanzanie, au Zimbabwe, en Sierra Leone et en Zambie, soit USD 2'121'000.-.

**ε.a.h)** *AC_____*

Entendu dans le cadre de la présente procédure de manière contradictoire (PP 502'161), AC_____ a expliqué que, pour rédiger son courrier du 27 février 2017, il ne s'était basé que sur un dossier qui lui avait été remis par l'avocat israélien de Monsieur C_____. Il ne connaissait pas, avant de consulter le dossier remis, ce qu'il expliquait dans son courrier. Il n'avait pas connaissance d'un projet spécifique en Afrique dans lequel D_____ aurait été impliqué; il l'avait appris par le biais du dossier qu'on lui avait remis.

**ε.a.i)** *AAA_____*

Entendu dans le cadre de la présente procédure de manière contradictoire (PP 502'226), AAA_____ a indiqué que le contrat entre ABJ_____ et CG_____MM avait été discuté entre AAB_____ et Monsieur C_____. AAE_____ le lui avait amené pour qu'il le signe, sans préciser quand.

**ε.a.j)** *AX_____*

Entendu dans le cadre de la procédure israélienne le 28 août 2017 (cl. B.4.5.8, PP 4'901'634 verso), AX_____ a déclaré que, courant 2015, Monsieur C_____ lui avait demandé de préparer un classeur sur des projets en Afrique qui n'avaient pas abouti puis d'établir un résumé comptable montrant les dépenses encourues dans le cadre d'un

partenariat privé entre D_____ et lui-même dans le cadre d'investissements communs. AX_____ n'avait jamais vu, su ou entendu parler d'un partenariat entre D_____ et Monsieur C_____. Un tel partenariat ne figurait pas dans les comptes des sociétés de CGR_____ ; seul CGR_____ avait investi dans les projets en question. Il avait simplement compris que Monsieur C_____ voulait encaisser de l'argent que D_____ lui devait.

Une fois le résumé établi, Monsieur C_____ avait demandé de modifier les chiffres mentionnés, en augmentant les dépenses; or, cela ne correspondait pas aux comptes clôturés et les changements demandés n'avaient aucune justification comptable. Par ailleurs, Monsieur C_____ ne souhaitait pas que les comptes clôturés soient corrigés en conséquence.

Monsieur C_____ lui avait demandé de se rendre dans ses bureaux de Herzliya, qu'il y avait rencontré D_____ et ACO_____, qui avait apporté une sorte de documentation sur de supposés investissements. Monsieur C_____ avait également modifié les chiffres de D_____.

Par la suite, Monsieur C_____ lui avait demandé de préparer un contrat, ce qu'il avait refusé de faire. AAA_____, le directeur général de CG_____MM, avait été convoqué dans les bureau de Monsieur C_____ à Herzliya pour signer ce contrat entre CG_____MM et un tiers.

Monsieur C_____ avait mentionné être satisfait de l'établissement du résumé/rapport entre D_____ et lui-même car D_____ avait un problème avec sa banque à l'étranger, sauf erreur la Banque 14_____. Il s'agissait d'un paiement effectué à AAV_____, d'après ce que AC_____ lui avait précisé quelques temps après.

Confronté à cette déclaration devant le Ministère public genevois le 22 mai 2019 (PP 502'794), Monsieur C_____ a rappelé qu'il s'agissait "*entre D_____ et moi d'une association légère, basée sur la confiance et scellée par une poignée de mains, qui portait sur des explorations à hauts risques et qui aurait dû être formalisée en cas de succès*". Cette association était "*off balance sheet*", c'est-à-dire qu'elle ne figurait pas dans les comptes des sociétés; il a précisé "*la comptabilité de mes relations avec D_____ était à part*".

Dès lors qu'il n'avait pas retrouvé la comptabilité de ce partenariat, il avait demandé à AX_____ de "*reconstituer la relation avec D_____*" pour faire suite à la demande de Me GAMMA et du Procureur genevois. Il en avait, au préalable, parlé avec AC_____ et/ou AAA_____, qui lui avaient recommandé de s'adresser à AX_____ pour ce travail. Il a ajouté "*c'était aussi parce que D_____ était ma relation*" et que AX_____ se trouvait en Israël et parlait hébreu, ce qui facilitait la "*reconstruction*" de la

comptabilité. En revanche, il a contesté avoir demandé à AX_____ de modifier les chiffres.

**ε.a.k) D_____**

Le 3 septembre 2018, D_____ s'est présenté, sur mandat de comparution, au Ministère public genevois, à Genève, et a été entendu en qualité de PADR de manière contradictoire (PP 501'966).

Il a déclaré avoir des projets en commun avec Monsieur C_____ depuis 2004; il s'agissait d'un partenariat entre personnes, c'est-à-dire entre lui et le précité, sans qu'il n'y ait de joint-venture. Il avait fait des propositions de projets d'investissement en Afrique à Monsieur C_____, qui les avait toutes déclinées. Il n'avait jamais eu de projets d'affaires en Guinée ni de partenaires économiques, pas plus qu'en Sierra Leone, au Mozambique ou en Zambie. Il avait eu un petit projet, sans lien avec Monsieur C_____, en Tanzanie, dans une mine de cuivre et non d'or. Il a contesté avoir investi les sommes mentionnées par Monsieur C_____ et a nié toute joint-venture. Il ne devait aucune somme à Monsieur C_____ en lien avec des projets en Afrique.

Il ne connaissait ni Monsieur A_____ ni AAE_____ ni AAB_____ et n'avait jamais fait d'affaires avec eux. Il avait versé de l'argent à N_____ et à S_____ à la demande de Monsieur C_____. Il avait reçu la facture de AAB_____, qu'il ne connaissait pas.

Le contrat du 3 novembre 2011 entre O_____ et S_____ avait été préparé par des personnes de CGR_____ et transmis à ACO_____, qui avait demandé à sa propre épouse, représentante de O_____, de le signer. S_____ n'avait jamais déployé d'activité pour lui ou ses sociétés.

D_____ a expliqué (PP 502'073) que ACO_____ lui avait rapporté les questions de la banque concernant les deux transferts. Il avait appelé Monsieur C_____ et était allé le voir à Herzliya. Monsieur C_____ lui avait proposé, pour justifier les transferts d'argent à N_____ et à S_____, de combiner ses projets en Afrique avec les siens propres et de faire croire à une structure, avec un partenariat de 70/30, ce qui était contraire à la réalité. Il avait mentionné son projet en Tanzanie, au Nigéria et aux Comores, alors que Monsieur C_____ avait ajouté d'autres projets qui n'avaient pas abouti. Ils avaient encore trouvé d'autres projets qui n'avaient pas abouti (cf. note manuscrite sur en tête de CG_____ INVESTMENTS, PP 6'000'154) et des courriels les étayant. Sur demande de Monsieur C_____, il avait également trouvé des courriels permettant de montrer des contacts entre eux. Ainsi, la réponse donnée par ACO_____ à la banque avait été préparée par Monsieur C_____ sur la base d'une note que celui-ci avait établie, qu'il a produite (cf. PP 6'000'172).

Monsieur C_____ a contesté les déclarations de D_____ (PP 502'075), tout en reconnaissant que D_____ l'avait appelé et lui avait mentionné la demande de la banque. Il lui avait conseillé d'appeler Me GAMMA pour savoir ce qu'il devait dire.

**ε.a.l)** *ABZ_____*

ABZ_____ a été entendu, le 7 juillet 2015, sur commission rogatoire en Guinée.

Il a déclaré ne pas connaître D_____ ni la société O_____. Il lui arrivait d'autoriser des tiers, notamment des Chinois, à utiliser son compte pour faire transférer de l'argent en Guinée et ensuite le retirer en espèces, moyennant versement d'une commission. En principe, il établissait une facture afin que ces tiers puissent transférer les fonds. Le contrat du 3 novembre 2011 et la facture du 15 octobre 2011 avaient été établis pour que les fonds puissent être transférés en Guinée.

**ε.b)** *Transaction 8 / Appréciation des faits*

La défense soutient que le montant de USD 1.5 million versé par D_____ à N_____ l'aurait été à titre de compensation, CGR_____ n'ayant pas eu connaissance de l'affectation ultérieure de cette somme par N_____. Ces explications sont contradictoires et ne sont pas crédibles.

**ε.b.a.a)** Pour justifier le transfert du 20 juin 2011 auprès de la banque, O_____ a produit une facture du 13 juin 2011 de N_____ à O_____ pour des services de conseil.

Cette facture a été émise sur instruction de AX_____, alors *strategic financial specialist* mandaté par CGR_____, alors même que AAV_____ avait été radiée et que la joint-venture avec ABY_____ avait déjà eu lieu.

La même année, soit le 20 décembre 2011, O_____ a transféré USD 625'000.- à S_____, dont l'ayant-droit économique, ABZ_____, a déjà servi d'intermédiaire pour des paiements à des tiers (cf. transaction no 2 et 3) et dont l'existence a été tue par CGR_____ dans le cadre de la due diligence faite par ABY_____.

Pour justifier ce transfert, O_____ a produit un contrat et une facture entre S_____ et O_____. Le transfert a été effectué sur instructions de AAU_____.

Les transferts à N_____ et à S_____ ont été effectués par des hommes de confiance de Monsieur C_____, soit AX_____ – *strategic financial specialist* mandaté par CGR_____ – et AAU_____ – *country manager* en Guinée de CGR_____ -.

Le Tribunal relève la concordance entre la demande de Madame E_____ d'être payée avec les montants versés par D_____ à ABJ_____ puis à Madame E_____.

Monsieur A_____ et ses associés ont recouru aux services de ABF_____, par le biais de ACL_____, comme ils l'ont fait pour d'autres paiements à Madame E_____.

Surtout et avant toute chose, il est souligné que le montant versé à Madame E_____ entre dans la comptabilité de AAB_____ en exécution de l'accord avec Madame E_____ portant sur le paiement de USD 5.5 millions et, plus spécifiquement, dans la cote "AX_____", donc comme faisant partie des montants versés par CGR_____ (PP 500'596).

Au surplus, pour justifier ce transfert, Monsieur A_____ a expliqué à son gestionnaire ABE_____ qu'il s'agissait d'une commission versée à Madame E_____ et que cela était en rapport avec le contrat conclu entre AAV_____ et CGR_____ ("*le paiement est en rapport avec ce contrat*", PP 500'049).

Le nombre de comptes bancaires dans différents pays, avec des sociétés de domicile appartenant à des personnes différentes, va à l'encontre de paiements légitimes. Il en est de même du motif invoqué pour légitimer le transfert, dans le contexte du cas d'espèce, soit des honoraires de consultants.

Madame E_____ a accepté la confiscation par les autorités américaines de ses deux propriétés immobilières et de son restaurant car ayant été acquis grâce à l'argent de CGR_____ ou de ses représentants.

Les explications de Monsieur C_____, soit un mécanisme de compensation, sont en contradiction avec les motifs avancés et les documents produits pour justifier le transfert des fonds.

Ces explications ont été données quatre ans après le transfert des fonds, alors que la banque - sollicitée par le Ministère public genevois – avait demandé des explications sur ces transferts.

Monsieur C_____ a parlé d'activité déployée par AAV_____ pour CG_____MM, alors que, d'une part, AAV_____ n'a jamais déployé d'activités pour CG_____MM et que, d'autre part, toutes les sommes dues à AAV_____ avaient été payées et AAV_____ avait dès lors été radiée.

Il en est de même pour ABJ_____ ou pour Monsieur A_____, AAB_____ ou AAE_____. Les précités n'ont jamais déployé d'activités pour CG_____MM.

**ε.b.a.b)** Le mécanisme de compensation avancé par Monsieur C_____ a été artificiellement monté de toutes pièces, tel que cela résulte des éléments suivants:

Monsieur C_____ a mentionné un partenariat entre lui-même et D_____, puis un partenariat entre CG_____MM et D_____ afin d'assoir sa thèse de la compensation.

Monsieur C_____ a, également, indiqué un partenariat avec AAV_____, avant de rectifier en ABJ_____, AAV_____ ayant été radiée.

Personne n'a entendu parler d'un partenariat entre D_____ et Monsieur C_____, en Afrique, en particulier pas Madame B_____.

Le partenariat en question ne se reflète pas dans les comptes des sociétés.

Le résumé comptable, produit par Monsieur C_____, par le biais de son avocat, fait état de dépenses de D_____ et de CG_____MM, selon une répartition 30/70, mais il n'en résulte aucune dette de l'un envers l'autre.

Les projets semblent avoir été choisis pour arriver au montant voulu.

Certains projets sont postérieurs au paiement de USD 1.5 million, ce qui signifie que l'opération de compensation n'était pas due au moment du paiement et que la créance n'était pas entièrement exigible.

Le partenariat et la compensation sont inconnus de toutes les personnes entendues: Madame B_____, AC_____, D_____, AX_____ et ABZ_____.

AAA_____ n'a fait que signer un contrat (entre CG_____MM et ABJ_____), qui lui a été soumis, mais ne s'est pas impliqué dans l'établissement des décomptes entre D_____ et CG_____MM.

Enfin, il est absurde de penser que CG_____MM aurait conclu un contrat avec ABJ_____, alors que la collaboration avec les ayants-droit de AAV_____, Monsieur A_____ et ses associés, était terminée et s'est terminée de manière très tendue en raison des revendications de tiers (AAM_____/Madame E_____).

Il résulte de ce qui précède que D_____ a effectué le versement de USD 1.5 million à N_____ sur instructions et pour le compte de CGR_____.

**ε.b.b)** CGR_____ savait que ce montant serait affecté à Madame E_____.

En effet, le montant de USD 1.5 million fait partie de la comptabilité de AAB_____ portant sur le paiement de USD 5.5 millions à Madame E_____ et, plus

spécifiquement, dans la cote "AX_____", soit AX_____, donc est inclus dans les montants à verser par CGR_____.

AAB_____ a eu une conversation téléphonique avec AX_____ et a établi la facture de N_____ à O_____, sur instructions du précité (cf. email du 15.06.11).

La facture est fausse dans son contenu.

Le Tribunal relève la volonté de CGR_____ de taire le rôle joué par ABZ_____ et par AAV_____.

A ce moment, soit lors du paiement, AAV_____ n'existait plus puisqu'elle avait été radiée, raison de l'utilisation d'une autre société appartenant aux mêmes animateurs que AAV_____, soit de ABJ_____.

A ce moment, CGR_____ avait restructuré le groupe pour que les sociétés, qui avaient eu un contact avec AAV_____, disparaissent de la structure qui détenait les droits miniers. C'est la raison pour laquelle CG_____MM a été utilisé, pour la première fois, avec Monsieur A_____, AAB_____ et AAE_____, via ABJ_____. Un contrat entre CG_____MM et ABJ_____ a donc été établi dans l'unique but de prouver une compensation inexistante.

Enfin, la thèse de la compensation ayant été écartée, il n'y a aucune autre raison d'expliquer cette transaction que par un moyen pour faire parvenir de l'argent à Madame E_____.

Ainsi, tout comme CGR_____ a utilisé AAV_____ et ABZ_____ comme intermédiaires pour effectuer des versements à Madame E_____, CGR_____ a utilisé D_____ puis N_____ pour effectuer des paiements à Madame E_____.

**φ)** *Transactions 8b, 9, 10, 11*

**φ.a)** S'agissant de la quatrième tranche selon le décompte de AAB_____, elle sera versée de la manière suivante et est mêlée à des frais que devait Madame E_____ en lien avec des investissements immobiliers en Floride.

Monsieur A_____, AAB_____ et AAE_____ ainsi que Madame E_____ ont effectué, séparément, des transactions immobilières en Floride (PV Madame E_____, cf. notes et courriels dans CRI AAB_____, classeurs B.2.8 à B.2.11). Les modalités de versement des USD 2 millions résultant de la quatrième tranche (transaction 8b, 9, 10, 11) tiennent compte de ces investissements et des coûts y afférent (i.e. PP 348'759: USD 2 millions = 967'885 + 936'451 + 50'000, reste dû à Madame E_____ USD 45'664.-; USD 67'885.81 de frais pour la "*Muskat Transaction*", PP 503'354).

ABF_____ a reçu de AAB_____ la somme de USD 1'904'336.83, laquelle a été virée en intégralité à Madame E_____, sous déduction de frais relatifs à une transaction immobilière "*Muskat*"(cf. transactions nos 8 à 11) ("*wires received from AAB_____*", soit virements reçus de AAB_____, PP 503'354; PP 503'355).

Par courriel du 21 septembre 2011, Monsieur A_____ a fait parvenir à Madame E_____ un modèle d'instructions à remplir et à signer pour que ABF_____ procède au transfert des fonds (cl. B.2.2.2).

| DISBURSEMENTS | MONIES RECEIVED |
|---|---|
| | $1,904,336.83 |
| ($67,885.81) | |
| ($500,000.00) | |
| ($150,000.00) | |
| ($250,000.00) | |
| ($967,885.81) | $1,904,336.83 |
| $936,451.02 | |

Wires received from AAI
Legal Fees and Costs for
Wire out to Madame E_
Wire out to Madame E_
Wire out to Madame E_

Available for Disbursemen

PP 503'354                    PP 503'355

Le 11 octobre 2011, USD 500'000.- (transaction 8b) ont été transférés du compte ACL_____ sur le compte de Madame E_____ auprès de Banque 10_____, à Miami (PP 503'340-1).

Le 28 décembre 2011, Madame E_____ a demandé à ABF_____ de lui transférer USD 250'000.- sur son compte auprès de la Banque 9_____ et USD 150'000.- sur son compte à Jacksonville, en Floride (PP 503'332; PV Madame E_____, PP 500'722, elle confirme les instructions données).

Le 11 janvier 2012, les sommes de USD 250'000.- (transaction 9) et USD 150'000.- (transaction 10) ont été transférées du compte ACL_____ sur le compte de Madame E_____ auprès de de la Banque 9_____, à Conakry (PP 503'338; compte crédité le 12 janvier 2012, de USD 247'826.71, 503'264, 503'331), respectivement sur le compte de la précitée auprès de Banque 10_____, à Miami (PP 503'340-1)

Le 14 mai 2012, ACL_____ a transféré le solde des 1'904'336.83, soit USD 936'451.02 (transaction 11) sur le compte de Madame E_____ après de la Banque 10_____ (note: montant crédité, PP 503'351).

Par courriel du 11 mai 2012, ABF_____ avait confirmé à Madame E_____ et à AAE_____ que l'instruction avait été donnée et que l'ordre serait exécuté le lundi (soit 14 mai 2012) (PP 503'352).

A relever que AAE_____ et Monsieur A_____ ont encore versé USD 50'000.- à Madame E_____ (cf. notes de AAB_____, PP 348'759).

**φ.b)** *Transaction 4 à 11 / Appréciation des faits*

Les transactions 4 à 11 ont été effectuées en exécution de l'accord conclu avec Madame E_____ portant sur le versement supplémentaire de USD 5.5 millions.

La manière dont cette somme de USD 5.5 millions devait être versée est détaillée dans les notes retrouvées chez AAB_____.

Ainsi, AAB_____ a indiqué que:

- le premier versement de USD 500'000.- sera effectué aux Etats-Unis (transactions 4, 5, 6), ce qui a été effectivement le cas;
- le deuxième de USD 1.9 million devait être effectué en Guinée et en espèces (transaction 7), ce qui a été le cas;
- le troisième de USD 100'000.- n'était pas déterminé et a en effet été effectué par ACK_____ (pas retenu dans l'AA);
- le quatrième versement de USD 2'000'000.- devait être effectué par "ABF_____", ce qui a été le cas via ACL_____ (transactions 8b, 9, 10, 11), la société de domicile de ABF_____;
- le cinquième versement devait être versé en Guinée, ce qui a été le cas, après avoir transité par le compte bancaire de N_____ (transaction 8a).

Ces notes permettent également de rattacher ces paiements à CGR_____, dans la mesure où AAB_____ indique clairement les montants à verser par "**AX_____**", soit AX_____, qui s'est occupé de tous les paiements effectués à Monsieur A_____, AAE_____, AAB_____ et à Madame E_____. Ces notes sont crédibles et corroborées par les montants effectivement versés à Madame E_____ (par le versement effectué par CGR_____ via N_____, qui n'a servi que d'intermédiaire dans ce paiement (cf. transaction 8).

Par conséquent, il sera retenu que les sommes, décrites sous transactions 4 à 11 et versées à Madame E_____, proviennent de CGR_____. Monsieur A_____, AAE_____, AAB_____, respectivement leurs sociétés, ou ABZ_____ n'ont servi que d'intermédiaires dans le versement de ces sommes.

Il sera relevé au surplus ce qui suit.

L'enregistrement du 8 mai 2012 (cf. *sufra*) confirme que cette somme de USD 5.5 millions a été versée car "*Monsieur C_____ l'avait promis*" et donc qu'elle provient bien de CGR_____.

La teneur des discussions enregistrées entre Madame E_____ et Monsieur A_____ (cf. *sufra*) assoit cette appréciation, selon laquelle les sommes versées à la précitée proviennent de CGR_____, contrairement aux USD 20'000.- que Monsieur A_____ portait sur lui et qui provenaient "*de sa poche*".

Il en est de même des déclarations de Madame E_____, qui a indiqué que toutes les sommes reçues provenaient de CGR_____. Cette déclaration est crédible dans la mesure où elle est corroborée par les éléments au dossier, spécifiquement les documents bancaires.

**γ)** *ACQ_____ – processus de révision des titres miniers*

**γ.a)** La Guinée a connu ses premières élections présidentielles libres. Le 27 juin 2010 a eu lieu le premier tour des élections présidentielles et, le 7 novembre 2010, le second tour. Le 3 décembre 2010, les résultats ont été confirmés et ACQ_____ a été élu Président de la Guinée (note: il avait été condamné à 5 ans de prison sous le régime de AAO_____ après avoir perdu les élections présidentielles de 1998).

Le Président ACQ_____ a décidé de revoir les titres miniers alors octroyés, notamment eu égard à l'accord conclu entre CGR_____ et ABY_____ portant sur la vente de 51 % des actions pour USD 2.5 milliards, alors que CGR_____ n'aurait versé que USD 160 millions pour l'acquisition des concessions, par le biais d'investissements dans les forages ou les infrastructures du pays.

Le 4 avril 2011, alors que le Président avait décidé que le fer de Simandou devait être exporté via la Guinée (et non le Libéria), le Ministère des mines a ordonné l'arrêt immédiat des travaux de CGR_____ en cours (PP 5'000'840).

En août 2011, la Société Guinéenne du Patrimoine Minier (SOGUIPAMI) a été créée. Elle était destinée à gérer les participations de l'Etat dans les sociétés minières.

Le 9 septembre 2011, un nouveau code minier a été établi.

Dans le cadre de la revue des titres miniers, le gouvernement guinéen a sollicité de CGR_____ le versement d'un montant supplémentaire en lien avec les concessions acquises. Des négociations ont suivi, lesquelles ont échoué. Dans le cadre de ces négociations, Monsieur A_____ est intervenu et s'est présenté comme étant le

représentant du "*Boss*", soit de Monsieur C_____, tel que cela ressort d'un courriel du 1er mars 2012, alors que "*AC*" se réfère au Président ACQ_____ (cf. PP 4'707'154 et également la conversation enregistrée de Monsieur A_____ du 11 avril 2013).

Le 26 mars 2012, le Président ACQ_____ a créé la Commission nationale des mines composée d'un Comité technique et d'un Comité stratégique (PP 5'000'893).

Le 29 mars 2012, il a fixé les modalités de la mise en œuvre par la commission d'un programme de revue des titres et conventions en vigueur (PP 5'000'903).

Le gouvernement de Guinée a mandaté le cabinet d'avocats DLA PIPER afin d'enquêter sur les circonstances de l'acquisition par CGR_____ GUINEE des droits sur les blocs 1 et 2 et l'approbation du transfert de ces droits à ABY_____ (PP 349'790). Selon les conclusions du rapport, les droits et l'approbation du transfert de ces droits avaient été acquis par le biais d'actes de corruption (PP 349'790).

Une procédure administrative a été ouverte.

**γ.b)** Le 8 mai 2012, Monsieur A_____ s'est rendu en Floride pour rencontrer Madame E_____. Il n'a pas rencontré l'intéressée, mais son mari, ABR_____, et son frère, ACP_____, et a pu brièvement lui parler au téléphone à la fin de la rencontre, alors que Madame E_____ se trouvait en Floride. Cette rencontre a été enregistrée par le FBI (PP 3'002'113, enregistrement PP B.4.7.13 audio files; retranscription, PP 500'497). Il ressort de cette rencontre que :

- Madame E_____ a reçu les USD 5.5 millions promis (PP 500'500) parce que "*c'est Monsieur C_____ qui avait dit*" (PP 500'500-1), Monsieur A_____ ajoutant "*quand Monsieur C_____ dit quelque chose, il le fait*" (PP 500'501);

- Madame E_____ souhaitait une proposition financière écrite de CGR_____ sur le versement d'une somme supplémentaire, ce à quoi Monsieur A_____ s'est opposé au motif que Monsieur C_____ n'allait jamais s'engager par écrit à verser un montant à Madame E_____, alors que précisément il était confronté à l'existence de documents écrits compromettants, mais que le versement de USD 5 millions était acquis, somme qui serait augmentée une fois les problèmes en lien avec les concessions minières résolus (PP 500'497-8, "*Monsieur C_____ ne marquera jamais: je m'engage ta ta ta ta, Monsieur C_____ pas Monsieur C_____ ou CGR_____; c'est tout ce qu'il est en train de combattre en ce moment (...) Il va pas refaire encore un papier!*");

- il ne servait à rien que Monsieur A_____ s'engage personnellement par écrit à verser ces montants dans la mesure où les fonds ne provenaient pas de lui;

- Monsieur C_____ s'enquerrait de l'état de ses démarches auprès de Madame E_____ ("*J'ai reçu un message de Monsieur C_____ (...) qui me dit:*

*Monsieur A_____, je sais que tu es allé voir Madame E_____, qu'est ce qui se passe?*" PP 500'499);

– Monsieur A_____ voulait, de son côté, faire signer une attestation à Madame E_____ dans laquelle elle niait avoir reçu des pots de vin ou avoir conclu des contrats au contenu illégal concernant les activités de CGR_____.

L'attestation en question a été préparée par une collaboratrice de Me Jean VEIL, avocat parisien de Monsieur C_____ (cf. résumé des conclusions de l'enquête interne pour le conseil de fondation de V_____, PP 300'547).

Par la suite, Madame E_____ a effectivement signé l'attestation en question, mais en deux fois, soit le 27 avril 2012 prétendument à Dubreka et le 5 mai 2012 aux Etats-Unis (PP 348'788 et 348'790). Ces attestations allaient dans le sens de ce que Monsieur A_____ préconisait, lors de la réunion du 8 mai 2012. En effet, Madame E_____ a déclaré résider à Dubreka et n'avoir jamais transmis de contrats qu'elle aurait conclus et avoir vu de faux contrats conclus en son nom. Par ailleurs, elle a soutenu que ACJ_____ n'avait pas agi en son nom, mais était l'auteur d'une tentative d'extorsion basée sur de faux documents, ce qu'elle avait dénoncé lorsqu'elle l'avait appris pour "*nettoyer son nom et sa réputation*" (PP 5'001'683).

Entendu dans le cadre de la présente procédure, Monsieur C_____ a contesté avoir tenu les propos que Monsieur A_____ lui prêtait. Monsieur A_____ avait utilisé son nom pour gagner en crédibilité auprès de son interlocutrice (PV PP 500'473). Il a ajouté "*on n'a jamais payé Madame E_____. Par nous, j'entends moi ou CGR_____*". Si Madame E_____ avait été payée, c'était en relation avec d'autres affaires qui ne concernaient pas CGR_____ (PV, PP 50'475).

Le 30 octobre 2012, le Comité technique a informé ACD_____ que celle-ci n'avait pas coopéré dans le cadre de la procédure et que les droits miniers avaient été obtenus illégalement.

Monsieur A_____ a signé une attestation écrite du 26 novembre 2012 (PP 3'000'067). Il a déclaré avoir rencontré, à deux ou trois reprises, le Président AAO_____, dans le cadre des projets miniers de CGR_____ et lui avoir offert une montre d'une valeur de moins de USD 5'000.- conformément aux usages locaux. Il a précisé avoir rencontré la première épouse du Président, AAJ_____, ainsi que K_____, qui l'avait présenté à sa demi-sœur Madame E_____. Monsieur A_____ avait rencontré Madame E_____ à plusieurs reprises dans sa maison de Dubreka, laquelle lui avait indiqué posséder un site diamantifère dans la région de Forécariah, site qui, après analyse du sol par CGR_____, ne s'était pas révélé intéressant, raison pour laquelle l'offre de Madame E_____ avait été déclinée. Les relations entre CGR_____ et Madame E_____ s'étaient limitées à cette opportunité d'affaires et Monsieur A_____ n'avait jamais

demandé à la précitée d'intervenir en faveur de CGR_____ auprès de quiconque, y compris auprès du Président, dont elle n'avait jamais été l'épouse. Monsieur A_____ a ajouté que Madame E_____ n'avait jamais été présente lors des rencontres entre CGR_____, Monsieur A_____ et le Président. Monsieur A_____ n'avait jamais effectué de versements à quiconque en ou hors de Guinée pour le compte de CGR_____ ni souscrit d'engagement de paiement pour son compte.

Le 2 décembre 2013 (PP 500'280), Madame E_____ a signé une nouvelle attestation, laquelle a été produite devant le Comité technique, alors qu'elle n'a pas été entendue par ledit comité. Elle a expliqué avoir rencontré le Président AAO_____, en 2000, et être devenue sa quatrième épouse. Elle a ajouté que AAN_____, alors Ministre de la jeunesse et des sports, l'avait appelée pour lui présenter un investisseur, soit CGR_____. Le lendemain, AAN_____ était venue chez elle à Dubreka avec des tiers, dont Monsieur A_____, qui l'avait informée que CGR_____ voulait exploiter des mines de fer et l'avait priée de les mettre en contact avec son époux, AAO_____. Si CGR_____ obtenait des titres miniers, Monsieur A_____ et AAN_____ lui avaient promis que USD 12 millions seraient versés à différentes personnes, dont elle-même. Madame E_____ avait signé divers contrats avec CGR_____ qui lui avaient été soumis par Monsieur A_____. Lorsqu'elle avait demandé la raison pour laquelle le nom de AAV_____ apparaissait sur ces contrats, Monsieur A_____ lui avait répondu que AAV_____ agissait pour le compte de CGR_____. Elle avait ensuite personnellement introduit Monsieur A_____ auprès de AAO_____ en indiquant que Monsieur A_____ représentait les intérêts de CGR_____, qui voulait exploiter des mines en Guinée.

Il ressort d'une conversation du 2 décembre 2012 entre ABP_____ et ABO_____ que Monsieur A_____ est allé rencontrer le précité à Miami pour essayer de trouver une issue au litige opposant CGR_____ à la Guinée (conversation mediapart, PP 350'301; sentence arbitrale PP 3'002'118).

Le 30 décembre 2012, le Comité technique a adressé à CGR_____ une lettre d'allégation des griefs reprochés.

Par recommandation du 21 mars 2014 (PP 3'000'005), dans le cadre de la révision des titres miniers et de la convention minière détenus par la société ACD_____, le Comité technique a estimé qu'il existait un faisceau d'indices précis et concordants établissant avec une certitude suffisante l'existence de pratiques de corruption ayant entaché l'octroi des titres et de la convention minière détenue par ACD_____, lesquelles affectaient la validité de ceux-ci. En conséquence, le Comité technique a recommandé au Comité stratégique de proposer aux autorités décisionnelles de retirer les titres détenus par ACD_____ et de résilier la convention sur les gisements des blocs 1 et 2 de Simandou et de Zogota.

Par décrets des 17, 18 et 24 avril 2014, le Président ACQ_____ a retiré les concessions accordées les 9 décembre 2008 et 19 mars 2010 à CGR_____ (PP 5'001'369 et 5'001'373) et résilié la convention minière (convention de base) du 16 décembre 2009 (PP 5'001'377).

CGR_____ a soutenu que par la révision des titres miniers, ACQ_____, nouvellement élu, visait en réalité le paiement d'importantes sommes d'argent qui lui étaient nécessaires pour rembourser des personnes qui l'avaient aidé dans le cadre de son accession à la Présidence.

η) *Procédure états-uniennes*

**η.a)** En janvier 2013, alors que la procédure sur la révision des titres miniers était en cours en Guinée, une procédure a été ouverte, aux Etats-Unis, pour blanchiment d'argent et corruption en lien avec le versement de pots-de-vin à des membres de l'ancien gouvernement de Guinée dans le cadre de l'attribution de concessions minières, en particulier à Simandou. Madame E_____ a accepté de coopérer à l'enquête dans l'espoir d'obtenir une immunité de poursuite ("*immunity for the Cooperating Witness's ownpotential criminal conduct*", plainte du FBI, ch. 10). A ce moment, Madame E_____ vivait aux Etats-Unis, à Jacksonville, en Floride, avait la seule nationalité guinéenne, était au bénéfice d'un passeport diplomatique et d'un simple visa valable jusqu'au 27 août 2013 (cf. réunion du 25.03.13 Madame E – Monsieur A). Elle était en train de mettre sur pied un commerce de boissons et de restauration rapide à l'aide de l'argent reçu de "*ABF_____*" ("*qui a financé tout ça? L'argent que ABF_____ m'avait envoyé*").

Au mois de mars et avril 2013, Monsieur A_____ est allé rencontrer Madame E_____ en Floride dans le but de la convaincre de détruire des documents originaux, y compris les contrats signés avec AAV_____ ou CGR_____ et de mentir aux investigateurs américains, voire de quitter le pays pour éviter de répondre à leurs questions, moyennant le versement de sommes d'argent et la signature d'une attestation préparée par CGR_____ ou ses avocats (cf. ci-après courriel du 5 avril 2013 de ACR_____ à Monsieur C_____, PP 500'676-7).

Ces entretiens étaient enregistrés. Il en ressort ce qui suit :

– Les 15 et 16 mars 2013, Monsieur A_____ a demandé de rencontrer Madame E_____, celle-ci s'enquérant au préalable de ce que Monsieur A_____ allait lui donner comme argent (Madame E: "*qu'est-ce que tu m'offres d'abord? Avant de te voir. Qu'est-ce que tu as pour moi?*"; Monsieur A: "*ça représente quand même pas mal d'argent qui peut arriver comme ça*"; Madame E: "*combien vous avez à me donner?*").

– Le 20 mars 2013, les intéressés se sont reparlés au téléphone pour fixer les modalités du rendez-vous. A la question de Madame E_____ qui demandait si "*Monsieur C_____*" avait demandé à Monsieur A_____ de la rencontrer et s'il était d'accord que Monsieur A_____ lui remette "*cette somme*", le précité a répondu "*bien sûr*".

– Le 25 mars 2013, ils se sont rencontrés à l'aéroport et Monsieur A_____ a précisé que, comme convenu, USD 2 millions seraient versés à Madame E_____. Sur le premier million, USD 300'000.- seraient remis immédiatement et le solde ultérieurement, alors que le deuxième million serait bloqué chez un avocat, qui ne sera pas "*ABF_____*" (Madame E: "*la dernière fois, c'était ABF_____*"; Monsieur A: "*ABF_____ a fait que des conneries*"). En échange, "*les papiers*" devaient être détruits ("*il faut qu'on détruise ces papiers*"; "*ces fameux papiers ils sont ici aux Etats-Unis? Parce que quand on va se voir la prochaine fois, il faut que l'on détruise ça*"). Par la suite, Monsieur A_____ a donné des conseils sur l'attitude que devait adopter Madame E_____ si elle était interrogée et lui a recommandé de dire qu'elle n'avait rien à voir avec tout ça, ajoutant "*comme on avait fait sur l'attestation*". Monsieur A_____ a ajouté: "*heureusement Monsieur C_____ a eu l'intelligence d'insister pour que ce soit fait de façon très très régulière pour qu'on puisse pas ensuite l'attaquer. .... Même ABN_____ était dedans ... y'a 20 signatures, 30 signatures sur le contrat de CGR_____*".

Par courriel du 5 avril 2013 (PP 500'676-7), ACR_____ a envoyé à Monsieur C_____, sur son adresse advisor@ad_____fa.com, l'attestation, que devait signer Madame E_____, avec la mention "*STRICTEMENT CONFIDENTIEL*", dont la teneur est la suivante :

*ATTESTATION*

*Je m'appelle Madame E_____. Je suis de nationalité guinéenne, j'ai vécu la plus grande partie de ma vie en Guinée et j'habite aujourd'hui aux Etats-Unis.*

*Des représentants de la société CGR_____ sont venus me voir et m'ont indiqué que la République de Guinée leur reprochait des faits dans lesquels j'aurais été impliquée. Ils m'ont exposé quels étaient ces faits et m'ont demandé si j 'étais d'accord pour dire ce que j'en pensais, j'ai été d 'accord parce que ce qu'ils m'ont rapporté est faux et je souhaite aujourd'hui attester ce qui suit.*

*Ma situation familiale*

*Je suis la demi-sœur de K_____, et non sa sœur. Nous n'avons jamais été très proches mais plutôt des rivaux.*

*Je n'ai jamais été mariée avec le Président AAO_____ aujourd'hui décédé. Il paraît qu'on dit que j'ai été sa quatrième épouse, c'est faux.*

*Mes relations avec la société CGR_____ il paraît qu'on dit que j'aurais signé des contrats avec CGR_____ et que CGR_____ devait me payer des commissions en contrepartie de mes services en leur faveur.*

*C'est faux, le n'ai jamais signé aucun contrat avec CGR_____ ni directement, ni par l'intermédiaire de qui que ce soit.*

*Il paraît qu'on dit que j'aurais intercédé auprès de dirigeants officiels de Guinée en faveur de CGR_____ pour que CGR_____ obtienne des droits miniers en Guinée. C'est faux, le ne suis jamais intervenue auprès de dirigeants guinéens en faveur de CGR_____. Je n'ai jamais donné d'instructions ni demandé à quiconque de prendre des décisions en faveur de CGR_____. Je ne me suis jamais intéressée aux affaires minières du pays.*

*Il paraît qu'on dit que CGR_____ m'aurait versé de l'argent. C'est faux, le n'ai jamais touché d'argent de la part de CGR_____ ni directement, ni indirectement. On parle d'un chèque de 7 ou 10 millions USD qu'ils m'auraient remis.*

*Ça ne s'est jamais passé. On dit qu'ils m'auraient remis de l'argent en liquide, des sommes de 2,5 millions USD et 150.000 USD. C'est faux, ils ne m'ont jamais versé ces sommes ni d'ailleurs aucune somme, ni à moi ni directement, ni à quelqu'un d'autre pour mon compte.*

*Ils ne m'ont pas non plus promis de me verser quoi que ce soit, ni à moi, ni à qui que ce soit pour mon compte.*

*Enfin, je voudrais dire que c'est ridicule de dire que j'aurais déménagé aux Etats-Unis parce que j'aurais eu peur que CGR_____ porte atteinte à ma personne. Cette idée ne m'est pas passée par la tête.*

*Je suis très choquée par les faits que m'a exposés CGR_____. On utilise mon nom, je n'ai rien à voir avec cette société ni avec les faits qu'on leur reproche.*

*Fait à ,*
*Le  avril 2013*

Le jour même, Monsieur C_____ a répondu :

*"Hi ACR_____, you have send me the below which have nothing to do with me? I guess it is the suggestion of J Veil off have it as part of CGR_____ response to the so called CT, which I think make sense. Anyway I cant help or advice on it and leave this entirely to our lawyers. I met that only once in my life for 5 min as she was present in the room, but we haven't spoken etc, so I have noob in or knowledge of her. Best Monsieur C_____ "*

En traduction libre: "*Salut ACR_____, tu m'as envoyé le message ci-dessous, lequel n'a rien à voir avec moi ? Je suppose qu'il s'agit de la suggestion de J VEIL de l'avoir dans le cadre de la réponse de CGR_____ au soi-disant CT, ce qui a du sens à mon avis. En tout état, je ne peux pas aider ou donner de conseil à ce sujet et je m'en remets intégralement à nos avocats à cet égard. Je l'ai rencontrée une seule fois dans ma vie durant 5 minutes, alors qu'elle était présente dans la pièce, mais nous n'avons pas discuté ensemble, etc, partant je n'ai rien à voir avec elle ni aucune connaissance d'elle. Salutations Monsieur C_____*".

Il est relevé que "*CT*" doit être compris comme étant le Comité technique et que Me Jean VEIL est l'avocat parisien de Monsieur C_____ et de CGR_____.

Monsieur C_____ a expliqué (audience 04.05.17, PP 500'640) que cette attestation avait été rédigée en réponse aux accusations graves formulées par le Comité technique et basées sur les affirmations mensongères de Madame E_____, qu'il qualifiait de "*criminelle*". Une réunion avait eu lieu chez Me Jean VEIL, à Paris, pour préparer la réponse de CGR_____ en sa présence ainsi qu'en présence de ACR_____. Monsieur C_____ imaginait que le projet d'attestation qui lui avait été envoyé devait être signé par Madame E_____, mais cela regardait les avocats et non pas lui; l'attestation démentait une des accusations mensongères de la précitée devant le Comité technique.

Deux autres réunions se sont déroulées entre Monsieur A_____ et Madame E_____, dont il ressort ce qui suit:

– Le 11 avril 2013, Madame E_____ et Monsieur A_____ se sont rencontrés une nouvelle fois à l'aéroport. Madame E_____ a informé Monsieur A_____ avoir été interrogée par le FBI. Monsieur A_____ a répondu qu'il fallait urgemment détruire les documents, comme il le lui avait demandé depuis longtemps, et contester avoir joué un rôle dans l'attribution des droits miniers de Simandou.

– Monsieur A_____ a également abordé le statut marital de Madame E_____, question "*très importante*" à ses yeux car si Madame E_____ était officiellement mariée à AAO_____, elle entrait dans "*une catégorie qui est très, on va dire, dangereuse, exposée parce que en tant que mari et d'épouse (…) tu rentres dans le cadre familial*", elle assumait un "*risque supplémentaire*", alors qu'en tant qu'amie de la famille, le Président connaissant bien le père de Madame E_____, c'était différent et il lui recommandait de le dire ainsi. Il ajoutait que les avocats à Paris et en Angleterre se penchaient sur cette question. Madame E_____ a indiqué qu'il était possible d'épouser quatre femmes en Guinée sans qu'il n'y ait besoin que ce soit officialisé et qu'elle ne pouvait pas mentir sur son statut d'épouse du Président.

- Madame E_____ a informé Monsieur A_____ avoir remis les contrats conclus avec AAV_____ et avec CGR_____ à ABO_____ (note: fils d'un Premier Ministre du Gabon et homme d'affaires influent en Afrique du Sud et en Guinée condamné le 31 mai 2017 à deux ans de prison aux États-Unis pour corruption d'agents publics au Niger, en Guinée et au Tchad) et qu'elle avait gardé les originaux dans un lieu sécurisé en Floride. Monsieur A_____ a alors compris que les documents avaient été transmis par ABO_____ à ABN_____ et ACQ_____; il a ajouté, s'adressant à Madame E_____, que si "*ça saute, toi tu es dans une grosse grosse galère (...) aux Etats-Unis pour toi c'est fini. Ils vont comprendre ce que tu as et ils te mettent dehors. Ils vont te poursuivre en justice en plus. C'est grave.*"

- Monsieur A_____ a présenté à Madame E_____ l'attestation susmentionnée envoyée le 5 avril 2013. Il lui a dit que celle-ci avait été préparée par des avocats et lui l'a lue.

- Monsieur A_____ a insisté lourdement pour que les documents soient détruits urgemment ("*il y a vraiment urgence*"), ce qu'il devait constater de visu, selon ce qui lui avait été demandé ("*ce qu'on m'a demandé*", "*on m'a demandé*", "*Monsieur C_____ m'a dit écoute (...) mais je veux que tu ailles voir, je veux que tu détruises ces documents*", "*le big boss*").

- Monsieur A_____ a confirmé l'accord, soit de verser USD 1 million à Madame E_____, dont USD 200'000.- immédiatement en Sierra Leone, et USD 5 millions quand le dossier serait terminé, soit "*si le groupe n'est pas mis dehors*", "*quand le vieux dégage*", soit ACQ_____. Madame E_____ a alors précisé qu'il s'était agi de USD 300'000.-, mais Monsieur A_____ a répondu avoir réussi à obtenir USD 200'000.-. Il a ajouté qu'en fonction de la manière dont l'affaire se terminerait, il y aurait encore plus et a précisé "*Et ça c'est directement la communication qui m'a été donnée directement par le numéro 1, je ne veux même pas donner son nom*", précisant ensuite qu'il s'agissait de "*Monsieur C_____*", "*tout ce que je te dis, c'est directement de Monsieur C_____*", "*personne d'autre*".

Monsieur A_____ a incité Madame E_____ à quitter les Etats-Unis pour la Sierra Leone.

Madame E_____ a signé l'attestation que Monsieur A_____ lui a présentée en supprimant toutefois la phrase sur son statut marital en remplissant "*Fait à Jacksonville, le 11 avril 2013*", attestation retrouvée chez AAB_____ (PP 348'792). Madame E_____ est ensuite partie en taxi et Monsieur A_____ a appelé AAB_____ (PP 4'700'479) pour l'informer que Madame E_____ avait signé l'attestation.

Ce même 11 avril 2013, Madame E_____ et Monsieur A_____ se sont revus à l'aéroport. Il ressort de cette rencontre ce qui suit:

– Madame E_____ a demandé à Monsieur A_____ ce qu'elle toucherait, immédiatement et aux Etats-Unis, en échange des mensonges qu'elle devait faire au FBI. Monsieur A_____ lui a répondu qu'elle n'avait pas d'autre choix que de mentir, elle devait nier avoir touché une quelconque somme d'argent et que les seules affaires qu'elle avait faites au pays "*c'est d'acheter du riz, d'acheter du sucre et des culs de poulets*", mais qu'elle ne s'était pas occupée "*des affaires du pays*", "*des histoires de mines*". S'agissant de l'argent versé, Monsieur A_____ a indiqué que :

   "*il y en a qu'un qui décide, tu dois comprendre que, toutes les personnes sont au milieu, il n'y a personne qui décide, il n'y en a qu'un, c'est celui qui est en haut, et c'est le seul (…) il n'y a personne qui peut te dire à 100% si ce n'est pas lui là-haut*" (…) "*AAB_____ c'est pas lui qui va te garantir (…) personne ne peut te garantir si ce n'est pas l'autre là-haut*".

– En référence aux documents à détruire, Monsieur A_____ a mentionné "*27 et 28 février*".

– Ils ont prévu de se revoir le samedi pour s'occuper de la destruction des documents originaux, et non seulement des photocopies.

Le 14 avril 2013, Madame E_____ et Monsieur A_____ se sont revus à l'aéroport.

Madame E_____ a demandé combien d'argent Monsieur A_____ avait à lui donner, et le précité lui a indiqué la somme de USD 20'000.- qu'il portait sur lui, lesquels provenaient de "*Monsieur A_____*" contrairement aux autres sommes à verser, alors que Madame E_____ a prétendu avoir les documents originaux avec elle.

Alors que Madame E_____ a expliqué avoir créé son affaire de restauration via une société, Monsieur A_____ a vérifié qu'elle ne l'avait pas fait par le biais de ABD_____ ("*c'est pas ABD_____?*").

En référence à AAO_____, Madame E_____ l'a appelé "*mon mari*" ("*quelque chose que mon mari m'a donné*").

Après avoir dit à Madame E_____ "*S'il y a un gros bordel aujourd'hui c'est par ce que ABO_____ est passé par ici*" et s'être levé pour contrôler l'horaire de son vol, Monsieur A_____ s'est fait arrêter par le FBI. Il était porteur de USD 20'000.- dans des enveloppes de la Banque 10_____.

Dans le cadre de la présente procédure (PV, PP 500'295), Monsieur C_____ a toujours contesté avoir eu des contacts avec Monsieur A_____ préalablement aux rencontres du précité avec Madame E_____. Monsieur A_____ l'affirmait à Madame E_____ pour être crédible.

**η.b)** *Monsieur A_____*

Le 15 avril 2013, le FBI a déposé plainte contre Monsieur A_____ devant la Cour fédérale du District Sud de New York (PP 3'000'190) pour subordination de témoin, de victime ou d'informateur, obstruction au déroulement d'une enquête pénale et destruction, altération et falsification de relevés dans le cadre d'une enquête fédérale.

Le 10 mars 2014, Monsieur A_____ a plaidé coupable ("*guilty plea*") pour obstruction au déroulement d'une enquête pénale et a été condamné à 2 ans de prison ainsi qu'à une amende de USD 75'000.-. Il a admis avoir offert de l'argent à Madame E_____ pour l'inciter à quitter les Etats-Unis afin d'éviter à avoir à répondre aux questions du FBI.

Il a été condamné le 29 juillet 2014 et est sorti de prison le 9 janvier 2015.

Le 29 juin 2015, Monsieur A_____ a signé une attestation écrite produite dans le cadre de la procédure arbitrale LCIA, dans laquelle il affirme ne pas avoir agi sur instructions de Monsieur C_____ (PP 500'328).

**η.c)** *Versement par chèques par ABH_____ à Madame E_____*

Alors que la procédure aux Etats-Unis était pendante, ABH_____ a signé six chèques en faveur de Madame E_____ pour un total de USD 50'000.- (PP 501'013ss).

**η.d)** *Madame E_____*

Par acte du 21 novembre 2014 (*Verified Complaint for forfeiture in rem, www. https://star.worldbank.org*), modifié par acte du 18 mars 2015 (*Amended Verified Complaint for forfeiture in rem*), les Etats-Unis ont sollicité la confiscation des trois biens immobiliers et du restaurant acquis par Madame E_____ en Floride à l'aide du produit de la corruption. Il était établi que Madame E_____ avait reçu des millions de dollars de CGR_____ et de ses représentants en lien avec un schéma de corruption visant à influencer son époux, AAO_____, pour l'octroi des titres miniers à CGR_____, CGR_____ ayant continué à exécuter ses promesses de paiement envers Madame E_____ après le décès de son mari.

En janvier 2016, un accord a été conclu entre les Etats-Unis et Madame E_____. Madame E_____ reconnaissait avoir acquis ces biens à l'aide du produit de la corruption, deux des biens immobiliers et le restaurant étaient confisqués par les Etats-

Unis, alors qu'elle conservait la résidence sise _____, dans laquelle elle vivait (*Stipulated settlement between United States and Madame E_____, accord entériné par Consent Order for Judgment of Forfeiture du 4 avril 2016, www. https://star.worldbank.org*).

**η.e)** *Audition Madame E_____*

Le 23 février 2017, Madame E_____ a été entendue par les autorités américaines (PP 500'755ss). Elle a déclaré ne pas avoir d'activité professionnelle au jour de son audition et s'occuper de ses enfants. Elle a indiqué avoir épousé le Président AAO_____ en 2000. Il s'agissait d'un mariage coutumier, "*le père avait donné la fille à l'homme*", conformément à la tradition.

Elle a expliqué que AAN_____ avait travaillé avec son père à la Banque centrale de Guinée. Par le biais de sa sœur, AAN_____ avait demandé à Madame E_____ de rencontrer les gens de CGR_____, en particulier Monsieur A_____.

En 2005 ou 2006, elle avait rencontré Monsieur C_____ qui lui avait promis 5 % contre l'obtention d'une partie de Simandou, ce que le Président savait. Elle a indiqué que le précité lui avait remis USD 200'000.- en espèces par le biais de son frère K_____, avant de déclarer que Monsieur C_____ n'était pas présent, mais avait donné l'ordre de donner l'argent (p. 58). Il lui avait également donné un collier en diamants.

AAV_____ avait été mise en place car Monsieur C_____ ne voulait pas payer directement Madame E_____. Monsieur A_____ était un intermédiaire entre CGR_____ et elle-même.

Elle n'avait pas reçu la part promise, mais des paiements en échange de cette part.

S'agissant des rencontres qui avaient eu lieu en 2013 avec Monsieur A_____, Madame E_____ a expliqué que Monsieur C_____ avait demandé que toute la documentation, soit tous les contrats conclus, soit détruite ou brûlée, les originaux et les photocopies. Elle savait que c'était Monsieur C_____ qui l'avait demandé car, lorsque Monsieur A_____ venait la voir, tout comme AAU_____ ou AAB_____, c'était que Monsieur C_____ le leur avait demandé. Monsieur A_____ lui avait proposé de l'argent en échange de la destruction des documents. Il lui avait également demandé de signer une attestation, mais celle-ci contenait des mensonges.

Tous les contrats signés étaient authentiques.

Quant à ABH_____, dont elle pensait qu'il travaillait pour le gouvernement guinéen, il lui avait proposé de prendre en charge les frais liés à sa venue aux Etats-Unis. Elle ne

savait pas si le précité avait des contacts avec ACU_____ et elle ne devait rien faire en échange de l'argent reçu.

**ι)** *Procédure guinéenne*

Peu après l'ouverture de la procédure états-unienne, les autorités guinéennes ont ouvert une procédure à l'encontre de K_____ et de ACB_____, lesquels ont été arrêtés et incarcérés les 16 respectivement 19 avril 2013.

La justice guinéenne a décidé la mise en liberté des intéressés au 6 août 2013. Ils n'ont toutefois été relaxés que le 29 novembre 2013. K_____ a quitté le territoire.

Diverses personnes ont été entendues par les autorités guinéennes.

Par jugement rendu le 30 mars 2020, le Tribunal de première instance de Kaloum, à Conakry, a acquitté six intervenants-clés dans le cadre de l'affaire de corruption des gisements miniers de Simandou et Zogota (cf. jugement annexé au courrier du 6 avril 2020 de Me GAMMA_____). Le jugement mentionne que la partie civile s'est désistée de son action pour cause d'arrangement intervenu entre elle et les prévenus, et le ministère public principal a abandonné les poursuites engagées contre les prévenus, ce qui prouvait que ledit ministère public ne disposait d'aucun élément de preuve pouvant amener celui-ci à entrer en condamnation contre les prévenus, raison pour laquelle le Tribunal a déclaré les prévenus Madame E_____, K_____, ABP_____, AAM_____, ACB_____ et AAF_____ non coupables des faits qui leur étaient reprochés.

**φ)** *Procédure israélienne*

Les autorités judiciaires israélienne ont ouvert une procédure pénale à l'encontre de Monsieur C_____.

Dans ce cadre, ils ont sollicité l'entraide des autorités suisses, procédure référencée sous CP/401/2015.

Les autorités suisses ont également sollicité l'aide des autorités israéliennes dans le cadre de la présente procédure (cf. classeurs B.4.5.4 à 6).

Diverses personnes ont été entendues par les autorités israéliennes.

**κ)** *Procédure LCIA*

Le 17 avril 2014, le Président ACQ_____ a retiré la concession accordée à CGR_____.

Le 28 avril 2014, ABY_____ a introduit une requête arbitrable à l'encontre de CGR_____ par devant le Tribunal arbitral de la London Court of International Arbitration (LCIA) en paiement de USD 1.25 milliards. En substance, elle reprochait à CGR_____ d'avoir conclu le contrat de joint-venture et la convention d'actionnaire sur la base de fausses garanties, CGR_____ ayant notamment caché avoir obtenu la concession minière par le biais d'actes de corruption ayant mené à la révocation de ladite concession. Ainsi, CGR_____ avait notamment corrompu Madame E_____ et ABP_____ en leur versant des millions de dollars ainsi que le Président AAO_____ en lui offrant des cadeaux (une montre et une voiture miniature en or et incrustée de diamants).

Madame B_____, Monsieur A_____ et Monsieur C_____ n'étaient pas parties à cette procédure et n'ont pas été entendus par le Tribunal arbitral.

Dans le cadre de cette procédure, les parties ont produits divers témoignages écrits (Witness Statement).

Par sentence arbitrale du 4 avril 2019 (280 pages, PP 3'002'000), CGR_____ a été condamnée à verser à ABY_____ la somme de USD 1.247 milliards. Le Tribunal a retenu que CGR_____ avait sciemment (nos 677ss) donné (10) de fausses garanties ou des garanties trompeuses dans le cadre de la procédure de due diligence (nos 676):

- en ne révélant pas l'existence de consultants ou d'agents (incluant AAV_____, Monsieur A_____, ABZ_____ et ACS_____) et en ne transmettant pas les contrats qui la liaient à ceux-ci,

- en ne transmettant pas les documents et informations en lien avec le transfert des actions du 17 février 2009 entre CGR_____ GUINEE BVI et CGR_____ GUERNESEY,

- en ne révélant pas l'existence des litiges avec AAM_____ et ABS_____,

- en ne révélant pas les liens existants avec K_____ et Madame E_____ et en affirmant faussement que K_____ et Madame E_____ n'avaient pas de lien de parenté (cf. déclaration AAU_____),

- en donnant une description trompeuse sur son rôle dans le retrait des titres miniers de AAL_____,

- en ne communiquant pas l'existence de ses relations professionnelles et financières avec Madame E_____ et ABD_____,

- en affirmant ne pas avoir corrompu Madame E_____.

Le Tribunal a estimé que CGR_____ avait sciemment (nos 677ss, 694, 695) caché le rôle que AAV_____ et Madame E_____ avaient joué dans l'octroi des titres miniers et les montants importants reçus ou attendus à titre de compensation.

Dans leur décision, les juges ont notamment retenu ce qui suit:

– Madame E_____ était la quatrième épouse de feu le Président AAO_____ et la demi-sœur de K_____, employé de CGR_____ (no 544), alors que AAU_____ avait faussement affirmé que Madame E_____ et K_____ n'avaient aucun lien de parenté (nos 550ss). Elle devait être considérée comme un agent du gouvernement ("*Government Officiel*"), tel que défini par le questionnaire sur la due diligence (cf. no 545, 548, 549).

– L'influence de CGR_____ sur le Président, alors souffrant, était considérable (no 562) et a eu un impact dans la décision de retrait des droits miniers de AAL_____ et l'attribution de ceux-ci à CGR_____ (no 568). CGR_____ et Madame E_____ avaient rencontré le Président à plusieurs occasions pour appuyer la position de CGR_____ en lien avec les blocs 1 et 2 (no 567).

– Madame E_____ avait une relation professionnelle/financière avec le groupe CG_____ et a reçu de l'argent payé à AAV_____ conformément au contrat de rachat de ses actions à titre de compensation de sa participation dans CGR_____ GUINEA BVI (nos 570ss, 576).

– CGR_____ avait corrompu Madame E_____ (nos 583ss) (et avait ce faisant violé ses obligations contractuelles vis-à-vis de ABY_____, no 773):

  o Madame E_____ était un agent du gouvernement, selon l'art. (v) de la définition du questionnaire de due diligence, soit une personne qui détient une position officielle, cérémoniale, désignée autrement ou héritée, dans un gouvernement ou une de ses organisations (no 584, 590),

  o CGR_____ a, via AAV_____, offert des actions à Madame E_____ (591ss), subsidiairement savait ou avait des raisons de croire que AAV_____ a offert des actions à la précitée, étant précisé que CGR_____ a intentionnellement vendu AAV_____ et signé un contrat avec AAV_____ afin de mettre en place un intermédiaire à même d'effectuer des paiements à Madame E_____ et a ainsi indirectement offert des actions de CGR_____ GUINEA à Madame E_____ (cf. nos 603 et 604 pour le rôle de Madame B_____) (no 604),

  o CGR_____ savait que la proposition de participation contenue dans le protocole d'accord du 20 février 2006 visait à s'assurer l'assistance de Madame E_____ pour influencer AAO_____ (nos 635, 637) et ce qu'a

fait Madame E_____ de fin décembre 2005 à septembre 2008 (no 626ss, 634).

    o  Les paiements effectués à Madame E_____ après le décès du Président AAO_____, alors que l'intéressée se trouvait aux Etats-Unis, rentraient également dans la définition de la corruption dans la mesure où ceux-ci étaient effectués dans le but d'obtenir le silence de Madame E_____ sur les accords corruptifs passés (nos 786, 787 et 789), mais il n'avait pas été démontré que CGR_____ avait connaissance de ces paiements (no 792).

–  Même si le Président ACQ_____ avait été corrompu pour retirer les droits miniers à ACD_____, ce qui n'avait pas été prouvé, cela ne signifiait pas que CGR_____ avait acquis les droits miniers en 2008 de manière légale, sans corruption (no 642 et 1002).

–  ABP_____ a reçu d'importantes sommes d'argent de CGR_____, mais non à des fins de corruption (nos 643ss).

–  CGR_____ n'a pas corrompu AAO_____ en lui remettant à deux occasions en 2006, une fois par AAG_____ et l'autre par AAA_____, des voitures miniatures en or incrustées de diamant (no 673, 674).

Par arrêt du 29 novembre 2019 statuant sur appel de CGR_____, la High Court a considéré l'appel infondé.

λ) *CIRDI*

Compte tenu de la requête arbitrale introduite (PP 300'625), le 8 septembre 2014, CGR_____ GUERNESEY, CGR_____ GUINEE et CGR_____ GUINEE SARL ont introduit une requête contre la République de Guinée par devant le Centre international pour le règlement des différends relatifs aux investissements (CIRDI, affaire no. ARB/14/22; (https://icsid.worldbank.org/fr/Pages/cases/casedetail.aspx?CaseNo=ARB/14/22).

Le 1er août 2014, la République de Guinée a introduit à son tour une requête.

Le 13 mars 2015, ABY_____ a vendu ses parts dans ACD_____ GUERNESEY (51 %) à CGR_____ pour USD 1.- dans la mesure où elle ne souhaitait pas être partie à la procédure CIRDI.

CGR_____ ayant soutenu que les contrats produits par la Guinée étaient des faux, le CIRDI a désigné des experts aux fins d'examen de l'authenticité des documents suivants (ci-après: les onze documents signés par Madame E_____) (clé USB en PP 303'708) :

    – Protocole d'accord entre AAV_____ et Madame E_____ du 20 février 2006 (R-24);

    – Lettre d'engagement n° 1 de AAV_____ envers Madame E_____ légalisée le 21 juillet 2006 (R-25);

    – Lettre d'engagement n° 2 de AAV_____ envers Madame E_____ légalisée le 21 juillet 2006 (R-26);

    – Protocole CGR_____ GUINEA SARL (AAA_____) / ABD_____ du 20 juin 2007 (R-27);

    – Contrat de commission CGR_____ GUINEA SARL (AAU_____) / ABD_____ du 27 février 2008 (R-28);

    – Protocole d'accord CGR_____ GUINEA SARL (AAU_____) / ABD_____ 28 février 2008 (R-29);

    – Attestation de cession d'actions de Madame E_____ à CGR_____ du 2 août 2009 (R-269);

    – Engagement de paiement de AAV_____ envers Madame E_____ du 8 juillet 2010 (R-30);

    – Contrat AAV_____ / ABD_____ du 3 août 2010 (R-31);

    – Contrat AAV_____ / ABD_____ - Madame E_____ portant sur USD 3.1 millions non daté (R-32);

    – Contrat AAV_____ / ABD_____ portant sur USD 5.5 millions du 3 août 2010 (R-346).

A relever que les experts disposaient des originaux des documents susmentionnés, à l'exception des documents nos 8 et 11, qui étaient des copies.

Les parties ont eu la possibilité de commenter le rapport préliminaire puis un rapport définitif, qui confirmait les conclusions de ce dernier, a été rendu.

Selon le rapport définitif du 12 février 2018 (PP 303'509ss), il n'existe aucun indice de substitution de page, d'altération de texte, d'ajout de texte ou autres irrégularités qui indiqueraient que les documents litigieux auraient été falsifiés. Ainsi, notamment, AAA_____ a signé le contrat avec ABD_____ du 20 juin 2007 et AAU_____ a signé les contrats des 27 et 28 février 2008. En outre, les signatures de Madame E_____ sur les contrats sont issues de la même personne. Les experts ont été entendus les 26 et 27 mars 2018 et ont confirmé les termes de leur rapport (PP 5'018'057ss).

Le 30 avril 2019, la procédure CIRDI a été suspendue d'entente entre les parties.

**μ)** *Enquêtes privées*

**μ.a)** La fondation V_____ a ordonné un audit auprès d'experts privés, soit Pepper Hamilton LLP- Kasowitz Benson Torres & Friedman LLP Freeh Group International Solutions, LLC. CGR_____ en a fait de même en mandatant les experts privés CROWE HORWATH.

Selon le rapport de Louis Joseph FREEH et Joseph Isadore LIEBERMAN rendu le 29 juillet 2015 (PP 300'545), les experts n'ont pas trouvé de preuves crédibles directes qui démontreraient que Monsieur C_____, ou l'un des employés, cadres ou dirigeants de CGR_____, ou ses entités apparentées, ont violé les lois des Etats-Unis, en particulier le FCPA et la loi sur l'entrave à la Justice, dans le cadre de l'obtention de permis d'exploitations minières et de la conduite des opérations commerciales en Guinée. Il n'existe, par ailleurs, pas de preuves crédibles directes qui démontreraient que quiconque au sein de CGR_____ a ordonné des paiements à des fins de trafic d'influence de fonctionnaires gouvernementaux guinéens dans le cadre des activités minières de CGR_____. De même, il n'existe aucune preuve crédible qui prouverait que quiconque chez CGR_____ a participé avec Monsieur A_____ à une entrave d'une enquête américaine.

Selon le rapport CROWE HORWATH rendu le 20 mars 2016 (PP 301'000), experts auxquels il était demandé si les coûts qui leur étaient soumis étaient proportionnés et en lien avec le projet de Simandou, il n'existait aucun élément qui leur permettait de penser, sous tous les aspects matériels, que les coûts engendrés par le projet n'étaient pas légitimes au 31 décembre 2012. Les auteurs du rapport se sont notamment basés sur les documents transmis par la fondation et sur des affidavits écrits de MM. AAE_____, AAB_____, Monsieur A_____, AAU_____, AJ_____, AAA_____ et AX_____.

**μ.b)** *Appréciation des faits*

Le ministère public ou les tribunaux ont recours à un ou plusieurs experts lorsqu'ils ne disposent pas des connaissances et des capacités nécessaires pour constater ou juger un état de fait (art. 182 CPP).

En l'occurrence, les experts mandatés ne se sont pas prononcés sur des points techniques que le Tribunal ne pourrait résoudre seul. Ils se sont prononcés sur les pièces qu'une partie leur a soumise et en ont tiré leurs propres conclusions. Or, il appartient au Tribunal de déterminer les faits sur lesquels il va se baser pour en tirer les conclusions qui s'imposent. Par ailleurs, il sera relevé que les experts mandatés n'ont pas eu connaissance de l'intégralité des pièces soumises au Tribunal (i.e. courriels, déclarations) et n'ont pas examiné le bien-fondé des transactions financières qui leur étaient soumises (e.g. la réalité économique des factures ou contrats justifiant les transactions). En effet, il ne suffit pas qu'un versement ait une cause pour exclure toute corruption, encore faut-il que cette cause soit réelle.

Il en résulte que le Tribunal fait sa propre appréciation des faits de la cause en s'écartant, le cas échéant, des conclusions des experts privés.

**v)** *Présente procédure pénale suisse*

**v.a)** Le 27 août 2013, le Ministère public genevois a ouvert la présente procédure.

Le 24 février 2017, la Guinée a déposé plainte pénale et s'est constituée partie plaignante à la présente procédure. Le 26 juin 2019, après qu'un accord a été conclu avec CGR_____ (PP 304'793), la Guinée a retiré sa constitution de partie plaignante à la présente procédure.

Diverses personnes ont été entendues à Genève ou sur commissions rogatoires.

**v.b)** Madame E_____ a été entendue, sur commission rogatoire, en Floride, les 6 et 7 juillet 2017 (PP 500'687ss). En substance, elle a confirmé ses déclarations faites, le 23 février 2017, par-devant les autorités américaines (PP 500'755ss).

En résumé, elle a déclaré avoir rencontré le Président AAO_____ par le biais de sa sœur, qui travaillait pour lui, alors que son père le connaissait. Sur instructions de son père, en 2000, elle avait épousé le Président et arrêté ses études. Il s'agissait d'un mariage coutumier, son père l'avait donnée à son mari (PP 500'729).

Avec AAO_____, elle jouait le rôle de conseillère et il était connu qu'elle bénéficiait de la confiance du Président. En 2005, sa sœur lui avait demandé de répondre à l'appel téléphonique de AAN_____, qui l'avait informée vouloir la rencontrer. Le précité était venu la rencontrer à son domicile de Dubréka accompagné du demi-frère de Madame E_____, K_____ et de Monsieur A_____, qui s'était présenté comme étant le représentant de CGR_____. AAN_____ l'avait présentée à Monsieur A_____ comme étant la dernière femme du Président et lui avait dit que CGR_____ souhaitait de l'aide et était prête à lui payer USD 12 millions à elle-même et aux personnes de bonne volonté. Monsieur A_____ avait confirmé ces dires et précisé qu'il se chargerait des contrats. Ils voulaient qu'elle persuade le Président de leur donner Simandou. Elle devait "*ouvrir la porte*".

Elle avait informé le Président qu'"*ils*" voulaient le voir; le Président avait été d'accord. Monsieur A_____ avait donc rencontré le Président AAO_____, qui avait fait appeler le ministre des mines AAI_____ et lui avait demandé de faciliter les démarches de CGR_____. Elle a précisé que le Président avait accepté de favoriser CGR_____ car CGR_____ lui avait promis son aide.

CGR_____ avait obtenu les permis sur les zones Nord et Sud de Simandou. CGR_____ avait ensuite organisé une réunion, dans la cour du Palais présidentiel,

entre le Président, Monsieur C_____, Monsieur A_____, AAB_____, K_____, AAA_____ et AM_____. A cette occasion, soit en 2006, Monsieur C_____ lui avait promis les 5 % et K_____ lui avait donné USD 200'000.- en espèces, Monsieur A_____ lui ayant au préalable dit que Monsieur C_____ lui avait amené de l'argent.

Elle avait ensuite été invitée par AAU_____ à la réception organisée par CGR_____, le précité souhaitant que la population la voit avec CGR_____ afin de gagner en crédibilité en Guinée.

En février 2007, elle avait aidé CGR_____ à obtenir les permis d'uranium en appelant le ministre des mines et en l'invitant à recevoir son demi-frère. CGR_____ lui avait promis 5 %, tout comme pour les permis de bauxite. Un protocole d'accord daté du 20 juin 2007 avait été signé en ce sens en présence de Monsieur C_____, qui était en train de manger une petite salade sans huile.

Début 2008, elle avait rencontré AAU_____ et ACB_____, qui lui avaient demandé son aide et de signer de nouveaux contrats. A cette occasion, AAU_____ avait appelé Monsieur C_____ sur son téléphone et l'avait mis sur haut-parleur. Monsieur C_____ avait demandé à AAU_____ de donner à Madame E_____ tout ce qu'elle voulait. Ensuite, ACB_____ était allé chercher les contrats signés par AAU_____ et les lui remis pour signature.

En avril 2008, AAU_____ et K_____ étaient allés rencontrer le Président. Madame E_____ était présente. Le Président avait fait appeler ABI_____, qui avait peur de retirer les concessions à AAL_____.

Quelques temps après, AAU_____ avait appelé Madame E_____ pour se plaindre que les blocs n'avaient toujours pas été attribués à CGR_____. Une nouvelle rencontre avait eu lieu avec le Président en présence du nouveau ministre des mines, ABM_____, qui ne pouvait pas refuser ce que le Président lui demandait de faire, soit attribuer les blocs 1 et 2 à CGR_____.

A un moment donné, CGR_____ avait arrêté de lui payer ce qu'elle lui devait. Elle en avait parlé au Chef d'état-major, qui s'était tourné vers ABP_____. Celui-ci puis le Président ABT_____ avait convoqué AAU_____ et lui avait demandé de lui payer ce que CGR_____ lui devait. AAU_____ et AAB_____ étaient allés la rencontrer et lui avaient proposé une sorte de contrat à l'amiable, qu'elle avait signé. Ce contrat mettait fin au litige en prévoyant le paiement de millions.

S'agissant du contrat du 20 février 2006, Monsieur A_____ le lui avait présenté déjà signé par AAE_____. AAV_____ était "*au milieu*" entre Madame E_____ et CGR_____ car Monsieur C_____ ne voulait pas qu'on voie que CGR_____ faisait affaire avec Madame E_____. Deux lettres d'engagement avaient également été

signées concernant la bauxite et l'uranium car CGR_____ lui avait promis 5 % sur toutes nouvelles affaires.

Le 2 août 2009, ACB_____ était venu la trouver à Freetown et l'avait convaincue de signer l'attestation du 2 août 2009, qui prévoyait le versement de USD 4 millions. ABR_____, dont la signature se trouvait également sur le document, était présent.

Par la suite, en 2010 probablement, AAB_____ était venue la voir trois fois à Freetown. La première fois, il était muni d'un document prévoyant le versement de USD 5 millions en sa faveur. Comme elle n'avait pas été d'accord, la somme avait été augmentée à USD 5.5 millions. Elle avait compris que Monsieur C_____ était derrière tout cela.

S'agissant de l'achat de sucre (transaction 1), Monsieur A_____ lui avait acheté du sucre par le biais de AAD_____ pour ses affaires personnelles. C'était toutefois CGR_____ qui avait payé le sucre.

S'agissant du versement effectué par ABZ_____ (transaction 2), elle n'avait jamais rencontré le précité ni fait d'affaires avec celui-ci. Elle savait néanmoins que ABZ_____ achetait du matériel à AAU_____. Ce paiement était en lien avec les USD 4 millions qui devaient être versés par CGR_____. Elle avait fabriqué les factures de ABD_____ à hauteur de USD 998'000.- et USD 2'000.- pour justifier le transfert des fonds. Elle n'avait jamais vendu de Caterpillar. Elle avait acheté une maison à Jacksonville avec cet argent. Par ailleurs, elle avait également reçu USD 998'000.- en espèces à Freetown provenant de CGR_____.

S'agissant du versement de USD 2 millions (transaction 3), cet argent provenait de CGR_____ et faisait partie des USD 4 millions promis. AAU_____ l'avait appelée et lui avait demandé où elle souhaitait que cet argent soit versé. Elle avait communiqué ses coordonnées bancaires à la banque Maroco-Guinéenne.

Elle ignorait qui avait versé les USD 1.9 million (transaction 7) car AAU_____ ne voulait pas qu'elle le sache, avant de reconnaitre qu'il s'agissant de son mari, ABR_____.

S'agissant de l'argent versé par AAB_____ (transactions 4, 5 et 6), AAB_____ était venu la voir à Miami et lui avait dit que Monsieur C_____ leur avait demandé de lui verser l'argent. Le précité et Monsieur A_____ lui avaient conseillé d'investir dans l'immobilier. Il était exact que l'argent reçu de Monsieur A_____, AAB_____ et AAE_____ provenait de CGR_____.

L'argent versé par N_____ (transaction 8a) et les USD 500'000.- versés par ACL_____ (transaction 8b) faisaient partie de l'argent que lui devait CGR_____ et

qu'elle réclamait à Monsieur A_____. Il en était de même des montants ayant transité par ABF_____ (transactions 9 à 11).

En tout, elle avait reçu USD 10 millions, montant qu'elle méritait dans la mesure où elle avait "*fait sa part*", soit elle avait "*bousculé*" son mari, le Président AAO_____ pour que CGR_____ puisse obtenir les permis.

Elle a ajouté que Monsieur A_____ et CGR_____ lui avait conseillé de créer une société. Monsieur A_____ lui avait précisé que c'était important qu'il y ait une société. Une société ABD_____ & CO LTD avait donc été créée pour elle à Genève pour faire "*passer l'argent à travers*".

Elle n'avait jamais fait d'affaires avec Monsieur A_____ dans le domaine des produits pharmaceutiques. En revanche, le précité l'avait aidée à trouver du sucre et du poulet, sans facturer ses services.

Tout le monde savait en Guinée que CGR_____ achetait toutes les personnes dont ils avaient besoin.

Il était exact qu'elle avait reçu USD 50'000.- du gouvernement de Guinée en remboursement des frais nécessaires à sa fuite à Freetown. Rien ne lui avait été demandé en échange.

Enfin, Madame E_____ a refusé de s'exprimer sur ses rencontres avec Monsieur A_____ aux Etats-Unis ou sur la personne qui payait ses honoraires d'avocat se prévalant de la clause de confidentialité figurant dans le "*non prosecution agreement*".

**v.c)** *Prévenus*

**v.c.a)** Madame B_____ a toujours contesté avoir été au courant d'un quelconque acte de corruption dans le cadre de l'octroi des concessions minières en Guinée. Si elle avait signé des documents qui pouvaient être lien avec d'éventuels actes de corruption, elle ignorait totalement que ces documents pouvaient avoir un tel but. Elle ne s'était jamais rendue en Guinée, n'avait jamais rencontré les animateurs de AAV_____ – si ce n'était à une reprise, dans le cadre d'une visite de courtoisie, deux d'entre eux à Genève – ni Madame E_____ ou AAO_____.

**v.c.b)** Monsieur C_____ a toujours contesté toute corruption dans l'attribution des concessions minières en Guinée. En tout état, il n'en était pas au courant. En réalité, il s'agissait d'un complot visant au retrait des concessions légalement attribuées à CGR_____.

**v.c.c)** Monsieur A_____ ne s'est jamais exprimé dans le cadre de la présente procédure car il a toujours refusé de le faire, de crainte que ses déclarations puissent être exploitées contre lui par les autorités américaines.

**o)** *Statut marital de Madame E_____ / appréciation des faits*

Il convient d'examiner la question du statut marital de Madame E_____ dans la mesure où celui-ci est contesté par les prévenus.

Les prévenus contestent que Madame E_____ ait été l'épouse de AAO_____. Ils en veulent pour preuve qu'aucun membre de la famille de feu AAO_____ et de la famille de Madame E_____ ne reconnaît l'intéressée comme épouse du Président. A l'appui de leurs dires, ils produisent diverses attestations, toutes postérieures à l'ouverture de la procédure administrative du Comité technique, voire à l'ouverture de la présente procédure pénale, du conseil de la famille de Madame E_____ (PP 349'362), du neveu de feu AAO_____ (PP 349'064), du jeune frère de AAO_____ et doyen de la famille de AAO_____ (PP 349'065), du doyen de la famille de Madame E_____ (PP 349'066), du père de Madame E_____ (PP 349'067), des frères de AAO_____ (PP 349'068).

En dépit de cela, le Tribunal retient que Madame E_____ était bien la quatrième épouse de feu le Président AAO_____, à l'instar de ce qu'a considéré la Tribunal arbitral de la London Court of International Arbitration (LCIA) (no 544 de la sentence arbitrable, PP 3'002'146).

En effet, tout d'abord, il appert que Madame E_____ a toujours été considérée comme l'épouse du Président AAO_____ par CGR_____ et par les ayant-droits de AAV_____ (cf. courriel du 10 mai 2006, dans lequel Madame E_____ est désignée comme *The Lady*, PP 500'303; courriel du 7 juin 2009 de AAB_____ à Monsieur C_____, dans lequel le premier cité mentionne "(…) *Madame E_____, wife of late president of Guinea*", PP 500'594; courriel du 18 septembre 2007 de AAU_____ à Monsieur C_____ sur ses rencontres avec les personnes clés dont The Lady et le Président, PP 5'010'816).

Dans leurs rapports à l'extérieur, les ayant-droits de AAV_____ désignaient également Madame E_____ comme étant l'épouse du Président AAO_____. Ainsi, en 2007 déjà, Monsieur A_____ a demandé à son gestionnaire de fortune d'ouvrir un compte pour l'intéressée mentionnant sa qualité d'épouse, ce qui faisait d'elle une PEP (Personne Exposée Politiquement) selon le gestionnaire (cf. PV ABE_____, PP 500'047).

Par ailleurs, elle est apparue dans la cérémonie du 19 septembre 2006, comme assumant un rôle officiel, escortée par la garde présidentielle. Elle était également présente lors de plusieurs réunions avec le Président.

Les ministres AAI_____ (PV, PP 500'237, 500'753 et CIRDI PP 500'914), ADO_____ (PV CIRDI, PP 500'914) et ACV_____ (PV 10.07.15, p. 3, PP 500'247) ont également indiqué que Madame E_____ était l'épouse de AAO.

Madame E_____ elle-même a toujours déclaré avoir épousé le Président AAO_____ en 2000, mais qu'il s'agissait d'un mariage coutumier (PV CRI CH aux USA des 06/07.07.2017, PP 500'690 et 500'729; PV USA du 23.02.2017, PP 500'755; PV CRI Guinée aux USA, PP 700'478; enregistrements rencontres et écoutes USA), précisant que pour tout le monde elle était la femme du Président (PP 500'690).

Par ailleurs, Madame E_____ était au bénéfice d'un passeport diplomatique confirmant ce statut (PP 5'012'571) peu importe que celui-ci ait été délivré en mars 2007 seulement.

Ce statut marital est confirmé par la teneur de la conversation téléphonique du 11 avril 2013 enregistrée entre Monsieur A_____ et Madame E_____, le précité insistant pour que Madame E_____ nie avoir été l'épouse du Président. Lors de cette conversation, Madame E_____ a indiqué qu'il était possible d'épouser quatre femmes en Guinée sans qu'il n'y ait besoin que ce soit officialisé et qu'elle ne pouvait pas mentir sur son statut d'épouse du Président.

Ce n'est qu'après l'ouverture de la procédure par le Comité technique que CGR_____ et les ayant-droits de AAV_____ ont nié la qualité d'épouse du Président de Madame E_____ (cf. déclarations des employés de CGR_____, i.e. déclaration de AAA_____, PP 500'905). Ce revirement ne peut être compris que comme une stratégie de défense visant à éliminer les liens maritaux gênants existants entre feu Président AAO_____ et Madame E_____, comme l'a exprimé Monsieur A_____ à l'intéressée le 11 avril 2013, précisant que CGR_____ (les avocats à Paris et en Angleterre) se penchait sur cette question. D'ailleurs, les avocats de CGR_____ ont rédigé une attestation que Monsieur A_____ devait faire signer à Madame E_____, ce qu'elle a fait en supprimant la mention sur son absence de statut marital, attestation dont le projet avait été envoyée à Monsieur C_____ (PP 500'676-7). Dans ces circonstances, les attestations écrites des familles de AAO_____ et de Madame E_____ produites par la défense de Monsieur C_____ ne convainquent pas sur l'absence de liens maritaux entre Madame E_____ et feu le Président AAO_____ ce d'autant plus qu'on ignore les circonstances dans lesquelles ces attestations ont été établies.

Il sera retenu que Madame E_____ était la quatrième épouse du Président AAO_____, peu importe qu'il ne s'agisse que d'un mariage coutumier. En tout état, il est établi qu'elle était considérée comme étant la quatrième épouse du Président AAO_____.

π) *Authenticité des documents / appréciation des faits*

**π.a)** A titre préalable, il sera remarqué que les prévenus n'avancent pas, à juste titre, que le contrat du 14 février 2006 conclu entre AAV_____ et CGR_____ GUINEE et que les quatre contrats conclus le 20 février 2006 seraient des faux.

En effet, s'agissant du contrat du 14 février 2006, les actions ont bien été transférées à AAV_____, alors que les contrats des 20 février 2006 conclus entre AAV_____ et AAM_____ / K_____, respectivement entre AAV_____ et Madame E_____ ont été envoyés à Madame B_____ pour signature et que le contrat du 20 février 2006 a été envoyé à la précitée après signature. Enfin, il sera relevé la similitude et l'imbrication des paiements prévus dans les contrats conclus entre, d'une part, AAV_____ et CGR_____ GUINEE et, d'autre part, AAV_____ et AAM_____ / K_____, respectivement AAV_____ et AAF_____ (les USD 19'500'000 (15'000'000 + 4'500'000) prévus dans le contrat avec AAV_____ équivalent aux sommes dues à AAF_____, AAM_____ et K_____ (USD 19'500'000 = 2'975'000 + 900'000 + 12'025'000 + 3600'000). Ces éléments démontrent que le contenu des contrats correspond à la réalité et attestent de l'authenticité de ceux-ci. Par ailleurs, les experts mandatés dans le cadre de la procédure CIRDI ont conclu à l'authenticité de ces documents.

Dans le cadre de la présente procédure, les prévenus contestent l'authenticité des contrats conclus entre CGR_____ et Madame E_____ ou ABD_____, soit en particulier les documents suivants:

– Lettres d'engagement du 21 juillet 2006;

– Protocole CGR_____ GUINEA SARL / ABD_____ du 20 juin 2007 (R-27);

– Contrat de commission CGR_____ GUINEA SARL (AAA_____) / ABD_____ du 27 février 2008 (R-28);

– Protocole d'accord CGR_____ GUINEA SARL (AAU_____) / ABD_____ 28 février 2008 (R-29);

– Attestation de cession d'actions de Madame E_____ à CGR_____ du 2 août 2009 (R-269).

S'agissant des lettres d'engagement du 21 juillet 2006, leur teneur rappelle la participation de Madame E_____ à hauteur de 5 %, ce qui correspond à la participation prévue dans le contrat entre AAV_____ et Madame E_____ du 20 février 2006, contrat qui avait été envoyé à Madame B_____, et qui mentionne expressément le contrat conclu le 20 février 2006 entre CGR_____ et la Guinée. Par ailleurs, les experts mandatés dans le cadre de la procédure CIRDI ont conclu à l'authenticité de ces documents. Enfin, Monsieur A_____ a déclaré lors de l'audience de jugement avoir signé ces lettres d'engagement (PV du 14 janvier 2021, page 5). Partant, ces lettres du 21 juillet 2006 doivent être considérées comme authentiques.

Le protocole signé le 20 juin 2007 concerne l'uranium, alors que les permis d'uranium ont été sollicités le 5 février 2007 et octroyés le 28 février 2007 est rédigé sur le même modèle que les lettres d'engagement du 21 juillet 2006 qui concernaient la bauxite et le protocole d'accord du 20 février 2006 qui visait le fer. Ces accords prévoyaient la même participation de Madame E_____ dans le projet, soit 5 %. Il a été signé par AAA_____, alors CEO de CGR_____ depuis trois mois. Par ailleurs, les experts mandatés dans le cadre de la procédure CIRDI ont conclu à l'authenticité de ce document Partant, ce protocole du 20 juin doit être considéré comme authentique.

Les 27 et 28 février 2008, CGR_____ GUINEE SARL, soit pour elle AAU_____, a conclu deux contrats avec ABD_____, le premier prévoyant le versement d'un montant de USD 4 millions et le second une participation de 5 %. La conclusion de ces contrats était rendue nécessaire dès lors que CGR_____ allait racheter la participation de AAV_____, raison pour laquelle CGR_____, et non plus AAV_____, devait signer le contrat. Ces éléments vont dans le sens de l'authenticité de ces contrats, authenticité définitivement établie par la teneur de l'enregistrement de la rencontre entre Monsieur A_____ et Madame E_____ du 11 avril 2013, duquel il ressort que Monsieur A_____ veut que les contrats originaux, notamment ceux des "*27 et 28 février*" soient détruits. Par ailleurs, le fait que l'attestation du 2 août 2009 reprenne le montant de USD 4 millions corrobore l'authenticité de ces contrats. Il en est de même de l'exécution à hauteur de USD 3 millions sur les USD 4 millions convenus entre les parties avant la renégociation du montant en été 2010. Au surplus, les experts mandatés dans le cadre de la procédure CIRDI ont conclu à l'authenticité de ces contrats. Partant, les contrats des 27 et 28 février 2008 doivent être considérés comme authentiques.

S'agissant de l'attestation de cession d'actions de Madame E_____ du 2 août 2009, pour les mêmes motifs, cette attestation est authentique. Par ailleurs, les experts mandatés dans le cadre de la procédure CIRDI ont conclu à l'authenticité de ce document. Partant, l'attestation du 2 août 2009 doit être considérée comme authentique.

Enfin, s'agissant de tous les documents en lien avec la négociation d'un nouveau montant à verser à Madame E_____ à la suite de la dénonciation de l'accord du 2 août 2009 portant sur le rachat de sa participation pour USD 4 millions, soit les documents suivants:

- engagement de paiement de AAV_____ envers Madame E_____ du 8 juillet 2010
- contrat AAV_____ / ABD_____ du 3 août 2010
- contrat AAV_____ / ABD_____ - Madame E_____ portant sur USD 3.1 millions
- contrat AAV_____ / ABD_____ portant sur USD 5.5 millions du 3 août 2010,

les originaux ont été retrouvés chez AAB_____ lors de la perquisition de son domicile. Au surplus, il sera relevé la concordance entre les montants négociés (USD 5.5 millions) et les montants effectivement versés à Madame E_____. Par ailleurs, les montants négociés ressortent également des notes retrouvées chez AAB_____. Ces éléments tendent à prouver l'authenticité de ces documents. En outre, les experts mandatés dans le cadre de la procédure CIRDI ont conclu à l'authenticité de ces documents, qui doivent, partant, être considérés comme authentiques.

Enfin, il ressort des écoutes du FBI que Monsieur A_____ s'est rendu en Floride pour détruire les orignaux des documents litigieux et non seulement les contrats des 27 et 28 février 2007 ou de simples copies qui circulaient. Les explications de Monsieur A_____ à ce sujet ne sont nullement crédibles et démenties par les éléments du dossier.

**θ)** *Rôle d'intermédiaire et d'écran de AAV_____*

Sur la base des éléments du dossier, le Tribunal retient que AAV_____ a servi d'intermédiaire et d'écran entre CGR_____ et Madame E_____.

**θ.a)** D'abord, d'un point de vue objectif, il est établi que les USD 8.5 millions versés à Madame E_____ proviennent de CGR_____.

AAV_____ a servi d'interface avec AAM_____ / K_____, AAF_____ et Madame E_____.

Les contrats conclus le 20 février 2006 entre AAV_____ et AAM_____ / K_____ ainsi qu'AAF_____ sont le miroir du contrat conclu le 14 février 2006 entre CGR_____ et AAV_____.

Les "*Milestones*" sont exactement les mêmes dans les deux étages contractuels, de même que la somme globale de USD 19.5 millions.

Le contrat du 14 février 2006 prévoyait que AAV_____ devait déployer ses efforts pour obtenir un accord sur les blocs 1 et 2 et assister CGR_____ pour l'acquisition de ces blocs. AAV_____ devait également assister CGR_____ de toute manière possible pour le projet de fer de Simandou.

Les sommes dues à AAM_____ / K_____ et AAF_____, selon la première échéance contractuelle, ont été apportées directement par AAG_____, à Conakry, le 20 février 2006. Ces paiements ont donc directement été effectués par CGR_____, sans passer par AAV_____.

Alors que AAV_____ aurait dû recevoir de CGR_____ la somme de USD 500'000.-en exécution de la première échéance contractuelle, la société n'a rien reçu.

D'ailleurs, AAV_____ n'avait pas de compte bancaire lors de la conclusion des contrats des 14 et 20 février 2006. AAV_____ n'a ouvert un compte bancaire que quatre années plus tard.

Le contrat du 28 février 2008 conclu directement entre CGR_____ et ABD_____, soit Madame E_____, reprend les termes et conditions du contrat du 20 février 2006, soit une participation de 5 % dans les blocs 1 et 2.

**θ.b)** Il ressort des éléments suivants que CGR_____ connaissait le rôle joué par AAV_____.

AAT_____ a été remplacée par AAV_____, une société de domicile n'ayant pas servi au préalable. Ce remplacement a été demandé par AAG_____. Par cette substitution, CGR_____ a cherché à obtenir une société vierge de toute activité, mais en à profiter pour garder la maîtrise des opérations.

Plusieurs démarches visant à cacher les ayant-droits économiques de AAV_____ ont été effectuées.

Les 8825 actions de AAV_____ (soit 17.65 %) sont restées propriété de AD_____ BVI, à titre fiduciaire, durant un an, soit jusqu'au 10 janvier 2007, avant d'être transférées à une structure opaque, laquelle mentionnait faussement que le *protector*, un gestionnaire de fortune, était l'ayant-droit économique.

Ainsi, Monsieur A_____ et ses associés ne sont jamais apparus comme les ayant-droits économiques de AAV_____ et ce, contrairement à la réalité.

AAV_____ n'a ouvert un compte bancaire qu'en 2010, soit quatre ans après le début de ses activités, alors qu'elle était censée recevoir, selon un échéancier convenu, la somme de USD 19'500'000.-.

Le contrat entre AAV_____ et AAM_____ / K_____ a été envoyé, le 15 février 2006, pour signature à Madame B_____ qui l'a fait modifier moyennant l'octroi d'une procuration.

CGR_____ connaissait les cinq contrats conclus les 14 et 20 février 2006, comme en témoigne notamment la venue de AAG_____ à Conakry avec la somme de CHF 500'000.- destinée à AAM_____ / K_____ et à AAF_____ et les protocoles d'accord du 20 février 2006.

CGR_____ connaissait les contrats signés avec ABD_____, les 27 et 28 février 2008, dans la mesure où ils ont été signés par AAU_____.

Les versements effectués à Madame E_____ ont été effectués par CGR_____.

Lors de la restructuration du groupe avant le vente à ABY_____, les intermédiaires, dont AAV_____, ont été effacés.

Dans la procédure de due diligence menée par ABY_____ avant la joint-venture, CGR_____ a donné de fausses garanties quant à l'absence de corruption pour obtenir les droits miniers. CGR_____ a également cherché à cacher les liens entre Madame E_____ et K_____.

AX_____ a donné des instructions pour que toutes les références aux intermédiaires soient effacées des rapports et de la comptabilité.

Le paiement de USD 22 millions est apparu de manière mensongère dans les comptes consolidés de CG_____ GUERNESEY. Il en va de même du paiement de USD 3 millions.

Le rachat des actions de AAV_____ a été effectué de manière croisée. Avant la fusion, CGR_____ TREASURY SERVICES payait sur le compte de ABJ_____ et, après la fusion, AE_____ payait sur le compte de AAV_____. Ainsi, CGR_____ n'a jamais payé directement la rémunération due à AAV_____.

AAV_____ a été radiée après avoir été payée. AE_____ a été radiée également.

CGR_____ et Monsieur A_____ ont tenté de détruire les contrats originaux et ont voulu cacher le rôle et le statut marital de Madame E_____ par la signature d'une attestation.

Les intervenants ont tous compris que CGR_____ était derrière AAV_____:

  – AAM_____;
  – Madame E_____ (attestation du 2 décembre 2013, conversations Monsieur A_____, audition procédure USA, audition procédure suisse);
  – ABZ_____.

AAV_____ fait partie des intermédiaires qui ont fait parvenir des sommes d'argent à Madame E_____, au même titre que AAD_____, N_____, O_____ / D_____, de même que ABZ_____ et ACL_____.

S'agissant de l'apport de AAV_____, les thèses de Monsieur C_____ et de Monsieur A_____ sont contradictoires.

D'une part, Monsieur A_____ indique qu'il était un apporteur d'affaires et que son rôle consistait en la mise à disposition de son temps, de son réseau et de son savoir-faire relationnel en Afrique. Or, Monsieur A_____ et ses associés ont été largement rémunérés et défrayés, séparément, par CGR_____ pour cette activité.

D'autre part, Monsieur C_____ a soutenu que AAV_____ devait participer aux coûts du projet de fer de Simandou à hauteur de sa participation. Or, à l'évidence AAV_____ n'avait pas la capacité financière de le faire.

Enfin, le contrat du 14 février 2006 ne parle pas d'un apporteur d'affaires.

Cette absence alléguée de consensus sur le rôle et l'apport de AAV_____ démontre qu'en réalité, cette dernière devait servir d'écran à CGR_____ dans l'acquisition des blocs 1 et 2.

Il résulte de ce qui précède que AAV_____ a servi d'intermédiaire et d'écran entre CGR_____ et Madame E_____.

**D.B. Faits qualifiés de faux dans les titres**

**a)** *D_____*

D_____, citoyen israélien domicilié en Ukraine, ancien pilote militaire dans l'armée israélienne, était considéré par Monsieur C_____ comme un ami et partenaire en affaires jusqu'à l'audition de D_____ devant le Ministère public genevois (cf. notamment PV Monsieur C_____, PP 500'340, 500'533-4).

**b)** *Acquisition des terrains en Roumanie*

A titre préalable, il convient de relever que les fonds versés à Madame E_____ (transaction 8a) ne proviennent pas du compte personnel Rotweiler de D_____, comme retenu dans l'acte d'accusation, mais du compte personnel de D_____ auprès de la 11, à Kiev (PP 353'421) (D_____/Banque 11_____, O_____, N_____/Banque 13_____, Madame E_____ + ACL_____).



**b.a)** *AB_____*

ACW_____, employé de AB_____, s'est occupé de l'acquisition de terrains, en Roumanie, sur la commune de Snagov, par le biais de la société roumaine SC ACX_____ INVEST SRL (ci-après: ACX_____) (PP 502'588; PP 502'595ss, liste des terrains cf. PP 304'229), dont l'administrateur, ACY_____, était alors payé EUR 1'000.- par mois jusqu'au transfert des actions de ACX_____ (PP 502'588; cf. témoignage de ACY_____, administrateur et actionnaire de ACX_____, PP 502'610).

L'acquisition des terres roumaines ne pouvait pas se faire par un étranger, la loi roumaine l'interdisant (cf. PP 502'612 = 4'801'635).

Ainsi, sous le couvert de faux prêts octroyés par ACZ_____ à ACX_____ (PP 502'612 et PP 502'589, 502'591 et 502'715ss), les terrains roumains ont été achetés par ACW_____ pour le compte de AB_____ (cf. demande de financement de EUR 570'000.- de ACW_____ à F_____, PP 502'588; PP 502'612).

Monsieur C_____ a confirmé que ACW_____, qui travaillait pour AB_____, avait amené cette "*affaire*" (PV Monsieur C_____, PP 501'028; cf. également le courriel du 28.07.2010 de Me Robert ROSU, qui mentionne que ACW_____ s'occupe de ACX_____).

D_____ n'est jamais apparu dans cette acquisition, que ce soit dans le cadre des discussions, des négociations ou du financement.

**b.b)** *Intermédiaire / écran*



V_____ détient W_____, qui détient ADA_____., qui détient 50 % de ADB_____, qui détient J_____ INC. (PP 501'385), qui détient elle-même I_____ (cf. schéma du 13 juin 2005).

I_____ a mis en place une société écran, L_____ (ci-après: L_____), afin d'acquérir les terrains roumains.

Or, _____, fils unique de ADC_____ et neveu de Monsieur C_____, lequel dirige effectivement I_____, ne voulait pas investir dans ces terres roumaines (cf. PP 502'615).

Madame B_____ s'est occupée de toutes les démarches administratives et corporatives pour ce faire (i.e. PP 502'588-9502'636, 502'640ss, 502'696).

Elle s'est tournée vers MOSSACK FONSECA & CO, à Genève, et a acheté la société L_____ (PV Madame B_____, PP 502'579), une société des Iles Vierges Britanniques, constituée le 21 avril 2009 (PP 501'140).

Par résolution du 5 juin 2009, L_____, représentée par un avocat roumain, a décidé d'acquérir pour le prix de RON 200, soit l'équivalent de CHF 71.-, la société ACX_____ (PP 502'635), reprenant *de facto* également les dettes de la société (cf. prêts ACZ_____).

Par courriel du 9 juin 2009, Madame B_____ a demandé à MOSSACK FONSECA & CO, à Genève, de lui transmettre l'acte de constitution et les statuts de la société L_____, d'émettre le certificat d'actions de L_____ et de lui faire parvenir ces documents à son bureau genevois (PP 502'659, 501'125). Par ailleurs, elle a demandé, par le biais de son assistante, de lui faire parvenir une procuration afin de permettre le transfert des actifs le jour même (PP 501'141).

Un certificat d'actions alors été émis selon lequel D_____ détenait les 50'000 actions de L_____ (PP 502'660). Ce certificat d'actions était néanmoins daté du 21 avril 2009, alors que son émission avait été demandée le 9 juin 2009.

Par contrat du 10 juin 2009, L_____ a acquis ACX_____ pour RON 200.- (PP 502'670). L'actionnaire et administrateur roumain d'ACX_____ a indiqué ne pas avoir reçu d'argent de la vente puisque les actifs de la société ne lui appartenaient pas (PP 502'612).

Selon une attestation manuscrite du 12 juin 2009, signée par D_____ et F_____, D_____ a reçu EUR 9 millions de CG_____ (PP 6'000'005ss). Monsieur C_____ conteste la véracité de ce document. Entendu dans le cadre de la procédure israélienne par la police israélienne et confronté à D_____, F_____ a reconnu avoir signé ladite attestation en présence de Monsieur C_____ (PP 4'901'596).

Cinq jours après, soit par contrat du 15 juin 2009 soumis au droit des Iles Vierges Britanniques, D_____ a vendu ses 50'000 actions dans L_____, acquises pour RON 200.-, à I_____, au prix de EUR 9 millions, un montant additionnel de EUR 4 millions étant dû si D_____ obtenait les droits à bâtir sur les terrains dans un délai de 12 mois (PP 501'059).

Le 15 juin 2009, J_____ INC a transféré USD 12'496'550.- soit l'équivalent de EUR 9 millions, à D_____, sur son compte personnel Rotweiler auprès de Banque 15_____, à Zurich (PP 501'122). Le 18 juin 2009, D_____ a transféré USD 7 millions sur le compte de sa société O_____ GLOBAL LTD auprès de Banque 12_____, à Zurich, USD 3 millions sur son compte personnel auprès de Banque 11_____, à Kiev, et 2.47 millions sur le compte de sa société ADE_____, auprès de Banque 15_____, à Zurich (PP 3'551'673).

Invité par la banque à justifier l'origine des USD 12'496'550.-, par télécopie du 17 juin 2009 de son avocat israélien, D_____ a fait parvenir le contrat du 15 juin 2009 (PP 501'058).

Le 16 juin 2009, les administrateurs de paille de L_____ ont pris la décision de supprimer le certificat d'actions en faveur de D_____ et d'émettre un nouveau certificat d'actions en faveur de I_____ (PP 501'124).

Le 15 août 2009, X_____ est devenue administratrice de L_____ (PP 502'634).

Par amendement daté d'août 2010, D_____ et I_____ ont convenu de prolonger le délai de 12 mois au 30 août 2011, I_____ s'engageant à avancer une somme de EUR 2.5 millions à titre de "*success fee*" (cf. art. 1), ladite somme devant être retournée si les droits n'étaient pas acquis entretemps (PP 6'000'019).

Madame B_____ s'est occupée, au niveau administratif, de l'exécution du paiement en transmettant à I_____ les coordonnées pour le paiement des fonds (PP 501'120).

Le 31 août 2010, I_____ a transféré à D_____, sur son compte auprès de Banque 15_____, à Zurich, la somme de USD 3'187'500 (PP 6'000'022), soit l'équivalent de EUR 2.5 millions.

Les droits à bâtir sur les terrains n'ont jamais été obtenus.

Par la suite, D_____ a, contractuellement, repris la dette qu'ACX_____ avait envers ACZ_____ (PP 502'719ss, 502'724, 502'589). D_____ a donné le pouvoir à ACW_____ de signer le contrat y relatif (PP 502'725). Madame B_____ a été impliquée dans le processus d'examen des modalités de reprise de la dette et dans la mise en place desdites modalités (PP 502'589, 502'728).

**b.c)** *Procédure israélienne*

D_____ et Monsieur C_____ ont été entendus dans le cadre d'une procédure pénale israélienne.

Une confrontation a eu lieu entre les intéressés le 17 août 2017.

Invités à transmettre le procès-verbal de cette audition par le Ministère public (cf. CRI du Mp du 16 novembre 2018) puis par la direction de la procédure du Tribunal correctionnel (cf. CRI du 28 février 2020), les autorités israéliennes n'ont pas donné suite à ces requêtes.

AX_____ et F_____ ont été entendus, à plusieurs reprises, par les autorités israéliennes (PP 4'901'639). Les procès-verbaux de leurs auditions ont été transmis, par la voie de l'entraide, aux autorités suisses (cf. cl. B.4.5.1 à 8).

**b.d)** *Procédure genevoise*

Entendu par le Ministère public genevois, D_____ a déclaré que l'acquisition s'était faite au moyen des EUR 9 millions prêtés par CG_____ (attestation manuscrite du 12.06.09, PP 6'000'0005; PV D_____, PP 501'971). Il n'avait jamais possédé, directement ou par l'intermédiaire d'une société, de terrains en Roumaine. Afin de justifier le transfert des EUR 9 millions, Monsieur C_____ lui avait demandé de signer le contrat du 15 juin 2009 puis l'amendement, ce qu'il avait fait dans le bureau du précité de Herzliya. Il n'avait jamais été actionnaire de L_____ et ignorait avoir été désigné en cette qualité sur le certificat d'actions. Par la suite, Monsieur C_____ lui avait demandé de procéder à divers transferts d'avoirs à des tiers, en déduction des EUR 9 millions reçus.

Quant à Monsieur C_____, il a déclaré que les terrains avaient été acquis pour EUR 3 à 4 millions, soit USD 5 millions. D_____ avait agi en son nom, mais CG_____ était

associé avec ce dernier dans ce projet à hauteur de 50/50, alors que selon Me GAMMA cette association était de 70/30 (PV, PP 501'029).

**b.d.a)** *Contrat de prêt du 11 juin 2010 entre O_____ et P_____*

Par contrat du 1er juin 2010 (PP 501'679) soumis au droit chypriote, O_____ s'est engagé à prêter USD 1 million à P_____, le montant devant être remboursé, sans intérêt d'ici au 31 décembre 2012. Le contrat a été élaboré par F_____, avocat interne de CG_____ (PP 4'901'484, 4'901'611) et le comptable de D_____ (PP 6'000'027ss).

Le 15 juin 2010, le montant de USD 1 million a été versé à P_____ en exécution du contrat de prêt (PP 6'000'026). Il a été débité du compte de O_____ auprès de Banque 12_____, à Zurich.

Sur demande de la banque qui exigeait des clarifications sur l'arrière-plan économique du transfert, le contrat a été transmis à celle-ci avec la précision "*prêt pour des projets personnels en Israël*" (PP 3'534'003, 3'534'025).

Le 15 juin 2010, le comptable de D_____ a transmis le swift du paiement à F_____ et à ACR_____, employés de CG_____ (PP 6'000'025).

Entendue dans le cadre de la présente procédure, Madame B_____ a indiqué ne jamais avoir vu ce contrat (PP 501'555). Monsieur C_____ en a fait de même, en précisant que la police israélienne lui avait peut-être soumis ce document (PP 501'555).

Entendu par le Ministère public (PP 502'062), D_____ a indiqué avoir transféré ladite somme sur demande de Monsieur C_____. La somme payée venait en déduction des EUR 9 millions dus à Monsieur C_____. Sauf erreur de sa part, il s'agissait du premier versement en déduction de ce montant.

**b.d.b)** G_____ : Q_____ et T_____

      USD 750'000.- le 15.04.2011
      USD 250'000.- le 15.04.2011
      USD 250'000.- le 01.06.2011
      USD 290'000.- le 16.09.2011
      USD 250'000.- le 25.01.2012
      ----------------
      USD 1'790'000.-

Entre les 15 avril 2011 et 25 janvier 2012, D_____ a transféré, par l'intermédiaire de sa société O_____, la somme de USD 1'790'000.- en cinq versements à deux sociétés, Q_____ INC et T_____, dont l'ayant-droit économique est G_____ (PV Monsieur C_____, PP 501'047).

A relever que G_____ et Monsieur C_____ se connaissent et ont été condamnés, le 17 décembre 2020, par les autorités judiciaires roumaines, de concert, par contumace et en dernière instance, à 5 ans de prison.

Entendu par le Ministère public (PP 502'059), D_____ a déclaré que Monsieur C_____ lui avait demandé de verser ces montants, qui ne correspondaient à aucune prestation réelle, lesquels venaient en déduction du montant dû de EUR 9 millions.

Quant à Monsieur C_____, il a contesté avoir donné des instructions de paiement à D_____. G_____ avait travaillé pour les sociétés détenues par les fondations V_____ et AR_____ (PP 502'060).

1.      *Contrat du 1er mars 2011 entre Q_____ et O_____ / USD 750'000.-*

Par contrat du 1$^{er}$ mars 2011 (PP 6'000'031) soumis au droit anglais, Q_____ INC s'est engagée à fournir divers services à O_____ dans le centre est de l'Europe, en 2011, moyennant versement de USD 750'000.- à verser d'ici au 31 (sic!) avril 2011 sur un compte bancaire chypriote.

Le 5 avril 2011 (PP 6'000'034), Q_____ INC a facturé à O_____ ses services pour USD 750'000.-.

Selon instructions du 14 avril 2011 (PP 501'851 ou 3'533'838), l'avocat israélien de D_____ a sollicité le paiement de USD 750'000.- du compte O_____ auprès de Banque 12_____, à Zurich, sur le compte de Q_____ INC auprès d'une banque chypriote, conformément au contrat du 1er mars 2011, qui était joint à l'ordre (PP 3'533'840, 501'845) et à la facture du 5 avril 2011.

Il ne ressort pas de la procédure que la facture a été transmise à la banque.

Ledit montant a été transféré le 15 avril 2011 (PP 6'000'035).

2.      *Contrat du 1er mars 2011 entre T_____ et O_____ / USD 250'000.-*

Par contrat du 1$^{er}$ mars 2011 (PP 6'000'036) soumis au droit anglais, T_____ s'est engagée à fournir divers services à O_____ dans le centre est de l'Europe, en 2011, moyennant le versement de USD 250'000.- d'ici au 30 avril 2011 sur un compte bancaire israélien.

Le 5 avril 2011 (PP 6'000'039), Q_____ INC a facturé à O_____ ses services pour USD 250'000.-.

Le 14 avril 2011 (PP 3'533'836), l'avocat israélien de D_____ a instruit la banque de procéder au paiement, conformément au contrat du 1er mars 2011, qui était joint à l'ordre (PP 3'533'843) et à la facture du 5 avril 2011.

Il ne ressort pas de la procédure que la facture a été transmise à la banque.

Ledit montant a été transféré le 15 avril 2011 du compte O_____ auprès de Banque 12_____, à Zurich (PP 6'000'040).

D_____ a déclaré (PP 502'060) que Monsieur C_____ lui avait demandé de payer USD 1 million à G_____. L'entourage du précité avait ensuite appelé son directeur financier et lui avait transmis les coordonnées pour procéder aux deux versements.

3.      *Contrat du 1er juin 2011 entre Q_____ et O_____ / USD 250'000.-*

Par contrat du 1$^{er}$ juin 2011 (PP 6'000'044) soumis au droit anglais, Q_____ INC s'est engagée à fournir divers services à O_____ dans le centre est de l'Europe, en 2011, moyennant le versement de USD 250'000.- d'ici au 20 juin 2011 sur un compte bancaire chypriote.

Par instruction du 21 juin 2011, l'avocat israélien de D_____ a requis la banque de payer ce montant conformément au contrat du 1er juin 2011 et à la facture y relative du 20 juin 2011 (PP 501'699).

Il ne ressort pas de la procédure que le contrat et la facture ont effectivement été joints à l'ordre (cf. PP 3'533'869, 3'534'005).

Ledit montant a été transféré le 1er juin 2011 du compte O_____ auprès de Banque 12_____, à Zurich (PP 6'000'047).

4.      *Contrat entre Q_____ - O_____ du 1$^{er}$ septembre 2011*

Par contrat du 1$^{er}$ septembre 2011 (PP 501'703) soumis au droit anglais, Q_____ INC s'est engagée à fournir divers services à O_____ dans le centre est de l'Europe, en 2011, moyennant le versement de USD 290'000.- d'ici au 14 septembre 2011 sur un compte bancaire chypriote.

Le 14 septembre 2011 (PP 6'000'069), Q_____ INC a facturé à O_____ ses services pour USD 290'000.-.

Par instruction du 15 septembre 2011, l'avocat israélien de D_____ a requis la banque de payer ce montant conformément au contrat de septembre 2011 et à la facture y

relative du 14 septembre 2011 (PP 3'533'884). Le contrat était joint à l'ordre (PP 3'533'886).

Il ne ressort pas de la procédure que la facture a été transmise à la banque.

Ledit montant a été transféré le 16 septembre 2011 du compte O_____ auprès de banque 12_____, à Zurich (PP 6'000'071).

5.      *Contrat T_____ – O_____ du 1er janvier 2012*

Par contrat du 1$^{er}$ janvier 2012 (PP 501'717) soumis au droit anglais, T_____ s'est engagée à fournir divers services à O_____ dans le centre est de l'Europe, en 2012, moyennant le versement de USD 250'000.- d'ici au 31 janvier 2012 sur un compte bancaire israélien.

Par instruction du 24 janvier 2012, l'avocat israélien de D_____ a requis la banque de payer USD 250'000.- conformément au contrat du 1er janvier 2012 (PP 3'533'913-4).

Par la suite, le contrat du 1er janvier 2012 a été transmis à la banque afin de justifier l'arrière-plan économique de la transaction (PP 3'533'985, 3'534'008).

Ledit montant a été transféré le 25 janvier 2012 du compte O_____ auprès de banque 12_____, à Zurich (PP 6'000113).

**b.d.c)** *Facture N_____ / transaction 8a*

Le 13 juin 2011 (PP 6'000'042), N_____ a facturé à O_____ USD 1.5 million pour ses services de conseil dans le sud de l'Afrique pour les années 2010 et 2011.

Cette facture a été envoyée par AAB_____ à D_____ le 16 juin 2011, conformément à la teneur de l'entretien téléphonique qu'il avait eu avec AX_____ (PP 6'000'041). D_____ a demandé à son comptable de payer le montant (PP 6'000'041).

Par instruction du 20 juin 2011, l'avocat israélien de D_____ a requis la banque de payer ce montant conformément à la facture du 13 juin 2011 (PP 501'695).

Il ne ressort pas de la procédure que la facture a effectivement été jointe à l'ordre (cf. PP 3'533'867, 3'534'005).

Ledit montant a été transféré le 20 juin 2011 du compte O_____ auprès de Banque 12_____, à Zurich (PP 6'000'043).

Entendu par le Ministère public (PP 501'985), D_____ a indiqué avoir transféré ladite somme sur demande de Monsieur C_____. Il n'avait jamais investi avec Monsieur

C_____ en Afrique. La facture émise ne correspondait à aucune prestation réelle. La somme payée venait en déduction des EUR 9 millions dus à Monsieur C_____.

**b.d.d)** *Contrat de location de bateau*

La fondation V_____, dont Monsieur C_____ est le premier bénéficiaire, détient un yacht, le *M_____*, par le biais de AT_____, dont l'administratrice est Madame B_____.

AT_____, a conclu un contrat de location avec D_____ portant sur la location de ce bateau du 1er au 15 juillet 2011 pour le prix de USD 500'000.-

Le 30 juin 2011, Madame B_____, en sa qualité d'administratrice, a signé le contrat (PP 6'000'049). Elle a déclaré que les contrats étaient préparés par le bureau de Londres puis lui étaient envoyés pour signature (PP 500'545).

Selon un addendum du 29 juin 2011 (PP 6'000'056-7), la période de location a été étendue moyennant supplément de USD 142'000.-. Le propriétaire du bateau, soit Madame B_____ pour le compte de AT_____, n'a pas signé l'addendum.

Ces deux montants ont été payés, les 7 et 12 juillet 2011, au broker, ADF_____ LTD, sur un compte bancaire à Londres, depuis un compte bancaire en Suisse de D_____ (PP 6'000'055 et 6'000'058).

A relever que D_____, par le biais de O_____, avait déjà loué le M_____ l'année précédente (PP 3'533'785-7 et 3'534'003).

Entendu par le Ministère public (PP 501'977), D_____ a contesté avoir loué le *M_____*, soit le yacht de Monsieur C_____, alors qu'il était possible qu'il ait été invité sur ce bateau entre les 7 et 12 juillet 2011. Il avait signé le contrat et l'addendum de location à la demande de Monsieur C_____, dans le bureau du précité à Herzliya. Le montant de la location avait été déduit des EUR 9 millions dus à Monsieur C_____.

**b.d.d)** *Contrat R_____ et O_____*

Par contrat du 1er janvier 2011 (PP 6'000'075) soumis au droit anglais, O_____ a engagé les services d'un consultant R_____ moyennant versement de USD 700'000.- par an, plus des frais sur un compte bancaire israélien.

Par instruction du 7 octobre 2011, l'avocat israélien de D_____ a requis la banque de payer USD 716'000.- conformément au contrat du 1er janvier 2011 (PP 3'533'889). Le contrat était joint à l'instruction (PP 3'533'891).

Ledit montant a été transféré le 7 octobre 2011 du compte O_____ auprès de Banque 12_____, à Zurich (PP 6'000'078).

Dans le cadre de la présente procédure, Monsieur C_____ a indiqué ignorer qui était R_____ (PP 501'048, 502'064).

D_____ a déclaré (PP 502'064) que Monsieur C_____ lui avait demandé de verser ce montant, qui ne correspondait à aucune prestation réelle, et venait en déduction des EUR 9 millions.

**b.d.e)** *Contrat S_____ et O_____*

Par contrat du 3 novembre 2011 (PP 6'000'079) soumis au droit anglais, S_____ s'est engagée à fournir divers services à O_____, moyennant le versement de USD 625'000.- par an.

Selon la facture (antérieure au contrat) du 15 octobre 2011 (PP 501'715), S_____ a facturé à O_____ ses services pour USD 625'000.- en lien avec des projets d'investissements en Guinée. L'argent devait être versé sur un compte en Guinée.

Ce montage a été mis en place entre AAU_____ et le comptable de D_____ (courriels, PP 6'000'084, 6'000'090, 6'000.092-3, 6'000'100).

Par instruction du 14 décembre 2011, l'avocat israélien de D_____ a requis la banque de payer USD 625'000.- conformément à un contrat du 3 novembre 2011 et à la facture y relative (PP 3'533'908). Seule la facture était jointe à l'instruction (PP 3'533'910).

Invité à clarifier l'arrière-plan économique de la transaction, le comptable de D_____ a, à son tour, transmis à la banque le contrat du 3 novembre (PP 3'534'007).

Par courriel du 20 décembre 2011, ce même comptable a informé AAU_____ que la banque avait demandé quelle était la raison du paiement. Des réponses lui avaient été apportées (PP 6'000'092, 6'000'100ss).

Ledit montant a été transféré le 20 décembre 2011 du compte O_____ auprès de Banque 12_____, à Zurich (PP 6'000'083) sur requête de AAU_____ au comptable de D_____ (cf. e-courriels, PP 6'000'084, 6'000'090, 6'000'092-3, 6'000'100).

Entendu par le Ministère public (PP 501'979ss), D_____ a déclaré que son épouse avait signé le contrat du 3 novembre 2011. S_____ n'avait jamais déployé d'activité pour eux. La facture émise ne correspondait à aucune prestation réelle déployée par S_____ en faveur de O_____. Monsieur C_____ lui avait demandé de verser cette somme. Le montant versé avait été déduit des EUR 9 millions.

Quant à Monsieur C_____, il a soutenu être totalement étranger à ce transfert d'argent (PP 501'983). Il avait connu l'existence de ABZ_____ en 2014.

**b.d.e)** *Contrat U_____*

L'ayant-droit économique de U_____ est ADG_____.

Selon une offre non datée (PP 6'000'145), U_____ s'est engagée à fournir des services de conseil et d'information de sécurité en Ukraine pour un montant de USD 250'000.-.

Le 12 décembre 2012 (PP 6'000'138), U_____ a facturé à O_____ ses services pour USD 250'000.-, montant à verser sur son compte auprès de la succursale genevoise d'une banque suisse.

Selon instruction du 17 décembre 2012 (PP 501'735 ou 3'533'940), l'avocat israélien de D_____ a sollicité le transfert de ladite somme du compte O_____ auprès de Banque 12_____, à Zurich, conformément à une facture du 12 décembre 2012.

Il ne ressort pas de la procédure que le contrat ou la facture ont effectivement été joints à l'instruction (cf. PP 3'533'940).

Le 17 décembre 2012, la somme de USD 250'000.- a été transférée sur le compte de U_____ auprès de la Banque 16_____ et le lendemain sur le compte personnel de son ayant-droit économique, ADG_____.

Invité à clarifier l'arrière-plan économique de la transaction, le client a indiqué qu'il s'agissait d'un service de conseil en sécurité informatique (PP 3'534'012).

Dans le cadre de la présente procédure, Monsieur C_____ a indiqué ignorer qui était U_____, alors qu'il a précisé savoir qui était son ayant-droit économique, soit ADG_____, ancien ministre israélien, sans le connaître (PP 501'048 cf. PV police israélienne de Monsieur C_____, PP 502'687). Lors de sa confrontation avec la police israélienne, Monsieur C_____ avait affirmé qu'il était possible qu'il ait demandé de payer ADH_____, associé de U_____, afin qu'il fasse des investigations sur ACU_____ (PP 502'071; cf. PV police israélienne de Monsieur C_____, PP 502'687).

D_____ a déclaré (PP 502'070) que Monsieur C_____ lui avait demandé de verser ce montant, qui ne correspondait à aucune prestation réelle, lequel venait en déduction des EUR 9 millions.

# E. AUDIENCE DE JUGEMENT

**a)** Lors de l'audience de jugement, les trois prévenus ont été entendus.

**a.a)** Madame B_____ a, en substance, confirmé ses précédentes déclarations.

Elle avait vendu AAV_____ à AAB_____ et ses associés en lien avec un partenariat potentiel avec CGR_____. Elle ignorait toutefois tout du projet dont il était question.

Elle n'avait pas lu les accords du 20 février 2006 entre, d'une part, AAV_____ et, d'autre part, AAM_____ / K_____ et Madame E_____. Elle ne savait pas qui étaient les intéressés. AAB_____ lui avait été recommandé par CGR_____, à qui elle faisait entièrement confiance.

En ce qui concernait le rachat des 17,65 %, elle avait suivi le conseil de la direction de CGR_____. Les courriers qu'elle avait signés relatifs au versement des USD 22 millions lui avaient été envoyés par F_____. Elle ne se souvenait plus de la raison pour laquelle elle avait signé les comptes consolidés de CGR_____ GUERNESEY mentionnant faussement que les USD 22 millions versés à AAV_____ étaient relatif à l'achat d'une aciérie à Baku.

S'agissant de la restructuration, le transfert des droits miniers dans la nouvelle société avait été effectué à la demande des acheteurs potentiels. Elle n'avait jamais eu de contacts avec ABY_____ et ne pouvait pas dire si l'existence de AAV_____ avait été révélée à ABY_____.

Elle n'avait eu connaissance de la transaction de sucre que par le biais de la présente procédure. Elle ne connaissait pas ABZ_____ et ne s'était plus occupée de CGR_____ GUINEE après la vente de ses actions à ABY_____. Elle ne s'occupait ni des aspects financiers du groupe ni de la comptabilité.

Enfin, en ce qui concernait la vente des terrains en Roumanie, elle avait agi sur instructions de F_____. Elle n'avait pas demandé d'explications au sujet de cette vente.

**a.b)** Monsieur C_____ a, en substance, confirmé ses précédentes déclarations.

Il a soutenu avoir rencontré, pour la première fois, AAB_____, au début de l'année 2008. Il ne connaissait pas l'intéressé ni ses associés auparavant, pas plus que leur domaine d'activité.

Il n'avait pas été consulté sur l'octroi d'une participation dans CGR_____ GUINEE à AAV_____. Il ignorait si AAV_____ avait concrètement investi dans le projet guinéen, si AAV_____ avait la surface financière suffisante pour le faire et quelle était la contreprestation de AAV_____ à l'octroi de la participation. Il était assez commun,

dans les affaires minières, que des participations soient octroyées aux apporteurs d'affaires.

Il a reconnu avoir participé à la négociation du montant du rachat de la participation de AAV_____, lequel se justifiait en raison du fait que "*AAV_____ avait amené CGR_____ en Guinée*".

Il ignorait tout des versements d'argent en faveur de Madame E_____.

Il a confirmé l'existence d'un partenariat "*informel*" entre D_____ et CG_____MM. D_____ avait effectué des investissements en Afrique. Si un projet se concrétisait, alors un partenariat aurait été conclu avec l'intéressé. Il avait demandé que les comptes en lien avec ce partenariat soient établis sur demande du Ministère public. Il n'avait, lui-même, pas reçu les rapports produits à la procédure.

S'agissant du courriel du 5 avril 2013 que ACR_____ lui avait adressé, en lien avec une attestation à faire signer à Madame E_____, cet envoi faisait suite à une réunion chez Me Jean VEIL. Cet avocat était chargé de répondre aux allégations du Comité technique guinéen. Il ne savait pas qui devait aller faire signer cette attestation à Madame E_____ et il n'avait pas demandé à Monsieur A_____ de le faire.

S'agissant de l'achat des terrains roumains, I_____. les avait achetés car AB_____ n'en avait alors pas les moyens financiers. A sa connaissance, aucun droit à bâtir n'avait été obtenu sur ces terrains. Il n'avait pas demandé à D_____ de transférer des sommes d'argent à des tiers.

**a.c)** Monsieur A_____ s'est exprimé, pour la première fois durant la procédure, lors de l'audience de jugement.

Il a déclaré qu'il n'avait jamais été question que ses associés et lui-même investissent dans le projet guinéen. Il était un apporteur d'affaires pour CGR_____. Il avait effectué du travail relationnel et investi beaucoup de temps dans le projet.

Les USD 500'000.- versés à AAM_____ / K_____ et AAF_____ avaient été apportés par AAG_____, en même temps que les protocoles d'accord avec les partenaires locaux. Cette somme provenait de ses associés, AAE_____ et AAB_____. Il avait lui-même, pour partie, rédigé les trois protocoles d'accord entre AAV_____ et les partenaires locaux.

Il avait acheté du sucre à Madame E_____ en raison d'un partenariat avec celle-ci. Il était prévu de partager les bénéfices de la vente de ce sucre. Toutefois, il n'avait rien perçu.

L'attestation du 2 août 2009 signée par Madame E_____ n'était pas en lien avec le contrat du 20 février 2006. Lorsque AAV_____ avait obtenu un accord sur sa rémunération, Monsieur A_____ et ses associés devaient honorer leurs engagements envers les partenaires locaux, soit AAM_____ / K_____ et AAF_____. ABD_____ était cessionnaire des droits des partenaires locaux, ce qui expliquait l'accord sur le versement de USD 4 millions en sa faveur. Monsieur A_____ ignorait si Madame E_____ avait perçu une partie de ces USD 4 millions et était étranger aux versements de USD 1 et 2 millions effectués par ABZ_____ à Madame E_____.

Monsieur A_____ n'avait pas connaissance que Madame E_____ demandait plus d'argent. Il s'était opposé à ce que AAB_____ aille, en juillet 2010, à la rencontre de l'intéressée, à Freetown. Il ignorait la teneur de leurs discussions et n'avait pas eu connaissance du contrat du 8 juillet 2010.

Antérieurement à ce voyage à Freetown, AAB_____ lui avait demandé ainsi qu'à AAE_____ d'effectuer des avances à Madame E_____ à hauteur de USD 500'000.-, ce qui correspondait à environ 10 % de la somme finale qui devait être versée à l'intéressée en sa qualité de cessionnaire des droits des partenaires locaux. Au final, une somme totale de USD 3'404'336.- avait été payée à Madame E_____ en cette qualité. À la question de savoir pourquoi l'argent avait servi à l'achat d'un bien immobilier, en Floride, à Madame E_____, Monsieur A_____ a répondu que l'intéressée faisait ce qu'elle voulait de son argent.

S'agissant de l'argent qui avait transité par le compte de N_____, Monsieur A_____ a indiqué qu'il ne connaissait pas D_____. AAB_____ lui avait demandé d'établir une facture de USD 1.5 million de N_____ à O_____ et lui avait expliqué qu'il s'agissait d'un mécanisme de compensation entre ABJ_____ et CG_____MM en lien avec des projets dans le sud de l'Afrique.

Il s'était rendu à la rencontre de Madame E_____ en Floride pour essayer de trouver une issue au litige concernant l'attribution des concessions minières à CGR_____ GUINEE. Il avait évoqué le nom de Monsieur C_____, qu'il avait appelé "*Monsieur C_____*", le "*numéro 1*", "*big boss*" ou "*celui qui est en haut*", avec Madame E_____, pour gagner en crédibilité.

**b)** Aucun des onze témoins convoqués par le Tribunal ne s'est présenté.

**c)** Les parties ont plaidé et pris les conclusions figurant en tête du présent jugement.

## F. SITUATION PERSONNELLE

**a.a)** Madame B_____ est née le _____ 1970, en Belgique, pays dont elle a la nationalité. En 2005, elle a épousé AQ_____ avec qui elle a eu deux enfants, nés en 2003 et 2004. En 2018, elle s'est installée avec sa famille en Italie. Elle est propriétaire d'un parc pour enfants, activité dont elle retire des revenus de EUR 1'000.- par mois environ. Elle est propriétaire d'une maison en France, à Thoiry, laquelle est louée.

Elle n'a pas d'antécédent judiciaire.

**a.b)** Monsieur C_____ est né le _____ 1956, en Israël. Il est double national franco-israélien. Il est marié et père de quatre enfants majeurs.

En 2004, il a pris à bail un appartement à Genève et a été mis au bénéfice d'un forfait fiscal avec son épouse, à Genève, initialement taxé sur la base d'une dépense annuelle de CHF 380'000.-, montant augmenté plusieurs fois (en 2013, CHF 1'000'000.-). En 2016, il a renoncé au forfait fiscal.

Il vit avec sa famille en Israël.

Monsieur C_____ a été condamné, le _____ 2020, en dernière instance et par contumace, par un Tribunal roumain à une peine privative de liberté de 5 ans.

**a.c)** Monsieur A_____ est né le _____ 1962, en France, pays dont il a la nationalité. Il est marié et père de quatre enfants majeurs issus de deux unions différentes.

Il indique travailler dans le négoce de bateaux, activité dont il a retiré EUR 250'000.- en 2019 et 2020.

En 2013, il s'est défait de tous ses biens, ne gardant que l'usufruit de la maison dans laquelle il habite et celle héritée de son père, dont il perçoit un revenu locatif de EUR 1'500.- par mois.

Monsieur A_____ a été condamné, le 29 juillet 2014, aux Etats-Unis à une peine de 2 ans fermes et à une amende de USD 75'000.- pour obstruction au déroulement d'une enquête pénale.

## G. DROIT

1. Compétence

   **1.1.** *Compétence / Corruption*

**1.1.1.1.** Aux termes de l'art. 3 CP, le Code pénal suisse est applicable à quiconque commet un crime ou un délit en Suisse. Cette disposition consacre le principe de territorialité. Il s'agit du principe de base applicable en droit pénal international, selon lequel la compétence pour connaître d'une infraction ressortit à l'Etat sur le territoire duquel cette dernière a été commise (ATF 144 IV 265 consid. 2.3.1 p. 270; ATF 121 IV 145 consid. 2b/bb p. 148 s.; ATF 108 IV 145 consid. 3 p. 146).

Selon l'art. 8 al. 1 CP (ancien art. 7 CP), un crime ou un délit est réputé commis tant au lieu où l'auteur a agi ou aurait dû agir qu'au lieu où le résultat s'est produit. Cette norme constitue un complément indispensable à l'art. 3 CP puisqu'elle définit selon quels critères une infraction est réputée commise en Suisse. Pour qu'une infraction puisse être considérée comme réalisée en Suisse, il suffit que l'un de ses éléments constitutifs ait été exécuté, même partiellement en Suisse (ATF 144 IV 265 consid. 2.3.1. p. 275; ATF 141 IV 205 consid. 5.2; POZO, no 202 et doctrine citée; Petit commentaire no 2 ad art. 8 CP).

Le comportement punissable de l'art. 322septies CP consiste à offrir, à promettre ou à octroyer l'avantage pour obtenir ainsi de l'agent public qu'il viole les devoirs de sa charge ou fasse un usage déterminé de son pouvoir d'appréciation. L'infraction est consommée dès que le corrupteur, même par l'entremise d'un tiers, offre de fournir un avantage indu, le promet ou le remet (CORBOZ, no 19 ad art. 322ter CP par renvoi du no 9 ad art. 322septies CP). Elle l'est même si l'agent public refuse d'emblée (ATF 126 IV 145 consid. 2a, 100 IV 58, 93 IV 53).

Ainsi, l'acte, au sens de l'art. 8 CP est localisable en Suisse, lorsque le corrupteur offre, promet ou octroie un avantage indu en Suisse à un agent public étranger, y compris au cas où une partie seulement du comportement typique est réalisé en Suisse (DYENS, Territorialité et ubiquité en droit pénal international suisse, no 1245, p. 375; VILLARD, La compétence territoriale du juge pénal suisse (art. 3 et 8 CP): réflexions autour d'évolutions récentes in RPS 135/2017 p. 145).

**1.1.1.2.** L'offre, la promesse ou l'octroi d'un avantage représentent trois facettes possibles du comportement punissable. Dès qu'au moins une partie de l'une d'entre elles est réalisée en Suisse, le droit de ce pays s'applique, sans que l'auteur soit forcément présent en Suisse. Cette interprétation large de la notion de lieu d'exécution respecte les exigences de la Convention OCDE 1997 (Bertrand PERRIN, La répression de la corruption d'agents publics étrangers en droit pénal suisse, Bâle 2008, p. 114 et 115).

En effet. le principe de territorialité doit être interprété largement, et en conformité avec la Convention pénale du Conseil de l'Europe (CPCEC) et avec la Convention de l'OCDE.

L'art. 17 ch. 1 let. a CPCEC prévoit que les Etats parties sont tenus d'établir leur compétence lorsque "*l'infraction est commise en tout ou en partie sur son territoire*". Le commentaire officiel de la Convention de l'OCDE précise que "*la compétence territoriale devrait être interprétée largement, de façon à ce qu'un large rattachement matériel à l'acte de corruption ne soit pas exigé*" (Commentaires relatifs à la Convention de l'OCDE sur la lutte contre la corruption d'agents publics étrangers dans les transactions commerciales internationales, § 25, www.oecd.org).

L'art. 4 de la Convention de l'OCDE est formulé en des termes parfaitement analogues à ceux de l'art. 17 ch. 1 CPCEC. Il commande, lui aussi, aux Etats parties d'établir leur compétence, lorsque l'infraction "*est commise en tout en partie sur son territoire*". La convention entend limiter les exigences concernant les critères de rattachement territoriaux (no 25 du commentaire officiel de la Convention; cf également no 790 du rapport explicatif – STE 173 – Convention pénale sur la corruption).

**1.1.1.3.** Pour statuer sur la compétence, il convient de passer par le concept d'unité d'actions, initialement développé par le Tribunal fédéral en matière de prescription (VILLARD, p. 148; DYENS, nos 524ss et 1188ss par renvoi du no 1244). Il y a unité naturelle d'actions lorsque les différents actes dont il retourne, en eux-mêmes distincts, participent de la même intention et forment objectivement un seul et même évènement en raison de l'étroit rapport géographique et/ou temporel qui les unit (ATF 133 IV 256; ATF 131 IV 83, 93, JT 2007 IV 83, 92; VILLARD, p. 148, 149; DYENS, no 524ss; BK, no 4 ad art. 8 CP; PERRIN, p. 463ss). L'unité naturelle d'actions est cependant exclue si un laps de temps assez long s'est écoulé entre les différents actes, quand bien même ceux-ci seraient liés entre eux (ATF 132 IV 49 consid. 3.1.1.3, ATF 131 IV 83 consid. 2.4.5., JT 2007 IV 83; Petit commentaire, no 7 ad art. 98 CP). Le Tribunal fédéral interprète restrictivement cette notion pour éviter de réintroduire sous une autre forme la figure du délit successif ou celle de l'unité sous l'angle de la prescription. Elle ne sera donc admise qu'à la double condition que les faits punissables procèdent d'une décision unique et se traduisent, dans le temps et l'espace, par des actes suffisamment rapprochés pour former un tout (arrêt du TF 6B_310/2014, 6B_311/2014, SJ 2016 I 414; Petit commentaire, no 7 ad art. 98 CP).

Le second critère de l'unité naturelle d'action est plus problématique du point de vue de la corruption transnationale (PERRIN, no 12.3.3, p. 467). La doctrine plaide pour un assouplissement de la jurisprudence qui permettrait de mettre davantage l'accent sur la notion d'ensemble que sur celui de temps. Dans le cadre d'un même projet ou d'un même contrat, l'aspect temporel devrait être fortement relativisé. Les actes de corruption qui sont perpétrés dans ce contexte forment un ensemble et devraient être considérés comme un seul acte. L'exécution d'un projet sur plusieurs années ne devrait pas empêcher que des actes de corruption commis au début, mais résultant d'une même volonté et s'inscrivant dans une pratique systématique, puisse échapper à la justice en

raison d'une découverte tardive des soupçons de corruption (PERRIN, no 12.3.3., p. 467).

**1.1.1.4.** Un acte punissable commis par des coauteurs est réputé exécuté partout où l'un des coauteurs a réalisé un seul des éléments de l'état de fait (arrêt du Tribunal fédéral 6B_115/2014 du 5 août 2014 consid. 2.2.1.; 6B_49/2010 du 19 août 2010 consid. 3; ATF 99 IV 121 consid. 1b; TRECHSEL ET AL., Schweizerisches Strafgesetzbuch, Praxiskommentar, n° 7 ad art. 8; HARARI/ LINIGER GROS, in Commentaire romand, CP I, 2009, n° 49 ad art. 8; POPP/PATRIZIA LEVANTE, in Commentaire bâlois, CP I, 2ème éd. 2007, n° 13 ad art. 8 et les références citées).

**1.1.2.** En l'occurrence, dès l'été 2005, CGR_____ a manifesté son intérêt pour les ressources de fer de Simandou. Madame B_____ a alors été sollicitée pour traduire des contrats en lien avec ce projet. Début janvier 2006, les démarches effectuées se sont concrétisées. Madame B_____ a été informée de la signature d'un protocole d'accord avec le Président guinéen et elle a créé, depuis les locaux genevois où elle travaillait, la structure future détentrice des droits miniers. Pour ce faire, elle a ainsi acheté une société AAS_____ INV. LTD, qu'elle a vendue à CGR_____ STEEL, dont elle était l'administratrice puis l'a renommée CGR_____ (GUINEA) LTD afin que cette société comporte le *brand name* CGR_____. Madame B_____ a, ensuite, établi et conclu, à Genève, les contrats de management et de conseil de cette société avec les autres sociétés du groupe (CGR_____ STEEL et CGR_____ GUERNESEY), elle-même étant administratrice de ces trois sociétés.

Le 13 février 2006, Madame B_____ a vendu, depuis ses bureaux genevois, une société de domicile AAV_____ à Monsieur A_____, AAB_____ et AAE_____, société qui servira d'intermédiaire et d'écran entre CGR_____ et la bénéficiaire des fonds corrupteurs. Le 13 février 2006, toujours, soit avant la conclusion du contrat entre CGR_____ et AAV_____ du 14 février 2006, Madame B_____ a attesté que AD_____ BVI détenait pour le compte de AAV_____ les actions qui lui seraient cédées, sous réserve de l'exécution du contrat qui sera signé le 20 février 2006 entre la Guinée et CGR_____ GUINEE, dont Madame B_____ était administratrice. Elle délivrera, d'ailleurs, depuis Genève, la procuration à AAA_____ pour signer ce contrat.

Dans le cadre de la mise en place du schéma corruptif, l'intermédiaire AAB_____ a fait parvenir à Madame B_____, qui se trouvait dans ses bureaux genevois et alors qu'elle était encore administratrice de AAV_____, via X_____, le contrat que AAV_____ devait signer avec les "*partenaires locaux*". Ce contrat devait être signé le même jour que le contrat entre la Guinée et CGR_____ GUINEE, soit le 20 février 2006. Après discussion téléphonique avec AAB_____, Madame B_____ a reçu un second contrat, soit celui qui devait être signé entre AAV_____ et Madame E_____,

la quatrième femme du Président AAO_____. Le contrat entre AAV_____ et Madame E_____ consistait en un pacte corruptif, soit la promesse d'octroi d'avantages indus, sous la forme d'une participation dans le projet en cas de succès de l'opération.

Alors qu'il était prévu que Madame B_____ signe, à Genève, les protocoles d'accord du 20 février 2006, elle a refusé de signer, directement, le pacte corruptif en sa qualité d'administratrice de AAV_____, via X_____. En revanche, elle a délivré, à Genève, une procuration à AAE_____ pour ce faire. Madame B_____ a ainsi cédé son pouvoir de signature afin de permettre la conclusion du pacte corruptif, soit la promesse d'avantages indus.

Malgré la vente de AAV_____, Madame B_____ a gardé, à Genève, durant près d'un an, la maîtrise des actions de cette société. En effet, AD_____ BVI, dont Madame B_____ était administratrice et qui était gérée depuis Genève par l'intéressée, est restée propriétaire des actions de AAV_____ pour le compte de Monsieur A_____, AAE_____ et AAB_____.

Ce n'est qu'en décembre 2006 - janvier 2007 que Madame B_____ a transféré, à Genève, la propriété des actions de AAV_____ de AD_____ BVI à une structure particulièrement opaque gérée également depuis Genève. La détention par AD_____ BVI puis par une fondation panaméenne des actions de AAV_____ empêchait l'identification des véritables ayant-droits économiques de cette société écran, soit Monsieur A_____, AAE_____ et AAB_____.

Par ailleurs, Madame B_____ a également gardé la maîtrise, depuis ses bureaux genevois, des actions de CGR_____ GUINEE, dont elle était l'administratrice depuis Genève, et dont une partie des actions avait été cédée à AAV_____, par contrat du 14 février 2006, en contrepartie de ses activités corruptrices. Finalement, les actions de CGR_____ GUINEE seront transférées par Madame B_____ à AAV_____, depuis ses bureaux genevois.

Elle a, ensuite, signé l'accord du 24 mars 2008 de rachat des actions que AAV_____ détenait dans CGR_____ GUINEE à titre de rémunération pour son activité corruptrice avant de signer le contrat de cession des actions et d'annuler le certificat d'actions, à Genève.

Au surplus, en 2009 et 2010, Madame B_____ s'est occupée, à Genève, de tous les aspects administratifs et corporatifs de la restructuration de CGR_____, destinée à cacher l'existence de toutes les sociétés qui étaient intervenues dans le schéma corruptif. Elle a signé, à Genève, tous les documents nécessaires au transfert des droits miniers et des sociétés impliquées dans la corruption à d'autres sociétés du groupe.

Par ses agissements, en particulier en délivrant, à Genève, la procuration pour signer, à sa place, le contrat du 20 février 2006 entre AAV_____ et Madame E_____, Madame B_____ a participé à la mise en place du schéma corruptif, en permettant la conclusion du pacte corruptif avec la femme du Président guinéen, soit la promesse d'avantages indus qui se concrétisera par le versement de sommes d'argent.

Par la suite, Madame B_____ a accompli, à Genève, de nombreux actes, permettant l'accomplissement de la corruption et qui, dès lors, aggravent l'atteinte portée au bien juridique lésé et contribuent à assurer l'obtention de l'avantage escompté (cf. en ce sens ATF 99 IV 212 consid. 1b traduit in JdT 1974 IV 98, 102).

Pour rappel, le 27 février 2008, un accord sur le rachat de la participation de Madame E_____ a été trouvé. Par décret présidentiel du 28 juillet 2008, les concessions de AAL_____ sur les blocs convoités 1 et 2 ont été retirées et des permis d'exploration seront octroyés à CGR_____ sur ces mêmes blocs le 9 décembre 2008.

L'accord du 27 février 2008 portant sur la reprise de la participation de Madame E_____ moyennant versement de USD 4 millions sera confirmé le 2 août 2009 puis un nouvel accord prévoyant le versement à l'intéressée de USD 5.5 millions supplémentaires sera trouvé le 8 juillet 2010.

Dans le cadre de l'exécution de ces accords, seize versements d'argent ont été effectués en faveur de Madame E_____ (outre le sucre acheté pour son compte):

| | | | |
|---|---|---|---|
| – | Août 2009 | USD 998'000.- | transaction 2 |
| – | Décembre 2009 | USD 2'000.- | transaction 2 |
| – | Mai 2010 | USD 2'000'000.- | transaction 3 |
| – | Juillet 2010 | USD 150'000.- | transaction 4 |
| – | Août 2010 | USD 100'000.- | transaction 4 |
| – | Juillet 2010 | USD 100'000.- | transaction 5 |
| – | Août 2010 | USD 50'000.- | transaction 5 |
| – | Juillet 2010 | USD 100'000.- | transaction 6 |
| – | Septembre 2010 | USD 1'900'000.- | transaction 7 |
| – | (ACK_____) | USD 100'000.- | pas dans l'AA |
| – | Juillet 2011 | USD 1'000'000.- | transaction 8a |
| – | Septembre 2011 | USD 500'000.- | transaction 8a |
| – | Octobre 2011 | USD 500'000.- | transaction 8b |
| – | Janvier 2012 | USD 250'000.- | transaction 9 |

    –   Janvier 2012       USD 150'000.-      transaction 10

    –   Mai 2012          USD 936'451.-      transaction 11

Partant, la corruption mise en place par le biais d'une promesse concrétisée par seize versements d'argent (dont quinze sont retenus dans l'acte d'accusation), répartis sur 2 ans et demi, doit être appréhendée comme un tout, soit comme une unité naturelle d'actions dans la mesure où la promesse et les versements procèdent tous d'une volonté unique, corrompre le Président guinéen par le versement de sommes d'argent à sa quatrième épouse.

Au demeurant, ne pas rattacher les paiements, qui résultent d'une promesse d'avantages indus, à cette promesse tendrait à l'impunité des criminels en matière de corruption transnationale. En effet, les prévenus ont multiplié les comptes bancaires utilisés dans divers pays (Guinée, Suisse, France, Ukraine, Etats-Unis, Israël, Bahamas), ce qui ne saurait leur permettrait de se soustraire aux autorités pénales. Ainsi, aucun des paiements n'est identique au précédent et plusieurs pays différents sont utilisés pour un seul paiement, ce qui fonderait autant de fors différents rendant impossible toute poursuite pénale.

Il convient de rappeler la nécessité de prévenir les conflits de compétence négatifs en admettant la compétence des autorités suisses même en l'absence de lien étroit avec la Suisse (cf. à cet égard ATF 141 IV 336 consid. 1.1; DYENS, no 1251 et réf. cit.).

Cette interprétation permet à la Suisse, dans le respect de ses engagements internationaux, d'apporter sa contribution dans un effort global de lutte contre l'impunité en matière de corruption transnationale. Comme retenu, dès lors qu'un rattachement territorial avec la Suisse existe, la "*facette*" de l'élément constitutif de la promesse ayant été réalisée en Suisse, les autorités pénales suisses doivent poursuivre et juger le corrupteur et ce, *a fortiori* lorsque l'Etat dont dépend l'agent public concerné demeure dans l'incapacité de mener à bien la poursuite ou, pire encore, lorsqu'il ne souhaite pas la mener (en ce sens, cf. DYENS, no 1250, p. 378).

En l'occurrence, si un certain nombre de comportements typiques de l'infraction de corruption d'agents public étrangers se sont déroulés en Guinée, la Guinée n'a pas poursuivi les prévenus. Elle a ouvert une procédure à l'encontre notamment de Madame E_____, laquelle s'est soldée par un abandon des poursuites en raison d'un arrangement trouvé entre la Guinée et les personnes poursuivies.

Il en est de même des autres pays, notamment par lesquels les fonds corrupteurs sont passés.

Mais, il y a plus. En effet, certains paiements du cas d'espèce fondent également la compétence de la Suisse.

**1.1.3.1.** Lorsque l'octroi de l'avantage indu intervient par le débit d'une somme d'argent depuis un compte bancaire ouvert en Suisse, la doctrine estime que la compétence territoriale suisse est donnée (Daniel JOSITSCH, Das Schweizerische Korruptionsstrafrecht, Art. 332ter bis Art. 322octies StGB, Zurich/Bâle/Genève 2004, p. 450; PERRIN, p. 115 s.; VILLARD, p. 145, cf. également p. 169; CASSANI, Grenzüberschreitende Korruption in Korruption in Staat und Wirtschsaft) et la jurisprudence du Tribunal pénal fédéral (arrêt du TPF SK.2014.24 du 1er octobre 2014 consid. 2.2.1. et BB.2010.112 du 28 juillet 2011, consid. 2.2).

**1.1.3.2.** S'agissant du transit par un compte bancaire en Suisse d'avantages indus dans le cadre de l'infraction de corruption d'agents publics étrangers réalisée à l'étranger, les tribunaux ne se sont jamais exprimés sur cette question (cf. arrêt du TPF BB.2016.386, les fonds reçus en Suisse et postérieurement transférés sur d'autres comptes étaient déjà dans la sphère de disposition du corrompu, ce qui n'est pas le cas en l'espèce s'agissant de O_____ (transaction 8).

Selon PERRIN, si une partie de l'offre, de la promesse ou de l'octroi d'un avantage est réalisée en Suisse, le droit suisse s'applique, sans que l'auteur soit forcément physiquement présent en Suisse. Ainsi, si l'auteur téléphone en Suisse pour donner un ordre de transfert de fonds, il agit en Suisse. Si l'auteur s'adresse à un établissement bancaire situé dans notre pays, le droit suisse peut s'appliquer. La consommation de l'acte requiert l'utilisation du territoire suisse (PERRIN, p. 114ss).

DYERS (nos 577ss) et POPP/LEVANTE (BK, no 6 ad art. 8 CP) n'abordent pas cette question spécifique en matière de corruption, mais se penchent sur les délits de transit (Transitdelikte) à savoir les infractions dont l'acte et le résultat se produisent à l'étranger, mais pour lesquelles la chaîne de causes et d'effets passe par le territoire suisse. Le simple transit ne permet pas de localiser le comportement typique sur le sol suisse pas plus que le résultat typique sauf si le comportement consistant à faire transiter des produits ou des marchandises par la Suisse est érigé en comportement typique à part entière (i.e. art. 19 al. 1 let. b LStup). En l'occurrence, la corruption n'est pas un délit de transit de sorte que ces considérations ne s'appliquent pas.

VILLARS, traitant de la problématique de l'ebanking (p. 168) rappelle que la justification du facteur de rattachement que constitue le débit d'un compte bancaire suisse, en particulier en matière de blanchiment d'argent ou de corruption, se fonde sur l'intervention physique de l'intermédiaire financier en Suisse. En transférant sur ordre de son client l'avantage indu provenant de l'argent du crime, l'intermédiaire financier est un instrument humain, au sens de la figure juridique de l'action médiate, et créé un

rattachement territorial au lieu de situation de l'instrument humain, qui réalise les éléments constitutifs objectifs de l'infraction.

**1.1.4.** *Transaction 1 / sucre*

Le 10 mai 2006, AAD_____ a facturé USD 250'000.- à CGR_____. Ce montant a été payé par CGR_____ TREASURY SERVICES, par débit de son compte bancaire, à Genève. Un mois et demi après, soit le 15 juin 2006, Monsieur A_____, pour le compte de AAD_____, a instruit une autre banque, à Genève, de débiter le compte de AAD_____ de USD 94'008.60 en faveur du compte de la société ABB_____ auprès de sa banque, à Paris, avec la mention "*règlement facture PF 61651 Madame E_____*" pour l'achat de sucre.

Par conséquent, l'avantage indu reproché est intervenu par débit d'un compte en Suisse et la compétence des autorités suisses est donnée.

**1.1.5.** *Transaction 8 / O_____*

S'agissant de la huitième transaction, tout d'abord et contrairement à ce que retient l'acte d'accusation, le montant de USD 1'500'000.- débité le 20 juin 2011 du compte O_____ GLOBAL LTD auprès de Banque 12_____, Zurich, (PP 353'003) ne provient pas des USD 12'496'550.- crédités le 15 juin 2009, soit deux ans auparavant (PP 501'122), mais des USD 1'500'000.- crédités le 16 juin 2011 en provenance du compte privé de D_____, auprès de la Banque 11_____, à Kiev. Aucun mouvement de fonds n'a eu lieu sur le compte O_____ GOBAL LTD entre le crédit le 16 juin 2011 et le débit le 20 juin 2011 de USD 1'500'000.- (PP 353'421).

Ainsi, le montant de USD 1'500'000.- a été crédité sur le compte suisse de O_____. Le 20 juin 2011, la banque zurichoise a reçu l'instruction, depuis l'étranger, de virer ce même montant sur le compte de N_____ auprès d'une banque à Nassau, montant qui sera, *in fine* et en totalité, distribué à Madame E_____.

Il convient de retenir que l'intervention de l'intermédiaire financier zurichois dans le versement de l'avantage indu à la supposée corrompue, lequel a agi sur instructions d'un signataire autorisé du compte, a créé un rattachement territorial, qui permet l'application du droit suisse. La compétence des autorités suisses est ainsi donnée.

**1.1.6.** Au vu de ce qui précède, les autorités suisses sont compétentes pour statuer sur les faits qualifiés de corruption qui lui sont soumis.

Cette compétence est donnée pour les trois prévenus, coauteurs, selon l'acte d'accusation.

**1.2. Compétence / Faux dans les titres**

**1.2.1.** Se rend coupable de faux dans les titres celui qui, dans le dessein de porter atteinte aux intérêts pécuniaires ou aux droits d'autrui, ou de se procurer ou de procurer à un tiers un avantage illicite, aura, pour tromper autrui, fait usage d'un titre faux (cf. art. 251 ch. 1 CP).

Les dispositions des art. 251 à 254 sont aussi applicables aux titres étrangers (art. 255 CP).

**1.2.2.** En l'occurrence, le certificat d'actions de L_____ a été émis, sur instructions de Madame B_____, dans les locaux genevois de MOSSACK & FONSECA & CO. Dans cette mesure le titre a été créé en Suisse et la compétence des autorités suisses est donnée.

S'agissant :

- du contrat du 15 juin 2009,

- du contrat du 11 juin 2010,

- des contrats des 1$^{er}$ mars 2011 et du contrat du 1$^{er}$ septembre 2011,

il n'existe pas de critère de rattachement avec la Suisse pour l'établissement de ces documents.

En revanche, en tant que l'art. 251 ch. 1 3$^{ème}$ par. CP, soit l'usage d'un titre faux, est visé, la compétence des autorités suisses est données. En effet, ces contrats ont été envoyés à la banque zurichoise pour justifier l'arrière-plan économique des transferts y relatifs. Ainsi, l'usage d'un titre faux a eu lieu en Suisse. La compétence des autorités suisses est donnée.

S'agissant du contrat de location de bateau, dans la mesure où Madame B_____ l'a signé à Genève, en sa qualité d'administratrice de la société propriétaire du bateau, la compétence des autorités suisses est donnée.

S'agissant:

- de l'amendement d'août 2010,

- des deux factures du 5 avril 2011,

- du contrat du 1er juin 2011

- de la facture du 14 septembre 2011,

- de la facture du 13 juin 2011,

    – de l'offre de service de U_____ et de la facture du 12 décembre 2012,

il n'y a pas de critère de rattachement avec la Suisse pour l'établissement de ces documents. Par ailleurs, il ne ressort pas de la procédure que ces documents ont été utilisés en Suisse. Toutefois, ces documents ont été établis pour justifier l'arrière-plan économique des transactions y relatives. Ainsi, ils ont été créés dans le but d'en faire usage auprès de la banque suisse de O_____ pour justifier les transferts. Il en a été fait mention dans toutes les instructions de transfert. Dans cette mesure, les titres ont été établis dans le but d'en faire usage auprès de la banque suisse. Le dessein d'emploi en Suisse fonde la compétence des autorités suisses (cf. en ce sens ATF 141 IV 336, critiqué par la doctrine: VILLARD, La compétence territoriale du juge pénal suisse (art. 3 et 8 CP): réflexions autour d'évolutions récentes, in RPS 135/2017 p. 145, 164 et LUDWICZAK, Compétence territoriale et vignette autoroutière: un dérapage incontrôlé, in Forum poenale 2016, p. 298 ss, 299).

Enfin, s'agissant de l'addendum du 29 juin 2011 au contrat de location de bateau, il n'a pas été établi en Suisse, il n'a pas été signé par Madame B_____ et il n'a pas servi à justifier l'arrière-plan économique du transfert y relatif. Par conséquent, les autorités suisses ne sont pas compétentes s'agissant de ce dernier document.

**2.** *Art. 322$^{septies}$ CP*

**2.1.** Selon l'art. 322$^{septies}$ 1$^{er}$ par. CP, celui qui aura offert, promis ou octroyé un avantage indu à une personne agissant pour un État étranger ou une organisation internationale en tant que membre d'une autorité judiciaire ou autre, en tant que fonctionnaire, en tant qu'expert, traducteur ou interprète commis par une autorité, ou en tant qu'arbitre ou militaire, en faveur de cette personne ou d'un tiers, pour l'exécution ou l'omission d'un acte en relation avec son activité officielle et qui soit contraire à ses devoirs ou dépende de son pouvoir d'appréciation, sera puni d'une peine privative de liberté de cinq ans au plus ou d'une peine pécuniaire.

Est un coauteur celui qui collabore, intentionnellement et de manière déterminante, avec d'autres personnes à la décision de commettre une infraction, à son organisation ou à son exécution, au point d'apparaître comme l'un des participants principaux; il faut que, d'après les circonstances du cas concret, la contribution du coauteur apparaisse essentielle à l'exécution de l'infraction. La seule volonté quant à l'acte ne suffit pas; il n'est toutefois pas nécessaire que le coauteur ait effectivement participé à l'exécution de l'acte ou qu'il ait pu l'influencer. La coactivité suppose une décision commune, qui ne doit cependant pas obligatoirement être expresse, mais peut aussi résulter d'actes concluants, le dol éventuel quant au résultat étant suffisant. Il n'est pas nécessaire que le coauteur participe à la conception du projet; il peut y adhérer ultérieurement. Il n'est pas non plus nécessaire que l'acte soit prémédité; le coauteur peut s'y associer en cours d'exécution. Ce qui est déterminant c'est que le coauteur se soit associé à la décision

dont est issue l'infraction ou à la réalisation de cette dernière, dans des conditions ou dans une mesure qui le font apparaître comme un participant non pas secondaire, mais principal (ATF 130 IV 58 consid. 9.2.1 p. 66; 125 IV 134 consid. 3a p. 136).

Ce concept de coactivité montre qu'une personne peut être considérée comme auteur d'une infraction, même si elle n'en est pas l'auteur direct, c'est-à-dire si elle n'a pas accompli elle-même tous les actes décrits dans la disposition pénale; cela résulte naturellement du fait qu'une infraction, comme toute entreprise humaine, n'est pas nécessairement réalisée par une personne isolée, mais peut procéder d'une action commune avec une répartition des tâches (ATF 120 IV 17 consid. 2d p. 23 s.).

**2.2.1.** Toute personne qui accomplit une tâche dévolue à l'Etat, quel que soit son statut, revêt la qualité d'agent public (FF 1999 5045, 5073).

La notion d'agent public étranger englobe, d'une part, les agents au sens formel (agents publics institutionnels) et, d'autre part, les agents au sens matériel (agents publics fonctionnels) (BSK StGB, PIETH, Art322$^{\text{septies}}$ CP, N 11; CR-CP II, op. cit., art. 322$^{\text{septies}}$ CP, N 17).

S'agissant des agents publics au sens formel, la définition de l'agent public étranger figurant à l'art. 322septies CP correspond à celle donnée par l'art. 1 al. 4 let. a de la Convention sur la lutte contre la corruption d'agents publics étrangers dans les transactions commerciales internationales (RS 0.311.21). Il s'agit de personnes qui détiennent un mandat législatif, administratif ou judiciaire, qu'elles aient été nommées ou élues (FF 2004 6549 pp. 6562 – 6566; BSK StGB, PIETH, Art. 322$^{\text{septies}}$ CP, N 12).

**2.2.2.** En tant que Président de Guinée, feu AAO_____ revêtait la qualité d'agent public et disposait d'un pouvoir décisionnel découlant de la loi ou de fait.

Feu le Président AAO_____ revêtait dès lors bien la qualité d'agent public.

**2.3.1.1.** Le comportement punissable consiste à offrir, à promettre ou à octroyer l'avantage pour obtenir ainsi de l'agent public qu'il viole les devoirs de sa charge ou fasse un usage déterminé de son pouvoir d'appréciation (Bernard CORBOZ, Les infractions en droit suisse, Volume II, 2010, art. 322ter CP N 19).

Il est sans importance que l'avantage (ou sa promesse) provienne directement de l'auteur, ce dernier peut faire agir un intermédiaire (FF 1999, 5077; cf. OCDE, Working group on bribery in international business transactions, typologies on the role of intermediaries in international business transaction, Final report, 9 octobre 2009, www.ocde.org).

L'avantage consiste en toute amélioration objectivement mesurable – juridique, économique ou personnelle – de la situation du bénéficiaire (FF 1999 5045, 5075). Il est indu lorsque l'agent public qui devrait en bénéficier n'a pas le droit de l'accepter (FF 1999 5045, 5076).

L'avantage peut être destiné à favoriser l'agent public lui-même, mais aussi une tierce personne (FF 1999 5045, 5077; Bertrand PERRIN, op. cit., page 161). Il est totalement indifférent que l'avantage profite à l'agent public lui-même ou à un tiers (un proche, un ami, une maîtresse) (Bernard CORBOZ, op. cit., art. 322ter CP N 12), pour autant toutefois 1) que la relation soit dûment établie entre cet avantage et la violation des devoirs attachés à la fonction (FF 1999 5045, 5077) et 2) que l'agent public, à un moment, ait eu connaissance de l'avantage octroyé au tiers (Rapport explicatif – STE 173 – Convention pénale sur la corruption, N 36 ad article 2, https://rm.coe.int/16800cce87 / Bertrand PERRIN, op. cit., page 163. ).

**2.3.2.1.** CGR_____ a octroyé un avantage à Madame E_____ consistant en l'achat de sucre et en la promesse d'un avantage sous la forme d'une participation de 5 % dans le projet guinéen, promesse qui s'est concrétisée par le versement de sommes d'argent, soit au total USD 8.5 millions.

Ces avantages étaient destinés à influencer AAO_____ dans le cadre du processus d'attribution des droits miniers de Simandou.

Pour ce faire, CGR_____ a fait intervenir un intermédiaire en la personne de AAV_____.

L'avantage était destiné à favoriser non pas AAO_____ lui-même, mais sa quatrième épouse Madame E_____.

**2.3.2.2.** S'agissant des avantages octroyés, il convient de faire la distinction entre i) le paiement du sucre livré à Madame E_____ et ii) les versements en lien avec l'octroi des USD 4 millions et de USD 5.5 millions en échange de la participation de 5 %.

i)        le *paiement du sucre livré à Madame E_____*

Le rôle de Madame E_____ consistait à permettre à CGR_____ d'accéder au Président AAO_____ afin que CGR_____ l'influence dans la délivrance des permis miniers par le versement de sommes d'argent à sa quatrième épouse.

En juin 2006, CGR_____ a, tout d'abord, acheté du sucre à Madame E_____. Cet octroi a été comptabilisé dans les livres de CGR_____ sous le code comptable "*Guinea Iron Ore*" (Guinée minerai de fer) (PP 500'301) et concernait les permis de bauxite, mais également et surtout le fer en Guinée (PP 500'301).

Ce paiement pour l'achat de sucre survient peu après la conclusion de l'accord du 20 février 2006 entre AAV_____ et Madame E_____, octroyant une participation de 5 % à l'intéressée dans le projet guinéen. Il fait suite au téléphone explicite de Madame E_____ à Monsieur A_____, qui démontre le rôle de la précitée dans le processus d'attribution des permis miniers en Guinée, téléphone relayé à CGR_____ pour que CGR_____ procède au premier paiement ("*first payment*"). Ce sera le premier de nombreux autres paiements.

Ainsi, l'avantage octroyé est en lien direct avec la volonté de CGR_____ d'influencer le processus étatique d'attribution des permis et est la contre-prestation attendue de l'avantage octroyé.

Si ce paiement de sucre n'est pas expressément prévu dans l'accord du 20 février 2006, il procède de la même volonté d'induire Madame E_____ à exercer son influence sur le Président AAO_____ afin que le précité favorise l'attribution des droits miniers à CGR_____ sur les blocs convoités.

ii)     *les versements en lien avec l'octroi de USD 4 millions, auxquels se sont ajoutés USD 5.5 millions supplémentaires en échange de la participation de 5 %*

La promesse de versements à Madame E_____, correspondant à la contrevaleur de la participation de 5 %, a pour but d'influencer le Président AAO_____ dans le processus d'attribution étatique des droits miniers.

En l'occurrence, il existe un lien suffisant entre l'avantage promis, et qui sera octroyé, et l'acte administratif visé.

En effet, il est établi qu'une première approche avait été tentée par CGR_____ et Monsieur A_____, par le biais de AAJ_____, première épouse du Président, pour accéder au pouvoir, soit au Président AAO_____ lui-même. CGR_____ et Monsieur A_____ ont pu rencontrer le Ministre des mines, voire le Président lui-même, qui les a renvoyés vers le Ministre des mines, mais cette démarche s'est révélée finalement infructueuse.

C'est la raison pour laquelle Monsieur A_____ a réactivé ses contacts et a pu rencontrer Madame E_____. Ce n'est qu'à partir de ce moment que les démarches de CGR_____ et de Monsieur A_____ ont été débloquées. Une rencontre a eu lieu avec le Président AAO_____ le 1er décembre 2005, le survol avec l'hélicoptère présidentiel a eu lieu le lendemain 2 décembre 2005 et les contrats ont été conclus avec la Guinée et avec Madame E_____, le 20 février 2006.

Il ressort du courriel de AX_____ à Madame B_____ du 17 janvier 2006 que CGR_____ était alors en train de négocier avec le Président AAO_____ en vue d'un accord avec la Guinée.

Dans l'accord qui sera conclu avec la Guinée le 20 février 2006, il était déjà question d'un droit de préemption de CGR_____ en cas de rétrocession de la moitié des permis miniers de AAL_____.

Il sera relevé que Madame E_____ ne jouait aucun autre rôle pour CGR_____. Pourtant, plusieurs rencontres ont été organisées entre Madame E_____ et les dirigeants de CGR_____. Plusieurs rencontres ont également eu lieu avec AAO_____, en présence de Madame E_____.

Au final, Madame E_____ a perçu de CGR_____ du sucre pour près de USD 100'000.- et USD 8'500'000.-. Or, rien ne justifiait que CGR_____ ne verse de tels avantages à Madame E_____, si ce n'est en raison de l'influence que pouvait exercer son époux, le Président de Guinée, sur le processus étatique d'attribution des droits miniers.

Le Président AAO_____ savait ainsi que sa quatrième épouse serait largement récompensée en cas d'influence du processus étatique d'attribution des droits miniers, peu importe s'il ne connaissait pas exactement les sommes qui seraient finalement versées.

Il convient d'ajouter qu'on ne voit pas quel était l'intérêt pour la Guinée d'octroyer des concessions, sur une des plus grandes réserves de fer non exploitée du monde, à un groupe, soit CGR_____, qui n'avait aucune expérience préalable en matière d'extraction de fer, qui n'était pas connu en Guinée (raison des présentations qu'il fallait faire du groupe) et, surtout, qui n'avait pas les capacités d'exploiter seul les concessions.

CGR_____ n'avait pour autre but que de revendre les concessions minières une fois obtenues en faisant un profit immédiat.

En l'occurrence, CGR_____ a investi environ USD 160 millions pour obtenir les concessions minières qu'elle a évaluées à USD 5 milliards.

Cette opération ne profitait pas à la Guinée qui ne pourrait tirer profit de l'exploitation des mines qu'à un stade ultérieur, soit précisément lors de l'exploitation du projet et dans une moindre mesure.

Dans cette situation, le Président AAO_____ n'avait aucun intérêt à retirer les droits à AAL_____ pour que CGR_____ puisse les revendiquer et ce, juste avant sa mort, si ce n'est pour en retirer un intérêt personnel ou pour favoriser un tiers. En l'occurrence, il

s'agissait de favoriser un tiers en la personne de sa quatrième épouse, qui n'était pas reconnue par la famille de AAO_____, comme cela ressort des attestations produites et de son exil à la mort du Président.

Cela est d'autant plus vrai que le Président était malade et allait mourir quelques mois après le retrait des concessions à AAL_____ et quelques jours avant l'octroi des permis d'exploration à CGR_____.

Les déclarations de Madame E_____ à cet égard sont corroborées par les éléments du dossier et sont, dans cette mesure, crédibles. Elle a indiqué que le Président AAO_____ avait accepté de favoriser CGR_____ car CGR_____ avait promis son aide à Madame E_____.

**2.3.2.3.** Le fait que l'argent ait été versé après la mort du Président AAO_____ n'est pas pertinent. La promesse d'octroyer de l'argent a été faite avant sa mort, sous la forme d'une participation dans le projet, qui correspondait à un tiers de la participation octroyée par CGR_____ à AAV_____. Ce n'est qu'une fois le projet concrétisé que les participations seront rachetées et les intermédiaires payés (cf. contrat du 20.02.2006 entre AAV_____ et Madame E_____ qui prévoit que la participation serait octroyée dès l'obtention des titres miniers nécessaire à l'exploitation de la zone minière de Simandou, PP 348'757).

Ainsi, le fait que le Président meurt au cours du processus d'attribution des titres miniers n'y change rien. La promesse a été faite et l'influence exercée du vivant du Président.

Le fait que Madame E_____ ait fui la Guinée n'y change rien non plus. Au contraire, cela montre encore plus qu'il était important pour le Président AAO_____ de trouver un moyen d'assurer la subsistance de sa quatrième épouse après son décès. D'ailleurs, il sera relevé que Madame E_____ a fui, tout en s'assurant que les pactes corruptifs soient remis à un tiers pour ne pas que CGR_____ "*oublie*" la promesse faite.

**2.3.2.4.** En octroyant une participation dans le projet Simandou, correspondant à un tiers de celle octroyée à l'intermédiaire, CGR_____ a promis un avantage indu au Président AAO_____ devant bénéficier à sa quatrième épouse. Cette promesse s'est concrétisée par des paiements de plusieurs millions de dollars américains. Cette promesse avait pour but d'influencer le processus étatique d'attribution des droits miniers et a été acceptée par le Président AAO_____, qui ne serait pas intervenu sans les méthodes employées par CGR_____.

Ainsi, par décret présidentiel du 28 juillet 2008, AAL_____ s'est vue retirer les blocs 1 et 2 et par arrêté pris quelques jours avant la mort du Président AAO_____, CGR_____ s'est vue octroyer les permis de recherche sur ces mêmes blocs, alors que CGR_____ devait nécessairement s'associer à un tiers pour exploiter les mines.

**2.3.2.5.** CGR_____ a concédé, par le biais de son intermédiaire AAV_____ et par la cession d'un tiers de sa propre participation, 5 % du projet à Madame E_____, participation qui sera rachetée une fois le projet mené à terme.

Les versements effectués étaient indus, Madame E_____ n'ayant fourni aucune contreprestation en échange de l'argent versé, si ce n'est celle liée à son rôle occulte dans l'attribution des concessions minières.

CGR_____ n'avait aucune relation commerciale avec Madame E_____. Or, l'argent versé à Madame E_____ provient de CGR_____.

**2.4.1.** Le comportement attendu de l'agent public peut consister aussi bien en une action qu'en une omission. Il doit être en relation avec son activité officielle (CR-CP II, op. cit., art. 322septies N 33). Les actes concernés peuvent entrer dans le cahier des tâches de l'agent public, mais ils peuvent aussi excéder sa sphère de compétence, par exemple lorsque l'agent public accomplit un acte qui ne lui incombe pas normalement. La disposition pénale est en effet suffisamment large pour embrasser également "les situations dans lesquelles des avantages sont octroyés en vue de favoriser des actes que le fonctionnaire peut accomplir simplement grâce à sa présence au sein de l'administration, même s'il ne s'agit pas d'actes administratifs explicitement prévus par la loi ou lorsqu'il accomplit un acte qui ne lui incombe pas normalement" (FF 1999 5045, 5078 - 5079 / Bertrand PERRIN, op. cit., page 182).

L'agent public viole ses devoirs chaque fois qu'il enfreint une norme de droit qui décrit quels sont les comportements qu'il doit adopter (Bertrand PERRIN, op. cit., page 184). Pour savoir quelles sont exactement les charges et devoirs qui incombent à l'agent public, il convient de consulter le droit étranger de l'Etat au service duquel il travaille. Seul celui-ci détermine ses obligations concrètes. La question de savoir s'il les a enfreintes ou non ne peut donc pas être résolue indépendamment du droit étranger (Daniel JOSITSCH, op. cit., page 402.).

L'offre, la promesse ou l'octroi d'un avantage pour une action ou une omission dépendant d'un pouvoir d'appréciation est considéré, de manière générale, comme de la corruption (Daniel JOSITSCH, op. cit., page 365.). Il suffit que le corrupteur agisse afin que l'agent public exerce son pouvoir d'appréciation dans un sens déterminé (CR-CP II, op. cit., art. 322septies N 34). L'existence d'un pouvoir d'appréciation doit se déterminer sur la base des règles juridiques étrangères pertinentes (CR-CP II, op. cit., art. 322septies N 35). Il faut interpréter la norme étrangère pour conclure à l'existence ou non d'un pouvoir d'appréciation (Bertrand PERRIN, op. cit., page 189).

D'après l'article 28 du Code minier en vigueur en Guinée au moment des faits (Code Minier, Loi L/95/036/CTRN du 30 juin 1995), le permis de recherche est accordé par Arrêté du Ministre chargé des Mines sur recommandation du CPDM (Centre de

promotion et de Développement Miniers jouant le rôle d'interface unique entre l'Administration et les investisseurs) au demandeur ayant présenté une demande conforme aux exigences du présent Code et de ses textes d'application et possédant les capacités techniques et financières suffisantes, ainsi que des engagements de travaux et de dépenses qu'il accepte de souscrire. En cas de demandes concurrentes, la priorité sera donnée à celui des demandeurs qui offre les meilleures conditions et garanties à l'Etat. Lorsque les conditions et garanties sont similaires, la priorité est donnée au premier demandeur.

**2.4.2.** Peu importe que les droits ont ou non été octroyés à CGR_____, le cas échéant, conformément à la loi guinéenne. Le Président AAO_____ a usé de sa position pour décider de retirer les concessions à AAL_____, par décret présidentiel et pour que les permis soient octroyés à CGR_____.

Ainsi, avant sa mort, le Président AAO_____ a entamé le processus étatique d'attribution des droits miniers. Il a retiré les droits octroyés à AAL_____, contre l'avis de ses ministres, afin que ceux-ci puissent être attribués à CGR_____, qui les convoitait, l'objectif premier et unique de CGR_____ (avant que Zogota ne se révèle intéressant) étant les blocs 1 et 2 exploités par AAL_____ ("*we are after Simandu iron ore deposit… AAL_____'s areas*", PP 349'082; contrats du 14 février 2006).

Monsieur C_____ ne s'est pas trompé en insistant sur le fait qu'il ne fallait pas mentionner le nom de AAL_____ dans aucun des documents écrits (PP 5'010'816). Ainsi, le retrait des droits ne devait pas apparaître comme étant lié à leur octroi.

Comme déjà mentionné, ces décisions ont été prises par ou sur influence du Président AAO_____, en violation des devoirs de sa charge dans la mesure où cela ne bénéficiait pas à la Guinée. Le joyau de la couronne, comme appelé par AAB_____, a été retiré à AAL_____ et cédé sans contrepartie pour l'Etat guinéen à CGR_____. Le Président AAO_____ a, dès lors, agi en violation des devoirs de sa charge.

Certes, les décisions prises ou instruites par le Président ont été une étape dans le processus d'attribution des concessions. Toutefois, il n'est pas exclu, sans qu'il n'y ait besoin de trancher cette question, que cette première étape se soit inscrite dans un processus plus large de corruption de CGR_____ pour arriver à son objectif.

Comme l'a mentionné Monsieur A_____ à Madame E_____ *"heureusement Monsieur C_____ a eu l'intelligence d'insister pour que ce soit fait de façon très très régulière pour qu'on ne puisse pas ensuite l'attaquer… Même ABN_____ était dedans… y'a 20 signatures, 30 signatures sur le contrat de CGR_____"*, alors qu'un montant de USD 100'000.- a été octroyé à ABN_____, alors ministre des finances et futur ministre des mines, deux jours après l'octroi des permis de recherches sur les blocs 1 et 2, montant payé par AX_____, qui précisait "*approuvé par Monsieur C_____*",

"*Monsieur C_____*" devant être compris comme étant Monsieur C_____ selon le précité.

**2.5.1.** Entre l'avantage indu et le comportement de l'agent public doit exister un rapport d'équivalence (relation de connexité) (CR-CP II, op. cit., art. 322septies N 36). Le Tribunal fédéral (en application de l'ancien art. 288 CP) définit ce rapport comme un lien suffisant entre l'avantage et un ou plusieurs actes futurs de l'agent public, déterminables de manière générique (ATF 126 IV 141 consid. 2.a, JdT 2001 IV 10 / CR-CP II, op. cit., art. 322ter N 56). Ce lien pourra s'analyser au regard de critères auxiliaires objectifs tels que le montant de l'avantage, la proximité dans le temps, la fréquence des contacts entre le donateur et le donataire et, plus particulièrement, la relation entre la situation professionnelle de l'auteur et la fonction exercée par l'agent public (FF 1999 5045, 5081).

**2.5.2.** La promesse de rémunération, sous la forme de l'octroi d'une participation, promesse concrétisée par des paiements ultérieurs, est à l'évidence en lien avec le comportement du Président AAO_____ d'influer sur le processus étatique d'attribution des titres miniers. En réalité, le fait que CGR_____ offre du sucre et paie des millions de dollars américains à Madame E_____ démontre, si besoin en est, que son mari, le Président AAO_____, a effectivement usé de son influence de son vivant. A défaut, aucune somme n'aurait assurément été versée.

**2.6.** L'infraction est intentionnelle. Le dol éventuel suffit (art. 12 al. 2 2ème ph. CP), notamment en ce qui concerne l'influence espérée de l'avantage indu (Bernard CORBOZ, op. cit., art. 322septies CP N 13).

Cet élément constitutif sera traité dans le considérant suivant.

**3.     Imputation des actes aux prévenus**

Il convient à présent d'examiner le rôle des prévenus dans le cadre de ce processus corruptif, soit examiner si les faits commis peuvent leur être imputés tant sur le plan objectif que subjectif.

**3.1.** *Madame B_____*

**3.1.1.1.** *Rôle au sein de CGR_____*

S'agissant, tout d'abord, du rôle de Madame B_____, au sein de la structure du groupe, elle a travaillé pour la famille Monsieur C_____ depuis ses 19 ans, soit depuis 1989. Elle est administratrice de AD_____ BVI, depuis sa création en 1998. AD_____ BVI est liée par un contrat de mandat avec la fondation V_____, qui prend en charge tous les frais de AD_____ BVI. Madame B_____ est également secrétaire du conseil de la

fondation V_____. Elle est non seulement administratrice de AD_____ BVI, mais également de toutes les sociétés du groupe CGR_____, en particulier de CGR_____ GUERNESEY, CGR_____ GUINEE (BVI), CGR_____ GUINEE (GUERNESEY) ou CGR_____ STEEL.

Madame B_____ est responsable de toute la structure corporative et administrative du groupe CGR_____ et elle occupe une position privilégiée dans toutes les sociétés du groupe détenues par la fondation V_____, de même qu'au sein de V_____ elle-même, ayant acquis une expérience précieuse au fil des années.

L'importance de son rôle se déduit également de sa rémunération, qui n'est pas celle d'une simple exécutante, vu son évolution notable au fil des années.

En cette qualité, Madame B_____ va mettre en place la structure nécessaire au processus corruptif et à l'effacement des preuves de la corruption.

**3.1.1.2.** *Mise en place de l'intermédiaire AAV_____*

Madame B_____ va mettre en place l'intermédiaire et l'écran entre CGR_____ et Madame E_____.

Alors qu'elle était au courant du projet guinéen, notamment pour avoir traduit certains des accords et pour avoir mis en place CGR_____ GUINEE, dont elle était l'administratrice, le 13 février 2006, Madame B_____ a vendu une *offshore*, soit AAV_____, à Monsieur A_____ et ses associés, Le même jour, mais avant la conclusion du contrat entre CGR_____ et AAV_____ du lendemain, Madame B_____ a attesté détenir, pour le compte de AAV_____, les actions de CGR_____ GUINEE.

Dans ce contexte, le 15 février 2006, la secrétaire de AAB_____ lui a envoyé pour signature, en sa qualité d'administratrice de AAV_____, via X_____, le protocole d'accord avec les partenaires locaux.

Madame B_____ a discuté plusieurs fois, au téléphone, avec AAB_____ et les deux protocoles d'accord du 20 février 2006, soit entre AAV_____ et AAM_____/K_____, respectivement entre AAV_____ et Madame E_____, lui ont été envoyés.

Elle a délégué son pouvoir de signature, en délivrant une procuration à AAE_____, via AAB_____, pour signer ces protocoles d'accord avant de démissionner immédiatement. Des administrateurs de paille ont alors été désignés.

De même, Madame B_____ a délivré une procuration à AAA_____ pour signer le contrat entre CGR_____ GUINEE et le gouvernement guinéen, le même jour que la conclusion du contrat entre AAV_____ et Madame E_____.

Par ces agissements, Madame B_____ a permis la mise en place du schéma corruptif.

**3.1.1.3.** *Mainmise sur les actions de AAV_____ et dissimulation des ayant-droits*

Malgré la vente de AAV_____ à AAD_____ et sa démission immédiate en sa qualité d'administratrice, via X_____, Madame B_____ a gardé la mainmise sur les actions de AAV_____.

En effet, Madame B_____ a attesté détenir, en sa qualité d'administratrice de AD_____ BVI, les actions de AAV_____, à titre fiduciaire et ce, jusqu'à décembre 2006.

A cette date, Madame B_____ a effectué les démarches nécessaires pour transférer lesdites actions. Ces actions ne seront pas transférées à Monsieur A_____ et à ses associés, à qui elle avait vendu la société, mais à une structure particulièrement opaque, gérée également depuis Genève, à qui elle a adressé tous les documents corporatifs de AAV_____.

Ce faisant, d'une part, Madame B_____ a gardé la mainmise sur les actions de l'intermédiaire, en garantie de la bonne exécution des accords à conclure, et, d'autre part, a permis de cacher les véritables ayant-droits économiques de AAV_____.

**3.1.1.4.** *Transfert des actions de CGR_____ GUINEE*

Une fois le contrat entre CGR_____ GUINEE et le gouvernement guinéen conclu, Madame B_____ s'est occupée du transfert des actions promises à AAV_____. Elle a signé le contrat de cession des actions de CGR_____ GUINEE en faveur de AAV_____.

Par la suite, Madame B_____ a signé l'accord du 24 mars 2008 de rachat des actions que AAV_____ détenait dans CGR_____ GUINEE. Elle a signé le contrat de cession de ces actions puis elle a annulé le certificat d'actions en faveur de AAV_____.

Ce faisant, elle a permis la rémunération de l'intermédiaire et écran entre CGR_____ et Madame E_____.

**3.1.1.5.** *Effacement de l'intermédiaire*

Madame B_____ a effectué toutes les démarches administratives et corporatives nécessaires à l'effacement de l'intermédiaire AAV_____.

Elle était responsable du plan de restructuration au niveau administratif et corporatif. Elle a signé quasiment tous les documents permettant la restructuration, en deux étapes, de CGR_____, en 2009 et 2010, en sa qualité d'administratrice de toutes les sociétés impliquées dans la restructuration, soit :

- CGR_____ GUERNESEY,
- CGR_____ STEEL,
- CGR_____ GUINEA (BVI),
- CGR_____ GUINEA (Guernesey).

Ainsi, dans un premier temps, elle a acheté une société au nom identique à celle qui détenait les droits miniers, mais domiciliée à Guernesey et non plus aux BVI. Elle a ainsi permis le transfert des permis miniers d'une société à l'autre.

Elle a signé le transfert de CGR_____ GUINEE SARL d'une société à l'autre. Elle a signé les contrats de transfert de prêt et signé les contrats de prêts. Elle a voté la dissolution de CGR_____ GUINEE BVI, ancienne détentrice des droits miniers et, dont une participation avait été cédée à AAV_____. Elle s'est désignée liquidatrice de cette société puis a constaté la liquidation.

Dans un second temps, elle a signé le contrat de cession de CGR_____ STEEL et CGR_____ GUINEE BVI à CG_____MM, pour le compte de l'acheteur et du vendeur, alors que ces deux sociétés avaient des liens avec AAV_____.

Quant à AX_____, il s'est occupé de faire effacer toute mention compromettante dans la comptabilité.

Au niveau comptable également, Madame B_____ a permis de cacher le rôle de AAV_____.

Madame B_____ a, en effet, signé les résolutions pour ne pas auditer les comptes 2009 et 2010 de CGR_____ GUERNESEY. En revanche, elle a signé les comptes consolidés de CGR_____ GUERNESEY, alors qu'ils mentionnaient faussement que les versements de USD 22 millions et de USD 3 millions à AAV_____ étaient en lien avec la vente d'une aciérie à Baku.

Dans la foulée, alors que les paiements à AAV_____ avaient jusque-là été effectués par CGR_____ TREASURY SERVICES, après la vente à ABY_____ les paiements ont été effectués par AE_____, une société étrangère aux activités de CGR_____,

détentrice d'une société exploitant une aciérie en Azerbaïdjan. A cette fin, AAV_____ a ouvert un nouveau compte en Israël. Après le dernier paiement, la société AAV_____ a été radiée et AE_____ le sera en 2014.

En agissant de la sorte, Madame B_____ a permis de supprimer tout lien avec l'intermédiaire dans les promesses faites à des fins corruptives et les versements corruptifs effectués ou à effectuer.

Enfin, Madame B_____ a obtenu une prime de résultat lorsque l'opération a été menée à terme, preuve en est encore de son implication dans le bon déroulement du projet. De même, AD_____ BVI, dont Madame B_____ était administratrice, a reçu 0.5 % des USD 500 millions payés par ABY_____ à CGR_____.

**3.1.1.6.** Madame B_____ a, ainsi, objectivement, activement participé à la mise en place et à l'effacement de l'intermédiaire et écran AAV_____. Elle a mis en place le schéma corruptif sous ses aspects corporatifs et administratifs.

**3.1.2.** Eu égard à son rôle au sein des sociétés CGR_____, Madame B_____ occupait une position privilégiée et connaissait le business modèle de CGR_____, tel que rappelé lors de la réunion stratégique de Guernesey.

Sous l'angle subjectif, Madame B_____ était informée, en 2005 déjà, du projet guinéen, qui visait à acquérir des concessions sur une des plus grandes réserves inexploitées de fer du monde dans une région géographique très risquée. Début 2006, elle avait été informée de la signature d'un protocole d'accord avec le Président guinéen.

La veille de la signature de l'accord avec AAV_____, elle a attesté détenir pour le compte de AAV_____ les actions de CGR_____ GUINEE qui seront cédées le lendemain. Madame B_____ a, toutefois, conditionné l'exécution de l'accord avec AAV_____, soit le transfert des actions, à l'exécution du contrat entre CGR_____ GUINEE et le gouvernement de la République de Guinée, ce qui démontre sa compréhension et son implication dans l'opération en cours.

Madame B_____ savait, comme elle l'a indiqué dans la procédure, que l'octroi d'une participation permettrait le versement ultérieur d'une commission en cas de réussite de l'opération.

Le 14 février 2006, le contrat entre AAV_____ et CGR_____ a été signé. Celui-ci mentionnait, effectivement, la participation de 17.65 %, évoquée par Madame B_____ la veille, et prévoyait le paiement des USD 19.5 millions, selon un échéancier très spécifique.

Or, ces paiements et cet échéancier n'étaient que le pendant de la rémunération promise à AAM_____/K_____ et à AAF_____, lesquels ont permis à CGR_____ d'accéder au Président AAO_____ par le biais de sa quatrième épouse.

Précisément, le contrat entre AAV_____ et AAM_____/K_____ a été envoyé, le 15 février 2006, à Madame B_____ pour signature dans la mesure où elle était, alors, encore administratrice de AAV_____, via X_____. Elle a, toutefois, refusé de le signer, préférant, dans un premier temps, déléguer son pouvoir de signature, avant de démissionner de ses fonctions dès la procuration délivrée.

Par la suite, Madame B_____ a caché le nom des personnes physiques derrière AAV_____ par le biais d'un rapport de fiducie.

Enfin, avant de transférer les actions de CGR_____ GUINEE à AAV_____, dont elle était restée propriétaire à titre fiduciaire via AD_____, Madame B_____ s'est assurée de la bonne exécution de l'accord conclu entre CGR_____ et la Guinée.

Elle a manifesté, par-là, qu'elle était parfaitement consciente de la situation, tout en gardant la maîtrise de l'opération. Elle a fait en sorte de ne pas apparaître personnellement ou de ne pas être liée d'une quelconque manière au pacte corruptif et de cacher le nom des personnes physiques derrière la société écran utilisée par CGR_____.

Par ailleurs, il sied de relever que le contrat entre AAV_____ et Madame E_____, qui avait été envoyé à Madame B_____, prévoyait non pas le versement de sommes d'argent, mais l'octroi d'une participation dans le projet. Or, l'octroi d'une participation démontre qu'une contrepartie est demandée au cocontractant, en l'occurrence influencer le Président AAO_____, pour que celui-ci influe à son tour dans le cadre du processus d'attribution des droits miniers.

Par ailleurs, Madame B_____ a été impliquée dans le règlement du litige avec AAM_____, qui réclamait l'exécution de l'accord conclu le 20 février 2006, lequel avait été précisément soumis à Madame B_____ pour signature (cf. échange de courriers de juin 2009, recours à des avocats, Madame B_____ est le contact de l'avocat genevois de AAV_____, traduction du courrier du 15 mars 2010). Elle ne s'en est pas étonnée ni inquiétée, malgré les termes utilisés par l'intéressé, ce qui démontre encore son implication dans le schéma corruptif et sa parfaite connaissance de celui-ci.

Madame B_____ a, également, démontré, par ses actions ultérieures, sa participation au schéma corruptif.

Elle a encore activement œuvré à la restructuration du groupe tendant à l'effacement de l'intermédiaire et écran AAV_____.

Elle a été, dans ce cadre, en contact étroit avec AX_____, lequel s'est occupé de tous les paiements à l'intermédiaire AAV_____ et à la bénéficiaire des fonds corruptifs Madame E_____ (cf. "*Proposed restructuring and step plan*" établi par AX_____, PP 306'391).

Alors qu'elle avait personnellement signé les résolutions pour ne pas auditer les comptes 2009 et 2010 de CGR_____ GUERNESEY, Madame B_____ a signé les comptes consolidés mensongers de CGR_____ GUERNESEY, dont le caractère falsifié n'a pas pu lui échapper.

En effet, Madame B_____ a une connaissance approfondie de la structure du groupe et de ses sociétés. Elle a néanmoins signé des comptes qui mentionnaient faussement:

- La nature du montant payé à AAV_____, qui figurait comme un investissement, ce qui est erroné et ce qu'elle ne pouvait que savoir;

- Le motif du paiement à AAV_____: la vente d'une aciérie à Baku, ce qui est erroné et ce qu'elle ne pouvait que savoir;

- Un paiement supplémentaire de USD 3 millions: dans la rubrique AE_____, après une référence à un montant versé au CEO de ACG_____, détenue par AE_____, ACH_____, ce qui est erroné et ce qu'elle ne pouvait que savoir.

Par ses agissements, Madame B_____ a manifesté sa volonté de cacher le rôle joué par AAV_____ dans le schéma corruptif mis en place.

Si l'intervention de AAV_____ était licite, s'il s'était agi de paiements à des intermédiaires indépendants du pouvoir, il n'y avait aucune raison de falsifier les comptes.

Enfin, Madame B_____ ne pouvait que connaître le rôle occulte de AX_____, qui s'est occupé de tous les paiements en lien avec la corruption, ainsi que de l'effacement de toutes les traces de la corruption. Madame B_____ est administratrice de CGR_____, laquelle est liée par un contrat de mandat à AZ_____, la société de AX_____. En cette qualité, elle ne pouvait que savoir que le statut de AX_____ avait été modifié en 2010. Or, elle a menti à cet égard, en soutenant faussement que celui-ci était subordonné à AJ_____, ce qu'elle ne pouvait que savoir vu ses liens avec l'intéressé et son rôle au sein de CGR_____.

D'ailleurs, AX_____ a reçu, après la vente à ABY_____, un bonus substantiel de USD 800'000.-, représentant 4.5 fois les services facturés, alors qu'il n'était qu'un mandataire de CGR_____, ce que Madame B_____ savait dès lors qu'elle avait approuvé les bonus octroyés en sa qualité d'administratrice de CGR_____ GUERNESEY.

Le fait que Madame B_____ n'ait peut-être pas eu connaissance des montants exacts versés à Madame E_____ ressortit à son rôle. En effet, la précitée n'était pas en charge de l'exécution des paiements.

En participant à l'effacement de l'intermédiaire et en cachant les sommes qui avaient été versées à celui-ci, soit USD 34.5 millions, Madame B_____ ne pouvait que savoir que le travail demandé, qui consistait à obtenir l'influence du Président guinéen dans le processus d'attribution des titres miniers, était en cours d'exécution. En effet, à défaut, la participation octroyée n'aurait pas été valorisée et la rémunération n'aurait pas été versée à l'intermédiaire.

**3.1.3.1.** Madame B_____ a collaboré, intentionnellement et de manière déterminante, avec d'autres personnes, à la décision de corrompre le Président AAO_____ par la promesse et l'octroi d'avantages indus à sa quatrième épouse.

Ces faits sont constitutifs de corruption d'agents publics étrangers et Madame B_____ sera reconnue coupable de ce chef d'infraction.

**3.1.3.2.** *Transaction 1 / Sucre*

En revanche, s'agissant du sucre acheté à Madame E_____, il n'est pas en lien direct avec l'accord du 20 février 2006 et les accords ultérieurs, raison pour laquelle il doit être traité à part.

CGR_____ ne pouvait que se douter qu'une partie, à tout le moins, des USD 250'000.- étaient destinés à récompenser Madame E_____, voire d'autres partenaires locaux, ainsi que cela a été le cas dans les faits.

La participation de Madame B_____ à ce versement n'est pas établie objectivement. Subjectivement, il ne ressort pas non plus du dossier qu'elle aurait été spécifiquement informée du versement à AAD_____ des USD 250'000.- en question, pas plus qu'il n'est établi qu'elle savait ou avait envisagé qu'une partie dudit montant bénéficierait finalement à Madame E_____ et aux autres partenaires locaux.

Le versement de USD 250'000.- de CGR_____ à AAD_____ n'est pas compris dans la rémunération de AAV_____.

Cette situation n'est pas comparable aux paiements en espèces effectués à Madame E_____ en échange de la participation convenue dans l'accord du 20 février 2006 envoyé à Madame B_____.

Il résulte de ce qui précède que Madame B_____ sera acquittée de corruption d'agents publics étrangers s'agissant des faits mentionnés sous chiffre B.b.I.1.1. de l'acte d'accusation.

**3.2.** *Monsieur C_____*

**3.2.1.** *Dirigeant effectif*

Monsieur C_____ est, officiellement, premier bénéficiaire de la fondation V_____, qui détient, par le biais de la holding W_____, toutes les sociétés du groupe CG_____ actives dans les ressources naturelles.

La fondation V_____ prend toutes les décisions stratégiques du groupe, alors que le Président du conseil de fondation, l'avocat de Monsieur C_____ dans la présente procédure, est également le représentant de la holding W_____ en tant qu'administrateur unique.

Quand à AD_____ BVI, elle est liée par un contrat de mandat à la fondation V_____, qui approuve son budget et prend en charge l'intégralités de ses frais.

Entre 2004 et 2010, AD_____ BVI était détenue par AC_____, par le biais d'une *offshore* AN_____. AC_____ était également CEO et CIO de CG_____MM, détenue par la fondation AR_____, dont Monsieur C_____ est également le premier bénéficiaire. AC_____ a déclaré avoir été engagé par la fondation V_____ après plusieurs discussions avec Monsieur C_____ et avoir une relation étroite avec Monsieur C_____ pour que les choses fonctionnent (PP 502'158).

Madame B_____ était administratrice de AD_____ BVI et de toutes les sociétés du groupe CGR_____, tout en étant la secrétaire du conseil de fondation. Elle travaillait pour la famille Monsieur C_____ depuis ses 19 ans et a travaillé pour AD_____ BVI dès sa création.

AC_____ et Madame B_____ étaient administrateurs de CGR_____, sise à Guernesey, laquelle détenait CGR_____ GUINEE, future détentrice des droits miniers.

Monsieur C_____ bénéficie de distributions de fonds de la fondation pour ses besoins personnels, mais également professionnels (distribution de fonds à AB_____ REAL ESTATE, dont l'actionnaire unique est Monsieur C_____). Il est rémunéré entre USD 250'000.- et 400'000.- par an par la fondation V_____ et également USD 700'000.- par an par CGR_____ pour ses activités de conseil.

Après la transaction avec ABY_____ en 2010, sur les USD 500 millions payés par ABY_____, entre 2010 et 2012, USD 350 millions seront reversés à W_____ et USD

150 millions seront distribués par la fondation V_____ pour soutenir la société AB_____ REAL ESTATE, détenue directement par Monsieur C_____. Ainsi, il a bénéficié directement des fonds versés par ABY_____.

Quant à AD_____ BVI, elle a reçu 0.5 % du montant de USD 500 millions payés par ABY_____. AC_____ a reçu USD 3 millions et Madame B_____ USD 150'000.-.

Dans le cadre de ses activités de "*conseil*", comme il les qualifie, Monsieur C_____ voyage à bord d'un des deux avions détenus *in fine* par la fondation V_____.

Les sociétés actives dans les ressources naturelles en Afrique portent toutes le nom de Monsieur C_____ sous le *brand name* de CGR_____, soit C_____ GROUP RESOURCES, ce qui revêtait une importance primordiale à teneur du courriel du 17 janvier 2006 de AAG_____ à Madame B_____.

Par ailleurs, il ressort de ses déclarations dans le cadre de la présente procédure que Monsieur C_____ se confond, parfois, avec le groupe avant de rectifier (i.e. "*on n'a jamais payé Madame E_____; par nous j'entends moi ou CGR_____*", PP 500'475).

Monsieur C_____ se décrit, également, comme l'ambassadeur du groupe, qui porte son nom et indique se présenter sous ce nom, laissant ainsi entendre à ses interlocuteurs qu'il en est à la tête. Il rencontre les chefs d'Etat, les ministres ou autres dirigeants. Il est présent lors de toutes les négociations importantes du groupe et lors de toutes les réunions stratégiques. Il ressort notamment du procès-verbal de la réunion stratégique du conseil d'administration et du management de CGR_____ d'août 2007, à Guernesey, que Monsieur C_____ est très impliqué dans la stratégie du groupe, qu'il commente, incluant les aspects financiers, les projets, le business modèle du groupe ou l'engagement d'un nouveau cadre, dont il propose la désignation (en l'occurrence un nouveau chef des ressources humaines en charge notamment de la politique de rémunération).

Vis-à-vis de l'extérieur, Monsieur C_____ est présenté comme le propriétaire du groupe CGR_____, référence étant ici faite au rapport d'activités de CGR_____ en Guinée, rédigé par AAU_____.

Il est par ailleurs également informé et impliqué dans les litiges qui concerne CGR_____ (i.e. AAM_____, Madame E_____, la procédure administrative guinéenne, CIRDI, LCIA).

Monsieur C_____ est, également, considéré, tant à l'intérieur qu'à l'extérieur de CGR_____, comme le chef de CGR_____. Ainsi, il est fait référence à Monsieur C_____ comme étant le "*big boss*" ou le "*No 1*" (i.e. conversation Monsieur A_____ du 11 avril 2013; PP 4'707'154; courriel du 10 mai 2006 de AAA_____).

Sa position au sein de CGR_____ ressort également des propos tenus par Monsieur A_____ à Madame E_____ en Floride (i.e. conversation du 11 avril 2013, "*il y en a qu'un qui décide, tu dois comprendre que toutes les personnes sont au milieu, il n'y a personne qui décide, il n'y en a qu'un, c'est celui qui est en haut, et c'est le seul (…)*").

Par ailleurs, Monsieur C_____ s'est entouré de personnes loyales et fidèles dans les structures mises en place, dont notamment :

–   Son avocat genevois, Me GAMMA, associé senior de la fondation, dont Monsieur C_____ est le premier bénéficiaire et le conseiller. Me GAMMA est également l'administrateur unique de W_____, la holding qui détient toutes les sociétés du groupe CGR_____;

–   AC_____ comme déjà mentionné;

–   Madame B_____ comme déjà mentionné;

–   AX_____, CFO de CGR_____ avant de devenir mandataire de CGR_____ Guernesey, en qualité de *conseiller financier stratégique*, sis en Israël;

–   F_____, avocat interne, sis en Israël, avant de devenir avocat externe.

La structure mise en place, que ce soit au niveau financier, au niveau corporatif ou au niveau humain, permet à Monsieur C_____ d'exercer son pouvoir décisionnel au sein du groupe qui porte son nom.

Ce pouvoir est mis en exergue dans le cadre du projet guinéen, qui nous occupe.

En effet, Monsieur C_____ a été impliqué dans toutes les étapes importantes du processus d'attribution des titres miniers:

–   Il a été informé du projet guinéen, au printemps 2006, tel que cela ressort du courriel du 10 mai 2006;

–   Il a été mis en contact avec AAB_____, en juin 2006 déjà, rencontre qui ne s'explique qu'en lien avec le projet guinéen;

–   Il était présent lors de la réunion du conseil stratégique de CGR_____ Guernesey lors duquel :

    o   il a donné des conseils stratégiques liés à la viabilité du projet guinéen (soit la problématique du transport),

    o   le business model de CGR_____ a été discuté, Monsieur C_____ mettant en exergue les points forts de CGR_____, soit notamment ses contacts dans l'establishment politique;

– Il a donné des instructions claires par rapport à l'attitude à adopter, notamment vis-à-vis de AAL_____;

– Il a été informé des rencontres avec les "*key people*", dont *The Lady*;

– Il a rencontré à cinq reprises, en 2008, le Président AAO_____, notamment en présence de Madame E_____;

– Il a rencontré à trois reprises la Présidente du Libéria, alors que la "*Liberian Transport Solution*", soit l'évacuation du minerai par le Libéria était une des conditions à la viabilité économique du projet guinéen;

– Il a rencontré les Présidents et les ministres successifs;

– Il entretient des liens étroits avec ABP_____;

– Il est partie prenante aux négociations avec de futurs partenaires, dont ABY_____;

– Il s'implique dans la résolution du litige avec le Comité technique de Guinée.

Les déclarations de AX_____ et de AAU_____ confirment ces éléments.

AX_____ a déclaré que Monsieur C_____ était le décideur dans la société CGR_____ et qu'il approuvait chacun des versements importants (PP 4'901'628). Quant à AAU_____, il a indiqué que Monsieur C_____ était son vrai "*boss*" et qu'il se présentait comme conseiller pour "*des combines pour les impôts*" (PP 4'900'065).

Il résulte de ce qui précède que Monsieur C_____ n'est, officiellement, ni un organe ou un membre d'organe, ni un associé ou un collaborateur au sein de la fondation V_____ et des sociétés détenues par cette fondation. Il ressort toutefois de sa position au sein de cette structure et de ses activités qu'il a un pouvoir décisionnel au sein du groupe CGR_____ et qu'il y occupe donc une position de dirigeant effectif.

### 3.2.2. *Rémunération des intermédiaires*

Il ressort de la procédure que Monsieur C_____ a été en charge de la rémunération de Monsieur A_____ et de ses associés, qui agissaient sous le couvert de AAV_____.

Ainsi, en juin 2006 déjà, Monsieur C_____ a eu des discussions avec AAB_____, à qui les principes de l'intervention de Monsieur A_____ et de ses associés ont été rappelés. A cette occasion, il a été manifesté la volonté de CGR_____ de dissocier strictement AAV_____ de CGR_____. En d'autres termes, AAV_____ ne devait, en aucun cas, apparaître comme agissant pour le compte de CGR_____.

Il ressort du courriel du 10 mai 2006 également, que Monsieur C_____, désigné comme le No 1, avait manifesté auprès du CEO AAG_____ et du futur CEO AAA_____ son objectif, soit le fer de Simandou.

Monsieur C_____ a, ensuite, été en charge de la négociation de l'accord du 24 mars 2008 portant sur le rachat de la participation de 17.65 % moyennant versement de USD 22 plus 8 millions, tel que cela ressort des éléments suivants:

Dans son courriel du 8 avril 2009, AAB_____ a parlé, en s'adressant à Monsieur C_____, de "*leur*" accord ("*our agreement*").

Les factures de AAV_____ ont été retrouvées lors de la perquisition de l'avion utilisé par Monsieur C_____.

L'accord du 24 mars 2008 portant sur le paiement de AAV_____ n'étant pas respecté, AAB_____ s'est adressé directement à Monsieur C_____ pour s'en plaindre et l'informer que ses associés et lui refusaient toute modification concernant le montant et les dates de paiement de leur rémunération. AAB_____ s'est, ensuite, adressé à AX_____ pour solliciter le versement de la troisième échéance et à Madame B_____, administratrice de CGR_____ STEEL.

Monsieur C_____ a, alors, convenu directement avec AAB_____ d'un nouvel échéancier de paiement.

Informé des prétentions financières de AAM_____, qui se plaignait du non-respect de l'accord conclu le 20 février 2006, Monsieur C_____ a discuté directement de ce problème avec AAB_____, à plusieurs reprises, durant le mois de juin 2009. Le paiement du solde de la rémunération due à AAV_____ sera conditionné à la résolution de ce litige, ce qui démontre l'interdépendance de la rémunération due à AAV_____ avec les promesses faites aux partenaires locaux, par accords du 20 février 2006, soit à AAM_____/K_____, AAF_____ et Madame E_____.

Monsieur C_____ a négocié, directement, avec AAB_____ le paiement d'un montant supplémentaire de USD 4.5 millions à verser à AAB_____ et à ses associés, en sus des USD 30 millions perçus. Ce faisant, il a reconnu le succès de l'intervention de AAB_____ et de ses associés dans l'attribution des titres miniers.

Comme il a été retenu, AAV_____ a joué le rôle d'intermédiaire ou d'écran entre CGR_____ et les partenaires locaux, dont Madame E_____. Aucune contreprestation à la participation octroyée à AAV_____ n'était prévue, si ce n'est de jouer le rôle d'intermédiaire et d'écran entre CGR_____ et la bénéficiaire des fonds corrupteurs. En effet, non seulement Monsieur A_____ et ses associés n'avaient aucune expérience préalable en matière minière, mais ils étaient rémunérés, séparément, par CGR_____,

pour le travail déployé sur le terrain et pour les frais encourus. Ainsi, la participation octroyée par Monsieur C_____ à Monsieur A_____ et à ses associés était le pendant de l'influence demandée au Président guinéen.

A cela s'ajoute que Monsieur C_____ est intervenu, directement, dans un des paiements corruptifs en sollicitant les services d'un ami et partenaire en affaires, D_____.

Par ailleurs, l'implication directe de Monsieur C_____ dans les versements corruptifs ressort des conversations enregistrées par le FBI, en Floride. Monsieur C_____ a été directement mis en cause dans le versement des USD 5.5 millions à Madame E_____. Monsieur A_____ a précisé l'implication de Monsieur C_____ dans le processus corruptif, en mettant en avant "*l'intelligence*" de Monsieur C_____ dans la mise en place du processus corruptif visant l'attribution des concessions minières.

A cet égard, la thèse de la défense du "*name dropping*" ne résiste pas à l'examen.

En effet, eu égard à la chronologie des évènements et à l'implication de Monsieur C_____, la mention de son nom dans les discussions entre Madame E_____ et Monsieur A_____ n'est à l'évidence pas une coïncidence. Par ailleurs, si Monsieur C_____ était étranger au processus corrupteur, la mention de son nom était inutile. Cela est d'autant plus vrai que si les USD 3.4 millions reçus par Madame E_____, comme le soutient Monsieur A_____, avaient été versés par Monsieur A_____ et ses associés, il aurait été inutile de recourir au nom de Monsieur C_____. De même, si Madame E_____ avait reçu les USD 3 millions de ABZ_____, la mention de Monsieur C_____ n'était pas nécessaire. Enfin, Monsieur A_____ fait clairement la différence entre l'argent versé par ses associés et lui-même et celui versé par Monsieur C_____. De même qu'il précise que les USD 20'000.- qu'il détenait sur lui lors de son arrestation provenaient de "*sa poche*".

Par son comportement ultérieur, Monsieur C_____ a, également, démontré son implication dans le processus corruptif mis en place.

Monsieur C_____ s'est impliqué personnellement dans la réponse à donner au Comité technique guinéen en rencontrant son avocat parisien Me Jean VEIL, en présence de ACR_____ (PP 500'640). Durant cette rencontre, il a été question de la rédaction d'une attestation que devait signer Madame E_____. Cette attestation a été envoyée à Monsieur C_____ par ACR_____. Tout en prétendant ne pas être concerné, il a donné son accord à cette manière d'agir ("*I think it make sense*"). Le 11 avril 2013, Monsieur A_____ s'est, ainsi, rendu à Miami, muni de cette attestation à faire signer à Madame E_____. Cette attestation avait pour but de présenter Madame E_____ comme une intermédiaire indépendante du pouvoir. Ces éléments démontrent que Monsieur C_____ a activement collaboré pour tenter de cacher le rôle joué par

Madame E_____ dans le processus étatique d'attribution des titres miniers, auquel il a activement participé.

Par ailleurs, Monsieur A_____ est allé à la rencontre de Madame E_____ pour détruire les contrats originaux moyennant le versement d'une somme d'argent supplémentaire promise par *Monsieur C_____*, soit Monsieur C_____.

Enfin, il sera relevé que AX_____ a été impliqué dans presque tous les paiements à Monsieur A_____ et à ses associés, via AAV_____ ou ABJ_____, et à Madame E_____. Il a été également en charge de l'effacement des preuves (i.e. restructuration, codes comptables à utiliser, références à supprimer). Or, ce n'est pas un hasard si AX_____ est passé du statut d'employé de CGR_____ à celui de mandataire de CGR_____, de même que ce n'est pas un hasard si AX_____ a été désigné auditeur interne de la fondation V_____ par la suite. Monsieur C_____ ne pouvait l'ignorer, s'il ne l'a pas approuvé, au vu de sa position de dirigeant effectif, ce d'autant plus que AX_____ a déménagé en 2010, en Israël, où réside Monsieur C_____.

**3.2.3.** Sous l'angle subjectif, en rencontrant AAB_____ en 2006 déjà, Monsieur C_____ a accepté, pleinement et sans réserve, l'intervention de tiers destinée à influencer le processus étatique d'attribution des droits miniers.

En août 2007, il a participé au comité stratégique de CGR_____, à Guernesey, lors duquel le projet guinéen a été évoqué de même que le business modèle de CGR_____, qui consistait à obtenir des concessions dans des régions géographiques très risquées et à les revendre à des sociétés ayant la capacité de les exploiter. A cette occasion, Monsieur C_____ a mis en avant les points forts de CGR_____, soit notamment l'establishment politique. A ce moment, Monsieur C_____ ne pouvait qu'avoir conscience des risques liés à la stratégie de son groupe, ce qui a été rappelé en août 2007. A cette date, il avait déjà rencontré AAB_____, en juin 2006, soit l'intermédiaire qui a conclu le pacte corruptif avec *The Lady*, soit la femme du Président AAO_____, comme déjà mentionné par AAA_____ dans son courriel du 10 mai 2006 à AAG_____.

Le courriel du 18 septembre 2007 que AAU_____ lui a adressé quelques jours après cette réunion stratégique démontre que, non seulement, Monsieur C_____ avait connaissance des démarches entreprises auprès des "*key people*" en Guinée, dont *The Lady*, soit la femme du Président, voire auprès du Président lui-même, mais qu'il a donné des instructions précises sur la manière d'agir en demandant qu'aucune référence ne soit faite à AAL_____, qui détenait les permis sur les blocs convoités. Or, la corruption mise en place permettra d'obtenir du Président guinéen le retrait des concessions entretemps octroyées à AAL_____ par un ministre limogé dans l'intervalle.

Par ailleurs, comme déjà mentionné, Monsieur C_____ avait la mainmise sur la rémunération des intermédiaires, Monsieur A_____ et ses associés. Dans cette mesure, il avait la maitrise sur le processus corruptif. Il était également informé des litiges qui pouvaient affecter la rémunération prévue. A cet égard, il n'est pas anodin que, dans le cadre du litige découlant des revendications formulées par AAM_____, qui réclamait l'exécution de l'accord du 20 février 2006, AAB_____ se soit adressé à Monsieur C_____ (cf. courriel du 7 juin 2009, PP 349'012) pour l'informer que AAM_____ avait trouvé un accord avec ABD_____, "*société qui appartient à Madame E_____, épouse de feu le Président de Guinée*".

Monsieur C_____ est encore intervenu, personnellement, dans le versement de USD 1.5 million à Madame E_____, en recourant aux services d'un partenaire en affaires d'alors, lequel était par ailleurs son ami, soit D_____. Il a tenté de cacher le réel motif de ce versement en faisant parvenir des documents, à l'appui de ses explications pour justifier le transfert de fonds, lesquelles sont contredites par les éléments du dossier.

Enfin, il a participé à la tentative de cacher l'intervention et le rôle joué par Madame E_____.

**3.2.4.** CGR_____ a obtenu des concessions minières dans un des pays les plus corrompus du monde, ce qu'elle appelle une zone géographique très risquée, en investissant quelque USD 160 millions et, ce sans avoir la capacité de les exploiter, mais dans l'objectif de les revendre comme son business model le prévoyait. Le profit immédiat de plusieurs milliards qui a été retiré est mirobolant. Sur ce montant, pas un centime n'a bénéficié à l'Etat guinéen, ce d'autant plus qu'aucune participation de l'Etat guinéen n'a alors été prévue, contrairement à ce qui avait été convenu dans l'accord du 20 février 2006. Monsieur C_____ a profité directement de cette transaction à hauteur de plusieurs millions de dollars, notamment par le biais de distributions de fonds destinés à être injectés directement dans la société AB_____, dont il est seul actionnaire. Ce seul fait est un indice fort de corruption.

V_____ a distribué les fonds suivants à Monsieur C_____, mais pour que ceux-ci soient

Il ressort de ce qui a été exposé que, non seulement, les concessions minières ont été obtenues par le biais de la corruption du Président AAO_____, mais que Monsieur C_____ a collaboré, intentionnellement et de manière déterminante, avec d'autres personnes, au processus corruptif ayant rendu possible le retrait des concessions à AAL_____ et l'octroi des permis à CGR_____ GUINEE.

Le fait que Monsieur C_____ n'ait pas été tenu au courant de tous les détails du plan mis en place n'y change rien. En effet, cela ne ressortait pas de son rôle dans le

processus de corruption mis en place. Comme il le dit lui-même (PP 500'296), Monsieur C_____ ne s'occupe pas de l'opérationnel, des détails techniques, lui il est "*en haut*".

**3.2.5.** Ces faits sont constitutifs de corruption d'agents publics étrangers et Monsieur C_____ sera reconnu coupable de ce chef d'infraction.

**3.2.5.** *Transaction 1 / sucre*

En revanche, s'agissant du sucre acheté à Madame E_____, il n'est pas en lien direct avec l'accord du 20 février 2006 et les accords ultérieurs, raison pour laquelle il doit être traité à part pour les raisons qui suivent.

CGR_____ ne pouvait que se douter qu'une partie, à tout le moins, des USD 250'000.- étaient destinés à récompenser Madame E_____ voire d'autres partenaires locaux, ainsi que cela a été le cas dans les faits.

En revanche, la participation de Monsieur C_____ à ce versement n'est pas établie objectivement. Subjectivement, il ne ressort pas non plus du dossier qu'il aurait été, spécifiquement, informé du versement à AAD_____ des USD 250'000.- en question, pas plus qu'il n'est établi qu'il savait ou avait envisagé qu'une partie dudit montant bénéficierait finalement à Madame E_____ et autres partenaires locaux.

Cette situation n'est pas comparable à celle qui prélavera en 2008 et 2009, lorsque Monsieur C_____ lui-même réglera la question du rachat de la participation de AAV_____. Ce rachat des actions détenues par AAV_____ dans CGR_____ GUINEE est lié au succès de l'opération, soit à l'influence effectivement exercée sur le Président sur le processus d'attribution des droits miniers.

Il résulte de ce qui précède que Monsieur C_____ sera acquitté de corruption d'agents publics étrangers s'agissant des faits mentionnés sous chiffre B.a.I.1.1 de l'acte d'accusation.

**3.3.** *Monsieur A_____*

**3.3.1.** *Accès au Président*

S'agissant de Monsieur A_____, en 2005, il n'avait aucune expérience en matière minière et aucune connaissance de la Guinée. En revanche, il tire sa force dans ses réseaux et ses capacités relationnelles. Il a été chargé d'identifier et d'approcher les "*key people*", comme AAU_____ les qualifie, pour pouvoir influencer le processus étatique décisionnel.

Ainsi, après avoir recouru à la première dame, il a été mis en contact avec la quatrième épouse du Président AAO_____, par le biais de son demi-frère, rencontre qui permettra d'accéder au Président et d'obtenir son influence sur le processus d'attribution des titres miniers en échange de promesse d'avantages à sa quatrième épouse.

### 3.3.2. *Mise en place de la société écran et conclusion des accords*

Monsieur A_____ a permis la mise en place et la conclusion des accords des 14 et 20 février 2006, lesquels étaient intrinsèquement liés.

Ses associés et lui-même ont servi d'intermédiaire et d'écran entre CGR_____ et la quatrième épouse du Président de Guinée.

Monsieur A_____ a été le contact privilégié de Madame E_____ dans le cadre de la conclusion et de la négociation de l'accord entre AAV_____ et Madame E_____, la précitée, en tant que "*partenaire locale*", se voyant promettre un tiers de la participation de AAV_____ dans le projet guinéen.

Ainsi, Monsieur A_____ a permis à CGR_____ d'accéder au pouvoir, par le biais de la quatrième épouse du Président. Il a concrètement conclu avec celle-ci une promesse d'avantages indus si l'influence demandée était apportée.

L'enregistrement par le FBI des conversations, en Floride, entre Monsieur A_____ et Madame E_____ sont confondantes sur le rôle joué par Monsieur A_____ dans le processus.

### 3.3.3. *Contacts*

Par la suite, Monsieur A_____ a gardé des contacts étroits avec Madame E_____.

Ainsi, par courriel du 28 février 2006, Monsieur A_____ a confirmé qu'il était en contact permanent avec ses partenaires locaux, dont faisait partie Madame E_____, concernant les blocs 1 et 2.

Par ailleurs, Monsieur A_____ a été pleinement impliqué dans le paiement du sucre à Madame E_____, qui consistait en la première étape de récompense vers l'obtention des permis d'exploitation des blocs 1 et 2.

En 2007, Monsieur A_____ s'est employé à trouver des moyens de faire parvenir les sommes dues à Madame E_____ en demandant à son gestionnaire de fortune d'acheter une société pour le compte de l'intéressée. Il s'est également renseigné sur les possibilités d'ouvrir un compte bancaire pour Madame E_____ en fournissant une copie du passeport de la précitée pour ce faire.

Par la suite, s'il s'est éloigné quelque peu de la Guinée, Monsieur A_____ est resté en contact étroit avec son associé AAB_____, chargé de négocier leur rémunération.

### 3.3.4. *Paiements*

En 2010, Monsieur A_____ a également contribué, par le biais de son associé AAB_____, à trouver un accord avec Madame E_____ sur le versement d'une somme supplémentaire à titre de rémunération.

Ainsi, il s'est pleinement associé aux démarches de AAB_____, durant l'été 2010, en lui envoyant le texte que devait signer Madame E_____.

Ensuite, Monsieur A_____ a mis à disposition ses comptes bancaires pour procéder au paiement de la somme supplémentaire de USD 5.5 millions convenue. Il a servi d'intermédiaire et d'écran à CGR_____ dans le versement des sommes payées en exécution de l'accord du 20 février 2006, qu'il avait lui-même contribué à mettre en place.

### 3.3.5. *Effacement*

Enfin, le comportement de Monsieur A_____ ultérieurement à la commission de l'infraction de corruption est confondant.

Il s'est rendu à de nombreuses reprises à la rencontre de Madame E_____, en Floride, pour tenter de faire disparaitre les documents originaux compromettant et faire mentir Madame E_____ sur son rôle et son implication dans l'attribution des titres miniers.

### 3.3.6. *Contacts Monsieur C_____*

Le fait que Monsieur A_____ n'a pas, ou peu, eu de contacts avec Monsieur C_____ ressortit à son rôle. En effet, il est établi par la procédure que c'est son associé AAB_____, qui était en contact avec Monsieur C_____. Monsieur A_____, quant à lui, était en contact principalement avec AAG_____, AAA_____ et AAU_____.

### 3.3.7. Sous l'angle subjectif, Monsieur A_____ connaissait parfaitement l'illicéité de son comportement.

Il a mis en place une société écran entre CGR_____ et Madame E_____, soit AAV_____, qui est devenue la cocontractante directe des partenaires locaux, dont la quatrième épouse du Président.

Il a participé à la rédaction de ces contrats, qui prévoyaient des versements mirobolants à ses contacts.

Madame E_____, femme quasi illettrée selon les dires de Monsieur A_____ et sans aucune activité professionnelle, se voyait offrir une participation, par le biais de la société écran, dans un des plus gros projets miniers du monde, le joyau dans la couronne de la Guinée, comme l'a appelé son associé AAB_____. Des sommes lui étaient promises en cas d'influence par son époux sur le processus d'attribution étatique des droits miniers. En revanche, aucune récompense n'était due si l'objectif n'était pas atteint.

Monsieur A_____ et ses associés ont mis un soin particulier à cacher la provenance des fonds destinés à Madame E_____, en recourant à divers comptes bancaires dans divers pays, à diverses personnes physiques ou morales, en procédant à des versements en espèces, à des virements bancaires ou à des remises de chèques, preuve en est si besoin qu'ils savaient que le versement de ces sommes étaient parfaitement illicites.

Monsieur A_____ a tenté de détruire les traces de la corruption et fausser les enquêtes en cours.

Enfin, il ressort des enregistrements du FBI que Monsieur A_____ était parfaitement conscient de l'illicéité de ses agissements et de la gravité des faits commis.

**3.3.8.** La procédure a permis d'établir que Monsieur A_____ a collaboré, intentionnellement et de manière déterminante, avec d'autres personnes, à la décision de corrompre le Président AAO_____ par la promesse et l'octroi d'avantages indus à sa quatrième épouse.

Monsieur A_____ a permis d'identifier le moyen d'accéder au pouvoir en Guinée et la mise en place du schéma corruptif. Monsieur A_____ et ses associés ont servi d'intermédiaire et d'écran à CGR_____ pour influencer le processus d'attribution des titres miniers et dans le versement des sommes dues en exécution de l'accord corruptif.

CGR_____ a été d'accord de lui offrir, ainsi qu'à ses partenaires, une participation dans un des plus gros projets miniers du monde en échange de ses agissements.

CGR_____ a été d'accord de rémunérer Monsieur A_____ et ses associés USD 34.5 millions en échange des services rendus.

**3.3.9.** Ces faits sont constitutifs de corruption d'agents publics étrangers et Monsieur A_____ sera reconnu coupable de ce chef d'infraction.

**4.** *Faux dans les titres*

**4.1.1.** Selon l'art. 251 ch. 1 CP, se rend coupable de faux dans les titres celui qui, dans le dessein de porter atteinte aux intérêts pécuniaires ou aux droits d'autrui, ou de se

procurer ou de procurer à un tiers un avantage illicite, aura créé un titre faux, falsifié un titre, abusé de la signature ou de la marque à la main réelles d'autrui pour fabriquer un titre supposé, ou constaté ou fait constater faussement, dans un titre, un fait ayant une portée juridique, ou aura, pour tromper autrui, fait usage d'un tel titre. Sont des titres tous les écrits destinés et propres à prouver un fait ayant une portée juridique et tous les signes destinés à prouver un tel fait (art. 110 al. 4 CP).

**4.1.2.** L'art. 251 ch. 1 CP vise non seulement un titre faux ou la falsification d'un titre (faux matériel), mais aussi un titre mensonger (faux intellectuel). Il y a faux matériel lorsque l'auteur réel du document ne correspond pas à l'auteur apparent, alors que le faux intellectuel vise un titre qui émane de son auteur apparent, mais dont le contenu ne correspond pas à la réalité (ATF 142 IV 119 consid. 2.1 p. 121; 138 IV 130 consid. 2.1 p. 134). Un simple mensonge écrit ne constitue pas un faux intellectuel. Le document doit revêtir une crédibilité accrue et son destinataire pouvoir s'y fier raisonnablement. Tel est le cas lorsque certaines assurances objectives garantissent aux tiers la véracité de la déclaration (ATF 144 IV 13 consid. 2.2.2 p. 14 s.; arrêts 6B_383/2019 du 8 novembre 2019 consid. 8.3.1 non publié in ATF 145 IV 470; 6B_467/2019 du 19 juillet 2019 consid. 3.3.1). Il peut s'agir, par exemple, d'un devoir de vérification qui incombe à l'auteur du document ou de l'existence de dispositions légales, comme les art. 958a ss CO (art. 958 ss aCO) relatifs au bilan, qui définissent le contenu du document en question (ATF 141 IV 369 consid. 7.1 p. 376; 132 IV 12 consid. 8.1, p. 15; 126 IV 65 consid. 2a, p. 68; arrêt 6B_382/2011 du 26 septembre 2011 consid. 2.1). En revanche, le simple fait que l'expérience montre que certains écrits jouissent d'une crédibilité particulière ne suffit pas, même si dans la pratique des affaires il est admis que l'on se fie à de tels documents (arrêt 6B_383/2019 du 8 novembre 2019 consid. 8.3.1 non publié in ATF 145 IV 470; ATF 142 IV 119 consid. 2.1 p. 121 et les références citées). Le caractère de titre d'un écrit est relatif. Par certains aspects, il peut avoir ce caractère, par d'autres non. La destination et l'aptitude à prouver un fait précis d'un document peuvent résulter directement de la loi, des usages commerciaux ou du sens et de la nature dudit document (arrêt 6B_383/2019 du 8 novembre 2019 consid. 8.3.1 non publié in ATF 145 IV 470; ATF 142 IV 119 consid. 2.2 p. 122 et les références citées).

**4.1.3.** Conformément à une jurisprudence bien établie, un contrat de vente conclu en la forme écrite simple, dont le contenu est faux, ne peut en principe pas faire l'objet d'un faux intellectuel dans les titres, faute de valeur probante accrue, dans la mesure où il n'existe pas de garanties spéciales selon lesquelles les déclarations concordantes des parties correspondent à leur volonté réelle (arrêt du Tribunal fédéral 6B_1406/2019 du 19 mai 2020 destiné à la publication consid. 1.2.2. et réf. citée: ATF 120 IV 25 consid. 3f p. 29; arrêts 6B_502/2009 du 7 septembre 2009 consid. 2.4; 6P.15/2007 du 19 avril 2007; DUPUIS ET AL., Petit commentaire, Code pénal, 2e éd. 2017, n° 40 ad art. 251 CP). Dans un arrêt récent, le Tribunal fédéral a retenu qu'un contrat de vente d'un snack-bar, qui constatait un faux prix de vente, destiné à être produit dans le cadre de la

liquidation du régime matrimonial afin de tromper l'épouse, ne constituait pas un faux intellectuel faute de valeur probante accrue (arrêt du Tribunal fédéral 6B_1406/2019 du 19 mai 2020 destiné à la publication).

Une facture munie d'une quittance n'est pas dotée en soi, de par la loi, d'une garantie objective suffisante pour faire l'objet d'un faux intellectuel dans les titres (ATF 121 IV 131 consid. 2). Cependant, selon la jurisprudence, l'auteur peut se rendre coupable de faux intellectuel dans les titres lorsqu'une facture au contenu inexact est également destinée à servir au destinataire avant tout comme pièce comptable, si bien que sa comptabilité s'en trouve faussée (ATF 138 IV 130). Cet arrêt met en exergue une complicité entre l'auteur de la fausse facture et son destinataire qui va l'intégrer dans sa comptabilité (consid. 2.4.3 et 3.1).

**4.1.4.** À teneur de l'art. 6 LBA, l'intermédiaire financier a, dans certaines circonstances particulières, une obligation de clarification qui va au-delà de l'identification de l'ayant droit économique. Ainsi, il doit clarifier l'arrière-plan économique et le but de la transaction lorsque celle-ci paraît inhabituelle, que des indices laissent supposer que les valeurs patrimoniales proviennent d'un crime ou que la transaction ou la relation d'affaires comportent un risque accru.

Le Tribunal fédéral a déjà jugé que les renseignements et les documents que le cocontractant fournit à l'intermédiaire financier lors de la procédure de clarification de l'arrière-plan économique prévue par l'art. 6 LBA n'étaient pas des titres (arrêt 6S.293/2005 du 24 février 2006 consid. 8.3, in SJ 2006 I 309; arrêt 6B_1051/2018 du 19 décembre 2018 consid. 2.3.2.; Commentaire bâlois, CPP, 2019, nos 130 et 144 ad art. 251 CP; LOMBARDINI, Banques et blanchiment d'argent, 3ème édition, 2016, p. 61 no 245).

**4.1.5.** Les dispositions des art. 251 à 254 sont aussi applicables aux titres étrangers (art. 255 CP).

La question de savoir si un écrit de provenance étrangère représente un titre s'examine au regard du droit suisse, selon la définition donnée par l'art. 110 al. 4 CP (Commentaire bâlois, CP, Marcus BOOG, no 1 ad art. 255 CP; Commentaire romand du CP, Hervé DUTOIT, no 6 ad art. 255 CP; Petit commentaire du Code pénal, no 2 ad art. 255 CP; Alexandre DYENS, Territorialité et ubiquité en droit pénal international suisse, no 1010, page 310).

**4.1.6.** Dans un arrêt du 1<sup>er</sup> décembre 1977 (ATF 103 IV 239, JdT 1979 IV 46), le Tribunal fédéral a jugé que la déclaration figurant sur un certificat d'actions selon laquelle les actions au porteur étaient totalement libérées était un titre doté d'une force probante accrue.

En pratique, les certificat d'actions sont émis sous la forme de papiers-valeurs (CR-CO II, 2e édition, 2017, François BOHNET, Art. 965 CO N 20). Une action au porteur est un papier-valeur (JdT 1963 II 47), lesquels sont définis aux art. 965 ss CO. La spécificité du papier-valeur découle de l'impossibilité de faire valoir (d'exercer) le droit ou de le transférer indépendamment du titre (CR-CO II, 2e édition, 2017, François BOHNET, Art. 965 CO N 6) : ceci est prévu par l'art. 966 CO, qui vient confirmer que la présentation du titre est nécessaire à la légitimation du prétendant, si bien que le débiteur ne peut être tenu de payer que si le titre lui est présenté (CR-CO II, 2e édition, François BOHNET, Art. 966 CO N 3). Les titres au porteur et à ordre sont qualifiés de papiers-valeurs de foi publique en raison de leur aptitude à circuler (CR-CO II, 2e édition, 2017, François BOHNET, Art. 965 CO N 12).

Le principe de la confiance (art. 2 CC) est essentiel pour l'interprétation des titres circulant dans le commerce, qui impliquent souvent des contacts rapides et impersonnels entre cocontractants. La personne qui se voit remettre le titre doit pouvoir se fier au sens objectif que la déclaration peut avoir pour elle, eu égard à l'ensemble des circonstances (CR-CO II, 2e édition, 2017, François BOHNET, Art. 965 CO N 17).

**4.1.7.** Sur le plan subjectif, le faux dans les titres est une infraction intentionnelle. L'intention doit porter sur tous les éléments constitutifs de l'infraction, le dol éventuel étant suffisant (arrêt 6B_522/2011 du 8 décembre 2011 consid. 1.3.). L'art. 251 CP exige de surcroît un dessein spécial, qui peut se présenter sous deux formes alternatives, soit le dessein de porter atteinte aux intérêts pécuniaires ou aux droits d'autrui, soit le dessein de se procurer ou de procurer à un tiers un avantage illicite. Il y a dessein de se procurer ou de procurer à un tiers un avantage illicite lorsque l'auteur veut dissimuler un délit (ATF 120 IV 364 consid. d; ATF 118 IV 260) ou en faciliter la commission (ATF 101 IV 205 consid. 6).

**4.2.1.** En l'espèce,

- le contrat du 15 juin 2009 entre L_____ et I_____ et son addendum,

- le contrat de prêt du 1er juin 2010 entre O_____ et P_____,

- les cinq contrats entre O_____ et Q_____, respectivement T_____,

- le contrat de location du yacht et son addendum,

- le contrat de conseil entre O_____ et R_____,

- le contrat entre O_____ et S_____ SARL,

- et l'offre de service de U_____ en faveur de O_____,

constateraient faussement des prestations qui n'auraient en réalité jamais été effectuées.

On se trouve donc dans l'hypothèse de documents qui émanent de leur auteur apparent, mais qui sont mensongers dans leur contenu. Il convient d'examiner si ces contrats sont dotés d'une garantie de véracité particulière et si, partant, ils peuvent constituer des faux intellectuels.

Le but de ces contrats était de justifier auprès de la banque zurichoise de O_____ l'arrière-plan économique des transactions effectuées. Ces contrats ont d'ailleurs permis de justifier auprès de la banque zurichoise le transfert des fonds.

On ne voit pas quelles assurances objectives – découlant de la loi ou encore des usages commerciaux – auraient garanti aux tiers, en l'occurrence à la banque zurichoise, la véracité du contenu des contrats en question. Les contrats ont été rédigés en la simple forme écrite sur un papier neutre, lequel ne mentionne que le nom des cocontractants. Les sociétés O_____ et L_____ sont des sociétés de domicile incorporées aux BVI sans activité commerciale et les contrats en question concernent des prestations très vagues pour O_____ (services ou prêt) ou la vente de la société de domicile L_____ pour EUR 9 millions, alors que le contrat d'achat d'ACX_____ pour l'équivalent de CHF 71.- ou l'acte initial d'achat des terrains par ACX_____, n'ont pas été remis à la banque, ni sollicité par celle-ci.

Par ailleurs, O_____ et L_____, son représentant ou son ayant droit économique, ne revêtent aucune position particulière par rapport à la banque qui conférerait aux contrats produits une valeur particulière.

Le seul fait que les contrats aient pu être rédigés afin d'être utilisés pour justifier l'arrière-plan économique des transactions qu'elles couvraient ne permet pas de conclure que ces contrats constituent des faux intellectuels dans les titres.

En effet, le Tribunal fédéral a déjà jugé que les renseignements et les documents que le cocontractant fournit à l'intermédiaire financier lors de la procédure de clarification de l'arrière-plan économique prévue par l'art. 6 LBA n'étaient pas des titres.

A défaut de valeur probante accrue, les contrats litigieux ne peuvent être considérés comme des faux intellectuels dans les titres, au sens de l'art. 251 CP.

**4.2.2.** Le même raisonnement doit s'appliquer aux factures visées par l'acte d'accusation. Une facture n'est pas dotée en soi, de par la loi, d'une garantie objective suffisante pour faire l'objet d'un faux intellectuel dans les titres. Le fait de la transmettre à la banque pour justifier l'arrière-plan économique de la transaction économique censé la justifier ne lui confère pas plus de garantie et, a contrario, le banquier ne saurait se contenter d'un tel document pour satisfaire ses obligations de diligence.

Partant, ces factures ne constituent pas des faux intellectuels dans les titres.

**4.2.3.** S'agissant du certificat d'actions, il ressort de la procédure que Madame B_____ a bien acheté une offshore, en l'occurrence L_____.

Le 9 juin 2009, elle a demandé à MOSSACK FONSECA d'émettre le certificat d'actions au nom de D_____, mais avec effet rétroactif au 21 avril 2009.

Le lendemain 10 juin 2009, D_____ a acheté L_____, qui détenait via ACX_____ des terrains roumains valant des millions, pour l'équivalent de CHF 71.-.

Cinq jours après, D_____ a vendu L_____ pour EUR 9 millions à I_____., qui détient un immeuble à Manhattan. Il a encaissé au passage une commission de EUR 2.5 millions.

La vente des terrains roumains à D_____ était fictive et devait permettre à D_____ de disposer de fonds mis à sa disposition par Monsieur C_____, les déclarations de D_____ à la procédure étant effectivement confirmées par les éléments figurant au dossier.

**4.2.3.1.** Pour transférer la propriété d'un papier-valeur ou le grever de quelque autre droit réel, il faut dans tous les cas le transfert de possession du titre (art. 967 al. 1 CO).

Le transfert de la possession s'analyse comme un acte de disposition; l'acte générateur d'obligation est le contrat de cession CR-CO II, 2e édition, 2017, François BOHNET, Art. 967 CO N 2).

Pour apprécier la forme et les clauses d'un contrat, il y a lieu de rechercher la réelle et commune intention des parties, sans s'arrêter aux expressions ou dénominations inexactes dont elles ont pu se servir, soit par erreur, soit pour déguiser la nature véritable de la convention (art. 18 al. 1 CO).

On est en présence d'une simulation, si les deux parties sont d'accord que les déclarations réciproques doivent produire un effet juridique qui ne correspond pas à leur volonté, parce qu'elles veulent soit feindre un rapport contractuel, soit cacher avec le contrat simulé un autre contrat réellement voulu (ATF 123 IV 61, consid. 5c/cc; CR-CO I, 2e édition, Bénédict WINIGER, art. 18 CO N 71).

La volonté commune des parties porte sur le fait, d'une part, de créer une apparence et, d'autre part, de ne pas y attacher la conséquence juridique déclarée. Faute d'une volonté contractuelle commune, l'acte simulé n'a pas d'effet juridique (CR-CO I, 2e édition, Bénédict WINIGER, art. 18 CO N 74).

L'inefficacité du contrat a, d'abord, des conséquences sur les rapports internes entre les parties elles-mêmes. Elles ne pourront pas faire valoir le contrat entre elles. Au

contraire, elles pourront invoquer son invalidité. Sur le plan externe, l'acte simulé est aussi sans effet envers les tiers, puisqu'il ne remplit pas les conditions d'un contrat. Son inefficacité leur est entièrement opposable et, inversement, les tiers peuvent faire valoir l'inefficacité contre les parties (CR-CO I, 2e édition, Bénédict WINIGER, art. 18 CO N 82).

**4.2.3.2.** En l'occurrence, dans la mesure où le transfert des actions reposait sur un acte simulé, il est inefficace en droit suisse.

Par conséquent, les actions de L_____ n'ont jamais été transférées à D_____. Le certificat d'actions est, dès lors, mensonger dans son contenu.

Le certificat d'actions est un titre, étant précisé que la question de savoir si un écrit de provenance étrangère représente un titre s'examine au regard du droit suisse.

**4.2.3.3.** Madame B_____ ne pouvait que le savoir, eu égard :

- au bref temps écoulé entre l'achat et la vente de L_____,
- au fait qu'elle n'a jamais eu de contact direct avec D_____, mais a agi sur instructions d'employés du groupe CG_____,
- à la nature insolite de la transaction. Il est relevé que Madame B_____ a une connaissance approfondie de la structure des sociétés détenues directement ou indirectement par Monsieur C_____. La vente de terrains roumains, par l'intermédiaire de D_____, à I_____. Cette vente est totalement insolite dans la structure des sociétés du groupe, ce qui n'a pas pu lui échapper.

**4.2.3.4.** Quant à Monsieur C_____, il est à l'origine du transfert d'argent à D_____, soit de USD 12 millions (l'équivalent de EUR 9 millions) de I_____. à D_____, somme dont Monsieur C_____ pourrait alors disposer librement.

Monsieur C_____ connaissait donc la cause simulée du transfert d'argent et, dans cette mesure, a accepté l'éventualité que des faux dans les titres soient établis aux fins du montage de l'opération.

**4.2.4.** Il résulte de ce qui précède que Madame B_____ et Monsieur C_____ seront reconnus coupables de faux dans les titres s'agissant du certificat d'actions et seront acquittés pour le surplus.

Quant à Monsieur A_____, il sera acquitté de faux dans les titres.

**5.** *Peine*

**5.1.** Le juge fixe la peine d'après la culpabilité de l'auteur (art. 47 CP). Il prend en considération les antécédents et la situation personnelle de ce dernier ainsi que l'effet de la peine sur son avenir (al. 1). La culpabilité est déterminée par la gravité de la lésion ou de la mise en danger du bien juridique concerné, par le caractère répréhensible de l'acte, par les motivations et les buts de l'auteur et par la mesure dans laquelle celui-ci aurait pu éviter la mise en danger ou la lésion, compte tenu de sa situation personnelle et des circonstances extérieures (al. 2).

La culpabilité doit être évaluée en fonction de tous les éléments objectifs pertinents, qui ont trait à l'acte lui-même, à savoir notamment la gravité de la lésion, le caractère répréhensible de l'acte et son mode d'exécution. Du point de vue subjectif, sont pris en compte l'intensité de la volonté délictuelle ainsi que les motivations et les buts de l'auteur. A ces composantes de la culpabilité, il faut ajouter les facteurs liés à l'auteur lui-même, à savoir les antécédents, la réputation, la situation personnelle (état de santé, âge, obligations familiales, situation professionnelle, risque de récidive, etc.), la vulnérabilité face à la peine, de même que le comportement après l'acte et au cours de la procédure pénale (ATF 141 IV 61 consid. 6 p. 66 s. et les références citées). Le juge dispose d'un large pouvoir d'appréciation et le Tribunal fédéral n'intervient que lorsque l'autorité cantonale a fixé une peine en dehors du cadre légal, si elle s'est fondée sur des critères étrangers à l'art. 47 CP, si des éléments d'appréciation importants n'ont pas été pris en compte ou, enfin, si la peine prononcée est exagérément sévère ou clémente au point de constituer un abus du pouvoir d'appréciation (ATF 144 IV 313 consid. 1.2 p. 319). L'exercice de ce contrôle suppose que le juge exprime, dans sa décision, les éléments essentiels relatifs à l'acte ou à l'auteur qu'il prend en compte, de manière à ce que l'on puisse constater que tous les aspects pertinents ont été pris en considération et comment ils ont été appréciés, que ce soit dans un sens aggravant ou atténuant (art. 50 CP). Il peut passer sous silence les éléments qui, sans abus du pouvoir d'appréciation, lui apparaissent non pertinents ou d'une importance mineure. La motivation doit cependant justifier la peine prononcée, en permettant de suivre le raisonnement adopté même si le juge n'est pas tenu d'exprimer en chiffres ou en pourcentages l'importance qu'il accorde à chacun des éléments qu'il cite (ATF 144 IV 313 consid. 1.2 p. 319). Plus la peine est élevée, plus la motivation doit être complète (ATF 144 IV 313 consid. 1.2 p. 319).

**5.2.** Les prévenus ont corrompu feu le Président de Guinée AAO_____ par la promesse puis le versement d'importantes sommes d'argent à sa quatrième épouse, soit USD 8.5 millions, afin qu'il influence le processus étatique d'attribution des droits miniers. Ils ont obtenu ainsi le retrait des concessions d'exploitation, alors attribuées à AAL_____ sur les blocs 1 et 2 de Simandou, et se sont assurés l'octroi de permis d'exploration à CGR_____ sur ces blocs avant la mort du Président.

De tels actes faussent le processus de décision au sein de l'administration, desservent l'intérêt public et affaiblissent l'Etat (cf. à cet égard arrêt 6B_908/2009 du 3 novembre 2010 consid. 2.3.2).

Les prévenus ont remis en cause la confiance de la collectivité dans l'impartialité et l'objectivité du processus décisionnel étatique. La méthode utilisée a, en effet, permis de fausser le jeu de la concurrence, avec des conséquences dommageables pour l'économie de la Guinée. Elle sape également les fondements démocratiques en compromettant l'impartialité des autorités et la libre formation de la volonté. Elle menace l'existence même de l'Etat de droit.

Les actes se sont déroulés de 2006, avec la promesse d'octroi d'avantages indus, à 2012 date des derniers versements d'argent.

Les prévenus ont usé de stratagèmes, de montages divers et complexes permettant de cacher et d'effacer leurs agissements criminels.

Ils ont, en effet, recouru à de multiples sociétés de domicile et à des circuits financiers internationaux divers, variés et opaques. Ils ont ouvert divers comptes bancaires dans plusieurs pays, au nom de sociétés de domicile ou de personnes physiques différentes. Ils ont fait verser les sommes d'argent en espèces, par virements bancaires ou par chèques. Ils ont recouru à divers intermédiaires. Il a fallu mettre en place une coopération judiciaire internationale longue et ardue afin d'identifier les circuits financiers utilisés.

Les prévenus se sont également attachés à effacer toute trace de leurs agissements en radiant les sociétés utilisées, en restructurant les sociétés du groupe, en falsifiant les comptes consolidés, en faisant signer des attestations au contenu mensonger à la bénéficiaire des fonds, et en cherchant à détruire des preuves.

Ils ont agi en qualité de coauteurs. Leur rôle respectif dans la commission du crime était bien défini.

**5.2.1.** *Monsieur C_____*

La faute de Monsieur C_____ est importante.

L'intéressé supervisait l'opération de corruption en donnant son accord aux décisions de principe et en fournissant des instructions. Il était le contact privilégié de l'associé de Monsieur A_____, AAB_____, lequel agissait comme un écran et un intermédiaire entre CGR_____ et la bénéficiaire des fonds corruptifs. Monsieur C_____ avait le contrôle sur la rémunération de cet écran et intermédiaire et partant sur l'opération corruptrice. Il est intervenu dans un paiement corrupteur, dont il a tenté de cacher le réel

motif, en inventant une opération de compensation et a essayé de faire taire la bénéficiaire des fonds, en lui faisant signer une attestation établie par son conseil parisien.

Il a été prêt à recourir à l'utilisation d'un faux dans les titres pour justifier une vente fictive de terrains, laquelle lui a permis de transférer d'importantes sommes d'argent. Il a ainsi porté atteinte à la confiance qui, dans les relations juridiques, est placée dans un titre comme moyen de preuve.

Ses mobiles sont éminemment égoïstes. Il a agi pour retirer d'importantes sommes d'argent de ses crimes.

La collaboration à la procédure du prévenu est mauvaise. Le prévenu a, toujours, nié toute implication dans les actes corruptifs. Il a donné des explications fantaisistes sur le rôle de AAV_____ et inventé des justifications sur ses agissements en avançant une opération de compensation inexistante.

Le prévenu n'a manifesté aucune prise de conscience. Il continue à nier toute corruption et tout rôle dans des actes corruptifs. Il s'est posé en victime d'un complot mondial orchestré par ACU_____ et s'est présenté comme un bienfaiteur de l'Afrique.

S'agissant de ses antécédents judiciaires, le prévenu a été condamné, le _____ 2020, en dernière instance et par contumace, par un Tribunal roumain à une peine privative de liberté de 5 ans. Cette condamnation est toutefois postérieure aux faits qui nous occupe et il ne peut exister de concours réel rétrospectif en cas de jugement prononcé à l'étranger (cf. ATF 142 V 551 consid. 4.1, ATF 142 IV 329 consid. 1.4.1.).

Aucune circonstance atténuante n'est réalisée.

Aux termes de l'art. 48 let. e CP, le juge atténue la peine si l'intérêt à punir a sensiblement diminué en raison du temps écoulé depuis l'infraction et que l'auteur s'est bien comporté dans l'intervalle. Cette disposition ne fixe pas de délai. Selon la jurisprudence, l'atténuation de la peine en raison du temps écoulé depuis l'infraction procède de la même idée que la prescription. L'effet guérisseur du temps écoulé, qui rend moindre la nécessité de punir, doit aussi pouvoir être pris en considération lorsque la prescription n'est pas encore acquise, si l'infraction est ancienne et si le délinquant s'est bien comporté dans l'intervalle. Cela suppose qu'un temps relativement long se soit écoulé depuis l'infraction.

Cette condition est en tout cas réalisée lorsque les deux tiers du délai de prescription de l'action pénale sont écoulés (ATF 140 IV 145 consid. 3.1 p. 148).

En l'occurrence, la prescription court dès la date du dernier agissement coupable, qui correspond à la date du dernier versement le 14 mai 2012. La prescription de 15 ans (cf. art. 97 al. let. b aCP, art. 2 al. 2 et art. 389 CP cum art. 322septies CP) sera acquise en mai 2027, de sorte que les deux tiers du délai de prescription de l'action pénale ne sont pas encore écoulés.

Dans cette mesure, la circonstance atténuante du temps écoulé n'est pas applicable.

Il y a lieu de tenir compte, en tant que facteur de fixation de la peine, d'une publication préjugeant de la culpabilité d'une personne soupçonnée dans les comptes-rendus de la presse, selon la gravité de l'atteinte aux droits (ATF 128 IV 97 consid. 3b/aa p. 104). Le Tribunal fédéral l'a admis dans un cas où une conférence de presse avait été donnée par le Procureur de la Confédération, conduisant à un grave préjugé de la culpabilité de l'accusé, entraînant un quasi-effet de sanction pénale. Le Tribunal fédéral avait dans cet arrêt estimé que cet important préjugé avait lourdement influencé les organes de poursuite pénale alors qu'il s'était avéré plus tard que les soupçons publiés étaient largement infondés (arrêt 9X.1/1998 du 29 octobre 1999 consid. 25b cité dans l'arrêt 6B_206/2015 du 8 octobre 2015 consid. 2.3.1.).

Il appartient au prévenu de démontrer en quoi la médiatisation dénoncée a conduit à ce qu'il soit préjugé et lui a causé un préjudice important (cf. ATF 128 IV 97 consid. 3b/bb p. 106 et les références citées; arrêt 6B_339/2011 du 5 septembre 2011 consid. 9.2.1.).

Le Tribunal relève que, certes la procédure a été médiatisée. Toutefois, il n'y a pas lieu de tenir compte de cet élément dans le cadre de la fixation de la peine. Les éventuelles conséquences médiatiques sur les prévenus résultent davantage de leurs agissements ou sont étrangères à la présente procédure pénale. Au demeurant, les prévenus n'avancent pas, a fortiori ne démontrent pas, que cette médiatisation leur aurait concrètement porté préjudice.

Il y a concours d'infractions, au sens de l'art. 49 al. 1 CP, motif d'aggravation de la peine.

L'infraction de corruption d'agents publics étrangers, tout comme celle de faux dans les titres, est passible d'une peine privative de liberté de 5 ans au plus ou d'une peine pécuniaire. En raison du concours, le plafond est, ainsi, porté à 7 ans et 6 mois.

C'est au prévenu Monsieur C_____ que profite en premier le crime. Il est le dirigent effectif de CGR_____ et les activités corruptrices n'auraient pas eu lieu sans son accord. Une fois les droits miniers obtenus, il les a revendus et a dégagé un gain faramineux.

Les éléments qui précèdent conduisent au prononcé d'une peine privative de liberté de 5 ans.

**5.2.2.** *Monsieur A_____*

La faute de Monsieur A_____ est importante.

L'intéressé était l'homme du terrain chargé de trouver le moyen d'accéder à AAO_____ afin d'influencer le processus étatique d'attribution des titres miniers. Il a ensuite été le contact privilégié de la bénéficiaire des fonds, Madame E_____, tout au long des années. Il a permis la signature du pacte corruptif et le paiement de sommes d'argent. Il a encore cherché à détruire les preuves de la corruption en allant à la rencontre de Madame E_____.

Ses mobiles sont éminemment égoïstes. Il a agi pour retirer d'importantes sommes d'argent de son crime.

La collaboration à la procédure du prévenu est mauvaise. Durant toute la durée de celle-ci, le prévenu s'est enfermé dans le silence, en refusant de donner toute explication sur les actes qui lui sont reprochés. Ses explications écrites par le biais de son conseil ne pallient pas son absence de collaboration. Son attitude a rendu plus difficile l'instruction et l'a ralentie. Pour le surplus, ses explications lors de l'audience de jugement ont été dans une large mesure fantaisistes. Le fait de suivre, le cas échéant, les conseils d'un avocat étranger de ne pas s'exprimer en raison des conséquences éventuelles de ses déclarations sur des procédures étrangères ne justifie pas son comportement. En effet, on ne voit pas en quoi collaborer à une enquête pénale pourrait s'avérer dommageable pour le prévenu, étant rappelé que celui-ci conteste tout comportement illicite. En tout état, le prévenu pouvait se distancer des conseils de son avocat, ce qu'il a d'ailleurs fait lors de l'audience de jugement.

Le prévenu n'a manifesté aucune prise de conscience. Le prévenu a refusé toute explication sur quelque sujet que ce soit durant l'instruction et ses déclarations lors de l'audience de jugement dénotent une absence de prise de conscience. Il est rappelé à cet égard que le droit de ne pas s'auto-incriminer n'exclut pas la possibilité de considérer comme un facteur aggravant de la peine le comportement du prévenu qui rend plus difficile l'enquête pénale par des dénégations opiniâtres, dont on peut déduire une absence de remords et de prise de conscience de sa faute (ATF 129 IV 6 consid. 6.1 p. 20; 118 IV 21 consid. 2b p. 25; 117 IV 112 consid. 1 p. 114 et plus récemment arrêts 6B_866/2010 du 19 juillet 2011 consid. 1.4 et 6B_660/2013 du 19 novembre 2013 consid. 2.2).

S'agissant de ses antécédents judiciaires, le prévenu a été condamné, le 29 juillet 2014, aux Etats-Unis à 2 ans de prison et à une amende de USD 75'000.- pour obstruction au

déroulement d'une enquête pénale. Cette condamnation est, toutefois, postérieure aux faits qui nous occupe et il ne peut exister de concours réel rétrospectif en cas de jugement prononcé à l'étranger.

Aucune circonstance atténuante est réalisée. Il est renvoyé, à cet égard, aux développements faits au considérant 5.2.1.

L'infraction de corruption d'agents publics étrangers est passible d'une peine privative de liberté de 5 ans au plus ou d'une peine pécuniaire.

Le prévenu a retiré, avec ses deux autres associés, USD 34.5 millions de son activité d'écran et d'intermédiaire dans la commission du crime. Il se trouvait sur le terrain et en contacts réguliers avec la bénéficiaire des fonds corrupteurs.

Sa faute est néanmoins moindre par rapport à celle de Monsieur C_____, ce qui justifie une peine légèrement inférieure à celle prononcée à l'encontre du précité.

Les éléments qui précèdent conduisent au prononcé d'une peine privative de liberté de 3 ans et 6 mois.

**5.2.3.** *Madame B_____*

La faute de Madame B_____ est importante.

L'intéressée était à la tête de la tour de contrôle depuis Genève de l'opération corruptrice. Elle a mis en place le schéma corrupteur sous l'angle corporatif et administratif puis l'a effacé. Elle a vendu une société de domicile non utilisée au préalable qui servira de société écran à CGR_____ pour soudoyer le Président par l'intermédiaire de sa femme. Elle a gardé la mainmise sur les actions de cette société écran. Elle s'est chargée de la bonne exécution des contrats mis en place. Elle a signé tous les documents dans le cadre de la restructuration permettant de cacher le rôle joué par la société écran mise en place et a caché la réalité des transferts de fonds effectués à cette société écran en signant des comptes falsifiés.

Elle a participé à la création d'un faux dans les titres pour justifier une vente fictive de terrains. Elle a ainsi porté atteinte à la confiance, qui dans les relations juridiques, est placée dans un titre comme moyen de preuve.

Ses mobiles sont égoïstes. La prévenue a néanmoins agi dans le cadre de son travail pour CGR_____ pour lequel elle était rémunérée, et donc en premier lieu pour favoriser les intérêts de CGR_____ et ainsi enrichir Monsieur C_____, auquel elle vouait une loyauté sans faille. Elle a néanmoins également retiré des profits de la réussite de l'opération par le biais d'un bonus.

- 195 -

La collaboration à la procédure de la prévenue est mauvaise. L'intéressée a, certes, donné des explications dans le cadre de la procédure. Elle a, toutefois, occulté les éléments compromettants, notamment les liens de AD_____ BVI avec la fondation V_____.

La prévenue n'a manifesté aucune prise de conscience. Elle continue à contester tout rôle dans les actes corruptifs, malgré son omniprésence à tous les niveaux dans la mise en place et dans l'effacement du schéma corrupteur. Elle a toujours nié toute implication dans les actes corruptifs et se cache derrière un rôle de pure exécutante, qui ne comprenait pas ce qu'elle faisait, alors que la réalité est tout autre. Elle a également contesté avoir établi un faux dans les titres, lequel était destiné à être utilisé dans le cadre d'une opération de vente simulée, à laquelle elle a activement prêté son concours.

Elle n'a pas d'antécédents judiciaires, ce qui a, en l'occurrence, un effet neutre sur la fixation de la peine et n'a pas à être prise en considération dans un sens atténuant (ATF 141 IV 61 consid. 6.3.2 p. 70; 136 IV 1 consid. 2.6 p. 2 ss).

Aucune circonstance atténuante est réalisée. Il est renvoyé, à cet égard, aux développements faits au considérant 5.2.1.

Il a concours d'infractions, au sens de l'art. 49 al. 1 CP, motif d'aggravation de la peine.

L'infraction de corruption d'agents publics étrangers, tout comme celle de faux dans les titres, est passible d'une peine privative de liberté de 5 ans au plus ou d'une peine pécuniaire. En raison du concours, le plafond est, ainsi, porté à 7 ans et 6 mois.

L'activité de la prévenue était plus éloignée du terrain que celle de ses co-prévenus, mais non moins nécessaire à la commission du crime. La prévenue a agi en qualité de fidèle employée. Elle a perçu un bonus de USD 150'000.- après la vente à ABY_____ en remerciements pour l'activité déployée. Sa faute est néanmoins moindre par rapport à celles de ses co-prévenus, ce qui justifie une peine inférieure à celle prononcée à l'encontre des précités.

Les éléments qui précèdent conduisent au prononcé d'une peine privative de liberté de 2 ans.

Selon l'art. 42 al. 1 CP, le juge suspend en général l'exécution d'une peine pécuniaire ou d'une peine privative de liberté de deux ans au plus lorsqu'une peine ferme ne parait pas nécessaire pour détourner l'auteur d'autres crimes ou délits.

La peine de 2 ans prononcée sera assortie du sursis complet, avec un délai d'épreuve de trois ans, suffisant pour pallier le risque de récidive.

**6.** **Créance compensatrice**

**6.1.1.** Lorsque l'avantage illicite doit être confisqué, mais que les valeurs patrimoniales en résultant ne sont plus disponibles - parce qu'elles ont été consommées, dissimulées ou aliénées -, le juge ordonne le remplacement par une créance compensatrice de l'Etat d'un montant équivalent (art. 71 al. 1 CP).

Le but de cette mesure est d'éviter que celui qui a disposé des objets ou valeurs à confisquer soit privilégié par rapport à celui qui les a conservés; elle ne joue qu'un rôle de substitution de la confiscation en nature et ne doit donc, par rapport à celle-ci, engendrer ni avantage ni inconvénient. En raison de son caractère subsidiaire, la créance compensatrice ne peut être ordonnée que si, dans l'hypothèse où les valeurs patrimoniales auraient été disponibles, la confiscation eût été prononcée: elle est alors soumise aux mêmes conditions que cette mesure. Néanmoins, un lien de connexité entre les valeurs saisies et l'infraction commise n'est pas requis (ATF 140 IV 57 consid. 4.1.2. et références citées).

La créance compensatrice peut être recouvrée sur n'importe quel actif de son débiteur, même s'il est d'origine licite et cet actif peut être saisi temporairement (LOMBARDINI, Banques et blanchiment d'argent, 3ème éd., p. 139, N 535).

**6.1.2.** Les biens obtenus d'une transaction juridique, conclue au moyen de la corruption, peuvent également être soumis à la confiscation, sans nécessairement être une conséquence directe et immédiate de la corruption. Les avoirs obtenus par une transaction légale basée sur la corruption doivent avoir un lien de causalité naturel et adéquat avec l'infraction. La légalité objective de la transaction légale obtenue par le biais de la corruption n'est pas pertinente dans cette décision. La confiscation couvre également les produits du crime, dont l'acquisition va au-delà de la formulation effective de l'infraction. Rien ne s'oppose en principe à la confiscation des biens acquis de manière purement indirecte (arrêt du Tribunal fédéral du 19 août 2015 consid. 2.2. et réf. cit.: ATF 137 IV 79 consid. 3.2.; Marc PIETH, Korruptionsgeldwäsche, in: Wirtschaft und Strafrecht, Festschrift für Niklaus Schmid [...], 2001, S. 449; Bernard BERTOSSA, Confiscation et corruption [...], SJ 131/2009, S. 378).

Si le succès consiste à influencer une décision discrétionnaire, la seule option est une estimation basée sur l'ensemble des circonstances, en vertu de l'art. 70 al. 5 CP (arrêt du Tribunal fédéral du 19 août 2015 consid. 2.2. et réf. cit.: Florian BAUMANN, in: BK, Strafrecht, vol. I, 3e éd. 2013, n. 42 et n. 73 sur l'art. 70/71 CPS).

**6.2.1.** En l'occurrence, CGR_____ n'avait pas les capacités d'exploiter seul les concessions obtenues et devait s'adjoindre les services d'un grand groupe minier en mesure de le faire.

CGR_____ a acquis les concessions minières en déboursant USD 160 millions et a revendu un peu plus de la moitié (51 % de l'actionnariat) pour USD 2.5 milliards. Le bénéfice direct de la transaction rendue possible grâce à la corruption est dès lors de plusieurs milliards de dollars américains. Sur cette somme, USD 500 millions ont été payés immédiatement par ABY_____ à CGR_____, qui en a reversé USD 349'500'717.- à sa holding W_____, détenue par la fondation V_____.

Sur cette somme, des distributions de USD 94 millions en 2010, USD 41 millions en 2011 et USD 15 millions en 2012, ont été directement effectuées par la fondation V_____ à la société AB_____ REAL ESTATE, dont Monsieur C_____ est seul actionnaire. Il est précisé que ces distributions sont distinctes de celles effectuées, à hauteur de quelques millions par année au total, pour les dépenses courantes de Monsieur C_____. Par conséquent, Monsieur C_____ s'est enrichi directement grâce à une transaction légale obtenue grâce à la corruption à hauteur de, à tout le moins, USD 150 millions.

Monsieur C_____ estime sa fortune entre USD 50 et 80 millions. C'est sans compter les biens détenus par les fondations V_____ et AR_____, dont il peut disposer sur simple requête auprès du conseil de fondation pour ses besoins personnels, professionnels ou philanthropiques. Selon plusieurs spécialistes dans l'économie, en 2013, Monsieur C_____ était l'homme le plus riche d'Israël avec une fortune estimée à USD 9 milliards. A l'heure actuelle, sa fortune est estimée à des centaines de millions de dollars, voire à un milliard (USD 800 millions au 03.07.2020, https://www.challenges.fr/classements/fortune/Monsieur C_____-Monsieur C_____2746; USD 1 milliard au 03.04.2019, https://www.forbes.com/profile/Monsieur C_____-Monsieur C_____/).

Compte tenu de ce qui précède, une créance compensatrice de CHF 50 millions sera prononcée à son encontre.

### 6.2.2. *Monsieur A_____*

**6.2.2.1.** Sa rémunération pour son activité corruptrice a été de USD 34.5 millions, à répartir à parts égales entre ses associés. Il s'est dès lors personnellement enrichi par la commission de l'infraction à hauteur de USD 11.5 millions.

Dans la mesure où cette somme n'est plus directement disponible, une créance compensatrice sera prononcée, en adéquation avec la situation patrimoniale du prévenu.

### 6.2.2.2. *Revenus*

Le prévenu perçoit, à l'heure actuelle, des revenus de EUR 143'000.- par an (EUR 250'000.-/2 + EUR 1'500 x 12).

**6.2.2.3.** *Maisons en France*

Il a cédé la nue-propriété de la maison dans laquelle il habite (achetée EUR 665'000.-, PP 4'405'744, 4'405'740), de même que celle de la maison héritée de son père (évaluée à EUR 750'000.-), dont il tire des revenus, à ses enfants en 2018, soit alors que la présente procédure pénale était en cours et sur le point d'être renvoyée en jugement.

**6.2.2.4.** *ADI_____*

Le prévenu a acquis, en 2011, avec ses deux associés AAB_____ et AAE_____, deux sociétés ADJ_____ et ADK_____ (cf. CRI USA, 4'700'476 et 4'700'417; PP 348'891). Ces sociétés, gérées par ADL_____, sont chacune propriétaires d'un immeuble situé l'un à côté de l'autre. Ces sociétés exploitent ensemble le *ADI_____* (cf. https://www.ADI_____hotel.com).

Cet hôtel a été mis en vente, en 2017, pour la somme de USD 14'900'000.- (https://www._____), mais n'a finalement pas été vendu. L'hôtel est actif encore à ce jour (cf. i.e. www.booking.com et prêt COVID obtenu en mai 2020).

**6.2.2.5.** *Propriétés immobilières en Floride*

Le prévenu détient la société ADM_____ (cf. CRI USA, PP 4'700'474-5), créée le 25 octobre 2011, sise en Floride et gérée par AAB_____. Cette société a acquis et détient les biens immobiliers suivants:

- Une maison de vacances située _____, Aventura (Floride), d'une valeur de USD 252'410.- ;
- Un condominium (_____, Miami), d'une valeur de USD 54'840.-.
- Un condominium (_____, Hollywood), d'une valeur de USD 86'110.-.
- Un condominium (_____, Hollywood), d'une valeur de USD 135'210.-.
- Un condominium (_____, Hollywood), d'une valeur de USD 130'380.-.

Ces valeurs sont toutefois des valeurs minimales et conservatrices, telles qu'évaluées par les autorités fiscales. Leur valeur de marché est plus élevée (cf. courrier de Me Michelle P. SMITH, avocate de Monsieur A_____, PP 4'700'417).

Le prévenu a déclaré avoir vendu ces biens pour subvenir à ses besoins et payer ses frais de procédure aux Etats-Unis (cf. PV audience de jugement).

Si cette déclaration apparaît vraisemblable sur le principe, le prévenu n'apporte aucun document démontrant que tous les biens ont été vendus et que l'intégralité du produit de la vente ne serait plus disponible.

**6.2.2.6.** *Bateaux de pêche au gros*

Le prévenu est également propriétaire d'à tout le moins un bateau amarré à Juan les Pins, au Sud de la France, acheté en 2011 et dénommé WABI (note: "*what a beautiful idee*"), qui bat pavillon belge, propriété d'une société SAS WABI, filiale de SARL AAC_____ France, dont Monsieur A_____ est associé et ayant-droit économique (PP 4'406'121, 4'405'616ss, 4'405'677).

Il apparaît, également, être propriétaire avec ses associés d'un autre bateau aux Etats-Unis dénommé WASN'T US (cf. CRI USA).

**6.2.2.6.** Il ressort de la procédure que le prévenu a cédé la propriété de ses biens à ses enfants ou à des tiers pour se soustraire au prononcé d'une confiscation ou d'une créance compensatrice par les autorités pénales.

Compte tenu de ce qui précède et afin donc de tenir compte de manière adéquate de sa situation personnelle et patrimoniale, une créance compensatrice de CHF 5 millions sera prononcée à son encontre.

Les actions des sociétés, qui détiennent le *ADI_____*, seront séquestrées en garantie de l'exécution de la créance compensatrice.

**6.2.3.** *Madame B_____*

La prévenue a reçu un bonus de USD 150'000.- à la suite de la transaction avec ABY_____, soit la transaction juridique conclue au moyen des actes de corruption, auxquels elle a participé. Ce montant correspond à son enrichissement.

La prévenue dispose de modestes revenus. Sa fortune mobilière s'élève entre EUR 70'000.- et 80'000.-. Elle habite en Italie et est restée propriétaire d'une maison, dont elle tire des revenus locatifs, d'une valeur de EUR 1'100'000.-, grevée d'une hypothèque de EUR 400'000.-.

Compte tenu de ces éléments et afin de tenir compte de l'impact de la créance compensatrice sur son avenir et sa situation personnelle, une créance compensatrice de CHF 50'000.- sera prononcée à son encontre.

**7.** **Frais et indemnités**

**7.1.1.** Selon l'art. 426 al. 1 CPP, le prévenu supporte les frais de procédure s'il est condamné. La répartition des frais de procédure repose sur le principe, selon lequel celui qui a causé les frais doit les supporter. Ainsi, le prévenu doit supporter les frais en cas de condamnation (art. 426 al. 1 CPP), car il a occasionné, par son comportement,

l'ouverture et la mise en œuvre de l'enquête pénale (ATF 138 IV 248 consid. 4.4.1. p. 254; arrêt 6B_136/2016 du 23 janvier 2017 consid. 4.1.1.).

Si sa condamnation n'est que partielle, les frais ne doivent être mis à sa charge que de manière proportionnelle, en considération des frais liés à l'instruction des infractions pour lesquelles un verdict de culpabilité a été prononcé. Il s'agit de réduire les frais, sous peine de porter atteinte à la présomption d'innocence, si le point sur lequel le prévenu a été acquitté a donné lieu à des frais supplémentaires et si le prévenu n'a pas, de manière illicite et fautive, provoqué l'ouverture de la procédure ou rendu plus difficile la conduite de celle-ci (cf. art. 426 al. 2 CPP). Il convient de répartir les frais en fonction des différents états de fait retenus, non selon les infractions visées. Comme il est difficile de déterminer avec exactitude les frais qui relèvent de chaque fait imputable ou non au condamné, une certaine marge d'appréciation doit être laissée au juge du fond (arrêt 6B_688/2014 du 22 décembre 2017 consid. 29.2. et références citées).

Selon l'art. 10 al. 1 let. e du Règlement fixant le tarif des frais en matière pénale (RTFMP; E 4.10.03), le Tribunal correctionnel peut prélever, outre les émoluments généraux, un émolument compris entre CHF 400.- et CHF 10'000.-.

A teneur de l'art. 15 RTFMP, en cas de circonstances exceptionnelles liées notamment au volume et à la durée de la procédure, à l'ampleur des débats ou à la situation financière des parties ou des autres participants à la procédure, l'autorité pénale ou, si elle est compétente, la direction de la procédure, peut déroger au plafond des émoluments prévus aux articles 4 à 13, et augmenter ceux-ci dans une juste mesure.

**7.1.2.** L'autorité pénale peut ordonner que les personnes astreintes au paiement des frais répondent solidairement de ceux qu'elles ont occasionnés ensemble (art. 418 al. 2 CPP).

Cette disposition vise essentiellement les cas de participation dans lesquels des motifs d'équité commandent que les intéressés soient tenus solidairement responsables, en application analogique de CO 50 (CR-CPP, 2e édition, Jean CREVOISIER / Laurent CREVOISIER, art. 418 CPP N 2).

**7.1.3.** L'autorité pénale peut réduire ou refuser l'indemnité ou la réparation du tort moral si le prévenu a provoqué illicitement et fautivement l'ouverture de la procédure ou a rendu plus difficile la conduite de celle-ci (art. 430 al. 1 let. a CPP):

**7.2.** En l'espèce, les prévenus sont partiellement acquittés de faux dans les titres s'agissant de Madame B_____ et de Monsieur C_____, respectivement acquitté de cette infraction s'agissant de Monsieur A_____. Les prévenus Madame B_____ et de Monsieur C_____ sont également acquittés de corruption en lien avec le paiement du sucre à Madame E_____. Toutefois, ces acquittements ne justifient pas une diminution des frais de la procédure qui seront mis à leur charge pour les raisons qui suivent.

En effet, les investigations effectuées sur le paiement du sucre à Madame E_____ ne concernent qu'une petite partie de la procédure et étaient nécessaires pour comprendre et établir les faits de corruption retenus à l'encontre des prévenus. Ce paiement a été retenu à l'encontre de Monsieur A_____.

S'agissant des actes d'enquête effectués en lien avec les faux dans les titres dont les prévenus ont été acquittés, ils étaient également nécessaires pour établir les faits en lien avec la corruption retenue à l'encontre des prévenus, en particulier en lien avec le versement de USD 1.5 million à Madame E_____, par le biais de D_____, O_____ et N_____.

En tout état, par son comportement Monsieur C_____ a provoqué l'ouverture de la procédure pénale dirigée contre lui. En effet, il ressort de la procédure que l'opération d'achat et de vente des terrains roumains par D_____, par le biais de L_____, était simulée.

Par conséquent, les prévenus seront condamnés solidairement à payer l'intégralité des frais de la procédure.

**7.3.** L'intégralité des frais étant mis à la charge des prévenus, ceux-ci seront intégralement déboutés de leurs prétentions en indemnisation.

**7.4.** Le patrimoine d'un prévenu peut être séquestré dans la mesure qui paraît nécessaire pour couvrir les frais de procédure et les indemnités à verser (art. 268 al. 1 let. a CPP).

Les autorités pénales peuvent compenser les créances portant sur des frais de procédure avec les indemnités accordées à la partie débitrice dans la même procédure pénale et avec des valeurs séquestrées (art. 442 al. 4 CPP).

Les avoirs séquestrés de Monsieur C_____ d'un peu plus de CHF 100'000.- déposés sur le compte de la Banque 1_____ seront affectés au paiement des frais de la procédure.

## H. SCHEMAS

**SCHEMA I**

AD_____ / V_____



* Administratrice = Madame B_____

* secrétaire = Madame B_____

* directrice dès 2008 et administratrice dès mars 2009 = Madame B_____


** contrat mandat = 250'000 $ puis 450'000 $ + donations + autres = Monsieur C_____

** contrat mandat = 700'000 $ = Monsieur C_____


*** mb conseil de fondation = Me GAMMA_____

*** administrateur unique = Me GAMMA_____

Case 1:17-cv-02726-JSR Document 74-9 Filed 05/11/21 Page 265 of 270

## SCHEMA II



**SCHEMA III**

**Transaction N_____**

**Service**

Monsieur C_____

D_____

Facture 13.06.2011 (AX_____)

O_____

Paiement commission à Madame E (ABE_____)

N_____

ACL_____

Madame E_____          Madame E_____



**Compensation**

CGMM          D_____

S___          ABJ___          CGMM

(620'000 $)     (1.5 mio $)

**SCHEMA IV**



**PAR CES MOTIFS,**
**LE TRIBUNAL CORRECTIONNEL**

**statuant contradictoirement :**

Acquitte **Monsieur C_____** de corruption d'agents publics étrangers s'agissant des faits mentionnés sous ch. B.a.I.1.1 de l'acte d'accusation (paiement de USD 94'038.-) (art. 322$^{\text{septies}}$ CP) et de faux dans les titres s'agissant des faits mentionnés sous ch. B.a.II. à l'exception du certificat d'actions mentionné sous chiffre B.a.II.2 (art. 251 CP).

Déclare Monsieur C_____ coupable de corruption d'agents publics étrangers (art. 322$^{\text{septies}}$ CP) et de faux dans les titres s'agissant du certificat d'actions mentionné sous chiffre a.II.2 (art. 251 cum art. 255 CP).

Condamne Monsieur C_____ à une peine privative de liberté de 5 ans (art. 40 CP).

Prononce à l'encontre de Monsieur C_____ en faveur de l'Etat de Genève une créance compensatrice de CHF 50'000'000.-, celle-ci s'éteignant automatiquement dans la mesure du paiement par Monsieur C_____ (art. 71 al. 1 CP).

Acquitte **Monsieur A_____** de faux dans les titres (art. 251 CP).

Déclare Monsieur A_____ coupable de corruption d'agents publics étrangers (art. 322$^{\text{septies}}$ CP).

Condamne Monsieur A_____ à une peine privative de liberté de 3 ans et 6 mois (art. 40 CP).

Prononce à l'encontre de Monsieur A_____ en faveur de l'Etat de Genève une créance compensatrice de CHF 5'000'000.-, celle-ci s'éteignant automatiquement dans la mesure du paiement par Monsieur A_____ (art. 71 al. 1 CP).

Ordonne le séquestre des actions des sociétés ADJ_____ et ADK_____ en vue de l'exécution de la créance compensatrice (art. 71 al. 3 CP).

Rejette les conclusions en indemnisation de Monsieur A_____ (art. 429 CPP).

Acquitte **Madame B_____** de corruption d'agents publics étrangers s'agissant des faits mentionnés sous ch. B.b.I.1.1 de l'acte d'accusation (paiement de USD 94'038.-) (art. 322$^{septies}$ CP) et de faux dans les titres s'agissant des faits mentionnés sous ch. B.b.II. à l'exception du certificat d'actions mentionné sous ch. B.b.II.2 (art. 251 CP).

Déclare Madame B_____ coupable de corruption d'agents publics étrangers (art. 322$^{septies}$ CP) et de faux dans les titres s'agissant du certificat d'actions mentionné sous chiffre B.b.II.2 (art. 251 cum art. 255 CP).

Condamne Madame B_____ à une peine privative de liberté de 2 ans (art. 40 CP).

Met Madame B_____ au bénéfice du sursis et fixe la durée du délai d'épreuve à 3 ans (art. 42 et 44 CP).

Avertit Madame B_____ que si elle devait commettre de nouvelles infractions durant le délai d'épreuve, le sursis pourrait être révoqué et la peine suspendue exécutée, cela sans préjudice d'une nouvelle peine (art. 44 al. 3 CP).

Prononce à l'encontre de Madame B_____ en faveur de l'Etat de Genève une créance compensatrice de CHF 50'000.-, celle-ci s'éteignant automatiquement dans la mesure du paiement par Madame B_____ (art. 71 al. 1 CP).

Rejette les conclusions en indemnisation de Madame B_____ (art. 429 CPP).

Condamne Monsieur C_____, Monsieur A_____ et Madame B_____, solidairement, aux frais de la procédure, qui s'élèvent à CHF 204'189.15, y compris un émolument de jugement de CHF 30'000.- (art. 418 al. 2 et 426 al. 1 et 2 CPP).

Ordonne le maintien du séquestre des avoirs déposés sur le compte no 1_____ au nom de Monsieur C_____ auprès de Banque 1_____ et compense à due concurrence la créance de l'Etat portant sur les frais de la procédure avec ces valeurs patrimoniales (art. 268 al. 1 let. a et 442 al. 4 CPP).

Ordonne la communication de la partie du dispositif du présent jugement qui la concerne à Banque 1_____.

Ordonne la communication du présent jugement aux autorités suivantes : Casier judiciaire suisse, Office fédéral de la police, Office cantonal de la population et des migrations, Service des contraventions (art. 81 al. 4 let. f CPP).

Le Greffier                                    La Présidente

Alain BANDOLLIER                        Alexandra BANNA

### Voies de recours

Les parties peuvent annoncer un appel contre le présent jugement, oralement pour mention au procès-verbal, ou par écrit au Tribunal pénal, rue des Chaudronniers 9, case postale 3715, CH-1211 Genève 3, dans le délai de 10 jours à compter de la communication du dispositif écrit du jugement (art. 398, 399 al. 1 et 384 let. a CPP).

Selon l'art. 399 al. 3 et 4 CPP, la partie qui annonce un appel adresse une déclaration écrite respectant les conditions légales à la Chambre pénale d'appel et de révision, Place du Bourg-de-Four 1, case postale 3108, CH-1211 Genève 3, dans les 20 jours à compter de la notification du jugement motivé.

Si le défenseur d'office ou le conseil juridique gratuit conteste également son indemnisation, il peut interjeter recours, écrit et motivé, dans le délai de 10 jours dès la notification du jugement motivé, à la Chambre pénale d'appel et de révision contre la décision fixant son indemnité (art. 396 al. 1 CPP).

L'appel ou le recours doit être remis au plus tard le dernier jour du délai à la juridiction compétente, à la Poste suisse, à une représentation consulaire ou diplomatique suisse ou, s'agissant de personnes détenues, à la direction de l'établissement carcéral (art. 91 al. 2 CPP).

### Etat de frais

| | | |
|---|---|---|
| Frais du Ministère public | CHF | 173'191.15 |
| Convocations devant le Tribunal | CHF | 735.00 |
| Frais postaux (convocation) | CHF | 213.00 |
| Emolument de jugement | CHF | 30'000.00 |
| Etat de frais | CHF | 50.00 |
| **Total CHF** | | **204'189.15** |
| | | ========== |
| Frais d'interprète du prévenu | **CHF** | **2'020.00 à la charge de l'Etat** |