# EXHIBIT MM

# OPUS2

Vale S.A. V. BSG Resources Limited (In Administration)

Day 1

November 17, 2020

Opus 2 - Official Court Reporters

Phone: 0203 008 6619
Email: transcripts@opus2.com
Website: https://www.opus2.com

| | |
|---|---|
| 1               Tuesday, 17 November 2020 | 1  A.  Not so active, no. |

1                Tuesday, 17 November 2020
2  (10.30 am)
3  MASTER DAVISON: Yes, Mr Willan.
4  MR WILLAN:  Good morning, Master. I appear on behalf of
5    Vale. My learned friend Mr Weekes appears on behalf of
6    Mr Cramer. I should mention that Ms Loizou is present
7    on the back row. She is counsel for Alvarez and Marsel,
8    who are the joint administrators of the judgment debtor,
9    not I think planning to take any active role today but
10    she is present.
11        Master, you will have seen there was a brief
12    discursus about whether the hearing was in public or
13    private. I hope you have been updated that there is no
14    application for it to be heard in private.
15        Master, unless there is anything else, I think
16    Mr Cramer can be sworn.
17  MASTER DAVISON: Yes, thanks.
18        MR DAG LARS CRAMER (affirmed)
19        Examination by MR WILLAN
20  MR WILLAN: Mr Cramer, good morning.
21  A.  Good morning.
22  Q.  I would like to start by asking you some questions about
23    how BSGR has been managed, and in answering those
24    questions I want you to focus solely on the period after
25    2012. So I don't want you to comment on whether it is

                    1

1    the same or different in 2009/2010, for reasons that you
2    will, I suspect, understand.
3        I should say, Mr Cramer, you are welcome to take
4    your mask off if you prefer.
5  A.  I do prefer it, thank you, yes.
6  MASTER DAVISON: I perhaps should have said that, Mr Cramer.
7    It is optional.
8  MR WILLAN: I first want to ask you about the board of
9    directors. You have been a director of BSGR throughout
10    that period since 2012, correct?
11  A.  Correct.
12  Q.  And how often did the board meet?
13  A.  From 2012 onwards it varied, but there were regular
14    board meetings.
15  Q.  At least quarterly?
16  A.  I don't recall, but I know that the people responsible
17    for that compliance would have managed that and ensured
18    that it was done in accordance with the Guernsey rules
19    and regulations.
20  Q.  I follow. But just to the best of your recollection,
21    are we talking twice a year, monthly, give me a sense of
22    how often?
23  A.  I'm speculating, but I would say between two and four
24    times a year.
25  Q.  Would you describe the board as an active board?

                    2

1  A.  Not so active, no.
2  Q.  Did it review the performance of the businesses of which
3    BSGR was owner?
4  A.  This was documented and to a certain extent, yes.
5  Q.  So you, as a director, would have had an understanding
6    of how each of the businesses was performing?
7  A.  I would have had an understanding of the overall
8    picture, not the detail of any underlying operation, and
9    not in certain underlying operations very little
10    knowledge.
11  Q.  Right. And when you say "certain" just so I know what
12    I can ask you about, which operations did you have no
13    significant knowledge about?
14  A.  I didn't have any significant knowledge of any of the
15    underlying operating companies from an operational
16    perspective. I was of course aware of their existence,
17    and I would from time to time become involved in assets
18    that were either in trouble or were looking to be sold
19    or involved in a transaction.
20  Q.  Right. Did the board, just now looking at major
21    transactions, did the board review and approve major
22    transactions that BSGR was entering into?
23  A.  Yes.
24  Q.  Was there a financial limit or a type of transaction
25    which you personally had to approve?

                    3

1  A.  No.
2  Q.  So for payments, was there delegated authority as to who
3    could approve particular payments?
4  A.  That would be slightly different in a different
5    capacity. I was not involved with the day—to—day
6    treasury operations of BSGR in any way. I was not
7    a signatory under normal circumstances, but there was,
8    which related to the foundations, oversight of the
9    finances of the group a risk management guideline which
10    required me to be aware of or informed of payments of
11    a certain magnitude.
12  Q.  Right, and a certain magnitude was what?
13  A.  I recall it being, there was a guideline of around
14    $5 million.
15  Q.  And you talked about not being involved in operational
16    activity. Were there any businesses that you were
17    personally involved in managing?
18  A.  Within BSGR?
19  Q.  Within BSGR.
20  A.  No.
21  Q.  I want to ask you some questions about the use of
22    management companies. Is it right that BSGR engaged
23    companies to provide outsourced management services and
24    again, I am focusing, I emphasise, post 2012?
25  A.  Yes, to a certain extent.

                    4

November 17, 2020                    Vale S.A. V. BSG Resources Limited (In Administration)                    Day 1

1  Q. And tell me what that extent was?
2  A. It's difficult to answer the question without the
3     chronology and the history, but I will do that, because
4     that's what you want. From 2012, there was a history
5     and an evolution of how the operating companies like
6     BSGR had been managed on behalf of the foundation, which
7     was the ultimate shareholder, and because of the
8     challenges that we were facing, which related to matters
9     such as this, certain things that had been completely
10    done by BSGR in the past, it involved other people like
11    myself. But the core functions of BSGR, other than
12    historically, the company secretarial work was done in
13    Guernsey and the company secretarial work was done in
14    Switzerland.
15 Q. I am just going to try and look at it in a slightly more
16    concrete way. Can I take you to the Onyx group?
17 A. Sure.
18 Q. You were the sole owner and CEO of the Onyx group?
19 A. Yes, I became the sole owner for certain reasons, yes.
20 Q. And the structure was a holding company in the BVI,
21    subsidiaries in Switzerland and England?
22 A. I believe that the BVI was the holding company and the
23    Swiss company then had subsidiaries.
24 Q. Right.
25 A. So, for instance, Onyx London was a subsidiary of the

5

1     Swiss company, which was the original and core operating
2     company of Onyx when I joined the group.
3  Q. Right, I follow. And now looking at the English
4     company. That was a management services and financial
5     advice company?
6  A. Yes.
7  Q. And how would you describe the role of the Swiss
8     company?
9  A. So it might be helpful if I give you the background or
10    you want to stick to 2012?
11 Q. Stick to 2012. It will save us getting into difficult
12    territory.
13 A. Okay. Basically the reason that Onyx existed was to
14    create the services that the owner of the foundations
15    assets, including the operating companies like
16    BSG Resources, BSG Real Estate, BSG Capital Markets
17    would need, and that needed to be separate from the
18    ownership of the foundation for fiscal and regulatory
19    reasons, to maintain the integrity of the foundation and
20    its position under Liechtenstein law, I believe.
21 Q. And so the Swiss company, what services did it provide,
22    in a sentence?
23 A. So, originally it provided all of the payment accounts
24    work and all of the company secretarial work, in the
25    context of their formation of companies, the management

6

1     of these companies and all of the documentation related
2     to the companies of the foundation, which was an
3     extensive part of its activity.
4  Q. Including BSGR?
5  A. Including BSGR, but once BSGR became incorporated in
6     Guernsey, there were bits and pieces that were done in
7     Guernsey by the people in Guernsey, and then, post 2012,
8     more and more was done in Guernsey, if I recall
9     correctly here.
10 Q. I think you may have answered this, but was the
11    structure that the Onyx group was under contract to the
12    foundation to provide services to the operating company,
13    so the contract was ——
14 A. Correct.
15 Q. Were there contracts between BSGR and the Onyx
16    companies?
17 A. I don't believe so, I believe, because things also
18    changed post 2012, so I just have to give a caveat, but
19    if my memory is correct, the Onyx contract was
20    originally directly with the foundation, to provide
21    these services and it was a contract that could be given
22    up with three months' notice on each side.
23 Q. Right. But am I right in understanding that BSGR paid
24    for Onyx's services?
25 A. Well, the way that it was managed and the way that the

7

1     foundation wanted it managed was to look at the Onyx
2     group of companies or other companies that from
3     different times were also in this type of role that
4     there was a cost associated with that, and then it was
5     a question of allocating those costs, and this wasn't
6     done, you know, with timesheets and so on. It was done
7     on a percentage allocation to the various operating
8     companies. That was the philosophy and the thinking
9     behind it.
10 Q. And would I be right in assuming that somewhere around
11    40% of Onyx UK's costs were attributed to BSGR?
12 A. I believe that would be fair, yes, I think over time.
13    That would be —— I would say, between 30 and 40%, yes.
14 Q. Just so I can understand who is doing what, if you like.
15    How many people is or was Onyx UK?
16 A. (Short pause). So in Onyx UK —— first of all, Onyx UK
17    was previously known as —— it had different names, but
18    it was always serving the same purpose, and the primary
19    focus of Onyx UK was to provide the infrastructure and
20    the support needed for the BSG Capital Markets activity,
21    but it also provided a point of employment, or it would
22    run a payroll for people, for instance, who were working
23    for BSGR, and it would also provide meeting space and
24    anything that was needed, not only for BSGR but anything
25    to do with the foundation.

8

1      So the bulk of the people working in the London
2    office ——
3   MASTER DAVISON: Sorry, I think Mr Cramer needs a glass.
4   A. That is kind, thank you. (Handed).
5   MASTER DAVISON: Sorry, go on.
6   A. The bulk of the people who were involved in the London
7    activities were either involved with BSG Capital Markets
8    or the work —— there was an accounting function where we
9    were collating data from the operating companies of the
10    group BSG Capital Markets group being one, BSG Resources
11    another, BSG Real Estate, and not in a statutory or
12    a very formal way, but we were assembling a set of
13    management accounts that we would use to report to the
14    foundation on the value and the high level activity of
15    the operating companies.
16   MR WILLAN: Mr Cramer, sorry to interrupt, if I can just
17    drag you back to the question. How many people within
18    Onyx UK, and if you want to tell me how many were
19    actually working on BSGR related matters. I am just
20    interested in the number of ——
21   A. I would have to refresh my memory on that and maybe look
22    at some documents. The big picture was that from around
23    2005 onwards, up until 2012, the numbers grew quite
24    a lot.
25   Q. Right. Just give me a figure. Were there a hundred

9

1    people sitting in the room, 10?
2   A. I would feel comfortable but I'm speculating here, 10 to
3    20. I mean, I am very happy to go back and give you
4    a very precise answer based on the records that we have.
5   Q. And you have previously said that Onyx provided the sort
6    of services you'd expect a corporate head office to
7    provide, and is that a fair summary of how you see it?
8   A. I think it's important that in many of the records where
9    I try to describe the role of Onyx and the
10    relationships, I'm trying to give an understanding,
11    without getting into specific detail. But, yes, what
12    Onyx was doing, if you think of the operating companies,
13    they were their own entities, and they were running
14    their business on a day—to—day basis. I saw Onyx's role
15    as that of a virtual holding company, corporate head
16    office, and that was the role that Onyx was playing and
17    providing those services in order to report on the
18    portfolio, if you will, to the foundation.
19   Q. So it is a sort of governance accounting ——
20   A. Not so much governance. I mean, to a certain extent,
21    you know, if there were high level issues, then one
22    would try to flag or implement —— for instance, I recall
23    when the UK Bribery Act came in, I think in 2011, one of
24    the things that would become obvious to us would be to
25    say all of the operating companies should be aware of

10

1    this, and implement such measures, but at a very high
2    level, because there was no compliance expert within the
3    Onyx group. There was a company secretarial expert, but
4    I believe she looked at things from a slightly different
5    perspective.
6   Q. So accounting, that was an Onyx function, or more
7    management?
8   A. Accounting, from the perspective of preparing accounts
9    for the foundation, but the statutory and core accounts
10    for each operating company was performed at the
11    operating company level, managed by them, and they would
12    employ and sign up with external auditors and manage
13    that process, and this was never done at the foundation
14    level, because that is the nature of a Liechtenstein
15    irrevocable discretionary foundation. It is very light
16    on such requirements.
17   Q. Did the Onyx group or individuals within the Onyx group
18    have authority to approve or enter into transactions on
19    behalf of BSGR?
20   A. No.
21   Q. Just to finish on Onyx, when did it cease to provide
22    those sorts of services to BSGR?
23   A. I don't recall the exact dates, but the circumstances
24    upon which Onyx could no longer exist and provide these
25    services was a function of it becoming unbankable, as

11

1    a result of the legal challenges and the allegations
2    that surfaced with BSGR and its association. It might
3    be helpful to know that one of the things that I had
4    done as overseeing the foundation was to develop banking
5    relationships.
6   Q. I am just at the moment interested to understand your
7    recollection date wise. You can place it —— that is
8    obviously probably post 2014, given what you have
9    described?
10   A. Yes, I recall that, because we were working very hard to
11    keep our banking partners, which in this case was
12    JP Morgan, in place. I remember very well —— I just
13    don't remember the date —— when I had the phone call,
14    where they phoned me to inform me that they had decided
15    to sever ties with the whole foundation, all of the
16    operating companies, including the Onyx group of
17    companies, and it was at that point in time, at the
18    beginning ——
19   Q. Sorry, Mr Cramer, but in terms of a date, are you able
20    to go beyond some time ——
21   A. I am really sorry. I mean, I'm sure we can find them.
22    It's just that I have so many dates and documents and it
23    was ——
24   Q. That is fine.
25   A. I remember what happened after that, and then why it

12

1    finally could not operate, but I don't know the dates.
2  Q.  That is fine. If you don't know the answer to
3    a question it is absolutely fine to say "I don't recall"
4    and we can move on.
5  A.  Thank you.
6  Q.  Was Norn Verdandi a successor to Onyx?
7  A.  It was part of the solution that we came up with to
8    replace what Onyx had done −− in a slightly different
9    way, but, yes, that's correct.
10 Q.  And you're CEO and sole owner of Norn Verdandi?
11 A.  That's correct.
12 Q.  You say in a slightly different way, but it was broadly
13   providing the same type of services, and you had the
14   same type of role within it?
15 A.  It had the same principles, but there was a big
16   difference, and the difference was that once Onyx had
17   ceased to exist and function −− sorry, I was told.
18 MASTER DAVISON:  It doesn't matter where you direct −− we
19   can all hear you.
20 A.  Okay. There was one big change. And the change was
21   that Onyx had always operated on a cost plus basis, and
22   when Onyx could not operate anymore, there were two
23   reasons why there was a slightly different model, and we
24   moved from a cost plus model to more of a commercial
25   arrangement, and there were two reasons for that. One

                            13

1    was the Onyx group of companies, and that's something
2    that we're still dealing with, as a result of a fairly
3    aggressive cost plus structure, ultimately ended up in
4    a complicated situation with the Swiss tax authorities.
5    They felt it was too aggressive, and we had to address
6    that retroactively, and we're coming to the end of that
7    today.
8        The other was that by that time I think a lot of
9    people felt:  "Well, we need to have a clear separation
10   here", you know, and the various people who are
11   providing various services, they should be paid for this
12   in a separate way, and their risk and the problems, they
13   should be paid on a commercial basis.
14 Q.  So was the Norn Verdandi/BSGR relationship under
15   a contract between Norn Verdandi and BSGR, or was it
16   still foundation level?
17 A.  It was one of the things that I wanted to refresh my
18   memory about before this hearing. I recall that
19   initially −− you see, there is a company called Heimdal
20   and Norn Verdandi is part of −− there is a relationship
21   there. So I believe that the contract, whether it was
22   with Norn Verdandi or Heimdal directly, at first it
23   would have started with the direct relationship with
24   BSGR Capital Markets, where it was providing services.
25   Then, over time, I recall that that would have been

                            14

1    changed to be a direct contract with the foundation,
2    Nysco and BH Holdings, companies for the various
3    foundations. So there was a migration.
4  Q.  And presumably you would have copies of those contracts?
5  A.  Yes.
6  Q.  And when we talk about Norn Verdandi agreeing commercial
7    terms with BSGR, just to understand how that works, did
8    you negotiate that with someone on behalf of BSGR to try
9    and come to commercial terms?
10 A.  No, with the foundation, counsel.
11 Q.  Right, you on the side of Norn Verdandi?
12 A.  Yes, or Heimdal. Think of them as the same, you know.
13 Q.  And somebody else on the side of the foundation?
14 A.  Yes.
15 Q.  And who was the somebody else who would −−
16 A.  It would have been Maitre Bonnant at the time.
17 Q.  You mentioned Heimdal, you are also the owner and
18   director of that company?
19 A.  Correct, yes.
20 Q.  And what services did that company provide to BSGR?
21 A.  So the best way to think of it, without getting into
22   detail, it is really the same thing. It just has to do
23   with offshore/onshore UK taxes, etc, etc. This is how
24   my relationship with my companies with the operating
25   companies in the foundation was structured, under

                            15

1    professional advice.
2  Q.  Right, I follow. I am coming to the end of the
3    questions on management companies, you will be pleased
4    to know, but I just want to pick up a couple of others.
5        Landsdale Partners. Where does that fit into the
6    BSGR management structure?
7  A.  So it doesn't. This was also a company that was created
8    to solve the vacuum that the dissolution or the
9    inability for Onyx to operate created, and it is the
10   company that we rent office space from.
11 Q.  Okay. Finally, I hope −− no, penultimate, Arckem.
12   Where does Arckem fit into the BSGR management
13   structure?
14 A.  In the same way that Arckem then was the service
15   facility within Onyx that would do the accounting for
16   the foundation, it was also separated under the person
17   who was doing that.
18 Q.  Did Arckem provide payment services? Did it actually
19   physically arrange transfers and banking?
20 A.  Yes, it did.
21 Q.  We talk about Arckem, but who was Arckem? Who were the
22   physical people actually doing its work?
23 A.  The owner, an individual called Martin Maloney, and he
24   is a qualified accountant.
25 Q.  Does he have a relationship with Onyx?

                            16

1  A. He was employed by Onyx, as was the owner of Landsdale
2     was employed by Onyx. I think —— and I am very glad
3     that you ask these questions, because what we were
4     doing, we were providing a solution to a challenge which
5     was a result of changes that were beyond our control.
6     If we had not have been confronted with these
7     developments, there would have been no need to do this.
8  Q. I follow. The last company I wanted to ask about is
9     Onyx Resources. Is that a company you've heard of?
10 A. It does not ring a bell, but that's a little bit
11    embarrassing, but, no.
12 Q. Very good.
13 A. If I may, the Onyx group of companies and its structure,
14    although I was the owner, I never did the paperwork.
15    I never incorporated the companies. I didn't manage the
16    maintenance of these companies. That was done
17    elsewhere.
18 Q. Well, the CEO normally would be doing rather more
19    important things.
20 A. No, no. If I may, I was the CEO of the Onyx company in
21    London, and it is very important to note that the core
22    company was in fact Onyx Switzerland, and I was never
23    a director of Onyx Switzerland, and I was never involved
24    in any of the activities or the payments in Onyx
25    Switzerland. So it is an important distinction.

17

1  Q. Very good. I am going to move on to the ICSID claims,
2     by which you understand I mean the claim by BSGR and
3     others against the Republic of Guinea?
4  A. I do.
5  Q. Your view at the time of the administration was that the
6     ICSID claim was potentially one of BSGR's most valuable
7     assets. Is that right?
8  A. Very much so, yes.
9  Q. Now, more recently there has been an attempt to settle
10    that claim with the Republic of Guinea, hasn't there?
11 A. Yes.
12 Q. And if I could ask you to take out —— I'm sorry,
13    I didn't touch the bundles but if I could ask you to
14    take bundle 3 from the box, which will probably be the
15    middle bundle.
16 A. Sure.
17 Q. And go, please, to tab 90.
18 A. It is in number 3?
19 Q. It is in number 3.
20 A. Sure.
21 Q. Tab 90. It is an English and French document
22    entitled ——
23 A. Yes.
24 Q. I assume it is a document you are familiar with?
25 A. I am familiar with it, yes.

18

1  Q. Is it your understanding, and I am not asking you to
2     tell me any legal advice you may or may not have
3     received, that this is or is not a binding agreement?
4  A. It is not a binding agreement.
5  Q. Who negotiated the commercial terms of this agreement on
6     behalf of BSGR?
7  A. My understanding is that it was an agreement to agree.
8  Q. Yes.
9  A. Part of a negotiation, if you will. The individuals
10    involved in this negotiation were primarily Beny
11    Steinmetz, Nicholas Sarkozy and the BSGR group's
12    internal lawyer, an individual called David Barnet.
13 Q. Let me just follow up on that slightly. Who was Beny
14    Steinmetz acting on behalf of? Was he acting on behalf
15    of BSGR?
16 A. I'm sorry, he was, he's the adviser to BSGR. He is the
17    ultimate —— he's one of the key beneficiaries of all of
18    the foundation's assets, together with his family.
19 Q. I follow. It is just helpful to know because obviously
20    (inaudible). Fine. So Beny Steinmetz is acting as
21    adviser of BSGR. He acts under an advisory contract,
22    does he?
23 A. There is a contract, yes.
24 Q. And that remained current in 2019?
25 A. I believe so. I think, at least in spirit, and it was

19

1     always there and, you know, it was signed and it was
2     rolled, and he had always been an adviser. A little bit
3     confusing sometimes, for tax reasons, he was an adviser
4     directly to the foundation, and then that changed
5     directly to the operating companies. But the purpose
6     and the spirit of what he was doing was always the same.
7  Q. Another individual whose name I have seen is Daniel
8     Pollack; do you know if he had a role in the
9     negotiations?
10 A. He would have assisted in the negotiations. He was
11    around and he was an individual who was helpful to them
12    in this, for two reasons.
13 Q. And before we get to why he is helpful who was he,
14    what's his position, what's his experience?
15 A. So he has been employed by BSGR in the past, and today
16    I believe his status —— and then he was working as
17    a consultant.
18 Q. Consultant to BSGR or to somebody else?
19 A. Also one of these tricky things, because where he was
20    paid and how he was involved and his contractual
21    relationships evolved over time, but at that time
22    I believe he was no longer paid by BSGR, but I'm
23    speculating here.
24 Q. Right. Do you know who he was paid by?
25 A. I don't. And I don't believe it was BSGR but we would

20

Case 1:19-cv-02026-KBT Document 74-149 Filed 05/14/21 Page 8 of 62
Case 1:19-cv-02026-KBT Document 74-149 Filed 05/14/21 Page 8 of 62

November 17, 2020          Vale S.A. V. BSG Resources Limited (In Administration)          Day 1

1    have to check.
2 Q. What's his background?  What was his ——
3 A. He is French speaking.  He speaks Hebrew.  He is
4    originally from Belgium, I believe.  He studied in
5    France.  He had worked for a company that BSGR had in
6    Liberia during the time of the Guinea project.
7 Q. You also mention Mr Barnet, who I think is an Israeli
8    lawyer.
9 A. Originally, he's British.  He probably has Israeli
10   citizenship as well.  I don't know exactly his legal
11   qualifications.  I think he might —— I know he worked as
12   a lawyer here in the UK, but now he —— for as long as
13   I've known him and worked with him, he's been based in
14   Israel.
15 Q. You talked about him, I think, as the in—house lawyer,
16   so he was instructed by BSGR for the purposes of these
17   negotiations?
18 A. No.
19 Q. By whom was he instructed?
20 A. He was working with Mr Steinmetz and Sarkozy directly on
21   this.
22 Q. But he did sometimes act as an in—house lawyer to BSGR?
23 A. Yes, very —— that was one of his key roles, in the
24   context of the work that he did for the foundation.
25 Q. Were you involved in those negotiations?

                              21

1 A. No.
2 Q. Did you attend any meetings with individuals involved in
3    negotiations?
4 A. If I can explain a little bit it might be helpful.
5 Q. Yes, please.
6 A. So when I became aware of these negotiations, from Beny
7    and Mr Barnet, I gave them some good advice, I believe,
8    and I told them that the only people who could make any
9    decision about the situation as it had evolved, because
10   we were in administration, were the joint
11   administrators.  I pointed this out because, going back
12   to before the ICSID proceedings, going back to the very
13   beginning of this conflict, Mr Steinmetz believed and
14   wanted to come to an amicable settlement with
15   the Government of Guinea, and there were any number of
16   initiatives that he was involved with, which amounted to
17   very little.  I was quite often sceptical to these
18   initiatives, but ultimately there was a potential
19   benefit in coming to an amicable arrangement.  So if he
20   was pursuing a solution in his role as an adviser, that
21   wasn't something that one necessarily needed to stop.
22 Q. Mr Cramer, if I can just pause you there.  I was just
23   asking whether you were involved ——
24 A. No.
25 Q. I think you said your role was you advised Mr Steinmetz

                              22

1    and Mr Barnet that they needed to make contact with the
2    joint administrators?
3 A. Correct.
4 Q. Do I understand from that that although Mr Steinmetz had
5    been negotiating on behalf of BSGR as its adviser, the
6    joint administrators hadn't been aware of or approved of
7    that, until your advice?
8 A. I believe so, yes.
9 Q. You mentioned one person, I think, Mr Sarkozy, who was
10   involved in negotiating the commercial terms on behalf
11   of Guinea.  Are you aware who else was involved on
12   behalf of Guinea in ——
13 A. No, I don't believe that Mr Sarkozy was negotiating
14   terms on behalf of Guinea.  I don't know.  I am
15   speculating what his role was.  I think I know and I can
16   tell you that.
17 Q. Just before you tell me that, tell me, do you know who
18   was negotiating on Guinea's side?
19 A. I know who was representing the Government of Guinea at
20   the time when the joint administrators first made
21   contact.
22 Q. Right.  And who was that?
23 A. An individual called Mamadu Kuyate.
24 Q. You will have to forgive my knowledge of Guinean.  Who
25   is she, I assume?

                              23

1 A. No, it is a he.  It does get very complicated and
2    confusing even for me, even though I have been following
3    it for some time.  Mamadu Kuyate, who Malcolm Cohen met
4    in a meeting in Paris, was operating as a special
5    adviser to the President of Guinea Alpha Conde.  Can
6    I explain what I think Sarkozy was doing?
7 Q. If you can do it in a sentence ——
8 A. I'll be very brief.  He was mediating.  He wasn't
9    negotiating on either side.
10 Q. Right, I follow.  If I can ask you to look at the terms,
11    which I hope you have in front of you.  I just want to
12    understand how this settlement was going to produce
13    value for BSGR, and how indeed it might still produce
14    value for BSGR.  Just to make sure I have followed the
15    structure of this, if you go, please, to clause 2.1.
16 A. We are back to the agreement?
17 Q. You are, yes.  Tab 90, page 1781.
18 A. Yes.
19 Q. 2.1:  BSGR is giving up its claims in what is referred
20    to there as a CIRDI, but that is the ICSID arbitration?
21 A. Yes.
22 Q. My understanding, please correct me if I'm wrong, is
23    that the purpose of the ICSID arbitration was to recover
24    the Simandou and Zogota licences?
25 A. Yes.

                              24

1   Q.  So you are giving that up.  At clause 2.3, you can see
2       expressly that you waive participation in the Simandou
3       deposits, yes?  At clause 2.4, it says:
4           "In return, the Republic of Guinea requested the
5       BSGR adviser to present a new investor, Niron,
6       a well-known actor of the mining sector, with a view to
7       mining the Zogota deposits."
8   A.  Yes.
9   Q.  So that is the licence that BSGR had and was trying to
10      vindicate in the ICSID arbitration, yes?
11  A.  Yes.
12  Q.  I think I can guess the answer to this, but the BSGR
13      adviser referred to there is who?
14  A.  Well, I believe -- I didn't prepare the document, and
15      I wasn't involved in negotiations -- and let me say
16      I don't believe that this was a deal or is a deal that
17      anybody would accept, but it must be -- I believe it is
18      referring to Beny Steinmetz.
19  Q.  Can I just pick that up.  When you say you don't think
20      it is a deal anyone will accept, two questions.  In
21      a nutshell, why?  Why not I suppose?
22  A.  Because, if it was my decision, which it wasn't at that
23      point in time, it would have been the joint
24      administrators, I don't believe that this was
25      a commercially good deal, as it stood at this stage, for

25

1       BSGR, because the potential value of the ICSID
2       complaint, however you would discount it, unless you
3       knew that you would lose, because then of course you
4       have to fight for scraps, would you enter into something
5       like this.  So the balance at this stage was wrong.
6   Q.  The second question is to what extent did you have any
7       input on whether -- were you consulted on whether this
8       was a good or bad deal, either by the joint
9       administrators or by the directors of the subsidiaries?
10  A.  I recall two occasions when I commented on this.  The
11      first occasion was in a meeting with Malcolm Cohen and
12      Beny, I think Mick Davis maybe was there, Daniel Pollack
13      and myself, Malcolm Cohen, and my reaction was, you
14      know, this just doesn't seem attractive enough for BSGR.
15  Q.  Was that in Paris?
16  A.  Yes.
17  Q.  What about the subsidiaries?  Did they consult you about
18      whether they should enter into it?
19  A.  You mean the BSGR group of companies with the Guinea
20      project?
21  Q.  The BSG Resources Guinea Limited, BSG Resources Guinea
22      SARL, so they are not in administration.  Their director
23      still controls them?
24  A.  Yes.
25  Q.  Did they consult you on whether this was a good or a bad

26

1       deal for them?
2   A.  I recall some conversation, but the spirit of what was
3       understood was, you know, they really have to fall in
4       line with the administrators.  I think it was
5       a technicality who controlled what.  But this was
6       a decision that needed to be made by the administrators,
7       and after this agreement to agree was signed between the
8       people who had this agenda, I think there were many
9       meetings with the administrators, where the
10      understanding was very simple.  This might help.
11      I think the JAs were trying to say:  "Look, is there
12      a viable deal to be done, and if there is a viable deal
13      to be done, let's talk about economics later."  They
14      went through a long process of trying to feel the
15      substance of the people who were being brought in to
16      provide the solution.
17  Q.  Right.  So does it follow that the person who was
18      pushing this deal, on BSGR's side, was Mr Steinmetz?
19  A.  Yes, I believe that's correct.
20  Q.  Obviously, though, we are talking about introducing
21      Niron.  BSGR didn't have an interest in Niron, does it?
22  A.  No.
23  Q.  So it had to realise some value from this through
24      another route?
25  A.  Yes.

27

1   Q.  And that was going to be a revenue share from Niron?
2   A.  Yes, that was the way they were presenting it at that
3       time, yes.
4   Q.  And forgive me, I may be reading too much into the
5       phrasing and tone of voice there, but you say that was
6       the way they were presenting it.  Did you doubt that was
7       the way they were going to --
8   A.  No, I'm sorry if I came across in the wrong way.
9       I was -- I think what they were putting on
10      the table, right.  It just seemed so unrealistic for
11      anybody to accept those terms.  So it was probably like
12      an opening gambit, and I believe that providing
13      a solution for the Government of Guinea in this
14      situation for the project to resuscitate it, for BSGR,
15      as long as the right level of value could be extracted
16      for BSGR, there was merit in exploring an amicable
17      solution, but the ultimate decision had to be properly
18      assessed and made by the correct people.
19          So I didn't feel at the time and to this day that
20      there was any harm in doing what Mr Steinmetz was
21      seeking to achieve, seeking negotiation and a solution
22      in an amicable way, as opposed to through the courts,
23      because a concern, if I may -- I don't want to drag it
24      out -- even with a positive award in BSGR's favour,
25      a hostile country, a country like Guinea, to actually

28

1    collect on the award, in monetary terms, or even through
2    restitution, if you are in hostile territory would be
3    complicated.
4  Q. I follow. Did you have a view as to what you thought
5    BSGR ought to be able to achieve money wise from
6    a settlement with Guinea?
7  A. It wasn't something that I even then spent a lot of time
8    thinking about, but I can speculate if you would ask me
9    now, if you want me to say off the top of my head what
10   I think a fair deal would be for BSGR?
11 Q. I do.
12 A. Anything between 10 and 20% revenue share, I'd be
13   gunning for.
14 Q. Of Zogota alone?
15 A. Yes, yes. But I wouldn't have let go of the Simandou
16   blocks either completely. I would have wanted to carve
17   something, participation in that for sure. So under
18   economic and financial terms, a completely different
19   deal.
20 Q. Did you think that was achievable?
21 A. I don't know, because I wasn't really part of the
22   dynamic. I mean, I don't speak Hebrew. I didn't ——
23   well, I don't speak French, I understand a bit of
24   French. I was never in discussions with anybody
25   involving this. I never discussed it even with

29

1    Mr Sarkozy. Everything is possible in a business
2    negotiation, and there remains many merits as to why,
3    you know, the Government of Guinea and the country would
4    benefit greatly from these operations, you know, being
5    developed, and where we are now, I believe that the
6    value of BSGR's position has increased, because
7    the Government of Guinea appear to have done a deal with
8    a Chinese consortium, over an asset that they don't have
9    the right to sell. So in a strange way I believe that
10   BSGR's position today is better than what it was. And
11   these negotiations or this agreement to agree may have
12   actually pushed things in that direction, by design or
13   default.
14 Q. I follow. I understand you weren't in the negotiations.
15   Did anybody, whether that be Mr Steinmetz, Mr Barnet,
16   tell you what the dynamic of the negotiations were?
17 A. Yes. They were very optimistic and they were very
18   optimistic because of Mr Sarkozy's involvement. If it
19   would be helpful I can explain why his role was so
20   crucial.
21 Q. If you can do it —— I am sorry, just with time, if you
22   can do it relatively briefly, that would be helpful.
23 A. Of course. As a former President of France, and Guinea
24   being a country of Francophone Africa, there is a strong
25   cultural and political tie. Many of the African leaders

30

1    have been educated in France and they like and aspire to
2    be close to the French establishment, and President
3    Alpha Conde was seeking to run for a third term. And he
4    wasn't getting Macron's support, but Nicholas Sarkozy
5    was more on board.
6  Q. Can I take you, please, to tab 93.
7  A. Yes.
8  Q. Just before I do that, can I ask this. Did Mr Steinmetz
9    or Mr Barnet tell you they perceived Guinea to be under
10   some pressure to settle, that there was some driver or
11   reason that they ——
12 A. Yes, the pressure related to my previous explanation.
13   As I understand, the pressure came from that this was an
14   opportunity for Alpha Conde to get the type of support
15   that he needed.
16 Q. So the document at tab 93, again, I suspect this is
17   a document you have seen before?
18 A. I have —— I mean, I have seen it going through this
19   review. I was not involved with the preparation of
20   this, but I'm sure I recognise it, yes.
21 Q. Just again, if you just look very briefly at it.
22   Clause 2 sets out what the transaction is. Very
23   broadly, it envisages, at line 2:
24       "Niron Guinea and affiliated parties will enter into
25   a revenue—sharing agreement with the BSGR companies."

31

1  A. Mm—hm.
2  Q. At the end of clause 2:
3        "Niron is committed to investing the necessary funds
4    for the operation of Zogota."
5        Then, clause 3 provides the revenue share. You can
6    see about five lines down:
7        "Niron has proposed, as a starting point, that 1% of
8    revenues received by it and its affiliates shall be
9    applied towards the revenue share, but that is subject
10   to agreement."
11       Who negotiated the 1% figure on behalf of BSGR?
12 A. I don't know whose idea it was, and I wasn't part of
13   that negotiation. I mean, I can speculate.
14 Q. Tell me what you do know.
15 A. So I wasn't involved in the negotiation and I wasn't
16   involved in preparing this document. I haven't signed
17   it. But I believe, and here I am speculating, that this
18   was what Niron were pushing for at this stage of the
19   negotiation.
20 MR WILLAN: Master, I think my learned friend has something.
21 MASTER DAVISON: I am so sorry.
22 MR WEEKES: Master, my learned friend is being very careful
23   but it may just be important to note this, that it
24   probably is of no assistance to the applicant to have
25   Mr Cramer speculate, and we don't think that it is

32

1     necessary for him to do so, so insofar as he is saying
2     "I'm speculating here", I think at that point the
3     examination should just move on.
4   MR WILLAN: Mr Cramer, let me take it like this. Tell me
5     what do you know and, not speculating, what do you know
6     about who was involved on the Niron side in these
7     discussions, generally?
8   A. So, at that stage, Niron, to me, the person who was the
9     face of Niron was Sir Mick Davis.
10   Q. Did you meet and talk to him in Paris?
11   A. If my recollection is correct, I believe he was in that
12     meeting. I was with Malcolm and him.
13   Q. But you don't know how the 1% figure came into being.
14     You don't know who was having those discussions?
15   A. I do not know. I was not the originator. It wasn't my
16     production. But it looks like people are being very
17     sharp. That's my opinion, you know.
18   Q. Being very sharp?
19   A. Aggressive. I don't think it was wishful thinking from
20     whoever came up with it.
21   Q. On Niron's side. It is aggressively low, rather than --
22   A. Yes. It is not a deal that BSGR should have or would
23     ever agree to, I hope.
24   Q. No. You talked previously about you would look for,
25     putting it very broadly, 10 to 20%, as a revenue share.

33

1     Do you know what the pie was worth? When we say 10 to
2     20% or 1%, do you know what the revenue from Zogota was
3     likely to be?
4   A. It's a very interesting question. I can talk about it
5     for a long time. But I will give you one example, which
6     will put this into perspective. The value of this
7     project, exploited properly, is enormous. It's one of
8     the most valuable unexploited natural resources that
9     exists in the world. It's perhaps one of the reasons
10     why we're here today. The value of the exploitation of
11     this project has many moving parts, but I will give you
12     just one example which will help you understand how
13     massively the valuation can change.
14     Today, between May and where we are today, the price
15     of iron ore has gone from $85 a tonne to over 120. Vale
16     produce over 400 million tonnes a year. Their cashflow
17     over these six months has increased by $16 billion. So
18     when you talk about the valuation of this project and in
19     fact the value of a revenue share agreement, it's
20     considerable and very important.
21   Q. Mr Cramer, I well understand the volatility of
22     commodities, but if you had to put some scale on it,
23     some sense of what this revenue share is worth, what are
24     we talking about? Tens of millions, hundreds of
25     millions, billions?

34

1   A. So, what I was trying to explain was not only the
2     volatility of the pricing but how that filters through
3     a small, relatively small movement in price, can have
4     a massive change. It is the sensitivity as well as the
5     volatility. This project is worth billions and
6     billions, and billions.
7   Q. Billions and billions and billions?
8   A. Not billions of billions, as in trillions or millions of
9     billions, but large, vast amounts of money.
10   Q. Were you aware as part of this deal that was being
11     discussed with Niron that there was anything else that
12     Niron were going to receive as part of the deal, any
13     other rights, other than the Zogota rights?
14   A. At the time, no, but I believe, and I recall that there
15     was a discussion and people spoke about it. There's an
16     asset further south called Euro Nimba, Mount Nimba, and
17     I believe that their initial ambition was to get
18     involved in that asset as well, because that was an
19     asset which had belonged to BHP, and BHP were leaving
20     it. Today I believe it's part of a consortium, where an
21     individual called Robert Friedlander, quite a well known
22     mining entrepreneur, has acquired it and he has a deal.
23     So that didn't work out.
24     I believe the purpose of this was, if you look at
25     the logistics, it is on the route at which it would be

35

1     exporting this iron ore out through Liberia.
2   Q. Just for my understanding, that interest wasn't anything
3     to do with the Balda foundation, or any of its
4     subsidiaries?
5   A. None whatsoever.
6   Q. I follow. If you look, please, at clause 3, you will
7     see at the end of that first paragraph:
8     "Subject to the outcome of their diligence on Niron
9     and the Zogota concession."
10     Did BSGR undertake diligence on Niron and the Zogota
11     concession?
12   A. Well, when you say BSGR now, BSGR is really the joint
13     administrators and I believe that that was one of the
14     things that was very important to them, and they started
15     on as soon as possible and I think that the record and
16     the meeting notes and the documentation from the joint
17     administrators will confirm and support that.
18   Q. And did you receive the results of that diligence?
19   A. Not that I can recall, and I don't believe it was
20     completed. I believe that it is ongoing.
21   Q. If you go on, please, to clause 8, you will see that the
22     parties undertook to work together in good faith in
23     order to complete all internal procedure to finalise the
24     terms of binding contracts for the revenue share, and
25     the other matters set out in the term sheet.

36

1       To your knowledge have any such agreements been
2    negotiated and executed?
3   A. Not to my knowledge. Again, it is the joint
4    administrators who would be familiar with this.
5   Q. Right. But you weren't -- if there were any such
6    negotiations you weren't involved?
7   A. No, no.
8   Q. In the previous agreement -- I am sorry, I skipped on.
9   A. No problem.
10   Q. Let me tell you this. It referred to Niron making
11    a payment of 50 million or being obliged to make
12    a payment of 50 million to the Government of Guinea. Do
13    you know whether any such payment has been made?
14   A. No.
15   Q. Sorry, is that no, you don't know or no, you know it
16    hasn't been?
17   A. The first no is I don't know, but if you'd like me to
18    speculate, I'd say highly unlikely. That would be
19    crazy.
20   Q. The agreement also referred to Niron undertaking
21    a feasibility study?
22   A. Yes.
23   Q. Do you know, and again I am not asking you to speculate,
24    what the status of that feasibility study is?
25   A. I know because I attended regular meeting with the joint

1    administrators, and this was a matter that was often on
2    the agenda, that they were chasing them, and that
3    certain progress was made. I know that they had done
4    certain work on the ground. I think that they had made
5    progress on the feasibility study. But all of these
6    records are kept by the joint administrators, and that
7    is the master document, if you'd like to find out about
8    this.
9   Q. To your knowledge, has the Zogota licence been awarded?
10   A. I don't know.
11   Q. I just want to go back to Niron. Do you have any
12    understanding as to who the beneficial owners of Niron
13    were at the time these discussions were taking place?
14   A. No.
15   Q. You knew it was a subsidiary of GSOL at the time?
16   A. No, I did not.
17   Q. Did you understand it to have any connection with GSOL?
18   A. I knew that this individual, Marcus Camis, was involved,
19    and at that point in time how these companies and
20    individuals really fitted together was unclear to me.
21   Q. Right.
22   A. And it is not completely clear to this day.
23   Q. So did you --
24   A. Or it is not clear at all if I ...
25   Q. If you wouldn't mind just taking out bundle 4.

1   A. Sure.
2   Q. And going, please, to tab 101.
3   A. Yes.
4   Q. Just to orientate you, this is a note of a meeting
5    in August 2019?
6   A. Sorry, which tab?
7   Q. Tab 101.
8   A. Yes.
9   Q. You can see, if you look at the participants in the
10    right-hand column, you're third down on page 2078.
11   A. Yes.
12   Q. You see your name there on the participants?
13   A. Yes.
14   Q. If you go, please, to page 2081 -- a lot of this I am
15    afraid is redacted -- but if you see the unredacted part
16    says:
17      "At this point Dag [which is you] ... "
18   MASTER DAVISON: What internal page is it?
19   MR WILLAN: 2081.
20   MASTER DAVISON: I don't have those in fact, so that's why
21    I asked for the internal page.
22   MR WILLAN: It is the fourth page.
23   MASTER DAVISON: Thanks.
24   MR WILLAN: "At this point Dag noted the Sunday Times had
25    been in the background asking for comments on the

1    proposed settlement development of Zogota. Malcolm,
2    [that is one of the joint administrators] noted that the
3    JA would not comment on the matter in the press and that
4    GSOL/Niron would hopefully also do the same."
5      I think it means also refrain from commenting.
6    Were you aware at the time that there was discussion
7    that GSOL were in this, were somehow connected to this
8    arrangement?
9   A. This indicates to me that this must have been something
10    that the joint administrators were aware of. And that
11    makes sense, because they would have asked Mick Davis,
12    I suspect, or Camis, so that would have been part of
13    their diligence.
14   Q. And Marcus Camis was someone you had previously met in
15    the context of GSOL, presumably?
16   A. No. I had met him when we were dealing with the
17    Star West negotiations.
18   Q. And did you know that Star West was a subsidiary of
19    GSOL?
20   A. No, not really, but I mean, I understood, you know, that
21    there was some type of, you know, relationship, but who
22    was who in that constellation, it was not something that
23    I was aware of.
24   Q. Did you ask? Did you ask Mr Barnet or Mr Steinmetz:
25    "Well, who is Niron?"

1    A. Subsequently, yes. I mean this has of course become an
2       important issue, and I have asked him who the owners
3       were and, in particular, whether he had any ownership or
4       economics of any part of this group.
5    Q. Wonderful. Let me ask you what you were told. Who were
6       you told the owners were?
7    A. He told me that he was not in any way a beneficiary or
8       an owner of any of these companies.
9    Q. And my question: who did he tell you the owners were?
10   A. He did not. He did not.
11   Q. He refused to tell you. You say you asked him?
12   A. Yes.
13   Q. And he refused?
14   A. I wouldn't say that he refused. He said that that
15      wasn't his business.
16   Q. Can I just ask you to look, please, at bundle 3. Sorry
17      to ask you to jump around.
18   A. No problem.
19   Q. And tab 87, please.
20   A. Yes.
21   Q. This is a press release relating to the settlement
22      issued by -- well, it is a press release relating to the
23      settlement, Mr Morse, at Buchanan, is I think someone
24      you have dealt with in relation to BSGR's press?
25   A. Yes, I have a long and close standing relationship with

41

1       Mr Morse.
2    Q. Were you involved in preparing or issuing this press
3       release?
4    A. Yes, I was.
5    Q. And your involvement, what was it?
6    A. One of the things that I have become involved with is of
7       course the PR for the group. At this point in time it
8       had been made clear by the administrators that only they
9       could speak really on behalf of BSGR, and one of the
10      things that was discussed, noted, recorded and known by
11      Bobby Morse is that from that point in time any
12      interaction was done on behalf of Nysco. That was the
13      agreement with the joint administrators, because they
14      very early on established that only they can speak on
15      behalf of BSGR.
16         That becomes of course a little bit complicated when
17      journalists, they write what they write, etc, etc, and
18      there was a desire here to put out some spin, you know,
19      to create a good feeling for what was actually
20      happening, to create a positive sentiment, and this
21      press release, which a lot of chefs were involved
22      with -- it is not a great press release -- was getting
23      this message across, that, you know, there has been
24      a positive development here, there's going to be
25      a settlement, people can stop fighting and get back to

42

1       trying to create some value for the project.
2    Q. If we look at the third paragraph down, beginning "At
3       the request of the Republic of Guinea ... "
4    A. Yes.
5    Q. It says:
6          "A new group of investors, presented by and
7       including Mr Beny Steinmetz, would exploit the Zogota
8       deposit."
9          Now, where did that statement come from? Who
10      provided the information to Mr Morse that the group of
11      investors were presented by and included Mr Steinmetz?
12   A. Most probably Mr Steinmetz.
13   Q. And do you know, beyond what appears on the face of the
14      page, anything about this new group of investors, who
15      they were, what Mr Steinmetz's role was?
16   A. I don't, but I can speculate if you want.
17   Q. I don't want you to speculate, but if you know
18      something --
19   A. I do know --
20   Q. -- and that gives you a reason to speculate, tell me
21      what you know?
22   A. I did not know at the time and I do not know what they
23      are thinking about, because I am not involved.
24   Q. Right. And you didn't at this time ask Mr Steinmetz
25      what his role as an investor was?

43

1    A. My impression was that he was trying to work himself
2       into this deal.
3    Q. Do you know, or know of any facts which cause you to
4       believe, that Mr Steinmetz in fact has any interest in
5       Niron or the potential settlement with the Republic of
6       Guinea?
7    A. Well, he has an indirect interest in the context of the
8       situation having been resolved amicably, as a key
9       beneficiary of the foundation's assets, yes. So, from
10      that perspective, he's a stakeholder. He has told me
11      that he does not have any interests in this situation,
12      directly or indirectly, as we stand today.
13   Q. Do you know, or know of any facts which cause you to
14      believe that any family member, company or trust
15      associated with Mr Steinmetz has any interest in Niron
16      or the potential settlement with Guinea?
17   A. No, I am not aware of any such situation.
18   Q. Do you know who approached Niron in order to suggest
19      that they get involved in this, they acquired a licence
20      and entered into the revenue share?
21   A. I wasn't part of it. I wasn't part of the discussions,
22      but to me the obvious catalyst for this is the
23      relationship between Mr Steinmetz and Sir Mick Davis.
24      His reputation in the mining industry and his potential
25      as a person who would be able to assemble the capital

44

1     required to redevelop this asset, so from that
2     perspective a very credible idea. But I'm speculating
3     here, but I think it's useful to know because it helps
4     your understanding.
5  Q. It does. And can I ask about one other relationship.
6     Do you know what the relationship between Mr Steinmetz
7     and Marcus Camis is?
8  A. No. I mean, I know they know each other and I know that
9     they have met, but I don't know to what extent they do
10    so.
11 Q. When you say they've met, do you know in what context
12    they've met?
13 A. In the context of Niron, other things, etc, etc.
14 Q. But all BSGR related matters?
15 A. No, I don't know the extent of their relationship. All
16    I do know is that they know each other and they talk to
17    each other and they're in touch with each other.
18 Q. Do you know of any business that Mr Steinmetz does with
19    Marcus Camis, separate to BSGR?
20 A. No, I'm not involved in that.
21 Q. Master, the transcriber very fairly reminded me,
22    I think, my learned friend might have reminded me that
23    we perhaps ought to take five minutes.
24 MASTER DAVISON: I am glad you have said that. I was
25    wondering, myself. So we will break for five minutes.

45

1  (11.44 am)
2                     (A short break)
3  (11.49 am)
4  MR WILLAN: Mr Cramer, I want to ask you now a bit about
5     GSOL. Do you know what I mean by GSOL?
6  A. Yes, kind of, yes.
7  Q. So there is a Bermuda fund called Global Special
8     Opportunities?
9  A. Yes.
10 Q. Now, GSOL, to your knowledge, GSOL had various dealings
11    with BSGR and its subsidiaries, didn't it?
12 A. So it's something that I have become aware of over time,
13    and there are several areas where BSGR has ended up
14    interfacing with companies associated with or part of.
15    My knowledge is very limited beyond that, but I do know
16    the specifics of the interface in some areas well and in
17    others not so well.
18 Q. When did you first come across GSOL, when would you
19    first have heard that name?
20 A. Relating ultimately to the negotiations and the debt
21    position that Octea has with a company called Star West,
22    but not necessarily GSOL. It is kind of a canvas of
23    things that have evolved, you know, so I understand
24    there is a relationship between these companies.
25 Q. Were you aware that BSGR Cooperative, a Dutch company,

46

1     a Dutch subsidiary, had dealings with GSOL over the
2     Cunico transaction?
3  A. I'm aware now.
4  Q. You weren't aware at the time?
5  A. No.
6  Q. And you dealt with a company called Litigation Solutions
7     Limited, I believe, at one point?
8  A. Yes.
9  Q. Were you aware -- let us take it in stages. Are you
10    aware now that that company is connected to GSOL?
11 A. It may be. I still don't know. I didn't know at the
12    time.
13 Q. What makes you think that it may be now?
14 A. Well, because the individuals here are appearing, you
15    know, in different companies and there's clearly
16    a relationship, but I really don't know.
17 Q. And are you aware, looking back now, of any other
18    dealings that BSGR or its subsidiaries had with GSOL or
19    its connected entities? We talked about Star West,
20    talked about Niron, talked about Cunico, talked about
21    Litigation Solutions. Are you aware of anything else?
22 A. No.
23 Q. And are you aware of, within the wider Balda Foundation,
24    any other dealings with GSOL or its connected companies?
25 A. There should be none.

47

1  Q. Are you aware or do you have any facts which cause you
2     to believe that Mr Steinmetz has any economic interest
3     of any nature in GSOL?
4  A. No, and I've asked him and he has said no.
5  Q. And presumably the same would go for family members,
6     trusts, companies associated with Mr Steinmetz, to the
7     best of your knowledge?
8  A. Yes, because otherwise he would be being clever and he
9     would understand the nature of that question.
10 Q. And do you know -- apologies if I asked you this
11    before -- who are the beneficial owners of GSOL?
12 A. No.
13 Q. Do you know of a gentleman named Brian Padgett?
14 A. Yes.
15 Q. Have you come across him as the managing director of
16    Silex, which is one of GSOL's directors? Have you
17    interfaced with him in that capacity?
18 A. No.
19 Q. The implementation agreement relating to the Star West
20    debt was signed by Mr Padgett. Did you have any
21    dealings with him in that capacity?
22 A. No.
23 Q. What dealings do you have -- have you had with
24    Mr Padgett?
25 A. So a brief background which will help?

48

1   Q. Brief?
2   A. I see this as an opportunity to help you understand
3      certain things, I think it's helpful.
4   Q. Please do.
5   A. As and when the foundation was dealing with increasingly
6      acrimonious and difficult legal proceedings, the
7      willingness of people to represent the foundation was
8      significantly reduced. At one stage I had introduced
9      and developed a very close and good relationship with
10     Rothschild Trust, and they always had their CEO sitting
11     on the foundation council. But they were one of the
12     unfortunate casualties of these problems that emerged,
13     and slowly but surely the willingness and the ability of
14     various people and institutions to take the risk and be
15     here had disappeared. The solution, because there's
16     a requirement, I believe, in the foundation bylaws, you
17     need three foundation council members, and he was
18     introduced, I don't really recall by whom, and how this
19     happened, this was a foundation council matter, but he
20     was a stopgap, you know, solution to having a third
21     foundation council member. So that was the background.
22   Q. He was not on the foundation board?
23   A. He was part of the band aid solutions to try to keep
24     things together.
25   Q. When did he come on to the foundation boards?

<center>49</center>

1   A. I don't recall, but it's certainly post 2012.
2   Q. But not in the last couple of years, it is longer than
3      that?
4   A. No, I would be speculating, but in my mind it's a recent
5      development, and I have had very little to do with him.
6   Q. And do you know if he has a relationship with
7      Mr Steinmetz?
8   A. I attended one meeting with him and Mr Steinmetz in
9      Geneva.
10   Q. Did you take from that meeting that they knew each
11     other?
12   A. They had met before, and we were there to discuss and
13     stay in touch with the foundation council members, like
14     we would do with Maitre Bonnant and other people.
15   Q. So you are not aware of any wider history or
16     relationship between them?
17   A. No.
18   Q. I am going to move on then to Star West. Star West is
19     a secured lender to the Octea group, isn't it?
20   A. Yes.
21   Q. Just to be clear, the Octea group is a subsidiary of the
22     BSGR, involved in diamond mining?
23   A. I understand.
24   Q. BSGR has given a guarantee for that debt, hasn't it?
25   A. Well, the best way to describe that debt is that

<center>50</center>

1     Star West acquired the debt previously owned by
2     Standard Chartered Bank and Tiffany, and my
3     understanding is, effectively —— sometimes this
4     happens, you know, banks, and at this point in time it
5     was something Standard Chartered Bank did —— sold it,
6     and their position is or was initially identical to the
7     position that Tiffany and Standard Chartered had had.
8   Q. So they took over the existing guarantee from BSGR?
9   A. Well, so ——
10   Q. Let me put it this way ——
11   A. It is important because there is a corporate guarantee
12     which was attached which was only partially released.
13   Q. Right. To cut to the bottom line, does BSGR currently
14     guarantee the debt owed to Star West?
15   A. So I'll try my best to answer this question and one, you
16     know, I'm not the person who drew up the loan
17     agreements, the old ones, etc, etc. I'm very familiar
18     today with the economics of what happens with cashflows
19     and we can go into detail of that, but the issue, when
20     this debt was entered into initially, both
21     Standard Chartered and Tiffany had a corporate guarantee
22     from BSGR and that's why I think they were willing to
23     extend these loans in the first place, because at that
24     point in time BSGR looked like a very solid operation.
25       When these loans became nonperforming loans, this

<center>51</center>

1     occurred at the same time as the overall position for
2     BSGR was also deteriorating, because of the challenges
3     that we were facing.
4   Q. Mr Cramer, I am really sorry to interrupt you. I just
5     at the moment want to establish does BSGR guarantee that
6     debt? The answer can be yes, it does, yes, in part, or
7     no. I am not really interested in ——
8   A. Yes, I believe yes, in part, but it is also an issue
9     which is in dispute between BSGR and Standard Chartered,
10     the quantum of the remaining residual guarantee that was
11     kept behind when the debt was sold. I'm sorry.
12   Q. No, it is my job to help you understand what I'm trying
13     to understand.
14   A. No problem, thank you.
15   Q. And there is a charge over the shares in Octea Limited
16     to support that debt?
17   A. I believe so, I get confused between a charge over the
18     shares or the asset. I'm not the expert on these
19     things.
20   Q. Right. Were you involved in the negotiations or
21     discussions that led up to Star West acquiring the debt
22     from Laurelton, the Tiffany subsidiary, and
23     Standard Chartered?
24   A. I facilitated the introduction of Star West to
25     Standard Chartered.

<center>52</center>

1   Q. How did Star West come to you for you to facilitate that
2     introduction?
3   A. So the introduction, I believe, originally came from
4     David Barnet and Beny Steinmetz, via an individual
5     called Yossi Tscheler. Yossi was the financial person
6     who understood the history of Octea's financing and had
7     been working with me to keep Standard Chartered at bay,
8     to preventing them from pulling the plug, and we
9     introduced -- and I believe that was the first time
10     I met Marcus Camis.
11   Q. And he was representing Star West?
12   A. Yes, he was.
13   Q. And in due course, this may be a detail which doesn't
14     matter, at that stage when they were first introduced,
15     were they introduced as Star West rather than as GSOL?
16   A. They were not introduced as GSOL, to the best of my
17     memory, because I think I would remember that. It's
18     Star West that I have in my mind. That's my memory.
19   Q. So you effect the introduction?
20   A. Mm-hm.
21   Q. There is then obviously a negotiation which takes place,
22     in a sense tripartite between BSGR, Standard Chartered
23     and Star West. Were you involved in that negotiation?
24   A. Not at all.
25   Q. Presumably, though, you reviewed the transaction before

53

1     it was signed off by BSGR's board?
2   A. No. I mean, it may have been tabled, etc, etc, but from
3     my perspective, and I think the reality of the situation
4     is there was nothing in the end that BSGR could or could
5     not do. This was Standard Chartered's decision to sell
6     their asset to Star West.
7   Q. BSGR agrees to pay money to Standard Chartered, doesn't
8     it, in addition to the debt?
9   A. Yes, I believe so, and it was Yossi Tschelet who was in
10     charge of these negotiations.
11   Q. And quite a large amount of money, over 50 million,
12     might have to be paid to Standard Chartered, depending
13     on various conditions?
14   A. That is not my recollection. What I recall, and I could
15     be mistaken, is that at that point in time there was
16     a residual of $16 million that had to be paid to
17     Standard Chartered Bank, and it became a matter of
18     negotiation between me and Star West as to who should be
19     paying that, and I felt that BSGR should not have to pay
20     it, but they felt that it was the residual of the
21     guarantee. So it became a matter of my subsequent
22     negotiations.
23   Q. Could I just ask you to take up bundle 5.
24   A. Yes.
25   Q. And go, please, to tab 135.

54

1   MASTER DAVISON: I don't seem to have a bundle 5.
2   MR WILLAN: That is not a promising start. There is a spare
3     set of bundles if you don't mind me passing them up to
4     you.
5   MASTER DAVISON: No, that's fine.
6   MR WILLAN: It may be best if we pass you the full set
7     because --
8   MASTER DAVISON: Is that the set that was thought to be for
9     the witness?
10   MR WILLAN: I think there was some confusion. I think it
11     was an updated set for you. (Handed).
12       If you go, please, to bundle 5, tab 135.
13   A. I have it, yes.
14   Q. And to page 2883.
15   A. Yes.
16   Q. Now, courtesies of the wonderful GDPR, we are not
17     allowed to know the names or the signatures of the
18     people who were involved.
19   A. I see.
20   Q. But you can see it was signed by at the top Octea
21     Limited?
22   A. Yes.
23   Q. And at the bottom left on this page by BSG Resources
24     Limited?
25   A. Yes.

55

1   Q. Now, I don't know which director signed it, but was it
2     you?
3   A. I don't know. I don't believe so. It's not impossible,
4     you know, that once this had been done -- I also notice
5     something else. On 2835, it actually says "Global
6     Special Opportunities Limited", as a party to the --
7   Q. It does indeed.
8   A. Yes. So the point that I'm trying to make is it's not
9     something that I was focusing on. I saw these people as
10     buyers of the debt. Who, what they were operating
11     under, was not a matter of concern or focus for me. If
12     this had been something that was agreed, we had no
13     choice, you see, because Standard Chartered were really
14     driving this. Any deal that allowed BSGR and Octea to
15     stay in the game would have been a free option and
16     a clawback opportunity. So I don't believe I signed it,
17     but if you showed me -- would it not have been part of
18     the discovery if I had? Would it be redacted?
19   Q. You disclosed a draft, an unsigned draft, and the joint
20     administrators have provided a signed but redacted final
21     version.
22   A. I see.
23   Q. So I haven't seen an unredacted signed version.
24   A. I believe that if my discovery was just a draft, it
25     would indicate that I was shown a draft and then

56

1   I didn't sign it. There would be no intention to play
2   a game here.
3   Q. I wasn't suggesting it.
4   A. I understand.
5   Q. Go back, please, to page 2846. Just before I ask this
6   question, did you know how much GSOL or Star West were
7   paying Standard Chartered for the debt?
8   A. I didn't. It wasn't something that I was privy to at
9   the time.
10   Q. So if you look at the definitions, "Purchase Price", you
11   weren't aware that they were paying 14 million for the
12   debt?
13   A. It was not at that point in time a matter of interest to
14   me.
15   Q. Obviously, you have a very long experience in finances.
16   Is it unusual to you to be told what the buyer of the
17   debt is paying, the distressed price?
18   A. Well, yes —— yes, and no. I mean, what was absolutely
19   clear to me, considering where the market was and where
20   mining assets and buyers for mining assets in Sierra
21   Leone, and the exposure that Standard Chartered had in
22   that region, that you were talking about cents to the
23   dollar, and the market at that time was —— I don't think
24   anybody would have done a deal like more than 20—cents
25   to the dollar. So if you had asked me without knowing,

57

1   I would have thought they were probably negotiating
2   somewhere between 10 and 20.
3   What was important to me is how BSGR and Octea could
4   create a platform from this deal where there was an
5   opportunity to reintroduce value to this operation,
6   which at this point in time was zero.
7   Q. Right. Did you have negotiations with
8   Standard Chartered about making a discounted pay—off?
9   If it is accepting 14 million for 80 million—odd of
10   debt, did you ever have discussions about ——
11   A. With Standard Chartered?
12   Q. With Standard Chartered.
13   A. No.
14   Q. If you go back, please, to page 2844, you will see
15   definitions of the initial settlement payment and the
16   initial settlement date. You will see there is a figure
17   of 16 million to be paid to the bank. That is
18   Standard Chartered.
19   A. Mm—hm.
20   Q. And the initial —— that settlement date is the primary
21   settlement date as it might be extended. Take it from
22   me that the primary settlement date is three years after
23   the agreement is entered into.
24   So my question to you is: were you aware that there
25   was an obligation on BSGR to pay 16 million three years

58

1   after it entered into this agreement?
2   A. Yes, you see, because this was the residual guarantee
3   that was left behind. This was their —— you know,
4   because BSGR was responsible for the full debt load and
5   we knew, as I said before, that there was
6   a 16 million—dollar hook still for BSGR in this deal.
7   Q. Then if you go back, please, to page 2840, slightly
8   complicated. You will see there is a definition of
9   "additional settlement payment", which means "in
10   addition to the initial settlement payment, the maximum
11   ASP, [that is additional settlement payment amount] as
12   adjusted in accordance with the ASP calculation, which
13   payable to the bank with effect from the acceleration
14   date".
15   Again, take it from me that one of the
16   acceleration dates would be three years after this
17   agreement was entered into, if you hadn't paid the
18   16 million.
19   If you look down and see the ASP calculation, there
20   is a table on the left showing how much you might have
21   paid of the initial settlement payment, so that is of
22   the 16 million, and you see part payment prior to the
23   acceleration date?
24   A. Right.
25   Q. And on the right you have how much of the additional

59

1   settlement payment it triggers?
2   A. Right.
3   Q. So if you've paid 16 million within three years, then
4   the additional settlement payment is zero?
5   A. Mm—hm.
6   Q. If you have paid nothing within three years, your
7   additional settlement payment is 58.5 million to
8   Standard Chartered. So were you aware that if you
9   failed to pay the 16 million to Standard Chartered, you
10   would become liable not only for the debt to Star West
11   but also for a payment of 16 million and 58.5 million to
12   Standard Chartered?
13   A. At the time, no, it was not something that I was focused
14   on. This agreement was negotiated and implemented,
15   Yossi and David. But it does make it clearer to me why
16   Standard Chartered today have ratcheted the 16 million
17   up to the 70, which up until now I have thought was very
18   unfair, because they had already sold it, and this is
19   a discussion which is well documented in the documents
20   with the joint administrators.
21   Q. Pause there. Ignore what has happened subsequently.
22   I want to go back to when this was executed, when you
23   are a director, there are no joint administrators. It
24   strikes me equally that it is quite an uncommercial
25   deal. You can end up paying all your debt to Star West

60

1     and still having to pay 75 million to
2     Standard Chartered.
3          Can you explain to me why that was a deal that BSGR
4     thought it appropriate to enter into?
5  A. Well, my understanding of the deal at that point in time
6     was that there was absolutely zero value, because
7     Standard Chartered, they had taken this thing as far as
8     they could, and they were very close to effectively
9     pulling the plug on the operations.
10         And the people who would have negotiated this
11    transaction, they would have done so with the intention
12    of trying to create some type of value from a zero value
13    situation, and although the terms may have been onerous
14    and the risk at this point in time may seem to have been
15    not great, they were certainly better than where we
16    were. And the history with Standard Chartered showed
17    that they were always willing to be reasonable, to
18    renegotiate, to come up with something that was very
19    fair, and up until that point in time they actually had.
20         It was only once we went into administration that
21    the mind set changed, and there was a changing of the
22    guard at Standard Chartered. We had a good relationship
23    with Standard Chartered for years. And the thinking
24    behind this at that point in time was of course we
25    wanted to generate as much cashflow as possible, and the

61

1     ambition was to generate the 16 million.
2          This is why when I negotiate with Star West, in my
3     mind is, you know, we've got to pay Standard Chartered
4     as well. We've got to get rid of that. So I'm focusing
5     on the bigger picture, not the detail, but even in the
6     detail there were always opportunities. And the record
7     will show that Standard Chartered were supportive, you
8     know. They were a partner in this project for many
9     reasons; their relationship with other mining operations
10    in Sierra Leone, the Government of Sierra Leone and
11    their perception of Standard Chartered Bank, and the
12    fact, which I think is commercially important here to
13    understand, is that there were three large mining
14    operations in Sierra Leone at this point in time, of
15    which Koidu Mining was one. African Minerals and London
16    Mining were listed here in London. They were also
17    heavily banked by Standard Chartered, and both of those
18    companies went bust in the crisis.
19         Koidu survived, first by amortising its debt and
20    then by only paying interest, so in a field of failures
21    I think that Standard Chartered felt that we were very
22    genuine in our attempts to look after the attempts of
23    our stakeholders.
24  Q. And you were heavily involved in Octea's business by
25    this stage, weren't you?

62

1  A. I was becoming more involved around this stage. At this
2     stage we still had –– and my chronology can be –– we
3     would have to go back to check it, but there was an
4     individual, who was the champion and the strong man of
5     these mining operations, and ultimately we had to ask
6     him to leave, and I was responsible for that. He is an
7     individual called Jan Juubert. He is the founder or the
8     driving force behind Octea, going back to 2002, and for
9     reasons that will take a lot of time to get into, so
10    I won't ––
11  Q. Don't worry so much about him. I am more focused on how
12    heavily ––
13  A. Then the next person to take over was a person called
14    Brett Richards. Brett Richards also briefly became the
15    chief executive of BSGR, but he became involved in an
16    attempt to undermine the shareholders and cut a side
17    deal. It was when he left that I was the person who was
18    best positioned to come in and try to solve this
19    problem, and from that point in time I became more
20    involved, which is quite late, you know, like 16/17,
21    something like that.
22  Q. Mr Pollack said, on your behalf: "Mr Cramer first
23    became involved with Octea's business in 2012 and has
24    been heavily involved since 2015."
25         Is that accurate evidence?

63

1  A. More or less, yes. 2012 is important because that is
2     when they decided to do an IPO, and because they were
3     going to market, and my banking relationships and so on,
4     I became involved in that.
5  Q. Yes. We have looked at the fact that GSOL paid
6     $14 million for this debt. Were you aware that before
7     entering into this deal BSGR and Octea had committed to
8     pay 15 million, 15.1 million I think, to GSOL
9     immediately after entering into the transaction with
10    Star West?
11  A. So at the time I wasn't involved in any of these
12    arrangements or discussions. But my understanding of
13    what happened then, and why we were initially drawing
14    money from Star West, is that there was an amount of 15
15    or $16 million in the company accounts which by then
16    were fully controlled by Standard Chartered Bank.
17    Octea, the group, was banking with Standard Chartered,
18    and they had the right, in a nonperforming loan
19    situation, to sweep the accounts. So technically they
20    could have swept the accounts and kept that money, but
21    as the acquirers of the debt, Star West became entitled
22    to it. But it was clear that this money was needed for
23    the operations, and at that time we were developing the
24    underground workings. We were at what's called an ore
25    gap. We weren't producing anything. And without that

64

1     money the operations would have been broken.

2  Q.  Pause there. I understand what you say. In fact, you

3     can see from the documents that Standard Chartered kept

4     a 6 million−dollar debt reserve account, and a new

5     15 million was paid by Octea to Star West. Did you know

6     that was taking place?

7  A.  No.

8  Q.  So if, for instance, I were to ask you to look at,

9     please, bundle 3, tab 81 and go, please, to page 1847.

10  A.  Number 3?

11  Q.  Bundle 3, tab 81.

12  A.  Yes.

13  Q.  At page 1847. It is a letter from Standard Chartered.

14  A.  Yes.

15  Q.  You will see at 5 (b), it says:

16     "The bank has reason to believe the arrangement

17     between the company and its subsidiary, GSOL and

18     Star West, is not a true third party arrangement. GSOL

19     was introduced by the bank by the company, and on

20     1 December, 2016, ten days after the implementation

21     agreement became effective, a payment was made to GSOL,

22     via a BSGR subsidiary account, for $15.3 million. These

23     funds are deposited into that account on 9 November 2016

24     by a company we understand is associated with the

25     Steinmetz family."

<center>65</center>

1     Would you be able to tell me who was the company

2     that provided the 15.3 million to the BSGR subsidiary

3     and who was the BSGR subsidiary that made the payment to

4     GSOL?

5  MR WEEKES:  Master, apologies, if I may just intervene here.

6     This document is a privileged document. It is covered

7     without prejudice privilege. It is a document which

8     I understand we have asked to be removed from the

9     bundle. In the circumstances in which it is a document

10     covered by without prejudice privilege, it can only be

11     admissible in evidence if the consent is obtained of

12     both parties to the correspondence. Insofar as I'm

13     aware, there is no indication that both parties to this

14     correspondence, Standard Chartered Bank and the

15     administrators, have agreed that this document should be

16     admissible in evidence. So, therefore, master, we say

17     it is not admissible, and therefore questions can't be

18     put in relation to its contents either.

19  MASTER DAVISON:  Why has it gone into the bundle then?

20  MR WEEKES:  I think what happened was it was disclosed in

21     error. That doesn't make a difference with respect to

22     without prejudice privilege, because without prejudice

23     privilege, it is not like disclosure of a document which

24     is covered by legal advice privilege collateral or

25     litigation privilege, where there can be an issue in

<center>66</center>

1     relation to collateral waiver. There can't be in

2     relation to without prejudice privilege, because you

3     have to obtain the agreement of the parties to the

4     correspondence that they agreed to waive it.

5     So having identified that it is a privileged

6     document, it is covered by that privilege, those

7     instructing me have written to those instructing my

8     learned friend and asked for it to come out of the

9     bundle, precisely to avoid this situation, because one

10     can't put a document into evidence which is covered by

11     privilege, unless the parties consent.

12  MASTER DAVISON:  Is that correspondence in the bundle?

13  MR WEEKES:  I am not sure that is, master.

14  MASTER DAVISON:  All right. Mr Willan, what do you have to

15     say?

16  MR WILLAN:  Master, there are two short points. One is I am

17     not putting it into evidence. This isn't a case where

18     I am trying to prove something by reliance on

19     a document. I am relying on it for the fact that it

20     refers to a fact and to ask whether that fact took

21     place.

22     Secondly, and more importantly, on any view, this is

23     not Mr Cramer's privilege. Once a document has been

24     disclosed, he can no longer object to producing it. He

25     has produced it. The parties who have any interest in

<center>67</center>

1     restraining use, and they can restrain its use or they

2     can apply for it to not to be released from the

3     undertaking on collateral use are BSGR, represented by

4     the joint administrators, or Standard Chartered.

5     They can seek whatever relief they want in relation

6     to my use of it at this hearing, but it is not nor

7     Mr Cramer, having disclosed that document, inadvertently

8     or otherwise −− we say in fact it was a perfectly

9     disclosable document −− to now assert the privilege.

10     Of course, without privilege prejudice is

11     complicated, because there are circumstances where it is

12     perfectly permissible to rely on it, including where an

13     agreement has been concluded, and indeed between third

14     parties, where you are not relying on it as evidence of

15     negotiations, but for some other purpose, where it is

16     legitimate.

17     As I say, it is not a matter that you need to

18     adjudicate today, because I am not asking you to admit

19     it into evidence. If Standard Chartered or BSGR want to

20     restrain use or want a restriction on it now becoming a

21     public document, they can make whatever application they

22     think fit.

23  MASTER DAVISON:  Do you want to come back on that in any

24     way, Mr Weekes?

25  MR WEEKES:  I do, master, yes. I don't, with respect to my

<center>68</center>

Case 1:19-cv-07026-VSB Document 4-149 Filed 05/14/21 Page 20 of 62
Case 1:19-cv-07026-VSB Document 74-249 Filed 05/14/21 Page 20 of 62

November 17, 2020                    Vale S.A. V. BSG Resources Limited (In Administration)                    Day 1

1   learned friend, understand the difference he is seeking
2   to draw. He is seeking to quote from the contents of
3   the document, and he is relying upon it for those
4   purposes as being evidence. That's something that you
5   are not allowed to do with a privileged document.
6       Of course, you could not take a document which is
7   covered by legal advice privilege, read it out and then
8   say: "I am not seeking to put it into evidence. I am
9   only seeking to ask you a question, based on the
10  contents of the document."
11      So the first point I am afraid doesn't take Vale
12  anywhere.
13      As regards the second point, it appears to be said:
14  "Well, Standard Chartered Bank or BSGR's administrators
15  can come along and object." Insofar as I'm aware, no
16  steps have been taken −− I will be corrected if I'm
17  wrong −− to tell them that this is a question or a line
18  of questioning which Vale intend to advance at the
19  hearing. They were well aware that this document had
20  been objected to and that questions in relation to it
21  would be objected to.
22      It is no answer to say: "Well, they could come
23  along to the hearing and object", because they are not
24  here and they are not on notice in that regard. Of
25  course, it not only is the position that Mr Cramer

69

1   should be declining to inadvertently be asked to waive
2   a privilege on behalf of BSGR, but also, of course, it
3   is a position where the court, we say, should be
4   intervening in these circumstances to make sure that
5   documents do not end up in the public domain, and
6   evidence be given about them, where there is third party
7   privilege involved, which is plainly the case here.
8       To say that an application could be made in due
9   course by those parties for the document to become
10  confidential, doesn't address the mischief. The
11  mischief is that this document is being put to a witness
12  and its contents are being read out, in circumstances
13  where, on its face, its author, Standard Chartered Bank,
14  would have a reasonable expectation that this document
15  would never be adduced in court proceedings, because
16  that's why one heads a document "Without prejudice, save
17  as to costs". This is a document in the context of
18  negotiations −−
19  MASTER DAVISON: Mr Weekes, have you actually got the
20      correspondence in which these points were ventilated?
21  MR WILLAN: Master, if it helps, I accept they wrote I think
22      yesterday, saying that they assert that they are subject
23      to without prejudice privilege, and we responded saying
24      we don't accept that, and we intend to −−
25  MASTER DAVISON: Do you have the actual letters?

70

1   MR WILLAN: I don't, I am afraid.
2   MR WEEKES: Master, it may be a way forward. We could
3       produce them for you in the short adjournment. I am
4       told that we wrote actually about it last week and we
5       chased yesterday. This shouldn't come as any surprise
6       to Vale.
7   MASTER DAVISON: All right, thanks.
8   MR WEEKES: So maybe, Master, we might suggest that one way
9       forward would be for any further questions in relation
10      to this document to be deferred until after the short
11      adjournment, and we will endeavour to produce the
12      correspondence, Master, so that you can review the
13      correspondence.
14  MASTER DAVISON: Can you live with that, Mr Willan?
15  MR WILLAN: I should probably have said I have no further
16      questions about this document. I am happy, if it
17      assists, for pro tem it not to be released from the
18      undertaking, now it has been referred to in open court,
19      that it is no longer subject to the restriction on
20      collateral use. I am happy for that to remain the
21      position so as to allow BSGR and/or Standard Chartered
22      to make representations to you as to what its status
23      should be.
24  MASTER DAVISON: No, but my question −−
25  MR WILLAN: I don't have any further questions on the

71

1       document anyway.
2   MASTER DAVISON: It is just this one question?
3   MR WILLAN: It was just the one question.
4   MASTER DAVISON: I will rule on that when I have seen the
5       correspondence there has been on it. So if you would
6       like to move on to another topic.
7   MR WILLAN: Yes.
8   MR WEEKES: Thank you, Master.
9   MR WILLAN: If I could ask you, please, if you have bundle 3
10      to hand. Leave that aside. I just want to understand
11      the economics here.
12          On the face of it −− actually, no, I will. If I can
13      take you, please, to bundle 3, tab 66, just so it can't
14      be said that I'm putting reliance on the document. At
15      page 1734. This is a working capital facility which
16      I think you were involved in negotiating with Star West?
17  A.  No, not −− no, actually not. It was Yossi Tschelet.
18  Q.  It is a working capital facility. This is a draft you
19      have produced to us. If you look at Recital A, please,
20      you will see that the parties entered into a heads of
21      terms, dated 13 September 2016. You will see, in
22      Recital E:
23          "On 1 December, 2016, Octea Limited transferred
24      15.3 million of proceeds of sale to Star West, per the
25      heads of terms."

72

1      Just pause there. By the end of 2016 ——
2 A. Sorry, exactly where was it?
3 Q. Recitals A and E, page 1734.
4 A. Yes.
5 Q. At the end of 2016, the position is this: Star West have
6     paid 14 million to acquire the debt, but they've
7     received 15.3 million proceeds from Octea, pursuant to
8     a prior agreement in the heads of terms?
9 A. Mm—hm.
10 Q. So they are plus or minus 1 million in the money. They
11     are 1 million cash better off than they were before the
12     transaction. 14 million out the door, 15.3 million in.
13     They have also acquired a debt worth 70 million plus,
14     which will or may be repaid over time?
15 A. It could also be worth nothing.
16 Q. It could be worth nothing, but in that case they have
17     made $1 million; what's the problem?
18 A. I don't think that's my understanding. But anyway, I'll
19     listen for the question.
20 Q. BSGR have committed to pay something between 16 million
21     and 70 million to Standard Chartered by way of
22     settlement payments, in addition to paying the debt in
23     full to Star West, so potentially having to pay the debt
24     twice over.
25      Just stepping back, that looks like a stunningly

73

1     good deal for Star West and an atrociously bad deal for
2     BSGR and Octea. What's your comment? Do you agree and
3     if not why do you disagree?
4 A. No, I don't agree. First, I have a comment. I think
5     one of the reasons why a lot of these documents that
6     have come out in discovery, where they are drafts, is
7     because they are sent to me, not because I'm involved in
8     their production, and I think that Yossi and David, when
9     they were negotiating this and putting it in place, that
10     was something that they would share with me, so that
11     I was aware.
12      But the bottom line, the commercial situation we
13     were dealing with, is you had an asset which was
14     basically worthless, where Standard Chartered, if they
15     hadn't been such a good supporter of the business, could
16     have pulled the plug on this business years ago, but for
17     any number of reasons they did not. I think they
18     recognised the significance of these operations to the
19     country of Sierra Leone, being an important producer,
20     employer and contributor to private sector GDP. So they
21     did not want to be seen as the people who pulled the
22     plug on these operations. One of the key individuals
23     involved with the Standard Chartered Bank facility here
24     was an individual, the country manager, who was also
25     closely associated with the ruling party at the time and

74

1     the Government of Sierra Leone. So historically they
2     were always supportive.
3      What Star West were securing here, I believe, from
4     their perspective, would have been an option. It was
5     absolutely clear that that $16 million was something
6     that the operations would need or they would be
7     worthless. And whether that $16 million, from the
8     perspective of BSGR and Octea, was in
9     Standard Chartered's accounts or Star West's account, it
10     did not matter, as long as we had access to it so we
11     could use it, so that we could develop the underground
12     part of these operations to start producing again.
13      And that's what we did. And from that point in time
14     it was like a reset, and my understanding at all times
15     and the thing that was important to me is that that
16     $16 million didn't disappear, ie that Standard Chartered
17     would sweep it, because then we would have had to have
18     closed down the operations. And I think that
19     Standard Chartered's willingness to do this deal, my
20     interpretation, it was very political. This was at
21     a time when they were kitchen sinking a lot of their
22     debt. I mean we know what happened, if you follow
23     financial markets, to Standard Chartered, and ultimately
24     they wrote off and they fired everybody involved in the
25     whole lending operation in West Africa.

75

1      So I believe that they were looking more at risk
2     management and reputational damage rather than the pure
3     economics.
4 Q. If you understood that Standard Chartered would sell off
5     this debt for 14 million up—front, and 16 million in
6     three years, why not negotiate with Standard Chartered
7     for a discounted pay—off, where you paid part of the
8     debt, rather than you having to pay the full debt to
9     Star West and money to Standard Chartered?
10 A. Well, I'm not sure I understand the question. Could
11     you ...
12 Q. Right. The deal here is that Standard Chartered get
13     14 million up—front from Star West, and a settlement
14     payment of 16 million in three years, and if they get
15     paid those two sums, their debt is written off. They
16     get nothing more.
17      So they're willing to give up their debt for a total
18     of effectively $30 million. You follow?
19 A. Not really, but what I can say is Standard Chartered by
20     this time, they had had enough. They wanted to clean
21     their balance sheet from this mess. They wanted to move
22     on. And the economics of that, however poor they were
23     for them, was much better than the complete write—offs
24     that they had with African Minerals and other debt,
25     so ——

76

1  Q. I completely understand.  My question, Mr Cramer, is why
2     did BSGR and Octea not go to Standard Chartered and say:
3     "We'll pay you 14 million now and we'll pay you
4     16 million in a few years.  You're still getting a good
5     percentage of recovery, and then that's the debt written
6     off"?  Why enter into instead a transaction where they
7     end up increasing, BSGR ends up increasing its overall
8     debt, by agreeing to pay both Standard Chartered at
9     least 16 million and Star West the full amount of the
10    debt?
11 A. I see, okay.  I think I understand.  I think there was
12    an option here.  First of all, the belief was that it
13    would be easier to claw back, you know, better value for
14    BSGR, once you were in the hands of what appeared to be
15    more financial investors, financial opportunists than
16    being under the heavy oak of a bank like
17    Standard Chartered, right.  There were no economics at
18    all for anybody, any of the stakeholders at that point
19    in time.  So to remove one's self from that situation
20    and try to reboot and renegotiate was a more valuable
21    proposition than as is.
22        With the benefit of hindsight, and what we know,
23    what happened, you know, the development of the assets,
24    the timing and the uplift, you know, the ratchet, is not
25    ideal, but I believe that if we had not have gone into

77

1     administration and the relationship with
2     Standard Chartered turned hostile, I think there would
3     have been a compromise and a solution which would have
4     benefited all stakeholders.  I don't feel that it was
5     the wrong thing to do.
6         We could also have ended up in the hands of very,
7     very hostile creditors which, at one stage had looked
8     like we were going to do but fortunately
9     Standard Chartered decided not to sell to them.  There
10    was another party involved.
11 Q. Did Mr Steinmetz ever talk to you about whether BSGR
12    should or shouldn't enter into this transaction?
13 A. He didn't advise me.  He may have advised David Barnet
14    and Yossi Tschelet during these conversations, but not
15    me, no.
16 Q. Was David Barnet involved in the negotiations?
17 A. Very much so.
18 Q. As a lawyer for BSGR or Octea?
19 A. Yes.
20 Q. Was Mr Steinmetz involved in the negotiations?
21 A. No.  I in those years met quite frequently with the
22    Standard Chartered people, and then the workout group,
23    etc, etc.  I mean, obviously they knew who he was, but
24    I don't recall him ever attending a meeting or being in
25    the loop.

78

1  Q. Do you know or do you know of any facts which cause you
2     to believe that Mr Steinmetz has an interest in the debt
3     owed to Star West?
4  A. Well, I've asked him and he has said no.
5  Q. Star West also acquired the debt payable by Octea to
6     Laurelton, didn't it?
7  A. Yes.
8  Q. Who introduced Star West to Laurelton?
9  A. Probably Standard Chartered, or possibly Yossi Tschelet,
10    and I can explain why I believe that, because I'm
11    speculating.
12 Q. No, fine.
13 A. Okay.
14 Q. But you weren't involved --
15 A. No.
16 Q. -- in the introduction.  Do you know --
17 A. Laurelton or Tiffany, by the way.
18 Q. The Tiffany subsidiary.  Do you know how much GSOL or
19    Star West paid for the Laurelton debt?
20 A. I have no idea.
21 Q. Do you know whether BSGR or any of its subsidiaries made
22    a payment to GSOL or Star West in respect of the
23    acquisition of the Laurelton debt, so equivalent of the
24    15.3 million that was paid in relation to the --
25 A. No.

79

1  Q. The companies' accounts, certainly in early years, refer
2     to the fact that all of the diamond proceeds, proceeds
3     of diamond sales, were to be paid into an account
4     controlled by Star West.  Were you aware of that
5     obligation under the finance agreements?
6  A. I became aware of it.  I think I know what you're
7     talking about, yes.
8  Q. Were the proceeds paid into an account under the control
9     of Star West?
10 A. No.
11 Q. They were paid into (inaudible)'s account?
12 A. Yes.
13 Q. And Star West has no security or control over that
14    account?
15 A. Exactly.  I didn't like that idea, that they would
16    control our cash.
17 Q. And they have waived that requirement that it goes into
18    their accounts?
19 A. Yes, because I didn't want to be at their mercy, like we
20    were with Standard Chartered.  You know, that would
21    be ...
22 Q. Since these original agreements were negotiated, have
23    you liaised with representatives of Star West over
24    continuing issues?
25 A. So the main interface has been between the Octea board,

80

1    its directors and business managers. I have
2    sporadically stepped in when things had become
3    acrimonious, and that's kind of I'd like to think
4    something that I can add value with, because I'm the
5    commercial interface, and they are financial people
6    primarily, from my understanding.
7  Q.  Yes. One of the examples I think is Boroma. You spoke
8    to them to secure their agreement for a transaction that
9    you were envisaging in relation to Boroma?
10 A.  I don't know if I did it directly or through the Octea
11    people, but, yes, it was important to get their blessing
12    and that they wouldn't try to block that.
13 Q.  When you talk about dealing with Star West, which people
14    is that?
15 A.  There are three people in my mind that I associate with
16    Star West. One is Marcus. The other is a guy called
17    Yannis and I forget his ——
18 Q.  Proparkis?
19 A.  I think, so and then Stavros, Stavros Papa ——
20 Q.  Papadoulou, I think?
21 A.  Papadoulou, yes.
22 Q.  Do you know what Stavros' role is?
23 A.  He is a lawyer, and he's the person who I interfaced
24    with, and we coordinated the legal work when we were
25    renegotiating the debt that they had acquired. So to

81

1    me, he appears to be very like David Barnet guy, or
2    something like that.
3  Q.  We talked about Marcus Camis and Mr Steinmetz. Do you
4    know if Yannis —— I'll call him that —— has
5    a relationship with Mr Steinmetz?
6  A.  I believe they know each other, yes.
7  Q.  What do you know about —— you said they know each other.
8    Tell me what you know about their relationship?
9  A.  So the overall relationship, I believe, is that the key
10    principal in this group is friendly with Mr Steinmetz,
11    and that they have been personal friends for a long
12    time, and he has a constellation of businesses that
13    these individuals are attached to and work for and were
14    involved with in various ways.
15 Q.  And you can almost certainly predict my next question.
16    Who is the key principal?
17 A.  So it's a guy, I believe, and I don't know, but it's an
18    individual called Sebi.
19 Q.  Mionis?
20 A.  Yes, I don't even know his surname. I don't know. But
21    Sebi, if you showed me a picture I'd be able to ——
22 Q.  Have you met him?
23 A.  I have.
24 Q.  In what context?
25 A.  I have met him at Mr Steinmetz's house. I believe,

82

1    maybe it was his daughter's wedding or I recall some
2    party in Israel, and I had dinner once with him and
3    Mr Steinmetz.
4  Q.  Social or business?
5  A.  It was more social.
6  Q.  And you talked about a web of businesses. Do you have
7    any more detail on that or ...?
8  A.  None whatsoever. I didn't say "a web".
9  Q.  Sorry, it was my —— forgive me. You may have said
10    "network"?
11 A.  No, like a portfolio. There is nothing sinister
12    intended from my answer.
13 Q.  I apologise. Is Octea servicing its debt to Star West
14    at the moment?
15 A.  Yes, it is, not in accordance with stipulated
16    guidelines. There are reasons for this, which I think
17    it would be helpful in many ways for me to expand on.
18 Q.  I will, I promise I will let you tell me. But the
19    payments come from Conatus, do they?
20 A.  Yes, they do.
21 Q.  To Star West?
22 A.  Yes, they do.
23 Q.  And can you give me a sense, if you know, of how much
24    interest is being paid per year at the moment?
25 A.  So the interest that is being accounted for is the

83

1    interest level and should be more or less pari passu,
2    which was required from Standard Chartered Bank and
3    Laurelton, okay. But what is important in my mind and
4    from the perspective of everybody working is to reach
5    the hurdle at which BSGR becomes a participant, and that
6    hurdle runs without interest. So the opportunity for
7    BSGR to claw back 20% of the equity is running at zero
8    interest, which is the only thing that really matters
9    commercially here.
10 Q.  Mr Cramer, I entirely understand. For the moment I am
11    just asking how much interest, tell me if you know, how
12    much interest is being accrued each year and how much
13    interest is being paid each year on the debt?
14 A.  So it would be in the region of 10%, which I believe is
15    pari passu with the number in place when they acquired
16    the debt package.
17 Q.  And is that interest being paid in full?
18 A.  How they are accounting for the payments doesn't matter
19    to me. What matters to me is the hurdle —— that's why
20    I brought it up —— which is running without interest.
21 Q.  I understand that. Just look at it this way. Say you
22    have a debt of 100 million. The figures aren't right
23    but it is running interest at 10% a year. So every year
24    10 million of interest accrues. Let's say the business
25    pays off 10 million of interest. You still have

84

1       100 million of principal left?

2   A. Yes.

3   Q. You are not getting any closer to the hurdle of

4       63 million of principal having been repaid, which is the

5       hurdle you're talking about?

6   A. Yes.

7   Q. It is quite important whether you are repaying -- you

8       are simply servicing your interest or you are paying

9       down your principal. So my question to you is: do you

10      know whether they are simply servicing interest or they

11      are reducing the principal outstanding on the debt?

12  A. I don't know how it's being accounted for in their

13      books, and I don't know how it's being accounted for

14      in Octea's books, but what I do know is that the MPV of

15      the mining operations, whether that interest was running

16      at 3, 5, 7, 10 or 15%, becomes most probably a very

17      academic exercise. The real value with that amount of

18      debt increasing, okay, it would be very difficult to --

19      it's possible but difficult to catch up with that run

20      rate.

21  Q. Do you know, in broad terms, how much is being paid

22      by Octea to Star West each year? Forget about whether

23      it is interest or principal. Just how much is actually

24      being paid down or paid over in respect of that?

25  A. So what I do know and what I'm very close to is that we

1       have been paying when we can. Due to the circumstances

2       that we have been dealing with, in an environment that

3       has become increasingly challenging for diamond

4       operators, the whole industry, exacerbated by Covid

5       there have been periods where we have been servicing it

6       and there have been periods when we haven't.

7       However, this last year, 2020 the Covid period,

8       which forced a lot of operators to close down, it has

9       been a disaster for the industry, and any comparable

10      operation in most cases has been mothballed.

11  Q. Mr Cramer, I am sorry to press you. I am just

12      interested in a figure. If you don't know it's fine,

13      but can you just tell me roughly how much in dollar

14      terms is being paid per year to Star West?

15  A. In 2020 we haven't paid anything, right. In 2019 we

16      did, and since inception I believe it is around maybe

17      $18 million, to date.

18  Q. And when is the loan due to mature? When is final

19      payment currently due?

20  A. Of?

21  Q. Of the Star West debt?

22  A. I don't know.

23  Q. If I can ask you, please, to take up bundle 3 again and

24      go to tab 79.

25  A. Yes.

1   Q. This is what appears to be a demand for partial

2       repayment of the loan, or a payment towards the loan?

3   A. Mm--hm.

4   Q. It is a slightly odd document, in that there is nothing

5       under the loan agreement that lets them demand payment

6       of chunks of money. But is this how it worked. They

7       would just simply demand a particular amount back at

8       a particular time?

9   A. I'm not the person interfacing with them on this. This

10      is done by the Octea people in Guernsey. It's also

11      handled by the business manager of Conatus, and to me it

12      is not odd, because basically this has become

13      a commercial arrangement, whereby we try to service the

14      debt to them, to the best of our ability, and Octea is

15      operating without any type of credit line, any access to

16      other liquidity, and they are often faced -- if they

17      push too hard, they can choose to foreclose, and then

18      they have the dilemma of how do you actually extract

19      value from this operation at all?

20      So there are times when they get very concerned. In

21      2020 they have been jumping up and down and sending lots

22      of nasty letters, etc, etc, and they appear to be teeing

23      us up to pull the plug. But so far we have provided

24      openness, transparency. They understand the challenges

25      that we have been facing and, most importantly, they've

1       seen the achievements that have been made and how

2       relative -- this operation has not gone bust, has not

3       been mothballed, but actually increasingly has a bright

4       future and will be able to resume scheduled and ordinary

5       repayments.

6   Q. When you receive a demand like this, you endeavour to

7       meet it, do you?

8   A. Yes. I mean, I don't receive it --

9   Q. No. So you said it was -- I think you mentioned

10      a business person in Conatus?

11  A. A business manager.

12  Q. Who is that?

13  A. Peter Driver.

14  Q. Peter Driver, who I think is also a director of the BSGR

15      and the Octea subsidiaries?

16  A. Yes.

17  Q. And you mentioned an Octea person in Guernsey. Is that

18      also Mr Driver?

19  A. No. He has an office. There are staff there. There is

20      an individual called Malcolm. I forget -- I know him.

21      I forget his surname. There is also another guy. And

22      how they divide this work I do not know, but I believe

23      Malcolm is full-time on the Octea payroll.

24  Q. Take it from me that if you look at the metadata of this

25      document, it shows that it was created by Marcus Camis,

1 and that would be consistent with your expectations,
2 that he would be involved in making these sorts of
3 demands?
4 A. Yes.
5 Q. And if you go, please, to tab 82.
6 A. One day I'm going to understand what metadata actually
7 means. It has become an important matter in my life but
8 now's not the time.
9 Q. It might be. This document is another demand for
10 payment.
11 A. Yes.
12 Q. Please take it from me that if you look at the metadata,
13 this document was created by Peter Driver.
14 To your knowledge, why would Peter Driver be
15 involved in the creation of demands by Star West?
16 A. This to me sounds very strange and probably not correct,
17 and I know that there must be an explanation. I can't
18 give it, but I recall from when we did the Conatus
19 application, in February, that there were issues
20 involving metadata and Peter Driver. That is the first
21 time the meta —— I don't believe there is some tech
22 reason for this. Categorically, Peter Driver would not
23 be issuing such invoices but I can't explain.
24 Q. I don't want to ask you about the technical details. It
25 will be a matter for another day.

89

1 A. Okay, I know.
2 Q. But you have no reason to believe that Peter Driver was
3 involved in preparing demands for Star West?
4 A. Nothing could be —— it is not possible in my mind.
5 Q. Okay.
6 A. The world would be flat before that happened.
7 Q. Well, I am afraid, Mr Cramer, your mind may yet be bent.
8 Do you know how these documents are received? Do
9 they come by email, do they come by post?
10 A. I don't know.
11 Q. Do you know who receives them?
12 A. Well, I don't know whether they're sent by email or in
13 a letter. I would assume they're done by email —— I do
14 not know —— to Peter Driver or to Malcolm, I don't know.
15 Q. And can you tell me, what do you understand the current
16 status of the Star West loan to be? Is it —— they have
17 not called default on it?
18 A. I think the current status is that they obviously want
19 to be paid, right, but they understand that the current
20 situation is that we have been producing, but there is
21 also a stockpile of unsold goods with the marketing
22 agent, because the marketing agent during this downturn
23 has been unable to sell. However, he has sold more than
24 most people in this market. So a feature of the market
25 has been, whether it is Al rosa, De Beers, other players

90

1 who have the balance sheet strength, to sit on
2 stockpiles, they have been waiting for a market which is
3 now bouncing back, and there is a seasonal effect around
4 this time of the year, with Thanksgiving and Christmas.
5 So they have access to our reviews. They have
6 insight into where we are going. We had a record
7 production in revenue year, in 2020, even though
8 headline prices were down by 35%.
9 Q. Just to bring you back to Star West ——
10 A. They see that it is a commercially sound decision to
11 wait, I believe.
12 Q. Right.
13 A. To be patient.
14 Q. We have been talking about Octea?
15 A. Yes.
16 Q. I just want to understand how you fit into that. You
17 provide your services via Conatus?
18 A. Yes.
19 Q. And you were involved in, is it a fair description that
20 you are involved in the overall strategic positioning
21 and development of Octea's business?
22 A. Yes.
23 Q. And the Octea group, as I understand it, Octea Limited
24 is owned by BSGR?
25 A. I don't have the group structure clear in my head. So

91

1 if we had an organogram, but you know, more or less.
2 I sometimes get the various names wrong, but
3 I understand the purpose.
4 Q. Tell me if this is consistent with your understanding.
5 You have Octea Limited, the holding company, you
6 have Octea Mining and Octea Diamonds underneath it, and
7 you have the actual mines underneath Octea Mining.
8 A. Yes, something like that.
9 Q. And the company Octea Diamonds, it actually processes
10 and sells the diamonds?
11 A. I believe so, but if you put it into the context, I know
12 how things work. I just don't want to say something
13 that's not correct from a technical company structure
14 perspective. That's not my strength.
15 Q. Fine. We will follow it through in a practical sense
16 probably after lunch.
17 But you have never been a director of any of
18 the Octea group companies?
19 A. I haven't for a very long time. It's possible, and I'd
20 have to go back and look that during the time of the
21 proposed IPO, when we were going to list the group ——
22 because historically you only had Koidu Mining and some
23 holding, and the Octea structure was created for the
24 IPO.
25 Q. That is right. But in the last ten years,

92

1    eight years ——
2  A.  I don't know, something like that, yes.
3  Q.  To your knowledge, has the Octea group as a whole or any
4    of the individual mining businesses been the subject of
5    a formal third party valuation, so where you brought
6    someone in to value those businesses?
7  A.  No.
8  Q.  My last question before lunch.  What do you believe to
9    be the fair market value of BSGR's interest in the Octea
10   group?
11 A.  Let's have lunch, and we've got an hour, and I can take
12   you through this.
13 Q.  I tell you what, give me the number, if you were having
14   to sell it, what you would say the fair market value was
15   and we can come back to the detail after lunch.
16 A.  So I would have to think about that.  I'll give you an
17   answer after lunch, because it's a moving target,
18   depending upon circumstances, where you are with
19   the Government, with licences, with diamond prices, the
20   outlook.  So considering where we are now, where the
21   market is going, what we've invested in the operations,
22   it is very different from what it may have been at the
23   time of the debt.
24 Q.  Yes.
25 A.  So is it all right, can you let me think about that?

93

1  Q.  I am very happy for you to give more detail after but
2    just now ——
3  A.  Even the number ——
4  Q.  Can you tell me what your first impression is.  You
5    are obviously a director of BSGR.  Just a sense of what
6    you think this business is worth.  Again, are we in the
7    region of nothing, tens of millions, hundreds of
8    millions, just give me a sense.  You can give me more
9    detail after lunch but I want to know your instinct of
10   what this company would raise, if BSGR had to sell it?
11 A.  For the record, I'm a non-executive director of BSGR,
12   and if I were to give you a number here that I believe
13   it is worth versus what the market would pay, first of
14   all, I think there is a big difference.  I believe in
15   the operations and I believe that managed and developed
16   in the right way, and if we extract value from not only
17   the main Koidu mining operations, but if we manage to
18   get back the Boroma licence, and perhaps amalgamate with
19   the Maya licence, which is next door, and those people
20   are in trouble, I believe that I would reject anything
21   below $200 million today.  But the market today, for
22   these operations, I don't think people would pay
23   a dollar.
24 MASTER DAVISON:  You are saying it is basically not saleable
25   today?

94

1  A.  It's very difficult, Master, to sell.  It is in the
2    wrong country.  It has the ——
3  MASTER DAVISON:  Okay, that's enough.  I think we are going
4    to come back to this after lunch.
5  MR WILLAN:  Thank you.
6  MASTER DAVISON:  So, Mr Cramer, we have a rule which is
7    applied across the board which is when you are in the
8    middle of giving evidence you mustn't talk about your
9    evidence or about the case more generally to anyone.
10 A.  I understand, thank you.
11 MASTER DAVISON:  Thanks.  Some correspondence?
12 MR WEEKES:  Master, yes.  If I may hand it up.  I have
13   a copy for my learned friend as well.  (Handed).
14 MASTER DAVISON:  Mr Willan, just remind me of the question?
15   I am afraid I lost it or the gist of it anyway, in the
16   objections.
17 MR WILLAN:  The Standard Chartered refer in that letter to
18   the fact that they don't believe that the arrangement ——
19 MASTER DAVISON:  I have it open in front of me.
20 MR WILLAN:  The third line.  My question was: "Are you
21   aware of the identity of the Steinmetz family company
22   which provided the money, or the identity of the BSGR
23   subsidiary that paid it to Star West?"  For all this
24   argument, the witness's answer was "no".
25      My interest, I should be clear, is not in the

95

1    document.  I am simply interested in the payment flows.
2    But it is the only reference I have to the payment
3    flows.
4  MASTER DAVISON:  It has escaped my attention.  The witness
5    has already answered "no"?
6  MR WILLAN:  He did.  I am happy pro tem for it simply to be
7    said —— it remains subject I think to 31/12, or whatever
8    the rule is, and then if anyone needs to argue about
9    whether it has become a public document, it can be done
10   subsequently, because the witness has said he doesn't
11   know about the payment.
12 MASTER DAVISON:  All right.  The payment may be moot.
13   Anyway, I'll rise now and we'll resume at 2 o'clock.
14 (1.05 pm)
15            (Luncheon Adjournment)
16 (2.00 pm)
17 MASTER DAVISON:  Yes, there was just something held over
18   from this morning, wasn't there, namely your question,
19   Mr Willan, arising out of this document ——
20 MR WILLAN:  The Standard Chartered letter.
21 MASTER DAVISON:  —— which prima facie would be privileged as
22   between Standard Chartered and BSGR's joint
23   administrators.
24      The question to Mr Cramer was whether he could
25   identify the entity or entities in paragraph 5 (b), and

96

1  he actually answered the question in the negative, and
2  therefore the point is now moot.
3        However, to the extent that it has any relevance
4  I think that Mr Weekes's objections were probably well
5  founded. I'll say no more than that. I won't make
6  a ruling as to whether the document is in fact
7  privileged. That would, as Mr Willan pointed out,
8  require further information, and it would also, at least
9  technically, be for Standard Chartered or BSGR's joint
10  administrators to take the point.
11        But I will direct, as Mr Willan indeed offered, that
12  its inclusion in the bundle and the reference to it in
13  open court do not take it out of the scope of Rule 31.22
14  I think it is.
15        All right. So we can resume where you left off,
16  Mr Willan.
17  MR WILLAN: Thank you.
18        Mr Cramer, you said before lunch something which ——
19  you said "For the record, I was a non—executive
20  director"?
21  A. Correct.
22  Q. It caused me just to go back and look at the BSGR's
23  website, when it had the directors' profiles on it,
24  which was until about mid 2014, and there you are
25  described as a director, whereas David Trafford is

97

1  described as a non—executive director. Is there
2  a reason why you weren't described as a non—executive
3  director on BSGR's website?
4  A. Not that I'm aware of. Perhaps a mistake by the people
5  preparing the website.
6  Q. And do you have an appointment letter that describes
7  your role as a director?
8  A. Yes, and in that letter it says "non—executive".
9  Q. Right. So we were speaking about Octea before lunch and
10  we were talking about the shares. Beyond the shares,
11  BSGR is also owed a debt by Octea, isn't it?
12  A. Correct.
13  Q. Do you recall the amount of that debt?
14  A. Approximately, I know there are documents that reference
15  that in conjunction with the administration, but
16  approximately, yes.
17  Q. Can you give me the approximate figure?
18  A. I believe that the principal is in the region of
19  100 million, and I believe that the accumulated interest
20  is 40 to 45.
21  Q. And that is subordinated to Star West up to this hurdle?
22  A. Yes.
23  Q. Do you believe that the debt to BSGR, let me put it the
24  other way round. Do you believe that debt is
25  recoverable by BSGR?

98

1  A. Not fully, but certainly a portion.
2  Q. And if you were asked to give your best estimate of what
3  proportion would be recovered, what proportion of the
4  principal do you anticipate would be recovered?
5  A. It is very difficult for me, off the top of my head, to
6  be making these calculations. I would welcome the
7  opportunity to provide you with my analysis, as we stand
8  today, but I'm really guessing and I'd prefer not to do
9  that.
10  Q. Just, if you can, I am not going to hold you to
11  a percentage, but are we talking less than 50%, more
12  than 50%. Give me the ballpark, if you can put it that
13  way?
14  A. If you exclude the interest and the accumulation of
15  interest, I believe one could have a good whack at the
16  100 million, not the full amount but at least half.
17  Q. Right. And Octea Limited is also required to pay BSGR
18  a management fee, isn't it?
19  A. Correct.
20  Q. And am I right to say that that is 2% of Octea's gross
21  revenues?
22  A. Yes, I believe it was, is and should be in future.
23  Q. And that payment is not subordinated to Star West?
24  A. That payment is not subordinated to Star West? No. No
25  I don't think it is. I know there are some issues

99

1  surrounding it, but I believe that the intention and
2  what I wanted to do with Star West was to have that paid
3  before repayments, yes.
4  Q. And is it being paid, to BSGR?
5  A. No, but there's a reason for that.
6  Q. And in brief terms what's the reason?
7  A. In order to receive those payments, BSGR needs to be
8  providing services, and under administration it is not
9  doing that.
10  Q. Right. And is there a contract which defines the
11  services which BSGR must provide to Octea?
12  A. I believe so, yes.
13  Q. Is that a contract that would be in your possession?
14  A. No, because I wouldn't have been involved in creating it
15  or drafting it at the time.
16  Q. To your knowledge, has Octea Limited, or any of its
17  subsidiaries, ever held funds to which its entitled in
18  the State Bank of Mauritius, other than in accounts in
19  the name of Conatus?
20  A. No, I only believe through Conatus, to the best of my
21  knowledge. Let me be clear. I don't manage the
22  accounts. I don't manage the cashflows. I don't sign
23  off on it, but I believe that to be accurate.
24  Q. I want to move to one of the mines, which is Koidu. As
25  I understand it, the process for sales is that Koidu

100

1  sells the diamonds to Octea Diamonds, and Octea Diamonds
2  sells them on consignment to Conatus, and Conatus sells
3  them on consignment to Infinite Diam?
4  A. Say that again.
5  Q. Let us take it in stages. Koidu sells its diamonds to
6  Octea Diamonds Limited?
7  A. I believe so. I'm not an expert on that but I believe
8  that's what happened, yes.
9  Q. And your company, Conatus, buys those diamonds from
10  Octea Diamonds Limited, on consignment?
11  A. I wouldn't say buy. That's not my understanding.
12  I don't think they ever own them. I think that it is
13  really just a payment agent. I don't think that Conatus
14  ever owns the diamonds. I think that -- no, I don't
15  think that Conatus owns the diamonds in any way.
16  Q. It may be a matter of terminology, but the --
17  A. I just want to be very careful, yes.
18  Q. -- Octea Diamonds and Conatus, through which, if I can
19  put it that way, the diamonds are sold on consignment?
20  A. Basically, would it help if I explained the chain
21  briefly, or shall I just answer your questions?
22  Q. Just answer my question, if you would. The contract
23  between Octea Diamonds and Conatus, through which Octea
24  Diamonds diamonds are sold on consignment?
25  A. So the way that I understand it -- I am sorry, I can't

101

1  answer that, because I don't really understand.
2  Basically, what's happening is that Octea is getting the
3  proceeds from the marketing agent and those proceeds are
4  sent back to the mining operations.
5  Q. Right. Okay.
6  A. But they don't own the diamonds at any stage of that
7  chain. They don't handle the diamonds. They don't have
8  legal title to the diamonds. So Conatus is merely
9  a facilitator of the payments, as I understand it.
10  Q. I understand. Do you understand Octea Diamonds itself
11  to generate a margin on the transaction, say the
12  difference between the price at which it purchases the
13  diamonds from the mines and the price at which they are
14  sold to the market?
15  A. So when it comes to the technical detail of what's
16  happening in this chain of Octea mining companies, I'm
17  not an expert on the detail, because I'm not involved,
18  but the principle of what happens is very clear and
19  I can explain it if --
20  Q. Let me just try this --
21  A. Yes.
22  Q. In one of your previous witness statements you explain
23  that by cutting out the structure that you had put in
24  place, you say "ODL was deprived of its margin on the
25  transaction". My simple question to you is: do you

102

1  understand ODL to make a margin on the transaction?
2  A. Now I understand. This is in the context of the uplift
3  achieved by the marketing agent from the export price
4  that is set by the Government and diamond experts.
5  Q. And you understand ODL to make that margin?
6  A. Yes.
7  Q. And what in percentage terms --
8  A. If there is an uplift.
9  Q. And what in percentage terms do you understand that
10  uplift to be?
11  A. So I don't know what it would have been to date, over
12  time, and what the average is, but I believe that the
13  target for the marketing agent is to create an uplift of
14  between 5 and 10% of the export volume, but in times for
15  instance like this, they are not achieving that and
16  there is no uplift.
17  Q. Understood. What happens to that margin? It presumably
18  goes into a bank account in Conatus' name?
19  A. Correct.
20  Q. And then what does Octea Diamonds do with it? It is its
21  own money --
22  A. 100% of it goes back. This is an uplift created purely,
23  and the additional margin of those cashflows go back.
24  Q. Go back to the mines --
25  A. Yes.

103

1  Q. By loan or by gift? What's the basis for the transfer
2  of Octea Diamonds' margin?
3  A. I'm not an accountant, and I can't give you the
4  technical handling of how this is done. But mainly 100%
5  of the uplift, the original amount, it flows straight
6  back to the mine for their operating and working
7  capital.
8  Q. You mentioned a marketing agent this morning, I think,
9  sitting on stock. That is Infinite Diam, is it?
10  A. Correct.
11  Q. When did Infinite Diam first become responsible for
12  selling the Koidu diamonds?
13  A. I don't know the date. I don't recall the date, but
14  I know the circumstances and why.
15  Q. Leave the circumstances. Do you remember broadly when
16  it took place, last year, five years ago, ten years ago?
17  A. Four or five years ago would be my guess, maybe five.
18  Q. And it replaced, did it, the Steinmetz Diamond Group?
19  A. Correct.
20  Q. In very brief terms, why was the Steinmetz Diamond Group
21  replaced with Infinite Diam?
22  A. Because the foundations' interest in the Steinmetz group
23  was sold.
24  Q. Infinite Diam is a company owned by Mr Steinmetz's
25  brother—in—law, is that right?

104

1    A.  Correct.
2    Q.  And it receives a commission of 2% on all Octea diamond
3        sales?
4    A.  That I don't know.  I'm not sure of that.
5    Q.  I understood you had previously given evidence that you
6        received a commission —— sorry, Conatus received
7        a commission of 2.1% on all diamond sales, of which you
8        paid over 2% to Infinite Diam and therefore you retained
9        a 0.1% interest?
10   A.  I recall that we looked at this in great detail, and
11       I had some input, you know, at that point in time of the
12       Conatus application to get everything correct.  So
13       I would refer to anything that is stated in that
14       application as correct but, you know, technical detail,
15       you know, I don't have the workings exact in my mind.
16   Q.  Just in broad terms, how did you understand or how do
17       you understand sitting there now Infinite Diam to be
18       remunerated?  They are not doing this as a charity.  How
19       is it paid?
20   A.  My understanding is that they are remunerated the same
21       way that all marketing agents in this industry are
22       remunerated, is that they are getting a percentage of
23       the uplift of the export price that has been achieved,
24       and some fee otherwise, which you're mentioning.  So
25       there is an absolute fee which relates to the services

                                    105

1        that they do, regardless of pricing, and then there is
2        of course an incentive to get the best possible price.
3    Q.  And is this all under the 2017 agreement which you've
4        disclosed, the 2017 agreement between Conatus and
5        Infinite Diam?
6    A.  Conatus doesn't really have anything to do with the
7        relationship, with the economics of what
8        Infinite Diam does or doesn't do.  That would have been
9        in place regardless.  Conatus is merely replacing a bank
10       account which became unavailable to us after
11       Standard Chartered pulled out.
12   Q.  Can you take out bundle 1, please.
13   A.  Sure.
14   Q.  And go to tab 4.  And you will see it is your first
15       witness statement in the commercial court proceedings.
16   A.  Yes.
17   Q.  And if you go, please, to page 48 of the bundle
18       numbering, paragraph 45.
19   A.  Yes.
20   Q.  And you see you refer to a marketing and services
21       agreement between Conatus and Infinite, so between your
22       company and Infinite Diam, by which it boils and sorts
23       the rough diamonds, executes the sales, strictly in
24       accordance with Conatus's instructions, and receives and
25       collects payments on behalf of Conatus.  You say: "In

                                    106

1        consideration for those services, infinite is paid a fee
2        equivalent of 2% of net revenues."
3            The structure you have just described now, a
4        percentage of the uplift in value and a base fee, is
5        very different to that?
6    A.  Sorry, which paragraph is this?
7    Q.  Paragraphs 45 and 46.  46 is the fee, 2% of net
8        revenues.
9    A.  45 and 46, yes.
10   Q.  Yes.
11   A.  (Pause).  Yes.
12   Q.  You just described a slightly different revenue
13       structure of a fee plus a percentage of the uplift
14       achieved.  Are you able to explain how that reconciles
15       with paragraph 46 of your witness statement?
16   A.  So what I believe is what's stated in here in the
17       witness statement is correct.  I'm not the business
18       manager for Conatus.  I don't run its affairs.  I don't
19       handle the payments.  I don't handle the interface.
20       I don't deal with the marketing agent.  I don't deal
21       with the documentation.  When we prepared this we of
22       course made very sure that this reflects the reality, so
23       this is the source document that we should refer to.
24   Q.  And your role in Conatus, you are obviously the owner of
25       the company?

                                    107

1    A.  Yes.
2    Q.  Are you a consultant, or what's your position within
3        Conatus?
4    A.  Well, I am the owner, and the whole structure and the
5        reason and the rationale for creating Conatus.
6    Q.  Mr Cramer, what is your position within Conatus, so
7        consultant, officer, employee?
8    A.  I'm the owner, and the one thing that I believe that
9        I do, I receive a quarterly fee as an adviser to
10       the Octea Diamond operations, that is paid from Conatus.
11   Q.  Were you aware that the Infinite Diam fee increased from
12       1% to 2% in September 2016?
13   A.  No.
14   Q.  Do you know of any reason why it might have, the fee
15       might have doubled in 2016?
16   A.  Well, it would have been perhaps a commercial
17       arrangement or agreement.
18   Q.  But you are not aware of any negotiations?
19   A.  No, I wasn't involved with them.
20   Q.  To your knowledge, does Infinite Diam sell all of the
21       diamonds it receives from the Koidu mine on arm's length
22       terms to independent buyers?
23   A.  Yes.
24   Q.  Does it purchase any diamonds for itself?
25   A.  I don't know.  I don't know whether they have other

                                    108

1    off — take agreements, whether they buy rough from others
2    or not.
3   Q. To the best of your knowledge, does Infinite Diam pay
4    over to Conatus the entire sale proceeds it receives,
5    less its 2% commission?
6   A. Yes, absolutely.
7   Q. Have you personally taken any steps to verify that all
8    of the proceeds of sale are paid over?
9   A. No.
10   Q. Has Conatus taken any steps, to your knowledge, to
11    verify that all of the proceeds are paid over?
12   A. Conatus and Octea both, in great detail.
13   Q. Right, tell me —— I don't want the great detail but tell
14    me what the exercise was, how did they do it?
15   A. So they are in constant dialogue with each other. There
16    are visits that take place. There has been a fair
17    amount of discussion with the joint administrators to
18    clarify that this is a transparent and open
19    relationship. There has been a discussion with the
20    joint administrators that if they were unhappy with the
21    arrangement, I am on the record as saying I have no bias
22    or agenda, would be very happy to replace the marketing
23    agent with somebody else, and these books and this
24    situation is open and transparent for all of those
25    involved.

<div align="center">109</div>

1   Q. BDO recommended that there should be a verification
2    exercise against Infinite 's bank accounts. Do you know
3    if that took place?
4   A. I don't know, but I know that there was a lot of
5    interest and discussions, and I provided all of the
6    information that I had to Matt Crane, who was
7    a specialist brought in to discuss this with me.
8   Q. And on the seller's side of the diamonds, to your
9    knowledge, does anyone other than the Octea group,
10    Infinite Diam or Conatus receive any benefit from the
11    sale of the diamonds?
12   A. Not that I'm aware of, no.
13   Q. I understand that some of the diamonds are sold by
14    Conatus direct to Diaruch in Dubai?
15   A. I'm not familiar with the details and the portion, but
16    I believe that Diaruch is also part of Infinite. It is
17    part of the marketing and sales structure I believe.
18   Q. I apologise, I had rather understood you were more
19    involved in the detail of Conatus. Who is actually
20    doing —— you saw in the agreement there is a reference
21    to selling strictly in accordance with Conatus's
22    instructions. Who is actually doing the instructing on
23    behalf of Conatus?
24   A. So the business manager, Mr Peter Driver, and Malcolm,
25    they would be able to give you precise answers on all of

<div align="center">110</div>

1    this, because they manage it.
2   Q. And Malcolm is?
3   A. I always forget his surname. He's the other guy who
4    sits in Guernsey on this. Malcolm —— I don't recall.
5   Q. This is not one of the joint administrators.
6   A. No, not Malcolm Cohen. Malcolm, he works full—time in
7    Guernsey for Octea.
8   Q. Finally, just on people, Mr Strykowski, have you come
9    across him?
10   A. Strykowski?
11   Q. He seems to be paid about $12,600 a month for some
12    involvement in the valuation and sales process?
13   A. I don't know who he is. I haven't met him. I can
14    speculate, because it might be helpful.
15   Q. No. I am worried about you speculating. If you know
16    something, someone has told you the name or you have
17    heard there is a consultant who does something, then
18    tell me that?
19   A. I know there is a consultant from the marketing agents,
20    who sits together with the Government expert and an
21    independent expert, in establishing the export price,
22    which is a very important and key dynamic to the
23    valuation in this flow pipeline.
24   Q. Do you have any dealings with that person?
25   A. None whatsoever.

<div align="center">111</div>

1   Q. That would be dealt with by Mr Driver, would it?
2   A. I believe that if this individual is in fact the
3    consultant who represents the marketing agent, he would
4    primarily be talking to Patrick Sword and the people in
5    that business.
6   Q. Are you aware of a company called Conatus 1 Limited?
7   A. Conatus 1 Limited? No.
8   Q. I am going to move on to the Tonguma mine. In 2017
9    Tonguma entered into a tribute arrangement with Stellar
10    Diamonds plc.
11   A. Yes.
12   Q. Were you involved in that transaction?
13   A. Very much so.
14   Q. In very broad terms, as a tribute arrangement, Stellar
15    has to develop the mine and fund it, and they pay
16    a revenue share to Tonguma?
17   A. Yes.
18   Q. And the terms required a payment of $5.5 million,
19    five years after the implementation of the mine plan?
20   A. Yes.
21   Q. When do you expect implementation of the mine plan to
22    take place?
23   A. It's a constantly moving target, but the outlook,
24    despite Covid, the potential is promising.
25   Q. So if you had to give your best guess today, what would

<div align="center">112</div>

1     your best guess for the implementation of the mine plan
2     be?
3  A. I can't speculate on this. I'm not in control of those
4     operations.
5  Q. Do you have any sense of the broad horizon, whether it
6     is likely to be within 12 months, within five years,
7     within 10 years?
8  A. We are talking, hopefully, years.
9  Q. In addition to the 5.5 million, there is payment of 10%
10    of the first revenue and 10% of the second revenue?
11 A. Yes.
12 Q. When do you —— let me put it a different way. Do you
13    have any view as to what the value of those 10% shares
14    will be?
15 A. I do, but the ranges are very broad.
16 Q. A broad range is fine. What is your broad range for the
17    first revenue and second revenue?
18 A. Assuming we get to production, and there is
19    a significant risk that you don't, but if you do, the
20    second big issue is the life of mine and the extent of
21    this ore body and for how long you can mine it. But if
22    you do get to the production and the margin of mining
23    these dykes, because it is a challenging mining
24    proposition, and the ore body is as big as expected, as
25    inferred, not proven, I could see these operations

113

1     perhaps running for 20 years plus.
2  Q. Very good. The question was: even as a broad range,
3     what do you estimate the value of the first and second
4     revenue shares to be?
5  A. Okay. So we would be looking at sales of —— this is all
6     very speculative, but $40 million to $50 million a year,
7     and the revenue share of that is, if it is 10%, it is
8     $5 million a year. And if you've got that for 20 years,
9     you start getting to some interesting numbers, and if
10    it's more than that even more. I've seen in the early
11    days, you know, spreadsheets were based on their
12    forecasts, and what people were hoping for it could be
13    even greater than that, run into several hundred
14    million, potentially.
15 Q. And what do you understand the split to be between first
16    revenue and second revenue?
17 A. Well, what one was trying to do here was to capture not
18    only export prices but any potential uplift. I would
19    have thought that the bulk is really at the export
20    level.
21 Q. Is that first revenue?
22 A. Yes.
23 Q. Now, the second revenue has been assigned to Conatus,
24    hasn't it?
25 A. Yes, it has.

114

1  Q. When did that take place?
2  A. I know that there has been a lot of toing and froing and
3     changes, etc, etc, so I don't recall the date.
4  Q. But you understand a contract has been agreed by which
5     it has been assigned?
6  A. Yes.
7  Q. Now, it may follow from the answers you have already
8     given, but what do you value —— what value do you place
9     on the revenue share that has been handed over to
10    Conatus?
11 A. Once the production starts, okay, so 20% of the figures
12    that I was describing.
13 Q. So 20% of the total revenue share?
14 A. Yes, because it's two tenths.
15 Q. I am not going to give the numbers, but when you gave
16    some evidence in your second witness statement you were
17    describing your total wealth personally, and you said
18    that the bulk of that comes from Conatus, and about
19    two—thirds of that comes from the Tongo/Tonguma project?
20 A. Correct.
21 Q. So you obviously had a figure in mind as a proportion of
22    your total wealth. Are you able to put a figure on the
23    value of that revenue share?
24 A. Yes, so if one was looking at a 20 to 40—year life,
25    remember these are just very prospective, this thing

115

1     comes to production. The revenue starts flowing.
2     Things are going well, and Conatus through its
3     entitlement were to get 20% of this possible, probable
4     revenue share for the foreseeable future, be it 20 to
5     40 years, that is what that calculation is based on.
6  Q. What is the figure? Because if you tell me what the 20%
7     is worth I can work out what ——
8  A. Assuming, and at this point of time one wanted to
9     capture the best possible potential, because the
10    potential value of this situation was being put at risk
11    by what was happening at the time, I would say 30 to
12    40 million.
13 Q. Obviously, you describe this as an agreement by which
14    the benefit of that has been assigned to you by Tonguma.
15    Why was Tonguma giving up 30 to 40 million worth of
16    income to Conatus?
17 A. Because Tonguma is the expansion area for Octea Mining.
18    It is a separate ore body, which is a couple of hundred
19    kilometres away from the main mining area. At the time
20    of the listing of the Octea group, this prospect, the
21    future growth was very important, and Octea had been
22    spending a lot of money in developing this resource.
23       So it was costing money and it wasn't generating any
24    revenue, and it was many years away from generating any
25    revenue, and even though by the time a decision was made

116

1    to dispose of this asset they had spent $40 million in
2    developing the asset, the projection was, and it has
3    turned out to be about right, that an additional
4    50 million would be required at least to complete the
5    feasibility study and take it to production.
6        In the meantime there were annual licence fees of
7    $500,000 to the Government.
8  Q. Mr Cramer, I understand you want to give the background
9    but can you just focus for a moment on why the transfer
10   to Conatus?
11 A. Yes.
12 Q. What did Conatus do to earn a potential fee of 30 to
13   40 million?
14 A. What Conatus did, through me personally, was to put
15   a transaction together whereby there was a clawback for
16   an asset that otherwise BSGR/Octea were giving up and
17   had decided to walk away from. A decision had been made
18   to hand back the licence to the Government of Sierra
19   Leone, and the reason why Octea had to do this was
20   basically if you snooze you lose. You're not allowed to
21   sit on an option. And if we were put in a position that
22   we either had to commit capital, which we did not have
23   at that point in time, or for the foreseeable future, to
24   the Tonguma operations or, ultimately, be in trouble with
25   the Government for not doing so. So it was give up the

117

1    licence or walk away if you don't develop it.
2  Q. And instead you put together the transaction with
3    Stella?
4  A. Yes.
5  Q. And had you agreed before doing that that you would
6    receive a share of the profits, if you successfully put
7    together a transaction?
8  A. Yes.
9  Q. Who did you agree that with?
10 A. With both Stella and the individuals I was negotiating
11   with. I made it clear up-front and with the blessing of
12   BSGR.
13 Q. And who at BSGR negotiated and agreed that you could
14   have a significant part of the benefit of this
15   transaction?
16 A. Ultimately, this was agreed and approved by the board,
17   I believe.
18 Q. By the board of BSGR?
19 A. Yes.
20 Q. And did you negotiate this figure, what percentage you
21   would get?
22 A. There was a lot of discussion about it.
23 Q. Is that yes, you did negotiate it?
24 A. Yes.
25 Q. And who did you negotiate it with?

118

1  A. I discussed it with the adviser to BSGR at great length.
2  Q. So that is Mr Steinmetz?
3  A. Yes. I discussed it with Peter Driver. I discussed it
4    with Gusta Bodin, who at time was a director. It was
5    well known and very much in the open, because it had
6    been a transaction that took a long time to put
7    together.
8  Q. Are you aware of what steps BSGR took to benchmark
9    whether that was a commercially reasonable term for the
10   work that you did in putting together the transaction?
11 A. Well, I think you're in territory where basically 80% of
12   something is worth a lot more than 100% of nothing.
13 Q. That is mathematically right. What I am asking is are
14   you aware of any benchmarking exercise that was done by
15   BSGR to establish whether that was a commercially
16   reasonable fee for the work you were doing?
17 A. No, but it's a very good deal for BSGR.
18 Q. I understand that Octea is in discussions to sell an
19   interest in Boroma at the moment?
20 A. No.
21 Q. Has Octea been in discussions -- sorry, Tonguma.
22   Has Octea been in discussions to sell interest in the
23   Tonguma --
24 A. Yes.
25 Q. Are those discussions ongoing?

119

1  A. Yes.
2  Q. And what are the proposed terms of that sale?
3  A. I don't know the detail, but the idea is for -- Stella
4    is now new field resources. It is an Australian listed
5    company -- is that they are prepared to pay an amount,
6    I think it is between 12 and $15 million now or under
7    certain payment terms for a cancellation of the future
8    participation.
9  Q. And presumably you, as Conatus, would get part of that?
10 A. No.
11 Q. So Conatus isn't party to those negotiations in its
12   capacity as the assignee of a percentage of the revenue
13   share?
14 A. Conatus would stay in and not be paid.
15 Q. Right, so it would maintain the second revenue share?
16 A. No, it would -- well, whatever revenue share it was
17   entitled to -- the first and the second revenue share,
18   the way it was structured, had a lot to do with tax,
19   etc, etc, but the ambition was 80/20, whether it was
20   first or second. So there was supposed to be an offset.
21   But the transaction is currently under
22   consideration by the joint administrators, they are the
23   only people who can decide whether they take the money
24   or stay in for the long run, but the proposal is 12 to
25   15 million, I believe, for Octea's share. The share

120

1    that Conatus has, I have elected to stay in, because
2    I would rather take the risk and it could be worth it or
3    not.
4  Q. Yes.
5  A. And that's the current situation we're in.
6  Q. On your figures, and you were suggesting, I appreciate
7    with caveats, 30 to $40 million for the value of your
8    revenue share, you would presumably say the Octea group
9    share is worth multiples of that, so 100 million plus?
10 A. It depends what your risk profile is. I think the
11   reality here is it is an option. It could be worth
12   nothing. Taking 12 to 15 million, and if Conatus had
13   had 20% of that, which is two to three million here and
14   now, may be a fantastic deal or it could be a bad deal.
15   But there's just such sensitivity and volatility. But
16   it is, I think, an interesting proposition, and one
17   worth considering for the joint administrators, because
18   the value of 12 to $15 million today for them could make
19   a lot of difference, and I'll tell you why if you're
20   interested.
21 Q. I am afraid I am not at the moment.
22       Who do you understand to be funding the 12 to
23   15 million? Is that coming from the current owners of
24   Tonguma?
25 A. No. Sorry, yes. Well, it is the New Field Resources.

121

1    It is the listed Australian, because what they are
2    saying is they would rather pay that now than have to
3    pay more money over time. So their willingness to do
4    this indicates that they believe that they are heading
5    in the right direction.
6  Q. Yes. My last question on this particular topic. Who is
7    negotiating that 12 to 15 million figure on behalf of
8    the Octea group?
9  A. I have been doing that.
10 Q. You have been doing that. Right, and who have you been
11   negotiating it with?
12 A. With the representative for New Field Resources, and
13   I am in touch with the CEO of this operation as well.
14 Q. So just give me the name of the representative you have
15   been dealing with?
16 A. So Carl —— I always forget his surname — Carl Smyson or
17   something. He is an ex De Beers guy. Then there is an
18   ex Morgan Stanley banker, who works for them as
19   a consultant, who I have been dealing with. I don't
20   recall his name right now, but I know him quite well, so
21   I can come back to you with that.
22 Q. As I understand it, the position is that you are
23   negotiating it, but there is no executed contract,
24   because that would need the consideration and approval
25   of the joint administrators?

122

1  A. What we are doing is we have negotiated terms in
2    principle that I believe are worthwhile considering, but
3    in order for it to progress further the New Field
4    Resources people have requested that the joint
5    administrators are comfortable with this, that they
6    would consider it before we take it further, because
7    they are very much aware of the administration
8    situation.
9  Q. To your knowledge, there is no one else beyond the New
10   Field people behind this proposal, it is not being
11   funded by anyone else?
12 A. Absolutely not.
13 Q. I want to turn then to the Boroma mine. Before I do,
14   was there a stage before those negotiations when it was
15   proposed that Conatus would sell its revenue share?
16 A. So I think it was an option, and I always preferred to
17   take the longer route, but one of the driving factors
18   behind New Field Resources' desire to do this deal is
19   they don't like the stigma and the attachment and the
20   association with BSGR, the group, but they did not feel
21   that way about me.
22 Q. Turning to Boroma, you were involved I think in 2019 in
23   a proposal to raise funds in order to get the Boroma
24   mine into production?
25 A. Correct.

123

1  Q. The proposal —— let's have a look at it. If you take up
2    bundle 4.
3  A. Volume 4.
4  Q. Volume 4, yes, at tab 97, page 2039.
5  A. One second.
6  Q. Tab 97, just to orientate you. And if you go, please,
7    to 2032.
8  A. Yes.
9  Q. This was a presentation which the board of Octea was
10   being asked to approve. If you go, please, to page 2039
11   you get a diagram explaining what the transaction was
12   going to be. You can see that the proposal was that
13   a company called Gemco, that is in the middle, would be
14   owned 50% by equity investors, 25% by Conatus and 25% by
15   MKB which is a block chain finance group, and that it
16   would acquire Boroma, so the mine?
17 A. Yes.
18 Q. And have a full marketing off—take right to the
19   diamonds?
20 A. Right.
21 Q. With a life of mine 10% revenue share going back
22   to Octea.
23 A. Right.
24 Q. So in a sense, a sort of reverse of the Tonguma
25   situation where —— leave that.

124

1            Was Gemco founded?
2    A.  No.
3    Q.  Has any equivalent of Gemco been founded?
4    A.  No.
5    Q.  So did this proposal effectively run into the ground?
6    A.  Yes.
7    Q.  And why is that?
8    A.  Would you like the long story or the short?
9    Q.  Always the short story?
10   A.  The Government of Sierra Leone revoked the Boroma
11       licence, and they took it back in September 2019.
12   Q.  I think I am right in saying that the licence, you said
13       they took it back, it expired, didn't it? It was due to
14       expire in July 2019?
15   A.  I would rather say revoked it, because there had been
16       lots of extensions, but they had reached their limit on
17       the "snooze, you lose".
18   Q.  Right. You personally, I think, have remained in
19       discussions with them to try and extend the licence
20       further?
21   A.  Me, personally?
22   Q.  Let us take it in stages. Has Tonguma continued
23       discussions with Sierra Leone to recover that licence?
24   A.  Tonguma? Not ——
25   Q.  The Octea group, let us put it that way. Has the Octea

125

1        group been in negotiations with Sierra Leone to regain
2        the Tonguma licence?
3    A.  I'm going to give the short answer because there is
4        a long and interesting ongoing story.
5    Q.  Yes.
6    A.  We believe, from an Octea and Koidu mining perspective,
7        that that's in the long run. The only viable
8        proposition, you know, to commercially exploit in
9        a responsible and sensible way, and because of the good
10       relationship on the ground and the achievements that we
11       have made, we hope, and we maintain a dialogue to try to
12       revisit it. But the underlying problem would be before
13       the licence is granted, you have to show you have the
14       money to develop the asset.
15   Q.  And when you say "we discussed it with Sierra Leone",
16       who is actually in discussions with Sierra Leone?
17   A.  The team on the ground who have the knowledge and the
18       relationships. It's all local on the ground, district
19       and federal relationships.
20   Q.  Are there ongoing efforts to raise funds for Boroma?
21   A.  At the moment I have been busy with other things. It's
22       something that I would very much like to get involved
23       with again, because the natural development of once the
24       ore body is depleted at Koidu, where there are two
25       pipes, and there's a dyke running through it. In

126

1        Boroma, which is the adjacent area, they go on for
2        kilometres, and it's always been the idea to try to
3        extract value, because if the dyke mining can be done
4        profitably and the grade is there, all stakeholders
5        would benefit greatly.
6    Q.  I understand. To your knowledge, has the Boroma licence
7        been awarded to anyone else?
8    A.  Yes, it was.
9    Q.  And to whom was it awarded?
10   A.  What I was told was it was a group of investors from
11       Equatorial Guinea, who had supported the incumbent
12       President in the elections, but as predicted there has
13       been no development in that asset, and I think where
14       the Government and the authorities are now is they
15       understand that they need to find somebody who is really
16       going to be able to invest and exploit this asset in
17       a responsible way.
18   Q.  And beyond the Octea company, Boroma, are you aware of
19       anyone else expressing interest in that licence, or are
20       Boroma really the only viable candidates?
21   A.  I don't know the detail. I suspect there are a lot of
22       people putting their hands up, because they see it as an
23       opportunity to make some quick money, but the number of
24       serious investors who would be prepared to take this
25       risk and have the resources and the skills of execution

127

1        to do this, it's few and far between, and that is the
2        trump card we have in this situation.
3    Q.  I want to actually very briefly ask you about the
4        executive incentive scheme. I am just interested in
5        where the proceeds of diamond sales go. I think I am
6        right in saying you recommended the creation of the
7        executive incentive scheme?
8    A.  Yes.
9    Q.  And it falls into two pieces I think. The first piece
10       is 2% of all diamond sale revenues go into a bonus pool,
11       yes?
12   A.  Correct.
13   Q.  Irrespective of profits.
14   A.  It is based on revenue.
15   Q.  Pure revenue. And once $63 million of Star West debt
16       has been repaid, then a second bonus pool kicks in?
17   A.  Correct.
18   Q.  And that is the same hurdle as when BSGR will start
19       getting repayments of its debt?
20   A.  Yes.
21   Q.  And at that point 5% of net profit goes into a second
22       bonus pool, in addition to the 2% of revenue?
23   A.  Correct.
24   Q.  And what steps did you take to benchmark 2% revenues
25       plus 5% net profits against industry standards for

128

1      executive incentive schemes?
2   A.   Not much.
3   Q.   Where did those figures come from? You came up with
4      them and they sort of sounded like sensible figures?
5      I don't mean to be dismissive.
6   A.   No, no, and by the way you haven't at all and I thank
7      you for that. It's made this much more productive.
8      Not at all. What I was trying to come up with,
9      first of all, was an incentive scheme that was very
10      clear for all, because once you start talking about EBIT
11      or net profit or gross profit, it gets very complicated,
12      and it often fails, because people don't understand the
13      meaning. They cannot see, you know, clearly what they
14      would be entitled to.
15      So the incentive often fails. That I have a lot of
16      experience with because, personally and in my corporate
17      jobs, I have been involved with incentive schemes.
18   Q.   I am really sorry to interrupt you. I am really not
19      interested in the principle of incentive schemes
20      generally. Just where you got 2% of revenue and 5% of
21      costs?
22   A.   I based it on my experience in incentives, managing
23      people, and getting the results from an incentive
24      scheme.
25   Q.   And you personally are one of the principal

1      beneficiaries of the executive incentive scheme?
2   A.   Yes, I would describe myself as the key man, if it were
3      like a portfolio management situation.
4   Q.   And did you get Star West to sign off on this executive
5      incentive scheme?
6   A.   After very tough and extensive negotiations, yes.
7   Q.   And that was with Mr Camis, was it?
8   A.   Mr Camis, with Yannis, with Stavros, their lawyers.
9   Q.   And did you ever see Sebi Mionis, in the context of
10      Star West?
11   A.   I did not. I know he was involved I think in the
12      beginning. I saw when I was going through my bundles or
13      doing some work that he may have been involved, I think,
14      in the first discussion when they were being introduced.
15   Q.   Just going back to —— we talked a bit about Sebi Mionis
16      before lunch. Mr Camis, did you ever see him in
17      a social situation? Did you ever see him in a social
18      situation?
19   A.   No. I had dinner with him once in Geneva, during the
20      course of these discussions, because he's based there.
21   Q.   And ever in a social situation with Mr Steinmetz?
22   A.   I believe in Israel. I think he was at that same party
23      where Sebi was, and I've met him one or two times around
24      Mr Steinmetz.
25   Q.   I think the other person is Yannis Paparkis —— forgive

1      the pronunciation. What about him? Social interaction
2      with Mr Steinmetz?
3   A.   Well, I don't have a social relationship with him or
4      anybody, but you know, I would have met him less than
5      Marcus. I have never had lunch or dinner with him.
6   Q.   But again, not at this wedding that you were all ——
7   A.   He could have been there as well. There were a lot of
8      people.
9   Q.   It is always hard to tell with personal interactions,
10      but what did you take to be from, the dinners and the
11      wedding you attended, what did you understand to be the
12      nature of the relationship? Was it a close personal
13      relationship? Did it appear to be a business
14      relationship?
15   A.   Between Beny and ——
16   Q.   Beny and these individuals we have discussed, so Yannis,
17      Marcus, and if the answer is different between them, do
18      say?
19   A.   Yes. My observation is that Beny has a personal
20      relationship and friendship with Sebi, and I believe
21      that Marcus and Yannis are his workers. They're part of
22      Sebi's team.
23   Q.   I see. Right. I am going to move on now to the claim
24      against Mr Soros, and repeat a question I asked this
25      morning. When the company went into administration, was

1      it your view that the claim against Mr Soros was one of
2      most significant assets?
3   A.   Very much so.
4   Q.   And I don't want you to tell me whether you have taken
5      any legal advice or whether your view reflects legal
6      advice, but if you were asked to value that claim, for
7      the purposes of selling it, somebody said "I'll come and
8      buy it from you", what monetary value would you place on
9      the claim against Mr Soros? How much would you advise
10      BSGR to sell it for?
11   A.   That is a different question.
12   Q.   Take it in stages. What monetary value do you put on
13      it?
14   A.   Up to 10 billion.
15   Q.   And how much would you advise BSGR to sell it for?
16   A.   I would advise BSGR to sell it for whatever amount BSGR
17      would need to settle with all of its creditors and take
18      the company back out of administration.
19   Q.   So in the billions?
20   A.   Yes.
21   Q.   And you consider it to be worth that?
22   A.   Yes, I do.
23   Q.   You received funding for that claim from an entity named
24      Litigation Solutions Limited?
25   A.   Correct.

1  Q. I have asked you about its connections with GSOL.  But

2     can I ask, at the time you were first dealing with

3     Litigation Solutions Limited, who did you understand it

4     to belong to?  Who did you understand it to be owned by?

5  A. So the connection with them came through David Barnet, and

6     I recognised that this appeared to be the same group of

7     people as we have seen before in other areas, and then

8     had yet to see in the Guinean settlement.

9  Q. Would I be right to infer that Mr Barnet is

10    Mr Steinmetz's personal lawyer as well?

11  A. He's probably the best person to answer that.

12  Q. But from your dealings with him, I mean, did you

13    understand him to be a representative of Mr Steinmetz?

14  A. He wears many hats, but my interaction with him has been

15    as legal adviser to BSGR operating companies and

16    anything to do with the foundation and agreements, etc,

17    etc.

18  Q. If we go back, for instance, to the ICSID settlement,

19    and I was asking you who Mr Barnet was representing in

20    the negotiations with Guinea, you said not BSGR.  He

21    wasn't instructed by BSGR for those negotiations?

22  A. No, he wasn't.

23  Q. And I think you told me he was instructed by

24    Mr Steinmetz?

25  A. But David Barnet was one of the individuals who was

1    working with and attended all the regular meetings with

2    the joint administrators.

3  Q. Right.

4  A. So his involvement ——

5  Q. In his capacity as a lawyer to BSGR?

6  A. At that point in time I really think that only Mr Barnet

7    can answer who he was acting for.

8  Q. But did you see, for instance, a retainer letter between

9    BSGR and Mr Barnet, for him to provide advice to BSGR

10    during the course of the joint administration?

11  A. No, not that I'm aware of.

12  Q. I can guess your answer, but do you know or do you know

13    of any facts which cause you to believe that

14    Mr Steinmetz, or anyone associated with him, has any

15    economic interest in the share of proceeds to which

16    Litigation Solutions Limited is entitled?

17  A. I don't believe that he does, for the same reason that

18    I have given you before.

19  Q. That he told you he hasn't?

20  A. Correct.

21  Q. It is obviously, one might say, a coincidence that the

22    same people come over and over again to invest in very

23    many of BSGR's assets.  Did that cause you to reflect or

24    any concerns?

25  A. In this case, no.

1  Q. Why did you think that they kept coming back and

2    investing in all of BSGR's major assets?

3  A. There's a simple answer: because unfortunately you can

4    find yourself in a position where as a beggar you can't

5    be a chooser, and in this specific situation we had

6    tested the market.  We had instructed Mishcon de Reya to

7    seek support of conventional litigation funders,

8    Burford, Tenor, other people.  There were meetings,

9    letters sent out, and in the end the market wasn't there

10    for us, for very clear reasons.

11  Q. And did you undertake any due diligence on Litigation

12    Solutions Limited to see whether they had a balance

13    sheet that could fund the 15 million that they were

14    providing to you or ——

15  A. I didn't.  This was handled by David Barnet and James

16    Livson at Mishcon de Reya.  They were responsible for

17    this relationship and the introduction.

18  Q. To your knowledge, and tell me if you don't know, was

19    Litigation Solutions Limited in the business of

20    litigation funding or was this effectively a one—off,

21    the investment in the Soros litigation , a one—off?

22  A. I believe this was an opportunistic financial investment

23    on their behalf, but they spoke about having experience

24    of having been involved in a successful litigation

25    against the bank.

1  Q. Were you involved in the negotiations of the terms with

2    Litigation Solutions Limited?

3  A. No, only at the margin, on some qualitative issues that

4    were not documented.

5  Q. I may come back to that.  It sounds very intriguing.

6  A. Yes.

7  Q. Obviously, the big point in one of these negotiations is

8    what percentage were you handing over.  So in this

9    contract you hand over 50% of the proceeds?

10  A. Yes.

11  Q. Which you say may be worth billions, in exchange for

12    15 million of funding?

13  A. Yes.

14  Q. Who was the person who agreed that potentially handing

15    over billions was worth 15 million of funding?  Who

16    negotiated that?

17  A. This would have been negotiated primarily by David

18    Barnet.

19  Q. Was he retained by BSGR for that purpose?

20  A. So at this point in time we weren't in administration,

21    were we?

22  Q. No.

23  A. David Barnet, this is one of the roles that he has

24    played within the BSGR group ever since I joined.  So

25    acting as a legal adviser, a counsel.  His contractual

1    arrangements, and where he's been paid from, has changed
2    over time, but the spirit of his involvement was that he
3    was a person who, like if you were a normal corporate,
4    he would be the internal legal counsel.
5    Q. For instance, is it your understanding that BSGR could
6       now go to Mr Barnet and say, "You acted as our lawyer.
7       Please can we have all the documents relating to the
8       negotiation of the Litigation Solutions Limited?"
9    A. Yes, he and/or James Livson, absolutely.
10   Q. Did you consider that it was in the best interests of
11      BSGR to hand over a 50% interest in the proceeds in
12      exchange for up to $15 million of funding?
13   A. I felt it was aggressive and it was bitter medicine, but
14      I felt that it was ultimately worth it, and the caveat
15      which I referred to before, which I got a concession out
16      of Stavros, you know, I said the principle was won.
17      I saw that there would be need for further funding, and
18      I didn't want BSGR to be diluted further, right. But
19      sometimes you have to take the problems and challenges
20      with you up into the air. And with the benefit of
21      hindsight, because I'm involved in one other very large
22      piece of ICSID arbitration and litigation, you know, the
23      litigation firms, they cut very, very tough terms, and
24      based on my experience, then and now, that's not an
25      abnormal ask. It is not an abnormal ask.

137

1    Q. Did you review and approve the transaction, as
2       a director of BSGR?
3    A. When we ultimately signed off on it, I was very much in
4       the hands of David Barnet.
5    Q. I understand, but he's an adviser, he is in-house
6       counsel. You are a director, a decision maker. Did you
7       personally review and approve this transaction?
8    A. I probably —— and I'm sure we'll find the documents ——
9       would have signed off on it. It was something that the
10      board agreed to do. But when it was time for signing,
11      you know, this was very much under the guidance of what
12      David had agreed, and the fact that this was where we
13      were commercially, and it was time to move forwards.
14      I think it was also complicated further by the fact
15      that ——
16   Q. Sorry, Mr Cramer, I just wanted it to be clear. So is
17      the answer yes, you did review and approve it, in your
18      capacity as a director?
19   A. My answer is that I accepted it more or less as a fait
20      accompli. I didn't review it. I didn't negotiate,
21      I didn't draft, I didn't make changes or suggestions.
22      I relied on the recommendation and the documentation put
23      forward by David Barnet, and I approved it on that
24      basis.
25   Q. Did you speak to Mr Steinmetz about it at all?

138

1    A. Not to my recollection.
2    Q. Did you understand Mr Barnet's recommendation to carry
3       with it the imprimatur of Mr Steinmetz?
4    A. Yes.
5    Q. And is that generally so, when Mr Barnet advises you do
6       something, you understand that that has the support of
7       Mr Steinmetz?
8    A. Well, he is in very close touch with Mr Steinmetz. They
9       are both based in Israel and often work out of the same
10      office, and in the context of being an adviser to BSGR,
11      any legal advice that needed to be secured, David Barnet
12      would secure from Mr Steinmetz. So I would assume that
13      anything that David Barnet was recommending would be
14      bona fide, from that perspective.
15   Q. Right. May I just ask you this: when you are sitting
16      there deciding whether to approve, for instance,
17      a funding agreement with Litigation Solutions Limited,
18      was your approach that if Mr Steinmetz wanted it then
19      unless there was a reason not to do it, then it should
20      happen?
21   A. No.
22   Q. Are you aware that the funding agreement was terminated
23      by Litigation Solutions Limited in 2020?
24   A. No, I didn't.
25   Q. I am going to ask you about Cunico very briefly. BSGR

139

1    owns shares in a Dutch company, doesn't it, BSGR
2    Holdings Cooperative UA?
3    A. Yes.
4    Q. Do you consider those shares to be worthless?
5    A. Yes.
6    Q. And the interest that BSGR Co—op owns —— BSGR Co—op
7       itself has an interest in a company called Cunico
8       Resources?
9    A. I know very little about this part of BSGR's operations.
10      I have never been involved at any level, other than at
11      board level. The detail, the twists and the turns, the
12      history is quite complicated. The partners, the
13      refinancing, the debt, it is really not my area of
14      expertise, and even the companies and how they change,
15      it's very deep waters for me. I know very little.
16   Q. So who dealt with this? Within BSGR, who was
17      responsible for this part of the business?
18   A. Yossi Tschelet, David Barnet. Operationally, there was
19      an individual called Mark Streich, you know, who was one
20      of the key guys in BSGR, who was very involved. Going
21      further back, there were all kinds of people, and I was
22      literally not involved at all.
23   Q. You probably know, though, that there was a dilution of
24      BSGR Co—ops' interest in Cunico from 50% down to 9% odd?
25   A. Yes, I do.

140

1 Q. Why do you say that the 9% interest is worthless? What
2    causes you to believe that?
3 A. Because my high level understanding of this is that not
4    only the underlying value of the business fell apart.
5    The relationship with the people the business was in
6    partnership with fell apart, and became very
7    acrimonious, and everybody was suing everybody else.
8 Q. And that is International Mining Resources?
9 A. IMR, yes.
10 Q. You have mentioned Yossi a few times. Not a criticism.
11    What's his role within BSGR?
12 A. Today or when?
13 Q. Tell me over the period 2012 to now. If it changes,
14    tell me how it develops.
15 A. In 2012, the role that he played would have been in
16    a normal corporate structure, and I have to be very
17    careful how I present this, because it is often taken
18    out of context, but I'd describe him as the CFO of BSGR.
19 Q. And did he work through Onyx, the Onyx group?
20 A. No, he didn't.
21 Q. He was contracted, directly engaged ——
22 A. Yes. He lived in Israel, separation tax, foundation,
23    Israel, Beny. But he was very much the person who
24    understood the accounts of BSGR, who interfaced with the
25    auditors, who dealt with Peter Driver and whoever was

<div align="center">141</div>

1    the executive chairman or CEO. So the inner workings of
2    the finances of all of the operations and all of the
3    projects, he was the person who would know these things.
4 Q. You have mentioned as one of the reasons Beny —— and
5    Yossi I think you said is in Israel. What did you
6    understand the relationship between Yossi and
7    Mr Steinmetz to be?
8 A. So Mr Steinmetz, in his role as adviser, was happy to
9    advise whoever he felt was appropriate, in whatever
10    situation. So he would have advised Yossi and vice
11    versa.
12 Q. The two being close together, that was —— do
13    I understand you to be suggesting there was a lot of
14    advice passing between Mr Steinmetz and Yossi?
15 A. I don't know because, you know, it is not something that
16    I was subject to on a day—to—day basis. But based on
17    Mr Steinmetz's enquiring mind and willingness to offer
18    opinions and advice, I would guess so.
19 Q. You mentioned quite a lot of legal actions in relation
20    to Cunico. Are you aware that there was a claim to
21    recover a deposit that BSGR had paid in relation to the
22    bidding process for Cunico?
23 A. I am aware of these things now, primarily because I have
24    gone back, but at the time it was just one of these
25    areas where I'd never been involved. And my

<div align="center">142</div>

1    involvement —— I couldn't add any value, so it was
2    a blank.
3 Q. My interest is really current. Do you know what the
4    current status of those proceedings are?
5 A. The record with the joint administrators showed that
6    this was a matter where I never opined about. I had no
7    knowledge.
8 Q. I am not trying to implicate you in any way.
9 A. No, no.
10 Q. Do you know what the current state ——
11 A. No, I don't. I'm just trying to be as clear and
12    transparent and open as I can.
13 Q. I understand. You will appreciate I am trying to be as
14    quick as I can, in the circumstances.
15 A. I understand.
16 Q. Was a put and call option concluded between BSGR and
17    GSOL in relation to the shares in BSGR Co—op?
18 A. Yes.
19 Q. Was either the put or the call ever exercised?
20 A. I don't know.
21 Q. What did you understand the purpose for the put and call
22    option to be?
23 A. I don't know.
24 Q. Were you involved in the negotiation or conclusion of
25    the put and call?

<div align="center">143</div>

1 A. No.
2 Q. Were you involved in the loan that was taken out by BSGR
3    Co—op from GSOL?
4 A. No, no.
5 Q. Who would have been involved in those matters?
6 A. My guess, David Barnet, Yossi Tschelet, and to a certain
7    extent of course Peter Driver.
8 Q. BSGR Holdings Co—op also has a debt receivable, on paper
9    at least, worth 98 million, from Cunico. Do you know
10    what the status of the attempts to recover that are?
11 A. No.
12 Q. Were you aware that GSOL acquired part of the Cunico
13    group, something called Feni Industries from Cunico in
14    2018?
15 A. No.
16 MR WILLAN: I wonder whether that is worth a five minute
17    break.
18 MASTER DAVISON: Yes, it is, yes. We will break for
19    ten minutes.
20 (3.14 pm)
21            (A short break)
22 (3.25 pm)
23 MR WILLAN: Mr Cramer, I just wanted to jump back to
24    a couple of topics which I omitted to ask you about.
25    Just going back to Litigation Solutions Limited, and we

<div align="center">144</div>

1     were talking about the 15 million funding that it had
2     agreed to provide. I think you said, paraphrasing you
3     slightly, "beggars can't be choosers". That was the
4     deal. "That was the only funding we could find.
5     Burford and so on were unwilling to fund."
6 A. Correct.
7 Q. Did you approach the parent company, Nysco, or the
8     foundation for money?
9 A. Yes.
10 Q. And the answer was?
11 A. We should find it in the market.
12 Q. And were you given any reason for that?
13 A. I think that the finances of the group as a whole were
14     becoming very, very stretched, you know, by that time,
15     and the burden of the legal expenses that we had been
16     through up until that point in time from the foundation,
17     counsel's perspective, it was just another thing, so
18     they understood the merit and the commercial reasons for
19     doing this, but you know, they really wanted to find
20     a funder.
21 Q. Even if that meant parting with 50% of the proceeds?
22 A. $5 billion is a lot of money and it would have solved
23     our problems.
24 Q. Yes.
25 A. And still would, I hope.

145

1 Q. Before the agreement with Litigation Solutions Limited
2     had been signed, it had already provided over $2 million
3     of funding. On what basis had it done that? Was there
4     some agreement under which it did it?
5 A. I believe this was, as I mentioned before, another
6     reason —— because there was an element of trust, this
7     was a relationship that was, you know, brought in, and
8     clearly the relationship between Mr Steinmetz and these
9     individuals went so far, and that's probably why.
10 Q. So it was being advanced on a completely undocumented
11     basis?
12 A. I believe so. The person who would be able to give
13     a precise answer would be David Barnet.
14 Q. And I just wanted to go back to the put and call option
15     in relation to BSGR Co-op. Now, in a sense, once it was
16     obvious that you were going to lose the bidding or
17     indeed once you had lost the bidding, BSGR Co-op was
18     effectively worthless. Why didn't the board consider
19     exercising the put to realise at least some value for
20     it?
21 A. I really don't know. I don't recall. It was one of
22     these issues where you have a limited amount of head
23     space and bandwidth. I wasn't focused on it. I hadn't
24     been historically. I relied on the people who were
25     involved to do the right thing.

146

1 Q. But these questions were reported up to the board,
2     weren't they? The Cunico issue was and the question of
3     whether you should take funding from GSOL was reported
4     to the board?
5 A. Yes.
6 Q. So you must have given it some thought, as a director?
7 A. Not a lot. It wasn't an area of focus, you know.
8     There's a limit to what one can focus on and, you know,
9     I was focusing on areas where I felt that I could add
10     value, and there were reasons for that, but you are not
11     interested in it now.
12 Q. But just take the put and call option. How did you
13     decide as a director whether to vote in favour of or
14     against that arrangement? Did you just rely on someone
15     else's advice?
16 A. Yes, yes.
17 Q. And who was that someone else?
18 A. David. I believe that Peter was closer to it than
19     I was. If Yossi was involved, I trust and rely on him
20     for such matters. So I felt comfortable that the people
21     who were involved with it were doing things which would
22     be in the best interest of BSGR.
23 Q. And if I were to ask the same question in relation to
24     Litigation Solutions, is that also an area where you,
25     rather than considering it yourself, relied on the

147

1     advice of others?
2 A. No. There it was not a very complicated issue to grasp,
3     and you didn't need the background or the history, and
4     I understood the commercial trade off. So when it came
5     to the detail, the actual contract, the lawyers'
6     language and how that was structured, and even the
7     commercial breaking point, once I tested it, I did feel
8     more comfortable, and I feel comfortable saying, yes,
9     I knew about it, I was familiar with it, even though
10     I didn't have the detail.
11 Q. For the implementation agreement with
12     Standard Chartered, and we talked about the 16 million
13     up to 70 million settlement, is that something you
14     considered the economics of or did you rely on the
15     advice of others?
16 A. It was more of a combination there. I think that the
17     detail, the contracts, you know, the legal language, the
18     economics, the history, the depth, they are people like
19     Yossi and Barnet were very close to. As I said before,
20     my focus was on how can we extract maximum value for
21     BSGR, once the dust has settled?
22 Q. Just take the example of the settlement payment, the
23     16 million up to 70 million. Who would have given that
24     thought and taken a decision as to whether that was the
25     right way to go?

148

1   A. Yossi and David.
2   Q. I am going to move on to Roslindale. BSGR holds an
3      interest in Roslindale, doesn't it?
4   A. Yes.
5   Q. And that is a Singaporean company?
6   A. I believe it is now, yes.
7   Q. And do you know the corporate structure beneath
8      Roslindale?
9   A. Not well at all. And also for historical reasons.
10  Q. But you know the underlying asset within Roslindale?
11  A. I am familiar with the background and why it came about,
12     yes.
13  Q. And the underlying asset is I think the Aphrodite
14     Oilfield on the Israeli/Cypriot border?
15  A. I think it was more gas than oil. Then there turned out
16     not to be so much gas either.
17  Q. If I can ask for the very brief version, how did it come
18     about?
19  A. It came about because there is, and it is proven to be
20     very viable, a very large reserve of gas and potentially
21     oil in territory that belongs to Israel in the Eastern
22     Mediterranean, and there was a bit of a boom going on
23     and an opportunity to acquire licences came in the way
24     of Mr Steinmetz and his personal businesses, and BSGR
25     funded part of this opportunity.

149

1   Q. But that was back in 2010, was it, the funding of it?
2   A. I don't recall the dates.
3   Q. If you can take out bundle 3, please, and go to tab 54.
4      These are draft accounts?
5   A. Yes.
6   Q. Do you know, were these ever approved?
7   A. I don't -- which year?
8   Q. 2016.
9   A. I know that once we got to 2016, and when we were with
10     Baker Tilley, we were falling behind, and I think that
11     they may have been approved but never signed off.
12     Again, Peter Driver would know all of these things.
13  Q. If you go, please, to 1492.
14  A. Yes.
15  Q. There is a description here of the interest in
16     Roslindale, and you can see it begins:
17     "In April 2012, the group granted Roslindale
18     a 16 million loan guarantee facility. The facility was
19     secured by a priority pledge on the assets of the
20     borrower."
21     So a secured loan?
22  A. Mm-hm.
23  Q. The next paragraph explains that it was convertible from
24     debt into ordinary shares. Do you see that, about four
25     lines down:

150

1      "Convert all the loans, together with accrued amount
2   of interest, into such number of ordinary shares as
3   reflects the proportionate amount of the loans to the
4   amount of the capital equity invested by the borrower.
5   As at the date of signing, which presumably is expected
6   to be somewhere in 2017, management has no intention to
7   enforce the right to convert."
8   A. Yes.
9   Q. Then, if you go on to the next paragraph, it explains,
10     and I am interested -- first there is a drop in the
11     interest rate. Don't worry about that. But the final
12     sentence says:
13     "In addition, in 2014, the group accepted a request
14     to convert the loan into cumulative, convertible,
15     redeemable preference shares that carry a coupon rate of
16     6-month LIBOR plus 7%."
17     Do you know what these preference shares were
18     convertible into? They are described as convertible
19     preference shares?
20  A. Convertible? No, I don't know exactly, but I believe
21     that I have a good understanding of the commercial
22     rationale and what was one trying to achieve. The
23     technical side of it is not my strength.
24  Q. Leave aside the technicalities. Was the idea that it
25     would remain convertible into ordinary equity?

151

1   A. I believe that the purpose of this structure and
2      instrumentation was to ensure that if there was value
3      released from this asset to put BSGR first.
4   Q. Right. And do you know whether it remains convertible
5      into ordinary equity, if BSGR so desires?
6   A. I do not believe that there could or should or would
7      have been any development which would take that
8      entitlement away from BSGR.
9   Q. But to your recollection do you ever recall a time when
10     you have actively considered exercising that right?
11  A. To take over the asset?
12  Q. To take, to convert into ordinary equity?
13  A. Not that I recall, no.
14  Q. Do you know whether the coupon is being paid? There is
15     reference to a coupon of LIBOR plus 7%?
16  A. I doubt it. I doubt it.
17  Q. Do you know whether BSGR has appointed any directors to
18     Roslindale?
19  A. I don't think so.
20  Q. Do you know why there was a decision in 2014 to convert
21     from a secured loan into preference shares?
22  A. Yes. Because what you were dealing with was a busted
23     flush, and the thinking behind this was to ensure that
24     if there was any value in trying to reconstitute value
25     in this situation, that BSGR would be in a position to

152

1      get its money back.
2   Q. You talk about a busted flush. Will you just drop down
3      a little bit further to the final paragraph on this
4      page. There is an explanation about the fact that it
5      has been "impaired due to uncertainty of future
6      cashflows", which it says "stems from the geographical
7      location of the field and the complex nature of the
8      political situation around the Middle East, because it
9      overlaps the Cypriot and Israel economic zones", and
10     effectively you need the consent or support of both
11     Cyprus and Israel to develop. It says this far it has
12     not been possible to reach an agreement?
13  A. Mm—hm.
14  Q. When you talk about a busted flush, is that the problem,
15     that you couldn't get consent or the business couldn't
16     get consent from both Cyprus and Israel?
17  A. There were a number of complicated moving parts that
18     needed to come right, and primarily in order to put the
19     busted flush straight and draw another card, you most
20     probably had to drill again, and that was going to cost
21     between 80 and 100 million. The first drill hole —— the
22     gas field is good and a lot of other hits have been made
23     but I think it was bad luck. The hole that was drilled,
24     there was nothing there. So the valuation and the
25     assessment that there was a lot of potential, or could

153

1      still be, is inferred by being in the right
2      neighbourhood.
3   Q. I follow.
4   A. But the test drill went down in the wrong place.
5   Q. If you go one paragraph up, the penultimate paragraph on
6      that page, it says:
7         "The board of directors continue to be of the
8      opinion that this oil and gas operation represents
9      a world class asset."
10        Was that your view, that it was a world class asset,
11     subject to this problem that there had been with
12     drilling in the wrong place?
13  A. If you could drill another one or two holes you could
14     actually have a very, very valuable asset, but first you
15     have to spend that money.
16  Q. Right.
17  A. So it is a conundrum here.
18  Q. I understand. You will see there is also reference on
19     this page, a small point, halfway down:
20        "During 2015 the group invested an additional
21     1 million in Roslindale."
22        A single sentence on its own, in the third
23     paragraph.
24        Do you know, were any further shares issued in
25     relation to that 1 million of debt?

154

1   A. I don't know the detail.
2   Q. It may be the answer is you don't, but do you know
3      whether that 1 million was in the form of debt or
4      equity?
5   A. I don't know.
6   Q. So BSGR was originally a lender and then became
7      a preference shareholder. Do you know who is the
8      ordinary shareholder in Roslindale, so who actually owns
9      the equity?
10  A. I am a little bit more familiar with it now than what
11     I was or ever was because of the bundles that I've
12     reviewed. I'm not an expert on this, but my
13     understanding is that there is a trust involved, which
14     the beneficiaries are Mr Steinmetz's children.
15  Q. What did you understand at the time? Leave aside what
16     you have discovered from the bundles. If we go back to
17     2016, say, what was your understanding then?
18  A. That was not my understanding. My understanding was
19     that Mr Steinmetz was in front of the asset, but I think
20     that the focus, from my perspective, considering the
21     very limited involvement that I had, because there was
22     a whole team of people within BSGR in those days that
23     were involved with oil and gas projects, that the key
24     thing was that BSGR's exposure, the loan should come out
25     before anybody else. And by doing that, what happened

155

1      after that was not a problem or an issue.
2   Q. Presumably, the reason that BSGR's money comes out first
3      is that it was BSGR's money that had gone in to actually
4      get the business going?
5   A. Correct, yes. They should be first in the waterfall.
6   Q. Yes. But once they have been repaid, then Mr Steinmetz
7      or his children would get the upside of that project?
8   A. Yes, because it was structured initially as a loan.
9   Q. Yes, okay. There is a board memo. I will see if I need
10     to take you to it. But in 2014, Mr Driver and Yossi
11     write to the board, and they refer to the strong
12     relationship between BSGR and the management
13     shareholders of Roslindale, Nammax. Did you understand
14     the strong relationship to be the relationship with
15     Mr Steinmetz?
16  A. Can I?
17  Q. Of course. Bundle 2, tab 30.
18  A. Yes, which paragraph?
19  Q. Page 973, three paragraphs up from the bottom:
20        "The strong relationship between BSGR and the
21     management and shareholders of Roslindale, Nammax,
22     [Nammax is a subsidiary of Roslindale] Provide
23     additional assurance on the recoverability of this
24     loan."
25        It is written to the board so it seems to be assumed

156

1    that they will understand what this strong relationship
2    is. My question to you is what did you understand the
3    strong relationship with the management and shareholders
4    of Roslindale/Nammax to be?
5    A. Clearly, the hand of Mr Steinmetz.
6    Q. So essentially the message from Mr Driver and
7    Mr Tschelet is we can trust that this will get repaid
8    because Mr Steinmetz will ––
9    A. Because Mr Steinmetz would have no incentive or reason
10   to be depriving BSGR of its rightful position.
11   Q. And you mentioned that you have since come to understand
12   that the interest is held on trust for Mr Steinmetz's
13   children. Is that something you solely discovered from
14   reading the bundles in this case?
15   A. Yes.
16   Q. It is not something he has talked to you about?
17   A. No.
18   Q. Do you know whether that's a change of ownership, ie it
19   was Mr Steinmetz and it moved, or you don't know?
20   A. I don't know who was the original owner of Nammax and
21   their structure on the other side.
22   Q. One of the directors of Roslindale is Doron Levy?
23   A. Yes.
24   Q. Is that someone you know?
25   A. Yes.

157

1    Q. Who is Mr Levy? Who is Mr Levy?
2    A. He is an Israeli lawyer. He has a lot of experience,
3    I believe in tax. He has represented the foundation in
4    a number of matters, so he would be an adviser to the
5    foundation, and I also believe that he has
6    a relationship with Mr Steinmetz.
7    Q. What do you understand the nature of that relationship
8    to be?
9    A. I believe that he has helped Mr Steinmetz and the
10   foundation deal with tax issues that Mr Steinmetz is
11   facing as a beneficiary of the foundation in Israel. He
12   was very involved at one stage in the foundation doing
13   an exercise reviewing BSGR's accounts, in the context of
14   the whole Guinea situation. He was an interface when we
15   commissioned a report from Louis Free, to look at BSGR's
16   activities surrounding the Guinea transaction, and he is
17   currently advising Nysco in the 2019 complaint.
18   Q. Don't talk to me about that if you don't mind.
19       Has he previously acted for BSGR? Has he been
20   instructed by and represented BSGR?
21   A. I don't know the precise contractual arrangements of his
22   involvement, but he has historically been very involved,
23   for the reason that at one stage when we were looking at
24   the foundation and its operating companies from the
25   perspective of Israeli tax, he got very involved in

158

1    advising on how to structure, how to organise the
2    companies, and this had a lot to do with technicalities
3    surrounding Israeli assessment of what is ––
4    MR WEEKES: I am getting a bit –– I know my learned friend
5    is –– I am beginning to get a little bit nervous.
6    MR WILLAN: I am not interested in that topic.
7    A. Okay.
8    Q. Is it your understanding that Mr Levy acted as BSGR's
9    representative in his capacity as director of
10   Roslindale?
11   A. No.
12   Q. Roslindale, as you can see, actually if you go back one
13   page in this document to page 972, you will see about
14   halfway down a paragraph that begins:
15       "The shareholdings in the project remain unchanged
16   since 2012. Roslindale is an Israeli incorporated
17   entity which owns 87.71% of Nammax, an Israeli
18   incorporated entity."
19       Were you aware that Roslindale's interest in Nammax
20   was diluted during 2018 by the issuance of shares to
21   Beny Steinmetz's daughter?
22   A. No.
23   Q. Is it something you have heard about before I just asked
24   you the question?
25   A. Well, I think that I saw here in the bundle when I was

159

1    going through it, I saw some reference, not necessarily
2    to the restructuring but the fact that Roslindale, that
3    the children are beneficiaries, but I was never involved
4    in anything to do with this.
5    Q. Would you have expected the directors of Roslindale to
6    consult BSGR prior to a dilution?
7    A. To the extent that it would have affected BSGR's
8    position of being in front, yes, but maybe I'm missing
9    something here.
10   Q. No, it plainly has reduced ––
11   A. It doesn't.
12   Q. This is not the level of the trust. This is the level
13   between Roslindale and Nammax. So BSGR has an interest
14   in Roslindale. Roslindale has an interest in Nammax.
15   Roslindale's interest in Nammax has been diluted by
16   a massive share issuance to Beny Steinmetz's daughter,
17   so it now has a much lower effective interest through
18   Roslindale in the ultimate project.
19       But as I understand it, you knew nothing about that?
20   A. No. Are you saying that the result of this would be
21   that if there is any value in the asset, whatever
22   participation BSGR would get would be diluted?
23   Q. Yes.
24   A. I was not aware of that.
25   Q. Would you have expected BSGR to have been informed of

160

1    that?
2  A. Yes, absolutely.
3  Q. You spoke about Mr Levy. Is he someone you have been in
4    contact with since 2018?
5  A. Sporadically, very sporadically.
6  Q. Have you spoken at all about the Roslindale interest?
7  A. Never.
8  Q. Were you aware this he was a director of Roslindale?
9  A. No.
10  Q. Again, if I wanted to identify within BSGR who would
11    know about Roslindale and these sorts of dealings, who
12    would you expect to have dealt with that within BSGR?
13  A. Within BSGR?
14  Q. Within BSGR.
15  A. Well, historically I would have said Yossi Tschelet but,
16    you know, his involvement with BSGR proper stopped years
17    ago, but at the time he would have been key. David
18    Barnet of course and Peter Driver, from a board
19    perspective, because he's very conscientious when it
20    comes to this type of work. I'm more on the commercial
21    side.
22  Q. Were you aware that Roslindale had also granted a loan
23    to a company called Cap Scorpio?
24  A. No.
25  Q. Do you know what Cap Scorpio is?

161

1  A. No.
2  Q. You will pleased to know we are heading very near to the
3    end. West African Power Limited, previously known I
4    think as BSGR Power.
5  A. Possibly, yes.
6  Q. It is a wholly—owned subsidiary of BSGR?
7  A. It is possible as well, yes.
8  Q. And you are a director of ——
9  A. Yes, but only I think quite recently was I appointed to
10    that because of a departure of somebody, and I filled
11    the stopgap I believe, I think since 2018.
12  Q. And the underlying asset is a 38% interest in a company
13    called Amperion, which underneath which owns a power
14    station in Nigeria?
15  A. Correct.
16  Q. And what do you believe the value of West African Power
17    Limited's interest in Amperion to be?
18  A. At least the original investment of around 25 to
19    $27 million.
20  Q. And if you were asked to put a fair market value on it,
21    not the floor, but what you think it ought to realise?
22  A. I would have to have access to the accounts of the
23    operating company, but because of the strategic
24    positioning of this asset, being the power station that
25    lights up Lagos, I think there's potentially a lot of

162

1    value here.
2  Q. I am sorry to sort of push you a bit, but a lot? Give
3    me a ballpark?
4  A. When this original investment was made, they were
5    talking about an IRR in the high 20s, on the original
6    investment, and being a power station, it is an annuity,
7    it is a utility stream, so you could be clipping coupons
8    from this investment for a long time. It is a valuable
9    asset.
10  Q. And I am sorry to do it, but if you had to put a fair
11    market value on the interest, what would it be?
12  A. So maybe you should be able to pull out $3 million of
13    dividends a year for the next 20 years.
14  Q. Right. Sorry to press you again. A fair market value
15    for the interest? Obviously it is extremely discounted?
16  A. It is so unfair. You know there is Nigerian risk.
17    What's the hurdle rate?
18  Q. I agree.
19  A. It is definitely worth, if I say a compounded return of
20    20% on 30 million, okay, you've got up to $6 million
21    a year for 20 years at least, you know. I think in the
22    end it's what the market would pay for it. If you
23    didn't have the problems here with the partner and the
24    fight with the partners, I reckon you could get between
25    25 and $50 million of cash for this asset today.

163

1  Q. You have spoken about the dispute. That's with the
2    majority shareholder I think is Calvados?
3  A. If Calvados is the vehicle in which Forte Oil was
4    participating through, yes.
5  Q. It was, quite. Now, you probably know that there have
6    been proceedings in Nigeria in relation to the assets?
7  A. Yes.
8  Q. As I understand it, an order was obtained effectively
9    restraining you, West African Power Limited, from
10    selling its shares?
11  A. Sorry, I'm not so sure about it.
12  Q. If you take out bundle 4. Go, please, to tab 96. You
13    will see a motion or a claim brought in the Federal High
14    Court in Lagos, in which Calvados seeks an order against
15    your company, sorry, the company of which you are
16    a director, West African Power Limited, and paragraph 1,
17    they want an interlocutory injunction restraining you
18    from selling your shares. It is reported by the
19    administrators that such an order was granted. Is that
20    your understanding?
21  A. I don't know the detail of this at all. I haven't been
22    following it. It is very difficult to follow. I find
23    it difficult to understand what Nigerian lawyers are
24    talking about. But I do know the big picture but
25    I don't want to bore you with that.

164

1   Q. If I can, if you just go over the page to 1997. One of
2     the grounds for seeking the injunction was that the
3     first defendant, that is West African Power, had been
4     taking steps to sell or transfer its shares in the
5     second defendant, that is Amperion. Is it right that,
6     as at 2019, you had been taking steps to sell the
7     interest in Amperion?
8   A. No, that's not how I understand it. This is not my
9     understanding.
10   Q. This is the other side's allegation, so I don't know
11     if ——
12   A. Oh, okay. I see. No, it's not what I understand at
13     all.
14   Q. So to your knowledge there had not been any efforts to
15     market or realise the value of the investment?
16   A. No, not at all. The effort that has been taking place
17     since we were in administration is that I have sought to
18     engage the joint administrators in ensuring that we
19     could extract the full value embedded in this asset, by
20     being assertive and protecting the value of this asset
21     against the partner and the legal initiatives in Nigeria
22     to dilute our value.
23   Q. I understand. Perhaps I can ask you, in a nutshell, if
24     you would, where do you see that dispute going? What's
25     your understanding of where it's headed?

165

1   A. I strongly believe that we could and would be very
2     successful in capturing that value, if this legal
3     initiative was structured and applied the right way, and
4     the pressure and the right way was put on the Nigerians.
5   Q. You have personally been involved in trying to
6     negotiate, have you, with Forte, as it was?
7   A. At a very high level, and my last attempt was to hand
8     over this relationship, which wasn't going very well, to
9     the joint administrators, and there was a meeting with
10     the JAs and the key principals representing Forte in
11     their offices in London.
12   Q. What do you understand Forte to want, to resolve this?
13   A. I believe that they want to effectively steal the asset.
14   Q. Right. I understand. So your view is it needs to be
15     fought. It needs to be fought off, and BSGR realises
16     its value in the investment?
17   A. I would like to hire (inaudible) maybe to do it.
18   Q. I want to ask you a few questions about other assets.
19   A. Yes.
20   Q. If I can ask you, please, to look at bundle 5, tab 129.
21     I am going to be very careful what I ask you about this
22     document, for reasons which you will understand.
23   A. No problem.
24   Q. But I hope it won't be objectionable.
25   A. Which page?

166

1   Q. Bundle 5, tab 129.
2   A. Yes.
3   Q. So just to orientate you, and I don't want to comment on
4     this.
5   A. Yes, no problem.
6   Q. This purports to be an accounting of where money paid by
7     Vale was used by BSGR. All I am interested in is
8     certain assets mentioned to know whether they still
9     exist or what has happened to them. The first one
10     I want to ask you about is halfway down. There is
11     a reference to just over 20 million going to African
12     Petroleum bid for OML, 30, 40% share.
13     If it helps, if you turn over the page, you will see
14     a slightly more detailed reference at the very bottom
15     row: "African Petroleum SEPC, total NAOC African bid
16     escrow, bid for OML 30%, 40% loan to BSGR Exploration."
17     Just breaking it down, what is BSGR Exploration?
18   A. So I believe it was, there was a whole company managed
19     by industry experts, which was BSG Energy was the top
20     company. Within that company there were initiatives in
21     Nigeria, Azerbaijan, Russia and other places, and this
22     was ultimately the same team that handled the drilling
23     with Nammax.
24   Q. Understood.
25   A. And this, if I recall, because you want to know what

167

1     this relates to ——
2   Q. What I want to know, what happened to this 20 million
3     and did it end up acquiring an asset, the OML licence?
4   A. To the best of my recollection, and I wasn't involved in
5     the day-to-day operations, but there was a bid for ——
6     there were these marginal oilfields in the Delta there
7     in Nigeria, that various groups were bidding for, but
8     this bid was created together with Forte Oil, and they
9     came very close to having a successful bid. I think
10     a lot of time, effort and money was spent on it.
11     Standard Chartered were going to back the consortium.
12     But ultimately it failed. Without having more access to
13     accounts or looking at it, obviously there were
14     expenses —— I think that there may be some smaller
15     assets acquired, but it certainly has something to do
16     with that.
17   Q. But to your knowledge there is no current asset that
18     represents the value of that 20 million?
19   A. No.
20   Q. If you go up a couple of lines on page 2787, the very
21     colourful page.
22   A. Yes.
23   Q. About four lines up from the bottom, there is
24     a reference to a payment of 8.5 million to Pelagic
25     Exploration Company, oil and gas deal paid on behalf of

168

1    BSGR Luxembourg. What do you understand BSGR Luxembourg
2    to be?
3  A. I don't know, but perhaps a company at the time that was
4    part of the BSGR Energy structure, you know, something
5    like that.
6  Q. Did you have involvement in the BSGR Energy structure?
7  A. No. I may have been a director at one point in time of
8    one of the top companies, and I remember that there was
9    a JV called DB Petroleum, which was a JV with Dubai
10    World, and I was a director on that board.
11  Q. Right. I am going to ask you about that in a moment.
12  A. Okay.
13  Q. What do you understand this to relate to, the Pelagic
14    Exploration oil and gas deal?
15  A. If you asked me this three weeks ago I wouldn't have
16    known, but I now know because, as part of my review, the
17    Pelagic, that is the original licence that's acquired
18    for the drilling offshore, Israel .
19  Q. So that comes under the Nammax/Roslindale structure?
20  A. Yes.
21  Q. I think you mentioned the DP company, the joint venture.
22    I think that got sold off at some point?
23  A. Yes.
24  Q. Do you remember when it got sold off?
25  A. Yes.

<center>169</center>

1  Q. When was that?
2  A. Sorry, I don't remember the years and the timing because
3    so much has been going on, but I know this part of the
4    narrative very well, because I was personally involved
5    in solving the problem and selling the assets.
6  Q. I only have one question about it, depending on what
7    your answer is?
8  A. Sure, okay.
9  Q. Was it sold off to an independent third party?
10  A. There were two parts to this transaction. One was there
11    was a split of the assets with the former partners,
12    Dubai World and, that's very independent. And then the
13    assets that we kept, which were the Russian producing
14    oil and gas assets, were sold to an independent third
15    party, I think around $25 million, in the nick of time,
16    because they subsequently went bust, and I was
17    responsible for that transaction.
18  Q. Fine, so all gone to independent buyers in the end?
19  A. Correct.
20  Q. To your knowledge, does BSGR still have any interest in
21    or debt receivable from Bateman Litwin?
22  A. No.
23  Q. Now, BSG Energy you mentioned, and I think you are right
24    to say you were a director of that company. Does it
25    still own any assets?

<center>170</center>

1  A. I mean, it would be reflected then in the BSGR accounts
2    or so on. Not that I can think of or am aware of at
3    this point in time.
4  Q. I am pleased I am on my last few questions.
5    Baku Steel. BSGR enjoyed a right to 40% of the
6    income from Baku Steel?
7  A. I was not involved. It's possible.
8  Q. Did you know that there was income sharing arrangement?
9  A. We are talking at a time which would have been like
10    pre—2010, like a long long time ago.
11  Q. Has that interest been sold off?
12  A. I believe a long time ago and, you know, I wasn't
13    involved in any way. I was aware of the asset at the
14    time, on a look through basis, from the foundation
15    council perspective.
16  Q. Then final asset I wanted to ask you about was if you
17    just take up bundle 3, please. Tab 56.
18  A. Yes.
19  Q. Page 1534.
20  A. Sorry, tab 56?
21  Q. Tab 56, which are accounts for BSG Resources, 2017.
22    Page 1534. It is dealing with related party loans
23    receivable at note 14, and there is a company BSG
24    Capital Markets Limited?
25  A. Correct.

<center>171</center>

1  Q. If you look at (b), there is a description of
2    a transaction by which BSGR was due to receive
3    38.6 million from Nysco, and it set it off against
4    35.4 million which it owed to BSGR, sorry, which was
5    owed to it by BSG Capital Markets, leaving effectively
6    a net sum which would have been due from Nysco,
7    3 million. But it was converted from a balance due from
8    Nysco to a balance due from BSG Capital Markets. Why
9    was that?
10  A. So you know, I am not an accountant. I don't get
11    involved in the preparation or the treatment of how
12    these things work in any shape or form. I rely on
13    professionals to do that and auditors. What I do know
14    about this situation is that BSG Capital Markets owes
15    BSGR 1.8 million, and that that is a matter that we are
16    trying to address and ensure that the $1.8 million gets
17    to BSGR.
18  Q. Because presumably BSG Capital Markets is less
19    creditworthy than Nysco. Nysco is a holding company for
20    lots of assets. BSG Capital Markets is ——
21  A. It depends. You know, is my understanding, from what
22    perspective and when you're looking at it. Ultimately,
23    the structure was you had the Balda Foundation, you have
24    Nysco, and Nysco held in to Capital Markets, BSG Real
25    Estate and BSG Resources.

<center>172</center>

Case 1:19-cv-02026-LLS-KHP Document 74-2 Filed 05/13/21 Page 46 of 62
Case 1:17-cv-07196-KBF-SDW Document 149-2 Filed 05/13/21 Page 46 of 62

November 17, 2020                    Vale S.A. V. BSG Resources Limited (In Administration)                    Day 1

1 Q. In terms of getting repayment of this debt, what assets
2   can be realised by BSG Capital Markets to repay that
3   debt?
4 A. The only asset really in BSG Capital Markets is a 16%
5   shareholding in a listed Canadian company called Gabriel
6   Resources. That position has the potential to be quite
7   valuable, depending upon the outcome of an ICSID
8   arbitration.
9 Q. That is the other ICSID arbitration you mentioned?
10 A. Correct.
11 Q. I understand. Was BSGR responsible for funding that
12   investment in Gabriel Resources?
13 A. I believe that at one stage the original investment may
14   have formed part of BSGR, and because at one stage this
15   was a listed company, and the trades and the shares
16   traded in the market, it was deemed for it to be housed
17   in capital markets rather than resources, which are
18   about owning and operating assets. So I would have to
19   go back and check, but I believe that it's possible that
20   the original investment in Gabriel, which I recall being
21   in November 2009, because I remember very well because
22   I had been involved ever since, that may have been made
23   by BSG Resources, but the funding may have actually come
24   originally from Capital Markets at the time, because by
25   then I think BSG Resources was kind of out of money. So

173

1   how this was treated internally, I don't know now.
2 Q. I promise you my last two questions. You have mentioned
3   on several occasions asking Mr Steinmetz whether he was
4   interested in various companies. When did those
5   conversations take place? So I am interested in
6   Litigation Solutions Limited or GSOL?
7 A. You mean if he had an economic interest?
8 Q. Yes.
9 A. The key focus on this for me, when I became aware of it
10   being a very important matter, was during the course of
11   the Conatus application this year.
12 Q. And that's an oral conversation, it is not something
13   that's documented?
14 A. Yes.
15 Q. And just you and him?
16 A. Yes. But I think that he would have no reason to
17   dispute that conversation having taken place.
18 Q. And then my last question. We talked about the value of
19   the ICSID claim, and you said to me you want 10 to 20%
20   of the Zogota revenue share. Ignore any settlement
21   prospect. You were just talking about the value of the
22   claim, how much you would sell it for. What financial
23   value would you put on the ICSID claim now? Don't worry
24   about the past. If you were looking at selling that
25   claim now, what value would you attribute to it?

174

1 A. It could run into billions of dollars.
2 Q. Right. When you say it could, of course it could, it
3   might, but if you had to do your best to value it, if
4   you were drawing up a list of the companies' affairs and
5   you were asked to put a value on it ——
6 A. Right now it's absolutely clear that the Chinese
7   consortium finally achieved what they want to be, to
8   have their hand on this asset. And if this litigation
9   and your entitlement or right to this asset is what
10   blocks them from exploiting this asset with
11   the Government's blessing, it is worth billions. That
12   would be a fantastic position to be in.
13 MR WILLAN: Mr Cramer, thank you very much. I think I have
14   reached the limit of the day. Master, in terms of the
15   way forward, I have finished the questions I wanted to
16   ask today and I hope I have been fair to Mr Cramer in
17   giving him an opportunity to tell what he wants to say,
18   whilst getting through it.
19       I don't ask you to adjourn the examination, but
20   I would ask for liberty to apply, and it would have to
21   be an application, if there are further questions
22   arising out of our consideration of the material we have
23   obtained today. Ultimately ——
24 MASTER DAVISON: Do you need an order from me?
25 MR WILLAN: Strictly, the White Book says we can simply make

175

1   another part 71 application.
2 MASTER DAVISON: But you would rather have liberty to apply
3   on this one?
4 MR WILLAN: I think it would make more sense than having to
5   issue a new part 71 application, which would be ex parte
6   again. We would end up with all the same fights. It
7   seems to me it would be more sensible simply to have
8   a liberty to apply on this, with no presumption I should
9   say as to how that will be approached. So it is simply
10   procedurally, this having been, us having got this
11   far ——
12 MASTER DAVISON: I don't see a difficulty with that but
13   obviously it would be treated in the same way as
14   a completely fresh application, so far as the merits are
15   concerned.
16 MR WILLAN: I accept we would need to show some reason for
17   it.
18 MASTER DAVISON: Do you have any observations on that,
19   Mr Weekes.
20 MR WEEKES: Master, what I would say, and obviously I must
21   act without instructions here because my client is
22   obviously still in the witness box ——
23 MASTER DAVISON: I can release him if you want to take
24   instructions. I mean, we have finished with his
25   evidence so if you want to do that that's fine.

176

1    MR WEEKES:  Master, that may be helpful.  Before, if we
2      might do so, I might say two things.  First of all,
3      plainly, and consistent with your observation, Master,
4      my client can't be put in any worse position than he
5      would be if a fresh application had to be made.  So in
6      other words we would expect, on such an application, to
7      say, to put no finer point on it ——
8    MASTER DAVISON:  There would have to be a good reason.
9    MR WEEKES:  There would have to be a good reason for
10      re—opening an examination which was entirely concluded,
11      and we would say, Chanel v Woolworth, they have had
12      their chance, they have had the hearing, they have asked
13      the questions they wanted to ask.  It is not being
14      suggested in the course of examination that there is
15      anything else they wanted to ask which they could not do
16      so.  We would say that any such application would face
17      extremely high hurdles, just as it would to issue
18      a fresh application under part 71.
19          I would wish to confirm with my client, Master
20      whether it is actually the position that we would say
21      no, just go away and issue a fresh application.
22    MASTER DAVISON:  I don't want to stop you speaking to
23      Mr Cramer about if you want to, but we are here just
24      dealing with mechanics, aren't we?  It is a question of
25      whether there should be liberty to apply or whether the

<center>177</center>

1      claimant should have to issue a new application.  It
2      seems to me that it makes more sense for me to say
3      liberty to apply, but with all the caveats that I have
4      already expressed.
5    MR WEEKES:  Master, it would be a matter then of making sure
6      that it was drafted so that the liberty to apply was
7      making it clear that we had the opportunity to make ——
8    MASTER DAVISON:  No doubt in drafting the preamble to the
9      order, which will follow today, you will be clear about
10      what I have said.  I don't think there is any difference
11      between you and Mr Willan on it.
12    MR WILLAN:  No, I fear that —— and I appreciate we don't
13      want to get into this ping pong.  Trying to draft
14      a principle as to when it can be triggered is going to
15      be I would have thought insuperably difficult.  Your
16      comments have been recorded on the transcript.  I have
17      accepted that we would certainly need to show good
18      reason.  My learned friend said ——
19    MASTER DAVISON:  All I meant to say was it would be dealt
20      with on the same footing as a fresh application, and
21      that is all I need to say.
22    MR WILLAN:  Certainly, and I have no objection no that.
23    MASTER DAVISON:  Was there anything else?
24    MR WEEKES:  Yes.  We need to seek a direction, which is an
25      inevitable consequence of 34.12, in relation to use of

<center>178</center>

1      the deposition, and the deposition means both any
2      transcript of today's proceedings and the actual answers
3      that were given, and any notes that anybody has been
4      making in court of those answers.  Master, if I may take
5      you through it in stages.  The first stage is if you
6      have the White Book, Master, it is page 1130.  This is
7      rule 34.12.  It provides, subparagraph 1:
8         "Where the court orders a party to be examined about
9      his or any other assets, for the purpose of any hearing
10      except the trial, the deposition may be used only for
11      the purpose of the proceedings in which the order was
12      made."
13         So, Master, that is the general rule.  There are the
14      exceptions which apply in subparagraph 2.  Of course,
15      one of the exceptions which doesn't appear here is not
16      an exception that the proceedings took place in public.
17      Master, I will take you to the authority which deals
18      with this point.
19         Whilst we are in the White Book, Master, the next
20      rule to look at is relevant is at page 1281.  And
21      this, Master, is concerned at rule 39.9.1.  It is
22      concerned with having access to the transcript.  In fact
23      it is 39.9, subparagraph 3:
24         "Any party or person may require a transcript or
25      transcripts of the recording of any hearing to be

<center>179</center>

1      supplied to them upon payment of the charges authorised
2      by any scheme enforced for the making or recording of
3      the transcript."
4         So that's the rule which gives effect to the
5      proposition that if a hearing takes place in public
6      a member of the public is entitled to apply for
7      a transcript of that hearing, provided they pay the fee
8      for the transcript itself.
9    MASTER DAVISON:  So you want me to modify that?
10    MR WEEKES:  Master, if I can next take you to the authority
11      which deals with this slight odd conundrum about when
12      you have a deposition hearing in public, how you make
13      use of the transcript.  That is in an authority in our
14      bundle which is tab 4, Master.
15    MASTER DAVISON:  Yes.
16    MR WEEKES:  Master, I do apologise, I should have answered.
17      The answer to your question, Master, is yes, we ask you
18      to make an order which gives effect to the consequence
19      of 34.12 being read together with 39.9.
20         Master, tab 4, this is a decision of
21      Mr Justice Floyd, as he then was, in North Shore
22      Ventures and Anstead Holdings.  The relevant part of the
23      judgment is at paragraph 29, which is page 2273.
24    MASTER DAVISON:  Yes.
25    MR WEEKES:  "The second part of the application is founded

<center>180</center>

1     on CPR rule 34.12. This rule provides that the product
2     of an examination as to assets cannot be used for any
3     purpose other than the purpose of the proceedings in
4     which the order was made. There is no dispute between
5     the parties as to this. Moreover, Mr Machel recognises
6     that collateral use by the claimant of the transcript
7     could amount to contempt of court."
8     Of course that applies to collateral use of the
9     transcript by anyone. It could amount to contempt of
10    court.
11    The situation which Mr Justice Floyd was dealing
12    with was what to do with making a direction about the
13    transcript, in circumstances where the part 71 hearing
14    had proceeded in public, as this one has.
15    Having addressed the terms which were sought by the
16    applicant in paragraphs 30 and 31, and finding they were
17    inappropriate, the judge goes on at paragraph 32:
18    "There remains, however, an anomaly which needs to
19    be addressed. If the cross—examination herein is in
20    public, a copy of the transcript is available as of
21    right to any member of the public. Yet CPR rule 34.12
22    provides quite generally that the use to which such
23    transcripts may be put is the purposes of the action
24    only. There is no provision corresponding to rule 31.22
25    which discharges the corresponding obligation in

<center>181</center>

1     relation to disclosure documents, when a document is
2     read to or by the court or referred to in a hearing in
3     public. The net effect is that although a nonparty may
4     obtain a copy of the transcript of an examination as to
5     assets conducted in public, it may only be used by
6     a third party for the purposes of proceedings to which,
7     by definition, he is not a party."
8     The judge goes on to say that that anomaly is not
9     a consequence of the judge's construction. It is the
10    effect of the rules. In paragraph 34, the judge goes
11    on:
12    "It is however difficult to see what a nonparty
13    could do with a transcript within use permitted by rule
14    34.12. One possibility is an application to be joined
15    as a party, but I think it unlikely that there would be
16    any such application by a nonparty in this case."
17    Obviously the same here too.
18    "In the present case I think it would be right, as
19    Mr Machel suggested, for me to direct that the file be
20    marked with an indication that copies of the transcript
21    can only be obtained for use for the purposes of the
22    present proceedings. Notice of that direction can be
23    given to the court transcription service. That will
24    enable the matter to be referred to a judge in the event
25    of a request which is not clearly for permitted

<center>182</center>

1     purpose."
2     So, Master, we do seek that direction, but there is
3     a further point which needs to be made, so that nobody,
4     including anybody who is observing the proceedings, is
5     under any doubt as to what the word "deposition" means
6     in rule 34.12. And that, Master, is very pithily
7     summarised by Mr Gee in his book, and that's in tab 7 of
8     this bundle.
9     This is from the current edition of Mr Gee's book.
10    Page 814 is the part which is most relevant.
11    MASTER DAVISON: Yes.
12    MR WEEKES: Having set out in paragraph 23, sub 30, the
13    rule, Mr Gee says, 34.12, and this is between the two
14    hole punches:
15    "It is not a complete code on the restriction of the
16    use of depositions."
17    Then he goes on to say:
18    "The deposition under CPR rule 34.12 includes the
19    oral answers given in this course of the examination,
20    the transcript of them and other record, including
21    counsel's or solicitors notes or a tape recording of the
22    cross—examination."
23    And that makes sense, Master, of course, because
24    there is no magic in it being recorded as a transcript
25    in a particular document marked "transcript". The

<center>183</center>

1     mischief which the rule is directed at is to make sure
2     that answers which are given by a witness under
3     compulsion — —
4     MASTER DAVISON: I think that is what anybody would call
5     a deposition. I don't think that is contentious.
6     MR WEEKES: No, Master. I had hoped not. But the reason
7     I am belabouring the point is that of course there are
8     people here taking notes, and they need to understand
9     that they couldn't leave this building and start using
10    those notes.
11    MASTER DAVISON: Because everything they have noted is part
12    of Mr Cramer's deposition.
13    MR WEEKES: Indeed.
14    MASTER DAVISON: Yes.
15    MR WEEKES: So they couldn't, for example, publish those
16    notes on the internet or take any other steps in
17    relation to them because that would be in contempt of
18    court. They are only entitled to use notes made of
19    today's deposition for the purposes of the proceedings
20    to which they relate.
21    MASTER DAVISON: Yes.
22    MR WEEKES: Master, it is not some curiosity, as
23    Mr Justice Floyd said. That is simply the effect of the
24    rule. But it is important that everybody understands
25    that that is the effect of the rule.

<center>184</center>

1  MASTER DAVISON:  Yes.
2  MR WEEKES:  Master, with that in mind, what we would suggest
3     is that it  specifically  be made clear, Master, in your
4     order, and potential wording could be along the lines
5     of: "Subject to any further order of the court, any
6     transcript of the deposition, including any notes made
7     of the hearing, shall  only be used for the purposes of
8     these proceedings."
9  MASTER DAVISON:  Which is the order that Mr Justice Floyd
10     made?
11  MR WEEKES:  Indeed, except he didn't add "notes made by the
12     parties".
13  MASTER DAVISON:  You just want an absolutely crystal clear
14     definition  of deposition.
15  MR WEEKES:  Absolutely, Master.  Then we would suggest that
16     in those circumstances it is  appropriate that a penal
17     notice be attached, because Mr Justice Floyd noted of
18     course breach of that prohibition  is  actually a contempt
19     of court.  So third persons —— I am sure it is not an
20     issue  for the claimant, but of course third  parties need
21     to know that the consequences of a breach of the order
22     are  potentially  penal.
23  MASTER DAVISON:  Yes.  All right.  I will just turn to
24     Mr Willan and ascertain how much of this is ——
25  MR WILLAN:  I am not sure it is really a matter for me in

1     many ways.
2  MASTER DAVISON:  No.
3  MR WILLAN:  In some ways it is more a matter for if you like
4     public  interest  that ——
5  MASTER DAVISON:  There is a bit of a tension isn't there
6     between 34.12 and 39.97
7  MR WILLAN:  There is.  There is undoubtedly a tension.  It
8     is  in some ways hard to reconcile with what is the
9     modern approach, that anything heard in open court,
10     there is a legitimate interest in the public knowing and
11     using to hold the justice  system to account, but that is
12     not an argument for me.  That is an argument for whoever
13     may want to make it in due course, assuming anyone has
14     any interest  at  all  in  what has been said today.
15     But all  I would say, Master, is  I have no objection
16     on my part to the direction, sorry, the marking on the
17     court file , which Mr Justice Floyd envisaged.  So he
18     said to direct that the  file  be marked with an
19     indication  that the transcript  can only be obtained for
20     use in the present proceedings.  That is fine .  That is
21     not an injunction against anyone.  That is a direction
22     as to what is on the court file , and if someone tries to
23     access it , as he points out, it  will get referred to
24     a judge to decide what to do with it .
25     I am very wary —— you caught me on the hoof without

1     any application or prior notice, to grant a contra
2     mundum injunction about the use of notes backed by
3     a penal notice, in circumstances where there has not
4     been any proper consideration of whether that is
5     a proper balancing of article  10 and article 6 rights .
6     Now, frankly, I am not interested in arguing.  It is
7     not my fight.  But to ask the court in the modern
8     climate, to grant an injunction, effectively , backed by
9     a penal notice is wrong, in my submission.  The rule is
10     there.  No objection at all to you directing that the
11     file  be marked that if anyone seeks a copy it should be
12     referred to a judge for them to consider the impact of
13     rule 34.12.  But anyone who is here will have heard
14     reference to rule 34.12.  I am not sure there are any
15     non—lawyers present in the room as observers anyway.
16     I do suggest that granting the sort of order that my
17     friend  is  asking is a bit wrong in principle , and
18     certainly insofar as he is trying to get restrictions  on
19     the use of documents beyond what is actually in the
20     rule .
21     Master, there are complications.  One of the
22     accepted implicit exceptions, for instance, is you can
23     always use the material for the purposes of deciding
24     whether to make an application for permission for
25     collateral  use.  In a sense that goes without saying,

1     because if you couldn't use it  for the purpose of
2     deciding whether you wanted to make an application to
3     use it  for that to be permitted to use it  for another
4     purpose, under rule 34.12.2C,  it  would be practically
5     impossible ever to make that application, because you
6     wouldn't be able to read the transcript  for the purposes
7     of deciding whether there is material in it  that you
8     need to rely on or that makes it  worth applying to the
9     court for permission.  Let me take an example.  Again,
10     not my fight.  But the joint administrators.  They have
11     a representative  sitting here today.  They are very
12     likely  to want to think about: Do we want to use the
13     answers that have been given for the conduct of the
14     joint administration?  Now, prima facie that is not for
15     the use of the proceedings in which it  has been taken
16     but I would have thought they have a very good shot
17     under rule 34.12.2 (c) of getting permission, given that
18     it  would be consistent with the purpose of this hearing
19     which is ultimately  for  realising the benefit of the
20     judgment granted by the court and ensuring that it  is
21     paid.
22     But it  must be possible for them to consider the
23     transcript  for the purpose of deciding whether to make
24     that application, and an injunction backed by a penal
25     notice that they can't use the transcript  for any

1    purposes other than these proceedings would prima facie
2    stop them doing that.
3        But, master, ultimately my submission to you is the
4    rule is there. You can direct that it be marked on the
5    file, so if anyone tried to get a transcript that it
6    will be referred to you. Those who are in court have
7    heard the discussion of rule 34.12 ——
8  MASTER DAVISON: But that would be in conflict with what you
9    have just said, which is that someone might want to
10    consider the transcript for some purpose prior to or
11    collateral to the present proceedings.
12  MR WILLAN: I suppose there are two options. One is —— take
13    the joint administrators. They have a representative
14    here who has taken a note. They may want to look at
15    that note ——
16  MASTER DAVISON: I tell you what. I was just wondering
17    whether it might be more consistent with the open
18    justice principle if I were to say that for the purposes
19    of rule 39.9. (3) I should treat the hearing as having
20    been held in private. So that would require an
21    application by anybody interested for an order releasing
22    the transcript, as it were.
23  MR WILLAN: The difficulty with that, Master, in my
24    submission is that the rules in relation to private
25    hearings have changed so that you can only do that not

<center>189</center>

1    if you like as a matter of convenience, and I don't
2    mean —— I am using that as shorthand.
3  MASTER DAVISON: Yes, you said in your skeleton.
4  MR WILLAN: It has got to be strictly necessary, in the
5    interests of justice, and having conducted the hearing
6    in private and in public —— I am not sure that
7    retrospectively if you like it can be strictly
8    necessary, but if you were to direct that any attempt to
9    access the transcript would be referred to a judge,
10    which is effectively what Mr Justice Floyd did, then in
11    practical terms it will have to come before you before
12    anything, a transcript will be released.
13        As I say, there are two scenarios where this really
14    arises. The first is the joint administrators for
15    instance have notes. They may look at those and decide
16    "We want to make an application under 34.12", and they
17    shouldn't be prohibited from looking at their notes for
18    that purpose. Or they may seek a transcript for
19    deciding whether they want to make that application, but
20    in that situation it seems to me that if you have given
21    the direction envisaged by Mr Justice Floyd, that the
22    consequence is they would have to write to you and say:
23    "Please may we have a copy of the transcript to decide
24    whether we want to make use of it, to make an
25    application to make use of it", and you can then

<center>190</center>

1    decide whether that is proper or not and, indeed, if
2    they need to be warned and query if they need to be
3    warned with a penal notice, that there are until such
4    permission is granted restrictions on the use of it.
5        But as I say, ultimately the question is should you
6    go further than rule 34.12 and grant what is, in effect,
7    a form of reporting restriction order, ie an injunction
8    against the world that they may not use any materials,
9    backed by a penal notice. My submission is no. The
10    rule is there. It is not a question of you granting now
11    some exceptional injunction going beyond the rule.
12  MASTER DAVISON: Thank you very much, Mr Willan. Did you
13    want to come back?
14  MR WEEKES: Yes, Master if I may. First of all, we are not
15    seeking to go any further than rule 34.12. As you
16    yourself indicated, all we are doing is simply giving
17    effect to the meaning of the word "deposition". And the
18    reason for referring to it in terms of notes of the
19    hearing is so that it is clear to anybody who is not
20    a lawyer, who has taken such notes, as to the use to
21    which they can be put. So all we are seeking is an
22    order which clearly records the effect of a rule of the
23    CPR. So I am not seeking an injunction. I am not
24    seeking an injunction contra mundum. I am simply
25    seeking an order which states in plain language the

<center>191</center>

1    effect of rule 34.12.
2        Secondly, master, one should not overstate this.
3    One could always make an application, that's what rule
4    34.12 subparagraph 2 provides. So all we are doing here
5    is putting in place a record of what 34.12 (1) provides,
6    and any person has a right to make an application for
7    use of the transcript, and of course they are to make
8    that application on notice and have to indicate the
9    reason to which they wish to use it, and then the court
10    can consider that, and if the court considers it
11    appropriate tends to make —— will make an order on terms
12    as to how it can be used.
13        The third point, with respect to my learned friend,
14    is simply a straw man. To suggest that there is some
15    difficulty associated with whether or not one can use
16    notes of a hearing for the purpose of considering
17    whether to make an application under rule 34.12 (2).
18    One can always use one's notes or documents which are
19    disclosed in the course of the proceedings for the
20    purposes of considering whether to make an application.
21        Of course the standard time in which it comes up is
22    when a party gives disclosure under CPR part 31, and
23    then the recipient of the disclosure considers they wish
24    to use that disclosure for the purpose of parallel
25    proceedings.

<center>192</center>

1    Of course they are entitled to consider that
2    disclosure for the purposes of considering whether to
3    make an application to use the documents. That's
4    completely standard. Otherwise it would be impossible
5    to use a document disclosed in one set of proceedings
6    for the purposes of another set of proceedings.
7        So that is not a difficulty at all. That is simply
8    illusory.
9        What we say, Master, is that the first part of the
10   direction we seek in relation to transcripts doesn't
11   appear to be controversial. In relation to the second
12   part, to which my learned friend takes some objection,
13   we say all that is doing is recording what the rules
14   provide anyway, for making sure that nobody is labouring
15   under any doubt at all in relation to it.
16 MASTER DAVISON: Thanks.
17       So what I will do is as follows: I will say that
18   there should be a preamble to the order which makes it
19   clear that "deposition", as that expression is used in
20   rule 34.12, includes all of Mr Cramer's evidence,
21   including his oral answers to questions, and I will say
22   in the body of the order that any application under rule
23   39.9 (3) is to be referred to a judge or master.
24       I won't be more specific than that because I don't
25   want to fetter the judge or master in the order that

193

1    they may wish to make as a result of any application
2    coming forward.
3        I won't make a wider order than I have indicated.
4    I certainly won't make what amounts to an injunction
5    against all the world and I won't endorse the order with
6    a penal notice either.
7 MR WEEKES: Thank you, master.
8 MASTER DAVISON: So, Mr Willan, no doubt you will take
9    carriage of drawing up the order, will you, and email it
10   to me?
11 MR WILLAN: I will.
12 MR WEEKES: Master, I did say I would briefly take
13   instructions from Mr Cramer in relation to the new
14   application point.
15 MASTER DAVISON: I have already ruled on that. That's just
16   a matter of mechanics. I'm sorry, I don't mean ——
17 MR WEEKES: I am content, Master, thank you.
18 MASTER DAVISON: Thank you all very much. Thank you,
19   Mr Cramer. That went much more smoothly than either of
20   us I think were expecting.
21 A. Thank you.
22 (4.40 pm)
23              (The hearing concluded)
24
25

194

1
2                    I N D E X
3  MR DAG LARS CRAMER (affirmed) ......................2
4  Examination by MR WILLAN  ........................2
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

195

196

A

**ability (2)** 49:13 87:14
**able (13)** 12:19 29:5 44:25 66:1 82:21 88:4 107:14 110:25 115:22 127:16 146:12 163:12 188:6
**abnormal (2)** 137:25,25
**absolute (1)** 105:25
**absolutely (11)** 13:3 57:18 61:6 75:5 109:6 123:12 137:9 161:2 175:6 185:13,15
**academic (1)** 85:17
**acceleration (3)** 59:13,16,23
**accept (6)** 25:17,20 28:11 70:21,24 176:16
**accepted (4)** 138:19 151:13 178:17 187:22
**accepting (1)** 58:9
**access (8)** 75:10 87:15 91:5 162:22 168:12 179:22 186:23 190:9
**accompli (1)** 138:20
**accordance (5)** 2:18 59:12 83:15 106:24 110:21
**account (11)** 65:4,22,23 75:9 80:3,8,11,14 103:18 106:10 186:11
**accountant (3)** 16:24 104:3 172:10
**accounted (3)** 83:25 85:12,13
**accounting (7)** 9:8 10:19 11:6,8 16:15 84:18 167:6
**accounts (20)** 6:23 9:13 11:8,9 64:15,19,20 75:9 80:1,18 100:18,22 110:2 141:24 150:4 158:13 162:22 168:13 171:1,21
**accrued (2)** 84:12 151:1
**accrues (1)** 84:24
**accumulated (1)** 98:19
**accumulation (1)** 99:14
**accurate (2)** 63:25 100:23
**achievable (1)** 29:20
**achieve (3)** 28:21 29:5 151:22
**achieved (4)** 103:3 105:23 107:14 175:7
**achievements (2)** 88:1 126:10
**achieving (1)** 103:15
**acquire (3)** 73:6 124:16 149:23
**acquired (10)** 35:22 44:19 51:1 73:13 79:5 81:25 84:15 144:12 168:15 169:17
**acquirers (1)** 64:21
**acquiring (2)** 52:21 168:3
**acquisition (1)** 79:23
**acrimonious (3)** 49:6 81:3 141:7
**across (6)** 28:8 42:23 46:18 48:15 95:7 111:9
**acted (3)** 137:6 158:19 159:8
**acting (5)** 19:14,14,20 134:7 136:25
**action (1)** 181:23
**actions (1)** 142:19
**active (3)** 1:9 2:25 3:1
**actively (1)** 152:10
**activities (3)** 9:7 17:24 158:16
**activity (4)** 4:16 7:3 8:20 9:14
**actor (1)** 25:6
**acts (1)** 19:21
**actual (4)** 70:25 92:7 148:5 179:2
**actually (30)** 9:19 16:18,22 28:25 30:12 42:19 56:5 61:19 70:19 71:4 72:12,17 85:23 87:18 88:3 89:6 92:9 97:1 110:19,22 126:16 128:3 154:14 155:8 156:3 159:12 173:23 177:20 185:18 187:19
**add (4)** 81:4 143:1 147:9 185:11
**addition (6)** 54:8 59:10 73:22 113:9 128:22 151:13
**additional (9)** 59:9,11,25 60:4,7 103:23 117:3 154:20 156:23
**address (3)** 14:5 70:10 172:16
**addressed (2)** 181:15,19
**adduced (1)** 70:15
**adjacent (1)** 127:1
**adjourn (1)** 175:19
**adjournment (3)** 71:3,11 96:15
**adjudicate (1)** 68:18
**adjusted (1)** 59:12
**administration (14)** 18:5 22:10 26:22 61:20 78:1 98:15 100:8 123:7 131:25 132:18 134:10 136:20 165:17 188:14
**administrators (42)** 1:8 22:11 23:2,6,20 25:24 26:9 27:4,6,9 36:13,17 37:4 38:1,6 40:2,10 42:8,13 56:20 60:20,23 66:15 68:4 69:14 96:23 97:10 109:17,20 111:5 120:22 121:17 122:25 123:5 134:2 143:5 164:19 165:18 166:9 188:10 189:13 190:14
**admissible (3)** 66:11,16,17
**admit (1)** 68:18
**advance (1)** 69:18
**advanced (1)** 146:10
**advice (16)** 6:5 16:1 19:2 22:7 23:7 66:24 69:7 132:5,6 134:9 139:11 142:14,18 147:15 148:1,15
**advise (5)** 78:13 132:9,15,16 142:9
**advised (3)** 22:25 78:13 142:10
**adviser (17)** 19:16,21 20:2,3 22:20 23:5 24:5 25:5,13 108:9 119:1 133:15 136:25 138:5 139:10 142:8 158:4
**advises (1)** 139:5
**advising (2)** 158:17 159:1
**advisory (1)** 19:21
**affairs (2)** 107:18 175:4
**affected (1)** 160:7
**affiliated (1)** 31:24
**affiliates (1)** 32:8
**affirmed (2)** 1:18 195:3
**afraid (6)** 39:15 69:11 71:1 90:7 95:15 121:21
**africa (2)** 30:24 75:25
**african (11)** 30:25 62:15 76:24 162:3,16 164:9,16 165:3 167:11,15,15
**after (20)** 1:24 12:25 27:7 58:22 59:1,16 62:22 64:9 65:20 71:10 92:16 93:15,17 94:1,9 95:4 106:10 112:19 130:6 156:1
**again (19)** 4:24 31:16,21 37:3,23 59:15 75:12 86:23 94:6 101:4 126:23 131:6 134:22 150:12 153:20 161:10 163:14 176:6 188:9
**against (14)** 18:3 110:2 128:25 131:24 132:1,9 135:25 147:14 164:14 165:21 172:3 186:21 191:8 194:5
**agenda (3)** 27:8 38:2 109:22
**agent (10)** 90:22,22 101:13 102:3 103:3,13 104:8 107:20 109:23 112:3
**agents (2)** 105:21 111:19
**aggressive (4)** 14:3,5 33:19 137:13
**aggressively (1)** 33:21
**ago (8)** 74:16 104:16,16,17 161:17 169:15 171:10,12
**agree (8)** 19:7 27:7 30:11 33:23 74:2,4 118:9 163:18
**agreed (11)** 56:12 66:15 67:4 115:4 118:5,13,16 136:14 138:10,12 145:2
**agreeing (2)** 15:6 77:8
**agreement (36)** 19:3,4,5,7 24:16 27:7 30:11 31:25 32:10 34:19 37:8,20 42:13 48:19 58:23 59:1,17 60:14 65:21 67:3 68:13 73:8 81:8 87:5 106:3,4,21 108:17 110:20 116:13 139:17,22 146:1,4 148:11 153:12
**agreements (6)** 37:1 51:17 80:5,22 109:1 133:16
**agrees (1)** 54:7
**aid (1)** 49:23
**air (1)** 137:20
**al (1)** 90:25
**allegation (1)** 165:10
**allegations (1)** 12:1
**allocating (1)** 8:5
**allocation (1)** 8:7
**allow (1)** 71:21
**allowed (4)** 55:17 56:14 69:5 117:20
**almost (1)** 82:15
**alone (1)** 29:14
**along (3)** 69:15,23 185:4
**alpha (3)** 24:5 31:3,14
**already (6)** 60:18 96:5 115:7 146:2 178:4 194:15
**also (40)** 7:17 8:3,21,23 15:17 16:7,16 20:19 21:7 37:20 40:4,5 52:2,8 56:4 60:11 62:16 63:14 70:2 73:13,15 74:24 78:6 79:5 87:10 88:14,18,21 90:21 97:8 98:11 99:17 110:16 138:14 144:8 147:24 149:9 154:18 158:5 161:22
**although (4)** 17:14 23:4 61:13 182:3
**alvarez (1)** 1:7
**always (18)** 8:18 13:21 20:1,2,6 49:10 61:17 62:6 75:2 111:3 122:16 123:16 125:9 127:2 131:9 187:23 192:3,18
**amalgamate (1)** 94:18
**ambition (3)** 35:17 62:1 120:19
**amicable (4)** 22:14,19 28:16,22
**amicably (1)** 44:8
**amortising (1)** 62:19
**amount (18)** 54:11 59:11 64:14 77:9 85:17 87:7 98:13 99:16 104:5 109:17 120:5 132:16 146:22 151:1,3,4 181:7,9
**amounted (1)** 22:16
**amounts (2)** 35:9 194:4
**amperion (4)** 162:13,17 165:5,7
**analysis (1)** 99:7
**andor (2)** 71:21 137:9
**annual (1)** 117:6
**annuity (1)** 163:6
**anomaly (2)** 181:18 182:8
**another (15)** 9:11 20:7 27:24 72:6 78:10 88:21 89:9,25 145:17 146:5 153:19 154:13 176:1 188:3 193:6
**anstead (1)** 180:22
**answer (26)** 5:2 10:4 13:2 25:12 51:15 52:6 69:22 83:12 93:17 95:24 101:21,22 102:1 126:3 131:17 133:11 134:7,12 135:3 138:17,19 145:10 146:13 155:2 170:7 180:17
**answered (4)** 7:10 96:5 97:1 180:16
**answering (1)** 1:23
**answers (8)** 110:25 115:7 179:2,4 183:19 184:2 188:13 193:21
**anticipate (1)** 99:4
**anybody (13)** 25:17 28:11 29:24 30:15 57:24 77:18 131:4 155:25 179:3 183:4 184:4 189:21 191:19
**anymore (1)** 13:22
**anyone (14)** 25:20 95:9 96:8 110:9 123:11 127:7,19 134:14 181:9 186:13,21 187:11,13 189:5
**anything (20)** 1:15 8:24,24 29:12 35:11 36:2 43:14 47:21 64:25 86:15 94:20 105:13 106:6 133:16 139:13 160:4 177:15 178:23 186:9 190:12
**anyway (6)** 72:1 73:18 95:15 96:13 187:15 193:14
**anywhere (1)** 69:12
**apart (2)** 141:4,6
**aphrodite (1)** 149:13
**apologies (2)** 48:10 66:5
**apologise (3)** 83:13 110:18 180:16
**appear (6)** 1:4 30:7 87:22 131:13 179:15 193:11
**appeared (2)** 77:14 133:6
**appearing (1)** 47:14
**appears (5)** 1:5 43:13 69:13 82:1 87:1
**applicant (2)** 32:24 181:16
**application (39)** 1:14 68:21 70:8 89:19 105:12,14 174:11 175:21 176:1,5,14 177:5,6,16,18,21 178:1,20 180:25 182:14,16 187:1,24 188:2,5,24 189:21 190:16,19,25 192:3,6,8,17,20 193:3,22 194:1,14
**applied (3)** 32:9 95:7 166:3
**applies (1)** 181:8
**apply (9)** 68:2 175:20 176:2,8 177:25 178:3,6 179:14 180:6
**applying (1)** 188:8
**appointed (2)** 152:17 162:9
**appointment (1)** 98:6
**appreciate (3)** 121:6 143:13 178:12
**approach (3)** 139:18 145:7 186:9
**approached (2)** 44:18 176:9
**appropriate (4)** 61:4 142:9 185:16 192:11
**approval (1)** 122:24
**approve (9)** 3:21,25 4:3 11:18 124:10 138:1,7,17 139:16
**approved (5)** 23:6 118:16 138:23 150:6,11
**approximate (1)** 98:17
**approximately (2)** 98:14,16
**april (1)** 150:17
**arbitration (6)** 24:20,23 25:10 137:22 173:8,9
**arckem (6)** 16:11,12,14,18,21,21
**area (6)** 116:17,19 127:1 140:13 147:7,24
**areas (5)** 46:13,16 133:7 142:25 147:9
**arent (2)** 84:22 177:24
**argue (1)** 96:8
**arguing (1)** 187:6
**argument (3)** 95:24 186:12,12
**arises (1)** 190:14
**arising (2)** 96:19 175:22
**arms (1)** 108:21
**around (12)** 4:13 8:10 9:22 20:11 41:17 63:1 86:16 91:3 130:23 153:8 162:18 170:15
**arrange (1)** 16:19
**arrangement (13)** 13:25 22:19 40:8 65:16,18 87:13 95:18 108:17 109:21 112:9,14 147:14 171:8
**arrangements (3)** 64:12 137:1 158:21
**article (2)** 187:5,5
**ascertain (1)** 185:24
**aside (3)** 72:10 151:24 155:15
**ask (50)** 2:8 3:12 4:21 17:3,8 18:12,13 24:10 29:8 31:8 40:24,24 41:5,16,17 43:24 45:5 46:4 54:23 57:5 63:5 65:8 67:20 69:9 72:9 86:23 89:24 128:3 133:2 137:25,25 139:15,25 144:24 147:23 149:17 165:23 166:18,20,21 167:10 169:11 171:16 175:16,19,20 177:13,15 180:17 187:7
**asked (21)** 39:21 40:11 41:2,11 48:4,10 57:25 66:8 67:8 70:1 79:4 99:2 124:10 131:24 132:6 133:1 159:23 162:20 169:15 175:5 177:12
**asking (11)** 1:22 19:1 22:23 37:23 39:25 68:18 84:11 119:13 133:19 174:3 187:17
**asp (3)** 59:11,12,19
**aspire (1)** 31:1
**assemble (1)** 44:25
**assembling (1)** 9:12
**assert (2)** 68:9 70:22
**assertive (1)** 165:20
**assessed (1)** 28:18
**assessment (2)** 153:25 159:3
**asset (38)** 30:8 35:16,18,19 45:1 52:18 54:6 74:13 117:1,2,16 126:14 127:13,16 149:10,13 152:3,11 154:9,10,14 155:19 160:21 162:12,24 163:9,25 165:19,20 166:13 168:3,17 171:13,16 173:4 175:8,9,10
**assets (27)** 3:17 6:15 18:7 19:18 44:9 57:20,20 77:23 132:2 134:23 135:2 150:19 164:6 166:18 167:8 168:15 170:5,11,13,14,25 172:20 173:1,18 179:9 181:2 182:5
**assigned (3)** 114:23 115:5 116:14
**assignee (1)** 120:12
**assistance (1)** 32:24
**assisted (1)** 20:10
**assists (1)** 71:17
**associate (1)** 81:15
**associated (8)** 8:4 44:15 46:14 48:6 65:24 74:25 134:14 192:15
**association (2)** 12:2 123:20
**assume (4)** 18:24 23:25 90:13 139:12
**assumed (1)** 156:25
**assuming (4)** 8:10 113:18 116:8 186:13
**assurance (1)** 156:23
**atrociously (1)** 74:1
**attached (3)** 51:12 82:13 185:17
**attachment (1)** 123:19
**attempt (4)** 18:9 63:16 166:7 190:8
**attempts (3)** 62:22,22 144:10
**attend (1)** 22:2
**attended (4)** 37:25 50:8 131:11 134:1
**attending (1)** 78:24
**attention (1)** 96:4
**attractive (1)** 26:14
**attribute (1)** 174:25
**attributed (1)** 8:11
**auditors (3)** 11:12 141:25 172:13
**august (1)** 39:5
**australian (2)** 120:4 122:1
**author (1)** 70:13
**authorised (1)** 180:1
**authorities (2)** 14:4 127:14
**authority (5)** 4:2 11:18 179:17 180:10,13
**available (1)** 181:20
**average (1)** 103:12
**avoid (1)** 67:9
**award (2)** 28:24 29:1
**awarded (3)** 38:9 127:7,9
**aware (54)** 3:16 4:10 10:25 22:6 23:6,11 35:10 40:6,10,23 44:17 46:12,25 47:3,4,9,10,17,21,23 48:1 50:15 57:11 58:24 60:8 64:6 66:13 69:15,19 74:11 80:4,6 95:21 98:4 108:11,18 110:12 112:6 119:8,14 123:7 127:18 134:11 139:22 142:20,23 144:12 159:19 160:24 161:8,22 171:2,23 174:9
**away (6)** 116:19,24 117:17 118:1 152:8 177:21
**azerbaijan (1)** 167:21

B

**b (3)** 65:15 96:25 172:1
**back (54)** 1:7 9:17 10:3 22:11,12 24:16 38:11 42:25 47:17 57:5 58:14 59:7 60:22 63:3,8 68:23 73:25 77:13 84:7 87:7 91:3,9 92:20 93:15 94:18 95:4 97:22 102:4 103:22,23,24 104:6 117:18 122:21 124:21 125:11,13 130:15 132:18 133:18 135:1 136:5 140:21 142:24 144:23,25 146:14 150:1 153:1 155:16 159:12 168:11 173:19 191:13
**backed (4)** 187:2,8 188:24 191:9
**background (8)** 6:9 21:2 39:25 48:25 49:21 117:8 148:3 149:11
**bad (5)** 26:8,25 74:1 121:14 153:23
**baker (1)** 150:10
**baku (2)** 171:5,6
**balance (6)** 26:5 76:21 91:1 135:12 172:7,8
**balancing (1)** 187:5
**balda (3)** 36:3 47:23 172:23
**ballpark (2)** 99:12 163:3
**band (1)** 49:23
**bandwidth (1)** 146:23
**bank (20)** 51:2,5 54:17 58:17 59:13 62:11 64:16 65:16,19 66:14 69:14 70:13 74:23 77:16 84:2 100:18 103:18 106:9 110:2 135:25
**banked (1)** 62:17
**banker (1)** 122:18
**banking (5)** 12:4,11 16:19 64:3,17
**banks (1)** 51:4
**barnet (31)** 19:12 21:7 22:7 23:1 30:15 31:9 40:24 53:4 78:13,16 82:1 133:5,9,19,25 134:6,9 135:15 136:18,23 137:6 138:4,23 139:5,11,13 140:18 144:6 146:13 148:19 161:18
**barnets (1)** 139:2
**base (1)** 107:4
**based (11)** 10:4 21:13 69:9 114:11 116:5 128:14 129:22 130:20 137:24 139:9 142:16
**basically (8)** 6:13 74:14 87:12 94:24 101:20 102:2 117:20 119:11
**basis (9)** 10:14 13:21 14:13 104:1 138:24 142:16 146:3,11 171:14
**bateman (1)** 170:21
**bay (1)** 53:7
**bdo (1)** 110:1
**became (18)** 5:19 7:5 22:6 51:25 54:17,21 63:14,15,19,23 64:4,21 65:21 80:6 106:10 141:6 155:6 174:9
**become (13)** 3:17 10:24 41:1 42:6 46:12 60:10 70:9 81:2 86:3 87:12 89:7 96:9 104:11
**becomes (3)** 42:16 84:5 85:16
**becoming (4)** 11:25 63:1 68:20 145:14
**beers (2)** 90:25 122:17
**before (35)** 14:18 20:13 22:12 23:17 31:8,17 48:11 50:12 53:25 57:5 59:5 64:6 73:11 90:6 93:8 97:18 98:9 100:3 118:5 123:6,13,14 126:12 130:16 133:7 134:18 137:15 146:1,5 148:19 155:25 159:23 177:1 190:11,11
**beggar (1)** 135:4
**beggars (1)** 145:3
**beginning (5)** 12:18 22:13 43:2 130:12 159:5
**begins (2)** 150:16 159:14
**behalf (24)** 1:4,5 5:6 11:19 15:8 19:6,14,14 23:5,10,12,14 24:9 32:11 42:9,12,15 63:22 70:2 106:25 110:23 122:7 135:23 168:25
**behind (9)** 8:9 52:11 59:3 61:24 63:8 123:10,18 150:10 152:23
**being (48)** 4:13,15 9:10 27:15 30:4,24 32:22 33:13,16,18 35:10 37:11 48:8 69:4 70:11,12 74:19 77:16 78:24 83:24,25 84:12,13,17 85:12,13,21,24 86:14 100:4 116:10 123:10 124:10 130:14 139:10 142:12 146:10 152:14 154:1 160:8 162:24 163:6 165:20 173:20 174:10 177:13 180:19 183:24
**belabouring (1)** 184:7
**belgium (1)** 21:4
**belief (1)** 77:12
**believe (115)** 5:22 6:20 7:17,17 8:12 11:4 14:21 19:25 20:16,22,25 21:4 22:7 23:8,13 25:14,16,17,24 27:19 28:12 30:5,9 32:17 33:11 35:14,17,20,24 36:13,19,20 44:4,14 47:7 48:2 49:16 52:8,17 53:3,9 54:9 56:3,16,24 65:16 75:3 76:1 77:25 79:2,10 82:6,9,17,25 84:14 86:16 88:22 89:21 90:2 91:11 92:11 93:8 94:12,14,15,20

95:18 98:18,19,23,24
99:15,22 100:1,12,20,23
101:7,7 103:12 107:16
108:8 110:16,17 112:2
118:17 120:25 122:4 123:2
126:6 130:22 131:20
134:13,17 135:22 141:2
146:5,12 147:18 149:6
151:20 152:1,6 158:3,5,9
162:11,16 166:1,13 167:18
171:12 173:13,19
believed (1) 22:13
bell (1) 17:10
belong (1) 133:4
belonged (1) 35:19
belongs (1) 149:21
below (1) 94:21
benchmark (1) 119:8 128:24
benchmarking (1) 119:14
beneath (1) 149:7
beneficial (2) 38:12 48:11
beneficiaries (4) 119:17 130:1
155:14 160:3
beneficiary (3) 41:7 44:9
158:11
benefit (9) 22:19 30:4 77:22
110:10 116:14 118:14
127:5 137:20 188:19
benefited (1) 78:4
bent (1) 90:7
beny (15) 19:10,13,20 22:6
25:18 26:12 43:7 53:4
131:15,16,19 141:23 142:4
159:21 160:16
bermuda (1) 46:7
best (21) 2:20 15:21 48:7
50:25 51:15 53:16 55:6
63:18 87:14 99:2 100:20
106:2 109:3 112:25 113:1
116:9 133:11 137:10
147:22 168:4 175:3
better (5) 30:10 61:15 73:11
76:23 77:13
between (46) 2:23 7:15 8:13
14:15 27:7 29:12 34:14
44:23 45:6 46:24 50:16
52:9,17 53:22 54:18 58:2
65:17 68:13 73:20 80:25
96:22 101:23 102:12
103:14 106:4,21,21 114:15
120:6 128:1 131:15,17
134:8 142:6,14 143:16
146:8 153:21 156:12,20
160:13 163:24 178:11
181:4 183:13 186:6
beyond (9) 12:20 17:5 43:13
46:15 98:10 123:9 127:18
187:19 191:11
bh (1) 15:2
bhp (2) 35:19,19
bias (1) 109:21
bid (6) 167:12,15,16
168:5,8,9
bidding (4) 142:22 146:16,17
168:7
big (8) 9:22 13:15,20 94:14
113:20,24 136:7 164:24
bigger (1) 62:5
billion (3) 34:17 132:14
145:22
billions (15) 34:25
35:5,6,6,7,7,7,8,8,9 132:19
136:11,15 175:1,11
binding (3) 19:3,4 36:24
bit (15) 17:10 20:2 22:4
29:23 42:16 46:4 130:15
149:22 153:3 155:10
159:4,5 163:2 186:5
187:17
bits (1) 7:6
bitter (1) 137:13
blank (1) 143:2
blessing (3) 81:11 118:11
175:11
block (2) 81:12 124:15
blocks (2) 29:16 95:22

board (26) 2:8,12,14,25,25
3:20,21 31:5 49:22 54:1
80:25 95:7 118:16,18
124:9 138:10 140:11
146:18 147:1,4 154:7
156:9,11,25 161:18 169:10
boards (1) 49:25
bobby (1) 42:11
bodin (1) 119:4
body (5) 113:21,24 116:18
126:24 193:22
boils (1) 106:22
bona (1) 139:14
bonnant (2) 15:16 50:14
bonus (3) 128:10,16,22
book (5) 175:25 179:6,19
183:7,9
books (3) 85:13,14 109:23
boom (1) 149:22
border (1) 149:14
bore (1) 164:25
boroma (14) 81:7,9 94:18
119:19 123:13,22,23
124:16 125:10 126:20
127:1,6,18,20
borrower (2) 150:20 151:4
both (11) 51:20 62:17
66:12,13 77:8 109:12
118:10 139:9 153:10,16
179:1
bottom (6) 51:13 55:23
74:12 156:19 167:14
168:23
bouncing (1) 91:3
box (2) 18:14 176:22
breach (2) 185:18,21
break (5) 45:25 46:2
144:17,18,21
breaking (2) 148:7 167:17
brett (2) 63:14,14
brian (1) 48:13
bribery (1) 10:23
brief (7) 1:11 24:8 48:25
49:1 100:6 104:20 149:17
briefly (7) 30:22 31:21 63:14
101:21 128:3 139:25
194:12
bright (1) 88:3
bring (1) 91:9
british (1) 21:9
broad (8) 85:21 105:16
112:14 113:5,15,16,16
114:2
broadly (4) 13:12 31:23
33:25 104:15
broken (1) 65:1
brotherinlaw (1) 104:25
brought (6) 27:15 84:20 93:5
110:7 146:7 164:13
buys (1) 101:9
bvi (2) 5:20,22
bylaws (1) 49:16

---

**C**

c (1) 188:17
calculation (3) 59:12,19
116:5
calculations (1) 99:6
call (9) 12:13 82:4
143:16,19,21,25 146:14
147:12 184:4
called (26) 14:19 16:23
19:12 23:23 35:16,21
46:7,21 47:6 53:5 63:7,13
64:24 81:16 82:18 88:20
90:17 112:6 124:13
140:7,19 144:13 161:23
162:13 169:9 173:5
calvados (3) 164:2,3,14
came (14) 10:23 13:7 28:8
31:13 33:13,20 53:3 129:3
133:5 148:4 149:11,19,23
168:9
camis (3) 38:18 40:12,14
45:7,19 53:10 82:3 88:25
130:7,8,16
canadian (1) 173:5

cancellation (1) 120:7
candidates (1) 127:20
cannot (2) 129:13 181:2
cant (13) 66:17 67:1,10
72:13 89:17,23 101:25
104:3 113:3 135:4 145:3
177:4 188:25
canvas (1) 46:22
cap (2) 161:23,25
capacity (7) 4:5 48:17,21
120:12 134:5 138:18 159:9
capital (22) 6:16 8:20 9:7,10
14:24 44:25 72:15,18
104:7 117:22 151:4 171:24
172:5,8,14,18,20,24
173:2,4,17,24
capture (2) 114:17 116:9
capturing (1) 166:2
card (2) 128:2 153:19
careful (4) 32:22 101:17
141:17 166:21
carl (2) 122:16,16
carriage (1) 194:9
carry (2) 139:2 151:15
carve (1) 36:10
cash (3) 73:11 80:16 163:25
cashflow (2) 34:16 61:25
cashflows (4) 51:18 100:22
103:23 153:6
casualties (1) 49:12
catalyst (1) 44:22
catch (1) 85:19
categorically (1) 89:22
caught (1) 186:25
cause (6) 44:3,13 48:1 79:1
134:13,23
caused (1) 97:22
causes (1) 141:2
caveat (2) 7:18 137:14
caveats (2) 121:7 178:3
cease (1) 11:21
ceased (1) 13:17
cents (1) 57:22
ceo (7) 5:18 13:10 17:18,20
49:10 122:13 142:1
certain (15) 3:4,9,11
4:11,12,25 5:9,19 10:20
38:3,4 49:3 120:7 144:6
167:8
cfo (1) 141:18
chain (4) 101:20 102:7,16
124:15
chairman (1) 142:1
challenge (1) 17:4
challenges (5) 5:8 12:1 52:2
87:24 137:19
challenging (2) 86:3 113:23
champion (1) 63:4
chance (1) 177:12
chanel (1) 177:11
change (6) 13:20,20 34:13
35:4 140:14 157:18
changed (6) 7:18 15:1 20:4
61:21 137:1 189:25
changes (4) 17:5 115:3
138:21 141:13
changing (1) 61:21
charge (3) 52:15,17 54:10
charges (1) 180:1
charity (1) 105:18
chartered (69) 51:2,5,7,21
52:9,23,25 53:7,22
54:7,12,17 56:13 57:7,21
58:8,11,12,18 60:8,9,12,16
61:2,7,16,22,23
62:3,7,11,17,21 64:16,17
65:3,13 66:14 68:4,19
69:14 70:13 71:21 73:21
74:14,23 75:16,23
76:4,6,9,12,19 77:2,8,17
78:2,9,22 79:9 80:24 84:2
95:17 96:20,22 97:9
106:11 148:12 168:1
chartereds (3) 54:5 75:9,19
chased (1) 71:5

chasing (1) 38:2
check (3) 21:1 63:3 173:19
chefs (1) 42:21
chief (1) 63:15
children (4) 155:14 156:7
157:13 160:3
chinese (2) 30:8 175:6
choice (1) 56:13
choose (1) 87:17
chooser (1) 135:5
choosers (1) 145:3
christmas (1) 91:4
chronology (2) 5:3 63:2
chunks (1) 87:6
circumstances (14) 4:7 11:23
66:9 68:11 70:4,12 86:1
93:18 104:14,15 143:14
181:13 185:16 187:3
cirdi (1) 24:20
citizenship (1) 21:10
claimant (3) 178:1 181:6
185:20
claims (2) 18:1 24:19
clarify (1) 109:18
class (2) 154:9,10
clause (8) 24:15 25:1,3
31:22 32:2,5 36:6,21
claw (2) 77:13 84:7
clawback (2) 56:16 117:15
clean (1) 76:20
clear (24) 14:9 38:22,24 42:8
50:21 57:19 64:22 75:5
91:25 95:25 100:21 102:18
118:11 129:10 135:10
124:13 127:18 131:25
132:18 140:1,7 145:7
149:5 161:23 162:12,23
164:15,15 167:18,20,20
168:25 169:3,21 170:24
171:23 172:19 173:5,15
comparable (1) 89:9
complaint (2) 26:2 158:17
complete (4) 36:23 76:23
117:4 183:15
completed (1) 36:20
completely (8) 5:9 29:16,18
38:22 77:1 146:10 176:14
193:4
complex (1) 153:7
compliance (2) 2:17 11:2
complicated (11) 14:4 24:1
29:3 42:16 59:8 68:11
129:11 138:14 140:12
148:2 153:17
complications (1) 187:21
compounded (1) 163:19
compromise (1) 78:3
compulsion (1) 184:3
conatus (5) 83:19 87:11
88:10 89:18 91:17
100:19,20
101:2,9,13,15,18,23
102:8 103:18 105:6,12
106:4,6,9,21,25 107:18,24
108:3,5,10 109:4,10,12
110:10,24,24,23 112:6,7
114:23 115:10,18 116:2,16
117:10,12,14 120:9,11,14
121:1,12 123:15 124:14
174:11
conatuss (2) 106:24 110:21
concern (2) 28:23 56:11
concerned (4) 87:20 176:15
179:21,22
concerns (1) 134:24
concession (3) 36:9,11
137:15
concluded (4) 68:13 143:16
177:10 194:23
conclusion (1) 143:24
concrete (1) 5:16
conde (3) 24:5 31:3,14
conditions (1) 54:13
conduct (1) 188:13
conducted (2) 182:5 190:5
confidential (1) 70:10
confirm (2) 36:17 177:19

81:5 87:13 106:15 108:16
145:18 148:4,7 151:21
161:20
commercially (8) 25:25
62:12 84:9 91:10 119:9,15
126:8 138:13
commission (4) 105:2,6,7
109:5
commissioned (1) 158:15
commit (1) 117:22
committed (32) 32:3 64:7
73:20
commodities (1) 34:22
companies (47) 3:15 4:22,23
5:5 6:15,25 7:1,2,16
8:2,2,8 9:9,15 10:12,25
12:16,17 14:1 15:2,24,25
16:3 17:13,15,16 20:5
26:19 31:25 38:19 41:8
46:14,24 47:15,24 48:6
62:18 80:1 92:18 102:16
133:15 140:14 158:24
159:2 169:8 174:4 175:4
company (72)
5:12,13,20,22,23
6:1,2,4,5,8,21,24 7:12
10:15 11:3,10,11 14:19
15:18,20 16:7,10
17:8,9,20,22 21:5 44:14
46:21,25 47:6,10 64:15
65:17,19,24 66:1 92:5,9,13
94:10 95:21 101:9 104:24
106:22 107:25 112:6 120:5
124:13 127:18 131:25
132:18 140:1,7 145:7
149:5 161:23 162:12,23
164:15,15 167:18,20,20
168:25 169:3,21 170:24
171:23 172:19 173:5,15
comparable (1) 89:9
complaint (2) 26:2 158:17
complete (4) 36:23 76:23
117:4 183:15
completed (1) 36:20
completely (8) 5:9 29:16,18
38:22 77:1 146:10 176:14
193:4
complex (1) 153:7
compliance (2) 2:17 11:2
complicated (11) 14:4 24:1
29:3 42:16 59:8 68:11
129:11 138:14 140:12
148:2 153:17
complications (1) 187:21
compounded (1) 163:19
compromise (1) 78:3
compulsion (1) 184:3
conatus (5) 83:19 87:11
88:10 89:18 91:17

conflict (2) 22:13 189:8
confronted (1) 17:6
confused (1) 52:17
confusing (2) 20:3 24:2
confusion (1) 55:10
conjunction (1) 98:15
connected (4) 40:7
47:10,19,24
connection (2) 38:17 133:5
connections (1) 133:1
conscientious (1) 161:19
consent (5) 66:11 67:11
115:5,6,11
consequence (4) 178:25
180:18 182:9 190:22
consequences (1) 185:21
consider (10) 123:6 132:21
137:10 140:4 146:18
187:12 188:22 189:10
192:10 193:1
considerable (1) 34:20
consideration (5) 107:1
120:22 122:24 175:22
187:4
considered (2) 148:14 152:10
considering (9) 57:19 93:20
121:17 123:2 147:25
155:20 192:16,20 193:2
considers (2) 192:10,23
consignment (5)
101:2,3,10,19,24
consistent (5) 89:1 92:4
113:16 187:17
consortium (4) 30:8 35:20
168:11 175:7
constant (1) 109:15
constantly (1) 112:23
constellation (2) 40:22 82:12
construction (1) 182:9
consult (3) 26:17,25 160:6
consultant (8) 20:17,18
108:2,7 111:17,19 112:3
122:19
consulted (1) 26:7
consultant (2) 131:2 161:14
contempt (4) 181:7,9 184:17
185:18
content (1) 194:17
contentious (1) 184:5
contents (4) 66:18 69:2,10
70:12
context (14) 6:25 21:24
40:15 44:7 45:11,13 70:17
82:24 92:11 103:2 130:9
139:10 141:18 158:13
continue (1) 154:7
continued (1) 125:22
continuing (1) 80:24
contra (2) 187:1 191:24
contract (56) 7:11,13,19,21
14:15,21 15:1 19:21,23
100:10,13 101:22 115:4
122:23 136:9 148:5
contracted (2) 141:21
contracts (4) 7:15 15:4
36:24 148:17
contractual (3) 20:20 136:25
158:21
contributor (1) 74:20
control (5) 17:5 80:8,13,16
113:3
controlled (3) 27:5 64:16
80:4
controls (1) 26:23
controversial (2) 193:11
conundrum (2) 154:17
180:11
convenience (1) 190:1
conventional (1) 135:7
conversation (3) 27:2
174:12,17
conversations (2) 78:14
174:5
convert (5) 151:1,7,14
152:12,20
converted (1) 172:7

convertible (7) 150:23
151:14,18,18,20,25 152:4
coop (7) 140:6,6 143:17
144:3,8 146:15,17
cooperative (2) 46:25 140:2
coops (1) 140:24
coordinated (1) 81:24
copies (2) 15:4 182:20
copy (5) 95:13 181:20 182:4
187:11 190:23
core (4) 5:11 6:1 11:9 17:21
corporate (8) 10:6,15
51:11,21 129:16 137:3
141:16 149:7
correct (37) 2:10,11 7:14,19
13:9,11 15:19 23:3 24:22
27:19 28:18 33:11 89:16
92:13 97:21 98:12 99:19
103:19 104:10,19
105:1,12,14 107:17 115:20
123:25 128:12,17,23
132:25 134:20 145:6 156:5
162:15 170:19 171:25
173:10
corrected (1) 69:16
correctly (1) 7:9
correspondence (9) 66:12,14
67:4,12 70:20 71:12,13
72:5 95:11
corresponding (2) 181:24,25
cost (5) 8:4 13:21,24 14:3
153:20
costing (1) 116:23
costs (4) 8:5,11 70:17 129:21
couldnt (6) 143:1 153:15,15
184:9,15 188:1
council (6) 49:11,17,19,21
50:13 171:15
counsel (5) 1:7 15:10 136:25
137:4 138:6
counsels (2) 145:17 183:21
country (7) 28:25,25 30:3,24
74:19,24 95:2
couple (5) 16:4 50:2 116:18
144:24 168:20
coupon (3) 151:15 152:14,15
coupons (1) 163:7
course (33) 5:16 26:3 30:23
41:1 42:7,16 53:13 61:24
68:10 69:6,25 70:2,9 106:2
107:22 130:20 134:10
144:7 156:17 161:18
174:10 175:2 177:14
179:14 181:8 183:19,23
184:7 185:18,20 186:13
192:7,19,21 193:1
courtesies (1) 55:16
courts (1) 28:22
covered (6) 66:6,10,24
67:6,10 69:7
covid (3) 86:4,7 112:24
cpr (5) 181:1,21 183:18
191:23 192:22
cramer (33) 1:6,16,18,20
2:3,6 9:3,16 12:19 22:22
32:25 33:4 34:21 46:4 52:4
63:22 68:7 69:25 77:1
84:10 86:11 90:7 95:6
96:24 97:18 108:6 117:18
138:16 144:23 175:13,16
177:23 194:13,19 195:5
cramers (3) 67:23 184:12
153:20
crane (1) 110:6
crazy (1) 37:19
create (7) 6:14 42:19,20
43:1 58:4 61:12 103:13
created (7) 16:7,9 88:25
89:13 92:23 103:22 168:8
creating (2) 100:14 108:5
creation (9) 29:15 128:6
credible (1) 45:2
credit (1) 87:15
creditors (2) 78:7 132:17
creditworthy (1) 172:19
crisis (1) 62:18

criticism (1) 141:10
crossexamination (2) 181:19
183:22
crucial (1) 30:20
crystal (1) 185:13
cultural (1) 30:25
cumulative (1) 151:14
cunico (11) 47:2,20 139:25
140:7,24 142:20,22
144:9,12,13 147:2
curiosity (1) 184:22
current (11) 19:24
90:15,18,19 121:5,23
143:3,4,10 168:17 183:9
currently (4) 51:13 86:19
120:21 158:17
cut (3) 51:13 63:16 137:23
cutting (1) 102:23
cypriot (1) 153:9
cyprus (2) 153:11,16

**D**

d (1) 195:2
dag (4) 1:18 39:17,24 195:3
damage (1) 76:2
daniel (2) 20:7 26:12
data (1) 9:9
date (15) 12:7,13,19
58:16,20,21,22 59:14,23
86:17 103:11 104:13,13
115:3 151:5
dated (1) 72:21
dates (5) 11:23 12:22 13:1
59:16 150:2
daughter (2) 159:21 160:16
daughters (1) 83:1
david (24) 19:12 53:4 60:15
74:8 78:13,16 82:1 97:25
133:5,25 135:15 136:17,23
138:4,12,23 139:11,13
140:18 144:6 146:13
147:18 149:1 161:17
davis (4) 26:12 33:9 40:11
44:23
davison (68) 1:3,17 2:6 9:3,5
13:18 32:21 39:18,20,23
45:24 55:1,5,8 66:19
67:12,14 68:23 70:19,25
71:7,14,24 72:2,4 94:24
95:3,6,11,14,19
96:4,12,17,21 144:18
175:24 176:2,12,18,23
177:8,22 178:8,19,23
180:9,15,24 183:11
184:4,11,14,21
185:1,9,13,23 186:2,5
189:8,16 190:3 191:12
193:16 194:8,15,18
day (5) 28:19 38:22 89:6,25
175:14
days (3) 65:20 114:11 155:22
daytoday (4) 4:5 10:14
142:16 168:5
db (1) 169:9
de (4) 90:25 122:17 135:6,16
137:16 36:16,20,25
26:8 27:1,12,12,18
29:10,19 30:7 33:22
35:10,12,22 44:2 56:14
57:24 58:4 59:6 60:25
61:3,5 63:17 64:7 74:1,1
75:19 76:12 107:20,20
119:17 121:14,14 123:18
145:4 158:10 168:25
169:14
dealing (13) 14:2 40:16 49:5
74:13 81:13 86:2
122:15,19 133:2 152:22
171:22 177:24 181:11
dealings (9) 46:10
47:1,18,24 48:21,23
111:24 133:12 161:11
deals (2) 179:17 180:11
dealt (7) 41:24 47:6 112:1
140:16 141:25 161:12
178:19

debt (66) 46:20 48:20
50:24,25 51:1,14,20
52:6,11,16,21 54:8 56:10
57:7,12,17 58:10 59:4
60:10,25 62:19 64:6,21
65:4 73:6,13,22,23 75:22
76:5,8,8,15,17,24
77:5,8,10 79:2,5,19,23
81:25 83:13 84:13,16,22
85:11,18 86:21 87:14
93:23 98:11,13,23,24
128:15,19 140:13 144:8
150:24 154:25 155:3
170:21 173:1,3
debtor (1) 1:8
december (2) 65:20 72:23
decide (6) 120:23 147:13
186:24 190:15,23 191:1
decided (4) 12:14 64:2 78:9
117:17
deciding (6) 139:16 187:23
188:2,7,23 190:19
decision (12) 22:9 25:22
27:6 28:17 54:5 91:10
116:25 117:17 138:6
148:24 152:20 180:20
declining (1) 70:1
deemed (1) 173:16
deep (1) 140:15
default (2) 30:13 90:17
defendant (2) 165:3,5
deferred (1) 71:10
defines (1) 100:10
definitely (1) 163:19
definition (3) 59:8 182:7
185:14
definitions (2) 57:10 58:15
delegated (1) 4:2
delta (1) 168:6
demand (5) 87:1,5,7 88:6
89:9
demands (3) 89:3,15 90:3
departure (1) 162:10
depending (4) 54:12 93:18
170:6 173:7
depends (2) 121:10 172:21
depleted (1) 126:24
deposit (2) 43:8 142:21
deposited (1) 65:23
deposition (13) 179:1,1,10
180:12 183:5,18
184:5,12,19 185:6,14
191:17 193:19
depositions (1) 183:16
deposits (2) 25:3,7
deprived (1) 102:24
depriving (1) 157:10
depth (1) 148:18
describe (7) 2:25 6:7 10:9
50:25 116:13 130:2 141:18
described (7) 12:9 97:25
98:1,2 107:3,12 181:22
193:10
describes (1) 98:6
describing (2) 115:12,17
description (3) 91:19 150:15
172:1
design (1) 30:12
desire (2) 42:18 123:18
desires (1) 152:5
despite (1) 112:24
detail (26) 3:8 10:11 15:22
51:19 53:13 62:5,6 63:7
93:15 94:1,9 102:15,17
105:10,14 109:12,13
110:19 120:3 127:21
140:11 148:5,10,17 155:1
164:21
detailed (1) 167:14
details (2) 89:24 110:15
deteriorating (1) 52:2
develop (6) 12:4 75:11
112:15 118:1 126:14
153:11
developed (3) 30:5 49:9
94:15
developing (3) 64:23 116:22

117:2
development (8) 40:1 42:24
50:5 77:23 91:21 126:23
127:13 152:7
developments (1) 17:7
develops (1) 141:14
diagram (1) 124:11
dialogue (2) 109:15 126:11
diam (34) 101:3
104:9,11,21,24 105:8,17
106:5,8,22 108:11,20
109:3 110:10
diamond (13) 50:22 80:2,3
86:3 93:19 103:4
104:18,20 105:2,7 108:10
128:5,10
diamonds (33) 92:6,9,10
101:1,1,1,5,6,9,10,14,15,18,19,20,24
102:6,7,8,10,13 103:20
104:2,12 106:23 108:21,24
110:8,11,13 112:10 124:19
diaruch (2) 110:14,16
didnt (32) 3:14 17:15 18:13
25:14 28:19 29:22 35:23
43:24 46:11 47:11 57:1,8
75:16 78:13 79:6 80:15,19
83:8 125:13 135:15 137:18
138:20,20,21,21 139:24
141:20 146:18 148:3,10
163:23 185:11
difference (8) 13:16,16 66:21
69:1 94:14 102:12 121:19
178:10
different (17) 2:1 4:4,4
8:3,17 11:4 13:8,12,23
29:18 47:15 93:22
107:5,12 113:12 131:7
132:11
difficult (11) 5:2 6:11 49:6
85:18,19 95:1 99:5
164:22,23 178:15 182:12
difficulty (4) 176:12 189:23
192:15 193:7
dilemma (1) 87:18
diligence (5) 36:8,10,18
40:13 135:11
dilute (1) 165:22
diluted (4) 137:18 159:20
160:15,22
dilution (2) 140:23 160:6
dinner (3) 83:2 130:19 131:5
dinners (1) 131:10
direct (9) 13:18 14:23 15:1
97:11 110:14 182:19
186:18 189:4 190:8
directed (1) 184:1
directing (1) 187:10
direction (10) 30:12 122:5
178:24 181:12 182:22
183:2 186:16,21 190:21
193:10
directly (8) 7:20 14:22 20:4,5
21:20 44:12 81:10 141:21
director (30) 2:9 15:18
17:23 26:22 48:15 56:1
60:23 88:14 92:17 94:5,11
97:20,25 98:1,3,7 119:4
138:2,6,18 147:6,13 159:9
161:8 162:8 164:16
169:7,10 170:24
directors (9) 2:9 26:9 48:16
81:1 97:23 152:17 154:7
158:22 160:5
disagree (1) 74:3
disappear (1) 75:16
disappeared (1) 49:15
disaster (1) 86:9
discharges (1) 181:25
disclosable (1) 68:9
disclosed (7) 56:19 66:20
67:24 68:7 106:4 192:19
193:5
disclosure (6) 66:23 182:1
192:22,23,24 193:2
discount (1) 26:2
discounted (5) 58:8 76:7

163:15
discovered (2) 155:16 157:13
discovery (3) 56:18,24 74:6
discretionary (1) 11:15
discursus (1) 1:12
discuss (2) 50:12 110:7
discussed (8) 29:25 35:11
42:10 119:1,3,3 126:15
131:16
discussion (8) 35:15 40:6
60:19 109:17,19 118:22
130:14 189:7
discussions (17) 29:24
33:7,14 38:13 44:20 52:21
58:10 64:12 110:5
119:18,21,22,25 125:19,23
126:16 130:20
dispose (1) 117:1
dispute (5) 52:9 164:1
165:24 174:17 181:4
dissolution (1) 16:8
distinction (1) 17:25
distressed (1) 57:17
district (1) 126:18
divide (1) 182:15
division (2) 28:6 152:16,16
159:13 166:22 168:2
165:10 167:3 169:3 170:2
172:10 174:1,23 175:19
176:12 177:22 178:10,12
184:5 190:1 193:24 194:16
door (2) 73:12 94:19
doron (1) 157:22
doubled (1) 108:15
doubt (7) 28:6 152:16,16
178:8 183:5 193:15 194:8
down (18) 32:6 39:10 43:2
59:19 75:18 85:9,24 86:8
87:21 91:8 140:24 150:25
153:2 154:4,19 159:14
167:10,17
downturn (1) 90:22
dp (1) 169:21
draft (8) 56:19,19,24,25
72:18 138:21 150:4 178:13
drafted (1) 178:6
drafting (2) 100:15 178:8
drafts (1) 74:6
drag (2) 9:17 28:23
draw (2) 69:2 153:19
drawing (3) 64:13 175:4
194:9
drew (1) 51:16
drill (4) 153:20,21 154:4,13
drilled (1) 153:23
drilling (3) 154:12 167:22
169:18
driver (19) 31:10 88:13,14,18
89:13,14,20,22 90:2,14
110:24 112:1 119:3 141:25
144:7 150:12 156:10 157:6
161:18
driving (3) 56:14 63:8 123:17
drop (2) 151:10 153:2
dubai (3) 110:14 169:9
170:12
due (13) 53:13 70:8
86:1,18,19 125:13 135:11
153:5 172:2,6,7,8 186:13
during (21) 6 78:14 90:22
92:20 130:19 134:10
154:20 159:20 174:10
dust (1) 148:21
dutch (3) 46:25 47:1 140:1
dyke (2) 126:25 127:3
dykes (1) 113:23
dynamic (3) 29:22 30:16
111:22

**E**

e (3) 72:22 73:3 195:2
early (3) 42:14 80:1 114:10
easier (1) 117:12
easier (1) 77:13
east (1) 153:8
eastern (1) 149:21
ebit (1) 129:10
economic (5) 29:18 48:2
134:15 153:9 174:7
economics (10) 27:13 41:4
51:18 72:11 76:3,22 77:17
106:7 148:14,18
edition (1) 183:9
educated (1) 31:1

effect (13) 53:19 59:13 91:3
180:4,18 182:3,10
184:23,25 191:6,17,22
192:1
effective (2) 65:21 160:17
effectively (12) 5:1 8:6
76:18 125:5 135:20 146:18
153:10 164:8 166:13 172:5
187:8 190:10
effort (2) 165:16 168:10
efforts (2) 126:20 165:14
eight (1) 93:1
either (10) 3:18 9:7 26:8
29:16 66:18 117:22 143:19
149:16 194:6,19
elected (1) 121:1
elections (1) 120:21
element (1) 146:6
else (18) 1:15 15:13,15
20:18 23:11 35:11 47:21
56:5 109:23 123:9,11
127:7,19 141:7 147:17
155:25 177:15 178:23
elses (1) 147:15
elsewhere (1) 17:17
email (4) 90:9,12,13 194:9
embarrassing (1) 191:7
embedded (1) 165:19
emerging (1) 49:12
emphasise (1) 4:24
employ (1) 11:12
employed (3) 17:1,2 20:15
employee (1) 108:7
employer (1) 74:20
employment (1) 8:21
enable (1) 182:24
end (16) 14:6 16:2 32:2 36:7
54:4 60:25 70:5 73:1,5
77:7 135:9 162:3 163:22
168:3 170:18 176:6
endeavour (2) 71:11 88:6
ended (3) 14:3 46:13 78:6
endorse (1) 194:5
ends (1) 77:7
energy (4) 167:19 169:4,6
170:23
enforce (1) 151:7
enforced (1) 180:2
engage (1) 165:18
engaged (2) 4:22 141:21
england (1) 5:21
english (2) 6:3 18:21
enjoyed (1) 171:5
enormous (1) 34:7
enough (3) 26:14 76:20 95:3
enquiring (1) 142:17
ensure (3) 152:2,23 172:16
ensured (1) 2:17
ensuring (2) 165:18 180:20
enter (7) 11:18 26:4,18
31:24 61:4 77:6 78:12
entered (7) 44:20 51:20
58:23 59:1,17 72:20 112:9
entering (3) 3:22 64:7,9
entire (1) 109:4
entirely (2) 84:10 177:10
entities (3) 10:13 47:19
96:25
entitled (9) 18:22 64:21
100:17 120:17 129:14
134:16 180:6 184:18 193:1
entitlement (3) 116:3 152:8
175:9
entity (4) 96:25 132:23
159:17,18
entrepreneur (1) 35:22
environment (1) 86:2
envisaged (2) 186:17 190:21
envisages (1) 31:23
envisaging (1) 81:9
equally (1) 60:24
equatorial (1) 127:11
equity (8) 84:7 124:14
151:4,25 152:5,12 155:4,9
equivalent (3) 79:23 107:2
125:3

error (1) 66:21
escaped (1) 96:4
escrow (1) 167:16
essentially (1) 157:6
establish (2) 52:5 119:15
established (1) 42:14
establishing (1) 111:21
establishment (1) 31:2
estate (3) 6:16 9:11 172:25
estimate (2) 99:2 114:3
etc (20) 15:23,23 42:17,17
  45:13,13 51:17,17 54:2,2
  78:23,23 87:22,22 115:3,3
  120:19,19 133:16,17
euro (1) 35:16
even (18) 24:2,2 28:24
  29:1,7,25 62:5 82:20 91:7
  94:3 114:2,10,13 116:25
  140:14 145:21 148:6,9
event (1) 182:24
ever (18) 33:23 58:10
  78:11,24 100:17 101:12,14
  130:9,16,17,21 136:24
  143:19 150:6 152:9 155:11
  173:22 188:5
every (1) 84:23
everybody (5) 75:24 84:4
  141:7,7 184:24
everything (3) 30:1 105:12
  184:11
evidence (16) 63:25 66:11,16
  67:10,17 68:14,19 69:4,8
  70:6 95:8,9 105:5 115:16
  176:25 193:20
evolution (1) 5:5
evolved (3) 20:20 22:9 160:16
ex (3) 122:17,18 176:5
exacerbated (1) 86:4
exact (1) 11:23 105:15
exactly (4) 21:10 73:2 80:15
  151:20
examination (9) 1:19 33:3
  175:19 177:10,14 181:2
  182:4 183:19 195:4
examined (1) 179:8
example (5) 34:5,12 148:22
  184:15 188:9
examples (1) 81:7
except (2) 179:10 185:11
exception (1) 179:16
exceptional (1) 191:11
exceptions (2) 179:14,15
  187:22
exchange (2) 136:11 137:12
exclude (1) 99:14
executed (3) 37:2 60:22
  122:23
executes (1) 106:23
execution (1) 127:25
executive (7) 63:15 128:4,7
  129:1 130:1,4 142:1
exercise (5) 85:17 109:14
  110:2 119:14 158:13
exercised (1) 143:19
exercising (2) 146:19 152:10
exist (3) 11:24 13:17 167:9
existed (1) 6:13
existence (1) 3:16
existing (1) 51:8
exists (1) 34:9
expand (1) 83:17
expansion (1) 116:17
expect (4) 10:6 112:21
  161:12 177:6
expectation (1) 70:14
expectations (1) 89:1
expected (4) 113:24 151:5
  160:5,25
expecting (1) 194:20
expenses (2) 145:15 168:14
experience (7) 20:14 57:15
  129:16,22 135:23 137:24
  158:2
expert (8) 11:2,3 52:18
  101:7 102:17 111:20,21
  155:12

expertise (1) 140:14
experts (2) 103:4 167:19
expire (1) 125:14
expired (1) 125:13
explain (10) 22:4 24:6 30:19
  35:1 61:3 79:10 89:23
  102:19,22 107:14
explained (1) 101:20
explaining (1) 124:11
explains (2) 150:23 151:9
explanation (3) 31:12 89:17
  153:4
exploit (3) 43:7 126:8 127:16
exploitation (1) 34:10
exploited (1) 34:7
exploration (4) 167:16,17
  168:25 169:14
exploring (1) 28:16
export (6) 103:3,14 105:23
  111:21 114:18,19
exporting (1) 36:1
exposure (2) 57:21 155:24
expressed (1) 178:4
expressing (1) 127:19
expression (1) 193:19
expressly (1) 25:2
extend (2) 51:23 125:19
extended (1) 58:21
extensions (1) 125:16
extensive (2) 7:3 130:6
extent (11) 3:4 4:25 5:1
  10:20 26:6 45:9,15 97:3
  113:20 144:7 160:7
external (1) 11:12
extract (5) 87:18 94:16
  127:3 148:20 165:19
extracted (1) 28:15
extremely (2) 163:15 177:17

**F**

face (5) 33:9 43:13 70:13
  72:12 177:16
faced (1) 87:16
facia (3) 96:21 188:14 189:1
facilitate (1) 53:1
facilitated (1) 52:24
facilitator (1) 102:9
facility (6) 16:15 72:15,18
  74:23 150:18,18
facing (4) 5:8 5:2:3 87:25
  158:11
factors (1) 123:17
failed (2) 60:9 168:12
fails (2) 129:12,15
failures (1) 62:20
fair (12) 8:12 10:7 29:10
  61:19 91:19 93:9,14
  109:16 162:20 163:10,14
  175:16
fairly (2) 14:2 45:21
fait (1) 138:19
faith (1) 36:22
fall (1) 27:3
falling (1) 150:10
falls (1) 128:9
familiar (8) 18:24,25 37:4
  51:17 110:15 148:9 149:11
  155:10
family (5) 19:18 44:14 48:5
  65:25 95:21
fantastic (2) 121:14 175:12
far (7) 61:7 87:23 128:1
  146:9 153:11 176:11,14
favour (2) 28:24 147:13
fear (1) 178:12
feasibility (4) 37:21,24 38:5
  117:5
feature (1) 90:24
february (1) 89:19
federal (2) 126:19 164:13
fee (13) 99:18 105:24,25
  107:1,4,7,13 108:9,11,14
  117:12 119:16 180:7
feel (7) 10:2 27:14 28:19
  78:4 123:20 148:7,8

feeling (1) 42:19
fees (1) 117:6
fell (2) 141:4,6
fell (10) 14:5,9 54:19,20
  62:21 137:13,14 142:9
  157:17 193:25
fetter (1) 193:25
few (5) 77:4 128:1 141:10
  166:18 171:4
fide (1) 139:14
field (9) 62:20 120:4 121:25
  122:12 123:3,10,18
  153:7,22
fight (4) 26:4 163:24 187:7
  188:10
fighting (1) 42:25
fights (1) 176:6
figure (5) 9:25 32:11 33:13
  58:16 86:12 98:17
  115:21,22 116:6 118:20
  122:7
figures (5) 84:22 115:11
  121:6 129:3,4
file (6) 182:19 186:17,18,22
  187:11 189:5
fide (1) 139:14
field (9) 62:20 120:4 121:25
filed (1) 164:6 166:6,10,12
  168:8
filters (1) 35:2
final (5) 56:20 86:18 151:11
  153:3 171:16
finalise (1) 36:23
finally (4) 13:1 16:11 111:8
  175:7
finance (2) 80:5 124:15
finances (4) 4:9 57:15 142:2
  145:13
financial (10) 3:24 6:4 29:18
  53:5 75:23 77:15,15 81:5
  135:22 174:22
financing (1) 53:6
find (9) 12:21 38:7 127:15
  135:4 138:8 145:4,11,19
  164:22
finding (1) 181:16
fine (12) 12:24 13:2,3 19:20
  55:5 79:12 86:12 92:15
  113:16 170:18 176:25
  186:20
finer (1) 177:7
finish (1) 11:21
finished (2) 175:15 176:24
fired (1) 75:24
firms (1) 137:23
first (46) 2:8 8:16 14:22
  23:20 26:11 36:7 37:17
  46:18,19 51:23 53:9,14
  62:19 63:22 69:11 74:4
  77:12 89:20 94:4,13
  104:11 106:14 113:10,17
  114:3,15,21 120:17,20
  128:9 129:9 130:14 133:2
  151:10 152:3 153:21
  154:14 156:2,5 165:3
  167:9 177:2 179:5 190:14
  191:14 193:9
fiscal (1) 6:18
fit (4) 16:5,12 68:22 91:16
fitted (1) 38:20
five (9) 32:6 45:23,25
  104:16,17,17 112:19 113:6
  144:16
flag (1) 10:22
flat (1) 90:6
floor (1) 162:21
flow (1) 111:23
flowing (1) 116:1
flows (1) 96:1,3 104:5
floyd (8) 180:21 181:11
  184:23 185:9,17 186:17
  190:10,21
flush (4) 152:23 153:2,14,19
focus (9) 1:24 8:19 56:11
  117:9 147:7,8 148:20
  155:20 174:9
focused (3) 60:13 63:11
  146:23

focusing (4) 4:24 56:9 62:4
  147:9
follow (18) 2:20 6:3 16:2
  17:8 19:13,19 24:10 27:17
  29:4 30:14 36:6 75:22
  76:18 92:15 115:7 154:3
  164:22 178:9
followed (1) 24:14
following (2) 24:2 164:22
follows (1) 193:17
footing (1) 178:20
force (1) 63:8
forced (1) 86:8
forecasts (1) 114:12
foreclose (1) 87:17
foreseeable (2) 116:4 117:23
forget (6) 81:17 85:22
  88:20,21 111:3 122:16
forgive (4) 23:24 28:4 83:9
  120:23
form (3) 155:3 172:12 191:7
formal (2) 9:12 93:5
formation (1) 6:25
formed (1) 173:14
former (2) 30:23 170:11
force (5) 164:3 166:6,10,12
  168:8
fortunately (1) 78:8
forward (5) 71:2,9 138:23
  175:15 194:2
forwards (1) 138:13
fought (2) 166:15,15
foundation (47) 5:6 6:18,19
  7:2,12,20 8:1,25 9:14
  10:18 11:9,13,15 12:4,15
  14:16 15:1,10,13,25 16:16
  20:4 21:24 36:3 47:23
  49:5,7,11,16,17 20:19,21,23
  50:13 133:16 141:22
  145:8,16
  158:3,5,10,11,12,24
  171:14 172:23
foundations (6) 4:8 6:14
  15:3 19:18 44:9 104:22
founded (4) 97:5 125:1,3
  180:25
founder (1) 63:7
four (2) 23 104:17 150:24
  188:7
fourth (1) 39:22
france (3) 21:5 30:23 31:1
francophone (1) 30:24
frankly (1) 187:6
fre (2) 56:15 158:15
french (5) 18:21 21:3
  29:23,24 31:2
frequently (1) 78:21
fresh (5) 176:14 177:5,18,21
  178:20
friedlander (1) 35:21
friendly (1) 82:10
friends (1) 82:11
friendship (1) 131:20
front (4) 24:11 95:19 155:19
  160:8
full (9) 55:6 59:4 73:23 76:8
  77:9 84:17 99:16 124:18
  165:19
fulltime (2) 88:23 111:6
fully (2) 64:16 99:1
function (4) 9:8 11:6,25
  13:17
functions (1) 5:11
fund (4) 46:7 112:15 135:13
  145:5
funded (2) 123:11 149:25
funder (1) 145:20
funders (1) 135:7
funding (16) 121:22 132:23
  135:20 136:12,15
  137:12,17 139:17,22
  140:14 146:3 146:13 147:1
  173:11,23
funds (5) 32:3 65:23 100:17
  123:23 126:20

further (19) 35:16 71:9,15,25
  97:8 123:3,6 125:20
  137:17,18 138:14 140:21
  153:3 154:24 175:21 183:3
  185:5 191:6,15
future (7) 88:4 99:22
  116:4,21 117:23 120:7
  153:5

**G**

gabriel (3) 173:5,12,20
gambit (1) 28:12
game (2) 56:15 57:2
gap (1) 64:25
gas (9) 149:15,16,20 153:22
  154:8 155:23 168:25
  169:14 170:14
gather (2) 22:7 115:15
gdp (1) 74:20
gdpr (1) 55:16
gee (2) 183:7,13
gees (1) 183:9
gemco (3) 124:13 125:1,3
general (1) 179:13
generally (5) 33:7 95:9
  129:20 139:5 181:22
generate (3) 61:25 62:1
  102:11
generating (2) 116:23,24
geneva (2) 50:9 130:19
gentleman (1) 48:13
genuine (1) 62:22
geographical (1) 153:9
get (41) 20:13 24:1 31:14
  35:17 42:25 44:19 52:17
  62:4 63:9 76:12,14,16
  81:11 87:20 92:2 94:18
  105:12 106:12 113:18,22
  116:3 118:21 120:9 123:23
  124:11 126:22 130:4
  153:1,15,16 156:4,7 157:7
  159:5 160:22 163:24
  172:10 178:13 186:23
  187:18 189:5
gets (2) 129:11 172:16
getting (16) 6:11 10:11
  15:21 31:4 42:22 77:4 85:3
  102:2 105:22 114:9 128:19
  129:23 159:4 173:1 175:18
  188:17
gift (1) 104:1
gist (1) 95:15
give (30) 22:21 6:9 7:18 9:25
  10:3,10 34:5,11 76:17
  83:23 89:18 93:13,16
  94:1,8,8,12 98:17 99:2,12
  104:3 110:25 112:25
  115:15 117:8,25 122:14
  126:3 146:12 163:2
given (17) 7:21 12:8 50:24
  70:6 105:5 115:8 134:18
  145:12 147:6 148:23 179:3
  182:23 183:19 184:2
  188:13,17 190:20
gives (4) 43:20 180:4,18
  192:22
giving (7) 24:19 25:1 95:8
  116:15 117:16 175:17
  191:16
glad (2) 17:2 45:24
glass (1) 9:3
global (2) 46:7 56:5
goes (9) 80:17 103:18,22
  128:21 181:17 182:8,10
  183:17 187:25
going (49) 5:15 18:1
  22:11,12 24:12 28:1,7
  31:18 35:12 39:2 42:24
  50:18 63:8 64:3 78:8 89:6
  91:6 92:21 93:21 95:13
  99:10 112:8 115:15 116:2
  124:12,21 126:3 127:8
  130:12,15 131:23 139:25
  140:20 144:25 146:16
  149:2,22 153:20 156:4
  160:1 165:24 166:8,21

guys (1) 140:20

**H**

hadnt (4) 23:6 59:17 74:15
  146:23
half (1) 99:16
halfway (3) 154:19 159:14
  167:10
hand (8) 72:10 95:12 117:18
  136:9 137:11 157:5 166:7
  175:8
handed (4) 9:4 55:11 95:13
  115:9
handing (2) 136:8,14
handle (3) 102:7 107:19,19
handled (3) 87:11 135:15
  167:22
handling (1) 104:4
hands (4) 77:14 78:6 127:22
  138:4
happen (1) 139:20
happened (12) 12:25 49:19
  60:21 64:13 66:20 75:22
  77:23 90:6 101:8 155:25
  167:9 168:2
happening (4) 42:20
  102:2,16 116:11
happens (4) 51:4,18 102:18
  103:17
happy (7) 10:3 71:16,20 94:1
  96:6 109:22 142:8
hard (4) 12:10 87:17 131:9
  186:8
harm (1) 28:20
hasnt (5) 18:10 37:16 50:24
  114:24 134:19
hats (1) 133:14
havent (8) 32:16 56:22
  86:6,15 92:19 111:13
  129:6 164:21
having (23) 33:14 44:8 49:20
  61:1 67:5 68:7 73:23 76:8
  85:4 93:13 135:23,24
  168:9,12 174:17
  176:4,10,10 179:22 181:15
  183:12 189:19 190:5
head (6) 10:6,19 29:9 91:25
  99:5 146:22
headed (1) 165:25
heading (2) 122:4 162:2
headline (1) 91:8
heads (4) 70:16 72:20,25
  73:8
hear (1) 13:19
heard (8) 1:14 17:9 46:19
  111:17 159:23 186:9
  187:13 189:7
hearing (20) 1:12 14:18 68:6
  69:19,23 177:12 179:9,25
  180:5,7,12 181:13 182:2
  185:7 188:18 189:19 190:5
  191:19 192:16 194:23
hearings (1) 189:25
heavily (4) 62:17,24 63:12,24
heavy (1) 77:16
hebrew (2) 21:3 29:22
heimdal (4) 14:19,22
  15:12,17
held (5) 96:17 100:17 157:12
  172:24 189:20
help (6) 27:10 34:12 48:25
  49:2 52:12 101:20
helped (1) 158:9
helpful (12) 6:9 12:3 19:19
  20:11,13 22:4 30:19,22
  49:3 83:17 111:14 177:1
helps (3) 45:3 70:21 167:13
here (45) 7:9 10:2 14:10
  20:23 21:12 32:17 33:2
  34:10 42:18,24 45:3 47:14
  49:15 57:2 62:12,16 65:5
  69:24 70:7 72:11 74:23
  75:3 76:12 77:12 84:9
  94:12 107:16 114:17
  121:11,13 150:15 154:17
  159:25 160:9 163:1,23

176:21 177:23 179:15
182:17 184:8 187:13
188:11 189:14 192:4
herein (1) 181:19
hes (12) 19:16,17 21:9,13
44:10 81:23 111:3 130:20
133:11 137:1 138:5 161:19
high (8) 9:14 10:21 11:1
141:3 163:5 164:13 166:7
177:17
highly (1) 37:18
himself (1) 44:1
hindsight (2) 77:22 137:21
hire (1) 166:17
historical (1) 149:9
historically (6) 5:12 75:1
92:22 146:24 158:22
161:15
history (8) 5:3,4 50:15 53:6
61:16 140:12 148:3,18
hits (1) 153:22
hold (2) 99:10 186:11
holding (6) 5:20,22 10:15
92:5,23 172:19
holdings (4) 15:2 140:2
144:8 180:22
holds (1) 149:2
hole (3) 153:21,23 183:14
holes (1) 154:13
hoof (1) 186:25
hook (1) 59:6
hope (8) 1:13 16:11 24:11
33:23 126:11 145:25
166:24 175:16
hoped (1) 184:6
hopefully (2) 40:4 113:8
hoping (1) 114:12
horizon (1) 113:5
hostile (4) 28:25 29:2 78:2,7
hour (1) 93:11
house (1) 82:25
housed (1) 173:16
however (7) 26:2 76:22 86:7
90:23 97:3 181:18 182:12
hundred (3) 9:25 114:13
116:18
hundreds (2) 34:24 94:7
hurdle (8) 84:5,6,19 85:3,5
98:21 128:18 163:17
hurdles (1) 177:17

**I**

icsid (13) 18:1,6 22:12
24:20,23 25:10 26:1
133:18 137:22 173:7,9
174:19,23
id (8) 29:12 37:18 81:3 82:21
92:19 99:8 141:18 142:25
idea (7) 32:12 45:2 79:20
80:15 120:3 127:2 151:24
ideal (1) 77:25
identical (1) 51:6
identified (1) 67:5
identify (2) 96:25 161:10
identity (2) 95:21,22
ie (3) 75:16 157:18 191:7
ignore (2) 60:21 174:20
ill (9) 24:8 51:15 73:18 82:4
93:16 96:13 97:5 121:19
132:7
illusory (1) 193:8
im (55) 2:23 10:2,10 12:21
18:12 19:16 20:22 24:22
28:8 31:20 33:2 45:2,20
47:3 51:16,17 52:11,12,18
56:8 62:4 66:12 69:15,16
72:14 74:7 76:10 79:10
81:4 85:25 87:9 89:6 94:11
98:4 99:8 101:7 102:16,17
104:3 105:4 107:17 108:8
110:12,15 113:3 126:3
134:11 137:21 138:8
143:11 155:12 160:8
161:20 164:11 194:16
immediately (1) 64:9
impact (1) 187:12

impaired (1) 153:5
implement (2) 10:22 11:1
implementation (6) 48:19
65:20 112:19,21 113:1
148:11
implemented (1) 60:14
implicate (1) 143:8
implicit (1) 187:22
important (22) 10:8
17:19,21,25 32:23 34:20
36:14 41:2 51:11 58:3
62:12 64:1 74:19 75:15
81:11 84:3 85:7 89:7
111:22 116:21 174:10
184:24
importantly (2) 67:22 87:25
impossible (3) 56:3 188:5
193:4
impression (2) 44:1 94:4
imprimatur (1) 139:3
imr (1) 141:9
inability (1) 16:9
inadvertently (2) 68:7 70:1
inappropriate (1) 181:17
inaudible (2) 19:20 166:17
inaudibles (1) 80:11
incentive (12) 106:2 128:4,7
129:1,9,15,17,19,23
130:1,5 157:9
incentives (1) 129:22
inception (1) 86:16
included (1) 43:11
includes (2) 183:18 190:20
including (10) 6:15 7:4,5
12:16 43:7 68:12 183:4,20
185:6 193:21
inclusion (1) 97:12
income (3) 116:16 171:6,8
incorporated (4) 7:5 17:15
159:16,18
increased (3) 30:6 34:17
108:11
increasing (3) 77:7,7 85:18
increasingly (3) 49:5 86:3
88:3
incumbent (1) 127:11
independent (6) 108:22
111:21 170:9,12,14,18
indicate (2) 56:25 192:8
indicated (2) 191:16 194:3
indicates (2) 40:9 122:4
indication (6) 66:13 182:20
186:19
indirect (1) 44:7
indirectly (1) 44:12
individual (16) 16:23 19:12
20:7,11 23:23 35:21 38:18
53:4 63:4,7 74:24 82:18
88:20 93:4 112:2 140:19
individuals (11) 11:17 19:9
22:2 38:20 47:14 74:22
82:13 118:10 131:16
133:25 146:9
industries (1) 144:13
industry (6) 44:24 86:4,9
105:21 128:25 167:19
inevitable (1) 178:25
infer (1) 133:9
inferred (2) 113:25 154:1
infinite (17) 101:3
104:9,11,21,24 105:8,17
106:5,8,21,22 107:1
108:11,20 109:3 110:10,16
infinites (1) 110:2
inform (1) 12:14
information (3) 43:10 97:8
110:6
informed (2) 4:10 160:25
infrastructure (1) 8:19
inhouse (3) 21:15,22 138:5
initial (6) 35:17 58:15,16,20
59:10,21
initially (5) 14:19 51:6,20
64:13 156:8
initiate (1) 166:3
initiatives (4) 22:16,18

165:21 167:20
injunction (11) 164:17 165:2
186:21 187:2,8 188:24
191:7,11,23,24 194:4
inner (1) 142:1
input (2) 26:7 105:11
insight (1) 91:6
insofar (4) 13:1 66:12 69:15
187:18
instance (11) 5:25 8:22
10:22 65:8 103:15 133:18
134:8 137:5 139:16 187:22
190:15
instead (2) 77:6 118:2
instinct (1) 94:9
institutions (1) 49:14
instructed (6) 21:16,19
133:21,23 135:6 158:20
instructing (1) 67:7,7 110:22
instructions (5) 106:24
110:22 176:21,24 194:13
instrumentation (1) 152:2
insuperably (1) 178:15
integrity (1) 6:19
intend (2) 69:18 70:24
intention (4) 57:1 61:11
100:1 151:6
interaction (3) 42:12 131:1
131:14
interactions (1) 131:9
interest (68) 27:21 36:2
44:4,7,15 48:2 57:13 62:20
67:25 79:2 83:24,25
84:1,6,8,11,12,13,17,20,23,24,25
85:8,10,15,23 93:9 95:25
98:19 99:14,15 104:22
105:9 110:5 119:19,22
127:19 134:15 137:11
140:6,7,24 141:1 143:3
147:22 149:3 150:15
151:2,11 157:12 159:19
160:13,14,15,17 161:6
162:12,17 163:11,15 165:7
170:20 171:11 174:7
186:4,10,14
interested (16) 9:20 12:6
52:7 86:12 96:1 121:20
128:4 129:19 147:11
151:10 159:6 167:7
174:4,5 187:6 189:21
interesting (1) 34:4 114:9
121:16 126:4
interests (3) 44:11 137:10
190:5
interface (5) 46:16 80:25
81:5 107:19 158:14
interfaced (3) 48:17 81:23
141:24
interfacing (2) 46:14 87:9
interlocutory (1) 164:17
internal (5) 19:12 36:23
39:18,21 137:4
internally (1) 174:1
international (1) 141:8
internet (1) 184:16
interpretation (1) 75:20
interrupt (3) 9:16 52:4
129:18
intervene (1) 66:5
intervening (1) 70:4
into (62) 3:22 6:11 10:11
11:18 15:21 16:5,12
26:4,18 28:4 31:24 33:13
34:6 44:2,20 51:19,20
58:23 59:1,17 61:4,20 63:9
64:7,9 65:23 66:19
67:10,17 68:19 69:8 72:20
77:6,25 78:12 80:3,8,11,17
91:6,16 92:11 103:18
112:9 114:13 123:24 125:5
128:9,10,21 131:25 137:20
150:24 151:2,14,18,25
152:5,12,21 175:1 178:13
intriguing (1) 136:5
introduced (9) 49:8,18

53:9,14,15,16 65:19 79:8
130:14
introducing (1) 27:20
introduction (6) 52:24
53:2,3,19 79:16 135:17
invest (2) 127:16 134:22
investigated (3) 93:21 151:4
154:20
investing (2) 32:3 135:2
investment (11) 135:21,22
162:18 163:4,6,8 165:15
166:16 173:12,13,20
investor (2) 25:5 43:25
investors (7) 43:6,11,14
77:15 124:14 127:10,24
invoices (1) 89:23
involved (95) 3:17,19
4:5,15,17 5:10 9:6,7 17:23
19:10 20:20 21:25
22:2,16,23 23:10,11 25:15
31:19 32:15,16 33:6 35:18
37:6 38:18 42:2,6,21 43:23
44:19 45:20 50:22 52:20
53:23 55:18 62:24
63:1,15,20,23,24 64:4,11
70:7 72:16 74:7,23 75:24
78:10,16,20 79:14 82:14
89:2,15 90:3 91:19,20
100:14 102:17 108:19
109:25 110:19 112:12
123:22 126:22 129:17
130:11,13 135:24 136:1
137:21 140:10,20,22
142:25 143:24 144:2,5
145:25 147:19,21
153:13,23 158:12,22,25
160:3 166:5 168:4 170:4
171:7,13 172:11 173:22
169:6
involving (2) 29:25 89:20
ipo (3) 64:2 92:21,24
iron (2) 34:15 36:1
irr (1) 163:5
irrespective (1) 128:13
irrevocable (1) 11:15
isnt (6) 50:19 67:17 98:11
99:18 120:11 186:5
israel (18) 21:14 83:2 130:22
139:9 141:22,23 142:5
149:21 153:9,11,16 158:11
169:18
israeli (7) 21:7,9 158:2,25
159:3,16,17
israelicypriot (1) 149:14
issuance (2) 159:20 160:16
issued (2) 41:22 154:24
issues (7) 10:21 80:24 89:19
99:25 136:3 146:22 158:10
issuing (2) 42:2 89:23
its (88) 5:2 6:20 7:3 10:8
12:2,22 16:22 17:13 23:5
24:19 32:8 34:4,7,9,19
35:20 36:3 45:3 46:11,12
47:18,19,24 49:3 50:1,4
53:17 56:3,8 62:19 65:17
66:18 68:1 70:12,13,13
71:22 77:7 79:21 81:1
82:17,17 83:13
85:12,13,19 86:12 87:10
92:19 93:17 95:1 97:12
100:16,17 101:15 102:24
103:20 107:18 109:5
114:21 115:9 116:2 117:8
122:3 126:20 127:14
128:21 129:13 130:11
134:12,12 135:18
136:16,22 138:11

**Column 5 (J, K, L)**

114:10 130:23 155:11

**J**

ja (1) 40:3
james (2) 135:15 137:9
jan (1) 63:7
jan (2) 27:11 166:10
job (1) 52:12
jobs (1) 129:17
joined (3) 6:2 136:24 182:14
joint (38) 1:8 22:10
23:2,6,20 25:23 26:8
36:12,16 37:3,25 38:6
40:2,10 42:13 56:19
60:20,23 68:4 96:22 97:9
109:17,20 111:5 120:22
121:17 122:25 123:4
134:2,10 143:5 165:18
166:9 189:5 188:10,14
189:13 190:14
journalists (1) 42:17
jp (1) 12:12
judge (9) 181:17 182:8,10,24
186:24 187:12 190:9
193:23,25
judges (1) 182:9
judgment (3) 1:8 180:23
182:20
july (1) 125:14
jump (2) 41:17 144:23
jumping (1) 87:21
joubert (1) 63:7
jv (2) 169:9,9

**K**

keep (3) 12:11 49:23 53:7
kept (6) 38:6 52:11 64:20
65:3 135:1 170:13
key (13) 19:17 21:23 44:8
74:22 82:9,16 111:22
130:2 140:20 155:23
161:17 166:10 174:9
kicks (1) 128:16
kilometres (2) 116:19 127:2
kind (9) 4:6 46:6,22 81:3
173:25
kinds (1) 140:21
kitchen (1) 75:21
knew (8) 26:3 38:15,18
50:10 59:5 78:23 148:9
160:19
know (238) 2:16 3:11 8:6
10:21 12:3 13:1,2 14:10
15:12 16:4 19:19 20:1,8,24
21:10,11 23:14,15,17,19
26:14 27:3 29:21 30:3,4
32:12,14
33:5,5,13,14,15,17 34:1,2
37:13,15,15,17,23,25
38:3,10 40:18,20,21
42:18,23
43:13,17,19,21,22,22
44:3,13,13,18
45:3,6,8,8,9,11,15,16,18
46:5,15,23 47:11,11,15,16
48:10,13 49:20 50:6
51:4,16 55:17 56:1,3,4
57:6 59:3 62:3,8 63:20
65:5 75:22 77:13,23,24,24
79:1,1,16,18,21 80:6,20
81:10,22
82:4,6,7,7,8,17,20,20
83:23 84:11
85:10,12,13,14,21,25
86:15,22 88:20,22 89:17
90:1,8,10,11,12,14,14
92:1,11 93:2 94:9 96:11
98:14 99:25 103:12
104:13,14 105:4,14,14,16
108:14,25,25 110:2,4,4
111:13,15,19 114:11 115:3
120:3 120:22 126:8 127:21
129:13 130:11 131:4
132:18 131:18 132:8
131:5 102:20 133:12
125:22,25 188:9

**Column 6 (continued L)**

140:9,15,19,23
142:3,15,15
143:3,10,20,23 144:9
145:14,19 146:7,21
147:7,8 148:17 149:7,10
150:6,9,12 151:17,20
152:4,14,17,20 154:24
155:1,2,5,7
157:18,19,20,24 158:21
159:4 161:11,16,25 162:2
163:16,21 164:5,21,24
165:10 167:8,25 168:2
169:3,4,16 170:3 171:8,12
172:10,13,21 174:1 185:21

**K** (... more)

knowing (2) 57:25 186:10
knowledge (26) 3:10,13,14
23:24 37:1,3 38:9 46:10,15
48:7 89:14 93:3 100:16,21
108:20 109:3,10 110:9
123:9 126:17 128:6 135:18
143:7 165:14 168:17
170:20
known (7) 8:17 21:13 35:21
42:10 119:5 162:3 169:16
koidu (11) 62:15,19 92:22
94:17 100:24,25 101:5
104:12 108:21 126:6,24
kuyate (2) 23:23 24:3

**L**

labouring (1) 193:14
lagos (2) 162:25 164:14
landsdale (2) 16:5 17:1
language (3) 148:6,17
191:25
large (5) 35:9 54:11 62:13
137:21 149:20
lars (2) 1:18 195:3
last (12) 17:8 50:2 71:4 86:7
92:25 93:8 104:16 122:6
166:7 171:4 174:2,18
late (1) 63:20
later (1) 27:13
laurelton (2) 52:22
79:6,8,17,19,23 84:3
lawyer (12) 19:12
21:8,12,15,22 78:18 81:23
133:10 134:5 137:6 158:2
191:20
lawyers (3) 130:8 148:5
164:23
leaders (1) 30:25
learned (11) 1:5 32:20,22
45:22 67:8 69:1 95:13
159:4 178:18 192:13
least (10) 2:15 19:25 77:9
97:8 99:16 117:4 144:9
146:19 162:18 163:21
leave (7) 63:6 72:10 104:15
124:25 151:24 155:15
184:9
leaving (2) 35:19 172:5
led (1) 52:21
left (6) 55:23 59:3,20 63:17
85:1 97:15
lending (1) 75:25
length (2) 108:11 119:1
leone (12) 57:21 62:10,10,14
74:19 75:1 117:19
125:10,23 126:1,15,16
less (18) 64:1 84:1 92:1 99:11
109:5 131:4 138:19 172:18
let (18) 19:13 25:15 29:15
33:4 37:10 41:5 47:9 51:10
83:18 93:25 98:23 100:21
101:5 102:20 113:12
125:22,25 188:9

**Column 7 (continued L)**

lets (5) 27:13 84:24 87:5
93:11 124:1
letter (1) 65:13 90:13 95:17
96:20 98:6,8 134:8
letters (3) 70:25 87:22 135:9
level (15) 9:14 10:21
11:2,11,14 14:16 38:23
84:1 114:20 140:10,11
141:3 160:12,12 166:7
levy (5) 157:22 158:1,1
159:8 161:3
liable (1) 60:10
liaised (1) 80:23
liberia (2) 21:6 36:1
liberty (6) 175:20 176:2,8
175:23 176:13
libor (2) 151:16 152:15
licence (18) 25:9 38:9 44:19
94:18,19 117:6,18 118:1
125:11,12,19,23 126:2,13
127:6,19 168:3 169:17
licences (3) 24:24 93:19
149:23
liechtenstein (2) 6:20 11:14
life (4) 89:7 113:20 115:24
124:21
light (1) 11:15
lights (1) 162:25
like (48) 1:22 5:5,10 6:15
8:14 26:5 28:11,25 31:1
33:4,16 37:17 38:7 50:13
51:24 57:24 63:20,21
66:23 72:6 73:25 75:14
77:16 78:8 80:15,19 81:3
82:1,2 83:11 88:9 92:8
93:2 103:15 119:19 125:8
126:22 129:4 130:3 137:3
148:18 166:17 169:5
171:9,10 186:3 190:1,7
likely (3) 34:3 113:6 188:12
limit (4) 3:24 125:16 147:8
175:14
limited (34) 26:21 46:15
47:7 52:15 55:21,24 56:6
72:23 91:23 92:5 99:17
100:16 101:6,10 112:6,7
132:24 133:3 134:16
135:12,19 136:2 137:8
139:17,23 144:25 146:1,22
151:21 162:3 164:9,16
171:24 174:6
limiteds (1) 162:17
line (7) 27:1 34:23 51:13
69:17 74:12 87:15 95:20
line (5) 92:15 150:25
168:20,23 185:4
liquidity (1) 87:16
list (2) 92:21 175:4
listed (5) 62:16 120:4 122:1
173:5,15
listen (1) 73:19
listing (1) 116:20
literally (1) 140:22
litigation (23) 47:6,21 66:25
132:24 133:3 134:16
135:7,11,19,20,21,24
136:2 137:8,22,23
139:17,23 144:25 146:1
147:24 174:6 175:8
little (12) 3:9 17:10 20:2
22:4,17 42:16 50:5
140:9,15 153:3 155:10
159:5
litwin (1) 170:21
live (1) 71:14
lived (1) 141:22
livson (2) 135:16 137:9
load (1) 59:4
loan (18) 51:16 64:18 86:18
87:2,2,5 90:16 104:1 144:2
150:18,21 151:14 152:21
155:24 156:8,24 161:22
167:16
loans (7) 51:23,25,25 57:20
151:1,3 171:22
local (1) 126:18

location (1) 153:7
logistics (1) 35:25
loizou (1) 1:6
london (7) 5:25 9:1,6 17:21 62:15,16 166:11
long (19) 21:12 27:14 28:15 34:5 41:25 57:15 75:10 82:11 92:19 113:21 119:6 120:24 125:8 126:4,7 163:8 171:10,10,12
longer (6) 11:24 20:22 50:2 67:24 71:19 123:17
look (30) 5:15 8:1 9:21 24:10 27:11 31:21 33:24 35:24 36:6 39:9 41:16 43:2 57:10 59:19 62:22 65:8 72:19 84:21 88:24 89:12 92:20 97:22 124:1 158:15 166:20 171:14 172:1 179:20 189:14 190:15
looked (5) 11:4 51:24 64:5 78:7 105:10
looking (12) 3:18,20 6:3 47:17 76:1 114:5 115:24 158:23 168:13 172:22 174:24 190:17
looks (2) 33:16 73:25
loop (1) 78:25
lose (4) 26:3 117:20 125:17 146:16
lost (2) 95:15 146:17
lot (30) 9:24 14:8 29:7 39:14 42:21 63:9 74:5 75:21 86:8 110:4 115:2 116:22 118:22 119:12 120:18 121:19 127:21 129:15 131:7 142:13,19 145:22 147:7 153:22,25 158:2 159:2 162:25 163:2 168:10
lots (3) 87:21 125:16 172:20
louis (1) 158:15
low (1) 33:21
lower (1) 160:17
luck (1) 153:23
lunch (11) 92:16 93:8,11,15,17 94:9 95:4 97:18 98:9 130:16 131:5
luncheon (1) 96:15
luxembourg (2) 169:1,1

**M**

machel (2) 181:5 182:19
macrons (1) 31:4
magic (1) 183:24
magnitude (2) 4:11,12
main (3) 80:25 94:17 116:19
mainly (1) 104:4
maintain (3) 6:19 120:15 126:11
maintenance (1) 17:16
maitre (2) 15:16 50:14
major (3) 3:20,21 135:2
majority (1) 164:2
maker (1) 138:6
makes (6) 40:11 47:13 178:2 183:23 188:4 193:18
making (10) 37:10 58:8 89:2 99:6 178:5,7 179:4 180:2 181:12 193:14
malcolm (13) 24:3 26:11,13 33:12 40:1 88:20,23 90:14 110:24 111:2,4,6,6
maloney (1) 16:23
mamadu (2) 23:23 24:3
man (3) 63:4 130:2 192:14
manage (6) 11:12 17:15 94:17 100:21,22 111:1
managed (8) 1:23 2:17 5:6 7:25 8:1 11:11 94:15 167:18
management (17) 4:9,22,23 6:4,25 9:13 11:7 16:3,6,12 76:2 99:18 130:3 151:6 156:12,21 157:3
manager (5) 74:24 87:11 88:11 107:18 110:24

managers (1) 81:1
managing (3) 4:17 48:15 129:22
many (15) 8:15 9:17,18 10:8 12:22 27:8 30:2,25 34:11 62:8 63:17 116:24 133:14 134:23 186:1
marcus (13) 38:18 40:14 45:7,19 53:10 81:16 82:3 88:25 131:5,17,21
margin (9) 102:11,24 103:1,5,17,23 104:2 113:22 136:3
marginal (1) 168:6
mark (1) 140:19
marked (5) 182:20 183:25 186:18 187:11 189:4
market (21) 57:19,23 64:3 90:24,24 91:2 93:9,14,21 94:13,21 102:14 135:6,9 145:11 162:20 163:11,14,22 165:15 173:16
marketing (14) 90:21,22 102:3 103:3,13 104:8 105:21 106:20 107:20 109:22 110:17 111:19 112:3 124:18
markets (17) 6:16 8:20 9:7,10 14:24 75:23 171:24 172:5,8,14,18,20,24 173:2,4,17,24
marking (1) 186:16
marsel (1) 1:7
martin (1) 16:23
mask (1) 2:4
massive (2) 35:4 160:16
massively (1) 34:13
master (124) 1:3,4,11,15,17 2:6 9:3,5 13:18 32:20,21,22 38:7 39:18,20,23 45:21,24 55:1,5,8 66:5,16,19 67:12,13,14,16 68:23,25 70:19,21,25 71:2,7,8,12,14,24 72:2,4,8 94:24 95:1,3,6,11,12,14,19 96:4,12,17,21 144:18 175:14,24 176:2,12,18,20,23 177:1,3,8,19,22 178:6,8,19,22,23 189:6,12,20
material (3) 175:22 187:23 188:7
materials (1) 191:8
mathematically (1) 119:13
matt (1) 110:6
matter (24) 13:18 38:1 40:3 49:19 53:14 54:17,21 56:11 57:13 68:17 75:10 84:18 89:7,25 101:16 143:6 172:15 174:10 178:5 182:24 185:25 186:3 190:1 194:16
matters (9) 5:8 9:19 36:25 45:14 84:8,19 144:5 147:20 158:4
mature (1) 86:18
mauritius (1) 100:18
maximum (2) 59:10 148:20
maya (1) 94:19
maybe (9) 9:21 26:12 71:8 83:1 86:16 104:17 160:8 163:12 166:17
mcfarland (1) 51:12
mean (24) 10:3,20 12:21 18:2 26:19 29:22 31:18 32:13 40:20 41:1 45:8 46:5 54:2 57:18 75:22 78:23 88:8 129:5 133:12 171:1 174:7 176:24 190:2 194:16
meaning (2) 129:13 191:17
means (4) 40:5 59:9 89:7 179:1 183:5
meant (2) 145:21 178:19
meantime (1) 117:6
measures (1) 11:1
mechanics (2) 177:24 194:16
mediating (1) 14:8
medicine (1) 137:13
mediterranean (1) 149:22
meet (3) 2:12 33:10 88:7
meeting (11) 8:23 24:4 26:11 33:12 36:16 37:25 39:4 50:8,10 78:24 166:9
meetings (5) 2:14 22:2 27:9 134:1 135:8
member (4) 44:14 49:21 180:6 181:21
members (3) 48:5 49:17 50:13
memo (1) 156:9
memory (5) 7:19 21:14,18 53:17,18
mention (2) 1:6 21:7
mentioned (15) 15:17 23:9 88:9,17 104:8 141:10 142:4,19 146:5 157:11 167:8 169:21 170:23 173:9 174:2
mentioning (1) 105:24
mercy (1) 80:19
merely (2) 102:8 106:9
merit (2) 28:16 145:18
merits (2) 30:2 176:14
mess (1) 76:21
message (2) 42:23 157:6
met (14) 24:3 40:14,16 45:9,11,12 50:12 53:10 78:21 82:22,25 111:13 130:23 131:4
meta (1) 89:21
metadata (4) 88:24 89:6,12,20
mick (4) 26:12 33:9 40:11 44:23
mid (1) 97:24
middle (4) 18:15 95:8 124:13 153:8
might (21) 6:9 12:2 21:11 22:4 24:13 27:10 45:22 54:12 58:21 59:20 71:8 89:9 108:14,15 111:14 134:21 175:3 177:2,2 189:9,17
migration (1) 15:3
million (11) 4:14 34:16 37:11,12 54:11,16 57:11 58:9,17 59:22 60:3 61:1
milliondollar (2) 59:6 65:4
millionod (1) 53:9
millions (5) 34:24,25 35:8 94:7,8
mind (15) 38:25 50:4 53:18 55:3 61:21 62:3 81:15 84:3

90:4,7 105:15 115:21 142:17 158:18 185:2 161:9
mine (13) 104:6 108:21 112:8,15,19,21 113:13,15,19,23,24 126:2 141:6,10
mined (4) 92:7 100:24 102:13 103:24
mining (27) 25:6,7 35:22 44:24 50:22 57:20,20 62:9,13,15,16 63:5 85:15 92:6,7,22 93:4 94:17 102:4,16 113:22,23 116:17,19 126:16,17 161:8
minus (1) 73:10
minute (1) 144:16
minutes (3) 45:23,25 144:19
mionis (3) 82:19 130:9,15
mischief (3) 70:10,11 184:1
mishcon (2) 135:6,16
missing (1) 160:8
mistake (1) 98:4
mistaken (1) 54:15
mkb (1) 124:15
mmbm (5) 32:1 53:20 58:19 60:5 73:9 87:3 150:22 153:13
model (2) 13:23,24
modern (2) 186:9 187:7
modify (1) 180:9
moment (10) 12:6 52:5 83:14,24 84:10 117:9 119:19 121:21 126:21 169:11
monetary (3) 29:1 132:8,12
money (28) 29:5 35:9 54:7,11 64:14,20,22 65:1 73:10 76:9 87:6 95:22 103:21 116:22,23 123:20 122:3 126:14 127:23 145:8,22 153:1 154:15 156:2,3 167:6 168:10 169:18
month (1) 111:11
monthly (1) 2:21
months (3) 7:22 34:17 113:6
moot (2) 96:12 97:2
more (49) 5:15 7:8,8 11:6 13:24 17:18 18:9 51:5 57:24 63:1,11,19 64:1 67:22 76:1,16 77:15,20 83:5,7 84:1 90:23 92:1 94:1,8 95:9 97:5 99:11 110:18 114:10,10 119:12 122:3 129:7 138:19 148:8,16 149:15 155:10 161:20 167:14 168:12 174:6,7 178:2,8 189:20 190:4
morse (4) 41:23 42:1,11 43:10
most (10) 18:6 34:8 43:12 85:16 86:10 87:25 90:24 132:2 153:19 183:10
mothballed (2) 86:10 88:3
motion (1) 164:13
mount (1) 35:16
move (11) 13:14 18:1 33:3 50:18 72:6 76:21 100:24 112:8 131:23 138:9 149:2
moved (2) 13:24 157:19
movement (1) 35:3
moving (4) 34:11 93:17 112:23 153:15
mpv (1) 85:14
ms (1) 1:6
much (39) 10:20 18:8 28:4 24:12 42:25 61:25 63:11 76:23 78:17 79:18 83:23 84:1,12,12 85:21,23

**N**

n (1) 195:2
name (8) 20:7 39:12 46:19 100:19 103:18 111:16 122:14,20
named (2) 48:13 132:23
namely (1) 96:18
names (3) 8:17 55:17 92:2
nammax (10) 156:13,21,22 157:20 159:17,19 160:13,14,15 167:23
narrative (1) 170:4
nasty (1) 87:22
natural (2) 34:8 126:23
nature (6) 11:4 48:3,9 131:12 153:7 188:7
near (1) 162:2
necessarily (3) 22:21 46:22 160:1
necessary (4) 32:3 33:1 190:4,8
need (23) 6:17 14:9 17:7 49:17 68:17 75:6 122:24 127:15 132:17 137:17 148:3 153:10 156:9 175:24 176:16 178:17,21,24 184:8 185:20 188:8 191:2,2
needed (10) 6:17 8:20,24 22:21 23:1 27:6 31:5 64:22 139:11 153:18
needs (7) 31:6 96:8 100:7 166:14,15 181:18 183:3
negative (1) 97:1
negotiate (8) 15:8 62:2 76:6 118:20,23,25 138:20 166:18
negotiated (10) 19:5 32:11 37:2 60:14 61:10 80:22 118:13 123:1 136:16,17
negotiating (12) 23:5,10,13,18 24:9 58:1 72:16 74:9 118:10 122:7,11,23
negotiation (12) 19:9,10 28:21 30:2 32:13,15,19 53:21,23 54:18 137:8 143:24
negotiations (30) 20:9,10 21:17,25 22:3,6 25:15 30:11,14,16 37:6 40:17 46:20 52:20 54:10,22 58:7 68:15 70:18 78:16,20 108:18 120:11 123:14 126:1 130:6 133:20,21 136:1,7
neighbourhood (1) 154:2
nervous (1) 159:5
net (7) 107:2,7 128:21,25 129:11 172:6 182:3
network (1) 83:10
never (16) 11:13 17:14,15,22,23 29:24,25 70:15 92:17 131:5 140:10 142:25 143:6 150:1 163:1 179:19 180:10
next (8) 63:13 82:15 94:19 150:23 151:9 163:13 179:19 180:10
nicholas (2) 19:11 31:4

nick (1) 170:15
nigeria (5) 162:14 164:6 165:21 167:21 168:7
nigerian (2) 163:16 164:23
nigerians (1) 166:4
nimba (2) 35:16,16
niron (25) 25:5 27:21,21 28:1 31:24 32:3,7,18 33:6,8,9 35:11,12 36:8,10 37:10,20 38:11,12 40:25 44:5,15,18 45:13 47:20
nirons (1) 33:21
nobody (2) 183:3 193:14
none (4) 36:5 47:25 83:8 111:25
nonexecutive (5) 94:11 97:19 98:1,2,8
nonlawyers (1) 187:15
nonparty (3) 182:3,12,16
nonperforming (2) 51:25 64:18
nor (1) 68:6
normal (3) 4:7 137:3 141:16
normally (1) 17:18
norn (8) 13:6,10 14:15,20,22 15:6,11 167:23
north (1) 180:21
note (6) 17:21 32:23 39:4 171:23 189:14,15
noted (5) 39:24 40:2 42:10 184:11 185:17
notes (16) 36:16 179:3 183:21 184:8,10,16,18 185:6,11 187:2 190:15,17 191:18,20 192:16,24
nothing (13) 54:4 60:6 73:15,16 76:16 83:11 87:4 90:4 94:7 119:12 121:12 153:24 160:19
notice (13) 7:22 56:4 69:24 182:22 185:17 187:1,3,9 188:25 191:3,9 192:8 194:6
november (3) 1:1 65:23 173:21
nows (1) 89:8
number (14) 9:20 18:18,19 22:15 65:10 74:17 84:15 93:13 94:3,12 127:23 151:2 153:17 158:4
numbering (1) 106:18
numbers (3) 9:23 114:9 115:15
nutshell (2) 25:21 165:23
nysco (11) 15:2 42:12 145:7 158:17 172:3,6,8,19,24,24

**O**

oak (1) 77:16
object (3) 67:24 69:15,23
objected (2) 69:20,21
objection (4) 178:22 186:15 187:10 193:12
objectionable (1) 166:24
objections (2) 95:16 97:4
obligation (3) 58:25 80:5 181:25
obliged (1) 37:11
observation (2) 131:19 177:3
observations (1) 176:18
observers (1) 187:15
observing (1) 183:4
obtain (2) 67:3 182:4
obtained (5) 66:11 164:8 175:23 182:21 186:19
obvious (3) 10:24 44:22 146:16
obviously (19) 12:8 19:19 27:20 53:21 57:18 83:23 90:18 94:5 107:24 115:21 116:13 134:21 136:7 163:15 168:13 176:13,20,22 182:17
occasion (1) 26:11
occasions (2) 26:10 174:3

occurred (1) 52:1
oclock (1) 96:13
octea (76) 46:21 50:19,21 52:15 55:20 56:14 58:3 63:8 64:7,17 65:5 72:23 73:7 74:2 75:8 77:2 78:18 79:5 80:25 81:10 83:13 85:22 87:10,14 88:15,17,23 91:14,23,23 92:5,6,6,7,9,18,23 93:3,9 98:9,11 99:17 100:11,16 101:1,6,10,18,23 102:2,10,16 103:20 104:5 105:2 108:10 109:12 110:9 111:7 116:17,20,21 117:18 119:18,21,22 121:8 122:8 124:9,22 125:25,25 126:6 127:18
octeas (7) 53:6 62:24 63:23 85:14 91:21 99:20 120:25
odd (4) 87:4,12 140:24 180:11
odi (3) 102:24 103:1,5
offer (1) 142:17
offered (1) 97:11
office (6) 9:2 10:6,16 16:10 88:19 139:10
officer (1) 108:7
offices (1) 166:11
offset (1) 120:20
offshore (1) 169:18
offshoreonshore (1) 15:23
offtake (2) 109:1 124:18
often (9) 2:12,22 22:17 38:1 87:16 129:12,15 139:9 141:17
oh (1) 165:12
oil (9) 149:15,21 154:8 151:25 194:5 163:4 168:8,25 169:14 170:14
oilfield (1) 149:14
oilfields (1) 168:6
okay (19) 6:13 13:20 16:11 77:11 79:13 84:3 85:18 90:1,5 95:3 102:5 114:5 115:11 156:9 159:7 163:20 165:12 169:12 170:8
old (1) 51:17
omitted (1) 144:24
oml (3) 167:12,16 168:3
once (18) 7:5 13:16 56:4 61:20 67:23 77:14 83:2 115:11 126:23 128:15 129:10 130:19 146:15,17 148:7,21 150:9 156:6
oneoff (2) 135:20,21
onerous (1) 61:13
ones (3) 51:17 77:19 192:18
ongoing (4) 36:20 119:25 126:4,20
onwards (2) 2:13 9:23
onyx (45) 5:16,18,25 6:2,13 7:11,15,19 8:1,11,15,16,16,19 9:18 10:5,9,12,16 11:3,6,17,21,24 12:16 13:6,8,16,21,24 14:1 16:9,15,25 17:1,2,9,13,20,22,23,24 141:19,19
open (9) 71:18 95:19 97:13 109:18,24 119:5 143:12 186:9 189:17
opening (1) 28:12
openness (1) 87:24
operate (3) 13:1,22 16:9
operating (23) 3:15 5:5 6:1,15 7:12 8:7 9:9,15 10:12,25 11:10,11 12:16 15:24 20:5 24:4 56:10 87:15 104:6 113:25 158:24 162:23 173:18
operation (10) 3:8 32:4 51:24 58:5 75:25 86:10

November 17, 2020     Vale S.A. V. BSG Resources Limited (In Administration)     Day 1

87:19 88:2 122:13 154:8
operational (2) 3:15 4:15
operationally (1) 140:18
operations (28) 3:9,12 4:6
30:4 61:9 62:9,14 63:5
64:23 65:1 74:18,22
75:6,12,18 85:15 93:21
94:15,17,22 102:4 108:10
113:4,25 117:24 140:9
142:2 168:5
operators (2) 86:4,8
opined (1) 143:6
opinion (2) 33:17 154:8
opinions (1) 142:18
opportunistic (1) 135:22
opportunities (1) 77:15
opportunities (3) 46:8 56:6
62:6
opportunity (11) 31:14 49:2
56:16 58:5 84:6 99:7
127:23 149:23,25 175:17
178:7
opposed (1) 28:22
optimistic (2) 30:17,18
option (10) 56:15 75:4 77:12
117:21 121:11 123:16
143:16,22 146:14 147:12
optional (1) 2:7
options (1) 189:12
oral (3) 174:12 183:19
193:21
order (31) 10:17 36:23 44:18
100:7 123:3,23 153:18
164:8,14,19 175:24 178:9
179:11 180:18 181:4
185:4,5,9,21 187:16
189:21 191:7,22,25 192:11
193:18,22,25 194:3,5,9
orders (1) 179:8
ordinary (7) 88:4 150:24
151:2,25 152:5,12 153:8
ore (7) 34:15 36:1 64:24
113:21,24 116:18 126:24
organise (1) 159:1
organogram (1) 92:1
orientate (3) 39:4 124:16
167:3
original (10) 6:1 80:22 104:5
157:20 162:18 163:4,5
169:17 173:13,20
originally (7) 6:23 7:20
21:4,9 53:3 155:6 173:24
originator (1) 33:15
others (6) 16:4 18:3 46:17
109:1 148:1,15
otherwise (5) 48:8 68:8
105:24 117:16 193:4
ought (3) 29:5 45:23 162:21
outcome (2) 36:8 173:7
outlook (2) 93:20 112:23
outsourced (1) 4:23
outstanding (1) 85:11
over (41) 8:12 14:25 20:21
30:8 34:15,16,17 46:12
47:1 51:8 52:15,17 54:11
63:13 73:14,24 80:13,23
85:24 96:17 103:11 105:8
109:4,8,11 115:9 122:3
134:22,22 136:8,9,15
137:2,11 141:13 146:2
152:11 165:1 166:8
167:11,13
overall (5) 3:7 52:1 77:7
82:9 91:20
overlaps (1) 153:9
overseeing (1) 12:4
oversight (1) 4:8
overstate (1) 192:2
owed (5) 51:14 79:3 98:11
124:14 133:4
owes (1) 172:14
own (6) 10:13 101:12 102:6
103:21 154:22 170:25
owned (5) 51:1 91:24 104:24
124:14 133:4
owner (14) 3:3 5:18,19 6:14

13:10 15:17 16:23 17:14
41:8 107:24 108:4,8
157:20
owners (6) 38:12 41:2,6,9
48:11 121:23
ownership (3) 6:18 41:3
157:18
owning (1) 173:18
owns (7) 101:14,15 140:1,6
155:8 159:17 162:13

**P**

package (1) 84:16
padgett (3) 48:13,20,24
paid (49) 7:23 14:11,13
20:20,22,24 54:12,16
58:17 59:17,21 60:3,6 64:5
65:5 73:6 76:7,15 79:19,24
80:3,8,11 83:24 84:13,17
85:21,24,24 86:14,15
90:19 95:23 100:2,4
105:8,19 107:1 108:10
109:8,11 111:11 120:14
137:1 142:21 152:14 167:6
168:25 188:21
papa (1) 81:19
papadoulou (2) 81:20,21
paparkis (1) 130:25
paper (1) 144:8
paperwork (1) 17:14
paragraph (19) 36:7 43:2
96:25 106:18 107:6,15
150:23 151:9 153:3
154:5,5,23 156:18 159:14
164:16 180:23 181:17
182:10 183:12
paragraphs (3) 107:7 156:19
181:16
parallel (1) 192:24
paraphrasing (1) 145:2
parent (1) 145:7
pari (2) 84:1,15
paris (3) 24:4 26:15 33:10
part (47) 7:3 13:7 14:20 19:9
29:21 32:12 35:10,12,20
39:15 40:12 41:4 44:21,21
46:14 49:23 52:6,6 56:17
59:22 75:12 76:7
110:16,17 118:14 120:9
131:21 140:9,17 144:12
149:25 169:4,16 170:3
173:14 176:1,5 177:18
180:22,25 181:13 183:10
184:11 186:16 192:22
193:9,12
parte (1) 176:5
partial (1) 87:1
partially (1) 51:12
participant (1) 84:5
participants (2) 39:9,12
participating (1) 164:4
participation (4) 25:2 29:17
120:8 160:22
particular (6) 4:3 41:3 87:7,8
122:6 183:25
parties (13) 31:24 36:22
66:12,13 67:3,11,25 68:14
70:9 72:20 181:5
185:12,20
parting (1) 145:21
partner (3) 62:8 163:23
165:21
partners (5) 12:11 16:5
140:12 163:24 170:11
partnership (1) 141:6
parts (3) 34:11 153:17
170:10
party (18) 56:6 65:18 70:6
74:25 78:10 83:2 93:5
120:11 130:22 170:9,15
171:22 179:8,24
182:6,7,15 192:22
pass (1) 55:6
passing (2) 55:3 142:14
passu (2) 84:1,15
past (3) 5:10 20:15 174:24

patient (1) 91:13
patrick (1) 112:4
pause (6) 8:16 22:22 60:21
65:2 73:1 107:11
pay (23) 54:7,19 58:25 60:9
61:1 62:3 64:8 73:20,23
76:8 77:3,3,8 94:13,22
99:17 109:3 112:15 120:5
122:2,3 163:22 180:7
payable (2) 59:13 79:5
paying (9) 54:19 57:7,11,17
60:25 62:20 73:22 85:8
86:1
payment (36) 6:23 16:18
37:11,12,13 58:15
59:9,10,11,21,22
60:1,4,7,11 65:21 66:3
76:14 79:22 86:19 87:2,5
89:10 96:1,2,11,12
99:23,24 101:13 112:18
113:9 120:7 148:22 168:24
180:1
payments (11) 4:2,3,10
17:24 73:22 83:19 84:18
100:7 102:9 106:25 107:19
payoff (2) 58:8 76:7
payroll (2) 8:22 88:23
pays (1) 84:25
pelagic (3) 168:24 169:13,17
penal (8) 185:16,22 187:3,9
188:24 191:3,9 194:6
penultimate (2) 16:11 154:5
people (56) 2:16 5:10 7:7
8:15,22 9:1,6,17 10:1
14:9,10 16:22 22:8 27:8,15
28:18 33:16 35:15 42:25
49:7,14 50:14 55:18 56:9
61:10 74:21 78:22
94:19,22 98:4 111:8 112:4
114:12 120:23 123:4,10
127:22 129:12,23 131:8
137:13,19 140:8 154:11
146:5 166:24 167:5 169:2
169:11 170:3,24 171:15
181:16 194:10 194:23
plain (1) 191:25
plainly (3) 70:7 160:10 177:3
plan (13) 112:19,21 113:1
14:9,10 16:22 22:8 27:8,15
28:18 33:16 35:15 42:25
49:7,14 50:14 55:18 56:9
61:10 74:21 78:22
94:19,22 98:4 111:8 112:4
114:12 120:23 123:4,10
127:22 129:12,23 131:8
137:13,19 140:8 154:11
146:5 166:24 167:5 169:2
169:11 170:3,24 171:15
181:16 194:10 194:23
plc (1) 112:10
please (37) 18:17 22:5
24:15,22 31:6 36:6,21
39:2,14 41:16,19 49:4
54:25 55:12 57:5 58:14
59:7,15 65:9,9 72:9,13,19
86:23 89:5,12 106:12,17
124:6,10 137:7 150:3,13
164:12 166:20 177:17
190:23
pledged (3) 16:3 162:2 171:4
pledge (1) 150:19
plug (5) 53:8 61:9 74:16,22
87:23
plus (11) 13:21,24 14:3
73:10,13 107:13 114:1
121:9 128:25 151:16
158:19 162:3
pm (5) 96:14,16 144:20,22
194:22
pointed (2) 22:11 97:7
points (3) 67:16 70:20
186:23
political (3) 30:25 75:20
153:8
pollack (3) 20:8 26:12 63:22
pong (1) 178:13
pool (3) 128:10,16,22
poor (1) 76:22
portfolio (3) 10:18 83:11
130:3
portion (2) 99:1 110:15
position (24) 6:20 20:14
30:6,10 46:21 51:6,7 52:1
69:25 70:3 71:21 73:5
108:2,6 117:21 122:22
135:4 152:25 157:10 160:8
173:6 175:12 177:4,20
positioned (1) 63:18
positioning (2) 91:20 162:24
positive (3) 28:24 42:20,24
possession (1) 100:13
possibility (1) 182:14
possible (34) 30:1 36:15
61:25 85:19 90:4 92:19
106:2 116:3,9 153:12

172:22
peter (15) 88:13,14
89:13,14,20,22 90:2,14
110:24 119:3 141:25 144:7
147:18 150:12 161:18
petroleum (3) 167:12,15
166:9
philosophy (1) 8:8
phone (1) 12:13
phoned (1) 12:14
phrasing (1) 28:5
physical (1) 16:22
physically (1) 16:19
pick (2) 16:4 25:19
picture (5) 3:8 9:22 62:5
82:21 164:24
pie (1) 34:1
piece (2) 128:9 137:22
pieces (2) 7:6 128:9
ping (1) 178:13
pipeline (1) 111:23
pipes (1) 126:25
pithily (1) 183:6
place (26) 12:7,12 38:13
51:23 53:21 65:6 67:21
74:9 84:15 102:24 104:16
106:9 109:16 110:3 112:22
115:1,8 132:8 154:4,12
165:16 174:5,17 179:16
180:5 192:5
places (1) 107:21
plan (1) 191:25
plainly (3) 70:7 160:10 177:3
plan (13) 112:19,21 113:1
plan (1) 112:19
platform (1) 58:4
play (1) 57:1
played (2) 136:24 141:15
players (1) 90:25
playing (1) 10:16
plc (1) 112:10
please (37) 18:17 22:5
24:15,22 31:6 36:6,21
39:2,14 41:16,19 49:4
54:25 55:12 57:5 58:14
59:7,15 65:9,9 72:9,13,19
86:23 89:5,12 106:12,17
124:6,10 137:7 150:3,13
164:12 166:20 177:17
190:23
pledged (3) 16:3 162:2 171:4
pledge (1) 150:19
plug (5) 53:8 61:9 74:16,22
87:23
plus (11) 13:21,24 14:3
73:10,13 107:13 114:1
121:9 128:25 151:16
158:19 162:3
pm (5) 96:14,16 144:20,22
194:22
pointed (2) 22:11 97:7
points (3) 67:16 70:20
186:23
political (3) 30:25 75:20
153:8
pollack (3) 20:8 26:12 63:22
pong (1) 178:13
pool (3) 128:10,16,22
poor (1) 76:22
portfolio (3) 10:18 83:11
130:3
portion (2) 99:1 110:15
position (24) 6:20 20:14
30:6,10 46:21 51:6,7 52:1
69:25 70:3 71:21 73:5
108:2,6 117:21 122:22
135:4 152:25 157:10 160:8
173:6 175:12 177:4,20
positioned (1) 63:18
positioning (2) 91:20 162:24
positive (3) 28:24 42:20,24
possession (1) 100:13
possibility (1) 182:14
possible (34) 30:1 36:15
61:25 85:19 90:4 92:19
106:2 116:3,9 153:12

162:7 171:7 173:19 188:22
possibly (2) 79:9 162:5
post (4) 4:24 7:7,18 12:8
50:1 90:9
potential (13) 22:18 26:1
44:5,16,24 112:24 114:18
116:9,10 117:12 153:25
173:6 185:4
potentially (7) 18:6 73:23
114:14 136:14 149:20
162:25 185:22
power (9) 162:3,4,13,16,24
163:6 164:9,16 165:3
pr (1) 42:7
practical (2) 92:15 190:11
practically (1) 188:4
pre2010 (1) 171:10
preamble (2) 178:8 193:18
precise (4) 10:4 110:25
146:13 158:21
precisely (1) 67:9
predict (1) 82:15
predicted (1) 127:12
prefer (3) 2:4,5 99:8
preference (5) 151:15,17,19
152:21 155:7
preferred (1) 123:16
prejudice (8) 66:7,10,22,22
67:2 68:10 70:16,23
preparation (2) 31:19 172:11
prepare (1) 25:14
prepared (3) 107:21 120:5
127:24
preparing (5) 11:8 32:16
42:2 90:3 98:5
present (9) 1:6,10 25:5
141:17 182:18,22 186:20
187:15 189:11
presentation (1) 124:9
presented (2) 43:6,11
presenting (2) 28:2,6
president (4) 24:5 30:23
31:2 127:12
press (9) 40:3 41:21,22,24
42:2,21,22 86:11 163:14
pressure (4) 31:10,12,13
166:4
presumably (10) 15:4 40:15
48:5 53:25 103:17 120:9
121:8 151:5 156:2 172:18
presumption (1) 176:8
preventing (1) 53:8
previous (3) 31:12 37:8
102:22
previously (8) 8:17 10:5
33:24 40:14 51:1 105:5
158:19 162:3
price (10) 34:14 35:3
57:10,17 102:12,13 103:3
105:23 106:2 111:21
prices (3) 91:8 93:19 114:18
pricing (2) 35:2 106:1
prima (3) 96:21 188:14 189:1
primarily (6) 19:10 81:6
112:4 136:17 142:23
153:18
primary (3) 8:18 58:20,22
principal (10) 82:10,16
85:1,4,9,11,23 98:18 99:4
129:25
principals (1) 166:10
principle (7) 102:18 123:2
129:19 137:16 178:14
187:17 189:18
principles (1) 13:15
prior (5) 59:22 73:8 160:6
187:1 189:10
priority (1) 150:19
private (6) 1:13,14 74:20
189:20,24 190:6
privilege (16)
66:7,10,22,23,24,25
67:2,6,11,23 68:9,10 69:7
70:2,7,23
privileged (5) 66:6 67:5 69:5
96:21 97:7

95:22 110:5 146:2 180:7
provides (6) 32:5 179:7
181:1,22 192:4,5
providing (8) 10:17 13:13
14:11,24 17:4 28:12 100:8
135:14
provision (1) 181:24
public (11) 1:12 68:21 70:5
96:9 179:16 180:5,6,12
181:14,20,21 182:3,5
186:4,10 190:6
publish (1) 184:15
pull (2) 87:23 163:12
pulled (3) 74:16,21 106:11
pulling (2) 53:8 61:9
punches (1) 183:14
purchase (2) 57:10 108:24
purchases (1) 102:12
pure (2) 76:2 128:15
purely (1) 103:22
purports (1) 167:6
purpose (22) 8:18 20:5
24:23 35:24 68:15 92:3
136:19 143:21 152:1
179:9,11 181:3,3 183:1
185:8 186:20 188:15
189:1,18 192:20 193:2,6
purposes (5) 21:16 69:4
132:7 181:23 182:6,21
184:19 185:7 187:23 188:6
189:1,18 192:20 193:2,6
pursuant (1) 73:7
pursuing (1) 22:20
push (2) 87:17 163:2
pushed (1) 30:12
pushing (2) 27:18 32:6
putting (8) 28:9 33:25 67:17
72:14 74:9 119:10 127:22
192:5

**Q**

q (709) 1:22 2:12,15,20,25
3:2,5,11,20,24
4:2,12,15,19,21
5:1,15,18,20,24
6:3,7,11,21 7:4,10,15,23
8:10,14 9:25 10:5,19
11:6,17,21 12:6,9,24
13:2,6,10,12 14:14
15:4,6,11,13,15,17,20
16:2,11,18,21,25
17:8,12,18
18:1,5,9,12,17,19,21,24
19:1,5,8,13,19,24
20:7,13,18,24
21:2,7,15,19,22,25
22:2,5,22,25
23:4,9,17,22,24
24:7,10,17,19,22
25:1,9,12,19
26:6,15,17,21,25
27:17,20,23 28:1,4
29:4,11,14,20 30:14,21
31:6,8,16,21 32:2,14
33:10,13,18,21,24 34:21
35:7,10 36:2,6,18,21
38:9,11,15,17,21,23,25
39:2,4,7,9,12,14
40:14,18,24
41:5,9,11,13,16,19,21
42:2,5 43:2,5,13,17,20,24
44:3,13,18
45:5,11,14,18,21
46:1,5,9,14,21
47:4,6,9,13,17,23
48:1,5,10,13,15,19,23
49:1,4,22,25
50:2,6,10,15,18,21,24
51:8,10,13 52:4,12,15,20
53:1,11,13,19,21,25
54:7,11,13,25
55:14,16,20,23
56:1,7,19,23 57:3,5,10,15
58:7,12,14,20 59:7,25
60:3,6,21 62:24 63:11,22

64:5 65:2,8,11,13,15 72:18
73:3,5,10,16,20 76:4,12
77:1 78:11,16,18,20
79:1,5,8,12,14,16,18,21
80:1,8,11,13,17,22
81:7,13,18,20,22
82:3,7,15,19,22,24
83:4,6,9,13,18,21,23
84:10,17,21 85:3,7,21
86:11,18,21,23 87:1,4
88:6,9,12,14,17,24
89:5,9,12,24
90:2,5,7,11,15
91:9,12,14,16,19,23
92:4,9,15,25 93:3,8,13,24
94:1,4 97:22
98:6,9,13,17,21,23
99:2,10,17,20,23
100:4,6,10,13,16,24
101:5,9,16,18,22
102:5,10,20,22
103:5,7,9,17,20,24
104:1,8,11,15,18,20,24
105:2,5,16
106:3,12,14,17,20
107:7,10,12,24
108:2,6,11,14,18,20,24
109:3,7,10,13
110:1,8,13,18
111:2,5,8,11,15,24
112:1,6,8,12,14,18,21,25
113:5,9,12,16
114:2,15,21,23
115:1,4,7,13,15,21
116:6,13 117:8,12
118:2,5,9,13,18,20,23,25
119:2,8,13,18,21,25
120:2,9,11,15 121:4,6,21
122:6,10,14,22
123:9,13,22
124:1,4,6,9,18,21,24
125:3,5,7,9,12,18,22,25
126:5,15,20 127:6,9,18
128:3,9,13,15,18,21,24
129:3,18,25
130:4,7,9,15,21,25
131:6,9,16,23
132:4,12,15,19,21,23
133:1,9,12,18,23
134:3,5,8,12,19,21
135:1,11,18
136:1,5,7,11,14,19,22
137:5,10 138:1,5,16,25
139:2,5,15,22,25
140:4,6,16,23
141:1,8,10,13,19,21
142:4,12,19
143:3,8,10,13,16,19,21,24
144:2,5,8,12
145:7,10,12,21,24
146:1,10,14
147:1,6,12,17,23
148:11,22
149:2,5,7,10,13,17
150:1,3,6,8,13,15,23
151:9,24
152:4,9,12,14,17,20
153:2,14 154:3,5,16,18
155:2,6,15 156:2,6,9,17,19
157:6,11,16,18,22,24
158:1,7,18 159:8,12,23
160:5,10,12,23,25
161:3,6,8,10,14,22,25
162:2,6,8,12,16,20
163:2,10,14,18
164:1,5,8,12
165:1,10,14,23
166:5,12,14,18,20,24
167:1,3,6,24
168:2,17,20,23
169:6,11,13,19,21,24
170:1,6,9,18,20,23
171:4,8,11,16,19,21
172:1,18 173:1,9,11
174:2,8,12,15,18 175:2
**qualifications** (1) 21:11

**qualified** (1) 16:24
**qualitative** (1) 136:3
**quantum** (1) 52:10
**quarterly** (2) 2:15 108:9
**query** (1) 191:2
**question** (43) 5:2 8:5 9:17
13:3 26:6 34:4 41:9 48:9
51:15 57:6 58:24 69:9,17
71:24 72:2,3 73:19 76:10
77:1 82:15 85:9 93:8
95:14,20 96:18,24 97:1
101:22 102:25 114:2 122:6
131:24 132:11 147:2,21
157:2 159:24 170:6 174:18
177:24 180:17 191:5,10
**questioning** (1) 69:18
**questions** (20) 1:22,24 4:21
16:3 17:3 25:20 66:17
69:20 71:9,16,25 101:21
147:1 166:18 171:4 174:2
175:15,21 177:13 193:21
**quick** (2) 127:23 143:14
**quite** (15) 9:23 22:17 35:21
54:11 60:24 63:20 78:21
85:7 122:20 140:12 142:19
162:9 164:5 173:6 181:22
**quote** (1) 69:2

**R**

**raise** (3) 94:10 123:23
126:20
**range** (3) 113:16,16 114:2
**ranges** (1) 113:15
**ratchet** (1) 77:24
**ratcheted** (1) 60:16
**rate** (4) 85:20 151:11,15
163:17
**rather** (13) 17:18 32:21
53:15 76:2,8 110:18 121:2
122:2 125:15 147:25
173:17 176:2
**rationale** (2) 108:5 151:22
**reach** (2) 84:4 153:12
**reached** (2) 125:16 175:14
**reaction** (1) 26:13
**read** (5) 69:7 70:12 180:19
182:2 188:6
**reading** (2) 28:4 157:14
**real** (4) 6:16 9:11 85:17
172:24
**realise** (4) 27:23 146:19
162:21 165:15
**realised** (1) 173:2
**realises** (1) 166:15
**realising** (1) 188:19
**reality** (3) 54:3 107:22
121:11
**really** (32) 12:21 15:22 27:3
29:21 36:12 38:20 40:20
42:9 47:16 49:18 52:4,7
56:13 76:19 84:8 99:8
101:13 102:1 106:6 114:19
127:15,20 129:18,18 134:6
140:13 143:3 145:19
146:21 173:4 185:25
190:13
**reason** (37) 6:13 31:11 43:20
65:16 89:22 90:2 98:2
100:5,6 108:5,14 117:19
134:17 139:19 145:12
146:6 156:2 157:9 158:23
174:16 176:16 177:8,9
178:18 184:6 191:18 192:9
**reasonable** (4) 61:17 70:14
119:9,16
**reasons** (19) 2:1 5:19 6:19
13:23,25 20:3,12 34:9 62:9
63:9 74:5,17 83:16 135:10
142:4 145:18 147:10 149:9
166:22
**reboot** (1) 77:20
**recall** (31) 2:16 4:13 7:18
10:22 11:23 12:10 13:3
14:18,25 26:10 27:2 35:14
36:19 49:18 50:1 54:14
78:24 83:1 89:18 98:13

104:13 105:10 111:4 115:3
122:20 146:21 150:2
152:9,13 167:25 173:20
118:6 172:2
**receive** (9) 35:12 36:18
88:6,8 100:7 108:9 110:10
118:6 172:2
**received** (7) 19:3 32:8 73:7
90:8 105:6,6 132:23
**receives** (5) 90:11 105:2
106:24 108:21 109:4
**recent** (1) 50:4
**recently** (2) 18:9 162:9
**recipient** (1) 192:23
**recital** (2) 72:19,22
**recitals** (1) 73:3
**reckon** (1) 163:24
**recognise** (1) 31:20
**recognised** (2) 74:18 133:6
**recognises** (1) 181:5
**recollection** (7) 2:20 12:7
33:11 54:14 139:1 152:9
168:4
**recommendation** (2) 138:22
139:2
**recommended** (2) 110:1
128:6
**recommending** (1) 139:13
**reconcile** (1) 186:8
**reconciles** (1) 107:14
**reconstitute** (1) 152:24
**record** (9) 36:15 62:6 91:6
94:11 97:19 109:21 143:5
183:20 192:5
**recorded** (3) 42:10 178:16
183:24
**recording** (4) 179:25 180:2
183:21 193:13
**records** (4) 10:4,8 38:6
191:22
**recover** (4) 24:23 125:23
142:21 144:10
**recoverability** (1) 156:23
**recoverable** (1) 98:25
**recovered** (2) 99:3,4
**recovery** (1) 77:5
**redacted** (3) 39:15 56:18,20
**redeemable** (1) 151:15
**redevelop** (1) 45:1
**reduced** (2) 49:8 160:10
**reducing** (1) 85:13
**refer** (6) 80:5 97:17 105:13
106:20 107:23 156:11
**reference** (11) 96:2 97:12
98:14 110:20 152:15
154:18 160:1 167:11,14
168:24 187:14
**referred** (13) 24:19 25:13
37:10,20 71:18 137:15
182:2,24 186:23 187:12
189:6 190:9 193:23
**referring** (2) 25:18 191:18
**refers** (1) 67:20
**refinancing** (1) 140:13
**reflect** (1) 134:23
**reflected** (1) 171:1
**reflects** (3) 107:22 132:5
151:3
**refrain** (1) 40:5
**refresh** (2) 9:21 14:17
**refused** (3) 41:11,13,14
**regain** (1) 126:1
**regard** (1) 69:24
**regardless** (2) 106:1,9
**regards** (1) 69:13
**region** (4) 57:22 84:14 94:7
98:18
**regular** (3) 2:13 37:25 134:1
**regulations** (1) 2:19
**regulatory** (1) 6:18
**reintroduce** (1) 58:5
**reject** (1) 94:20
**relate** (2) 169:13 184:20
**related** (7) 4:5 8:7,9 9:19
31:12 45:14 171:22

**relates** (2) 105:25 168:1
**relating** (5) 41:21,22 46:20
48:19 137:7
**relation** (24) 41:24 66:18
67:1,2 68:5 69:20 71:9
79:24 81:9 142:19,21
143:17 146:15 147:23
154:25 164:6 178:25 182:1
184:17 189:24
193:10,11,15 194:13
**relationship** (44) 14:14,20,23
15:24 16:25 40:21 41:25
42:3 45:5,6,15 46:24
47:16 49:9 50:6,16 61:22
62:9 78:1 82:5,8,9 106:7
109:19 126:10
131:3,12,13,14,20 135:17
141:5 142:6 146:7,8
156:12,14,14,20 157:1,3
158:6,7 166:8
**relationships** (6) 10:10 12:5
20:21 64:3 126:18,19
**relative** (1) 88:2
**relatively** (2) 30:22 35:3
**release** (6) 41:21,22
42:3,16,24 45:5,6
**released** (5) 51:12 68:2
71:17 152:3 190:12
**releasing** (1) 189:21
**relevance** (1) 97:3
**relevant** (3) 179:20 180:22
183:10
**reliance** (2) 67:18 72:14
**relied** (3) 138:22 146:24
169:6
**relief** (1) 68:5
**rely** (6) 68:12 147:14,19
148:14 172:12 188:8
**relying** (3) 67:19 68:14 69:3
**remain** (3) 71:20 151:25
159:15
**remained** (2) 19:24 125:18
**remaining** (1) 52:10
**remains** (4) 30:2 96:7 152:4
181:16
**remember** (10) 12:12,13,25
53:17 104:15 115:25
169:8,24 170:2 173:21
**remind** (1) 95:4
**reminded** (2) 45:21,22
**remove** (1) 77:19
**removed** (1) 66:8
**remunerated** (3)
105:18,20,22
**renegotiate** (2) 61:18 77:20
**renegotiating** (1) 81:25
**rent** (1) 16:10
**reopening** (1) 177:10
**repaid** (5) 73:14 85:4 128:16
156:6 157:7
**repay** (1) 173:2
**repaying** (1) 85:7
**repayment** (2) 67:2 173:1
**repayments** (3) 88:5 100:3
128:19
**repeat** (1) 131:24
**replace** (2) 13:8 109:22
**replaced** (2) 104:18,21
**replacing** (1) 106:9
**report** (3) 9:13 10:17 158:15
**reported** (3) 147:1,3 164:18
**reporting** (1) 191:7
**reports** (1) 10:14
**represent** (2) 71:1,22
**representation** (6) 122:12,14
133:13 159:9 188:11
189:13
**representatives** (1) 80:23
**represented** (3) 68:3
158:3,20
**representing** (4) 23:19 53:11
133:19 166:10
**represents** (3) 112:3 154:8
168:18
**republic** (5) 18:3,10 25:4
43:3 44:5

**reputation** (1) 44:24
**reputational** (1) 76:2
**request** (3) 43:3 151:13
182:25
**requested** (2) 25:4 123:4
**require** (3) 97:8 179:24
189:20
**required** (6) 4:10 45:1 84:2
99:17 112:18 117:4
**requirement** (2) 49:16 80:17
**requirements** (1) 11:16
**reserve** (2) 65:4 149:20
**reset** (1) 75:14
**residual** (4) 52:10 54:16,20
59:2
**resolve** (1) 166:12
**resolved** (1) 44:8
**resource** (1) 116:22
**resources** (22) 6:16 9:10
17:9 26:21,21 34:8 55:23
120:4 121:25 122:12
123:4,18 127:25 140:8
141:8 171:21 172:25
173:6,12,17,23,25
**respect** (5) 66:21 68:25
79:22 85:24 192:13
**responded** (1) 70:23
**responsible** (10) 2:16 59:4
63:6 104:11 126:9 127:17
135:16 140:17 170:17
173:11
**restitution** (1) 29:2
**restrain** (2) 68:1,20
**restraining** (3) 68:1 164:9,17
**restriction** (4) 60:20 71:19
183:15 191:7
**restrictions** (2) 187:18 191:4
**restructuring** (1) 160:2
**result** (5) 12:1 14:2 17:5
160:20 194:1
**results** (2) 36:18 129:23
**resume** (3) 88:4 96:13 97:15
**resuscitate** (1) 28:14
**retained** (2) 105:8 136:19
**retainer** (1) 134:8
**retroactively** (1) 14:6
**retrospectively** (1) 190:7
**return** (2) 25:4 163:19
**revenue** (42) 28:1 29:12
32:5,9 33:25 34:2,19,23
36:24 44:20 91:7 107:12
112:16 113:10,10,17,17
114:4,7,16,16,21,23
115:9,13,23 116:1,4,24,25
120:12,15,16,17 121:8
123:15 124:21
128:14,15,22 129:20
174:20
**revenues** (6) 32:8 99:21
107:2,8 128:10,24
**revenuesharing** (1) 31:25
**reverse** (1) 124:24
**review** (9) 3:2,21 31:19
71:12 138:1,7,17,20
169:16
**reviewed** (2) 53:25 155:12
**reviewing** (1) 158:13
**reviews** (1) 91:5
**revisit** (1) 126:12
**revoked** (2) 125:10,15
**reya** (2) 135:16,16
**richards** (2) 63:14,14
**rid** (1) 62:4
**rightful** (1) 157:10
**righthand** (1) 39:10
**rights** (3) 35:13,13 187:5
**ring** (1) 17:10
**rise** (1) 96:13
**risk** (11) 4:9 14:12 49:14
61:14 76:1 113:19 116:10
121:2,10 127:25 163:16
**robert** (1) 35:21
**role** (20) 1:9 6:7 8:3
10:9,14,16 13:4 20:8
22:20,25 23:15 30:19
43:15,25 46:12 88:7

107:24 141:11,15 142:8
**roles** (2) 21:23 136:23
**rolled** (1) 20:2
**room** (2) 10:1 187:15
**rosa** (1) 90:25
**roslindale** (26) 149:2,3,8,10
150:16,17 152:18 154:21
155:8 156:13,21,22 157:22
159:10,12,16
160:2,5,13,14,18
161:6,8,11,22
**roslindalenammax** (1) 157:4
**roslindales** (2) 159:19 160:15
**rothschild** (1) 49:10
**rough** (2) 106:23 109:1
**roughly** (1) 86:13
**round** (1) 98:24
**route** (3) 27:24 35:25 123:17
**row** (2) 1:7 167:15
**ruled** (1) 194:13
**rules** (4) 2:18 182:10 189:24
193:13
**ruling** (2) 74:25 97:6
**run** (9) 8:22 31:3 85:19
107:18 114:13 120:24
125:5 126:7 175:1
**running** (7) 10:3 84:7,20,23
85:15 114:1 126:25
**runs** (1) 84:6
**russia** (1) 167:21
**russian** (1) 170:13

**S**

**sale** (6) 72:24 109:4,8
110:11 120:2 128:10
**saleable** (1) 94:24
**sales** (9) 80:3 100:25 105:3,7
106:23 110:17 111:12
114:5 128:5
**same** (25) 2:1 8:18
13:13,14,15 15:12,22
16:14 20:6 40:4 48:5 52:1
105:20 128:18 130:22
133:6 134:17,22 139:9
147:23 167:22 176:6,13
178:20 182:17
**sarkozy** (7) 19:11 21:20
23:9,13 24:6 30:1 31:10
**sarkozys** (1) 30:18
**sarl** (1) 26:22
**save** (2) 6:11 70:16
**saw** (7) 10:14 56:9 110:20
130:12 137:17 159:25
160:1
**saying** (11) 3:3 74:22 125:12
94:24 109:21 122:2 125:12
128:6 148:8 160:20 187:25
**scale** (1) 34:22
**scenarios** (1) 190:13
**sceptical** (2) 22:17
**scheduled** (1) 88:4
**scheme** (5) 128:4,7 129:24
130:1,5 180:2
**schemes** (3) 129:1,17,19
**scope** (1) 97:13
**scorpio** (2) 161:23,25
**scraps** (1) 26:4
**seasonal** (1) 91:3
**sebi** (6) 82:18,21
130:9,15,23 131:10
**sebis** (1) 131:22
**second** (18) 26:6 69:13
113:10,17,20 114:3,16,23
115:16 120:15,17,20 124:5
128:16,21 165:5 180:25
193:11
**secondly** (2) 67:22 192:7
**secretarial** (4) 5:12,13 6:24
11:3
**sector** (2) 25:6 74:20
**secure** (2) 81:8 139:12
**secured** (5) 50:19 139:11
150:19,21 152:21
**securing** (1) 75:3
**security** (1) 80:13

**see** (51) 10:7 14:19 25:1
32:6 36:7,21 39:9,12,15
49:2 55:19,20 56:13,22
58:14,16 59:2,8,19,22
65:3,15 72:20,21 77:11
91:10 106:14,20 113:25
124:12 127:22 129:13
130:9,16,17 131:23 133:8
134:8 135:12 150:16,24
154:18 156:9 159:12,13
164:13 165:12,24 167:13
176:12 182:12
**seek** (6) 68:5 135:7 178:24
183:2 190:18 193:10
**seeking** (13) 28:21,21 31:3
69:1,2,8,9 165:2
191:15,21,23,24,25
**seeks** (2) 136:14 167:11
**seem** (3) 26:14 55:1 61:14
**seemed** (3) 20:10
**seems** (5) 111:11 156:25
176:7 178:2 190:20
**seen** (10) 1:11 20:7 31:17,18
56:23 72:4 74:21 88:1
114:10 133:7
**self** (1) 77:19
**sell** (18) 30:9 54:5 76:4 78:9
90:23 93:14 94:10 95:1
108:20 119:18,22 123:15
132:10,15,16 165:4,6
174:22
**sellers** (1) 110:8
**selling** (7) 104:12 110:21
132:7 164:10,18 170:5
174:24
**sells** (5) 92:10 101:1,2,2,5
**sending** (1) 87:21
**sense** (15) 2:21 34:23 40:11
53:22 83:23 92:15 94:5,8
113:5 124:24 146:15 176:4
178:2 183:23 187:25
**sensible** (3) 126:9 129:4
176:7
**sensitivity** (2) 35:4 121:15
**sent** (4) 74:7 90:12 102:4
135:9
**sentence** (6) 22:24:7
151:12 154:22
**sentiment** (1) 42:20
**separate** (4) 6:17 14:12
45:19 116:18
**separated** (1) 16:16
**separation** (2) 14:9 141:22
**sepc** (1) 167:15
**september** (3) 72:21 108:12
125:11
**serious** (1) 127:24
**service** (3) 16:14 87:13
182:23
**services** (22) 4:23 6:4,14,21
7:12,21,24 10:6,17
11:22,25 13:13 14:11,24
15:20 16:18 91:17
17:9,20 14:5
**servicing** (4) 83:13 85:8,10
86:5
**serving** (1) 8:18
**set** (23) 9:12 36:25
55:3,6,8,11 61:21 103:4
172:3 183:12 193:5,6
**sets** (1) 31:22
**setsir** (3) 18:9 31:10 132:17
**settled** (1) 148:21
**settlement** (28) 22:14 24:12
29:6 40:1 41:21,23 42:25
44:5,16 58:15,16,20,21,22
59:9,10,11,21 60:1,4,7
73:22 76:13 133:8,18
148:13,22 174:20
**sever** (1) 12:15
**several** (3) 46:13 114:13
174:3
**shall** (3) 32:8 101:21 185:7
**shape** (1) 172:12
**share** (3) 28:1 29:12 32:5,9

33:25 34:19,23 36:24
44:20 74:10 112:16 114:7
115:9,13,23 116:4 118:6
120:13,15,16,17,25,25
121:8,9 123:15 124:21
134:15 160:16 167:12
174:20
**shareholder (4)** 5:7 155:7,8
164:2
**shareholders (4)** 63:16
156:13,21 157:3
**shareholding (1)** 173:5
**shareholdings (1)** 159:15
**shares (21)** 52:15,18
98:10,10 113:13 114:4
140:1,4 143:17 150:24
151:2,15,17,19 152:21
154:24 159:20 164:10,18
165:4 173:15
**sharing (1)** 171:8
**sharp (2)** 33:17,18
**sheet (4)** 36:25 76:21 91:1
135:13
**shore (1)** 180:21
**short (9)** 8:16 46:2 67:16
71:3,10 125:8,9 126:3
144:21
**shorthand (1)** 190:2
**shot (1)** 108:18
**should (39)** 1:6 2:3,6 10:25
14:11,13 26:18 33:3,22
47:25 54:18,19 66:15
70:1,3 71:15,23 78:12 84:1
95:25 99:22 107:23 110:1
139:19 145:11 147:3 152:6
155:24 156:5 163:12 176:8
177:25 178:1 180:16
187:11 189:19 191:5 192:2
193:18
**shouldnt (3)** 71:5 78:12
190:17
**show (4)** 62:7 126:13 176:16
178:17
**showed (4)** 56:17 61:16
82:21 143:5
**showing (1)** 59:20
**shown (1)** 56:25
**shows (1)** 88:25
**side (12)** 7:22 15:11,13 23:18
27:18 33:6,21 63:16 110:8
151:23 157:21 161:21
**sides (1)** 165:10
**sierra (12)** 57:20 62:10,10,14
74:19 75:1 117:18
125:10,23 126:1,15,16
**sign (4)** 11:12 57:1 100:22
130:4
**signatory (1)** 4:7
**signatures (1)** 55:17
**signed (14)** 20:1 27:7 32:16
48:20 54:1 55:20
56:1,16,20,23 138:3,9
146:2 150:11
**significance (1)** 74:18
**significant (5)** 3:13,14
113:19 118:14 132:2
**significantly (1)** 49:8
**signing (2)** 138:10 151:5
**silex (1)** 48:16
**simandou (3)** 24:24 25:2
29:15
**simple (3)** 27:10 102:25
135:3
**since (11)** 2:10 63:24 80:22
86:16 136:24 157:11
159:16 161:4 162:11
165:17 173:22
**singaporean (1)** 149:5
**single (1)** 154:22
**sinister (1)** 83:11
**sinking (1)** 75:21
**sir (2)** 33:9 44:23
**sit (2)** 91:1 117:21
**sits (2)** 111:4,20
**sitting (6)** 10:1 49:10 104:9
105:17 139:15 188:11

**situation (31)** 14:4 22:9
28:14 44:8,11,17 54:3
61:13 64:19 67:9 74:12
77:19 90:20 109:24 116:10
121:5 123:8 124:25 128:2
130:3,17,18,21 135:5
142:10 152:25 153:8
158:14 172:14 181:11
190:20
**six (1)** 34:17
**skeleton (1)** 190:3
**skills (1)** 127:25
**skipped (1)** 37:8
**slight (1)** 180:11
**slightly (12)** 4:4 5:15 11:4
13:8,12,23 19:13 59:7 87:4
107:12 145:3 167:14
**slowly (1)** 49:13
**small (3)** 35:3,3 154:19
**smaller (1)** 168:14
**smoothly (1)** 194:19
**smyson (1)** 122:16
**snooze (2)** 117:20 125:17
**social (7)** 83:4,5
130:17,17,21 131:1,3
**sold (15)** 3:18 51:5 52:11
60:18 90:23 101:19,24
102:14 104:23 110:13
169:22,24 170:9,14 171:11
**sole (3)** 5:18,19 13:10
**solely (2)** 1:24 157:13
**solicitors (1)** 183:21
**solid (1)** 51:24
**solution (10)** 13:7 17:4
132:6 27:16 28:13,17,21
49:15,20 78:3
**solutions (16)** 47:6,21 49:23
132:24 133:3 134:16
135:12,19 136:2 137:8
139:17,23 144:25 146:1
147:24 174:6
**solve (2)** 16:8 63:18
**solved (1)** 145:22
**solving (1)** 170:5
**somebody (7)** 15:13,15
20:18 109:23 127:15 132:7
162:10
**somehow (1)** 40:7
**someone (11)** 15:8 40:14
41:23 93:6 111:16
147:14,17 157:24 161:3
186:22 189:9
**something (47)** 14:1 22:21
26:4 29:7,17 32:20 40:9,22
43:18 46:12 51:5 56:5,9,12
57:8 60:13 61:18 63:21
67:18 69:4 73:20 74:10
75:5 81:4 82:2 92:8,12
93:2 96:17 97:18
111:16,17 119:12 122:17
126:22 138:9 139:6 142:15
144:13 148:13 157:13,16
159:23 160:9 168:15 169:4
174:12
**sometimes (5)** 20:3 21:22
51:3 92:2 137:19
**somewhere (3)** 8:10 58:2
151:6
**soon (1)** 36:15
**soros (4)** 131:24 132:1,9
135:21
**sort (6)** 10:5,19 124:24
129:4 163:2 187:16
**sorts (4)** 11:22 89:2 106:22
161:11
**sought (2)** 165:17 181:15
**sound (1)** 91:10
**sounded (1)** 129:4
**sounds (2)** 89:16 136:5
**source (1)** 107:23
**south (1)** 35:16
**space (3)** 8:23 16:10 146:23
**spare (1)** 55:2
**speak (5)** 29:22,23 42:9,14
138:25
**speaking (3)** 21:3 98:9

177:22
**speaks (1)** 21:3
**special (3)** 24:4 46:7 56:6
**specialist (1)** 110:7
**specific (3)** 10:11 135:5
193:24
**specifically (1)** 185:3
**specifics (1)** 46:16
**speculate (10)** 29:8 32:13,25
37:18,23 43:16,17,20
111:14 113:3
**speculating (11)** 2:23 10:2
20:23 23:15 32:17 33:2,5
45:2 50:4 79:11 111:15
**speculative (1)** 114:6
**speed (1)** 154:15
**spending (1)** 116:22
**spent (3)** 29:7 117:1 168:10
**spin (1)** 42:18
**spirit (4)** 19:25 20:6 27:2
137:2
**split (2)** 114:15 170:11
**spoke (4)** 35:15 81:7 135:23
161:3
**spoken (2)** 161:6 164:1
**sporadically (3)** 81:2 161:5,5
**spreadsheets (1)** 114:11
**staff (1)** 88:19
**stage (17)** 25:25 26:5 32:18
33:8 49:8 53:14 62:25
63:1,2 78:7 102:6 123:14
158:12,23 173:13,14 179:5
**stages (5)** 47:9 101:5 125:22
132:12 179:5
**stakeholder (1)** 44:10
**stakeholders (4)** 62:23 77:18
78:4 127:4
**stand (2)** 44:12 99:7
**standard (74)** 51:2,5,7,21
52:9,23,25 53:7,22
54:5,7,12,17 56:13 57:7,21
58:8,11,12,18 60:8,9,12,16
61:2,7,16,22,23
62:3,7,11,17,21 64:16,17
65:3,13 66:14 68:4,19
69:14 70:13 71:21 73:21
74:14,23 75:9,16,19,23
76:4,6,9,12,19 77:2,8,17
78:2,9,22 79:9 80:20 84:2
95:17 96:20,22 97:9
100:20,25 116:22 117:2
127:10,22 159:23
**standards (1)** 128:25
**standing (1)** 41:25
**stanley (1)** 122:18
**star (65)** 40:17,18 46:21
47:19 48:19 50:18,18
51:1,14 52:21,24
53:1,11,15,18,23 54:6,18
57:6 60:10,25 62:2
64:10,14,21 65:5,18
72:16,24 73:5,23 74:1
75:3,9 76:9,13 77:9
79:3,5,8,19,22
80:4,9,13,23 83:13,16
83:13,21 85:22 86:14,21
89:15 90:3,16 91:9 95:23
98:21 99:23,24 100:2
128:15 130:4,10
**start (7)** 1:22 55:2 75:12
114:9 128:18 129:10 184:9
**started (2)** 14:23 36:14
**starting (1)** 32:7
**starts (2)** 115:11 116:1
**stated (2)** 105:13 107:16
**statement (5)** 43:9 106:15
107:15,17 115:16
**statements (1)** 102:22
**states (1)** 191:25
**station (3)** 162:14,24 163:6
**status (7)** 20:16 37:24 71:22
90:16,18 143:14 144:10
**statutory (2)** 9:11 11:9
**stay (5)** 50:13 56:15

120:14,24 121:1
**steal (1)** 166:13
**steel (2)** 171:5,6
**steinmetz (68)** 19:11,14,20
21:20 22:13,25 23:4 25:18
27:18 28:20 30:15 31:8
40:24 43:7,11,12,24
44:4,15,23 45:6,18 48:2,6
50:7,8 53:4 65:25 78:11,20
79:2 82:3,5,10 83:3 95:21
104:18,20,22 119:2
130:21,24 131:2 133:13,24
134:14 138:25
139:3,7,8,12,18 142:7,8,14
146:8 149:24 155:19
156:6,15 157:5,8,9,19
158:6,9,10 174:3
**steinmetzs (9)** 43:15 82:25
104:24 133:10 142:17
155:14 157:12 159:21
160:16
**stella (3)** 118:3,10 120:3
**stellar (2)** 112:9,14
**stems (1)** 153:6
**stepped (1)** 81:2
**stepping (1)** 73:25
**steps (8)** 69:16 109:7,10
119:8 128:24 165:4,6
184:16
**stick (2)** 6:10,11
**stigma (1)** 123:19
**still (16)** 14:2,16 24:13 26:23
47:11 59:6 61:1 63:2 77:4
84:25 145:25 154:1 167:8
76:10 105:4 106:13 107:22
138:8 164:11 170:8 178:5
184:1 185:19,25 187:14
190:6 193:14
**surely (1)** 49:13
**surfaced (1)** 12:2
**surgeon (1)** 82:20 88:21
111:3 122:16
**surprise (1)** 71:5
**surrounding (3)** 100:1
**susie (3)** 2:5 9:4 13:5
**suspect (4)** 2:2 31:16 40:12
127:21
**sweep (2)** 64:19 75:17
**swept (1)** 64:20
**swiss (5)** 5:23 6:1,7,21 14:4
**switzerland (5)** 5:14,21
17:22,23,25
**sword (1)** 112:4
**sworn (1)** 1:16
**system (1)** 186:11

113:8 129:10 145:1 163:5
164:24 171:9 174:21
**tape (1)** 183:21
**target (3)** 93:17 103:13
112:23
**tax (7)** 14:4 20:3 120:18
141:22 158:3,10,25
**taxes (1)** 15:23
**team (4)** 126:17 131:22
155:22 167:22
**tech (1)** 89:21
**technical (6)** 89:24 92:13
102:15 104:4 105:14
151:23
**technicalities (2)** 151:24
159:2
**technicality (1)** 27:5
**technically (2)** 64:19 97:9
**teeing (1)** 87:22
**tem (2)** 71:17 96:6
**ten (4)** 65:20 92:25 104:16
144:19
**tends (1)** 192:11
**tenor (1)** 135:8
**tens (2)** 34:24 94:7
**tension (2)** 186:5,7
**tenths (1)** 115:14
**term (3)** 31:3 36:25 119:9
**terminated (1)** 139:22
**terminology (1)** 101:16
**terms (36)** 12:19 15:7,9 19:5
23:10,14 24:10 28:11
29:1,18 36:24 61:13
72:21,25 73:8 85:21 86:14
76:10 105:6 106:11 107:20
105:16 108:22 112:14,18
120:2,7 123:1 136:1
137:23 173:1 175:14
181:15 190:11 191:18
192:11
**territory (4)** 6:12 29:2
119:11 149:21
**test (1)** 154:4
**tested (2)** 135:16 148:7
**thank (16)** 2:5 9:4 13:5
52:14 72:8 95:5,10 97:17
129:6 175:13 191:12
194:7,17,18,18,21
**thanks (5)** 1:17 39:23 71:7
95:11 193:16
**thanksgiving (1)** 91:4
**thats (40)** 5:4 13:9,11 14:1
17:10 27:19 33:17 39:20
51:22 53:18 55:9 69:4
70:16 73:18 75:13 77:5
81:3 84:19 92:13,14 95:3
101:8,11 121:5 126:7
137:24 146:9 157:18 164:1
165:8 169:17 170:12
174:12,13 176:25 180:4
183:7 192:3 193:3 194:8
185:3 193:2 194:15
**therefore (6)** 46:16,17 97:2
105:8
**theres (10)** 35:15 42:24
47:15 49:15 100:5 121:15
126:25 135:3 147:8 162:25
**thetonguma (1)** 117:24
**theyre (5)** 45:17 76:17
90:12,13 131:21
**theyve (4)** 45:11,12 73:6
87:25
**thing (10)** 15:22 61:7 75:15
78:5 84:8 108:8 115:25
145:17 146:25 155:24
**thinking (6)** 8:29 8:33:19
43:23 61:23 152:23
**third (16)** 31:3 39:10 43:2
49:20 65:18 63:10 73:6
93:5 95:20 154:22
170:9,14 182:6 185:19,20
192:13
**though (7)** 24:2 27:20 53:25
91:7 116:25 140:23 148:9
**thought (10)** 29:4 50:3 53:1
60:17 61:4 114:19 147:6
148:24 178:15 188:16

**three (14)** 7:22 49:17
58:22,25 59:16 60:3,6
62:13 76:6,14 81:15
121:13 156:19 169:15
**through (26)** 27:14,23 28:22
29:1 31:18 35:2 36:1 81:10
92:15 93:12 100:20
101:18,23 116:2 117:14
126:25 130:12 133:5
141:19 145:16 160:1,17
164:4 171:14 175:18 179:5
**throughout (1)** 2:9
**tie (1)** 30:25
**ties (1)** 12:15
**tiffany (6)** 51:2,7,21 52:22
79:17,18
**tilley (1)** 150:10
**time (108)** 3:17,17 8:12
12:17,20 14:8,25 15:16
18:5 20:21,21 21:6 23:20
24:3 25:23 28:3,19 29:7
30:21 34:5 35:14
38:13,15,19 40:6 42:7,11
43:22,24 46:12 47:4,12
51:4,24 52:1 53:9 54:15
57:9,13,23 58:6 60:6 13
61:5,14,19,24 62:14
63:9,19 64:11,23 73:14
74:25 75:13,21 76:20
77:19 82:12 87:8 89:8,21
91:4 92:19,20 93:23
100:15 103:12 105:11
116:8,11,19,25 117:23
119:4,6 122:3 133:2 134:6
136:20 137:2 138:10,13
142:24 145:14,16 152:9
155:15 161:17 163:8
168:10 169:3,7 170:15
171:3,9,10,12,14 173:24
192:21
**times (8)** 2:24 8:3 39:24
75:14 87:20 103:14 130:23
141:10
**timesheets (1)** 8:6
**timing (2)** 77:24 170:2
**title (1)** 102:8
**today (25)** 1:9 14:7 20:15
30:10 34:10,14,14 35:20
44:12 51:18 60:16 68:18
94:21,21,25 99:8 112:25
121:18 141:12 163:25
175:16,23 178:9 186:14
188:11
**together (2)** 179:2 184:19
**together (14)** 19:18 36:22
38:20 49:24 111:20 117:15
118:2,7 119:17,20 142:12
**toing (1)** 115:2
**told (12)** 13:17 22:8 41:5,6,7
44:10 57:16 71:4 111:16
127:10 133:23 134:19
**tom (1)** 28:5
**tongotonguma (1)** 115:19
**tonguma (13)** 112:8,9,16
116:14,15,17 119:21,23
121:24 124:24 125:22,24
126:2
**tonne (1)** 34:15
**tonnes (1)** 34:16
**too (4)** 14:5 28:4 87:17
182:17
**took (8)** 51:8 67:20 104:16
110:3 119:6,8 125:11,13
179:16
**topic (3)** 72:6 122:6 159:6
**topics (1)** 144:24
**total (5)** 76:17 115:13,17,22
167:15
**touch (5)** 18:13 45:17 50:13
122:13 139:8
**tough (2)** 130:6 137:23
**towards (2)** 32:9 87:2
**trade (1)** 148:4
**traded (1)** 173:16
**trades (1)** 173:15

**tab (30)** 18:21,21 24:17
31:6,16 39:2,6,7 41:19
54:25 55:12 65:9,11 72:13
86:24 89:5 106:14 124:4,6
150:3 156:17 164:12
166:20 167:1 171:17,20,21
180:14,20 183:7
**table (2)** 28:10 59:20
**tabled (1)** 54:2
**taken (12)** 61:7 69:16
109:7,10 132:4 141:17
144:2 148:24 174:17
188:15 189:14 191:20
**takes (3)** 53:21 180:5 193:12
**taking (8)** 38:13,25 65:6
121:12 165:4,6,16 184:8
**talk (13)** 15:16 41:22 71:13
33:10 34:4,18 45:16 78:11
81:13 95:8 153:2,14
158:18
**talked (13)** 4:15 21:15 33:24
47:19,20,20,20 82:3 83:6
130:15 148:12 157:16
174:18
**talking (17)** 2:21 27:20
34:24 57:22 80:7 85:5
91:14 98:10 99:11 112:4

trafford (1) 97:25
transaction (29) 3:19,24
31:22 47:2 53:25 61:11
64:9 73:12 77:6 78:12 81:8
102:11,25 103:1 112:12
117:15 118:2,7,15
119:6,10 120:21 124:11
138:1,7 158:16 170:10,17
172:2
transactions (3) 3:21,22
11:18
transcriber (1) 45:21
transcript (31) 178:16
179:2,22,24 180:3,7,8,13
181:6,9,13,20 182:4,13,20
183:20,24,25 185:6 186:19
188:6,23,25 189:5,10,22
190:9,12,18,23 192:7
transcription (1) 182:23
transcripts (3) 179:25
181:23 193:10
transfer (3) 104:1 117:9
165:4
transferred (1) 72:23
transfers (1) 16:19
transparency (1) 87:24
transparent (3) 109:18,24
143:12
treasury (1) 4:6
treat (1) 189:19
treated (2) 174:1 176:13
treatment (1) 172:11
trial (1) 179:10
tribute (2) 112:9,14
tricky (1) 20:19
tried (1) 189:5
tries (1) 186:22
triggered (1) 178:14
triggers (1) 60:1
trillions (1) 35:8
tripartite (1) 53:22
trouble (3) 3:18 94:20
117:24
true (1) 65:18
trump (1) 128:2
trust (8) 44:14 49:10 146:6
147:19 155:13 157:7,12
160:12
trusts (1) 48:6
try (14) 5:15 10:9,22 15:8
49:23 51:15 63:18 77:20
81:12 87:13 102:20 125:19
126:11 127:2
trying (22) 10:10 25:9
27:11,14 35:1 43:1 44:1
52:12 56:8 61:12 67:18
114:17 129:8 143:8,11,13
151:22 152:24 166:5
172:16 178:13 187:18
tschelet (9) 53:5 54:9 72:17
78:14 79:9 140:18 144:6
157:7 161:15
tuesday (1) 1:1
turn (3) 123:13 167:13
185:23
turned (3) 78:2 117:3 149:15
turning (1) 123:22
turns (1) 140:11
twice (2) 2:21 73:24
twists (1) 140:11
twothirds (1) 115:19
type (9) 3:24 8:3 13:13,14
31:14 40:21 61:12 87:15
161:20

**U**

ua (1) 140:2
uk (8) 8:15,16,16,19 9:18
10:23 15:23 21:12
uks (1) 8:11
ultimate (4) 5:7 19:17 28:17
160:18
ultimately (16) 14:3 22:18
46:20 63:5 75:23 117:24
118:16 137:14 138:3

167:22 168:12 172:22
175:23 188:19 189:3 191:5
unable (1) 90:23
unavailable (1) 100:14
unbankable (1) 11:25
uncertainty (1) 153:5
unchanged (1) 159:15
unclear (1) 38:20
uncommercial (1) 60:24
underground (2) 64:24 75:11
underlying (8) 3:8,9,15
126:12 141:4 149:10,13
162:12
undermine (1) 63:16
underneath (3) 92:6,7
162:13
understand (93) 2:2 8:14
12:6 15:7 18:2 23:4 24:12
29:23 30:14 31:13
34:12,21 38:17 46:23 48:9
49:2 50:23 52:12,13 57:4
62:13 65:2,24 66:8 69:1
72:10 76:10 77:1,11
84:10,21 87:24 89:6
90:15,19 91:16,23 92:3
95:10 100:25 101:25
102:1,9,10,10 103:1,2,5,9
105:16,17 110:13 114:15
115:4 117:8 119:18 121:22
122:22 127:6,15 129:12
131:11 133:3,4,13 138:5
139:2,6 142:6,13
143:13,15,21 154:18
155:15 156:13 157:1,2,11
158:7 160:19 164:8,23
165:8,12,23 166:12,14,22
169:1,13 173:11 184:8
understanding (32) 3:5,7
7:23 10:10 19:1,7 24:22
27:10 36:2 38:12 45:4 51:3
61:5 64:12 73:18 75:14
81:6 92:4 101:11 105:20
137:5 141:3 151:21
155:13,17,18,18 159:8
164:20 165:9,25 172:21
understands (1) 184:24
understood (11) 27:3 40:20
53:6 76:4 103:17 105:5
110:18 141:24 145:18
148:4 167:24
undertake (2) 36:10 135:11
undertaking (3) 37:20 68:3
71:18
undertook (1) 36:22
undocumented (1) 146:10
undoubtedly (1) 186:7
unexploited (1) 84:8
unfair (2) 60:18 163:16
unfortunate (1) 49:12
unfortunately (1) 135:3
unhappy (1) 100:19
unless (4) 1:15 26:2 67:11
139:19
unlikely (2) 37:18 182:15
unrealistic (1) 28:10
unredacted (2) 39:15 56:23
unsigned (1) 56:19
unsold (1) 90:21
until (8) 9:23 23:7 60:17
61:19 71:10 97:24 145:16
191:3
unusual (1) 57:16
unwilling (1) 145:5
updated (2) 1:13 55:11
upfront (3) 76:5,13 118:11
uplift (12) 77:24
103:2,8,10,13,16,22 104:5
105:23 107:4,13 114:18
upon (5) 11:24 69:3 93:18
173:7 180:1
upside (1) 156:7
used (7) 167:7 179:10 181:2
182:5 185:7 192:12 193:19
useful (1) 45:3
using (3) 184:9 186:11 190:2
utility (1) 163:7

**V**

v (1) 177:11
vacuum (1) 16:8
vale (6) 1:5 34:15 69:11,18
71:6 167:7
valuable (6) 18:6 34:8 77:20
154:14 163:8 173:7
valuation (6) 34:13,18 93:5
111:12,23 153:24
value (63) 9:14 24:13,14
26:1 27:23 28:15 30:6
34:6,10,19 43:1 58:5
61:6,12,12 77:13 81:4
85:17 87:19 93:6,9,14
94:16 107:4 113:13 114:3
115:8,8,23 116:10
121:7,18 127:3 132:6,8,12
141:4 143:1 146:19 147:14
146:25 163:11,11,14
165:15,19,20,22 166:2,16
168:18 174:18,21,23,25
175:3,5
varied (1) 2:13
various (11) 8:7 14:10,11
15:2 46:10 49:14 54:13
82:14 92:2 168:7 174:4
vast (1) 35:9
vehicle (1) 164:3
ventilated (1) 70:20
venture (1) 169:21
ventures (1) 180:22
verdandi (7) 13:6,10
14:15,20,22 15:6,11
verdandibsgr (1) 14:14
verification (1) 110:1
verify (2) 109:7,11
versa (1) 142:11
version (3) 56:21,23 149:17
versus (1) 94:13
via (3) 53:4 65:22 91:17
viable (5) 27:12,12 126:7
127:20 149:20
vice (1) 142:10
vindicate (1) 25:10
virtual (1) 10:15
visits (1) 109:16
voice (1) 28:5
volatility (4) 34:21 35:2,5
121:15
volume (3) 103:14 124:3,4
vote (1) 147:13

**W**

wait (1) 91:11
waiting (1) 91:2
waive (3) 25:2 67:4 70:1
waived (1) 80:17
waiver (1) 67:1
walk (2) 117:17 118:1
wants (1) 175:17
warned (2) 191:2,3
wary (1) 186:25
wasnt (3) 82:5 221:25 24:8
25:15,22 29:7,21 31:4
32:12,15,15 33:15 36:2
41:15 44:21,21 57:3,8
64:11 96:18 108:19 116:23
133:21,22 135:9 146:23
147:7 166:8 168:4 171:12
waterfall (1) 156:5
waters (1) 140:15
way (47) 4:6 5:16 7:25,25
9:12 13:9,12 14:12 15:21
16:14 28:2,6,7,8,22 30:9
41:7 50:25 51:10 68:24
71:2,8 73:21 79:17 84:21
94:16 98:24 99:13
113:12 120:18 123:21
125:25 126:9 127:17 129:6
143:8 148:25 149:23
147:7 166:8 168:4 171:12
176:13

ways (5) 82:14 83:17
186:1,3,8
wealth (2) 115:17,22
wears (1) 133:14
web (2) 83:6,8
website (3) 97:23 98:3,5
wedding (3) 83:1 131:6,11
week (1) 71:4
weekes (34) 1:5 32:22
66:5,20 67:13 68:24,25
70:19 71:2,8 72:8 95:12
159:4 176:19,20 177:1,9
178:5,24 180:10,16,25
183:12 184:6,13,15,22
185:2,11,15 191:14
194:7,12,17
weekess (1) 97:4
weeks (1) 169:15
welcome (2) 2:3 99:6
wellknown (1) 25:6
went (8) 27:14 61:20 62:18
131:25 146:9 154:4 170:16
194:19
werent (11) 30:14 37:5,6
47:4 57:11 62:25 64:25
74:7 80:21 108:21 154:7
west (70) 40:17,18 46:21
47:19 48:19 50:18,18
51:1,14 52:21,24
53:1,11,15,18,23 54:6,18
57:6 60:10,25 62:2
64:10,14,21 65:5,18
72:16,24 73:5,23 74:1
75:3,25 76:9,13 77:9
79:3,5,8,19,22
80:4,9,13,23 81:13,16
83:13,21 85:22 86:14,21
89:15 90:3,16 91:9 95:23
98:21 99:23,24 100:2
128:15 130:4,10 162:3,16
164:9,16 165:3
wests (1) 75:9
weve (4) 62:3,4 93:11,21
whack (1) 99:15
whatever (7) 68:5,21 96:7
120:16 132:16 142:9
160:21
whats (15) 20:14,14 21:2
64:24 73:17 74:2 100:6
102:2,15 104:1 107:16
108:2 141:11 163:17
165:24
whatsoever (3) 36:5 83:8
111:25
whereas (1) 97:25
whereby (2) 87:13 117:15
whilst (2) 175:18 179:19
white (3) 175:25 179:6,19
whoever (4) 33:20 141:25
142:9 186:12
whole (9) 12:15 75:25 86:4
93:3 108:4 145:13 155:22
158:14 167:18
whollyowned (1) 162:6
whom (3) 21:19 49:18 127:9
whose (2) 20:7 32:12
wider (3) 47:23 50:15 194:3
willan (57) 1:3,4,19,20 2:8
9:16 32:20 33:4
39:19,22,24 46:4 55:2,6,10
67:14,16 70:21
71:1,14,15,25 72:3,7,9
95:5,14,17,20 96:6,11,20
97:7,11,16 136:14 163:13
116:5,24 161:16 163:13,21
170:2
yesterday (2) 70:22 71:5
yet (3) 9:7 133:8 181:21
yossi (20) 53:5,5 54:9 60:15
72:17 74:8 78:14 79:9
140:18 141:10
142:5,6,10,14 144:6
147:19 148:19 149:1
156:10 161:15
youd (4) 10:6 37:17 38:7
174:19
youre (10) 13:10 39:10 77:4
80:6 85:5 105:24 117:20
119:11 121:19 172:22

96:4,10 102:22 106:15
107:15,17 115:16 176:22
184:2
witness (1) 95:24
won (1) 137:16
wonder (1) 144:16
wonderful (2) 41:5 55:16
wondering (2) 45:25 189:16
wont (7) 63:10 97:5 166:24
193:24 194:3,4,5
woolworth (1) 177:11
wording (1) 185:4
work (23) 5:12,13 6:24,24
9:8 16:22 21:24 35:23
36:22 38:4 44:1 81:24
82:13 88:22 92:12 116:7
119:10,16 130:13 139:9
141:19 161:20 172:12
worked (4) 21:5,11,13 87:6
workers (1) 131:21
working (12) 8:22 9:1,19
12:10 20:16 21:20 53:7
72:15,18 84:4 104:6 134:1
workings (3) 46:24 105:15
142:1
workout (1) 78:22
works (3) 15:7 111:6 122:18
world (8) 34:9 90:6 154:9,10
169:10 170:12 191:8 194:5
worried (1) 111:15
worry (3) 63:11 151:11
174:23
worse (1) 177:4
worth (24) 34:1,23 35:5
73:13,15,16 94:6,13
116:7,15 119:12
121:2,9,11,17 132:21
136:11,15 137:14 144:9,16
163:19 175:11 188:8
worthless (5) 74:14 75:7
140:4 141:1 146:18
worthwhile (1) 123:2
wouldnt (8) 29:15 38:25
41:14 81:12 100:14 101:11
169:15 188:6
write (4) 42:17,17 156:11
190:22
writeoffs (1) 76:23
written (4) 67:7 76:15 77:5
156:25
wrong (11) 24:22 26:5 28:8
69:17 78:5 92:2 95:2
154:4,12 187:9,17
wrote (3) 70:21 71:4 75:24

**X**

x (1) 195:2

**Y**

yannis (6) 81:17 82:4
130:8,25 131:16,21
year (20) 2:21,24 34:16
83:24 84:12,13,23,23
85:22 86:7,14 91:4,7
104:16 114:6,8 150:7
163:13,21 174:11
years (30) 50:2 58:22,25
59:16 60:3,6 61:23 74:16
76:6,14 77:4 78:21 80:1
92:25 93:1 104:16,16,17
112:19 113:6,7,8 114:1,8

yourself (3) 135:4 147:25
191:16
youve (5) 17:9 60:3 106:3
114:8 163:20

**Z**

zero (5) 58:6 60:4 61:6,12
84:7
zogota (12) 24:24 25:7 29:14
32:4 34:2 35:13 36:9,10
38:9 40:1 43:7 174:20
zones (1) 153:9

**0**

01 (1) 105:9

**1**

1 (19) 32:7,11 33:13 34:2
65:20 72:23 73:10,11,17
106:12 108:12 112:6,7
154:21,25 155:3 164:16
179:7 192:5
10 (21) 10:1,2 29:12 33:25
34:1 58:2 84:14,23,24,25
85:16 103:14
113:7,9,10,13 114:7
124:21 132:14 174:19
187:5
100 (9) 84:22 85:1 98:19
99:16 103:22 104:4 119:12
121:9 153:21
101 (2) 39:2,7
1030 (1) 1:2
105 (1) 96:14
1130 (1) 179:6
1144 (1) 46:1
1149 (1) 46:3
12 (7) 113:6 120:6,24
121:12,18,22 122:7
120 (1) 34:15
12600 (1) 111:11
1281 (1) 179:20
129 (2) 166:20 167:1
13 (1) 72:21
135 (2) 54:25 55:12
14 (9) 57:11 58:9 64:6
73:6,12 76:5,13 77:3
171:23
1492 (1) 150:13
15 (15) 64:8,14 65:5 85:16
120:6,25 121:12,18,23
122:7 135:13 136:12,15
137:12 145:1
151 (1) 64:8
153 (6) 65:22 66:2 72:24
73:7,12 79:24
1534 (2) 171:19,22
16 (25) 34:17 54:16 58:17,25
59:6,18,22 60:3,9,11,16
62:1 64:15 73:20 75:5,7,16
76:5,14 77:4,9 148:12,23
150:18 173:4
1617 (1) 63:20
17 (1) 1:1
1734 (2) 72:15 73:3
1781 (1) 24:17
18 (3) 86:17 172:15,16
1847 (2) 65:9,13
1997 (1) 165:1

**2**

2 (22) 31:22,23 32:2 96:13
99:20 105:2,8 107:2,7
108:12 109:5 128:10,22,24
129:20 146:2 156:17
179:14 192:4,17 195:3,4
20 (22) 10:3 29:12 33:25
34:2 58:2 84:7 114:1,8
115:11,13,24 116:3,4,6
121:13 163:13,20,21
164:6,24 165:3,5
200 (2) 94:21 96:16
2002 (1) 63:8

2005 (1) 9:23
2009 (1) 173:21
20092010 (1) 2:1
2010 (1) 150:1
2011 (1) 10:23
2012 (17) 1:25 2:10,13 4:24
5:4 6:10,11 7:7,18 9:23
50:1 63:23 64:1 141:13,15
150:17 159:16
2014 (5) 12:8 97:24 151:13
152:20 156:10
2015 (2) 63:24 154:20
2016 (11) 65:20,23 72:21,23
73:1,5 108:12,15 150:8,9
155:17
2017 (5) 106:3 4 112:8 151:6
171:21
2018 (4) 144:14 159:20
161:4 162:11
2019 (8) 19:24 39:5 86:15
123:22 125:11,14 158:17
165:6
2020 (6) 1:1 86:7,15 87:21
91:7 139:23
2032 (1) 124:7
2039 (2) 124:4,10
2078 (1) 39:10
2081 (2) 39:14,19
20cents (1) 57:24
20s (1) 163:5
2273 (1) 180:23
23 (2) 25:1 183:12
24 (1) 25:3
25 (5) 124:14,14 162:18
163:25 170:15
27 (1) 162:19
2787 (1) 168:20
2835 (1) 56:5
2840 (1) 59:7
2844 (1) 58:14
2846 (1) 57:5
2883 (1) 55:14
29 (1) 180:23

**3**

3 (20) 18:14,18,19 32:5 36:6
41:16 65:9,10,11 72:9,13
85:16 86:23 150:3 163:12
171:17 172:2 179:23
189:19 193:23
30 (12) 8:13 76:18 116:11,15
117:12 121:7 156:17
163:20 167:12,16 181:16
183:12
31 (2) 181:16 192:22
3112 (1) 96:7
3122 (2) 97:13 181:24
314 (1) 181:18
32 (1) 181:17
325 (1) 144:22
34 (1) 182:10
3412 (21) 178:25 179:7
180:19 181:1,21 182:14
183:6,13,18 186:6
187:13,14 189:7 190:16
191:6,15 192:1,4,5,17
193:20
34122 (1) 188:17
3412c (1) 188:4
35 (1) 91:8
354 (1) 172:4
38 (1) 162:12
386 (1) 172:3
399 (5) 179:23 180:19 186:6
189:19 193:23
3991 (1) 179:21

**4**

4 (8) 38:25 106:14 124:2,3,4
164:12 180:14,20
40 (13) 8:11,13 98:20 114:6
116:5,12,15 117:1,13
121:7 167:12,16 171:5
400 (1) 34:16

**40year (1)** 115:24
**440 (1)** 194:22
**45 (4)** 98:20 106:18 107:7,9
**46 (4)** 107:7,7,9,15
**48 (1)** 106:17

---
### 5
---

**5 (15)** 4:14 54:23 55:1,12
    65:15 85:16 96:25 103:14
    114:8 128:21,25 129:20
    145:22 166:20 167:1
**50 (13)** 37:11,12 54:11
    99:11,12 114:6 117:4
    124:14 136:9 137:11
    140:24 145:21 163:25
**500000 (1)** 117:7
**54 (1)** 150:3
**55 (2)** 112:18 113:9
**56 (3)** 171:17,20,21
**585 (2)** 60:7,11

---
### 6
---

**6 (3)** 65:4 163:20 187:5
**63 (2)** 85:4 128:15
**66 (1)** 72:13
**6month (1)** 151:16

---
### 7
---

**7 (4)** 85:16 151:16 152:15
    183:7
**70 (5)** 60:17 73:13,21
    148:13,23
**71 (4)** 176:1,5 177:18 181:13
**75 (1)** 61:1
**79 (1)** 86:24

---
### 8
---

**8 (1)** 36:21
**80 (3)** 58:9 119:11 153:21
**8020 (1)** 120:19
**81 (2)** 65:9,11
**814 (1)** 183:10
**82 (1)** 89:5
**85 (2)** 34:15 168:24
**87 (1)** 41:19
**8771 (1)** 159:17

---
### 9
---

**9 (3)** 65:23 140:24 141:1
**90 (3)** 18:17,21 24:17
**93 (2)** 31:6,16
**96 (1)** 164:12
**97 (2)** 124:4,6
**972 (1)** 159:13
**973 (1)** 156:19
**98 (1)** 144:9